EXHIBIT A

No. 11-556

# In the Supreme Court of the United States

MAETTA VANCE, PETITIONER

*v.*

BALL STATE UNIVERSITY, ET AL.

*ON WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE SEVENTH CIRCUIT*

## BRIEF FOR THE UNITED STATES AS
## AMICUS CURIAE IN SUPPORT OF NEITHER PARTY

P. DAVID LOPEZ
 *General Counsel*
CAROLYN L. WHEELER
 *Acting Associate General*
 *Counsel*
DANIEL T. VAIL
 *Acting Assistant General*
 *Counsel*
JULIE L. GANTZ
 *Attorney*
 *Equal Employment*
 *Opportunity Commission*
 *Washington, D.C. 20507*

DONALD B. VERRILLI, JR.
 *Solicitor General*
  *Counsel of Record*
THOMAS E. PEREZ
 *Assistant Attorney General*
SRI SRINIVASAN
 *Deputy Solicitor General*
ANN O'CONNELL
 *Assistant to the Solicitor*
 *General*
DENNIS J. DIMSEY
APRIL J. ANDERSON
 *Attorneys*
 *Department of Justice*
 *Washington, D.C. 20530-0001*
 *SupremeCtBriefs@usdoj.gov*
 *(202) 514-2217*

## QUESTION PRESENTED

Whether an employee must have the power to carry out a tangible employment action, such as hiring, firing, promoting, demoting, transferring, or disciplining an employee, in order to qualify as a supervisor for purposes of vicarious employer liability under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.*

(I)

## TABLE OF CONTENTS

Page

Interest of the United States .............................................................1

Statement ...........................................................................................2

Summary of argument.......................................................................8

An employee who directs another employee's daily work
activities but cannot take tangible employment actions
is a supervisor for purposes of vicarious liability under
Title VII:

    A.  Title VII imposes vicarious liability on employers
for harassment by an employee with authority to
direct the victim's daily work activities ................... 11

        1.  Imposing vicarious liability for harassment
by an employee with authority to direct the
victim's daily work activities is consistent
with agency principles.......................................... 11

        2.  Imposing vicarious liability for harassment
by an employee with authority to direct the
victim's daily  work activities is consistent
with the objectives of  Title VII ......................... 22

    B.  The EEOC's longstanding interpretation is
reasonable and entitled to deference....................... 26

    C.  On the existing record in this case, Davis fails
to qualify as petitioner's supervisor......................... 30

Conclusion ....................................................................................... 33

## TABLE OF AUTHORITIES

Cases:

    *Albemarle Paper Co.* v. *Moody*, 422 U.S. 405 (1975)....... 23, 25

    *Allison Engine Co.* v. *United States ex rel. Sanders*,
553 U.S. 662 (2008)............................................................... 32

    *Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742
(1998) ...........................................................................*passim*

    *Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S.
53 (2006) .................................................................. 16, 21, 22

(III)

IV

Cases—Continued:                                                    Page

*Dulaney* v. *Packaging Corp. of Am.*, 673 F.3d 323
  (4th Cir. 2012) ........................................................... 28

*EEOC* v. *CRST Van Expedited, Inc.*, 679 F.3d 657
  (8th Cir. 2012) ................................................. 20, 21, 28

*Faragher* v. *City of Boca Raton*, 524 U.S. 775
  (1998) ................................................................... *passim*

*Federal Express Corp.* v. *Holowecki*, 552 U.S. 389
  (2008) ........................................................................ 28

*Hall* v. *Bodine Elec. Co.*, 276 F.3d 345 (7th Cir. 2002) ...... 6, 29

*Kasten* v. *Saint-Gobain Performance Plastics Corp.*,
  131 S. Ct. 1325 (2011) ............................................... 28

*Mack* v. *Otis Elevator Co.*, 326 F.3d 116 (2d. Cir.),
  cert. denied, 540 U.S. 1016 (2003) ........................... 18, 28

*Martin* v. *Occupational Safety & Health Review
  Comm'n*, 499 U.S. 144 (1991) ..................................... 27

*Merck KGaA* v. *Integra Lifesciences I, Ltd.*, 545 U.S.
  193 (2005) ................................................................ 32

*Meritor Sav. Bank, FSB* v. *Vinson*, 477 U.S. 57
  (1986) ................................................................ 1, 2, 26

*Mikels* v. *City of Durham*, 183 F.3d 323 (4th Cir. 1999) ....... 32

*Oncale* v. *Sundowner Offshore Servs., Inc.*, 523 U.S. 75
  (1998) ................................................................ 1, 2, 22

*Parkins* v. *Civil Constructors of Illinois, Inc.*, 163 F.3d
  1027 (7th Cir. 1998) .................................................. 29

*Pennsylvania State Police* v. *Suders*, 542 U.S. 129
  (2004) ................................................................ 15, 23

*Rhodes* v. *Illinois Dep't of Transp.*, 359 F.3d 498
  (7th Cir. 2004) ..................................................... 6, 7, 19, 29

*Skidmore* v. *Swift Co.*, 323 U.S. 134 (1944) ...................... 27

*Sprint/United Mgmt. Co.* v. *Mendelsohn*, 552 U.S. 379
  (2008) ........................................................................ 32

V

Cases—Continued:                                                    Page

*Staub* v. *Proctor Hosp.*, 131 S. Ct. 1186 (2011).......................... 25

*Suders* v. *Easton*, 325 F.3d 432 (3d Cir. 2003) ........................ 15

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S.
    308 (2007) .............................................................. 32

*Weyers* v. *Lear Operations Corp.*, 359 F.3d 1049
    (8th Cir. 2004)..................................................... 19, 20, 28

*Whitten* v. *Fred's, Inc.*, 601 F.3d 231 (4th Cir. 2010) ...... 17, 28

Statutes:

Civil Rights Act of 1964, Tit. VII, 42 U.S.C. 2000e
    *et seq.* ...........................................................*passim*
        42 U.S.C. 2000e(b) ........................................... 8, 11
        42 U.S.C. 2000e-2(a)........................................ 1, 2, 16, 21
        42 U.S.C. 2000e-5(f)(1).........................................1
        42 U.S.C. 2000e-16 (2006 & Supp. IV 2010).......................1

Uniformed Services Employment and Reemployment
    Rights Act of 1994, 38 U.S.C. 4301 *et seq.* ......................... 25

Miscellaneous:

EEOC, *Enforcement Guidance on Vicarious Employ-
    er Liability for Unlawful Harassment by Supervi-
    sors*, 8 FEP Manual (BNA) 405:7654 (1999),
    available at 1999 WL 33305874 .................................... 13, 26

Susan Estrich, *Sex at Work*, 43 Stan. L. Rev. 813
    (1991) ................................................................ 14

*Prosser and Keaton on the Law of Torts* (W. Page
    Keeton ed., 5th ed. 1984)............................................. 25, 26

1 Restatement (Second) of Agency § 219(2)(d) (1957) .......... 12

1 Restatement (Third) of Agency § 1.02 (2006)...................... 21

# In the Supreme Court of the United States

---

No. 11-556

MAETTA VANCE, PETITIONER

*v.*

BALL STATE UNIVERSITY, ET AL.

---

*ON WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE SEVENTH CIRCUIT*

---

**BRIEF FOR THE UNITED STATES AS**
**AMICUS CURIAE IN SUPPORT OF NEITHER PARTY**

---

### INTEREST OF THE UNITED STATES

Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.*, prohibits discrimination in employment on various bases. 42 U.S.C. 2000e-2(a). Actionable discrimination includes harassment that creates a hostile working environment. See, *e.g.*, *Meritor Sav. Bank, FSB* v. *Vinson*, 477 U.S. 57, 66 (1986); *Oncale* v. *Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998). The Attorney General is responsible for enforcing Title VII against public employers, and the Equal Employment Opportunity Commission (EEOC) enforces Title VII against private employers. 42 U.S.C. 2000e-5(f)(1). In addition, Title VII applies to the United States in its capacity as the nation's largest employer. 42 U.S.C. 2000e-16 (2006 & Supp. IV 2010). The United States thus has a strong interest in the proper interpretation of Title VII. At the

(1)

2

Court's invitation, the United States filed a brief as amicus curiae at the petition stage of this case.

## STATEMENT

1. Title VII prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C. 2000e-2(a). Employers may be liable for harassment on those bases that creates a hostile working environment. See, *e.g.*, *Meritor Sav. Bank, FSB* v. *Vinson*, 477 U.S. 57, 66 (1986); *Oncale* v. *Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998).

The standard for determining an employer's liability for harassment turns on the harasser's status in the workplace. An employer is vicariously liable for a supervisor's harassment. *Faragher* v. *City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742, 764-765 (1998). If the supervisor took no tangible employment action against the victim, however, the employer may assert as an affirmative defense that it exercised reasonable care to prevent and correct harassment and that the victim unreasonably failed to take advantage of the corrective and preventive opportunities. *Faragher*, 524 U.S. at 789, 807; *Ellerth*, 524 U.S. at 760, 764-765; see *id.* at 761 (defining "tangible employment action" to include "a significant change of employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"). When the harasser is a co-worker rather than a supervisor, the employer is liable if the victim proves that the employer was negligent because it "knew or should have known about the conduct" but failed to take appropriate action. *Ellerth*, 524 U.S. at 759, 765; see also *Faragher*, 524 U.S. at 799.

3

The Court has stated that the rule of vicarious liability for a supervisor's harassment applies to a "supervisor with immediate (or successively higher) authority." *Faragher*, 524 U.S. at 807; *Ellerth* 524 U.S. at 765. The Court has not, however, specifically defined which employees qualify as supervisors for purposes of that rule.

2.  Petitioner Maetta Vance, who is African-American, began working for respondent Ball State University in 1989 as a substitute server in the Banquet and Catering Division of University Dining Services. She became a part-time catering assistant in 1991. Pet. App. 2a, 27a. Petitioner was involved in several confrontations at work, including racially-charged incidents. *Id.* at 1a-2a. Most relevant here are her altercations with Saundra Davis, a catering specialist who is white. *Id.* at 54a.

a. Sometime before 2002, petitioner and Davis argued, and Davis slapped petitioner on the head. Pet. App. 3a, 18a, 30a n.5. Petitioner told her employer about the incident but did not pursue the matter. *Id.* at 3a. Davis was soon transferred to another department. *Id.* at 3a, 30a n.5.

The conflicts resumed when Davis returned to the Banquet and Catering Division in 2005. Pet. App. 3a. On September 23, 2005, Davis blocked petitioner from exiting an elevator and said, "I'll do it again"—apparently referring to the slapping incident. *Id.* at 3a, 18a, 29a-30a. Petitioner filed an internal complaint describing the incident. *Id.* at 3a-4a. Around the same time, petitioner overheard Davis using the terms "Sambo" and "Buckwheat" while looking at her, but she apparently did not report those comments. *Id.* at 6a, 59a-61a. Petitioner told her supervisors that she was "not comfortable with Saundra Davis leaving her notes and delegating jobs to her in the kitchen." 1:06-cv-01452

4

Docket entry No. (Docket entry No.) 59-16, at 2 (S.D. Ind. Nov. 1, 2007); J.A. 66-67.

In May 2006, petitioner filed another internal complaint alleging that Davis blocked her way at the elevator, that she was left alone with Davis in the kitchen, and that Davis gave her "weird" looks. Pet. App. 6a-7a, 37a n.8. In response to petitioner's complaints, managers attempted to separate her from Davis. *Id.* at 36a; J.A. 367.

b. During this period, petitioner also had difficulties with others in the department, some of which were racially charged. In September 2005, someone told petitioner that co-worker Connie McVicker had bragged about her family ties to the Ku Klux Klan and had called petitioner a "nigger." Pet. App. 3a, 31a-32a. Petitioner reported the incident, and Bill Kimes, general manager of the Banquet and Catering Division, gave McVicker a written warning, which was atypical for a first offense. *Id.* at 4a-5a, 33a n.6, 34a-35a. A few days later, another supervisor met with McVicker and suggested she consider a transfer. *Id.* at 35a. Petitioner also reported that McVicker had called her a "monkey." *Id.* at 5a, 35a. In December 2005, petitioner filed a complaint with the EEOC alleging, *inter alia*, race discrimination. *Id.* at 6a, 36a.

In 2006, petitioner alleged that Karen Adkins, an assistant personnel director, was "mean mugging" and following petitioner at work. Pet. App. 7a, 37a n.8. Petitioner also filed an internal retaliation complaint against Kimes. *Id.* at 7a, 40a. Respondent investigated the complaints but found no basis for disciplinary action. *Id.* at 37a n.8, 40a-41a. In August 2006, petitioner filed a second complaint with the EEOC, claiming that respondent had retaliated against her by diminishing her

5

duties, withholding her breaks, denying her overtime, and disciplining her unequally. *Id.* at 7a, 40a.

c. Petitioner filed this suit in October 2006, alleging that she was subjected to a hostile work environment and was retaliated against for complaining about discrimination, in violation of Title VII. Pet. App. 7a, 52a.

In January 2007, respondent promoted petitioner to a full-time catering assistant. Pet. App. 27a, 41a. Petitioner claimed that Davis and others continued to harass her. According to petitioner's complaints, she was consigned to "entry level duties" such as cutting up celery sticks. *Id.* at 43a, 71a. Petitioner further alleged that in August 2007, Davis encountered petitioner at an elevator and said, "Are you scared?" in a southern accent. *Id.* at 38a. Petitioner reported the incident, and Davis received a verbal warning. *Ibid.* Also that month, petitioner filed a grievance about an incident in which McVicker said "payback" as petitioner passed her at the elevator. *Id.* at 37a, 63a. Soon afterwards, McVicker transferred to another job. *Id.* at 36a.

d. On petitioner's various complaint forms, she listed Davis as a "supervisor." J.A. 28-29, 45; Docket entry No. 60-12, at 1. But when asked in a deposition if Davis was her supervisor, petitioner said, "[O]ne day she's a supervisor; one day she's not. * * * It's inconsistent." Pet. App. 54a. Petitioner believed Davis was "part of management because she doesn't clock in." *Ibid.* Another employee said he was unsure of Davis's status, but claimed that Kimes told him Davis was a supervisor. J.A. 385-387. Kimes said Davis's status was "complicated" and explained that Davis did "direct and lead" at times. J.A. 366-367. Davis's job description states that she supervises "[k]itchen [a]ssistants and [s]ubstitutes," and exercises "leadership of up to 20 part-time, substi-

6

tute, and student employees." J.A. 12. But Kimes also testified that he "c[ould]n't have [Davis] directing [petitioner]" because of problems between them and that he tried to separate them after petitioner complained. J.A. 367. Generally, Kimes or the kitchen chef assigned petitioner's day-to-day tasks. Pet. App. 27a, 41a-42a.

3. The district court granted summary judgment in favor of respondent. Pet. App. 25a-80a.

a. The court concluded that Davis was not petitioner's supervisor and that respondent therefore was not vicariously liable for Davis's conduct. Pet. App. 53a-55a. The court applied Seventh Circuit precedent holding that "[a] supervisor is someone with the power to directly affect the terms and conditions of the plaintiff's employment," *id.* at 53a (citing *Rhodes* v. *Illinois Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004)), which authority "primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee," *ibid.* (quoting *Hall* v. *Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002)). Accordingly, the court ruled, even assuming "Davis periodically had authority to direct the work of other employees, such power would still not be sufficient to establish a supervisory relationship for purposes of Title VII." *Id.* at 54a. The court noted that it was "well established under Seventh Circuit law that '[a]n employee merely having authority to oversee aspects of another employee's job performance does not qualify as a supervisor.'" *Ibid.* (quoting *Rhodes*, 359 F.3d at 506). The court found "nothing in the record indicating that Ms. Davis had the ability to hire, fire, demote, promote, transfer, or discipline [petitioner]." *Ibid.* (internal quotation marks omitted).

b. The court evaluated petitioner's mistreatment by Davis and McVicker under the standard for harassment

7

by co-workers. Pet. App. 59a-68a. The court determined that most of petitioner's confrontations with Davis had "no racial character or purpose," and that any racial remarks were "not sufficiently severe or pervasive" to support a hostile work environment claim. *Id.* at 59a-60a. The court concluded that McVicker's racial statements did not "rise to the level of actionable harassment." *Id.* at 61a-63a.

The court further concluded that, even if petitioner had suffered severe or pervasive racial harassment by Davis and McVicker, she could not demonstrate a basis for employer liability. Petitioner could not establish that respondent was negligent because respondent had addressed petitioner's complaints in a way "reasonably calculated to foreclose subsequent harassment." Pet. App. 60a-61a, 63a-66a.

c. The court also rejected petitioner's claims against other employees and her claim of unlawful retaliation. Pet. App. 55a-59a, 68a-80a.

4. The court of appeals affirmed. Pet. App. 1a-24a. The court agreed with the district court that Davis was not petitioner's supervisor because Davis lacked the "power to directly affect the terms and conditions of [petitioner's] employment" by hiring, firing, demoting, promoting, transferring, or disciplining her. *Id.* at 12a (quoting *Rhodes*, 359 F.3d at 506) (emphasis omitted). The court observed that it "ha[d] not joined other circuits in holding that the authority to direct an employee's daily activities establishes supervisory status under Title VII." *Id.* at 12a-13a. The court thus held that petitioner's assertion "that Davis had the authority to tell her what to do" failed to raise a triable issue concerning supervisory status. *Id.* at 13a.

8

Applying the standard for co-worker harassment, the court assumed that McVicker and Davis had created a hostile work environment. Pet. App. 15a. The court concluded, however, that respondent was not negligent because it "promptly investigat[ed] each of [petitioner's] complaints and t[ook] disciplinary action when appropriate." *Ibid.*; see *id.* at 15a-19a. The court also upheld the district court's rejection of petitioner's remaining claims. *Id.* at 13a-14a, 19a-24a.

## SUMMARY OF ARGUMENT

A. 1. Title VII imposes liability on employers for the acts of their "agent[s]." 42 U.S.C. 2000e(b). In *Faragher* v. *City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc.* v. *Ellerth*, 524 U.S. 742 (1998), the Court explained that, under agency principles, an employer can be vicariously liable for harassment by an employee who is a supervisor. That is because a victim of harassment may be reluctant to accept the risks of confronting a harasser who has supervisory authority, and the agency relationship between the employer and the supervisor thus aids the harasser in accomplishing the harassment.

The court of appeals held that a "supervisor" for purposes of *Faragher* and *Ellerth* is confined to persons who have power to take tangible employment actions against the victim, and does not encompass persons who control the victim's day-to-day work activities. That understanding is unduly restrictive. This Court held in *Faragher* that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." 524 U.S. at 807. An employee who controls work assignments certainly may possess "immediate" and

9

substantial authority over the victim, notwithstanding a lack of power to take tangible employment actions. Indeed, in *Faragher* itself, the Court concluded that a lifeguard captain who made daily work assignments was a supervisor for purposes of Title VII even though he lacked authority to take tangible employment actions.

Under agency principles as applied in *Faragher* and *Ellerth*, vicarious liability under Title VII extends to harassment by employees with authority to direct the daily work activities of their victims. An employee's reluctance to accept the risks of confronting a superior is not limited to situations in which the harasser has power to take tangible employment actions. It may be equally difficult for the victim to confront a harassing supervisor with authority to direct daily work activities, including the authority to assign particularly undesirable tasks. That was the case in *Faragher*, for instance, where the lifeguard captain threatened the victim that if she did not date him, he would have her "clean the toilets for a year." 529 U.S. at 780. When an employer vests an employee with authority to direct daily work assignments, the harassment is facilitated by the agency relationship and vicarious liability is warranted.

2. Title VII's purpose to avoid harm and to encourage the creation of anti-harassment policies and effective grievance mechanisms further supports the conclusion that Title VII imposes vicarious liability on an employer for harassment by an employee with authority to control the victim's daily work activities. The affirmative defense provided in *Faragher* and *Ellerth*—which allows an employer to avoid liability for supervisor harassment by showing that it exercised reasonable care to prevent and correct harassment and that the plaintiff unreasonably failed to take advantage of those preven-

10

tative and corrective opportunities—encourages employers to screen supervisors, monitor them, and establish effective training and complaint programs. If employers faced vicarious liability only for the actions of those supervisors with power to take tangible employment actions, employers would have diminished incentives to train and monitor intermediate supervisors. And employees subject to harassment by those with control over day-to-day assignments would have a diminished ability to make use of employer grievance procedures.

Title VII also ensures that victims are compensated for injuries suffered on account of unlawful employment discrimination. Because the employer seeks to profit through its agents, it is appropriate for the employer to bear the costs when those agents abuse their delegated authority to injure others.

B. The court of appeals' approach is also inconsistent with EEOC guidance defining who is a supervisor for purposes of vicarious liability under Title VII. The EEOC's guidance provides that an employee is a supervisor if the employee (a) has authority to undertake or recommend tangible employment actions, or (b) has authority to direct the victim's daily activities. The EEOC thoroughly considered the Court's decisions in *Faragher* and *Ellerth* in formulating its position, the guidance has governed the agency's enforcement actions since 1999, and it is entitled to deference.

C. Under a correct approach that recognizes that an individual with authority to direct daily work activities qualifies as a supervisor, here, Davis would fail to qualify as petitioner's supervisor on the record as it currently stands. There is scant evidence in the record that Davis exercised the requisite authority over petitioner's

11

daily work activities; and authority to direct a limited number of tasks does not suffice. Although there is evidence that Davis had a supervisory title, a supervisory title does not itself connote the necessary authority to direct day-to-day work assignments.

### ARGUMENT

**AN EMPLOYEE WHO DIRECTS ANOTHER EMPLOYEE'S DAILY WORK ACTIVITIES BUT CANNOT TAKE TANGIBLE EMPLOYMENT ACTIONS IS A SUPERVISOR FOR PURPOSES OF VICARIOUS LIABILITY UNDER TITLE VII**

**A. Title VII Imposes Vicarious Liability On Employers For Harassment By An Employee With Authority To Direct The Victim's Daily Work Activities**

*1. Imposing vicarious liability for harassment by an employee with authority to direct the victim's daily work activities is consistent with agency principles*

a. The term "supervisor" does not appear in Title VII, but the statutory text imposes liability on employers for the actions of their "agent[s]." 42 U.S.C. 2000e(b) (defining "employer" to include an agent of the employer); see also *Faragher* v. *City of Boca Raton*, 524 U.S. 775, 791 (1998). Thus, "[i]n express terms, Congress has directed federal courts to interpret Title VII based on agency principles." *Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742, 754 (1998).

Accordingly, in *Faragher* and *Ellerth*, two cases involving allegations of workplace sexual harassment, this Court applied agency principles to determine the scope of an employer's vicarious liability under Title VII. The Court first explained that an employer is liable for "torts committed by an employee within the scope of his or her employment," *Ellerth*, 524 U.S. at 756, but that "sexual harassment by a supervisor" generally falls out-

12

side the scope of employment because it is not done with a purpose to serve the employer, *id.* at 756-757. The Court concluded, however, that an employer could still be vicariously liable for a supervisor's harassment—notwithstanding that the supervisor is acting outside the scope of his employment—based on a separate agency principle supporting vicarious liability when an employee is "aided in accomplishing the tort by the existence of the agency relation." *Faragher*, 524 U.S. at 801-802 (quoting 1 Restatement (Second) of Agency § 219(2)(d), at 481 (1957)); see also *Ellerth*, 524 U.S. at 759-762.

The Court explained that a supervisor's harassment of a subordinate is aided by the existence of the agency relation because "[t]he agency relationship affords contact with an employee subjected to a supervisor's * * * harassment, and the victim may * * * be reluctant to accept the risks of blowing the whistle on a superior." *Faragher*, 524 U.S. at 803. Contrasting supervisor harassment from harassment by a co-worker, the Court observed: "When a fellow employee harasses, the victim can walk away or tell the offender where to go, but it may be difficult to offer such responses to a supervisor." *Ibid.* The Court thus held that, under agency principles, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Id.* at 807. When the harassment is committed by a co-worker rather than a supervisor, however, the employer generally may be liable only if negligent. See *Ellerth*, 524 U.S. at 759, 765.

b. The court of appeals held that a "supervisor" for purposes of the various liability rules set forth in *Faragher* and *Ellerth* is confined to persons possessing "power to *directly* affect the terms and conditions of

13

[the victim's] employment," which the court understood as "primarily consist[ing] of the power to fire, hire, demote, promote, transfer, or discipline an employee." Pet. App. 12a (citations omitted). Under that approach, the court explained, the "the authority to direct an employee's daily activities" is insufficient to establish supervisory status. *Id.* at 13a. That understanding is unduly restrictive.

Nothing in *Faragher* or *Ellerth* suggests that supervisory status is limited to those employees who have authority to "fire, hire, demote, promote, transfer, or discipline an employee," to the exclusion of those with "authority to direct an employee's daily activities." Pet. App. 12a-13a (citation omitted). The decisions state that an employer is subject to vicarious liability for a hostile environment created by "a supervisor with immediate (or successively higher) authority over the employee." *Faragher*, 524 U.S. at 807; see also *Ellerth* 524 U.S. at 765. And a person who controls daily work assignments and schedules certainly may possess "immediate"—and substantial—"authority over the employee," notwithstanding a lack of power to take tangible employment actions.[1]  The Court in *Faragher* recognized as much,

---

[1] This Court has defined "tangible employment action" to include "a significant change of employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761. "A tangible employment decision requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors." *Id.* at 762. While those sorts of actions affecting an employee's general employment status amount to tangible employment actions, an alteration in an employee's day-to-day work activities or schedule is generally not considered a tangible employment action for these purposes. See EEOC, *Enforcement*

14

noting that harassment by a supervisor "is aided by the agency relation" because a supervisor's "power to supervise—[which may be] to hire and fire, and *to set work schedules* and pay rates—does not disappear when [the supervisor] chooses to harass through insults and offensive gestures rather than directly with threats of firing or promises of promotion." 524 U.S. at 802-803 (quoting Susan Estrich, *Sex at Work*, 43 Stan. L. Rev. 813, 854 (1991)) (emphasis added). The Court thus acknowledged that the setting of day-to-day work schedules, although not a tangible employment action, may readily be among the powers a supervisor uses to intimidate a subordinate.

The court of appeals' restrictive approach cannot be squared with this Court's resolution of the specific claims in *Faragher*. There, the Court concluded that the employer was vicariously liable for harassment by two employees even though one had no authority to effect tangible employment actions. Lifeguard captain David Silverman was "responsible for making the [employees'] daily assignments, and for supervising their work and fitness training." 524 U.S. at 781, 810. In contrast, Bill Terry, Chief of the Marine Safety Division, had "authority to hire new [employees] (subject to the approval of higher management), to supervise all aspects of [their] work assignments, to engage in counseling, to deliver oral reprimands, and to make a record of any such discipline." *Id.* at 781. The Court upheld vicarious liability for both Silverman's and Terry's actions, explaining that "these supervisors were granted virtually unchecked authority over their subordinates, directly control[ing]

*Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors*, 8 FEP Manual (BNA) 405:7654 (1999), available at 1999 WL 33305874.

15

and supervis[ing] all aspects of [Faragher's] day-to-day activities." *Id.* at 808 (internal quotation marks and citation omitted) (brackets in original).

The Court's focus on the power to supervise and control Faragher's "day-to-day activities" necessarily encompasses power over daily assignments, and necessarily applied to Silverman, who was responsible for making the lifeguards' daily assignments. He thus could substantially determine the desirability (or undesirability) of Faragher's daily work experience. Under the court of appeals' restrictive approach, however, Silverman would have merely been considered Faragher's co-worker because he lacked authority to take tangible employment actions against her, even though he controlled her daily assignments.[2]

c. Under this Court's application of agency principles in *Faragher* and *Ellerth*, vicarious liability under Title VII extends to harassment by employees with authority to control the daily work activities of their victims. An employee's "reluctan[ce] to accept the risks of blowing the whistle on a superior," *Faragher*, 524 U.S. at 803, is not confined to situations where the harasser has the power to take tangible employment actions. See *Ellerth*, 524 U.S. at 761. Because an employee with supervisory powers vested by the employer may "implicitly threaten to misuse [those] supervisory powers to deter any re-

---

[2] While the question of who is a supervisor was not directly at issue, this Court in *Pennsylvania State Police* v. *Suders*, 542 U.S. 129 (2004), evaluated the respondent's constructive discharge claim under the *Faragher* and *Ellerth* framework for harassment by supervisors, even though the harassers had no authority to take tangible employment actions. See *Suders* v. *Easton*, 325 F.3d 432, 450 n.11 (3d Cir. 2003) (noting that supervisors could not take tangible employment actions but were "responsible for day-to-day supervision").

16

sistance or complaint," *Faragher*, 524 U.S. at 801, it may be equally difficult for a victim to "walk away or tell the offender where to go" when the harasser, although lacking authority to take tangible employment actions, directs the victim's daily work activities, *id.* at 803. Harassment in that context is aided by the agency relationship for purposes of the vicarious liability rules set forth in *Faragher* and *Ellerth*.

This Court's decision in *Burlington Northern & Santa Fe Railway Co.* v. *White*, 548 U.S. 53 (2006), is instructive in this regard. There, the Court held that Title VII's anti-retaliation provision, 42 U.S.C. 2000e-2(a), encompassed the retaliatory reallocation of job duties within the same position. The Court explained that "[a]lmost every job category involves some responsibilities and duties that are less desirable than others," and "[c]ommon sense suggests that one good way to discourage an employee * * * from bringing discrimination charges would be to insist that she spend more time performing the arduous duties and less time performing those that are easier or more agreeable." 548 U.S. at 70-71. It is equally a matter of common sense that the authority to control an employee's day-to-day work assignments and schedule materially contributes to a person's ability to harass another and materially diminishes the victim's practical ability to resist and respond.

d. A number of reported decisions illustrate how employees with authority to direct the daily work activities of others have used that power to threaten subordinates into tolerating workplace harassment. In *Faragher*, for instance, lifeguard captain Silverman, who had authority to "make [the victim's] daily assignments," 524 U.S. at 781, subjected the victim to various forms of sexual harassment. In addition to tackling the victim, "pantomim-

17

[ing] an act of oral sex," making "frequent, vulgar references to women and sexual matters," and "comment[ing] on the bodies of female lifeguards," Silverman explicitly wielded his authority to direct the victim's work assignments by telling her, "[d]ate me or clean the toilets for a year." *Id.* at 780, 782. This Court concluded that vicarious liability was appropriate, noting that Silverman "directly controll[ed] and supervis[ed] all aspects of [the victim's] day-to-day activities," and that the victim was "completely isolated from the City's higher management." *Id.* at 808 (internal quotation marks and citations omitted).

Similarly, in *Whitten* v. *Fred's, Inc.*, 601 F.3d 231 (4th Cir. 2010), the plaintiff was sexually harassed by a "store manager," the senior employee on site. *Id.* at 236.[3] The store manager controlled scheduling, and he told the victim that if she wanted long weekends off from work, she needed to "be good to [him] and give [him] what [he] want[ed]." *Ibid.* (internal quotation marks and citation omitted) (brackets in original). After she attempted to ignore the store manager's harassment throughout the work day, he ordered her to stay late and clean the store, and he later revoked her day off. *Ibid.* The court concluded that supervisor liability was appropriate under *Faragher* and *Ellerth* because, "[u]nlike a mere coworker, [the store manager] could change Whitten's schedule and impose unpleasant duties on a whim," which made the victim "vulnerable to his conduct in ways that comparable conduct by a mere co-worker would not." *Id.* at 246.

---

[3] *Whitten* involved only state law claims, but the court applied the *Faragher* and *Ellerth* framework, noting that South Carolina law "essentially follows the substantive strictures of Title VII." 601 F.3d at 242.

18

In *Mack* v. *Otis Elevator Co.*, 326 F.3d 116 (2d Cir.), cert. denied, 540 U.S. 1016 (2003), the plaintiff, an elevator mechanic's helper, alleged that she was sexually harassed by the "mechanic in charge" of her worksite, James Connolly, who had authority "to assign and schedule work" and to "direct the work force." *Id.* at 120. Connolly referred to the victim on multiple occasions as an "attractive young lady," and told her repeatedly that she had a "fantastic ass," "luscious lips," and "beautiful eyes." *Ibid.* Connolly regularly changed his clothes in front of the plaintiff at the end of his shift, boasted to her about sexual exploits, and on one occasion "grabbed [her] by the waist, pulled her onto his lap, tried to kiss her[,] and touched her buttocks." *Ibid.* When matters grew increasingly tense between the two, Connolly gave the plaintiff very little overtime work and told her that he did not care if she complained about him because "I get away with everything. I always have and I always will." *Id.* at 121. The court concluded that Connolly's authority to direct the plaintiff's workday, in addition to the fact that he was the senior employee on site, clothed him with "special dominance over other onsite employees," and the harassment was therefore aided by Connolly's agency relationship with the employer. *Id.* at 125.

In each of these cases, the employer vested certain employees with authority to direct the daily activities of others, and that power was abused to harass individual subordinates. That harassment was facilitated by the authority vested by the employer, and vicarious liability was therefore warranted under agency principles as applied by this Court in *Faragher* and *Ellerth.*

By contrast, decisions from circuits that have limited supervisor liability to employees with authority to take

19

tangible employment actions illustrate how that restrictive rule unfairly shields employers from liability when their agents harass victims by abusing delegated authority. In *Rhodes* v. *Illinois Department of Transportation*, 359 F.3d 498 (7th Cir. 2004), for example, the plaintiff was the only female employee during her first two seasons as a highway maintainer. *Id.* at 502. After she complained about a route change, she alleged that the two employees with responsibility for assigning tasks in the work yard called her vulgar names, forced her to wash her truck in sub-zero temperatures, assigned her to work in the yard instead of on road crews, instructed a mechanic not to fix the heat in her truck, and improperly marked her as absent from work when she went to take a licensing test. *Id.* at 501-503. The employer conceded that the plaintiff had been subjected to a hostile work environment, *id.* at 505, but the court concluded that vicarious liability was unwarranted because the harassers had no authority to make economic decisions regarding the victim's employment. *Id.* at 506. In a concurring opinion, Judge Rovner expressed concern that the court's unduly narrow definition of supervisor liability was "troubling * * * in a case like this" and should be reexamined. *Id.* at 509. She explained that, regardless of whether the harassers possessed formal employment authority, "a factfinder reasonably might conclude that the power [the employer] had given them to manage the Yard on a day-to-day basis enabled or facilitated their ability to create a hostile work environment." *Id.* at 510.

In *Weyers* v. *Lear Operations Corp.*, 359 F.3d 1049 (8th Cir. 2004), the plaintiff, who was 43 years old when she was hired, alleged that she was subjected to a hostile work environment by her "team leader," who had au-

20

thority to assign her daily tasks. *Id.* at 1051-1052. She alleged that the team leader subjected her to constant harassment about her age, including telling her "if you're over 25, you're female, you're out of here. You don't work for me. You don't work in my department." *Id.* at 1052 & n.3, 1057. She also alleged that the team leader used his authority to prohibit her from participating in training opportunities available to other new employees, which she believed contributed to her dismissal. *Id.* at 1057. The court of appeals reversed a jury verdict in the plaintiff's favor, concluding that the employer was not vicariously liable for the harassment because the team leader "himself did not have the power to take tangible employment actions against [the plaintiff]." *Ibid.* The court noted that its "option of adopting the broader * * * definition of supervisor status [had been] foreclosed" by circuit precedent. *Id.* at 1056-1057.

In *EEOC* v. *CRST Van Expedited, Inc.*, 679 F.3d 657 (8th Cir. 2012), various female truck drivers attempting to complete their employer's training program, which involved a 28-day over-the-road training trip with a "Lead Driver" who evaluated the trainee's performance at the end of the trip, alleged that they were subjected to sexual harassment during those trips. *Id.* at 665. One victim alleged that a Lead Driver made constant sexual remarks while giving her instructions, such as telling her "the gear stick is not the penis of [your] husband, [you] don't have to touch the gear stick so often" and "[y]ou got big tits for your size," and that another Lead Driver "forced [her] to have unwanted sex with him on several occasions in order to get a passing grade." *Id.* at 666. Another victim alleged that her Lead Driver repeatedly entered the cab wearing only his underpants and rubbed the back of her head; ordered her to clean

21

up the truck when she complained about the mess, saying "that's what you're on the truck for, you're my bitch * * * [s]hut up and clean it up"; and that he routinely urinated in bottles and bags in the cabin and ordered her to "shut up and clean it up" when she complained. *Id.* at 688. Despite the Lead Drivers' repeated abuse of authority to harass trainees, the court concluded that, "[a]pplying [circuit] precedent," the employer could not be vicariously liable because it was "undisputed that none of CRST's Lead Drivers wielded any * * * power" to take tangible employment actions against the victims. *Id.* at 684.

e. Determining whether an employee who harassed a subordinate has authority to direct the victim's daily work activities will require evaluation of facts specific to the employment relationship between the harasser and the victim. In Title VII, Congress "directed federal courts to interpret Title VII based on agency principles," *Ellerth*, 524 U.S. at 754, and agency principles require evaluation of specific facts. See 1 Restatement (Third) of Agency § 1.02 (2006) ("Whether a relationship is one of agency is a legal conclusion made after an assessment of the facts of the relationship.").

This Court has recognized the need for a similarly fact-specific approach in other Title VII contexts. "Context matters." *Burlington Northern*, 548 U.S. at 69. For instance, the test for determining whether an employer took a prohibited retaliatory action against an employee under Title VII's antiretaliation provision, 42 U.S.C. 2000e-2(a), depends on whether the challenged action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68 (internal quotation marks and citation omitted). In adopting that standard,

22

the Court acknowledged that "the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 69. To determine whether unlawful harassment has occurred, moreover, the plaintiff must show that harassment was sufficiently severe or pervasive to alter the terms and conditions of his or her employment, and the severity of harassment "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Oncale* v. *Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (internal quotation marks and citation omitted).

In any event, the court of appeals' more restrictive approach does not necessarily offer a bright-line alternative. Whether an employee has authority to take tangible employment actions against a victim may not be clear in an employer's policy documents, and there may be no examples of the alleged harasser taking such actions. As a factual matter, the inquiry into whether an employee possesses authority to direct a subordinate's daily activities may be no more contextual than the inquiry into whether he has authority to take tangible employment actions. In either case, the analysis will turn on consideration of the particularities of the authority possessed by the putative supervisor.

> ### 2. *Imposing vicarious liability for harassment by an employee with authority to direct the victim's daily work activities is consistent with the objectives of Title VII*

Imposing vicarious liability on an employer for harassment by an employee with authority to control the victim's daily work activities not only is consistent with this Court's application of agency principles in *Faragher*

23

and *Ellerth*, but also is consistent with the objectives of Title VII.

a. The primary object of Title VII is not "to provide redress but to avoid harm." *Faragher*, 524 U.S. at 806 (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417 (1975)); see also *Ellerth*, 524 U.S. at 764 (noting "Title VII is designed to encourage the creation of antiharassment policies and effective grievance mechanisms"). The Court in *Faragher* and *Ellerth* took special care to "adapt agency concepts to the practical objectives of Title VII" by recognizing an affirmative defense through which employers may avoid liability for harm inflicted by supervisors by implementing policies designed to prevent and correct harassment. *Faragher*, 524 U.S. at 802 n.3. The affirmative defense is unavailable in cases in which a tangible employment action is taken. In those circumstances, the "official power of the enterprise" has been brought to bear on the victim, and the "aided by the agency relation" standard is satisfied. *Ellerth*, 524 U.S. at 762-763. But in cases where no tangible employment action is taken, an employer can avoid liability for supervisor harassment by showing that it exercised reasonable care to prevent and correct harassment and that the plaintiff employee unreasonably failed to take advantage of those preventive and corrective opportunities. *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 764-765.

The affirmative defense established in *Faragher* and *Ellerth* "accommodates [the avoidable consequences] doctrine by requiring plaintiffs reasonably to stave off avoidable harm." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 146 (2004) (internal quotation marks and citation omitted). Properly applied, the defense encourages employers to screen supervisors, monitor them,

24

and establish effective training and complaint programs. *Faragher*, 524 U.S. at 803; *Ellerth*, 524 U.S. at 764-765. The defense thus promotes Title VII's "design[] to encourage the creation of antiharassment policies and effective grievance mechanisms." *Id.* at 764.

If employers face vicarious liability only for the actions of those supervisors with power to take tangible employment actions, employers could attempt to insulate themselves from vicarious liability by confining the authority to effect tangible employment actions to a centralized personnel department. Such a department might be off site, and might have indirect or infrequent contact with potential victims, leaving workers vulnerable to harassment by those with the greatest day-to-day ability to create intolerable working conditions. Cf. *Faragher*, 524 U.S. at 808 (noting that supervisors supervised and controlled "all aspects of [Faragher's] day-to-day activities" and "had virtually unchecked authority," and that "Faragher and her colleagues were completely isolated from the City's higher management") (internal quotation marks omitted).

In that event, employers would have a diminished incentive to train or monitor immediate supervisors. And victims would have a diminished ability and incentive to make use of any available grievance procedures. That arrangement would disserve the core purposes of Title VII. But if supervisory liability were properly considered to encompass the authority to control day-to-day work assignments, employers would lack any comparable ability or incentive to avoid vicarious liability by assigning that authority to a remote, central department: by nature, the assignment of day-to-day activities and schedules generally requires the exercise of on-site discretion and supervision. Employees, moreover, would

25

be better positioned to take advantage of internal complaint procedures.

This Court recently addressed a similar dynamic in *Staub* v. *Proctor Hospital*, 131 S.Ct. 1186 (2011), a case arising under the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. 4301 *et seq.*, which the Court has recognized "is very similar to Title VII." *Staub*, 131 S. Ct. at 1191. In *Staub*, the employer fired the plaintiff based in part on reports from biased supervisors, including the plaintiff's immediate supervisor and a more senior supervisor. *Id.* at 1189. The Court concluded that the employer could be vicariously liable for the discharge even though an unbiased vice president of human resources took the challenged employment action. Otherwise, the Court explained, an employer could "be effectively shielded from discriminatory acts and recommendations of supervisors" by vesting ultimate authority for personnel decisions in an independent official. *Id.* at 1193. The same considerations counsel in favor of recognizing that an employee with authority to direct day-to-day work activities qualifies as a supervisor for purposes of vicarious employer liability.

b. In addition to promoting deterrence, Title VII provides a means "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co.*, 422 U.S. at 418. Common-law principles hold an employer vicariously liable for the wrongful acts of its agents to promote compensation of victims of wrongful conduct. *Prosser and Keaton on the Law of Torts* 500-501 (W. Page Keeton ed., 5th ed. 1984). The common-law approach rests on the view that, because the employer has sought to profit through its agents, the employer, rather than the innocent victims, should bear the costs when those agents abuse their del-

egated authority to injure others. *Ibid.* Because employers benefit from empowering lower-level supervisors to direct other workers, it is appropriate that they should, subject to the *Faragher* and *Ellerth* defense, be subject to liability for abuse of that power.

### B.  The EEOC's Longstanding Interpretation Is Reasonable And Entitled To Deference

Shortly after the Court decided *Faragher* and *Ellerth*, the EEOC issued enforcement guidance defining who qualifies as a supervisor for purposes of vicarious employer liability under Title VII. EEOC, *Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors*, 8 FEP Manual (BNA) 405:7654 (1999), available at 1999 WL 33305874 (reproduced at Pet. App. 81a-93a) (EEOC Guidance). The guidance provides that an individual qualifies as a supervisor if:

> a. the individual has authority to undertake or recommend tangible employment decisions affecting the employee; *or*

> b. the individual has authority to direct the employee's daily work activities.

Pet. App. 90a (emphasis added). That guidance is "an administrative interpretation of [Title VII] by the enforcing agency," and "constitute[s] a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Sav. Bank, FSB* v. *Vinson*, 477 U.S. 57, 65 (1986) (internal quotation marks and citations omitted). The court of appeals initially adopted its narrow construction of supervisor liability without the benefit of the EEOC's guidance. The Court should afford deference to that considered guidance in resolving the question presented.

27

1. Agency enforcement guidelines are "entitled to respect" when the agency has shown "thoroughness * * * in its consideration" and "validity [in] its reasoning." *Skidmore* v. *Swift Co.*, 323 U.S. 134, 140 (1944); see *Martin* v. *Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 156-157 (1991). The EEOC's guidance document demonstrates that the EEOC thoroughly considered the issue of supervisory status to formulate a position on the scope of vicarious liability under Title VII. The guidance document is entitled to deference.

To define the scope of supervisor liability under Title VII, the EEOC explained that because vicarious liability for supervisor harassment under *Faragher* and *Ellerth* is grounded in the harasser's potential misuse of delegated authority, "that authority must be of sufficient magnitude so as to assist the harasser explicitly or implicitly in carrying out the harassment" for vicarious liability to exist. Pet. App. 89a. The EEOC concluded that, when an employee has authority to direct another employee's day-to-day work activities, that person's ability to harass "is enhanced by his or her authority to increase the employee's workload or assign undesirable tasks," and vicarious liability is therefore appropriate. *Id.* at 91a. The EEOC explained that its interpretation was supported by the Court's resolution of the specific claims in *Faragher*, in which the Court concluded that Silverman was a supervisor notwithstanding his lack of authority to take tangible employment actions. *Id.* at 91a-92a.

The EEOC's guidance also recognizes limits on who should qualify as a supervisor by virtue of authority to direct another employee's daily activities. Those limits are directly tied to whether harassment would be "aided by the agency relation" in specific circumstances. The

28

guidance explains that a determination of supervisor status "is based on [the employee's] job function rather than job title (e.g., 'team leader') and must be based on the specific facts." Pet. App. 89a-90a. Moreover, if an employee is only temporarily authorized to direct the daily work activities of another, the employer is vicariously liable only for unlawful harassment that occurs during that temporary period. *Id.* at 92a. The guidance further clarifies that an employee who "merely relays other officials' instructions regarding work assignments and reports back to those officials does not have true supervisory authority," and harassment in that scenario would not be aided by the agency relationship. *Ibid.* And an employee who directs "only a limited number of tasks or assignments" for another employee likewise would not have sufficient authority to qualify as a supervisor. *Ibid.*

The EEOC's guidance has governed the agency's enforcement actions since 1999, and the EEOC has filed numerous briefs in the courts of appeals setting forth its understanding. See EEOC Br. as Amicus Curiae, *Dulaney* v. *Packaging Corp. of Am.*, 673 F.3d 323 (4th Cir. 2012) (No. 10-2316); EEOC Br., *CRST*, *supra* (Nos. 09-3764, 09-3765, 10-1682); EEOC Pet. for Reh'g and Suggestion for Reh'g En Banc, *CRST*, *supra*; EEOC Br. as Amicus Curiae, *Whitten*, *supra* (No. 09-1265); EEOC Br. as Amicus Curiae, *Weyers*, *supra* (No. 02-3732); EEOC Br. as Amicus Curiae, *Mack*, *supra* (No. 02-7056). The agency's consistent position warrants a measure of deference. See *Kasten* v. *Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1335 (2011) (giving weight to EEOC's consistent position set forth in compliance manual and court of appeals briefs); *Federal Express Corp.* v. *Holowecki*, 552 U.S. 389, 399 (2008) (not-

ing, in deferring to EEOC guidance, that it had "been binding on EEOC staff for at least five years").

2. The court of appeals initially adopted its restrictive view of supervisor liability under Title VII without the benefit of the EEOC's guidance. Shortly after this Court decided *Faragher* and *Ellerth*, the court of appeals held in *Parkins* v. *Civil Constructors of Illinois, Inc.*, 163 F.3d 1027 (7th Cir. 1998), that supervisory authority under those cases "primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee." *Id.* at 1034. The *Parkins* court explained that "[a]bsent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes [of] imputing liability to the employer." *Ibid.* In its decision below, the court of appeals reiterated that holding.

The EEOC issued its guidance shortly after the court of appeals' decision in *Parkins*, and certain judges then called for the court of appeals to reconsider its holding. See *Rhodes*, 359 F.3d at 509 (Rovner, J., concurring in part and concurring in the judgment); *id.* at 510 (Cudahy, J., concurring). The court of appeals, however, has continued to hold that employees who assign tasks and recommend discipline fail to qualify as supervisors. *Id.* at 506; see also *Hall* v. *Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002) (finding no supervisory status where harasser directed work, contributed to evaluations, and trained victim). Consistent with the EEOC's guidance, this Court should reject the court of appeals' unduly restrictive approach and hold that supervisory liability extends to harassment by an employee who has authority to direct the victim's daily work activities.

30

### C. On The Existing Record In This Case, Davis Fails To Qualify As Petitioner's Supervisor

For the reasons explained above, the court of appeals erred in refusing to recognize that supervisor liability under Title VII extends to harassment by employees with authority to direct the day-to-day work activities of their victims. But here, even under the correct legal test, Davis—the only employee whose supervising status is in issue, see Pet. 29—would fail to qualify as petitioner's supervisor on the record as it currently stands.

At the summary judgment phase, the parties engaged in substantial discovery of the facts pertaining to petitioner's claims. There is scant evidence in the resulting record that Davis exercised the requisite authority over petitioner's daily work activities. Petitioner's deposition testimony describes no instances in which Davis actually directed her work. J.A. 102-248. Petitioner now points to indicia in the record of Davis possessing a lead role in the kitchen of some sort, see Pet. Br. 10, 42-43, but there is no evidence describing the nature of any authority over petitioner or whether the authority encompassed control of day-to-day work activities. And petitioner would be required to do more than demonstrate that Davis possessed some minimal level of authority over petitioner, because "someone who directs only a limited number of tasks or assignments would not qualify as a 'supervisor.'" Pet. App. 92a (EEOC Guidance).[4]

---

[4] The record also does not demonstrate that petitioner "reasonably believed" Davis was her supervisor. See Pet. App. 92a (EEOC Guidance) (noting that an employer may be vicariously liable "if the employee reasonably believed that the harasser had [supervisory] power," even if that belief is false). When asked whether she considered Davis her supervisor at the time of their confrontation at the elevator in April 2006, petitioner replied: "I don't know what she is." J.A.

31

Petitioner did refer to Davis as a "supervisor" or "kitchen supervisor" in various complaint forms. J.A. 28-29, 45; Docket entry No. 60-12, at 1. And another employee stated that Kimes had told him Davis was a supervisor. J.A. 385-387. Davis's job description also states that she "lead[s] and direct[s]" "kitchen part-time, substitute, and student employee helpers" and supervises "[k]itchen [a]ssistants and [s]ubstitutes." J.A. 12-13. And Kimes acknowledged that Davis directed employees "[a]t times." J.A. 367.

But even if Davis was labeled a "supervisor" and her job description characterized her as supervising petitioner, that would not suffice. Supervisor status "is based on * * * job function rather than job title" and "must be based on the specific facts." Pet. App. 89a-90a (EEOC Guidance). The record as it stands contains no specific facts demonstrating that Davis directed petitioner's day-to-day work. In fact, the record suggests that either Kimes or the chef outlined petitioner's daily tasks on "prep lists." *Id.* at 41a-42a, 72a. While Davis on occasion may have handed petitioner her prep lists, the record does not show that Davis prepared them. See J.A. 74. And someone "who merely relays other officials' instructions regarding work assignments" does not qualify as a supervisor. Pet. App. 92a (EEOC Guidance). Nor would it be enough for petitioner to show that Davis occasionally took the lead in the kitchen. An employer may be liable where a temporary supervisor "commits unlawful harassment of a subordinate while serving as

---

197; see also Pet. App. 54a. Petitioner explained that, "one day she's a supervisor; one day she's not. One day she's to tell people what to do, and one day she's not." *Ibid.* Asked whether Davis was her supervisor even "intermittently, once in a while," petitioner answered that she was "not sure." J.A. 198.

32

his or her supervisor." *Ibid.* But here, the record contains only oblique references to any exercise of authority by Davis and fails to indicate that the harassment occurred during any such period.[5]

This Court on its own could review the record as it presently stands to determine whether summary judgment was appropriately granted on that record under the correct legal standard. The Court's usual practice, however, is to remand to the lower courts to apply the correct standard as announced by this Court. See, *e.g., Allison Engine Co.* v. *United States ex rel. Sanders*, 553 U.S. 662, 673 (2008); *Sprint/United Mgmt. Co.* v. *Mendelsohn*, 552 U.S. 379, 388 (2008); *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 329 (2007); *Merck KGaA* v. *Integra Lifesciences I, Ltd.*, 545 U.S. 193, 208 (2005). In any remand, the courts below presumably would also have discretion to determine whether it would be appropriate to allow petitioner to amend her pleadings or supplement her discovery to attempt to satisfy the correct standard. See *Ellerth*, 524 U.S. at 766.

### CONCLUSION

The judgment of the court of appeals should be vacated and the case remanded for further proceedings consistent with the Court's decision.

Respectfully submitted.

---

[5] Petitioner's observation that Davis "d[id not] clock in" may indicate that Davis outranked petitioner in the organizational hierarchy, but it does not show that she had authority to direct petitioner's day-to-day activities. Pet. App. 54a; see also *Mikels* v. *City of Durham*, 183 F.3d 323, 334 (4th Cir. 1999) (finding no supervisory status where harasser outranked victim but had "minimal" authority over her).

33

P. DAVID LOPEZ
   *General Counsel*
CAROLYN L. WHEELER
   *Acting Associate General*
   *Counsel*
DANIEL T. VAIL
   *Acting Assistant General*
   *Counsel*
JULIE L. GANTZ
   *Attorney*
   *Equal Employment*
   *Opportunity Commission*

SEPTEMBER 2012

DONALD B. VERRILLI, JR.
   *Solicitor General*
THOMAS E. PEREZ
   *Assistant Attorney General*
SRI SRINIVASAN
   *Deputy Solicitor General*
ANN O'CONNELL
   *Assistant to the Solicitor*
   *General*
DENNIS J. DIMSEY
APRIL J. ANDERSON
   *Attorneys*