IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 5:13-CV-00255-C |
| | ) | ECF |
| EQUAL EMPLOYMENT | ) | |
| OPPORTUNITY COMMISSION, *et al.*, | ) | |
| | ) | |
| Defendants | ) | |

## APPENDIX TO MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT

EEOC, Consideration of Arrest and Conviction Records in Employment
Decisions Under Title VII (EEOC Guidance), No. 915.002
(April 25, 2012) ................................................................................................... App 0001

EEOC, Compliance Manual, § 15-VI.B.2, April 19, 2006 ........................................... App 0056

EEOC, Policy Statement on the Issue of Conviction Records,
February 4, 1987 ...................................................................................................... App 0113

EEOC, Policy Statement on the Issue of Conviction Records, July 29, 1987 ........... App 0116

**CERTIFICATE OF SERVICE**

I hereby certify that, on April 4, 2014, a true and correct copy of the Appendix was served

by CM/ECF on:

> Jonathan F. Mitchell
> Andrew Stephen Oldham
> Arthur D'Andrea
> Office of the Texas Attorney General
> 209 West 14th Street
> P.O. Box 12548
> Austin, Texas 70711-2548

> s/ *Justin M. Sandberg*
> JUSTIN M. SANDBERG
> Trial Attorney
> U.S. Department of Justice

| *EEOC Enforcement Guidance* | **Number**<br>915.002<br>**Date**<br>4/25/2012 |
| --- | --- |

1. **SUBJECT**: Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et seq*.

2. **PURPOSE**: The purpose of this Enforcement Guidance is to consolidate and update the U.S. Equal Employment Opportunity Commission's guidance documents regarding the use of arrest or conviction records in employment decisions under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

3. **EFFECTIVE DATE**: Upon receipt.

4. **EXPIRATION DATE**: This Notice will remain in effect until rescinded or superseded.

5. **ORIGINATOR**: Office of Legal Counsel.

**Consideration of Arrest and Conviction Records in Employment Decisions Under
Title VII of the Civil Rights Act of 1964**

**Table of Contents**

I.      Summary                                                                                1

II.     Introduction                                                                           3

III.    Background                                                                             4

        A.      Criminal History Records                                                       4
        B.      Employers' Use of Criminal History Information                                6
        C.      The EEOC's Interest in Employers' Use of Criminal Records in
                Employment Screening                                                          6

IV.     Disparate Treatment Discrimination and Criminal Records                               6

V.      Disparate Impact Discrimination and Criminal Records                                  8

        A.      Determining Disparate Impact of Policies or Practices that Screen
                Individuals Based on Records of Criminal Conduct                              9
                1.      Identifying the Practice or Policy                                    9
                2.      Determining Disparate Impact                                          9
        B.      Job Related for the Position in Question and Consistent with
                Business Necessity                                                           10
                1.      Generally                                                            10
                2.      Arrests                                                              12
                3.      Convictions                                                          13
                4.      Determining Whether a Criminal Conduct Exclusion Is Job
                        Related and Consistent with Business Necessity                       14
                5.      Validation                                                           14
                6.      Detailed Discussion of the *Green* Factors and Criminal
                        Conduct Screens                                                      15
                        a. The Nature and Gravity of the Offense or Conduct                  15
                        b. The Time that Has Passed Since the Offense, Conduct
                           and/or Completion of the Sentence                                 15
                        c. The Nature of the Job Held or Sought                              16
                7. Examples of Criminal Conduct Exclusions that Do Not Consider
                   the *Green* Factors                                                       16
                8. Targeted Exclusions that Are Guided by the *Green* Factors                17
                9. Individualized Assessment                                                 18

        C.      Less Discriminatory Alternatives                                             20

VI.    Positions Subject to Federal Prohibitions or Restrictions on Individuals
with Records of Certain Criminal Conduct    20

    A.    Hiring in Certain Industries    20
    B.    Obtaining Occupational Licenses    21
    C.    Waiving or Appealing Federally Imposed Occupational
        Restrictions    21
    D.    Security Clearances    23
    E.    Working for the Federal Government    23

VII.    Positions Subject to State and Local Prohibitions or Restrictions on Individuals
with Records of Certain Criminal Conduct    24

VIII.    Employer Best Practices    25

# I.       Summary

- An employer's use of an individual's criminal history in making employment decisions may, in some instances, violate the prohibition against employment discrimination under Title VII of the Civil Rights Act of 1964, as amended.

- The Guidance builds on longstanding court decisions and existing guidance documents that the U.S. Equal Employment Opportunity Commission (Commission or EEOC) issued over twenty years ago.

- The Guidance focuses on employment discrimination based on race and national origin. The Introduction provides information about criminal records, employer practices, and Title VII.

- The Guidance discusses the differences between arrest and conviction records.

  - The fact of an arrest does not establish that criminal conduct has occurred, and an exclusion based on an arrest, in itself, is not job related and consistent with business necessity. However, an employer may make an employment decision based on the conduct underlying an arrest if the conduct makes the individual unfit for the position in question.

  - In contrast, a conviction record will usually serve as sufficient evidence that a person engaged in particular conduct. In certain circumstances, however, there may be reasons for an employer not to rely on the conviction record alone when making an employment decision.

- The Guidance discusses disparate treatment and disparate impact analysis under Title VII.

  - A violation may occur when an employer treats criminal history information differently for different applicants or employees, based on their race or national origin (disparate treatment liability).

  - An employer's neutral policy (e.g., excluding applicants from employment based on certain criminal conduct) may disproportionately impact some individuals protected under Title VII, and may violate the law if not job related and consistent with business necessity (disparate impact liability).

    - National data supports a finding that criminal record exclusions have a disparate impact based on race and national origin. The national data provides a basis for the Commission to investigate Title VII disparate impact charges challenging criminal record exclusions.

o Two circumstances in which the Commission believes employers will consistently meet the "job related and consistent with business necessity" defense are as follows:

- The employer validates the criminal conduct exclusion for the position in question in light of the Uniform Guidelines on Employee Selection Procedures (if there is data or analysis about criminal conduct as related to subsequent work performance or behaviors); or

- The employer develops a targeted screen considering at least the nature of the crime, the time elapsed, and the nature of the job (the three factors identified by the court in *Green v. Missouri Pacific Railroad*, 549 F.2d 1158 (8th Cir. 1977)). The employer's policy then provides an opportunity for an individualized assessment for those people identified by the screen, to determine if the policy as applied is job related and consistent with business necessity. (Although Title VII does not require individualized assessment in all circumstances, the use of a screen that does not include individualized assessment is more likely to violate Title VII.).

- Compliance with other federal laws and/or regulations that conflict with Title VII is a defense to a charge of discrimination under Title VII.

- State and local laws or regulations are preempted by Title VII if they "purport[] to require or permit the doing of any act which would be an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-7.

- The Guidance concludes with best practices for employers.

## II.    Introduction

The EEOC enforces Title VII of the Civil Rights Act of 1964 (Title VII) which prohibits employment discrimination based on race, color, religion, sex, or national origin.[1]    This Enforcement Guidance is issued as part of the Commission's efforts to eliminate unlawful discrimination in employment screening, for hiring or retention, by entities covered by Title VII, including private employers as well as federal, state, and local governments.[2]

In the last twenty years, there has been a significant increase in the number of Americans who have had contact[3] with the criminal justice system[4] and, concomitantly, a major increase in the number of people with criminal records in the working-age population.[5]  In 1991, only 1.8% of the adult population had served time in prison.[6]  After ten years, in 2001, the percentage rose to 2.7% (1 in 37 adults).[7]  By the end of 2007, 3.2% of all adults in the United States (1 in every 31) were under some form of correctional control involving probation, parole, prison, or jail.[8]  The Department of Justice's Bureau of Justice Statistics (DOJ/BJS) has concluded that, if incarceration rates do not decrease, approximately 6.6% of all persons born in the United States in 2001 will serve time in state or federal prison during their lifetimes.[9]

Arrest and incarceration rates are particularly high for African American and Hispanic men.[10]  African Americans and Hispanics[11] are arrested at a rate that is 2 to 3 times their proportion of the general population.[12]    Assuming that current incarceration rates remain unchanged, about 1 in 17 White men are expected to serve time in prison during their lifetime;[13] by contrast, this rate climbs to 1 in 6 for Hispanic men; and to 1 in 3 for African American men.[14]

The Commission, which has enforced Title VII since it became effective in 1965, has well-established guidance applying Title VII principles to employers' use of criminal records to screen for employment.[15]  This Enforcement Guidance builds on longstanding court decisions and policy documents that were issued over twenty years ago.  In light of employers' increased access to criminal history information, case law analyzing Title VII requirements for criminal record exclusions, and other developments,[16] the Commission has decided to update and consolidate in this document all of its prior policy statements about Title VII and the use of criminal records in employment decisions.  Thus, this Enforcement Guidance will supersede the Commission's previous policy statements on this issue.

The Commission intends this document for use by employers considering the use of criminal records in their selection and retention processes; by individuals who suspect that they have been denied jobs or promotions, or have been discharged because of their criminal records; and by EEOC staff who are investigating discrimination charges involving the use of criminal records in employment decisions.

## III. Background

The contextual framework for the Title VII analysis in this Enforcement Guidance includes how criminal record information is collected and recorded, why employers use criminal records, and the EEOC's interest in such criminal record screening.

### A. Criminal History Records

Criminal history information can be obtained from a wide variety of sources including, but not limited to, the following:

- Court Records. Courthouses maintain records relating to criminal charges and convictions, including arraignments, trials, pleas, and other dispositions.[17] Searching county courthouse records typically provides the most complete criminal history.[18] Many county courthouse records must be retrieved on-site,[19] but some courthouses offer their records online.[20] Information about federal crimes such as interstate drug trafficking, financial fraud, bank robbery, and crimes against the government may be found online in federal court records by searching the federal courts' Public Access to Court Electronic Records or Case Management/Electronic Case Files.[21]

- Law Enforcement and Corrections Agency Records. Law enforcement agencies such as state police agencies and corrections agencies may allow the public to access their records, including records of complaints, investigations, arrests, indictments, and periods of incarceration, probation, and parole.[22] Each agency may differ with respect to how and where the records may be searched, and whether they are indexed.[23]

- Registries or Watch Lists. Some government entities maintain publicly available lists of individuals who have been convicted of, or are suspected of having committed, a certain type of crime. Examples of such lists include state and federal sex offender registries and lists of individuals with outstanding warrants.[24]

- State Criminal Record Repositories. Most states maintain their own centralized repositories of criminal records, which include records that are submitted by most or all of their criminal justice agencies, including their county courthouses.[25] States differ with respect to the types of records included in the repository,[26] the completeness of the records,[27] the frequency with which they are updated,[28] and whether they permit the public to search the records by name, by fingerprint, or both.[29] Some states permit employers (or third-parties acting on their behalf) to access these records, often for a fee.[30] Others limit access to certain types of records,[31] and still others deny access altogether.[32]

- The Interstate Identification Index (III). The Federal Bureau of Investigation (FBI) maintains the most comprehensive collection of criminal records in the nation, called the "Interstate Identification Index" (III). The III database compiles

records from each of the state repositories, as well as records from federal and international criminal justice agencies.[33]

The FBI's III database may be accessed for employment purposes by:

- the federal government;[34]

- employers in certain industries that are regulated by the federal government, such as "the banking, nursing home, securities, nuclear energy, and private security guard industries; as well as required security screenings by federal agencies of airport workers, HAZMAT truck drivers and other transportation workers";[35] and

- employers in certain industries "that the state has sought to regulate, such as persons employed as civil servants, day care, school, or nursing home workers, taxi drivers, private security guards, or members of regulated professions."[36]

Recent studies have found that a significant number of state and federal criminal record databases include incomplete criminal records.

➢ A 2011 study by the DOJ/BJS reported that, as of 2010, many state criminal history record repositories still had not recorded the final dispositions for a significant number of arrests.[37]
➢ A 2006 study by the DOJ/BJS found that only 50% of arrest records in the FBI's III database were associated with a final disposition.[38]

Additionally, reports have documented that criminal records may be inaccurate.

➢ One report found that even if public access to criminal records has been restricted by a court order to seal and/or expunge such records, this does not guarantee that private companies also will purge the information from their systems or that the event will be erased from media archives.[39]
➢ Another report found that criminal background checks may produce inaccurate results because criminal records may lack "unique" information or because of "misspellings, clerical errors or intentionally inaccurate identification information provided by search subjects who wish to avoid discovery of their prior criminal activities."[40]

Employers performing background checks to screen applicants or employees may attempt to search these governmental sources themselves or conduct a simple Internet search, but they often rely on third-party background screening businesses.[41] Businesses that sell criminal history information to employers are "consumer reporting agencies" (CRAs)[42] if they provide the information in "consumer reports"[43] under the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq*. (FCRA). Under FCRA, a CRA generally may not report records of arrests that did not result in entry of a judgment of conviction, where the arrests occurred more than seven years ago.[44]

However, they may report convictions indefinitely.[45]

CRAs often maintain their own proprietary databases that compile information from various sources, such as those described above, depending on the extent to which the business has purchased or otherwise obtained access to data.[46]  Such databases vary with respect to the geographic area covered, the type of information included (e.g., information about arrests, convictions, prison terms, or specialized information for a subset of employers such as information about workplace theft or shoplifting cases for retail employers[47]), the sources of information used (e.g., county databases, law enforcement agency records, sex offender registries), and the frequency with which they are updated.  They also may be missing certain types of disposition information, such as updated convictions, sealing or expungement orders, or orders for entry into a diversion program.[48]

## B.     Employers' Use of Criminal History Information

In one survey, a total of 92% of responding employers stated that they subjected all or some of their job candidates to criminal background checks.[49]  Employers have reported that their use of criminal history information is related to ongoing efforts to combat theft and fraud,[50] as well as heightened concerns about workplace violence[51] and potential liability for negligent hiring.[52]  Employers also cite federal laws as well as state and local laws[53] as reasons for using criminal background checks.

## C.     The EEOC's Interest in Employers' Use of Criminal Records in Employment Screening

The EEOC enforces Title VII, which prohibits employment discrimination based on race, color, religion, sex, or national origin.  Having a criminal record is not listed as a protected basis in Title VII.  Therefore, whether a covered employer's reliance on a criminal record to deny employment violates Title VII depends on whether it is part of a claim of employment discrimination based on race, color, religion, sex, or national origin.  Title VII liability for employment discrimination is determined using two analytic frameworks:  "disparate treatment" and "disparate impact."  Disparate treatment is discussed in Section IV and disparate impact is discussed in Section V.

## IV.    Disparate Treatment Discrimination and Criminal Records

A covered employer is liable for violating Title VII when the plaintiff demonstrates that it treated him differently because of his race, national origin, or another protected basis.[54]  For example, there is Title VII disparate treatment liability where the evidence shows that a covered employer rejected an African American applicant based on his criminal record but hired a similarly situated White applicant with a comparable criminal record.[55]

> **Example 1:  Disparate Treatment Based on Race.**  John, who is White, and Robert, who is African American, are both recent graduates of State University.  They have similar educational backgrounds, skills, and work experience.   They  each  pled  guilty  to  charges  of  possessing  and

distributing marijuana as high school students, and neither of them had any subsequent contact with the criminal justice system.

After college, they both apply for employment with Office Jobs, Inc., which, after short intake interviews, obtains their consent to conduct a background check. Based on the outcome of the background check, which reveals their drug convictions, an Office Jobs, Inc., representative decides not to refer Robert for a follow-up interview. The representative remarked to a co-worker that Office Jobs, Inc., cannot afford to refer "these drug dealer types" to client companies. However, the same representative refers John for an interview, asserting that John's youth at the time of the conviction and his subsequent lack of contact with the criminal justice system make the conviction unimportant. Office Jobs, Inc., has treated John and Robert differently based on race, in violation of Title VII.

Title VII prohibits "not only decisions driven by racial [or ethnic] animosity, but also decisions infected by stereotyped thinking . . . ."[56] Thus, an employer's decision to reject a job applicant based on racial or ethnic stereotypes about criminality—rather than qualifications and suitability for the position—is unlawful disparate treatment that violates Title VII.[57]

**Example 2: Disparate Treatment Based on National Origin.** Tad, who is White, and Nelson, who is Latino, are both recent high school graduates with grade point averages above 4.0 and college plans. While Nelson has successfully worked full-time for a landscaping company during the summers, Tad only held occasional lawn-mowing and camp-counselor jobs. In an interview for a research job with Meaningful and Paid Internships, Inc. (MPII), Tad discloses that he pled guilty to a felony at age 16 for accessing his school's computer system over the course of several months without authorization and changing his classmates' grades. Nelson, in an interview with MPII, emphasizes his successful prior work experience, from which he has good references, but also discloses that, at age 16, he pled guilty to breaking and entering into his high school as part of a class prank that caused little damage to school property. Neither Tad nor Nelson had subsequent contact with the criminal justice system.

The hiring manager at MPII invites Tad for a second interview, despite his record of criminal conduct. However, the same hiring manager sends Nelson a rejection notice, saying to a colleague that Nelson is only qualified to do manual labor and, moreover, that he has a criminal record. In light of the evidence showing that Nelson's and Tad's educational backgrounds are similar, that Nelson's work experience is more extensive, and that Tad's criminal conduct is more indicative of untrustworthiness, MPII has failed to state a legitimate, nondiscriminatory reason for rejecting Nelson. If Nelson filed a Title VII charge alleging disparate treatment based on national origin and the EEOC's investigation

confirmed these facts, the EEOC would find reasonable cause to believe that discrimination occurred.

There are several kinds of evidence that may be used to establish that race, national origin, or other protected characteristics motivated an employer's use of criminal records in a selection decision, including, but not limited to:

- Biased statements. Comments by the employer or decisionmaker that are derogatory with respect to the charging party's protected group, or that express group-related stereotypes about criminality, might be evidence that such biases affected the evaluation of the applicant's or employee's criminal record.

- Inconsistencies in the hiring process. Evidence that the employer requested criminal history information more often for individuals with certain racial or ethnic backgrounds, or gave Whites but not racial minorities the opportunity to explain their criminal history, would support a showing of disparate treatment.

- Similarly situated comparators (individuals who are similar to the charging party in relevant respects, except for membership in the protected group). Comparators may include people in similar positions, former employees, and people chosen for a position over the charging party. The fact that a charging party was treated differently than individuals who are not in the charging party's protected group by, for example, being subjected to more or different criminal background checks or to different standards for evaluating criminal history, would be evidence of disparate treatment.

- Employment testing. Matched-pair testing may reveal that candidates are being treated differently because of a protected status.[58]

- Statistical evidence. Statistical analysis derived from an examination of the employer's applicant data, workforce data, and/or third party criminal background history data may help to determine if the employer counts criminal history information more heavily against members of a protected group.

## V. Disparate Impact Discrimination and Criminal Records

A covered employer is liable for violating Title VII when the plaintiff demonstrates that the employer's neutral policy or practice has the effect of disproportionately screening out a Title VII-protected group and the employer fails to demonstrate that the policy or practice is job related for the position in question and consistent with business necessity.[59]

In its 1971 *Griggs v. Duke Power Company* decision, the Supreme Court first recognized that Title VII permits disparate impact claims.[60] The *Griggs* Court explained that "[Title VII] proscribes . . . practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude [African Americans] cannot be shown to be related to job performance, the practice is prohibited."[61] In 1991,

Congress amended Title VII to codify this analysis of discrimination and its burdens of proof.[62] Title VII, as amended, states:

> An unlawful employment practice based on disparate impact is established . . . if a complaining party demonstrates that an employer uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity. . . .[63]

With respect to criminal records, there is Title VII disparate impact liability where the evidence shows that a covered employer's criminal record screening policy or practice disproportionately screens out a Title VII-protected group and the employer does not demonstrate that the policy or practice is job related for the positions in question and consistent with business necessity.

### A. Determining Disparate Impact of Policies or Practices that Screen Individuals Based on Records of Criminal Conduct

#### 1. Identifying the Policy or Practice

The first step in disparate impact analysis is to identify the particular policy or practice that causes the unlawful disparate impact. For criminal conduct exclusions, relevant information includes the text of the policy or practice, associated documentation, and information about how the policy or practice was actually implemented. More specifically, such information also includes which offenses or classes of offenses were reported to the employer (e.g., all felonies, all drug offenses); whether convictions (including sealed and/or expunged convictions), arrests, charges, or other criminal incidents were reported; how far back in time the reports reached (e.g., the last five, ten, or twenty years); and the jobs for which the criminal background screening was conducted.[64] Training or guidance documents used by the employer also are relevant, because they may specify which types of criminal history information to gather for particular jobs, how to gather the data, and how to evaluate the information after it is obtained.

#### 2. Determining Disparate Impact

Nationally, African Americans and Hispanics are arrested in numbers disproportionate to their representation in the general population. In 2010, 28% of all arrests were of African Americans,[65] even though African Americans only comprised approximately 14% of the general population.[66] In 2008, Hispanics were arrested for federal drug charges at a rate of approximately three times their proportion of the general population.[67] Moreover, African Americans and Hispanics were more likely than Whites to be arrested, convicted, or sentenced for drug offenses even though their rate of drug use is similar to the rate of drug use for Whites.[68]

African Americans and Hispanics also are incarcerated at rates disproportionate to their numbers in the general population. Based on national incarceration data, the U.S. Department of Justice estimated in 2001 that 1 out of every 17 White men (5.9% of the White men in the U.S.)

is expected to go to prison at some point during his lifetime, assuming that current incarceration rates remain unchanged.[69]  This rate climbs to 1 in 6 (or 17.2%) for Hispanic men.[70]  For African American men, the rate of expected incarceration rises to 1 in 3 (or 32.2%).[71]  Based on a state-by-state examination of incarceration rates in 2005, African Americans were incarcerated at a rate 5.6 times higher than Whites,[72] and 7 states had a Black-to-White ratio of incarceration that was 10 to1.[73]  In 2010, Black men had an imprisonment rate that was nearly 7 times higher than White men and almost 3 times higher than Hispanic men.[74]

National data, such as that cited above, supports a finding that criminal record exclusions have a disparate impact based on race and national origin.  The national data provides a basis for the Commission to further investigate such Title VII disparate impact charges.  During an EEOC investigation, the employer also has an opportunity to show, with relevant evidence, that its employment policy or practice does not cause a disparate impact on the protected group(s).  For example, an employer may present regional or local data showing that African American and/or Hispanic men are not arrested or convicted at disproportionately higher rates in the employer's particular geographic area.  An employer also may use its own applicant data to demonstrate that its policy or practice did not cause a disparate impact.  The Commission will assess relevant evidence when making a determination of disparate impact, including applicant flow information maintained pursuant to the Uniform Guidelines on Employee Selection Procedures,[75] workforce data, criminal history background check data, demographic availability statistics, incarceration/conviction data, and/or relevant labor market statistics.[76]

An employer's evidence of a racially balanced workforce will not be enough to disprove disparate impact.  In *Connecticut v. Teal*, the Supreme Court held that a "bottom line" racial balance in the workforce does not preclude employees from establishing a prima facie case of disparate impact; nor does it provide employers with a defense.[77]  The issue is whether the policy or practice deprives a disproportionate number of Title VII-protected individuals of employment opportunities.[78]

Finally, in determining disparate impact, the Commission will assess the probative value of an employer's applicant data.  As the Supreme Court stated in *Dothard v. Rawlinson*, an employer's "application process might itself not adequately reflect the actual potential applicant pool since otherwise qualified people might be discouraged from applying" because of an alleged discriminatory policy or practice.[79]  Therefore, the Commission will closely consider whether an employer has a reputation in the community for excluding individuals with criminal records.  Relevant evidence may come from ex-offender employment programs, individual testimony, employer statements, evidence of employer recruitment practices, or publicly posted notices, among other sources.[80]  The Commission will determine the persuasiveness of such evidence on a case-by-case basis.

**B.    Job Related For the Position in Question and Consistent with Business Necessity**

**1.    Generally**

After the plaintiff in litigation establishes disparate impact, Title VII shifts the burdens of

production and persuasion to the employer to "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity."[81]  In the legislative history of the 1991 Civil Rights Act, Congress referred to *Griggs* and its progeny such as *Albemarle Paper Company v. Moody*[82] and *Dothard*[83] to explain how this standard should be construed.[84]  The *Griggs* Court stated that the employer's burden was to show that the policy or practice is one that "bear[s] a demonstrable relationship to successful performance of the jobs for which it was used" and "measures the person for the job and not the person in the abstract."[85]  In both *Albemarle*[86] and *Dothard*,[87] the Court emphasized the factual nature of the business necessity inquiry.  The Court further stated in *Dothard* that the terms of the exclusionary policy must "be shown to be necessary to safe and efficient job performance."[88]

In a case involving a criminal record exclusion, the Eighth Circuit in its 1975 *Green v. Missouri Pacific Railroad* decision, held that it was discriminatory under Title VII for an employer to "follow[] the policy of disqualifying for employment any applicant with a conviction for any crime other than a minor traffic offense."[89]  The Eighth Circuit identified three factors (the "*Green* factors") that were relevant to assessing whether an exclusion is job related for the position in question and consistent with business necessity:

- The nature and gravity of the offense or conduct;[90]
- The time that has passed since the offense or conduct and/or completion of the sentence;[91] and
- The nature of the job held or sought.[92]

In 2007, the Third Circuit in *El v. Southeastern Pennsylvania Transportation Authority*[93] developed the statutory analysis in greater depth.  Douglas El challenged SEPTA's policy of excluding everyone ever convicted of a violent crime from the job of paratransit driver.[94]  El, a 55 year-old African American paratransit driver-trainee, was terminated from employment when SEPTA learned of his conviction for second-degree murder 40 years earlier; the conviction involved a gang fight when he was 15 years old and was his only disqualifying offense under SEPTA's policy.[95]  The Third Circuit expressed "reservations" about a policy such as SEPTA's (exclusion for all violent crimes, no matter how long ago they were committed) "in the abstract."[96]

Applying Supreme Court precedent, the *El* court observed that some level of risk is inevitable in all hiring, and that, "[i]n a broad sense, hiring policies . . . ultimately concern the management of risk."[97]  Recognizing that assessing such risk is at the heart of criminal record exclusions, the Third Circuit concluded that Title VII requires employers to justify criminal record exclusions by demonstrating that they "accurately distinguish between applicants [who] pose an unacceptable level of risk and those [who] do not."[98]

The Third Circuit affirmed summary judgment for SEPTA, but stated that the outcome of the case might have been different if Mr. El had, "for example, hired an expert who testified that there is a time at which a former criminal is no longer any more likely to recidivate than the average person, . . . [so] there would be a factual question for the jury to resolve."[99]  The Third Circuit reasoned, however, that the recidivism evidence presented by SEPTA's experts, in

conjunction with the nature of the position at issue—paratransit driver-trainee with unsupervised access to vulnerable adults—required the employer to exercise the utmost care.[100]

In the subsections below, the Commission discusses considerations that are relevant to assessing whether criminal record exclusion policies or practices are job related and consistent with business necessity. First, we emphasize that arrests and convictions are treated differently.

### 2. Arrests

The fact of an arrest does not establish that criminal conduct has occurred.[101] Arrests are not proof of criminal conduct. Many arrests do not result in criminal charges, or the charges are dismissed.[102] Even if an individual is charged and subsequently prosecuted, he is presumed innocent unless proven guilty.[103]

An arrest, however, may in some circumstances trigger an inquiry into whether the conduct underlying the arrest justifies an adverse employment action. Title VII calls for a fact-based analysis to determine if an exclusionary policy or practice is job related and consistent with business necessity. Therefore, an exclusion based on an arrest, in itself, is not job related and consistent with business necessity.

Another reason for employers not to rely on arrest records is that they may not report the final disposition of the arrest (e.g., not prosecuted, convicted, or acquitted). As documented in Section III.A., *supra*, the DOJ/BJS reported that many arrest records in the FBI's III database and state criminal record repositories are not associated with final dispositions.[104] Arrest records also may include inaccuracies or may continue to be reported even if expunged or sealed.[105]

> **Example 3: Arrest Record Is Not Grounds for Exclusion.** Mervin and Karen, a middle-aged African American couple, are driving to church in a predominantly white town. An officer stops them and interrogates them about their destination. When Mervin becomes annoyed and comments that his offense is simply "driving while Black," the officer arrests him for disorderly conduct. The prosecutor decides not to file charges against Mervin, but the arrest remains in the police department's database and is reported in a background check when Mervin applies with his employer of fifteen years for a promotion to an executive position. The employer's practice is to deny such promotions to individuals with arrest records, even without a conviction, because it views an arrest record as an indicator of untrustworthiness and irresponsibility. If Mervin filed a Title VII charge based on these facts, and disparate impact based on race were established, the EEOC would find reasonable cause to believe that his employer violated Title VII.

Although an arrest record standing alone may not be used to deny an employment opportunity, an employer may make an employment decision based on the conduct underlying the arrest if the conduct makes the individual unfit for the position in question. The conduct, not the arrest, is relevant for employment purposes.

0015

**Example 4: Employer's Inquiry into Conduct Underlying Arrest**. Andrew, a Latino man, worked as an assistant principal in Elementary School for several years. After several ten and eleven-year-old girls attending the school accused him of touching them inappropriately on the chest, Andrew was arrested and charged with several counts of endangering the welfare of children and sexual abuse. Elementary School has a policy that requires suspension or termination of any employee who the school believes engaged in conduct that impacts the health or safety of the students. After learning of the accusations, the school immediately places Andrew on unpaid administrative leave pending an investigation. In the course of its investigation, the school provides Andrew a chance to explain the events and circumstances that led to his arrest. Andrew denies the allegations, saying that he may have brushed up against the girls in the crowded hallways or lunchroom, but that he doesn't really remember the incidents and does not have regular contact with any of the girls. The school also talks with the girls, and several of them recount touching in crowded situations. The school does not find Andrew's explanation credible. Based on Andrew's conduct, the school terminates his employment pursuant to its policy.

Andrew challenges the policy as discriminatory under Title VII. He asserts that it has a disparate impact based on national origin and that his employer may not suspend or terminate him based solely on an arrest without a conviction because he is innocent until proven guilty. After confirming that an arrest policy would have a disparate impact based on national origin, the EEOC concludes that no discrimination occurred. The school's policy is linked to conduct that is relevant to the particular jobs at issue, and the exclusion is made based on descriptions of the underlying conduct, not the fact of the arrest. The Commission finds no reasonable cause to believe Title VII was violated.

### 3. Convictions

By contrast, a record of a conviction will usually serve as sufficient evidence that a person engaged in particular conduct, given the procedural safeguards associated with trials and guilty pleas.[106] However, there may be evidence of an error in the record, an outdated record, or another reason for not relying on the evidence of a conviction. For example, a database may continue to report a conviction that was later expunged, or may continue to report as a felony an offense that was subsequently downgraded to a misdemeanor.[107]

Some states require employers to wait until late in the selection process to ask about convictions.[108] The policy rationale is that an employer is more likely to objectively assess the relevance of an applicant's conviction if it becomes known when the employer is already knowledgeable about the applicant's qualifications and experience.[109] As a best practice, and consistent with applicable laws,[110] the Commission recommends that employers not ask about

convictions on job applications and that, if and when they make such inquiries, the inquiries be limited to convictions for which exclusion would be job related for the position in question and consistent with business necessity.

### 4. Determining Whether a Criminal Conduct Exclusion Is Job Related and Consistent with Business Necessity

To establish that a criminal conduct exclusion that has a disparate impact is job related and consistent with business necessity under Title VII, the employer needs to show that the policy operates to effectively link specific criminal conduct, and its dangers, with the risks inherent in the duties of a particular position.

Two circumstances in which the Commission believes employers will consistently meet the "job related and consistent with business necessity" defense are as follows:

- o The employer validates the criminal conduct screen for the position in question per the Uniform Guidelines on Employee Selection Procedures (Uniform Guidelines) standards (if data about criminal conduct as related to subsequent work performance is available and such validation is possible); [111] or

- o The employer develops a targeted screen considering at least the nature of the crime, the time elapsed, and the nature of the job (the three *Green* factors), and then provides an opportunity for an individualized assessment for people excluded by the screen to determine whether the policy as applied is job related and consistent with business necessity.

The individualized assessment would consist of notice to the individual that he has been screened out because of a criminal conviction; an opportunity for the individual to demonstrate that the exclusion should not be applied due to his particular circumstances; and consideration by the employer as to whether the additional information provided by the individual warrants an exception to the exclusion and shows that the policy as applied is not job related and consistent with business necessity. *See* Section V.B.9, *infra* (examples of relevant considerations in individualized assessments).

Depending on the facts and circumstances, an employer may be able to justify a targeted criminal records screen solely under the *Green* factors. Such a screen would need to be narrowly tailored to identify criminal conduct with a demonstrably tight nexus to the position in question. Title VII thus does not necessarily require individualized assessment in all circumstances. However, the use of individualized assessments can help employers avoid Title VII liability by allowing them to consider more complete information on individual applicants or employees, as part of a policy that is job related and consistent with business necessity.

### 5. Validation

The Uniform Guidelines describe three different approaches to validating employment screens.[112] However, they recognize that "[t]here are circumstances in which a user cannot or

need not utilize" formal validation techniques and that in such circumstances an employer "should utilize selection procedures which are as job related as possible and which will minimize or eliminate adverse impact as set forth [in the following subsections]."[113]  Although there may be social science studies that assess whether convictions are linked to future behaviors, traits, or conduct with workplace ramifications,[114] and thereby provide a framework for validating some employment exclusions, such studies are rare at the time of this drafting.

### 6.  Detailed Discussion of the *Green* Factors and Criminal Conduct Screens

Absent a validation study that meets the Uniform Guidelines' standards, the *Green* factors provide the starting point for analyzing how specific criminal conduct may be linked to particular positions.  The three *Green* factors are:

- The nature and gravity of the offense or conduct;
- The time that has passed since the offense, conduct and/or completion of the sentence; and
- The nature of the job held or sought.

#### a.  The Nature and Gravity of the Offense or Conduct

Careful consideration of the nature and gravity of the offense or conduct is the first step in determining whether a specific crime may be relevant to concerns about risks in a particular position.  The nature of the offense or conduct may be assessed with reference to the harm caused by the crime (e.g., theft causes property loss).  The legal elements of a crime also may be instructive.  For example, a conviction for felony theft may involve deception, threat, or intimidation.[115]  With respect to the gravity of the crime, offenses identified as misdemeanors may be less severe than those identified as felonies.

#### b.  The Time that Has Passed Since the Offense, Conduct and/or Completion of the Sentence

Employer policies typically specify the duration of a criminal conduct exclusion.  While the *Green* court did not endorse a specific timeframe for criminal conduct exclusions, it did acknowledge that permanent exclusions from all employment based on any and all offenses were not consistent with the business necessity standard.[116]  Subsequently, in *El*, the court noted that the plaintiff might have survived summary judgment if he had presented evidence that "there is a time at which a former criminal is no longer any more likely to recidivate than the average person . . . ."[117]  Thus, the court recognized that the amount of time that had passed since the plaintiff's criminal conduct occurred was probative of the risk he posed in the position in question.

Whether the duration of an exclusion will be sufficiently tailored to satisfy the business necessity standard will depend on the particular facts and circumstances of each case.  Relevant and available information to make this assessment includes, for example, studies demonstrating how much the risk of recidivism declines over a specified time.[118]

### c. The Nature of the Job Held or Sought

Finally, it is important to identify the particular job(s) subject to the exclusion. While a factual inquiry may begin with identifying the job title, it also encompasses the nature of the job's duties (e.g., data entry, lifting boxes), identification of the job's essential functions, the circumstances under which the job is performed (e.g., the level of supervision, oversight, and interaction with co-workers or vulnerable individuals), and the environment in which the job's duties are performed (e.g., out of doors, in a warehouse, in a private home). Linking the criminal conduct to the essential functions of the position in question may assist an employer in demonstrating that its policy or practice is job related and consistent with business necessity because it "bear[s] a demonstrable relationship to successful performance of the jobs for which it was used."[119]

### 7. Examples of Criminal Conduct Exclusions that Do Not Consider the *Green* Factors

A policy or practice requiring an automatic, across-the-board exclusion from all employment opportunities because of any criminal conduct is inconsistent with the *Green* factors because it does not focus on the dangers of particular crimes and the risks in particular positions. As the court recognized in *Green*, "[w]e cannot conceive of any business necessity that would automatically place every individual convicted of any offense, except a minor traffic offense, in the permanent ranks of the unemployed."[120]

> **Example 5: Exclusion Is Not Job Related and Consistent with Business Necessity.** The National Equipment Rental Company uses the Internet to accept job applications for all positions. All applicants must answer certain questions before they are permitted to submit their online application, including "have you ever been convicted of a crime?" If the applicant answers "yes," the online application process automatically terminates, and the applicant sees a screen that simply says "Thank you for your interest. We cannot continue to process your application at this time."
>
> The Company does not have a record of the reasons why it adopted this exclusion, and it does not have information to show that convictions for all offenses render all applicants unacceptable risks in all of its jobs, which range from warehouse work, to delivery, to management positions. If a Title VII charge were filed based on these facts, and there was a disparate impact on a Title VII-protected basis, the EEOC would find reasonable cause to believe that the blanket exclusion was not job related and consistent with business necessity because the risks associated with all convictions are not pertinent to all of the Company's jobs.
>
> **Example 6: Exclusion Is Not Job Related and Consistent with Business Necessity.** Leo, an African American man, has worked

successfully at PR Agency as an account executive for three years. After a change of ownership, the new owners adopt a policy under which it will not employ anyone with a conviction. The policy does not allow for any individualized assessment before exclusion. The new owners, who are highly respected in the industry, pride themselves on employing only the "best of the best" for every position. The owners assert that a quality workforce is a key driver of profitability.

Twenty years earlier, as a teenager, Leo pled guilty to a misdemeanor assault charge. During the intervening twenty years, Leo graduated from college and worked successfully in advertising and public relations without further contact with the criminal justice system. At PR Agency, all of Leo's supervisors assessed him as a talented, reliable, and trustworthy employee, and he has never posed a risk to people or property at work. However, once the new ownership of PR Agency learns about Leo's conviction record through a background check, it terminates his employment. It refuses to reconsider its decision despite Leo's positive employment history at PR Agency.

Leo files a Title VII charge alleging that PR Agency's conviction policy has a disparate impact based on race and is not job related for the position in question and consistent with business necessity. After confirming disparate impact, the EEOC considers PR Agency's defense that it employs only the "best of the best" for every position, and that this necessitates excluding everyone with a conviction. PR Agency does not show that all convictions are indicative of risk or danger in all its jobs for all time, under the *Green* factors. Nor does PR Agency provide any factual support for its assertion that having a conviction is necessarily indicative of poor work or a lack of professionalism. The EEOC concludes that there is reasonable cause to believe that the Agency's policy is not job related for the position in question and consistent with business necessity. [121]

### 8.    Targeted Exclusions that Are Guided by the *Green* Factors

An employer policy or practice of excluding individuals from particular positions for specified criminal conduct within a defined time period, as guided by the *Green* factors, is a targeted exclusion. Targeted exclusions are tailored to the rationale for their adoption, in light of the particular criminal conduct and jobs involved, taking into consideration fact-based evidence, legal requirements, and/or relevant and available studies.

As discussed above in Section V.B.4, depending on the facts and circumstances, an employer may be able to justify a targeted criminal records screen solely under the *Green* factors. Such a screen would need to be narrowly tailored to identify criminal conduct with a demonstrably tight nexus to the position in question. Title VII thus does not necessarily require individualized assessment in all circumstances. However, the use of individualized assessments can help employers avoid Title VII liability by allowing them to consider more complete information on individual applicants or employees, as part of a policy that is job related and consistent with business necessity.

### 9. Individualized Assessment

Individualized assessment generally means that an employer informs the individual that he may be excluded because of past criminal conduct; provides an opportunity to the individual to demonstrate that the exclusion does not properly apply to him; and considers whether the individual's additional information shows that the policy as applied is not job related and consistent with business necessity.

The individual's showing may include information that he was not correctly identified in the criminal record, or that the record is otherwise inaccurate. Other relevant individualized evidence includes, for example:

- The facts or circumstances surrounding the offense or conduct;
- The number of offenses for which the individual was convicted;
- Older age at the time of conviction, or release from prison; [122]
- Evidence that the individual performed the same type of work, post conviction, with the same or a different employer, with no known incidents of criminal conduct;
- The length and consistency of employment history before and after the offense or conduct; [123]
- Rehabilitation efforts, e.g., education/training; [124]
- Employment or character references and any other information regarding fitness for the particular position; [125] and
- Whether the individual is bonded under a federal, state, or local bonding program. [126]

If the individual does not respond to the employer's attempt to gather additional information about his background, the employer may make its employment decision without the information.

> **Example 7: Targeted Screen with Individualized Assessment Is Job Related and Consistent with Business Necessity.** County Community Center rents meeting rooms to civic organizations and small businesses, party rooms to families and social groups, and athletic facilities to local recreational sports leagues. The County has a targeted rule prohibiting anyone with a conviction for theft crimes (e.g., burglary, robbery, larceny, identity theft) from working in a position with access to personal financial

information for at least four years after the conviction or release from incarceration. This rule was adopted by the County's Human Resources Department based on data from the County Corrections Department, national criminal data, and recent recidivism research for theft crimes. The Community Center also offers an opportunity for individuals identified for exclusion to provide information showing that the exclusion should not be applied to them.

Isaac, who is Hispanic, applies to the Community Center for a full-time position as an administrative assistant, which involves accepting credit card payments for room rentals, in addition to having unsupervised access to the personal belongings of people using the facilities. After conducting a background check, the County learns that Isaac pled guilty eighteen months earlier, at age twenty, to credit card fraud, and that he did not serve time in prison. Isaac confirms these facts, provides a reference from the restaurant where he now works on Saturday nights, and asks the County for a "second chance" to show that he is trustworthy. The County tells Isaac that it is still rejecting his employment application because his criminal conduct occurred eighteen months ago and is directly pertinent to the job in question. The information he provided did nothing to dispel the County's concerns.

Isaac challenges this rejection under Title VII, alleging that the policy has a disparate impact on Hispanics and is not job related and consistent with business necessity. After confirming disparate impact, the EEOC finds that this screen was carefully tailored to assess unacceptable risk in relevant positions, for a limited time period, consistent with the evidence, and that the policy avoided overbroad exclusions by allowing individuals an opportunity to explain special circumstances regarding their criminal conduct. Thus, even though the policy has a disparate impact on Hispanics, the EEOC does not find reasonable cause to believe that discrimination occurred because the policy is job related and consistent with business necessity. [127]

**Example 8: Targeted Exclusion Without Individualized Assessment Is Not Job Related and Consistent with Business Necessity.** "Shred 4 You" employs over 100 people to pick up discarded files and sensitive materials from offices, transport the materials to a secure facility, and shred and recycle them. The owner of "Shred 4 You" sells the company to a competitor, known as "We Shred." Employees of "Shred 4 You" must reapply for employment with "We Shred" and undergo a background check. "We Shred" has a targeted criminal conduct exclusion policy that prohibits the employment of anyone who has been convicted of any crime related to theft or fraud in the past five years, and the policy does not provide for any individualized consideration. The company explains that its clients entrust it with handling sensitive and confidential information

and materials; therefore, it cannot risk employing people who pose an above-average risk of stealing information.

Jamie, who is African American, worked successfully for "Shred 4 You" for five years before the company changed ownership. Jamie applies for his old job, and "We Shred" reviews Jamie's performance appraisals, which include high marks for his reliability, trustworthiness, and honesty. However, when "We Shred" does a background check, it finds that Jamie pled guilty to misdemeanor insurance fraud five years ago, because he exaggerated the costs of several home repairs after a winter storm. "We Shred" management informs Jamie that his guilty plea is evidence of criminal conduct and that his employment will be terminated. Jamie asks management to consider his reliable and honest performance in the same job at "Shred 4 You," but "We Shred" refuses to do so. The employer's conclusion that Jamie's guilty plea demonstrates that he poses an elevated risk of dishonesty is not factually based given Jamie's history of trustworthiness in the same job. After confirming disparate impact based on race (African American), the EEOC finds reasonable cause to believe that Title VII was violated because the targeted exclusion was not job related and consistent with business necessity based on these facts.

## C.    Less Discriminatory Alternatives

If an employer successfully demonstrates that its policy or practice is job related for the position in question and consistent with business necessity, a Title VII plaintiff may still prevail by demonstrating that there is a less discriminatory "alternative employment practice" that serves the employer's legitimate goals as effectively as the challenged practice but that the employer refused to adopt.[128]

## VI.    Positions Subject to Federal Prohibitions or Restrictions on Individuals with Records of Certain Criminal Conduct

In some industries, employers are subject to federal statutory and/or regulatory requirements that prohibit individuals with certain criminal records from holding particular positions or engaging in certain occupations. Compliance with federal laws and/or regulations is a defense to a charge of discrimination. However, the EEOC will continue to coordinate with other federal departments and agencies with the goal of maximizing federal regulatory consistency with respect to the use of criminal history information in employment decisions.[129]

## A.    Hiring in Certain Industries

Federal laws and regulations govern the employment of individuals with specific convictions in certain industries or positions in both the private and public sectors. For example, federal law excludes an individual who was convicted in the previous ten years of specified crimes from working as a security screener or otherwise having unescorted access to the secure areas of an airport.[130] There are equivalent requirements for federal law enforcement officers,[131]

child care workers in federal agencies or facilities,[132] bank employees,[133] and port workers,[134] among other positions.[135]   Title VII does not preempt these federally imposed restrictions. However, if an employer decides to impose an exclusion that goes beyond the scope of a federally imposed restriction, the discretionary aspect of the policy would be subject to Title VII analysis.

> **Example 9: Exclusion Is Not Job Related and Consistent with Business Necessity.**  Your Bank has a rule prohibiting anyone with convictions for any type of financial or fraud-related crimes within the last twenty years from working in positions with access to customer financial information, even though the federal ban is ten years for individuals who are convicted of any criminal offense involving dishonesty, breach of trust, or money laundering from serving in such positions.
>
> Sam, who is Latino, applies to Your Bank to work as a customer service representative.  A background check reveals that Sam was convicted of a misdemeanor for misrepresenting his income on a loan application fifteen years earlier.  Your Bank therefore rejects Sam, and he files a Title VII charge with the EEOC, alleging that the Bank's policy has a disparate impact based on national origin and is not job related and consistent with business necessity.  Your Bank asserts that its policy does not cause a disparate impact and that, even if it does, it is job related for the position in question because customer service representatives have regular access to financial information and depositors must have "100% confidence" that their funds are safe.  However, Your Bank does not offer evidence showing that there is an elevated likelihood of committing financial crimes for someone who has been crime-free for more than ten years.  After establishing that the Bank's policy has a disparate impact based on national origin, the EEOC finds that the policy is not job related for the position in question and consistent with business necessity.  The Bank's justification for adding ten years to the federally mandated exclusion is insufficient because it is only a generalized concern about security, without proof.

## B.    Obtaining Occupational Licenses

Title VII also does not preempt federal statutes and regulations that govern eligibility for occupational licenses and registrations.  These restrictions cover diverse sectors of the economy including the transportation industry,[136] the financial industry,[137] and import/export activities,[138] among others.[139]

## C.   Waiving or Appealing Federally Imposed Occupational Restrictions

Several federal statutes and regulations provide a mechanism for employers or individuals to appeal or apply for waivers of federally imposed occupational restrictions.  For example, unless a bank receives prior written consent from the Federal Deposit Insurance

Corporation (FDIC), an individual convicted of a criminal offense involving dishonesty, breach of trust, money laundering, or another financially related crime may not work in, own, or control "an insured depository institution" (e.g., bank) for ten years under the Federal Deposit Insurance Act.[140] To obtain such FDIC consent, the insured institution must file an application for a waiver on behalf of the particular individual.[141] Alternatively, if the insured institution does not apply for the waiver on the individual's behalf, the individual may file a request directly with the FDIC for a waiver of the institution filing requirement, demonstrating "substantial good cause" to grant the waiver.[142] If the FDIC grants the individual's waiver request, the individual can then file an application directly with the FDIC for consent to work for the insured institution in question.[143] Once the institution, or the individual, submits the application, the FDIC's criminal record waiver review process requires consideration of mitigating factors that are consistent with Title VII, including evidence of rehabilitation, and the nature and circumstances of the crime.[144]

Additionally, port workers who are denied the Transportation Workers Identification Credential (TWIC) based on their conviction record may seek a waiver for certain permanently disqualifying offenses or interim disqualifying offenses, and also may file an individualized appeal from the Transportation Security Administration's initial determination of threat assessment based on the conviction.[145] The Maritime Transportation Security Act, which requires all port workers to undergo a criminal background check to obtain a TWIC,[146] provides that individuals with convictions for offenses such as espionage, treason, murder, and a federal crime of terrorism are permanently disqualified from obtaining credentials, but those with convictions for firearms violations and distribution of controlled substances may be temporarily disqualified.[147] Most offenses related to dishonesty are only temporarily disqualifying.[148]

> **Example 10: Consideration of Federally Imposed Occupational Restrictions.** John Doe applies for a position as a truck driver for Truckers USA. John's duties will involve transporting cargo to, from, and around ports, and Truckers USA requires all of its port truck drivers to have a TWIC. The Transportation Security Administration (TSA) conducts a criminal background check and may deny the credential to applicants who have permanently disqualifying criminal offenses in their background as defined by federal law. After conducting the background check for John Doe, TSA discovers that he was convicted nine years earlier for conspiracy to use weapons of mass destruction. TSA denies John a security card because this is a permanently disqualifying criminal offense under federal law.[149] John, who points out that he was a minor at the time of the conviction, requests a waiver by TSA because he had limited involvement and no direct knowledge of the underlying crime at the time of the offense. John explains that he helped a friend transport some chemical materials that the friend later tried to use to damage government property. TSA refuses to grant John's waiver request because a conviction for conspiracy to use weapons of mass destruction is not subject to the TSA's waiver procedures.[150] Based on this denial, Truckers USA rejects John's application for the port truck driver position. Title VII does not override Truckers USA's policy because the policy is consistent with another federal law.

While Title VII does not mandate that an employer seek such waivers, where an employer does seek waivers it must do so in a nondiscriminatory manner.

### D. Security Clearances

The existence of a criminal record may result in the denial of a federal security clearance, which is a prerequisite for a variety of positions with the federal government and federal government contractors.[151] A federal security clearance is used to ensure employees' trustworthiness, reliability, and loyalty before providing them with access to sensitive national security information.[152] Under Title VII's national security exception, it is not unlawful for an employer to "fail or refuse to hire and employ" an individual because "such individual has not fulfilled or has ceased to fulfill" the federal security requirements.[153] This exception focuses on whether the position in question is, in fact, subject to national security requirements that are imposed by federal statute or Executive Order, and whether the adverse employment action actually resulted from the denial or revocation of a security clearance.[154] Procedural requirements related to security clearances must be followed without regard to an individual's race, color, religion, sex, or national origin.[155]

### E. Working for the Federal Government

Title VII provides that, with limited coverage exceptions, "[a]ll personnel actions affecting employees or applicants for employment . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."[156] The principles discussed above in this Guidance apply in the federal employment context. In most circumstances, individuals with criminal records are not automatically barred from working for the federal government.[157] However, the federal government imposes criminal record restrictions on its workforce through "suitability" requirements for certain positions.[158] The federal government's Office of Personnel Management (OPM) defines suitability as "determinations based on a person's character or conduct that may have an impact on the integrity or efficiency of the service."[159] Under OPM's rules, agencies may bar individuals from federal employment for up to three years if they are found unsuitable based on criminal or dishonest conduct, among other factors.[160] OPM gives federal agencies the discretion to consider relevant mitigating criteria when deciding whether an individual is suitable for a federal position.[161] These mitigating criteria, which are consistent with the three *Green* factors and also provide an individualized assessment of the applicant's background, allow consideration of: (1) the nature of the position for which the person is applying or in which the person is employed; (2) the nature and seriousness of the conduct; (3) the circumstances surrounding the conduct; (4) the recency of the conduct; (5) the age of the person involved at the time of the conduct; (6) contributing societal conditions; and (7) the absence or presence of rehabilitation or efforts toward rehabilitation.[162] In general, OPM requires federal agencies and departments to consider hiring an individual with a criminal record if he is the best candidate for the position in question and can comply with relevant job requirements.[163] The EEOC continues to coordinate with OPM to achieve employer best practices in the federal sector.[164]

**VII.   Positions Subject to State and Local Prohibitions or Restrictions on Individuals with Records of Certain Criminal Conduct**

States and local jurisdictions also have laws and/or regulations that restrict or prohibit the employment of individuals with records of certain criminal conduct.[165]   Unlike federal laws or regulations, however, state and local laws or regulations are preempted by Title VII if they "purport[] to require or permit the doing of any act which would be an unlawful employment practice" under Title VII.[166]   Therefore, if an employer's exclusionary policy or practice is *not* job related and consistent with business necessity, the fact that it was adopted to comply with a state or local law or regulation does not shield the employer from Title VII liability.[167]

> **Example 11:  State Law Exclusion Is Job Related and Consistent with Business Necessity.**   Elijah, who is African American, applies for a position as an office assistant at Pre-School, which is in a state that imposes criminal record restrictions on school employees.   Pre-School, which employs twenty-five full- and part-time employees, uses all of its workers to help with the children.   Pre-School performs a background check and learns that Elijah pled guilty to charges of indecent exposure two years ago.   After being rejected for the position because of his conviction, Elijah files a Title VII disparate impact charge based on race to challenge Pre-School's policy.   The EEOC conducts an investigation and finds that the policy has a disparate impact and that the exclusion is job related for the position in question and consistent with business necessity because it addresses serious safety risks of employment in a position involving regular contact with children.   As a result, the EEOC would not find reasonable cause to believe that discrimination occurred.

> **Example 12: State Law Exclusion Is Not Consistent with Title VII.**   County Y enforces a law that prohibits all individuals with a criminal conviction from working for it.   Chris, an African American man, was convicted of felony welfare fraud fifteen years ago, and has not had subsequent contact with the criminal justice system.   Chris applies to County Y for a job as an animal control officer trainee, a position that involves learning how to respond to citizen complaints and handle animals.   The County rejects Chris's application as soon as it learns that he has a felony conviction. Chris files a Title VII charge, and the EEOC investigates, finding disparate impact based on race and also that the exclusionary policy is not job related and consistent with business necessity.   The County cannot justify rejecting everyone with any conviction from all jobs.   Based on these facts, County Y's law "purports to require or permit the doing of an[] act which would be an unlawful employment practice" under Title VII.

## VIII.   Employer Best Practices

The following are examples of best practices for employers who are considering criminal record information when making employment decisions.

*General*

- Eliminate policies or practices that exclude people from employment based on any criminal record.

- Train managers, hiring officials, and decisionmakers about Title VII and its prohibition on employment discrimination.

*Developing a Policy*

- Develop a narrowly tailored written policy and procedure for screening applicants and employees for criminal conduct.

  - Identify essential job requirements and the actual circumstances under which the jobs are performed.

  - Determine the specific offenses that may demonstrate unfitness for performing such jobs.

    o Identify the criminal offenses based on all available evidence.

  - Determine the duration of exclusions for criminal conduct based on all available evidence.

    o Include an individualized assessment.

  - Record the justification for the policy and procedures.

  - Note and keep a record of consultations and research considered in crafting the policy and procedures.

- Train managers, hiring officials, and decisionmakers on how to implement the policy and procedures consistent with Title VII.

*Questions about Criminal Records*

- When asking questions about criminal records, limit inquiries to records for which exclusion would be job related for the position in question and consistent with business necessity.

*Confidentiality*

- Keep information about applicants' and employees' criminal records confidential. Only use it for the purpose for which it was intended.

Approved by the Commission:

_____          _____
Chair Jacqueline A. Berrien                            Date

---

[1]      42 U.S.C. § 2000e *et seq*.  The EEOC also enforces other anti-discrimination laws including: Title I of the Americans with Disabilities Act of 1990, as amended (ADA),  and Section 501 of the Rehabilitation Act, as amended, which prohibit employment discrimination on the basis of disability; the Age Discrimination in Employment Act of 1967, as amended (ADEA), which prohibits discrimination on the basis of age 40 or above; Title II of the Genetic Information Nondiscrimination Act of 2008 (GINA), which prohibits discrimination on the basis of genetic information; and the Equal Pay Act of 1963, as amended (EPA), which requires employers to pay male and female employees at the same establishment equal wages for equal work.

[2]      All entities covered by Title VII are subject to this analysis.  *See* 42 U.S.C. § 2000e-2 (anti-discrimination provisions); 42 U.S.C. § 2000e(b)–(e) (defining "employer," "employment agency," and "labor organization"); 42 U.S.C. § 2000e-16(a) (prohibiting discriminatory employment practices by federal departments and agencies).  For purposes of this Guidance, the term "employer" is used in lieu of listing all Title VII-covered entities.  The Commission considers other coverage questions that arise in particular charges involving, for example, joint employment or third party interference in *Compliance Manual Section 2: Threshold Issues,* U.S. EQUAL EMP'T OPPORTUNITY COMM'N, § 2-III B., *Covered Entities*, http://www.eeoc.gov/policy/docs/threshold.html#2-III-B (last visited April 23, 2012).

[3]      For the purposes of this Guidance, references to "contact" with the criminal justice system may include, for example, an arrest, charge, indictment, citation, conviction, incarceration, probation, or parole.

[4]      *See* THOMAS P. BONCZAR, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, PREVALENCE OF IMPRISONMENT IN THE U.S. POPULATION, 1974–2001, at 3 (2003), http://bjs.ojp.usdoj.gov/content/pub/pdf/piusp01.pdf [hereinafter PREVALENCE OF IMPRISONMENT] ("Between 1974 and 2001 the number of former prisoners living in the United States more than doubled, from 1,603,000 to 4,299,000."); SEAN ROSENMERKEL ET AL., BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, FELONY SENTENCES IN STATE COURTS, 2006 – STATISTICAL TABLES 1 (2009), http://bjs.ojp.usdoj.gov/content/pub/pdf/fssc06st.pdf (reporting that between 1990 and 2006, there has been a 37% increase in the number of felony offenders sentenced in state courts); *see also* PEW CTR. ON THE STATES, ONE IN 31: THE LONG REACH OF AMERICAN CORRECTIONS 4 (2009), http://www.pewcenteronthestates.org/uploadedFiles/PSPP_1in31_report_FINAL_WEB_3-26-09.pdf [hereinafter ONE IN 31] ("During the past quarter-century, the number of prison and jail inmates has grown by 274 percent . . . .[bringing] the total population in custody to 2.3 million. During the same period, the number under community supervision grew by a staggering 3,535,660 to a total of 5.1 million."); PEW CTR. ON THE STATES, ONE IN 100: BEHIND BARS IN AMERICA 2008, at 3 (2008), http://www.pewcenteronthestates.org/uploadedFiles/8015PCTS_Prison08_FINAL_2-1-1_FORWEB.pdf ("[M]ore than one in every 100 adults is now confined in an American jail or

prison."); Robert Brame, Michael G. Turner, Raymond Paternoster, & Shawn D. Bushway, *Cumulative Prevalence of Arrest From Ages 8 to 23 in a National Sample*, 129 PEDIATRICS 21, 25, 26 (2012) (finding that approximately 1 out of 3 of all American youth will experience at least 1 arrest for a nontraffic offense by the age of 23).

⁵      *See* JOHN SCHMITT & KRIS WARNER, CTR. FOR ECON. & POLICY RESEARCH, EX-OFFENDERS AND THE LABOR MARKET 12 (2010), www.cepr.net/documents/publications/ex-offenders-2010-11.pdf ("In 2008, ex-prisoners were 2.9 to 3.2 percent of the total working-age population (excluding those currently in prison or jail) or about one in 33 working-age adults. Ex-felons were a larger share of the total working-age population: 6.6 to 7.4 percent, or about one in 15 working-age adults [not all felons serve prison terms]."); *see id.* at 3 (concluding that "in the absence of some reform of the criminal justice system, the share of ex-offenders in the working-age population will rise substantially in coming decades").

⁶      PREVALENCE OF IMPRISONMENT, *supra* note 4, at 4, Table 3.

⁷      *Id.*

⁸      ONE IN 31, *supra* note 4, at 5 (noting that when all of the individuals who are probationers, parolees, prisoners or jail inmates are added up, the total is more than 7.3 million adults; this is more than the populations of Chicago, Philadelphia, San Diego, and Dallas combined, and larger than the populations of 38 states and the District of Columbia).

⁹      PREVALENCE OF IMPRISONMENT, *supra* note 4, at 7.

¹⁰     *Id.* at 5, Table 5; *cf.* PEW CTR. ON THE STATES, COLLATERAL COSTS: INCARCERATION'S EFFECT ON ECONOMIC MOBILITY 6 (2010), http://www.pewcenteronthestates.org/uploadedFiles/Collateral_Costs.pdf?n=8653 ("Simply stated, incarceration in America is concentrated among African American men.  While 1 in every 87 white males ages 18 to 64 is incarcerated and the number for similarly-aged Hispanic males is 1 in 36, for black men it is 1 in 12."). Incarceration rates are even starker for 20-to-34-year-old men without a high school diploma or GED: 1 in 8 White males in this demographic group is incarcerated, compared to 1 in 14 Hispanic males, and 1 in 3 Black males. PEW CTR. ON THE STATES, *supra*, at 8, Figure 2.

¹¹     This document uses the terms "Black" and "African American," and the terms "Hispanic" and "Latino," interchangeably.

¹²     *See infra* notes 65–67 (citing data for the arrest rates and population statistics for African Americans and Hispanics).

¹³     PREVALENCE OF IMPRISONMENT, *supra* note 4, at 1.

¹⁴     *Id.* at 8.

15      *See Policy Statement on the Issue of Conviction Records Under Title VII of the Civil Rights Act of 1964*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N (Feb. 4, 1987), http://www.eeoc.gov/policy/docs/convict1.html; *EEOC Policy Statement on the Use of Statistics in Charges Involving the Exclusion of Individuals with Conviction Records from Employment*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N  (July 29, 1987), http://www.eeoc.gov/policy/docs/convict2.html; *Policy Guidance on the Consideration of Arrest Records in Employment Decisions Under Title VII*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N (Sept. 7, 1990), http://www.eeoc.gov/policy/docs/arrest_records.html;  *Compliance Manual Section 15: Race & Color Discrimination*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, § 15-VI.B.2 (April 19, 2006), http://www.eeoc.gov/policy/docs/race-color.pdf. *See also* EEOC Decision No. 72-1497 (1972) (challenging a criminal record exclusion policy based on "serious crimes"); EEOC Decision No. 74-89 (1974) (challenging a policy where a felony conviction was considered an adverse factor that would lead to disqualification); EEOC Decision No. 78-03 (1977) (challenging an exclusion policy based on felony or misdemeanor convictions involving moral turpitude or the use of drugs); EEOC Decision No. 78-35 (1978) (concluding that an employee's discharge was reasonable given his pattern of criminal behavior and the severity and recentness of his criminal conduct).

16      In 2011, U.S. Attorney General Eric Holder assembled a Cabinet-level interagency Reentry Council to support the federal government's efforts to promote the successful reintegration of ex-offenders back into their communities.  *National Reentry Resource Center – Federal Interagency Reentry Council*, http://www.nationalreentryresourcecenter.org/reentry-council (last visited April 23, 2012).  As a part of the Council's efforts, it has focused on removing barriers to employment for ex-offenders to reduce recidivism by publishing several fact sheets on employing individuals with criminal records.  *See, e.g.*, FED. INTERAGENCY REENTRY COUNCIL, REENTRY MYTHBUSTER! ON FEDERAL HIRING POLICIES (2011), http://www.nationalreentryresourcecenter.org/documents/0000/1083/Reentry_Council_Mythbuster_Fed_Employment.pdf; FED. INTERAGENCY REENTRY COUNCIL, REENTRY MYTHBUSTER! ON HIRING/CRIMINAL RECORDS GUIDANCE (2011), http://www.nationalreentryresourcecenter.org/documents/0000/1082/Reentry_Council_Mythbuster_Employment.pdf; FED. INTERAGENCY REENTRY COUNCIL, REENTRY MYTHBUSTER! CRIMINAL HISTORIES AND EMPLOYMENT BACKGROUND CHECKS (2011), http://www.nationalreentryresourcecenter.org/documents/0000/1176/Reentry_Council_Mythbuster_FCRA_Employment.pdf; FED. INTERAGENCY REENTRY COUNCIL, REENTRY MYTHBUSTER! ON FEDERAL BONDING PROGRAM (2011), http://www.nationalreentryresourcecenter.org/documents/0000/1061/Reentry_Council_Mythbuster_Federal_Bonding.pdf.

        In addition to these federal efforts, several state law enforcement agencies have embraced initiatives and programs that encourage the employment of ex-offenders.  For example, Texas' Department of Criminal Justice has a Reentry and Integration Division and within that Division, a Reentry Task Force Workgroup.  *See Reentry and Integration Division-Reentry Task Force*, TEX. DEP'T OF CRIMINAL JUSTICE, http://www.tdcj.state.tx.us/divisions/rid/rid_texas_reentry_task_force.html (last visited April 23, 2012).  One of the Workgroups in this Task Force specifically focuses on identifying

employment opportunities for ex-offenders and barriers that affect ex-offenders' access to employment or vocational training programs. *Reentry and Integration Division – Reentry Task Force Workgroups*, TEX. DEP'T OF CRIMINAL JUSTICE, http://www.tdcj.state.tx.us/divisions/rid/r_workgroup/rid_workgroup_employment.html (last visited April 23, 2012). Similarly, Ohio's Department of Rehabilitation and Correction has an Offender Workforce Development Office that "works with departmental staff and correctional institutions within the Ohio Department of Rehabilitation and Correction to prepare offenders for employment and the job search process." *Jobs for Ohio Offenders*, OHIO DEP'T OF REHAB. AND CORR. OFFENDER WORKFORCE DEV., http://www.drc.ohio.gov/web/JOBOFFEN.HTM (last updated Aug. 9, 2010). Law enforcement agencies in other states such as Indiana and Florida have also recognized the importance of encouraging ex-offender employment. *See, e.g.*, *IDOC: Road to Re-Entry*, IND. DEP'T OF CORR., http://www.in.gov/idoc/reentry/index.htm (last visited April 23, 2012) (describing various services and programs that are available to ex-offenders to help them to obtain employment); FLA. DEP'T OF CORRS., RECIDIVISM REDUCTION STRATEGIC PLAN: FISCAL YEAR 2009-2014, at 11, 12 (2009), http://www.dc.state.fl.us/orginfo/FinalRecidivismReductionPlan.pdf (identifying the lack of employment as one of the barriers to successful ex-offender reentry).

[17]    CARL R. ERNST & LES ROSEN, "NATIONAL" CRIMINAL HISTORY DATABASES 1 (2002), http://www.brbpub.com/articles/CriminalHistoryDB.pdf.

[18]    LEXISNEXIS, CRIMINAL BACKGROUND CHECKS: WHAT NON-PROFITS NEED TO KNOW ABOUT CRIMINAL RECORDS 4 (2009), http://www.lexisnexis.com/risk/nonprofit/documents/Volunteer_Screening_White_Paper.pdf.

[19]    *Id.*

[20]    ERNST & ROSEN, *supra* note 17, at 1; NAT'L ASS'N OF PROF'L BACKGROUND SCREENERS, CRIMINAL BACKGROUND CHECKS FOR EMPLOYMENT PURPOSES 5, http://www.napbs.com/files/public/Learn_More/White_Papers/CriminalBackgroundChecks.pdf.

[21]    LEXISNEXIS, *supra* note 18, at 6. *See also* NAT'L ASS'N OF PROF'L BACKGROUND SCREENERS, *supra* note 20 at 5.

[22]    ERNST & ROSEN, *supra* note 17, at 1.

[23]    *Id.*

[24]    *See* SEARCH, THE NATIONAL TASK FORCE ON THE CRIMINAL BACKGROUNDING OF AMERICA 3, 4 (2005), http://www.search.org/files/pdf/ReportofNTFCBA.pdf. Registries and watch lists can also include federal and international terrorist watch lists, and registries of individuals who are being investigated for certain types of crimes, such as gang-related crimes. *Id. See also* LEXISNEXIS, *supra* note 18, at 5 (reporting that "all 50 states currently have a publicly available sex offender registry").

[25]    *See* U.S. DEP'T OF JUSTICE, THE ATTORNEY GENERAL'S REPORT ON CRIMINAL HISTORY

BACKGROUND CHECKS 4 (2006), http://www.justice.gov/olp/ag_bgchecks_report.pdf [hereinafter BACKGROUND CHECKS].  *See also* ERNST & ROSEN, *supra* note 17, at 2.

[26]    *See* NAT'L ASS'N OF PROF'L BACKGROUND SCREENERS, *supra* note 20, at 5.  *See also* LEXISNEXIS, *supra* note 18, at 5.

[27]    LEXISNEXIS, *supra* note 18, at 5.  *See also* AM. ASS'N OF COLLS. OF PHARMACY, REPORT OF THE AACP CRIMINAL BACKGROUND CHECK ADVISORY PANEL 6–7 (2006), http://www.aacp.org/resources/academicpolicies/admissionsguidelines/Documents/AACPBackgroundChkRpt.pdf.

[28]    AM. ASS'N OF COLLS. OF PHARMACY, *supra* note 27, at 6–7.

[29]    BACKGROUND CHECKS, *supra* note 25, at 4.

[30]    *Id.*

[31]    NAT'L ASS'N OF PROF'L BACKGROUND SCREENERS, *supra* note 20, at 5.

[32]    BACKGROUND CHECKS, *supra* note 25, at 4.

[33]    *Id.* at 3.

[34]    *See id.* ("Non-criminal justice screening using FBI criminal history records is typically done by a government agency applying suitability criteria that have been established by law or the responsible agency.").

[35]    *Id.* at 5.

[36]    *Id.* at 4.

[37]    DENNIS A. DEBACCO & OWEN M. GREENSPAN, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, SURVEY OF STATE CRIMINAL HISTORY INFORMATION SYSTEMS, 2010, at 2 (2011), https://www.ncjrs.gov/pdffiles1/bjs/grants/237253.pdf [hereinafter STATE CRIMINAL HISTORY].

[38]    *See* BACKGROUND CHECKS, *supra* note 25, at 17.

[39]    SEARCH, REPORT OF THE NATIONAL TASK FORCE ON THE COMMERCIAL SALE OF CRIMINAL JUSTICE RECORD INFORMATION 83 (2005), www.search.org/files/pdf/RNTFCSCJRI.pdf; *see also* Douglas Belkin, *More Job Seekers Scramble to Erase Their Criminal Past*, WALL ST. J., Nov. 11, 2009, at A1, *available at* http://online.wsj.com/article/SB125789494126242343.html?KEYWORDS=Douglas+Belkin ("Arrests that have been legally expunged may remain on databases that data-harvesting companies offer to prospective employers; such background companies are under no legal obligation to erase them.").

If applicants deny the existence of expunged or sealed records, as they are permitted to do in several states, they may appear dishonest if such records are reported in a criminal background check. *See generally* Debbie A. Mukamal & Paul N. Samuels, *Statutory Limitations on Civil Rights of People with Criminal Records*, 30 FORDHAM URB. L.J. 1501, 1509–10 (2003) (noting that 29 of the 40 states that allow expungement/sealing of arrest records permit the subject of the record to deny its existence if asked about it on employment applications or similar forms, and 13 of the 16 states that allow the expungement/sealing of adult conviction records permit the subject of the record to deny its existence under similar circumstances).

[40]    *See* SEARCH, INTERSTATE IDENTIFICATION NAME CHECK EFFICACY: REPORT OF THE NATIONAL TASK FORCE TO THE U.S. ATTORNEY GENERAL 21–22 (1999), www.search.org/files/pdf/III_Name_Check.pdf ("A so-called 'name check' is based not only on an individual's name, but also on other personal identifiers such as sex, race, date of birth and Social Security Number. . . . [N]ame checks are known to produce inaccurate results as a consequence of identical or similar names and other identifiers."); *id.* at 7 (finding that in a sample of 82,601 employment applicants, 4,562 of these individuals were *inaccurately* indicated by a "name check" to have criminal records, which represents approximately 5.5% of the overall sample).

[41]    BACKGROUND CHECKS, *supra* note 25, at 2.

[42]    A "consumer reporting agency" is defined by FCRA as "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information *or other information* on consumers for the purposes of furnishing consumer reports to third parties . . . ."  15 U.S.C. § 1681a(f) (emphasis added); *see also* BACKGROUND CHECKS, *supra* note 25, at 43 (stating that the records that CRAs collect include "criminal history information, such as arrest and conviction information").

[43]    A "consumer report" is defined by FCRA as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, *character, general reputation, personal characteristics*, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for . . . employment purposes . . . ." 15 U.S.C. § 1681a(d)(1) (emphasis added).

[44]    *See* 15 U.S.C. § 1681c(a)(2) ("[N]o consumer reporting agency may make any consumer report containing . . . records of arrest that, from date of entry, antedate the report by more than seven years or until the governing statute of limitations has expired, whichever is the longer period."). *But see id.* §1681c(b)(3) (stating that the reporting restrictions for arrest records do not apply to individuals who will earn "an annual salary which equals, or which may reasonably be expected to equal $75,000 or more").

[45]    15 U.S.C. § 1681c(a)(5) ("[N]o consumer reporting agency may make any consumer report containing . . . [a]ny other adverse item of information, other than records of convictions of crimes which antedates the report by more than seven years.").

[46]    BACKGROUND CHECKS, *supra* note 25, at 2.

[47]    *See* Adam Klein, *Written Testimony of Adam Klein*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/7-26-11/klein.cfm (last visited April 23, 2012) (describing how "several data-collection agencies also market and sell a retail-theft contributory database that is used by prospective employers to screen applicants").  *See also Retail Theft Database, ESTEEM, Workplace Theft Contributory Database*, LEXISNEXIS, http://www.lexisnexis.com/risk/solutions/retail-theft-contributory-database.aspx (last visited April 23, 2012) (stating that their database has "[t]heft and shoplifting cases supplied by more than 75,000 business locations across the country").  These databases may contain inaccurate and/or misleading information about applicants and/or employees.  *See generally* Goode v. LexisNexis Risk & Info. Analytics Grp., Inc., No. 2:11-CV-2950-JD, 2012 WL 975043 (E.D. Pa. Mar. 22, 2012) (unpublished).

[48]    BACKGROUND CHECKS, *supra* note 25, at 2.

[49]    SOC'Y FOR HUMAN RES. MGMT., BACKGROUND CHECKING: CONDUCTING CRIMINAL BACKGROUND CHECKS, slide 3 (Jan. 22, 2010), http://www.slideshare.net/shrm/background-check-criminal?from=share_email [hereinafter CONDUCTING CRIMINAL BACKGROUND CHECKS] (73% of the responding employers reported that they conducted criminal background checks on all of their job candidates, 19% reported that they conducted criminal background checks on selected job candidates, and a mere 7% reported that they did not conduct criminal background checks on any of their candidates).  The survey excluded the "not sure" responses from its analysis, which may account for the 1% gap in the total number of employer responses.  *Id.*

[50]    CONDUCTING CRIMINAL BACKGROUND CHECKS, *supra* note 49, at slide 7  (39% of the surveyed employers reported that they conducted criminal background checks "[t]o reduce/prevent theft and embezzlement, other criminal activity"); *see also* Sarah E. Needleman, *Businesses Say Theft by Their Workers is Up*, WALL ST. J., Dec. 11, 2008, at B8, *available at* http://online.wsj.com/article/SB122896381748896999.html.

[51]    CONDUCTING CRIMINAL BACKGROUND CHECKS, *supra* note 49, at slide 7 (61% of the surveyed employers reported that they conducted criminal background checks "[to] ensure a safe work environment for employees"); *see also* ERIKA HARRELL, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, WORKPLACE VIOLENCE, 1993–2009, at 1 (2011), http://bjs.ojp.usdoj.gov/content/pub/pdf/wv09.pdf (reporting that in 2009, "[n]onfatal violence in the workplace was about 15% of all nonfatal violent crime against persons age 16 or older").  *But see id.* (noting that from "2002 to 2009, the rate of nonfatal workplace violence has declined by 35%, following a 62% decline in the rate from 1993 to 2002").  Studies indicate that most workplace violence is committed by individuals with no relationship to the business or its employees.  *See id.* at 6 (reporting that between 2005 and 2009, strangers committed the majority of workplace violence against individuals (53% for males and 41% for females) while violence committed by co-workers accounted for a much smaller percentage (16.3% for males and 14.3% for females)); *see also* NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, CTR. FOR DISEASE CONTROL & PREVENTION, WORKPLACE VIOLENCE PREVENTION STRATEGIES AND RESEARCH

NEEDS 4, Table 1 (2006), http://www.cdc.gov/niosh/docs/2006-144/pdfs/2006-144.pdf (reporting that approximately 85% of the workplace homicides examined were perpetrated in furtherance of a crime by persons with no relationship to the business or its employees; approximately 7% were perpetrated by employees or former employees, 5% were committed by persons with a personal relationship to an employee, and 3% were perpetrated by persons with a customer-client relationship to the business).

[52] CONDUCTING CRIMINAL BACKGROUND CHECKS, *supra* note 49, at slide 7 (55% percent of the surveyed employers reported that they conducted criminal background checks "[t]o reduce legal liability for negligent hiring"). Employers have a common law duty to exercise reasonable care in hiring to avoid foreseeable risks of harm to employees, customers, and the public. If an employee engages in harmful misconduct on the job, and the employer has not exercised such care in selecting the employee, the employer may be subject to liability for negligent hiring. *See, e.g.*, Stires v. Carnival Corp., 243 F. Supp. 2d 1313, 1318 (M.D. Fla. 2002) ("[N]egligent hiring occurs when . . . the employer knew or should have known of the employee's unfitness, and the issue of liability primarily focuses upon the adequacy of the employer's pre-employment investigation into the employee's background.").

[53] CONDUCTING CRIMINAL BACKGROUND CHECKS, *supra* note 49, at slide 4 (40% of the surveyed employers reported that they conducted criminal background checks for "[j]ob candidates for positions for which state law requires a background check (e.g., day care teachers, licensed medical practitioners, etc.)"); *see id.* at slide 7 (20% of the employers reported that they conducted criminal background checks "[t]o comply with the applicable State law requiring a background check (e.g., day care teachers, licensed medical practitioners, etc.) for a particular position"). The study did not report the exact percentage of employers that conducted criminal background checks to comply with applicable federal laws or regulations, but it did report that 25% of the employers conducted background checks for "[j]ob candidates for positions involving national defense or homeland security." *Id.* at slide 4.

[54] *See* 42 U.S.C. § 2000e-2(a).

[55] Disparate treatment based on the race or national origin of job applicants with the same qualifications and criminal records has been documented. For example, a 2003 study demonstrated that White applicants with the same qualifications and criminal records as Black applicants were three times more likely to be invited for interviews than the Black applicants. *See* Devah Pager, *The Mark of a Criminal Record*, 108 AM. J. SOC. 937, 958, Figure 6 (2003), www.princeton.edu/~pager/pager_ajs.pdf. Pager matched pairs of young Black and White men as "testers" for her study. The "testers" in Pager's study were college students who applied for 350 low-skilled jobs advertised in Milwaukee-area classified advertisements, to test the degree to which a criminal record affects subsequent employment opportunities. The same study showed that White job applicants with a criminal record were called back for interviews more often than equally-qualified Black applicants who *did not have* a criminal record. *Id.* at 958. *See also* Devah Pager et al., *Sequencing Disadvantage: The Effects of Race and Criminal Background for Low Wage Job Seekers*, 623 ANNALS AM. ACAD. POL. & SOC. SCI., 199 (2009), www.princeton.edu/~pager/annals_sequencingdisadvantage.pdf (finding that among Black and

White testers with similar backgrounds and criminal records, "the negative effect of a criminal conviction is substantially larger for blacks than whites. . . . the magnitude of the criminal record penalty suffered by black applicants (60 percent) is roughly double the size of the penalty for whites with a record (30 percent)"); *see id.* at 200–201 (finding that personal contact plays an important role in mediating the effects of a criminal stigma in the hiring process, and that Black applicants are less often invited to interview, thereby having fewer opportunities to counteract the stigma by establishing rapport with the hiring official); Devah Pager, *Statement of Devah Pager, Professor of Sociology at Princeton University*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/11-20-08/pager.cfm (last visited April 23, 2012) (discussing the results of the *Sequencing Disadvantage* study); DEVAH PAGER & BRUCE WESTERN, NYC COMMISSION ON HUMAN RIGHTS, RACE AT WORK, REALITIES OF RACE AND CRIMINAL RECORD IN THE NYC JOB MARKET 6, Figure 2 (2006), http://www.nyc.gov/html/cchr/pdf/race_report_web.pdf (finding that White testers *with* a felony conviction were called back 13% of the time, Hispanic testers *without* a criminal record were called back 14% of the time, and Black testers *without* a criminal record were called back 10% of the time).

[56]   *Race & Color Discrimination*, *supra* note 15, § V.A.1.

[57]   A 2006 study demonstrated that employers who are averse to hiring people with criminal records sometimes presumed, in the absence of evidence to the contrary, that African American men applying for jobs have disqualifying criminal records.  Harry J. Holzer et al., *Perceived Criminality, Criminal Background Checks, and the Racial Hiring Practices of Employers*, 49 J.L. & ECON. 451 (2006), http://www.jstor.org/stable/pdfplus/10.1086/501089.pdf; *see also* HARRY HOLZER ET AL., URBAN INST., EMPLOYER DEMAND FOR EX-OFFENDERS: RECENT EVIDENCE FROM LOS ANGELES 6–7 (2003), http://www.urban.org/UploadedPDF/410779_ExOffenders.pdf (describing the results of an employer survey where over 40% of the employers indicated that they would "probably not" or "definitely not" be willing to hire an applicant with a criminal record).

[58]   The Commission has not done matched-pair testing to investigate alleged discriminatory employment practices.  However, it has issued an Enforcement Guidance that discusses situations where individuals or organizations file charges on the basis of matched-pair testing, among other practices.  *See generally Enforcement Guidance: Whether "Testers" Can File Charges and Litigate Claims of Employment Discrimination*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N (May 22, 1996), http://www.eeoc.gov/policy/docs/testers.html.

[59]   42 U.S.C. § 2000e-2(k)(1)(A)(i).  If an employer successfully demonstrates that its policy or practice is job related for the position in question and consistent with business necessity, a Title VII plaintiff may still prevail by demonstrating that there is a less discriminatory "alternative employment practice" that serves the employer's legitimate goals as effectively as the challenged practice but that the employer refused to adopt.  *Id.* § 2000e-2(k)(1)(A)(ii).

[60]   401 U.S. 424, 431–32 (1971).

[61]     *Id.* at 431.

[62]     The Civil Rights Act of 1991, Pub. L. No. 102-166, § 105; *see also* Lewis v. City of Chicago, 130 S. Ct. 2191 (2010) (reaffirming disparate impact analysis); Ricci v. DeStefano, 557 U.S. 557 (2009) (same).

[63]     42 U.S.C. § 2000e-2(k)(1)(A)(i).

[64]     The Commission presumes that employers use the information sought and obtained from its applicants and others in making an employment decision. *See* Gregory v. Litton Sys. Inc.,316 F. Supp. 401, 403 (C.D. Cal.1970). If an employer asserts that it did not factor the applicant's or employee's known criminal record into an employment decision, the EEOC will seek evidence supporting this assertion. For example, evidence that the employer has other employees from the same protected group with roughly comparable criminal records may support the conclusion that the employer did not use the applicant's or employee's criminal record to exclude him from employment.

[65]     Unif. Crime Reporting Program, Fed. Bureau of Investigation, Crime in the U.S. 2010, at Table 43a (2011), http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/table-43/10tbl43a.xls.

[66]     U.S. Census Bureau, The Black Population: 2010, at 3 (2011) , http://www.census.gov/prod/cen2010/briefs/c2010br-06.pdf (reporting that in 2010, "14 percent of all people in the United States identified as Black, either alone, or in combination with one or more races").

[67]     Accurate data on the number of Hispanics arrested and convicted in the United States is limited. *See* Nancy E. Walker et al., Nat'l Council of La Raza, Lost Opportunities: The Reality of Latinos in the U.S. Criminal Justice System 17–18 (2004), http://www.policyarchive.org/handle/10207/bitstreams/20279.pdf (explaining why "[i]t is very difficult to find any information – let alone accurate information – on the number of Latinos arrested  in the United States"). The Department of Justice's Bureau of Justice Statistics' (BJS) *Sourcebook of Criminal Justice Statistics* and the FBI's Crime Information Services Division do not provide data for arrests by ethnicity. *Id.* at 17. However, the U.S. Drug Enforcement Administration (DEA) disaggregates data by Hispanic and non-Hispanic ethnicity. *Id.* at 18. According to DOJ/BJS, from October 1, 2008 to September 30, 2009, 45.5% of drug arrests made by the DEA were of Hispanics or Latinos. Mark Motivans, Bureau of Justice Statistics, U.S. Dep't of Justice, Federal Justice Statistics, 2009 – Statistical Tables, at 6, Table 1.4 (2011), http://bjs.ojp.usdoj.gov/content/pub/pdf/fjs09.pdf. Accordingly, Hispanics were arrested for drug offenses by the DEA at a rate of three times their numbers in the general population. *See* U.S. Census Bureau, Overview of Race and Hispanic Origin: 2010, at 3 (2011), http://www.census.gov/prod/cen2010/briefs/c2010br-02.pdf (reporting that in 2010, "there were 50.5 million Hispanics in the United States, composing 16 percent of the total population"). However, national statistics indicate that Hispanics have similar or lower drug usage rates compared to Whites. *See, e.g.,* Substance Abuse & Mental Health Servs.

ADMIN., U.S. DEP'T OF HEALTH & HUMAN SERVS., RESULTS FROM THE 2010 NATIONAL SURVEY ON DRUG USE AND HEALTH: SUMMARY OF NATIONAL FINDINGS 21, Figure 2.10 (2011), http://oas.samhsa.gov/NSDUH/2k10NSDUH/2k10Results.pdf (reporting, for example, that the usage rate for Hispanics in 2009 was 7.9% compared to 8.8% for Whites).

[68]    *See, e.g.*, HUMAN RIGHTS WATCH, DECADES OF DISPARITY: DRUG ARRESTS AND RACE IN THE UNITED STATES 1 (2009), http://www.hrw.org/sites/default/files/reports/us0309web_1.pdf (noting that the "[t]he higher rates of black drug arrests do not reflect higher rates of black drug offending . . . . blacks and whites engage in drug offenses - possession and sales - at roughly comparable rates"); SUBSTANCE ABUSE & MENTAL HEALTH SERVS. ADMIN., U.S. DEP'T OF HEALTH & HUMAN SERVS., RESULTS FROM THE 2010 NATIONAL SURVEY ON DRUG USE AND HEALTH: SUMMARY OF NATIONAL FINDINGS 21 (2011), http://oas.samhsa.gov/NSDUH/2k10NSDUH/2k10Results.pdf (reporting that in 2010, the rates of illicit drug use in the United States among persons aged 12 or older were 10.7% for African Americans,  9.1% for Whites, and 8.1% for Hispanics); HARRY LEVINE & DEBORAH SMALL, N.Y. CIVIL LIBERTIES UNION, MARIJUANA ARREST CRUSADE: RACIAL BIAS AND POLICE POLICY IN NEW YORK CITY, 1997–2007, at 13–16 (2008), www.nyclu.org/files/MARIJUANA-ARREST-CRUSADE_Final.pdf (citing U.S. Government surveys showing that Whites use marijuana at higher rates than African Americans and Hispanics; however, the marijuana arrest rate of Hispanics is nearly three times the arrest rate of Whites, and the marijuana arrest rate of African Americans is five times the arrest rate of Whites).

[69]    PREVALENCE OF IMPRISONMENT, *supra* note 4, at 1, 8.  Due to the nature of available data, the Commission is using incarceration data as a proxy for conviction data.

[70]    *Id.*

[71]    *Id.*

[72]    MARC MAUER & RYAN S. KING, THE SENTENCING PROJECT, UNEVEN JUSTICE: STATE RATES OF INCARCERATION BY RACE AND ETHNICITY 10 (2007), www.sentencingproject.org/Admin%5CDocuments%5Cpublications%5Crd_stateratesofincbyraceandethnicity.pdf.

[73]    *Id.*

[74]    PAUL GUERINO ET AL., BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, PRISONERS IN 2010, at 27, Table 14 (2011), http://bjs.ojp.usdoj.gov/content/pub/pdf/p10.pdf (reporting that as of December 31, 2010, Black men were imprisoned at a rate of 3,074 per 100,000 Black male residents, Hispanic men were imprisoned at a rate of 1,258 per 100,000 Hispanic male residents, and White men were imprisoned at a rate of 459 per 100,000 White male residents); *cf.* ONE IN 31, *supra* note 4, at 5 ("Black adults are four times as likely as whites and nearly 2.5 times as likely as Hispanics to be under correctional control.  One in 11 black adults -- 9.2 percent -- was under correctional control [probation, parole, prison, or jail] at year end 2007.").

[75]    The Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. part 1607, provide that "[employers] should maintain and have available . . . information on [the] adverse impact of [their employment selection procedures]."  29 C.F.R. § 1607.15A.  "Where [an employer] has not maintained [such records, the EEOC] may draw an inference of adverse impact of the selection process from the failure of [the employer] to maintain such data . . . ." *Id.* § 1607.4D.

[76]    *See, e.g.*, El v. SEPTA, 418 F. Supp. 2d 659, 668–69 (E.D. Pa. 2005) (finding that the plaintiff established a prima facie case of disparate impact with evidence from the defendant's personnel records and national data sources from the U.S. Bureau of Justice Statistics and the Statistical Abstract of the U.S.), *aff'd on other grounds,* 479 F.3d 232 (3d Cir. 2007); Green v. Mo. Pac. R.R., 523 F.2d 1290, 1294–95 (8th Cir. 1975) (concluding that the defendant's criminal record exclusion policy had a disparate impact based on race by evaluating local population statistics and applicant data), *appeal after remand*, 549 F.2d 1158, 1160 (8th Cir. 1977).

[77]    457 U.S. 440, 442 (1982).

[78]    *Id.* at 453–54

[79]    433 U.S. 321, 330 (1977).

[80]    *See, e.g.*, Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 365 (1977) (stating that "[a] consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection").

[81]    42 U.S.C. § 2000e-2(k)(1)(A)(i).  *See* Griggs v. Duke Power Co., 401 U.S. 424 (1971). *See also* 42 U.S.C. § 2000e(m) (defining the term "demonstrates" to mean "meets the burdens of production and persuasion").

[82]    422 U.S. 405 (1975).

[83]    433 U.S. 321 (1977).

[84]    137 CONG. REC. 15273 (1991) (statement of Sen. Danforth) ("[T]he terms 'business necessity' and 'job related' are intended to reflect the concepts enunciated by the Supreme Court in *Griggs v. Duke Power Co*, and in the other Supreme Court decisions prior to *Wards Cove Packing Co. v. Atonio*." (citations omitted)).  Section 105(b) of the Civil Rights Act of 1991 provides that only the interpretive memorandum read by Senator Danforth in the Congressional Record may be considered legislative history or relied upon in construing or applying the business necessity standard.

[85]    401 U.S. at 431, 436.

[86]    422 U.S. at 430–31 (endorsing the EEOC's position that discriminatory tests are impermissible unless shown, by professionally acceptable methods, to predict or correlate with "'important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated'" (quoting 29 C.F.R. § 1607.4(c))).

[87]    433 U.S. at 331–32 (concluding that using height and weight as proxies for strength did not satisfy the business necessity defense because the employer failed to establish a correlation between height and weight and the necessary strength, and also did not specify the amount of strength necessary to perform the job safely and efficiently).

[88]    *Id.* at 331 n.14.

[89]    523 F.2d 1290, 1293 (8th Cir. 1975). "In response to a question on an application form, Green [a 29-year-old African American man] disclosed that he had been convicted in December 1967 for refusing military induction. He stated that he had served 21 months in prison until paroled on July 24, 1970." *Id.* at 1292–93.

[90]    Green v. Mo. Pac. R.R., 549 F.2d 1158, 1160 (8th Cir. 1977) (upholding the district court's injunction prohibiting the employer from using an applicant's conviction record as an absolute bar to employment but allowing it to consider a prior criminal record as a factor in making individual hiring decisions, as long as the defendant took these three factors into account).

[91]    *Id.* (referring to completion of the sentence rather than completion of parole).

[92]    *Id.*

[93]    479 F.3d 232 (3d Cir. 2007).

[94]    *Id.* at 235.

[95]    *Id.* at 235, 236.

[96]    *Id.* at 235.

[97]    *Id.* at 244.

[98]    *Id.* at 244–45.

[99]    *Id.* at 247. *Cf.* Shawn Bushway et al., *The Predictive Value of Criminal Background Checks: Do Age and Criminal History Affect Time to Redemption?*, 49 CRIMINOLOGY 27, 52 (2011) [hereinafter *The Predictive Value of Criminal Background Checks*] ("Given the results of the current as well as previous [recidivism] studies, the 40-year period put forward in *El v. SEPTA* (2007) . . . seems too old of a score to be still in need of settlement.").

*El*, 479 F.3d at 248.

101    Some states have enacted laws to limit employer inquiries concerning all or some arrest records.  *See* BACKGROUND CHECKS, *supra* note 25, at 48–49.  At least 13 states have statutes explicitly prohibiting arrest record inquiries and/or dissemination subject to certain exceptions. *See, e.g.*, Alaska (ALASKA STAT. § 12.62.160(b)(8)); Arkansas (ARK. CODE ANN. § 12-12-1009(c)); California (CAL. LAB. CODE § 432.7(a)); Connecticut (CONN. GEN. STAT. § 46a-80(e)); Illinois (775 ILL. COMP. STAT. § 5/2-103(A)) (dealing with arrest records that have been ordered expunged, sealed, or impounded); Massachusetts (MASS. GEN. LAWS ch. 151B § 4(9)); Michigan (MICH COMP. LAWS § 37.2205a(1) (applying to misdemeanor arrests only)); Nebraska (NEB. REV. STAT. § 29-3523(2)) (ordering no dissemination of arrest records under certain conditions and specified time periods)); New York (N.Y. EXEC. LAW § 296(16)); North Dakota (N.D. CENT. CODE § 12-60-16.6(2)); Pennsylvania (18 PA. CONS. STAT. § 9121(b)(2)); Rhode Island (R.I. GEN. LAWS § 28-5-7(7)), and Wisconsin (WIS. STAT. §§ 111.321, 111.335a).

102    *See* United States v. Armstrong, 517 U.S. 456, 464 (1996) (discussing federal prosecutors' broad discretionary authority to determine whether to prosecute cases and whether to bring charges before a grand jury); Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978) (explaining same for state prosecutors); *see also* THOMAS H. COHEN & TRACEY KYCKELHAHN, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, FELONY DEFENDANTS IN LARGE URBAN COUNTIES, 2006, at 10, Table 11 (2010), http://bjs.ojp.usdoj.gov/content/pub/pdf/fdluc06.pdf (reporting that in the 75 largest counties in the country, nearly one-third of the felony arrests did not result in a conviction because the charges against the defendants were dismissed).

103    Schware v. Bd. of Bar Exam'rs, 353 U.S. 232, 241 (1957) ("The mere fact that a [person] has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct."); United States. v. Hynes, 467 F.3d 951, 957 (6th Cir. 2006) (upholding a preliminary jury instruction that stated that a "defendant is presumed to be innocent unless proven guilty.  The indictment against the Defendant is only an accusation, nothing more.  It's not proof of guilt or anything else."); *see* Gregory v. Litton Sys. Inc., 316 F. Supp. 401, 403 (C.D. Cal. 1970) ("[I]nformation concerning a prospective employee's record of arrests without convictions, is irrelevant to [an applicant's] suitability or qualification for employment."), *modified on other grounds*, 472 F.2d 631 (9th Cir. 1972); Dozier v. Chupka, 395 F. Supp. 836, 850 n.10 (S.D. Ohio 1975) (stating that the use of arrest records was too crude a predictor of an employee's predilection for theft where there were no procedural safeguards to prevent reliance on unwarranted arrests); City of Cairo v. Ill. Fair Empl. Prac. Comm., 8 Empl. Prac. Dec. (CCH) ¶ 9682 (Ill. App. Ct. 1974) (concluding that, where applicants sought to become police officers, they could not be absolutely barred from appointment solely because they had been arrested, as distinguished from convicted); *see also* EEOC Dec. 74-83, ¶ 6424 (CCH) (1983) (finding no business justification for an employer's unconditional termination of all employees with arrest records (all five employees terminated were Black), purportedly to reduce thefts in the workplace; the employer produced no evidence that these particular employees had been involved in any of the thefts, or that all people who are arrested but not convicted are prone towards crime in the future); EEOC Dec. 76-87, ¶ 6665 (CCH) (1983) (holding that an applicant who sought to become a police officer could not be rejected based on one arrest five years earlier

for riding in a stolen car when he asserted that he did not know that the car was stolen and the charge was dismissed).

104    *See* STATE CRIMINAL HISTORY, *supra* note 37, at 2; *see also* BACKGROUND CHECKS, *supra* note 25, at 17.

105    *See supra* notes 39–40.

106    S*ee* Clark v. Arizona, 548 U.S. 735, 766 (2006) ("The first presumption [in a criminal case] is that a defendant is innocent unless and until the government proves beyond a reasonable doubt each element of the offense charged. . . ."). *See also* FED. R. CRIM P 11 (criminal procedure rule governing pleas).   The Supreme Court has concluded that criminal defendants have a Sixth Amendment right to effective assistance of counsel during plea negotiations.  *See generally* Lafler v. Cooper, 132 S. Ct. 1376  (2012); Missouri v. Frye, 132 S. Ct. 1399 (2012).

107    *See supra* text accompanying note 39.

108    *See e.g.*, HAW. REV. STAT. § 378-2.5(b).  Under this provision, the employer may withdraw the offer of employment if the prospective employee has a conviction record "that bears a rational relationship to the duties and responsibilities of the position." *Id.  See also* CONN. GEN. STAT. § 46a-80(b) ("[N]o employer . . . shall inquire about a prospective employee's past convictions until such prospective employee has been deemed otherwise qualified for the position."); MINN. STAT. § 364.021(a) ("[A] public employer may not inquire or consider the criminal record or criminal history of an applicant for public employment until the applicant has been selected for an interview by the employer.").  State fair employment practices agencies have information about applicable state law.

109    *See generally* NAT'L LEAGUE OF CITIES &  NAT'L EMP'T LAW PROJECT, CITIES PAVE THE WAY: PROMISING REENTRY POLICIES THAT PROMOTE LOCAL HIRING OF PEOPLE WITH CRIMINAL RECORDS (2010), www.nelp.org/page/-/SCLP/2010/CitiesPavetheWay.pdf?nocdn=1 (identifying local initiatives that address ways to increase employment opportunities for individuals with criminal records, including delaying a background check until the final stages of the hiring process, leveraging development funds, and expanding bid incentive programs to promote local hiring priorities); NAT'L EMP'T LAW PROJECT, CITY AND COUNTY HIRING INITIATIVES (2010), www.nelp.org/page/-/SCLP/CityandCountyHiringInitiatives.pdf (discussing the various city and county initiatives that have removed questions regarding criminal history from the job application and have waited until after a conditional offer of employment has been made to conduct a background check and inquire about the applicant's criminal background).

110    Several federal laws automatically prohibit employing individuals with certain felony convictions or, in some cases, misdemeanor convictions.  *See, e.g.*, 5 U.S.C. § 7371(b) (requiring the mandatory removal of any federal law enforcement officer who is convicted of a felony); 46 U.S.C. § 70105(c)(1)(A) (mandating that individuals who have been convicted of espionage, sedition, treason or terrorism be permanently disqualified from receiving a biometric transportation security card and thereby excluded from port work employment); 42 U.S.C.

§ 13726(b)(1) (disqualifying persons with felony convictions or domestic violence convictions from working for a private prisoner transport company); 25 U.S.C. § 3207(b) (prohibiting individuals with a felony conviction, or any of two or more misdemeanor convictions, from working with Indian children if their convictions involved crimes of violence, sexual assault, molestation, exploitation, contact or prostitution, crimes against persons, or offenses committed against children); 18 U.S.C. § 922(g)(1), (9) (prohibiting an individual convicted of a felony or a misdemeanor for domestic violence from possessing a firearm, thereby excluding such individual from a wide range of jobs that require such possession); 18 U.S.C. § 2381 (prohibiting individuals convicted of treason from "holding any office under the United States").  Other federal laws prohibit employing individuals with certain convictions for a defined time period.  *See, e.g.*, 5 U.S.C. § 7313(a) (prohibiting individuals convicted of a felony for inciting a riot or civil disorder from holding any position in the federal government for five years after the date of the conviction); 12 U.S.C. § 1829 (requiring a ten-year ban on employing individuals in banks if they have certain financial-related convictions); 49 U.S.C. § 44936(b)(1)(B) (imposing a ten-year ban on employing an individual as a security screener for an air carrier if that individuals has been convicted of specified crimes).

[111]     *See* 29 C.F.R. § 1607.5 (describing the general standards for validity studies).

[112]     *Id.*

[113]     *Id.* § 1607.6B.  The following subsections state:

> (1) *Where informal or unscored procedures are used.* When an informal or unscored selection procedure which has an adverse impact is utilized, the user should eliminate the adverse impact, or modify the procedure to one which is a formal, scored or quantified measure or combination of measures and then validate the procedure in accord with these guidelines, or otherwise justify continued use of the procedure in accord with Federal law.
> (2) *Where formal and scored procedures are used.* When a formal and scored selection procedure is used which has an adverse impact, the validation techniques contemplated by these guidelines usually should be followed if technically feasible. Where the user cannot or need not follow the validation techniques anticipated by these guidelines, the user should either modify the procedure to eliminate adverse impact or otherwise justify continued use of the procedure in accord with Federal law.

> *Id.* § 1607.6A, B(1)–(2).

[114]     *See, e.g.,* Brent W. Roberts et al., *Predicting the Counterproductive Employee in a Child-to-Adult Prospective Study*, 92 J. APPLIED PSYCHOL. 1427, 1430 (2007), http://internal.psychology.illinois.edu/~broberts/Roberts,%20Harms,%20Caspi,%20&%20Moffitt,%202007.pdf (finding that in a study of New Zealand residents from birth to age 26, "[a]dolescent criminal convictions were unrelated to committing counterproductive activities at work [such as tardiness, absenteeism, disciplinary problems, etc.]. In fact, according to the

[results of the study], people with an adolescent criminal conviction record were less likely to get in a fight with their supervisor or steal things from work.").

115    *See* OHIO REV. CODE ANN. § 2913.02.

116    523 F.2d at 1298 (stating that "[w]e cannot conceive of any business necessity that would automatically place every individual convicted of any offense, except a minor traffic offense, in the permanent ranks of the unemployed").

117    479 F.3d at 247.

118    *See, e.g.*, Keith Soothill & Brian Francis, *When do Ex-Offenders Become Like Non-Offenders?*, 48 HOWARD J. OF CRIM. JUST., 373, 380–81 (2009) (examining conviction data from Britain and Wales, a 2009 study found that the risk of recidivism declined for the groups with prior records and eventually converged within 10 to 15 years with the risk of those of the nonoffending comparison groups); Alfred Blumstein & Kiminori Nakamura, *Redemption in the Presence of Widespread Criminal Background Checks,* 47 CRIMINOLOGY 327 (2009) (concluding that there may be a "point of redemption" (i.e., a point in time where an individual's risk of re-offending or re-arrest is reasonably comparable to individuals with no prior criminal record) for individuals arrested for certain offenses if they remain crime free for a certain number of years); Megan C. Kurlychek, Robert Brame & Shawn D. Bushway, *Enduring Risk? Old Criminal Records and Predictions of Future Criminal Involvement*, 53 CRIME & DELINQUENCY 64 (2007) (analyzing juvenile police contacts and Racine, Wisconsin police contacts for an aggregate of crimes for 670 males born in 1942 and concluding that, after seven years, the risk of a new offense approximates that of a person without a criminal record); Megan C. Kurlychek et al., *Scarlet Letters and Recidivism: Does an Old Criminal Record Predict Future Offending?*, 5 CRIMINOLOGY & PUB. POL'Y 483 (2006) (evaluating juvenile police contacts and arrest dates from Philadelphia police records for an aggregate of crimes for individuals born in 1958, a 2006 study concluded that the risk of recidivism decreases over time and that, six or seven years after an arrest, an individual's risk of re-arrest approximates that of an individual who has never been arrested).

119    *Griggs*, 401 U.S. at 431.

120    523 F.2d at 1298; *see also* Field v. Orkin Extermination Co., No. Civ. A. 00-5913, 2002 WL 32345739, at *1 (E.D. Pa. Feb. 21, 2002) (unpublished) ("[A] blanket policy of denying employment to any person having a criminal conviction is a [*per se*] violation of Title VII."). The only exception would be if such an exclusion were required by federal law or regulation. *See, e.g., supra* note 110.

121    *Cf. Field*, 2002 WL 32345739, at *1.  In *Field*, an employee of ten years was fired after a new company that acquired her former employer discovered her 6-year-old felony conviction. The new company had a blanket policy of firing anyone with a felony conviction less than 10 years old.  The court granted summary judgment for the employee because the employer's argument that her conviction was related to her job qualifications was "weak at best," especially

given her positive employment history with her former employer. *Id.*

[122] Recidivism rates tend to decline as ex-offenders' ages increase. A 2011 study found that an individual's age at conviction is a variable that has a "substantial and significant impact on recidivism." *The Predictive Value of Criminal Background Checks*, *supra* note 99, at 43. For example, the 26-year-olds in the study, with no prior criminal convictions, had a 19.6% chance of reoffending in their first year after their first conviction, compared to the 36-year-olds who had an 8.8% chance of reoffending during the same time period, and the 46-year-olds who had a 5.3% of reoffending. *Id.* at 46. *See also* PATRICK A. LANGAN & DAVID J. LEVIN, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, SPECIAL REPORT: RECIDIVISM OF PRISONERS RELEASED IN 1994, at 7 (2002), http://bjs.ojp.usdoj.gov/content/pub/pdf/rpr94.pdf (finding that, although 55.7% of ex-offenders aged 14–17 released in 1994 were reconvicted within three years, the percentage declined to 29.7% for ex-offenders aged 45 and older who were released the same year).

Consideration of an applicant's age at the time the offense occurred or at his release from prison would benefit older individuals and, therefore, would not violate the Age Discrimination in Employment Act of 1967, *as amended,* 29 U.S.C. § 621 *et seq.* *See* Age Discrimination in Employment Act, 29 C.F.R. § 1625.2 ("Favoring an older individual over a younger individual because of age is not unlawful discrimination under the ADEA, even if the younger individual is at least 40 years old."); *see also* Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 600 (2004) (concluding that the ADEA does not preclude an employer from favoring an older employee over a younger one within the protected age group).

[123] *See* Laura Moskowitz, *Statement of Laura Moskowitz, Staff Attorney, National Employment Law Project's Second Chance Labor Project*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/11-20-08/moskowitz.cfm (last visited April 23, 2012) (stating that one of the factors that is relevant to the assessment of an ex-offender's risk to a workplace and to the business necessity analysis, is the "length and consistency of the person's work history, including whether the person has been recently employed"; also noting that various studies have "shown a strong relationship between employment and decreases in crime and recidivism"). *But see* Stephen J. Tripodi et al., *Is Employment Associated With Reduced Recidivism?: The Complex Relationship Between Employment and Crime*, 54 INT'L J. OF OFFENDER THERAPY AND COMP. CRIMINOLOGY 716, 716 (2010) (finding that "[b]ecoming employed after incarceration, although apparently providing initial motivation to desist from crime, does not seem to be on its own sufficient to prevent recidivism for many parolees").

[124] *See* WENDY ERISMAN & JEANNE BAYER CONTARDO, INST. FOR HIGHER EDUC. POLICY, LEARNING TO REDUCE RECIDIVISM: A 50 STATE ANALYSIS OF POSTSECONDARY CORRECTIONAL EDUCATION 5 (2005), http://www.ihep.org/assets/files/publications/g-l/LearningReduceRecidivism.pdf (finding that increasing higher education for prisoners enhances their prospects for employment and serves as a cost-effective approach to reducing recidivism); *see also* John H. Laud & Robert J. Sampson, *Understanding Desistance from Crime*, 28 CRIME & JUST. 1, 17–24 (2001), http://www.ncjrs.gov/pdffiles1/Digitization/192542-192549NCJRS.pdf (stating that factors associated with personal rehabilitation and social

stability, such as stable employment, family and community involvement, and recovery from substance abuse, are correlated with a decreased risk of recidivism).

125    Some employers have expressed a greater willingness to hire ex-offenders who have had an ongoing relationship with third party intermediary agencies that provide supportive services such as drug testing, referrals for social services, transportation, child care, clothing, and food. *See* Amy L. Solomon et al., *From Prison to Work: The Employment Dimensions of Prisoner Reentry*, 2004 URBAN INST. 20, http://www.urban.org/UploadedPDF/411097_From_Prison_to_Work.pdf.    These types of services can help ex-offenders avoid problems that may interfere with their ability to obtain and maintain employment.  *Id.*; *see generally* Victoria Kane, *Transcript of 7-26-11 Meeting,* U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/7-26-11/transcript.cfm#kane (last visited April 23, 2012) (describing why employers should partner with organizations that provide supportive services to ex-offenders).

126    *See generally* REENTRY MYTHBUSTER! ON FEDERAL BONDING PROGRAM, *supra* note 16; *Work Opportunity Tax Credit (WOTC),* EMP'T & TRAINING ADMIN., U.S. DEP'T OF LABOR, http://www.doleta.gov/business/incentives/opptax/ (last visited April 3, 2012); *Directory of State Bonding Coordinators*, EMP'T & TRAINING ADMIN., U.S. DEP'T OF LABOR, http://www.doleta.gov/usworkforce/onestop/FBPContact.cfm (last visited April 3, 2012); *Federal Bonding Program - Background*, U.S. DEP'T OF LABOR, http://www.bonds4jobs.com/program-background.html (last visited April 3, 2012);  *Bureau of Prisons: UNICOR's Federal Bonding Program,* http://www.bop.gov/inmate_programs/itb_bonding.jsp (last visited April 3, 2012).

127    This example is loosely based on a study conducted by Alfred Blumstein and Kiminori Nakamura measuring the risk of recidivism for individuals who have committed burglary, robbery, or aggravated assault.  *See* Blumstein & Nakamura, *supra* note 118.

128    42 U.S.C. § 2000e-2(k)(1)(A)(ii), (C).  *See also* Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 998 (1988).

129    *See* Exec. Order No. 12,067, 3 C.F.R. 206 (1978 Comp.).

130    *See* 49 U.S.C. §§ 44935(e)(2)(B), 44936(a)(1), (b)(1).  The statute mandates a criminal background check.

131    *See* 5 U.S.C. § 7371(b) (requiring mandatory removal from employment of law enforcement officers convicted of felonies).

132    *See* 42 U.S.C. § 13041(c) ("Any conviction for a sex crime, an offense involving a child victim, or a drug felony may be grounds for denying employment or for dismissal of an employee. . . .").

133    12 U.S.C. § 1829.

[134]   46 U.S.C. § 70105(c).

[135]   Other jobs and programs subject to federally-imposed restrictions based on criminal convictions include the business of insurance (18 U.S.C. § 1033(e)), employee benefits employee (29 U.S.C. § 1111(a)), participation in Medicare and state health care programs (42 U.S.C. § 1320a-7(a)–(b)), defense contractor (10 U.S.C. § 2408(a)), prisoner transportation (42 U.S.C. § 13726b(b)(1)), and court-imposed occupational restrictions (18 U.S.C. §§ 3563(b)(5), 3583(d)).  This list is not meant to be exhaustive.

[136]   *See, e.g.*, federal statutes governing commercial motor vehicle operator's licenses (49 U.S.C. § 31310(b)-(h)), locomotive operator licenses (49 U.S.C. § 20135(b)(4)(B)), and certificates, ratings, and authorizations for pilots, flight instructors, and ground instructors (49 U.S.C. §§ 44709(b)(2), 44710(b), 4711(c); 14 C.F.R. § 61.15).

[137]   *See, e.g.*, federal statutes governing loan originator licensing/registration (12 U.S.C. § 5104(b)(2)), registration of brokers and dealers (15 U.S.C. § 78o(b)(4)(B)), registration of commodity dealers (7 U.S.C. § 12a(2)(D), (3)(D), (E), (H)), and registration of investment advisers (15 U.S.C. § 80b-3(e)(2)-(3), (f)).

[138]   *See, e.g.*, custom broker's licenses (19 U.S.C. § 1641(d)(1)(B)), export licenses (50 U.S.C. App. § 2410(h)), and arms export (22 U.S.C. § 2778(g)).

[139]   *See, e.g.*, grain inspector's licenses (7 U.S.C. § 85), merchant mariner's documents, licenses, or certificates of registry (46 U.S.C. § 7503(b)), licenses to import, manufacture, or deal in explosives or permits to use explosives (18 U.S.C. § 843(d)), and farm labor contractor's certificates of registration (29 U.S.C. § 1813(a)(5)).  This list of federally-imposed restrictions on occupational licenses and registrations for individuals with certain criminal convictions is not meant to be exhaustive.  For additional information, please consult the relevant federal agency or department.

[140]   *See* 12 U.S.C. § 1829(a)(1).  The statute imposes a ten-year ban for individuals who have been convicted of certain financial crimes such as corruption involving the receipt of commissions or gifts for procuring loans (18 U.S.C. § 215), embezzlement or theft by an officer/employee of a lending, credit, or insurance institution (18 U.S.C § 657), false or fraudulent statements by an officer/employee of the federal reserve or a depository institution (18 U.S.C. § 1005), or fraud by wire, radio, or television that affects a financial institution (18 U.S.C. § 1343), among other crimes.  *See* 12 U.S.C. § 1829(a)(2)(A)(i)(I), (II).  Individuals who have either been convicted of the crimes listed in § 1829(a)(2)(A), or conspiracy to commit those crimes, will not receive an exception to the application of the 10-year ban from the FDIC. 12 U.S.C. § 1829(a)(2)(A).

[141]   *See* Fed. Deposit Ins. Corp., FDIC Statement of Policy For Section 19 of the FDI Act, § C, "Procedures" (amended May 13, 2011), http://www.fdic.gov/regulations/laws/rules/5000-1300.html [hereinafter FDIC Policy]; *see also*

Statement of Policy, 63 Fed. Reg. 66,177, 66,184 (Dec. 1, 1998); Clarification of Statement of Policy, 76 Fed. Reg. 28,031 (May 13, 2011) (clarifying the FDIC's Statement of Policy for Section 19 of the FDI Act).

"Approval is automatically granted and an application [for a waiver] will not be required where [an individual who has been convicted of] the covered offense [criminal offenses involving dishonesty, breach of trust, or money laundering] . . . meets all of the ["*de minimis*"] criteria" set forth in the FDIC's Statement of Policy. FDIC POLICY, *supra*, § B (5). These criteria include the following: (1) there is only one conviction or program of record for a covered offense; (2) the offense was punishable by imprisonment for a term of one year or less and/or a fine of $1,000 or less, and the individual did not serve time in jail; (3) the conviction or program was entered at least five years prior to the date an application would otherwise be required; and (4) the offense did not involve an insured depository institution or insured credit union. *Id.* Additionally, an individual's conviction for writing a "bad" check will be considered a *de minimis* offense, even if it involved an insured depository institution or insured credit union, if: (1) all other requirements of the *de minimis* offense provisions are met; (2) the aggregate total face value of the bad or insufficient funds check(s) cited in the conviction was $1000 or less; and (3) no insured depository institution or insured credit union was a payee on any of the bad or insufficient funds checks that were the basis of the conviction. *Id.*

[142]    *See* FDIC POLICY, *supra* note 141, § C, "PROCEDURES."

[143]    *Id. But cf.* NAT'L H.I.R.E. NETWORK, PEOPLE WITH CRIMINAL RECORDS WORKING IN FINANCIAL INSTITUTIONS: THE RULES ON FDIC WAIVERS, http://www.hirenetwork.org/FDIC.html ("Institutions rarely seek a waiver, except for higher level positions when the candidate is someone the institution wants to hire. Individuals can only seek FDIC approval themselves if they ask the FDIC to waive the usual requirement. Most individuals probably are unaware that they have this right."); FED. DEPOSIT INSUR. CORP. 2010 ANNUAL REPORT, § VI.A: KEY STATISTICS, FDIC ACTIONS ON FINANCIAL INSTITUTION APPLICATIONS 2008–2010 (2011), http://www.fdic.gov/about/strategic/report/2010annualreport/chpt6-01.html (reporting that between 2008 and 2010, the FDIC approved a total of 38 requests for consent to employ individuals with covered offenses in their background; the agency did not deny any requests during this time period).

[144]    FDIC POLICY, *supra* note 141, § D, "EVALUATION OF SECTION 19 APPLICATIONS" (listing the factors that are considered in this waiver review process, which include: (1) the nature and circumstances underlying the offense; (2) "[e]vidence of rehabilitation including the person's reputation since the conviction . . . the person's age at the time of conviction . . . and the time which has elapsed since the conviction"; (3) the position to be held in the insured institution; (4) the amount of influence/control the individual will be able to exercise over management affairs; (5) management's ability to control and supervise the individual's activities; (6) the degree of ownership the individual will have in the insured institution; (7) whether the institution's fidelity bond coverage applies to the individual; (8) the opinion of the applicable federal and/or state regulators; and (9) any other relevant factors).

0050

[145] *See* 49 C.F.R. §§ 1515.7 (describing the procedures for waiver of criminal offenses, among other standards), 1515.5 (explaining how to appeal the Initial Determination of Threat Assessment based on a criminal conviction).  In practice, some worker advocacy groups have criticized the TWIC appeal process due to prolonged delays, which leaves many workers jobless; especially workers of color.  *See generally* MAURICE EMSELLEM ET AL., NAT'L EMP'T LAW PROJECT, A SCORECARD ON THE POST-911 PORT WORKER BACKGROUND CHECKS: MODEL WORKER PROTECTIONS PROVIDE A LIFELINE FOR PEOPLE OF COLOR, WHILE MAJOR TSA DELAYS LEAVE THOUSANDS JOBLESS DURING THE RECESSION (2009), http://nelp.3cdn.net/2d5508b4cec6e13da6_upm6b20e5.pdf.

      The Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 6201, 124 Stat. 721 (2010) (the Act) includes a process to appeal or dispute the accuracy of information obtained from criminal records.  The Act requires participating states to perform background checks on applicants and current employees who have direct access to patients in long-term care facilities, such as nursing homes, to determine if they have been convicted of an offense or have other disqualifying information in their background, such as a finding of patient or resident abuse, that would disqualify them from employment under the Social Security Act or as specified by state law.  *See* 42 U.S.C. § 1320a-7l(a)(3)(A), (a)(4)(B), (6)(A)–(E).  The background check involves an individualized assessment of the relevance of a conviction or other disqualifying information. The Act protects applicants and employees in several ways, for example, by: (1) providing a 60-day provisional period of employment for the prospective employee, pending the completion of the criminal records check; (2) providing an independent process to appeal or dispute the accuracy of the information obtained in the criminal records check; and (3) allowing the employee to remain employed (subject to direct on-site supervision) during the appeals process. 42 U.S.C. § 1320a-7l(a)(4)(B)(iii), (iv).

[146] *See* 46 U.S.C. § 70105(d); *see generally* TWIC Program, 49 C.F.R. § 1572.103 (listing the disqualifying offenses for maritime and land transportation security credentials, such as convictions and findings of not guilty by reason of insanity for espionage, murder, or unlawful possession of an explosive; also listing temporarily disqualifying offenses, within seven years of conviction or five years of release from incarceration, including dishonesty, fraud, or misrepresentation (expressly excluding welfare fraud and passing bad checks), firearms violations, and distribution, intent to distribute, or importation of controlled substances).

[147] 46 U.S.C. § 70105(c)(1)(A)–(B).

[148] 46 U.S.C. § 70105(c)(1)(B)(iii).

[149] *See* 46 U.S.C. § 70105(c)(1)(A)(iv) (listing "Federal crime of terrorism" as a permanent disqualifying offense); *see also* 18 U.S.C. § 2332b(g)(5)(B) (defining "Federal crime of terrorism" to include the use of weapons of mass destruction under § 2332a).

[150] *See* 49 C.F.R. § 1515.7(a)(i) (explaining that only certain applicants with disqualifying crimes in their backgrounds may apply for a waiver; these applicants do not include individuals

who have been convicted of a Federal crime of terrorism as defined by 18 U.S.C. § 2332b(g)).

[151]    These positions are defined as "national security positions" and include positions that "involve activities of the Government that are concerned with the protection of the nation from foreign aggression or espionage, including development of defense plans or policies, intelligence or counterintelligence activities, and related activities concerned with the preservation of the military strength of the United States" or "require regular use of, or access to, classified information." 5 C.F.R. § 732.102(a)(1)–(2). The requirements for "national security positions" apply to competitive service positions, Senior Executive Service positions filled by career appointment within the Executive Branch, and excepted service positions within the Executive Branch. *Id.* § 732.102(b). The head of each Federal agency can designate any position within that department or agency as a "sensitive position" if the position "could bring about, by virtue of the nature of the position, a material adverse effect on the national security." *Id.* § 732.201(a). Designation of a position as a "sensitive position" will fall under one of three sensitivity levels: Special-Sensitive, Critical-Sensitive, or Noncritical-Sensitive. *Id.*

[152]    *See* Exec. Order No. 12,968, § 3.1(b), 3 C.F.R. 391 (1995 Comp.):

> [E]ligibility for access to classified information shall be granted only to employees who are United States citizens for whom an appropriate investigation has been completed and whose personal and professional history affirmatively indicates loyalty to the United States, strength of character, trustworthiness, honestly, reliability, discretion, and sound judgment, as well as freedom from conflicting allegiances and potential for coercion, and willingness and ability to abide by regulations governing the use, handling, and protection of classified information. A determination of eligibility for access to such information is a discretionary security decision based on judgments by appropriately trained adjudicative personnel. Eligibility shall be granted only where facts and circumstances indicate access to classified information is clearly consistent with the national security interests of the United States, and any doubt shall be resolved in favor of the national security.

[153]    42 U.S.C. § 2000e-2(g); *see, e.g.*, Bennett v. Chertoff, 425 F.3d 999, 1001 (D.C. Cir. 2005) ("[E]mployment actions based on denial of a security clearance are not subject to judicial review, including under Title VII."); Ryan v. Reno, 168 F.3d 520, 524 (D.C. Cir. 1999) ("[A]n adverse employment action based on denial or revocation of a security clearance is not actionable under Title VII.").

[154]    *See Policy Guidance on the use of the national security exception contained in § 703(g) of Title VII of the Civil Rights Act of 1964, as amended*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, § II, *Legislative History* (May 1, 1989), http://www.eeoc.gov/policy/docs/national_security_exemption.html ("[N]ational security requirements must be applied equally without regard to race, sex, color, religion or national origin."); *see also* Jones v. Ashcroft, 321 F. Supp. 2d 1, 8 (D.D.C. 2004) (indicating that the

national security exception did not apply because there was no evidence that the government considered national security as a basis for its decision not to hire the plaintiff at any time before the commencement of the plaintiff's lawsuit, where the plaintiff had not been forthright about an arrest).

155    Federal contractor employees may challenge the denial of a security clearance with the EEOC or the Office of Contract Compliance Programs when the denial is based on race, color, religion, sex, or national origin.  *See generally* Exec. Order No. 11,246, 3 C.F.R. 339 (1964–1965 Comp.).

156    42 U.S.C. § 2000e-16(a).

157    Robert H. Shriver, III, *Written Testimony of Robert H. Shriver, III, Senior Policy Counsel for the U.S. Office of Personnel Management*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/7-26-11/shriver.cfm (last visited April 23, 2012) (stating that "with just a few exceptions, criminal convictions do not automatically disqualify an applicant from employment in the competitive civil service"); *see also* REENTRY MYTHBUSTER! ON FEDERAL HIRING POLICIES, *supra* note 16 ("The Federal Government employs people with criminal records with the requisite knowledge, skills and abilities.").  *But see supra* note 110, listing several federal statutes that prohibit individuals with certain convictions from working as federal law enforcement officers or port workers, or with private prisoner transport companies.

158    OPM has jurisdiction to establish the federal government's suitability policy for competitive service positions, certain excepted service positions, and career appointments in the Senior Executive Service.  *See* 5 C.F.R. §§ 731.101(a) (stating that OPM has been directed "to examine 'suitability' for competitive Federal employment"), 731.101(b) (defining the covered positions within OPM's jurisdiction); *see also* Shriver, *supra* note 157.

OPM is also responsible for establishing standards that help agencies decide whether to grant their employees and contractor personnel long-term access to federal facilities and information systems.  *See* Homeland Security Presidential Directive 12: Policy for a Common Identification Standard for Federal Employees and Contractors, 2 PUB. PAPERS 1765 (Aug. 27, 2004) ("establishing a mandatory, Government-wide standard for secure and reliable forms of identification issued by the Federal Government to its employees and contractors [including contractor employees]"); *see also* Exec. Order No. 13,467, § 2.3(b), 3 C.F.R. 196 (2009 Comp.) ("[T]he Director of [OPM] . . . [is] responsible for developing and implementing uniform and consistent policies and procedures to ensure the effective, efficient, and timely completion of investigations and adjudications relating to determinations of suitability and eligibility for logical and physical access."); *see generally* Shriver, *supra* note 157.

159    5 C.F.R. § 731.101(a).

160    *See* 5 C.F.R. §§ 731.205(a) (stating that if an agency finds applicants unsuitable based on the factors listed in 5 C.F.R. § 731.202, it may, in its discretion, bar those applicants from federal employment for three years),  § 731.202(b) (disqualifying factors from federal civilian

employment may include: misconduct or negligence in employment; material, intentional false statement, or deception or fraud in examination or appointment; refusal to furnish testimony as required by 5 C.F.R. § 5.4; alcohol abuse without evidence of substantial rehabilitation; illegal use of narcotics, drugs, or other controlled substances; and knowing and willful engagement in acts or activities designed to overthrow the U.S. Government by force).

[161]    *See id.* § 731.202(c).

[162]    *Id.*

[163]    *See generally* Shriver, *supra* note 157.  *See also* REENTRY MYTHBUSTER! ON FEDERAL HIRING POLICIES, *supra* note 16 ("Consistent with Merit System Principles, [federal] agencies [and departments] are required to consider people with criminal records when filling positions if they are the best candidates and can comply with requirements.").

[164]    *See generally EEOC Informal Discussion Letter* (March 19, 2007), http://www.eeoc.gov/eeoc/foia/letters/2007/arrest_and_conviction_records.html#N1 (discussing the EEOC's concerns with changes to OPM's suitability regulations at 5 CFR part 731).

[165]    *See* Stephen Saltzburg, *Transcript of 7-26-11 Meeting*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/7-26-11/transcript.cfm#saltzburg (last visited April 23, 2012) (discussing the findings from the American Bar Association's (ABA) Collateral Consequences of Conviction Project, which found that in 17 states that it has examined to date, 84% of the collateral sanctions against ex-offenders relate to employment).  For more information about the ABA's project, visit: Janet Levine, *ABA Criminal Justice Section Collateral Consequences Project*, INST. FOR SURVEY RESEARCH, TEMPLE UNIV., http://isrweb.isr.temple.edu/projects/accproject/ (last visited April 20, 2012).  In April 2011, Attorney General Holder sent a letter to every state Attorney General, with a copy to every Governor, asking them to "evaluate the collateral consequences" of criminal convictions in their state, such as employment-related restrictions on ex-offenders, and "to determine whether those [consequences] that impose burdens on individuals . . . without increasing public safety should be eliminated."  Letter from Eric H. Holder, Jr., Att'y Gen., Dep't of Justice, to state Attorney Generals and Governors (April 18, 2011), http://www.nationalreentryresourcecenter.org/documents/0000/1088/Reentry_Council_AG_Letter.pdf.

Most states regulate occupations that involve responsibility for vulnerable citizens such as the elderly and children. *See* STATE CRIMINAL HISTORY, *supra* note 37, at 10 ("Fifty states and the District of Columbia reported that criminal history background checks are legally required" for several occupations such as nurses/elder caregivers, daycare providers, caregivers in residential facilities, school teachers, and nonteaching school employees).  For example, Hawaii's Department of Human Services may deny applicants licensing privileges to operate a childcare facility if: (1) the applicant or any prospective employee has been convicted of a crime other than a minor traffic violation or has been confirmed to have abused or neglected a child or threatened harm; and (2) the department finds that the criminal history or child abuse record of

the applicant or prospective employee may pose a risk to the health, safety, or well-being of children.  *See* HAW. REV. STAT. § 346-154(e)(1)–(2).

<sup>166</sup>    42 U.S.C. § 2000e-7.

<sup>167</sup>    *See* Int'l Union v. Johnson Controls, Inc., 499 U.S. 187, 210 (1991) (noting that "[i]f state tort law furthers discrimination in the workplace and prevents employers from hiring women who are capable of manufacturing the product as efficiently as men, then it will impede the accomplishment of Congress' goals in enacting Title VII"); Gulino v. N.Y. State Educ. Dep't, 460 F.3d 361, 380 (2d Cir. 2006) (affirming the district court's conclusion that "the mandates of state law are no defense to Title VII liability").



| EEOC | DIRECTIVES TRANSMITTAL | Number 915.003 |
| --- | --- | --- |
| | | Date 4/19/06 |

**SUBJECT:**  EEOC COMPLIANCE MANUAL

**PURPOSE:**  This transmittal covers the issuance of Section 15 of the new Compliance Manual, on "Race and Color Discrimination." The Manual Section provides guidance on analyzing charges of race and color discrimination under Title VII of the Civil Rights Act of 1964.

**ORIGINATOR:**  Office of Legal Counsel, Title VII/ADEA/EPA Division

**EFFECTIVE DATE:**  Upon receipt

**DISTRIBUTION:**  EEOC Compliance Manual holders

_____/S/_____

Cari M. Dominguez
Chair

# SECTION 15: RACE and COLOR DISCRIMINATION
## TABLE OF CONTENTS

15-I OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

15-II WHAT IS "RACE" DISCRIMINATION? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

15-III WHAT IS "COLOR" DISCRIMINATION? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

15-IV RELATED PROTECTED BASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    A.       NATIONAL ORIGIN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    B.       RELIGION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    C.       INTERSECTIONAL DISCRIMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

15-V EVALUATING EMPLOYMENT DECISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    A.       RACIAL DISPARATE TREATMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        1.      Recognizing Racial Motive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        2.      Conducting a Thorough Investigation . . . . . . . . . . . . . . . . . . . . . . 13
            •    Potential Evidence of Racial Disparate Treatment
            •    Employer Credibility
        3.      Recognizing "Pattern or Practice" Race Discrimination . . . . . . . . . 19
    B.       RACIAL DISPARATE IMPACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

15-VI EQUAL ACCESS TO JOBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    A.       RECRUITING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        1.      Job Advertisements and Employment Agencies . . . . . . . . . . . . . . 23
        2.      Word-of-Mouth Referrals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        3.      Homogeneous Recruitment Sources . . . . . . . . . . . . . . . . . . . . . . 24
        4.      Discriminatory Screening of Recruits . . . . . . . . . . . . . . . . . . . . . 24
    B.       HIRING AND PROMOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        1.      Uniform and Consistently Applied Standards . . . . . . . . . . . . . . . . 25
        2.      Job-Related Standards, Consistent with Business Necessity . . . . . . . 27
            •    Education Requirements
            •    Employment Testing
            •    Conviction and Arrest Records
    C.       DIVERSITY AND AFFIRMATIVE ACTION . . . . . . . . . . . . . . . . . . . . . . . . . 31

15-VII EQUAL OPPORTUNITY FOR JOB SUCCESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
    A.       RACIAL HARASSMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
        1.      Unwelcome Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
        2.      Severe or Pervasive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
        3.      Employer Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
            •    Conduct of Supervisors
            •    Conduct of Owner, President, Partners, or Officers
            •    Conduct of Co-workers and Non-employees
    B.       RACIAL BIAS IN OTHER EMPLOYMENT TERMS AND CONDITIONS . . . . . . . . 44
        1.      Work Assignments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
        2.      Performance Evaluations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
        3.      Training and Constructive Feedback . . . . . . . . . . . . . . . . . . . . . . 46
        4.      Workplace Networks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
        5.      Appearance and Grooming Standards . . . . . . . . . . . . . . . . . . . . . 47
        6.      Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
        7.      Discipline and Discharge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
    C.       RETALIATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

15-VIII REMEDIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

15-IX ☞PROACTIVE PREVENTION☜ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

# SECTION 15: RACE and COLOR DISCRIMINATION

## 15-I  OVERVIEW

With the enactment of the Civil Rights Act of 1964, Congress sought to eliminate the problems of segregation and discrimination in the United States.  The impetus for the Act was the civil rights movement of the 1950s and 1960s, which challenged the denial of the right of Blacks to participate equally in society.

The employment title of the Act — Title VII — covers employment discrimination based on race, color, religion, sex, national origin, or protected activity.  Title VII's prohibitions against race and color discrimination were aimed at ending a system in which Blacks were "largely relegated to unskilled and semi-skilled jobs."[1]  However, Congress drafted the statute broadly to cover race or color discrimination against anyone – Whites, Blacks, Asians, Latinos, Arabs, American Indians and Alaska Natives, Native Hawaiians and Pacific Islanders, persons of more than one race, and all other persons.[2]

Today, the national policy of nondiscrimination is firmly rooted in the law.[3]  In addition, it generally is agreed that equal opportunity has increased dramatically in America, including in employment.  Blacks and other people of color now work in virtually every field, and opportunities are increasing at every level.

Yet significant work remains to be done.  Charges alleging race discrimination in employment accounted for 35.5 percent of the Commission's 2005 charge receipts, making race still the most-alleged basis of employment discrimination under federal law.[4]  In addition, several private studies conducted in the early 2000s provide telling evidence that race discrimination in employment persists.  A 2003 study in Milwaukee found that Whites with a criminal record received job call-backs at a rate more than three times that of Blacks with the same criminal record, and even

---

[1]  *See United Steelworkers of America v. Weber*, 443 U.S. 193, 202-03 (1979) (also noting: the 1962 unemployment rate of Blacks and other people of color was 124 percent higher than that of Whites).

[2]  The following terms are used interchangeably in this document due to their frequent and accepted vernacular usage: "Black" and "African American"; "White" and "Caucasian"; "Asian" and "Asian American"; "American Indian" and "Native American"; and "Latino" and "Hispanic."  The document will refer to non-Whites generally as "people of color."

[3]  *See Franks v. Bowman Transp. Co., Inc.*, 424 U.S. 747, 763 (1976) ("Congress intended to prohibit all practices in whatever form which create inequality in employment opportunity due to discrimination [prohibited by Title VII] . . . and ordained that its policy of outlawing such discrimination should have the highest priority.") (citations omitted). For a good discussion of the history of Title VII enforcement, see CELEBRATING THE 40TH ANNIVERSARY OF TITLE VII (2004), at http://www.eeoc.gov/abouteeoc/40th/panel/; and THE STORY OF THE UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION: ENSURING THE PROMISE OF OPPORTUNITY FOR 35 YEARS (2000), *available at* http://www.eeoc.gov/abouteeoc/35th/index.html.

[4]  *See* EEOC Charge Statistics, *at* http://www.eeoc.gov/stats/charges.html.

at a rate higher than Blacks *without* a criminal record.[5]  A 2003 study in California found that temporary agencies preferred White applicants three to one over African American applicants.[6] And, a 2002 study in Boston and Chicago found that résumés of persons with names common among Whites were 50 percent more likely to generate a request for an interview than equally impressive résumés of persons with names common among Blacks.[7]

Moreover, racial and ethnic disparities still exist in the labor market.  People of color are more likely than Whites to work in lower-paying jobs and less likely to work in higher-paying jobs.[8] Unlawful employment discrimination is one of the reasons for these disparities.  Therefore, vigorous law enforcement, and proactive prevention of discrimination – i.e., enhanced outreach, education, and technical assistance to promote voluntary compliance – remain critical to ensuring that race and color play no part in employment decisions.

---

[5]    *See* Devah Pager, *The Mark of a Criminal Record*, AMERICAN JOURNAL OF SOCIOLOGY (Mar. 2003) (audit study sending matched pairs of Black and White male college students with similar self-presentation styles to apply for 350 low-skilled jobs advertised in the Milwaukee classifieds; purpose was to test the degree to which a criminal record affects subsequent employment opportunities; study found that when the White "testers" were assigned a fake 18-month prison record – for possession of cocaine with intent to sell – they were called back by employers 17% of the time, while the Black testers assigned the same record were called back only 5% of the time; Whites without a criminal record had a 34% call back rate versus a 14% call back rate for Blacks without a criminal record), *available at* http://www.northwestern.edu/ipr/publications/papers/2003/pagerajs.pdf.

[6]    *See* Jenny Bussey and John Trasviña, *Racial Preferences: The Treatment of White and African American Job Applicants by Temporary Employment Agencies in California*, *at* http://www.impactfund.org/DRC%20December%202003%20Report.pdf (Dec. 2003) (audit study sending specially trained matched pairs of White and Black job applicants to temporary agencies to determine whether one applicant received better treatment in one way or another, such as in obtaining an interview or job offer, higher pay, or longer job assignment; study found that the temporary agencies audited in Los Angeles preferred the White applicants 4 to 1 over the African American applicants, and more than 2 to 1 in San Francisco).

[7]    *See* Marianne Bertrand and Sendhil Mullainathan, *Are Emily and Brendan More Employable than Lakisha and Jamal?  A Field Experiment on Labor Market Discrimination*, *at* http://gsb.uchicago.edu/pdf/bertrand.pdf (Nov. 18, 2002) (after randomly assigning names common among Whites or Blacks to résumés of similar quality, Professors Bertrand and Mullainathan responded to over 1300 job advertisements in Boston and Chicago, and found that the hypothetical White applicants were 50 percent more likely to receive responses seeking interviews than the hypothetical Black applicants; moreover, the study revealed that improvements in résumé quality significantly increased the chances for a callback for Whites but did not significantly increase the chances for Blacks).

[8]    See generally the Census 2000 Special EEO Tabulation (Employment by EEO-1 Job Categories), available at http://www.census.gov/eeo2000/index.html.

0059

The purpose of this Manual Section is to provide guidance on Title VII's prohibition against workplace discrimination based on race or color.[9] It discusses coverage issues, the importance of conducting a thorough investigation, various employer practices, and remedies for a violation.[10] The Manual Section includes numerous examples, as well as guidance reflecting the Commission's strong interest in proactive prevention and "best practices."[11]

## 15-II  WHAT IS "RACE" DISCRIMINATION?

Title VII prohibits employer actions that discriminate, by motivation or impact, against persons because of race. Title VII does not contain a definition of "race," nor has the Commission adopted one. For the collection of federal data on race and ethnicity, the Office of Management and Budget (OMB) has provided the following five racial categories: *American Indian or Alaska Native*; *Asian*; *Black or African American*; *Native Hawaiian or Other Pacific Islander*; and *White*; and one ethnicity category, *Hispanic or Latino*.[12] OMB has made clear that these categories are "social-political constructs . . . and should not be interpreted as being genetic, biological, or anthropological in nature."[13]

---

[9]     Section 1981 of the Civil Rights Act of 1866 – 42 U.S.C. § 1981 – also provides a federal remedy for race discrimination in employment. Section 1981 prohibits race discrimination in the making and enforcing of contracts, which includes, but is not limited to, most employment relationships. While Title VII provides that private employers must have 15 or more employees to be covered, Section 1981 covers employers with any number of employees. The EEOC does not enforce Section 1981.

[10]     The analysis in this Section generally applies to private, state and local, and federal sector complaints of race or color discrimination under Title VII. Moreover, while this document focuses on discrimination by employers, Title VII also prohibits discriminatory practices by labor organizations, including union membership and representation, and employment agencies, including referral practices.

[11]     Best practices are proactive measures designed to reduce the likelihood of Title VII violations and to address impediments to equal employment opportunity. A comprehensive overview of best practices is presented in the 1998 report "'Best' Equal Employment Opportunity Policies, Programs, and Practices in the Private Sector," which was prepared by an EEOC task force headed by former Commissioner Reginald E. Jones. *See* EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, "BEST" EQUAL EMPLOYMENT OPPORTUNITY POLICIES, PROGRAMS, AND PRACTICES IN THE PRIVATE SECTOR (2d ed. 1998). According to the report, a "best practice": complies with the law; promotes equal employment opportunity; shows management commitment and accountability; ensures management and employee communication; produces noteworthy results; and does not result in unfairness. The complete report is available at http://www.eeoc.gov/abouteeoc/task_reports/practice.html.

[12]     *See* OFFICE OF MANAGEMENT AND BUDGET, PROVISIONAL GUIDANCE ON THE IMPLEMENTATION OF THE 1997 STANDARDS FOR FEDERAL DATA ON RACE AND ETHNICITY 6-7 (12/15/00).

[13]     *See id.* 9-10.

0060

Title VII's prohibition of race discrimination generally encompasses:

- **Ancestry:** Employment discrimination because of racial or ethnic ancestry. Discrimination against a person because of his or her ancestry can violate Title VII's prohibition against race discrimination. Note that there can be considerable overlap between "race" and "national origin," but they are not identical.[14] For example, discrimination against a Chinese American might be targeted at her Asian ancestry and not her Chinese national origin. In that case, she would have a claim of discrimination based on race, not national origin.

- **Physical Characteristics:** Employment discrimination based on a person's physical characteristics associated with race, such as a person's color, hair, facial features, height and weight.[15]

- **Race-linked Illness:** Discrimination based on race-linked illnesses. For example, sickle cell anemia is a genetically-transmitted disease that affects primarily persons of African descent. Other diseases, while not linked directly to race or ethnicity, may nevertheless have a disproportionate impact. For example, Native Hawaiians have a disproportionately high incidence of diabetes.[16] If the employer applies facially neutral standards to exclude treatment for conditions or risks that disproportionately affect employees on the basis of race or ethnicity, the employer must show that the standards are based on generally accepted medical criteria.[17]

- **Culture:** Employment discrimination because of cultural characteristics related to race or ethnicity. Title VII prohibits employment discrimination against a person because of cultural characteristics often linked to race or ethnicity, such as a person's name,[18] cultural dress and grooming practices,[19] or accent or manner of speech. For example, an employment decision based on a person having a so-called "Black accent," or "sounding White," violates Title VII if the accent or manner of speech does not materially interfere with the ability to perform job duties.

---

[14]    See also § 15-IV.A., *infra*.

[15]    See also § 15-VII.B.5, *infra*, on Appearance and Grooming Standards.

[16]    *See* Centers for Disease Control and Prevention Fact Sheet, *available at* http://www.cdc.gov/od/oc/media/pressrel/fs040402.htm (last visited 11/30/05).

[17]    *See* Section 3: *Employee Benefits*, EEOC Compliance Manual, Title VII/EPA Issues § II.B., *available at* http://www.eeoc.gov/policy/docs/benefits.html.

[18]    *See supra* note 7; *cf. El-Hakem v. BJY, Inc.*, 415 F.3d 1068, 1073 (9th Cir. 2005) ("names are often a proxy for race and ethnicity").

[19]    See also § 15-VII.B.5, *infra*, on Appearance and Grooming Standards.

0061

- **Perception:** Employment discrimination against an individual based on a belief that the individual is a member of a particular racial group, regardless of how the individual identifies himself. Discrimination against an individual based on a perception of his or her race violates Title VII even if that perception is wrong.

- **Association:** Employment discrimination against an individual because of his/her association with someone of a particular race. For example, it is unlawful to discriminate against a White person because he or she is married to an African American or has a multiracial child,[20] or because he or she maintains friendships or otherwise associates with persons of a certain race.

- **Subgroup or "Race Plus":** Title VII prohibits discrimination against a subgroup of persons in a racial group because they have certain attributes in addition to their race. Thus, for example, it would violate Title VII for an employer to reject Black women with preschool age children, while not rejecting other women with preschool age children.[21]

- **"Reverse" Race Discrimination:** Title VII prohibits race discrimination against all persons, including Caucasians.[22] A plaintiff may prove a claim of discrimination through direct or circumstantial evidence. Some courts, however, take the position that if a White person relies on circumstantial evidence to establish a reverse discrimination claim, he or she must meet a heightened standard of proof.[23] The

---

[20]    *See Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.*, 173 F.3d 988, 994-95 (6th Cir. 1999) (holding employee stated a claim under Title VII when he alleged that company owner discriminated against him after his biracial child visited him at work: "A white employee who is discharged because his child is biracial is discriminated against on the basis of his race, even though the root animus for the discrimination is a prejudice against the biracial child" because "the essence of the alleged discrimination . . . is the contrast in races.").

[21]    *Cf. Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971) (holding that an employer's refusal to hire a subgroup of women – those with preschool-age children – was sex-based).

[22]    *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 280 (1976) (Title VII prohibits race discrimination against all persons, including Whites).

[23]    *See, e.g., Mattioda v. White*, 323 F.3d 1288 (10th Cir. 2003) (Caucasian plaintiff failed to establish prima facie case because he did not present "background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority"); *Phelan v. City of Chicago*, 347 F.3d 679, 684-85 (7th Cir. 2003) (in cases of reverse race discrimination, White employee must show background circumstances demonstrating that particular employer has reason or inclination to discriminate invidiously against whites or evidence that there is something "fishy" about facts at hand); *Gagnon v. Sprint Corp.*, 284 F.3d 839, 848 (8th Cir. 2002) (in a Title VII claim of reverse race discrimination, employee must show that defendant is that unusual employer who discriminates against the majority, but if the employee fails to make this showing, he may still proceed by producing direct evidence of

0062

Commission, in contrast, applies the same standard of proof to all race discrimination claims, regardless of the victim's race or the type of evidence used.[24] In either case, the ultimate burden of persuasion remains always on the plaintiff.[25]

## 15-III  WHAT IS "COLOR" DISCRIMINATION?

Title VII prohibits employment discrimination because of "color" as a basis separately listed in the statute. The statute does not define "color." The courts and the Commission read "color" to have its commonly understood meaning – pigmentation, complexion, or skin shade or tone. Thus, color discrimination occurs when a person is discriminated against based on the lightness, darkness, or other color characteristic of the person. Even though race and color clearly overlap, they are not synonymous.[26] Thus, color discrimination can occur between persons of different races or ethnicities, or between persons of the same race or ethnicity.[27]

### EXAMPLE 1
### COLOR-BASED HARASSMENT

James, a light-complexioned African American, has worked as a waiter at a restaurant for over a year. His manager, a brown-complexioned African American, has frequently made offensive comments and jokes about James's skin color, causing him to lose sleep and dread coming in to work. James's requests that the conduct stop only intensified the abuse. James has been subjected to

---

discrimination). *But see, e.g., Iadimarco v. Runyon,* 190 F.3d 151, 163 (3d Cir.1999) (rejecting heightened "background circumstances" standard); *Lucas v. Dole*, 835 F.2d 532, 533-34 (4th Cir. 1987) (declining to decide whether a "higher prima facie burden" applies in reverse discrimination cases).

[24]     *See McDonald*, 427 U.S. at 280 ("Title VII prohibits racial discrimination against the white petitioners in this case upon the *same standards* as would be applicable were they Negroes") (emphasis added).

[25]     *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000).

[26]     *See Walker v. Secretary of the Treasury, IRS*, 713 F. Supp. 403, 405-08 (N.D. Ga. 1989) (discrimination based on color not necessarily the same as race; cause of action available for suit by light skinned Black person against a dark skinned Black person), *aff'd* 953 F.2d 650 (11th Cir. 1992); *cf. Rodriguez v. Guttuso*, 795 F. Supp. 860, 865 (N.D. Ill. 1992) (Fair Housing claim succeeded on statutory ground of "color" discrimination where light-complexioned Latino defendant refused to rent to Latino couple because husband was a dark-complexioned Latino).

[27]     *See Santiago v. Stryker Corp.*, 10 F. Supp. 2d 93, 96 (D.P.R. 1998) (holding dark-complexioned Puerto Rican citizen replaced by light-complexioned Puerto Rican citizen could establish a prima facie case of "color" discrimination (quoting, with approval, *Felix v. Marquez*, 24 EPD ¶ 31,279 (D.D.C.1980): "'Color may be a rare claim, because color is usually mixed with or subordinated to claims of race discrimination, but considering the mixture of races and ancestral national origins in Puerto Rico, color may be the most practical claim to present.'")).

harassment in the form of a hostile work environment, based on his color. (See § 15-VII.A. for a discussion of harassment.)

### EXAMPLE 2
### COLOR-BASED EMPLOYMENT DECISIONS

Melanie, a brown-complexioned Latina, works as a sales clerk for a major department store. She applies for a promotion to be the Counter Manager for a major line of beauty products, but the employer denies her the promotion because the vendor prefers a "light skinned representative" to manage its product line at this particular location. The employer has unlawfully discriminated on the basis of color.

Throughout the remainder of this Manual Section, the term "race," rather than "color," generally is used. This is done for stylistic reasons, as well as to reflect that many more race claims are made each year than color claims. However, the same analyses apply to both race and color.

## 15-IV  RELATED PROTECTED BASES

Multiple protected bases of discrimination can be raised by the same set of facts, both because negative stereotypes and biases may be directed at more than one protected basis at a time, and because certain protected bases overlap considerably. Thus, for example, a discrimination complaint by an "Asian Indian" can implicate race, color, and national origin,[28] as can, for example, a complaint by a Black person from an African nation, or by a dark-skinned Latino. For Title VII purposes, the question is whether any prohibited factors led to an adverse employment action, alone or combined.

All bases of discrimination that are reasonably implicated by the facts should be included in the charge or complaint (e.g., race, color, national origin, religion, sex, etc.). Failure to include all possible bases may result in a court dismissing a legitimate claim.[29]

---

[28]     *See, e.g., Dixit v. City of New York Dep't of General Servs.*, 972 F. Supp. 730, 735 (S.D.N.Y. 1997) (holding that a charge that alleged discrimination on the basis of being "Asian Indian" sufficed to raise both race and national origin because EEOC could reasonably be expected to investigate both).

[29]     Although a lawsuit can encompass any claim that can reasonably be expected to flow from the charge of discrimination, some courts narrowly construe what can reasonably be expected to flow. *Compare, e.g., Bryant v. Bell Atlantic Md., Inc.*, 288 F.3d 124 (4th Cir. 2002) (plaintiff whose charge alleged only race discrimination could not later bring suit based on, *inter alia*, color) *with, e.g., Deravin v. Kerik*, 335 F.3d 195 (2d Cir. 2003) (African American who checked "national origin" in his charge, alleging preferential treatment of Irish Americans, could bring subsequent lawsuit based on race).

15-7

## A.  NATIONAL ORIGIN

In forbidding "national origin" discrimination, Title VII prohibits the denial of equal employment opportunity because of the place of origin of an individual or his or her ancestors, or because an individual has the physical, cultural, or linguistic characteristics of a national origin group.  National origin and race often overlap because persons who themselves are, or whose ancestors were, of the same national origin frequently are of the same race.[30]  The overlap between race and national origin is particularly clear in the case of Asian Americans.[31]  For a thorough discussion of national origin discrimination,  see Section 13:  *National Origin Discrimination* (2002), *available at* http://www.eeoc.gov/policy/docs/national-origin.html, and see Guidelines on Discrimination Because of National Origin, at 29 C.F.R. § 1606.1.

## B.  RELIGION

Title VII's prohibition against race discrimination also may overlap with its prohibition against discrimination based on religion.  Both race and religion might be implicated where, for example, an employer discriminates against an employee based on the employee's belief in a religion tied to a particular race or ethnicity (e.g., Hinduism/Asians).

## C.  INTERSECTIONAL DISCRIMINATION

Title VII prohibits discrimination not just because of one protected trait (e.g., race), but also because of the intersection of two or more protected bases (e.g., race and sex).  For example, Title VII prohibits discrimination against African American women even if the employer does not discriminate against White women or African American men.[32]  Likewise, Title VII protects Asian

---

[30]     *Cf. St. Francis College v. Al-Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring) (noting that, according to EEOC's definition of "national origin" at 29 C.F.R. § 1606.1, "in the Title VII context, the terms [race and national origin] overlap as a legal matter," and reading the majority opinion to state only that § 1981 does not cover discrimination where the two do not overlap, i.e., where the discrimination is based on "birthplace alone," which is purely national origin); *Perkins v. Lake County Dep't of Utils.*, 860 F. Supp. 1262, 1272-73 (N.D. Ohio 1994) (listing the § 1981 cases in which courts engaged in what it called "mental gymnastics" to define "race" and to distinguish it from national origin).

[31]     Race and national origin also clearly overlap with respect to American Indians, because they often are perceived in racial terms and they originate from tribes that "were at one time considered to be nations by both the colonizing countries and later the United States."  *Dawavendewa v. Salt River Project Agric. Improvement and Powers Distr.*, 154 F.3d 1117, 1119-20 (9th Cir. 1998).  Thus, an allegation that an employer discriminated against an American Indian may be analyzed as either race discrimination or national origin discrimination.  *See Perkins*, 860 F. Supp. at 1273 n.7 (noting that courts have analyzed discrimination against American Indians in terms of both national origin and race discrimination).

[32]     *See Jeffries v. Harris County Comty. Action Comm'n*, 615 F.2d 1025, 1032-34 (5th Cir. 1980) ("we hold that when a Title VII plaintiff alleges that an employer discriminates against black females, the fact that black males and white females are not subject to discrimination is irrelevant").  For a discussion of the progress that women of color have made, as well as stubborn patterns of stagnation, see EEOC's study titled

0065

American women from discrimination based on stereotypes and assumptions about them "even in the absence of discrimination against Asian American men or White women."[33] The law also prohibits individuals from being subjected to discrimination because of the intersection of their race and a trait covered by another EEO statute – e.g., race and disability,[34] or race and age.[35]

## 15-V   EVALUATING EMPLOYMENT DECISIONS

Race and color cases generally fall under one of two categories, depending on which category most suits the facts – disparate treatment and disparate impact.   Disparate treatment discrimination occurs when race or another protected trait is a motivating factor in how an individual is treated.  Disparate impact discrimination occurs when a neutral policy or practice has a significant negative impact on one or more protected groups, and either the policy or practice is not job-related and consistent with business necessity or there is a less discriminatory alternative and the employer has refused to adopt it.

### A.   RACIAL DISPARATE TREATMENT

#### 1.   Recognizing Racial Motive

Title VII is violated if race was all or part of the motivation for an employment decision.[36] The most obvious violation is a decision driven by racial animus.

---

WOMEN OF COLOR: THEIR EMPLOYMENT IN THE PRIVATE SECTOR (2003), *available at* http://www.eeoc.gov/stats/reports/womenofcolor/index.html.

[33]     *Lam v. University of Hawaii*, 40 F.3d 1551, 1561-62 (9th Cir. 1994) (holding lower court erred when it treated the claim of an Asian woman in terms of race *or* sex separately; lower court should have considered whether discrimination occurred because of the plaintiff's combined race *and* sex).

[34]     *See* Peter Blanck et al., *The Emerging Workforce of Entrepreneurs with Disabilities: Preliminary Study of Entrepreneurship in Iowa*, 85 IOWA L. REV. 1583 n.157 (2000) (African American women with disabilities disproportionately disadvantaged in employment opportunities). The Americans with Disabilities Act of 1990 (ADA) forbids employers with 15 or more employees from discriminating against qualified individuals with disabilities. *See* 42 U.S.C. §§ 12101 *et seq.* Numerous EEOC resources explaining the ADA can be found on the Commission's web site at www.eeoc.gov.

[35]     The Age Discrimination in Employment Act of 1967 (ADEA) forbids employers with 20 or more employees from discriminating against applicants or employees age 40 and over because of their age. *See* 29 U.S.C. §§ 621 *et seq.*

[36]     However, note that under certain circumstances the statute permits "a business or enterprise on or near an Indian reservation" to give a preference to "an Indian living on or near a reservation." 42 U.S.C. § 2000e-2(i); Section 2: *Threshold Issues*, EEOC Compl.  Man., § 2-II.B.4.ii, *at* http://www.eeoc.gov/policy/docs/threshold.html#2-III-B-4-b-ii.  See also § 15-VI.C, *infra*, discussing diversity and affirmative action.

0066

**EXAMPLE 3**
**RACIAL ANIMUS**

The employer is a family-owned construction company in need of a construction manager for one of its work crews. Dexter, an African American, is new to the area and applies for the job. He held the same position with another company before relocating. Dexter is rejected. When he finds out that a less-qualified White person was hired instead of him, Dexter alleges discrimination. The company secretary credibly testifies that she overheard an argument between the owner and his son over whether Dexter should be hired. Because Dexter was clearly the most qualified applicant, the son wanted to hire Dexter, but the owner did not. At one point the secretary heard the owner say: "As long as I'm running this company I won't have a Black man doing a White man's job!" The employer has violated Title VII.

Racially biased decisionmaking and treatment, however, are not always conscious.[37] The statute thus covers not only decisions driven by racial animosity, but also decisions infected by stereotyped thinking or other forms of less conscious bias.[38]

**EXAMPLE 4**
**RACIAL STEREOTYPING OR BIAS**

Charles, an African American, files a charge alleging that the employer, a retailer, used an interview to discriminate against him in favor of a less experienced White applicant. During the EEOC investigator's discussion with the hiring manager, she notices that the hiring manager's statements are peppered with comments such as "we were looking for a clean cut image," and "this is a sophisticated upscale location . . . I have to make sure the people I hire have, you know, the 'soft-skills' we need." Knowing that these statements

---

[37]     *See Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 42, 59-61 (1st Cir. 1999) (holding layoff could be found unlawful where performance evaluations on which layoffs were based were racially biased, and discussing the longstanding recognition that unlawful discrimination can stem from stereotyping and cognitive bias, as well as from conscious animus). For an academic discussion of the role unconscious bias can play in discrimination, see also Charles R. Lawrence III, *The Id, the Ego, and Equal Protection: Reckoning with Unconscious Racism*, 39 STAN. L. REV. 317 (1987).

[38]     For example, although a "personality conflict" can be a legitimate, nondiscriminatory reason for an employment decision, the personality conflict must not be rooted in any employer racial bias toward the employee. See generally Chad Derum and Karen Engle, *The Rise of the Personal Animosity Presumption in Title VII and the Return of "No Cause" Employment*, 81 TEX. L. REV. 1177, 1224-47 (2003).

0067

could be reflective of racial stereotyping and bias,[39] the investigator evaluates the employer's decisionmaking very carefully. The investigator interviews Charles's most recent employer, who tells the investigator that "customers just loved working with Charles . . . he was one of our most effective and motivated employees." The investigator also interviews the person hired and finds no basis for believing her "soft skills," or her "image," were any better than Charles's. In addition, the investigator notices that, like the person hired over Charles, the rest of the staff also is White even though the qualified labor market is significantly more diverse. The investigator concludes that the employer rejected Charles based on racial stereotyping or bias.

Title VII also does not permit racially motivated decisions driven by business concerns – for example, concerns about the effect on employee relations,[40] or the negative reaction of clients or customers.[41] Nor may race or color ever be a bona fide occupational qualification under Title VII.[42]

## EXAMPLE 5
## RACIAL STEERING OR ASSIGNMENT

An employer admits that it usually assigns Black and Asian American salespersons to sales territories with a high percentage of

---

[39]     See PHILIP MOSS & CHRIS TILLY, STORIES EMPLOYERS TELL: RACE, SKILL, AND HIRING IN AMERICA (2001) (discussing wide-ranging survey of employers in major U.S. cities regarding skills employers seek for jobs requiring no more than a high school education; concluding that in this segment of labor market racial disparities are caused by hard-to-separate mix of objective skill differences, cultural gaps, and employer racial bias in assessing skills, particularly "soft skills," i.e., positive attitude, interaction skills, motivation, dependability).

[40]     See International Union, UAW v. Johnson Controls, Inc., 499 U.S. 187, 199 (1991) (disparate treatment liability "does not depend on why the employer discriminates but rather on the explicit terms of the discrimination"); Goodman v. Lukens Steel Co., 482 U.S. 656, 668-69 (1987) (though there was "no suggestion below that the Unions held any racial animus against or denigrated Blacks generally," Unions violated Title VII and § 1981 by intentionally not pressing the work grievances of Black employees so as not to antagonize the employer or upset White workers).

[41]     Cf. Rucker v. Higher Educational Aids Bd., 669 F.2d 1179 (7th Cir. 1982) (Black employee had viable retaliation claim for opposing employer's rejection of White person for promotion to youth counselor on grounds that the predominantly Black community preferred a Black counselor: stating "Title VII is a blanket prohibition of racial discrimination, rational and irrational alike, even more so than of other forms of discrimination attacked in Title VII . . . . [Thus,] it is clearly forbidden by Title VII to refuse on racial grounds to hire someone because your customers or clientele do not like his race.").

[42]     See 42 U.S.C. § 2000e-2(e)(1) (Title VII's "bona fide occupational qualification" (BFOQ) exception applies to all Title VII bases except race and color); 42 U.S.C. § 2000e-2(k)(2) ("business necessity" defense available in disparate impact cases is not available in intentional discrimination cases).

0068

Blacks and Asian Americans. It is uncontested that the employer does not harbor ill-will toward either group. Instead, the employer believes they will better serve sales territories with high percentages of Blacks and Asian Americans, and thus increase sales to the benefit of the firm's bottom line and their careers. Charges are filed by employees who want the opportunity to work in territories regardless of their racial makeup. The employer has violated Title VII, which prohibits employers from depriving employees of employment opportunities by limiting, segregating, or classifying them on the basis of race.[43]

## EXAMPLE 6
## YIELDING TO CUSTOMERS' RACIAL PREFERENCES

The employer is a home care agency that hires out aides to provide personal, in-home assistance to elderly, disabled, and ill persons. It has a mostly White clientele. Many of its clients have expressed a desire for White home care aides. Gladys, an African American aide at another agency, applies for a job opening with the employer because it pays more than her current job. She is well qualified and has received excellent performance reviews in her current position. The employer wants to hire Gladys but ultimately decides not to because it believes its clientele would not be comfortable with an African American aide. The employer has violated Title VII because customer preference is not a defense to race discrimination.[44]

---

[43] *See* 42 U.S.C. § 2000e-2(a) ((1) unlawful to discriminate in, among other things, compensation, terms, conditions, or privileges of employment, because of such individual's race, etc; (2) unlawful to deprive employment opportunities by limiting, segregating, or classifying employees because of race or other Title VII-protected traits); *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 743-44 (7th Cir. 1999) (African American Plaintiff who alleged he was fired because of race could survive summary judgment because a jury could infer from unlawful segregation and job limitations – i.e, African-American salespersons were required to serve predominantly African-American accounts, and White salespersons were required to serve accounts owned or frequented by Whites – that the employer's stated nondiscriminatory reason for firing Plaintiff was pretext); *cf. Ferrill v. The Parker Group, Inc.*, 168 F.3d 468, 472-73 & 475 n.7 (11th Cir. 1999) (holding liable under § 1981 telephone marketing firm that admittedly assigned Black employees to make calls to Black households, and White employees to make calls to White households).

[44] *E.g., Ray v. University of AK*, 868 F. Supp. 1104, 1126-27 (E.D. Ark. 1994) (even if race could be a BFOQ, customer preference could not satisfy the defense); *Rucker*, at note 41, *supra*.

0069

## 2.    Conducting a Thorough Investigation

Because discrimination often is subtle, and there rarely is a "smoking gun,"[45] determining whether race played a role in the decisionmaking requires examination of all of the surrounding facts and circumstances.[46]    The presence or absence of any one piece of evidence often will not be determinative.  Sources of information can include witness statements, including consideration of their credibility; documents; direct observation; and statistical evidence such as EEO-1 data, among others.  *See* EEOC Compl. Man., Vol. I, Sec. 26, "Selection and Analysis of Evidence."  A non-exhaustive list of important areas of inquiry and analysis is set out below.

<u>Potential Evidence of Racial Disparate Treatment</u>

- **Race-related statements (oral or written) made by decisionmakers or persons influential to the decision**.  Race-related statements include not only slurs and patently biased statements, but also "code words" that are purportedly neutral on their face but which, in context, convey a racial meaning.[47]  The credibility of the witness(es) attesting to discriminatory statements, and the credibility of the witness(es) denying them, are critical to determining whether such statements actually were made.   If racially discriminatory statements were made, their importance will depend on their egregiousness and how closely they relate – in time

---

[45]      *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081-82 (3d Cir. 1996) ("It has become easier to coat various forms of discrimination with the appearance of propriety, or to ascribe some other less odious intention to what is in reality discriminatory behavior.  In other words, while discriminatory conduct persists, violators have learned not to leave the proverbial 'smoking gun' behind."); *cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973) ("it is abundantly clear that Title VII tolerates no racial discrimination, subtle or otherwise").

[46]      Circumstantial evidence can be just as useful and persuasive as direct evidence, and sometimes more so.  *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("The reason for treating circumstantial and direct evidence alike is both clear and deep-rooted: 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'") (citation omitted).

[47]      *See, e.g., Ash v. Tyson Foods, Inc.*, No. 05-379, 2006 WL 386343, at *1 (U.S. Feb. 21, 2006) (per curiam) (referring to African American men as "boy" could be evidence of discrimination without any explicit racial modifiers: "Although it is true the disputed word will not always be evidence of racial animus, it does not follow that the term, standing alone, is always benign. The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage.  Insofar as the Court of Appeals held that modifiers or qualifications are necessary in all instances to render the disputed term probative of bias, the court's decision is erroneous."); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1117 (9th Cir. 2004) ("The reference to McGinest as a 'drug dealer' might certainly be deemed to be a code word or phrase.  In fact, reported cases have recognized the racial motivations behind this and other comments and slurs experienced by McGinest. . . .  GTE's attempt to deny the possible racial overtones of many of the comments made to McGinest or uttered in his presence indicates a willful blindness to racial stereotyping.") (citations omitted); *Aman ,*85 F.3d at 1083 (supervisor's statement to Black employee that he would get rid of "all of you" could be seen, in context, as conveying a racially offensive message).

and content – to the decision in question. For example, a statement that there are "too many Asians" in a department, made by a hiring official when discussing applicants, would be strong evidence supporting an Asian American's failure-to-hire claim. Such a statement also would support a claim of hostile work environment by Asian American employees.[48]

- **Comparative treatment evidence**. This is evidence as to whether the claimant was treated the same as, or differently than, similarly situated persons of a different race. Such evidence is not always required, but a difference in the treatment of similarly situated persons of different races is probative of discrimination because it tends to show that the treatment was not based on a nondiscriminatory reason. Conversely, an employer's consistent treatment of similarly situated persons of different races tends to support its contention that no discrimination occurred. Comparator evidence that supports either party's position must be weighed in light of all the circumstances. For example, if the group of similarly situated persons who were treated better than the claimant included persons of the claimant's race, that would weaken his or her claim, but it would not be conclusive proof of nondiscrimination because the balance of the evidence overall might still more convincingly point to discrimination.[49] Identification of persons who are similarly situated to the claimant should be based on the nature of the allegations, the alleged nondiscriminatory reasons, and other important factors suggested by the context,[50] but should not be based on unduly restrictive standards.[51]

---

[48]    See subsection 15-VII.A. for a discussion of harassment.

[49]    *See, e.g., Connecticut v. Teal*, 457 U.S. 440, 455 (1982) ("Congress never intended to give an employer license to discriminate against some [persons of a certain race] merely because he favorably treats other members of the employees' group."); *cf. Sinai v. New England Telephone & Telegraph Co*, 3 F.3d 471, 474 (1st Cir. 1993) (in a Section 1981 case: "The relevant issue in a discrimination claim is whether the defendant discriminates against the plaintiff on an improper basis. The fact that the defendant hired other members of the protected class is evidence that the jury can consider in reaching the ultimate issue, but is not dispositive in itself. The jury must weigh all of the evidence.").

[50]    For example, if an employee alleges that his race was a reason he was discharged or disciplined for misconduct, similarly situated employees should be identified who engaged in misconduct of comparable seriousness. *See McDonnell Douglas*, 411 U.S. at 804 (Court stated that Black employee who was terminated and refused rehire because of alleged misconduct should be given a fair opportunity to show that the reason was pretextual, and "[e]specially relevant to such a showing would be evidence that white employees involved in acts . . . of comparable seriousness . . . were nevertheless retained or rehired").

[51]    Some courts engage in an analysis of "similarly situated" that is unduly restrictive. *See, e.g., Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (requiring plaintiff to show that all relevant aspects of her employment situation were "nearly identical" to those of her comparator). See generally Ernest F. Lidge III, *The Courts' Misuse of the Similarly Situated Concept in Employment Discrimination Law,* 67 Mo. L. Rev. 831, 863-82 (2002).

- **Relevant background facts**. Specific employment decisions and issues should not be looked at in isolation. Other information that can shed light on whether the employer's adverse employment decision was motivated by race includes the employer's treatment of other employees (or customers, etc.), race-related attitudes, the work environment generally, and the context of the challenged employment decision.[52] For example, background evidence that an employer has permitted racial jokes and slurs about Asian Americans in the workplace would support an Asian American employee's allegation that her termination was based on her race.[53] Similarly, background evidence that an employer has discriminated against African Americans in hiring, pay, or promotions would support an African American employee's claim that a pattern of mistreatment – e.g., her supervisor undermining her work, ostracizing her, and making snide comments – is actually a pattern of race-based harassment.[54] The point is that background evidence can help determine the employer's state of mind and otherwise provide important context. Also, as suggested by the above examples, the inquiry into background evidence can reveal other potential violations of the statute.

- **Relevant personnel policies**. An employer's deviation from an applicable personnel policy, or a past practice, can support an inference of a discriminatory motive. Conversely, acting in conformance with a consistently applied nondiscriminatory policy or practice would suggest there is no such motive.

- **The decisionmaker's race**. The race of the decisionmaker may be relevant, but is not controlling.[55] In other words, it should not be presumed that a person would not

---

[52]   *See, e.g., National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (prior discrimination acts may be used as background evidence to support a claim); *Aman*, 85 F.3d at 1083 ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.") (citation and quotation marks omitted).

[53]   *See, e.g., United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 713 n.2 (1983) (background evidence that person responsible for promotion decisions made derogatory remarks about Blacks in general and Plaintiff in particular was relevant to Plaintiff's failure to promote claim); *Robinson v. Runyon*, 149 F.3d 507, 512-13 (6th Cir. 1998) (evidence that coworkers circulated fake employment application incorporating racial stereotypes of African-Americans, and that supervisors laughed upon reading the document, was relevant to African American employee's discriminatory discharge claim).

[54]   See subsection 15-VII.A. for a discussion of harassment.

[55]   *See United States v. Crosby,* 59 F.3d 1133, 1135 n. 4 (11th Cir.1995) (although a Title VII violation may occur even where a supervisor or decisionmaker is of the same race as the alleged victim, there was no evidence here that the Black supervisor held members of his own race to a higher standard of conduct than members of another race) (citing *Billingsley v. Jefferson County*, 953 F.2d 1351, 1353 (11th Cir.1992) (Title VII cause of action even where decision-maker and employee are of the same race)). Same-race harassment also violates Title VII. *See infra* note 122.

discriminate against members of his own race. As the Supreme Court has noted, "[b]ecause of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group."[56]

- **Statistical evidence**. Statistics reflecting the employer's general policy or practice can be helpful in determining whether race was a factor in a particular selection decision. For example, a Black applicant's allegation of hiring discrimination would be bolstered by evidence that the selection rate of qualified Black applicants is significantly below the selection rate of qualified applicants of other races, or that Blacks are significantly under-represented in the employer's workplace given their availability in the qualified labor market.[57] Conversely, while a racially diverse workforce cannot immunize an employer from liability for specific acts of discrimination, the more racially diverse the relevant part of the employer's workforce is, the less credible would be the claim of discrimination.[58] Statistical evidence also is important in determining whether the employer has a systemic pattern or practice of discriminating (see § 15-V.A.3.).

## Employer Credibility

The credibility of the employer's explanation is key and must be judged in light of all the evidence obtained during the investigation. If an employer's explanation for the employee's treatment ultimately is not credible, that is powerful evidence that discrimination is the most likely explanation.[59] An employer's credibility will be undermined if its explanation is unsupported by

---

[56] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Castaneda v. Partida*, 430 U.S. 482, 499 (1977)).

[57] *See McDonnell Douglas*, 411 U.S. at 804-05 (statistical evidence showing an employer's general policy or practice is relevant to whether individual employment decision was discriminatory); *Bell v. E.P.A.*, 232 F.3d 546, 553-54 (7th Cir. 2000) (stating statistical evidence may be "relevant to and probative of the issue of pretext even when it is insufficient to support a pattern and practice disparate treatment case" and "the evidence that blacks are not promoted as often as nonblacks, even though not statistically significant, is still circumstantial evidence of possible discrimination").

[58] *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978) (while "[a] racially balanced work force cannot immunize an employer from liability for specific acts of discrimination, . . . [p]roof that [the employer's] workforce was racially balanced or that it contained a disproportionately high percentage of minority employees is not wholly irrelevant").

[59] *See Reeves*, 530 U.S. at 147 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. Proving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law

or contrary to the balance of the facts. Similarly, the credibility of the explanation can be called into question if it is unduly vague,[60] appears to be an after-the-fact explanation, or appears otherwise fabricated (e.g., the explanation shifts, or inconsistent reasons are given).

Of course, even if the employer's explanation lacks credibility, discrimination will not be found if the evidence affirmatively demonstrates that the employer's real motivation was not race or another protected EEO trait, but something not covered by the laws enforced by EEOC – for example, an employee's blowing the whistle to the SEC about violations of securities laws. Also, an employer's business decision cannot be found discriminatory simply because it appears that the employer acted unwisely, or that the employer's decision was in error or a misjudgment. At the same time, the reasonableness of the employer's explanation is an important part of the overall picture.[61] The investigator must look at the totality of the evidence to determine if there is reason to believe the employer acted in a racially motivated manner.

**EXAMPLE 7**
**EMPLOYER EXPLANATION CREDIBLE**

> Alex, of Hispanic descent, has been progressively promoted and now holds a mid-level management position in a public relations firm in which he is responsible for several important accounts. The clients and the employer are happy with his performance. A senior-level management position that involves more responsibility opens up. The employer desires someone with demonstrated creativity to fill it. Alex applies for the job, but is not selected. Instead, the employer chooses Jennifer, a White female who, while qualified, has slightly less seniority and relevant experience. Alex files a charge alleging race and/or national origin discrimination. The investigation reveals that while Jennifer has somewhat less experience than Alex, she has displayed more creativity than Alex by developing a new way to reach the youth market, consistently suggesting improvements on the

---

that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt.") (citations and internal quotation marks omitted).

[60]     Employers have leeway to make subjective decisions, but regardless of whether the reasons are objective or subjective, the employer's "explanation of its legitimate reasons must be clear and reasonably specific" so that "the plaintiff is afforded a 'full and fair opportunity' to demonstrate pretext." *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 258 (1981). The explanation must be clearly set forth through the presentation of evidence. *Id.* at 255. A person evaluating a decision based on subjective factors should do so carefully because subjective factors "are more susceptible of abuse and more likely to mask pretext." *See Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 320 (3d Cir. 2000) (citation and quotation marks omitted).

[61]     *See, e.g., Burdine*, 450 U.S. at 259 (Title VII "was not intended to 'diminish traditional management prerogatives.' . . . The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination") (citations omitted).

15-17

design of marketing materials, and implementing a new system for quickly disseminating time-sensitive documents. Alex, on the other hand, is seen as competent, hard working, and professional, but not as someone who displays quite as much creativity as wanted for the new job. There is clear and reasonably specific evidence verifying the perceived difference between Alex's and Jennifer's creativity. There is no evidence of discrimination other than comparative qualifications. The relatively minor differences in the employees' qualifications, alone, do not warrant a conclusion that Alex's nonpromotion was motivated by race or national origin.[62]

## EXAMPLE 8
## EMPLOYER EXPLANATION NOT CREDIBLE

To change Example 7, if Alex outshone Jennifer in the other performance categories important for the promotion, such as customer relations, and leadership skills, the employer's stated reason – that it chose the most qualified person – would lack credibility and it would be reasonable to suspect that Alex's race/national origin motivated the employer. Similarly, if there was any evidence supporting Alex's case other than relative qualifications – e.g., derogatory statements about the leadership potential of Hispanics, shifting explanations, a pattern of not promoting Hispanics, or inconsistency suggesting bias against Hispanics in measuring creativity – the totality of the evidence could lead one to conclude that Alex's race/national origin likely motivated the employer.[63]

---

[62]    In *Ash v. Tyson Foods*, the Supreme Court declined to articulate a standard for inferring pretext from superior qualifications, but the Court rejected the Eleventh Circuit's formulation – that "the disparity in qualifications [must be] so apparent as virtually to jump off the page and slap you in the face" – as unhelpful, imprecise, and unlikely to yield consistent results in the courts. *See Ash v. Tyson Foods, Inc.*, No. 05-379, 2006 WL 386343, at *2 (U.S. Feb. 21, 2006) (per curiam).

[63]    *See Goosby*, 228 F.3d at 320-21 (summary judgment for employer inappropriate because sufficient evidence existed for a jury to find discrimination; even though the employer contended that the decision was based on Plaintiff's score on a competency-assessment tool called "the Matrix" that was purported to be objective, its criteria and their weighting actually were highly subjective and decisions based on the Matrix were inconsistent in that Plaintiff pointed out that her supervisor did not follow the Matrix with respect to certain Whites); *Bell*, 232 F.3d at 554 (reversing summary judgment for employer because Plaintiffs' comparative qualifications, coupled with statistical evidence, were sufficient to support the conclusion that the employer's stated reason that it promoted the best persons was pretextual).

0075

### 3.    Recognizing "Pattern or Practice" Race Discrimination

A systemic "pattern or practice" of intentional discrimination involves statistical and/or other evidence that demonstrates that discrimination is "standard operating procedure – the regular rather than the unusual practice."[64]  For example, a pattern or practice would be established if, despite the fact that Blacks made up 20 percent of a company's applicants for manufacturing jobs and 22 percent of the available manufacturing workers, not one of the 87 jobs filled during a six year period went to a Black applicant.[65]

To the extent possible, the statistical analysis must include nondiscriminatory factors that reasonably might be said to account for any disparity.  In a hiring case, for example, relevant factors would include the racial makeup and qualifications (e.g., education and experience relevant to the job) of the applicants, or of the general labor market if applicant data are unreliable or difficult to obtain.[66]  The disparity also should be "statistically significant," meaning unlikely to have occurred by chance.[67]  Other instances and evidence of discrimination should be examined in conjunction

---

[64]    *Teamsters v. United States*, 431 U.S. 324, 336 (1977).  "Absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population from which employees are hired," and statistics showing a stark imbalance are often a "telltale sign" of discrimination. *Id.* at 339 n.20.  At the same time, Title VII does not *require* an employer's workforce to be racially balanced. *See* 42 U.S.C. § 2000e-2(j) (Title VII does not require race-based hiring simply because there is a racial imbalance between the employer's workforce and the community).

[65]    This example is based on the facts in *EEOC v. O&G Spring and Wire Forms Specialty Co.*, 38 F.3d 872, 876-78 & n.8 (7th Cir. 1994) (company engaged in pattern or practice of race discrimination).

[66]    For example, in a pattern-or-practice case involving alleged hiring discrimination against Blacks, the analysis could measure the difference between the percentage of qualified Black applicants selected and the percentage of qualified non-Black applicants selected.  If applicant flow data are unreliable, or are difficult or impossible to obtain, the analysis could measure the difference between the percentage of Blacks in the job(s) at issue and the percentage of Blacks in the relevant geographical area working in comparable positions. *See Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 311 n.13 (1977). *See also Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (regression analysis that accounted for major relevant factors – here, job title, education, tenure – was admissible; failure of analysis to include "all measurable variables" went not to admissibility, but to probative value).  The probative value of statistics also may be affected by the size of the at-issue pool (i.e., sample size). *See Teamsters*, 431 U.S. at 339 n.20.

[67]    *See Hazelwood*, 433 U.S. at 311 n.17 ("a fluctuation of more than two or three standard deviations would undercut the hypothesis that decisions were being made randomly with respect to race," though "not intend[ing] to suggest that precise calculations of statistical significance are necessary in employing statistical proof").  When statistics are not being relied upon as the core of a pattern-or-practice case, but as circumstantial evidence in an individual case, the statistics need not be as finely tuned, nor is statistical significance required. *See supra* note 57 and accompanying text.

with the statistics.[68]  If the statistical disparity is gross, it alone can establish a pattern or practice claim, such as when there is an "inexorable zero."[69]  In all cases, the employer's explanation or rebuttal (which may be statistical, nonstatistical, or both) should be fully analyzed and weighed against the evidence supporting the claim.  EEOC staff should contact headquarters experts for assistance in statistical cases.[70]

## B.    RACIAL DISPARATE IMPACT

A finding of discrimination in the form of disparate impact does not depend on the existence of an unlawful motive.[71]  Disparate impact analysis is aimed at removing barriers to EEO that are not necessarily intended or designed to discriminate – "practices that are fair in form, but discriminatory in operation"[72] in that they operate as "built-in headwinds for [a protected class] and are unrelated to measuring job capability."[73]

---

[68]      *See, e.g.*, *Teamsters*, 431 U.S. at 339-40 (anecdotal evidence of discrimination experienced by specific individuals brings the "cold numbers convincingly to life," and the usefulness of statistics depends on all of the surrounding facts and circumstances); *Bazemore*, 478 U.S. at 400 (probative value of statistics will "depend in a given case on the factual context of each case in light of all the evidence").

[69]      *See Hazelwood*, 433 U.S. at 307-08 ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination."); *Teamsters*, 431 U.S. at 341 n.23 ("In any event, fine tuning of the statistics could not have obscured the glaring absence of minority line drivers.  As the Court of Appeals remarked, the company's inability to rebut the inference of discrimination came not from a misuse of statistics but from 'the inexorable zero.'"); *cf. United States v. City of Warren*, 138 F.3d 1083, 1094 (6th Cir. 1998) (in disparate impact case: "The fact that as of 1986, when both the durational residency requirement and the challenged recruiting practices were intact, the City of Warren employed not a single black person out of a workforce of 1500 certainly demonstrates a grossly discriminatory impact. Statistical analysis is unnecessary to establish this point.").

[70]      Investigators generally should contact the Research and Technical Information division of the Office of Research, Information and Planning (ORIP) with questions during an investigation.  The Office of General Counsel's Research and Analytical Services (RAS) unit also is an available resource for investigators and attorneys.

[71]      *See* 42 U.S.C. § 2000e-2(k) (disparate impact provision of Title VII); 29 C.F.R. Part 1607 (Uniform Guidelines on Employee Selection Procedures); *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971).

[72]      *Griggs*, 401 U.S. at 431.

[73]      *Id.* at 432.

0077

The statute exempts certain policies or practices from disparate impact challenges – most notably, seniority systems.[74]  Otherwise, however, the disparate impact approach applies to all types of employment criteria, whether objective or subjective,[75] including:

- recruitment practices

- hiring or promotion criteria

- layoff or termination criteria

- appearance or grooming standards

- education requirements

- experience requirements

- employment tests

Proving unlawful disparate impact under Title VII first requires a statistical demonstration that the employer has an employment policy or practice that causes a significant disparate impact based on race (or another protected trait).  The particular policy or practice causing the impact must be identified, unless the elements of the employer's decision-making process cannot be separated for analysis, in which case the decision-making process can be analyzed as one employment practice.[76]

Once a policy or practice has been proven to cause a significant impact, the employer has the burden of demonstrating that the policy or practice is job related for the position in question and consistent with business necessity.[77]  If the employer satisfies this burden, the case focuses on

---

[74]     The disparate impact exemption for bona fide seniority systems and certain other bona fide systems is in section 703(h) of Title VII.  *See* 42 U.S.C. § 2000e-2(h); *Teamsters*, 431 U.S. at 353-54.  Title VII also exempts from disparate impact challenge rules barring the employment of individuals who currently and knowingly use or possess a controlled substance, unless the use or possession is under the supervision of a licensed health care professional or otherwise authorized by Federal law.  *See* 42 U.S.C. § 2000e-2(k)(3).

[75]     *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990-91 (1988) ("If an employer's undisciplined system of subjective decision-making has precisely the same effects as a system pervaded by impermissible intentional discrimination, it is difficult to see why Title VII's proscription against discriminatory actions should not apply.").

[76]     *See* 42 U.S.C. § 2000e-2(k)(1)(B)(i).

[77]     *See* 42 U.S.C. § 2000e-2(k)(1)(A)(i).  If a policy or practice used at a certain point of the selection process has a discriminatory impact, the employer must justify the discriminatory policy or practice even if later stages of the selection process eliminate the disparate impact when looking at the selection process as a whole.  *See Teal*, 457 U.S. at 453-55.

0078

whether the person challenging the policy or practice can demonstrate that a less discriminatory alternative exists that meets the business need and whether the employer refuses to adopt it.[78]

**EXAMPLE 9**
**NO-BEARD POLICY**

A pizza delivery restaurant has an inflexible no-beard policy. The restaurant fires Jamal, one of its African American drivers, for failing to remain clean shaven. Jamal has a severe case of pseudofolliculitis barbae ("PFB"), an inflammatory skin condition that occurs primarily in Black men and that is caused by shaving. The severity of the condition varies, but many of those who suffer from PFB effectively cannot shave at all. If Jamal or EEOC were to challenge the no-beard policy as unlawful because it has a significant negative impact on Blacks, the employer would have to prove the policy is job-related and consistent with business necessity.[79] See also § 15-VII.B.5.

## 15-VI  EQUAL ACCESS TO JOBS

### A.    RECRUITING

*Who* ultimately receives employment opportunities is highly dependent on *how* and *where* the employer looks for candidates. Accordingly, Title VII forbids not only recruitment practices that purposefully discriminate on the basis of race but also practices that disproportionately limit employment opportunities based on race and are not related to job requirements or business needs.[80] For example, recruiting from racially segregated sources, such as certain neighborhoods, schools,

---

[78]    *See* 42 U.S.C. §§ 2000e-2(k)(1)(A)(ii) & (k)(1)(C).

[79]    *See Bradley v. Pizzaco of Nebraska*, 7 F.3d 797, 798-99 (8th Cir. 1993) (granting EEOC an injunction against a pizza restaurant because burden of a narrow exception for Black men with PFB was minimal and the restaurant "failed to prove a compelling need for the strict no-beard policy as applied to those afflicted with PFB and has failed to present any evidence suggesting that the current policy is without workable alternatives or that it has a manifest relationship to the employment in question"). The analysis of job-relatedness and business necessity is fact specific – there are no absolutes. For example, a no-beard policy could be legal in a situation in which beards were shown to interfere with safely using a respirator and no viable alternative existed under the circumstances. *See* 29 C.F.R. § 1910.134(g)(1)(i) (OSHA respirator standard); Interpretation Letter from John L. Henshaw, Assistant Secretary of Labor for OSHA, to Senator Carl Levin (Mar. 7, 2003) (while employers "cannot permit respirators with tight-fitting facepieces to be worn by employees who have facial hair that comes between the sealing surface of the facepiece and the face, or that interferes with valve function," the problem sometimes can be solved by trimming the beard, and "[s]ome types of respirators do not require a face seal and can usually be worn by bearded employees. . . . All respirators must be selected based on the respiratory hazard to which the worker is exposed. The employer must also consider user factors that affect performance and reliability."), *available at* http://www.osha.gov/.

[80]    *See* 42 U.S.C. §§ 2000e-2(a)(1), (a)(2).

15-22

religious institutions, and social networks, leads to hiring that simply replicates societal patterns of racial segregation.

## 1.      Job Advertisements and Employment Agencies

Title VII specifically forbids job advertisements based on race, color, and other protected traits.[81]  The statute also prohibits discrimination by employment agencies.[82]  If an employer asks an employee-referral agency or search firm not to refer or search for candidates of a particular race, both the employer that made the request and the employment agency that honored it would be liable.[83]

## 2.      Word-of-Mouth Referrals

While word-of-mouth recruiting in a racially diverse workforce can be an effective way to promote diversity, the same method of recruiting in a non-diverse workforce is a barrier to equal employment opportunity if it does not create applicant pools that reflect the diversity in the qualified labor market.[84]  Similarly, unions that are not racially diverse should avoid relying solely on member referrals as the source of new members.[85]

---

[81]      *See* 42 U.S.C. § 2000e-3(b) (unlawful for entities covered by Title VII to print or publish or cause to be printed or published any notice or advertisement indicating any preference, limitation, specification, or discrimination based on race, color, religion, sex, or national origin, except when religion, sex, or national origin is a BFOQ (race and color can never be BFOQs)).

[82]      *See* 42 U.S.C. § 2000e-2(b) (unlawful for employment agencies to discriminate); 42 U.S.C. § 2000e(c) (defining "employment agency").

[83]      *See* Enforcement Guidance: *Application of EEO Laws to Contingent Workers Placed by Temporary Employment Agencies and Other Staffing Firms*, at Question 7 (Dec. 1997), *available at* http://www.eeoc.gov/policy/docs/conting.html.

[84]      Investigative staff should contact their legal units when investigating potential disparate impact of word-of-mouth recruiting, nepotism, and the like.  *Compare Thomas v. Washington County Sch. Bd.*, 915 F.2d 922, 924-26 (4th Cir. 1990) (affirming disparate impact ruling where employer's "practices of nepotism and word-of-mouth hiring kept [African Americans] unaware of job openings), *with EEOC v. Chicago Miniature Lamp Works, Inc.*, 947 F.2d 292 (7th Cir. 1991) (passive reliance on employee referrals by accepting applicants who learned of jobs through current employees could be basis of pattern or practice disparate treatment claim, but disparate impact claim not allowed because, without an affirmative act by the employer, such a claim would in essence be a "bottom-line" attack on employer's workforce statistics).

[85]      *See EEOC v. Steamship Clerks Union, Local 1066*, 48 F.3d 594 (1st Cir. 1995) (affirming lower court ruling that union's "membership sponsorship policy" had unlawful disparate impact on Blacks); *cf. Teamsters*, 431 U.S. at 349 n.32 (describing how neutral practices can unlawfully perpetuate the effect of discrimination: "*Local 53 Asbestos Workers v. Vogler* . . . provides an apt illustration:  There a union had a policy of excluding persons not related to present members by blood or marriage.  When in 1966 suit was brought to change this policy, all of the union's members were white, largely as a result of pre-Act intentional [racial] discrimination.  The court observed: 'While the nepotism requirement is applicable to black and white

15-23

### 3.    Homogeneous Recruitment Sources

Title VII is violated by recruiting persons only from largely homogeneous sources if the recruitment practice has a racial purpose, or if it has a significant racial impact and cannot be justified as job related and consistent with business necessity.  For example, Title VII might be violated if a municipal employer with an overwhelmingly White population and workforce abuts a major city with an overwhelmingly Black population, but the municipality only hires its own residents and refuses to advertise its jobs in newspapers that circulate in the abutting major city.[86] As another example, Title VII might be violated if a statistically significant racial disparity results from recruiting persons exclusively from predominantly White schools, or exclusively from predominantly Black schools, when it would be feasible to recruit qualified students from a range of sources.  More investigation would be needed to determine whether a racial motivation exists, or whether the employer's recruitment practices can be justified as job related and consistent with business necessity.

### 4.    Discriminatory Screening of Recruits

The process of screening or culling recruits presents another opportunity for discrimination. Race obviously cannot be used as a screening criterion.  Nor may employers use a screening criterion that has a significantly disparate racial impact unless it is proven to be job related and consistent with business necessity.

### EXAMPLE 10
### DISCRIMINATORY SCREENING
An executive in a large company asks a recruiter in the human resources department to find her a new secretary.  The executive tells the recruiter that in addition to excellent secretarial skills, she wants

---

alike and is not on its face discriminatory, in a completely white union the present effect of its continued application is to forever deny to [Blacks] and Mexican-Americans any real opportunity for membership'").

[86]    *Compare United States v. City of Warren, MI*, 138 F.3d 1083, 1094 (6th Cir. 1998) (on similar facts, holding Department of Justice established that municipality's recruiting practices had a disparate impact on Black potential job applicants in violation of Title VII: "Warren's limitation of its applicant pool to residents of the overwhelmingly white city, combined with its refusal to publicize jobs outside the racially homogenous county, produced a de facto barrier between employment opportunities and members of a protected class.  A plaintiff need not identify a sign reading 'No Blacks Need Apply' before invoking Title VII.")*, and NAACP v. Town of Harrison, NJ*, 940 F.2d 792, 799-805 (3d Cir. 1991) (affirming lower court's finding that requirement that town employees become residents within one year of hire had unlawful disparate impact on Blacks; town's population was 0.2 percent Black and town had never hired a Black person, though the metropolitan area was home to over 214,000 Blacks, and Blacks made up 22 percent of town's private sector workforce)*, with NAACP v. City of Bayonne, NJ*, 134 F.3d 113, 123-25 (3d Cir. 1998) (upholding finding that the plaintiff did not prove that residency requirement caused disparate impact – statistical evidence was not strong, and city showed that its four-year moratorium on the residency requirement did not raise the number of Black employees).

15-24

only to interview candidates who will relate well with high level executives inside and outside the company. In response to this, the recruiter searches the company's résumé database. The search produces 50 current résumés. In order to reduce this to a more manageable number, the recruiter refines the search to eliminate résumés from zip codes that are predominantly Black or Latino. This violates Title VII.

## B.    HIRING AND PROMOTION

The law generally leaves it to the employer's business judgment to determine who should be hired or promoted. Within that context, however, an applicant's race should not affect his or her chances. This means that employers cannot treat persons of different races differently in the hiring or promotion process. Nor may employers use selection criteria that have a significant discriminatory effect without being able to prove that the criteria are job-related and consistent with business necessity. Thus, a sound way for employers both to achieve business goals and to comply with the law is to hire and promote based on job-related ability, as measured by uniform and consistently applied qualification/selection standards.

### 1.    Uniform and Consistently Applied Standards

When making hiring and promotion decisions, employers must apply the same selection criteria to persons of different races, and apply them in the same way, giving the same weight to each criterion for each person. The reasons given for selection decisions should be credible and supported by the evidence. The following are examples.

### EXAMPLE 11
### NONDISCRIMINATORY SELECTION DECISION

Malcolm, an Asian American, applies for an executive position with the employer, a health maintenance organization. Malcolm is well qualified; he has a B.S. in biology from a large state university and an M.D. from a prestigious private university. Malcolm also has seven years' experience practicing internal medicine and recently obtained an Executive M.B.A. from a well-respected business school. The employer interviewed Malcolm and eight other candidates. Malcolm was one of two finalists brought back for a final round of interviews. The employer's selection committee ultimately chose Robert, a White finalist with slightly fewer qualifications but with experience in a similar job for a competitor. The employer tells EEOC that given Robert's experience, it believed it would gain the most competitive benefit by hiring him. The EEOC investigator confirms Robert's experience working for a competitor, and reads the minutes of the selection committee's final meeting which reflect that this was the reason discussed at the meeting for choosing Robert over

15-25

0082

Malcolm. Here, the evidence supports the employer's legitimate, nondiscriminatory reason.

**EXAMPLE 12**
**DISCRIMINATORY SELECTION DECISION**

Kai, a Native American, files a charge after he applied for a promotion, was interviewed, and was not selected. The investigation reveals that, based on objective qualifications, Kai was deemed one of the top candidates but the job ended up going to Ted, a similarly qualified White candidate from outside the company. The hiring manager tells the investigator that he thought that Kai was well qualified but he chose Ted because he "seemed to be a better fit; I'm comfortable with him and I can see him in my job one day." When pressed to be more specific,[87] the manager says he liked the fact that Ted worked for a competitor. However, the investigation reveals that although Ted did work for another company in the industry, it was not really a competitor. Employee and management witnesses tell the investigator that Ted's experience working for another company in the industry was no more valuable than Kai's experience working for the company itself. The witnesses also tell the investigator that, until now, the company practice had been to prefer qualified internal candidates over similarly qualified external candidates. There is reasonable cause to believe that Kai was discriminated against based on his race or national origin.

**EXAMPLE 13**
**DISCRIMINATORY SELECTION DECISION**

Rita, an African American, has worked seven years as a Program Analyst for a federal agency. She consistently has received outstanding performance evaluations. Each of the last four years, Rita has applied for openings for jobs in her office in a higher grade. The agency has rejected Rita each time. After the fourth rejection, Rita initiated EEO counseling, and then a formal complaint, because she believed she had been repeatedly discriminated against. She stated that four White employees were promoted over her, each time for a different reason. The investigation reveals that the agency actually did apply the same promotion criteria during each selection. Importantly, however, witness interviews and documentary evidence (e.g., the employer's interview notes) strongly suggest that the agency weighted the criteria differently each time so that Rita was the least qualified applicant. In other words, it appears that when a job-related qualification favored Rita it was deemed less important than

---

[87] *See supra* note 60.

0083

when a qualification favored a White candidate. Moreover, statistics reveal that Whites are promoted more often than similarly qualified African Americans. There is reasonable cause to believe Rita was discriminated against based on her race.

## 2. Job-Related Standards, Consistent with Business Necessity

In an employer's important effort to hire the best candidate, it might unintentionally engage in race discrimination by using selection standards that measure differences between racial groups that are not related to the job. Title VII provides that, if a selection standard is shown to have a significant impact based on race, the employer must demonstrate that the standard is job-related and consistent with business necessity. Thus, employers should be sure to "measure the person for the job and not the person in the abstract."[88]

### Education Requirements

Educational requirements obviously may be important for certain jobs. For example, graduation from medical school is required to practice medicine. However, employers often impose educational requirements out of their own sense of desirable qualifications. Such requirements may run afoul of Title VII if they have a disparate impact and exceed what is needed to perform the job. As the Supreme Court stated in one of its earliest interpretations of Title VII: "History is filled with examples of men and women who rendered highly effective performance without the conventional badges of accomplishment in terms of certificates, diplomas, or degrees. Diplomas and tests are useful servants, but Congress has mandated the commonsense proposition that they are not to become masters of reality."[89]

**EXAMPLE 14**
**EDUCATION REQUIREMENT**

Chloe, White, is the Head Secretary for a division of XYZ Corp. She took the job right after college and now is departing after three years to go to graduate school. The employer was thrilled with Chloe's work, and when it gets notice that she is leaving, it sets out to find a replacement. Sylvia, an African American, applies for the job. Sylvia is a successful graduate of the local business institute, and has spent the last five years working as a secretary for a regional bank, rising a year ago to become the Executive Secretary in one of its major departments. The employer rejects Sylvia's application because she is not a college graduate, which triggers a charge. Statistical evidence shows that in the local labor market African Americans and Hispanics in the pool of administrative and clerical

---

[88]    *Griggs*, 401 U.S. at 433.

[89]    *Id*.

0084

workers are significantly less likely to have college degrees than Whites. The employer defends its education requirement by attributing Chloe's success to the fact that she was college educated, noting that the Head Secretary position involves not only traditional secretarial work, but also more complex responsibilities such as preparing reports, and training and supervising other clerical staff. The investigation reveals, however, that none of the firm's prior successful Head Secretaries had college degrees, and it is not the industry standard. Most importantly, the employer presents no evidence that a college degree is more predictive of, or correlated with, job performance than a degree from a business institute plus significant relevant experience (i.e., Sylvia's qualifications), or other credentials and experiences that would render a person qualified for the job. The evidence establishes that the employer has violated Title VII because the college-degree requirement screens out African Americans and Hispanics to a significant degree but it has not been demonstrated to be job related and consistent with business necessity.

## Employment Testing

Employment testing is another practice to which the disparate impact principle frequently is applied. Title VII provides that it is not an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test "provided that such test, its administration or action upon the results is not designed, intended or used to discriminate on the basis of race" or other protected bases.[90] Under this provision, employment tests that have a disparate impact based on race or another protected trait must be validated pursuant to the government's Uniform Guidelines on Employee Selection Procedures.[91] For example, if an employer decides to use a personality test to determine which employees are "management material," and the test has a significant disparate impact based on race or another protected trait, the employer first must have the test professionally validated to ensure that the test is predictive of, or significantly correlates with, important elements of a manager's job performance.[92] Even if the employer meets that standard, the test still may violate Title VII if there is another, less

---

[90]    *See* 42 U.S.C. § 2000e-2(h).

[91]    *See* 29 C.F.R. Part 1607 (UGESP); *Griggs*, 401 U.S. at 436 ("From the sum of the legislative history relevant in this case, the conclusion is inescapable that the EEOC's construction of § 703(h) to require that employment tests be job-related comports with Congressional intent.").

[92]    *See* 29 C.F.R. § 1607.3A ("The use of any selection procedure which has an adverse impact on the hiring, promotion, or other employment or membership opportunities of members of any race, sex, or ethnic group will be considered to be discriminatory and inconsistent with these guidelines, unless the procedure has been validated in accordance with these guidelines, or the provisions of section 6 below are satisfied.").

0085

discriminatory alternative to the test that serves the employer's needs and the employer fails to use this alternative.[93]

Title VII also explicitly prohibits employers from race-norming employment tests, i.e, adjusting scores, using different cutoff scores, or otherwise altering the results of employment tests on the basis of race or other Title VII-protected bases.[94] For example, it is illegal to use different "passing" scores for different racial groups or to alter scores on employment tests in order to make the mean score the same for each race. This does not mean an employer cannot change the way it grades employment tests. For example, an employer may go from a straight ranking system to a grade banding system (i.e., a system that groups similar grades together) if done for nondiscriminatory purposes.[95]

### Conviction and Arrest Records

Of course, it is unlawful to disqualify a person of one race for having a conviction or arrest record while not disqualifying a person of another race with a similar record. For example, an employer cannot reject Black applicants who have conviction records when it does not reject similarly situated White applicants.[96]

In addition to avoiding disparate treatment in rejecting persons based on conviction or arrest records, upon a showing of disparate impact, employers also must be able to justify such criteria as job related and consistent with business necessity.[97] This means that, with respect to conviction

---

[93]  *See* 42 U.S.C. § 2000e-2(k)(1)(A).

[94]  *See* 42 U.S.C. § 2000e-2(*l*).

[95]  *See Chicago Firefighters Local 2 v. City of Chicago*, 249 F.3d 649, 655-56 (7th Cir. 2001) (rather than using a straight ranking system to measure and compare test scores on a promotional exam, the fire department banded similar scores together; court stated that the banding was designed to simplify scoring and remove meaningless gradations, not for the unlawful purpose of making the scores of any particular race seem higher).

[96]  A 2003 study suggests this is a significant problem. *See* Devah Pager, *The Mark of a Criminal Record*, AMERICAN JOURNAL OF SOCIOLOGY (Mar. 2003) (audit study sending matched pairs of Black and White male college students with similar self-presentation styles to apply for 350 low-skilled jobs advertised in the Milwaukee classifieds; purpose was to test the degree to which a criminal record affects subsequent employment opportunities; study found that when the White "testers" were assigned a fake 18-month prison record – for possession of cocaine with intent to sell – they were called back by employers 17% of the time, while the Black testers assigned the same record were called back only 5% of the time; Whites without a criminal record had a 34% call back rate versus a 14% call back rate for Blacks without a criminal record), *available at* http://www.northwestern.edu/ipr/publications/papers/2003/pagerajs.pdf.

[97]  *See Green v. Missouri Pacific Railroad Co.*, 523 F.2d 1290, 1293-99 (8th Cir. 1975) (applying Title VII disparate impact principles to employer's "no convictions" hiring policy); *Caston v. Methodist Medical Center of Ill.*, 215 F. Supp. 2d 1002, 1008 (C.D. Ill. 2002) (race-based disparate impact

records, the employer must show that it considered the following three factors: (1) the nature and gravity of the offense(s); (2) the time that has passed since the conviction and/or completion of the sentence; and (3) the nature of the job held or sought.[98] A blanket exclusion of persons convicted of any crime thus would not be job-related and consistent with business necessity.[99] Instead, the above factors must be applied to each circumstance. Generally, employers will be able to justify their decision when the conduct that was the basis of the conviction is related to the position, or if the conduct was particularly egregious.

Arrest records are treated slightly differently. While a conviction record constitutes reliable evidence that a person engaged in the conduct alleged (i.e., convictions require proof "beyond a reasonable doubt"), an arrest without a conviction does not establish that a person actually engaged in misconduct.[100] Thus, when a policy or practice of rejecting applicants based on arrest records has a disparate impact on a protected class, the arrest records must not only be related to the job at issue, but the employer must also evaluate whether the applicant or employee actually engaged in the misconduct. It can do this by giving the person the opportunity to explain and by making follow-up inquiries necessary to evaluate his/her credibility.[101]

Other employment policies that relate to off-the-job employee conduct also are subject to challenge under the disparate impact approach, such as policies related to employees' credit history. People of color have also challenged, under the disparate impact theory, employer policies of discharging persons whose wages have been garnished to satisfy creditors' judgments.[102]

---

claim challenging employer's policy of not hiring former felons was cognizable under Title VII and thus survived motion to dismiss).

[98]     See generally EEOC's *Policy Statement on the Issue of Conviction Records under Title VII of the Civil Rights Act of 1964* (1987).

[99]     See Green, 523 F.2d at 1298-99 (striking down employer's absolute bar of anyone ever convicted of a crime other than a minor traffic offense: "Although the reasons [the employer] advances for its absolute bar can serve as relevant considerations in making individual hiring decisions, they in no way justify an absolute policy which sweeps so broadly. We cannot conceive of any business necessity that would automatically place every individual convicted of any offense, except a minor traffic offense, in the permanent ranks of the unemployed. This is particularly true for blacks who have suffered and still suffer from the burdens of discrimination in our society.").

[100]    See Gregory v. Litton Sys., Inc., 316 F. Supp. 401 (C.D. Cal. 1970) (judgment for Plaintiff who challenged employer policy of not hiring anyone who had been arrested on "a number of occasions," where this threshold was undefined, and company had in its employ many persons who had been arrested), *aff'd*, 472 F.3d 631 (9th Cir. 1972).

[101]    See generally EEOC's *Policy Guidance on the Consideration of Arrest Records in Employment Decisions under Title VII of the Civil Rights Act of 1964* (1990).

[102]    Compare, e.g., Robinson v. City of Dallas, 514 F.2d 1271 (5th Cir. 1975) (recognizing policy of discharging persons who failed to pay "just debts" could be challenged, but ruling for employer because

0087

## C.     DIVERSITY AND AFFIRMATIVE ACTION

In order to open the American workplace to historically excluded groups, some employers use diversity and affirmative action programs. Diversity and affirmative action are related concepts, but the terms have different origins and legal connotations. Workforce diversity is a business management concept under which employers voluntarily promote an inclusive workplace. Employers that value diversity create a culture of respect for individual differences in order to "draw talent and ideas from all segments of the population" and thereby potentially gain a "competitive advantage in the increasingly global economy."[103] Many employers have concluded that a diverse workforce makes a company stronger, more profitable, and a better place to work,[104] and they implement diversity initiatives for competitive reasons rather than in response to discrimination, although such initiatives may also help to avoid discrimination.

Title VII permits diversity efforts designed to open up opportunities to everyone. For example, if an employer notices that African Americans are not applying for jobs in the numbers that would be expected given their availability in the labor force, the employer could adopt strategies to expand the applicant pool of qualified African Americans such as recruiting at schools with high African American enrollment.[105] Similarly, an employer that is changing its hiring practices can take steps to ensure that the practice it selects minimizes the disparate impact on any racial group.[106] For

---

although Plaintiffs established that Blacks comprised a disproportionately large portion of the poor people in Dallas, they did not offer statistics showing that people who do not pay their just debts tend to be poor people), *with Johnson v. Pike Corp. of America*, 332 F. Supp. 490 (C.D. Cal. 1971) (approving stipulation for judgment against defendant where garnishment policy had disparate impact on Blacks and other people of color and was not supported by business necessity).

[103]     EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, "BEST" EQUAL EMPLOYMENT OPPORTUNITY POLICIES, PROGRAMS, AND PRACTICES IN THE PRIVATE SECTOR 7 (2d ed. 1998). The complete report is available at http://www.eeoc.gov/abouteeoc/task_reports/practice.html.

[104]     *Cf. Grutter v. Bollinger*, 539 U.S. 306, 330 (2003) ("major American businesses have made clear that the skills needed in today's increasingly global marketplace can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints. . . . What is more, high- ranking retired officers and civilian leaders of the United States military assert that, '[b]ased on [their] decades of experience,' a 'highly qualified, racially diverse officer corps . . . is essential to the military's ability to fulfill its principle mission to provide national security'") (citations to briefs omitted).

[105]     *Cf. Duffy v. Wolle*, 123 F.3d 1026, 1038-39 (8th Cir. 1997) (*Bivens* action under the *McDonnell Douglas* framework: "An employer's affirmative efforts to recruit minority and female applicants [do] not constitute discrimination. An inclusive recruitment effort enables employers to generate the largest pool of qualified applicants and helps to ensure that minorities and women are not discriminatorily excluded from employment. This not only allows employers to obtain the best possible employees, but it is an excellent way to avoid lawsuits.") (citations and quotation marks omitted).

[106]     *See* EEOC Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. §§ 1607.3(B), 1607.6(A) (approving use of alternative selection procedures in order to eliminate or decrease adverse impact).

0088

example, an employer that previously required new hires to have a college degree could change this requirement to allow applicants to have a college degree or two years of relevant experience in the field. A need for diversity efforts may be prompted by a change in the population's racial demographics, which could reveal an underrepresentation of certain racial groups in the work force in comparison to the current labor pool.

Affirmative action, in contrast, "means those actions appropriate to overcome the effects of past or present practices, policies, or other barriers to equal employment opportunity."[107] Affirmative action under Title VII may be (1) court-ordered after a finding of discrimination,[108] (2) negotiated as a remedy in consent decrees and settlement agreements, or (3) conducted pursuant to government regulation.[109] Also, employers may implement voluntary affirmative action plans in appropriate circumstances, such as to eliminate a manifest imbalance in a traditionally segregated job category.[110] In examining whether such a voluntary affirmative action plan is legal under Title VII, courts consider whether the affirmative action plan involves a quota or inflexible goal, whether the plan is flexible enough so that each candidate competes against all other qualified candidates, whether the plan unnecessarily trammels the interests of third parties, and whether the action is temporary, e.g., not designed to continue after the plan's goal has been met.[111]

---

[107]    EEOC Guidelines on Affirmative Action, 29 C.F.R. § 1608.1(c).

[108]    *See*, *e.g.*, *Local 28 of the Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 448-49 (1986) (Congress gave lower courts broad power under Title VII to fashion the most complete relief possible to remedy discrimination, including the power to fashion affirmative action relief).

[109]    For example, federal contractors may be subject to affirmative action requirements of Executive Order 11246, which is enforced by the Department of Labor's Office of Federal Contract Compliance Programs (http://www.dol.gov/esa/ofccp/index.htm) and/or the affirmative action requirements of state and local governments. Federal executive branch agencies must have "an affirmative program of equal employment opportunity" for all employees and applicants for employment, *see* 42 U.S.C. § 2000e-16 and 29 U.S.C. § 791, as set forth in EEOC's Management Directive 715 (http://www.eeoc.gov/federal/md715/index.html).

[110]    *See United Steel Workers of America v. Weber,* 443 U.S. 193 (1979)*,* and *Johnson v. Transportation Agency,* 480 U.S. 616 (1987).

[111]    *See Weber*, 443 U.S. at 208 (because Blacks had long been excluded from craft unions because of race, only 1.83% of the plant's craft workers were Black, and thus the union and the employer collectively bargained an affirmative action plan that reserved for Blacks 50% of the openings in an in-plant craft training program, to be followed until the percentage of Black craftworkers in the plant was commensurate with the percentage of Blacks in the local labor force; Supreme Court upheld the affirmative action plan on grounds that its purposes mirrored those of Title VII, the plan did not unnecessarily trammel the interests of White employees, and the plan was a temporary measure not intended to maintain a racial balance, but intended to eliminate a racial imbalance); *Sheet Metal Workers*, 478 U.S. at 448 ("[t]he availability of race-conscious affirmative relief . . . as a remedy for a violation of Title VII . . . furthers the broad purposes underlying the statute" because "Congress enacted Title VII based on its determination that racial minorities were subject to pervasive and systematic discrimination in employment"). *See also Johnson,* 480 U.S. at 632 ("manifest imbalance" does not need to reach the level of a *prima facie* case of

0089

An affirmative action plan implemented by a public sector employer is subject to both Title VII of the Civil Rights Act of 1964 and the Equal Protection Clause of the United States Constitution.[112]  Some federal courts have held that public law enforcement agencies may satisfy the Equal Protection Clause if an "operational need" justifies the employer's voluntary affirmative action efforts.[113]  In the higher education context, the Supreme Court decided in *Grutter v. Bollinger* that attaining a diverse student body can justify considering race as a factor in specific admissions decisions at colleges and universities without violating the Equal Protection Clause or Title VI of the Civil Rights Act of 1964.  The Supreme Court has not yet ruled on whether an "operational need" or diversity rationale could justify voluntary affirmative action efforts under Title VII, but a

---

discrimination); EEOC Guidelines on Affirmative Action, 29 C.F.R. Part 1608.

[112]     *Compare Wygant v. Jackson Board of Education*, 476 U.S. 267, 273-76 (1986) (finding that a race-based layoff provision in a collective-bargaining agreement, which was created by a public school board and teachers union to remedy present effects of societal discrimination against minority employees and to provide minority role models for minority students, violated the Equal Protection Clause), *with Johnson,* 480 U.S. at 620 n.2 & 641-42 (upholding under Title VII a public employer's voluntary affirmative action plan which permitted sex to be considered as a factor for promotions to positions within a traditionally segregated job classification, and  noting that, "where the issue is properly raised, public employers must justify the adoption and implementation of a voluntary affirmative action plan under the Equal Protection Clause").  The *Johnson* Court observed, in a footnote, that "[Title VII] was not intended to extend as far as . . . the Constitution."  *Johnson*, 480 U.S. at 628 n.6.

[113]     *See, e.g., Petit v. City of Chicago*, 352 F.3d 1111, 1115 (7th Cir. 2003) (Chicago Police Department had a compelling interest in diversity in police force serving large, racially and ethnically divided metropolitan area, justifying, under Equal Protection Clause, city's affirmative action promotions of African American and Hispanic officers to rank of sergeant); *Reynolds v. City of Chicago*, 296 F.3d 524, 530-31 (7th Cir. 2002) (upholding non-remedial promotion of Hispanic officer because city proved it was warranted by compelling public safety need for Hispanic officers in supervisory roles to sensitize other officers to special problems related to Hispanic neighborhoods, and to promote trust in the citizens of those neighborhoods; court recognized this as particularly compelling in light of the need for effective police work in the age of public concern about international terrorism); *Talbert v. City of Richmond*, 648 F.2d 925, 931-32 (4th Cir. 1981) (holding that "the attainment of racial diversity in the top ranks of the police department was a legitimate interest of the city" and thus promotion of City's first Black officer to Major over White plaintiff in a city with a 50% Black population was lawful); *accord Cotter v. City of Boston*, 323 F.3d 160, 172 n.10 (1st Cir. 2002) (declining to address whether meeting the operational needs of the police department are compelling state interests but stating that Court is "sympathetic to the argument that communities place more trust in a diverse police force and that the resulting trust reduces crime rates and improves policing").  *But see Patrolmen's Benevolent Ass'n. v. City of New York,* 310 F.3d 43, 52-53 (2d Cir. 2002) (acknowledging that "'a law enforcement body's need to carry out its mission effectively, with a workforce that appears unbiased, is able to communicate with the public and is respected by the community it serves,' may constitute a compelling state interest," but holding that race-based transfers of Black and Hispanic police officers to precinct where a Black man was tortured were not lawful because "mere assertion of an 'operational need' to make race-conscious employment decisions does not give a police department *carte blanche* to dole out work assignments based on race if no such justification is established") (internal citation omitted).

15-33

0090

number of legal scholars and practitioners have debated the issue.[114]

The Commission encourages voluntary affirmative action and diversity efforts to improve opportunities for racial minorities in order to carry out the Congressional intent embodied in Title VII.[115] Further, the Commission believes that "persons subject to Title VII must be allowed flexibility in modifying employment systems and practices to comport with the purposes" of the statute.[116] However, employers are cautioned that very careful implementation of affirmative action and diversity programs is recommended to avoid the potential for running afoul of the law.[117] EEOC investigators should consult with attorneys from their legal unit on charges of discrimination involving affirmative action and diversity plans.

---

[114] *See, e.g.,* Richard N. Appel, *Affirmative Action in the Workplace: Forty Years Later,* 22 HOFSTRA LAB. & EMP. L.J. 549, 571-74 (Spring 2005) (addressing whether *Grutter* diversity rationale will justify race-conscious decisions in the private sector employment context under Title VII); Michael L. Foreman, Kristin M. Dadey and Audrey J. Wiggins, *The Continuing Relevance of Race-conscious Remedies and Programs in Integrating the Nation's Workforce*, 22 HOFSTRA LAB. & EMP. L.J. 81, 101-104 (Fall 2004) (discussing the implications of *Grutter* for affirmative action plans in employment); Paul Frymer and John D. Skrentny, *The Rise of Instrumental Affirmative Action: Law and the New Significance of Race in America*, 36 CONN. L. REV. 677, 693-697 (Spring 2004) (discussing the treatment of "operational need" cases involving police under Title VII and the Equal Protection Clause); Rebecca Hanner White, *Affirmative Action in the Workplace: The Significance of Grutter,* 92 KY. L.J. 263, 272-78 (2003-2004) (distinguishing affirmative action in employment context from educational context and analyzing whether the diversity rationale in *Grutter* will justify affirmative use of race for non-remedial purpose under Title VII, especially for private employers).

[115] EEOC Guidelines on Affirmative Action, 29 C.F.R. § 1608.1(c).

[116] *Id.*

[117] *See, e.g., Frank v. Xerox Corp*., 347 F.3d 130, 137 (5th Cir. 2003) (a jury could consider Xerox's "Balanced Workforce Initiative" (BWF), in which Xerox identified explicit, specific racial goals for each grade and job level, to be direct evidence of discrimination against Blacks in light of evidence that Blacks were considered to be "over-represented" and Whites "under-represented," and managers were evaluated on how well they complied with the BWF; thus "a jury looking at these facts could find that Xerox considered race in fashioning its employment policies and that because Plaintiffs were black, their employment opportunities had been limited"); *Taxman v. Board of Education of the Township of Piscataway*, 91 F.3d 1547, 1557-58 (3d Cir. 1996) (holding that where Black employees were not underutilized or under-represented, school district conducting reduction in force could not choose to retain a Black employee instead of a White employee of equal seniority, ability, and qualifications, solely on grounds of diversity).

0091

# 15-VII EQUAL OPPORTUNITY FOR JOB SUCCESS

## A. RACIAL HARASSMENT

Failing to provide a work environment free of racial harassment is a form of discrimination under Title VII. Liability can result from the conduct of a supervisor, coworkers, or non-employees such as customers or business partners over whom the employer has control.[118]

A hostile environment can be comprised of various types of conduct. While there is not an exhaustive list, examples include offensive jokes, slurs, epithets or name calling, physical assaults or threats, intimidation, ridicule or mockery, insults or put-downs, offensive objects or pictures, and interference with work performance. The conduct need not be explicitly racial in nature to violate Title VII's prohibition against race discrimination, but race must be a reason that the work environment is hostile.[119] To determine if a work environment is hostile, all of the circumstances should be considered. Incidents of racial harassment directed at other employees in addition to the charging party are relevant to a showing of hostile work environment.[120]

There are two requirements for race-based conduct to trigger potential liability for unlawful harassment: (1) the conduct must be unwelcome; and (2) the conduct must be sufficiently severe *or* pervasive to alter the terms and conditions of employment in the mind of the victim and from the

---

[118] For a more detailed discussion of the standards for unlawful harassment, see Enforcement Guidance: *Vicarious Employer Liability for Unlawful Harassment by Supervisors* (June 1999); *Enforcement Guidance on Harris v. Forklift Sys., Inc.* (November 1993); *Policy Guidance on Current Issues of Sexual Harassment* (Mar. 1990); 29 C.F.R. § 1604.11.

[119] *See Aman*, 85 F.3d at 1083 (conduct need not be overtly racial in character as long as harassment was because of race); *Policy Guidance on Current Issues of Sexual Harassment*, at 19 (Mar. 1990) (harassment need not be explicitly sexual, racial, religious, etc. to give rise to Title VII liability as long as it was because of the protected trait), *available at* http://www.eeoc.gov/policy/docs/currentissues.html.

[120] *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185-86 (4th Cir. 2001) (racial harassment both directed at Plaintiff, and not specifically directed at Plaintiff but part of Plaintiff's work environment, could be considered); *Schwapp v. Town of Avon*, 118 F.3d 106, 111-12 (2d Cir. 1997) (permitting claim of Black Plaintiff to survive summary judgment based on racially offensive incidents involving Plaintiff directly, as well as incidents he was aware of involving other Blacks (some occurring prior to his employment) and other minority groups). Courts might give less weight to racially offensive conduct experienced second-hand. *See Singletary v. Missouri Dep't of Corrections*, 423 F.3d 886, 893 (8th Cir. 2005) (affirming summary judgment for employer in part because racial epithets about Plaintiff were not made in his presence, which lessened the objective hostility of his work environment); *Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 567 (7th Cir. 2004) ("We do not mean to hold that a plaintiff can never demonstrate a hostile work environment through second-hand comments or in situations where a plaintiff is not the intended target of the statements. However, what Weaver personally experienced does not amount to an objectively hostile work environment. She heard an offensive term directed at a third person once and only learned from others about other offensive comments directed at third persons.").

0092

perspective of a reasonable person in the victim's position. At this point, the harassing conduct "offends Title VII's broad rule of workplace equality."[121]

## 1. Unwelcome Conduct

The conduct must be unwelcome in the sense that the alleged victim did not solicit or incite the conduct and regarded it as undesirable or offensive. When the conduct involves mistreatment or is racially derogatory in nature, unwelcomeness usually is not an issue, even when the alleged harasser and victim are of the same race.[122] Sometimes employers argue that the conduct in question was not unwelcome because it was playful banter, and the alleged victim was an active participant. The facts in such cases require careful scrutiny to determine whether the alleged victim was, in fact, a willing participant.[123]

## 2. Severe or Pervasive

To violate Title VII, racially abusive conduct does not have to be so egregious that it causes economic or psychological injury.[124] At the same time, Title VII is not "a general civility code,"[125] and thus conduct is not illegal just because it is uncomfortable, or inappropriate. The "severe or pervasive" standard reflects what the Supreme Court has called a "middle path" between these extremes.[126]

---

[121] *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).

[122] *See, e.g., Kang v. U. Lim America*, 296 F.3d 810, 817 (9th Cir. 2002) (hostile work environment could be found where Korean supervisor with stereotypical beliefs about the superiority of Korean workers held Korean Plaintiff to higher standards, required him to work harder for longer hours, and subjected Plaintiff to verbal and physical abuse when he failed to live up to supervisor's expectations); *Ross v. Douglas County*, 234 F.3d 391, 393 & 395-97 (8th Cir. 2000) (affirming verdict in favor of Black employee whose Black supervisor subjected him to racially derogatory slurs, such as the "N-word" and "black boy," and referred to the employee's wife, who was White, as "whitey": "Such comments were demeaning to Ross. They could have been made to please Johnson's white superior or they may have been intended to create a negative and distressing environment for Ross. Whatever the motive, we deem such conduct discriminatory.").

[123] *E.g., Vaughn v. Pool Offshore Co.*, 683 F.2d 922, 924-25 (5th Cir. 1982) (trial court did not err in finding for employer where plaintiff used racial slurs along with his co-employees, other employees were subjected to the same obnoxious treatment as plaintiff, his co-workers expressed amicable feelings towards him, and plaintiff testified at trial that he did not believe that pranks against him were racially motivated or that he was singled out for abusive treatment).

[124] *See Harris*, 510 U.S. at 22; *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986).

[125] *Oncale*, 523 U.S. at 80-81.

[126] *Harris*, 510 U.S. at 21 ("This standard, which we reaffirm today, takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury.").

15-36

Harassment must be analyzed on a case-by-case basis, by looking at all the circumstances and the context. Relevant factors in evaluating whether racial harassment creates a sufficiently hostile work environment may include any of the following (no single factor is determinative):

- The frequency of the discriminatory conduct;

- The severity of the conduct;

- Whether the conduct was physically threatening or humiliating;

- Whether it unreasonably interfered with the employee's work performance; and

- The context in which the harassment occurred, as well as any other relevant factor.

The more severe the harassment, the less pervasive it needs to be, and vice versa. Accordingly, unless the harassment is quite severe, a single incident or isolated incidents of offensive racial conduct or remarks generally do not create an abusive working environment.[127] But a single, extremely serious incident of harassment may be sufficient to constitute a Title VII violation, especially if the harassment is physical.[128] Examples of the types of single incidents that can create a hostile work environment based on race include: an actual or depicted noose or burning cross (or any other manifestation of an actual or threatened racially motivated physical assault),[129] a favorable reference to the Ku Klux Klan, an unambiguous racial epithet such as the "N-word,"[130] and a racial comparison to an animal.[131] Racial comments or other acts that are not sufficiently

_____

[127]    *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'").

[128]    *See Smith v. Sheahan*, 189 F.3d 529, 533-34 (7th Cir. 1999) (a sufficiently severe episode may occur as rarely as once and still violate Title VII).

[129]    *See Reedy v. Quebecor Printing Eagle, Inc.*, 333 F.3d 906, 909 (8th Cir. 2003) (racially hateful bathroom graffiti that amounted to death threat aimed at Plaintiff could be fairly characterized as severe); *Williams v. New York City Housing Auth.*, 154 F. Supp. 2d 820, 824-25 (S.D.N.Y. 2001) ("Indeed, the noose is among the most repugnant of all racist symbols, because it is itself an instrument of violence. It is impossible to appreciate the impact of the display of a noose without understanding this nation's opprobrious legacy of violence against African-Americans."); *cf. Jackson v. Flint Ink North Am. Corp.*, 379 F.3d 791, 795 (8th Cir. 2004) (in racial discrimination case involving graffiti depicting a burning cross, court noted that because "its symbolism is potentially more hostile and intimidating than the racial slurs[,] [e]ven a single instance of workplace graffiti, if sufficiently severe, can go a long way toward making out a Title VII claim"), *rev'd on reh'g on other grounds*, 382 F.3d 869, 870 (8th Cir. 2004).

[130]    *Cf. Spriggs*, 242 F.3d at 185 ("Far more than a mere offensive utterance," the N-word is "pure anathema to African Americans. Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'n-----' by a supervisor in the presence of his subordinates.") (citation and quotation marks omitted).

[131]    In an *amicus curiae* brief in *Oates v. Discovery Zone*, 116 F.3d 1161 (7th Cir. 1997), the Commission argued that a Black employee provided sufficient evidence of racial harassment where he

0094

severe standing alone may become actionable when repeated, although there is no threshold magic number of harassing incidents giving rise to liability.[132]  Moreover, investigators must be sensitive to the possibility that comments, acts, or symbols that might seem benign to persons of the harasser's race could nevertheless create a hostile work environment for a reasonable person in the victim's position.[133]

Below are examples designed to explain the concept of conduct sufficiently "severe or pervasive" to alter someone's working conditions.

### EXAMPLE 15
### SUFFICIENTLY SEVERE CONDUCT

Tim, an African American, is an employee at an auto parts manufacturing plant.  After a racially charged dispute with a White coworker, the coworker told Tim: "Watch your back, boy!"  The next day, a hangman's noose, reminiscent of those historically used for racially motivated lynchings, appeared above Tim's locker.  Given the violently threatening racial nature of this symbol and the context, this incident would be enough to alter Tim's working conditions.[134]

---

complained to his supervisor that a picture of gorillas with his name written on it was racially offensive, and his supervisor laughed at his complaint, refused to take the picture down, and allowed it to remain on display for a week after his complaint.  The Seventh Circuit did not reach the merits of the Commission's argument, finding that the plaintiff had waived his racial harassment claim by not alleging it in his complaint.  *Id.* at 1168.  One member of the panel, however, noted that "[h]ad it been properly before the district court, I agree with the amicus brief filed by the Equal Employment Opportunity Commission that it would not have been a proper candidate for summary judgment." *Id.* at 1177 (Wood, J., concurring in part and dissenting in part).  A copy of the Commission's *amicus curiae* brief is available at http://www.eeoc.gov/briefs/oates_v_discovery.txt.  *See also Spriggs*, 242 F.3d at 185 ("To suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the merely unflattering; it is degrading and humiliating in the extreme.").

[132]    The character of the comments or acts is important in determining the frequency needed to alter someone's working conditions.  *See, e.g., Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002) (no magic number of offensive comments needed; unambiguous racial epithets fall on the more severe end of the spectrum).  *See also* Example 16 and accompanying note 135, *infra*.

[133]    *Cf. Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 824 (4th Cir. 2004) (Gregory, Circuit Judge, concurring in the judgment) ("While many Southerners unquestionably embrace the [Confederate] flag, not out of malice or continued belief in racial subordination, but out of genuine respect for their ancestors, we must also acknowledge that some minorities and other individuals feel offended, threatened or harassed by the symbol.").  See also discussion of "code words," at note 47, *supra*.

[134]    *See supra* notes 129-131 and accompanying text.

0095

## EXAMPLE 16
## SUFFICIENTLY PERVASIVE CONDUCT

Miyuki, of Japanese descent, gets a job as a clerk in a large general merchandise store. After her first day on the job, a small group of young male coworkers starts making fun of her when they see her by slanting their eyes, or performing Karate chops in the air, or intentionally mispronouncing her name. This occurs many times during her first month on the job. This is pervasive harassment because of race and/or national origin.[135]

## EXAMPLE 17
## CONDUCT NOT SUFFICIENTLY SEVERE OR PERVASIVE

Steven, an African American, is a librarian at a public library. Steven approaches his supervisor, White, with the idea of creating a section in the stacks devoted to books of interest particularly to African Americans, similar to those he has seen in major bookstore chains. Steven's supervisor rejects the idea out of hand, stating that he does not want to create a "ghetto corner" in the library. This statement alone, while racially offensive, does not constitute severe or pervasive racial harassment, absent more frequent or egregious incidents.[136]

## EXAMPLE 18
## SUFFICIENTLY SEVERE OR PERVASIVE CONDUCT

Patrick, Caucasian, is a new employee in a company owned by an African American. All of the employees in Patrick's department, including his manager, also happen to be African American. Patrick's manager was pressured to hire Patrick because his father is a friend of a company executive. On Patrick's first day on the job, the manager said to him, "This is a Black company. Whiteboys like

---

[135] *Compare with, e.g., Manatt v. Bank of America*, 339 F.3d 792 (9th Cir. 2003) (Asian Plaintiff's working environment was not so objectively abusive as to alter the conditions of her employment where, over a two-and-a-half year period, harassment consisted of: two offensive and inappropriate incidents (one in which two co-workers cruelly ridiculed Plaintiff for mispronouncing a word, and another instance in which co-workers pulled their eyes back with their fingers in an attempt to imitate or mock the appearance of Asians), as well as other offhand remarks by her coworkers and supervisors (Plaintiff overheard jokes in which the phrase 'China man' was used, and overheard a reference to China and communism); the court noted that the incidents occurred over a span of two-and-a-half years and that if they had occurred over a shorter period of time or been repeated more frequently, Plaintiff "may very well have had an actionable hostile environment claim").

[136] *Compare with, e.g., Reedy*, 333 F.3d at 908-09 (working environment of Plaintiff, Black, was so objectively abusive as to alter the conditions of his employment where, over a seven-month period coworkers called him and other Black employees "n------" on numerous occasions and threatened them with violence, and the company allowed racial slurs, pictures, and threats to linger in the men's bathroom).

you might get all the breaks in your world, but not here. Your daddy got you this job, but he can't do it for you." Although Patrick made every effort to prove himself, he was unable to do so because over the course of the next six months the manager subjected him to a pattern of mistreatment. For example, the manager would assign Patrick the majority of the uninteresting and routine work, and would set artificial and unrealistic deadlines. The manager would yell at Patrick when he made a mistake due to having to rush. The manager also frequently failed to inform Patrick of important meetings, or ignored Patrick when he spoke at meetings he did attend. Once the manager asked Patrick to get him a cup of coffee – a task not part of his job, and which no one else ever was asked to do – and said to him, "By the way, as you've probably guessed, I like my coffee black." In contrast to the manager's treatment of Patrick, the manager assigned Patrick's coworkers – all African American – challenging assignments, provided them with coaching and training, and often extended their work deadlines. The totality of the evidence supports the conclusion that Patrick suffered from race-based harassment sufficient to alter his working conditions.[137]

## EXAMPLE 19
### SUFFICIENTLY SEVERE OR PERVASIVE CONDUCT

Kyra is a newly hired programer at a computer software development company. She is the first African American, and the first woman, to be hired by the company. All of the other employees are White or Asian American men. During her first few weeks on the job, several employees made insensitive comments to her. For example, one of her coworkers told her, "You're so articulate for a Black person." Kyra also overheard a conversation between a group of coworkers in which one said, "I didn't know Oprah could write code," to which the group responded with laughter. Her team leader said to her, "I know you got this job because you're a 'twofer' under our new affirmative action program, but you won't get any breaks here." Over her first few weeks, Kyra learned that the team leader held her to more exacting standards than her newly hired White and Asian American counterparts. While normally each programer's work was reviewed once by management to look for bugs – a process the company called "code review" – the computer code Kyra wrote was put to an extra round of code review, without any evidence that it was warranted.

---

[137] *See Aman*, 85 F.3d at 1078-84 (reasonable jury could find two Black employees were subjected to racially hostile environment where managers and coworkers repeatedly made coded racial remarks, and managers required them to do menial tasks outside their job description, yelled at them, and made their jobs more difficult by withholding necessary information, refusing to deal with them, and falsely accusing them of misconduct).

After the first project Kyra was assigned to work on was complete, Kyra had trouble getting assigned to another project because other team leaders incorrectly assumed that Kyra's work was substandard. When she raised the issue with management, she was told that the company had always had a word-of-mouth assignment system, and she needed to learn how to "play with the boys." The evidence supports the conclusion that Kyra was subjected to a hostile work environment because of her race, sex, or the intersection of both, in light of the pattern of offensive comments and evidence that the bias altered the terms and conditions of Kyra's employment.

### 3.       Employer Liability

Employers and employees each have an essential role in preventing race harassment. When employers and employees both take appropriate steps to prevent and correct harassment, offensive conduct generally will be corrected before escalating to the point of violating Title VII.

### <u>Conduct of Supervisors</u>

The rules for liability differ depending on whether the harasser is a supervisor. An individual qualifies as an employee's supervisor if the individual has authority to undertake or recommend tangible employment decisions affecting the employee, or the individual has authority to direct the employee's daily work activities.[138] As a general rule, employers are responsible for the behavior of their supervisors because employers act through their supervisors.

Thus, any time discrimination by a supervisor results in the victim suffering a tangible employment action, such as being fired (or quitting in response to intolerable harassment accompanied by an official company act),[139] demoted, not promoted, or docked in pay, the employer is automatically liable, and there are no defenses available to the employer. For example, if a supervisor has a racially motivated grudge against an employee and acts on it by denying the employee a raise otherwise deserved under the employer's pay system, the employer would be automatically liable and no defense would be available.

---

[138]      *See* Enforcement Guidance: *Vicarious Employer Liability for Unlawful Harassment by Supervisors*, § III (June 1999). The Guidance also states the Commission's position that even if the harasser had no actual supervisory power over the employee, the employer will be subject to vicarious liability if the employee reasonably believed that the harasser had such authority. But, if the harasser had no actual supervisory authority over the employee and the employee did not reasonably believe that the harasser had such authority, then the standard of liability for co-worker harassment applies. *Id.*

[139]      The Supreme Court has held that a claim for constructive discharge is available under Title VII when the harassment is so egregious or intolerable that quitting is a fitting response, and no affirmative defense is available when the constructive discharge is caused by an official company act, such as when a person quits in response to a humiliating demotion, an extreme cut in pay, or a transfer to a position that is unbearable. *See Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004).

0098

There is an exception to the general rule that applies when the supervisor's harassment was not tangible – i.e., the case involves a hostile work environment instead of a firing, demotion, pay cut, etc. In this situation, the employer avoids liability if it proves the elements of the following affirmative defense:

- The employer exercised reasonable care to prevent and correct promptly any harassing behavior; *and*

- The employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.[140]

**EXAMPLE 20**
**EMPLOYER NOT LIABLE FOR UNLAWFUL**
**HARASSMENT BY A SUPERVISOR**

Carla, an Asian American, claims that she was subjected to frequent offensive comments based on race and sex by her first-level supervisor. Carla was aware of the employer's anti-harassment complaint procedures, but did not notify her employer; nor were there extenuating circumstances explaining her failure to follow the employer's procedures. The employer learned of the harassment from Carla's coworker, and immediately conducted an investigation. The employer reprimanded the supervisor and transferred him to another division. The employer is not liable for the harassment because it took reasonable preventative and corrective measures and Carla unreasonably failed to complain about the harassment.[141]

For a full discussion of the affirmative defense for supervisory harassment, see Enforcement Guidance: *Vicarious Employer Liability for Unlawful Harassment by Supervisors* (June 1999), *available at* http://www.eeoc.gov/policy/docs/harassment.html.

---

[140]    *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher*, 524 U.S. at 807. The failure to complain is not necessarily fatal if it was not unreasonable – for example, if the victim can establish that he or she reasonably believed, based on evidence (not mere speculation), that a complaint would result in retaliation, or that there were obstacles to making or filing a complaint, or that the employer's complaint mechanism otherwise was ineffective.

[141]    *Compare with, e.g., Spriggs*, 242 F.3d at 188-89 (jury could conclude that employer did not meet duty to prevent and correct supervisor's racial harassment: Black Plaintiff complained to management that his White supervisor repeatedly used epithets such as "n-----" and "monkey" to describe Plaintiff and Blacks generally, as well as to describe the supervisor's own wife (who was Black), but management downplayed the complaints, tried to defend the conduct, or responded with indifference, and thus the conduct continued).

### Conduct of Owner, President, Partners, or Officers

If the harasser is of a sufficiently high rank to fall "within that class . . . who may be treated as the organization's proxy,"[142] the employer cannot raise the affirmative defense even if the harassment did not result in a tangible employment action. Examples of officials who qualify as "proxies" or "alter egos" include a president, an owner, partners, and corporate officers.

### Conduct of Co-Workers and Non-Employees

For the unlawful harassing conduct of non-supervisory employees, or non-employees over whom the employer has control (e.g., independent contractors or customers on the premises), the employer will be liable if it knew or should have known about the conduct and failed to take prompt and appropriate corrective action.[143] This means that an employer should have an anti-harassment policy and complaint procedure and should be vigilant enough to detect harassing conduct that it reasonably should know about even without a complaint.[144] It should also create an environment in which employees feel free to raise concerns, and are confident that those concerns will be addressed. Victims of harassment, in turn, should make sure management knows about the harassing conduct.

**EXAMPLE 21**
**EMPLOYER LIABLE FOR UNLAWFUL HARASSMENT**
**BY A NON-EMPLOYEE OVER WHOM IT HAS CONTROL**

Charles is a frequent visitor on XYZ Senior Community's "neighborhood days," when XYZ allows senior citizens in the neighborhood to visit its residents. During his visits, Charles often yells derogatory comments about Blacks and Latinos at Cheryl, a Black employee of Puerto Rican national origin, and has even pushed and tripped her on a few occasions. Cheryl complains about the conduct to a manager, and is told that XYZ cannot take any action against Charles because he is not a resident. On subsequent visits, Charles continues to yell racial and ethnic slurs at Cheryl, and she files an EEOC charge. XYZ is liable for the actions of Charles, a non-employee, because it had the power to control Charles's access

---

[142]    *Faragher*, 524 U.S. at 789-90.

[143]    *See, e.g., Reedy*, 333 F.3d at 910 (reversing summary judgment for employer because "Reedy offered sufficient evidence that Quebecor knew or should have known about the harassment but failed to take prompt and effective remedial action").

[144]    *See, e.g., Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278-79 (11th Cir. 2002) (under circuit precedent the employer did not have actual notice that Mexican employee was being called epithets such as "Julio," "taco," and "sp--," but there was "ample evidence" that it had constructive notice: harasser's supervisor's office was located in the department where much of the abuse occurred; and the abuse occurred up to three to four times each day and in the presence of others).

**0100**

to the premises, was aware of Charles's offensive conduct, and did not take corrective action.

## B.    RACIAL BIAS IN OTHER EMPLOYMENT TERMS AND CONDITIONS

Even if a company works hard to recruit and hire in a way that provides equal opportunity, and even if it maintains a harassment-free workplace, it still must ensure that race is not otherwise a barrier to employee success. Employers cannot permit race bias to affect work assignments, performance measurements, pay, training, mentoring or networking, discipline, or any other term, condition, or privilege of employment.[145]

### 1.    Work Assignments

Work assignments are part-and-parcel of employees' everyday terms and conditions of employment and are also important for gaining valuable on-the-job experience. Work assignments must be distributed in a nondiscriminatory manner. This means that race cannot be a factor in determining the amount of work a person receives, or in determining who gets the more, or less, desirable assignments.

### EXAMPLE 22
### WORK ASSIGNMENTS

After receiving an advanced business degree, Mary was hired as an entry-level associate at a management and technology consulting firm. She was the only Black associate among the new entry-level associates. Most of the firm's managers are White males. Initially, as with other new associates, Mary received routine assignments, and consistently met the expectations of the assigning managers. But as other associates became increasingly busy with complex, long-term projects, Mary noticed that she continued to receive projects that were short-term and routine. At her six-month performance review, the firm told Mary that her performance was good, and she received a bonus on par with other associates. She told the reviewers that she would like to receive more demanding work. Nevertheless, Mary's difficulty getting choice assignments became compounded in the remaining half of the year as managers gave important work to those associates who had successfully handled it for them in the past. This happened despite Mary's repeating on several occasions her request for more challenges. After a year at the firm, it was clear that her contemporaries had much higher standing in the firm than she did, as reflected in the low pay raise she received as compared to others.

---

[145]    *See* 42 U.S.C. § 2000e-2(a)(1) (unlawful "to discriminate . . . with respect to . . . compensation, terms, conditions, or privileges of employment"); Section 2: *Threshold Issues*, EEOC Compliance Manual, § 2-II.B.1, *available at* http://www.eeoc.gov/policy/docs/threshold.html; Section 613: *Terms, Conditions and Privileges of Employment*, EEOC Compliance Manual, Volume II.

Mary opted to seek a fresh start with another firm. Soon after, Mary filed a charge against the employer alleging race discrimination in the terms and conditions of her employment. The employer cannot offer, and the investigation does not reveal, a credible nondiscriminatory explanation for Mary's treatment. Thus, the evidence suggests that race bias affected how managers assigned Mary work, which in turn stalled her career development and affected her pay.[146]

## 2.    Performance Evaluations

Performance evaluations frequently serve as the basis for numerous other employment decisions, such as pay, promotions, and terminations. They should be unaffected by race bias.

### EXAMPLE 23
### PERFORMANCE EVALUATIONS

Daniel is a customer service representative, and the only African American in his unit. Until recently he has received uniformly stellar performance ratings, received performance awards, and earned a good reputation among his customers and colleagues. Things began to change, however, when a new supervisor was assigned a year ago to manage his unit. While Daniel had long been rated one of the best employees, the new supervisor began rating Daniel as below average, which has affected Daniel's quarterly bonuses. He files a charge alleging race discrimination. A review of the performance evaluations of Daniel and others in his unit reveals that while Daniel's overall performance rating has dropped markedly, the ratings of his counterparts have gone up. Significantly, on the most objective part of his performance evaluation – "quantity of results," which measures the number of accounts serviced – Daniel was rated below average when in actuality he serviced more accounts than persons with higher ratings in this performance category. In addition, there is evidence that the supervisor undermined Daniel's professional standing with customers – for example, by taking over meetings Daniel was supposed to lead, and refusing to correct a customer's clearly mistaken belief that Daniel was responsible for an error. This treatment is markedly different than that of Daniel's colleagues. The investigation reveals no evidence of a nondiscriminatory reason – such as a pure personality clash (i.e., one

---

[146]    *Cf. Herrnreiter v. Chicago Housing Authority*, 315 F.3d 742, 744-45 (7th Cir. 2002) (in this circuit, among the employment actions an employee may challenge are those that "reduce the employee's career prospects by preventing him from using the skills in which he is trained and experienced, so that the skills are likely to atrophy and his career is likely to be stunted").

0102

not rooted in the alleged bias)[147] – that explains Daniel's treatment. There is reasonable cause to believe Daniel's performance evaluations, and thus his pay, were racially discriminatory.[148]

### 3.    Training and Constructive Feedback

Training is important for employees to become proficient in their jobs and to prepare for advancement.  This includes both formal training and informal training through feedback from supervisors.  As with other aspects of the employment relationship, race cannot be a factor in who receives training and constructive feedback.

**EXAMPLE 24**
**TRAINING AND CONSTRUCTIVE FEEDBACK**

Tina, a brown-skinned woman of Mexican descent, is a new office clerk.  Her primary duties are to sort and file purchase orders and invoices.  Within a few weeks, it is clear to the employer that Tina is processing her purchase orders and invoices too slowly due to mistakes.  The employer terminates Tina, who then files a charge alleging race discrimination.  The investigation reveals that although White employees who perform at a substandard level are coached toward increasingly good performance, Tina and other employees of color get less feedback and thus tend to repeat mistakes and make new ones that could have been avoided.  The evidence establishes that the employer unlawfully terminated Tina.[149]

---

[147]    *See supra* note 38, regarding "personality conflict" as a potential mask for unconscious bias.

[148]    *See Thomas*, 183 F.3d at 62-65 (denying summary judgment for employer because reasonable person could conclude Plaintiff's layoff was based on racially biased performance evaluations: after a new supervisor was hired, Plaintiff, the office's only African American customer service representative, went from being one of the highest rated employees to one of the lowest rated, and the evidence suggested that the new supervisor deliberately undermined Plaintiff's work, rated Plaintiff harsher than Whites, and that Plaintiff's earlier high ratings were more accurate).

[149]    *See Vaughn v. Edel*, 918 F.2d 517, 522 (5th Cir. 1990) (suit by Black female terminated as part of cost-cutting staff reductions; company had refrained from criticizing, counseling, or giving poor performance ratings to Plaintiff for fear of triggering a charge of discrimination; court upheld company liability because evidence established that if Plaintiff were White the company would not have inflated her performance ratings and would have criticized and counseled her, all of which would have given her an equal chance to improve to a level that would have prevented her termination).  Similarly, it would violate Title VII to avoid hiring Blacks or other people of color for fear that a later employment decision (e.g, discipline, nonpromotion, layoff) might trigger a discrimination charge.

### 4.	Workplace Networks

Informal workplace networks can be just as important to an organization as official job titles and reporting relationships.  Thus, an employee's success may depend not only on his or her job duties, but also on his or her integration into important workplace networks.  Employers cannot allow racial bias to affect an employee's ability to become part of these networks.

### EXAMPLE 25
### WORKPLACE NETWORKS

Suhail, of Arab descent, works for a computer software company. The company thrives on active socializing between employees and decisionmakers both on and off the job – from lunch outings, after-work happy hours and weekend golf outings, to children's birthday parties and family barbeques.  Many employees establish strong relationships with decisionmakers through these informal networks, and as a result, tend to get put on the plum projects and get the plum promotions.  Suhail has experienced difficulty in building relationships with decisionmakers because he often receives invitations late or indirectly from peers, rather from the decisionmakers themselves.  After being passed over for several important projects, Suhail files a charge alleging race/national origin discrimination because he believes he is being excluded from his workplace network for reasons related to his Arab descent.  Suhail's exclusion would be actionable if it affects the terms and conditions of his employment.[150]

### 5.	Appearance and Grooming Standards

Appearance standards generally must be neutral, adopted for nondiscriminatory reasons, consistently applied to persons of all racial and ethnic groups, and, if the standard has a disparate

---

[150]	*Cf. Firefighters Institute for Racial Equality v. City of Saint Louis*, 549 F.2d 506, 514-15 (8th Cir. 1977) (City was liable under Title VII for White firefighters' exclusion of Blacks from their "supper clubs," informal eating arrangements among on-duty firefighters at firehouses using employer-provided cooking facilities; court ordered Fire Department to issue regulations prohibiting segregated use of City kitchen facilities such that City "may comport with its duty to provide a nondiscriminatory working environment," adding that "the inclusion of Blacks and the reduction of racial tension in firehouses cannot help but aid the City as an employer where the job at hand requires the close cooperation of its employees and a concerted team effort"); *Meritor*, 477 U.S. at 65-66 (citing *Firefighters* with approval).  *But cf. Domingo v. New England Fish Co.*, 727 F.2d 1429, 1438 (9th Cir. 1984) (holding rationale of *Firefighters* inapplicable because, while seating in Alaska cannery mess hall was racially segregated, there were no employer seating restrictions, and plaintiffs failed to offer evidence that their segregated eating was not by choice).

impact, it must be job-related and consistent with business necessity.[151] The following are examples of areas in which appearance standards may implicate Title VII's prohibition against race discrimination:

- **Height and Weight:** Standards for height and weight sometimes are challenged as having an unlawful adverse impact. For example, a requirement that employees be at least six feet tall might have an adverse impact on Asian Americans due to average height and weight differences, and thus such a requirement would need to be job-related and consistent with business necessity.[152]

- **Dress:** An employer can impose the same dress code on all workers in similar jobs, regardless of their race or ethnicity, as long as the policy was not adopted for discriminatory reasons and is enforced evenhandedly. However, an employer must treat racial or ethnic attire that complies with the dress code the same as other attire that complies with the dress code.[153] For example, Title VII prohibits employers from banning the wearing of traditional Hawaiian dress that complies with the employer's dress code requirements.

- **Hair:** Employers can impose neutral hairstyle rules – e.g., that hair be neat, clean, and well-groomed – as long as the rules respect racial differences in hair textures and are applied evenhandedly. For example, Title VII prohibits employers from preventing African American women from wearing their hair in a natural, unpermed "afro" style that complies with the neutral hairstyle rule. Title VII also prohibits employers from applying neutral hairstyle rules more restrictively to hairstyles worn

---

[151] Employer appearance and grooming standards also may raise discrimination issues with respect to other protected bases, such as national origin, gender, or religion. When an employee's dress or appearance is religiously-based, an employer has an affirmative duty to accommodate the employee's religious beliefs, unless doing so would pose an undue hardship. For a detailed discussion of religious accommodation and undue hardship, refer to 29 C.F.R. § 1605.2.

[152] *See Officers for Justice v. Civil Service Comm'n of City and County of San Francisco*, 395 F. Supp. 378, 380-81 (D.C. Cal. 1976) (granting preliminary injunction eliminating pre-selection requirement of a height of 5 ft. 6 in. for certain police officers; holding plaintiffs were likely to succeed at trial on argument that the requirement had a disparate impact on Asian Americans, Latinos, and females, and the city was unlikely to be able to demonstrate job relatedness and business necessity), *cited with approval in Dothard v. Rawlinson*, 433 U.S. 321, 332 n.15 (1977) (height and weight requirement had disparate impact on women).

[153] By the same token, an employee whose clothing complies with the dress code cannot be forced to wear cultural attire. *See Bryant v. Begin Manage Program*, 281 F. Supp. 2d 561 (E.D.N.Y. 2003) (reasonable jury could find race discrimination where Plaintiff, an African American who wore business suits on "casual days," was pressured by her African American supervisor to wear afro-centric clothing even though the dress code made no mention of afro-centric clothing, and Plaintiff was replaced by an African American who did wear afro-centric attire).

0105

by African Americans.[154]

- **Beards:** Employers generally can require employees to be clean-shaven. However, Title VII requires an employer to make exceptions to a no-beard policy for men with pseudofolliculitis barbae, an inflammatory skin condition that occurs primarily in Black men and that is caused by shaving, unless being clean-shaven is job-related and consistent with business necessity (see Example 9 and accompanying footnote).

## 6. Compensation

Employees must receive compensation without regard to race. All forms of compensation are covered, such as salary, overtime pay, bonuses, stock options, expense accounts, commissions, life insurance, vacation and holiday pay, and benefits.

### EXAMPLE 26
### COMPENSATION

Andrew Kim, of Korean descent, alleges that he is being discriminatorily paid less than his White counterparts. The employer cites Kim's performance as the reason for his lower pay. The investigator then compares the compensation of Kim and similarly situated employees, according to the factors the employer says go into salary (experience ("Exp.") and performance rating ("Perf.")):

| Protected Class | Salary | Salary Factors | Not in Protected Class | Salary | Salary Factors |
|---|---|---|---|---|---|
| Kim (CP) | $28,000 | Exp. = 3 yrs<br>Perf. = 3 | Smith | $31,000 | Exp. = 3 yrs<br>Perf. = 4 |
| | | | Thomas | $34,000 | Exp. = 5 yrs<br>Perf. = 4 |
| | | | Adams | $37,000 | Exp. = 5 yrs<br>Perf. = 5 |

---

[154] *See Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 661 (6th Cir. 1999) (court held a reasonable jury could find Title VII violation where company prevented Black female from wearing hair in a "finger waves" hairstyle and in other hairstyles deemed "too eyecatching," while not subjecting White women to such standards, and even though the company admitted Plaintiff's hairstyles complied with company policy that hairstyles be neat, well-groomed, and safe); *Rogers v. American Airlines*, 527 F. Supp. 229, 232-34 (S.D.N.Y. 1981) (holding that a neutral employer policy against women wearing braids or cornrows was not a race-based distinction, and thus such a policy would violate Title VII only if it had a disparate impact on Black women and was not job-related and consistent with business necessity, or if the policy were applied in a discriminatory manner; the court also stated in *dicta* that an employer policy banning "afro" hairstyles likely would be a race-based distinction in violation of Title VII because, unlike braids or cornrows, an "afro" is the product of natural hair growth rather than artifice).

The employer's explanation for Kim's salary is credible because it accounts for the pay disparity. While Kim has the same amount of experience as Smith, Kim's performance rating is one point lower. There is no evidence that the performance rating itself was discriminatory. The $3000 difference between the pay of Kim and Smith is in line with the $3000 differences between the pay of Smith and the other non-Asian American employees. The evidence does not indicate discrimination.

For further information on discrimination in compensation, see Section 10: *Compensation Discrimination* (2000), *available at* http://www.eeoc.gov/policy/docs/compensation.html.

## 7.    Discipline and Discharge

Discipline and discharge decisions are typically based on either employee misconduct or unsatisfactory work performance. Such rules and policies regarding discipline and discharge must be enforced in an evenhanded manner, without regard to race.

### EXAMPLE 27
### DISCIPLINE AND DISCHARGE

Monica, a Filipino sales representative, is the only person of color in her district. Monica's job requires that she travel to the offices of clients and potential clients to market company products. Company policy requires sales representatives to be in the field from 8:30 a.m. to 5:30 p.m., and that they make sales calls on at least seven clients each and every day. Actual practice, however, is different. Most sales representatives "bank" their sales calls so that if they have a particularly productive day, they record the "extra" sales calls as occurring on a less productive day. When Monica learns that the practice is common among sales representatives, she begins to do it too, because she likes the flexibility that it offers. Things change after the company assigns a new District Manager to Monica's district. The new manager tells Monica that "banking" sales calls is against policy and that he intends to ask the Regional Manager for permission to discipline Monica, which would deny her a bonus and make her a candidate for layoff. When Monica protests that other sales representatives in her district use the same practice, her supervisor feigns ignorance and does nothing about it. The Regional Manager approves the discipline based upon the District Manager's recommendation. Monica files a charge alleging race discrimination. The investigation does not reveal a credible and persuasive nondiscriminatory explanation for what otherwise appears to be a

0107

racial double standard. Thus, it is likely that Monica's discipline was racially motivated, in violation of Title VII.[155]

## C. RETALIATION

Employees have a right to be free from retaliation for their opposition to discrimination or their participation in an EEOC proceeding by filing a charge, testifying, assisting, or otherwise participating in any manner in an investigation, proceeding, or hearing under Title VII.[156] There are three essential elements of a retaliation claim:

- **Employee Protected Activity** – opposition to discrimination or participation in the statutory complaint process;

- **Employer Adverse Action** – any adverse treatment (beyond a petty slight or a trivial annoyance) that is based on a retaliatory motive and is reasonably likely to deter protected activity; and

- **Causal Connection** – between the protected activity and the adverse action.

### EXAMPLE 28
### RETALIATION

Pedro files a charge alleging discrimination because of his race, Black, and his national origin, Dominican. In the months following his charge, Pedro begins receiving less and less overtime work. He files another charge alleging that the denial of overtime is retaliatory. The employer states that Pedro was not assigned overtime because there is less work. The investigation reveals no significant change in the amount of overtime available before and after Pedro's charge. Other employees with similar qualifications as Pedro have continued to be assigned overtime at approximately the same rate. These facts establish that Pedro has been subjected to retaliation for filing a charge, in violation of Title VII.

---

[155] *See Ellerth*, 524 U.S. at 762 (company may be vicariously liable for tangible employment action taken after review by higher level supervisors; citing with approval *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir.1990) (committee was unaware of discriminatory animus driving supervisor's recommendation, but company was liable because the committee "acted as the conduit of [the supervisor's] prejudice – his cat's paw")).

[156] *See* 42 U.S.C. § 2000e-3(a). *See Johnson v. University of Cincinnati*, 215 F.3d 561, 579-81 (6th Cir. 2000) (affirmative action official who alleged discrimination not based on his status as an African American, but based on his advocacy for increased employment opportunities for minorities and women, could bring a claim under §704(a) of Title VII for retaliation). The other statutes enforced by EEOC also prohibit retaliation. *See* 29 U.S.C. § 623(d) (ADEA); 42 U.S.C. §§ 12203(a), (b) (ADA); 29 U.S.C. § 215(a)(3) (Equal Pay Act).

0108

For a detailed discussion of the prohibition against retaliation, refer to Section 8: *Retaliation*, EEOC Compliance Manual (1998), *available at* http://www.eeoc.gov/policy/docs/retal.html.

## 15-VIII  REMEDIES

In a disparate treatment case, the statute allows the following remedies (as applicable): injunctive relief, reinstatement, front pay (until or in lieu of reinstatement), back pay, attorney's fees and costs, compensatory damages for any past or future out-of-pocket losses and any emotional harm, and punitive damages if the employer acted with malice or with reckless indifference to the individual's federally protected rights.  Punitive damages are unavailable against a federal, state, or local government employer.

The law places caps on the sum of compensatory and punitive damages for which an employer may be liable.  The caps are based on the size of the employer's workforce:

- Employers with 15 - 100 employees:  up to $50,000

- Employers with 101 - 200 employees:  up to $100,000

- Employers with 201 - 500 employees:  up to $200,000

- Employers with 501 or more employees:  up to $300,000

*See* 42 U.S.C. § 1981a(b).  The caps apply to the sum of: punitive damages, and compensatory damages for emotional harm and future pecuniary losses.  The caps do not apply to back pay and interest on back pay, front pay, or past pecuniary losses.[157]  For further information, see Enforcement Guidance: *Compensatory and Punitive Damages Available Under §102 of the Civil Rights Act of 1991* (1992), *available at* http://www.eeoc.gov/policy/docs/damages.html.

In a "mixed motives" case, in which an employment decision was motivated in part by race but the employer proves it also was motivated in part by a nondiscriminatory reason that would have resulted in the same decision by itself, Title VII still is violated but the remedies available are limited.  The law allows declaratory relief, injunctive relief, and attorney's fees and costs, but not reinstatement, hiring, back pay, or compensatory or punitive damages.[158]

In an "after-acquired evidence" case, in which an employment decision was motivated by race but the employer proves that it subsequently discovered evidence of the applicant's or employee's wrongdoing that would have led to a similar decision on legitimate grounds even absent

---

[157]    The caps on damages do not apply to suits filed under 42 U.S.C. § 1981, which also prohibits race discrimination in employment.  *See supra* note 9.

[158]    *See* 42 U.S.C. § 2000e-2(m) (proof that race was motivating factor establishes unlawful employment practice, even though other factors also motivated the practice); 42 U.S.C. §2000e-5(g)(2)(B) (limiting remedies when employer demonstrates that it would have taken same action in the absence of the impermissible motivating factor).

discrimination, Title VII still is violated. However, the remedies available are limited as follows: back pay is generally limited to the period from the date of the unlawful employment action to the date that the misconduct was discovered, compensatory damages are typically excluded for out-of-pocket losses incurred after the date that the evidence of wrongdoing was discovered, and reinstatement (or instatement) and front pay are not available. Other remedies, including compensatory damages for emotional harm and punitive damages, are not affected. For a fuller discussion of after-acquired evidence, see *Enforcement Guidance on After-Acquired Evidence and McKennon v. Nashville Banner Publishing Co.* (1995), *available at* http://www.eeoc.gov/policy/docs/mckennon.html.

In a disparate impact case, in which a policy or practice has a significant disparate impact but cannot be justified by job-relatedness and business necessity, the employee is entitled to injunctive relief, reinstatement, front pay (until or in lieu of reinstatement), back pay, and attorney's fees and costs. Compensatory damages and punitive damages are not available in disparate impact cases.[159]

## 15-IX ☞ PROACTIVE PREVENTION ☜

*The following are examples of **best practices** for employers – proactive measures designed to reduce the likelihood of Title VII violations and to address impediments to equal employment opportunity.*

### General

- Develop a **strong EEO policy** that is **embraced by the CEO** and top executives, **train managers and employees** on its contents, enforce it, and **hold company managers accountable**.

- Make sure decisions are **transparent (to the extent feasible) and documented**. The reasons for employment decisions should be well explained to affected persons. Make sure managers maintain records for at least the statutorily-required periods.

### Recruitment, Hiring, and Promotion

- Recruit, hire, and promote with EEO in mind, by implementing practices designed to widen and **diversify the pool of candidates** considered for employment openings, including openings in upper-level management.

- Monitor for EEO by **conducting self-analyses** to determine whether current employment practices disadvantage people of color, treat them differently, or leave uncorrected the effects of historical discrimination in the company.

---

[159]    *See* 42 U.S.C. § 1981a(a)(1) (compensatory and punitive damages not available for "an employment practice that is unlawful because of disparate impact").

0110

- Analyze the duties, functions, and competencies relevant to jobs. Then create **objective, job-related qualification standards** related to those duties, functions, and competencies. Make sure they are **consistently applied** when choosing among candidates. **Identify and remove barriers** to EEO – such as word-of-mouth recruiting in a workforce that does not reflect the diversity of the qualified labor market, or employment tests – if they cannot demonstrably be tied to job performance and business necessity.

- Develop the potential of employees, supervisors, and executives with EEO in mind, by providing **training and mentoring** to give workers of all backgrounds the opportunity, skill, experience, and information necessary to perform well, and to ascend to upper-level jobs.[160]

- Make sure **promotion criteria** are made **known**, and that **job openings** are **communicated** to all eligible employees.

## Harassment

To protect employees from unlawful racial (and other) harassment, employers should adopt a strong anti-harassment **policy**, periodically **train** each employee on its contents and procedures, and vigorously **follow and enforce** it. The policy should contain:

- A clear **explanation** of prohibited conduct, including examples;

- Clear assurance that employees who make complaints or provide information related to complaints will be **protected against retaliation**;

- A clearly described **complaint process** that provides multiple, accessible avenues of complaint;

- Assurance that the employer will protect the **confidentiality** of harassment complaints to the extent possible;

- A complaint process that provides a **prompt, thorough, and impartial investigation**; and

- Assurance that the employer will take **immediate and appropriate corrective action** when it determines that harassment has occurred.

---

[160]     Harvard Business School Professor David A. Thomas found in a three-year study of several large corporations that high quality mentoring was one of the most salient features of the careers of high-potential Blacks who successfully made it to the upper executive level. Professor Thomas also found that the career trajectories of Black executives differed markedly from the career trajectories of White executives. High-potential Whites who ultimately reached the executive level entered a fast track much earlier in their careers than high-potential Blacks. Blacks who reached the executive level were much more likely to have distinguished themselves through special projects, task force assignments, turnaround assignments, a change in location, or having a highly visible big success. *See* David A. Thomas, *The Truth About Mentoring Minorities: Race Matters*, HARVARD BUSINESS REVIEW (April 2001).

For a full explanation of these points, see Enforcement Guidance: *Vicarious Employer Liability for Unlawful Harassment by Supervisors* (June 1999), *available at* http://www.eeoc.gov/policy/docs/harassment.html.

## **Terms, Conditions, and Privileges of Employment**

- **Monitor** compensation practices and performance appraisal systems for **patterns of potential discrimination**. Make sure performance appraisals are based on employees' actual job performance. Ensure consistency, i.e., that comparable job performances receive comparable ratings regardless of the evaluator, and that appraisals are neither artificially low nor artificially high. Allow employees, without negative consequences, to have their appraisals reviewed and corrected when appropriate.

- Develop the potential of employees, supervisors, and executives with EEO in mind, by providing **training and mentoring** that provides workers of all backgrounds the opportunity, skill, experience, and information necessary to perform well, and to ascend to upper-level jobs.

- Promote an **inclusive culture** in the workplace by inculcating an environment of professionalism and respect for personal differences. In addition, employees of all backgrounds should have **equal access to workplace networks**.[161]

- Foster open communication and early dispute resolution. This will minimize the chance of misunderstandings escalating into legally actionable EEO problems. In addition, an **alternative dispute-resolution (ADR) program** can resolve EEO problems without the acrimony associated with an adversarial process. Importantly, however, even if there is such a program, an employee still is free to file a charge of discrimination with EEOC, and utilizing a company grievance procedure or other ADR mechanism does not suspend the running of the time period for filing an EEOC charge. As a best practice, however, employers should consider expressly waiving in advance any defense related to an employee's failure to adhere to the charge-filing time period if the employee properly utilizes the employer's ADR program.

- Protect against retaliation. Provide clear and credible assurances that if employees make complaints or provide information related to complaints the employer will **protect employees from retaliation**, and consistently follow through on this guarantee.

---

[161] The Commission's Best Practices Task Force Report uses the phrase "like me bias" to describe one of the key general barriers to equal employment opportunity: "It is an axiom of human nature that people often like to associate with other people who are like themselves. This enhances a comfort level in working relationships. Such 'like me' bias may be conscious or unconscious. Nevertheless, the 'like me' syndrome can lead to a tendency to employ and work with people like oneself . . . ." *See* EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, "BEST" EQUAL EMPLOYMENT OPPORTUNITY POLICIES, PROGRAMS, AND PRACTICES IN THE PRIVATE SECTOR 27 (2d ed. 1998). The complete report is available at http://www.eeoc.gov/abouteeoc/task_reports/practice.html.

*The U.S. Equal Employment Opportunity Commission*

**EEOC Policy Statement on the Issue of Conviction Records under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. (1982). (2/4/87)**

# CONVICTION RECORDS

At the Commission meeting of November 26, 1985, the Commission approved a modification of its existing policy with respect to the manner in which a business necessity is established for denying an individual employment because of a conviction record. The modification, which is set forth below, does not alter the Commission's underlying position that an employer's policy or practice of excluding individuals from employment on the basis of their conviction records has an adverse impact on Blacks[1] and Hispanics[2] in light of statistics showing that they are convicted at a rate disproportionately greater than their representation in the population. Consequently, the Commission has held and continues to hold that such a policy or practice is unlawful under Title VII in the absence of a justifying business necessity.[3]

However, the Commission has revised the previous requirements for establishing business necessity[4] in the following manner. Where a charge involves an allegation that the Respondent employer failed[5] to hire or terminated the employment of the Charging Party as a result of a conviction policy or practice that has an adverse impact on the protected class to which the Charging Party belongs, the Respondent must show that it considered these three factors to determine whether its decision was justified by business necessity:

1. The nature and gravity of the offense or offenses;

2. The time that has passed since the conviction and/or completion of the sentence; and

3. The nature of the job held or sought.[6]

This procedure condenses the Commission's previous standard for business necessity, substituting a one-step analysis for the prior two-step procedure and retaining some but not all of the factors previously considered.[7] The modification principally eliminates the need to consider an individual's employment history and efforts at rehabilitation. However, consideration is still given to the job-relatedness of a conviction, covered by the first and third factors, and to the time frame involved, covered by the second factor. Moreover, the first factor encompasses consideration of the circumstances of the offense(s) for which an individual was convicted as well as the number of offenses.

The Commission continues to hold that, where there is evidence of adverse impact, an absolute bar to employment based on the mere fact that an individual has a conviction record is unlawful under Title VII.[8] The Commission's position on this issue is supported by the weight of judicial authority.[9]

It should be noted that the modified procedure does not affect charges alleging disparate treatment on a prohibited basis in an employer's use of a conviction record as a disqualification for employment. A charge brought under the disparate treatment theory of discrimination is one where, for example, an employer allegedly rejects Black applicants who have conviction records but does not reject similarly situated White applicants.

With respect to conviction charges that are affected by this modification--that is, those raising the issue of adverse impact--Commission decisions that apply the previous standard are no longer available as Commission decision precedent for establishing business necessity. To the extent that such prior decisions are inconsistent with the position set forth herein, they are expressly overruled.

**0113**

Questions concerning the application of the Commission's revised business necessity standard to the facts of a particular charge should be directed to the Regional Attorney for the Commission office in which the charge was filed.

---

1. See, e.g., Commission Decision No. 72-1497, CCH EEOC Decisions (1973) ¶ 6352, and Commission Decision Nos. 74-89, 78-10, 78-35, and 80-10, CCH EEOC Decisions (1983) ¶¶ 6418, 6715, 6720, and 6822, respectively.

2. See Commission Decision No. 78-03, CCH EEOC Decisions (1983) ¶ 6714.

3. See, e.g., Commission decisions cited supra nn.1-2.

4. Prior to this modification, for an employer to establish a business necessity justifying excluding an individual from employment because of a conviction record, the evidence had to show that the offense for which the applicant or employee was convicted was job-related. If the offense was not job-related, a disqualification based on the conviction alone violated Title VII. However, even if the offense was determined to be job-related, the employer had to examine other relevant factors to determine whether the conviction affected the individual's ability to perform the job in a manner consistent with the safe and efficient operation of the employer's business. The factors identified by the Commission to be considered by an employer included:
1. The number of offenses and the circumstances of each offense for which the individual was convicted;
2. The length of time intervening between the conviction for the offense and the employment decision;
3. The individual's employment history; and
4. The individual's efforts at rehabilitation.
See, e.g., Commission Decision No. 78-35, CCH EEOC Decisions (1983) ¶ 6720.

Thus, under the previous procedure, business necessity was established by means of a two-step process: first, by showing that the conviction was job-related; then, by separately demonstrating that the conviction would affect the individual's ability to safely and efficiently perform the job upon consideration of the four factors enumerated above.

5. Although the term "employer" is used herein, the Commission's position on this issue applies to all entities covered by Title VII. See, e.g., Commission Decision No. 77-23, CCH EEOC Decisions (1983) ¶ 6710 (union's policy of denying membership to persons with conviction records unlawfully discriminated against Blacks).

6.The Commission's revised business necessity analysis follows a decision by the United States Court of Appeals for the Eighth Circuit in the Green v. Missouri Pacific Railroad Company case. Green, 523 F.2d 1290 (8th Cir. 1975), is the leading Title VII case on the issue of conviction records. In that case, the court held that the defendant's absolute policy of refusing employment to any person convicted of a crime other than a minor traffic offense had an adverse impact on Black applicants and was not justified by business necessity. On a second appeal in that case, following remand, the court upheld the district court's injunctive order prohibiting the defendant from using an applicant's conviction record as an absolute bar to employment but allowing it to consider a prior criminal record as a factor in making individual hiring decisions as long as the defendant took into account "the nature and gravity of the offense or offenses, the time that has passed since the conviction and/or completion of sentence, and the nature of the job for which the applicant has applied." Green v. Missouri Pacific Railroad Company, 549 F.2d 1158, 1160 (8th Cir. 1977).

7.See discussion supra n.4.

8.See, e.g., Commission Decision No. 78-35, CCH EEOC Decisions (1983) ¶ 6720.

9. See Green, 523 F.2d at 1298; Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971), cert. denied, 406 U.S. 950 (1972) (brought under 42 U.S.C. §§ 1981 and 1983); and Richardson v. Hotel Corporation of America, 332 F. Supp. 519 (E.D. La. 1971), aff'd mem., 468 F.2d 951 (5th Cir. 1972). See also Hill v. United States Postal Service, 522 F. Supp. 1283 (S.D. N.Y. 1981); Craig v. Department of

**0114**

Health, Education, and Welfare, 508 F. Supp. 1055 (W.D. Mo. 1981); and Cross v. United States Postal Service, 483 F. Supp. 1050 (E.D. Mo. 1979).

---

*This page was last modified on September 11, 2006.*

 Return to Home Page

**0115**

*The U.S. Equal Employment Opportunity Commission*

---

**EEOC Policy Statement on the Use of Statistics in Charges Involving the Exclusion of Individuals with Conviction Records from Employment (7/29/87)**

# CONVICTION RECORDS - STATISTICS

Green v. Missouri Pacific Railroad Company, 523 F.2d 129010 EPD ¶ 10,314 (8th Cir. 1975), is the leading Title VII case on the issue of conviction records. In Green, the court held that the defendant's policy of refusing employment to any person convicted of a crime other than a minor traffic offense had an adverse impact on Black applicants and was not justified by business necessity. In a second appeal following remand, the court upheld the district court's injunctive order prohibiting the defendant from using an applicant's conviction record as an absolute bar to employment but allowing it to consider a prior criminal record as long as it constituted a business necessity. Green v. Missouri Pacific Railroad Company, 549 F.2d 1158, 1160,13 EPD ¶ 11,579 (8th Cir. 1977). See also Commission Decision No. 72- 1497, CCH EEOC Decisions (1973) ¶ 6352, and Commission Decision Nos. 74-89, 78-10, 78-35, and 80-10, CCH EEOC Decisions (1983) ¶¶ 6418, 6715, 6720, and 6822, respectively.

It is the Commission's position that an employer's policy or practice of excluding individuals from employment on the basis of their conviction records has an adverse impact on Blacks[1] and Hispanics[2] in light of statistics showing that they are convicted at a rate disproportionately greater than their representation in the population. Policy Statement on the Issue of Conviction Records Under Title VII (February 4, 1987). However, when the employer can present more narrowly drawn statistics showing either that Blacks and Hispanics are not convicted at a disproportionately greater rate or that there is no adverse impact in its own hiring process resulting from the convictions policy, then a no cause determination would be appropriate.

1. Where the Employer's Policy is Not Crime-Specific

An employer's policy of excluding from employment all persons convicted of any crime is likely to create an adverse impact for Blacks and Hispanics based on national and regional conviction rate statistics. However, it is open to the respondent/employer to present more narrow local, regional, or applicant flow data, showing that the policy probably will not have an adverse impact on its applicant pool and/or in fact does not have an adverse impact on the pool. As the Supreme Court has stated,

> Although 'a statistical showing of disproportionate impact need not always be based on an analysis of the characteristics of actual applicants,' Dothard v. Rawlinson, 433 U.S. 321, 330, 'evidence showing that the figures for the general population might not accurately reflect the pool of qualified job applicants' undermines the significance of such figures. Teamsters v. United States, 431 U.S. 324, 340 n. 20.

New York City Transit Authority v. Beazer, 440 U.S. 568, 586 n. 29,19 EPD ¶ 9027 at p. 6315 (1979). See also Costa v. Markey, 30 EPD ¶ 33,173 at p. 27,638 (1st Cir. 1982), vacated on other grounds, 706 F.2d 796, 32 EPD ¶ 32,622 (1st Cir.), cert. denied, 104 S. Ct. 547, 32 EPD ¶ 33,955 (1983).

If the employer provides applicant flow data, information should be sought to assure that the employer's applicant pool was not artificially limited by discouragement. For example, if many Blacks with conviction records did not apply for a particular job because they knew of the employer's policy and they therefore expected to be rejected, then applicant flow data would not be an accurate reflection of the conviction policy's actual effect. See Dothard v. Rawlinson, 433 U.S. 321, 330 (1977). (Section 608, Recruitment, of Volume II of the Compliance Manual will provide a more detailed discussion of when and how to investigate for discouragement.)

2. Where the Employer's Policy is Crime-Specific

**0116**

In the past, when the Commission has evaluated an employer's "no convictions" policy dealing with a subcategory of crimes; e.g., theft, robbery, or drug-related crimes; the Commission has relied upon national or regional conviction statistics for crimes as a whole. See, e.g., Commission Decision No. 73- 0257, CCH EEOC Decisions (1973) ¶ 6372, and Commission Decision Nos. 76-110 and 80-17, CCH EEOC Decisions (1983) ¶¶ 6676 and 6809, respectively. However, these statistics only show a probability of adverse impact for Blacks and Hispanics, while more narrow data may show no adverse impact.

If the employer can present more narrow regional or local data on conviction rates for all crimes showing that Blacks and Hispanics are not convicted at disproportionately higher rates, then a no cause determination would be proper.[3] Alternatively, the employer may present national, regional, or local data on conviction rates for the particular crime which is targeted in its crime-specific convictions policy. If such data shows no adverse impact, then a no cause determination would be appropriate. Finally, the employer can use applicant flow data to demonstrate that its conviction policy has not resulted in the exclusion from employment of a disproportionately high number of Blacks and Hispanics.

---

1. See, e.g., Commission Decision No. 72-1497, CCH EEOC Decisions (1973) ¶ 6352, and Commission Decision Nos. 74-89, 78-10, 78-35, and 80- 10, CCH EEOC Decisions (1983) ¶¶ 6418, 6715, 6720, and 6822, respectively.

2. See Commission Decision No. 78-03, CCH EEOC Decisions (1983) ¶ 6714.

3. However, if even more narrow statistics, such as regional or local crime-specific data, show adverse impact, then a cause finding would be appropriate absent a justifying business necessity.

---

*This page was last modified on September 20, 2006.*

 Return to Home Page