EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### LUBBOCK DIVISION

STATE OF TEXAS,

        *Plaintiff,*

vs.                                                                  Case No. 5:13-cv-00255-C

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

JACQUELINE A. BERRIEN,
    in her official capacity as Chair of the Equal
    Employment Opportunity Commission,

    and

ERIC H. HOLDER,
    in his official capacity as Attorney General
    of the United States,

        *Defendants.*

## PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

# TABLE OF CONTENTS

Table of Authorities.................................................................................................................ii

Introduction.............................................................................................................................1

Background...............................................................................................................................1

Summary of Argument............................................................................................................3

Argument .................................................................................................................................4

      I.      The State Has Standing................................................................................4

            A.      The State's Injuries Are Concrete, Traceable, and Redressable .................4

            B.      EEOC's Counterarguments Are Meritless.............................................6

      II.     The State's Claims Are Ripe.......................................................................8

            A.      The State's Claims Are Presumptively Reviewable, And EEOC Does Not Attempt To Rebut That Presumption .................................................8

                 1.      The State's claims are fit for review........................................9

                 2.      The balance of hardships tips decidedly in the State's favor .............11

            B.      EEOC's Counterarguments Lack Merit....................................................14

      III.    The Felon-Hiring Rule Constitutes Final Agency Action ............................16

            A.      The Felon-Hiring Rule Is Reviewable Under Section 704...............................17

            B.      EEOC's Counterarguments Lack Merit....................................................23

Conclusion ..............................................................................................................25

Certificate of Service

Exhibits

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Gardner,*
  387 U.S. 136 (1967) ..............................................................................8, 9, 13, 15

*Alaska v. United States Dep't of Transp.,*
  868 F.2d 441 (D.C. Cir. 1989) ..............................................................................8

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
  458 U.S. 592 (1982) ..............................................................................8

*American Bus Ass'n v. United States,*
  627 F.2d 525 (D.C. Cir. 1980) ..............................................................18, 22

*Appalachian Power Co. v. EPA,*
  208 F.3d 1015 (D.C. Cir. 2000) ..............................................18, 19, 22, 23, 24

*AT&T v. EEOC,*
  270 F.3d 973 (D.C. Cir. 2001) ..............................................................24

*Atchison, Topeka & Santa Fe Ry. v. Pena,*
  44 F.3d 437 (7th Cir. 1994) ..............................................................20

*Barrick Goldstrike Mines v. Browner,*
  215 F.3d 45 (D.C. Cir. 2000) ..............................................................19, 22, 23

*Bennett v. Spear,*
  520 U.S. 154 (1997) ..............................................................17

*Better Gov't Ass'n v. Department of State,*
  780 F.2d 86 (D.C. Cir. 1986) ..............................................................19, 23

*Board of Trs. Univ. of Ala. v. Garrett,*
  531 U.S. 356 (2001) ..............................................................16

*Christopher v. SmithKline Beecham Corp.,*
  132 S. Ct. 2156 (2012) ..............................................................10

*Ciba-Geigy Corp. v. EPA,*
  801 F.2d 430 (D.C. Cir. 1986) ..............................................................14, 24

*City of Boerne v. Flores,*
  521 U.S. 507 (1997) ..............................................................16

*City of Dania Beach v. FAA,*
  485 F.3d 1181 (D.C. Cir. 2007) ..............................................................24

*Clean Air Implementation Project v. EPA*,
   150 F.3d 1200 (D.C. Cir. 1998)................................................................................13

*Cohen v. United States*,
   578 F.3d 1 (D.C. Cir. 2009) ....................................................... 17, 18, 20, 22

*Cohen v. United States*,
   650 F.3d 717 (D.C. Cir. 2011) (en banc) ..............................................................17

*CSI Aviation Servs. v. DOT*,
   637 F.3d 408 (D.C. Cir. 2011)...............................................................................24

*Eagle-Picher Indus., Inc. v. EPA*,
   759 F.2d 905 (D.C. Cir. 1985)..................................................................................9

*EEOC v. Peoplemark, Inc.*,
   732 F.3d 584 (6th Cir. 2013) .................................................... 1, 2, 7, 11, 12, 15

*El v. SEPTA*,
   479 F.3d 232 (3d Cir. 2007)..............................................................................2, 14

*Federal Express Corp. v. Holowecki*,
   552 U.S. 389 (2008) ........................................................................................ 24, 25

*Illinois Dep't of Transp. v. Hinson*,
   122 F.3d 370 (7th Cir. 1997) ...................................................................................8

*Kimel v. Florida Bd. of Regents*,
   528 U.S. 62 (2000) .................................................................................................16

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .......................................................................................4, 5, 24

*Manufactured Housing Institute v. EPA*,
   467 F.3d 391 (4th Cir. 2006) ............................................................................20, 22

*McLouth Steel Prods. Corp. v. Thomas*,
   838 F.2d 1317 (D.C. Cir. 1988)..............................................................................23

*NRDC v. EPA*,
   643 F.3d 311 (D.C. Cir. 2011)......................................................................19, 20, 22

*Ohio Forestry Ass'n v. Sierra Club*,
   523 U.S. 726 (1998) ..........................................................................................9, 13

*Owner-Operator Indep. Drivers Ass'n v. Federal Motor Carrier Safety Admin.*,
   656 F.3d 580 (7th Cir. 2011) ..................................................... 6, 7, 9, 13, 15

*Reckitt Benckiser v. EPA*,
    613 F.3d 1131 (D.C. Cir. 2010)................................................................13

*Roark & Hardee LP v. City of Austin*,
    522 F.3d 533 (5th Cir. 2008) .................................................................12

*Sabre, Inc. v. Department of Transp.*,
    429 F.3d 1113 (D.C. Cir. 2005)...............................................9, 11, 12, 14, 16

*Safe Extensions v. FAA*,
    509 F.3d 593 (D.C. Cir. 2007)................................................................24

*Seminole Tribe of Florida v. Florida*,
    517 U.S. 44 (1996) ............................................................................16

*Shaughnessy v. Pedreiro*,
    349 U.S. 48 (1955).............................................................................9

*Shays v. FEC*,
    414 F.3d 76 (D.C. Cir. 2005)................................................................10

*Stilwell v. Office of Thrift Supervision*,
    569 F.3d 514 (D.C. Cir. 2009)..............................................................6, 7

*Student Loan Marketing Ass'n v. Riley*,
    104 F.3d 397 (D.C. Cir. 1997)..............................................................24

*Syncor Int'l Corp. v. Shalala*,
    127 F.3d 90 (D.C. Cir. 1997)...........................................................18, 22

*Teva Pharms. USA, Inc. v. Sebelius*,
    595 F.3d 1303 (D.C. Cir. 2010)............................................................10

*Texas v. United States*,
    497 F.3d 491 (5th Cir. 2007) ...............................................................13

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) ..........................................................................23

*United States v. Texas*,
    143 U.S. 621 (1892) ..........................................................................16

*Whitman v. American Trucking Ass'ns*,
    531 U.S. 457 (2001) ...........................................................................9

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ...........................................................................7

**Statutes**

42 U.S.C. § 2000e-2(k) ............................................................................................7

5 U.S.C. § 704 ...............................................................................4, 16, 17, 20

**Other Authorities**

Robert A. Anthony, *Interpretative Rules, Policy Statements, Guidances, Manuals, and the Like—Should
   Federal Agencies Use Them to Bind the Public?*, 41 DUKE L.J. 1311 (1992) ............................................23

Br. of the United States as Amicus Curiae,
   *University of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2012), No. 12-484 ..............................25

Br. for the United States as Amicus Curiae,
   *Vance v. Ball State*, 133 S. Ct. 2434 (2012), No. 11-556............................................................... 24, 25

Notice 2006-50, 2006-25 I.R.B. 1141, 2006-1 C.B. 1141, 2006 WL 1452787 (June 19, 2006) ............18

6 Charles Alan Wright, et al.,
   FED. PRAC. & PROC. CIV. § 1476 (3d ed. 2013 supp.) ...........................................................................1

v

## INTRODUCTION

Defendants want to have their cake and eat it too.  On the one hand, they want to bully employers into hiring felons on the basis of an unlawful interpretation of Title VII that the Equal Employment Opportunity Commission ("EEOC" or "Commission") adopted in contravention of the Administrative Procedure Act ("APA").  If an employer refuses to fall in line, it faces abusive investigations, sanctionable litigation tactics, and allegations of discrimination under the EEOC's Felon-Hiring Rule[1] that the Sixth Circuit recently described as "*frivolous*" and "*groundless*."  *EEOC v. Peoplemark, Inc.*, 732 F.3d 584, 592 (6th Cir. 2013) (emphasis in original); *see also id.* at 595 (affirming sanctions against EEOC for its abusive enforcement of the Felon-Hiring Rule).

Of course, EEOC would like to retain the coercive effects of the Felon-Hiring Rule without risking another stinging rebuke on the merits.  So it has mustered the audacity to tell the State of Texas that the timing of this suit is "far from impeccable," and that the largest employer in the second-largest State in the Nation should be forced to wait until it too suffers the abusive and sanctionable conduct that EEOC has unleashed on other violators of the rule.  MTD at 1. Thankfully, fifty years of precedent under the APA and the ripeness doctrine foreclose the Commission's attempt to dodge judicial review of its administrative overreaching.  The motion to dismiss should be denied.

## BACKGROUND

EEOC promulgated the Felon-Hiring Rule on April 25, 2012.  *See* FAC Ex. A.  The 2012 rule represents EEOC's first attempt to formalize its felon-hiring policy in a standalone document. Before 2012, the Commission's view that Title VII somehow prohibits employers from refusing to

---

[1] *See* EEOC, Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964, No. 915.002 (Apr. 25, 2012) ("Felon-Hiring Rule," attached as Exhibit A to the First Amended Complaint, "FAC").  The State construes EEOC's motion to dismiss, ECF No. 16 ("MTD"), to apply equally to the FAC.  *See* 6 CHARLES ALAN WRIGHT, ET AL., FED. PRAC. & PROC. CIV. § 1476 (3d ed. 2013 supp.).  The FAC and this opposition together constitute the State's response to that motion.

hire felons was relegated to the 605th section of the EEOC "Compliance Manual."  *See El v. SEPTA*, 479 F.3d 232, 243 (3d Cir. 2007) (recounting that fact).  And the courts routinely held that the "Compliance Manual" was "not . . . entitled to great deference."  *Id.* at 244.  That was so because the manual was "terse" and rested on nothing more than EEOC's administrative say-so, which it asserted "without explanation, analysis, or authority."  *Id.* at 248.

So EEOC promulgated the Felon-Hiring Rule, which purports to afford the explanation and analysis that the Third Circuit found lacking.  The rule announces that "[a] policy or practice requiring an automatic, across-the-board exclusion from all employment opportunities because of any criminal conduct is inconsistent with the [various factors enumerated in the rule] because it does not focus on the dangers of particular crimes and the risks in particular positions."  FAC Ex. A at 16.  Instead of "across-the-board exclusion[s]," the Felon-Hiring Rule holds that employers *must* afford felons "individualized assessments."  *Id.* at 18–20.  If an employer fails to do so, the rule binds EEOC's staff to find that the no-felon policy is an unlawful employment practice.  *Id.* at 3.  And the Commission expressly ruled that its interpretation of Title VII preempts any state law that requires employers to apply across-the-board exclusions for felons.  *Id.* at 24.

The State of Texas employs hundreds of thousands of people, and many of them are employed by agencies (like the Texas Department of Public Safety, "DPS") that impose across-the-board no-felon policies pursuant to state law.  *See* FAC ¶¶ 23–31.  DPS's no-felon policy is materially identical to the one that the Federal Bureau of Investigation uses.  *See* FAC ¶ 24; *id.* Ex. B; n.2, *infra*.  But because DPS is a state law-enforcement agency rather than a federal one, it either must violate state law or risk "*frivolous*" and "*groundless*" allegations of racial discrimination under the Felon-Hiring Rule.  *Peoplemark*, 732 F.3d at 592.  And that risk is far from theoretical:  EEOC already has filed a "charge of discrimination" against DPS for applying the across-the-board no-felon policy required by state law.  *See* FAC ¶ 37 & Ex. C.

2

## SUMMARY OF ARGUMENT

EEOC cannot seem to make up its mind.  It desperately wants to force employers to abandon their categorical no-felons policies, and it wants federal courts to afford deferential effect to the thoroughness of its "enforcement guidance."  But when confronted with an APA suit by an employer that cannot be bullied into compliance, EEOC all of sudden wants this Court to believe that its Felon-Hiring Rule is just a bunch of precatory musings that cannot have more than a contingent effect on anyone.  Whatever else might be said about the Commission's tactics, they do not sum to a valid jurisdictional objection.

I.      The State has standing for two reasons.  First, Texas employs hundreds of thousands of people, and it receives thousands of job applications every year.  In processing those job applications, the State's agencies routinely apply the no-felons policies required by state law and prohibited by the Felon-Hiring Rule.  That conflict makes the State an "object" of the Commission's administrative action and easily satisfies the standing requirements of Article III.  Any doubt about the concreteness of the State's injury is resolved by the fact that EEOC already has launched a "charge of discrimination" against DPS for categorically refusing to hire felons.

Second, the State has standing because EEOC cannot attempt to both change the State's hiring policies and nonetheless object to the State's standing to challenge that attempt.  Both the D.C. Circuit and the Seventh Circuit have rejected EEOC's have-and-eat-its-cake strategy, and this Court should do so too.

II.     The State's claims are ripe.  This is a facial challenge to EEOC's rule, and as such, it is quintessentially fit for review.  The Commission's principal argument to the contrary is that further factual development is necessary to differentiate between the State's lawful no-felons policies (for example, those barring "a child predator [from] working at a school") and its unlawful ones.  MTD at 16.  But it is far too late to rehabilitate the Felon-Hiring Rule by suggesting that the EEOC

was willing to recognize *any* exceptions — even commonsense exceptions — to its expansive view of disparate impact.  In fact, the Felon-Hiring Rule held that a preschool *cannot* impose Texas's across-the-board policy against hiring child predators.  Factual development will do nothing to ease the conflict between EEOC's atextual interpretation of the law and Texas's refusal to follow it.

III.     Finally, the Felon-Hiring Rule is a "final agency action" made reviewable by 5 U.S.C. § 704.  An unbroken line of cases dating back decades holds that "guidance" documents are reviewable to the extent they bind the agency's staff or force regulated entities to change their behavior.  The Felon-Hiring Rule does both.

The Commission's sole counterargument is that the Felon-Hiring Rule is unreviewable because it is not a "binding" "legislative rule."  In a decision that EEOC oddly neglects to mention, the D.C. Circuit repudiated that argument.  And the Commission cites no decision from any court that ever has agreed with it.  This Court should not be the first.

## ARGUMENT

### I.     THE STATE HAS STANDING

#### A.     The State's Injuries Are Concrete, Traceable, and Redressable

The State easily satisfies the constitutional minimum for standing to challenge EEOC's Felon-Hiring Rule.  Article III requires only an injury, caused by the agency, which a court can redress.  *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  And when the plaintiff is "an object of the [agency's] action," "there is ordinarily little question that the action . . . has caused him injury, and that a judgment preventing . . . the action will redress it."  *Id.* at 561–62.  Here, there is no doubt that the State of Texas is "an object of the [EEOC's] action."  The State employs hundreds of thousands of people, *see* FAC ¶¶ 23–30, and as an employer, the State is squarely the "object" of the Felon-Hiring Rule, *see, e.g.*, FAC Ex. A at 8–20 (purporting to prohibit all employers from using categorical no-felons policies).  In fact, EEOC singled out employers like the State of

4

Texas who categorically refuse to hire felons pursuant to state "laws and/or regulations that restrict or prohibit the employment of individuals with records of certain criminal conduct." *Id.* at 24. Because the State-qua-employer is an "object" of the EEOC's action, all three of the constitutional standing requirements are easily satisfied. *See Lujan*, 504 U.S. at 561–62.

Those injuries could not be more concrete and certain. *Cf.* MTD at 12 (arguing the State's injury is "speculative"). For example, the Texas Department of Public Safety categorically refuses to hire *anyone* convicted of *any* felony (and some misdemeanors). *See* FAC ¶ 24. And on November 1, 2013, EEOC sent a "charge of discrimination" to DPS for categorically refusing to hire a convicted felon named William R. Smith. *See id.* ¶ 37 & Ex. C.

Mr. Smith applied to work as a DPS "Customer Service Representative," a position that would have given him access to a statewide database containing identifying information for 26 million Texans (including their names, addresses, dates of birth, social security numbers, and copies of their birth certificates). FAC ¶ 37. In his job application, Mr. Smith disclosed a previous felony conviction for the unauthorized use of a motor vehicle. FAC Ex. C at 2. Consistent with state law and its policy judgment that convicted felons never should have access to sensitive information regarding every man, woman, and child in the State, DPS categorically refused to consider Mr. Smith's application and rejected it without using any of the "individualized" factors that EEOC's rule commands. FAC ¶ 37. And because DPS refused to accede to EEOC's unlawful interpretation of Title VII, the State is presently on the receiving end of a "charge of discrimination." *Id.* Moreover, EEOC authorized Mr. Smith to bring a private lawsuit against DPS. *See id.*; FAC Ex. D. That is more than sufficient to constitute a concrete "injury" that was caused by the unlawful Felon-Hiring Rule.

**B.      EEOC's Counterarguments Are Meritless**

**1.**      In all events, it does not matter whether EEOC, Defendant Holder, or a private individual is threatening to enforce the Commission's Felon-Hiring Rule.  *Compare* MTD at 11–13 (arguing the opposite), *with Owner-Operator Indep. Drivers Ass'n v. Federal Motor Carrier Safety Admin.*, 656 F.3d 580, 58–86 (7th Cir. 2011) (considering and rejecting the same standing argument that Defendants raise here).  In *Owner-Operator*, truck drivers challenged a rule that regulated the number of hours they could operate their vehicles, and the agency argued that the plaintiffs' injury was "speculative" because they were not presently subject to an enforcement action.  *Id.* at 586.  The court of appeals rejected the agency's standing objection because it was part of the federal agency's strategy to eat cake and have it too:

> The Agency's standing argument . . . ignores the very idea that it advances to justify adopting the [] rule in the first place: a punitive stick (it says) is necessary to increase compliance with [the agency's] regulations.  The [agency's] rule aims to alter truck drivers' behavior now to avoid a remedial directive in the future. . . .  In the end, it strikes us as odd that the Agency is arguing that it must have a strict rule *now* to get truck drivers to be more compliant with [the agency's] rules, but at the same time it is asserting that these rules are not meant to change anyone's immediate behavior enough to confer standing to challenge that regulation.

*Id.* at 586 (emphasis in original); *see also Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 518 (D.C. Cir. 2009) (finding it "more than a little ironic" that a federal agency "would suggest Petitioners lack standing and then, later in the same brief," label the petitioner a "prime example" of the "very problem the [r]ule was intended to address" (internal quotation marks omitted)).

So too here.  EEOC apparently thinks that Texas's categorical refusal to hire felons for certain jobs — like those allowing access to statewide databases containing sensitive personal information for all 26 million men, women, and children in the State — necessitated a rule to condemn the practice as "unlawful."  *See* FAC Ex. A.  The Commission asserts an urgent "interest" in stopping the State from following state law insofar as it categorically bars felons from employment, *id.* at 6, 24, and the Commission wields "a punitive stick . . . to increase compliance

with" its Felon-Hiring Rule, *Owner-Operator*, 656 F.3d at 586; *see* FAC ¶¶ 17–22 (listing examples of EEOC's punitive enforcement tactics). It is "more than a little ironic," *Stilwell*, 569 F.3d at 518, to claim that the State nonetheless incurs no injury from the EEOC's efforts to preempt Texas law and to change the hiring policies for the State's police officers, youth-correction officers, state-supported-living-center employees, General Land Office employees, lottery officials, game wardens, and school teachers.

2.      For at least three independent reasons, it is facile to suggest that Title VII, not EEOC's Felon-Hiring Rule, preempts Texas's no-felons policies. *Cf.* MTD at 10–11. First, Title VII says nothing about an employer's categorical refusal to hire felons. To the extent that categorical refusal constitutes an unlawful employment practice, it is solely on account of EEOC's say-so in the Felon-Hiring Rule. *Compare* FAC Ex. A at 9, 18–20 (purporting to prohibit categorical no-felon policies and requiring "individualized assessments" of all felons for all jobs), *with* 42 U.S.C. § 2000e-2(k) (discussing disparate impact without mentioning categorical no-felon policies or requiring "individualized assessments" of felons' job applications).

Second, Title VII says nothing about whether EEOC's staff should impose abusive and sanctionable litigations tactics — under the guise of an administrative "investigation" — when an employer categorically refuses to hire felons. Again, that binding directive comes solely from the Felon-Hiring Rule and its enforcement by EEOC staff. It is the Commission's effort to launch "*frivolous*" and "*groundless*" allegations against employers, *Peoplemark*, 732 F.3d at 592 — and its promise to bring similar suits in the future, *see* FAC ¶ 35 — that injures the State.

Third and finally, it is always true that Congress's statute — rather than the agency's interpretation of it — carries preemptive force. *See, e.g.*, *Wyeth v. Levine*, 555 U.S. 555, 573 (2009) (rejecting "an overbroad view of an agency's power to pre-empt state law" because congressional intent to preempt is all that matters); MTD at 11 (asserting that obvious fact). But that does not

7

mean that regulated entities lack standing when agencies nonetheless purport to promulgate rules that preempt state law. *See, e.g., Illinois Dep't of Transp. v. Hinson*, 122 F.3d 370, 372 (7th Cir. 1997) (State has standing where it "complains that a federal regulation will preempt one of the state's laws"); *Alaska v. United States Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989) (agreeing that the State has standing to seek declaratory and injunctive relief "because DOT claims that its rules preempt state consumer protection statutes, [and therefore] the States have suffered injury to their sovereign power to enforce state law"); *cf. Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607–08 (1982) (stating, in the context of state standing in *parens patriae* actions, that States have an "interest in securing observance of the terms under which it participates in the federal system"). The bottom line is that the federal agency has arrogated to itself the power to divine a Felon-Hiring Rule that has no basis in the text of Title VII, and that federal agency has directed the State to disregard duly enacted state laws and conform its behavior to the federal rule. *See* FAC Ex. A at 24. That is more than sufficient to create an "injury" that confers standing.

## II.   THE STATE'S CLAIMS ARE RIPE

### A.   The State's Claims Are Presumptively Reviewable, And EEOC Does Not Attempt To Rebut That Presumption

EEOC's ripeness objections also are easily dismissed.  For at least fifty years, the Supreme Court has held that it is the agency's burden to prove that a statute precludes pre-enforcement review of its rule:

> The first question we consider is whether Congress . . . intended to forbid pre-enforcement review of this sort of regulation promulgated by the [agency].  The question is phrased in terms of 'prohibition' rather than 'authorization' because a survey of our cases shows that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress.

*Abbott Labs. v. Gardner*, 387 U.S. 136, 139–40 (1967).  The Court emphasized that the agency's burden is particularly heavy because the availability of pre-enforcement review "ha[s] been

reinforced by the enactment of the Administrative Procedure Act, which embodies the basic presumption of judicial review." *Id.* at 140.  The Court further held that the APA "manifests a congressional intention that [its judicial-review provisions] cover a broad spectrum of administrative actions," and that the APA's "'generous review provisions' must be given a 'hospitable' interpretation." *Id.* at 140–41 (quoting *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51 (1955)).

Where as here Congress did nothing to prohibit the State from seeking pre-enforcement review of the Felon-Hiring Rule, the ripeness inquiry all but disappears, and pre-enforcement review is "the norm." *See, e.g., Owner-Operator*, 656 F.3d at 586 ("In the decades since *Abbott Laboratories*, pre-enforcement review of final rules has become the norm.").  To create an exception to that norm, EEOC must prove that the issues somehow are not fit for judicial review and that the balance of hardships somehow tips in EEOC's favor.  *Abbott Labs.*, 387 U.S. at 149; *Sabre, Inc. v. Department of Transp.*, 429 F.3d 1113, 1119–20 (D.C. Cir. 2005); *Owner-Operator*, 656 F.3d at 586–87.  The Commission cannot meet that standard.

*1.     The State's claims are fit for review*

**a.**     First, the State's claims are fit for review because they are purely legal, facial challenges to the Felon-Hiring Rule.  The fitness-for-review question turns on whether the case "would benefit from further factual development" and "whether judicial intervention would inappropriately interfere with further administrative action."  *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998); *see also Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 479–80 (2001).  These considerations protect "the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting."  *Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 905, 915 (D.C. Cir. 1985).

Here, Texas is *not* seeking a declaration that its no-felon policies "are, and always will be, lawful hiring practices" because they never create statistical disparities in "the relevant labor market."

9

MTD at 14–15.  Rather, the State is seeking a declaration that no-felon policies never can create unlawful disparate impacts because (a) they always are justified by business necessity and job-relatedness (Count I); (b) Congress specifically disclaimed EEOC's authority to promulgate a contrary rule (Count II); and (c) the private-party disparate-impact suits contemplated by EEOC's Felon-Hiring Rule are unconstitutional (Count III).  None of those claims "require[] the Court to answer various factual questions."  MTD at 15.

To the contrary, there are only two facts that matter.  First, state law and policy require many Texas employers to impose categorical bans against convicted felons who apply for jobs.  *See* FAC ¶¶ 23–31.  And second, the Defendants believe that the State's policies are unlawful because they never allow the State to make "individualized" and race-conscious assessments of job applicants that EEOC somehow thinks Title VII requires.  *See* FAC Ex. A at 18–20.  Thus, the case poses a conflict of two mutually incompatible interpretations of Title VII.  As the D.C. Circuit held in the same situation:

> [T]he substantive issues [plaintiff] raises are undoubtedly 'purely legal' in the relevant sense.  They turn on questions of statutory construction, and the interpretations chosen by the [agency] and proposed by [plaintiff] both constitute bright-line rules, impervious, so far as appears, to factual variation.  This in itself largely answers the question whether delay might afford additional 'concreteness'; it would not.

*Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1308–09 (D.C. Cir. 2010) (internal citation and alteration omitted); *see also, e.g.*, *Shays v. FEC*, 414 F.3d 76, 95 (D.C. Cir. 2005).

**b.**     It is too late for the EEOC's lawyers to manufacture the need for further factual development by asserting nuances that the Commission itself rejected in the Felon-Hiring Rule.  *See Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166–67 (2012) (rejecting the agency's interpretation of its own rule as "nothing more than a convenient litigating position," and a "*post hoc* rationalization advanced by an agency seeking to defend past agency action against attack" (internal quotation marks and alteration omitted)).  For example, the Commission's motion to dismiss asserts

(at 16) that "[n]o one wants a child predator working at a school" — presumably in an effort to seem reasonable and offer one (if only one) safe harbor for Texas's categorical no-felon policies. But EEOC's Felon-Hiring Rule says the exact opposite.

The rule offers the hypothetical example of "Elijah," an African American man who wants to bring a disparate-impact suit against a preschool for refusing to hire him on account of his felony conviction for "indecent exposure two years ago." FAC Ex. A at 24. Even on those facts, the Felon-Hiring Rule says that the preschool *cannot* impose a categorical ban against hiring convicted sex offenders like Elijah. *Id.* at 18–20. To the contrary, EEOC would "conduct[] an investigation" — thus raising the specter of the Commission's frivolous and sanctionable enforcement tactics, *see Peoplemark*, 732 F.3d at 592 — and force the preschool to carry its burden to prove "the exclusion is job related for the position in question and consistent with business necessity because it addresses serious safety risks of employment in a position involving regular contact with children." FAC Ex. A at 24. And if the preschool cannot carry its burden to show that (a) Elijah would have "regular contact" with the children and that (b) Elijah's indecent-exposure conviction is sufficiently recent to be probative of his riskiness as a child predator, EEOC staff would be bound by the Felon-Hiring Rule to find an unlawful employment practice. *See id.* at 15, 17, 24. While EEOC's lawyers now appear to recognize the commonsense proposition that "[n]o one" would want Elijah to work in the preschool under any set of circumstances, MTD at 16, the Felon-Hiring Rule says otherwise.

### 2. *The balance of hardships tips decidedly in the State's favor*

**a.** EEOC has pointed to no institutional interest in delaying resolution of this case. "[T]he court has — in accordance with the [APA's] presumption of reviewability — repeatedly held that absent institutional interests favoring the postponement of review, a petitioner need not show that delay would impose individual hardship to show ripeness." *Sabre*, 429 F.3d at 1120. In *Sabre*, the Department of Transportation asserted jurisdiction over certain "ticket agents," and it stated that

it would take "appropriate actions" in the future to enforce the law against unlawful "ticket agents." *Id.* at 1117. Sabre sought pre-enforcement review, and the department objected on ripeness grounds because it was unclear whether Sabre was covered by the rule, and even it if was, what "appropriate actions" the department might want to take. *Id.* at 1119. The D.C. Circuit rejected the ripeness objection because "[t]he Department has failed to offer plausible reasons why it has an institutional interest in postponing review." *Id.* at 1120. While Sabre had no obligation to show "hardship," it nonetheless could do so: in particular, Sabre claimed that "a high probability of adverse government action" against it as a "ticket agent" would force Sabre to abandon "marketing plans, which it could otherwise implement presumably at considerable profit." *Id.* at 1118–20.

This is an *a fortiori* case. There is no dispute whether the State of Texas is regulated by the Felon-Hiring Rule. *Cf. Sabre*, 429 F.3d at 1118 (noting whole dispute was whether Sabre fell within the ambit of department's "ticket agent" rule). There is no dispute whether the State of Texas is in violation of the Felon-Hiring Rule. *Cf. id.* at 1117 (noting department's view that Sabre remained "free to operate its business as it wishes"). Plus, there is no dispute that the State of Texas stands to lose much more than Sabre did, and that the State's "hardship" is thus much higher. While Sabre faced only the potential for "appropriate actions" from a department that threatened an unspecified portion of the company's profit margins, *id.*, the State faces the promise of investigations by an EEOC with a proven track record of "*frivolous*" and "*groundless*" enforcement tactics, *Peoplemark*, 732 F.3d at 592; the reputational harm associated with allegations of racial discrimination; and unconstitutional damages actions by individuals like William R. Smith, which infringe Texas's sovereign immunity.

**b.**     Moreover, the Felon-Hiring Rule places the State and its constituent agencies on the horns of a dilemma, which is more than sufficient to obviate any ripeness concerns. For example, in *Roark & Hardee LP v. City of Austin*, 522 F.3d 533 (5th Cir. 2008), the Fifth Circuit held that the

challenged ordinance was ripe for judicial review because it forced owners and operators of public places to choose between complying with an allegedly invalid law or to risk a $2000 fine.  *See also Abbott Labs.*, 387 U.S. at 152 ("These regulations purport to give an authoritative interpretation of a statutory provision that has a direct effect on the day-to-day business of all prescription drug companies; its promulgation puts petitioners in a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate."); *Ohio Forestry*, 523 U.S. at 734 ("hardship" can arise from purely legal harms or the harm of being "force[d] . . . to modify [one's] behavior in order to avoid future adverse consequences"); *Texas v. United States*, 497 F.3d 491, 499 (5th Cir. 2007) ("If Texas cannot challenge the Procedures in this lawsuit, the State is forced to choose one of two undesirable options: participate in an allegedly invalid process that eliminates a procedural safeguard promised by Congress, or eschew the process with the hope of invalidating it in the future, which risks the approval of gaming procedures in which the state had no input."); *Reckitt Benckiser v. EPA*, 613 F.3d 1131, 1136–41 (D.C. Cir. 2010) (holding ripe agency's letter asserting authority to bring future enforcement proceedings because it creates "compliance 'dilemma'" for the company).

The dilemma caused by the Felon-Hiring Rule is even starker because EEOC is trying to do much more than levy a $2,000 fine.  The whole point of its Felon-Hiring Rule is to coerce the State into abandoning the hiring policies adopted by the Texas Legislature by threatening frivolous allegations of discrimination and abusive enforcement actions in "high-profile" cases.  FAC ¶ 35; *see Owner-Operator*, 656 F.3d at 586–87 (finding ripeness where whole point of rule is to force regulated entities to change their behaviors); *Clean Air Implementation Project v. EPA*, 150 F.3d 1200, 1205 (D.C. Cir. 1998) (finding ripeness where agency action forces petitioners to "change their behavior or risk costly sanctions").  That effort to modify the State's behavior independently suffices to make the case ripe.

c.      Against all of that, EEOC can point to no "institutional interest" in delaying resolution of this case.  *Sabre*, 429 F.3d at 1120.  An agency plausibly can invoke the ripeness doctrine if its rule is tentative or preliminary:  "the [ripeness] doctrine enables agencies to deliberate and craft policy free of judicial interference until administrative action has a direct and immediate impact.  Judicial intervention into agency decisionmaking at an earlier stage denies the agency an opportunity to correct its own mistakes and to apply its expertise."  *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 434 (D.C. Cir. 1986).  But those concerns are inapposite here.  EEOC admits that it already has deliberated and (by a formal 4-1 vote) formalized its policy choice in the Felon-Hiring Rule.  And far from "correct[ing] its own mistakes," EEOC has doubled down on the rule after the Third Circuit dismissed the Commission's interpretation of Title VII as "terse" and "provid[ing] nothing of substance."  *El*, 479 F.3d at 248.  Thus, there is no evidence that EEOC will recognize the error of its ways and rescind the Felon-Hiring Rule without this Court's intervention.

**B.      EEOC's Counterarguments Lack Merit**

EEOC offers three counterarguments, each of which is easily dismissed.

**1.**      First, EEOC shrugs off the pre-enforcement hardships that the Felon-Hiring Rule imposes on the State of Texas.  Don't worry, it says, because it is possible that the State's no-felons policies do not "ha[ve] a statistically significant differential effect . . . on a protected class."  MTD at 15.  And even if the policies create a disparate impact based on race, EEOC says that it is possible that its staff could conduct "a fact-specific inquiry" for job-relatedness and business necessity and determine, in its administrative grace, that it can bless Texas's policies anyway.  *Id.* at 17.

Talk about cold comfort.  What EEOC cannot bring itself to acknowledge is that the answers to its "fact-specific inquir[ies]" are knowable only after the Commission brings the full weight of its enforcement apparatus down on employers' shoulders.  That is why the Commission refuses now to approve *any* of the State's categorical no-felons policies — *even* for jobs like State

Troopers.[2]  And that means employers like Texas have to decide whether to keep their no-felon policies and risk EEOC enforcement actions — replete with "*frivolous*" and "*groundless*" allegations of racial discrimination, *Peoplemark*, 732 F.3d at 592 — or instead to jettison the policies and save themselves from bruising run-ins with the Commission and its staff.  Staring down the barrel of the Commission's Felon-Hiring Rule, many employers would choose the latter.  But either way, EEOC cannot put employers to that choice while also claiming that the dispute is not ripe.

**2.**    Next, EEOC argues that Count III is unripe because "[n]umerous contingencies would have to come to pass for [the State] to face" a private-damages suit from a felon who alleges that Texas's categorical no-felons policies violate the Felon-Hiring Rule.  MTD at 19.  Again, that perversion of the ripeness doctrine runs against 50 years of Supreme Court precedent:

> [A]s *Abbott Laboratories* itself demonstrated, hardship need not take the form of an actual enforcement action; the threat of enforcement is sufficient because the law is in force the moment it becomes effective and a person made to live in the shadow of a law that she believes to be invalid should not be compelled to wait and see if a remedial action is coming.

*Owner-Operator*, 656 F.3d at 586 (citing *Abbott Labs.*, 387 U.S. at 150–54).  And in all events, as noted above, the State faces a "concrete threat" of litigation from William R. Smith.  MTD at 20; *see supra* p.5; FAC ¶ 37 & Exs. C–D.

**3.**    Finally, EEOC argues that Count III is unripe because, even without damages actions by individuals like William R. Smith, the State of Texas could be sued under the Felon-Hiring Rule by others (like the EEOC itself).  MTD at 20–21.  That proves far too much because

---

[2] That refusal is particularly noteworthy because EEOC has no problem with *federal* law-enforcement agencies that apply categorical no-felons policies.  For example, the FBI says that "conviction of a felony" "*will automatically disqualify*" applicants for all jobs with the Bureau.  FAC Ex. B at 1 (emphasis added).  That means that any felony — of any degree of seriousness, of any age, and of any degree of job-relatedness — "will automatically disqualify" the applicant from the most menial job in an agency with 36,000 employees.  And the Felon-Hiring Rule says that is ok.  *See* FAC Ex. A at 20–23.  But somehow, the same rule says that the State of Texas cannot impose the FBI's hiring policy on the men and women charged with carrying firearms and serving as peace officers on the front line of the State's public-safety battlefield.  *See* MTD at 16–17 (arguing that the State cannot impose categorical no-hiring policies against felons convicted of "unlicensed acupuncture" and "littering in a cave," even though the FBI presumably can).

the exact same objection would render unripe *every* comparable violation of the Eleventh Amendment. For example, in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), the Court held that the Eleventh Amendment barred private damages actions against the State of Florida under the Indian Gaming Regulatory Act. The Court went out of its way to recognize that "[t]he Federal Government can bring suit in federal court against a State" under the Act, *id.* at 71 n.14 (citing *United States v. Texas*, 143 U.S. 621, 644–45 (1892)) — and that fact did nothing to render unripe the State's objections to the *private party's* suit under the same statute. The federal government likewise can sue the States to enforce the Religious Freedom Restoration Act, the Age Discrimination in Employment Act, and the Americans with Disabilities Act. But again, that did nothing to render unripe the State's objections to *private parties'* suits under all three statutes, nor did it prevent the Court from holding that those suits were unconstitutional. *See City of Boerne v. Flores*, 521 U.S. 507 (1997) (RFRA); *Kimel v. Florida Bd. of Regents*, 528 U.S. 62 (2000) (ADEA); *Board of Trs. Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001) (title I of the ADA); *accord Sabre*, 429 F.3d at 1121 (finding irrelevant fact that Sabre had independent obligation not to commit deceptive trade practices). If EEOC's ripeness objection was correct, all of those landmark Eleventh Amendment decisions would be wrong.

## III.   THE FELON-HIRING RULE CONSTITUTES FINAL AGENCY ACTION

Finally, the Felon-Hiring Rule constitutes "final agency action" reviewable under 5 U.S.C. § 704 ("Section 704"). EEOC does not dispute that the rule is an "agency action," which it took through a formal 4-1 vote. *See* FAC ¶ 10. And it does not dispute that the rule is "final" in every conceivable meaning of the word; the Felon-Hiring Rule undisputedly represents the culmination of the Commission's decisionmaking process and hence the EEOC's "final" (if misguided) pronouncement on the issue. Instead, the Commission appears to think that the Felon-Hiring Rule does not constitute "final agency action" because "no 'legal consequences' flow from it." MTD at 7.

Again, the Commission wants to have its cake and eat it too.  Employers like Peoplemark —

that have been on the receiving end of EEOC's sanctionable conduct and frivolous allegations of

racial discrimination under the Felon-Hiring Rule — obviously would disagree that "no 'legal

consequences' flow[ed]" from EEOC's deeply flawed interpretation of Title VII.  And the

Commission routinely goes into federal court and demands "deference" for its interpretation of Title

VII; just last Term for example, EEOC *twice* urged the Supreme Court of the United States to afford

legal effect to guidance documents that were materially identical to the Felon-Hiring Rule.  But when

it comes to defending a facial challenge to its actions, EEOC all of a sudden thinks its work isn't

worth the paper it was printed on.  Its gamesmanship runs contrary to decades' worth of precedent

under the APA and should be rejected.

### A.    The Felon-Hiring Rule Is Reviewable Under Section 704

The Supreme Court has held that agency actions are "final" and hence reviewable under

Section 704 where they mark the "consummation" of the agency's decisionmaking progress, and

"legal consequences will flow" from what the agency did.  *Bennett v. Spear*, 520 U.S. 154, 177–78

(1997).  The Commission does not contest that its Felon-Hiring Rule marks the "consummation" of

its rulemaking process, *see* MTD at 7; accordingly, its Section 704 objection boils down to whether

the rule generates "legal consequences."  It does.

**1.**    The courts long have held that agency "guidance" documents like the Felon-Hiring

Rule constitute final and reviewable agency actions under Section 704.  For example, in *Cohen v.

United States*, 578 F.3d 1 (D.C. Cir. 2009), the court held that an IRS "guidance" document entitled

"Notice 2006-50" constituted final agency action.[3]  That document "announce[d]" the IRS's

interpretation of the Tax Code and "provide[d] related guidance to taxpayers and collectors."

---

[3] The D.C. Circuit subsequently granted rehearing en banc on other grounds and affirmed the panel's
decision. *See* 650 F.3d 717 (D.C. Cir. 2011) (en banc); *see also id.* at 735 (noting that the en banc court saw no
need to reconsider the panel's analysis under Section 704).

Notice 2006-50, 2006-25 I.R.B. 1141, 2006-1 C.B. 1141, 2006 WL 1452787 (June 19, 2006).  That "guidance" included instructions on how taxpayers could seek certain refunds, it established a "safe harbor" for refunds, and it created administrative procedures for aggrieved taxpayers.  *See id.* Critically, legal consequences flowed from the IRS's "guidance" insofar as it used "mandatory words like 'will' instead of permissive words like 'may'" to describe how the agency's staff would process refund claims.  *Cohen*, 578 F.3d at 7; *see also Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) ("The primary distinction between a substantive rule — really any rule — and a general statement of policy . . . turns on whether an agency intends to bind itself to a particular legal position."); *American Bus Ass'n v. United States*, 627 F.2d 525, 532 (D.C. Cir. 1980) (similar).  Like the EEOC here, the IRS tried to insulate its rule from judicial review by backing away from it and disclaiming it as nothing more than worthless words; but the D.C. Circuit held "[t]hat's just mean" because it "places taxpayers in a virtual house of mirrors" where they can't figure out which of the agency's instructions to heed.  *Cohen*, 578 F.3d at 9.

Likewise, the court held that an agency's "guidance" document constituted final agency action in *Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000).  There the agency used its guidance to announce a "multi-factor, case-by-case analysis" that EPA's staff would apply to determine the adequacy of States' air-quality monitoring standards.  *Id.* at 1022.  The court found irrelevant that answers to EPA's "case-by-case analysis" turned on facts that were unknowable *ex ante*.  *Id.* at 1022–23.  All that mattered, the court held, is that the agency directed States to search their laws and policies, to find standards that conflicted with EPA's analysis of the Clean Air Act, and to replace them in accordance with the "guidance" document.  *Id.* at 1023.  The court also found irrelevant the fact that EPA included the following disclaimer at the end of its document: "'The policies set forth in this paper are intended solely as guidance, do not represent final Agency action, and cannot be relied upon to create any rights enforceable by any party.'"  *Id.* (quoting

18

guidance document).   Even that disclaimer did nothing to render the guidance non-final under

Section 704 because legal consequences nonetheless flowed from it:

> Insofar as the "policies" mentioned in the disclaimer consist of requiring State
> permitting authorities to search for deficiencies in existing monitoring regulations
> and replace them through terms and conditions of a permit, "rights" may not be
> created but "obligations" certainly are — obligations on the part of the State
> regulators and those they regulate.   At any rate, the entire Guidance, from beginning
> to end — except the [disclaimer] paragraph — reads like a ukase.   It commands, it
> requires, it orders, it dictates.   Through the Guidance, EPA has given the States their
> "marching orders" and EPA expects the States to fall in line.

*Id.*

The court of appeals yet again held that an administrative guidance document constituted

final and reviewable agency action in *Barrick Goldstrike Mines v. Browner*, 215 F.3d 45 (D.C. Cir. 2000).

There the agency's guidance interpreted an environmental statute to allow metal-mining companies

to release a *de minimis* level of toxic chemicals without triggering various statutory reporting

requirements.   If Barrick and other mines failed to conform to the statutory interpretation

announced in the guidance, the agency could bring enforcement actions against them.   *Id.* at 47–48.

EPA tried to avoid Barrick's facial challenge to the guidance by walking away from it as non-

binding, but the D.C. Circuit sternly rebuked that about-face:   "That the issuance of a guideline or

guidance may constitute final agency action has been settled in this circuit for many years."   *Id.* at 48

(citing, *inter alia*, *Better Gov't Ass'n v. Department of State*, 780 F.2d 86 (D.C. Cir. 1986)); *see also Better*

*Gov't*, 780 F.2d at 93 (rejecting proposition that agency can escape judicial review under Section 704

by labeling its rule an "informal" guidance document).   And the court concluded that Section 704's

final-agency-action requirement was satisfied because the guidance bound the agency's staff in its

application of the *de minimis* exception to Barrick's chemicals.   215 F.3d at 48 ("Here there is no

doubt that EPA will refuse to apply the *de minimis* exception to Barrick's waste rock and that its

refusal to do so has legal consequences — namely, that Barrick is bound to keep track of its

movement of waste rock and report the movements as releases of toxic substances."); *see also NRDC*

19

*v. EPA*, 643 F.3d 311, 319–20 (D.C. Cir. 2011) ("guidance" document constitutes final agency action reviewable under Section 704 insofar as it restrains administrative staff's discretion).

And, at the risk of belaboring the point, the regional circuits uniformly have interpreted Section 704 likewise to extend to "guidance" documents like the Felon-Hiring Rule. For example, in *Manufactured Housing Institute v. EPA*, 467 F.3d 391 (4th Cir. 2006), the court of appeals held that a "policy" "memorandum" was reviewable as final agency action based on the agency's threatened enforcement of it. The policy memorandum enunciated a list of factors that States should use to determine, on a "case-by-case" basis, whether a particular housing complex is "large" and thus excludable from a general ban on selling water to tenants. *Id.* at 397. Following a familiar pattern, the agency tried to walk away from the policy in court, shrugging off its guidance as "just a suggestion" that carries no binding effect and that "leaves decisions to the States on a case-by-case basis." *Id.* The court rejected the agency's backpedalling out of hand because "EPA's threats levied against at least two States regarding their [water] oversight programs prove that States are not free to treat this EPA policy as a mere suggestion." *Id.* Given those threats — and the home-builders' "fear of subjecting themselves to EPA regulations" — the court found it "self-evident" that the guidance document "gives rise to legal rights and consequences." *Id.* at 398; *see also Atchison, Topeka & Santa Fe Ry. v. Pena*, 44 F.3d 437, 441 (7th Cir. 1994) (holding that a letter from the agency's chief counsel constituted final agency action because it "made absolutely clear that [agency staff] would enforce the Act in accordance with its new interpretation, thereby compelling the railroads to alter their operations to comply with the [agency's] directive or face stiff penalties for noncompliance").

2.    Compared to *Cohen*, *Syncor*, *American Bus*, *Appalachian Power*, *Barrick*, *NRDC*, *Manufactured Housing*, and *Atchison*, this is an easy case. The Felon-Hiring Rule includes page after page of the unconditional and "mandatory" language that so often is "decisive" of the Section 704 issue. *Cohen*, 578 F.3d at 7; *see, e.g.*, FAC ¶ 13; FAC Ex. A at 8 ("EEOC would find reasonable cause

to believe that discrimination occurred."); *id.* at 10 (EEOC "will" "investigate" "criminal record
exclusions"); *id.* ("The Commission will assess relevant evidence when making a determination of
disparate impact, including [various specific factors]."); *id.* ("An employer's evidence of a racially
balanced workforce will not be enough to disprove disparate impact."); *id.* ("[I]n determining
disparate impact, the Commission will assess the probative value of an employer's applicant data.");
*id.* ("[T]he Commission will closely consider whether an employer has a reputation in the community
for excluding individuals with criminal records."); *id.* ("The Commission will determine the
persuasiveness of such evidence on a case-by-case basis."); *id.* at 12 ("[A]n exclusion based on an
arrest, in itself, is not job related and consistent with business necessity."); *id.* ("[E]mployers [may]
not [] rely on arrest records" as "proof of criminal conduct."); *id.* ("[A]n arrest record standing alone
may not be used to deny an employment opportunity."); *id.* ("EEOC would find reasonable cause to
believe that his employer violated Title VII."); *id.* at 14 ("To establish that a criminal conduct
exclusion that has a disparate impact is job related and consistent with business necessity under Title
VII, the employer needs to show that the policy operates to effectively link specific criminal
conduct, and its dangers, with the risks inherent in the duties of a particular position."); *id.* ("Such a
screen would need to be narrowly tailored to identify criminal conduct with a demonstrably tight
nexus to the position in question."); *id.* at 15 ("Absent a validation study that meets the Uniform
Guidelines' standards, the [specifically enumerated] factors provide the starting point for analyzing
how specific criminal conduct may be linked to particular positions."); *id.* ("Careful consideration of
the nature and gravity of the offense or conduct is the first step in determining whether a specific
crime may be relevant to concerns about risks in a particular position."); *id.* ("Whether the duration
of an exclusion will be sufficiently tailored to satisfy the business necessity standard will depend on
the particular facts and circumstances of each case."); *id.* at 16 ("[I]t is important to identify the
particular job(s) subject to the exclusion."); *id.* at 17 ("EEOC concludes that there is reasonable

cause to believe that the [employer's] policy" violates the Felon-Hiring Rule.); *id.* at 20 ("EEOC finds reasonable cause to believe that Title VII was violated."); *id.* at 21 ("EEOC finds that the policy is" unlawful.). And the EEOC went out of its way to condemn categorical no-felons policies like Texas's in mandatory terms: "A policy or practice requiring an automatic, across-the-board exclusion from all employment opportunities because of any criminal conduct is inconsistent with the [enumerated] factors because it does not focus on the dangers of particular crimes and the risks in particular positions." *Id.* at 16; *see also id.* ("EEOC would find reasonable cause to believe that the blanket exclusion was not job related and consistent with business necessity."). And an entire section of the Felon-Hiring Rule prohibits Texas from disqualifying felons under *state* law, even when the exact same hiring policy would be lawful if imposed under *federal* law. *See id.* at 24; FAC ¶ 14; *supra* n.2. In short, "the entire Guidance, from beginning to end . . .[,] reads like a ukase. It commands, it requires, it orders, it dictates." *Appalachian Power*, 208 F.3d at 1023.

But the legal consequences that flow from the Felon-Hiring Rule do not end there. The Commission expressly intended the rule to bind "EEOC staff who are investigating discrimination charges involving the use of criminal records in employment decisions." FAC Ex. A at 3; *see Cohen*, 578 F.3d at 7 (agency's intent to bind staff makes rule reviewable under Section 704); *Barrick*, 215 F.3d at 48; *Appalachian Power*, 208 F.3d at 1023 (same); *NRDC*, 643 F.3d at 319–20 (same); *Syncor*, 127 F.3d at 94 (same); *American Bus*, 627 F.2d at 532 (similar). Moreover, EEOC's rule has direct legal consequences — that bind both the Commission's staff and the Nation's employers — because it creates two safe harbors. *See* Ex. A at 2; 14; *Cohen*, 578 F.3d at 7 (finding safe harbors probative of finality of agency action). The fact that the Felon-Hiring Rule directs employers to apply a list of enumerated factors, which EEOC will review on a "case-by-case basis," FAC Ex. A at 10, further supports reviewability of the Commission's final agency action, *Appalachian Power*, 208 F.3d at 1022–23; *Manufactured Housing*, 467 F.3d at 397. Finally, EEOC could not avoid the finality of the Felon-

Hiring Rule even if it had included a boilerplate disclaimer or an inaccurate label for its action, *see Appalachian Power*, 208 F.3d at 1023; *Barrick*, 215 F.3d at 48; *Better Government*, 780 F.2d at 93; but the fact that the rule does not attempt that feint makes it even easier than the cases above.

### B.      EEOC's Counterarguments Lack Merit

Against all of that, EEOC offers a single, solitary counterargument: it says the Felon-Hiring Rule is not "final" because it is not "binding." To be clear, the Commission does not contest that its rule is "binding" in the practical sense — that is, that the rule binds EEOC's staff and the Nation's employers. *See* Part III.A, *supra*. Rather, EEOC contends that the Felon-Hiring Rule is not "binding" in the sense that it does not carry the "force of law." MTD at 6–10. But the D.C. Circuit expressly has rejected the argument that Section 704 is limited to agency actions that carry the force of law — a fact that the Commission oddly but conveniently neglects to mention.

In *Appalachian Power*, the agency made the exact same argument under Section 704 that EEOC makes here. *See* 208 F.3d at 1020. It argued that its guidance document was not a "binding" "legislative rule" because it had not gone through notice-and-comment rulemaking, *cf. United States v. Mead Corp.*, 533 U.S. 218, 229–31 (2001), and that Section 704 withholds judicial review from any agency action that does not qualify as a "legislative rule." That argument has no basis in the text of Section 704, and the D.C. Circuit rejected it in emphatic terms:

> [W]e have . . . recognized that an agency's other pronouncements can, as a practical matter, have a binding effect. If an agency acts as if a document issued at headquarters is controlling in the field, if it treats the document in the same manner as it treats a legislative rule, if it bases enforcement actions on the policies or interpretations formulated in the document, if it leads private parties or State permitting authorities to believe that it will declare permits invalid unless they comply with the terms of the document, then the agency's document is for all practical purposes "binding."

*Appalachian Power*, 208 F.3d at 1021 (citing *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1321 (D.C. Cir. 1988); Robert A. Anthony, *Interpretative Rules, Policy Statements, Guidances, Manuals, and the Like—Should Federal Agencies Use Them to Bind the Public?*, 41 DUKE L.J. 1311, 1328–29 (1992)).

For the same reason, *AT&T v. EEOC*, 270 F.3d 973 (D.C. Cir. 2001), does nothing to help EEOC here.  In that case, AT&T *conceded* that it could point to no specific action (like the Felon-Hiring Rule) that EEOC had taken.  *Id.* at 975 (noting that AT&T instead relied on the Commission's "entire course of . . . actions with respect to the Company's service credit policy"); *cf. Lujan*, 504 U.S. at 568 (parties cannot bring "generalized" and "programmatic" challenges to government action).  Much less could AT&T point to anything that EEOC had done that bound its staff's discretion; anything that "shed light upon the Commission's intentions" to enforce its views against AT&T; or anything that forced employers to change their policies.  *Id.* at 975–76.  In fact, the court relied on *Appalachian Power* for the proposition that a guidance document does constitute final and reviewable agency action under Section 704 where it "inflicts injury or forces a party to change its behavior."  *Id.* at 976 (citing *Appalachian Power*, 208 F.3d at 1022).  The court simply held that AT&T failed to plead such injuries[4] — a holding that is both unremarkable and unhelpful for EEOC given that it does not dispute that its Felon-Hiring Rule *does* force employers to change their behaviors and *does* bind the Commission's staff "for all practical purposes."  *Appalachian Power*, 208 F.3d at 1021.

Finally, there is a good reason that EEOC is unwilling to dispute in this Court that the Felon-Hiring Rule is binding for all practical purposes.  That's because it routinely goes into other courts and urges deference for its guidance documents, and it can succeed in that endeavor only if it can show that its staff has taken a "consistent position" in its "enforcement actions" under the guidance document at issue.  Br. for the United States as Amicus Curiae at 28, *Vance v. Ball State*, 133 S. Ct. 2434 (2012), No. 11-556 ("EEOC's *Vance* Br.," attached as Ex. A); *see Federal Express Corp. v.*

---

[4] EEOC is wrong to the extent it implies that *AT&T* can be read to hold that all "letters of determination" are not final agency actions.  *See* MTD at 9.  The D.C. Circuit repeatedly has held the opposite.  *See, e.g., CSI Aviation Servs. v. DOT*, 637 F.3d 408 (D.C. Cir. 2011); *City of Dania Beach v. FAA*, 485 F.3d 1181 (D.C. Cir. 2007); *Safe Extensions v. FAA*, 509 F.3d 593 (D.C. Cir. 2007); *Student Loan Marketing Ass'n v. Riley*, 104 F.3d 397 (D.C. Cir. 1997); *Ciba-Geigy*, 801 F.2d at 435–37.  And in all events, that implication is irrelevant here because the Felon-Hiring Rule bears no resemblance to the interim letter at issue in *AT&T*.

24

*Holowecki*, 552 U.S. 389, 399 (2008) (affording some deference to a guidance document that had "been binding on EEOC staff for at least five years").  In fact, just last Term, EEOC *twice* urged the Supreme Court to afford legal effect to positions that the Commission took in its "guidance" documents, and both times, EEOC emphasized that its guidance documents "consistently" bind its staff and their enforcement decisions.  *See* EEOC's *Vance* Br. at 26–29; Br. of the United States as Amicus Curiae at 28–30, *University of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2012), No. 12-484 ("EEOC's *Nassar* Br.," attached as Ex. B).

The fact that EEOC wants to retain the ability to tell other courts in other contexts that its guidance deserves deference and legal effect makes it all the more untenable for the Commission to tell this Court the opposite.  The Commission is not the first agency to eats its cake while attempting to keep it.  But as *Cohen*, *Syncor*, *American Bus*, *Appalachian Power*, *Barrick*, *NRDC*, *Manufactured Housing*, and *Atchison* all make clear, the courts reject that strategy every time an agency is bold enough to try it.  This Court should do the same.

## CONCLUSION

Defendants' motion to dismiss should be denied.

Respectfully submitted.

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

JONATHAN F. MITCHELL
Solicitor General

 /s/  Andrew S. Oldham
ANDREW S. OLDHAM
Deputy Solicitor General

ARTHUR C. D'ANDREA
RICHARD B. FARRER
DUSTIN M. HOWELL
Assistant Solicitors General

209 West 14th Street
P.O. Box 12548
Austin, Texas 70711-2548
(512) 936-1700

Dated:  March 18, 2014

## CERTIFICATE OF SERVICE

I hereby certify that, on March 18, 2014, a true and correct copy of the foregoing was served by CM/ECF on:

Justin M. Sandberg, Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Mass. Ave. NW, Rm. 7302
Washington, D.C. 20001
Justin.Sandberg@usdoj.gov


/s/ Andrew S. Oldham
Andrew S. Oldham

**EXHIBITS**

**Tab**

Br. for the United States as Amicus Curiae,
   *Vance v. Ball State*, 133 S. Ct. 2434 (2012), No. 11-556 ......................................................... A

Br. of the United States as Amicus Curiae,
   *University of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2012), No. 12-484 ................................. B

EXHIBIT A

www.supremecourtpreview.org

No. 11-556

# In the Supreme Court of the United States

MAETTA VANCE, PETITIONER

*v.*

BALL STATE UNIVERSITY, ET AL.

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT*

**BRIEF FOR THE UNITED STATES AS
AMICUS CURIAE IN SUPPORT OF NEITHER PARTY**

P. DAVID LOPEZ
 *General Counsel*
CAROLYN L. WHEELER
  *Acting Associate General
  Counsel*
DANIEL T. VAIL
  *Acting Assistant General
  Counsel*
JULIE L. GANTZ
  *Attorney*
  *Equal Employment
  Opportunity Commission
  Washington, D.C. 20507*

DONALD B. VERRILLI, JR.
  *Solicitor General
    Counsel of Record*
THOMAS E. PEREZ
  *Assistant Attorney General*
SRI SRINIVASAN
  *Deputy Solicitor General*
ANN O'CONNELL
  *Assistant to the Solicitor
  General*
DENNIS J. DIMSEY
APRIL J. ANDERSON
  *Attorneys*

  *Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217*

**QUESTION PRESENTED**

Whether an employee must have the power to carry out a tangible employment action, such as hiring, firing, promoting, demoting, transferring, or disciplining an employee, in order to qualify as a supervisor for purposes of vicarious employer liability under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.*

(I)

## TABLE OF CONTENTS

Page

Interest of the United States ............................................................ 1

Statement ............................................................................................ 2

Summary of argument ...................................................................... 8

An employee who directs another employee's daily work
activities but cannot take tangible employment actions
is a supervisor for purposes of vicarious liability under
Title VII:

A. Title VII imposes vicarious liability on employers
for harassment by an employee with authority to
direct the victim's daily work activities .................... 11

1. Imposing vicarious liability for harassment
by an employee with authority to direct the
victim's daily work activities is consistent
with agency principles ............................................ 11

2. Imposing vicarious liability for harassment
by an employee with authority to direct the
victim's daily work activities is consistent
with the objectives of Title VII .......................... 22

B. The EEOC's longstanding interpretation is
reasonable and entitled to deference ...................... 26

C. On the existing record in this case, Davis fails
to qualify as petitioner's supervisor .......................... 30

Conclusion .......................................................................................... 33

## TABLE OF AUTHORITIES

Cases:

*Albemarle Paper Co.* v. *Moody*, 422 U.S. 405 (1975) ....... 23, 25

*Allison Engine Co.* v. *United States ex rel. Sanders*,
553 U.S. 662 (2008) ................................................................ 32

*Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742
(1998) ........................................................................... *passim*

*Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S.
53 (2006) .................................................................. 16, 21, 22

(III)

IV

Cases—Continued:                                          Page

    *Dulaney* v. *Packaging Corp. of Am.*, 673 F.3d 323
      (4th Cir. 2012) ............................................................. 28

    *EEOC* v. *CRST Van Expedited, Inc.*, 679 F.3d 657
      (8th Cir. 2012) ........................................... 20, 21, 28

    *Faragher* v. *City of Boca Raton*, 524 U.S. 775
      (1998) ................................................................*passim*

    *Federal Express Corp.* v. *Holowecki*, 552 U.S. 389
      (2008) ........................................................................ 28

    *Hall* v. *Bodine Elec. Co.*, 276 F.3d 345 (7th Cir. 2002)...... 6, 29

    *Kasten* v. *Saint-Gobain Performance Plastics Corp.*,
      131 S. Ct. 1325 (2011)........................................... 28

    *Mack* v. *Otis Elevator Co.*, 326 F.3d 116 (2d. Cir.),
      cert. denied, 540 U.S. 1016 (2003) ................................. 18, 28

    *Martin* v. *Occupational Safety & Health Review
      Comm'n*, 499 U.S. 144 (1991)................................ 27

    *Merck KGaA* v. *Integra Lifesciences I, Ltd.*, 545 U.S.
      193 (2005) ............................................................. 32

    *Meritor Sav. Bank, FSB* v. *Vinson*, 477 U.S. 57
      (1986) ................................................................ 1, 2, 26

    *Mikels* v. *City of Durham*, 183 F.3d 323 (4th Cir. 1999)....... 32

    *Oncale* v. *Sundowner Offshore Servs., Inc.*, 523 U.S. 75
      (1998) ............................................................ 1, 2, 22

    *Parkins* v. *Civil Constructors of Illinois, Inc.*, 163 F.3d
      1027 (7th Cir. 1998)............................................ 29

    *Pennsylvania State Police* v. *Suders*, 542 U.S. 129
      (2004) ............................................................ 15, 23

    *Rhodes* v. *Illinois Dep't of Transp.*, 359 F.3d 498
      (7th Cir. 2004) ...................................... 6, 7, 19, 29

    *Skidmore* v. *Swift Co.*, 323 U.S. 134 (1944)............................ 27

    *Sprint/United Mgmt. Co.* v. *Mendelsohn*, 552 U.S. 379
      (2008) ........................................................................ 32

V

Cases—Continued:                                                    Page

*Staub* v. *Proctor Hosp.*, 131 S. Ct. 1186 (2011)....................... 25

*Suders* v. *Easton*, 325 F.3d 432 (3d Cir. 2003) ....................... 15

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S.
    308 (2007) ............................................................... 32

*Weyers* v. *Lear Operations Corp.*, 359 F.3d 1049
    (8th Cir. 2004)............................................... 19, 20, 28

*Whitten* v. *Fred's, Inc.*, 601 F.3d 231 (4th Cir. 2010) ...... 17, 28

Statutes:

Civil Rights Act of 1964, Tit. VII, 42 U.S.C. 2000e
    *et seq.* .............................................................*passim*
        42 U.S.C. 2000e(b) ......................................... 8, 11
        42 U.S.C. 2000e-2(a).............................. 1, 2, 16, 21
        42 U.S.C. 2000e-5(f)(1)...........................................1
        42 U.S.C. 2000e-16 (2006 & Supp. IV 2010)......................1

Uniformed Services Employment and Reemployment
    Rights Act of 1994, 38 U.S.C. 4301 *et seq.* .......................... 25

Miscellaneous:

EEOC, *Enforcement Guidance on Vicarious Employ-
    er Liability for Unlawful Harassment by Supervi-
    sors*, 8 FEP Manual (BNA) 405:7654 (1999),
    available at 1999 WL 33305874 ..................................... 13, 26

Susan Estrich, *Sex at Work*, 43 Stan. L. Rev. 813
    (1991) ...................................................................... 14

*Prosser and Keaton on the Law of Torts* (W. Page
    Keeton ed., 5th ed. 1984)............................................. 25, 26

1 Restatement (Second) of Agency § 219(2)(d) (1957) .......... 12

1 Restatement (Third) of Agency § 1.02 (2006)...................... 21

# 𝕴𝖓 𝖙𝖍𝖊 𝕾𝖚𝖕𝖗𝖊𝖒𝖊 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘

———

No. 11-556

MAETTA VANCE, PETITIONER

*v.*

BALL STATE UNIVERSITY, ET AL.

———

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT*

———

**BRIEF FOR THE UNITED STATES AS
AMICUS CURIAE IN SUPPORT OF NEITHER PARTY**

———

### INTEREST OF THE UNITED STATES

Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.*, prohibits discrimination in employment on various bases. 42 U.S.C. 2000e-2(a). Actionable discrimination includes harassment that creates a hostile working environment. See, *e.g.*, *Meritor Sav. Bank, FSB* v. *Vinson*, 477 U.S. 57, 66 (1986); *Oncale* v. *Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998). The Attorney General is responsible for enforcing Title VII against public employers, and the Equal Employment Opportunity Commission (EEOC) enforces Title VII against private employers. 42 U.S.C. 2000e-5(f)(1). In addition, Title VII applies to the United States in its capacity as the nation's largest employer. 42 U.S.C. 2000e-16 (2006 & Supp. IV 2010). The United States thus has a strong interest in the proper interpretation of Title VII. At the

(1)

2

Court's invitation, the United States filed a brief as amicus curiae at the petition stage of this case.

### STATEMENT

1. Title VII prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C. 2000e-2(a). Employers may be liable for harassment on those bases that creates a hostile working environment. See, *e.g.*, *Meritor Sav. Bank, FSB* v. *Vinson*, 477 U.S. 57, 66 (1986); *Oncale* v. *Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998).

The standard for determining an employer's liability for harassment turns on the harasser's status in the workplace. An employer is vicariously liable for a supervisor's harassment. *Faragher* v. *City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742, 764-765 (1998). If the supervisor took no tangible employment action against the victim, however, the employer may assert as an affirmative defense that it exercised reasonable care to prevent and correct harassment and that the victim unreasonably failed to take advantage of the corrective and preventive opportunities. *Faragher*, 524 U.S. at 789, 807; *Ellerth*, 524 U.S. at 760, 764-765; see *id.* at 761 (defining "tangible employment action" to include "a significant change of employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"). When the harasser is a co-worker rather than a supervisor, the employer is liable if the victim proves that the employer was negligent because it "knew or should have known about the conduct" but failed to take appropriate action. *Ellerth*, 524 U.S. at 759, 765; see also *Faragher*, 524 U.S. at 799.

3

The Court has stated that the rule of vicarious liability for a supervisor's harassment applies to a "supervisor with immediate (or successively higher) authority." *Faragher*, 524 U.S. at 807; *Ellerth* 524 U.S. at 765. The Court has not, however, specifically defined which employees qualify as supervisors for purposes of that rule.

2.  Petitioner Maetta Vance, who is African-American, began working for respondent Ball State University in 1989 as a substitute server in the Banquet and Catering Division of University Dining Services. She became a part-time catering assistant in 1991. Pet. App. 2a, 27a. Petitioner was involved in several confrontations at work, including racially-charged incidents. *Id.* at 1a-2a. Most relevant here are her altercations with Saundra Davis, a catering specialist who is white. *Id.* at 54a.

a.  Sometime before 2002, petitioner and Davis argued, and Davis slapped petitioner on the head. Pet. App. 3a, 18a, 30a n.5. Petitioner told her employer about the incident but did not pursue the matter. *Id.* at 3a. Davis was soon transferred to another department. *Id.* at 3a, 30a n.5.

The conflicts resumed when Davis returned to the Banquet and Catering Division in 2005. Pet. App. 3a. On September 23, 2005, Davis blocked petitioner from exiting an elevator and said, "I'll do it again"—apparently referring to the slapping incident. *Id.* at 3a, 18a, 29a-30a. Petitioner filed an internal complaint describing the incident. *Id.* at 3a-4a. Around the same time, petitioner overheard Davis using the terms "Sambo" and "Buckwheat" while looking at her, but she apparently did not report those comments. *Id.* at 6a, 59a-61a. Petitioner told her supervisors that she was "not comfortable with Saundra Davis leaving her notes and delegating jobs to her in the kitchen."   1:06-cv-01452

4

Docket entry No. (Docket entry No.) 59-16, at 2 (S.D. Ind. Nov. 1, 2007); J.A. 66-67.

In May 2006, petitioner filed another internal complaint alleging that Davis blocked her way at the elevator, that she was left alone with Davis in the kitchen, and that Davis gave her "weird" looks. Pet. App. 6a-7a, 37a n.8. In response to petitioner's complaints, managers attempted to separate her from Davis. *Id.* at 36a; J.A. 367.

b. During this period, petitioner also had difficulties with others in the department, some of which were racially charged. In September 2005, someone told petitioner that co-worker Connie McVicker had bragged about her family ties to the Ku Klux Klan and had called petitioner a "nigger." Pet. App. 3a, 31a-32a. Petitioner reported the incident, and Bill Kimes, general manager of the Banquet and Catering Division, gave McVicker a written warning, which was atypical for a first offense. *Id.* at 4a-5a, 33a n.6, 34a-35a. A few days later, another supervisor met with McVicker and suggested she consider a transfer. *Id.* at 35a. Petitioner also reported that McVicker had called her a "monkey." *Id.* at 5a, 35a. In December 2005, petitioner filed a complaint with the EEOC alleging, *inter alia*, race discrimination. *Id.* at 6a, 36a.

In 2006, petitioner alleged that Karen Adkins, an assistant personnel director, was "mean mugging" and following petitioner at work. Pet. App. 7a, 37a n.8. Petitioner also filed an internal retaliation complaint against Kimes. *Id.* at 7a, 40a. Respondent investigated the complaints but found no basis for disciplinary action. *Id.* at 37a n.8, 40a-41a. In August 2006, petitioner filed a second complaint with the EEOC, claiming that respondent had retaliated against her by diminishing her

5

duties, withholding her breaks, denying her overtime, and disciplining her unequally. *Id.* at 7a, 40a.

c. Petitioner filed this suit in October 2006, alleging that she was subjected to a hostile work environment and was retaliated against for complaining about discrimination, in violation of Title VII. Pet. App. 7a, 52a.

In January 2007, respondent promoted petitioner to a full-time catering assistant. Pet. App. 27a, 41a. Petitioner claimed that Davis and others continued to harass her. According to petitioner's complaints, she was consigned to "entry level duties" such as cutting up celery sticks. *Id.* at 43a, 71a. Petitioner further alleged that in August 2007, Davis encountered petitioner at an elevator and said, "Are you scared?" in a southern accent. *Id.* at 38a. Petitioner reported the incident, and Davis received a verbal warning. *Ibid.* Also that month, petitioner filed a grievance about an incident in which McVicker said "payback" as petitioner passed her at the elevator. *Id.* at 37a, 63a. Soon afterwards, McVicker transferred to another job. *Id.* at 36a.

d. On petitioner's various complaint forms, she listed Davis as a "supervisor." J.A. 28-29, 45; Docket entry No. 60-12, at 1. But when asked in a deposition if Davis was her supervisor, petitioner said, "[O]ne day she's a supervisor; one day she's not. * * * It's inconsistent." Pet. App. 54a. Petitioner believed Davis was "part of management because she doesn't clock in." *Ibid.* Another employee said he was unsure of Davis's status, but claimed that Kimes told him Davis was a supervisor. J.A. 385-387. Kimes said Davis's status was "complicated" and explained that Davis did "direct and lead" at times. J.A. 366-367. Davis's job description states that she supervises "[k]itchen [a]ssistants and [s]ubstitutes," and exercises "leadership of up to 20 part-time, substi-

6

tute, and student employees." J.A. 12. But Kimes also testified that he "c[ould]n't have [Davis] directing [petitioner]" because of problems between them and that he tried to separate them after petitioner complained. J.A. 367. Generally, Kimes or the kitchen chef assigned petitioner's day-to-day tasks. Pet. App. 27a, 41a-42a.

3. The district court granted summary judgment in favor of respondent. Pet. App. 25a-80a.

a. The court concluded that Davis was not petitioner's supervisor and that respondent therefore was not vicariously liable for Davis's conduct. Pet. App. 53a-55a. The court applied Seventh Circuit precedent holding that "[a] supervisor is someone with the power to directly affect the terms and conditions of the plaintiff's employment," *id.* at 53a (citing *Rhodes* v. *Illinois Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004)), which authority "primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee," *ibid.* (quoting *Hall* v. *Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002)). Accordingly, the court ruled, even assuming "Davis periodically had authority to direct the work of other employees, such power would still not be sufficient to establish a supervisory relationship for purposes of Title VII." *Id.* at 54a. The court noted that it was "well established under Seventh Circuit law that '[a]n employee merely having authority to oversee aspects of another employee's job performance does not qualify as a supervisor.'" *Ibid.* (quoting *Rhodes*, 359 F.3d at 506). The court found "nothing in the record indicating that Ms. Davis had the ability to hire, fire, demote, promote, transfer, or discipline [petitioner]." *Ibid.* (internal quotation marks omitted).

b. The court evaluated petitioner's mistreatment by Davis and McVicker under the standard for harassment

7

by co-workers. Pet. App. 59a-68a. The court deter-
mined that most of petitioner's confrontations with Da-
vis had "no racial character or purpose," and that any
racial remarks were "not sufficiently severe or perva-
sive" to support a hostile work environment claim. *Id.*
at 59a-60a. The court concluded that McVicker's racial
statements did not "rise to the level of actionable har-
assment." *Id.* at 61a-63a.

The court further concluded that, even if petitioner
had suffered severe or pervasive racial harassment by
Davis and McVicker, she could not demonstrate a basis
for employer liability. Petitioner could not establish that
respondent was negligent because respondent had ad-
dressed petitioner's complaints in a way "reasonably
calculated to foreclose subsequent harassment." Pet.
App. 60a-61a, 63a-66a.

c. The court also rejected petitioner's claims against
other employees and her claim of unlawful retaliation.
Pet. App. 55a-59a, 68a-80a.

4. The court of appeals affirmed. Pet. App. 1a-24a.
The court agreed with the district court that Davis was
not petitioner's supervisor because Davis lacked the
"power to directly affect the terms and conditions of [pe-
titioner's] employment" by hiring, firing, demoting,
promoting, transferring, or disciplining her. *Id.* at 12a
(quoting *Rhodes*, 359 F.3d at 506) (emphasis omitted).
The court observed that it "ha[d] not joined other cir-
cuits in holding that the authority to direct an employ-
ee's daily activities establishes supervisory status under
Title VII." *Id.* at 12a-13a. The court thus held that peti-
tioner's assertion "that Davis had the authority to tell
her what to do" failed to raise a triable issue concerning
supervisory status. *Id.* at 13a.

8

Applying the standard for co-worker harassment, the court assumed that McVicker and Davis had created a hostile work environment. Pet. App. 15a. The court concluded, however, that respondent was not negligent because it "promptly investigat[ed] each of [petitioner's] complaints and t[ook] disciplinary action when appropriate." *Ibid.*; see *id.* at 15a-19a. The court also upheld the district court's rejection of petitioner's remaining claims. *Id.* at 13a-14a, 19a-24a.

## SUMMARY OF ARGUMENT

A. 1. Title VII imposes liability on employers for the acts of their "agent[s]." 42 U.S.C. 2000e(b). In *Faragher* v. *City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc.* v. *Ellerth*, 524 U.S. 742 (1998), the Court explained that, under agency principles, an employer can be vicariously liable for harassment by an employee who is a supervisor. That is because a victim of harassment may be reluctant to accept the risks of confronting a harasser who has supervisory authority, and the agency relationship between the employer and the supervisor thus aids the harasser in accomplishing the harassment.

The court of appeals held that a "supervisor" for purposes of *Faragher* and *Ellerth* is confined to persons who have power to take tangible employment actions against the victim, and does not encompass persons who control the victim's day-to-day work activities. That understanding is unduly restrictive. This Court held in *Faragher* that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." 524 U.S. at 807. An employee who controls work assignments certainly may possess "immediate" and

9

substantial authority over the victim, notwithstanding a lack of power to take tangible employment actions. Indeed, in *Faragher* itself, the Court concluded that a lifeguard captain who made daily work assignments was a supervisor for purposes of Title VII even though he lacked authority to take tangible employment actions.

Under agency principles as applied in *Faragher* and *Ellerth*, vicarious liability under Title VII extends to harassment by employees with authority to direct the daily work activities of their victims. An employee's reluctance to accept the risks of confronting a superior is not limited to situations in which the harasser has power to take tangible employment actions. It may be equally difficult for the victim to confront a harassing supervisor with authority to direct daily work activities, including the authority to assign particularly undesirable tasks. That was the case in *Faragher*, for instance, where the lifeguard captain threatened the victim that if she did not date him, he would have her "clean the toilets for a year." 529 U.S. at 780. When an employer vests an employee with authority to direct daily work assignments, the harassment is facilitated by the agency relationship and vicarious liability is warranted.

2. Title VII's purpose to avoid harm and to encourage the creation of anti-harassment policies and effective grievance mechanisms further supports the conclusion that Title VII imposes vicarious liability on an employer for harassment by an employee with authority to control the victim's daily work activities. The affirmative defense provided in *Faragher* and *Ellerth*—which allows an employer to avoid liability for supervisor harassment by showing that it exercised reasonable care to prevent and correct harassment and that the plaintiff unreasonably failed to take advantage of those preven-

10

tative and corrective opportunities—encourages em-
ployers to screen supervisors, monitor them, and estab-
lish effective training and complaint programs. If em-
ployers faced vicarious liability only for the actions of
those supervisors with power to take tangible employ-
ment actions, employers would have diminished incen-
tives to train and monitor intermediate supervisors.
And employees subject to harassment by those with con-
trol over day-to-day assignments would have a dimin-
ished ability to make use of employer grievance proce-
dures.

Title VII also ensures that victims are compensated
for injuries suffered on account of unlawful employment
discrimination. Because the employer seeks to profit
through its agents, it is appropriate for the employer to
bear the costs when those agents abuse their delegated
authority to injure others.

B. The court of appeals' approach is also inconsistent
with EEOC guidance defining who is a supervisor for
purposes of vicarious liability under Title VII. The
EEOC's guidance provides that an employee is a super-
visor if the employee (a) has authority to undertake or
recommend tangible employment actions, or (b) has au-
thority to direct the victim's daily activities. The EEOC
thoroughly considered the Court's decisions in *Faragher*
and *Ellerth* in formulating its position, the guidance has
governed the agency's enforcement actions since 1999,
and it is entitled to deference.

C. Under a correct approach that recognizes that an
individual with authority to direct daily work activities
qualifies as a supervisor, here, Davis would fail to quali-
fy as petitioner's supervisor on the record as it current-
ly stands. There is scant evidence in the record that
Davis exercised the requisite authority over petitioner's

11

daily work activities; and authority to direct a limited number of tasks does not suffice. Although there is evidence that Davis had a supervisory title, a supervisory title does not itself connote the necessary authority to direct day-to-day work assignments.

ARGUMENT

**AN EMPLOYEE WHO DIRECTS ANOTHER EMPLOYEE'S DAILY WORK ACTIVITIES BUT CANNOT TAKE TANGIBLE EMPLOYMENT ACTIONS IS A SUPERVISOR FOR PURPOSES OF VICARIOUS LIABILITY UNDER TITLE VII**

    **A.  Title VII Imposes Vicarious Liability On Employers For Harassment By An Employee With Authority To Direct The Victim's Daily Work Activities**

        *1.  Imposing vicarious liability for harassment by an employee with authority to direct the victim's daily work activities is consistent with agency principles*

a. The term "supervisor" does not appear in Title VII, but the statutory text imposes liability on employers for the actions of their "agent[s]."  42 U.S.C. 2000e(b) (defining "employer" to include an agent of the employer); see also *Faragher* v. *City of Boca Raton*, 524 U.S. 775, 791 (1998). Thus, "[i]n express terms, Congress has directed federal courts to interpret Title VII based on agency principles." *Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742, 754 (1998).

Accordingly, in *Faragher* and *Ellerth*, two cases involving allegations of workplace sexual harassment, this Court applied agency principles to determine the scope of an employer's vicarious liability under Title VII. The Court first explained that an employer is liable for "torts committed by an employee within the scope of his or her employment," *Ellerth*, 524 U.S. at 756, but that "sexual harassment by a supervisor" generally falls out-

12

side the scope of employment because it is not done with a purpose to serve the employer, *id.* at 756-757. The Court concluded, however, that an employer could still be vicariously liable for a supervisor's harassment—notwithstanding that the supervisor is acting outside the scope of his employment—based on a separate agency principle supporting vicarious liability when an employee is "aided in accomplishing the tort by the existence of the agency relation." *Faragher*, 524 U.S. at 801-802 (quoting 1 Restatement (Second) of Agency § 219(2)(d), at 481 (1957)); see also *Ellerth*, 524 U.S. at 759-762.

The Court explained that a supervisor's harassment of a subordinate is aided by the existence of the agency relation because "[t]he agency relationship affords contact with an employee subjected to a supervisor's * * * harassment, and the victim may * * * be reluctant to accept the risks of blowing the whistle on a superior." *Faragher*, 524 U.S. at 803. Contrasting supervisor harassment from harassment by a co-worker, the Court observed: "When a fellow employee harasses, the victim can walk away or tell the offender where to go, but it may be difficult to offer such responses to a supervisor." *Ibid.* The Court thus held that, under agency principles, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Id.* at 807. When the harassment is committed by a co-worker rather than a supervisor, however, the employer generally may be liable only if negligent. See *Ellerth*, 524 U.S. at 759, 765.

b. The court of appeals held that a "supervisor" for purposes of the various liability rules set forth in *Faragher* and *Ellerth* is confined to persons possessing "power to *directly* affect the terms and conditions of

13

[the victim's] employment," which the court understood as "primarily consist[ing] of the power to fire, hire, demote, promote, transfer, or discipline an employee." Pet. App. 12a (citations omitted).  Under that approach, the court explained, the "the authority to direct an employee's daily activities" is insufficient to establish supervisory status. *Id.* at 13a.  That understanding is unduly restrictive.

Nothing in *Faragher* or *Ellerth* suggests that supervisory status is limited to those employees who have authority to "fire, hire, demote, promote, transfer, or discipline an employee," to the exclusion of those with "authority to direct an employee's daily activities."  Pet. App. 12a-13a (citation omitted).  The decisions state that an employer is subject to vicarious liability for a hostile environment created by "a supervisor with immediate (or successively higher) authority over the employee." *Faragher*, 524 U.S. at 807; see also *Ellerth* 524 U.S. at 765.  And a person who controls daily work assignments and schedules certainly may possess "immediate"—and substantial—"authority over the employee," notwithstanding a lack of power to take tangible employment actions.[1]  The Court in *Faragher* recognized as much,

---

[1] This Court has defined "tangible employment action" to include "a significant change of employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761.  "A tangible employment decision requires an official act of the enterprise, a company act.  The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors." *Id.* at 762.  While those sorts of actions affecting an employee's general employment status amount to tangible employment actions, an alteration in an employee's day-to-day work activities or schedule is generally not considered a tangible employment action for these purposes. See EEOC, *Enforcement*

14

noting that harassment by a supervisor "is aided by the agency relation" because a supervisor's "power to supervise—[which may be] to hire and fire, and *to set work schedules* and pay rates—does not disappear when [the supervisor] chooses to harass through insults and offensive gestures rather than directly with threats of firing or promises of promotion." 524 U.S. at 802-803 (quoting Susan Estrich, *Sex at Work*, 43 Stan. L. Rev. 813, 854 (1991)) (emphasis added). The Court thus acknowledged that the setting of day-to-day work schedules, although not a tangible employment action, may readily be among the powers a supervisor uses to intimidate a subordinate.

The court of appeals' restrictive approach cannot be squared with this Court's resolution of the specific claims in *Faragher*. There, the Court concluded that the employer was vicariously liable for harassment by two employees even though one had no authority to effect tangible employment actions. Lifeguard captain David Silverman was "responsible for making the [employees'] daily assignments, and for supervising their work and fitness training." 524 U.S. at 781, 810. In contrast, Bill Terry, Chief of the Marine Safety Division, had "authority to hire new [employees] (subject to the approval of higher management), to supervise all aspects of [their] work assignments, to engage in counseling, to deliver oral reprimands, and to make a record of any such discipline." *Id.* at 781. The Court upheld vicarious liability for both Silverman's and Terry's actions, explaining that "these supervisors were granted virtually unchecked authority over their subordinates, directly controll[ing]

---

*Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors*, 8 FEP Manual (BNA) 405:7654 (1999), available at 1999 WL 33305874.

15

and supervis[ing] all aspects of [Faragher's] day-to-day activities." *Id.* at 808 (internal quotation marks and citation omitted) (brackets in original).

The Court's focus on the power to supervise and control Faragher's "day-to-day activities" necessarily encompasses power over daily assignments, and necessarily applied to Silverman, who was responsible for making the lifeguards' daily assignments.  He thus could substantially determine the desirability (or undesirability) of Faragher's daily work experience.  Under the court of appeals' restrictive approach, however, Silverman would have merely been considered Faragher's co-worker because he lacked authority to take tangible employment actions against her, even though he controlled her daily assignments.[2]

c.  Under this Court's application of agency principles in *Faragher* and *Ellerth*, vicarious liability under Title VII extends to harassment by employees with authority to control the daily work activities of their victims.  An employee's "reluctan[ce] to accept the risks of blowing the whistle on a superior," *Faragher*, 524 U.S. at 803, is not confined to situations where the harasser has the power to take tangible employment actions. See *Ellerth*, 524 U.S. at 761.  Because an employee with supervisory powers vested by the employer may "implicitly threaten to misuse [those] supervisory powers to deter any re-

---

[2] While the question of who is a supervisor was not directly at issue, this Court in *Pennsylvania State Police* v. *Suders*, 542 U.S. 129 (2004), evaluated the respondent's constructive discharge claim under the *Faragher* and *Ellerth* framework for harassment by supervisors, even though the harassers had no authority to take tangible employment actions. See *Suders* v. *Easton*, 325 F.3d 432, 450 n.11 (3d Cir. 2003) (noting that supervisors could not take tangible employment actions but were "responsible for day-to-day supervision").

16

sistance or complaint," *Faragher*, 524 U.S. at 801, it may be equally difficult for a victim to "walk away or tell the offender where to go" when the harasser, although lacking authority to take tangible employment actions, directs the victim's daily work activities, *id.* at 803. Harassment in that context is aided by the agency relationship for purposes of the vicarious liability rules set forth in *Faragher* and *Ellerth*.

This Court's decision in *Burlington Northern & Santa Fe Railway Co.* v. *White*, 548 U.S. 53 (2006), is instructive in this regard. There, the Court held that Title VII's anti-retaliation provision, 42 U.S.C. 2000e-2(a), encompassed the retaliatory reallocation of job duties within the same position. The Court explained that "[a]lmost every job category involves some responsibilities and duties that are less desirable than others," and "[c]ommon sense suggests that one good way to discourage an employee * * * from bringing discrimination charges would be to insist that she spend more time performing the arduous duties and less time performing those that are easier or more agreeable." 548 U.S. at 70-71. It is equally a matter of common sense that the authority to control an employee's day-to-day work assignments and schedule materially contributes to a person's ability to harass another and materially diminishes the victim's practical ability to resist and respond.

d. A number of reported decisions illustrate how employees with authority to direct the daily work activities of others have used that power to threaten subordinates into tolerating workplace harassment. In *Faragher*, for instance, lifeguard captain Silverman, who had authority to "make [the victim's] daily assignments," 524 U.S. at 781, subjected the victim to various forms of sexual harassment. In addition to tackling the victim, "pantomim-

17

[ing] an act of oral sex," making "frequent, vulgar references to women and sexual matters," and "comment[ing] on the bodies of female lifeguards," Silverman explicitly wielded his authority to direct the victim's work assignments by telling her, "[d]ate me or clean the toilets for a year." *Id.* at 780, 782. This Court concluded that vicarious liability was appropriate, noting that Silverman "directly controll[ed] and supervis[ed] all aspects of [the victim's] day-to-day activities," and that the victim was "completely isolated from the City's higher management." *Id.* at 808 (internal quotation marks and citations omitted).

Similarly, in *Whitten* v. *Fred's, Inc.*, 601 F.3d 231 (4th Cir. 2010), the plaintiff was sexually harassed by a "store manager," the senior employee on site. *Id.* at 236.[3] The store manager controlled scheduling, and he told the victim that if she wanted long weekends off from work, she needed to "be good to [him] and give [him] what [he] want[ed]." *Ibid.* (internal quotation marks and citation omitted) (brackets in original). After she attempted to ignore the store manager's harassment throughout the work day, he ordered her to stay late and clean the store, and he later revoked her day off. *Ibid.* The court concluded that supervisor liability was appropriate under *Faragher* and *Ellerth* because, "[u]nlike a mere co-worker, [the store manager] could change Whitten's schedule and impose unpleasant duties on a whim," which made the victim "vulnerable to his conduct in ways that comparable conduct by a mere co-worker would not." *Id.* at 246.

---

[3] *Whitten* involved only state law claims, but the court applied the *Faragher* and *Ellerth* framework, noting that South Carolina law "essentially follows the substantive strictures of Title VII." 601 F.3d at 242.

18

In *Mack* v. *Otis Elevator Co.*, 326 F.3d 116 (2d Cir.), cert. denied, 540 U.S. 1016 (2003), the plaintiff, an elevator mechanic's helper, alleged that she was sexually harassed by the "mechanic in charge" of her worksite, James Connolly, who had authority "to assign and schedule work" and to "direct the work force." *Id.* at 120.  Connolly referred to the victim on multiple occasions as an "attractive young lady," and told her repeatedly that she had a "fantastic ass," "luscious lips," and "beautiful eyes." *Ibid.*  Connolly regularly changed his clothes in front of the plaintiff at the end of his shift, boasted to her about sexual exploits, and on one occasion "grabbed [her] by the waist, pulled her onto his lap, tried to kiss her[,] and touched her buttocks." *Ibid.*  When matters grew increasingly tense between the two, Connolly gave the plaintiff very little overtime work and told her that he did not care if she complained about him because "I get away with everything.  I always have and I always will." *Id.* at 121.  The court concluded that Connolly's authority to direct the plaintiff's workday, in addition to the fact that he was the senior employee on site, clothed him with "special dominance over other onsite employees," and the harassment was therefore aided by Connolly's agency relationship with the employer. *Id.* at 125.

In each of these cases, the employer vested certain employees with authority to direct the daily activities of others, and that power was abused to harass individual subordinates.  That harassment was facilitated by the authority vested by the employer, and vicarious liability was therefore warranted under agency principles as applied by this Court in *Faragher* and *Ellerth*.

By contrast, decisions from circuits that have limited supervisor liability to employees with authority to take

19

tangible employment actions illustrate how that restric-
tive rule unfairly shields employers from liability when
their agents harass victims by abusing delegated au-
thority. In *Rhodes* v. *Illinois Department of Transpor-
tation*, 359 F.3d 498 (7th Cir. 2004), for example, the
plaintiff was the only female employee during her first
two seasons as a highway maintainer. *Id.* at 502. After
she complained about a route change, she alleged that
the two employees with responsibility for assigning
tasks in the work yard called her vulgar names, forced
her to wash her truck in sub-zero temperatures, as-
signed her to work in the yard instead of on road crews,
instructed a mechanic not to fix the heat in her truck,
and improperly marked her as absent from work when
she went to take a licensing test. *Id.* at 501-503. The
employer conceded that the plaintiff had been subjected
to a hostile work environment, *id.* at 505, but the court
concluded that vicarious liability was unwarranted be-
cause the harassers had no authority to make economic
decisions regarding the victim's employment. *Id.* at 506.
In a concurring opinion, Judge Rovner expressed con-
cern that the court's unduly narrow definition of super-
visor liability was "troubling * * * in a case like this"
and should be reexamined. *Id.* at 509. She explained
that, regardless of whether the harassers possessed
formal employment authority, "a factfinder reasonably
might conclude that the power [the employer] had given
them to manage the Yard on a day-to-day basis enabled
or facilitated their ability to create a hostile work envi-
ronment." *Id.* at 510.

In *Weyers* v. *Lear Operations Corp.*, 359 F.3d 1049
(8th Cir. 2004), the plaintiff, who was 43 years old when
she was hired, alleged that she was subjected to a hos-
tile work environment by her "team leader," who had au-

20

thority to assign her daily tasks. *Id.* at 1051-1052. She alleged that the team leader subjected her to constant harassment about her age, including telling her "if you're over 25, you're female, you're out of here. You don't work for me. You don't work in my department." *Id.* at 1052 & n.3, 1057. She also alleged that the team leader used his authority to prohibit her from participating in training opportunities available to other new employees, which she believed contributed to her dismissal. *Id.* at 1057. The court of appeals reversed a jury verdict in the plaintiff's favor, concluding that the employer was not vicariously liable for the harassment because the team leader "himself did not have the power to take tangible employment actions against [the plaintiff]." *Ibid.* The court noted that its "option of adopting the broader * * * definition of supervisor status [had been] foreclosed" by circuit precedent. *Id.* at 1056-1057.

In *EEOC v. CRST Van Expedited, Inc.*, 679 F.3d 657 (8th Cir. 2012), various female truck drivers attempting to complete their employer's training program, which involved a 28-day over-the-road training trip with a "Lead Driver" who evaluated the trainee's performance at the end of the trip, alleged that they were subjected to sexual harassment during those trips. *Id.* at 665. One victim alleged that a Lead Driver made constant sexual remarks while giving her instructions, such as telling her "the gear stick is not the penis of [your] husband, [you] don't have to touch the gear stick so often" and "[y]ou got big tits for your size," and that another Lead Driver "forced [her] to have unwanted sex with him on several occasions in order to get a passing grade." *Id.* at 666. Another victim alleged that her Lead Driver repeatedly entered the cab wearing only his underpants and rubbed the back of her head; ordered her to clean

21

up the truck when she complained about the mess, saying "that's what you're on the truck for, you're my bitch * * * [s]hut up and clean it up"; and that he routinely urinated in bottles and bags in the cabin and ordered her to "shut up and clean it up" when she complained. *Id.* at 688. Despite the Lead Drivers' repeated abuse of authority to harass trainees, the court concluded that, "[a]pplying [circuit] precedent," the employer could not be vicariously liable because it was "undisputed that none of CRST's Lead Drivers wielded any * * * power" to take tangible employment actions against the victims. *Id.* at 684.

e. Determining whether an employee who harassed a subordinate has authority to direct the victim's daily work activities will require evaluation of facts specific to the employment relationship between the harasser and the victim. In Title VII, Congress "directed federal courts to interpret Title VII based on agency principles," *Ellerth*, 524 U.S. at 754, and agency principles require evaluation of specific facts. See 1 Restatement (Third) of Agency § 1.02 (2006) ("Whether a relationship is one of agency is a legal conclusion made after an assessment of the facts of the relationship.").

This Court has recognized the need for a similarly fact-specific approach in other Title VII contexts. "Context matters." *Burlington Northern*, 548 U.S. at 69. For instance, the test for determining whether an employer took a prohibited retaliatory action against an employee under Title VII's antiretaliation provision, 42 U.S.C. 2000e-2(a), depends on whether the challenged action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68 (internal quotation marks and citation omitted). In adopting that standard,

22

the Court acknowledged that "the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 69. To determine whether unlawful harassment has occurred, moreover, the plaintiff must show that harassment was sufficiently severe or pervasive to alter the terms and conditions of his or her employment, and the severity of harassment "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (internal quotation marks and citation omitted).

In any event, the court of appeals' more restrictive approach does not necessarily offer a bright-line alternative. Whether an employee has authority to take tangible employment actions against a victim may not be clear in an employer's policy documents, and there may be no examples of the alleged harasser taking such actions. As a factual matter, the inquiry into whether an employee possesses authority to direct a subordinate's daily activities may be no more contextual than the inquiry into whether he has authority to take tangible employment actions. In either case, the analysis will turn on consideration of the particularities of the authority possessed by the putative supervisor.

> ### 2. *Imposing vicarious liability for harassment by an employee with authority to direct the victim's daily work activities is consistent with the objectives of Title VII*

Imposing vicarious liability on an employer for harassment by an employee with authority to control the victim's daily work activities not only is consistent with this Court's application of agency principles in *Faragher*

23

and *Ellerth*, but also is consistent with the objectives of Title VII.

a. The primary object of Title VII is not "to provide redress but to avoid harm." *Faragher*, 524 U.S. at 806 (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417 (1975)); see also *Ellerth*, 524 U.S. at 764 (noting "Title VII is designed to encourage the creation of antiharassment policies and effective grievance mechanisms"). The Court in *Faragher* and *Ellerth* took special care to "adapt agency concepts to the practical objectives of Title VII" by recognizing an affirmative defense through which employers may avoid liability for harm inflicted by supervisors by implementing policies designed to prevent and correct harassment. *Faragher*, 524 U.S. at 802 n.3. The affirmative defense is unavailable in cases in which a tangible employment action is taken. In those circumstances, the "official power of the enterprise" has been brought to bear on the victim, and the "aided by the agency relation" standard is satisfied. *Ellerth*, 524 U.S. at 762-763. But in cases where no tangible employment action is taken, an employer can avoid liability for supervisor harassment by showing that it exercised reasonable care to prevent and correct harassment and that the plaintiff employee unreasonably failed to take advantage of those preventive and corrective opportunities. *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 764-765.

The affirmative defense established in *Faragher* and *Ellerth* "accommodates [the avoidable consequences] doctrine by requiring plaintiffs reasonably to stave off avoidable harm." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 146 (2004) (internal quotation marks and citation omitted). Properly applied, the defense encourages employers to screen supervisors, monitor them,

24

and establish effective training and complaint programs. *Faragher*, 524 U.S. at 803; *Ellerth*, 524 U.S. at 764-765. The defense thus promotes Title VII's "design[] to encourage the creation of antiharassment policies and effective grievance mechanisms." *Id.* at 764.

If employers face vicarious liability only for the actions of those supervisors with power to take tangible employment actions, employers could attempt to insulate themselves from vicarious liability by confining the authority to effect tangible employment actions to a centralized personnel department. Such a department might be off site, and might have indirect or infrequent contact with potential victims, leaving workers vulnerable to harassment by those with the greatest day-to-day ability to create intolerable working conditions. Cf. *Faragher*, 524 U.S. at 808 (noting that supervisors supervised and controlled "all aspects of [Faragher's] day-to-day activities" and "had virtually unchecked authority," and that "Faragher and her colleagues were completely isolated from the City's higher management") (internal quotation marks omitted).

In that event, employers would have a diminished incentive to train or monitor immediate supervisors. And victims would have a diminished ability and incentive to make use of any available grievance procedures. That arrangement would disserve the core purposes of Title VII. But if supervisory liability were properly considered to encompass the authority to control day-to-day work assignments, employers would lack any comparable ability or incentive to avoid vicarious liability by assigning that authority to a remote, central department: by nature, the assignment of day-to-day activities and schedules generally requires the exercise of on-site discretion and supervision. Employees, moreover, would

25

be better positioned to take advantage of internal complaint procedures.

This Court recently addressed a similar dynamic in *Staub* v. *Proctor Hospital*, 131 S.Ct. 1186 (2011), a case arising under the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. 4301 *et seq.*, which the Court has recognized "is very similar to Title VII." *Staub*, 131 S. Ct. at 1191. In *Staub*, the employer fired the plaintiff based in part on reports from biased supervisors, including the plaintiff's immediate supervisor and a more senior supervisor. *Id.* at 1189. The Court concluded that the employer could be vicariously liable for the discharge even though an unbiased vice president of human resources took the challenged employment action. Otherwise, the Court explained, an employer could "be effectively shielded from discriminatory acts and recommendations of supervisors" by vesting ultimate authority for personnel decisions in an independent official. *Id.* at 1193. The same considerations counsel in favor of recognizing that an employee with authority to direct day-to-day work activities qualifies as a supervisor for purposes of vicarious employer liability.

b. In addition to promoting deterrence, Title VII provides a means "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co.*, 422 U.S. at 418. Common-law principles hold an employer vicariously liable for the wrongful acts of its agents to promote compensation of victims of wrongful conduct. *Prosser and Keaton on the Law of Torts* 500-501 (W. Page Keeton ed., 5th ed. 1984). The common-law approach rests on the view that, because the employer has sought to profit through its agents, the employer, rather than the innocent victims, should bear the costs when those agents abuse their del-

26

egated authority to injure others. *Ibid.* Because employers benefit from empowering lower-level supervisors to direct other workers, it is appropriate that they should, subject to the *Faragher* and *Ellerth* defense, be subject to liability for abuse of that power.

### B.   The EEOC's Longstanding Interpretation Is Reasonable And Entitled To Deference

Shortly after the Court decided *Faragher* and *Ellerth*, the EEOC issued enforcement guidance defining who qualifies as a supervisor for purposes of vicarious employer liability under Title VII. EEOC, *Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors*, 8 FEP Manual (BNA) 405:7654 (1999), available at 1999 WL 33305874 (reproduced at Pet. App. 81a-93a) (EEOC Guidance). The guidance provides that an individual qualifies as a supervisor if:

a. the individual has authority to undertake or recommend tangible employment decisions affecting the employee; *or*

b. the individual has authority to direct the employee's daily work activities.

Pet. App. 90a (emphasis added). That guidance is "an administrative interpretation of [Title VII] by the enforcing agency," and "constitute[s] a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Sav. Bank, FSB* v. *Vinson*, 477 U.S. 57, 65 (1986) (internal quotation marks and citations omitted). The court of appeals initially adopted its narrow construction of supervisor liability without the benefit of the EEOC's guidance. The Court should afford deference to that considered guidance in resolving the question presented.

27

1. Agency enforcement guidelines are "entitled to respect" when the agency has shown "thoroughness * * * in its consideration" and "validity [in] its reasoning." *Skidmore* v. *Swift Co.*, 323 U.S. 134, 140 (1944); see *Martin* v. *Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 156-157 (1991). The EEOC's guidance document demonstrates that the EEOC thoroughly considered the issue of supervisory status to formulate a position on the scope of vicarious liability under Title VII. The guidance document is entitled to deference.

To define the scope of supervisor liability under Title VII, the EEOC explained that because vicarious liability for supervisor harassment under *Faragher* and *Ellerth* is grounded in the harasser's potential misuse of delegated authority, "that authority must be of sufficient magnitude so as to assist the harasser explicitly or implicitly in carrying out the harassment" for vicarious liability to exist. Pet. App. 89a. The EEOC concluded that, when an employee has authority to direct another employee's day-to-day work activities, that person's ability to harass "is enhanced by his or her authority to increase the employee's workload or assign undesirable tasks," and vicarious liability is therefore appropriate. *Id.* at 91a. The EEOC explained that its interpretation was supported by the Court's resolution of the specific claims in *Faragher*, in which the Court concluded that Silverman was a supervisor notwithstanding his lack of authority to take tangible employment actions. *Id.* at 91a-92a.

The EEOC's guidance also recognizes limits on who should qualify as a supervisor by virtue of authority to direct another employee's daily activities. Those limits are directly tied to whether harassment would be "aided by the agency relation" in specific circumstances. The

28

guidance explains that a determination of supervisor status "is based on [the employee's] job function rather than job title (e.g., 'team leader') and must be based on the specific facts." Pet. App. 89a-90a. Moreover, if an employee is only temporarily authorized to direct the daily work activities of another, the employer is vicariously liable only for unlawful harassment that occurs during that temporary period. *Id.* at 92a. The guidance further clarifies that an employee who "merely relays other officials' instructions regarding work assignments and reports back to those officials does not have true supervisory authority," and harassment in that scenario would not be aided by the agency relationship. *Ibid.* And an employee who directs "only a limited number of tasks or assignments" for another employee likewise would not have sufficient authority to qualify as a supervisor. *Ibid.*

The EEOC's guidance has governed the agency's enforcement actions since 1999, and the EEOC has filed numerous briefs in the courts of appeals setting forth its understanding. See EEOC Br. as Amicus Curiae, *Dulaney* v. *Packaging Corp. of Am.*, 673 F.3d 323 (4th Cir. 2012) (No. 10-2316); EEOC Br., *CRST, supra* (Nos. 09-3764, 09-3765, 10-1682); EEOC Pet. for Reh'g and Suggestion for Reh'g En Banc, *CRST, supra*; EEOC Br. as Amicus Curiae, *Whitten, supra* (No. 09-1265); EEOC Br. as Amicus Curiae, *Weyers, supra* (No. 02-3732); EEOC Br. as Amicus Curiae, *Mack, supra* (No. 02-7056). The agency's consistent position warrants a measure of deference. See *Kasten* v. *Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1335 (2011) (giving weight to EEOC's consistent position set forth in compliance manual and court of appeals briefs); *Federal Express Corp.* v. *Holowecki*, 552 U.S. 389, 399 (2008) (not-

29

ing, in deferring to EEOC guidance, that it had "been binding on EEOC staff for at least five years").

2. The court of appeals initially adopted its restrictive view of supervisor liability under Title VII without the benefit of the EEOC's guidance. Shortly after this Court decided *Faragher* and *Ellerth*, the court of appeals held in *Parkins* v. *Civil Constructors of Illinois, Inc.*, 163 F.3d 1027 (7th Cir. 1998), that supervisory authority under those cases "primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee." *Id.* at 1034. The *Parkins* court explained that "[a]bsent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes [of] imputing liability to the employer." *Ibid.* In its decision below, the court of appeals reiterated that holding.

The EEOC issued its guidance shortly after the court of appeals' decision in *Parkins*, and certain judges then called for the court of appeals to reconsider its holding. See *Rhodes*, 359 F.3d at 509 (Rovner, J., concurring in part and concurring in the judgment); *id.* at 510 (Cudahy, J., concurring). The court of appeals, however, has continued to hold that employees who assign tasks and recommend discipline fail to qualify as supervisors. *Id.* at 506; see also *Hall* v. *Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002) (finding no supervisory status where harasser directed work, contributed to evaluations, and trained victim). Consistent with the EEOC's guidance, this Court should reject the court of appeals' unduly restrictive approach and hold that supervisory liability extends to harassment by an employee who has authority to direct the victim's daily work activities.

30

### C. On The Existing Record In This Case, Davis Fails To Qualify As Petitioner's Supervisor

For the reasons explained above, the court of appeals erred in refusing to recognize that supervisor liability under Title VII extends to harassment by employees with authority to direct the day-to-day work activities of their victims. But here, even under the correct legal test, Davis—the only employee whose supervising status is in issue, see Pet. 29—would fail to qualify as petitioner's supervisor on the record as it currently stands.

At the summary judgment phase, the parties engaged in substantial discovery of the facts pertaining to petitioner's claims. There is scant evidence in the resulting record that Davis exercised the requisite authority over petitioner's daily work activities. Petitioner's deposition testimony describes no instances in which Davis actually directed her work. J.A. 102-248. Petitioner now points to indicia in the record of Davis possessing a lead role in the kitchen of some sort, see Pet. Br. 10, 42-43, but there is no evidence describing the nature of any authority over petitioner or whether the authority encompassed control of day-to-day work activities. And petitioner would be required to do more than demonstrate that Davis possessed some minimal level of authority over petitioner, because "someone who directs only a limited number of tasks or assignments would not qualify as a 'supervisor.'" Pet. App. 92a (EEOC Guidance).[4]

---

[4] The record also does not demonstrate that petitioner "reasonably believed" Davis was her supervisor. See Pet. App. 92a (EEOC Guidance) (noting that an employer may be vicariously liable "if the employee reasonably believed that the harasser had [supervisory] power," even if that belief is false). When asked whether she considered Davis her supervisor at the time of their confrontation at the elevator in April 2006, petitioner replied: "I don't know what she is." J.A.

31

Petitioner did refer to Davis as a "supervisor" or "kitchen supervisor" in various complaint forms. J.A. 28-29, 45; Docket entry No. 60-12, at 1. And another employee stated that Kimes had told him Davis was a supervisor. J.A. 385-387. Davis's job description also states that she "lead[s] and direct[s]" "kitchen part-time, substitute, and student employee helpers" and supervises "[k]itchen [a]ssistants and [s]ubstitutes." J.A. 12-13. And Kimes acknowledged that Davis directed employees "[a]t times." J.A. 367.

But even if Davis was labeled a "supervisor" and her job description characterized her as supervising petitioner, that would not suffice. Supervisor status "is based on * * * job function rather than job title" and "must be based on the specific facts." Pet. App. 89a-90a (EEOC Guidance). The record as it stands contains no specific facts demonstrating that Davis directed petitioner's day-to-day work. In fact, the record suggests that either Kimes or the chef outlined petitioner's daily tasks on "prep lists." *Id.* at 41a-42a, 72a. While Davis on occasion may have handed petitioner her prep lists, the record does not show that Davis prepared them. See J.A. 74. And someone "who merely relays other officials' instructions regarding work assignments" does not qualify as a supervisor. Pet. App. 92a (EEOC Guidance). Nor would it be enough for petitioner to show that Davis occasionally took the lead in the kitchen. An employer may be liable where a temporary supervisor "commits unlawful harassment of a subordinate while serving as

---

197; see also Pet. App. 54a. Petitioner explained that, "one day she's a supervisor; one day she's not. One day she's to tell people what to do, and one day she's not." *Ibid.* Asked whether Davis was her supervisor even "intermittently, once in a while," petitioner answered that she was "not sure." J.A. 198.

32

his or her supervisor." *Ibid.* But here, the record contains only oblique references to any exercise of authority by Davis and fails to indicate that the harassment occurred during any such period.[5]

This Court on its own could review the record as it presently stands to determine whether summary judgment was appropriately granted on that record under the correct legal standard. The Court's usual practice, however, is to remand to the lower courts to apply the correct standard as announced by this Court. See, *e.g.*, *Allison Engine Co.* v. *United States ex rel. Sanders*, 553 U.S. 662, 673 (2008); *Sprint/United Mgmt. Co.* v. *Mendelsohn*, 552 U.S. 379, 388 (2008); *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 329 (2007); *Merck KGaA* v. *Integra Lifesciences I, Ltd.*, 545 U.S. 193, 208 (2005). In any remand, the courts below presumably would also have discretion to determine whether it would be appropriate to allow petitioner to amend her pleadings or supplement her discovery to attempt to satisfy the correct standard. See *Ellerth*, 524 U.S. at 766.

## CONCLUSION

The judgment of the court of appeals should be vacated and the case remanded for further proceedings consistent with the Court's decision.

Respectfully submitted.

---

[5] Petitioner's observation that Davis "d[id not] clock in" may indicate that Davis outranked petitioner in the organizational hierarchy, but it does not show that she had authority to direct petitioner's day-to-day activities. Pet. App. 54a; see also *Mikels* v. *City of Durham*, 183 F.3d 323, 334 (4th Cir. 1999) (finding no supervisory status where harasser outranked victim but had "minimal" authority over her).

33

P. DAVID LOPEZ
   *General Counsel*
CAROLYN L. WHEELER
   *Acting Associate General*
   *Counsel*
DANIEL T. VAIL
   *Acting Assistant General*
   *Counsel*
JULIE L. GANTZ
   *Attorney*
   *Equal Employment*
   *Opportunity Commission*

DONALD B. VERRILLI, JR.
   *Solicitor General*
THOMAS E. PEREZ
   *Assistant Attorney General*
SRI SRINIVASAN
   *Deputy Solicitor General*
ANN O'CONNELL
   *Assistant to the Solicitor*
   *General*
DENNIS J. DIMSEY
APRIL J. ANDERSON
   *Attorneys*

SEPTEMBER 2012

EXHIBIT B

American Bar Association
www.supremecourtpreview.org

No. 12-484

# In the Supreme Court of the United States

UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL
CENTER, PETITIONER

*v.*

NAIEL NASSAR

---

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT*

---

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
SUPPORTING RESPONDENT**

---

DONALD B. VERRILLI, JR.
    *Solicitor General
        Counsel of Record*
THOMAS E. PEREZ
    *Assistant Attorney General*
SRI SRINIVASAN
    *Deputy Solicitor General*
MELISSA ARBUS SHERRY
    *Assistant to the Solicitor
        General*

P. DAVID LOPEZ
    *General Counsel*
CAROLYN L. WHEELER
    *Acting Associate General
        Counsel*
GAIL S. COLEMAN
    *Attorney
    Equal Employment
        Opportunity Commission
    Washington, D.C. 20507*

DENNIS J. DIMSEY
TOVAH R. CALDERON
    *Attorneys*

    *Department of Justice
    Washington, D.C. 20530-0001
    SupremeCtBriefs@usdoj.gov
    (202) 514-2217*

## QUESTION PRESENTED

Whether Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.*, authorizes a mixed-motive standard for retaliation claims.

(I)

## TABLE OF CONTENTS

Page

Interest of the United States ................................................1
Statutory provisions involved ..............................................2
Statement.........................................................................2
Summary of argument .......................................................7
Argument:
   The 1991 amendments authorize a mixed-motive
   standard for Title VII retaliation claims............................10
     A. Title VII's "motivating factor" provision applies
       directly to retaliation claims......................................11
     B. Applying the "motivating factor" provision to
       retaliation claims best effectuates congressional
       intent.......................................................................24
     C. The EEOC's longstanding interpretation is
       reasonable and entitled to deference .........................28
     D. Because the 1991 amendments authorize a
       mixed-motive standard for Title VII retaliation
       claims, *Gross* does not control.....................................30
Conclusion........................................................................33
Appendix — Statutory provisions .............................................1a

## TABLE OF AUTHORITIES

Cases:

   *Bibbs* v. *Block*, 778 F.2d 1318 (8th Cir. 1985) ......................25
   *Borgo* v. *Goldin*, 204 F.3d 251 (D.C. Cir. 2000) ...................22
   *Burlington N. & Santa Fe Ry. Co.* v. *White*,
     548 U.S. 53 (2006) ......................................7, 27, 32
   *Carter* v. *Luminant Power Servs. Co.*, No. 12-10642,
     2013 WL 1337365 (Apr. 3, 2013) ..................................23, 24
   *CBOCS W., Inc.* v. *Humphries*, 553 U.S. 442
     (2008) ........................................8, 14, 16, 20, 24, 26
   *Crawford* v. *Metropolitan Gov't of Nashville &
     Davidson Cnty.*, 555 U.S. 271 (2009) ..................................27

(III)

IV

Cases—Continued:                                              Page

*Cruz-Packer* v. *Chertoff*, 612 F. Supp. 2d 67 (D.D.C.
   2009) ........................................................................18

*Desert Palace, Inc.* v. *Costa*, 539 U.S. 90 (2003)............23, 25

*EEOC* v. *General Lines, Inc.*, 865 F.2d 1555
   (10th Cir. 1989).....................................................26

*Federal Express Corp.* v. *Holowecki*, 552 U.S. 389
   (2008) ...............................................................29, 30

*Gomez-Perez* v. *Potter*, 553 U.S. 474
   (2008) ...............................................8, 13, 14, 16, 21

*Gross* v. *FBL Fin. Servs., Inc.*, 557 U.S. 167
   (2009) .............................................................*passim*

*Jackson* v. *Birmingham Bd. of Educ.*, 544 U.S. 167
   (2005) ....................................8, 12, 13, 14, 15, 21

*Johnson* v. *Legal Servs. of Ark., Inc.*, 813 F.2d 893
   (8th Cir. 1987)......................................................26

*Kasten* v. *Saint-Gobain Performance Plastics Corp.*,
   131 S. Ct. 1325 (2011) ....................................9, 30

*Kubicko* v. *Ogden Logistics Servs.*, 181 F.3d 544
   (4th Cir. 1999)......................................................23

*Landgraf* v. *USI Film Prods.*, 511 U.S. 244
   (1994) ..........................................................3, 20, 27

*Lindh* v. *Murphy*, 521 U.S. 320 (1997) ................................21

*McNutt* v. *Board of Trs. of the Univ. of Ill.*, 141 F.3d
   706 (7th Cir. 1998).............................................23, 26

*Mount Healthy City Sch. Dist. Bd. of Educ.* v. *Doyle*,
   429 U.S. 274 (1977) ..............................................31

*NLRB* v. *Transportation Mgmt. Corp.*, 462 U.S. 393
   (1983) ...................................................................31

*Patterson* v. *McLean Credit Union*, 491 U.S. 164
   (1989) ...................................................................19

*Porter* v. *Natsios*, 414 F.3d 13 (D.C. Cir. 2005)...................22

V

Cases—Continued:                                                    Page

   *Powerex Corp.* v. *Reliant Energy Servs., Inc.*,
     551 U.S. 224 (2007) ............................................................32

   *Price Waterhouse* v. *Hopkins*, 490 U.S. 228 (1989) ..........2, 9

   *Robinson* v. *Shell Oil Co.*, 519 U.S. 337 (1997) ..............22, 30

   *Ross* v. *Communications Satellite Corp.*, 759 F.2d
     355 (4th Cir. 1985)............................................................26

   *Smith* v. *Xerox Corp.*, 602 F.3d 320 (5th Cir. 2010) ..........6, 7

   *Sullivan* v. *Little Hunting Park, Inc.*, 396 U.S. 229
     (1969) ................................................................................8, 12

   *Thompson* v. *North Am. Stainless, LP*, 131 S. Ct.
     863 (2011) ..................................................................7, 29, 30

   *Williams* v. *Boorstin*, 663 F.2d 109 (D.C. Cir. 1980),
     cert. denied, 451 U.S. 985 (1981)...................................26

   *Woodson* v. *Scott Paper Co.*, 109 F.3d 913
     (3d Cir.), cert. denied, 522 U.S. 914 (1997).................23, 26

   *Zanders* v. *National R.R. Passenger Corp.*,
     898 F.2d 1127 (6th Cir. 1990) ........................................26

Statutes:

   Age Discrimination in Employment Act of 1967,
     29 U.S.C. 621 *et seq.* .................................................4, 10, 13

       29 U.S.C. 623(a)(1) .....................................................4

       29 U.S.C. 633a(a) .....................................................13

   Civil Rights Act of 1964, Pub. L. No. 88-352,
     78 Stat. 241:

       § 706(g), 78 Stat. 261 ...............................................20

       Title VII, 42 U.S.C. 2000e *et seq.* ....................................12

       42 U.S.C. 2000e-2.........................................8, 18, 19

       42 U.S.C. 2000e-2(a)..................................................2

       42 U.S.C. 2000e-2(a)(1) ............................................15

       42 U.S.C. 2000e-2(a)(2) ............................................15

VI

Statutes—Continued:                                                    Page

      42 U.S.C. 2000e-2(a)-(d)..............................................14
      42 U.S.C. 2000e-2(b)....................................................15
      42 U.S.C. 2000e-2(b)-(d) ..............................................2
      42 U.S.C. 2000e-2(c)(1) ...............................................15
      42 U.S.C. 2000e-2(c)(2) ...............................................15
      42 U.S.C. 2000e-2(d)....................................................15
      42 U.S.C. 2000e-2(g)....................................................18
      42 U.S.C. 2000e-2(m) ..........................................*passim*
      42 U.S.C. 2000e-2(n)(1)................................................17
      42 U.S.C. 2000e-2(n)(1)(A) ....................................17, 18
      42 U.S.C. 2000e-3...................................................17, 19
      42 U.S.C. 2000e-3(a) ..........................................*passim*
      42 U.S.C. 2000e-5(a)...................................................1, 22
      42 U.S.C. 2000e-5(b)-(d) .............................................22
      42 U.S.C. 2000e-5(f).....................................................22
      42 U.S.C. 2000e-5(f)(1)..................................................1
      42 U.S.C. 2000e-5(g)....................................................21
      42 U.S.C. 2000e-5(g)(1)................................................22
      42 U.S.C. 2000e-5(g)(2)(A) .........................................20
      42 U.S.C. 2000e-5(g)(2)(B) .............................9, 11, 21
      42 U.S.C. 2000e-5(i)-(k)...............................................22
      42 U.S.C. 2000e-16 (2006 & Supp. V 2011)...................1
Civil Rights Act of 1991, Pub. L. No. 102-166,
   105 Stat. 1071 .....................................................................3
    § 2, 105 Stat. 1071........................................................27
    § 101, 105 Stat. 1071-1072 ..........................................19
    § 102(a), 105 Stat. 1072 ...............................................19
    § 102(a)(2), 105 Stat. 1072 ..........................................19
    § 107, 105 Stat. 1075....................................................24
    § 107(a), 105 Stat. 1075 (42 U.S.C. 2000e-2(m)) ........3, 11

VII

Statutes—Continued:                                    Page

§ 107(b), 105 Stat. 1075 (42 U.S.C.
    2000e-5(g)(2)(B))......................................................4
§ 108, 105 Stat. 1076.......................................................17
Education Amendments of 1972, 20 U.S.C. 1681
    *et seq.* ....................................................................12
38 U.S.C. 4311 .................................................................22
42 U.S.C. 1981 .................................................................16
42 U.S.C. 1981a ...........................................................8, 19
42 U.S.C. 1981a(b)(3)(D).................................................6
42 U.S.C. 1982 ............................................................12, 14

Miscellaneous:

2 *EEOC Compliance Manual* (May 20, 1998),
    http://www.eeoc.gov/policy/docs/retal.pdf....................28, 29
*Effect of Desert Palace, Inc. v. Costa, 539 U.S. 90
    (2003), on Revised Enforcement Guidance on Re-
    cent Developments in Disparate Treatment Theory
    (July 14, 1992) (as amended Jan. 16, 2009),*
    http://www.eeoc.gov/policy/docs/disparat.html ................29
*Enforcement Guidance on Recent Developments in
    Disparate Treatment Theory* (July 14, 1992), 1992
    WL 1364355 .............................................................28
H.R. Rep. No. 40, 102d Cong., 1st Sess. (1991):
    Pt. 1 ....................................................................20, 25, 26
    Pt. 2 ....................................................................20, 24, 27

# In the Supreme Court of the United States

———

No. 12-484

UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL
CENTER, PETITIONER

*v.*

NAIEL NASSAR

———

*ON WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT*

———

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
SUPPORTING RESPONDENT**

———

### INTEREST OF THE UNITED STATES

This case presents the question whether Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.*, authorizes a mixed-motive standard for retaliation claims. The Attorney General enforces Title VII against public employers, 42 U.S.C. 2000e-5(f)(1), and the Equal Employment Opportunity Commission enforces Title VII against private employers, 42 U.S.C. 2000e-5(a) and (f)(1). In addition, Title VII applies to the United States in its capacity as the Nation's largest employer. 42 U.S.C. 2000e-16 (2006 & Supp. V 2011). The United States, as the principal enforcer of the federal civil rights laws and the Nation's largest employer, has a substantial interest in the proper interpretation of Title VII.

(1)

2

## STATUTORY PROVISIONS INVOLVED

Pertinent statutory provisions are set forth in an appendix to this brief.  App., *infra*, 1a-31a.

## STATEMENT

1.  Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.*, makes it an "unlawful employment practice" to discriminate against any individual "because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. 2000e-2(a); see also 42 U.S.C. 2000e-2(b)-(d) (prohibition for employment agencies, labor organizations, and training programs).  Title VII also makes it an "unlawful employment practice" to discriminate against any individual "because" the individual has complained about, opposed, or participated in a proceeding about, prohibited discrimination.  42 U.S.C. 2000e-3(a). This latter form of discrimination is often referred to as "retaliation," although Title VII does not use that term.

In *Price Waterhouse* v. *Hopkins*, 490 U.S. 228 (1989), a Title VII gender discrimination case, this Court held that the words "because of" in Section 2000e-2(a) encompass "mixed-motive" claims, *i.e.*, claims challenging an employment decision motivated by both legitimate and illegitimate factors.  See *id.* at 240-242 (plurality opinion); *id.* at 258-260 (White, J., concurring in the judgment); cf. *id.* at 262-269 (O'Connor, J., concurring in the judgment) (focusing on burden of persuasion).  The plurality held that a Title VII plaintiff need only show that a prohibited factor (*e.g.*, an employee's gender) played a "motivating" part in the employment decision. *Id.* at 244.  The plurality also held, however, that an employer will not be held liable if it proves, by a preponderance of the evidence, that it would have made the same decision regardless of the illegitimate motive. See

3

*id.* at 244-245, 252-255. Justices White and O'Connor, separately concurring in the judgment, held that the illegitimate motive must play a "substantial" part in the employment decision to satisfy a plaintiff's burden of proof. *Id.* at 259 (White, J., concurring in the judgment); *id.* at 262, 265 (O'Connor, J., concurring in the judgment). And Justice O'Connor would have required the plaintiff to present "direct evidence" of the illegitimate factor before shifting the burden to the employer to show that it would have made the same decision regardless of that factor. *Id.* at 276.

Two years later, Congress enacted the Civil Rights Act of 1991 (1991 Act), Pub. L. No. 102-166, 105 Stat. 1071. "[I]n large part," the 1991 Act was "a response to a series of decisions of this Court," and Section 107 in particular was a direct "respon[se]" to this Court's decision in *Price Waterhouse*. *Landgraf* v. *USI Film Prods.*, 511 U.S. 244, 250-251 (1994). Section 107 codified one aspect of *Price Waterhouse* by providing a mixed-motive standard: "Except as otherwise provided in this title, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 1991 Act § 107(a), 105 Stat. 1075 (42 U.S.C. 2000e-2(m)). Section 107, however, abrogated a separate aspect of *Price Waterhouse* by declining to codify a complete defense to liability if the employer demonstrates that it would have taken the same action in the absence of the impermissible motive. Under the 1991 amendments, such a defense does not absolve an employer of liability, but instead restricts the remedies a court may order: declaratory relief, injunctive relief, attorney's fees and costs, but not

4

damages, reinstatement, or back pay. § 107(b), 105 Stat. 1075 (42 U.S.C. 2000e-5(g)(2)(B)).

In 2009, this Court decided *Gross* v. *FBL Financial Services, Inc.*, 557 U.S. 167. *Gross* held that the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. 621 *et seq.*, which prohibits discrimination "because of" age, 29 U.S.C. 623(a)(1), does not encompass a mixed-motive standard. 557 U.S. at 173. Unlike under Title VII, therefore, proof that age played some motivating role in the employer's adverse employment decision does not suffice to establish liability. Rather, a plaintiff alleging discrimination under the ADEA must prove "that age was the 'but-for' cause of the employer's adverse decision." *Id.* at 176. The Court distinguished the ADEA from Title VII on the ground that, in 1991, Congress amended Title VII to expressly include "motivating factor" language, but did not similarly amend the ADEA. See *id.* at 174. Those amendments, the Court concluded, make Title VII "materially different [from the ADEA] with respect to the relevant burden of persuasion." *Id.* at 173.

2. Respondent is a doctor of Middle Eastern descent who was previously employed by petitioner as a member of the medical school faculty. Pet. App. 2. In that capacity, respondent also served as a clinician at petitioner's affiliated hospital. *Ibid.* In June 2004, petitioner hired Dr. Beth Levine to oversee the HIV/AIDS clinic where respondent worked. *Id.* at 2-3. Respondent felt harassed by Dr. Levine, who heavily scrutinized his productivity and billing practices and made derogatory comments about "Middle Easterners." *Id.* at 3 (stating that "Middle Easterners are lazy," and that they "hired another one," referring to the hospital's hiring of another doctor of Middle Eastern descent). To avoid further

5

harassment, respondent began looking for a way to continue working at the hospital's clinic without being subject to Dr. Levine's supervision. *Id.* at 4.

Respondent eventually secured an offer to work directly for the hospital as a staff physician, beginning on July 10, 2006. Pet. App. 5. After receiving that offer, respondent sent a resignation letter to Dr. Gregory Fitz, the chair of internal medicine and Dr. Levine's immediate supervisor, resigning from the university. *Id.* at 4, 5. Respondent explained that his resignation was a result of Dr. Levine's "continuing harassment and discrimination," which "stems from [her] religious, racial and cultural bias against Arabs and Muslims that has resulted in a hostile work environment." *Id.* at 5. Dr. Fitz opposed the hospital's hiring of respondent, which prompted the hospital to withdraw its initial offer. *Id.* at 5-6.

3. Respondent filed a charge with the Equal Employment Opportunity Commission (EEOC), which found "credible[] testimonial evidence" that petitioner had retaliated against respondent for making allegations of discrimination against Dr. Levine. Resp. Br. 8 (quoting Pl. Trial Ex. 78). Respondent thereafter filed suit in the Northern District of Texas claiming, *inter alia*, that petitioner retaliated against him in violation of Title VII, 42 U.S.C. 2000e-3(a).[1]

A bifurcated jury trial followed. Pet. App. 6. In response to the retaliation claim, petitioner presented evidence that Dr. Fitz opposed the hospital's hiring of respondent because of a longstanding affiliation agreement between petitioner and the hospital that required the hospital to fill its physician posts with university

---

[1]  Respondent also sued for constructive discharge, and the jury so found, but that judgment was vacated on appeal and is not at issue here. See Pet. App. 6, 8-10, 15.

6

faculty. *Id.* at 4-5.  At the liability phase, the jury was instructed that respondent "does not have to prove that retaliation was [petitioner's] only motive, but he must prove that [petitioner] acted at least in part to retaliate." *Id.* at 47.[2]  The jury found petitioner liable for retaliation. *Id.* at 48.

During the liability phase, the jury was not instructed as to petitioner's "affirmative defense"—*i.e.*, that it would have taken the same action regardless of the impermissible motive.  Instead, during the subsequent remedial phase, the district court explained that the jury may not award damages "for those actions which [petitioner] proves by a preponderance of the evidence that it would have taken even if it had not considered [respondent's] protected activity."  Pet. App. 42-43. Finding that petitioner failed to make the requisite showing, the jury awarded respondent $438,167.66 in back pay and $3,187,500 in compensatory damages. *Id.* at 43-44.  The district court denied petitioner's motions for judgment as a matter of law and for a new trial, but reduced the compensatory damages award to $300,000 pursuant to a statutory cap.  *Id.* at 7, 24-25; see 42 U.S.C. 1981a(b)(3)(D).

4. The court of appeals affirmed in relevant part. Pet. App. 10-12, 15.  On appeal, petitioner argued that the district court erred in instructing the jury based on a theory of mixed-motive retaliation. See Pet. C.A. Br. 42-44.  Petitioner conceded that its argument was foreclosed by the court's previous decision in *Smith* v. *Xerox Corp.*, 602 F.3d 320 (5th Cir. 2010), and the court of appeals so held. See Pet. App. 12 n.16.  In *Smith*, the

---

[2]  The parties dispute whether petitioner timely objected to the jury instructions. See Pet. 23-25; Br. in Opp. 8-11; Pet. Cert. Reply Br. 1-4; Resp. Br. 14-15; see also Pet. App. 61-67.

7

Fifth Circuit had adhered to its prior precedent and held that the "burden shifting scheme" set forth in *Price Waterhouse*, which provided employers an affirmative defense to liability in mixed-motive cases, continued to apply to Title VII retaliation claims, notwithstanding this Court's decision in *Gross*.  602 F.3d at 328-330. Even though the jury instructions here departed from *Price Waterhouse* in that respect (*i.e.*, by providing a defense to damages, not liability), neither the parties nor the court suggested that the district court's instructions were inconsistent with *Smith*.

5. The court of appeals denied rehearing en banc, with six judges voting in favor of rehearing.  Pet. App. 59-67.

### SUMMARY OF ARGUMENT

Title VII's "motivating factor" provision (42 U.S.C. 2000e-2(m)), which establishes an employer's liability as long as a prohibited factor plays a motivating role in the challenged decision, applies not only to Title VII substantive discrimination claims but also to Title VII retaliation claims.[3]  For that reason, this Court's decision in *Gross* v. *FBL Financial Services, Inc.*, 557 U.S. 167 (2009), has no bearing on this case.

A. Section 2000e-2(m)'s "motivating factor" standard applies directly to retaliation claims under Title VII. The statute prohibits the consideration of race, color, religion, sex, or national origin in "any employment practice." 42 U.S.C. 2000e-2(m).  Retaliation is express-

---

[3]  This brief refers to discrimination claims under Section 2000e-2(a)-(d) as "substantive discrimination" claims, and to discrimination claims under Section 2000e-3(a) as "retaliation" claims, consistent with this Court's decision in *Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 61-67 (2006).  See also *Thompson* v. *North Am. Stainless, LP*, 131 S. Ct. 863, 868 (2011).

8

ly designated an "unlawful employment practice," 42
U.S.C. 2000e-3(a), and it follows from a consistent line of
this Court's decisions that retaliation for complaining
about discrimination based on race, color, religion, sex,
or national origin is itself discrimination motivated (at
least in part) by those protected characteristics. See
*Gomez-Perez* v. *Potter*, 553 U.S. 474, 479-491 (2008);
*CBOCS W., Inc.* v. *Humphries*, 553 U.S. 442, 446-457
(2008); *Jackson* v. *Birmingham Bd. of Educ.*, 544 U.S.
167, 173-184 (2005); *Sullivan* v. *Little Hunting Park,
Inc.*, 396 U.S. 229, 237 (1969). Congress could have
chosen to limit the mixed-motive standard to substantive
discrimination claims by, for example, directly amending
the substantive antidiscrimination provisions in Section
2000e-2(a)-(d), rather than enacting a new provision that
applies to "any employment practice." Congress also
could have limited Section 2000e-2(m) to claims based on
the race, color, religion, sex, or national origin of the
plaintiff. But Congress did neither. By its plain terms,
Section 2000e-2(m) fully applies to Title VII retaliation
claims.

Petitioner's arguments to the contrary are without
merit. This Court's decisions refute the suggestion that
Congress must explicitly refer to "retaliation" in a dis-
crimination statute in order for the statute to encompass
retaliation claims. And Section 2000e-2 is not "Title
VII's discrimination provision" (Pet. Br. 5). Other sub-
sections in Section 2000e-2 extend beyond the substan-
tive antidiscrimination provisions codified therein and,
like (m), apply directly to retaliation claims.

The negative inference petitioner seeks to draw from
Congress's express reference to the antiretaliation pro-
vision in two other provisions is also unwarranted. The
first (42 U.S.C. 1981a) is codified in a different statute

9

and the statutory history and context refute any such negative inference; and the second (42 U.S.C. 2000e-5(g)(2)(B)) was enacted more than 25 years before Section 2000e-2(m), and five years before this Court in *Sullivan* recognized that discrimination based on a protected characteristic encompasses retaliation for complaining about discrimination based on that characteristic. In any event, other Title VII provisions do not expressly mention the antiretaliation provision, yet plainly apply to retaliation claims.

B. The government's interpretation best effectuates Congress's intent to restore and expand protections against intentional employment discrimination. The 1991 amendments sought to restore the rule that prevailed in some lower courts before this Court's decision in *Price Waterhouse* v. *Hopkins*, 490 U.S. 228 (1989). That rule applied equally to substantive discrimination and retaliation claims and, whatever the rule, courts generally applied the same causation standard to each. Petitioner would instead attribute to Congress a desire to adopt a new legal regime applying a different causation standard depending on the type of intentional discrimination alleged under Title VII. Nothing in the statute's text or legislative history supports that approach.

C. The government's interpretation is further supported by the longstanding and consistent position of the EEOC. Shortly after the 1991 amendments, the EEOC issued guidance announcing that it would apply the "motivating factor" standard to Title VII retaliation claims, and it has adhered to that position ever since. The EEOC's views are reasonable and entitled to deference. See *Kasten* v. *Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1335-1336 (2011).

10

D. Because Section 2000e-2(m)'s mixed-motive stand-ard applies directly to Title VII retaliation claims, this Court's decision in *Gross* does not control.  Petitioner and its amici argue that *Gross*'s "but for" causation standard is more practical and better policy, but that argument should be directed at Congress, not this Court.  In any event, many of petitioner's policy con-cerns are equally applicable to substantive discrimina-tion claims (to which the mixed-motive standard indis-putably applies), and resolving this case in petitioner's favor thus would not achieve the clarity and uniformity it seeks.  Petitioner contends that retaliation claims are different, but this Court has broadly construed Title VII's antiretaliation provision in the face of similar ar-guments raised in previous cases.

## ARGUMENT

### THE 1991 AMENDMENTS AUTHORIZE A MIXED-MOTIVE STANDARD FOR TITLE VII RETALIATION CLAIMS

In *Gross* v. *FBL Financial Services, Inc.*, 557 U.S. 167 (2009), this Court held that the ADEA does not authorize a mixed-motive standard for age discrimina-tion claims, *i.e.*, proof that age played some motivating role in the employer's adverse employment decision does not, by itself, suffice to establish liability.  Petition-er argues (Br. 21-24) that *Gross* dictates the unavailabil-ity of a mixed-motive standard for Title VII retaliation claims because, "just as in *Gross*, Congress did not ex-tend its motivating-factor amendments in the 1991 [Act]" to Title VII's antiretaliation provision.  Petition-er's premise is incorrect.

The "motivating factor" provision (42 U.S.C. 2000e-2(m)) applies directly to Title VII retaliation claims. That reading is confirmed by the statutory text, struc-ture, context, and purpose, by this Court's repeated and

11

recent reaffirmation that retaliation *is* discrimination based on "race, color, religion, sex, or national origin," and by the EEOC's longstanding interpretation. Properly understood, Section 2000e-2(m) applies to Title VII retaliation claims and establishes an employer's liability as long as retaliation played a motivating role in the challenged decision, regardless of whether other factors also played a role. *Gross* therefore has no bearing on this case.

### A. Title VII's "Motivating Factor" Provision Applies Directly To Retaliation Claims

1. The 1991 amendments added a "motivating factor" provision to Title VII. By its terms, an "unlawful employment practice" is established whenever a "complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 1991 Act § 107(a), 105 Stat. 1075 (42 U.S.C. 2000e-2(m)). That standard applies to Title VII retaliation claims.[4]

As an initial matter, Section 2000e-2(m)'s mixed-motive standard broadly applies to "any employment practice." 42 U.S.C. 2000e-2(m). Retaliation is expressly designated an "unlawful employment practice" under Title VII. See 42 U.S.C. 2000e-3(a) (defining an "unlawful employment practice"); 42 U.S.C. 2000e-3 (entitled "[o]ther unlawful employment practices"). Because "*any* employment practice" by definition includes the

---

[4] The accompanying remedial provision applies whenever "an individual proves a violation under section 2000e-2(m)." 42 U.S.C. 2000e-5(g)(2)(B). Accordingly, if Section 2000e-2(m) applies to Title VII retaliation claims, so too does Section 2000e-5(g)(2)(B)'s remedial framework.

12

"unlawful employment practice[s]" prohibited by Section 2000e-3(a), a retaliation claim necessarily fits within the category of actions encompassed by Section 2000e-2(m).

Section 2000e-2(m) provides for liability when the challenged employment practice is motivated in part by "race, color, religion, sex, or national origin." 42 U.S.C. 2000e-2(m). A Title VII retaliation claim naturally fits within that language as well. That is the teaching of a consistent line of this Court's decisions. See *Gomez-Perez* v. *Potter*, 553 U.S. 474, 479-491 (2008) (retaliation for opposing age discrimination constitutes discrimination "based on age" under the ADEA's federal-sector provision); *CBOCS W., Inc.* v. *Humphries*, 553 U.S. 442, 446-457 (2008) (retaliation for opposing race discrimination constitutes discrimination based on race under 42 U.S.C. 1981); *Jackson* v. *Birmingham Bd. of Educ.*, 544 U.S. 167, 173-184 (2005) (retaliation for opposing sex discrimination constitutes discrimination "on the basis of sex" under Title IX of the Education Amendments of 1972, 20 U.S.C. 1681 *et seq.*); *Sullivan* v. *Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969) (retaliation for opposing race discrimination constitutes discrimination based on race under 42 U.S.C. 1982).

In *Jackson*, for example, this Court held that Title IX, which prohibits sex discrimination in federally funded education programs, also prohibits retaliation, even though the "statute makes no mention of retaliation." See 544 U.S. at 173-176 (citation omitted). The Court explained that "retaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination." *Id.* at 174. Accordingly, the Court concluded that "when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes in-

13

tentional 'discrimination' 'on the basis of sex,' in viola-
tion of Title IX." *Ibid.* In short, "retaliation in response
to a complaint about sex discrimination *is* 'discrimina-
tion' 'on the basis of sex.'" *Id.* at 179 n.3 (emphasis
added).

Similarly, in *Gomez-Perez*, this Court held that the
federal-sector provision of the ADEA, 29 U.S.C. 633a(a),
prohibits retaliation, even though that provision likewise
makes no mention of retaliation. See 553 U.S. at 479-
481. As the Court explained, "the statutory phrase
'discrimination based on age' includes retaliation based
on the filing of an age discrimination complaint." *Id.* at
479; see *id.* at 488 ("[R]etaliation for complaining about
age discrimination is 'discrimination based on age.'").
The Court followed its reasoning in *Jackson* even
though the ADEA (unlike Title IX) contains an express
right of action, *id.* at 482-483, and even though the
ADEA's private-sector provision separately prohibits
both substantive discrimination and retaliation, *id.* at
486-488.

In both cases, the Court grounded its decision in the
text of the relevant statute. See *Gomez-Perez*, 553 U.S.
at 484 ("*Jackson* did not hold that Title IX prohibits
retaliation because the Court concluded as a policy mat-
ter that such claims are important. Instead, the holding
in *Jackson* was based on an interpretation of the 'text of
Title IX.'") (quoting *Jackson*, 544 U.S. at 173, 178).
Indeed, the Court found the statutes clear enough to
satisfy the "notice" requirements of the Spending
Clause, *Jackson*, 544 U.S. at 183, and to provide the
clear statement necessary to waive federal sovereign
immunity, *Gomez-Perez*, 553 U.S. at 491. Both decisions
also relied on this Court's 1969 decision in *Sullivan*,
which recognized a claim for retaliation under 42 U.S.C.

14

1982, a statute guaranteeing property rights for all citizens equal to those "enjoyed by white citizens." See *Gomez-Perez*, 553 U.S. at 479-481, 484-485, 488, 490 n.6; *id.* at 493 n.1 (Roberts, C.J., dissenting); *Jackson*, 544 U.S. at 176-177; see also *CBOCS*, 553 U.S. at 446-457.

This Court's decisions thus firmly establish that retaliation for complaining about race discrimination *is* "discrimination based on race" (*Sullivan*, *CBOCS*)[5]; that retaliation for complaining about sex discrimination *is* "discrimination on the basis of sex" (*Jackson*); and that retaliation for complaining about age discrimination *is* "discrimination based on age" (*Gomez-Perez*). An employer who retaliates against an employee for complaining about discrimination based on race (or color, religion, sex, or national origin) thus *is* discriminating based on that protected characteristic. *A fortiori*, "race" (or "color," "religion," "sex," or "national origin") *is* a "motivating factor" within the meaning of Section 2000e-2(m).

2. Congress could have chosen to limit Section 2000e-2(m)'s "motivating factor" standard to substantive discrimination claims in a number of ways. For example, rather than enacting a new provision, Congress could have directly amended the substantive antidiscrimination provisions in Section 2000e-2(a)-(d). Those provisions, like Section 2000e-3(a)'s bar against retaliation, prohibit discrimination "because of" an impermissible factor. See 42 U.S.C. 2000e-2(a)-(d) ("because of"); 42

---

[5]  See *Gomez-Perez*, 553 U.S. at 479 ("While [Section] 1982 does not use the phrase 'discrimination based on race,' that is its plain meaning."); *CBOCS*, 553 U.S. at 459 (Thomas, J., dissenting) (While Section 1981(a) "does not use the modern statutory formulation prohibiting 'discrimination on the basis of race,' * * * that is the clear import of its terms.").

15

U.S.C. 2000e-3(a) ("because"). Yet Congress left each of those provisions untouched and instead codified the mixed-motive standard as an entirely new subsection that applies to "any employment practice." 42 U.S.C. 2000e-2(m).

Congress also could have limited Section 2000e-2(m) to claims involving *the complaining party's* race, color, religion, sex, or national origin. Instead, Section 2000e-2(m) applies whenever "the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice." 42 U.S.C. 2000e-2(m). That language encompasses retaliation because it makes clear that Section 2000e-2(m) applies regardless of the complaining party's membership in a protected class. In contrast, Title VII's substantive antidiscrimination provisions proscribe discrimination because of "such individual's" or "his" race, color, religion, sex, or national origin. See 42 U.S.C. 2000e-2(a)(1) ("such individual's"); 42 U.S.C. 2000e-2(a)(2) ("such individual's"); 42 U.S.C. 2000e-2(b) ("his"); 42 U.S.C. 2000e-2(c)(1) ("his"); 42 U.S.C. 2000e-2(c)(2) ("such individual's"); 42 U.S.C. 2000e-2(d) ("his"). If Congress had intended the "motivating factor" provision to apply to substantive discrimination claims alone, it could have simply tracked the language of those provisions. That Section 2000e-2(m) is *not* defined in terms of the complaining party's membership in a protected class reinforces the conclusion that it applies equally to retaliation claims. See *Jackson*, 544 U.S. at 179 (finding omission of the modifier "*such individual's*" significant in holding that Title IX protects a male coach from retaliation for complaining about sex discrimination against a female basketball team).

16

3. Petitioner nevertheless contends (Br. 17-20) that Section 2000e-2(m) does not apply to Title VII retaliation claims for three primary reasons. None withstands scrutiny.

a. Petitioner first argues (Br. 17) that the prohibited motivating factors are "race, color, religion, sex, or national origin," 42 U.S.C. 2000e-2(m)—not "retaliation." That observation is of little consequence under this Court's decisions. Petitioner fails to address, let alone distinguish, *Gomez-Perez, CBOCS, Jackson,* or *Sullivan.* As discussed above, the Court has repeatedly (and recently) held that retaliation for complaining about discrimination based on a protected characteristic *is* discrimination based on that protected characteristic. See pp. 12-14, *supra.* Under those decisions, any employer who retaliates against an employee because he complained about national origin discrimination (as the jury found in this case) has engaged in discrimination motivated (at least in part) by "national origin."

The fact that Section 2000e-2(m) contains no express mention of "retaliation" hardly gives rise to any inference that Congress intended to exclude retaliation claims from the provision's scope. The antiretaliation provision itself, 42 U.S.C. 2000e-3(a), does not use the word "retaliation." And the 1991 amendments came many years after this Court's decision in *Sullivan.* Given *Sullivan,* "there was no need for Congress to include explicit language about retaliation." *CBOCS,* 553 U.S. at 453-454 (concluding that the failure to include "the word 'retaliation'" when amending 42 U.S.C. 1981 in the 1991 Act was understandable in light of *Sullivan*); accord *Gomez-Perez,* 553 U.S. at 485, 488; *Jackson,* 544 U.S. at 176.

17

b. Petitioner also relies (Br. 17) on the placement of the "motivating factor" provision within Section 2000e-2 (which contains the substantive antidiscrimination provisions), and not within Section 2000e-3 (which contains the antiretaliation provision). As an initial matter, petitioner mistakenly characterizes "Section 2000e-2" as "Title VII's discrimination provision" (Br. 5, 17), and its reasoning proceeds from that erroneous premise. In fact, only certain subsections of Section 2000e-2 are appropriately characterized as "Title VII's discrimination provision[s]," most notably Section 2000e-2(a). And, as discussed above (pp. 14-15, *supra*), Congress did not directly amend those provisions.

More fundamentally, Congress has never treated the provisions within Section 2000e-2 as confined to substantive discrimination, to the exclusion of retaliation. For instance, Subsection (n), like Subsection (m), was added as part of the 1991 Act. See § 108, 105 Stat. 1076. Subsection (n) limits the opportunities to collaterally attack employment practices implemented as part of a litigated or consent judgment resolving "a claim of employment discrimination under the Constitution or Federal civil rights laws." 42 U.S.C. 2000e-2(n)(1)(A). On its face, that provision applies beyond the substantive antidiscrimination provisions in Section 2000e-2; indeed, it applies beyond Title VII. If an employee sues for retaliatory discharge under Section 2000e-3(a), and the court orders reinstatement, any person adversely affected by that judgment (*e.g.*, an employee who loses his seniority as a result) would generally be barred from collaterally attacking the judgment if he was given notice and an opportunity to be heard. 42 U.S.C. 2000e-2(n)(1). That Congress placed the consent-judgment

18

provision in 42 U.S.C. 2000e-2, and not in 42 U.S.C. 2000e-3, is of no moment: the text controls.

The national-security exemption, 42 U.S.C. 2000e-2(g), likewise demonstrates that petitioner's understanding of Section 2000e-2 is incorrect. That exemption provides that "it shall not be an unlawful employment practice for an employer * * * to discharge any individual from any position" if the individual has failed to fulfill any requirement imposed in the interest of national security. *Ibid.* That exemption plainly applies to a Title VII retaliatory discharge claim because retaliation is also an "unlawful employment practice." See pp. 11-12, *supra*; cf. *Cruz-Packer* v. *Chertoff*, 612 F. Supp. 2d 67, 69, 70-71 (D.D.C. 2009) (dismissing substantive discrimination and retaliation claims brought under Title VII's federal-sector provision based on 42 U.S.C. 2000e-2(g)). Again, the mere placement in Section 2000e-2 says nothing about the subsection's application to retaliation claims brought under Section 2000e-3(a).

Viewed in context, the fact that Congress codified the "motivating factor" provision as part of Section 2000e-2 has little probative force. Had Congress codified the retaliation provision within Section 2000e-2, for instance as 42 U.S.C. 2000e-2(z), instead of as 42 U.S.C. 2000e-3(a), the analysis would remain the same, and Section 2000e-2(m)'s "motivating factor" standard would apply in either event.

c. Petitioner briefly cites (Br. 23) two other provisions in which Congress expressly referenced Title VII's antiretaliation provision and suggests that its failure to do so in Section 2000e-2(m) evidences an intent to exclude such claims. That is incorrect.

19

i. Contrary to petitioner's characterization (Br. 23), Congress did not "amend[] Title VII's retaliation provisions in 1991." The only purported amendment petitioner identifies is Section 102(a) of the 1991 Act, which authorizes the recovery of compensatory and punitive damages. § 102(a), 105 Stat. 1072. Section 102, however, did not amend Title VII directly. Instead, Congress created a new statutory provision codified at 42 U.S.C. 1981a. And that provision applies to other discrimination laws in addition to Title VII. See 1991 Act § 102(a)(2), 105 Stat. 1072. In that distinct context, Congress specified that compensatory and punitive damages are available in cases of "unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) prohibited under section 703, 704, or 717 of the Act [42 U.S.C. 2000e-2, 2000e-3, 2000e-16]." *Id.* § 102(a), 105 Stat. 1072.

As the text of that provision indicates, Congress, by listing the specific forms of "unlawful intentional discrimination" for which damages would be available, sought to distinguish between those unlawful practices, on the one hand, and a practice made unlawful because of its disparate impact, on the other hand. There is thus no basis for inferring from Section 1981a that, in any provision in which Congress fails to specifically refer to retaliation, Congress intends to exclude retaliation claims from the provision's scope.

Any such negative inference is fully rebutted when one considers the 1991 amendments to Section 1981a's neighboring provision, 42 U.S.C. 1981. In response to this Court's decision in *Patterson* v. *McLean Credit Union*, 491 U.S. 164 (1989), Congress amended Section 1981 to make clear that its protections applied even after contract formation. 1991 Act § 101, 105 Stat. 1071-

20

1072; see *Landgraf*, 511 U.S. at 251.  Even though the text makes no mention of "retaliation," Congress plainly intended the amended provision to apply to all forms of intentional employment discrimination, including "retaliation."  See, *e.g.*, H.R. Rep. No. 40, 102d Cong., 1st Sess. Pt. 1, at 92 & n.92 (1991) (*House Report Pt. 1*); H.R. Rep. No. 40, 102d Cong., 1st Sess. Pt. 2, at 37 (1991) (*House Report Pt. 2*).  In *CBOCS*, this Court so held.  553 U.S. at 450-451, 452-454, 457.  If Congress's specific reference to the Title VII antiretaliation provision in Section 1981a meant that any provision that fails to contain such a reference necessarily excludes retaliation, this Court would have reached the opposite result in *CBOCS*.  Section 1981a therefore is of no assistance to petitioner.

ii. Petitioner also cites (Br. 23) Section 2000e-5(g)(2)(A), which precludes courts from ordering certain relief, such as reinstatement, when the employee was discharged for reasons "other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e-3(a) of this title." 42 U.S.C. 2000e-5(g)(2)(A). It is true that, under the government's reading, Congress could have omitted the final phrase "or in violation of section 2000e-3(a) of this title," because retaliation for complaining about discrimination based on race, color, religion, sex, or national origin is itself discrimination based on those same protected characteristics. But the negative inference petitioner seeks to draw is unwarranted for several reasons.

First, the substance of that provision was enacted as part of the Civil Rights Act of 1964—more than 25 years before Section 2000e-2(m). Civil Rights Act of 1964, Pub. L. No. 88-352, § 706(g), 78 Stat. 261. "'[N]egative implications raised by disparate provisions are strong-

21

est' in those instances in which the relevant statutory provisions were 'considered simultaneously when the language raising the implication was inserted.'" *Gomez-Perez*, 553 U.S. at 486 (quoting *Lindh* v. *Murphy*, 521 U.S. 320, 330 (1997)) (brackets in original). Here, the two provisions were not "enacted together." *Ibid.*[6]

Second, the government's interpretation relies in substantial part on decisions of this Court that postdate the 1964 enactment, including the 1969 *Sullivan* decision. This Court has assumed that Congress was aware of *Sullivan* when enacting subsequent statutes. See *Gomez-Perez*, 553 U.S. at 485, 488, 490 n.6 (noting that the ADEA's federal-sector provision was enacted "five years after the decision in *Sullivan*" and that "Congress was presumably familiar with *Sullivan*"); *Jackson*, 544 U.S. at 176 (noting that Title IX was enacted three years after *Sullivan* and that it is "realistic to presume that Congress was thoroughly familiar with" that decision) (citation omitted). The same cannot be said of a statutory provision enacted five years beforehand.

In any event, there are a number of provisions in Title VII that plainly apply to retaliation claims even though they contain no express reference to Section 2000e-3(a). As noted above, several subsections of Section 2000e-2 fall into that category. See pp. 17-18, *supra*. But there are other provisions as well. Many of the

---

[6] The 1991 amendments reorganized Section 2000e-5(g) to create separate paragraphs and subparagraphs. § 107(b), 105 Stat. 1075. Although Congress retained the language of the original 1964 Act in the newly designated Subparagraph (A), it did not use that language as a model for the mixed-motive remedial provision in Subparagraph (B). Unlike Subparagraph (A), Section 2000e-5(g)(2)(B) references neither "discrimination on account of race, color, religion, sex, or national origin," nor a "violation of section 2000e-3(a)." It simply cross-references Section 2000e-2(m).

22

enforcement provisions, for example, indisputably apply to all "unlawful employment practices," including retaliation. See 42 U.S.C. 2000e-5(b)-(d), (f), (g)(1); see also 42 U.S.C. 2000e-5(i)-(k) (applying to all actions brought "under this section" or "subchapter"). Yet the anti-retaliation provision is separately enumerated in only one of those provisions: Section 2000e-5(g)(2)(A). Cf. 42 U.S.C. 2000e-5(a) (referring generally to "section 2000e-3"). Accordingly, the most that can be said is that Congress sometimes refers expressly to the antiretaliation provision, and sometimes does not. Cf. *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 341-342 (1997) ("[T]hat other statutes have been more specific [in referring specifically to "former employees"] proves only that Congress *can* use the unqualified term 'employees' to refer only to current employees, not that it did so in this particular statute.").[7]

4. As petitioner notes (Br. 18), several courts of appeals have held that Section 2000e-2(m)'s "motivating factor" standard does not apply to retaliation claims.[8] Every one of the decisions cited by petitioner, however, predated this Court's decisions in *Jackson, CBOCS,* and *Gomez-Perez.* And not a single one cites *Sullivan,* on

---

[7] The same reasoning applies with more force to 38 U.S.C. 4311 (cited at Pet. Br. 19), a different discrimination statute adopted at a different time by a different Congress. See *CBOCS*, 553 U.S. at 454 (rejecting argument that Congress's failure to mention the "word 'retaliation'" in amending 42 U.S.C. 1981 was intended to exclude retaliation because "Congress has included explicit antiretaliation language in other civil rights statutes").

[8] Contrary to petitioner's suggestion (Br. 18), the D.C. Circuit has not decided that issue. See *Porter* v. *Natsios*, 414 F.3d 13, 19 (2005). The case petitioner cites involved only "pre-1991 claims of retaliation under Title VII." *Borgo* v. *Goldin*, 204 F.3d 251, 255 n.6 (D.C. Cir. 2000).

23

which this Court relied in each of those decisions. The court of appeals' decisions cited by petitioner simply assume that "race, color, religion, sex, or national origin" cannot be a "motivating factor" in a retaliation case, and that Congress has to expressly mention "retaliation." See, *e.g.*, *Kubicko* v. *Ogden Logistics Servs.*, 181 F.3d 544, 552 n.7 (4th Cir. 1999); *McNutt* v. *Board of Trs. of the Univ. of Ill.*, 141 F.3d 706, 707-709 (7th Cir. 1998); *Woodson* v. *Scott Paper Co.*, 109 F.3d 913, 933 (3d Cir.), cert. denied, 522 U.S. 914 (1997). Those assumptions do not survive this Court's intervening decisions for the reasons explained, and the other arguments advanced in support of limiting Section 2000e-2(m) to substantive discrimination claims are unpersuasive for the reasons set forth above. Cf. *Gross*, 557 U.S. at 183-184 & n.5 (Stevens, J., dissenting) (noting majority's rejection of widespread agreement among circuit courts); *Desert Palace, Inc.* v. *Costa*, 539 U.S. 90, 95 (2003) (rejecting near-unanimous agreement among courts of appeals).

The Fifth Circuit, in a decision issued after petitioner's opening brief in this case, recently concluded that Section 2000e-2(m) does not encompass retaliation claims, although the court considered it a "close question." *Carter* v. *Luminant Power Servs. Co.*, No. 12-10642, 2013 WL 1337365, at *3 (Apr. 3, 2013). Unlike the earlier court of appeals' decisions, the Fifth Circuit addressed this Court's decisions in *Gomez-Perez*, *CBOCS*, *Jackson*, and *Sullivan*. And the court recognized the "force" of arguing that "race" is a "motivating factor" whenever an employer retaliates against an individual for complaining about race discrimination. *Id.* at *2. The court nevertheless concluded that such reasoning should not be applied to Title VII. *Id.* at *2-*3.

24

As explained, however, this Court's decisions cannot be so easily distinguished.[9]

### B. Applying The "Motivating Factor" Provision To Retaliation Claims Best Effectuates Congressional Intent

The 1991 amendments were intended to "restore and strengthen" protections against intentional employment discrimination. *House Report Pt. 2*, at 1. Applying the "motivating factor" provision to Title VII retaliation claims best effectuates that intent. Conversely, the statute's history provides no support for petitioner's theory that Congress intended to apply a mixed-motive standard to all intentional discrimination claims under Title VII *except* retaliation claims.

1. In amending Title VII to add the "motivating factor" provision, Congress expressed that it was "clarifying," "reaffirming," and "restor[ing]" Congress's original intent in enacting the Civil Rights Act of 1964. 1991 Act § 107, 105 Stat. 1075 ("clarifying"); *House Report*

---

[9] The Fifth Circuit's asserted distinctions between Title VII and *Gomez-Perez* do not withstand scrutiny. The court noted that the ADEA's federal-sector provision was enacted "only five years" after *Sullivan*, whereas the 1991 amendments were adopted seventeen years later. *Carter*, 2013 WL 1337365, at *3. That *CBOCS* (decided the same day as *Gomez-Perez*) relied heavily on *Sullivan* to interpret the same 1991 amendments, 553 U.S. at 446-457, strongly suggests that Congress did not simply forget about *Sullivan*. The court also noted that, unlike here, *Gomez-Perez* did not involve a situation in which "private employers are already subjected to an 'antidiscrimination' and an 'antiretaliation' prohibition, and Congress adds a provision that does not mention retaliation." *Carter*, 2013 WL 1337365, at *3. In fact, the circumstances in *Gomez-Perez* were analogous: private employers were already subject to a substantive antidiscrimination provision and an antiretaliation provision, and Congress added a federal-sector provision that did not mention retaliation. 553 U.S. at 486.

25

*Pt. 2*, at 2 ("reaffirming"); *House Report Pt. 1*, at 47 ("restor[ing]").[10]  According to the House Reports, the amendments were designed to "restore the rule applied" by certain courts of appeals (and the EEOC) before *Price Waterhouse*:  "that any discrimination that is actually shown to play a role in a contested employment decision may be the subject of liability."  *House Report Pt. 2*, at 18; see *id.* at 17-18 & n.31 (citing court of appeals' decisions); *House Report Pt. 1*, at 46 & n.41, 48 (citing court of appeals' decisions and EEOC decisions).

The "rule" Congress sought to "restore" was not limited to substantive discrimination claims; it applied equally to retaliation claims.  The House Reports, for example, relied heavily on *Bibbs* v. *Block*, 778 F.2d 1318, 1321-1324 (8th Cir. 1985) (en banc).  See *House Report Pt. 1*, at 46 n.41, 48; *House Report Pt. 2*, at 18 n.31.  The "rule" announced in that case, which Congress "en-

---

[10] Petitioner suggests that if Congress had intended to clarify its original intent to allow a mixed-motive standard, Section 2000e-2(m) would have been unnecessary.  Br. 19 (citing *Gross*, 557 U.S. at 178 n.5).  But Congress's decision to codify that portion of *Price Waterhouse* is unsurprising given the fractured nature of that decision; the uncertainty over the appropriate standard (*i.e.*, whether plaintiffs had to demonstrate a "motivating" or "substantial" factor, and whether the two standards were qualitatively different); and the confusion over the "direct evidence" requirement (*i.e.*, whether "direct evidence" was required to shift the burden of proof and, if so, what qualified as "direct evidence").  By codifying a mixed-motive standard in Section 2000e-2(m), Congress resolved much of that uncertainty.  To prove a violation under Section 2000e-2(m), a plaintiff must demonstrate that the impermissible consideration was a "motivating" factor, 42 U.S.C. 2000e-2(m); that showing can be satisfied with any evidence (not just "direct evidence"), *Desert Palace*, 539 U.S. at 98-101; and, unlike under *Price Waterhouse*, proof that an employer would have made the same decision regardless of the impermissible motive is no defense to liability.

26

dorse[d]" and "restore[d]," *House Report Pt. 1*, at 48, had been applied to retaliation claims. See *Johnson* v. *Legal Servs. of Ark., Inc.*, 813 F.2d 893, 899-900 (8th Cir. 1987); *EEOC* v. *General Lines, Inc.*, 865 F.2d 1555, 1560 (10th Cir. 1989). Indeed, at that time, courts generally applied the same causation standard (however defined) to retaliation claims under Section 2000e-3(a), as they did to discrimination claims under Section 2000e-2(a). See, *e.g.*, *Woodson*, 109 F.3d at 934; *Zanders* v. *National R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990); *Ross* v. *Communications Satellite Corp.*, 759 F.2d 355, 364-366 (4th Cir. 1985); *Williams* v. *Boorstin*, 663 F.2d 109, 116-117 (D.C. Cir. 1980), cert. denied, 451 U.S. 985 (1981).

Contrary to its stated intent to "restore" and "reaffirm," petitioner would attribute to Congress the opposite intent: to create a new legal regime that carves out an exception for "retaliation," varying the causation standard depending on the type of intentional discrimination at issue. The legislative history strongly suggests that Congress did not intend such a stark departure from the status quo. See *McNutt*, 141 F.3d at 708-709 (acknowledging that it could identify "no logical reason why Congress would have changed the mixed-motive standard for one class of unlawful employment practices while allowing *Price Waterhouse* to operate in another"); cf. *CBOCS*, 553 U.S. at 450, 454 (giving effect to Congress's intent to "restore" an interpretation that prevailed before this Court's decision in *Patterson*).

2. Applying Section 2000e-2(m)'s "motivating factor" standard to Title VII retaliation claims also better effectuates Congress's general intent in adopting the 1991 amendments. Congress sought to provide "additional protections against unlawful discrimination in employ-

27

ment" and "additional remedies * * * to deter unlawful harassment and intentional discrimination in the workplace." 1991 Act § 2, 105 Stat. 1071. The 1991 amendments were designed to "restore and strengthen," not constrict, the protections available to victims of intentional employment discrimination. *House Report Pt. 2*, at 1; see *Landgraf*, 511 U.S. at 250. And the "motivating factor" provision was intended to prohibit "*all*" forms of "invidious consideration of sex, race, color, religion, or national origin in employment decisions." *House Report Pt. 2*, at 17.

To be sure, Congress may have primarily focused on substantive discrimination claims of the sort at issue in *Price Waterhouse*. But that is not indicative of an intent to provide victims of retaliation with lesser protection. To the contrary, this Court has recognized that broad protection against retaliation is critical to securing the primary objective of guaranteeing "a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status." *Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 63 (2006) (*Burlington Northern*). "Title VII depends for its enforcement upon the cooperation of employees who are willing to file complaints and act as witnesses," *id.* at 67, and "fear of retaliation is the leading reason why people stay silent," *Crawford* v. *Metropolitan Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 279 (2009) (brackets and citations omitted). Construing Section 2000e-2(m)'s "motivating factor" provision narrowly to exclude retaliation claims "threaten[s] to undermine Title VII's twin objectives of deterring employers from discriminatory conduct and redressing the injuries suffered by victims of discrimination." *House Report Pt. 2*, at 17.

28

**C. The EEOC's Longstanding Interpretation Is Reasonable And Entitled To Deference**

The EEOC has consistently taken the view that Section 2000e-2(m)'s "motivating factor" standard applies directly to Title VII retaliation claims. That longstanding and consistent interpretation is reasonable and entitled to deference.

Shortly after the 1991 amendments, the EEOC issued enforcement guidance advising that "it will find liability and pursue injunctive relief whenever retaliation plays any role in an employment decision." *Enforcement Guidance on Recent Developments in Disparate Treatment Theory* (July 14, 1992), 1992 WL 1364355, at *6 n.14 (*Enforcement Guidance*). The guidance explained that "[t]he Commission has a unique interest in protecting the integrity of its investigative process, and if retaliation were to go unremedied, it would have a chilling effect upon the willingness of individuals to speak out against employment discrimination." *Ibid.* Accordingly, the EEOC announced that it "will find cause when retaliation is a motivating factor in an employment decision, and evidence showing that the employer would have taken the same action even absent its retaliatory motive would pertain only to whether the charging party is eligible for individual relief." *Ibid.*[11]

The EEOC's compliance manual advances the same position. 2 *EEOC Compliance Manual* § 8-II(E)(1) (May   20,   1998),   http://www.eeoc.gov/policy/docs/

---

[11] The enforcement guidance acknowledged that Section 107 of the 1991 Act did not specifically mention "retaliation," but still found no reason to deviate from the EEOC's "long-standing rule." *Enforcement Guidance*, at *6 n.14. As described in the text, the EEOC subsequently elaborated on its reasoning, making clear that it understood Section 2000e-2(m) to apply directly to retaliation claims.

29

retal.pdf ("If there is credible * * * evidence that retaliation was a motive for the challenged action, 'cause' should be found.  Evidence as to any legitimate motive for the challenged action would be relevant only to relief, not to liability.").[12]  The compliance manual explains that "Section 107 applies to retaliation," and disagrees with the courts of appeals to have held otherwise.  *Id.* § 8-II(E)(1) n.45 (citing cases); *ibid.* ("The basis for finding 'cause' whenever there is credible * * * evidence of a retaliatory motive is Section 107 of the [1991 Act].").  The Commission further explains that its interpretation is consistent with the courts' "long held" view "that the evidentiary framework for proving employment discrimination based on race, sex, or other protected class status also applies to claims of discrimination based on retaliation." *Ibid.*  And, it continues, a contrary interpretation "that permits proven retaliation to go unpunished" would "undermine[] the purpose of the anti-retaliation provisions of maintaining unfettered access to the statutory remedial mechanism." *Ibid.*

The EEOC's longstanding and consistent interpretation of the statute provides additional support for the conclusion that the "motivating factor" provision encompasses Title VII retaliation claims.  "[T]he agency's policy statements, embodied in its compliance manual and internal directives * * * reflect 'a body of experience and informed judgment.'" *Federal Express Corp.*

---

[12] As originally worded, the compliance manual referred to credible "direct" evidence of a retaliatory motive. § 8-II(E)(1).  The EEOC no longer requires "direct" evidence following this Court's decision in *Desert Palace.  See Effect of Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), on Revised Enforcement Guidance on Recent Developments in Disparate Treatment Theory (July 14, 1992)* (as amended Jan. 16, 2009), http://www.eeoc.gov/policy/docs/disparat.html.

30

v. *Holowecki*, 552 U.S. 389, 399 (2008) (citations omitted). As such, they warrant a measure of respect and deference. See *Kasten* v. *Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1335-1336 (2011) (giving weight to EEOC's consistent position set forth in compliance manual); *Federal Express*, 552 U.S. at 399 (deferring to EEOC guidance that had "been binding on EEOC staff for at least five years"); *Robinson*, 519 U.S. at 345-346 (EEOC's positions "carry persuasive force given their coherence and their consistency with a primary purpose of antiretaliation provisions"); see also *Thompson* v. *North Am. Stainless, LP*, 131 S. Ct. 863, 870-871 (2011) (Ginsburg, J., concurring) (deferring to EEOC's "longstanding views" as expressed in compliance manual).

### D. Because The 1991 Amendments Authorize A Mixed-Motive Standard For Title VII Retaliation Claims, *Gross* Does Not Control

This Court's decision in *Gross* rested in large part on the ground that Congress added a "motivating factor" provision to Title VII, but not to the ADEA. See 557 U.S. at 174-175. Because Congress *did* add a "motivating factor" provision to Title VII, and because that provision applies directly to the Title VII retaliation claim at issue here, *Gross* has no bearing on this case.

Petitioner and its amici, however, contend that the "but for" standard adopted in *Gross* is more practical and represents better policy. Those arguments cannot overcome the statutory text, structure, or purpose. Nor can they override the EEOC's longstanding position that Title VII authorizes a mixed-motive standard for retaliation claims. In any event, they fail on their own terms.

31

1. Many of the arguments advanced by petitioner and its amici suffer from the same flaw: they apply equally to Title VII substantive discrimination claims to which the mixed-motive standard indisputably applies. Petitioner argues, for example, that the mixed-motive standard is "difficult to apply." Br. 25 (quoting *Gross*, 557 U.S. at 179); see *id.* at 26-28. Petitioner contends that mixed motives are "easy to allege" and "difficult for defendants to disprove," precluding summary judgment and prompting the settlement of "meritless" cases. *Id.* at 31-32. And petitioner emphasizes the need for a uniform standard. Pet. Br. 28-30.

Deciding this case in petitioner's favor would not resolve any of those concerns. A mixed-motive standard would still apply to other claims, and the uniformity petitioner envisions is illusory. Regardless of the outcome here, a standard other than *Gross*'s "but for" cause would continue to apply to substantive discrimination claims under Title VII (42 U.S.C. 2000e-2(m)), to other federal statutes where the causation standard is express (see Pet. Br. 19; Equal Employment Advisory Council Amicus Br. 13-15), in contexts where the expert agency has issued an authoritative interpretation adopting a burden-shifting standard (see *NLRB* v. *Transportation Mgmt. Corp.*, 462 U.S. 393, 401-403 (1983); *Gross*, 557 U.S. at 179 n.6), and to constitutional claims (see *Mount Healthy City Sch. Dist. Bd. of Educ.* v. *Doyle*, 429 U.S. 274, 285-287 (1977); *Gross*, 557 U.S. at 179 n.6).[13]

Creating a new, divergent standard for a subset of Title VII intentional discrimination claims would only exacerbate the purported confusion. Under petitioner's

---

[13] For this reason and others, the Court should decline petitioner's invitation to consider whether *Gross* should be applied to other statutes not before the Court.

32

theory, juries in cases alleging both substantive discrimination and retaliation under Title VII would confront two different causation standards.  Cf. Pet. Br. 29 n.1. The objectives identified by petitioner would be better served by applying the same causation standard to claims arising under the *same* statute.  To the extent petitioner and its amici disagree with the policy decisions reflected in the 1991 amendments to Title VII, their concerns should be directed at Congress, not this Court.  See *Powerex Corp.* v. *Reliant Energy Servs., Inc.*, 551 U.S. 224, 237-238 (2007).

2.  Petitioner, however, contends (Br. 33-35) that its stated concerns are "especially acute in the retaliation context" because retaliation is even easier to allege and more difficult to disprove than substantive discrimination.  In petitioner's view, employees will strategically complain of discrimination, however meritless, in order to shield themselves from an adverse employment action.  Employers, in turn, will be deterred from making necessary employment decisions for fear of being accused of retaliation.

That same argument was made, unsuccessfully, in several recent Title VII retaliation cases.  Faced with similar expressed concerns, the Court broadly construed the antiretaliation provision to extend to third parties (*Thompson*), to employees that do not speak out on their own initiative (*Crawford*), and to circumstances beyond employer- or workplace-related retaliatory acts (*Burlington Northern*).[14]  Indeed, to the extent the Court has deemed it appropriate to subject retaliation claims to differential treatment, it has interpreted the antiretal-

---

[14] See Resp. Br. at 24-27, *Thompson, supra*; Pet. Br. at 29-31, 47 n.16 & Reply Br. at 8-10, *Burlington Northern, supra*; cf. Resp. Br. at 33-34, *Crawford, supra*.

33

iation provision to provide *more* protection than the substantive antidiscrimination provisions. See *Burlington Northern*, 548 U.S. at 61-67 (Section 2000e-3(a) is not limited to the materially adverse employment actions required by Section 2000e-2(a).). Petitioner's arguments thus provide no basis for construing Section 2000e-2(m) to exclude retaliation claims from its terms.

## CONCLUSION

The judgment of the court of appeals should be affirmed.

Respectfully submitted.

P. DAVID LOPEZ
  *General Counsel*
CAROLYN L. WHEELER
  *Acting Associate General
  Counsel*
GAIL S. COLEMAN
  *Attorney
  Equal Employment
  Opportunity Commission*

DONALD B. VERRILLI, JR.
  *Solicitor General*
THOMAS E. PEREZ
  *Assistant Attorney General*
SRI SRINIVASAN
  *Deputy Solicitor General*
MELISSA ARBUS SHERRY
  *Assistant to the Solicitor
  General*
DENNIS J. DIMSEY
TOVAH R. CALDERON
  *Attorneys*

APRIL 2013