## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | |
|---|---|
| TEXAS,<br><br>   *Plaintiff,*<br><br>v.<br><br>EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; VICTORIA A. LIPNIC, in her official capacity as Acting Chair of the Equal Employment Opportunity Commission; and JEFFERSON B. SESSIONS, III, in his official capacity as Attorney General of the United States,<br><br>   *Defendants.* | Case No. 5:13-CV-00255-C |

## SECOND AMENDED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

1. Texas seeks declaratory and injunctive relief against the Equal Employment Opportunity Commission ("EEOC") and its recently promulgated felon-hiring rule. *See* EEOC, Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964, No. 915.002 (Apr. 25, 2012) ("Felon-Hiring Rule" or "Enforcement Guidance," attached hereto as Ex. A). EEOC's rule purports to limit the prerogative of employers, including Texas, to exclude convicted felons from employment. Texas also seeks declaratory and injunctive relief against Jefferson B. Sessions, III, in his official capacity as the Attorney General of the United States ("Sessions"), who has authority to enforce EEOC's views against the States. Texas brings this suit under section 10(a) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. Texas and its constituent agencies have the sovereign right to impose categorical bans on the hiring of criminals, and neither the EEOC nor

Sessions has authority to say otherwise. As alleged herein, the Felon-Hiring Rule is invalid on its face.

## I. THE PARTIES

2.     The Plaintiff is Texas. Through its constituent agencies, Texas employs hundreds of thousands of people.

3.     The Defendants are the EEOC, a federal law-enforcement agency, as well as Victoria A. Lipnic, the Chair of EEOC, who is sued in her official capacity, and Jefferson B. Sessions, III, the Attorney General of the United States, who is sued in his official capacity.

4.     The EEOC is empowered to bring civil enforcement actions against employers for violating Title VII of the Civil Rights Act of 1964 ("Title VII"). *See* 42 U.S.C. § 2000e-6. The EEOC also may issue "right-to-sue" letters that allow private individuals to sue their employers for violating EEOC's interpretation of Title VII. *See id*. § 2000e-5(f).

5.     Sessions is empowered to bring civil enforcement actions against governmental employers, including Texas, for alleged violations of Title VII. *See id*. § 2000e-5(f)(1). The Attorney General also may issue "right-to-sue" letters that allow private individuals to sue their governmental employers, including Texas, for violating EEOC's interpretation of Title VII. *See id*.

## II. JURISDICTION AND VENUE

6.     The Court has federal-question jurisdiction under 28 U.S.C. § 1331 because this suit concerns the scope of EEOC's authority under Title VII, and it also arises under the APA. The Court also has jurisdiction under 28 U.S.C. § 1346 because the EEOC is an agency of the United States. Finally, the Court has jurisdiction to compel an officer or employee of the EEOC to perform his or her duty under 28 U.S.C. § 1361.

7.    Venue is proper in this District under 28 U.S.C. § 1391(e) because Texas is a resident of this District, Texas and its constituent agencies have employees in this District, and a substantial part of the events or omissions giving rise to Texas's claim against EEOC's unlawful agency action occurred in this District.

8.    This Court is authorized to award the requested declaratory and injunctive relief under the APA, the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and 28 U.S.C. § 1361.

## III.  FACTUAL ALLEGATIONS

### A.    The EEOC and its Felon-Hiring Rule.

9.    Congress has denied EEOC the authority to promulgate substantive rules interpreting Title VII. *General Elec. Co. v. Gilbert*, 429 U.S. 125, 140–46 (1976). EEOC has authority to issue only "procedural regulations" to carry out the provisions of Title VII. *See* 42 U.S.C. § 2000e-12(a).

10.    On April 25, 2012, EEOC's Commissioners adopted, by a 4 to 1 vote, a rule purporting to offer "enforcement guidance" for employers' use of arrest or conviction records. *See* Ex. A. That rule directs employers to conform their hiring practices to EEOC's "guidance"; it directs individuals to file charges of discrimination for alleged violations of EEOC's "guidance"; and it directs EEOC staff to bring the full weight of the United States' enforcement authority to bear on those employers who might disobey the Commission's "guidance." In particular:  "The Commission intends this document for use by employers considering the use of criminal records in their selection and retention processes; by individuals who suspect that they have been denied jobs or promotions, or have been discharged because of their criminal records; and by EEOC staff who are investigating discrimination charges involving the use of criminal records in employment decisions." *Id.* at 3.

11.    The Felon-Hiring Rule reflects EEOC's substantive interpretation of Title VII. In EEOC's view, hiring policies or practices that categorically exclude all

3

convicted felons create an unlawful "disparate impact" under Title VII, and the statute instead mandates that all employers conduct "individualized assessments" of convicted felons' job applications. *Id*. at 9, 18–20. If an employer refuses to hire a convicted felon, it is the employer's burden to prove that the felony disqualification is "job related for the position in question and consistent with business necessity." *Id*. at 8; *see also id*. at 13–14 (urging employers not to "ask about convictions on job applications"). The Felon-Hiring Rule warns that EEOC will investigate and challenge employers who use felony convictions as "an absolute bar to employment." *Id*. at 11 n.90. And it further cautions that "[a]n employer's evidence of a racially balanced workforce will not be enough to disprove disparate impact." *Id*. at 10.

12.    The Felon-Hiring Rule also instructs employers, including Texas, to ignore state and local laws that disqualify convicted felons from holding certain jobs, to the extent those state and local laws conflict with EEOC's interpretation of Title VII. *See id*. at 24 ("States and local jurisdictions also have laws and/or regulations that restrict or prohibit the employment of individuals with records of certain criminal conduct. . . . Unlike federal laws or regulations, however, state and local laws or regulations are preempted by Title VII.").

13.    Critically, the Commission's Felon-Hiring Rule purports to bind "EEOC staff" by requiring them to investigate and to find that employers commit unlawful employment practices where they refuse to give individualized consideration to job applicants with felony convictions. *Id*. at 3; *see, e.g.*, *id*. at 8 ("EEOC would find reasonable cause to believe that discrimination occurred."); *id*. at 12 ("EEOC would find reasonable cause to believe that his employer violated Title VII."); *id*. at 17 ("EEOC concludes that there is reasonable cause to believe that the [employer's] policy" violates EEOC's felon-hiring rule.); *id*. at 20 ("EEOC finds reasonable cause to believe that Title VII was violated."); *id*. at 21 ("EEOC finds that the policy is" unlawful.).

14.    Moreover, EEOC's felon-hiring rule specifically holds that no-felon hiring policies required by Texas law are unlawful, and the Commission directs its staff to enforce that finding in the field. *See id*. at 24 ("EEOC investigates [the no-felon hiring policy required by state law], finding disparate impact based on race and also that the exclusionary policy is not job related and consistent with business necessity."). In short, "the entire Guidance, from beginning to end . . .[,] reads like a ukase. It commands, it requires, it orders, it dictates." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000).

15.    Defendants consider themselves bound by EEOC's Felon-Hiring Rule, and they unwaveringly follow it. In the Commission's own estimation, the rule reflects its staff's "well-established" practice of finding unlawful employment practices where employers categorically refuse to hire felons. Ex. A, at 3. Neither EEOC nor the Attorney General can identify a single instance in which either defendant has failed to follow the substantive interpretation of Title VII promulgated in the Felon-Hiring Rule.

16.    To the contrary, consistent with the Felon-Hiring Rule, EEOC has launched hundreds of investigations against employers who, in EEOC's estimation, are insufficiently solicitous of convicted felons who want jobs.

17.    For example, EEOC is prosecuting G4S Secure Solutions (USA), Inc. ("G4S"), a private security company that provides security guards for government buildings, nuclear power plants, and other secure installations. When G4S explained that Pennsylvania law prohibited the company from hiring felons to work as security officers, the EEOC claimed that state law was preempted, argued that such categorical bans violate Title VII, and demanded that the company justify the "business necessity" of every criminal background check that it performed over a period of decades.

18.    On June 11, 2013, EEOC used its Felon-Hiring Rule to sue the national discount retailer Dollar General. *See* Compl., *EEOC v. Dolgencorp LLC d/b/a Dollar General*, No. 1:13-cv-04307 (N.D. Ill.). EEOC brought suit on behalf of 8,400 employees who were denied employment on account of their felony convictions. *Id*. at 4. For example, EEOC's lead plaintiff was denied employment as a "Stocker/Cashier" because her criminal-background check revealed two drug-related convictions. *Id*. at 5. In EEOC's view, however, Dollar General failed to carry its burden to prove that it had a "business necessity" not to hire twice-convicted drug abusers to handle the company's money, serve the company's customers, and manage the company's assets. *Id*. at 4.

19.    Also on June 11, 2013, EEOC used its Felon-Hiring Rule to sue the carmaker BMW. *See* Compl., *EEOC v. BMW Mfg. Co.*, No. 7:13-cv-01583 (D.S.C.). EEOC sued on behalf of felons who were fired from their jobs at a BMW manufacturing facility. *Id*. at 2, 5. BMW fired those employees because they had been convicted of various crimes including murder, rape, and other offenses involving "theft, dishonesty, and moral turpitude." *Id*. at 5 (internal quotation marks omitted). In EEOC's view, however, BMW failed to carry its burden to prove that it had a "business necessity" not to hire violent felons and convicted thieves to work in a warehouse with millions of dollars' worth of luxury automobiles. *Id*. at 7.

20.    The targets of these investigations and prosecutions have been subjected to sanctionable litigation tactics. For example, EEOC brought a disparate-impact lawsuit against a temporary staffing company named Peoplemark because it refused to hire a woman named Sherri Scott after her criminal-background check disclosed that she was "a two-time felon with convictions for housebreaking and larceny." *EEOC v. Peoplemark, Inc.*, No. 1:08-cv-907, 2011 WL 1707281, at *1 (W.D. Mich. Mar. 31, 2011). In an attempt to prove that Peoplemark's hiring policy created a disparate impact, EEOC conducted a three-year investigation of the company and subpoenaed

18,000 pages of corporate documents. Its investigation uncovered nothing, and Peoplemark's decision not to hire Sherri Scott proved prudent when she went back to prison in the middle of EEOC's investigation for a *third* felony conviction (this one for felonious assault). *Id.* at *3 n.2. EEOC nonetheless continued to litigate against Peoplemark in an effort to harass the company and to "drive up [Peoplemark's] costs." *Id.* at *5. The United States District Court for the Western District of Michigan sanctioned EEOC by dismissing its complaint with prejudice, awarding Peoplemark over $750,000 in fees and costs, and concluding that EEOC's conduct "falls between frivolous and insulting." *Id.* at *5, *11 n.8, *12. And the Sixth Circuit recently upheld the sanctions against EEOC on appeal. *See EEOC v. Peoplemark, Inc.*, 732 F.3d 584 (6th Cir. 2013).

21.     Similarly, EEOC sued a trade-show-and-convention company called Freeman for refusing to hire felons. In the course of that lawsuit, EEOC committed numerous discovery violations.  Only after forcing Freeman to file a 222-page motion to compel did EEOC finally abandon its recalcitrance. Even then, however, the Commission did not abandon its abusive litigation tactics.  EEOC retaliated by imposing overbroad discovery demands on Freeman, which the United States District Court of the District of Maryland eventually disallowed—but only after Freeman was forced to spend substantial time and money in a discovery dispute occasioned by EEOC's attempts to force the company to hire felons.

22.     The soda company Pepsi Beverages avoided EEOC's abusive litigation tactics, but did so only by caving to the Commission's demands. EEOC accused Pepsi of creating an unlawful "disparate impact" by refusing to hire approximately 300 individuals with criminal backgrounds. In January 2012, EEOC forced Pepsi to avoid that unintentional disparate impact by committing intentional racial discrimination and hiring those 300 convicted criminals.

**B.    Texas and its Employees.**

23.    Texas employs hundreds of thousands of people. For many jobs, Texas law and longstanding hiring policies impose absolute bans on hiring convicted felons (or in some instances persons convicted of certain categories of felonies). These absolute exclusions do not allow the sort of "individualized assessments" that EEOC's Felon-Hiring Rule purports to require. *Cf.* Ex. A, at 18–20.

24.    For example, the Texas Department of Public Safety ("DPS") is a Texas agency. It employs hundreds of Texas Troopers and other law enforcement officers throughout Texas, including in this District. Under Texas law, "[a] person who has been convicted of a felony is disqualified to be an officer" for any law-enforcement agency anywhere in Texas.  TEX. OCC. CODE § 1701.312(a). And DPS refuses to hire anyone convicted of any felony or certain misdemeanors.    *See* DPS, Employment/Career    Opportunities,    http://agency.governmentjobs.com/txdps/ default.cfm ("Background investigations, including criminal history record checks, previous employment verifications, and personal references are conducted on ALL prospective employees. Felony convictions and certain misdemeanor convictions will be cause for immediate rejection."); DPS, Disqualifiers, http://www.dps.texas.gov/ trainingacademy/recruiting/disqualifiers/trafficcriminalrcrds.htm.  DPS's  no-felons policy is materially identical to the across-the-board policy employed by the Federal Bureau of Investigation, under which "conviction of a felony" "will automatically disqualify" applicants for *all* jobs with the Bureau. FBI, Employment Disqualifiers, https://www.fbijobs.gov/working-at-fbi/eligibility,    formerly    located    at    https:// www.fbijobs.gov/51.asp, a copy of said prior webpage is attached hereto as Ex. B.

25.    The Texas Department of Aging and Disability Services ("DADS") is a Texas agency. It administers various programs and facilities for the benefit of elderly and disabled individuals throughout Texas, including in this District. DADS "applies absolute criminal bars to employment." DADS, Bars to Employment with DADS,

http://www.dads.state.tx.us/hiringbars/index.html. The "bars" imposed by DADS include a long and wide-ranging list of disqualifying felonies statutorily specified by the Texas Legislature and others specified by the agency. *See id.*

26.    The Texas General Land Office ("GLO") is a Texas agency. It administers public lands and oversees various veterans' affairs throughout Texas, including in this District. "[T]o prudently manage its workforce," GLO imposes criminal-background checks on "all job applicants selected for hire and all volunteer workers, regardless of their positions." GLO, Legislative Appropriations Request FY 2016–2017, at 11 (Aug. 23, 2012), *available at* http://www.glo.texas.gov/the-glo/reports/audit-legislative/files/LAR-2016-2017.pdf. And to protect the brave veterans who live in GLO-administered Texas State Veterans Homes, the Texas Legislature has imposed absolute bans on employing certain convicted felons who otherwise might want to work in those facilities. *See* TEX. HEALTH & SAFETY CODE ch. 250.

27.    The Texas Juvenile Justice Department ("JJD") is a Texas agency. It administers correctional programs and institutions for juveniles throughout Texas, including in this District. JJD applies absolute bars to employment for any applicant convicted of or arrested for certain felonies, "[r]egardless of the nature of the position." JJD Personnel Policy and Procedure Manual, Background Checks 2, *available at* http://www.tjjd.texas.gov/policies/PRS/prs02/prs0208.pdf. And it imposes even more sweeping absolute bars to employment for criminals who want to work in "correctional series positions." *Id.*

28.    The Texas Lottery Commission ("TLC") is a Texas agency. It administers Texas's lottery system, including in this District. TLC imposes an absolute bar to hiring anyone convicted of any felony or certain other designated offenses within the last ten years.

29.    The Parks and Wildlife Department ("PWD") is a Texas agency. It administers numerous parks and wildlife programs and employs game wardens

throughout Texas, including in this District. Under Texas law, the approximately 500 game wardens employed by PWD are "peace officers," and as such, they fall under the same absolute no-felons policy that applies to other law-enforcement officers throughout Texas. *See* 31 TEX. ADMIN. CODE § 55.802(1); TEX. OCC. CODE §§ 1701.001(3)–(4), 1701.312(a); TEX. PARKS & WILD. CODE § 11.019. PWD imposes an absolute ban on hiring any game warden who ever has been convicted of a felony or Class A misdemeanor.   PWD, Requirements for Game Warden, http://www.tpwd.state.tx.us/warden/recruiting-careers/requirements.   PWD also imposes absolute prohibitions on game-warden applicants who have been convicted of certain lesser offenses. *Id*.

30.    In addition, the Texas Legislature prohibits school districts from hiring anyone convicted of certain felonies. *See* TEX. EDUC. CODE § 22.085. And many local school districts throughout Texas maintain an absolute exclusion on hiring convicted felons to teach or coach their students. For example, the Austin Independent School District imposes an absolute ban on hiring anyone convicted of any felony at any point in the past. *See* Austin ISD, Board Policy Manual, Employment Practices, http://pol.tasb.org/Policy/download/1146?filename=DC(REGULATION).pdf.

31.    Texas applies these policies to all job applicants, without regard to their races. For example, DPS will summarily and categorically reject every single convicted felon who applies to be a Trooper without regard to anything else (including race) on his job application. Accordingly, there is no risk that Texas could incur "Title VII disparate *treatment* liability" through its no-felon policies. Ex. A, at 6 (emphasis added). But EEOC's view of disparate *impact* liability turns Texas's race-neutral virtue into a vice: because the above-referenced Texas agencies apply absolute and categorical exclusions against all convicted felons, they never make the sort of race-conscious "individualized assessments" that EEOC's Felon-Hiring Rule purports to require. Ex. A, at 18–20.

**C.    Effect of the Felon-Hiring Rule on Texas and its Employees.**

32.    The EEOC's Felon-Hiring Rule has a direct and immediate impact on the day-to-day business of Texas, its agencies, and its political subdivisions. EEOC has propounded a substantive interpretation of Title VII that purports to preempt Texas's sovereign power to enact and abide by state-law hiring practices. Texas either must violate state and local laws that prohibit the "individualized assessments" that EEOC requires and consider convicted felons for hire as Troopers, jailers, and school teachers—or Texas must ignore the EEOC's rule and risk an enforcement action like the ones the Commission launched against Peoplemark and Freeman. *See* Ex. A, at 1 ("The national data provide[] a basis for the Commission to investigate [such] Title VII disparate impact charges."); ¶¶ 20–21, *supra*.

33.    If Texas agencies choose to comply with the EEOC's rule, they not only violate Texas law, but also must rewrite their hiring policies at taxpayer expense. And these Texas entities also must begin evaluating and hiring felons to serve in law enforcement, teach in local elementary schools, nurse veterans and the disabled, counsel juvenile detainees, and coach little league. This would expose Texas— including, in particular, its most vulnerable citizens—to a class of individuals who have a proven track record of disobeying the law. And it could expose Texas entities to liability for employee misconduct. *See City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989); *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1403 (5th Cir. 1996) ("Common sense recommends—and state law demands—that, in the interest of the safety of school children, school officials investigate the criminal histories of prospective school employees. The School Officials' total abdication of this responsibility constitutes a facially inadequate hiring process. . . . [T]he hiring inadequacies alleged here reveal a deliberate indifference to Doe's welfare."), *rev'd en banc*, 113 F.3d 1412 (5th Cir. 1997); *Kitzman-Kelley v. Warner*, 203 F.3d 454, 456 (7th Cir. 2000) (Illinois Department of Children and Family Services can be liable under

42 U.S.C. § 1983 where it "did nothing to investigate [an abusive caretaker's] background"). As the President of the National Small Business Association recently stated, "State and federal courts will allow potentially devastating tort lawsuits against businesses that hire felons who commit crimes at the workplace or in customers' homes. Yet the EEOC is threatening to launch lawsuits if they do not hire those same felons."

34.    But adhering to Texas law also is a perilous and costly option. Noncompliance with EEOC's rule could trigger an EEOC investigation, a Justice Department enforcement action, or a suit by "private attorneys general," *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 211 (1972), authorized by the Justice Department. Texas employers (like DPS, DADS, GLO, JJD, TLC, and PWD) no less than private ones are susceptible to "charges" of discrimination based on the EEOC's unlawful interpretation of Title VII and the Commission's abusive investigations of those unlawful charges. *See* 42 U.S.C. § 2000e-5(b).

35.    Indeed, EEOC publicly has adopted a strategy of accusing high-profile employers of discrimination to attract attention from the media. *See* EEOC, Performance and Accountability Report (2011) ("[T]he quantity of systemic lawsuits and their representation on the total docket is expected to continue to steadily increase."). And it has a proven track record of abusive litigation tactics. *See* ¶¶ 15–22, *supra*. An EEOC allegation of discrimination and an abusive investigation by the Commission would do lasting and unwarranted damage to Texas's reputation as an equal-opportunity employer, undermining its efforts to recruit and retain employees of all races.

36.    The only difference between the EEOC's authority vis-à-vis Texas employers and private ones is that the Commission does not have authority directly to prosecute the former. *See* 42 U.S.C. § 2000e-5(f)(1). When it is a Texas employer that allegedly committed an unlawful employment practice, EEOC must refer the

charge of discrimination to Defendant Sessions, who is the head of the Department of Justice ("DOJ"). *Id.* Defendant Sessions, in turn, either can sue Texas or authorize the employee to do so. *Id.* But the federal government brings enforcement suits in its own name in only 18% of its cases. *See* EEOC, All Statutes: FY1997–FY2016, http://www.eeoc.gov/eeoc/statistics/enforcement/all.cfm. The overwhelming majority of cases are resolved during the EEOC's abusive investigatory process. *See id.*

37. And the impact on Texas is far from theoretical. In fact, Texas already has been accused of discrimination under EEOC's Felon-Hiring Rule. For example, on November 1, 2013, EEOC sent a "charge of discrimination" to DPS for refusing to hire William R. Smith (attached hereto as Ex. C). Mr. Smith applied to work as a DPS "Customer Service Representative," *id.* at 2, a position that would have given him access to a statewide database containing identifying information for 26 million Texans (including their names, addresses, dates of birth, social security numbers, and copies of their birth certificates). In his job application, Mr. Smith disclosed that he previously was convicted of a felony for the unauthorized use of a motor vehicle. *Id.* Consistent with Texas law and its policy judgment that convicted felons should not have access to sensitive information regarding every man, woman, and child in Texas, DPS categorically refused to consider Mr. Smith's application and rejected his application without using any of the "individualized" factors that EEOC's rule commands. Because DPS refused to accede to EEOC's unlawful interpretation of Title VII, it is presently on the receiving end of a "charge of discrimination." And EEOC gave Mr. Smith a "right to sue" letter on December 23, 2013 (attached hereto as Ex. D).

## IV.  CLAIMS FOR RELIEF

### COUNT ONE

**Declaratory Judgment And Injunction Under 28 U.S.C. §§ 2201–2202
That Texas's No-Felons Policies Do Not Constitute
"Unlawful Employment Practices"**

38.    The allegations in paragraphs 1–37 are reincorporated herein.

39.    Texas law and policy impose numerous categorical exclusions on Texas's ability to hire convicted felons. Those categorical exclusions prohibit Texas, its agencies, and its officials from conducting "individualized assessments" of convicted felons' job applications.

40.    EEOC's Felon-Hiring Rule purports to interpret Title VII to preempt Texas's law and policy by requiring the "individualized assessments" that Texas law and policy do not allow.

41.    Sections 2201 and 2202 of title 28, United States Code, authorize this Court to "declare the rights and other legal relations of any interested party" in cases within its jurisdiction, as well as to issue "[f]urther necessary or proper relief" based on that declaratory judgment. Texas qualifies for declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202 because EEOC's Felon-Hiring Rule purports to preempt Texas law and forces Texas entities and officials to choose between evaluating and hiring convicted felons in defiance of Texas law or risking investigations, challenges, and lawsuits from EEOC and Defendant Sessions.

42.    This injury is more than sufficient for Article III standing and brings the case within the subject-matter jurisdiction of this Court. *See, e.g.*, *Illinois Dep't of Transp. v. Hinson*, 122 F.3d 370, 372 (7th Cir. 1997) (State has standing where it "complains that a federal regulation will preempt one of the state's laws"); *Alaska v. United States Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989) (agreeing that the State has standing to seek declaratory and injunctive relief "because DOT claims that its rules preempt state consumer protection statutes, [and therefore] the States have suffered injury to their sovereign power to enforce state law"); *cf. Alfred L. Snapp &*

*Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607–08 (1982) (stating, in the context of state standing in *parens patriae* actions, that States have an "interest in securing observance of the terms under which it participates in the federal system").

43.    Texas respectfully requests a declaration of its right to maintain and enforce its laws and policies that absolutely bar convicted felons (or certain categories of convicted felons) from serving as police officers, youth-correction officers, Texas-supported-living-center employees, GLO employees, lottery officials, game wardens, school teachers, and any other job Texas and its Legislature deem appropriate. Such absolute bars do not constitute an "unlawful employment practice" under 42 U.S.C. § 2000e-2(k)(1)(A).

44.    Texas also seeks a declaration and injunction that Ms. Lipnic, Mr. Sessions, and their successors cannot enforce the interpretation of Title VII that appears in its Felon-Hiring Rule, nor can they or their subordinates issue right-to-sue letters pursuant to that rule.

## COUNT TWO
### Declaratory Judgment Under 28 U.S.C. § 706
### That EEOC's Felon-Hiring Rule Is Unlawful

45.    The allegations in paragraphs 1–44 are reincorporated herein.

46.    EEOC's Felon-Hiring Rule, which purports to offer "guidance" regarding the Commission's interpretation of Title VII, constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *see, e.g., Appalachian Power*, 208 F.3d at 1023 (holding a similar "guidance" document was reviewable under § 704).

47.    Section 702 of title 5, United States Code, authorizes any person "adversely affected or aggrieved by agency action" to seek judicial relief against that agency, and Section 706 instructs this Court to "hold unlawful and set aside" agency

action "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C).

48. Texas respectfully asks this Court to hold unlawful and set aside EEOC's Felon-Hiring Rule, on the ground that EEOC has exceeded its statutory authority. *See, e.g.*, *American Fed'n of Gov't Emps., AFL-CIO, Local 3669 v. Shinseki*, 709 F.3d 29 (D.C. Cir. 2013); *Emily's List v. Fed. Election Comm'n*, 581 F.3d 1 (D.C. Cir. 2009); *Fin. Planning Ass'n v. SEC*, 482 F.3d 481 (D.C. Cir. 2007); *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166 (D.C. Cir. 2003); *Michigan v. EPA*, 268 F.3d 1075 (D.C. Cir. 2001). Congress withheld rulemaking authority from the EEOC, yet the agency has unlawfully circumvented those limits on its power by announcing a substantive interpretation of Title VII, backed by the credible threat of civil prosecution and the issuance of right-to-sue letters.

49. Even if EEOC had been given rulemaking authority by Congress, promulgation of the Felon-Hiring Rule constitutes "rule making" within the meaning of APA, 5 U.S.C. § 551(5), and would be required to comply with the notice-and-comment procedures of 5 U.S.C. § 553. EEOC did not comply with those procedures, and its unlawful rule should be set aside under 5 U.S.C. § 706(2)(C).

50. And in all events, the Felon-Hiring Rule is invalid on its face because it is plainly contrary to the text of Title VII and, in the alternative, it is an unreasonable interpretation of Title VII.

## V. DEMAND FOR JUDGMENT

Plaintiff respectfully requests the following relief from the Court:

A. A declaratory judgment that Texas and its constituent agencies and its officials are entitled to maintain and enforce laws and policies that absolutely bar convicted felons, or a certain category of convicted felons, from government employment, and that Texas need not conduct the "individualized assessments" that EEOC purports to require.

B. A declaratory judgment holding unlawful and setting aside EEOC's Felon-Hiring Rule.

C.    A declaration and injunction that Defendant Sessions and DOJ may not issue right-to-sue letters to persons seeking to sue the Texas or any of its constituent agencies or Texas officials based on the interpretation of Title VII that appears in the Felon-Hiring Rule.

D.    All other relief to which Texas may show itself to be entitled.

Respectfully submitted this the 26th day of July, 2017.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY D. STARR
Deputy First Assistant Attorney General

MICHAEL C. TOTH
Special Counsel to the First Assistant
Attorney General

ANDREW D. LEONIE
Associate Deputy Attorney General

*/s/ Austin R. Nimocks*
AUSTIN R. NIMOCKS
Associate Deputy Attorney General
Texas Bar No. 24002695
austin.nimocks@oag.texas.gov

DAVID J. HACKER
Senior Counsel

JOEL STONEDALE
Counsel

Office of Special Litigation
ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Mail Code 009
Austin, Texas 78711-2548
(512) 936-1414
(512) 936-0545 Fax

*ATTORNEYS FOR PLAINTIFFS*

### CERTIFICATE OF SERVICE

I certify that on the 26th day of July, 2017, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Austin R. Nimocks*
AUSTIN R. NIMOCKS
Associate Deputy Attorney General

**EXHIBITS**

**TAB**

EEOC, Consideration of Arrest and Conviction Records in Employment
    Decisions Under Title VII of the Civil Rights Act of 1964,
    No. 915.002 (Apr. 25, 2012) .................................................................................................... A

FBI, Employment Disqualifiers, https://www.fbijobs.gov/51.asp ....................................... B

EEOC, "Charge of Discrimination" (Nov. 1, 2013) ................................................................ C

EEOC, Dismissal and Notice of Rights (Dec. 23, 2013) ......................................................... D

EXHIBIT A

| ***EEOC Enforcement Guidance*** | **Number**<br>915.002<br>**Date**<br>4/25/2012 |
|---|---|

1.    **SUBJECT**: Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et seq*.

2.    **PURPOSE**:  The purpose of this Enforcement Guidance is to consolidate and update the U.S. Equal Employment Opportunity Commission's guidance documents regarding the use of arrest or conviction records in employment decisions under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

3.    **EFFECTIVE DATE**:  Upon receipt.

4.    **EXPIRATION DATE**:  This Notice will remain in effect until rescinded or superseded.

5.    **ORIGINATOR**:  Office of Legal Counsel.

**Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964**

**Table of Contents**

| | | |
|---|---|---|
| I. | Summary | 1 |
| II. | Introduction | 3 |
| III. | Background | 4 |
| | A. Criminal History Records | 4 |
| | B. Employers' Use of Criminal History Information | 6 |
| | C. The EEOC's Interest in Employers' Use of Criminal Records in Employment Screening | 6 |
| IV. | Disparate Treatment Discrimination and Criminal Records | 6 |
| V. | Disparate Impact Discrimination and Criminal Records | 8 |
| | A. Determining Disparate Impact of Policies or Practices that Screen Individuals Based on Records of Criminal Conduct | 9 |
| |    1. Identifying the Practice or Policy | 9 |
| |    2. Determining Disparate Impact | 9 |
| | B. Job Related for the Position in Question and Consistent with Business Necessity | 10 |
| |    1. Generally | 10 |
| |    2. Arrests | 12 |
| |    3. Convictions | 13 |
| |    4. Determining Whether a Criminal Conduct Exclusion Is Job Related and Consistent with Business Necessity | 14 |
| |    5. Validation | 14 |
| |    6. Detailed Discussion of the *Green* Factors and Criminal Conduct Screens | 15 |
| |       a. The Nature and Gravity of the Offense or Conduct | 15 |
| |       b. The Time that Has Passed Since the Offense, Conduct and/or Completion of the Sentence | 15 |
| |       c. The Nature of the Job Held or Sought | 16 |
| |    7. Examples of Criminal Conduct Exclusions that Do Not Consider the *Green* Factors | 16 |
| |    8. Targeted Exclusions that Are Guided by the *Green* Factors | 17 |
| |    9. Individualized Assessment | 18 |
| | C. Less Discriminatory Alternatives | 20 |

VI.     Positions Subject to Federal Prohibitions or Restrictions on Individuals
        with Records of Certain Criminal Conduct                                    20

        A.      Hiring in Certain Industries                                        20
        B.      Obtaining Occupational Licenses                                     21
        C.      Waiving or Appealing Federally Imposed Occupational
                Restrictions                                                        21
        D.      Security Clearances                                                 23
        E.      Working for the Federal Government                                  23

VII.    Positions Subject to State and Local Prohibitions or Restrictions on Individuals
        with Records of Certain Criminal Conduct                                    24

VIII.   Employer Best Practices                                                     25

### I.    Summary

- An employer's use of an individual's criminal history in making employment decisions may, in some instances, violate the prohibition against employment discrimination under Title VII of the Civil Rights Act of 1964, as amended.

- The Guidance builds on longstanding court decisions and existing guidance documents that the U.S. Equal Employment Opportunity Commission (Commission or EEOC) issued over twenty years ago.

- The Guidance focuses on employment discrimination based on race and national origin. The Introduction provides information about criminal records, employer practices, and Title VII.

- The Guidance discusses the differences between arrest and conviction records.

  - The fact of an arrest does not establish that criminal conduct has occurred, and an exclusion based on an arrest, in itself, is not job related and consistent with business necessity. However, an employer may make an employment decision based on the conduct underlying an arrest if the conduct makes the individual unfit for the position in question.

  - In contrast, a conviction record will usually serve as sufficient evidence that a person engaged in particular conduct. In certain circumstances, however, there may be reasons for an employer not to rely on the conviction record alone when making an employment decision.

- The Guidance discusses disparate treatment and disparate impact analysis under Title VII.

  - A violation may occur when an employer treats criminal history information differently for different applicants or employees, based on their race or national origin (disparate treatment liability).

  - An employer's neutral policy (e.g., excluding applicants from employment based on certain criminal conduct) may disproportionately impact some individuals protected under Title VII, and may violate the law if not job related and consistent with business necessity (disparate impact liability).

    - National data supports a finding that criminal record exclusions have a disparate impact based on race and national origin. The national data provides a basis for the Commission to investigate Title VII disparate impact charges challenging criminal record exclusions.

1

    ○  Two circumstances in which the Commission believes employers will consistently meet the "job related and consistent with business necessity" defense are as follows:

- The employer validates the criminal conduct exclusion for the position in question in light of the Uniform Guidelines on Employee Selection Procedures (if there is data or analysis about criminal conduct as related to subsequent work performance or behaviors); or

- The employer develops a targeted screen considering at least the nature of the crime, the time elapsed, and the nature of the job (the three factors identified by the court in *Green v. Missouri Pacific Railroad*, 549 F.2d 1158 (8th Cir. 1977)). The employer's policy then provides an opportunity for an individualized assessment for those people identified by the screen, to determine if the policy as applied is job related and consistent with business necessity. (Although Title VII does not require individualized assessment in all circumstances, the use of a screen that does not include individualized assessment is more likely to violate Title VII.).

- Compliance with other federal laws and/or regulations that conflict with Title VII is a defense to a charge of discrimination under Title VII.

- State and local laws or regulations are preempted by Title VII if they "purport[] to require or permit the doing of any act which would be an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-7.

- The Guidance concludes with best practices for employers.

## II.    Introduction

The EEOC enforces Title VII of the Civil Rights Act of 1964 (Title VII) which prohibits employment discrimination based on race, color, religion, sex, or national origin.[1]    This Enforcement Guidance is issued as part of the Commission's efforts to eliminate unlawful discrimination in employment screening, for hiring or retention, by entities covered by Title VII, including private employers as well as federal, state, and local governments.[2]

In the last twenty years, there has been a significant increase in the number of Americans who have had contact[3] with the criminal justice system[4] and, concomitantly, a major increase in the number of people with criminal records in the working-age population.[5]  In 1991, only 1.8% of the adult population had served time in prison.[6]  After ten years, in 2001, the percentage rose to 2.7% (1 in 37 adults).[7]  By the end of 2007, 3.2% of all adults in the United States (1 in every 31) were under some form of correctional control involving probation, parole, prison, or jail.[8] The Department of Justice's Bureau of Justice Statistics (DOJ/BJS) has concluded that, if incarceration rates do not decrease, approximately 6.6% of all persons born in the United States in 2001 will serve time in state or federal prison during their lifetimes.[9]

Arrest and incarceration rates are particularly high for African American and Hispanic men.[10]  African Americans and Hispanics[11] are arrested at a rate that is 2 to 3 times their proportion of the general population.[12]    Assuming that current incarceration rates remain unchanged, about 1 in 17 White men are expected to serve time in prison during their lifetime;[13] by contrast, this rate climbs to 1 in 6 for Hispanic men; and to 1 in 3 for African American men.[14]

The Commission, which has enforced Title VII since it became effective in 1965, has well-established guidance applying Title VII principles to employers' use of criminal records to screen for employment.[15]  This Enforcement Guidance builds on longstanding court decisions and policy documents that were issued over twenty years ago.  In light of employers' increased access to criminal history information, case law analyzing Title VII requirements for criminal record exclusions, and other developments,[16] the Commission has decided to update and consolidate in this document all of its prior policy statements about Title VII and the use of criminal records in employment decisions.  Thus, this Enforcement Guidance will supersede the Commission's previous policy statements on this issue.

The Commission intends this document for use by employers considering the use of criminal records in their selection and retention processes; by individuals who suspect that they have been denied jobs or promotions, or have been discharged because of their criminal records; and by EEOC staff who are investigating discrimination charges involving the use of criminal records in employment decisions.

### III.    Background

The contextual framework for the Title VII analysis in this Enforcement Guidance includes how criminal record information is collected and recorded, why employers use criminal records, and the EEOC's interest in such criminal record screening.

###   A.    Criminal History Records

Criminal history information can be obtained from a wide variety of sources including, but not limited to, the following:

- Court Records.  Courthouses maintain records relating to criminal charges and convictions, including arraignments, trials, pleas, and other dispositions.[17] Searching county courthouse records typically provides the most complete criminal history.[18]  Many county courthouse records must be retrieved on-site,[19] but some courthouses offer their records online.[20] Information about federal crimes such as interstate drug trafficking, financial fraud, bank robbery, and crimes against the government may be found online in federal court records by searching the federal courts' Public Access to Court Electronic Records or Case Management/Electronic Case Files.[21]

- Law Enforcement and Corrections Agency Records.  Law enforcement agencies such as state police agencies and corrections agencies may allow the public to access their records, including records of complaints, investigations, arrests, indictments, and periods of incarceration, probation, and parole.[22]  Each agency may differ with respect to how and where the records may be searched, and whether they are indexed.[23]

- Registries or Watch Lists.  Some government entities maintain publicly available lists of individuals who have been convicted of, or are suspected of having committed, a certain type of crime.  Examples of such lists include state and federal sex offender registries and lists of individuals with outstanding warrants.[24]

- State Criminal Record Repositories.  Most states maintain their own centralized repositories of criminal records, which include records that are submitted by most or all of their criminal justice agencies, including their county courthouses.[25] States differ with respect to the types of records included in the repository,[26] the completeness of the records,[27] the frequency with which they are updated,[28] and whether they permit the public to search the records by name, by fingerprint, or both.[29]  Some states permit employers (or third-parties acting on their behalf) to access these records, often for a fee.[30]  Others limit access to certain types of records,[31] and still others deny access altogether.[32]

- The Interstate Identification Index (III).  The Federal Bureau of Investigation (FBI) maintains the most comprehensive collection of criminal records in the nation, called the "Interstate Identification Index" (III).  The III database compiles

records from each of the state repositories, as well as records from federal and international criminal justice agencies.[33]

The FBI's III database may be accessed for employment purposes by:

- the federal government;[34]

- employers in certain industries that are regulated by the federal government, such as "the banking, nursing home, securities, nuclear energy, and private security guard industries; as well as required security screenings by federal agencies of airport workers, HAZMAT truck drivers and other transportation workers";[35] and

- employers in certain industries "that the state has sought to regulate, such as persons employed as civil servants, day care, school, or nursing home workers, taxi drivers, private security guards, or members of regulated professions."[36]

Recent studies have found that a significant number of state and federal criminal record databases include incomplete criminal records.

- A 2011 study by the DOJ/BJS reported that, as of 2010, many state criminal history record repositories still had not recorded the final dispositions for a significant number of arrests.[37]
- A 2006 study by the DOJ/BJS found that only 50% of arrest records in the FBI's III database were associated with a final disposition.[38]

Additionally, reports have documented that criminal records may be inaccurate.

- One report found that even if public access to criminal records has been restricted by a court order to seal and/or expunge such records, this does not guarantee that private companies also will purge the information from their systems or that the event will be erased from media archives.[39]
- Another report found that criminal background checks may produce inaccurate results because criminal records may lack "unique" information or because of "misspellings, clerical errors or intentionally inaccurate identification information provided by search subjects who wish to avoid discovery of their prior criminal activities."[40]

Employers performing background checks to screen applicants or employees may attempt to search these governmental sources themselves or conduct a simple Internet search, but they often rely on third-party background screening businesses.[41]    Businesses that sell criminal history information to employers are "consumer reporting agencies" (CRAs)[42] if they provide the information in "consumer reports"[43] under the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* (FCRA).  Under FCRA, a CRA generally may not report records of arrests that did not result in entry of a judgment of conviction, where the arrests occurred more than seven years ago.[44]

However, they may report convictions indefinitely.[45]

CRAs often maintain their own proprietary databases that compile information from various sources, such as those described above, depending on the extent to which the business has purchased or otherwise obtained access to data.[46] Such databases vary with respect to the geographic area covered, the type of information included (e.g., information about arrests, convictions, prison terms, or specialized information for a subset of employers such as information about workplace theft or shoplifting cases for retail employers[47]), the sources of information used (e.g., county databases, law enforcement agency records, sex offender registries), and the frequency with which they are updated. They also may be missing certain types of disposition information, such as updated convictions, sealing or expungement orders, or orders for entry into a diversion program.[48]

### B.     Employers' Use of Criminal History Information

In one survey, a total of 92% of responding employers stated that they subjected all or some of their job candidates to criminal background checks.[49] Employers have reported that their use of criminal history information is related to ongoing efforts to combat theft and fraud,[50] as well as heightened concerns about workplace violence[51] and potential liability for negligent hiring.[52] Employers also cite federal laws as well as state and local laws[53] as reasons for using criminal background checks.

### C.     The EEOC's Interest in Employers' Use of Criminal Records in Employment Screening

The EEOC enforces Title VII, which prohibits employment discrimination based on race, color, religion, sex, or national origin. Having a criminal record is not listed as a protected basis in Title VII. Therefore, whether a covered employer's reliance on a criminal record to deny employment violates Title VII depends on whether it is part of a claim of employment discrimination based on race, color, religion, sex, or national origin. Title VII liability for employment discrimination is determined using two analytic frameworks: "disparate treatment" and "disparate impact." Disparate treatment is discussed in Section IV and disparate impact is discussed in Section V.

## IV.     Disparate Treatment Discrimination and Criminal Records

A covered employer is liable for violating Title VII when the plaintiff demonstrates that it treated him differently because of his race, national origin, or another protected basis.[54] For example, there is Title VII disparate treatment liability where the evidence shows that a covered employer rejected an African American applicant based on his criminal record but hired a similarly situated White applicant with a comparable criminal record.[55]

> **Example 1: Disparate Treatment Based on Race.** John, who is White, and Robert, who is African American, are both recent graduates of State University. They have similar educational backgrounds, skills, and work experience. They each pled guilty to charges of possessing and

6

distributing marijuana as high school students, and neither of them had any subsequent contact with the criminal justice system.

After college, they both apply for employment with Office Jobs, Inc., which, after short intake interviews, obtains their consent to conduct a background check. Based on the outcome of the background check, which reveals their drug convictions, an Office Jobs, Inc., representative decides not to refer Robert for a follow-up interview. The representative remarked to a co-worker that Office Jobs, Inc., cannot afford to refer "these drug dealer types" to client companies. However, the same representative refers John for an interview, asserting that John's youth at the time of the conviction and his subsequent lack of contact with the criminal justice system make the conviction unimportant. Office Jobs, Inc., has treated John and Robert differently based on race, in violation of Title VII.

Title VII prohibits "not only decisions driven by racial [or ethnic] animosity, but also decisions infected by stereotyped thinking . . . ."[56] Thus, an employer's decision to reject a job applicant based on racial or ethnic stereotypes about criminality—rather than qualifications and suitability for the position—is unlawful disparate treatment that violates Title VII.[57]

**Example 2: Disparate Treatment Based on National Origin.** Tad, who is White, and Nelson, who is Latino, are both recent high school graduates with grade point averages above 4.0 and college plans. While Nelson has successfully worked full-time for a landscaping company during the summers, Tad only held occasional lawn-mowing and camp-counselor jobs. In an interview for a research job with Meaningful and Paid Internships, Inc. (MPII), Tad discloses that he pled guilty to a felony at age 16 for accessing his school's computer system over the course of several months without authorization and changing his classmates' grades. Nelson, in an interview with MPII, emphasizes his successful prior work experience, from which he has good references, but also discloses that, at age 16, he pled guilty to breaking and entering into his high school as part of a class prank that caused little damage to school property. Neither Tad nor Nelson had subsequent contact with the criminal justice system.

The hiring manager at MPII invites Tad for a second interview, despite his record of criminal conduct. However, the same hiring manager sends Nelson a rejection notice, saying to a colleague that Nelson is only qualified to do manual labor and, moreover, that he has a criminal record. In light of the evidence showing that Nelson's and Tad's educational backgrounds are similar, that Nelson's work experience is more extensive, and that Tad's criminal conduct is more indicative of untrustworthiness, MPII has failed to state a legitimate, nondiscriminatory reason for rejecting Nelson. If Nelson filed a Title VII charge alleging disparate treatment based on national origin and the EEOC's investigation

confirmed these facts, the EEOC would find reasonable cause to believe that discrimination occurred.

There are several kinds of evidence that may be used to establish that race, national origin, or other protected characteristics motivated an employer's use of criminal records in a selection decision, including, but not limited to:

- Biased statements.  Comments by the employer or decisionmaker that are derogatory with respect to the charging party's protected group, or that express group-related stereotypes about criminality, might be evidence that such biases affected the evaluation of the applicant's or employee's criminal record.

- Inconsistencies in the hiring process.  Evidence that the employer requested criminal history information more often for individuals with certain racial or ethnic backgrounds, or gave Whites but not racial minorities the opportunity to explain their criminal history, would support a showing of disparate treatment.

- Similarly situated comparators (individuals who are similar to the charging party in relevant respects, except for membership in the protected group).  Comparators may include people in similar positions, former employees, and people chosen for a position over the charging party.  The fact that a charging party was treated differently than individuals who are not in the charging party's protected group by, for example, being subjected to more or different criminal background checks or to different standards for evaluating criminal history, would be evidence of disparate treatment.

- Employment testing.  Matched-pair testing may reveal that candidates are being treated differently because of a protected status.[58]

- Statistical evidence.  Statistical analysis derived from an examination of the employer's applicant data, workforce data, and/or third party criminal background history data may help to determine if the employer counts criminal history information more heavily against members of a protected group.

## V.    Disparate Impact Discrimination and Criminal Records

A covered employer is liable for violating Title VII when the plaintiff demonstrates that the employer's neutral policy or practice has the effect of disproportionately screening out a Title VII-protected group and the employer fails to demonstrate that the policy or practice is job related for the position in question and consistent with business necessity.[59]

In its 1971 *Griggs v. Duke Power Company* decision, the Supreme Court first recognized that Title VII permits disparate impact claims.[60]  The *Griggs* Court explained that "[Title VII] proscribes . . . practices that are fair in form, but discriminatory in operation.  The touchstone is business necessity.  If an employment practice which operates to exclude [African Americans] cannot be shown to be related to job performance, the practice is prohibited."[61]  In 1991,

Congress amended Title VII to codify this analysis of discrimination and its burdens of proof.[62] Title VII, as amended, states:

> An unlawful employment practice based on disparate impact is established . . . if a complaining party demonstrates that an employer uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity. . . .[63]

With respect to criminal records, there is Title VII disparate impact liability where the evidence shows that a covered employer's criminal record screening policy or practice disproportionately screens out a Title VII-protected group and the employer does not demonstrate that the policy or practice is job related for the positions in question and consistent with business necessity.

### A.     Determining Disparate Impact of Policies or Practices that Screen Individuals Based on Records of Criminal Conduct

#### 1.     Identifying the Policy or Practice

The first step in disparate impact analysis is to identify the particular policy or practice that causes the unlawful disparate impact. For criminal conduct exclusions, relevant information includes the text of the policy or practice, associated documentation, and information about how the policy or practice was actually implemented. More specifically, such information also includes which offenses or classes of offenses were reported to the employer (e.g., all felonies, all drug offenses); whether convictions (including sealed and/or expunged convictions), arrests, charges, or other criminal incidents were reported; how far back in time the reports reached (e.g., the last five, ten, or twenty years); and the jobs for which the criminal background screening was conducted.[64] Training or guidance documents used by the employer also are relevant, because they may specify which types of criminal history information to gather for particular jobs, how to gather the data, and how to evaluate the information after it is obtained.

#### 2.     Determining Disparate Impact

Nationally, African Americans and Hispanics are arrested in numbers disproportionate to their representation in the general population. In 2010, 28% of all arrests were of African Americans,[65] even though African Americans only comprised approximately 14% of the general population.[66] In 2008, Hispanics were arrested for federal drug charges at a rate of approximately three times their proportion of the general population.[67] Moreover, African Americans and Hispanics were more likely than Whites to be arrested, convicted, or sentenced for drug offenses even though their rate of drug use is similar to the rate of drug use for Whites.[68]

African Americans and Hispanics also are incarcerated at rates disproportionate to their numbers in the general population. Based on national incarceration data, the U.S. Department of Justice estimated in 2001 that 1 out of every 17 White men (5.9% of the White men in the U.S.)

is expected to go to prison at some point during his lifetime, assuming that current incarceration rates remain unchanged.[69] This rate climbs to 1 in 6 (or 17.2%) for Hispanic men.[70] For African American men, the rate of expected incarceration rises to 1 in 3 (or 32.2%).[71] Based on a state-by-state examination of incarceration rates in 2005, African Americans were incarcerated at a rate 5.6 times higher than Whites,[72] and 7 states had a Black-to-White ratio of incarceration that was 10 to1.[73] In 2010, Black men had an imprisonment rate that was nearly 7 times higher than White men and almost 3 times higher than Hispanic men.[74]

National data, such as that cited above, supports a finding that criminal record exclusions have a disparate impact based on race and national origin. The national data provides a basis for the Commission to further investigate such Title VII disparate impact charges. During an EEOC investigation, the employer also has an opportunity to show, with relevant evidence, that its employment policy or practice does not cause a disparate impact on the protected group(s). For example, an employer may present regional or local data showing that African American and/or Hispanic men are not arrested or convicted at disproportionately higher rates in the employer's particular geographic area. An employer also may use its own applicant data to demonstrate that its policy or practice did not cause a disparate impact. The Commission will assess relevant evidence when making a determination of disparate impact, including applicant flow information maintained pursuant to the Uniform Guidelines on Employee Selection Procedures,[75] workforce data, criminal history background check data, demographic availability statistics, incarceration/conviction data, and/or relevant labor market statistics.[76]

An employer's evidence of a racially balanced workforce will not be enough to disprove disparate impact. In *Connecticut v. Teal*, the Supreme Court held that a "bottom line" racial balance in the workforce does not preclude employees from establishing a prima facie case of disparate impact; nor does it provide employers with a defense.[77] The issue is whether the policy or practice deprives a disproportionate number of Title VII-protected individuals of employment opportunities.[78]

Finally, in determining disparate impact, the Commission will assess the probative value of an employer's applicant data. As the Supreme Court stated in *Dothard v. Rawlinson*, an employer's "application process might itself not adequately reflect the actual potential applicant pool since otherwise qualified people might be discouraged from applying" because of an alleged discriminatory policy or practice.[79] Therefore, the Commission will closely consider whether an employer has a reputation in the community for excluding individuals with criminal records. Relevant evidence may come from ex-offender employment programs, individual testimony, employer statements, evidence of employer recruitment practices, or publicly posted notices, among other sources.[80] The Commission will determine the persuasiveness of such evidence on a case-by-case basis.

**B.    Job Related For the Position in Question and Consistent with Business Necessity**

**1.    Generally**

After the plaintiff in litigation establishes disparate impact, Title VII shifts the burdens of

production and persuasion to the employer to "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity."[81]  In the legislative history of the 1991 Civil Rights Act, Congress referred to *Griggs* and its progeny such as *Albemarle Paper Company v. Moody*[82] and *Dothard*[83] to explain how this standard should be construed.[84]  The *Griggs* Court stated that the employer's burden was to show that the policy or practice is one that "bear[s] a demonstrable relationship to successful performance of the jobs for which it was used" and "measures the person for the job and not the person in the abstract."[85]  In both *Albemarle*[86] and *Dothard*,[87] the Court emphasized the factual nature of the business necessity inquiry.  The Court further stated in *Dothard* that the terms of the exclusionary policy must "be shown to be necessary to safe and efficient job performance."[88]

In a case involving a criminal record exclusion, the Eighth Circuit in its 1975 *Green v. Missouri Pacific Railroad* decision, held that it was discriminatory under Title VII for an employer to "follow[] the policy of disqualifying for employment any applicant with a conviction for any crime other than a minor traffic offense."[89]  The Eighth Circuit identified three factors (the "*Green* factors") that were relevant to assessing whether an exclusion is job related for the position in question and consistent with business necessity:

- The nature and gravity of the offense or conduct;[90]
- The time that has passed since the offense or conduct and/or completion of the sentence;[91] and
- The nature of the job held or sought.[92]

In 2007, the Third Circuit in *El v. Southeastern Pennsylvania Transportation Authority*[93] developed the statutory analysis in greater depth.  Douglas El challenged SEPTA's policy of excluding everyone ever convicted of a violent crime from the job of paratransit driver.[94]  El, a 55 year-old African American paratransit driver-trainee, was terminated from employment when SEPTA learned of his conviction for second-degree murder 40 years earlier; the conviction involved a gang fight when he was 15 years old and was his only disqualifying offense under SEPTA's policy.[95]  The Third Circuit expressed "reservations" about a policy such as SEPTA's (exclusion for all violent crimes, no matter how long ago they were committed) "in the abstract."[96]

Applying Supreme Court precedent, the *El* court observed that some level of risk is inevitable in all hiring, and that, "[i]n a broad sense, hiring policies . . . ultimately concern the management of risk."[97]  Recognizing that assessing such risk is at the heart of criminal record exclusions, the Third Circuit concluded that Title VII requires employers to justify criminal record exclusions by demonstrating that they "accurately distinguish between applicants [who] pose an unacceptable level of risk and those [who] do not."[98]

The Third Circuit affirmed summary judgment for SEPTA, but stated that the outcome of the case might have been different if Mr. El had, "for example, hired an expert who testified that there is a time at which a former criminal is no longer any more likely to recidivate than the average person, . . . [so] there would be a factual question for the jury to resolve."[99]  The Third Circuit reasoned, however, that the recidivism evidence presented by SEPTA's experts, in

conjunction with the nature of the position at issue—paratransit driver-trainee with unsupervised access to vulnerable adults—required the employer to exercise the utmost care.[100]

In the subsections below, the Commission discusses considerations that are relevant to assessing whether criminal record exclusion policies or practices are job related and consistent with business necessity.  First, we emphasize that arrests and convictions are treated differently.

###     2.     Arrests

The fact of an arrest does not establish that criminal conduct has occurred.[101]  Arrests are not proof of criminal conduct.  Many arrests do not result in criminal charges, or the charges are dismissed.[102]  Even if an individual is charged and subsequently prosecuted, he is presumed innocent unless proven guilty.[103]

An arrest, however, may in some circumstances trigger an inquiry into whether the conduct underlying the arrest justifies an adverse employment action.  Title VII calls for a fact-based analysis to determine if an exclusionary policy or practice is job related and consistent with business necessity.  Therefore, an exclusion based on an arrest, in itself, is not job related and consistent with business necessity.

Another reason for employers not to rely on arrest records is that they may not report the final disposition of the arrest (e.g., not prosecuted, convicted, or acquitted).  As documented in Section III.A., *supra*, the DOJ/BJS reported that many arrest records in the FBI's III database and state criminal record repositories are not associated with final dispositions.[104]  Arrest records also may include inaccuracies or may continue to be reported even if expunged or sealed.[105]

> **Example 3: Arrest Record Is Not Grounds for Exclusion.**  Mervin and Karen, a middle-aged African American couple, are driving to church in a predominantly white town.  An officer stops them and interrogates them about their destination.  When Mervin becomes annoyed and comments that his offense is simply "driving while Black," the officer arrests him for disorderly conduct.  The prosecutor decides not to file charges against Mervin, but the arrest remains in the police department's database and is reported in a background check when Mervin applies with his employer of fifteen years for a promotion to an executive position.  The employer's practice is to deny such promotions to individuals with arrest records, even without a conviction, because it views an arrest record as an indicator of untrustworthiness and irresponsibility.  If Mervin filed a Title VII charge based on these facts, and disparate impact based on race were established, the EEOC would find reasonable cause to believe that his employer violated Title VII.

Although an arrest record standing alone may not be used to deny an employment opportunity, an employer may make an employment decision based on the conduct underlying the arrest if the conduct makes the individual unfit for the position in question.  The conduct, not the arrest, is relevant for employment purposes.

**Example 4: Employer's Inquiry into Conduct Underlying Arrest**. Andrew, a Latino man, worked as an assistant principal in Elementary School for several years. After several ten and eleven-year-old girls attending the school accused him of touching them inappropriately on the chest, Andrew was arrested and charged with several counts of endangering the welfare of children and sexual abuse. Elementary School has a policy that requires suspension or termination of any employee who the school believes engaged in conduct that impacts the health or safety of the students. After learning of the accusations, the school immediately places Andrew on unpaid administrative leave pending an investigation. In the course of its investigation, the school provides Andrew a chance to explain the events and circumstances that led to his arrest. Andrew denies the allegations, saying that he may have brushed up against the girls in the crowded hallways or lunchroom, but that he doesn't really remember the incidents and does not have regular contact with any of the girls. The school also talks with the girls, and several of them recount touching in crowded situations. The school does not find Andrew's explanation credible. Based on Andrew's conduct, the school terminates his employment pursuant to its policy.

Andrew challenges the policy as discriminatory under Title VII. He asserts that it has a disparate impact based on national origin and that his employer may not suspend or terminate him based solely on an arrest without a conviction because he is innocent until proven guilty. After confirming that an arrest policy would have a disparate impact based on national origin, the EEOC concludes that no discrimination occurred. The school's policy is linked to conduct that is relevant to the particular jobs at issue, and the exclusion is made based on descriptions of the underlying conduct, not the fact of the arrest. The Commission finds no reasonable cause to believe Title VII was violated.

### 3.    Convictions

By contrast, a record of a conviction will usually serve as sufficient evidence that a person engaged in particular conduct, given the procedural safeguards associated with trials and guilty pleas.[106] However, there may be evidence of an error in the record, an outdated record, or another reason for not relying on the evidence of a conviction. For example, a database may continue to report a conviction that was later expunged, or may continue to report as a felony an offense that was subsequently downgraded to a misdemeanor.[107]

Some states require employers to wait until late in the selection process to ask about convictions.[108] The policy rationale is that an employer is more likely to objectively assess the relevance of an applicant's conviction if it becomes known when the employer is already knowledgeable about the applicant's qualifications and experience.[109] As a best practice, and consistent with applicable laws,[110] the Commission recommends that employers not ask about

13

convictions on job applications and that, if and when they make such inquiries, the inquiries be limited to convictions for which exclusion would be job related for the position in question and consistent with business necessity.

### 4. Determining Whether a Criminal Conduct Exclusion Is Job Related and Consistent with Business Necessity

To establish that a criminal conduct exclusion that has a disparate impact is job related and consistent with business necessity under Title VII, the employer needs to show that the policy operates to effectively link specific criminal conduct, and its dangers, with the risks inherent in the duties of a particular position.

Two circumstances in which the Commission believes employers will consistently meet the "job related and consistent with business necessity" defense are as follows:

- o  The employer validates the criminal conduct screen for the position in question per the Uniform Guidelines on Employee Selection Procedures (Uniform Guidelines) standards (if data about criminal conduct as related to subsequent work performance is available and such validation is possible);[111] or

- o  The employer develops a targeted screen considering at least the nature of the crime, the time elapsed, and the nature of the job (the three *Green* factors), and then provides an opportunity for an individualized assessment for people excluded by the screen to determine whether the policy as applied is job related and consistent with business necessity.

The individualized assessment would consist of notice to the individual that he has been screened out because of a criminal conviction; an opportunity for the individual to demonstrate that the exclusion should not be applied due to his particular circumstances; and consideration by the employer as to whether the additional information provided by the individual warrants an exception to the exclusion and shows that the policy as applied is not job related and consistent with business necessity.  *See* Section V.B.9, *infra* (examples of relevant considerations in individualized assessments).

Depending on the facts and circumstances, an employer may be able to justify a targeted criminal records screen solely under the *Green* factors.  Such a screen would need to be narrowly tailored to identify criminal conduct with a demonstrably tight nexus to the position in question. Title VII thus does not necessarily require individualized assessment in all circumstances. However, the use of individualized assessments can help employers avoid Title VII liability by allowing them to consider more complete information on individual applicants or employees, as part of a policy that is job related and consistent with business necessity.

### 5. Validation

The Uniform Guidelines describe three different approaches to validating employment screens.[112]  However, they recognize that "[t]here are circumstances in which a user cannot or

need not utilize" formal validation techniques and that in such circumstances an employer "should utilize selection procedures which are as job related as possible and which will minimize or eliminate adverse impact as set forth [in the following subsections]."[113]  Although there may be social science studies that assess whether convictions are linked to future behaviors, traits, or conduct with workplace ramifications,[114] and thereby provide a framework for validating some employment exclusions, such studies are rare at the time of this drafting.

### 6.    Detailed Discussion of the *Green* Factors and Criminal Conduct Screens

Absent a validation study that meets the Uniform Guidelines' standards, the *Green* factors provide the starting point for analyzing how specific criminal conduct may be linked to particular positions.  The three *Green* factors are:

- The nature and gravity of the offense or conduct;
- The time that has passed since the offense, conduct and/or completion of the sentence; and
- The nature of the job held or sought.

#### a.    The Nature and Gravity of the Offense or Conduct

Careful consideration of the nature and gravity of the offense or conduct is the first step in determining whether a specific crime may be relevant to concerns about risks in a particular position.  The nature of the offense or conduct may be assessed with reference to the harm caused by the crime (e.g., theft causes property loss).  The legal elements of a crime also may be instructive.  For example, a conviction for felony theft may involve deception, threat, or intimidation.[115]  With respect to the gravity of the crime, offenses identified as misdemeanors may be less severe than those identified as felonies.

#### b.    The Time that Has Passed Since the Offense, Conduct and/or Completion of the Sentence

Employer policies typically specify the duration of a criminal conduct exclusion.  While the *Green* court did not endorse a specific timeframe for criminal conduct exclusions, it did acknowledge that permanent exclusions from all employment based on any and all offenses were not consistent with the business necessity standard.[116]  Subsequently, in *El*, the court noted that the plaintiff might have survived summary judgment if he had presented evidence that "there is a time at which a former criminal is no longer any more likely to recidivate than the average person . . . ."[117]  Thus, the court recognized that the amount of time that had passed since the plaintiff's criminal conduct occurred was probative of the risk he posed in the position in question.

Whether the duration of an exclusion will be sufficiently tailored to satisfy the business necessity standard will depend on the particular facts and circumstances of each case.  Relevant and available information to make this assessment includes, for example, studies demonstrating how much the risk of recidivism declines over a specified time.[118]

### c.    The Nature of the Job Held or Sought

Finally, it is important to identify the particular job(s) subject to the exclusion.  While a factual inquiry may begin with identifying the job title, it also encompasses the nature of the job's duties (e.g., data entry, lifting boxes), identification of the job's essential functions, the circumstances under which the job is performed (e.g., the level of supervision, oversight, and interaction with co-workers or vulnerable individuals), and the environment in which the job's duties are performed (e.g., out of doors, in a warehouse, in a private home).  Linking the criminal conduct to the essential functions of the position in question may assist an employer in demonstrating that its policy or practice is job related and consistent with business necessity because it "bear[s] a demonstrable relationship to successful performance of the jobs for which it was used."[119]

### 7.    Examples of Criminal Conduct Exclusions that Do Not Consider the *Green* Factors

A policy or practice requiring an automatic, across-the-board exclusion from all employment opportunities because of any criminal conduct is inconsistent with the *Green* factors because it does not focus on the dangers of particular crimes and the risks in particular positions.  As the court recognized in *Green*, "[w]e cannot conceive of any business necessity that would automatically place every individual convicted of any offense, except a minor traffic offense, in the permanent ranks of the unemployed."[120]

> **Example 5:    Exclusion Is Not Job Related and Consistent with Business Necessity.**  The National Equipment Rental Company uses the Internet to accept job applications for all positions.  All applicants must answer certain questions before they are permitted to submit their online application, including "have you ever been convicted of a crime?"  If the applicant answers "yes," the online application process automatically terminates, and the applicant sees a screen that simply says "Thank you for your interest.  We cannot continue to process your application at this time."
>
> The Company does not have a record of the reasons why it adopted this exclusion, and it does not have information to show that convictions for all offenses render all applicants unacceptable risks in all of its jobs, which range from warehouse work, to delivery, to management positions.  If a Title VII charge were filed based on these facts, and there was a disparate impact on a Title VII-protected basis, the EEOC would find reasonable cause to believe that the blanket exclusion was not job related and consistent with business necessity because the risks associated with all convictions are not pertinent to all of the Company's jobs.
>
> **Example 6:    Exclusion Is Not Job Related and Consistent with Business Necessity.**  Leo, an African American man, has worked

16

successfully at PR Agency as an account executive for three years. After a change of ownership, the new owners adopt a policy under which it will not employ anyone with a conviction. The policy does not allow for any individualized assessment before exclusion. The new owners, who are highly respected in the industry, pride themselves on employing only the "best of the best" for every position. The owners assert that a quality workforce is a key driver of profitability.

Twenty years earlier, as a teenager, Leo pled guilty to a misdemeanor assault charge. During the intervening twenty years, Leo graduated from college and worked successfully in advertising and public relations without further contact with the criminal justice system. At PR Agency, all of Leo's supervisors assessed him as a talented, reliable, and trustworthy employee, and he has never posed a risk to people or property at work. However, once the new ownership of PR Agency learns about Leo's conviction record through a background check, it terminates his employment. It refuses to reconsider its decision despite Leo's positive employment history at PR Agency.

Leo files a Title VII charge alleging that PR Agency's conviction policy has a disparate impact based on race and is not job related for the position in question and consistent with business necessity. After confirming disparate impact, the EEOC considers PR Agency's defense that it employs only the "best of the best" for every position, and that this necessitates excluding everyone with a conviction. PR Agency does not show that all convictions are indicative of risk or danger in all its jobs for all time, under the *Green* factors. Nor does PR Agency provide any factual support for its assertion that having a conviction is necessarily indicative of poor work or a lack of professionalism. The EEOC concludes that there is reasonable cause to believe that the Agency's policy is not job related for the position in question and consistent with business necessity. [121]

### 8.    Targeted Exclusions that Are Guided by the *Green* Factors

An employer policy or practice of excluding individuals from particular positions for specified criminal conduct within a defined time period, as guided by the *Green* factors, is a targeted exclusion. Targeted exclusions are tailored to the rationale for their adoption, in light of the particular criminal conduct and jobs involved, taking into consideration fact-based evidence, legal requirements, and/or relevant and available studies.

As discussed above in Section V.B.4, depending on the facts and circumstances, an employer may be able to justify a targeted criminal records screen solely under the *Green* factors.  Such a screen would need to be narrowly tailored to identify criminal conduct with a demonstrably tight nexus to the position in question.  Title VII thus does not necessarily require individualized assessment in all circumstances.  However, the use of individualized assessments can help employers avoid Title VII liability by allowing them to consider more complete information on individual applicants or employees, as part of a policy that is job related and consistent with business necessity.

### 9.     Individualized Assessment

Individualized assessment generally means that an employer informs the individual that he may be excluded because of past criminal conduct; provides an opportunity to the individual to demonstrate that the exclusion does not properly apply to him; and considers whether the individual's additional information shows that the policy as applied is not job related and consistent with business necessity.

The individual's showing may include information that he was not correctly identified in the criminal record, or that the record is otherwise inaccurate.  Other relevant individualized evidence includes, for example:

- The facts or circumstances surrounding the offense or conduct;
- The number of offenses for which the individual was convicted;
- Older age at the time of conviction, or release from prison;[122]
- Evidence that the individual performed the same type of work, post conviction, with the same or a different employer, with no known incidents of criminal conduct;
- The length and consistency of employment history before and after the offense or conduct;[123]
- Rehabilitation efforts, e.g., education/training;[124]
- Employment or character references and any other information regarding fitness for the particular position;[125] and
- Whether the individual is bonded under a federal, state, or local bonding program.[126]

If the individual does not respond to the employer's attempt to gather additional information about his background, the employer may make its employment decision without the information.

> **Example 7:  Targeted Screen with Individualized Assessment Is Job Related and Consistent with Business Necessity.**  County Community Center rents meeting rooms to civic organizations and small businesses, party rooms to families and social groups, and athletic facilities to local recreational sports leagues.  The County has a targeted rule prohibiting anyone with a conviction for theft crimes (e.g., burglary, robbery, larceny, identity theft) from working in a position with access to personal financial

information for at least four years after the conviction or release from incarceration. This rule was adopted by the County's Human Resources Department based on data from the County Corrections Department, national criminal data, and recent recidivism research for theft crimes. The Community Center also offers an opportunity for individuals identified for exclusion to provide information showing that the exclusion should not be applied to them.

Isaac, who is Hispanic, applies to the Community Center for a full-time position as an administrative assistant, which involves accepting credit card payments for room rentals, in addition to having unsupervised access to the personal belongings of people using the facilities. After conducting a background check, the County learns that Isaac pled guilty eighteen months earlier, at age twenty, to credit card fraud, and that he did not serve time in prison. Isaac confirms these facts, provides a reference from the restaurant where he now works on Saturday nights, and asks the County for a "second chance" to show that he is trustworthy. The County tells Isaac that it is still rejecting his employment application because his criminal conduct occurred eighteen months ago and is directly pertinent to the job in question. The information he provided did nothing to dispel the County's concerns.

Isaac challenges this rejection under Title VII, alleging that the policy has a disparate impact on Hispanics and is not job related and consistent with business necessity. After confirming disparate impact, the EEOC finds that this screen was carefully tailored to assess unacceptable risk in relevant positions, for a limited time period, consistent with the evidence, and that the policy avoided overbroad exclusions by allowing individuals an opportunity to explain special circumstances regarding their criminal conduct. Thus, even though the policy has a disparate impact on Hispanics, the EEOC does not find reasonable cause to believe that discrimination occurred because the policy is job related and consistent with business necessity. [127]

**Example 8: Targeted Exclusion Without Individualized Assessment Is Not Job Related and Consistent with Business Necessity.** "Shred 4 You" employs over 100 people to pick up discarded files and sensitive materials from offices, transport the materials to a secure facility, and shred and recycle them. The owner of "Shred 4 You" sells the company to a competitor, known as "We Shred." Employees of "Shred 4 You" must reapply for employment with "We Shred" and undergo a background check. "We Shred" has a targeted criminal conduct exclusion policy that prohibits the employment of anyone who has been convicted of any crime related to theft or fraud in the past five years, and the policy does not provide for any individualized consideration. The company explains that its clients entrust it with handling sensitive and confidential information

19

and materials; therefore, it cannot risk employing people who pose an above-average risk of stealing information.

Jamie, who is African American, worked successfully for "Shred 4 You" for five years before the company changed ownership. Jamie applies for his old job, and "We Shred" reviews Jamie's performance appraisals, which include high marks for his reliability, trustworthiness, and honesty. However, when "We Shred" does a background check, it finds that Jamie pled guilty to misdemeanor insurance fraud five years ago, because he exaggerated the costs of several home repairs after a winter storm. "We Shred" management informs Jamie that his guilty plea is evidence of criminal conduct and that his employment will be terminated. Jamie asks management to consider his reliable and honest performance in the same job at "Shred 4 You," but "We Shred" refuses to do so. The employer's conclusion that Jamie's guilty plea demonstrates that he poses an elevated risk of dishonesty is not factually based given Jamie's history of trustworthiness in the same job. After confirming disparate impact based on race (African American), the EEOC finds reasonable cause to believe that Title VII was violated because the targeted exclusion was not job related and consistent with business necessity based on these facts.

C.      **Less Discriminatory Alternatives**

If an employer successfully demonstrates that its policy or practice is job related for the position in question and consistent with business necessity, a Title VII plaintiff may still prevail by demonstrating that there is a less discriminatory "alternative employment practice" that serves the employer's legitimate goals as effectively as the challenged practice but that the employer refused to adopt.[128]

VI.     **Positions Subject to Federal Prohibitions or Restrictions on Individuals with Records of Certain Criminal Conduct**

In some industries, employers are subject to federal statutory and/or regulatory requirements that prohibit individuals with certain criminal records from holding particular positions or engaging in certain occupations. Compliance with federal laws and/or regulations is a defense to a charge of discrimination. However, the EEOC will continue to coordinate with other federal departments and agencies with the goal of maximizing federal regulatory consistency with respect to the use of criminal history information in employment decisions.[129]

A.      **Hiring in Certain Industries**

Federal laws and regulations govern the employment of individuals with specific convictions in certain industries or positions in both the private and public sectors. For example, federal law excludes an individual who was convicted in the previous ten years of specified crimes from working as a security screener or otherwise having unescorted access to the secure areas of an airport.[130]   There are equivalent requirements for federal law enforcement officers,[131]

child care workers in federal agencies or facilities,[132] bank employees, [133] and port workers,[134] among other positions.[135]    Title VII does not preempt these federally imposed restrictions. However, if an employer decides to impose an exclusion that goes beyond the scope of a federally imposed restriction, the discretionary aspect of the policy would be subject to Title VII analysis.

> **Example 9: Exclusion Is Not Job Related and Consistent with Business Necessity.**  Your Bank has a rule prohibiting anyone with convictions for any type of financial or fraud-related crimes within the last twenty years from working in positions with access to customer financial information, even though the federal ban is ten years for individuals who are convicted of any criminal offense involving dishonesty, breach of trust, or money laundering from serving in such positions.
>
> Sam, who is Latino, applies to Your Bank to work as a customer service representative.  A background check reveals that Sam was convicted of a misdemeanor for misrepresenting his income on a loan application fifteen years earlier.  Your Bank therefore rejects Sam, and he files a Title VII charge with the EEOC, alleging that the Bank's policy has a disparate impact based on national origin and is not job related and consistent with business necessity.  Your Bank asserts that its policy does not cause a disparate impact and that, even if it does, it is job related for the position in question because customer service representatives have regular access to financial information and depositors must have "100% confidence" that their funds are safe.  However, Your Bank does not offer evidence showing that there is an elevated likelihood of committing financial crimes for someone who has been crime-free for more than ten years.  After establishing that the Bank's policy has a disparate impact based on national origin, the EEOC finds that the policy is not job related for the position in question and consistent with business necessity.  The Bank's justification for adding ten years to the federally mandated exclusion is insufficient because it is only a generalized concern about security, without proof.

### B.    Obtaining Occupational Licenses

Title VII also does not preempt federal statutes and regulations that govern eligibility for occupational licenses and registrations.  These restrictions cover diverse sectors of the economy including the transportation industry,[136]  the financial industry,[137] and import/export activities,[138] among others.[139]

### C.    Waiving or Appealing Federally Imposed Occupational Restrictions

Several federal statutes and regulations provide a mechanism for employers or individuals to appeal or apply for waivers of federally imposed occupational restrictions.  For example, unless a bank receives prior written consent from the Federal Deposit Insurance

Corporation (FDIC), an individual convicted of a criminal offense involving dishonesty, breach of trust, money laundering, or another financially related crime may not work in, own, or control "an insured depository institution" (e.g., bank) for ten years under the Federal Deposit Insurance Act.[140]  To obtain such FDIC consent, the insured institution must file an application for a waiver on behalf of the particular individual.[141]  Alternatively, if the insured institution does not apply for the waiver on the individual's behalf, the individual may file a request directly with the FDIC for a waiver of the institution filing requirement, demonstrating "substantial good cause" to grant the waiver.[142]  If the FDIC grants the individual's waiver request, the individual can then file an application directly with the FDIC for consent to work for the insured institution in question.[143]  Once the institution, or the individual, submits the application, the FDIC's criminal record waiver review process requires consideration of mitigating factors that are consistent with Title VII, including evidence of rehabilitation, and the nature and circumstances of the crime.[144]

Additionally, port workers who are denied the Transportation Workers Identification Credential (TWIC) based on their conviction record may seek a waiver for certain permanently disqualifying offenses or interim disqualifying offenses, and also may file an individualized appeal from the Transportation Security Administration's initial determination of threat assessment based on the conviction.[145]  The Maritime Transportation Security Act, which requires all port workers to undergo a criminal background check to obtain a TWIC,[146] provides that individuals with convictions for offenses such as espionage, treason, murder, and a federal crime of terrorism are permanently disqualified from obtaining credentials, but those with convictions for firearms violations and distribution of controlled substances may be temporarily disqualified.[147]  Most offenses related to dishonesty are only temporarily disqualifying.[148]

> **Example 10: Consideration of Federally Imposed Occupational Restrictions.**  John Doe applies for a position as a truck driver for Truckers USA.  John's duties will involve transporting cargo to, from, and around ports, and Truckers USA requires all of its port truck drivers to have a TWIC.  The Transportation Security Administration (TSA) conducts a criminal background check and may deny the credential to applicants who have permanently disqualifying criminal offenses in their background as defined by federal law.  After conducting the background check for John Doe, TSA discovers that he was convicted nine years earlier for conspiracy to use weapons of mass destruction.  TSA denies John a security card because this is a permanently disqualifying criminal offense under federal law.[149]  John, who points out that he was a minor at the time of the conviction, requests a waiver by TSA because he had limited involvement and no direct knowledge of the underlying crime at the time of the offense.  John explains that he helped a friend transport some chemical materials that the friend later tried to use to damage government property.  TSA refuses to grant John's waiver request because a conviction for conspiracy to use weapons of mass destruction is not subject to the TSA's waiver procedures.[150]  Based on this denial, Truckers USA rejects John's application for the port truck driver position.  Title VII does not override Truckers USA's policy because the policy is consistent with another federal law.

While Title VII does not mandate that an employer seek such waivers, where an employer does seek waivers it must do so in a nondiscriminatory manner.

### D.     Security Clearances

The existence of a criminal record may result in the denial of a federal security clearance, which is a prerequisite for a variety of positions with the federal government and federal government contractors.[151]   A federal security clearance is used to ensure employees' trustworthiness, reliability, and loyalty before providing them with access to sensitive national security information.[152]   Under Title VII's national security exception, it is not unlawful for an employer to "fail or refuse to hire and employ" an individual because "such individual has not fulfilled or has ceased to fulfill" the federal security requirements.[153]   This exception focuses on whether the position in question is, in fact, subject to national security requirements that are imposed by federal statute or Executive Order, and whether the adverse employment action actually resulted from the denial or revocation of a security clearance.[154]   Procedural requirements related to security clearances must be followed without regard to an individual's race, color, religion, sex, or national origin.[155]

### E.     Working for the Federal Government

Title VII provides that, with limited coverage exceptions, "[a]ll personnel actions affecting employees or applicants for employment . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."[156]   The principles discussed above in this Guidance apply in the federal employment context.   In most circumstances, individuals with criminal records are not automatically barred from working for the federal government.[157]   However, the federal government imposes criminal record restrictions on its workforce through "suitability" requirements for certain positions.[158]   The federal government's Office of Personnel Management (OPM) defines suitability as "determinations based on a person's character or conduct that may have an impact on the integrity or efficiency of the service."[159]   Under OPM's rules, agencies may bar individuals from federal employment for up to three years if they are found unsuitable based on criminal or dishonest conduct, among other factors.[160]   OPM gives federal agencies the discretion to consider relevant mitigating criteria when deciding whether an individual is suitable for a federal position.[161]   These mitigating criteria, which are consistent with the three *Green* factors and also provide an individualized assessment of the applicant's background, allow consideration of: (1) the nature of the position for which the person is applying or in which the person is employed; (2) the nature and seriousness of the conduct; (3) the circumstances surrounding the conduct; (4) the recency of the conduct; (5) the age of the person involved at the time of the conduct; (6) contributing societal conditions; and (7) the absence or presence of rehabilitation or efforts toward rehabilitation.[162] In general, OPM requires federal agencies and departments to consider hiring an individual with a criminal record if he is the best candidate for the position in question and can comply with relevant job requirements.[163]   The EEOC continues to coordinate with OPM to achieve employer best practices in the federal sector.[164]

23

**VII.    Positions Subject to State and Local Prohibitions or Restrictions on Individuals with Records of Certain Criminal Conduct**

States and local jurisdictions also have laws and/or regulations that restrict or prohibit the employment of individuals with records of certain criminal conduct.[165]  Unlike federal laws or regulations, however, state and local laws or regulations are preempted by Title VII if they "purport[] to require or permit the doing of any act which would be an unlawful employment practice" under Title VII.[166]  Therefore, if an employer's exclusionary policy or practice is *not* job related and consistent with business necessity, the fact that it was adopted to comply with a state or local law or regulation does not shield the employer from Title VII liability.[167]

> **Example 11:  State Law Exclusion Is Job Related and Consistent with Business Necessity.**  Elijah, who is African American, applies for a position as an office assistant at Pre-School, which is in a state that imposes criminal record restrictions on school employees.  Pre-School, which employs twenty-five full- and part-time employees, uses all of its workers to help with the children.  Pre-School performs a background check and learns that Elijah pled guilty to charges of indecent exposure two years ago.  After being rejected for the position because of his conviction, Elijah files a Title VII disparate impact charge based on race to challenge Pre-School's policy.  The EEOC conducts an investigation and finds that the policy has a disparate impact and that the exclusion is job related for the position in question and consistent with business necessity because it addresses serious safety risks of employment in a position involving regular contact with children.  As a result, the EEOC would not find reasonable cause to believe that discrimination occurred.

> **Example 12: State Law Exclusion Is Not Consistent with Title VII.**  County Y enforces a law that prohibits all individuals with a criminal conviction from working for it.  Chris, an African American man, was convicted of felony welfare fraud fifteen years ago, and has not had subsequent contact with the criminal justice system.  Chris applies to County Y for a job as an animal control officer trainee, a position that involves learning how to respond to citizen complaints and handle animals.  The County rejects Chris's application as soon as it learns that he has a felony conviction. Chris files a Title VII charge, and the EEOC investigates, finding disparate impact based on race and also that the exclusionary policy is not job related and consistent with business necessity.  The County cannot justify rejecting everyone with any conviction from all jobs.  Based on these facts, County Y's law "purports to require or permit the doing of an[] act which would be an unlawful employment practice" under Title VII.

## VIII.   Employer Best Practices

The following are examples of best practices for employers who are considering criminal record information when making employment decisions.

*General*

- Eliminate policies or practices that exclude people from employment based on any criminal record.

- Train managers, hiring officials, and decisionmakers about Title VII and its prohibition on employment discrimination.

*Developing a Policy*

- Develop a narrowly tailored written policy and procedure for screening applicants and employees for criminal conduct.

  - Identify essential job requirements and the actual circumstances under which the jobs are performed.

  - Determine the specific offenses that may demonstrate unfitness for performing such jobs.

    o Identify the criminal offenses based on all available evidence.

  - Determine the duration of exclusions for criminal conduct based on all available evidence.

    o Include an individualized assessment.

  - Record the justification for the policy and procedures.

  - Note and keep a record of consultations and research considered in crafting the policy and procedures.

- Train managers, hiring officials, and decisionmakers on how to implement the policy and procedures consistent with Title VII.

*Questions about Criminal Records*

- When asking questions about criminal records, limit inquiries to records for which exclusion would be job related for the position in question and consistent with business necessity.

25

*Confidentiality*

- Keep information about applicants' and employees' criminal records confidential.  Only use it for the purpose for which it was intended.

Approved by the Commission:

_____        _____

Chair Jacqueline A. Berrien                            Date

26

## ENDNOTES

[1]     42 U.S.C. § 2000e *et seq.*  The EEOC also enforces other anti-discrimination laws including: Title I of the Americans with Disabilities Act of 1990, as amended (ADA),  and Section 501 of the Rehabilitation Act, as amended, which prohibit employment discrimination on the basis of disability; the Age Discrimination in Employment Act of 1967, as amended (ADEA), which prohibits discrimination on the basis of age 40 or above; Title II of the Genetic Information Nondiscrimination Act of 2008 (GINA), which prohibits discrimination on the basis of genetic information; and the Equal Pay Act of 1963, as amended (EPA), which requires employers to pay male and female employees at the same establishment equal wages for equal work.

[2]     All entities covered by Title VII are subject to this analysis.  *See* 42 U.S.C. § 2000e-2 (anti-discrimination provisions); 42 U.S.C. § 2000e(b)–(e) (defining "employer," "employment agency," and "labor organization"); 42 U.S.C. § 2000e-16(a) (prohibiting discriminatory employment practices by federal departments and agencies).  For purposes of this Guidance, the term "employer" is used in lieu of listing all Title VII-covered entities.  The Commission considers other coverage questions that arise in particular charges involving, for example, joint employment or third party interference in *Compliance Manual Section 2: Threshold Issues,* U.S. EQUAL EMP'T OPPORTUNITY COMM'N, § 2-III B., *Covered Entities,* http://www.eeoc.gov/policy/docs/threshold.html#2-III-B (last visited April 23, 2012).

[3]     For the purposes of this Guidance, references to "contact" with the criminal justice system may include, for example, an arrest, charge, indictment, citation, conviction, incarceration, probation, or parole.

[4]     *See* THOMAS P. BONCZAR, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, PREVALENCE OF IMPRISONMENT IN THE U.S. POPULATION, 1974–2001, at 3 (2003), http://bjs.ojp.usdoj.gov/content/pub/pdf/piusp01.pdf [hereinafter PREVALENCE OF IMPRISONMENT] ("Between 1974 and 2001 the number of former prisoners living in the United States more than doubled, from 1,603,000 to 4,299,000."); SEAN ROSENMERKEL ET AL., BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, FELONY SENTENCES IN STATE COURTS, 2006 – STATISTICAL TABLES 1 (2009), http://bjs.ojp.usdoj.gov/content/pub/pdf/fssc06st.pdf (reporting that between 1990 and 2006, there has been a 37% increase in the number of felony offenders sentenced in state courts); *see also* PEW CTR. ON THE STATES, ONE IN 31: THE LONG REACH OF AMERICAN CORRECTIONS 4 (2009), http://www.pewcenteronthestates.org/uploadedFiles/PSPP_1in31_report_FINAL_WEB_3-26-09.pdf [hereinafter ONE IN 31] ("During the past quarter-century, the number of prison and jail inmates has grown by 274 percent . . . .[bringing] the total population in custody to 2.3 million.  During the same period, the number under community supervision grew by a staggering 3,535,660 to a total of 5.1 million."); PEW CTR. ON THE STATES, ONE IN 100: BEHIND BARS IN AMERICA 2008, at 3 (2008), http://www.pewcenteronthestates.org/uploadedFiles/8015PCTS_Prison08_FINAL_2-1-1_FORWEB.pdf ("[M]ore than one in every 100 adults is now confined in an American jail or

prison."); Robert Brame, Michael G. Turner, Raymond Paternoster, & Shawn D. Bushway, *Cumulative Prevalence of Arrest From Ages 8 to 23 in a National Sample*, 129 PEDIATRICS 21, 25, 26 (2012) (finding that approximately 1 out of 3 of all American youth will experience at least 1 arrest for a nontraffic offense by the age of 23).

5       *See* JOHN SCHMITT & KRIS WARNER, CTR. FOR ECON. & POLICY RESEARCH, EX-OFFENDERS AND THE LABOR MARKET 12 (2010), www.cepr.net/documents/publications/ex-offenders-2010-11.pdf ("In 2008, ex-prisoners were 2.9 to 3.2 percent of the total working-age population (excluding those currently in prison or jail) or about one in 33 working-age adults. Ex-felons were a larger share of the total working-age population: 6.6 to 7.4 percent, or about one in 15 working-age adults [not all felons serve prison terms]."); *see id.* at 3 (concluding that "in the absence of some reform of the criminal justice system, the share of ex-offenders in the working-age population will rise substantially in coming decades").

6       PREVALENCE OF IMPRISONMENT, *supra* note 4, at 4, Table 3.

7       *Id.*

8       ONE IN 31, *supra* note 4, at 5 (noting that when all of the individuals who are probationers, parolees, prisoners or jail inmates are added up, the total is more than 7.3 million adults; this is more than the populations of Chicago, Philadelphia, San Diego, and Dallas combined, and larger than the populations of 38 states and the District of Columbia).

9       PREVALENCE OF IMPRISONMENT, *supra* note 4, at 7.

10      *Id.* at 5, Table 5; *cf.* PEW CTR. ON THE STATES, COLLATERAL COSTS: INCARCERATION'S EFFECT ON ECONOMIC MOBILITY 6 (2010), http://www.pewcenteronthestates.org/uploadedFiles/Collateral_Costs.pdf?n=8653 ("Simply stated, incarceration in America is concentrated among African American men.  While 1 in every 87 white males ages 18 to 64 is incarcerated and the number for similarly-aged Hispanic males is 1 in 36, for black men it is 1 in 12."). Incarceration rates are even starker for 20-to-34-year-old men without a high school diploma or GED: 1 in 8 White males in this demographic group is incarcerated, compared to 1 in 14 Hispanic males, and 1 in 3 Black males. PEW CTR. ON THE STATES, *supra*, at 8, Figure 2.

11      This document uses the terms "Black" and "African American," and the terms "Hispanic" and "Latino," interchangeably.

12      *See infra* notes 65–67 (citing data for the arrest rates and population statistics for African Americans and Hispanics).

13      PREVALENCE OF IMPRISONMENT, *supra* note 4, at 1.

14      *Id.* at 8.

---

[15]    *See Policy Statement on the Issue of Conviction Records Under Title VII of the Civil Rights Act of 1964*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N (Feb. 4, 1987), http://www.eeoc.gov/policy/docs/convict1.html; *EEOC Policy Statement on the Use of Statistics in Charges Involving the Exclusion of Individuals with Conviction Records from Employment*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N  (July 29, 1987), http://www.eeoc.gov/policy/docs/convict2.html; *Policy Guidance on the Consideration of Arrest Records in Employment Decisions Under Title VII*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N (Sept. 7, 1990), http://www.eeoc.gov/policy/docs/arrest_records.html;  *Compliance Manual Section 15: Race & Color Discrimination*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, § 15-VI.B.2 (April 19, 2006), http://www.eeoc.gov/policy/docs/race-color.pdf. *See also* EEOC Decision No. 72-1497 (1972) (challenging a criminal record exclusion policy based on "serious crimes"); EEOC Decision No. 74-89 (1974) (challenging a policy where a felony conviction was considered an adverse factor that would lead to disqualification); EEOC Decision No. 78-03 (1977) (challenging an exclusion policy based on felony or misdemeanor convictions involving moral turpitude or the use of drugs); EEOC Decision No. 78-35 (1978) (concluding that an employee's discharge was reasonable given his pattern of criminal behavior and the severity and recentness of his criminal conduct).

[16]    In 2011, U.S. Attorney General Eric Holder assembled a Cabinet-level interagency Reentry Council to support the federal government's efforts to promote the successful reintegration of ex-offenders back into their communities.  *National Reentry Resource Center – Federal Interagency Reentry Council*, http://www.nationalreentryresourcecenter.org/reentry-council (last visited April 23, 2012).  As a part of the Council's efforts, it has focused on removing barriers to employment for ex-offenders to reduce recidivism by publishing several fact sheets on employing individuals with criminal records.  *See, e.g.*, FED. INTERAGENCY REENTRY COUNCIL, REENTRY MYTHBUSTER! ON FEDERAL HIRING POLICIES (2011), http://www.nationalreentryresourcecenter.org/documents/0000/1083/Reentry_Council_Mythbuster_Fed_Employment.pdf; FED. INTERAGENCY REENTRY COUNCIL, REENTRY MYTHBUSTER! ON HIRING/CRIMINAL RECORDS GUIDANCE (2011), http://www.nationalreentryresourcecenter.org/documents/0000/1082/Reentry_Council_Mythbuster_Employment.pdf; FED. INTERAGENCY REENTRY COUNCIL, REENTRY MYTHBUSTER! CRIMINAL HISTORIES AND EMPLOYMENT BACKGROUND CHECKS (2011), http://www.nationalreentryresourcecenter.org/documents/0000/1176/Reentry_Council_Mythbuster_FCRA_Employment.pdf; FED. INTERAGENCY REENTRY COUNCIL, REENTRY MYTHBUSTER! ON FEDERAL BONDING PROGRAM (2011), http://www.nationalreentryresourcecenter.org/documents/0000/1061/Reentry_Council_Mythbuster_Federal_Bonding.pdf.

        In addition to these federal efforts, several state law enforcement agencies have embraced initiatives and programs that encourage the employment of ex-offenders.  For example, Texas' Department of Criminal Justice has a Reentry and Integration Division and within that Division, a Reentry Task Force Workgroup.  *See Reentry and Integration Division-Reentry Task Force*, TEX. DEP'T OF CRIMINAL JUSTICE, http://www.tdcj.state.tx.us/divisions/rid/rid_texas_reentry_task_force.html (last visited April 23, 2012).  One of the Workgroups in this Task Force specifically focuses on identifying

29

employment opportunities for ex-offenders and barriers that affect ex-offenders' access to employment or vocational training programs.  *Reentry and Integration Division – Reentry Task Force Workgroups*, TEX. DEP'T OF CRIMINAL JUSTICE, http://www.tdcj.state.tx.us/divisions/rid/r_workgroup/rid_workgroup_employment.html (last visited April 23, 2012).  Similarly, Ohio's Department of Rehabilitation and Correction has an Offender Workforce Development Office that "works with departmental staff and correctional institutions within the Ohio Department of Rehabilitation and Correction to prepare offenders for employment and the job search process."  *Jobs for Ohio Offenders*, OHIO DEP'T OF REHAB. AND CORR. OFFENDER WORKFORCE DEV., http://www.drc.ohio.gov/web/JOBOFFEN.HTM (last updated Aug. 9, 2010).  Law enforcement agencies in other states such as Indiana and Florida have also recognized the importance of encouraging ex-offender employment.  *See, e.g.*, *IDOC: Road to Re-Entry*, IND. DEP'T OF CORR., http://www.in.gov/idoc/reentry/index.htm (last visited April 23, 2012) (describing various services and programs that are available to ex-offenders to help them to obtain employment); FLA. DEP'T OF CORRS., RECIDIVISM REDUCTION STRATEGIC PLAN: FISCAL YEAR 2009-2014, at 11, 12 (2009), http://www.dc.state.fl.us/orginfo/FinalRecidivismReductionPlan.pdf (identifying the lack of employment as one of the barriers to successful ex-offender reentry).

[17]    CARL R. ERNST & LES ROSEN, "NATIONAL" CRIMINAL HISTORY DATABASES 1 (2002), http://www.brbpub.com/articles/CriminalHistoryDB.pdf.

[18]    LEXISNEXIS, CRIMINAL BACKGROUND CHECKS: WHAT NON-PROFITS NEED TO KNOW ABOUT CRIMINAL RECORDS 4 (2009), http://www.lexisnexis.com/risk/nonprofit/documents/Volunteer_Screening_White_Paper.pdf.

[19]    *Id.*

[20]    ERNST & ROSEN, *supra* note 17, at 1; NAT'L ASS'N OF PROF'L BACKGROUND SCREENERS, CRIMINAL BACKGROUND CHECKS FOR EMPLOYMENT PURPOSES 5, http://www.napbs.com/files/public/Learn_More/White_Papers/CriminalBackgroundChecks.pdf.

[21]    LEXISNEXIS, *supra* note 18, at 6.  *See also* NAT'L ASS'N OF PROF'L BACKGROUND SCREENERS, *supra* note 20 at 5.

[22]    ERNST & ROSEN, *supra* note 17, at 1.

[23]    *Id.*

[24]    *See* SEARCH, THE NATIONAL TASK FORCE ON THE CRIMINAL BACKGROUNDING OF AMERICA 3, 4 (2005), http://www.search.org/files/pdf/ReportofNTFCBA.pdf.  Registries and watch lists can also include federal and international terrorist watch lists, and registries of individuals who are being investigated for certain types of crimes, such as gang-related crimes. *Id.*  *See also* LEXISNEXIS, *supra* note 18, at 5 (reporting that "all 50 states currently have a publicly available sex offender registry").

[25]    *See* U.S. DEP'T OF JUSTICE, THE ATTORNEY GENERAL'S REPORT ON CRIMINAL HISTORY

BACKGROUND CHECKS 4 (2006), http://www.justice.gov/olp/ag_bgchecks_report.pdf [hereinafter BACKGROUND CHECKS]. *See also* ERNST & ROSEN, *supra* note 17, at 2.

[26]    *See* NAT'L ASS'N OF PROF'L BACKGROUND SCREENERS, *supra* note 20, at 5. *See also* LEXISNEXIS, *supra* note 18, at 5.

[27]    LEXISNEXIS, *supra* note 18, at 5. *See also* AM. ASS'N OF COLLS. OF PHARMACY, REPORT OF THE AACP CRIMINAL BACKGROUND CHECK ADVISORY PANEL 6–7 (2006), http://www.aacp.org/resources/academicpolicies/admissionsguidelines/Documents/AACPBackgroundChkRpt.pdf.

[28]    AM. ASS'N OF COLLS. OF PHARMACY, *supra* note 27, at 6–7.

[29]    BACKGROUND CHECKS, *supra* note 25, at 4.

[30]    *Id.*

[31]    NAT'L ASS'N OF PROF'L BACKGROUND SCREENERS, *supra* note 20, at 5.

[32]    BACKGROUND CHECKS, *supra* note 25, at 4.

[33]    *Id.* at 3.

[34]    *See id.* ("Non-criminal justice screening using FBI criminal history records is typically done by a government agency applying suitability criteria that have been established by law or the responsible agency.").

[35]    *Id.* at 5.

[36]    *Id.* at 4.

[37]    DENNIS A. DEBACCO & OWEN M. GREENSPAN, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, SURVEY OF STATE CRIMINAL HISTORY INFORMATION SYSTEMS, 2010, at 2 (2011), https://www.ncjrs.gov/pdffiles1/bjs/grants/237253.pdf [hereinafter STATE CRIMINAL HISTORY].

[38]    *See* BACKGROUND CHECKS, *supra* note 25, at 17.

[39]    SEARCH, REPORT OF THE NATIONAL TASK FORCE ON THE COMMERCIAL SALE OF CRIMINAL JUSTICE RECORD INFORMATION 83 (2005), www.search.org/files/pdf/RNTFCSCJRI.pdf; *see also* Douglas Belkin, *More Job Seekers Scramble to Erase Their Criminal Past*, WALL ST. J., Nov. 11, 2009, at A1, *available at* http://online.wsj.com/article/SB125789494126242343.html?KEYWORDS=Douglas+Belkin ("Arrests that have been legally expunged may remain on databases that data-harvesting companies offer to prospective employers; such background companies are under no legal obligation to erase them.").

If applicants deny the existence of expunged or sealed records, as they are permitted to do in several states, they may appear dishonest if such records are reported in a criminal background check. *See generally* Debbie A. Mukamal & Paul N. Samuels, *Statutory Limitations on Civil Rights of People with Criminal Records*, 30 FORDHAM URB. L.J. 1501, 1509–10 (2003) (noting that 29 of the 40 states that allow expungement/sealing of arrest records permit the subject of the record to deny its existence if asked about it on employment applications or similar forms, and 13 of the 16 states that allow the expungement/sealing of adult conviction records permit the subject of the record to deny its existence under similar circumstances).

[40]    *See* SEARCH, INTERSTATE IDENTIFICATION NAME CHECK EFFICACY: REPORT OF THE NATIONAL TASK FORCE TO THE U.S. ATTORNEY GENERAL 21–22 (1999), www.search.org/files/pdf/III_Name_Check.pdf ("A so-called 'name check' is based not only on an individual's name, but also on other personal identifiers such as sex, race, date of birth and Social Security Number. . . . [N]ame checks are known to produce inaccurate results as a consequence of identical or similar names and other identifiers."); *id.* at 7 (finding that in a sample of 82,601 employment applicants, 4,562 of these individuals were *inaccurately* indicated by a "name check" to have criminal records, which represents approximately 5.5% of the overall sample).

[41]    BACKGROUND CHECKS, *supra* note 25, at 2.

[42]    A "consumer reporting agency" is defined by FCRA as "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information *or other information* on consumers for the purposes of furnishing consumer reports to third parties . . . ."  15 U.S.C. § 1681a(f) (emphasis added); *see also* BACKGROUND CHECKS, *supra* note 25, at 43 (stating that the records that CRAs collect include "criminal history information, such as arrest and conviction information").

[43]    A "consumer report" is defined by FCRA as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, *character, general reputation, personal characteristics*, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for . . . employment purposes . . . ." 15 U.S.C. § 1681a(d)(1) (emphasis added).

[44]    *See* 15 U.S.C. § 1681c(a)(2) ("[N]o consumer reporting agency may make any consumer report containing . . . records of arrest that, from date of entry, antedate the report by more than seven years or until the governing statute of limitations has expired, whichever is the longer period."). *But see id.* §1681c(b)(3) (stating that the reporting restrictions for arrest records do not apply to individuals who will earn "an annual salary which equals, or which may reasonably be expected to equal $75,000 or more").

[45]    15 U.S.C. § 1681c(a)(5) ("[N]o consumer reporting agency may make any consumer report containing . . . [a]ny other adverse item of information, other than records of convictions of crimes which antedates the report by more than seven years.").

[46]     BACKGROUND CHECKS, *supra* note 25, at 2.

[47]     *See* Adam Klein, *Written Testimony of Adam Klein*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/7-26-11/klein.cfm (last visited April 23, 2012) (describing how "several data-collection agencies also market and sell a retail-theft contributory database that is used by prospective employers to screen applicants").  *See also Retail Theft Database, ESTEEM, Workplace Theft Contributory Database*, LEXISNEXIS, http://www.lexisnexis.com/risk/solutions/retail-theft-contributory-database.aspx (last visited April 23, 2012) (stating that their database has "[t]heft and shoplifting cases supplied by more than 75,000 business locations across the country").  These databases may contain inaccurate and/or misleading information about applicants and/or employees.  *See generally* Goode v. LexisNexis Risk & Info. Analytics Grp., Inc., No. 2:11-CV-2950-JD, 2012 WL 975043 (E.D. Pa. Mar. 22, 2012) (unpublished).

[48]     BACKGROUND CHECKS, *supra* note 25, at 2.

[49]     SOC'Y FOR HUMAN RES. MGMT., BACKGROUND CHECKING: CONDUCTING CRIMINAL BACKGROUND CHECKS, slide 3 (Jan. 22, 2010), http://www.slideshare.net/shrm/background-check-criminal?from=share_email [hereinafter CONDUCTING CRIMINAL BACKGROUND CHECKS] (73% of the responding employers reported that they conducted criminal background checks on all of their job candidates, 19% reported that they conducted criminal background checks on selected job candidates, and a mere 7% reported that they did not conduct criminal background checks on any of their candidates).  The survey excluded the "not sure" responses from its analysis, which may account for the 1% gap in the total number of employer responses.  *Id.*

[50]     CONDUCTING CRIMINAL BACKGROUND CHECKS, *supra* note 49, at slide 7  (39% of the surveyed employers reported that they conducted criminal background checks "[t]o reduce/prevent theft and embezzlement, other criminal activity"); *see also* Sarah E. Needleman, *Businesses Say Theft by Their Workers is Up*, WALL ST. J., Dec. 11, 2008, at B8, *available at* http://online.wsj.com/article/SB122896381748896999.html.

[51]     CONDUCTING CRIMINAL BACKGROUND CHECKS*, supra* note 49, at slide 7 (61% of the surveyed employers reported that they conducted criminal background checks "[to] ensure a safe work environment for employees"); *see also* ERIKA HARRELL, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, WORKPLACE VIOLENCE, 1993–2009, at 1 (2011), http://bjs.ojp.usdoj.gov/content/pub/pdf/wv09.pdf (reporting that in 2009, "[n]onfatal violence in the workplace was about 15% of all nonfatal violent crime against persons age 16 or older").  *But see id.* (noting that from "2002 to 2009, the rate of nonfatal workplace violence has declined by 35%, following a 62% decline in the rate from 1993 to 2002").  Studies indicate that most workplace violence is committed by individuals with no relationship to the business or its employees.  *See id.* at 6 (reporting that between 2005 and 2009, strangers committed the majority of workplace violence against individuals (53% for males and 41% for females) while violence committed by co-workers accounted for a much smaller percentage (16.3% for males and 14.3% for females)); *see also* NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, CTR. FOR DISEASE CONTROL & PREVENTION, WORKPLACE VIOLENCE PREVENTION STRATEGIES AND RESEARCH

NEEDS 4, Table 1 (2006), http://www.cdc.gov/niosh/docs/2006-144/pdfs/2006-144.pdf (reporting that approximately 85% of the workplace homicides examined were perpetrated in furtherance of a crime by persons with no relationship to the business or its employees; approximately 7% were perpetrated by employees or former employees, 5% were committed by persons with a personal relationship to an employee, and 3% were perpetrated by persons with a customer-client relationship to the business).

[52]    CONDUCTING CRIMINAL BACKGROUND CHECKS, *supra* note 49, at slide 7 (55% percent of the surveyed employers reported that they conducted criminal background checks "[t]o reduce legal liability for negligent hiring"). Employers have a common law duty to exercise reasonable care in hiring to avoid foreseeable risks of harm to employees, customers, and the public. If an employee engages in harmful misconduct on the job, and the employer has not exercised such care in selecting the employee, the employer may be subject to liability for negligent hiring. *See, e.g.*, Stires v. Carnival Corp., 243 F. Supp. 2d 1313, 1318 (M.D. Fla. 2002) ("[N]egligent hiring occurs when . . . the employer knew or should have known of the employee's unfitness, and the issue of liability primarily focuses upon the adequacy of the employer's pre-employment investigation into the employee's background.").

[53]    CONDUCTING CRIMINAL BACKGROUND CHECKS, *supra* note 49, at slide 4 (40% of the surveyed employers reported that they conducted criminal background checks for "[j]ob candidates for positions for which state law requires a background check (e.g., day care teachers, licensed medical practitioners, etc.)"); *see id.* at slide 7 (20% of the employers reported that they conducted criminal background checks "[t]o comply with the applicable State law requiring a background check (e.g., day care teachers, licensed medical practitioners, etc.) for a particular position"). The study did not report the exact percentage of employers that conducted criminal background checks to comply with applicable federal laws or regulations, but it did report that 25% of the employers conducted background checks for "[j]ob candidates for positions involving national defense or homeland security." *Id.* at slide 4.

[54]    *See* 42 U.S.C. § 2000e-2(a).

[55]    Disparate treatment based on the race or national origin of job applicants with the same qualifications and criminal records has been documented. For example, a 2003 study demonstrated that White applicants with the same qualifications and criminal records as Black applicants were three times more likely to be invited for interviews than the Black applicants. *See* Devah Pager, *The Mark of a Criminal Record*, 108 AM. J. SOC. 937, 958, Figure 6 (2003), www.princeton.edu/~pager/pager_ajs.pdf. Pager matched pairs of young Black and White men as "testers" for her study. The "testers" in Pager's study were college students who applied for 350 low-skilled jobs advertised in Milwaukee-area classified advertisements, to test the degree to which a criminal record affects subsequent employment opportunities. The same study showed that White job applicants with a criminal record were called back for interviews more often than equally-qualified Black applicants who *did not have* a criminal record. *Id.* at 958. *See also* Devah Pager et al., *Sequencing Disadvantage: The Effects of Race and Criminal Background for Low Wage Job Seekers*, 623 ANNALS AM. ACAD. POL. & SOC. SCI., 199 (2009), www.princeton.edu/~pager/annals_sequencingdisadvantage.pdf (finding that among Black and

White testers with similar backgrounds and criminal records, "the negative effect of a criminal conviction is substantially larger for blacks than whites. . . . the magnitude of the criminal record penalty suffered by black applicants (60 percent) is roughly double the size of the penalty for whites with a record (30 percent)"); *see id.* at 200–201 (finding that personal contact plays an important role in mediating the effects of a criminal stigma in the hiring process, and that Black applicants are less often invited to interview, thereby having fewer opportunities to counteract the stigma by establishing rapport with the hiring official); Devah Pager, *Statement of Devah Pager, Professor of Sociology at Princeton University*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/11-20-08/pager.cfm (last visited April 23, 2012) (discussing the results of the *Sequencing Disadvantage* study); DEVAH PAGER & BRUCE WESTERN, NYC COMMISSION ON HUMAN RIGHTS, RACE AT WORK, REALITIES OF RACE AND CRIMINAL RECORD IN THE NYC JOB MARKET 6, Figure 2 (2006), http://www.nyc.gov/html/cchr/pdf/race_report_web.pdf (finding that White testers *with* a felony conviction were called back 13% of the time, Hispanic testers *without* a criminal record were called back 14% of the time, and Black testers *without* a criminal record were called back 10% of the time).

[56]    *Race & Color Discrimination*, *supra* note 15, § V.A.1.

[57]    A 2006 study demonstrated that employers who are averse to hiring people with criminal records sometimes presumed, in the absence of evidence to the contrary, that African American men applying for jobs have disqualifying criminal records. Harry J. Holzer et al., *Perceived Criminality, Criminal Background Checks, and the Racial Hiring Practices of Employers*, 49 J.L. & ECON. 451 (2006), http://www.jstor.org/stable/pdfplus/10.1086/501089.pdf; *see also* HARRY HOLZER ET AL., URBAN INST., EMPLOYER DEMAND FOR EX-OFFENDERS: RECENT EVIDENCE FROM LOS ANGELES 6–7 (2003), http://www.urban.org/UploadedPDF/410779_ExOffenders.pdf (describing the results of an employer survey where over 40% of the employers indicated that they would "probably not" or "definitely not" be willing to hire an applicant with a criminal record).

[58]    The Commission has not done matched-pair testing to investigate alleged discriminatory employment practices. However, it has issued an Enforcement Guidance that discusses situations where individuals or organizations file charges on the basis of matched-pair testing, among other practices. *See generally Enforcement Guidance: Whether "Testers" Can File Charges and Litigate Claims of Employment Discrimination*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N (May 22, 1996), http://www.eeoc.gov/policy/docs/testers.html.

[59]    42 U.S.C. § 2000e-2(k)(1)(A)(i). If an employer successfully demonstrates that its policy or practice is job related for the position in question and consistent with business necessity, a Title VII plaintiff may still prevail by demonstrating that there is a less discriminatory "alternative employment practice" that serves the employer's legitimate goals as effectively as the challenged practice but that the employer refused to adopt. *Id.* § 2000e-2(k)(1)(A)(ii).

[60]    401 U.S. 424, 431–32 (1971).

[61]     *Id.* at 431.

[62]     The Civil Rights Act of 1991, Pub. L. No. 102-166, § 105; *see also* Lewis v. City of Chicago, 130 S. Ct. 2191 (2010) (reaffirming disparate impact analysis); Ricci v. DeStefano, 557 U.S. 557 (2009) (same).

[63]     42 U.S.C. § 2000e-2(k)(1)(A)(i).

[64]     The Commission presumes that employers use the information sought and obtained from its applicants and others in making an employment decision. *See* Gregory v. Litton Sys. Inc.,316 F. Supp. 401, 403 (C.D. Cal.1970).  If an employer asserts that it did not factor the applicant's or employee's known criminal record into an employment decision, the EEOC will seek evidence supporting this assertion.  For example, evidence that the employer has other employees from the same protected group with roughly comparable criminal records may support the conclusion that the employer did not use the applicant's or employee's criminal record to exclude him from employment.

[65]     Unif. Crime Reporting Program, Fed. Bureau of Investigation, Crime in the U.S. 2010, at Table 43a (2011), http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/table-43/10tbl43a.xls.

[66]     U.S. Census Bureau, The Black Population: 2010, at 3 (2011) , http://www.census.gov/prod/cen2010/briefs/c2010br-06.pdf (reporting that in 2010, "14 percent of all people in the United States identified as Black, either alone, or in combination with one or more races").

[67]     Accurate data on the number of Hispanics arrested and convicted in the United States is limited.  *See* Nancy E. Walker et al., Nat'l Council of La Raza, Lost Opportunities: The Reality of Latinos in the U.S. Criminal Justice System 17–18 (2004), http://www.policyarchive.org/handle/10207/bitstreams/20279.pdf (explaining why "[i]t is very difficult to find any information – let alone accurate information – on the number of Latinos arrested  in the United States").  The Department of Justice's Bureau of Justice Statistics' (BJS) *Sourcebook of Criminal Justice Statistics* and the FBI's Crime Information Services Division do not provide data for arrests by ethnicity.  *Id.* at 17.  However, the U.S. Drug Enforcement Administration (DEA) disaggregates data by Hispanic and non-Hispanic ethnicity.  *Id.* at 18.  According to DOJ/BJS, from October 1, 2008 to September 30, 2009, 45.5% of drug arrests made by the DEA were of Hispanics or Latinos.  Mark Motivans, Bureau of Justice Statistics, U.S. Dep't of Justice, Federal Justice Statistics, 2009 – Statistical Tables, at 6, Table 1.4 (2011), http://bjs.ojp.usdoj.gov/content/pub/pdf/fjs09.pdf. Accordingly, Hispanics were arrested for drug offenses by the DEA at a rate of three times their numbers in the general population.  *See* U.S. Census Bureau, Overview of Race and Hispanic Origin: 2010, at 3 (2011), http://www.census.gov/prod/cen2010/briefs/c2010br-02.pdf (reporting that in 2010, "there were 50.5 million Hispanics in the United States, composing 16 percent of the total population").  However, national statistics indicate that Hispanics have similar or lower drug usage rates compared to Whites.  *See, e.g.,* Substance Abuse & Mental Health Servs.

ADMIN., U.S. DEP'T OF HEALTH & HUMAN SERVS., RESULTS FROM THE 2010 NATIONAL SURVEY ON DRUG USE AND HEALTH: SUMMARY OF NATIONAL FINDINGS 21, Figure 2.10 (2011), http://oas.samhsa.gov/NSDUH/2k10NSDUH/2k10Results.pdf (reporting, for example, that the usage rate for Hispanics in 2009 was 7.9% compared to 8.8% for Whites).

[68]    *See, e.g.*, HUMAN RIGHTS WATCH, DECADES OF DISPARITY: DRUG ARRESTS AND RACE IN THE UNITED STATES 1 (2009), http://www.hrw.org/sites/default/files/reports/us0309web_1.pdf (noting that the "[t]he higher rates of black drug arrests do not reflect higher rates of black drug offending . . . . blacks and whites engage in drug offenses - possession and sales - at roughly comparable rates"); SUBSTANCE ABUSE & MENTAL HEALTH SERVS. ADMIN., U.S. DEP'T OF HEALTH & HUMAN SERVS., RESULTS FROM THE 2010 NATIONAL SURVEY ON DRUG USE AND HEALTH: SUMMARY OF NATIONAL FINDINGS 21 (2011), http://oas.samhsa.gov/NSDUH/2k10NSDUH/2k10Results.pdf (reporting that in 2010, the rates of illicit drug use in the United States among persons aged 12 or older were 10.7% for African Americans,  9.1% for Whites, and 8.1% for Hispanics); HARRY LEVINE & DEBORAH SMALL, N.Y. CIVIL LIBERTIES UNION, MARIJUANA ARREST CRUSADE: RACIAL BIAS AND POLICE POLICY IN NEW YORK CITY, 1997–2007, at 13–16 (2008), www.nyclu.org/files/MARIJUANA-ARREST-CRUSADE_Final.pdf (citing U.S. Government surveys showing that Whites use marijuana at higher rates than African Americans and Hispanics; however, the marijuana arrest rate of Hispanics is nearly three times the arrest rate of Whites, and the marijuana arrest rate of African Americans is five times the arrest rate of Whites).

[69]    PREVALENCE OF IMPRISONMENT, *supra* note 4, at 1, 8.  Due to the nature of available data, the Commission is using incarceration data as a proxy for conviction data.

[70]    *Id.*

[71]    *Id.*

[72]    MARC MAUER & RYAN S. KING, THE SENTENCING PROJECT, UNEVEN JUSTICE: STATE RATES OF INCARCERATION BY RACE AND ETHNICITY 10 (2007), www.sentencingproject.org/Admin%5CDocuments%5Cpublications%5Crd_stateratesofincbyraceandethnicity.pdf.

[73]    *Id.*

[74]    PAUL GUERINO ET AL., BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, PRISONERS IN 2010, at 27, Table 14 (2011), http://bjs.ojp.usdoj.gov/content/pub/pdf/p10.pdf (reporting that as of December 31, 2010, Black men were imprisoned at a rate of 3,074 per 100,000 Black male residents, Hispanic men were imprisoned at a rate of 1,258 per 100,000 Hispanic male residents, and White men were imprisoned at a rate of 459 per 100,000 White male residents); *cf.* ONE IN 31, *supra* note 4, at 5 ("Black adults are four times as likely as whites and nearly 2.5 times as likely as Hispanics to be under correctional control.  One in 11 black adults -- 9.2 percent -- was under correctional control [probation, parole, prison, or jail] at year end 2007.").

75      The Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. part 1607, provide that "[employers] should maintain and have available . . . information on [the] adverse impact of [their employment selection procedures]." 29 C.F.R. § 1607.15A. "Where [an employer] has not maintained [such records, the EEOC] may draw an inference of adverse impact of the selection process from the failure of [the employer] to maintain such data . . . ." *Id.* § 1607.4D.

76      *See, e.g.*, El v. SEPTA, 418 F. Supp. 2d 659, 668–69 (E.D. Pa. 2005) (finding that the plaintiff established a prima facie case of disparate impact with evidence from the defendant's personnel records and national data sources from the U.S. Bureau of Justice Statistics and the Statistical Abstract of the U.S.), *aff'd on other grounds,* 479 F.3d 232 (3d Cir. 2007); Green v. Mo. Pac. R.R., 523 F.2d 1290, 1294–95 (8th Cir. 1975) (concluding that the defendant's criminal record exclusion policy had a disparate impact based on race by evaluating local population statistics and applicant data), *appeal after remand*, 549 F.2d 1158, 1160 (8th Cir. 1977).

77      457 U.S. 440, 442 (1982).

78      *Id.* at 453–54

79      433 U.S. 321, 330 (1977).

80      *See, e.g.*, Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 365 (1977) (stating that "[a] consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection").

81      42 U.S.C. § 2000e-2(k)(1)(A)(i).  *See* Griggs v. Duke Power Co., 401 U.S. 424 (1971). *See also* 42 U.S.C. § 2000e(m) (defining the term "demonstrates" to mean "meets the burdens of production and persuasion").

82      422 U.S. 405 (1975).

83      433 U.S. 321 (1977).

84      137 Cong. Rec. 15273 (1991) (statement of Sen. Danforth) ("[T]he terms 'business necessity' and 'job related' are intended to reflect the concepts enunciated by the Supreme Court in *Griggs v. Duke Power Co*, and in the other Supreme Court decisions prior to *Wards Cove Packing Co. v. Atonio*." (citations omitted)).  Section 105(b) of the Civil Rights Act of 1991 provides that only the interpretive memorandum read by Senator Danforth in the Congressional Record may be considered legislative history or relied upon in construing or applying the business necessity standard.

85      401 U.S. at 431, 436.

---

[86]     422 U.S. at 430–31 (endorsing the EEOC's position that discriminatory tests are impermissible unless shown, by professionally acceptable methods, to predict or correlate with "'important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated'" (quoting 29 C.F.R. § 1607.4(c))).

[87]     433 U.S. at 331–32 (concluding that using height and weight as proxies for strength did not satisfy the business necessity defense because the employer failed to establish a correlation between height and weight and the necessary strength, and also did not specify the amount of strength necessary to perform the job safely and efficiently).

[88]     *Id.* at 331 n.14.

[89]     523 F.2d 1290, 1293 (8th Cir. 1975).  "In response to a question on an application form, Green [a 29-year-old African American man] disclosed that he had been convicted in December 1967 for refusing military induction. He stated that he had served 21 months in prison until paroled on July 24, 1970." *Id.* at 1292–93.

[90]     Green v. Mo. Pac. R.R., 549 F.2d 1158, 1160 (8th Cir. 1977) (upholding the district court's injunction prohibiting the employer from using an applicant's conviction record as an absolute bar to employment but allowing it to consider a prior criminal record as a factor in making individual hiring decisions, as long as the defendant took these three factors into account).

[91]     *Id.* (referring to completion of the sentence rather than completion of parole).

[92]     *Id.*

[93]     479 F.3d 232 (3d Cir. 2007).

[94]     *Id.* at 235.

[95]     *Id.*  at 235, 236.

[96]     *Id.* at 235.

[97]     *Id.* at 244.

[98]     *Id.* at 244–45.

[99]     *Id.* at 247. *Cf.* Shawn Bushway et al., *The Predictive Value of Criminal Background Checks: Do Age and Criminal History Affect Time to Redemption?*, 49 CRIMINOLOGY 27, 52 (2011) [hereinafter *The Predictive Value of Criminal Background Checks*] ("Given the results of the current as well as previous [recidivism] studies, the 40-year period put forward in *El v. SEPTA* (2007) . . . seems too old of a score to be still in need of settlement.").

---

[100]    *El*, 479 F.3d at 248.

[101]    Some states have enacted laws to limit employer inquiries concerning all or some arrest records.  *See* BACKGROUND CHECKS, *supra* note 25, at 48–49.  At least 13 states have statutes explicitly prohibiting arrest record inquiries and/or dissemination subject to certain exceptions. *See, e.g.*, Alaska (ALASKA STAT. § 12.62.160(b)(8)); Arkansas (ARK. CODE ANN. § 12-12-1009(c)); California (CAL. LAB. CODE § 432.7(a)); Connecticut (CONN. GEN. STAT. § 46a-80(e)); Illinois (775 ILL. COMP. STAT. § 5/2-103(A)) (dealing with arrest records that have been ordered expunged, sealed, or impounded); Massachusetts (MASS. GEN. LAWS ch. 151B § 4(9)); Michigan (MICH COMP. LAWS § 37.2205a(1) (applying to misdemeanor arrests only)); Nebraska (NEB. REV. STAT. § 29-3523(2)) (ordering no dissemination of arrest records under certain conditions and specified time periods)); New York (N.Y. EXEC. LAW § 296(16)); North Dakota (N.D. CENT. CODE § 12-60-16.6(2)); Pennsylvania (18 PA. CONS. STAT. § 9121(b)(2)); Rhode Island (R.I. GEN. LAWS § 28-5-7(7)), and Wisconsin (WIS. STAT. §§ 111.321, 111.335a).

[102]    *See* United States v. Armstrong, 517 U.S. 456, 464 (1996) (discussing federal prosecutors' broad discretionary authority to determine whether to prosecute cases and whether to bring charges before a grand jury); Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978) (explaining same for state prosecutors); *see also* THOMAS H. COHEN & TRACEY KYCKELHAHN, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, FELONY DEFENDANTS IN LARGE URBAN COUNTIES, 2006, at 10, Table 11 (2010), http://bjs.ojp.usdoj.gov/content/pub/pdf/fdluc06.pdf (reporting that in the 75 largest counties in the country, nearly one-third of the felony arrests did not result in a conviction because the charges against the defendants were dismissed).

[103]    Schware v. Bd. of Bar Exam'rs, 353 U.S. 232, 241 (1957) ("The mere fact that a [person] has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct."); United States. v. Hynes, 467 F.3d 951, 957 (6th Cir. 2006) (upholding a preliminary jury instruction that stated that a "defendant is presumed to be innocent unless proven guilty.  The indictment against the Defendant is only an accusation, nothing more.  It's not proof of guilt or anything else."); *see* Gregory v. Litton Sys. Inc., 316 F. Supp. 401, 403 (C.D. Cal. 1970) ("[I]nformation concerning a prospective employee's record of arrests without convictions, is irrelevant to [an applicant's] suitability or qualification for employment."), *modified on other grounds*, 472 F.2d 631 (9th Cir. 1972); Dozier v. Chupka, 395 F. Supp. 836, 850 n.10 (S.D. Ohio 1975) (stating that the use of arrest records was too crude a predictor of an employee's predilection for theft where there were no procedural safeguards to prevent reliance on unwarranted arrests); City of Cairo v. Ill. Fair Empl. Prac. Comm., 8 Empl. Prac. Dec. (CCH) ¶ 9682 (Ill. App. Ct. 1974) (concluding that, where applicants sought to become police officers, they could not be absolutely barred from appointment solely because they had been arrested, as distinguished from convicted); *see also* EEOC Dec. 74-83, ¶ 6424 (CCH) (1983) (finding no business justification for an employer's unconditional termination of all employees with arrest records (all five employees terminated were Black), purportedly to reduce thefts in the workplace; the employer produced no evidence that these particular employees had been involved in any of the thefts, or that all people who are arrested but not convicted are prone towards crime in the future); EEOC Dec. 76-87, ¶ 6665 (CCH) (1983) (holding that an applicant who sought to become a police officer could not be rejected based on one arrest five years earlier

for riding in a stolen car when he asserted that he did not know that the car was stolen and the charge was dismissed).

104     *See* STATE CRIMINAL HISTORY, *supra* note 37, at 2; *see also* BACKGROUND CHECKS, *supra* note 25, at 17.

105     *See supra* notes 39–40.

106     S*ee* Clark v. Arizona, 548 U.S. 735, 766 (2006) ("The first presumption [in a criminal case] is that a defendant is innocent unless and until the government proves beyond a reasonable doubt each element of the offense charged. . . ."). *See also* FED. R. CRIM P 11 (criminal procedure rule governing pleas).   The Supreme Court has concluded that criminal defendants have a Sixth Amendment right to effective assistance of counsel during plea negotiations.  *See generally* Lafler v. Cooper, 132 S. Ct. 1376  (2012); Missouri v. Frye, 132 S. Ct. 1399 (2012).

107     *See supra* text accompanying note 39.

108     *See e.g.*, HAW. REV. STAT. § 378-2.5(b).  Under this provision, the employer may withdraw the offer of employment if the prospective employee has a conviction record "that bears a rational relationship to the duties and responsibilities of the position."  *Id.  See also* CONN. GEN. STAT. § 46a-80(b) ("[N]o employer . . . shall inquire about a prospective employee's past convictions until such prospective employee has been deemed otherwise qualified for the position."); MINN. STAT. § 364.021(a) ("[A] public employer may not inquire or consider the criminal record or criminal history of an applicant for public employment until the applicant has been selected for an interview by the employer.").  State fair employment practices agencies have information about applicable state law.

109     *See generally* NAT'L LEAGUE OF CITIES &  NAT'L EMP'T LAW PROJECT, CITIES PAVE THE WAY: PROMISING REENTRY POLICIES THAT PROMOTE LOCAL HIRING OF PEOPLE WITH CRIMINAL RECORDS (2010), www.nelp.org/page/-/SCLP/2010/CitiesPavetheWay.pdf?nocdn=1 (identifying local initiatives that address ways to increase employment opportunities for individuals with criminal records, including delaying a background check until the final stages of the hiring process, leveraging development funds, and expanding bid incentive programs to promote local hiring priorities); NAT'L EMP'T LAW PROJECT, CITY AND COUNTY HIRING INITIATIVES (2010), www.nelp.org/page/-/SCLP/CityandCountyHiringInitiatives.pdf (discussing the various city and county initiatives that have removed questions regarding criminal history from the job application and have waited until after a conditional offer of employment has been made to conduct a background check and inquire about the applicant's criminal background).

110     Several federal laws automatically prohibit employing individuals with certain felony convictions or, in some cases, misdemeanor convictions.  *See, e.g.*, 5 U.S.C. § 7371(b) (requiring the mandatory removal of any federal law enforcement officer who is convicted of a felony); 46 U.S.C. § 70105(c)(1)(A) (mandating that individuals who have been convicted of espionage, sedition, treason or terrorism be permanently disqualified from receiving a biometric transportation security card and thereby excluded from port work employment); 42 U.S.C.

§ 13726(b)(1) (disqualifying persons with felony convictions or domestic violence convictions from working for a private prisoner transport company); 25 U.S.C. § 3207(b) (prohibiting individuals with a felony conviction, or any of two or more misdemeanor convictions, from working with Indian children if their convictions involved crimes of violence, sexual assault, molestation, exploitation, contact or prostitution, crimes against persons, or offenses committed against children); 18 U.S.C. § 922(g)(1), (9) (prohibiting an individual convicted of a felony or a misdemeanor for domestic violence from possessing a firearm, thereby excluding such individual from a wide range of jobs that require such possession); 18 U.S.C. § 2381 (prohibiting individuals convicted of treason from "holding any office under the United States"). Other federal laws prohibit employing individuals with certain convictions for a defined time period. *See, e.g.*, 5 U.S.C. § 7313(a) (prohibiting individuals convicted of a felony for inciting a riot or civil disorder from holding any position in the federal government for five years after the date of the conviction); 12 U.S.C. § 1829 (requiring a ten-year ban on employing individuals in banks if they have certain financial-related convictions); 49 U.S.C. § 44936(b)(1)(B) (imposing a ten-year ban on employing an individual as a security screener for an air carrier if that individuals has been convicted of specified crimes).

[111]    *See* 29 C.F.R. § 1607.5 (describing the general standards for validity studies).

[112]    *Id.*

[113]    *Id.* § 1607.6B.  The following subsections state:

> (1) *Where informal or unscored procedures are used.* When an informal or unscored selection procedure which has an adverse impact is utilized, the user should eliminate the adverse impact, or modify the procedure to one which is a formal, scored or quantified measure or combination of measures and then validate the procedure in accord with these guidelines, or otherwise justify continued use of the procedure in accord with Federal law.
> (2) *Where formal and scored procedures are used.* When a formal and scored selection procedure is used which has an adverse impact, the validation techniques contemplated by these guidelines usually should be followed if technically feasible. Where the user cannot or need not follow the validation techniques anticipated by these guidelines, the user should either modify the procedure to eliminate adverse impact or otherwise justify continued use of the procedure in accord with Federal law.

> *Id.* § 1607.6A, B(1)–(2).

[114]    *See, e.g.,* Brent W. Roberts et al., *Predicting the Counterproductive Employee in a Child-to-Adult Prospective Study*, 92 J. APPLIED PSYCHOL. 1427, 1430 (2007), http://internal.psychology.illinois.edu/~broberts/Roberts,%20Harms,%20Caspi,%20&%20Moffit t,%202007.pdf (finding that in a study of New Zealand residents from birth to age 26, "[a]dolescent criminal convictions were unrelated to committing counterproductive activities at work [such as tardiness, absenteeism, disciplinary problems, etc.]. In fact, according to the

[results of the study], people with an adolescent criminal conviction record were less likely to get in a fight with their supervisor or steal things from work.").

115    *See* OHIO REV. CODE ANN. § 2913.02.

116    523 F.2d at 1298 (stating that "[w]e cannot conceive of any business necessity that would automatically place every individual convicted of any offense, except a minor traffic offense, in the permanent ranks of the unemployed").

117    479 F.3d at 247.

118    *See, e.g.*, Keith Soothill & Brian Francis, *When do Ex-Offenders Become Like Non-Offenders?*, 48 HOWARD J. OF CRIM. JUST., 373, 380–81 (2009) (examining conviction data from Britain and Wales, a 2009 study found that the risk of recidivism declined for the groups with prior records and eventually converged within 10 to 15 years with the risk of those of the nonoffending comparison groups); Alfred Blumstein & Kiminori Nakamura, *Redemption in the Presence of Widespread Criminal Background Checks,* 47 CRIMINOLOGY 327 (2009) (concluding that there may be a "point of redemption" (i.e., a point in time where an individual's risk of re-offending or re-arrest is reasonably comparable to individuals with no prior criminal record) for individuals arrested for certain offenses if they remain crime free for a certain number of years); Megan C. Kurlychek, Robert Brame & Shawn D. Bushway, *Enduring Risk? Old Criminal Records and Predictions of Future Criminal Involvement*, 53 CRIME & DELINQUENCY 64 (2007) (analyzing juvenile police contacts and Racine, Wisconsin police contacts for an aggregate of crimes for 670 males born in 1942 and concluding that, after seven years, the risk of a new offense approximates that of a person without a criminal record); Megan C. Kurlychek et al., *Scarlet Letters and Recidivism: Does an Old Criminal Record Predict Future Offending?*, 5 CRIMINOLOGY & PUB. POL'Y 483 (2006) (evaluating juvenile police contacts and arrest dates from Philadelphia police records for an aggregate of crimes for individuals born in 1958, a 2006 study concluded that the risk of recidivism decreases over time and that, six or seven years after an arrest, an individual's risk of re-arrest approximates that of an individual who has never been arrested).

119    *Griggs*, 401 U.S. at 431.

120    523 F.2d at 1298; *see also* Field v. Orkin Extermination Co., No. Civ. A. 00-5913, 2002 WL 32345739, at *1 (E.D. Pa. Feb. 21, 2002) (unpublished) ("[A] blanket policy of denying employment to any person having a criminal conviction is a [*per se*] violation of Title VII."). The only exception would be if such an exclusion were required by federal law or regulation. *See, e.g., supra* note 110.

121    *Cf. Field*, 2002 WL 32345739, at *1.  In *Field*, an employee of ten years was fired after a new company that acquired her former employer discovered her 6-year-old felony conviction. The new company had a blanket policy of firing anyone with a felony conviction less than 10 years old.  The court granted summary judgment for the employee because the employer's argument that her conviction was related to her job qualifications was "weak at best," especially

given her positive employment history with her former employer.  *Id.*

[122]    Recidivism rates tend to decline as ex-offenders' ages increase.  A 2011 study found that an individual's age at conviction is a variable that has a "substantial and significant impact on recidivism."  *The Predictive Value of Criminal Background Checks*, *supra* note 99, at 43.  For example, the 26-year-olds in the study, with no prior criminal convictions, had a 19.6% chance of reoffending in their first year after their first conviction, compared to the 36-year-olds who had an 8.8% chance of reoffending during the same time period, and the 46-year-olds who had a 5.3% of reoffending.  *Id.* at 46. *See also* PATRICK A. LANGAN & DAVID J. LEVIN, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, SPECIAL REPORT:  RECIDIVISM OF PRISONERS RELEASED IN 1994, at 7 (2002), http://bjs.ojp.usdoj.gov/content/pub/pdf/rpr94.pdf (finding that, although 55.7% of ex-offenders aged 14–17 released in 1994 were reconvicted within three years, the percentage declined to 29.7% for ex-offenders aged 45 and older who were released the same year).

    Consideration of an applicant's age at the time the offense occurred or at his release from prison would benefit older individuals and, therefore, would not violate the Age Discrimination in Employment Act of 1967, *as amended*, 29 U.S.C. § 621 *et seq*. *See* Age Discrimination in Employment Act, 29 C.F.R. § 1625.2 ("Favoring an older individual over a younger individual because of age is not unlawful discrimination under the ADEA, even if the younger individual is at least 40 years old."); *see also* Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 600 (2004) (concluding that the ADEA does not preclude an employer from favoring an older employee over a younger one within the protected age group).

[123]    *See* Laura Moskowitz, *Statement of Laura Moskowitz, Staff Attorney, National Employment Law Project's Second Chance Labor Project*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/11-20-08/moskowitz.cfm (last visited April 23, 2012) (stating that one of the factors that is relevant to the assessment of an ex-offender's risk to a workplace and to the business necessity analysis, is the "length and consistency of the person's work history, including whether the person has been recently employed"; also noting that various studies have "shown a strong relationship between employment and decreases in crime and recidivism").  *But see* Stephen J. Tripodi et al., *Is Employment Associated With Reduced Recidivism?: The Complex Relationship Between Employment and Crime*, 54 INT'L J. OF OFFENDER THERAPY AND COMP. CRIMINOLOGY 716, 716 (2010) (finding that "[b]ecoming employed after incarceration, although apparently providing initial motivation to desist from crime, does not seem to be on its own sufficient to prevent recidivism for many parolees").

[124]    *See* WENDY ERISMAN & JEANNE BAYER CONTARDO, INST. FOR HIGHER EDUC. POLICY, LEARNING TO REDUCE RECIDIVISM: A 50 STATE ANALYSIS OF POSTSECONDARY CORRECTIONAL EDUCATION 5 (2005), http://www.ihep.org/assets/files/publications/g-l/LearningReduceRecidivism.pdf (finding that increasing higher education for prisoners enhances their prospects for employment and serves as a cost-effective approach to reducing recidivism); *see also* John H. Laud & Robert J. Sampson, *Understanding Desistance from Crime*, 28 CRIME & JUST. 1, 17–24 (2001), http://www.ncjrs.gov/pdffiles1/Digitization/192542-192549NCJRS.pdf (stating that factors associated with personal rehabilitation and social

---

stability, such as stable employment, family and community involvement, and recovery from substance abuse, are correlated with a decreased risk of recidivism).

[125]    Some employers have expressed a greater willingness to hire ex-offenders who have had an ongoing relationship with third party intermediary agencies that provide supportive services such as drug testing, referrals for social services, transportation, child care, clothing, and food. *See* Amy L. Solomon et al., *From Prison to Work: The Employment Dimensions of Prisoner Reentry*, 2004 URBAN INST. 20, http://www.urban.org/UploadedPDF/411097_From_Prison_to_Work.pdf.   These types of services can help ex-offenders avoid problems that may interfere with their ability to obtain and maintain employment.  *Id.*; *see generally* Victoria Kane, *Transcript of 7-26-11 Meeting,* U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/7-26-11/transcript.cfm#kane (last visited April 23, 2012) (describing why employers should partner with organizations that provide supportive services to ex-offenders).

[126]    *See generally* REENTRY MYTHBUSTER! ON FEDERAL BONDING PROGRAM, *supra* note 16; *Work Opportunity Tax Credit (WOTC),* EMP'T & TRAINING ADMIN., U.S. DEP'T OF LABOR, http://www.doleta.gov/business/incentives/opptax/ (last visited April 3, 2012); *Directory of State Bonding Coordinators*, EMP'T & TRAINING ADMIN., U.S. DEP'T OF LABOR, http://www.doleta.gov/usworkforce/onestop/FBPContact.cfm (last visited April 3, 2012); *Federal Bonding Program - Background*, U.S. DEP'T OF LABOR, http://www.bonds4jobs.com/program-background.html (last visited April 3, 2012);  *Bureau of Prisons: UNICOR's Federal Bonding Program,* http://www.bop.gov/inmate_programs/itb_bonding.jsp (last visited April 3, 2012).

[127]    This example is loosely based on a study conducted by Alfred Blumstein and Kiminori Nakamura measuring the risk of recidivism for individuals who have committed burglary, robbery, or aggravated assault.  *See* Blumstein & Nakamura, *supra* note 118.

[128]    42 U.S.C. § 2000e-2(k)(1)(A)(ii), (C).  *See also* Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 998 (1988).

[129]    *See* Exec. Order No. 12,067, 3 C.F.R. 206 (1978 Comp.).

[130]    *See* 49 U.S.C. §§ 44935(e)(2)(B), 44936(a)(1), (b)(1).  The statute mandates a criminal background check.

[131]    *See* 5 U.S.C. § 7371(b) (requiring mandatory removal from employment of law enforcement officers convicted of felonies).

[132]    *See* 42 U.S.C. § 13041(c) ("Any conviction for a sex crime, an offense involving a child victim, or a drug felony may be grounds for denying employment or for dismissal of an employee. . . .").

[133]    12 U.S.C. § 1829.

[134]    46 U.S.C. § 70105(c).

[135]    Other jobs and programs subject to federally-imposed restrictions based on criminal convictions include the business of insurance (18 U.S.C. § 1033(e)), employee benefits employee (29 U.S.C. § 1111(a)), participation in Medicare and state health care programs (42 U.S.C. § 1320a-7(a)–(b)), defense contractor (10 U.S.C. § 2408(a)), prisoner transportation (42 U.S.C. § 13726b(b)(1)), and court-imposed occupational restrictions (18 U.S.C. §§ 3563(b)(5), 3583(d)).  This list is not meant to be exhaustive.

[136]    *See, e.g.*, federal statutes governing commercial motor vehicle operator's licenses (49 U.S.C. § 31310(b)-(h)), locomotive operator licenses (49 U.S.C. § 20135(b)(4)(B)), and certificates, ratings, and authorizations for pilots, flight instructors, and ground instructors (49 U.S.C. §§ 44709(b)(2), 44710(b), 4711(c); 14 C.F.R. § 61.15).

[137]    *See, e.g.*, federal statutes governing loan originator licensing/registration (12 U.S.C. § 5104(b)(2)), registration of brokers and dealers (15 U.S.C. § 78o(b)(4)(B)), registration of commodity dealers (7 U.S.C. § 12a(2)(D), (3)(D), (E), (H)), and registration of investment advisers (15 U.S.C. § 80b-3(e)(2)-(3), (f)).

[138]    *See, e.g.*, custom broker's licenses (19 U.S.C. § 1641(d)(1)(B)), export licenses (50 U.S.C. App. § 2410(h)), and arms export (22 U.S.C. § 2778(g)).

[139]    *See, e.g.*, grain inspector's licenses (7 U.S.C. § 85), merchant mariner's documents, licenses, or certificates of registry (46 U.S.C. § 7503(b)), licenses to import, manufacture, or deal in explosives or permits to use explosives (18 U.S.C. § 843(d)), and farm labor contractor's certificates of registration (29 U.S.C. § 1813(a)(5)).  This list of federally-imposed restrictions on occupational licenses and registrations for individuals with certain criminal convictions is not meant to be exhaustive.  For additional information, please consult the relevant federal agency or department.

[140]    *See* 12 U.S.C. § 1829(a)(1).  The statute imposes a ten-year ban for individuals who have been convicted of certain financial crimes such as corruption involving the receipt of commissions or gifts for procuring loans (18 U.S.C. § 215), embezzlement or theft by an officer/employee of a lending, credit, or insurance institution (18 U.S.C § 657), false or fraudulent statements by an officer/employee of the federal reserve or a depository institution (18 U.S.C. § 1005), or fraud by wire, radio, or television that affects a financial institution (18 U.S.C. § 1343), among other crimes.  *See* 12 U.S.C. § 1829(a)(2)(A)(i)(I), (II).  Individuals who have either been convicted of the crimes listed in § 1829(a)(2)(A), or conspiracy to commit those crimes, will not receive an exception to the application of the 10-year ban from the FDIC. 12 U.S.C. § 1829(a)(2)(A).

[141]    *See* Fed. Deposit Ins. Corp., FDIC Statement of Policy For Section 19 of the FDI Act, § C, "Procedures" (amended May 13, 2011), http://www.fdic.gov/regulations/laws/rules/5000-1300.html [hereinafter FDIC Policy]; *see also*

46

Statement of Policy, 63 Fed. Reg. 66,177, 66,184 (Dec. 1, 1998); Clarification of Statement of Policy, 76 Fed. Reg. 28,031 (May 13, 2011) (clarifying the FDIC's Statement of Policy for Section 19 of the FDI Act).

"Approval is automatically granted and an application [for a waiver] will not be required where [an individual who has been convicted of] the covered offense [criminal offenses involving dishonesty, breach of trust, or money laundering] . . . meets all of the ["*de minimis*"] criteria" set forth in the FDIC's Statement of Policy.  FDIC POLICY, *supra*, § B (5).  These criteria include the following: (1) there is only one conviction or program of record for a covered offense; (2) the offense was punishable by imprisonment for a term of one year or less and/or a fine of $1,000 or less, and the individual did not serve time in jail; (3) the conviction or program was entered at least five years prior to the date an application would otherwise be required; and (4) the offense did not involve an insured depository institution or insured credit union.  *Id.*  Additionally, an individual's conviction for writing a "bad" check will be considered a *de minimis* offense, even if it involved an insured depository institution or insured credit union, if: (1) all other requirements of the *de minimis* offense provisions are met; (2) the aggregate total face value of the bad or insufficient funds check(s) cited in the conviction was $1000 or less; and (3) no insured depository institution or insured credit union was a payee on any of the bad or insufficient funds checks that were the basis of the conviction.  *Id.*

[142]     *See* FDIC POLICY, *supra* note 141, § C, "PROCEDURES."

[143]     *Id.  But cf.* NAT'L H.I.R.E. NETWORK, PEOPLE WITH CRIMINAL RECORDS WORKING IN FINANCIAL INSTITUTIONS: THE RULES ON FDIC WAIVERS, http://www.hirenetwork.org/FDIC.html ("Institutions rarely seek a waiver, except for higher level positions when the candidate is someone the institution wants to hire.  Individuals can only seek FDIC approval themselves if they ask the FDIC to waive the usual requirement.  Most individuals probably are unaware that they have this right."); FED. DEPOSIT INSUR. CORP. 2010 ANNUAL REPORT, § VI.A: KEY STATISTICS, FDIC ACTIONS ON FINANCIAL INSTITUTION APPLICATIONS 2008–2010 (2011), http://www.fdic.gov/about/strategic/report/2010annualreport/chpt6-01.html (reporting that between 2008 and 2010, the FDIC approved a total of 38 requests for consent to employ individuals with covered offenses in their background; the agency did not deny any requests during this time period).

[144]     FDIC POLICY, *supra* note 141,  § D, "EVALUATION OF SECTION 19 APPLICATIONS" (listing the factors that are considered in this waiver review process, which include: (1) the nature and circumstances underlying the offense; (2) "[e]vidence of rehabilitation including the person's reputation since the conviction . . . the  person's  age at the time of conviction . . .  and the time which has elapsed since the conviction"; (3) the position to be held in the insured institution; (4) the amount of influence/control the individual will be able to exercise over management affairs; (5) management's ability to control and supervise the individual's activities; (6) the degree of ownership the individual will have in the insured institution; (7) whether the institution's fidelity bond coverage applies to the individual; (8) the opinion of the applicable federal and/or state regulators; and (9) any other relevant factors).

<sup>145</sup>    *See* 49 C.F.R. §§ 1515.7 (describing the procedures for waiver of criminal offenses, among other standards), 1515.5 (explaining how to appeal the Initial Determination of Threat Assessment based on a criminal conviction).  In practice, some worker advocacy groups have criticized the TWIC appeal process due to prolonged delays, which leaves many workers jobless; especially workers of color.  *See generally* Maurice Emsellem et al., Nat'l Emp't Law Project, A Scorecard on the Post-911 Port Worker Background Checks: Model Worker Protections Provide a Lifeline for People of Color, While Major TSA Delays Leave Thousands Jobless During the Recession (2009), http://nelp.3cdn.net/2d5508b4cec6e13da6_upm6b20e5.pdf.

The Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 6201, 124 Stat. 721 (2010) (the Act) includes a process to appeal or dispute the accuracy of information obtained from criminal records.  The Act requires participating states to perform background checks on applicants and current employees who have direct access to patients in long-term care facilities, such as nursing homes, to determine if they have been convicted of an offense or have other disqualifying information in their background, such as a finding of patient or resident abuse, that would disqualify them from employment under the Social Security Act or as specified by state law.  *See* 42 U.S.C. § 1320a-7l(a)(3)(A), (a)(4)(B), (6)(A)–(E).  The background check involves an individualized assessment of the relevance of a conviction or other disqualifying information.  The Act protects applicants and employees in several ways, for example, by: (1) providing a 60-day provisional period of employment for the prospective employee, pending the completion of the criminal records check; (2) providing an independent process to appeal or dispute the accuracy of the information obtained in the criminal records check; and (3) allowing the employee to remain employed (subject to direct on-site supervision) during the appeals process.  42 U.S.C. § 1320a-7l(a)(4)(B)(iii), (iv).

<sup>146</sup>    *See* 46 U.S.C. § 70105(d); *see generally* TWIC Program, 49 C.F.R. § 1572.103 (listing the disqualifying offenses for maritime and land transportation security credentials, such as convictions and findings of not guilty by reason of insanity for espionage, murder, or unlawful possession of an explosive; also listing temporarily disqualifying offenses, within seven years of conviction or five years of release from incarceration, including dishonesty, fraud, or misrepresentation (expressly excluding welfare fraud and passing bad checks), firearms violations, and distribution, intent to distribute, or importation of controlled substances).

<sup>147</sup>    46 U.S.C. § 70105(c)(1)(A)–(B).

<sup>148</sup>    46 U.S.C. § 70105(c)(1)(B)(iii).

<sup>149</sup>    *See* 46 U.S.C. § 70105(c)(1)(A)(iv) (listing "Federal crime of terrorism" as a permanent disqualifying offense); *see also* 18 U.S.C. § 2332b(g)(5)(B) (defining "Federal crime of terrorism" to include the use of weapons of mass destruction under § 2332a).

<sup>150</sup>    *See* 49 C.F.R. § 1515.7(a)(i) (explaining that only certain applicants with disqualifying crimes in their backgrounds may apply for a waiver; these applicants do not include individuals

who have been convicted of a Federal crime of terrorism as defined by 18 U.S.C. § 2332b(g)).

[151]     These positions are defined as "national security positions" and include positions that "involve activities of the Government that are concerned with the protection of the nation from foreign aggression or espionage, including development of defense plans or policies, intelligence or counterintelligence activities, and related activities concerned with the preservation of the military strength of the United States" or "require regular use of, or access to, classified information."  5 C.F.R. § 732.102(a)(1)–(2).  The requirements for "national security positions" apply to competitive service positions, Senior Executive Service positions filled by career appointment within the Executive Branch, and excepted service positions within the Executive Branch. *Id.* § 732.102(b).  The head of each Federal agency can designate any position within that department or agency as a "sensitive position" if the position "could bring about, by virtue of the nature of the position, a material adverse effect on the national security."  *Id.* § 732.201(a).  Designation of a position as a "sensitive position" will fall under one of three sensitivity levels: Special-Sensitive, Critical-Sensitive, or Noncritical-Sensitive.  *Id.*

[152]     *See* Exec. Order No. 12,968, § 3.1(b), 3 C.F.R. 391 (1995 Comp.):

> [E]ligibility for access to classified information shall be granted only to employees who are United States citizens for whom an appropriate investigation has been completed and whose personal and professional history affirmatively indicates loyalty to the United States, strength of character, trustworthiness, honestly, reliability, discretion, and sound judgment, as well as freedom from conflicting allegiances and potential for coercion, and willingness and ability to abide by regulations governing the use, handling, and protection of classified information. A determination of eligibility for access to such information is a discretionary security decision based on judgments by appropriately trained adjudicative personnel.  Eligibility shall be granted only where facts and circumstances indicate access to classified information is clearly consistent with the national security interests of the United States, and any doubt shall be resolved in favor of the national security.

[153]     42 U.S.C. § 2000e-2(g); *see, e.g.*, Bennett v. Chertoff, 425 F.3d 999, 1001 (D.C. Cir. 2005) ("[E]mployment actions based on denial of a security clearance are not subject to judicial review, including under Title VII."); Ryan v. Reno, 168 F.3d 520, 524 (D.C. Cir. 1999) ("[A]n adverse employment action based on denial or revocation of a security clearance is not actionable under Title VII.").

[154]     *See Policy Guidance on the use of the national security exception contained in § 703(g) of Title VII of the Civil Rights Act of 1964, as amended*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, § II, *Legislative History* (May 1, 1989), http://www.eeoc.gov/policy/docs/national_security_exemption.html ("[N]ational security requirements must be applied equally without regard to race, sex, color, religion or national origin."); *see also* Jones v. Ashcroft, 321 F. Supp. 2d 1, 8 (D.D.C. 2004) (indicating that the

national security exception did not apply because there was no evidence that the government considered national security as a basis for its decision not to hire the plaintiff at any time before the commencement of the plaintiff's lawsuit, where the plaintiff had not been forthright about an arrest).

155    Federal contractor employees may challenge the denial of a security clearance with the EEOC or the Office of Contract Compliance Programs when the denial is based on race, color, religion, sex, or national origin.  *See generally* Exec. Order No. 11,246, 3 C.F.R. 339 (1964–1965 Comp.).

156    42 U.S.C. § 2000e-16(a).

157    Robert H. Shriver, III, *Written Testimony of Robert H. Shriver, III, Senior Policy Counsel for the U.S. Office of Personnel Management*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/7-26-11/shriver.cfm (last visited April 23, 2012) (stating that "with just a few exceptions, criminal convictions do not automatically disqualify an applicant from employment in the competitive civil service"); *see also* REENTRY MYTHBUSTER! ON FEDERAL HIRING POLICIES, *supra* note 16 ("The Federal Government employs people with criminal records with the requisite knowledge, skills and abilities.").  *But see supra* note 110, listing several federal statutes that prohibit individuals with certain convictions from working as federal law enforcement officers or port workers, or with private prisoner transport companies.

158    OPM has jurisdiction to establish the federal government's suitability policy for competitive service positions, certain excepted service positions, and career appointments in the Senior Executive Service.  *See* 5 C.F.R. §§ 731.101(a) (stating that OPM has been directed "to examine 'suitability' for competitive Federal employment"), 731.101(b) (defining the covered positions within OPM's jurisdiction); *see also* Shriver, *supra* note 157.

OPM is also responsible for establishing standards that help agencies decide whether to grant their employees and contractor personnel long-term access to federal facilities and information systems.  *See* Homeland Security Presidential Directive 12: Policy for a Common Identification Standard for Federal Employees and Contractors, 2 PUB. PAPERS 1765 (Aug. 27, 2004) ("establishing a mandatory, Government-wide standard for secure and reliable forms of identification issued by the Federal Government to its employees and contractors [including contractor employees]"); *see also* Exec. Order No. 13,467, § 2.3(b), 3 C.F.R. 196 (2009 Comp.) ("[T]he Director of [OPM] . . . [is] responsible for developing and implementing uniform and consistent policies and procedures to ensure the effective, efficient, and timely completion of investigations and adjudications relating to determinations of suitability and eligibility for logical and physical access."); *see generally* Shriver, *supra* note 157.

159    5 C.F.R. § 731.101(a).

160    *See* 5 C.F.R. §§ 731.205(a) (stating that if an agency finds applicants unsuitable based on the factors listed in 5 C.F.R. § 731.202, it may, in its discretion, bar those applicants from federal employment for three years),  § 731.202(b) (disqualifying factors from federal civilian

employment may include: misconduct or negligence in employment; material, intentional false statement, or deception or fraud in examination or appointment; refusal to furnish testimony as required by 5 C.F.R. § 5.4; alcohol abuse without evidence of substantial rehabilitation; illegal use of narcotics, drugs, or other controlled substances; and knowing and willful engagement in acts or activities designed to overthrow the U.S. Government by force).

161     *See id.* § 731.202(c).

162     *Id.*

163     *See generally* Shriver, *supra* note 157.  *See also* REENTRY MYTHBUSTER! ON FEDERAL HIRING POLICIES, *supra* note 16 ("Consistent with Merit System Principles, [federal] agencies [and departments] are required to consider people with criminal records when filling positions if they are the best candidates and can comply with requirements.").

164     *See generally EEOC Informal Discussion Letter* (March 19, 2007), http://www.eeoc.gov/eeoc/foia/letters/2007/arrest_and_conviction_records.html#N1 (discussing the EEOC's concerns with changes to OPM's suitability regulations at 5 CFR part 731).

165     *See* Stephen Saltzburg, *Transcript of 7-26-11 Meeting*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/7-26-11/transcript.cfm#saltzburg (last visited April 23, 2012) (discussing the findings from the American Bar Association's (ABA) Collateral Consequences of Conviction Project, which found that in 17 states that it has examined to date, 84% of the collateral sanctions against ex-offenders relate to employment).  For more information about the ABA's project, visit: Janet Levine, *ABA Criminal Justice Section Collateral Consequences Project*, INST. FOR SURVEY RESEARCH, TEMPLE UNIV., http://isrweb.isr.temple.edu/projects/accproject/ (last visited April 20, 2012).  In April 2011, Attorney General Holder sent a letter to every state Attorney General, with a copy to every Governor, asking them to "evaluate the collateral consequences" of criminal convictions in their state, such as employment-related restrictions on ex-offenders, and "to determine whether those [consequences] that impose burdens on individuals . . . without increasing public safety should be eliminated."  Letter from Eric H. Holder, Jr., Att'y Gen., Dep't of Justice, to state Attorney Generals and Governors (April 18, 2011), http://www.nationalreentryresourcecenter.org/documents/0000/1088/Reentry_Council_AG_Letter.pdf.

Most states regulate occupations that involve responsibility for vulnerable citizens such as the elderly and children. *See* STATE CRIMINAL HISTORY, *supra* note 37, at 10 ("Fifty states and the District of Columbia reported that criminal history background checks are legally required" for several occupations such as nurses/elder caregivers, daycare providers, caregivers in residential facilities, school teachers, and nonteaching school employees).  For example, Hawaii's Department of Human Services may deny applicants licensing privileges to operate a childcare facility if: (1) the applicant or any prospective employee has been convicted of a crime other than a minor traffic violation or has been confirmed to have abused or neglected a child or threatened harm; and (2) the department finds that the criminal history or child abuse record of

the applicant or prospective employee may pose a risk to the health, safety, or well-being of children.  *See* HAW. REV. STAT. § 346-154(e)(1)–(2).

166     42 U.S.C. § 2000e-7.

167     *See* Int'l Union v. Johnson Controls, Inc., 499 U.S. 187, 210 (1991) (noting that "[i]f state tort law furthers discrimination in the workplace and prevents employers from hiring women who are capable of manufacturing the product as efficiently as men, then it will impede the accomplishment of Congress' goals in enacting Title VII"); Gulino v. N.Y. State Educ. Dep't, 460 F.3d 361, 380 (2d Cir. 2006) (affirming the district court's conclusion that "the mandates of state law are no defense to Title VII liability").

EXHIBIT B

Case 5:13-cv-00255-C    Document 60-1    Filed 07/26/17    Page 76 of 81    PageID 1193



# FEDERAL BUREAU OF INVESTIGATION
## CAREERS

[                    ] Search

**FBIjobs Home**
**FBI.gov**
**View Jobs & Apply**
- How to Apply
...................................
**Career Paths**
- Special Agents
- Professional Staff
**Recruiting Events**
**Student Center**
- College Recruiting
- Internship Programs
- Presidential Management
  Fellows (PMF) Program
**Life @ FBI**
- Who We Are
- Meet Our People
- Benefits at the FBI
**Diversity**
- Statistics
- Diversity Programs
- Testimonials
**Background Investigation**
- Disqualifiers
- Drug Policy
- Process
- Forms
**Find Out More**
- FAQ's
- Find Your Local
  Field Office
- Featured Commercials

## BACKGROUND INVESTIGATION
All FBI employees require clearance.

FBIjobs.gov > Background Investigation > FBI Employment Disqualifiers

**EMPLOYMENT DISQUALIFIERS**

There are specific elements that will automatically disqualify job candidates for employment with the FBI. The FBI Employment Disqualifiers are:

- Conviction of a felony
- Use of illegal drugs in violation of the FBI Employment Drug Policy (see the **FBI Employment Drug Policy** for more details)
- Default of a student loan (insured by the U.S. Government)
- Failure of an FBI-administered urinalysis drug test
- Failure to register with the Selective Service System (for males only)

Please note that if you are disqualified by any of the above tests, you are not eligible for employment with the FBI. All of these disqualifiers are extensively researched during the **FBI Background Investigation Process**. Please make sure you can meet FBI employment requirements and pass all disqualifiers before you apply for an FBI position.

Accessibility | Privacy Policy | Site Map | Equal Opportunity | DOJ | DNI
FBIjobs.gov is an official site of the U.S. Federal Government, U.S. Department of Justice

https://www.fbijobs.gov/51.asp                                                                                    1/1

EXHIBIT C

EEOC FORM 131 (11/09)

**U.S. Equal Employment Opportunity Commission**

| | |
|---|---|
| Stuart Platt<br>General Counsel<br>TX DEPARTMENT OF PUBLIC SAFETY<br>P O Box 4087<br>Austin, TX 78773 | **PERSON FILING CHARGE**<br><br>**William R. Smith** |

| THIS PERSON (check one or both) | |
|---|---|
| [X] | Claims To Be Aggrieved |
| [ ] | Is Filing on Behalf of Other(s) |

EEOC CHARGE NO.
**451-2014-00103**

### NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act (Title VII)   [ ] The Equal Pay Act (EPA)   [ ] The Americans with Disabilities Act (ADA)

[ ] The Age Discrimination in Employment Act (ADEA)   [ ] The Genetic Information Nondiscrimination Act (GINA)

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by **02-DEC-13** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by  to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by **22-NOV-13** to   **Katherine S. Perez, ADR Coordinator, at  (210) 281-2507**
   If you <u>DO NOT</u> wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

| | |
|---|---|
| **Julia  Way,**<br>**Intake Supervisor**<br><br>*EEOC Representative*<br><br>*Telephone*     **(210) 281-7621** | **San Antonio Field Office**<br>**5410 Fredericksburg Rd**<br>**Suite 200**<br>**San Antonio, TX 78229**<br>**Fax: (210) 281-7690** |

TEXAS DEPT. OF PUBLIC SAFETY
OFFICE OF GENERAL COUNSEL

NOV 04 2013

Enclosure(s):  [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[X] Race  [ ] Color  [X] Sex  [ ] Religion  [ ] National Origin  [ ] Age  [ ] Disability  [ ] Retaliation  [ ] Genetic Information  [ ] Other

**See enclosed copy of charge of discrimination.**

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| **November 1, 2013** | **Travis G. Hicks,**<br>**Director** | |

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 451-2014-00103 |

**Texas Workforce Commission Civil Rights Division** and EEOC

*State or local Agency, if any*

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Mr. William R. Smith**    2013 OCT 30  AM 11 52 | **(512) 507-2386** | **01-01-1983** |

| Street Address | City, State and ZIP Code |
|---|---|
| **4534 Little Hill Circle, Austin, TX 78725** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **TX DEPT OF PUBLIC SAFETY** | **Unknown** | **(512) 424-2000** |

| Street Address | City, State and ZIP Code |
|---|---|
| **5805 North Lamar Blvd.,  Austin, TX 78752** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

**DISCRIMINATION BASED ON** *(Check appropriate box(es).)*

☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| **09-11-2013** | **10-08-2013** |

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

On September 11, 2013, I applied online for the position of Customer Service Representative (Contact Center). Although I met the qualifications for the position I was never contacted for an interview nor hired. The job application asked if the applicant had a felony conviction and I indicated that I had been convicted of a felony for unauthorized use of a vehicle.

I believe I have discriminated against because of my race (Black), sex (male), and felony conviction, in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| x 10·25·13     x W~ Smith | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |
| Date     Charging Party Signature | |

EXHIBIT D

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To:    **William R. Smith**
       **4534 Little Hill Circle**
       **Austin, TX 78725**

From:    **San Antonio Field Office**
         **5410 Fredericksburg Rd**
         **Suite 200**
         **San Antonio, TX 78229**

| | |
|---|---|
| [ ] | *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))* |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **451-2014-00103** | **Travis G. Hicks, Director** | **(210) 281-7603** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]    The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]    Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ]    The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]    Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X]    The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]    The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]    Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*Travis G. Hicks*                                        12/19/2013

Enclosures(s)                    **Travis G. Hicks,**                    *(Date Mailed)*
                                 **Director**

cc:    **Kathleen T. Murphy-Darveau**
       **Senior Asst. General Counsel**
       **TX DEPARTMENT OF PUBLIC SAFETY**
       **P O Box 4087**
       **Austin, TX 78773**

TEXAS DEPT. OF PUBLIC SAFETY
OFFICE OF GENERAL COUNSEL

DEC 23 2013