**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

| | |
|---|---|
| STATE OF TEXAS,<br><br>                                        *Plaintiff*,<br><br>                    v.<br><br>EQUAL    EMPLOYMENT    OPPORTUNITY<br>COMMISSION, *et al*.,<br><br>                                        *Defendants*,<br><br>                    and<br><br>BEVERLY HARRISON and TEXAS STATE<br>CONFERENCE OF THE NAACP,<br><br>                    *Proposed Defendant-Intervenors.* | Civil Action. No. 5:13-CV-255-C |

**MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE OF BEVERLY**
**HARRISON AND TEXAS STATE CONFERENCE OF THE NAACP AS DEFENDANTS**

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ................................................................................................................ 3

ARGUMENT ..................................................................................................................... 8

I.      APPLICANTS SHOULD BE GRANTED INTERVENTION AS OF RIGHT. ............... 8

     A.      The motion to intervene is timely. ........................................................... 9

     B.      Proposed Defendant-Intervenors have a strong interest in the legality and application of the EEOC's Guidance and the EEOC's ability to issue "right-to-sue" letters. ......................................................................................... 11

     C.      Applicants will suffer prejudice if they are not able to intervene in this case. ....................................................................................................... 13

     D.      Defendants may not adequately represent the interests of Applicants. ............. 16

II.     APPLICANTS SHOULD BE GRANTED PERMISSIVE INTERVENTION. ............... 21

CONCLUSION ................................................................................................................. 22

**<u>TABLE OF AUTHORITIES</u>**

<u>PAGE(S)</u>

<u>CASES:</u>

*Black Fire Fighters Ass'n of Dallas v. City of Dallas*,
    19 F.3d 992 (5th Cir. 1994) ...................................................................................... 12, 13

*City of Houston v. Am. Traffic Solutions, Inc.*,
    668 F.3d 291 (5th Cir. 2012) ...................................................................................... 8, 19

*Conservation Law Found. of New England, Inc. v. Mosbacher*,
    966 F.2d 39 (1st Cir. 1992) ......................................................................................... 20

*Doe No. 1 v. Glickman*,
    256 F.3d 371 (5th Cir. 2001) ...................................................................................... 8, 15, 16

*Edwards v. City of Houston*,
    78 F.3d 983 (5th Cir. 1996) ........................................................................................ 11, 12, 13

*Entergy Gulf States Louisiana, L.L.C. v. EPA*,
    817 F.3d 198 (5th Cir. 2016) ...................................................................................... 8

*Gen. Tel. Co. of the Nw., Inc. v. EEOC*,
    446 U.S. 318 (1980).................................................................................................... 20

*Green v. Missouri Pacific Railroad*,
    549 F.2d 1158 (8th Cir. 1977) .................................................................................... 1

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    229 F.R.D. 126 (S.D. Tex. 2005)................................................................................ 21

*Librado v. M.S. Carriers, Inc.*,
    02 Civ. 2095(D), 2004 WL 287724 (N.D. Tex. Feb. 5, 2004) ................................. 22

*Newby v. Enron Corp.*,
    443 F.3d 416 (5th Cir. 2006) ...................................................................................... 21-22

*Reid v. Gen. Motors Corp.*,
    240 F.R.D. 257 (E.D. Tex. 2006) ............................................................................... 21

*Rivera v. City of San Antonio*,
    Civ. A. No. SA-06-CA-235-XR, 2006 WL 3691015 (W.D. Tex. Dec. 12, 2006) .................. 21

*Ross v. Marshall*,
    426 F.3d 745 (5th Cir. 2005) ...................................................................................... 11

**PAGE(S)**

*S. Dade Land Corp. v. Sullivan*,
    155 F.R.D. 694 (S.D. Fla. 1994)............................................................................20-21

*Sierra Club v. Espy*,
    18 F.3d 1202 (5th Cir. 1994) ..............................................................................9, 13

*Siesta Village Market, LLC v. Perry*,
    Nos. 06 Civ 585(D), 06 Civ 232(D), 2006 WL 1880524 (N.D. Tex. July 7, 2006)................ 21

*Stallworth v. Monsanto Co.*,
    558 F.2d 257 (5th Cir. 1977) ..................................................................................... 9

*Texas v. United States*,
    805 F.3d 653 (5th Cir. 2015) ............................................................................ 11, 16

*Trans World Airlines, Inc. v. Mattox*,
    712 F. Supp. 99 (W.D. Tex. 1989) ............................................................................ 8

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*,
    834 F.3d 562 (5th Cir. 2016). .................................................................................. 11

*Wildearth Guardians v. Jewell*,
    No. 16 Civ. 168, 2016 WL 4133533 (D. Utah Aug. 3, 2016) ............................................16-17


**PAGE(S)**

**STATUTES & OTHER AUTHORITIES:**

42 U.S.C.
    § 2000e-5(b)............................................................................................................ 12
    § 2000e-5(f)(1)........................................................................................................ 12

Tex. Occ. Code §§ 53.022-53.023 (effective Sept. 1, 1999) ......................................................... 5

H.B. 1188, 85th Leg. (Tx. 2017),
    http://www.capitol.state.tx.us/BillLookup/History.aspx?LegSess=83R&Bill=HB1188 ........... 5

Fed. R. Civ. P.
    24(a)(2) ................................................................................................................ 8, 16
    24(b)........................................................................................................................ 21

**PAGE(S)**

Berg, Mark T., & Beth M. Huebner, *Reentry and the Ties that Bind*, 28 Just. Q. 382, 397-98 (Apr. 2011), http://www.pacific-gateway.org/reentry,%20employment%20and%20recidivism.pdf .......................................... 7

Bucknor, Cherrie, & Alan Barber, Ctr. for Econ. & Pol'y Res., *The Price We Pay: Economic Costs of Barriers to Employment for Former Prisoners and People Convicted of Felonies* 1 (June 2016), http://bit.ly/2atNJBu ..................................... 7-8

Chammah, Maurice, *Business Association Scores Victories on Criminal Justice Agenda*, Texas Tribune (May 23, 2013), https://www.texastribune.org/2013/05/23/business-association-looks-back-criminal-justice-a/ .............................................................................................. 5

Dear Colleague Letter from Sandra Battle, Acting Asst. Secretary of C.R., U.S. Dep't of Educ. and T.E. Wheeler, II, Acting Asst. Att'y Gen. for C.R., U.S. Dep't of Just. (Feb. 22, 2017), http://i2.cdn.turner.com/cnn/2017/images/02/23/1atransletterpdf022317.pdf ................... 17-18

Gaebler, Helen, *Criminal Records in the Digital Age: A Review of Current Practices and Recommendations for Reform in Texas* 4, 10 (William Wayne Justice Center for Public Interest Law, University of Texas School of Law, Mar. 2013), https://law.utexas.edu/wp-content/uploads/sites/27/Criminal-Records-in-the-Digital-Age-Report-by-Helen-Gaebler.pdf .......................................................................................... 6

Kurlychek, Megan C., et al., *Scarlet Letters and Recidivism: Does an Old Criminal Record Predict Future Offending?*, 5 Criminology & Pub. Pol'y 483, 483 (2006) ............................... 7

Lundquist, Jennifer, et al., *Does a Criminal Past Predict Worker Performance? Evidence from America's Largest Employer* 27 (Dec. 2, 2016) (unpublished manuscript), http://bit.ly/2lloRle ............................................................................. 3

Minor, Dylan, et al., *Criminal Background and Job Performance* 11 (May 14, 2017), http://bit.ly/2mzFsCj ...................................................................................................................... 3

Office of Deputy Mayor for Public Safety, City of Philadelphia, *Economic Benefits of Employing Formerly Incarcerated Individuals in Philadelphia* l-13, 18 (2011), http://bit.ly/2m2dei3 ...................................................................................... 8

Pager, Devah, *The Mark of a Criminal Record*, 108 Am. J. of Soc. 937, 955-58 (Mar. 2003), http://bit.ly/1vNQBJk ................................................................................................................. 14

President George W. Bush, State of the Union Address (Jan. 20, 2004), http://georgewbush-whitehouse.archives.gov/news/releases/2004/01/20040120-7.html ......................................... 7

**PAGE(S)**

Soc'y for Human Resource Mgmt., *Background Checking–The Use of Criminal Background Checks in Hiring Decisions* 3 (July 19, 2012), http://bit.ly/2mhlrzh........................................ 14

Tex. Pub. Pol'y Found., *Working with Conviction: Criminal Offenses as Barriers to Entering Licensed Occupations in Texas* 1 (Nov. 2007), https://www.texaspolicy.com/library/doclib/2007-11-PP28-licensing-ml.pdf. ......................... 7

Thompson, Senfronia, Judiciary & Civ. Juris. Comm. Rep., *Bill Analysis of H.B. 1188* (2013), http://www.legis.state.tx.us/tlodocs/83R/analysis/pdf/HB01188h.pdf.............................. 14, 15

Proposed Defendant-Intervenors, Beverly Harrison and the Texas State Conference of the NAACP ("Texas NAACP") (together, "Proposed Defendant-Intervenors" or "Applicants"), by and through their undersigned counsel, respectfully submit this Memorandum of Law in support of their Motion to Intervene as of right pursuant to Rule 24(a) of the Federal Rules of Civil Procedure or, alternatively, permissively pursuant to Rule 24(b) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Plaintiff, the State of Texas, brought this action to challenge the legality of the Equal Employment Opportunity Commission's ("EEOC") guidance, adopted in 2012, on the use of criminal records in hiring. Second Amended Compl. Doc. 62 ¶¶ 48-50; Doc. 31 at 1-55 (EEOC, Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII ("Guidance"), No. 915.002 (Apr. 25, 2012)). The Guidance provides employers with information about how they can use criminal history information when screening applicants for jobs, consistent with existing jurisprudence (*see, e.g.*, *Green v. Missouri Pacific Railroad*, 549 F.2d 1158 (8th Cir. 1977)) and EEOC policies that have been in place for decades. *See* Doc. 52 at 8 (this court indicating that the Guidance "is [] a consummation of the EEOC's decisionmaking process that has been in play for many years …"). The Guidance does *not* prohibit employers from using criminal background checks, or even try to discourage their use. Rather, it sensibly advises employers not to categorically refuse to hire anyone with a criminal history. Instead, employers should consider the nature of the person's offense, the amount of time that has passed since the criminal conduct occurred, and whether the conduct has any relationship to the job sought. The Guidance further advises employers to offer individuals the opportunity to explain their criminal background before making a decision about whether to offer the person a job. Guidance § V(B)(6)-

-1-

(9). The Guidance is a critical tool to ensure that employers use criminal history information in a responsible and nondiscriminatory manner. Guidance § VI(A) ("[I]f an employer decides to impose an exclusion that goes beyond the scope of a federally imposed restriction, the discretionary aspect of the policy would be subject to Title VII [of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII")] analysis.")

Texas asks this Court to declare that it has the right to impose absolute bars on hiring persons with felony criminal convictions, even if those convictions are decades old and unrelated to the job at issue, and without any individualized consideration of the job applicant. Doc. 62 ¶ 43; *see also id*. ¶¶ 23-31 (identifying various state agencies and school districts that categorically deny employment to people with any or certain felony convictions). Texas further seeks a declaration that the EEOC cannot issue right-to-sue-letters pursuant to an "interpretation of Title VII that appears in its [Guidance]." *Id*. ¶ 44.

Proposed Defendant-Intervenors are Beverly Harrison, a Black woman and grandmother, whom Dallas County Schools ("DCS") denied a job as a school crossing guard due to a 40-year old conviction, and the Texas NAACP, which has worked to eliminate barriers faced by its members and other Black people with criminal records, including absolute bans on hiring people with felony convictions. Applicants have a strong interest in, and benefit from, the use of the Guidance by employers in Texas. They seek to intervene as defendants in this case either as of right or permissively to vigorously defend the Guidance (and its application in Texas), which the current federal administration has shown that it may not do. Unlike the existing parties, Applicants would provide this Court with the real-world effects that absolute bans and other limitations on hiring people with criminal convictions have on individuals, families, and communities of color as this Court performs a careful and thorough analysis of the Guidance.

-2-

## BACKGROUND

For most of her life, Beverly Harrison has resided in Dallas, Texas. Ms. Harrison is a 61-year-old Black woman and grandmother who retired from the Dallas City Marshal's Office in 2009 after nearly 30 years of service to the City of Dallas. Ms. Harrison has continued to work for supplemental income and to contribute to her community since her retirement, most recently for the Dallas Independent School District ("DISD") as a school cafeteria employee.

Ms. Harrison's uninterrupted work history, following her interaction with the criminal system decades ago, is consistent with studies that confirm the relatively high quality of employees with records. *See, e.g*., Jennifer Lundquist, et al., *Does a Criminal Past Predict Worker Performance? Evidence from America's Largest Employer* 27 (Dec. 2, 2016) (unpublished manuscript), http://bit.ly/2lloRle (research on military members with past felony convictions, who were granted waivers by the government, reveal that they are no more likely to be terminated and are promoted more than individuals without records); *see also* Dylan Minor, et al., *Criminal Background and Job Performance* 11 (May 14, 2017), http://bit.ly/2mzFsCj (a study finding that employees with records have lower turnover and a lesser likelihood of voluntarily separating from the employer).

In 2013, Ms. Harrison applied for a job with DCS as a school crossing guard or bus monitor. Ms. Harrison received a conditional offer of employment from DCS and began work as a school crossing guard. After eight days on the job, however, Ms. Harrison learned that DCS was terminating her employment because of an entry that appeared on her criminal background report from almost 40 years earlier. In 1975, when she was 19 years old, Ms. Harrison pleaded no contest to the offense of aggravated assault, a third-degree felony, and was sentenced to five years of probation. In 1977, after two years of satisfactory compliance with the terms of her probation, the

Dallas County Criminal Court issued an order discharging Ms. Harrison from probation early, setting aside the judgment of conviction, and "releas[ing her] from all penalties and disabilities resulting from the Judgment of Conviction."

In the many decades since, Ms. Harrison has *never* been convicted of a crime. Nonetheless, the entry from 1975 has rendered her ineligible to secure employment with certain employers like DCS and may in the future render her ineligible to work for certain employers in Texas. Ms. Harrison's denial of employment by DCS is the basis of a pending complaint with the EEOC because of, among other things, DCS's failure to provide a meaningful individualized assessment of Ms. Harrison's application or an opportunity for her to demonstrate that its policy as applied to her is not job related or consistent with business necessity, as the Guidance encourages. For medical reasons, Ms. Harrison intends to leave her current job and seek employment elsewhere in Texas, reasonably causing her great concern that her criminal record may again make her ineligible for employment. *See* Declaration of Beverly Harrison in the Appendix to this memorandum as Exhibit A, 001.

The Texas NAACP is a subsidiary organization of the National Association for the Advancement of Colored People, Inc. ("NAACP"), a national non-profit, non-partisan organization. The Texas NAACP was founded in 1936, incorporated in 1937, and is the oldest and one of the largest and most significant non-profit organizations in the state of Texas that promotes and protects the rights of Black Americans. It is headquartered in Austin and has over 70 adult branches across Texas. The members of those branches are residents of every region of the state.

The Texas NAACP's organizational objectives include pursuing the elimination of all racial discrimination, including in employment and other economic spheres, and seeking enforcement of and defending federal antidiscrimination laws, such as Title VII. The Texas

NAACP, along with its branches, has worked to eliminate barriers faced by Black and other people with criminal records, such as its members, including obstacles like felony conviction bans by employers in Texas. For example, in 2012, the San Antonio branch of the NAACP partnered with the public transit authority (VIA Metropolitan Transit) on behalf of individuals with convictions to "ban the box" and require employers in Texas to give job applicants individualized consideration before asking for criminal history.

This effort by a branch of the Texas NAACP is part of a broader effort to advocate for policies that ease obstacles to employment for people with criminal records in Texas. For example, in 2013, with the backing of the Texas Association of Business, Governor Rick Perry signed into law House Bill 1188, with overwhelming bipartisan support in the Texas Legislature (a vote of 134-2 in the House and 31-0 in the Senate). H.B. 1188, 85th Leg. (Tx. 2017), http://www.capitol.state.tx.us/BillLookup/History.aspx?LegSess=83R&Bill=HB1188; *see also* Maurice Chammah, *Business Association Scores Victories on Criminal Justice Agenda*, Texas Tribune (May 23, 2013), https://www.texastribune.org/2013/05/23/business-association-looks-back-criminal-justice-a/. H.B. 1188 encourages employers to hire qualified applicants with criminal records by limiting the liability for employers who wish to hire such individuals but fear the consequence of negligent hiring lawsuits based solely on the employee having a criminal history. Further, in 1999, the Texas Legislature amended the Texas Occupations Code to require state licensing authorities to consider many of the same factors contained in the Guidance when deciding whether to grant certain occupational licenses to people with criminal histories. *Compare* Guidance § 6 *with* Tex. Occ. Code §§ 53.022-53.023 (effective Sept. 1, 1999).

People with criminal records need jobs so that they can support themselves and their families and contribute to their communities. Texas's defense of broad-sweeping bans on hiring

people with criminal convictions affects the lives of millions of Texans, including members of the NAACP in Texas. The number of Texans, disproportionately men of color, who have been caught up in the criminal system is staggering. Approximately 4.7 million of Texas's citizens, or nearly 20 percent of the state's population, will be either arrested or convicted of a crime in their lifetime. *See, e.g.,* Helen Gaebler, *Criminal Records in the Digital Age: A Review of Current Practices and Recommendations for Reform in Texas* 4, 10 (William Wayne Justice Center for Public Interest Law, University of Texas School of Law, Mar. 2013), https://law.utexas.edu/wp-content/uploads/sites/27/Criminal-Records-in-the-Digital-Age-Report-by-Helen-Gaebler.pdf (hereinafter "*Criminal Records*"); *see id.* (Black Texans constitute 27 percent of drug arrests and 36 percent of the prison/state jail population yet make up only 11 percent of the State's adult population). Indeed, each year, over a million Texans are arrested, and hundreds of thousands will either be incarcerated or placed under state surveillance. *Id.* at 4. And more than 70,000 Texans are released from confinement each year and must reintegrate into society and rejoin communities. Gaebler, *Criminal Records*, at 8.

When job opportunities are denied because of enforcement of discriminatory employment policies, including bans on hiring people with criminal convictions without an individualized assessment of the applicant and whether the policy is job related or consistent with business necessity, the Texas NAACP has to redirect its efforts from such re-entry work as job searches and training skills for individuals with convictions to enforcement of antidiscrimination statutes such as Title VII. *See* Declaration of Dr. Gary Watkins, Chair of the Criminal Justice Committee of Texas NAACP, in the Appendix to this memorandum as Exhibit B, 004.

Moreover, categorical bans on hiring individuals with criminal convictions, which Texas uses and seeks a declaration from this Court that it has the absolute right to do, does not make the

communities in which Ms. Harrison and members of the NAACP in Texas live in safer, given that steady employment has been shown to be a key factor in lowering recidivism rates. *See, e.g.*, Mark T. Berg & Beth M. Huebner, *Reentry and the Ties that Bind*, 28 Just. Q. 382, 397-98 (Apr. 2011), http://www.pacific-gateway.org/reentry,%20employment%20and%20recidivism.pdf (a study revealing that two years after release, nearly twice as many employed individuals had avoided another interaction with the criminal justice system when compared with their unemployed counterparts); *see also* Megan C. Kurlychek, et al., *Scarlet Letters and Recidivism: Does an Old Criminal Record Predict Future Offending?*, 5 Criminology & Pub. Pol'y 483, 483 (2006) (a study concluding that, six or seven years after release from incarceration, the risk of recidivism among people with records is only marginally higher than those who have never offended). The former President and Texas Governor George W. Bush agrees. *See* President George W. Bush, State of the Union Address (Jan. 20, 2004), http://georgewbush-whitehouse.archives.gov/news/releases/2004/01/20040120-7.html ("We know from long experience that if [people who were formerly incarcerated] can't find work, or a home, or help, they are much more likely to commit crimes and return to prison ... America is [the] land of the second chance, and when the gates of the prison open, the path ahead should lead to a better life."); *see also* Tex. Pub. Pol'y Found., *Working with Conviction: Criminal Offenses as Barriers to Entering Licensed Occupations in Texas* 1 (Nov. 2007), https://www.texaspolicy.com/library/doclib/2007-11-PP28-licensing-ml.pdf.

Our nation's economy suffers when there are lost workers, like Ms. Harrison and members of the NAACP in Texas, due to bans on hiring people with criminal convictions. *See, e.g.*, Cherrie Bucknor & Alan Barber, Ctr. for Econ. & Pol'y Res., *The Price We Pay: Economic Costs of Barriers to Employment for Former Prisoners and People Convicted of Felonies* 1 (June 2016),

http://bit.ly/2atNJBu (economists estimating that reduced prospects in the labor market translated into a $78 to $87 billion reduction in U.S. gross domestic product in 2014); *see also* Office of Deputy Mayor for Public Safety, City of Philadelphia, *Economic Benefits of Employing Formerly Incarcerated Individuals in Philadelphia* l-13, 18 (2011), http://bit.ly/2m2dei3 (a study estimating that putting 100 formerly incarcerated people back to work would increase their collective lifetime earnings by $55 million, their income tax contributions by $1.9 million, and their sales tax payments by $770,000 – all the while saving over $2 million annually by staying out of the criminal system).

## ARGUMENT

### I.    Applicants Should Be Granted Intervention As Of Right.

The court must permit intervention as of right under Rule 24(a)(2) if the prospective intervenor files a timely motion, claims an interest in the proceeding, shows that disposition of the action threatens to impair or impede that interest, and demonstrates that the existing parties may not adequately represent that interest. Fed. R. Civ. P. 24(a)(2); *Trans World Airlines, Inc. v. Mattox*, 712 F. Supp. 99, 104 (W.D. Tex. 1989) (granting intervention where these factors have been satisfied); *Doe No. 1 v. Glickman*, 256 F.3d 371, 381 (5th Cir. 2001) (applying requirements of Fed. R. Civ. P. 24(a) and granting intervention as a matter of right).

Federal courts have emphasized that the Rule's intervention requirements should be construed flexibly and in favor of intervention. *City of Houston v. Am. Traffic Solutions, Inc.,* 668 F.3d 291, 293 (5th Cir. 2012) (The inquiry "is a flexible one, which focuses on the particular facts and circumstances surrounding each application."); *see also Entergy Gulf States Louisiana, L.L.C. v. EPA*, 817 F.3d 198, 203 (5th Cir. 2016) (Rule 24 "is to be liberally construed, with doubts resolved in favor of the proposed intervenor.") (internal quotation marks and citations omitted);

-8-

*Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994) ("Federal courts should allow intervention where no one would be hurt and greater justice could be attained.") (quotation marks and citations omitted).

Here, Applicants satisfy all four requirements for intervention as of right.

### A.  The motion to intervene is timely.

Applicants have filed a timely motion.

Timeliness is measured by:

> (1) [t]he length of time during which the would-be intervenor actually knew or reasonably should have known of its interest in the case before it petitioned for leave to intervene; (2) the extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as it knew or reasonably should have known of its interest in the case; (3) the extent of the prejudice that the would-be intervenor may suffer if intervention is denied; and (4) the existence of unusual circumstances militating either for or against a determination that the application is timely.

*Sierra Club,* 18 F.3d at 1205; *see also id.* ("The requirement of timeliness is not a tool of retribution to punish the tardy would-be intervenor, but rather a guard against prejudicing the original parties by the failure to apply sooner."). "The analysis is contextual; absolute measures of timeliness should be ignored." *Id.*; *Stallworth v. Monsanto Co.*, 558 F.2d 257, 263 (5th Cir. 1977).

Plaintiff filed its initial complaint on November 4, 2013, Doc. 1. On May 22, 2014, Applicants moved to intervene, Doc. 34, alerting this Court and the existing parties of their interests in this matter. Their motion was terminated by this Court in light of its initial ruling that granted Defendants' Motion to Dismiss, Docs. 36-37. Subsequently, the Fifth Circuit Court of Appeals vacated this Court's order of dismissal and remanded this case for further proceedings, Docs. 41-42, pursuant to which this Court recently entered an order denying Defendants' Motion to Dismiss, Doc. 52, and further ordering the parties to cross-move for summary judgment by

September 14, 2017, Doc. 59. Defendants have only recently filed an answer on June 26, 2017, Doc. 56. And, to date, the only substantive events that have occurred in the litigation are the filing of: (i) Plaintiff's first amended complaint and second amended complaint on March 18, 2014 (Doc. 24) and July 28, 2017 (Doc. 62), respectively; (ii) the aforementioned motion to dismiss by Defendants on April 4, 2014 (Doc. 29) and supplemental briefing on that renewed motion to dismiss following remand, (Docs. 47, 49-50); and (iii) Defendants' Answer on June 26, 2017 (Doc. 56).

Applicants' Motion to Intervene also is timely because it has been filed promptly after this Court denied Defendants' Motion to Dismiss on June 2, 2017, Doc. 52. Applicants understand that Defendants only recently served discovery on Plaintiff—the only discovery that Applicants are aware has been sought in this case—to be used in support of the motion for summary judgment that the parties must file by September 14, 2017. Doc. 58 at 1. If granted intervention, Applicants do not anticipate seeking additional discovery, but will participate in summary judgment proceedings. Thus, because the litigation is in its earliest stages, the existing parties will not suffer any prejudice if Applicants' Motion to Intervene is granted.

In contrast, Applicants would be prejudiced if intervention were denied because, as discussed in detail below, they have a strong interest in this action, including the continued legality and use of the Guidance. Should the Guidance be set aside or weakened, Ms. Harrison and members of the NAACP in Texas may be denied the opportunity to obtain employment in Texas because of criminal convictions. DCS's denial of an employment opportunity to Ms. Harrison because of its categorical hiring ban, despite her dedicated and consistent employment for decades for the City of Dallas, including its Marshal's Office, and DISD, as a school cafeteria employee, is emblematic of the absurdity of such policies and is the basis of a pending complaint with the

Dallas Office of the EEOC as a violation of Title VII. Moreover, Applicants would suffer prejudice if intervention were denied because, as explained in detail in section D below, recent actions raise doubts about the federal government's commitment to the defense of existing agency guidance such as that which is challenged by Texas in this case.

**B. Proposed Defendant-Intervenors have a strong interest in the legality and application of the EEOC's Guidance and the EEOC's ability to issue "right-to-sue" letters.**

To intervene as of right, an applicant must have an interest that is "direct, substantial, [and] legally protectable." *Ross v. Marshall*, 426 F.3d 745, 757 (5th Cir. 2005). The test for determining the sufficiency of intervenors' interest is a non-stringent, "practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Id.* (internal citations and quotation marks omitted).

The interest in the proceedings necessary for intervention as of right is an interest "that the substantive law recognizes as belonging to or being owned by the applicant. *Edwards v. City of Houston*, 78 F.3d 983, 1004 (5th Cir. 1996) (en banc) (citation omitted). Courts have held that "an interest is sufficient if it is of the type that the law deems worthy of protection, even if the intervenor does not have an enforceable legal entitlement." *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 834 F.3d 562, 566 (5th Cir. 2016). "[T]he inquiry turns on whether the intervenor has a stake in the matter that goes beyond a generalized preference that the case come out a certain way." *Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015). In particular, courts have held that an intervenor has a legally protectable interest where she is an intended beneficiary of a government regulatory program and seeks to defend the program. *See Wal-Mart*, 834 F.3d at 569; *see also Texas*, 805 F.3d at 660 (concluding that women who potentially qualified for deferred

-11-

action under a federal government program could intervene in litigation challenging the program because they were its intended beneficiaries).

Here, as indicated above, Ms. Harrison has a strong interest in the legality of the Guidance, which DCS should have used in considering her criminal history as part of its hiring decision, and the application of the Guidance in any future hiring decisions in which she is an applicant for employment in Texas. Moreover, Ms. Harrison has a direct interest in the EEOC's ability to issue right-to-sue letters pursuant to Title VII to protect her right to be free from racial discrimination in employment, and otherwise using that statute to vindicate any claim that she may have against DCS or any other employer in Texas who denies her a job because of her criminal record.

This protection has several elements. First, if Ms. Harrison files a charge with the EEOC, as she has with respect to DCS's denial of a job to her, the agency will conduct an investigation. 42 U.S.C. § 2000e-5(b). If the EEOC finds reasonable cause to believe that a violation of Title VII has occurred, it will initiate conciliation with the state and, if that fails, it will refer the matter to the DOJ to decide whether to bring an action enforcing Ms. Harrison's rights. *Id.* § 2000e-5(f)(1). If, on the other hand, the EEOC does not find reasonable cause, it will dismiss the charge but issue a "right-to-sue" letter to Ms. Harrison. *Id.* § 2000e-5(b). Only after obtaining a right-to-sue letter can Ms. Harrison bring an action against the state herself. *Id.* § 2000e-5(f)(1).

Ms. Harrison's interest is more direct than many that the Fifth Circuit has held sufficient to justify intervention as of right. Even "prospective interference with promotion[al] opportunities can justify intervention," *Black Fire Fighters Ass'n of Dallas v. City of Dallas*, 19 F.3d 992, 994 (5th Cir. 1994), and securing "equal access to a promotion system and promotion opportunities" without discrimination is an interest justifying intervention as of right. *Edwards*, 78 F.3d at 1004.

In Ms. Harrison's case, the disposition of this case would not determine potential promotion, but rather may determine whether Ms. Harrison can obtain employment at all.

On behalf of its members, specifically, as well as Texas's Black communities more broadly, the Texas NAACP has an interest in furthering its organizational mission of eliminating racial barriers in employment practices, including the discrimination caused by categorical bans on hiring people with criminal convictions. Indeed, the Texas NAACP works to help those with criminal records to gain employment not only for those individuals' sake, but also because of the profound impact that criminal records have on Black communities. The Texas NAACP and its branches have a strong interest in the use of the Guidance by employers in Texas because it discourages categorical bans and provides information about how to use the criminal records of applicants in hiring decisions consistent with Title VII. Moreover, the Texas NAACP has a strong interest in the EEOC's ability to issue right-to-sue letters in the event that members of the NAACP in Texas seek to challenge employment practices that categorically deny employment to Black and other people with criminal convictions. As part of its mission, therefore, Texas NAACP is dedicated to defending the legality and use of the Guidance, as well as the ability of the EEOC to issue right-to-sue letters, which Texas threatens in this action.

Courts have granted intervention of right to organizations based on the organizations' interest in protecting the interests of their members and constituents, as the Texas NAACP seeks to do here for Ms. Harrison and other similarly-situated Black Texans. *See, e.g., Edwards*, 78 F.3d at 1004; *Black Fire Fighters Ass'n*, 19 F.3d at 994; *Sierra Club*, 18 F.3d at 1207.

### C.  Applicants will suffer prejudice if they are not able to intervene in this case.

As referenced above, if any of Plaintiff's claims are successful, it will be even harder for Texans with criminal records, including Black people like Ms. Harrison and members of the

NAACP in Texas, to gain employment in Texas given that the stigma of criminal justice involvement can be lifelong and have lasting impact on employment opportunities. *See, e.g.,* Devah Pager, *The Mark of a Criminal Record*, 108 Am. J. of Soc. 937, 955-58 (Mar. 2003), http://bit.ly/1vNQBJk (a study finding that a criminal record halved the callback rate for white applicants from 34 percent to 17 percent, that white applicants with records received more callbacks than Black applicants without records, who had a 14 percent callback rate, and that Black applicants with records were penalized even more significantly than white applicants, with their callback rate reduced by almost two-thirds to 5 percent); *see also* Soc'y for Human Resource Mgmt., *Background Checking–The Use of Criminal Background Checks in Hiring Decisions* 3 (July 19, 2012), http://bit.ly/2mhlrzh (recent surveys indicate that nearly nine in ten employers perform background checks for some or all of their positions). The Texas Legislature has recognized that job seekers with criminal records receive less than half as many job offers as other applicants. Senfronia Thompson, Judiciary & Civ. Juris. Comm. Rep., *Bill Analysis of H.B. 1188* (2013), http://www.legis.state.tx.us/tlodocs/83R/analysis/pdf/HB01188h.pdf.

Indeed, if the Guidance is successfully challenged in this action, employers, like Texas, may feel free to adopt and use unnecessarily restrictive and overly broad criminal records policies. Thus, the outcome of this action may block Ms. Harrison and members of the NAACP in Texas from employment opportunities or even a fair opportunity to apply for jobs and receive an individualized assessment of their qualifications, as the Guidance encourages.

Ms. Harrison already has been denied a job with DCS because of an employment policy which, inconsistent with the Guidance, categorically bars her from employment, regardless of the facts that her conviction is now more than 40 years old and that she has collectively worked for decades for other Texas employers, notably the Dallas County Marshall's Office and DISD (as a

school cafeteria worker). This policy also is the basis for potential Title VII liability against DCS.

Further, Texas's lawsuit threatens the work of the Texas NAACP and its branches to eliminate barriers faced by their members with criminal records because of obstacles like categorical bans that prevent those individuals from obtaining employment. Texas seeks a declaration that such bans do not constitute unlawful employment practices, seeking to enshrine across Texas a discriminatory employment scheme that causes the depletion of resources from the Black individuals, families, and communities that the Texas NAACP and its branches serve and seek to empower. The Texas NAACP, along with its branches, furthers its mission by doing extensive work assisting individuals with convictions to obtain the benefits of full citizenship including opportunities to work and contribute to their families and their communities. The Texas Legislature recognized in 2013 that employment policies to assist people with criminal records allow them to become self-sufficient and enhance employers' hiring options and profitability. Thompson, *Bill Analysis of H.B. 1188*. When employment opportunities are denied because of continued enforcement of discriminatory policies, Texas NAACP has to redirect its efforts from such proactive community reentry activities as job searches and training skills on behalf of individuals with convictions to advocating for the enforcement of antidiscrimination laws like Title VII.

Were Texas successful in this action, Ms. Harrison and members of the NAACP in Texas would have less legal protection when they fall victim to these unfair and likely unlawful policies. *See, e.g., Doe*, 256 F.3d at 378-79 (finding that potential intervenor would suffer prejudice by being denied intervention because a ruling in that litigation could hurt its future litigation prospects). Texas seeks, through this litigation, to undermine or even eliminate tools (*i.e.*, the EEOC's ability to issue right-to-sue letters consistent with the Guidance) that racial minorities

with criminal convictions like Ms. Harrison and members of the NAACP in Texas may use to challenge employment policies. Indeed, an adverse disposition of this litigation would preclude Ms. Harrison and members of the NAACP in Texas from obtaining a right-to-sue letter necessary for legal action under Title VII.

Consequently, the outcome of this litigation will have a substantial impact on Proposed Defendant-Intervenors' interests.

### D. Defendants may not adequately represent the interests of Applicants.

Finally, proposed Defendant-Intervenors satisfy the fourth requirement for mandatory intervention: their significant protectable interests may not be adequately represented by the existing parties. Fed. R. Civ. P. 24(a)(2); *see also Doe*, 256 F.3d at 380 ("The potential intervener need only show that the representation *may be* inadequate.").

In the Fifth Circuit, there are two presumptions of adequate representation. Where, as here, the party seeking to intervene has the "same ultimate objective" as a party to the suit, the existing party is presumed to be adequately represented unless the movant demonstrates "adversity of interest, collusion, or nonfeasance." *Texas*, 805 F.3d at 661-62. Moreover, where, as here, "the putative representative is a governmental body or officer charged by law with representing the interests of the [intervenor]," there is a presumption of adequate representation. *Id*. at 661. That presumption, however, is by no means dispositive and can be overcome if the movant shows that "its interest is in fact different from that of [the state] and that the interest will not be represented by [the state]." *Id*. at 662.

Proposed Defendant-Intervenors satisfy their burden because it is not clear that the government-Defendants will adequately, let alone zealously, represent Applicants' interest. *See Wildearth Guardians v. Jewell*, No. 16 Civ. 168, 2016 WL 4133533, at *5 (D. Utah Aug. 3, 2016)

-16-

(granting intervention based on inadequate government representation where "the parties' divergent interests might lead to widely divergent zealousness of defense").

Recent changes in the federal government's litigation and policy positions reflect a willingness to repeal or weaken protections adopted, promulgated, and enforced during the prior administration, creating a significant risk that Defendants will not adequately and forcefully defend the Guidance. Thus, Defendants here may ultimately take a different position than they initially took in this case and that is adverse to that of Proposed Defendant-Intervenors. *See, e.g.,* Brief for the United States as *Amicus Curiae* at 1-2, 9, 15-18, *Zarda v. Altitude Express, Inc.*, No. 15-3775 (2nd Cir. July 26, 2017), ECF No. 417 (the Department of Justice taking the position in its amicus brief that Title VII's prohibition on employment discrimination does not extend to discrimination based on sexual orientation and indicating that the EEOC was "not speaking for the United States" in taking a contrary position in its amicus brief); Order on Government's Motion for Voluntary dismissal of Discriminatory Purpose Claim and Assertion of Mootness, *Veasey v. Abbott*, No. 2:13-cv-00193 (S.D. Tex. Apr. 3, 2017), ECF No. 1022 (in a case challenging Texas's photo identification law that it initiated and affirmatively litigated for approximately seven years, the Department of Justice voluntarily dismissing a claim of discriminatory purpose after a super-majority of the Fifth Circuit Court of Appeals, sitting en banc, concluded that the evidence in the case could support a finding of discriminatory purpose, and a district court has found that the law was enacted with discriminatory intent); Mot. to Dismiss Appeal, *Texas v. USA*, No. 16-11534 (5th Cir. Mar. 2, 2017) (in a case that it initiated, the Department of Justice voluntarily dismissing a pending appeal and effectively ending a challenge to a district court's injunction against the prior administration's guidance to schools that transgender students are allowed to use restrooms that match their gender identity); *see also* Dear Colleague Letter from Sandra Battle, Acting Asst.

-17-

Secretary of C.R., U.S. Dep't of Educ. and T.E. Wheeler, II, Acting Asst. Att'y Gen. for C.R., U.S. Dep't of Just. (Feb. 22, 2017), http://i2.cdn.turner.com/cnn/2017/images/02/23/1atransletterpdf022317.pdf (the Department of Education and the Department of Justice jointly rescinding policy and guidance issued by the previous administration specifying that transgender students have the right to use public school restrooms that match their gender identity); Brief for the United States as *Amicus Curiae* Supporting Pet'rs in Nos. 16-285 and 16-1300 and Supporting Resp'ts in No. 16-1307, *NLRB v. Murphy Oil USA, Inc.,* Nos. 16-285, 16-300, and 16-307 (June 16, 2017), http://www.scotusblog.com/wp-content/uploads/2017/06/16-285-16-300-16-307-Brief-for-the-United-States.pdf (on appeal, the current administration, represented by the Department of Justice, reversing the previous administration's position on class action waivers in arbitration agreements in a pending Supreme Court case); Brief for Appellees at 2-3, *Chamber of Commerce of United States v. Hugler*, No. 17-10238 (5th Cir. July 3, 2017), http://hr.cch.com/eld/Chamberof_Commerce.pdf (on appeal, the current administration, represented by the Department of Justice on behalf of the Department of Labor, "no longer defending" the previous administration's position on arbitration waivers); Appellants' Reply Br. at 22-23, *Nevada v. LABR*, 16-41606 (5th Cir. June 30, 2017) (in a case challenging the Department of Labor's overtime rule, the Department of Justice, on behalf of the DOL, declining in their appellants' reply brief to defend the salary level set by the DOL under the previous administration, which had been defended in the district court and in the opening appellant brief).

Accordingly, based on recent actions, Applicants have reason to believe that Defendants may decline to defend the Guidance at all or may decline to forcefully defend it in this Court, necessitating intervention by Applicants to protect their interests. *See* Stipulation and Order adding Proposed Pl.-Intervenor and Allowing Amendment of Proposed Complaint in Intervention (Fed.

-18-

R. Civ. P. 15(a), 19(a), 21, 24), *United States v. N.Y.C. Bd. of Educ.*, No. 1:96-cv-00374, (E.D.N.Y. Aug. 4, 2004), ECF No. 442 (describing how after the federal government initiated a lawsuit challenging discrimination in the recruitment and hiring of Black, Hispanic, Asian, and women applicants for certain positions in New York City public schools in violation of Title VII, it declined to defend the legality of the remedy agreed to by the parties and, as a result, the court granted movants' intervention to protect their interests, including that the remedies provided for by the agreement are consistent with Title VII); *see also City of Houston*, 668 F.3d at 294 ("Without these intervenors' participation, the City might well be inclined to settle the litigation on terms that preserve the adverse ruling [regarding the intervenor' interest].").

In addition, Applicants and Defendants may raise very different arguments in defense of the Guidance, and, thus, do not share identical objectives with regard to its defense. For example, Defendants repeatedly have downplayed the significance of the Guidance by arguing that it is not legally binding and does not carry legal consequences. *See, e.g.*, Doc. 16 at 7; Doc. 30 at 1; Doc. 33-1 at 2. At the motion to dismiss stage, this Court rejected that argument. Doc. 52 at 8. Ultimately, Defendants' view on the weight of the Guidance and its applicability in the State of Texas may affect the zealousness with which they approach the defense of that important Guidance. In the same vein, Defendants may seek to defend broadly their power to promulgate and enforce the Guidance, regardless of whether Defendants intend to use that power against Texas's discriminatory hiring laws. Ms. Harrison, on the other hand, seeks that the government maintain that enforcement power in a form that can be used specifically against the Texas law that took her job away, and the Texas NAACP seeks the same to protect and promote the employment of its members.

Finally, the Supreme Court's analysis of the legislative history of the 1972 amendments to

Title VII, providing the EEOC's enforcement authority, explicitly states that the interest of a private party, like Ms. Harrison, and the EEOC do not completely overlap, and thus are in fact different: "The amendments did not transfer all private enforcement to the EEOC and assign to that agency exclusively the task of protecting private interests. The EEOC's civil suit was intended to supplement, not replace, the private action." *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 325-26 (1980) (further holding, "the EEOC is not merely a proxy for the victims of discrimination.")

Proposed Defendant-Intervenors bring to this litigation a perspective on the core issues raised in this case that is not likely to be presented by the current Defendants, whose role is to represent the broad public interest, and which would assist this Court in understanding the necessity of the Guidance. The unique experiences and perspectives of Proposed Defendant-Intervenors—and, in particular, of Ms. Harrison—on the real-life effects of absolute bans on hiring people with felony convictions that are not temporally limited and related to the job at issue are invaluable to this Court's assessment and analysis of Plaintiff's claims and, thus, strongly counsel in favor of this Court's granting their Motion to Intervene. *See, e.g., Conservation Law Found. of New England, Inc. v. Mosbacher*, 966 F.2d 39, 44 (1st Cir. 1992) ("The Secretary's judgments are necessarily constrained by his view of the public welfare. While the Secretary may well believe that what best serves the public welfare will also best serve the overall interests of fisherman, the fact remains that the fisherman may see their own interest in a different, perhaps more parochial light."); *S. Dade Land Corp. v. Sullivan*, 155 F.R.D. 694, 697 (S.D. Fla. 1994) ("[T]he Societies' basis for intervention is that the government's position that maintaining the current levels of water in the Park is itself jeopardizing their members' use and enjoyment of the Park." Moreover, the Proposed Intervenors' special expertise regarding wildlife will permit them to represent that

special interest in a manner that remaining Defendants could not adequately meet.")

In light of the reasonable uncertainty surrounding the new administration's views of and commitment to the civil rights statutes and policies, like the Guidance, and because Applicants would bring a unique civil rights perspective to this case, Applicants' interests in this litigation are sufficiently different from those of Defendants and justify intervention.

## II.    Applicants Should Be Granted Permissive Intervention.

Although Proposed Defendant-Intervenors respectfully assert their ability to intervene as of right, as an alternative, the Court should allow Applicants to intervene under Federal Rule of Civil Procedure 24(b). The Court may grant permissive intervention where the motion to intervene is timely, the putative intervenor "has a claim or defense that shares with the main action a common question of law or fact," and intervention will not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b); *see also Reid v. Gen. Motors Corp.*, 240 F.R.D. 257, 260 (E.D. Tex. 2006); *see also Siesta Village Market, LLC v. Perry*, Nos. 06 Civ 585(D), 06 Civ 232(D), 2006 WL 1880524 (N.D. Tex. July 7, 2006) (in an action against Texas's Governor, granting movants' request to intervene as defendants under Rule 24(b) to defend against plaintiffs' constitutional challenges); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 229 F.R.D. 126, 130-31 (S.D. Tex. 2005) (granting permissive intervention where movant's claims have both questions of law and fact in common with the main action and the court concluded that the intervention would not unduly delay the adjudication of the rights of the original parties); *Rivera v. City of San Antonio*, Civ. A. No. SA-06-CA-235-XR, 2006 WL 3691015, at **1, 5 (W.D. Tex. Dec. 12, 2006). Courts do not interpret this provision strictly, *see id.*, and the decision to allow permissive intervention is within the discretion of the court. *Newby v. Enron Corp.*, 443 F.3d 416,

424-25 (5th Cir. 2006) (affirming a grant of permissive intervention based on the district court's discretion). Applicants satisfy this test.

*First*, the motion to intervene is timely. As described above, Applicants moved to intervene less than two months after this Court denied Defendants' Motion to Dismiss, around a month after Defendants' filing of an Answer, and before the parties' deadline for submitting summary judgment motions. *See, e.g., Librado v. M.S. Carriers, Inc.*, 02 Civ. 2095(D), 2004 WL 287724 (N.D. Tex. Feb. 5, 2004) (granting permissive intervention even when, unlike here, the proposed intervenor waited almost two years to file his motion to intervene).

*Second*, Applicants meet the commonality requirement because they seek to defend the legality of the Guidance, as well as the use of the Guidance in Texas and EEOC's ability to issue right-to-sue letters consistent with the Guidance, the very subjects of Plaintiff's challenge.

*Third*, Applicants will comply with any scheduling or briefing orders entered by this Court. Thus, intervention will not delay resolution of the case and will not prejudice the rights of any existing party.

Accordingly, if this Court does not grant intervention as of right under Rule 24(a), it should grant permissive intervention under Rule 24(b).

## CONCLUSION

For the reasons set forth above, Proposed Defendant-Intervenors respectfully request that this Court grant the Applicants' motion to intervene.

Dated:    August 2, 2017                    Respectfully submitted,


                                           s/ Edward B. Cloutman
                                           Edward B. Cloutman III (Bar No. 04411000)
                                           CLOUTMAN & CLOUTMAN, L.L.P.
                                           3301 Elm Street
                                           Dallas, Texas 75226

Telephone:  214.939.9222
Facsimile:  214.939.9229
E-Mail:  crawfish11@prodigy.net

Samuel Spital* (N.Y. Bar No. 4334595)
Leah C. Aden* (N.Y. Bar No. 4555207)
Natasha Merle* (N.Y. Bar No. 4723029)
Nana Wilberforce* Not admitted to practice in New
   York; admitted only in D.C. (Bar. No. 1025742)
   and CA (Bar. No. 296436). Supervised by
   members of the N.Y. Bar.
NAACP LEGAL DEFENSE & EDUCATIONAL
   FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
Telephone:  212.965.2200
Facsimile:  212.226.7592
E-Mail:  sspital@naacpldf.org
           laden@naacpldf.org
           nmerle@naacpldf.org
           nwilberforce@naacpldf.org

Coty Montag* (D.C. Bar No. 498357)
NAACP LEGAL DEFENSE & EDUCATIONAL
   FUND, INC.
1444 I Street NW, 10th Floor
Washington, District of Columbia 20005
Telephone:  202.682.1300
Facsimile:  202.682.1312
E-Mail:  cmontag@naacpldf.org

Robert H. Stroup* (N.Y. Bar No. 2824712)
Dana Lossia* (N.Y. Bar No. 706482)
LEVY RATNER, P.C.
80 Eighth Avenue
New York, New York 10011
Telephone:  212.627.8100
Facsimile:  212.627.8182
E-Mail:  rstroup@levyratner.com
           dlossia@levyratner.com

Beth Avery* (Cal. Bar No. 298232)
NATIONAL EMPLOYMENT LAW PROJECT
2030 Addison Street, Suite 310
Berkeley, California 94704
Telephone:  510.982.5945

-23-

Facsimile:  866.665.5705
E-Mail:  bavery@nelp.org

***Attorneys for Proposed Defendant-Intervenors***
*applications for pro hac vice admission
pending or forthcoming*

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *Plaintiff*, <br><br> v. <br><br> EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, *et al.*, *Defendants*, <br><br> and <br><br> BEVERLY HARRISON and TEXAS STATE CONFERENCE OF THE NAACP, <br><br> *Proposed Defendant-Intervenors.* | Civil Action. No. 5:13-CV-255-C |

## CERTIFICATE OF SERVICE

I certify that on August 2, 2017, I filed the attached document with the Clerk of the Court using the Court's ECF system. Based on the records currently on file in this case, the Clerk of the Court will transmit a Notice of Electronic Filing to those registered participants of the ECF system.

*s/ Edward B. Cloutman*
Edward B. Cloutman III (Bar No. 04411000)

-25-