**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 5:13-CV-00255-C |
| | ) | |
| EQUAL EMPLOYMENT | ) | |
| OPPORTUNITY COMMISSION, *et al.*, | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

**<u>APPENDIX TO DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT</u>**

EEOC, *Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII* (Guidance), No. 915.002 (Apr. 25, 2012) ............................ APP 0001-0055

EEOC, *Policy Statement on the Issue of Conviction Records*, (Feb. 4, 1987) ......... APP 0056-0058

Email from Austin Nimocks to James Powers and Justin Sandberg, *Texas v. EEOC et al. – Discovery Issues* (Aug. 29, 2017) .......................... APP 0059-0062

Declaration of Amy Tippie, *Texas v. EEOC, et al.*, 5:13-cv-00255-C (July 19, 2017) ............................................................................. APP 0063-0066

Declaration of Kathleen T. Murphy, *Texas v. EEOC, et al.*, 5:13-cv-00255-C (July 18, 2017) ............................................................................. APP 0067-0069

Declaration of Ann Bright, *Texas v. EEOC, et al.*, 5:13-cv-00255-C (July 24, 2017) ............................................................................. APP 0070-0073

Declaration of Royce Myers, *Texas v. EEOC, et al.*, 5:13-cv-00255-C (July 21, 2017) ............................................................................. APP 0074-0077

Declaration of Bob Biard, *Texas v. EEOC, et al.*, 5:13-cv-00255-C (July 31, 2017) ............................................................................. APP 0078-0080

Plaintiff's Amended Responses to Defendants' First Set of Interrogatories, Requests for Admission, and Requests for Production to Plaintiff (Aug. 29, 2017) ........ APP 0081-0097

EEOC, William R. Smith's Charge of Discrimination and Corresponding
      Documentation ............................................................................................ APP 0098-0101

Texas Juvenile Justice Dep't Personnel Policy & Procedure Manual, *Criminal History:
Standards, Background Checks, and Self-Reporting Requirements*, PRS.02.08,
      (July 1, 2017) ............................................................................................ APP 0102-0109

Texas Lottery Commission, Employee Background Investigations, EN-016
      (Oct. 10, 2016) .......................................................................................... APP 0110-0113

Reorganization Plan No. 1 of 1978, 43 Fed. Reg. 19,807 ...................................... APP 0114-0115

| *EEOC Enforcement Guidance* | **Number** 915.002 **Date** 4/25/2012 |
|---|---|

1.  **SUBJECT**: Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et seq*.

2.  **PURPOSE**: The purpose of this Enforcement Guidance is to consolidate and update the U.S. Equal Employment Opportunity Commission's guidance documents regarding the use of arrest or conviction records in employment decisions under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

3.  **EFFECTIVE DATE**: Upon receipt.

4.  **EXPIRATION DATE**: This Notice will remain in effect until rescinded or superseded.

5.  **ORIGINATOR**: Office of Legal Counsel.

APP 0001

**Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964**

**Table of Contents**

| | | | |
|---|---|---|---|
| I. | Summary | | 1 |
| II. | Introduction | | 3 |
| III. | Background | | 4 |
| | A. | Criminal History Records | 4 |
| | B. | Employers' Use of Criminal History Information | 6 |
| | C. | The EEOC's Interest in Employers' Use of Criminal Records in Employment Screening | 6 |
| IV. | Disparate Treatment Discrimination and Criminal Records | | 6 |
| V. | Disparate Impact Discrimination and Criminal Records | | 8 |
| | A. | Determining Disparate Impact of Policies or Practices that Screen Individuals Based on Records of Criminal Conduct | 9 |
| | | 1. Identifying the Practice or Policy | 9 |
| | | 2. Determining Disparate Impact | 9 |
| | B. | Job Related for the Position in Question and Consistent with Business Necessity | 10 |
| | | 1. Generally | 10 |
| | | 2. Arrests | 12 |
| | | 3. Convictions | 13 |
| | | 4. Determining Whether a Criminal Conduct Exclusion Is Job Related and Consistent with Business Necessity | 14 |
| | | 5. Validation | 14 |
| | | 6. Detailed Discussion of the *Green* Factors and Criminal Conduct Screens | 15 |
| | |    a. The Nature and Gravity of the Offense or Conduct | 15 |
| | |    b. The Time that Has Passed Since the Offense, Conduct and/or Completion of the Sentence | 15 |
| | |    c. The Nature of the Job Held or Sought | 16 |
| | | 7. Examples of Criminal Conduct Exclusions that Do Not Consider the *Green* Factors | 16 |
| | | 8. Targeted Exclusions that Are Guided by the *Green* Factors | 17 |
| | | 9. Individualized Assessment | 18 |
| | C. | Less Discriminatory Alternatives | 20 |

VI.    Positions Subject to Federal Prohibitions or Restrictions on Individuals
       with Records of Certain Criminal Conduct                                    20

       A.    Hiring in Certain Industries                                          20
       B.    Obtaining Occupational Licenses                                       21
       C.    Waiving or Appealing Federally Imposed Occupational
             Restrictions                                                         21
       D.    Security Clearances                                                   23
       E.    Working for the Federal Government                                    23

VII.   Positions Subject to State and Local Prohibitions or Restrictions on Individuals
       with Records of Certain Criminal Conduct                                    24

VIII.  Employer Best Practices                                                     25

## I.    Summary

- An employer's use of an individual's criminal history in making employment decisions may, in some instances, violate the prohibition against employment discrimination under Title VII of the Civil Rights Act of 1964, as amended.

- The Guidance builds on longstanding court decisions and existing guidance documents that the U.S. Equal Employment Opportunity Commission (Commission or EEOC) issued over twenty years ago.

- The Guidance focuses on employment discrimination based on race and national origin. The Introduction provides information about criminal records, employer practices, and Title VII.

- The Guidance discusses the differences between arrest and conviction records.

  - The fact of an arrest does not establish that criminal conduct has occurred, and an exclusion based on an arrest, in itself, is not job related and consistent with business necessity.  However, an employer may make an employment decision based on the conduct underlying an arrest if the conduct makes the individual unfit for the position in question.

  - In contrast, a conviction record will usually serve as sufficient evidence that a person engaged in particular conduct.  In certain circumstances, however, there may be reasons for an employer not to rely on the conviction record alone when making an employment decision.

- The Guidance discusses disparate treatment and disparate impact analysis under Title VII.

  - A violation may occur when an employer treats criminal history information differently for different applicants or employees, based on their race or national origin (disparate treatment liability).

  - An employer's neutral policy (e.g., excluding applicants from employment based on certain criminal conduct) may disproportionately impact some individuals protected under Title VII, and may violate the law if not job related and consistent with business necessity (disparate impact liability).

    o  National data supports a finding that criminal record exclusions have a disparate impact based on race and national origin.  The national data provides a basis for the Commission to investigate Title VII disparate impact charges challenging criminal record exclusions.

APP 0004

- o Two circumstances in which the Commission believes employers will consistently meet the "job related and consistent with business necessity" defense are as follows:

    - The employer validates the criminal conduct exclusion for the position in question in light of the Uniform Guidelines on Employee Selection Procedures (if there is data or analysis about criminal conduct as related to subsequent work performance or behaviors); or

    - The employer develops a targeted screen considering at least the nature of the crime, the time elapsed, and the nature of the job (the three factors identified by the court in *Green v. Missouri Pacific Railroad*, 549 F.2d 1158 (8th Cir. 1977)). The employer's policy then provides an opportunity for an individualized assessment for those people identified by the screen, to determine if the policy as applied is job related and consistent with business necessity. (Although Title VII does not require individualized assessment in all circumstances, the use of a screen that does not include individualized assessment is more likely to violate Title VII.).

- Compliance with other federal laws and/or regulations that conflict with Title VII is a defense to a charge of discrimination under Title VII.

- State and local laws or regulations are preempted by Title VII if they "purport[] to require or permit the doing of any act which would be an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-7.

- The Guidance concludes with best practices for employers.

2

## II.    Introduction

The EEOC enforces Title VII of the Civil Rights Act of 1964 (Title VII) which prohibits employment discrimination based on race, color, religion, sex, or national origin.[1]    This Enforcement Guidance is issued as part of the Commission's efforts to eliminate unlawful discrimination in employment screening, for hiring or retention, by entities covered by Title VII, including private employers as well as federal, state, and local governments.[2]

In the last twenty years, there has been a significant increase in the number of Americans who have had contact[3] with the criminal justice system[4] and, concomitantly, a major increase in the number of people with criminal records in the working-age population.[5]  In 1991, only 1.8% of the adult population had served time in prison.[6]  After ten years, in 2001, the percentage rose to 2.7% (1 in 37 adults).[7]  By the end of 2007, 3.2% of all adults in the United States (1 in every 31) were under some form of correctional control involving probation, parole, prison, or jail.[8]  The Department of Justice's Bureau of Justice Statistics (DOJ/BJS) has concluded that, if incarceration rates do not decrease, approximately 6.6% of all persons born in the United States in 2001 will serve time in state or federal prison during their lifetimes.[9]

Arrest and incarceration rates are particularly high for African American and Hispanic men.[10]  African Americans and Hispanics[11] are arrested at a rate that is 2 to 3 times their proportion of the general population.[12]    Assuming that current incarceration rates remain unchanged, about 1 in 17 White men are expected to serve time in prison during their lifetime;[13] by contrast, this rate climbs to 1 in 6 for Hispanic men; and to 1 in 3 for African American men.[14]

The Commission, which has enforced Title VII since it became effective in 1965, has well-established guidance applying Title VII principles to employers' use of criminal records to screen for employment.[15]  This Enforcement Guidance builds on longstanding court decisions and policy documents that were issued over twenty years ago.  In light of employers' increased access to criminal history information, case law analyzing Title VII requirements for criminal record exclusions, and other developments,[16] the Commission has decided to update and consolidate in this document all of its prior policy statements about Title VII and the use of criminal records in employment decisions.  Thus, this Enforcement Guidance will supersede the Commission's previous policy statements on this issue.

The Commission intends this document for use by employers considering the use of criminal records in their selection and retention processes; by individuals who suspect that they have been denied jobs or promotions, or have been discharged because of their criminal records; and by EEOC staff who are investigating discrimination charges involving the use of criminal records in employment decisions.

APP 0006

## III.    Background

The contextual framework for the Title VII analysis in this Enforcement Guidance includes how criminal record information is collected and recorded, why employers use criminal records, and the EEOC's interest in such criminal record screening.

### A.    Criminal History Records

Criminal history information can be obtained from a wide variety of sources including, but not limited to, the following:

- Court Records.  Courthouses maintain records relating to criminal charges and convictions, including arraignments, trials, pleas, and other dispositions.[17] Searching county courthouse records typically provides the most complete criminal history.[18]  Many county courthouse records must be retrieved on-site,[19] but some courthouses offer their records online.[20]  Information about federal crimes such as interstate drug trafficking, financial fraud, bank robbery, and crimes against the government may be found online in federal court records by searching the federal courts' Public Access to Court Electronic Records or Case Management/Electronic Case Files.[21]

- Law Enforcement and Corrections Agency Records.  Law enforcement agencies such as state police agencies and corrections agencies may allow the public to access their records, including records of complaints, investigations, arrests, indictments, and periods of incarceration, probation, and parole.[22]  Each agency may differ with respect to how and where the records may be searched, and whether they are indexed.[23]

- Registries or Watch Lists.  Some government entities maintain publicly available lists of individuals who have been convicted of, or are suspected of having committed, a certain type of crime.  Examples of such lists include state and federal sex offender registries and lists of individuals with outstanding warrants.[24]

- State Criminal Record Repositories.  Most states maintain their own centralized repositories of criminal records, which include records that are submitted by most or all of their criminal justice agencies, including their county courthouses.[25] States differ with respect to the types of records included in the repository,[26] the completeness of the records,[27] the frequency with which they are updated,[28] and whether they permit the public to search the records by name, by fingerprint, or both.[29]  Some states permit employers (or third-parties acting on their behalf) to access these records, often for a fee.[30]  Others limit access to certain types of records,[31] and still others deny access altogether.[32]

- The Interstate Identification Index (III).  The Federal Bureau of Investigation (FBI) maintains the most comprehensive collection of criminal records in the nation, called the "Interstate Identification Index" (III).  The III database compiles

records from each of the state repositories, as well as records from federal and international criminal justice agencies.[33]

The FBI's III database may be accessed for employment purposes by:

- the federal government;[34]

- employers in certain industries that are regulated by the federal government, such as "the banking, nursing home, securities, nuclear energy, and private security guard industries; as well as required security screenings by federal agencies of airport workers, HAZMAT truck drivers and other transportation workers";[35] and

- employers in certain industries "that the state has sought to regulate, such as persons employed as civil servants, day care, school, or nursing home workers, taxi drivers, private security guards, or members of regulated professions."[36]

Recent studies have found that a significant number of state and federal criminal record databases include incomplete criminal records.

➢ A 2011 study by the DOJ/BJS reported that, as of 2010, many state criminal history record repositories still had not recorded the final dispositions for a significant number of arrests.[37]

➢ A 2006 study by the DOJ/BJS found that only 50% of arrest records in the FBI's III database were associated with a final disposition.[38]

Additionally, reports have documented that criminal records may be inaccurate.

➢ One report found that even if public access to criminal records has been restricted by a court order to seal and/or expunge such records, this does not guarantee that private companies also will purge the information from their systems or that the event will be erased from media archives.[39]

➢ Another report found that criminal background checks may produce inaccurate results because criminal records may lack "unique" information or because of "misspellings, clerical errors or intentionally inaccurate identification information provided by search subjects who wish to avoid discovery of their prior criminal activities."[40]

Employers performing background checks to screen applicants or employees may attempt to search these governmental sources themselves or conduct a simple Internet search, but they often rely on third-party background screening businesses.[41]  Businesses that sell criminal history information to employers are "consumer reporting agencies" (CRAs)[42] if they provide the information in "consumer reports"[43] under the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* (FCRA).  Under FCRA, a CRA generally may not report records of arrests that did not result in entry of a judgment of conviction, where the arrests occurred more than seven years ago.[44]

However, they may report convictions indefinitely.[45]

CRAs often maintain their own proprietary databases that compile information from various sources, such as those described above, depending on the extent to which the business has purchased or otherwise obtained access to data.[46] Such databases vary with respect to the geographic area covered, the type of information included (e.g., information about arrests, convictions, prison terms, or specialized information for a subset of employers such as information about workplace theft or shoplifting cases for retail employers[47]), the sources of information used (e.g., county databases, law enforcement agency records, sex offender registries), and the frequency with which they are updated. They also may be missing certain types of disposition information, such as updated convictions, sealing or expungement orders, or orders for entry into a diversion program.[48]

### B.    Employers' Use of Criminal History Information

In one survey, a total of 92% of responding employers stated that they subjected all or some of their job candidates to criminal background checks.[49] Employers have reported that their use of criminal history information is related to ongoing efforts to combat theft and fraud,[50] as well as heightened concerns about workplace violence[51] and potential liability for negligent hiring.[52] Employers also cite federal laws as well as state and local laws[53] as reasons for using criminal background checks.

### C.    The EEOC's Interest in Employers' Use of Criminal Records in Employment Screening

The EEOC enforces Title VII, which prohibits employment discrimination based on race, color, religion, sex, or national origin. Having a criminal record is not listed as a protected basis in Title VII. Therefore, whether a covered employer's reliance on a criminal record to deny employment violates Title VII depends on whether it is part of a claim of employment discrimination based on race, color, religion, sex, or national origin. Title VII liability for employment discrimination is determined using two analytic frameworks: "disparate treatment" and "disparate impact." Disparate treatment is discussed in Section IV and disparate impact is discussed in Section V.

### IV.    Disparate Treatment Discrimination and Criminal Records

A covered employer is liable for violating Title VII when the plaintiff demonstrates that it treated him differently because of his race, national origin, or another protected basis.[54] For example, there is Title VII disparate treatment liability where the evidence shows that a covered employer rejected an African American applicant based on his criminal record but hired a similarly situated White applicant with a comparable criminal record.[55]

> **Example 1:  Disparate Treatment Based on Race.** John, who is White, and Robert, who is African American, are both recent graduates of State University. They have similar educational backgrounds, skills, and work experience.  They each pled guilty to charges of possessing and

APP 0009

distributing marijuana as high school students, and neither of them had any subsequent contact with the criminal justice system.

After college, they both apply for employment with Office Jobs, Inc., which, after short intake interviews, obtains their consent to conduct a background check. Based on the outcome of the background check, which reveals their drug convictions, an Office Jobs, Inc., representative decides not to refer Robert for a follow-up interview. The representative remarked to a co-worker that Office Jobs, Inc., cannot afford to refer "these drug dealer types" to client companies. However, the same representative refers John for an interview, asserting that John's youth at the time of the conviction and his subsequent lack of contact with the criminal justice system make the conviction unimportant. Office Jobs, Inc., has treated John and Robert differently based on race, in violation of Title VII.

Title VII prohibits "not only decisions driven by racial [or ethnic] animosity, but also decisions infected by stereotyped thinking . . . ."[56] Thus, an employer's decision to reject a job applicant based on racial or ethnic stereotypes about criminality—rather than qualifications and suitability for the position—is unlawful disparate treatment that violates Title VII.[57]

**Example 2: Disparate Treatment Based on National Origin.** Tad, who is White, and Nelson, who is Latino, are both recent high school graduates with grade point averages above 4.0 and college plans. While Nelson has successfully worked full-time for a landscaping company during the summers, Tad only held occasional lawn-mowing and camp-counselor jobs. In an interview for a research job with Meaningful and Paid Internships, Inc. (MPII), Tad discloses that he pled guilty to a felony at age 16 for accessing his school's computer system over the course of several months without authorization and changing his classmates' grades. Nelson, in an interview with MPII, emphasizes his successful prior work experience, from which he has good references, but also discloses that, at age 16, he pled guilty to breaking and entering into his high school as part of a class prank that caused little damage to school property. Neither Tad nor Nelson had subsequent contact with the criminal justice system.

The hiring manager at MPII invites Tad for a second interview, despite his record of criminal conduct. However, the same hiring manager sends Nelson a rejection notice, saying to a colleague that Nelson is only qualified to do manual labor and, moreover, that he has a criminal record. In light of the evidence showing that Nelson's and Tad's educational backgrounds are similar, that Nelson's work experience is more extensive, and that Tad's criminal conduct is more indicative of untrustworthiness, MPII has failed to state a legitimate, nondiscriminatory reason for rejecting Nelson. If Nelson filed a Title VII charge alleging disparate treatment based on national origin and the EEOC's investigation

APP 0010

confirmed these facts, the EEOC would find reasonable cause to believe that discrimination occurred.

There are several kinds of evidence that may be used to establish that race, national origin, or other protected characteristics motivated an employer's use of criminal records in a selection decision, including, but not limited to:

- <u>Biased statements</u>.    Comments by the employer or decisionmaker that are derogatory with respect to the charging party's protected group, or that express group-related stereotypes about criminality, might be evidence that such biases affected the evaluation of the applicant's or employee's criminal record.

- <u>Inconsistencies in the hiring process</u>.    Evidence that the employer requested criminal history information more often for individuals with certain racial or ethnic backgrounds, or gave Whites but not racial minorities the opportunity to explain their criminal history, would support a showing of disparate treatment.

- <u>Similarly situated comparators (individuals who are similar to the charging party in relevant respects, except for membership in the protected group)</u>.  Comparators may include people in similar positions, former employees, and people chosen for a position over the charging party.  The fact that a charging party was treated differently than individuals who are not in the charging party's protected group by, for example, being subjected to more or different criminal background checks or to different standards for evaluating criminal history, would be evidence of disparate treatment.

- <u>Employment testing</u>.  Matched-pair testing may reveal that candidates are being treated differently because of a protected status.[58]

- <u>Statistical evidence</u>.  Statistical analysis derived from an examination of the employer's applicant data, workforce data, and/or third party criminal background history data may help to determine if the employer counts criminal history information more heavily against members of a protected group.

## V.    Disparate Impact Discrimination and Criminal Records

A covered employer is liable for violating Title VII when the plaintiff demonstrates that the employer's neutral policy or practice has the effect of disproportionately screening out a Title VII-protected group and the employer fails to demonstrate that the policy or practice is job related for the position in question and consistent with business necessity.[59]

In its 1971 *Griggs v. Duke Power Company* decision, the Supreme Court first recognized that Title VII permits disparate impact claims.[60]  The *Griggs* Court explained that "[Title VII] proscribes . . . practices that are fair in form, but discriminatory in operation.  The touchstone is business necessity.  If an employment practice which operates to exclude [African Americans] cannot be shown to be related to job performance, the practice is prohibited."[61]  In 1991,

Congress amended Title VII to codify this analysis of discrimination and its burdens of proof.[62] Title VII, as amended, states:

> An unlawful employment practice based on disparate impact is established . . . if a complaining party demonstrates that an employer uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity. . . .[63]

With respect to criminal records, there is Title VII disparate impact liability where the evidence shows that a covered employer's criminal record screening policy or practice disproportionately screens out a Title VII-protected group and the employer does not demonstrate that the policy or practice is job related for the positions in question and consistent with business necessity.

### A.    Determining Disparate Impact of Policies or Practices that Screen Individuals Based on Records of Criminal Conduct

#### 1.    Identifying the Policy or Practice

The first step in disparate impact analysis is to identify the particular policy or practice that causes the unlawful disparate impact. For criminal conduct exclusions, relevant information includes the text of the policy or practice, associated documentation, and information about how the policy or practice was actually implemented. More specifically, such information also includes which offenses or classes of offenses were reported to the employer (e.g., all felonies, all drug offenses); whether convictions (including sealed and/or expunged convictions), arrests, charges, or other criminal incidents were reported; how far back in time the reports reached (e.g., the last five, ten, or twenty years); and the jobs for which the criminal background screening was conducted.[64] Training or guidance documents used by the employer also are relevant, because they may specify which types of criminal history information to gather for particular jobs, how to gather the data, and how to evaluate the information after it is obtained.

#### 2.    Determining Disparate Impact

Nationally, African Americans and Hispanics are arrested in numbers disproportionate to their representation in the general population. In 2010, 28% of all arrests were of African Americans,[65] even though African Americans only comprised approximately 14% of the general population.[66] In 2008, Hispanics were arrested for federal drug charges at a rate of approximately three times their proportion of the general population.[67] Moreover, African Americans and Hispanics were more likely than Whites to be arrested, convicted, or sentenced for drug offenses even though their rate of drug use is similar to the rate of drug use for Whites.[68]

African Americans and Hispanics also are incarcerated at rates disproportionate to their numbers in the general population. Based on national incarceration data, the U.S. Department of Justice estimated in 2001 that 1 out of every 17 White men (5.9% of the White men in the U.S.)

is expected to go to prison at some point during his lifetime, assuming that current incarceration rates remain unchanged.[69]  This rate climbs to 1 in 6 (or 17.2%) for Hispanic men.[70]  For African American men, the rate of expected incarceration rises to 1 in 3 (or 32.2%).[71]  Based on a state-by-state examination of incarceration rates in 2005, African Americans were incarcerated at a rate 5.6 times higher than Whites,[72] and 7 states had a Black-to-White ratio of incarceration that was 10 to1.[73]  In 2010, Black men had an imprisonment rate that was nearly 7 times higher than White men and almost 3 times higher than Hispanic men.[74]

National data, such as that cited above, supports a finding that criminal record exclusions have a disparate impact based on race and national origin.  The national data provides a basis for the Commission to further investigate such Title VII disparate impact charges.  During an EEOC investigation, the employer also has an opportunity to show, with relevant evidence, that its employment policy or practice does not cause a disparate impact on the protected group(s).  For example, an employer may present regional or local data showing that African American and/or Hispanic men are not arrested or convicted at disproportionately higher rates in the employer's particular geographic area.  An employer also may use its own applicant data to demonstrate that its policy or practice did not cause a disparate impact.  The Commission will assess relevant evidence when making a determination of disparate impact, including applicant flow information maintained pursuant to the Uniform Guidelines on Employee Selection Procedures,[75] workforce data, criminal history background check data, demographic availability statistics, incarceration/conviction data, and/or relevant labor market statistics.[76]

An employer's evidence of a racially balanced workforce will not be enough to disprove disparate impact.  In *Connecticut v. Teal*, the Supreme Court held that a "bottom line" racial balance in the workforce does not preclude employees from establishing a prima facie case of disparate impact; nor does it provide employers with a defense.[77]  The issue is whether the policy or practice deprives a disproportionate number of Title VII-protected individuals of employment opportunities.[78]

Finally, in determining disparate impact, the Commission will assess the probative value of an employer's applicant data.  As the Supreme Court stated in *Dothard v. Rawlinson*, an employer's "application process might itself not adequately reflect the actual potential applicant pool since otherwise qualified people might be discouraged from applying" because of an alleged discriminatory policy or practice.[79]  Therefore, the Commission will closely consider whether an employer has a reputation in the community for excluding individuals with criminal records.  Relevant evidence may come from ex-offender employment programs, individual testimony, employer statements, evidence of employer recruitment practices, or publicly posted notices, among other sources.[80]  The Commission will determine the persuasiveness of such evidence on a case-by-case basis.

## B.    Job Related For the Position in Question and Consistent with Business Necessity

### 1.    Generally

After the plaintiff in litigation establishes disparate impact, Title VII shifts the burdens of

production and persuasion to the employer to "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity."[81]  In the legislative history of the 1991 Civil Rights Act, Congress referred to *Griggs* and its progeny such as *Albemarle Paper Company v. Moody*[82] and *Dothard*[83] to explain how this standard should be construed.[84]  The *Griggs* Court stated that the employer's burden was to show that the policy or practice is one that "bear[s] a demonstrable relationship to successful performance of the jobs for which it was used" and "measures the person for the job and not the person in the abstract."[85]  In both *Albemarle*[86] and *Dothard*,[87] the Court emphasized the factual nature of the business necessity inquiry.  The Court further stated in *Dothard* that the terms of the exclusionary policy must "be shown to be necessary to safe and efficient job performance."[88]

In a case involving a criminal record exclusion, the Eighth Circuit in its 1975 *Green v. Missouri Pacific Railroad* decision, held that it was discriminatory under Title VII for an employer to "follow[] the policy of disqualifying for employment any applicant with a conviction for any crime other than a minor traffic offense."[89]  The Eighth Circuit identified three factors (the "*Green* factors") that were relevant to assessing whether an exclusion is job related for the position in question and consistent with business necessity:

- The nature and gravity of the offense or conduct;[90]
- The time that has passed since the offense or conduct and/or completion of the sentence;[91] and
- The nature of the job held or sought.[92]

In 2007, the Third Circuit in *El v. Southeastern Pennsylvania Transportation Authority*[93] developed the statutory analysis in greater depth.  Douglas El challenged SEPTA's policy of excluding everyone ever convicted of a violent crime from the job of paratransit driver.[94]  El, a 55 year-old African American paratransit driver-trainee, was terminated from employment when SEPTA learned of his conviction for second-degree murder 40 years earlier; the conviction involved a gang fight when he was 15 years old and was his only disqualifying offense under SEPTA's policy.[95]  The Third Circuit expressed "reservations" about a policy such as SEPTA's (exclusion for all violent crimes, no matter how long ago they were committed) "in the abstract."[96]

Applying Supreme Court precedent, the *El* court observed that some level of risk is inevitable in all hiring, and that, "[i]n a broad sense, hiring policies . . . ultimately concern the management of risk."[97]  Recognizing that assessing such risk is at the heart of criminal record exclusions, the Third Circuit concluded that Title VII requires employers to justify criminal record exclusions by demonstrating that they "accurately distinguish between applicants [who] pose an unacceptable level of risk and those [who] do not."[98]

The Third Circuit affirmed summary judgment for SEPTA, but stated that the outcome of the case might have been different if Mr. El had, "for example, hired an expert who testified that there is a time at which a former criminal is no longer any more likely to recidivate than the average person, . . . [so] there would be a factual question for the jury to resolve."[99]  The Third Circuit reasoned, however, that the recidivism evidence presented by SEPTA's experts, in

conjunction with the nature of the position at issue—paratransit driver-trainee with unsupervised access to vulnerable adults—required the employer to exercise the utmost care.[100]

In the subsections below, the Commission discusses considerations that are relevant to assessing whether criminal record exclusion policies or practices are job related and consistent with business necessity. First, we emphasize that arrests and convictions are treated differently.

### 2.    Arrests

The fact of an arrest does not establish that criminal conduct has occurred.[101] Arrests are not proof of criminal conduct. Many arrests do not result in criminal charges, or the charges are dismissed.[102] Even if an individual is charged and subsequently prosecuted, he is presumed innocent unless proven guilty.[103]

An arrest, however, may in some circumstances trigger an inquiry into whether the conduct underlying the arrest justifies an adverse employment action. Title VII calls for a fact-based analysis to determine if an exclusionary policy or practice is job related and consistent with business necessity. Therefore, an exclusion based on an arrest, in itself, is not job related and consistent with business necessity.

Another reason for employers not to rely on arrest records is that they may not report the final disposition of the arrest (e.g., not prosecuted, convicted, or acquitted). As documented in Section III.A., *supra*, the DOJ/BJS reported that many arrest records in the FBI's III database and state criminal record repositories are not associated with final dispositions.[104] Arrest records also may include inaccuracies or may continue to be reported even if expunged or sealed.[105]

> **Example 3: Arrest Record Is Not Grounds for Exclusion.** Mervin and Karen, a middle-aged African American couple, are driving to church in a predominantly white town. An officer stops them and interrogates them about their destination. When Mervin becomes annoyed and comments that his offense is simply "driving while Black," the officer arrests him for disorderly conduct. The prosecutor decides not to file charges against Mervin, but the arrest remains in the police department's database and is reported in a background check when Mervin applies with his employer of fifteen years for a promotion to an executive position. The employer's practice is to deny such promotions to individuals with arrest records, even without a conviction, because it views an arrest record as an indicator of untrustworthiness and irresponsibility. If Mervin filed a Title VII charge based on these facts, and disparate impact based on race were established, the EEOC would find reasonable cause to believe that his employer violated Title VII.

Although an arrest record standing alone may not be used to deny an employment opportunity, an employer may make an employment decision based on the conduct underlying the arrest if the conduct makes the individual unfit for the position in question. The conduct, not the arrest, is relevant for employment purposes.

APP 0015

**Example 4: Employer's Inquiry into Conduct Underlying Arrest**. Andrew, a Latino man, worked as an assistant principal in Elementary School for several years. After several ten and eleven-year-old girls attending the school accused him of touching them inappropriately on the chest, Andrew was arrested and charged with several counts of endangering the welfare of children and sexual abuse. Elementary School has a policy that requires suspension or termination of any employee who the school believes engaged in conduct that impacts the health or safety of the students. After learning of the accusations, the school immediately places Andrew on unpaid administrative leave pending an investigation. In the course of its investigation, the school provides Andrew a chance to explain the events and circumstances that led to his arrest. Andrew denies the allegations, saying that he may have brushed up against the girls in the crowded hallways or lunchroom, but that he doesn't really remember the incidents and does not have regular contact with any of the girls. The school also talks with the girls, and several of them recount touching in crowded situations. The school does not find Andrew's explanation credible. Based on Andrew's conduct, the school terminates his employment pursuant to its policy.

Andrew challenges the policy as discriminatory under Title VII. He asserts that it has a disparate impact based on national origin and that his employer may not suspend or terminate him based solely on an arrest without a conviction because he is innocent until proven guilty. After confirming that an arrest policy would have a disparate impact based on national origin, the EEOC concludes that no discrimination occurred. The school's policy is linked to conduct that is relevant to the particular jobs at issue, and the exclusion is made based on descriptions of the underlying conduct, not the fact of the arrest. The Commission finds no reasonable cause to believe Title VII was violated.

### 3. Convictions

By contrast, a record of a conviction will usually serve as sufficient evidence that a person engaged in particular conduct, given the procedural safeguards associated with trials and guilty pleas.[106] However, there may be evidence of an error in the record, an outdated record, or another reason for not relying on the evidence of a conviction. For example, a database may continue to report a conviction that was later expunged, or may continue to report as a felony an offense that was subsequently downgraded to a misdemeanor.[107]

Some states require employers to wait until late in the selection process to ask about convictions.[108] The policy rationale is that an employer is more likely to objectively assess the relevance of an applicant's conviction if it becomes known when the employer is already knowledgeable about the applicant's qualifications and experience.[109] As a best practice, and consistent with applicable laws,[110] the Commission recommends that employers not ask about

convictions on job applications and that, if and when they make such inquiries, the inquiries be limited to convictions for which exclusion would be job related for the position in question and consistent with business necessity.

### 4.    Determining Whether a Criminal Conduct Exclusion Is Job Related and Consistent with Business Necessity

To establish that a criminal conduct exclusion that has a disparate impact is job related and consistent with business necessity under Title VII, the employer needs to show that the policy operates to effectively link specific criminal conduct, and its dangers, with the risks inherent in the duties of a particular position.

Two circumstances in which the Commission believes employers will consistently meet the "job related and consistent with business necessity" defense are as follows:

o   The employer validates the criminal conduct screen for the position in question per the Uniform Guidelines on Employee Selection Procedures (Uniform Guidelines) standards (if data about criminal conduct as related to subsequent work performance is available and such validation is possible); [111] or

o   The employer develops a targeted screen considering at least the nature of the crime, the time elapsed, and the nature of the job (the three *Green* factors), and then provides an opportunity for an individualized assessment for people excluded by the screen to determine whether the policy as applied is job related and consistent with business necessity.

The individualized assessment would consist of notice to the individual that he has been screened out because of a criminal conviction; an opportunity for the individual to demonstrate that the exclusion should not be applied due to his particular circumstances; and consideration by the employer as to whether the additional information provided by the individual warrants an exception to the exclusion and shows that the policy as applied is not job related and consistent with business necessity. *See* Section V.B.9, *infra* (examples of relevant considerations in individualized assessments).

Depending on the facts and circumstances, an employer may be able to justify a targeted criminal records screen solely under the *Green* factors. Such a screen would need to be narrowly tailored to identify criminal conduct with a demonstrably tight nexus to the position in question. Title VII thus does not necessarily require individualized assessment in all circumstances. However, the use of individualized assessments can help employers avoid Title VII liability by allowing them to consider more complete information on individual applicants or employees, as part of a policy that is job related and consistent with business necessity.

### 5.    Validation

The Uniform Guidelines describe three different approaches to validating employment screens.[112] However, they recognize that "[t]here are circumstances in which a user cannot or

need not utilize" formal validation techniques and that in such circumstances an employer "should utilize selection procedures which are as job related as possible and which will minimize or eliminate adverse impact as set forth [in the following subsections]."[113]  Although there may be social science studies that assess whether convictions are linked to future behaviors, traits, or conduct with workplace ramifications,[114] and thereby provide a framework for validating some employment exclusions, such studies are rare at the time of this drafting.

### 6.    Detailed Discussion of the *Green* Factors and Criminal Conduct Screens

Absent a validation study that meets the Uniform Guidelines' standards, the *Green* factors provide the starting point for analyzing how specific criminal conduct may be linked to particular positions.  The three *Green* factors are:

- The nature and gravity of the offense or conduct;
- The time that has passed since the offense, conduct and/or completion of the sentence; and
- The nature of the job held or sought.

#### a.    The Nature and Gravity of the Offense or Conduct

Careful consideration of the nature and gravity of the offense or conduct is the first step in determining whether a specific crime may be relevant to concerns about risks in a particular position.  The nature of the offense or conduct may be assessed with reference to the harm caused by the crime (e.g., theft causes property loss).  The legal elements of a crime also may be instructive.  For example, a conviction for felony theft may involve deception, threat, or intimidation.[115]  With respect to the gravity of the crime, offenses identified as misdemeanors may be less severe than those identified as felonies.

#### b.    The Time that Has Passed Since the Offense, Conduct and/or Completion of the Sentence

Employer policies typically specify the duration of a criminal conduct exclusion.  While the *Green* court did not endorse a specific timeframe for criminal conduct exclusions, it did acknowledge that permanent exclusions from all employment based on any and all offenses were not consistent with the business necessity standard.[116]  Subsequently, in *El*, the court noted that the plaintiff might have survived summary judgment if he had presented evidence that "there is a time at which a former criminal is no longer any more likely to recidivate than the average person . . . ."[117]  Thus, the court recognized that the amount of time that had passed since the plaintiff's criminal conduct occurred was probative of the risk he posed in the position in question.

Whether the duration of an exclusion will be sufficiently tailored to satisfy the business necessity standard will depend on the particular facts and circumstances of each case.  Relevant and available information to make this assessment includes, for example, studies demonstrating how much the risk of recidivism declines over a specified time.[118]

APP 0018

### c.     The Nature of the Job Held or Sought

Finally, it is important to identify the particular job(s) subject to the exclusion.  While a factual inquiry may begin with identifying the job title, it also encompasses the nature of the job's duties (e.g., data entry, lifting boxes), identification of the job's essential functions, the circumstances under which the job is performed (e.g., the level of supervision, oversight, and interaction with co-workers or vulnerable individuals), and the environment in which the job's duties are performed (e.g., out of doors, in a warehouse, in a private home).  Linking the criminal conduct to the essential functions of the position in question may assist an employer in demonstrating that its policy or practice is job related and consistent with business necessity because it "bear[s] a demonstrable relationship to successful performance of the jobs for which it was used."[119]

### 7.     Examples of Criminal Conduct Exclusions that Do Not Consider the *Green* Factors

A policy or practice requiring an automatic, across-the-board exclusion from all employment opportunities because of any criminal conduct is inconsistent with the *Green* factors because it does not focus on the dangers of particular crimes and the risks in particular positions.  As the court recognized in *Green*, "[w]e cannot conceive of any business necessity that would automatically place every individual convicted of any offense, except a minor traffic offense, in the permanent ranks of the unemployed."[120]

> **Example 5:   Exclusion Is Not Job Related and Consistent with Business Necessity.**  The National Equipment Rental Company uses the Internet to accept job applications for all positions.  All applicants must answer certain questions before they are permitted to submit their online application, including "have you ever been convicted of a crime?"  If the applicant answers "yes," the online application process automatically terminates, and the applicant sees a screen that simply says "Thank you for your interest.  We cannot continue to process your application at this time."
>
> The Company does not have a record of the reasons why it adopted this exclusion, and it does not have information to show that convictions for all offenses render all applicants unacceptable risks in all of its jobs, which range from warehouse work, to delivery, to management positions.  If a Title VII charge were filed based on these facts, and there was a disparate impact on a Title VII-protected basis, the EEOC would find reasonable cause to believe that the blanket exclusion was not job related and consistent with business necessity because the risks associated with all convictions are not pertinent to all of the Company's jobs.
>
> **Example 6:   Exclusion Is Not Job Related and Consistent with Business Necessity.**  Leo, an African American man, has worked

successfully at PR Agency as an account executive for three years. After a change of ownership, the new owners adopt a policy under which it will not employ anyone with a conviction. The policy does not allow for any individualized assessment before exclusion. The new owners, who are highly respected in the industry, pride themselves on employing only the "best of the best" for every position. The owners assert that a quality workforce is a key driver of profitability.

Twenty years earlier, as a teenager, Leo pled guilty to a misdemeanor assault charge. During the intervening twenty years, Leo graduated from college and worked successfully in advertising and public relations without further contact with the criminal justice system. At PR Agency, all of Leo's supervisors assessed him as a talented, reliable, and trustworthy employee, and he has never posed a risk to people or property at work. However, once the new ownership of PR Agency learns about Leo's conviction record through a background check, it terminates his employment. It refuses to reconsider its decision despite Leo's positive employment history at PR Agency.

Leo files a Title VII charge alleging that PR Agency's conviction policy has a disparate impact based on race and is not job related for the position in question and consistent with business necessity. After confirming disparate impact, the EEOC considers PR Agency's defense that it employs only the "best of the best" for every position, and that this necessitates excluding everyone with a conviction. PR Agency does not show that all convictions are indicative of risk or danger in all its jobs for all time, under the *Green* factors. Nor does PR Agency provide any factual support for its assertion that having a conviction is necessarily indicative of poor work or a lack of professionalism. The EEOC concludes that there is reasonable cause to believe that the Agency's policy is not job related for the position in question and consistent with business necessity. [121]

### 8.    Targeted Exclusions that Are Guided by the *Green* Factors

An employer policy or practice of excluding individuals from particular positions for specified criminal conduct within a defined time period, as guided by the *Green* factors, is a targeted exclusion. Targeted exclusions are tailored to the rationale for their adoption, in light of the particular criminal conduct and jobs involved, taking into consideration fact-based evidence, legal requirements, and/or relevant and available studies.

As discussed above in Section V.B.4, depending on the facts and circumstances, an employer may be able to justify a targeted criminal records screen solely under the *Green* factors. Such a screen would need to be narrowly tailored to identify criminal conduct with a demonstrably tight nexus to the position in question. Title VII thus does not necessarily require individualized assessment in all circumstances. However, the use of individualized assessments can help employers avoid Title VII liability by allowing them to consider more complete information on individual applicants or employees, as part of a policy that is job related and consistent with business necessity.

### 9.      Individualized Assessment

Individualized assessment generally means that an employer informs the individual that he may be excluded because of past criminal conduct; provides an opportunity to the individual to demonstrate that the exclusion does not properly apply to him; and considers whether the individual's additional information shows that the policy as applied is not job related and consistent with business necessity.

The individual's showing may include information that he was not correctly identified in the criminal record, or that the record is otherwise inaccurate. Other relevant individualized evidence includes, for example:

- The facts or circumstances surrounding the offense or conduct;
- The number of offenses for which the individual was convicted;
- Older age at the time of conviction, or release from prison; [122]
- Evidence that the individual performed the same type of work, post conviction, with the same or a different employer, with no known incidents of criminal conduct;
- The length and consistency of employment history before and after the offense or conduct; [123]
- Rehabilitation efforts, e.g., education/training; [124]
- Employment or character references and any other information regarding fitness for the particular position; [125] and
- Whether the individual is bonded under a federal, state, or local bonding program. [126]

If the individual does not respond to the employer's attempt to gather additional information about his background, the employer may make its employment decision without the information.

> **Example 7:  Targeted Screen with Individualized Assessment Is Job Related and Consistent with Business Necessity.** County Community Center rents meeting rooms to civic organizations and small businesses, party rooms to families and social groups, and athletic facilities to local recreational sports leagues. The County has a targeted rule prohibiting anyone with a conviction for theft crimes (e.g., burglary, robbery, larceny, identity theft) from working in a position with access to personal financial

APP 0021

information for at least four years after the conviction or release from incarceration. This rule was adopted by the County's Human Resources Department based on data from the County Corrections Department, national criminal data, and recent recidivism research for theft crimes. The Community Center also offers an opportunity for individuals identified for exclusion to provide information showing that the exclusion should not be applied to them.

Isaac, who is Hispanic, applies to the Community Center for a full-time position as an administrative assistant, which involves accepting credit card payments for room rentals, in addition to having unsupervised access to the personal belongings of people using the facilities. After conducting a background check, the County learns that Isaac pled guilty eighteen months earlier, at age twenty, to credit card fraud, and that he did not serve time in prison. Isaac confirms these facts, provides a reference from the restaurant where he now works on Saturday nights, and asks the County for a "second chance" to show that he is trustworthy. The County tells Isaac that it is still rejecting his employment application because his criminal conduct occurred eighteen months ago and is directly pertinent to the job in question. The information he provided did nothing to dispel the County's concerns.

Isaac challenges this rejection under Title VII, alleging that the policy has a disparate impact on Hispanics and is not job related and consistent with business necessity. After confirming disparate impact, the EEOC finds that this screen was carefully tailored to assess unacceptable risk in relevant positions, for a limited time period, consistent with the evidence, and that the policy avoided overbroad exclusions by allowing individuals an opportunity to explain special circumstances regarding their criminal conduct. Thus, even though the policy has a disparate impact on Hispanics, the EEOC does not find reasonable cause to believe that discrimination occurred because the policy is job related and consistent with business necessity. [127]

**Example 8: Targeted Exclusion Without Individualized Assessment Is Not Job Related and Consistent with Business Necessity.** "Shred 4 You" employs over 100 people to pick up discarded files and sensitive materials from offices, transport the materials to a secure facility, and shred and recycle them. The owner of "Shred 4 You" sells the company to a competitor, known as "We Shred." Employees of "Shred 4 You" must reapply for employment with "We Shred" and undergo a background check. "We Shred" has a targeted criminal conduct exclusion policy that prohibits the employment of anyone who has been convicted of any crime related to theft or fraud in the past five years, and the policy does not provide for any individualized consideration. The company explains that its clients entrust it with handling sensitive and confidential information

and materials; therefore, it cannot risk employing people who pose an above-average risk of stealing information.

Jamie, who is African American, worked successfully for "Shred 4 You" for five years before the company changed ownership. Jamie applies for his old job, and "We Shred" reviews Jamie's performance appraisals, which include high marks for his reliability, trustworthiness, and honesty. However, when "We Shred" does a background check, it finds that Jamie pled guilty to misdemeanor insurance fraud five years ago, because he exaggerated the costs of several home repairs after a winter storm. "We Shred" management informs Jamie that his guilty plea is evidence of criminal conduct and that his employment will be terminated. Jamie asks management to consider his reliable and honest performance in the same job at "Shred 4 You," but "We Shred" refuses to do so. The employer's conclusion that Jamie's guilty plea demonstrates that he poses an elevated risk of dishonesty is not factually based given Jamie's history of trustworthiness in the same job. After confirming disparate impact based on race (African American), the EEOC finds reasonable cause to believe that Title VII was violated because the targeted exclusion was not job related and consistent with business necessity based on these facts.

### C.  Less Discriminatory Alternatives

If an employer successfully demonstrates that its policy or practice is job related for the position in question and consistent with business necessity, a Title VII plaintiff may still prevail by demonstrating that there is a less discriminatory "alternative employment practice" that serves the employer's legitimate goals as effectively as the challenged practice but that the employer refused to adopt.[128]

## VI.  Positions Subject to Federal Prohibitions or Restrictions on Individuals with Records of Certain Criminal Conduct

In some industries, employers are subject to federal statutory and/or regulatory requirements that prohibit individuals with certain criminal records from holding particular positions or engaging in certain occupations. Compliance with federal laws and/or regulations is a defense to a charge of discrimination. However, the EEOC will continue to coordinate with other federal departments and agencies with the goal of maximizing federal regulatory consistency with respect to the use of criminal history information in employment decisions.[129]

### A.  Hiring in Certain Industries

Federal laws and regulations govern the employment of individuals with specific convictions in certain industries or positions in both the private and public sectors. For example, federal law excludes an individual who was convicted in the previous ten years of specified crimes from working as a security screener or otherwise having unescorted access to the secure areas of an airport.[130] There are equivalent requirements for federal law enforcement officers,[131]

child care workers in federal agencies or facilities,[132] bank employees,[133] and port workers,[134] among other positions.[135]    Title VII does not preempt these federally imposed restrictions. However, if an employer decides to impose an exclusion that goes beyond the scope of a federally imposed restriction, the discretionary aspect of the policy would be subject to Title VII analysis.

> **Example 9: Exclusion Is Not Job Related and Consistent with Business Necessity.**  Your Bank has a rule prohibiting anyone with convictions for any type of financial or fraud-related crimes within the last twenty years from working in positions with access to customer financial information, even though the federal ban is ten years for individuals who are convicted of any criminal offense involving dishonesty, breach of trust, or money laundering from serving in such positions.
>
> Sam, who is Latino, applies to Your Bank to work as a customer service representative.  A background check reveals that Sam was convicted of a misdemeanor for misrepresenting his income on a loan application fifteen years earlier.  Your Bank therefore rejects Sam, and he files a Title VII charge with the EEOC, alleging that the Bank's policy has a disparate impact based on national origin and is not job related and consistent with business necessity.  Your Bank asserts that its policy does not cause a disparate impact and that, even if it does, it is job related for the position in question because customer service representatives have regular access to financial information and depositors must have "100% confidence" that their funds are safe.  However, Your Bank does not offer evidence showing that there is an elevated likelihood of committing financial crimes for someone who has been crime-free for more than ten years.  After establishing that the Bank's policy has a disparate impact based on national origin, the EEOC finds that the policy is not job related for the position in question and consistent with business necessity.  The Bank's justification for adding ten years to the federally mandated exclusion is insufficient because it is only a generalized concern about security, without proof.

### B.    Obtaining Occupational Licenses

Title VII also does not preempt federal statutes and regulations that govern eligibility for occupational licenses and registrations.  These restrictions cover diverse sectors of the economy including the transportation industry,[136] the financial industry,[137] and import/export activities,[138] among others.[139]

### C.    Waiving or Appealing Federally Imposed Occupational Restrictions

Several federal statutes and regulations provide a mechanism for employers or individuals to appeal or apply for waivers of federally imposed occupational restrictions.  For example, unless a bank receives prior written consent from the Federal Deposit Insurance

APP 0024

Corporation (FDIC), an individual convicted of a criminal offense involving dishonesty, breach of trust, money laundering, or another financially related crime may not work in, own, or control "an insured depository institution" (e.g., bank) for ten years under the Federal Deposit Insurance Act.[140]  To obtain such FDIC consent, the insured institution must file an application for a waiver on behalf of the particular individual.[141]  Alternatively, if the insured institution does not apply for the waiver on the individual's behalf, the individual may file a request directly with the FDIC for a waiver of the institution filing requirement, demonstrating "substantial good cause" to grant the waiver.[142]  If the FDIC grants the individual's waiver request, the individual can then file an application directly with the FDIC for consent to work for the insured institution in question.[143] Once the institution, or the individual, submits the application, the FDIC's criminal record waiver review process requires consideration of mitigating factors that are consistent with Title VII, including evidence of rehabilitation, and the nature and circumstances of the crime.[144]

Additionally, port workers who are denied the Transportation Workers Identification Credential (TWIC) based on their conviction record may seek a waiver for certain permanently disqualifying offenses or interim disqualifying offenses, and also may file an individualized appeal from the Transportation Security Administration's initial determination of threat assessment based on the conviction.[145]  The Maritime Transportation Security Act, which requires all port workers to undergo a criminal background check to obtain a TWIC,[146] provides that individuals with convictions for offenses such as espionage, treason, murder, and a federal crime of terrorism are permanently disqualified from obtaining credentials, but those with convictions for firearms violations and distribution of controlled substances may be temporarily disqualified.[147]  Most offenses related to dishonesty are only temporarily disqualifying.[148]

> **Example 10: Consideration of Federally Imposed Occupational Restrictions.**  John Doe applies for a position as a truck driver for Truckers USA.  John's duties will involve transporting cargo to, from, and around ports, and Truckers USA requires all of its port truck drivers to have a TWIC.   The Transportation Security Administration (TSA) conducts a criminal background check and may deny the credential to applicants who have permanently disqualifying criminal offenses in their background as defined by federal law.  After conducting the background check for John Doe, TSA discovers that he was convicted nine years earlier for conspiracy to use weapons of mass destruction.  TSA denies John a security card because this is a permanently disqualifying criminal offense under federal law.[149]  John, who points out that he was a minor at the time of the conviction, requests a waiver by TSA because he had limited involvement and no direct knowledge of the underlying crime at the time of the offense.  John explains that he helped a friend transport some chemical materials that the friend later tried to use to damage government property.  TSA refuses to grant John's waiver request because a conviction for conspiracy to use weapons of mass destruction is not subject to the TSA's waiver procedures.[150]  Based on this denial, Truckers USA rejects John's application for the port truck driver position.  Title VII does not override Truckers USA's policy because the policy is consistent with another federal law.

While Title VII does not mandate that an employer seek such waivers, where an employer does seek waivers it must do so in a nondiscriminatory manner.

### D.    Security Clearances

The existence of a criminal record may result in the denial of a federal security clearance, which is a prerequisite for a variety of positions with the federal government and federal government contractors.[151]    A federal security clearance is used to ensure employees' trustworthiness, reliability, and loyalty before providing them with access to sensitive national security information.[152]    Under Title VII's national security exception, it is not unlawful for an employer to "fail or refuse to hire and employ" an individual because "such individual has not fulfilled or has ceased to fulfill" the federal security requirements.[153]    This exception focuses on whether the position in question is, in fact, subject to national security requirements that are imposed by federal statute or Executive Order, and whether the adverse employment action actually resulted from the denial or revocation of a security clearance.[154]    Procedural requirements related to security clearances must be followed without regard to an individual's race, color, religion, sex, or national origin.[155]

### E.    Working for the Federal Government

Title VII provides that, with limited coverage exceptions, "[a]ll personnel actions affecting employees or applicants for employment . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."[156]    The principles discussed above in this Guidance apply in the federal employment context.    In most circumstances, individuals with criminal records are not automatically barred from working for the federal government.[157]    However, the federal government imposes criminal record restrictions on its workforce through "suitability" requirements for certain positions.[158]    The federal government's Office of Personnel Management (OPM) defines suitability as "determinations based on a person's character or conduct that may have an impact on the integrity or efficiency of the service."[159]    Under OPM's rules, agencies may bar individuals from federal employment for up to three years if they are found unsuitable based on criminal or dishonest conduct, among other factors.[160]    OPM gives federal agencies the discretion to consider relevant mitigating criteria when deciding whether an individual is suitable for a federal position.[161]    These mitigating criteria, which are consistent with the three *Green* factors and also provide an individualized assessment of the applicant's background, allow consideration of: (1) the nature of the position for which the person is applying or in which the person is employed; (2) the nature and seriousness of the conduct; (3) the circumstances surrounding the conduct; (4) the recency of the conduct; (5) the age of the person involved at the time of the conduct; (6) contributing societal conditions; and (7) the absence or presence of rehabilitation or efforts toward rehabilitation.[162] In general, OPM requires federal agencies and departments to consider hiring an individual with a criminal record if he is the best candidate for the position in question and can comply with relevant job requirements.[163]    The EEOC continues to coordinate with OPM to achieve employer best practices in the federal sector.[164]

## VII. Positions Subject to State and Local Prohibitions or Restrictions on Individuals with Records of Certain Criminal Conduct

States and local jurisdictions also have laws and/or regulations that restrict or prohibit the employment of individuals with records of certain criminal conduct.[165]  Unlike federal laws or regulations, however, state and local laws or regulations are preempted by Title VII if they "purport[] to require or permit the doing of any act which would be an unlawful employment practice" under Title VII.[166]  Therefore, if an employer's exclusionary policy or practice is *not* job related and consistent with business necessity, the fact that it was adopted to comply with a state or local law or regulation does not shield the employer from Title VII liability.[167]

> **Example 11:  State Law Exclusion Is Job Related and Consistent with Business Necessity.**  Elijah, who is African American, applies for a position as an office assistant at Pre-School, which is in a state that imposes criminal record restrictions on school employees.  Pre-School, which employs twenty-five full- and part-time employees, uses all of its workers to help with the children.  Pre-School performs a background check and learns that Elijah pled guilty to charges of indecent exposure two years ago.  After being rejected for the position because of his conviction, Elijah files a Title VII disparate impact charge based on race to challenge Pre-School's policy.  The EEOC conducts an investigation and finds that the policy has a disparate impact and that the exclusion is job related for the position in question and consistent with business necessity because it addresses serious safety risks of employment in a position involving regular contact with children.  As a result, the EEOC would not find reasonable cause to believe that discrimination occurred.

> **Example 12: State Law Exclusion Is Not Consistent with Title VII.**  County Y enforces a law that prohibits all individuals with a criminal conviction from working for it.  Chris, an African American man, was convicted of felony welfare fraud fifteen years ago, and has not had subsequent contact with the criminal justice system.  Chris applies to County Y for a job as an animal control officer trainee, a position that involves learning how to respond to citizen complaints and handle animals.  The County rejects Chris's application as soon as it learns that he has a felony conviction. Chris files a Title VII charge, and the EEOC investigates, finding disparate impact based on race and also that the exclusionary policy is not job related and consistent with business necessity.  The County cannot justify rejecting everyone with any conviction from all jobs.  Based on these facts, County Y's law "purports to require or permit the doing of an[] act which would be an unlawful employment practice" under Title VII.

APP 0027

## VIII.   Employer Best Practices

The following are examples of best practices for employers who are considering criminal record information when making employment decisions.

*General*

- Eliminate policies or practices that exclude people from employment based on any criminal record.

- Train managers, hiring officials, and decisionmakers about Title VII and its prohibition on employment discrimination.

*Developing a Policy*

- Develop a narrowly tailored written policy and procedure for screening applicants and employees for criminal conduct.

  - Identify essential job requirements and the actual circumstances under which the jobs are performed.

  - Determine the specific offenses that may demonstrate unfitness for performing such jobs.

    - Identify the criminal offenses based on all available evidence.

  - Determine the duration of exclusions for criminal conduct based on all available evidence.

    - Include an individualized assessment.

  - Record the justification for the policy and procedures.

  - Note and keep a record of consultations and research considered in crafting the policy and procedures.

- Train managers, hiring officials, and decisionmakers on how to implement the policy and procedures consistent with Title VII.

*Questions about Criminal Records*

- When asking questions about criminal records, limit inquiries to records for which exclusion would be job related for the position in question and consistent with business necessity.

APP 0028

*Confidentiality*

- Keep information about applicants' and employees' criminal records confidential.  Only use it for the purpose for which it was intended.

Approved by the Commission:

_____                              _____

Chair Jacqueline A. Berrien                                   Date

APP 0029

# ENDNOTES

[1]    42 U.S.C. § 2000e *et seq.*  The EEOC also enforces other anti-discrimination laws including: Title I of the Americans with Disabilities Act of 1990, as amended (ADA),  and Section 501 of the Rehabilitation Act, as amended, which prohibit employment discrimination on the basis of disability; the Age Discrimination in Employment Act of 1967, as amended (ADEA), which prohibits discrimination on the basis of age 40 or above; Title II of the Genetic Information Nondiscrimination Act of 2008 (GINA), which prohibits discrimination on the basis of genetic information; and the Equal Pay Act of 1963, as amended (EPA), which requires employers to pay male and female employees at the same establishment equal wages for equal work.

[2]    All entities covered by Title VII are subject to this analysis.  *See* 42 U.S.C. § 2000e-2 (anti-discrimination provisions); 42 U.S.C. § 2000e(b)–(e) (defining "employer," "employment agency," and "labor organization"); 42 U.S.C. § 2000e-16(a) (prohibiting discriminatory employment practices by federal departments and agencies).  For purposes of this Guidance, the term "employer" is used in lieu of listing all Title VII-covered entities.  The Commission considers other coverage questions that arise in particular charges involving, for example, joint employment or third party interference in *Compliance Manual Section 2: Threshold Issues,* U.S. EQUAL EMP'T OPPORTUNITY COMM'N, § 2-III B., *Covered Entities,* http://www.eeoc.gov/policy/docs/threshold.html#2-III-B (last visited April 23, 2012).

[3]    For the purposes of this Guidance, references to "contact" with the criminal justice system may include, for example, an arrest, charge, indictment, citation, conviction, incarceration, probation, or parole.

[4]    *See* THOMAS P. BONCZAR, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, PREVALENCE OF IMPRISONMENT IN THE U.S. POPULATION, 1974–2001, at 3 (2003), http://bjs.ojp.usdoj.gov/content/pub/pdf/piusp01.pdf [hereinafter PREVALENCE OF IMPRISONMENT] ("Between 1974 and 2001 the number of former prisoners living in the United States more than doubled, from 1,603,000 to 4,299,000."); SEAN ROSENMERKEL ET AL., BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, FELONY SENTENCES IN STATE COURTS, 2006 – STATISTICAL TABLES 1 (2009), http://bjs.ojp.usdoj.gov/content/pub/pdf/fssc06st.pdf (reporting that between 1990 and 2006, there has been a 37% increase in the number of felony offenders sentenced in state courts); *see also* PEW CTR. ON THE STATES, ONE IN 31: THE LONG REACH OF AMERICAN CORRECTIONS 4 (2009), http://www.pewcenteronthestates.org/uploadedFiles/PSPP_1in31_report_FINAL_WEB_3-26-09.pdf [hereinafter ONE IN 31] ("During the past quarter-century, the number of prison and jail inmates has grown by 274 percent . . . .[bringing] the total population in custody to 2.3 million. During the same period, the number under community supervision grew by a staggering 3,535,660 to a total of 5.1 million."); PEW CTR. ON THE STATES, ONE IN 100: BEHIND BARS IN AMERICA 2008, at 3 (2008), http://www.pewcenteronthestates.org/uploadedFiles/8015PCTS_Prison08_FINAL_2-1-1_FORWEB.pdf ("[M]ore than one in every 100 adults is now confined in an American jail or

prison."); Robert Brame, Michael G. Turner, Raymond Paternoster, & Shawn D. Bushway, *Cumulative Prevalence of Arrest From Ages 8 to 23 in a National Sample*, 129 PEDIATRICS 21, 25, 26 (2012) (finding that approximately 1 out of 3 of all American youth will experience at least 1 arrest for a nontraffic offense by the age of 23).

[5]     *See* JOHN SCHMITT & KRIS WARNER, CTR. FOR ECON. & POLICY RESEARCH, EX-OFFENDERS AND THE LABOR MARKET 12 (2010), www.cepr.net/documents/publications/ex-offenders-2010-11.pdf ("In 2008, ex-prisoners were 2.9 to 3.2 percent of the total working-age population (excluding those currently in prison or jail) or about one in 33 working-age adults. Ex-felons were a larger share of the total working-age population: 6.6 to 7.4 percent, or about one in 15 working-age adults [not all felons serve prison terms]."); *see id.* at 3 (concluding that "in the absence of some reform of the criminal justice system, the share of ex-offenders in the working-age population will rise substantially in coming decades").

[6]     PREVALENCE OF IMPRISONMENT, *supra* note 4, at 4, Table 3.

[7]     *Id.*

[8]     ONE IN 31, *supra* note 4, at 5 (noting that when all of the individuals who are probationers, parolees, prisoners or jail inmates are added up, the total is more than 7.3 million adults; this is more than the populations of Chicago, Philadelphia, San Diego, and Dallas combined, and larger than the populations of 38 states and the District of Columbia).

[9]     PREVALENCE OF IMPRISONMENT, *supra* note 4, at 7.

[10]    *Id.* at 5, Table 5; *cf.* PEW CTR. ON THE STATES, COLLATERAL COSTS: INCARCERATION'S EFFECT ON ECONOMIC MOBILITY 6 (2010), http://www.pewcenteronthestates.org/uploadedFiles/Collateral_Costs.pdf?n=8653 ("Simply stated, incarceration in America is concentrated among African American men. While 1 in every 87 white males ages 18 to 64 is incarcerated and the number for similarly-aged Hispanic males is 1 in 36, for black men it is 1 in 12."). Incarceration rates are even starker for 20-to-34-year-old men without a high school diploma or GED: 1 in 8 White males in this demographic group is incarcerated, compared to 1 in 14 Hispanic males, and 1 in 3 Black males. PEW CTR. ON THE STATES, *supra*, at 8, Figure 2.

[11]    This document uses the terms "Black" and "African American," and the terms "Hispanic" and "Latino," interchangeably.

[12]    *See infra* notes 65–67 (citing data for the arrest rates and population statistics for African Americans and Hispanics).

[13]    PREVALENCE OF IMPRISONMENT, *supra* note 4, at 1.

[14]    *Id.* at 8.

---

[15]     *See Policy Statement on the Issue of Conviction Records Under Title VII of the Civil Rights Act of 1964*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N (Feb. 4, 1987), http://www.eeoc.gov/policy/docs/convict1.html; *EEOC Policy Statement on the Use of Statistics in Charges Involving the Exclusion of Individuals with Conviction Records from Employment*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N  (July 29, 1987), http://www.eeoc.gov/policy/docs/convict2.html; *Policy Guidance on the Consideration of Arrest Records in Employment Decisions Under Title VII*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N (Sept. 7, 1990), http://www.eeoc.gov/policy/docs/arrest_records.html;  *Compliance Manual Section 15: Race & Color Discrimination*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, § 15-VI.B.2 (April 19, 2006), http://www.eeoc.gov/policy/docs/race-color.pdf. *See also* EEOC Decision No. 72-1497 (1972) (challenging a criminal record exclusion policy based on "serious crimes"); EEOC Decision No. 74-89 (1974) (challenging a policy where a felony conviction was considered an adverse factor that would lead to disqualification); EEOC Decision No. 78-03 (1977) (challenging an exclusion policy based on felony or misdemeanor convictions involving moral turpitude or the use of drugs); EEOC Decision No. 78-35 (1978) (concluding that an employee's discharge was reasonable given his pattern of criminal behavior and the severity and recentness of his criminal conduct).

[16]     In 2011, U.S. Attorney General Eric Holder assembled a Cabinet-level interagency Reentry Council to support the federal government's efforts to promote the successful reintegration of ex-offenders back into their communities. *National Reentry Resource Center – Federal Interagency Reentry Council*, http://www.nationalreentryresourcecenter.org/reentry-council (last visited April 23, 2012). As a part of the Council's efforts, it has focused on removing barriers to employment for ex-offenders to reduce recidivism by publishing several fact sheets on employing individuals with criminal records. *See, e.g.*, FED. INTERAGENCY REENTRY COUNCIL, REENTRY MYTHBUSTER! ON FEDERAL HIRING POLICIES (2011), http://www.nationalreentryresourcecenter.org/documents/0000/1083/Reentry_Council_Mythbuster_Fed_Employment.pdf; FED. INTERAGENCY REENTRY COUNCIL, REENTRY MYTHBUSTER! ON HIRING/CRIMINAL RECORDS GUIDANCE (2011), http://www.nationalreentryresourcecenter.org/documents/0000/1082/Reentry_Council_Mythbuster_Employment.pdf; FED. INTERAGENCY REENTRY COUNCIL, REENTRY MYTHBUSTER! CRIMINAL HISTORIES AND EMPLOYMENT BACKGROUND CHECKS (2011), http://www.nationalreentryresourcecenter.org/documents/0000/1176/Reentry_Council_Mythbuster_FCRA_Employment.pdf; FED. INTERAGENCY REENTRY COUNCIL, REENTRY MYTHBUSTER! ON FEDERAL BONDING PROGRAM (2011), http://www.nationalreentryresourcecenter.org/documents/0000/1061/Reentry_Council_Mythbuster_Federal_Bonding.pdf.

     In addition to these federal efforts, several state law enforcement agencies have embraced initiatives and programs that encourage the employment of ex-offenders. For example, Texas' Department of Criminal Justice has a Reentry and Integration Division and within that Division, a Reentry Task Force Workgroup. *See Reentry and Integration Division-Reentry Task Force*, TEX. DEP'T OF CRIMINAL JUSTICE, http://www.tdcj.state.tx.us/divisions/rid/rid_texas_reentry_task_force.html (last visited April 23, 2012). One of the Workgroups in this Task Force specifically focuses on identifying

APP 0032

employment opportunities for ex-offenders and barriers that affect ex-offenders' access to employment or vocational training programs. *Reentry and Integration Division – Reentry Task Force Workgroups*, TEX. DEP'T OF CRIMINAL JUSTICE, http://www.tdcj.state.tx.us/divisions/rid/r_workgroup/rid_workgroup_employment.html (last visited April 23, 2012). Similarly, Ohio's Department of Rehabilitation and Correction has an Offender Workforce Development Office that "works with departmental staff and correctional institutions within the Ohio Department of Rehabilitation and Correction to prepare offenders for employment and the job search process." *Jobs for Ohio Offenders*, OHIO DEP'T OF REHAB. AND CORR. OFFENDER WORKFORCE DEV., http://www.drc.ohio.gov/web/JOBOFFEN.HTM (last updated Aug. 9, 2010). Law enforcement agencies in other states such as Indiana and Florida have also recognized the importance of encouraging ex-offender employment. *See, e.g.*, *IDOC: Road to Re-Entry*, IND. DEP'T OF CORR., http://www.in.gov/idoc/reentry/index.htm (last visited April 23, 2012) (describing various services and programs that are available to ex-offenders to help them to obtain employment); FLA. DEP'T OF CORRS., RECIDIVISM REDUCTION STRATEGIC PLAN: FISCAL YEAR 2009-2014, at 11, 12 (2009), http://www.dc.state.fl.us/orginfo/FinalRecidivismReductionPlan.pdf (identifying the lack of employment as one of the barriers to successful ex-offender reentry).

[17]    CARL R. ERNST & LES ROSEN, "NATIONAL" CRIMINAL HISTORY DATABASES 1 (2002), http://www.brbpub.com/articles/CriminalHistoryDB.pdf.

[18]    LEXISNEXIS, CRIMINAL BACKGROUND CHECKS: WHAT NON-PROFITS NEED TO KNOW ABOUT CRIMINAL RECORDS 4 (2009), http://www.lexisnexis.com/risk/nonprofit/documents/Volunteer_Screening_White_Paper.pdf.

[19]    *Id.*

[20]    ERNST & ROSEN, *supra* note 17, at 1; NAT'L ASS'N OF PROF'L BACKGROUND SCREENERS, CRIMINAL BACKGROUND CHECKS FOR EMPLOYMENT PURPOSES 5, http://www.napbs.com/files/public/Learn_More/White_Papers/CriminalBackgroundChecks.pdf.

[21]    LEXISNEXIS, *supra* note 18, at 6. *See also* NAT'L ASS'N OF PROF'L BACKGROUND SCREENERS, *supra* note 20 at 5.

[22]    ERNST & ROSEN, *supra* note 17, at 1.

[23]    *Id.*

[24]    *See* SEARCH, THE NATIONAL TASK FORCE ON THE CRIMINAL BACKGROUNDING OF AMERICA 3, 4 (2005), http://www.search.org/files/pdf/ReportofNTFCBA.pdf. Registries and watch lists can also include federal and international terrorist watch lists, and registries of individuals who are being investigated for certain types of crimes, such as gang-related crimes. *Id. See also* LEXISNEXIS, *supra* note 18, at 5 (reporting that "all 50 states currently have a publicly available sex offender registry").

[25]    *See* U.S. DEP'T OF JUSTICE, THE ATTORNEY GENERAL'S REPORT ON CRIMINAL HISTORY

APP 0033

BACKGROUND CHECKS 4 (2006), http://www.justice.gov/olp/ag_bgchecks_report.pdf [hereinafter BACKGROUND CHECKS].  *See also* ERNST & ROSEN, *supra* note 17, at 2.

[26]    *See* NAT'L ASS'N OF PROF'L BACKGROUND SCREENERS, *supra* note 20, at 5.  *See also* LEXISNEXIS, *supra* note 18, at 5.

[27]    LEXISNEXIS, *supra* note 18, at 5.  *See also* AM. ASS'N OF COLLS. OF PHARMACY, REPORT OF THE AACP CRIMINAL BACKGROUND CHECK ADVISORY PANEL 6–7 (2006), http://www.aacp.org/resources/academicpolicies/admissionsguidelines/Documents/AACPBackgroundChkRpt.pdf.

[28]    AM. ASS'N OF COLLS. OF PHARMACY*, supra* note 27, at 6–7.

[29]    BACKGROUND CHECKS, *supra* note 25, at 4.

[30]    *Id.*

[31]    NAT'L ASS'N OF PROF'L BACKGROUND SCREENERS, *supra* note 20, at 5.

[32]    BACKGROUND CHECKS, *supra* note 25, at 4.

[33]    *Id.* at 3.

[34]    *See id.* ("Non-criminal justice screening using FBI criminal history records is typically done by a government agency applying suitability criteria that have been established by law or the responsible agency.").

[35]    *Id.* at 5.

[36]    *Id.* at 4.

[37]    DENNIS A. DEBACCO & OWEN M. GREENSPAN, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, SURVEY OF STATE CRIMINAL HISTORY INFORMATION SYSTEMS, 2010, at 2 (2011), https://www.ncjrs.gov/pdffiles1/bjs/grants/237253.pdf [hereinafter STATE CRIMINAL HISTORY].

[38]    *See* BACKGROUND CHECKS, *supra* note 25, at 17.

[39]    SEARCH, REPORT OF THE NATIONAL TASK FORCE ON THE COMMERCIAL SALE OF CRIMINAL JUSTICE RECORD INFORMATION 83 (2005), www.search.org/files/pdf/RNTFCSCJRI.pdf; *see also* Douglas Belkin, *More Job Seekers Scramble to Erase Their Criminal Past*, WALL ST. J., Nov. 11, 2009, at A1, *available at* http://online.wsj.com/article/SB125789494126242343.html?KEYWORDS=Douglas+Belkin ("Arrests that have been legally expunged may remain on databases that data-harvesting companies offer to prospective employers; such background companies are under no legal obligation to erase them.").

APP 0034

If applicants deny the existence of expunged or sealed records, as they are permitted to do in several states, they may appear dishonest if such records are reported in a criminal background check.  *See generally* Debbie A. Mukamal & Paul N. Samuels, *Statutory Limitations on Civil Rights of People with Criminal Records*, 30 FORDHAM URB. L.J. 1501, 1509–10 (2003) (noting that 29 of the 40 states that allow expungement/sealing of arrest records permit the subject of the record to deny its existence if asked about it on employment applications or similar forms, and 13 of the 16 states that allow the expungement/sealing of adult conviction records permit the subject of the record to deny its existence under similar circumstances).

[40]     *See* SEARCH, INTERSTATE IDENTIFICATION NAME CHECK EFFICACY: REPORT OF THE NATIONAL TASK FORCE TO THE U.S. ATTORNEY GENERAL 21–22 (1999), www.search.org/files/pdf/III_Name_Check.pdf ("A so-called 'name check' is based not only on an individual's name, but also on other personal identifiers such as sex, race, date of birth and Social Security Number. . . . [N]ame checks are known to produce inaccurate results as a consequence of identical or similar names and other identifiers."); *id.* at 7 (finding that in a sample of 82,601 employment applicants, 4,562 of these individuals were *inaccurately* indicated by a "name check" to have criminal records, which represents approximately 5.5% of the overall sample).

[41]     BACKGROUND CHECKS, *supra* note 25, at 2.

[42]     A "consumer reporting agency" is defined by FCRA as "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information *or other information* on consumers for the purposes of furnishing consumer reports to third parties . . . ."  15 U.S.C. § 1681a(f) (emphasis added); *see also* BACKGROUND CHECKS, *supra* note 25, at 43 (stating that the records that CRAs collect include "criminal history information, such as arrest and conviction information").

[43]     A "consumer report" is defined by FCRA as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, *character, general reputation, personal characteristics*, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for . . . employment purposes . . . ."  15 U.S.C. § 1681a(d)(1) (emphasis added).

[44]     *See* 15 U.S.C. § 1681c(a)(2) ("[N]o consumer reporting agency may make any consumer report containing . . . records of arrest that, from date of entry, antedate the report by more than seven years or until the governing statute of limitations has expired, whichever is the longer period."). *But see id.* §1681c(b)(3) (stating that the reporting restrictions for arrest records do not apply to individuals who will earn "an annual salary which equals, or which may reasonably be expected to equal $75,000 or more").

[45]     15 U.S.C. § 1681c(a)(5) ("[N]o consumer reporting agency may make any consumer report containing . . . [a]ny other adverse item of information, other than records of convictions of crimes which antedates the report by more than seven years.").

46      BACKGROUND CHECKS, *supra* note 25, at 2.

47      *See* Adam Klein, *Written Testimony of Adam Klein*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/7-26-11/klein.cfm (last visited April 23, 2012) (describing how "several data-collection agencies also market and sell a retail-theft contributory database that is used by prospective employers to screen applicants"). *See also Retail Theft Database, ESTEEM, Workplace Theft Contributory Database*, LEXISNEXIS, http://www.lexisnexis.com/risk/solutions/retail-theft-contributory-database.aspx (last visited April 23, 2012) (stating that their database has "[t]heft and shoplifting cases supplied by more than 75,000 business locations across the country"). These databases may contain inaccurate and/or misleading information about applicants and/or employees. *See generally* Goode v. LexisNexis Risk & Info. Analytics Grp., Inc., No. 2:11-CV-2950-JD, 2012 WL 975043 (E.D. Pa. Mar. 22, 2012) (unpublished).

48      BACKGROUND CHECKS, *supra* note 25, at 2.

49      SOC'Y FOR HUMAN RES. MGMT., BACKGROUND CHECKING: CONDUCTING CRIMINAL BACKGROUND CHECKS, slide 3 (Jan. 22, 2010), http://www.slideshare.net/shrm/background-check-criminal?from=share_email [hereinafter CONDUCTING CRIMINAL BACKGROUND CHECKS] (73% of the responding employers reported that they conducted criminal background checks on all of their job candidates, 19% reported that they conducted criminal background checks on selected job candidates, and a mere 7% reported that they did not conduct criminal background checks on any of their candidates). The survey excluded the "not sure" responses from its analysis, which may account for the 1% gap in the total number of employer responses. *Id.*

50      CONDUCTING CRIMINAL BACKGROUND CHECKS, *supra* note 49, at slide 7 (39% of the surveyed employers reported that they conducted criminal background checks "[t]o reduce/prevent theft and embezzlement, other criminal activity"); *see also* Sarah E. Needleman, *Businesses Say Theft by Their Workers is Up*, WALL ST. J., Dec. 11, 2008, at B8, *available at* http://online.wsj.com/article/SB122896381748896999.html.

51      CONDUCTING CRIMINAL BACKGROUND CHECKS, *supra* note 49, at slide 7 (61% of the surveyed employers reported that they conducted criminal background checks "[to] ensure a safe work environment for employees"); *see also* ERIKA HARRELL, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, WORKPLACE VIOLENCE, 1993–2009, at 1 (2011), http://bjs.ojp.usdoj.gov/content/pub/pdf/wv09.pdf (reporting that in 2009, "[n]onfatal violence in the workplace was about 15% of all nonfatal violent crime against persons age 16 or older"). *But see id.* (noting that from "2002 to 2009, the rate of nonfatal workplace violence has declined by 35%, following a 62% decline in the rate from 1993 to 2002"). Studies indicate that most workplace violence is committed by individuals with no relationship to the business or its employees. *See id.* at 6 (reporting that between 2005 and 2009, strangers committed the majority of workplace violence against individuals (53% for males and 41% for females) while violence committed by co-workers accounted for a much smaller percentage (16.3% for males and 14.3% for females)); *see also* NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, CTR. FOR DISEASE CONTROL & PREVENTION, WORKPLACE VIOLENCE PREVENTION STRATEGIES AND RESEARCH

NEEDS 4, Table 1 (2006), http://www.cdc.gov/niosh/docs/2006-144/pdfs/2006-144.pdf (reporting that  approximately 85% of the workplace homicides examined were perpetrated in furtherance of a crime by persons with no relationship to the business or its employees; approximately 7% were perpetrated by employees or former employees, 5% were committed by persons with a personal relationship to an employee, and 3% were perpetrated by persons with a customer-client relationship to the business).

52    CONDUCTING CRIMINAL BACKGROUND CHECKS, *supra* note 49, at slide 7 (55% percent of the surveyed employers reported that they conducted criminal background checks "[t]o reduce legal liability for negligent hiring"). Employers have a common law duty to exercise reasonable care in hiring to avoid foreseeable risks of harm to employees, customers, and the public.  If an employee engages in harmful misconduct on the job, and the employer has not exercised such care in selecting the employee, the employer may be subject to liability for negligent hiring.  *See, e.g.*, Stires v. Carnival Corp., 243 F. Supp. 2d 1313, 1318 (M.D. Fla. 2002) ("[N]egligent hiring occurs when . . .  the employer knew or should have known of the employee's unfitness, and the issue of liability primarily focuses upon the adequacy of the employer's pre-employment investigation into the employee's background.").

53    CONDUCTING CRIMINAL BACKGROUND CHECKS, *supra* note 49, at slide 4 (40% of the surveyed employers reported that they conducted criminal background checks for "[j]ob candidates for positions for which state law requires a background check (e.g., day care teachers, licensed medical practitioners, etc.)"); *see id.* at slide 7 (20% of the employers reported that they conducted criminal background checks "[t]o comply with the applicable State law requiring a background check (e.g., day care teachers, licensed medical practitioners, etc.) for a particular position").  The study did not report the exact percentage of employers that conducted criminal background checks to comply with applicable federal laws or regulations, but it did report that 25% of the employers conducted background checks for "[j]ob candidates for positions involving national defense or homeland security."  *Id.* at slide 4.

54    *See* 42 U.S.C. § 2000e-2(a).

55    Disparate treatment based on the race or national origin of job applicants with the same qualifications and criminal records has been documented.   For example, a 2003 study demonstrated that White applicants with the same qualifications and criminal records as Black applicants were three times more likely to be invited for interviews than the Black applicants. *See* Devah Pager, *The Mark of a Criminal Record*, 108 AM. J. SOC. 937, 958, Figure 6 (2003), www.princeton.edu/~pager/pager_ajs.pdf.  Pager matched pairs of young Black and White men as "testers" for her study.  The "testers" in Pager's study were college students who applied for 350 low-skilled jobs advertised in Milwaukee-area classified advertisements, to test the degree to which a criminal record affects subsequent employment opportunities.  The same study showed that White job applicants with a criminal record were called back for interviews more often than equally-qualified Black applicants who *did not have* a criminal record. *Id.* at 958.  *See also* Devah Pager et al., *Sequencing Disadvantage: The Effects of Race and Criminal Background for Low Wage Job Seekers*, 623 ANNALS AM. ACAD. POL. & SOC. SCI., 199 (2009), www.princeton.edu/~pager/annals_sequencingdisadvantage.pdf (finding that among Black and

White testers with similar backgrounds and criminal records, "the negative effect of a criminal conviction is substantially larger for blacks than whites. . . . the magnitude of the criminal record penalty suffered by black applicants (60 percent) is roughly double the size of the penalty for whites with a record (30 percent)"); *see id.* at 200–201 (finding that personal contact plays an important role in mediating the effects of a criminal stigma in the hiring process, and that Black applicants are less often invited to interview, thereby having fewer opportunities to counteract the stigma by establishing rapport with the hiring official); Devah Pager, *Statement of Devah Pager, Professor of Sociology at Princeton University*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/11-20-08/pager.cfm (last visited April 23, 2012) (discussing the results of the *Sequencing Disadvantage* study); DEVAH PAGER & BRUCE WESTERN, NYC COMMISSION ON HUMAN RIGHTS, RACE AT WORK, REALITIES OF RACE AND CRIMINAL RECORD IN THE NYC JOB MARKET 6, Figure 2 (2006), http://www.nyc.gov/html/cchr/pdf/race_report_web.pdf (finding that White testers *with* a felony conviction were called back 13% of the time, Hispanic testers *without* a criminal record were called back 14% of the time, and Black testers *without* a criminal record were called back 10% of the time).

[56]     *Race & Color Discrimination*, *supra* note 15, § V.A.1.

[57]     A 2006 study demonstrated that employers who are averse to hiring people with criminal records sometimes presumed, in the absence of evidence to the contrary, that African American men applying for jobs have disqualifying criminal records. Harry J. Holzer et al., *Perceived Criminality, Criminal Background Checks, and the Racial Hiring Practices of Employers*, 49 J.L. & ECON. 451 (2006), http://www.jstor.org/stable/pdfplus/10.1086/501089.pdf; *see also* HARRY HOLZER ET AL., URBAN INST., EMPLOYER DEMAND FOR EX-OFFENDERS: RECENT EVIDENCE FROM LOS ANGELES 6–7 (2003), http://www.urban.org/UploadedPDF/410779_ExOffenders.pdf (describing the results of an employer survey where over 40% of the employers indicated that they would "probably not" or "definitely not" be willing to hire an applicant with a criminal record).

[58]     The Commission has not done matched-pair testing to investigate alleged discriminatory employment practices.  However, it has issued an Enforcement Guidance that discusses situations where individuals or organizations file charges on the basis of matched-pair testing, among other practices.  *See generally Enforcement Guidance: Whether "Testers" Can File Charges and Litigate Claims of Employment Discrimination*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N (May 22, 1996), http://www.eeoc.gov/policy/docs/testers.html.

[59]     42 U.S.C. § 2000e-2(k)(1)(A)(i).  If an employer successfully demonstrates that its policy or practice is job related for the position in question and consistent with business necessity, a Title VII plaintiff may still prevail by demonstrating that there is a less discriminatory "alternative employment practice" that serves the employer's legitimate goals as effectively as the challenged practice but that the employer refused to adopt.  *Id.* § 2000e-2(k)(1)(A)(ii).

[60]     401 U.S. 424, 431–32 (1971).

[61]     *Id.* at 431.

[62]     The Civil Rights Act of 1991, Pub. L. No. 102-166, § 105; *see also* Lewis v. City of Chicago, 130 S. Ct. 2191 (2010) (reaffirming disparate impact analysis); Ricci v. DeStefano, 557 U.S. 557 (2009) (same).

[63]     42 U.S.C. § 2000e-2(k)(1)(A)(i).

[64]     The Commission presumes that employers use the information sought and obtained from its applicants and others in making an employment decision. *See* Gregory v. Litton Sys. Inc.,316 F. Supp. 401, 403 (C.D. Cal.1970). If an employer asserts that it did not factor the applicant's or employee's known criminal record into an employment decision, the EEOC will seek evidence supporting this assertion. For example, evidence that the employer has other employees from the same protected group with roughly comparable criminal records may support the conclusion that the employer did not use the applicant's or employee's criminal record to exclude him from employment.

[65]     UNIF. CRIME REPORTING PROGRAM, FED. BUREAU OF INVESTIGATION, CRIME IN THE U.S. 2010, at Table 43a (2011), http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/table-43/10tbl43a.xls.

[66]     U.S. CENSUS BUREAU, THE BLACK POPULATION: 2010, at 3 (2011) , http://www.census.gov/prod/cen2010/briefs/c2010br-06.pdf (reporting that in 2010, "14 percent of all people in the United States identified as Black, either alone, or in combination with one or more races").

[67]     Accurate data on the number of Hispanics arrested and convicted in the United States is limited. *See* NANCY E. WALKER ET AL., NAT'L COUNCIL OF LA RAZA, LOST OPPORTUNITIES: THE REALITY OF LATINOS IN THE U.S. CRIMINAL JUSTICE SYSTEM 17–18 (2004), http://www.policyarchive.org/handle/10207/bitstreams/20279.pdf (explaining why "[i]t is very difficult to find any information – let alone accurate information – on the number of Latinos arrested  in the United States"). The Department of Justice's Bureau of Justice Statistics' (BJS) *Sourcebook of Criminal Justice Statistics* and the FBI's Crime Information Services Division do not provide data for arrests by ethnicity. *Id.* at 17. However, the U.S. Drug Enforcement Administration (DEA) disaggregates data by Hispanic and non-Hispanic ethnicity. *Id.* at 18. According to DOJ/BJS, from October 1, 2008 to September 30, 2009, 45.5% of drug arrests made by the DEA were of Hispanics or Latinos. MARK MOTIVANS, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, FEDERAL JUSTICE STATISTICS, 2009 – STATISTICAL TABLES, at 6, Table 1.4 (2011), http://bjs.ojp.usdoj.gov/content/pub/pdf/fjs09.pdf. Accordingly, Hispanics were arrested for drug offenses by the DEA at a rate of three times their numbers in the general population. *See* U.S. CENSUS BUREAU, OVERVIEW OF RACE AND HISPANIC ORIGIN: 2010, at 3 (2011), http://www.census.gov/prod/cen2010/briefs/c2010br-02.pdf (reporting that in 2010, "there were 50.5 million Hispanics in the United States, composing 16 percent of the total population"). However, national statistics indicate that Hispanics have similar or lower drug usage rates compared to Whites. *See, e.g.,* SUBSTANCE ABUSE & MENTAL HEALTH SERVS.

APP 0039

ADMIN., U.S. DEP'T OF HEALTH & HUMAN SERVS., RESULTS FROM THE 2010 NATIONAL SURVEY ON DRUG USE AND HEALTH: SUMMARY OF NATIONAL FINDINGS 21, Figure 2.10 (2011), http://oas.samhsa.gov/NSDUH/2k10NSDUH/2k10Results.pdf (reporting, for example, that the usage rate for Hispanics in 2009 was 7.9% compared to 8.8% for Whites).

[68]    *See, e.g.*, HUMAN RIGHTS WATCH, DECADES OF DISPARITY: DRUG ARRESTS AND RACE IN THE UNITED STATES 1 (2009), http://www.hrw.org/sites/default/files/reports/us0309web_1.pdf (noting that the "[t]he higher rates of black drug arrests do not reflect higher rates of black drug offending . . . . blacks and whites engage in drug offenses - possession and sales - at roughly comparable rates"); SUBSTANCE ABUSE & MENTAL HEALTH SERVS. ADMIN., U.S. DEP'T OF HEALTH & HUMAN SERVS., RESULTS FROM THE 2010 NATIONAL SURVEY ON DRUG USE AND HEALTH: SUMMARY OF NATIONAL FINDINGS 21 (2011), http://oas.samhsa.gov/NSDUH/2k10NSDUH/2k10Results.pdf (reporting that in 2010, the rates of illicit drug use in the United States among persons aged 12 or older were 10.7% for African Americans,  9.1% for Whites, and 8.1% for Hispanics); HARRY LEVINE & DEBORAH SMALL, N.Y. CIVIL LIBERTIES UNION, MARIJUANA ARREST CRUSADE: RACIAL BIAS AND POLICE POLICY IN NEW YORK CITY, 1997–2007, at 13–16 (2008), www.nyclu.org/files/MARIJUANA-ARREST-CRUSADE_Final.pdf (citing U.S. Government surveys showing that Whites use marijuana at higher rates than African Americans and Hispanics; however, the marijuana arrest rate of Hispanics is nearly three times the arrest rate of Whites, and the marijuana arrest rate of African Americans is five times the arrest rate of Whites).

[69]    PREVALENCE OF IMPRISONMENT, *supra* note 4, at 1, 8.  Due to the nature of available data, the Commission is using incarceration data as a proxy for conviction data.

[70]    *Id.*

[71]    *Id.*

[72]    MARC MAUER & RYAN S. KING, THE SENTENCING PROJECT, UNEVEN JUSTICE: STATE RATES OF INCARCERATION BY RACE AND ETHNICITY 10 (2007), www.sentencingproject.org/Admin%5CDocuments%5Cpublications%5Crd_stateratesofincbyraceandethnicity.pdf.

[73]    *Id.*

[74]    PAUL GUERINO ET AL., BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, PRISONERS IN 2010, at 27, Table 14 (2011), http://bjs.ojp.usdoj.gov/content/pub/pdf/p10.pdf (reporting that as of December 31, 2010, Black men were imprisoned at a rate of 3,074 per 100,000 Black male residents, Hispanic men were imprisoned at a rate of 1,258 per 100,000 Hispanic male residents, and White men were imprisoned at a rate of 459 per 100,000 White male residents); *cf.* ONE IN 31, *supra* note 4, at 5 ("Black adults are four times as likely as whites and nearly 2.5 times as likely as Hispanics to be under correctional control.  One in 11 black adults -- 9.2 percent -- was under correctional control [probation, parole, prison, or jail] at year end 2007.").

[75]     The Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. part 1607, provide that "[employers] should maintain and have available . . . information on [the] adverse impact of [their employment selection procedures]."  29 C.F.R. § 1607.15A.  "Where [an employer] has not maintained [such records, the EEOC] may draw an inference of adverse impact of the selection process from the failure of [the employer] to maintain such data . . . ." *Id.* § 1607.4D.

[76]     *See, e.g.*, El v. SEPTA, 418 F. Supp. 2d 659, 668–69 (E.D. Pa. 2005) (finding that the plaintiff established a prima facie case of disparate impact with evidence from the defendant's personnel records and national data sources from the U.S. Bureau of Justice Statistics and the Statistical Abstract of the U.S.), *aff'd on other grounds,* 479 F.3d 232 (3d Cir. 2007); Green v. Mo. Pac. R.R., 523 F.2d 1290, 1294–95 (8th Cir. 1975) (concluding that the defendant's criminal record exclusion policy had a disparate impact based on race by evaluating local population statistics and applicant data), *appeal after remand*, 549 F.2d 1158, 1160 (8th Cir. 1977).

[77]     457 U.S. 440, 442 (1982).

[78]     *Id.* at 453–54

[79]     433 U.S. 321, 330 (1977).

[80]     *See, e.g.*, Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 365 (1977) (stating that "[a] consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection").

[81]     42 U.S.C. § 2000e-2(k)(1)(A)(i).  *See* Griggs v. Duke Power Co., 401 U.S. 424 (1971). *See also* 42 U.S.C. § 2000e(m) (defining the term "demonstrates" to mean "meets the burdens of production and persuasion").

[82]     422 U.S. 405 (1975).

[83]     433 U.S. 321 (1977).

[84]     137 Cong. Rec. 15273 (1991) (statement of Sen. Danforth) ("[T]he terms 'business necessity' and 'job related' are intended to reflect the concepts enunciated by the Supreme Court in *Griggs v. Duke Power Co*, and in the other Supreme Court decisions prior to *Wards Cove Packing Co. v. Atonio*." (citations omitted)).  Section 105(b) of the Civil Rights Act of 1991 provides that only the interpretive memorandum read by Senator Danforth in the Congressional Record may be considered legislative history or relied upon in construing or applying the business necessity standard.

[85]     401 U.S. at 431, 436.

APP 0041

---

[86]    422 U.S. at 430–31 (endorsing the EEOC's position that discriminatory tests are impermissible unless shown, by professionally acceptable methods, to predict or correlate with "'important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated'" (quoting 29 C.F.R. § 1607.4(c))).

[87]    433 U.S. at 331–32 (concluding that using height and weight as proxies for strength did not satisfy the business necessity defense because the employer failed to establish a correlation between height and weight and the necessary strength, and also did not specify the amount of strength necessary to perform the job safely and efficiently).

[88]    *Id.* at 331 n.14.

[89]    523 F.2d 1290, 1293 (8th Cir. 1975). "In response to a question on an application form, Green [a 29-year-old African American man] disclosed that he had been convicted in December 1967 for refusing military induction. He stated that he had served 21 months in prison until paroled on July 24, 1970." *Id.* at 1292–93.

[90]    Green v. Mo. Pac. R.R., 549 F.2d 1158, 1160 (8th Cir. 1977) (upholding the district court's injunction prohibiting the employer from using an applicant's conviction record as an absolute bar to employment but allowing it to consider a prior criminal record as a factor in making individual hiring decisions, as long as the defendant took these three factors into account).

[91]    *Id.* (referring to completion of the sentence rather than completion of parole).

[92]    *Id.*

[93]    479 F.3d 232 (3d Cir. 2007).

[94]    *Id.* at 235.

[95]    *Id.* at 235, 236.

[96]    *Id.* at 235.

[97]    *Id.* at 244.

[98]    *Id.* at 244–45.

[99]    *Id.* at 247. *Cf.* Shawn Bushway et al., *The Predictive Value of Criminal Background Checks: Do Age and Criminal History Affect Time to Redemption?*, 49 CRIMINOLOGY 27, 52 (2011) [hereinafter *The Predictive Value of Criminal Background Checks*] ("Given the results of the current as well as previous [recidivism] studies, the 40-year period put forward in *El v. SEPTA* (2007) . . . seems too old of a score to be still in need of settlement.").

<sup>100</sup>    *El*, 479 F.3d at 248.

<sup>101</sup>    Some states have enacted laws to limit employer inquiries concerning all or some arrest records. *See* BACKGROUND CHECKS, *supra* note 25, at 48–49. At least 13 states have statutes explicitly prohibiting arrest record inquiries and/or dissemination subject to certain exceptions. *See, e.g.*, Alaska (ALASKA STAT. § 12.62.160(b)(8)); Arkansas (ARK. CODE ANN. § 12-12-1009(c)); California (CAL. LAB. CODE § 432.7(a)); Connecticut (CONN. GEN. STAT. § 46a-80(e)); Illinois (775 ILL. COMP. STAT. § 5/2-103(A)) (dealing with arrest records that have been ordered expunged, sealed, or impounded); Massachusetts (MASS. GEN. LAWS ch. 151B § 4(9)); Michigan (MICH COMP. LAWS § 37.2205a(1) (applying to misdemeanor arrests only)); Nebraska (NEB. REV. STAT. § 29-3523(2)) (ordering no dissemination of arrest records under certain conditions and specified time periods)); New York (N.Y. EXEC. LAW § 296(16)); North Dakota (N.D. CENT. CODE § 12-60-16.6(2)); Pennsylvania (18 PA. CONS. STAT. § 9121(b)(2)); Rhode Island (R.I. GEN. LAWS § 28-5-7(7)), and Wisconsin (WIS. STAT. §§ 111.321, 111.335a).

<sup>102</sup>    *See* United States v. Armstrong, 517 U.S. 456, 464 (1996) (discussing federal prosecutors' broad discretionary authority to determine whether to prosecute cases and whether to bring charges before a grand jury); Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978) (explaining same for state prosecutors); *see also* THOMAS H. COHEN & TRACEY KYCKELHAHN, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, FELONY DEFENDANTS IN LARGE URBAN COUNTIES, 2006, at 10, Table 11 (2010), http://bjs.ojp.usdoj.gov/content/pub/pdf/fdluc06.pdf (reporting that in the 75 largest counties in the country, nearly one-third of the felony arrests did not result in a conviction because the charges against the defendants were dismissed).

<sup>103</sup>    Schware v. Bd. of Bar Exam'rs, 353 U.S. 232, 241 (1957) ("The mere fact that a [person] has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct."); United States. v. Hynes, 467 F.3d 951, 957 (6th Cir. 2006) (upholding a preliminary jury instruction that stated that a "defendant is presumed to be innocent unless proven guilty. The indictment against the Defendant is only an accusation, nothing more. It's not proof of guilt or anything else."); *see* Gregory v. Litton Sys. Inc., 316 F. Supp. 401, 403 (C.D. Cal. 1970) ("[I]nformation concerning a prospective employee's record of arrests without convictions, is irrelevant to [an applicant's] suitability or qualification for employment."), *modified on other grounds*, 472 F.2d 631 (9th Cir. 1972); Dozier v. Chupka, 395 F. Supp. 836, 850 n.10 (S.D. Ohio 1975) (stating that the use of arrest records was too crude a predictor of an employee's predilection for theft where there were no procedural safeguards to prevent reliance on unwarranted arrests); City of Cairo v. Ill. Fair Empl. Prac. Comm., 8 Empl. Prac. Dec. (CCH) ¶ 9682 (Ill. App. Ct. 1974) (concluding that, where applicants sought to become police officers, they could not be absolutely barred from appointment solely because they had been arrested, as distinguished from convicted); *see also* EEOC Dec. 74-83, ¶ 6424 (CCH) (1983) (finding no business justification for an employer's unconditional termination of all employees with arrest records (all five employees terminated were Black), purportedly to reduce thefts in the workplace; the employer produced no evidence that these particular employees had been involved in any of the thefts, or that all people who are arrested but not convicted are prone towards crime in the future); EEOC Dec. 76-87, ¶ 6665 (CCH) (1983) (holding that an applicant who sought to become a police officer could not be rejected based on one arrest five years earlier

for riding in a stolen car when he asserted that he did not know that the car was stolen and the charge was dismissed).

104    *See* STATE CRIMINAL HISTORY, *supra* note 37, at 2; *see also* BACKGROUND CHECKS, *supra* note 25, at 17.

105    *See supra* notes 39–40.

106    S*ee* Clark v. Arizona, 548 U.S. 735, 766 (2006) ("The first presumption [in a criminal case] is that a defendant is innocent unless and until the government proves beyond a reasonable doubt each element of the offense charged. . . ."). *See also* FED. R. CRIM P 11 (criminal procedure rule governing pleas).   The Supreme Court has concluded that criminal defendants have a Sixth Amendment right to effective assistance of counsel during plea negotiations.  *See generally* Lafler v. Cooper, 132 S. Ct. 1376  (2012); Missouri v. Frye, 132 S. Ct. 1399 (2012).

107    *See supra* text accompanying note 39.

108    *See e.g.*, HAW. REV. STAT. § 378-2.5(b).  Under this provision, the employer may withdraw the offer of employment if the prospective employee has a conviction record "that bears a rational relationship to the duties and responsibilities of the position." *Id.  See also* CONN. GEN. STAT. § 46a-80(b) ("[N]o employer . . . shall inquire about a prospective employee's past convictions until such prospective employee has been deemed otherwise qualified for the position."); MINN. STAT. § 364.021(a) ("[A] public employer may not inquire or consider the criminal record or criminal history of an applicant for public employment until the applicant has been selected for an interview by the employer.").  State fair employment practices agencies have information about applicable state law.

109    *See generally* NAT'L LEAGUE OF CITIES &  NAT'L EMP'T LAW PROJECT, CITIES PAVE THE WAY: PROMISING REENTRY POLICIES THAT PROMOTE LOCAL HIRING OF PEOPLE WITH CRIMINAL RECORDS (2010), www.nelp.org/page/-/SCLP/2010/CitiesPavetheWay.pdf?nocdn=1 (identifying local initiatives that address ways to increase employment opportunities for individuals with criminal records, including delaying a background check until the final stages of the hiring process, leveraging development funds, and expanding bid incentive programs to promote local hiring priorities); NAT'L EMP'T LAW PROJECT, CITY AND COUNTY HIRING INITIATIVES (2010), www.nelp.org/page/-/SCLP/CityandCountyHiringInitiatives.pdf (discussing the various city and county initiatives that have removed questions regarding criminal history from the job application and have waited until after a conditional offer of employment has been made to conduct a background check and inquire about the applicant's criminal background).

110    Several federal laws automatically prohibit employing individuals with certain felony convictions or, in some cases, misdemeanor convictions.  *See, e.g.*, 5 U.S.C. § 7371(b) (requiring the mandatory removal of any federal law enforcement officer who is convicted of a felony); 46 U.S.C. § 70105(c)(1)(A) (mandating that individuals who have been convicted of espionage, sedition, treason or terrorism be permanently disqualified from receiving a biometric transportation security card and thereby excluded from port work employment); 42 U.S.C.

§ 13726(b)(1) (disqualifying persons with felony convictions or domestic violence convictions from working for a private prisoner transport company); 25 U.S.C. § 3207(b) (prohibiting individuals with a felony conviction, or any of two or more misdemeanor convictions, from working with Indian children if their convictions involved crimes of violence, sexual assault, molestation, exploitation, contact or prostitution, crimes against persons, or offenses committed against children); 18 U.S.C. § 922(g)(1), (9) (prohibiting an individual convicted of a felony or a misdemeanor for domestic violence from possessing a firearm, thereby excluding such individual from a wide range of jobs that require such possession); 18 U.S.C. § 2381 (prohibiting individuals convicted of treason from "holding any office under the United States").  Other federal laws prohibit employing individuals with certain convictions for a defined time period. *See, e.g.*, 5 U.S.C. § 7313(a) (prohibiting individuals convicted of a felony for inciting a riot or civil disorder from holding any position in the federal government for five years after the date of the conviction); 12 U.S.C. § 1829 (requiring a ten-year ban on employing individuals in banks if they have certain financial-related convictions); 49 U.S.C. § 44936(b)(1)(B) (imposing a ten-year ban on employing an individual as a security screener for an air carrier if that individuals has been convicted of specified crimes).

111     *See* 29 C.F.R. § 1607.5 (describing the general standards for validity studies).

112     *Id.*

113     *Id.* § 1607.6B.  The following subsections state:

> (1) *Where informal or unscored procedures are used*. When an informal or unscored selection procedure which has an adverse impact is utilized, the user should eliminate the adverse impact, or modify the procedure to one which is a formal, scored or quantified measure or combination of measures and then validate the procedure in accord with these guidelines, or otherwise justify continued use of the procedure in accord with Federal law.
> (2) *Where formal and scored procedures are used*. When a formal and scored selection procedure is used which has an adverse impact, the validation techniques contemplated by these guidelines usually should be followed if technically feasible. Where the user cannot or need not follow the validation techniques anticipated by these guidelines, the user should either modify the procedure to eliminate adverse impact or otherwise justify continued use of the procedure in accord with Federal law.

> *Id.* § 1607.6A, B(1)–(2).

114     *See, e.g.,* Brent W. Roberts et al., *Predicting the Counterproductive Employee in a Child-to-Adult Prospective Study*, 92 J. APPLIED PSYCHOL. 1427, 1430 (2007), http://internal.psychology.illinois.edu/~broberts/Roberts,%20Harms,%20Caspi,%20&%20Moffit t,%202007.pdf (finding that in a study of New Zealand residents from birth to age 26, "[a]dolescent criminal convictions were unrelated to committing counterproductive activities at work [such as tardiness, absenteeism, disciplinary problems, etc.].  In fact, according to the

APP 0045

[results of the study], people with an adolescent criminal conviction record were less likely to get in a fight with their supervisor or steal things from work.").

115    *See* OHIO REV. CODE ANN. § 2913.02.

116    523 F.2d at 1298 (stating that "[w]e cannot conceive of any business necessity that would automatically place every individual convicted of any offense, except a minor traffic offense, in the permanent ranks of the unemployed").

117    479 F.3d at 247.

118    *See, e.g.*, Keith Soothill & Brian Francis, *When do Ex-Offenders Become Like Non-Offenders?*, 48 HOWARD J. OF CRIM. JUST., 373, 380–81 (2009) (examining conviction data from Britain and Wales, a 2009 study found that the risk of recidivism declined for the groups with prior records and eventually converged within 10 to 15 years with the risk of those of the nonoffending comparison groups); Alfred Blumstein & Kiminori Nakamura, *Redemption in the Presence of Widespread Criminal Background Checks,* 47 CRIMINOLOGY 327 (2009) (concluding that there may be a "point of redemption" (i.e., a point in time where an individual's risk of re-offending or re-arrest is reasonably comparable to individuals with no prior criminal record) for individuals arrested for certain offenses if they remain crime free for a certain number of years); Megan C. Kurlychek, Robert Brame & Shawn D. Bushway, *Enduring Risk? Old Criminal Records and Predictions of Future Criminal Involvement*, 53 CRIME & DELINQUENCY 64 (2007) (analyzing juvenile police contacts and Racine, Wisconsin police contacts for an aggregate of crimes for 670 males born in 1942 and concluding that, after seven years, the risk of a new offense approximates that of a person without a criminal record); Megan C. Kurlychek et al., *Scarlet Letters and Recidivism: Does an Old Criminal Record Predict Future Offending?*, 5 CRIMINOLOGY & PUB. POL'Y 483 (2006) (evaluating juvenile police contacts and arrest dates from Philadelphia police records for an aggregate of crimes for individuals born in 1958, a 2006 study concluded that the risk of recidivism decreases over time and that, six or seven years after an arrest, an individual's risk of re-arrest approximates that of an individual who has never been arrested).

119    *Griggs*, 401 U.S. at 431.

120    523 F.2d at 1298; *see also* Field v. Orkin Extermination Co., No. Civ. A. 00-5913, 2002 WL 32345739, at *1 (E.D. Pa. Feb. 21, 2002) (unpublished) ("[A] blanket policy of denying employment to any person having a criminal conviction is a [*per se*] violation of Title VII."). The only exception would be if such an exclusion were required by federal law or regulation. *See, e.g., supra* note 110.

121    *Cf. Field*, 2002 WL 32345739, at *1.  In *Field*, an employee of ten years was fired after a new company that acquired her former employer discovered her 6-year-old felony conviction. The new company had a blanket policy of firing anyone with a felony conviction less than 10 years old.  The court granted summary judgment for the employee because the employer's argument that her conviction was related to her job qualifications was "weak at best," especially

given her positive employment history with her former employer.  *Id.*

122      Recidivism rates tend to decline as ex-offenders' ages increase.  A 2011 study found that an individual's age at conviction is a variable that has a "substantial and significant impact on recidivism."  *The Predictive Value of Criminal Background Checks*, *supra* note 99, at 43.  For example, the 26-year-olds in the study, with no prior criminal convictions, had a 19.6% chance of reoffending in their first year after their first conviction, compared to the 36-year-olds who had an 8.8% chance of reoffending during the same time period, and the 46-year-olds who had a 5.3% of reoffending.  *Id.* at 46.  *See also* PATRICK A. LANGAN & DAVID J. LEVIN, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, SPECIAL REPORT:  RECIDIVISM OF PRISONERS RELEASED IN 1994, at 7 (2002), http://bjs.ojp.usdoj.gov/content/pub/pdf/rpr94.pdf (finding that, although 55.7% of ex-offenders aged 14–17 released in 1994 were reconvicted within three years, the percentage declined to 29.7% for ex-offenders aged 45 and older who were released the same year).

          Consideration of an applicant's age at the time the offense occurred or at his release from prison would benefit older individuals and, therefore, would not violate the Age Discrimination in Employment Act of 1967, *as amended,* 29 U.S.C. § 621 *et seq.  See* Age Discrimination in Employment Act, 29 C.F.R. § 1625.2 ("Favoring an older individual over a younger individual because of age is not unlawful discrimination under the ADEA, even if the younger individual is at least 40 years old."); *see also* Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 600 (2004) (concluding that the ADEA does not preclude an employer from favoring an older employee over a younger one within the protected age group).

123      *See* Laura Moskowitz, *Statement of Laura Moskowitz, Staff Attorney, National Employment Law Project's Second Chance Labor Project*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/11-20-08/moskowitz.cfm (last visited April 23, 2012) (stating that one of the factors that is relevant to the assessment of an ex-offender's risk to a workplace and to the business necessity analysis, is the "length and consistency of the person's work history, including whether the person has been recently employed"; also noting that various studies have "shown a strong relationship between employment and decreases in crime and recidivism").  *But see* Stephen J. Tripodi et al., *Is Employment Associated With Reduced Recidivism?: The Complex Relationship Between Employment and Crime*, 54 INT'L J. OF OFFENDER THERAPY AND COMP. CRIMINOLOGY 716, 716 (2010) (finding that "[b]ecoming employed after incarceration, although apparently providing initial motivation to desist from crime, does not seem to be on its own sufficient to prevent recidivism for many parolees").

124      *See* WENDY ERISMAN & JEANNE BAYER CONTARDO, INST. FOR HIGHER EDUC. POLICY, LEARNING TO REDUCE RECIDIVISM: A 50 STATE ANALYSIS OF POSTSECONDARY CORRECTIONAL EDUCATION 5 (2005), http://www.ihep.org/assets/files/publications/g-l/LearningReduceRecidivism.pdf (finding that increasing higher education for prisoners enhances their prospects for employment and serves as a cost-effective approach to reducing recidivism); *see also* John H. Laud & Robert J. Sampson, *Understanding Desistance from Crime*, 28 CRIME & JUST. 1, 17–24 (2001), http://www.ncjrs.gov/pdffiles1/Digitization/192542-192549NCJRS.pdf (stating that factors associated with personal rehabilitation and social

stability, such as stable employment, family and community involvement, and recovery from substance abuse, are correlated with a decreased risk of recidivism).

[125]     Some employers have expressed a greater willingness to hire ex-offenders who have had an ongoing relationship with third party intermediary agencies that provide supportive services such as drug testing, referrals for social services, transportation, child care, clothing, and food. *See* Amy L. Solomon et al., *From Prison to Work: The Employment Dimensions of Prisoner Reentry*, 2004 URBAN INST. 20, http://www.urban.org/UploadedPDF/411097_From_Prison_to_Work.pdf.   These types of services can help ex-offenders avoid problems that may interfere with their ability to obtain and maintain employment.  *Id.*; *see generally* Victoria Kane, *Transcript of 7-26-11 Meeting,* U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/7-26-11/transcript.cfm#kane (last visited April 23, 2012) (describing why employers should partner with organizations that provide supportive services to ex-offenders).

[126]     *See generally* REENTRY MYTHBUSTER! ON FEDERAL BONDING PROGRAM, *supra* note 16; *Work Opportunity Tax Credit (WOTC),* EMP'T & TRAINING ADMIN., U.S. DEP'T OF LABOR, http://www.doleta.gov/business/incentives/opptax/ (last visited April 3, 2012); *Directory of State Bonding Coordinators*, EMP'T & TRAINING ADMIN., U.S. DEP'T OF LABOR, http://www.doleta.gov/usworkforce/onestop/FBPContact.cfm (last visited April 3, 2012); *Federal Bonding Program - Background*, U.S. DEP'T OF LABOR, http://www.bonds4jobs.com/program-background.html (last visited April 3, 2012);  *Bureau of Prisons: UNICOR's Federal Bonding Program,* http://www.bop.gov/inmate_programs/itb_bonding.jsp (last visited April 3, 2012).

[127]     This example is loosely based on a study conducted by Alfred Blumstein and Kiminori Nakamura measuring the risk of recidivism for individuals who have committed burglary, robbery, or aggravated assault.  *See* Blumstein & Nakamura, *supra* note 118.

[128]     42 U.S.C. § 2000e-2(k)(1)(A)(ii), (C).  *See also* Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 998 (1988).

[129]     *See* Exec. Order No. 12,067, 3 C.F.R. 206 (1978 Comp.).

[130]     *See* 49 U.S.C. §§ 44935(e)(2)(B), 44936(a)(1), (b)(1).  The statute mandates a criminal background check.

[131]     *See* 5 U.S.C. § 7371(b) (requiring mandatory removal from employment of law enforcement officers convicted of felonies).

[132]     *See* 42 U.S.C. § 13041(c) ("Any conviction for a sex crime, an offense involving a child victim, or a drug felony may be grounds for denying employment or for dismissal of an employee. . . .").

[133]     12 U.S.C. § 1829.

APP 0048

[134]    46 U.S.C. § 70105(c).

[135]    Other jobs and programs subject to federally-imposed restrictions based on criminal convictions include the business of insurance (18 U.S.C. § 1033(e)), employee benefits employee (29 U.S.C. § 1111(a)), participation in Medicare and state health care programs (42 U.S.C. § 1320a-7(a)–(b)), defense contractor (10 U.S.C. § 2408(a)), prisoner transportation (42 U.S.C. § 13726b(b)(1)), and court-imposed occupational restrictions (18 U.S.C. §§ 3563(b)(5), 3583(d)).  This list is not meant to be exhaustive.

[136]    *See, e.g.*, federal statutes governing commercial motor vehicle operator's licenses (49 U.S.C. § 31310(b)-(h)), locomotive operator licenses (49 U.S.C. § 20135(b)(4)(B)), and certificates, ratings, and authorizations for pilots, flight instructors, and ground instructors (49 U.S.C. §§ 44709(b)(2), 44710(b), 4711(c); 14 C.F.R. § 61.15).

[137]    *See, e.g.*, federal statutes governing loan originator licensing/registration (12 U.S.C. § 5104(b)(2)), registration of brokers and dealers (15 U.S.C. § 78o(b)(4)(B)), registration of commodity dealers (7 U.S.C. § 12a(2)(D), (3)(D), (E), (H)), and registration of investment advisers (15 U.S.C. § 80b-3(e)(2)-(3), (f)).

[138]    *See, e.g.*, custom broker's licenses (19 U.S.C. § 1641(d)(1)(B)), export licenses (50 U.S.C. App. § 2410(h)), and arms export (22 U.S.C. § 2778(g)).

[139]    *See, e.g.*, grain inspector's licenses (7 U.S.C. § 85), merchant mariner's documents, licenses, or certificates of registry (46 U.S.C. § 7503(b)), licenses to import, manufacture, or deal in explosives or permits to use explosives (18 U.S.C. § 843(d)), and farm labor contractor's certificates of registration (29 U.S.C. § 1813(a)(5)).  This list of federally-imposed restrictions on occupational licenses and registrations for individuals with certain criminal convictions is not meant to be exhaustive.  For additional information, please consult the relevant federal agency or department.

[140]    *See* 12 U.S.C. § 1829(a)(1).  The statute imposes a ten-year ban for individuals who have been convicted of certain financial crimes such as corruption involving the receipt of commissions or gifts for procuring loans (18 U.S.C. § 215), embezzlement or theft by an officer/employee of a lending, credit, or insurance institution (18 U.S.C § 657), false or fraudulent statements by an officer/employee of the federal reserve or a depository institution (18 U.S.C. § 1005), or fraud by wire, radio, or television that affects a financial institution (18 U.S.C. § 1343), among other crimes.  *See* 12 U.S.C. § 1829(a)(2)(A)(i)(I), (II).  Individuals who have either been convicted of the crimes listed in § 1829(a)(2)(A), or conspiracy to commit those crimes, will not receive an exception to the application of the 10-year ban from the FDIC. 12 U.S.C. § 1829(a)(2)(A).

[141]    *See* Fed. Deposit Ins. Corp., FDIC Statement of Policy For Section 19 of the FDI Act, § C, "Procedures" (amended May 13, 2011), http://www.fdic.gov/regulations/laws/rules/5000-1300.html [hereinafter FDIC Policy]; *see also*

Statement of Policy, 63 Fed. Reg. 66,177, 66,184 (Dec. 1, 1998); Clarification of Statement of Policy, 76 Fed. Reg. 28,031 (May 13, 2011) (clarifying the FDIC's Statement of Policy for Section 19 of the FDI Act).

"Approval is automatically granted and an application [for a waiver] will not be required where [an individual who has been convicted of] the covered offense [criminal offenses involving dishonesty, breach of trust, or money laundering] . . . meets all of the ["*de minimis*"] criteria" set forth in the FDIC's Statement of Policy.  FDIC POLICY, *supra*, § B (5).  These criteria include the following: (1) there is only one conviction or program of record for a covered offense; (2) the offense was punishable by imprisonment for a term of one year or less and/or a fine of $1,000 or less, and the individual did not serve time in jail; (3) the conviction or program was entered at least five years prior to the date an application would otherwise be required; and (4) the offense did not involve an insured depository institution or insured credit union.  *Id.* Additionally, an individual's conviction for writing a "bad" check will be considered a *de minimis* offense, even if it involved an insured depository institution or insured credit union, if: (1) all other requirements of the *de minimis* offense provisions are met; (2) the aggregate total face value of the bad or insufficient funds check(s) cited in the conviction was $1000 or less; and (3) no insured depository institution or insured credit union was a payee on any of the bad or insufficient funds checks that were the basis of the conviction.  *Id.*

142    *See* FDIC POLICY, *supra* note 141, § C, "PROCEDURES."

143    *Id.  But cf.* NAT'L H.I.R.E. NETWORK, PEOPLE WITH CRIMINAL RECORDS WORKING IN FINANCIAL INSTITUTIONS: THE RULES ON FDIC WAIVERS, http://www.hirenetwork.org/FDIC.html ("Institutions rarely seek a waiver, except for higher level positions when the candidate is someone the institution wants to hire.  Individuals can only seek FDIC approval themselves if they ask the FDIC to waive the usual requirement.  Most individuals probably are unaware that they have this right."); FED. DEPOSIT INSUR. CORP. 2010 ANNUAL REPORT, § VI.A: KEY STATISTICS, FDIC ACTIONS ON FINANCIAL INSTITUTION APPLICATIONS 2008–2010 (2011), http://www.fdic.gov/about/strategic/report/2010annualreport/chpt6-01.html (reporting that between 2008 and 2010, the FDIC approved a total of 38 requests for consent to employ individuals with covered offenses in their background; the agency did not deny any requests during this time period).

144    FDIC POLICY, *supra* note 141,  § D, "EVALUATION OF SECTION 19 APPLICATIONS" (listing the factors that are considered in this waiver review process, which include: (1) the nature and circumstances underlying the offense; (2) "[e]vidence of rehabilitation including the person's reputation since the conviction . . . the  person's  age at the time of conviction . . .  and the time which has elapsed since the conviction"; (3) the position to be held in the insured institution; (4) the amount of influence/control the individual will be able to exercise over management affairs; (5) management's ability to control and supervise the individual's activities; (6) the degree of ownership the individual will have in the insured institution; (7) whether the institution's fidelity bond coverage applies to the individual; (8) the opinion of the applicable federal and/or state regulators; and (9) any other relevant factors).

[145]    *See* 49 C.F.R. §§ 1515.7 (describing the procedures for waiver of criminal offenses, among other standards), 1515.5 (explaining how to appeal the Initial Determination of Threat Assessment based on a criminal conviction).  In practice, some worker advocacy groups have criticized the TWIC appeal process due to prolonged delays, which leaves many workers jobless; especially workers of color.  *See generally* MAURICE EMSELLEM ET AL., NAT'L EMP'T LAW PROJECT, A SCORECARD ON THE POST-911 PORT WORKER BACKGROUND CHECKS: MODEL WORKER PROTECTIONS PROVIDE A LIFELINE FOR PEOPLE OF COLOR, WHILE MAJOR TSA DELAYS LEAVE THOUSANDS JOBLESS DURING THE RECESSION (2009), http://nelp.3cdn.net/2d5508b4cec6e13da6_upm6b20e5.pdf.

The Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 6201, 124 Stat. 721 (2010) (the Act) includes a process to appeal or dispute the accuracy of information obtained from criminal records.  The Act requires participating states to perform background checks on applicants and current employees who have direct access to patients in long-term care facilities, such as nursing homes, to determine if they have been convicted of an offense or have other disqualifying information in their background, such as a finding of patient or resident abuse, that would disqualify them from employment under the Social Security Act or as specified by state law.  *See* 42 U.S.C. § 1320a-7l(a)(3)(A), (a)(4)(B), (6)(A)–(E).  The background check involves an individualized assessment of the relevance of a conviction or other disqualifying information. The Act protects applicants and employees in several ways, for example, by: (1) providing a 60-day provisional period of employment for the prospective employee, pending the completion of the criminal records check; (2) providing an independent process to appeal or dispute the accuracy of the information obtained in the criminal records check; and (3) allowing the employee to remain employed (subject to direct on-site supervision) during the appeals process. 42 U.S.C. § 1320a-7l(a)(4)(B)(iii), (iv).

[146]    *See* 46 U.S.C. § 70105(d); *see generally* TWIC Program, 49 C.F.R. § 1572.103 (listing the disqualifying offenses for maritime and land transportation security credentials, such as convictions and findings of not guilty by reason of insanity for espionage, murder, or unlawful possession of an explosive; also listing temporarily disqualifying offenses, within seven years of conviction or five years of release from incarceration, including dishonesty, fraud, or misrepresentation (expressly excluding welfare fraud and passing bad checks), firearms violations, and distribution, intent to distribute, or importation of controlled substances).

[147]    46 U.S.C. § 70105(c)(1)(A)–(B).

[148]    46 U.S.C. § 70105(c)(1)(B)(iii).

[149]    *See* 46 U.S.C. § 70105(c)(1)(A)(iv) (listing "Federal crime of terrorism" as a permanent disqualifying offense); *see also* 18 U.S.C. § 2332b(g)(5)(B) (defining "Federal crime of terrorism" to include the use of weapons of mass destruction under § 2332a).

[150]    *See* 49 C.F.R. § 1515.7(a)(i) (explaining that only certain applicants with disqualifying crimes in their backgrounds may apply for a waiver; these applicants do not include individuals

who have been convicted of a Federal crime of terrorism as defined by 18 U.S.C. § 2332b(g)).

[151]    These positions are defined as "national security positions" and include positions that "involve activities of the Government that are concerned with the protection of the nation from foreign aggression or espionage, including development of defense plans or policies, intelligence or counterintelligence activities, and related activities concerned with the preservation of the military strength of the United States" or "require regular use of, or access to, classified information."  5 C.F.R. § 732.102(a)(1)–(2).  The requirements for "national security positions" apply to competitive service positions, Senior Executive Service positions filled by career appointment within the Executive Branch, and excepted service positions within the Executive Branch. *Id.* § 732.102(b).  The head of each Federal agency can designate any position within that department or agency as a "sensitive position" if the position "could bring about, by virtue of the nature of the position, a material adverse effect on the national security."  *Id.* § 732.201(a).  Designation of a position as a "sensitive position" will fall under one of three sensitivity levels: Special-Sensitive, Critical-Sensitive, or Noncritical-Sensitive.  *Id.*

[152]    *See* Exec. Order No. 12,968, § 3.1(b), 3 C.F.R. 391 (1995 Comp.):

> [E]ligibility for access to classified information shall be granted only to employees who are United States citizens for whom an appropriate investigation has been completed and whose personal and professional history affirmatively indicates loyalty to the United States, strength of character, trustworthiness, honestly, reliability, discretion, and sound judgment, as well as freedom from conflicting allegiances and potential for coercion, and willingness and ability to abide by regulations governing the use, handling, and protection of classified information. A determination of eligibility for access to such information is a discretionary security decision based on judgments by appropriately trained adjudicative personnel.  Eligibility shall be granted only where facts and circumstances indicate access to classified information is clearly consistent with the national security interests of the United States, and any doubt shall be resolved in favor of the national security.

[153]    42 U.S.C. § 2000e-2(g); *see, e.g.*, Bennett v. Chertoff*, 425 F.3d 999, 1001 (D.C. Cir. 2005) ("[E]mployment actions based on denial of a security clearance are not subject to judicial review, including under Title VII."); Ryan v. Reno, 168 F.3d 520, 524 (D.C. Cir. 1999) ("[A]n adverse employment action based on denial or revocation of a security clearance is not actionable under Title VII.").

[154]    *See Policy Guidance on the use of the national security exception contained in § 703(g) of Title VII of the Civil Rights Act of 1964, as amended*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, § II, *Legislative History* (May 1, 1989), http://www.eeoc.gov/policy/docs/national_security_exemption.html ("[N]ational security requirements must be applied equally without regard to race, sex, color, religion or national origin."); *see also* Jones v. Ashcroft, 321 F. Supp. 2d 1, 8 (D.D.C. 2004) (indicating that the

national security exception did not apply because there was no evidence that the government considered national security as a basis for its decision not to hire the plaintiff at any time before the commencement of the plaintiff's lawsuit, where the plaintiff had not been forthright about an arrest).

155    Federal contractor employees may challenge the denial of a security clearance with the EEOC or the Office of Contract Compliance Programs when the denial is based on race, color, religion, sex, or national origin.  *See generally* Exec. Order No. 11,246, 3 C.F.R. 339 (1964–1965 Comp.).

156    42 U.S.C. § 2000e-16(a).

157    Robert H. Shriver, III, *Written Testimony of Robert H. Shriver, III, Senior Policy Counsel for the U.S. Office of Personnel Management*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/7-26-11/shriver.cfm (last visited April 23, 2012) (stating that "with just a few exceptions, criminal convictions do not automatically disqualify an applicant from employment in the competitive civil service"); *see also* REENTRY MYTHBUSTER! ON FEDERAL HIRING POLICIES, *supra* note 16 ("The Federal Government employs people with criminal records with the requisite knowledge, skills and abilities.").  *But see supra* note 110, listing several federal statutes that prohibit individuals with certain convictions from working as federal law enforcement officers or port workers, or with private prisoner transport companies.

158    OPM has jurisdiction to establish the federal government's suitability policy for competitive service positions, certain excepted service positions, and career appointments in the Senior Executive Service.  *See* 5 C.F.R. §§ 731.101(a) (stating that OPM has been directed "to examine 'suitability' for competitive Federal employment"), 731.101(b) (defining the covered positions within OPM's jurisdiction); *see also* Shriver, *supra* note 157.

   OPM is also responsible for establishing standards that help agencies decide whether to grant their employees and contractor personnel long-term access to federal facilities and information systems.  *See* Homeland Security Presidential Directive 12: Policy for a Common Identification Standard for Federal Employees and Contractors, 2 PUB. PAPERS 1765 (Aug. 27, 2004) ("establishing a mandatory, Government-wide standard for secure and reliable forms of identification issued by the Federal Government to its employees and contractors [including contractor employees]"); *see also* Exec. Order No. 13,467, § 2.3(b), 3 C.F.R. 196 (2009 Comp.) ("[T]he Director of [OPM] . . . [is] responsible for developing and implementing uniform and consistent policies and procedures to ensure the effective, efficient, and timely completion of investigations and adjudications relating to determinations of suitability and eligibility for logical and physical access."); *see generally* Shriver, *supra* note 157.

159    5 C.F.R. § 731.101(a).

160    *See* 5 C.F.R. §§ 731.205(a) (stating that if an agency finds applicants unsuitable based on the factors listed in 5 C.F.R. § 731.202, it may, in its discretion, bar those applicants from federal employment for three years),  § 731.202(b) (disqualifying factors from federal civilian

employment may include: misconduct or negligence in employment; material, intentional false statement, or deception or fraud in examination or appointment; refusal to furnish testimony as required by 5 C.F.R. § 5.4; alcohol abuse without evidence of substantial rehabilitation; illegal use of narcotics, drugs, or other controlled substances; and knowing and willful engagement in acts or activities designed to overthrow the U.S. Government by force).

[161]    *See id.* § 731.202(c).

[162]    *Id.*

[163]    *See generally* Shriver, *supra* note 157.  *See also* REENTRY MYTHBUSTER! ON FEDERAL HIRING POLICIES, *supra* note 16 ("Consistent with Merit System Principles, [federal] agencies [and departments] are required to consider people with criminal records when filling positions if they are the best candidates and can comply with requirements.").

[164]    *See generally EEOC Informal Discussion Letter* (March 19, 2007), http://www.eeoc.gov/eeoc/foia/letters/2007/arrest_and_conviction_records.html#N1 (discussing the EEOC's concerns with changes to OPM's suitability regulations at 5 CFR part 731).

[165]    *See* Stephen Saltzburg, *Transcript of 7-26-11 Meeting*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/7-26-11/transcript.cfm#saltzburg (last visited April 23, 2012) (discussing the findings from the American Bar Association's (ABA) Collateral Consequences of Conviction Project, which found that in 17 states that it has examined to date, 84% of the collateral sanctions against ex-offenders relate to employment).  For more information about the ABA's project, visit: Janet Levine, *ABA Criminal Justice Section Collateral Consequences Project*, INST. FOR SURVEY RESEARCH, TEMPLE UNIV., http://isrweb.isr.temple.edu/projects/accproject/ (last visited April 20, 2012).  In April 2011, Attorney General Holder sent a letter to every state Attorney General, with a copy to every Governor, asking them to "evaluate the collateral consequences" of criminal convictions in their state, such as employment-related restrictions on ex-offenders, and "to determine whether those [consequences] that impose burdens on individuals . . . without increasing public safety should be eliminated."  Letter from Eric H. Holder, Jr., Att'y Gen., Dep't of Justice, to state Attorney Generals and Governors (April 18, 2011), http://www.nationalreentryresourcecenter.org/documents/0000/1088/Reentry_Council_AG_Letter.pdf.

Most states regulate occupations that involve responsibility for vulnerable citizens such as the elderly and children. *See* STATE CRIMINAL HISTORY, *supra* note 37, at 10 ("Fifty states and the District of Columbia reported that criminal history background checks are legally required" for several occupations such as nurses/elder caregivers, daycare providers, caregivers in residential facilities, school teachers, and nonteaching school employees).  For example, Hawaii's Department of Human Services may deny applicants licensing privileges to operate a childcare facility if: (1) the applicant or any prospective employee has been convicted of a crime other than a minor traffic violation or has been confirmed to have abused or neglected a child or threatened harm; and (2) the department finds that the criminal history or child abuse record of

APP 0054

the applicant or prospective employee may pose a risk to the health, safety, or well-being of children.  *See* HAW. REV. STAT. § 346-154(e)(1)–(2).

<sup>166</sup>     42 U.S.C. § 2000e-7.

<sup>167</sup>     *See* Int'l Union v. Johnson Controls, Inc., 499 U.S. 187, 210 (1991) (noting that "[i]f state tort law furthers discrimination in the workplace and prevents employers from hiring women who are capable of manufacturing the product as efficiently as men, then it will impede the accomplishment of Congress' goals in enacting Title VII"); Gulino v. N.Y. State Educ. Dep't, 460 F.3d 361, 380 (2d Cir. 2006) (affirming the district court's conclusion that "the mandates of state law are no defense to Title VII liability").

**EEOC Policy Statement on the Issue of Conviction Records under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. (1982). (2/4/87)**

# CONVICTION RECORDS

At the Commission meeting of November 26, 1985, the Commission approved a modification of its existing policy with respect to the manner in which a business necessity is established for denying an individual employment because of a conviction record. The modification, which is set forth below, does not alter the Commission's underlying position that an employer's policy or practice of excluding individuals from employment on the basis of their conviction records has an adverse impact on Blacks[1] and Hispanics[2] in light of statistics showing that they are convicted at a rate disproportionately greater than their representation in the population. Consequently, the Commission has held and continues to hold that such a policy or practice is unlawful under Title VII in the absence of a justifying business necessity.[3]

However, the Commission has revised the previous requirements for establishing business necessity[4] in the following manner. Where a charge involves an allegation that the Respondent employer failed[5] to hire or terminated the employment of the Charging Party as a result of a conviction policy or practice that has an adverse impact on the protected class to which the Charging Party belongs, the Respondent must show that it considered these three factors to determine whether its decision was justified by business necessity:

1. The nature and gravity of the offense or offenses;

2. The time that has passed since the conviction and/or completion of the sentence; and

3. The nature of the job held or sought.[6]

This procedure condenses the Commission's previous standard for business necessity, substituting a one-step analysis for the prior two-step procedure and retaining some but not all of the factors previously considered.[7] The modification principally eliminates the need to consider an individual's employment history and efforts at rehabilitation. However, consideration is still given to the job-relatedness of a conviction, covered by the first and third factors, and to the time frame involved, covered by the second factor. Moreover, the first factor encompasses consideration of the circumstances of the offense(s) for which an individual was convicted as well as the number of offenses.

The Commission continues to hold that, where there is evidence of adverse impact, an absolute bar to employment based on the mere fact that an individual has a conviction record is unlawful under Title VII.[8] The Commission's position on this issue is supported by the weight of judicial authority.[9]

It should be noted that the modified procedure does not affect charges alleging disparate treatment on a prohibited basis in an employer's use of a conviction record as a disqualification for employment. A charge brought under the disparate treatment theory of discrimination is one where, for example, an employer allegedly rejects Black applicants who have conviction records but does not reject similarly situated White applicants.

With respect to conviction charges that are affected by this modification--that is, those raising the issue of adverse impact--Commission decisions that apply the previous standard are no longer available as Commission decision precedent for establishing business necessity. To the extent that such prior decisions are inconsistent with the position set forth herein, they are expressly overruled.

Questions concerning the application of the Commission's revised business necessity standard to the facts of a particular

charge should be directed to the Regional Attorney for the Commission office in which the charge was filed.

---

1. See, e.g., Commission Decision No. 72-1497, CCH EEOC Decisions (1973) ¶ 6352, and Commission Decision Nos. 74-89, 78-10, 78-35, and 80-10, CCH EEOC Decisions (1983) ¶¶ 6418, 6715, 6720, and 6822, respectively.

2. See Commission Decision No. 78-03, CCH EEOC Decisions (1983) ¶ 6714.

3. See, e.g., Commission decisions cited supra nn.1-2.

4. Prior to this modification, for an employer to establish a business necessity justifying excluding an individual from employment because of a conviction record, the evidence had to show that the offense for which the applicant or employee was convicted was job-related. If the offense was not job-related, a disqualification based on the conviction alone violated Title VII. However, even if the offense was determined to be job-related, the employer had to examine other relevant factors to determine whether the conviction affected the individual's ability to perform the job in a manner consistent with the safe and efficient operation of the employer's business. The factors identified by the Commission to be considered by an employer included:
1. The number of offenses and the circumstances of each offense for which the individual was convicted;
2. The length of time intervening between the conviction for the offense and the employment decision;
3. The individual's employment history; and
4. The individual's efforts at rehabilitation.
See, e.g., Commission Decision No. 78-35, CCH EEOC Decisions (1983) ¶ 6720.

Thus, under the previous procedure, business necessity was established by means of a two-step process: first, by showing that the conviction was job-related; then, by separately demonstrating that the conviction would affect the individual's ability to safely and efficiently perform the job upon consideration of the four factors enumerated above.

5. Although the term "employer" is used herein, the Commission's position on this issue applies to all entities covered by Title VII. See, e.g., Commission Decision No. 77-23, CCH EEOC Decisions (1983) ¶ 6710 (union's policy of denying membership to persons with conviction records unlawfully discriminated against Blacks).

6. The Commission's revised business necessity analysis follows a decision by the United States Court of Appeals for the Eighth Circuit in the Green v. Missouri Pacific Railroad Company case. Green, 523 F.2d 1290 (8th Cir. 1975), is the leading Title VII case on the issue of conviction records. In that case, the court held that the defendant's absolute policy of refusing employment to any person convicted of a crime other than a minor traffic offense had an adverse impact on Black applicants and was not justified by business necessity. On a second appeal in that case, following remand, the court upheld the district court's injunctive order prohibiting the defendant from using an applicant's conviction record as an absolute bar to employment but allowing it to consider a prior criminal record as a factor in making individual hiring decisions as long as the defendant took into account "the nature and gravity of the offense or offenses, the time that has passed since the conviction and/or completion of sentence, and the nature of the job for which the applicant has applied." Green v. Missouri Pacific Railroad Company, 549 F.2d 1158, 1160 (8th Cir. 1977).

7. See discussion supra n.4.

8. See, e.g., Commission Decision No. 78-35, CCH EEOC Decisions (1983) ¶ 6720.

9. See Green, 523 F.2d at 1298; Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971), cert. denied, 406 U.S. 950 (1972) (brought under 42 U.S.C. §§ 1981 and 1983); and Richardson v. Hotel Corporation of America, 332 F. Supp. 519 (E.D. La. 1971), aff'd mem., 468 F.2d 951 (5th Cir. 1972). See also Hill v. United States Postal Service, 522 F. Supp. 1283 (S.D. N.Y. 1981); Craig v. Department of Health, Education, and Welfare, 508 F. Supp. 1055 (W.D. Mo. 1981); and Cross v. United States Postal Service, 483 F. Supp. 1050 (E.D. Mo. 1979).

---

*This page was last modified on September 11, 2006.*

Policy Statement on the Issue of Conviction Records under Title VII of the Civil Rights Act of 1964

Return to Home Page

APP 0058

| From: | Nimocks, Austin |
|---|---|
| To: | Powers, James R. (CIV); Sandberg, Justin (CIV) |
| Cc: | Nimocks, Austin; Hacker, David; Leonie, Andrew; Starr, Brantley |
| Subject: | Texas v. EEOC et al. - Discovery Issues |
| Date: | Tuesday, August 29, 2017 8:09:57 PM |
| Attachments: | Texas"s Am Resp to Feds 1st Int & RFP - FINAL.pdf |

Mr. Powers and Mr. Sandburg,

This is in response to your letter of Aug. 18, 2017. Thank you for making time on Aug. 23, 2017 to discuss the concerns in your letter and, additionally, for providing us through today, Aug. 29, 2017, to be responsive.

Attached to this e-mail, you will find an updated, amended responsive document to the discovery you propounded. This, of course, is provided as a good faith effort to resolve the issues discussed in your Aug. 18, 2017 letter and our Aug. 23, 2017 conference call. I am, as we discussed on Aug. 23, 2017, not reattaching the 340 pages of material that we have provided to date, as we are not providing any new information or material at this time. (You will recall that, on July 28, 2017, with our initial responses, we provided a 337-page PDF of material, and then an additional 3-page Declaration on July 31, 2017.)

Additionally, below, I'm attempting to respond to your enumerated points from your letter of Aug. 18, 2017. For the sake of ease and clarity, my responses will be enumerated in like fashion.

1.  For the sake of ease and simplicity, we did attempt to consolidate our objections, and the specific explanations for them, primarily within the Answer to Interrogatory No. 1. Additional or repeat objections, for emphasis, were also made within specific responses at times. *See, e.g.*, Resp. to Int. No. 7. By so doing, we provided you with a 17-page document. Had we repeated each set of objections for each interrogatory, request for production, and request for admission, I estimate that the document would exceed 90 pages, or perhaps even more. I am aware of no provision in the rules that precludes incorporating objections by reference, as we did. As such, we feel that the manner in which we objected is appropriate, especially given the circumstances.

2.  With respect, we may have to agree to disagree as to whether the discovery you propounded is burdensome, or even appropriate in some instances. For example, Interrogatory No. 1 asks us to identify the historic actions of *your* client. I will not belabor the irony of that request, but we nonetheless did specifically identify the actions of which the Attorney General is aware. As another example, your RFA No. 5 demands that we confess full knowledge and omniscience as to every history element of Texas. (Other RFAs demand admissions premised on omniscience as well.) If we demanded that General Sessions admit that the United States has never [fill in blank], you can appreciate that it would be difficult to answer such a query. Yet, notwithstanding the inappropriateness of many of your requests, and how impossible many of them are to answer, we nonetheless engaged in a significant good faith effort to provide myriad answers and admissions to demonstrate the extent of our knowledge and understanding regarding the topics at issue. Moreover, per our discussion on Aug. 23, 2017, I understand that you may be primarily concerned about documents and/or information

you suspect we possess, but did not disclose. However, as I explained on the phone on Aug. 23, 2017, and articulate in the amended responses (attached), we have not withheld any documents and/or information. We've disclosed all that we have and/or know and, as we did on July 31, 2017, will supplement our responses if additional facts come into our possession.

3. I've amended our objections to Int. No. 1 to remove the "reasonably calculated" standard that was amended out of Rule 26. As noted by the Committee, the Amendments seek largely to restore the standard adopted in 1983. In 1983, according to the Committee, additions were made "to deal with the problem of over-discovery." Fed. R. Civ. P. 26, Advis. Comm. Notes. Thus, the Committee was concerned that "the use of the 'reasonably calculated' phrase to define the scope of discovery 'might swallow any other limitation on the scope of discovery.'" *Id.* In the opinion of one district judge, "[o]ne gets the impression from reading the advisory committee's notes that the amendment was not intended to exclude a delineable swath of material so much as it is intended to send a signal to district judges to become more hands-on in the process of regulating—*mostly limiting*—discovery on relevance grounds alone." *Benavidez v. Sandia Nat'l Labs.*, 319 F.R.D. 696, 715 (D.N.M. 2017) (emphasis added). Another court described the "reasonably calculated" standard as part of "prior, *broader* iterations of the scope of discovery." *VHT, Inc. v. Zillow Group, Inc.*, C15-1096JLR, 2016 WL 7077235, at *1 n.4 (W.D. Wash. Sept. 8, 2016) (emphasis added). As to what is relevant, we rely not upon our theory of the case, but binding precedent. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807 (2016). (I will not rehash the argumentation over *Hawkes* in this e-mail.) Moreover, we rely upon the law of the case doctrine. That Texas is an object of the EEOC Rule being challenged is the law of the case and, thus, is not to be re-litigated. As explained by the Fifth Circuit:

> Under law-of-the-case doctrine, "the district court on remand, or the appellate court on a subsequent appeal, abstains from reexamining an issue of fact or law that has already been decided on appeal." *United States v. Teel*, 691 F.3d 578, 582 (5th Cir. 2012). A corollary of the law-of-the-case doctrine is the mandate rule, which "requires a district court on remand to effect [the court's] mandate and to do nothing else." *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 453 (5th Cir. 2007) (citation and internal quotation marks omitted). "A district court on remand 'must implement both the letter and the spirit of the appellate court's mandate and may not disregard the explicit directives of that court.'" *United States v. McCrimmon*, 443 F.3d 454, 459 (5th Cir. 2006) (quoting *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002)). "Whether the law of the case doctrine foreclose[s] the district court's exercise of discretion on remand and the interpretation of the scope of this court's remand order present questions of law that this court reviews de novo." *United States v. Hamilton*, 440 F.3d 693, 697 (5th Cir. 2006) (citation and internal quotation marks omitted).

*Perez v. Stephens*, 784 F.3d 276, 280 (5th Cir. 2015). Thus, we contend that any notion that Texas does not have standing not only conflicts with *Hawkes*, but the multiple actions of both the Fifth Circuit and District Court. However, even if the objections about which you complain are somehow inappropriate, we nonetheless still answered Int. No. 1 as completely as possible.

4. Our amended responses (attached) are now sworn by me. As you may be aware, the Attorney General of Texas has the exclusive authority to represent Texas in court. Tex. Const. art. IV, § 22; *Texas v. Int'l & G.N. Ry. Co.*, 35 S.W. 1067, 1068 (Tex. 1896).

5. On every discovery request made by your office, we have multiple valid objections which were asserted. And because we have valid objections, answering the request is not required. Yet, even though we have valid objections, we still chose to provide substantive responses to some items. I fail to see how this, at any level, harms your client or is problematic. However, you will see that in our amended responses to your RFPs (attached), we clarify that documents have not been withheld because of the objections.

6. As explained in my response to your third point, *supra*, being an object of the EEOC Rule at issue is sufficient. Whether Texas agencies have undertaken efforts "to analyze its laws, policies, regulations, or practices related to the employment of individuals with criminal convictions in response to the EEOC's Enforcement Guidance" doesn't change the fact that Texas is an object of the regulation at issue. However, we nonetheless provided a substantive answer to Int. No. 7 and amended that answer (attached).

7. I believe it is self-evident that a reasonable query was made regarding your RFAs given the information and documents contained with our discovery responses. Nonetheless, I've amended the responses to specifically state that a reasonable inquiry was made. However, I've not done that regarding RFA Nos. 1 or 6. RFA No. 1 asks us to identify, with omniscient precision, the historic actions of *your* agency. I will not belabor the irony of that request, nor do I believe that we are required to make a reasonable inquiry into it. Moreover, we admitted what we reasonably could admit—that we are unaware of any such action. Such is the best answer we can provide, and we provided it. RFA No. 6, if I'm reading it correctly, requires me to take the over 300 Texas laws regarding felons, identified within our responses, and then search regarding each of them to find statistical evidence that may support a disparate impact claim. With respect, such an inquiry is not reasonable. Rather, we admitted what we could—that we are not aware of statistical evidence that may be used to support a claim that a state or local law concerning the hiring of convicted felons disparately impacts a group protected under Title VII.

8. With respect, our responses are as responsive as possible, including our substantive response to Int. No. 1. Some of your requests, we believe, are unreasonable, demanding historic omniscience, or asking us to fully account for the actions of DOJ or EEOC. We've admitted what we can, what we know, and what we've found, which is the best we can do. Regarding your RFA No. 4, I interpret it to mean that Texas avers, in this lawsuit, that we may bar any felon from any job, at any time, for any reason, or no reason at all. Such a query goes beyond this case, which asks whether EEOC has exceeded the boundaries of its authority in its interpretation of Title VII, thereby conflicting with Texas law. As cited, being a felon in Texas has over 300 statutory and/or administrative impacts, each one carefully drafted, debated, and promulgated by the Texas Legislature and/or agency responsible. I nonetheless, however, amended our answer to RFA No. 4 to verify Texas's belief that it has the right to enact the laws and regulations *that exist*. I also amended, to be responsive to your expressed concerns, the answers to Int. Nos. 5 & 8.

I'm hopeful that these amended responses, and our explanations, will serve to alleviate the

gravamen of any concerns you may have regarding this matter. In the interim, I will return to preparing the briefing that we both have due on Sept. 14, 2017.

Sincerely,
Austin

Austin R. Nimocks
Associate Deputy Attorney General
Office of Special Litigation
209 W. 14th Street (Mail Code 009)
Austin, TX  78701
512-298-9302



KEN PAXTON
ATTORNEY GENERAL OF TEXAS

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

TEXAS,

      *Plaintiff,*

v.

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION;
VICTORIA A. LIPNIC, in her
official capacity as Acting Chair of
the Equal Employment
Opportunity Commission; and
JEFFERSON B. SESSIONS, III, in
his official capacity as Attorney
General of the United States,

      *Defendants.*

Case No. 5:13-CV-00255-C

## DECLARATION OF AMY TIPPIE

I, Amy Tippie, state that the following is true and correct and based upon my personal knowledge:

1.    I am a citizen of the United States and the State of Texas, over the age of 18 years, and competent to testify.

2.    I am the Deputy Director for Statewide Workforce Operations, Human Resources, of the Texas Health and Human Services Commission (HHSC). I became employed by HHSC on September 1, 2016, when the administrative support divisions of the Texas Department of Aging and Disability Services (DADS) were transferred to HHSC. Prior to that date, I was employed by DADS since September 2004 in various positions involved with implementing human resources policies and procedures across DADS programs.

3.    DADS is a state agency in the Texas Health and Human Services system. Since its inception in September 2004, DADS has served aging Texans and

APP 0063

individuals with disabilities by providing a wide range of supports and services that promote and enhance individual well-being, dignity, and choice. These services have included community care programs to promote independent living for persons who are aging or have physical, intellectual, or developmental disabilities, and institutional care programs such as nursing facility care and state supported living centers.

4.     DADS has also been responsible for regulating long-term care service providers such as nursing facilities, assisted living facilities, intermediate care facilities for individuals with intellectual disabilities, home health agencies, home and community-based services providers, and day activity and health services facilities. DADS, and the DADS programs that have transferred to HHSC, serve people who are among the most vulnerable in the state, working in partnership with consumers, caregivers, service providers, and other stakeholders; developing and improving service options that are responsive to individual needs and preferences; and ensuring and protecting self-determination, consumer rights, and safety.

5.     However, health and human services in Texas are in the middle of a two-year transformation. In the first phase, most of DADS client services programs were transferred to HHSC on September 1, 2016. In the second phase, DADS regulatory programs and the state supported living centers will transfer to HHSC on September 1, 2017, and DADS will be abolished.

6.     All of the health and human services agencies under the umbrella of HHSC use the same Health and Human Services Human Resources Manual (HHS HR Manual) for their employees. A true and correct copy of Chapter 2.C. of the HHS HR Manual is attached hereto as Attachment 22. Appendices to the HHS HR Manual further explain barriers to employment with HHSC. A true and correct copy of Appendix A ("Criminal Background Check and Registry Clearance") of the HHS

HR Manual is attached hereto as Attachment 23. A true and correct copy of Appendix B ("Bars to Employment") of the HHS HR Manual is attached hereto as Attachment 24. To the best of my knowledge and understanding, these records were created by HHSC in the regular course of its business, and are kept by HHSC in the regular course of our business.

7.    In addition to the aforementioned policies contained within the HHS HR Manual, each agency and each program may have additional policies that apply to them. I am familiar with the human resources policies and procedures that apply to DADS employees and to HHSC employees working in programs that transferred from DADS in September 2016. I am familiar with the statutes, rules, and policies that provide for criminal bars to employment with DADS and with HHSC in the programs that transferred from DADS in September 2016.

8.    State supported living centers (SSLCs) are state-operated campus-based residential care facilities for individuals with intellectual or developmental disabilities who have severe or profound intellectual disabilities or who also have complex medical needs or serious behavioral issues. Because these individuals are so vulnerable, DADS has adopted a rule that applies to SSLCs the same criminal bars to employment that the Texas Legislature enacted for many kinds of licensed health care providers in Texas Health and Safety Code Chapter 250 (Attachment 14). The DADS rule that adopts the restrictions in Chapter 250 is found at 40 Tex. Admin. Code § 3.201 (Attachment 13). Section 250.006 lists the criminal convictions that are bars to employment. All of the criminal bars are for crimes related to harm to individuals, as DADS wants to protect the vulnerable individuals living in SSLCs from potential employees who have a history of causing harm to individuals.

9.    Additionally, 40 Tex. Admin. Code § 3.201 adopts Texas Health and Safety Code § 533.007 (Attachment 28), which provides that SSLCs may deny employment if the applicant's criminal history record indicates that the applicant is

not qualified or suitable. The DADS Operational Handbook lists additional crimes that DADS has determined are contraindications to employment. (Attachment 25). The excerpt of the DADS Operational Handbook provided as Attachment 25 is a true and correct copy. Moreover, to the best of my knowledge and understanding, this record was created by DADS in the regular course of its business, and is kept by DADS in the regular course of our business.

10.    Other kinds of DADS employees who come in contact with the vulnerable individuals we serve are also subject to the restrictions in Health and Safety Code Chapter 250 (Attachment 14). This includes Regulatory Services survey operations and enforcement staff, Trust Fund Monitoring staff, and Educational Services Regulatory Trainers, all of whom go to facilities and other health care providers DADS regulates and come in contact with the consumers there.

11.    Among HHSC employees working in programs that transferred from DADS in September 2016, Quality Monitoring Program staff, Quality Service Reviewers, and Guardianship staff are also subject to the restrictions in Health and Safety Code Chapter 250, because they come in contact with the vulnerable individuals served in facilities and other health care providers DADS regulates.

12.    These restrictions are made known to prospective applicants. *See* Bars to Employment with DADS, *available at* https://www.dads.state.tx.us/hiringbars/index.html (Attachment 12).

13.    I, Amy Tippie, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing Declaration is true and correct.

Executed this 19th day of July, 2017.

AMY TIPPIE

APP 0066

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| TEXAS,<br><br>   *Plaintiff,*<br><br>v.<br><br>EQUAL EMPLOYMENT<br>OPPORTUNITY COMMISSION;<br>VICTORIA A. LIPNIC, in her<br>official capacity as Acting Chair of<br>the Equal Employment<br>Opportunity Commission; and<br>JEFFERSON B. SESSIONS, III, in<br>his official capacity as Attorney<br>General of the United States,<br><br>   *Defendants.* | Case No. 5:13-CV-00255-C |

## DECLARATION OF KATHLEEN T. MURPHY

I, Kathleen T. Murphy, state that the following is based upon my personal knowledge:

1. I am a citizen of both Texas and the United States, over the age of eighteen, and competent to testify.

2. I am the Senior Assistant General Counsel in the Office of General Counsel of the Texas Department of Public Safety (DPS). I have been employed with DPS since September 1995 and a licensed attorney since 1991.

3. DPS is a law enforcement agency of the State of Texas established under Chapter 411 of the Texas Government Code. The responsibilities of DPS include combating crime and terrorism, enhancing highway and public safety, enhancing statewide emergency management, and enhancing public safety licensing and regulatory services. We accomplish our mission by proactively protecting the citizens of Texas in an ever-changing threat environment, while always remaining faithful to the U.S. and Texas Constitutions. For the forthcoming

2018–2019 biennium, the Texas Legislature appropriated approximately $2.4 billion, and over 9,000 full-time-equivalent positions, for DPS to accomplish its mission.

4.    In 2013, DPS was required to respond to a charge of discrimination provided by EEOC. The charge was levied by a Mr. Smith. Though he made unsubstantiated allegations of race and sex discrimination, his primary complaint was that he was unlawfully discriminated against because of his "felony conviction." Specifically, Mr. Smith stated that "[t]he job application asked if the applicant had a felony conviction and I indicated that I had been convicted of a felony for unauthorized use of a vehicle." In correspondence dated September 18, 2013, Mr. Smith was advised that his application would not be considered because of his felony conviction.

5.    A copy of documents maintained by DPS regarding this issue is attached hereto as Attachment 4. These documents are true and correct copies of records maintained by DPS, which I am authorized to certify as true and correct. These records are kept by DPS in the regular course of our business. Furthermore, it was in the regular course of the business of DPS that employees of DPS, with knowledge of the information recorded made, transmitted, received, or otherwise archived the information to be included in the record. Finally, these records were created at or near the time of the acts, events, conditions, or information recorded in the records.

6.    In addition to addressing the aforementioned matter involving Mr. Smith, employees of DPS reviewed the EEOC Enforcement Guidance 915.002 (April 25, 2012) upon release to discern whether it presented a conflict with DPS policy regarding the hiring of felons, specifically section 01.15.10.03 of the Employment Policies and Procedures of DPS. The last two pages of Attachment 4 are a true and correct copy of DPS Policy § 01.15.10.03, which remains in full force and effect

today.

7.    DPS consistently makes prospective applicants aware of the policy against hiring felons for any DPS position. *See* http://agency.governmentjobs.com/ txdps/default.cfm ("Felony convictions and certain misdemeanor convictions will be cause for immediate rejection.") (a true and correct copy of which is Attachment 5); http://www.dps.texas.gov/trainingAcademy/recruiting/disqualifiers/trafficCriminal Rcrds.htm ("Having been or currently on court-ordered supervision or probation for any offense of the grade of felony or Class A misdemeanor" and "Having been convicted of any offense of the grade of felony or Class A misdemeanor") (a true and correct copy of which is Attachment 6).

8.    I, Kathleen T. Murphy, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing Declaration is true and correct.


Executed this 18th day of July, 2017.


_____

KATHLEEN T. MURPHY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| TEXAS,<br><br>        *Plaintiff,*<br><br>v.<br><br>EQUAL EMPLOYMENT<br>OPPORTUNITY COMMISSION;<br>VICTORIA A. LIPNIC, in her<br>official capacity as Acting Chair of<br>the Equal Employment<br>Opportunity Commission; and<br>JEFFERSON B. SESSIONS, III, in<br>his official capacity as Attorney<br>General of the United States,<br><br>        *Defendants.* | Case No. 5:13-CV-00255-C |

## DECLARATION OF ANN BRIGHT

I, Ann Bright, state that the following is based upon my personal knowledge:

1.      I am a citizen of both Texas and the United States, over the age of eighteen, and competent to testify.

2.      I am the Chief Operating Officer of the Texas Parks and Wildlife Department (TPWD). I have been employed with TPWD since August 2002 and a licensed attorney since 1987.

3.      TPWD is the Texas agency responsible for managing and conserving the natural and cultural resources of Texas and providing hunting, fishing and outdoor recreation opportunities for the use and enjoyment of present and future generations. To fulfill this mission, TPWD strives to be a recognized national leader in implementing effective natural resources conservation and outdoor recreational programs; serve Texas, its citizens, and employees with the highest standards of service, professionalism, fairness, courtesy, and respect; rely on the best available

science to guide its conservation decisions; responsibly manage agency finances and appropriations to ensure the most efficient and effective use of tax-payer and user fee resources; and attract and retain the best, brightest, and most talented workforce to successfully execute our mission. For the forthcoming 2018–2019 biennium (September 1, 2017 – August 31, 2019), the Texas Legislature appropriated approximately $728,939,928 (consisting of $385,032,636 for fiscal year 2018 and $343,907,292 for fiscal year 2019), and authorized approximately 3,145 full-time-equivalent positions, for TPWD to accomplish its mission.

4.      Central to TPWD's mission is its Law Enforcement Division. This division operates twenty-nine law enforcement offices and the Game Warden Training Center, provides safe boating and recreational water safety on public waters, and employs over 500 Texas game wardens, over 100 administrative staff and communication operators. Law enforcement is also responsible for enforcing the Parks and Wildlife Code, all TPWD regulations, the Texas Penal Code and selected statutes and regulations applicable to clean air and water, hazardous materials and human health. Applicants for game warden positions must have a B.A./B.S. from an accredited institution and graduation from the Game Warden Training Center.

5.      Also central to TPWD's mission is its State Parks Division. The State Parks Division operates over 95 sites throughout the State of Texas, including 74 state parks, 13 historic sites, and 8 natural areas, covering a total of more than 627,000 acres. Since state parks operate 7 days per week/365 days per year, a wide range of occupations and disciplines is necessary to serve state park visitors and ensure their safety. In state fiscal year 2016 (September 1, 2015 – August 31, 2016), there were almost 9 million visitors to state parks. To ensure the safety of these visitors, included in the over 1,300 full time equivalent employees in the State Parks Division are state park police officers.

6.      Under Texas law, the over 500 game wardens and 155 state park police officers employed by TPWD are "peace officers," and as such, they fall under the same absolute no felons policy that applies to other law-enforcement officers throughout Texas. *See,* Tex. Code Crim. Proc. Art. 2.12(10) (Attachment 17); 31 Tex. Admin. Code § 55.802(1) (Attachment 9); Tex. Occ. Code §§ 1701.001(3)–(4), 1701.312(a) (Attachment 7); Tex. Parks & Wild. Code § 11.019 (Attachment 8). TPWD imposes an absolute ban on hiring any game warden or park police officer who ever has been convicted of a felony or Class A misdemeanor. *See* http://tpwd.texas.gov/warden/recruiting-careers/requirements (Attachment 10). TPWD also rejects game-warden applicants who have been convicted of certain lesser offenses. *Id.*

7.      Though TPWD does not maintain a no felon hiring policy for all positions, TPWD has always reserved the right to reject applicants for any position with TPWD on the basis that they have been convicted of a felony or certain other designated offenses, based on the specific duties and responsibilities of the position; number of offenses committed by the individual; nature and seriousness of each offense; length of time between the offense(s) and employment decision; efforts by the individual at rehabilitation; accuracy of information on the individual's employment application; and applicable state or federal laws and regulations. TPWD has always exercised this prerogative, which is critical to fulfilling TPWD's mission and maintaining the public trust we have over the natural and cultural resources of Texas.

8.      Attached to this Declaration as Attachment 16 is a copy of TPWD's internal policy, as described above. This attached document is a record created and maintained by TPWD, which I am authorized to certify as true and correct. This record is kept by TPWD in the regular course of our business. Furthermore, it was in the regular course of the business of TPWD that employees of TPWD, with knowledge

APP 0072

of the information recorded made, transmitted, received, or otherwise archived the information to be included in the record. Finally, this record was created at or near the time of the acts, events, conditions, or information recorded in the records.

9.    I, Ann Bright, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing Declaration is true and correct.

Executed this 24th day of July, 2017.

_____
ANN BRIGHT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

TEXAS,

    *Plaintiff,*

v.

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION;
VICTORIA A. LIPNIC, in her
official capacity as Acting Chair of
the Equal Employment
Opportunity Commission; and
JEFFERSON B. SESSIONS, III, in
his official capacity as Attorney
General of the United States,

    *Defendants.*

Case No. 5:13-CV-00255-C

## DECLARATION OF ROYCE MYERS

I, Royce Myers, state that the following is based upon my personal
knowledge:

1.　　I am a citizen of both Texas and the United States, over the age of
eighteen, and competent to testify.

2.　　I am the Director of Human Resources at the Texas Juvenile Justice
Department (TJJD). I have been employed with TJJD since 2005. I have been
Director of HR since 2008. I am certified as a Senior Professional in Human
Resources (SPHR).

3.　　TJJD, created on December 1, 2011, represents the merger of the then
Texas Juvenile Probation Commission (TJPC) and the Texas Youth Commission
(TYC). The mission of TJJD is to transform young lives and create safer
communities. TJJD contracts with eight active private sector providers in an effort
to deliver a diverse array of individualized services to the youth. The programs

*Declaration of Royce Myers*

range from organized family care, foster group-living services, vocational trade services, secure institutional care, and gender-specific residential services for young females and young males. Through its efforts, TJJD strives to achieve an effective and integrated juvenile justice system that:

     a.     Advances public safety through rehabilitation.

     b.     Equitably affords youth access to services matching their needs to enhance opportunities for a satisfying and productive life.

     c.     Employs a stabilized and engaged workforce fully empowered to be agents of change.

     d.     Operates safe and therapeutic environments with positive peer cultures emphasizing mutual accountability.

     e.     Is a model system with innovative, data-driven, and successful programming.

    4.     Central to fulfilling TJJD's mission are our correctional employees. Applicants for employment with TJJD must meet the criminal history standards outlined in TJJD policy to be eligible for hire. *See* TJJD Personnel Policy and Procedure Manual, Conditions of Employment, Criminal History: Standards, Background Checks, and Self-Reporting Requirements, PRS.02.08, *available at* https://www.tjjd.texas.gov/policies/PRS/prs02/prs0208.pdf (Attachment 11).

    5.     Moreover, under Texas law, certain employees for TJJD are licensed as "peace officers" and to maintain their license, fall under the same absolute no felons policy that applies to other law-enforcement officers throughout Texas. *See* 31 Tex. Admin. Code § 55.802(1) (Attachment 9); Tex. Occ. Code §§ 1701.001(3)–(4), 1701.312(a) (Attachment 7).

    6.     Though TJJD does not maintain a no felon hiring policy for all positions, TJJD has always reserved the absolute right to reject applicants for any position with our agency on the basis that they have been convicted of a felony or

*Declaration of Royce Myers*

certain other designated offenses. TJJD has always exercised this prerogative, which is critical to fulfilling TJJD's mission.

7.     Attached to this Declaration as Attachment 11 is a copy of TJJD's aforementioned internal policy, as described above. This attached document is a record created and maintained by TJJD, which I am authorized to certify as true and correct. This record is kept by TJJD in the regular course of our business. Furthermore, it was in the regular course of the business of TJJD that employees of TJJD, with knowledge of the information recorded made, transmitted, received, or otherwise archived the information to be included in the record. Finally, this record was created at or near the time of the acts, events, conditions, or information recorded in the records.

8.     TJJD provides a graduated model that assesses each applicant's criminal history in relation to the functions of the job. At one end of the spectrum, individuals applying for direct youth care positions, such as Juvenile Correctional Officers, who have a felony conviction are prohibited from that JCO position. This is consistent with Title 42 U.S.C. § 13041(d). Also, consistent with Tex. Occ. Code § 1701.312, individuals in licensed peace officer positions are prohibited if they have a felony conviction, preventing them from licensure. The same individuals may apply for other positions at TJJD and, depending on the crime, the position, and the time from the conviction be considered for employment or for an individual review.

9.     I, Royce Myers, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing Declaration is true and correct.

Executed this $\mathscr{2}1^{st}$ day of July, 2017.

ROYCE MYERS

---

**SWORN TO AND SUBSCRIBED** before me on the 21st day of July 2017

Debbi McDaid
_____
Notary Public in and for the State of Texas

DEBBI MCDAID
Notary Public, State of Texas
My Commission Expires
September 01, 2019
(Notary Seal)

NOTARY WITHOUT BOND

My Commission expires: 9. 1. 2019

*Declaration of Royce Myers*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### LUBBOCK DIVISION

| | |
|---|---|
| TEXAS, | |
| *Plaintiff,* | |
| v. | Case No. 5:13-CV-00255-C |
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; VICTORIA A. LIPNIC, in her official capacity as Acting Chair of the Equal Employment Opportunity Commission; and JEFFERSON B. SESSIONS, III, in his official capacity as Attorney General of the United States, | |
| *Defendants.* | |

## DECLARATION OF BOB BIARD

I, Bob Biard, state that the following is based upon my personal knowledge:

1.    I am a citizen of both Texas and the United States, over the age of eighteen, and competent to testify.

2.    I am the General Counsel for the Texas Lottery Commission (TLC). I have held this position since September 2012, been employed with TLC since December 2008, and acted as a licensed attorney since 1986. Overall, I have served in Texas government over 17 years.

3.    As reflected in the State Lottery Act, Bingo Enabling Act, and the TLC mission statement, TLC is the Texas state agency charged with and committed to generating revenue for the State of Texas through the responsible management and sale of entertaining lottery products; and promoting and maintaining the integrity of charitable bingo conducted in Texas for the benefit of charitable organizations. Accordingly, TLC incorporates the highest standards of security, integrity and

responsible gaming principles, sets and achieves challenging goals, provides quality customer service, and utilizes a TEAM approach. To that end, for the forthcoming 2018–2019 fiscal biennium, the Texas Legislature appropriated approximately $463 million, and approximately 323.5 full-time-equivalent positions.

4.     First and foremost among TLC's core values are integrity and responsibility. TLC works hard to maintain the public trust by protecting and ensuring the security of its lottery games, systems, drawings and operational facilities. TLC values and requires ethical behavior by its employees, licensees and vendors.

5.     In order to fulfill TLC's mission and uphold its core values, TLC maintains an absolute bar to employing any person who has been convicted of a felony (or certain other designated offenses) if less than ten years has elapsed since the termination of the sentence, parole, mandatory supervision, or probation served for the offense. This policy originated as a statutory requirement in the 1991 legislation establishing the Texas Lottery as a division in the office of the Comptroller of Public Accounts, which specifically prohibited the employment of a person who would be denied a license as a lottery ticket sales agent under the statutory eligibility requirements for a lottery license.  Then, and now, the eligibility requirements for lottery ticket sales agent licensees similarly prohibit licensure to convicted felons (this provision is currently codified at Texas Government Code § 466.155(a)(1)(A)). Thus, the employment prohibition has existed since before TLC commenced operation as a separate state agency in 1993 and, although it is not currently in the TLC's governing statutes, TLC management believes the prohibition continues to be critical to fulfilling TLC's mission and maintaining the public trust.

6.     Attached to this Declaration as Attachment 20 is a copy of TLC's internal written procedure (Enforcement Division Procedure EN-016) reflecting the agency's long-standing policy, as described above. This attached document is a record

created and maintained by TLC, which I am authorized to certify as true and correct. This record is kept by TLC in the regular course of TLC business. Furthermore, it was in the regular course of the business of TLC that employees of TLC, with knowledge of the information recorded, made, transmitted, received, or otherwise archived the information to be included in the record. Finally, this record was created at or near the time of the acts, events, conditions, or information recorded in the record.

7.    TLC consistently makes prospective job applicants aware that final selection for any position will be subject to an extensive criminal background investigation. The TLC also makes current employees aware of the no-felony employment policy through an express statement on eligibility for employment in the TLC Personnel Handbook. A true and correct copy of an excerpt from the TLC Personnel Handbook is provided as Attachment 21.

8.    I, Bob Biard, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing Declaration is true and correct.

Executed this 31st day of July, 2017.

_Bob Biard_

BOB BIARD

---

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

| | |
|---|---|
| TEXAS,<br><br>   *Plaintiff,*<br><br>v.<br><br>EQUAL EMPLOYMENT OPPOR-TUNITY COMMISSION; VICTORIA A. LIPNIC, in her official capacity as Act-ing Chair of the Equal Employment Op-portuity Commission; and JEFFER-SON B. SESSIONS, III, in his official ca-pacity as Attorney General of the United States,<br><br>   *Defendants.* | Case No. 5:13-CV-00255-C |

**PLAINTIFF'S AMENDED RESPONSES TO DEFENDANTS'
FIRST SET OF INTERROGATORIES, REQUESTS FOR ADMIS-
SION, AND REQUESTS FOR PRODUCTION TO PLAINTIFF**

Texas, by and through the Attorney General, and pursuant to the Federal Rules of Civil Procedure, serves its amended responses to Defendants' First Set of Interrogatories, Requests for Admission, and Requests for Production to Plaintiff (the "Request") as follows:

**Preliminary Statement**

Texas's amended responses are made without prejudice to, and are not a waiver of, its right to rely on other facts, documents, or legal theories. Texas does not waive, and hereby expressly reserves, the right to assert any and all objections as to the admissibility of such responses into evidence in this action, or in any other pro-ceedings, on any and all grounds including, but not limited to, competency, relevancy, materiality, and privilege. Texas responds herein without, in any way, implying that they consider the responses to be relevant or material to the subject matter of this action.

1

Texas will produce documents only to the extent that such documents are in the possession, custody, or control of the Attorney General. Texas expressly reserves the right to supplement, clarify, revise, or correct any or all of the responses herein, and assert additional objections or privileges, in one or more subsequent supplemental response(s). Publicly available documents including, but not limited to, newspaper clippings, court papers, and documents available on the Internet, will not be produced.

### RESPONSES AND OBJECTIONS TO DEFENDANTS' INTERROGATORIES

**1.     Describe each and every instance in which the EEOC investigated Plaintiff related to Plaintiff's laws, policies, regulations, or practices regarding the employment of individuals with criminal convictions as a potential violation of Title VII, as referenced in Paragraph 34 of Plaintiff's Amended Complaint.**

### RESPONSE:

Texas objects to this interrogatory as it is outside the scope of discovery allowed by Fed. R. Civ. P. 26 and not relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Texas maintains that it is an object of the challenged rule, which causes Texas an increased regulatory burden. *See* ECF No. 52; *Texas v. Equal Employment Opportunity Comm'n*, 827 F.3d 372, 378 (5th Cir. 2016), *reh'g en banc granted, opinion withdrawn*, 838 F.3d 511 (5th Cir. 2016). Moreover, Defendants' new rule threatens Plaintiff's interest in establishing statewide policies regarding felons and managing their own workplaces. ECF No. 24 at 23–37. "By forcing state officials . . . to choose between a federal rule or complying with State law, the Rule causes an irreparable injury." *Nat'l Fed'n of Indep. Bus. v. Perez*, No. 5:16-CV-00066-C, 2016 WL 3766121, at *44

2

(N.D. Tex. June 27, 2016) (Cummings, J.) (citations omitted). Sovereigns suffer injury when their duly enacted laws or policies are enjoined or impeded. *Texas v. United States*, 201 F. Supp. 3d 810, 834–35 (N.D. Tex. 2016), *order clarified,* No. 7:16-CV-00054-O, 2016 WL 7852331 (N.D. Tex. Oct. 18, 2016), and *appeal dismissed sub nom*. *Texas, et al. v. United States et al.* (Oct. 21, 2016) (citations omitted); *Nevada, Texas et al. v. U.S. Dep't of Labor*, 218 F. Supp. 3d 520, 532 (E.D. Tex. 2016) (finding harm to states where "compliance costs" were expended to comply with new federal regulation). *See Maryland v. King*, 133 S. Ct. 1, 3 (2012) (citing *New Motor Vehicle Bd. v. Orrin W. Fox Co.,* 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("It also seems to me that any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.")); *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws"); *Texas v. United States*, 95 F. Supp. 3d 965, 981 (N.D. Tex. 2015) ("[W]henever an enactment of a state's people is enjoined, the state suffers irreparable injury."); *Coalition for Econ. Equity v. Wilson,* 122 F.3d 718, 719 (9th Cir. 1997). Here, Defendants' rule removes from non-federal officials discretion and authority to create and enforce their own rules and regulations for their workplaces. This unlawful interference is harm to Plaintiff's sovereign interest. *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001) (holding that erroneous tribal gaming commission decision amounts to an irreparable injury to the state's sovereign interest); *North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1059 (D.N.D. 2015) (states suffer irreparable harm where defective federal regulation would divest them of their sovereignty over intrastate waters).

Texas also objects to this interrogatory for reason that it is not proportional as required by Fed. R. Civ. P. 26(b)(1) because the requesting party's ability to obtain the information is similar to if not superior to that of the responding party as it seeks

information in possession of Defendants, for reason that the interrogatory is unreasonably cumulative and duplicative because the information sought can be obtained from that source which is more convenient, less burdensome and less expensive, and further for reason that the requesting party has had ample opportunity to discover and obtain such information on its own, thus making the interrogatory overly broad and unnecessary as it burdens Texas with searching for and/or otherwise providing information within Defendants' custody and control. *See* Fed. R. Civ. P. 26(b)(1) and 2015 Notes of Advisory Committee to Fed. R. Civ. P. 26.

Texas also objects that this interrogatory is overly broad and propounded for the purposes of harassment, annoyance, oppression, undue burden and expense or delay, contrary to the provisions of Fed. R. Civ. P. 26(c)(1), as it seeks information in possession of Defendants, thus making it unnecessary to burden Texas with searching for and/or otherwise providing information within Defendants' custody and control.

Texas also objects to the extent that is seeks information in the possession or control of third parties, or which is otherwise publicly available. Rule 26 "applies only with respect to documents that are within the custody or control of the disclosing party within the meaning of Rule 34." 8A Charles Alan Wright, Arthur R. Miller, et al., FEDERAL PRACTICE AND PROCEDURE § 2053, p. 370 (2010). Moreover, discovery is not required regarding public records which are equally accessible to all parties. *See Ayyad v. Holder*, No. 05-CV-02342-WYD-MJW, 2014 WL 4084165, at *1 (D. Colo. Aug. 19, 2014); *Baum v. Vill. of Chittenango*, 218 F.R.D. 36, 40 (N.D.N.Y. 2003) (court would not compel production of a public transcript, as such, was "equally accessible to all."); *Snowden ex rel. Victor v. Connaught Labs., Inc.*, 137 F.R.D. 325, 333 (D. Kan. 1991) (citation omitted) ("It is well-established that discovery need not be required of documents of public record which are equally accessible to all parties."); *Tequila Centinela, S.A. de C.V. v. Bacardi & Co., Ltd.*, 242 F.R.D. 1, 11 (D.D.C. 2007) ("Typically,

4

courts do not order discovery of public records which are equally accessible to all parties."); *Krause v. Buffalo & Erie Cty. Workforce Dev. Consortium, Inc.*, 426 F. Supp. 2d 68, 90 (W.D.N.Y. 2005) (refusing to strike undisclosed voter registration cards submitted as evidence as they were "equally accessible to all parties."). Nonetheless, Plaintiff has already identified both Texas and local laws and/or policies that conflict with the EEOC rule at issue in this case. Plaintiff is not required to demonstrate or cite every single legal conflict, state or local, that may exist within Texas's borders. *See, e.g.*, ECF No. 52 at 7–8. "It further is settled law that 'a party [upon whom a discovery demand is served] . . . need not seek such documents from third parties if compulsory process against the third parties is available to the party seeking the documents.'" *Nosal v. Granite Park LLC*, 269 F.R.D. 284, 290 (S.D.N.Y. 2010) (quoting *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 138 (2d Cir. 2007)). *See CGC Holding Co., LLC v. Hutchens*, No. 11-CV-01012-RBJ-KLM, 2016 WL 1238149, at *10 (D. Colo. Mar. 30, 2016).

Texas also objects to this interrogatory in that it seeks law, not facts. "[T]he coercive power of discovery can be invoked to uncover facts, but the task of researching the law is left to the parties themselves." *Ind. Coal Council v. Hodel*, 118 F.R.D. 264, 266 (D.D.C. 1988). "[D]iscovery does not serve the function of providing Plaintiff with legal research." *Taylor v. Greene*, No. 08-81054-CIV, 2010 WL 5248502, at *3 (S.D. Fla. Dec. 16, 2010). "The defendant is not required to provide legal research to the plaintiff." *Maale v. Caicos Beach Club Charter, Ltd.*, No. 08-80131-CIV, 2010 WL 297808, at *4 (S.D. Fla. Jan. 19, 2010). This request asks Plaintiff to do Defendants' legal research and is, thus, improper. Plaintiff already identified both Texas and local laws and/or policies that conflict with the EEOC rule at issue in this case. Plaintiff is not required to demonstrate or cite every single legal conflict, state or local, that may exist within Texas's borders. Indeed, "if the theoretical possibility that there are more documents sufficed to justify additional discovery, discovery would never end." *Id.* at

5

*1. "The discovery rules are not a ticket to an unlimited, never-ending exploration of every conceivable matter that captures an attorney's interest." *Vakharia v. Swedish Covenant Hosp.*, No. 90 C 6548, 1994 WL 75055, at *2 (N.D. Ill. Mar. 9, 1994). "'[D]iscovery' is not a synonym for investigation." *Am. Bank v. City of Menasha*, 627 F.3d 261, 265 (7th Cir. 2010), *as amended* (Dec. 8, 2010). If the Defendants seek that information, they are capable of performing legal research to obtain it.

Notwithstanding these objections, and without waiving these or any other objections, and in a good faith effort to provide information, Texas is aware of the investigation documented in ECF No. 32-5, which ultimately produced litigation, *Waldon et al. v. Cincinnati Pub. Schs.*, Case No. 1:12-cv-677 (S.D. Ohio), as well as that involving the Texas Department of Public Safety. *See* Decl. of Kathleen Murphy, provided herewith. *See*, additionally, all Declarations and information submitted herewith. The challenged guidance has also formed the basis of several other legal challenges against employers covered by Title VII. *See, e.g.*, *McCain v. United States*, No. 2:14-CV-92, 2015 WL 1221257 (D. Vt. Mar. 17, 2015); *Williams v. Compassionate Care Hospice*, No. CV162095JLLJAD, 2016 WL 4149987 (D.N.J. Aug. 3, 2016).

**2.    Describe each and every instance in which the United States Department of Justice initiated any kind of legal proceeding against Plaintiff, including filing a complaint in federal court or enforcement action, alleging that Plaintiff's laws, policies, regulations, or practices regarding the employment of individuals with criminal convictions were discriminatory or in violation of Title VII, as referenced in Paragraph 34 of Plaintiff's Amended Complaint.**

**<u>RESPONSE:</u>**

Texas fully incorporates by reference and reasserts all prior and subsequent objections and responses.

**3.    Describe each and every instance in which Plaintiff was sued by a private party in any state or federal court related to its laws, policies, reg-**

6

ulations, or practices regarding the employment of individuals with criminal convictions based on an alleged violation of Title VII, as referenced in Paragraph 34 of Plaintiff's Amended Complaint.

**RESPONSE:**

Texas fully incorporates by reference and reasserts all prior and subsequent objections and responses.

4.    **Describe each and every instance in which Plaintiff has modified a law, policy, regulation, or practice related to the employment of individuals with criminal convictions as a result of the EEOC's Enforcement Guidance.**

**RESPONSE:**

Texas fully incorporates by reference and reasserts all prior and subsequent objections and responses.

5.    **Describe each and every state law that disqualifies convicted felons from holding certain jobs that Plaintiff has ignored as a result of the EEOC Enforcement Guidance, as alleged in Paragraph 12 of Plaintiff's Amended Complaint.**

**RESPONSE:**

Texas fully incorporates by reference and reasserts all prior and subsequent objections and responses. Moreover, Texas objects that the interrogatory misrepresents Paragraph 12 of Plaintiff's Second Amended Complaint (ECF No. 62), which comments that the EEOC Rule at issue "instructs employers, including Texas, to ignore state and local laws," and does not aver that Texas and its instrumentalities do or have ignored state and local laws. Additionally, Texas refers Defendants to Restrictions on Convicted Felons in Texas, as chronicled by the Texas Law Library, *available online at* https://www.sll.texas.gov/library-resources/collections/restrictions-on-convicted-felons/. The Attorney General has made a reasonable inquiry into the Texas agencies or local governments referenced in the Second Amended Com-

7

APP 0087

plaint (ECF No. 62), or which have provided evidence herein, and the Attorney General admits that he is unaware of any instance where a Texas agency knowingly or willfully violated or ignored Texas law prohibiting the employment of convicted felons.

**6.    Describe each and every local law that disqualifies convicted felons from holding certain jobs that Plaintiff has ignored as a result of the EEOC Enforcement Guidance, as alleged in Paragraph 12 of Plaintiff's Amended Complaint.**

**RESPONSE:**

Texas fully incorporates by reference and reasserts all prior and subsequent objections and responses.

**7.    Describe all efforts Plaintiff has undertaken to analyze its laws, policies, regulations, or practices related to the employment of individuals with criminal convictions in response to the EEOC's Enforcement Guidance.**

**RESPONSE:**

Texas fully incorporates by reference and reasserts all prior and subsequent objections and responses. In addition, this request seeks information protected by the attorney/client privilege, deliberative process privilege, attorney work-product privilege, other applicable privileges, and any information it could be calculated to lead to would also be covered by those privileges. Notwithstanding these objections, and without waiving these or any other objections, and in a good faith effort to provide information, Texas directs Defendants to the Declarations and information provided by Texas in response to these discovery requests. Moreover, beyond the information provided with these responses, Texas avers that the efforts of the Attorney General, the chief lawyer for Texas, as reflected in the publicly filed documents in this matter, reflect efforts by Texas "to analyze its laws, policies, regulations, or practices related

8

to the employment of individuals with criminal convictions in response to the EEOC's Enforcement Guidance."

**8.    Identify each and every "state law and longstanding hiring policy" of Plaintiff that imposes an "absolute ban on hiring convicted felons," as alleged in paragraph 23 of Plaintiff's Amended Complaint.**

**RESPONSE:**

Texas fully incorporates by reference and reasserts all prior and subsequent objections and responses. Notwithstanding these objections, and without waiving these or any other objections, and in a good faith effort to provide information, Texas directs Defendants to the Declarations and information provided herewith as non-exhaustive examples of the same, as well as Texas's Second Amended Complaint (ECF No. 62), which identifies said laws as well. Additionally, Texas refers Defendants to Restrictions on Convicted Felons in Texas, as chronicled by the Texas Law Library, *available online at* https://www.sll.texas.gov/library-resources/collections/restrictions-on-convicted-felons/. The Attorney General is not aware of other laws or information responsive to this request.

**9.    Identify each and every "state law and longstanding hiring policy" of Plaintiff that bars "persons convicted of certain categories of felonies," from holding Texas state jobs, as alleged in paragraph 23 of Plaintiff's Amended Complaint.**

**RESPONSE:**

Texas fully incorporates by reference and reasserts all prior and subsequent objections and responses.

**10.    Identify all jobs as to which Plaintiff seeks "a declaration of its right to maintain and enforce its laws and policies that absolutely bar convicted felons (or certain categories of convicted felons) from serving," as alleged in paragraph 43 of Plaintiff's Amended Complaint.**

**RESPONSE:**

APP 0089

Texas fully incorporates by reference and reasserts all prior and subsequent objections and responses.

**11.    Identify all hiring policies that Plaintiff has rewritten at tax-payer expense as a result of the EEOC Enforcement Guidance, as referenced in paragraph 33 of Plaintiff's Amended Complaint.**

**RESPONSE:**

Texas fully incorporates by reference and reasserts all prior and subsequent objections and responses. Notwithstanding these objections, and without waiving these or any other objections, and in a good faith effort to provide information, the Attorney General does not know how many agencies, local governments, or other instrumentalities of Texas government have changed policies since the EEOC Rule at issue was released, or how many agencies, local governments, or other instrumentalities of Texas government have not changed policies since the EEOC Rule at issue was released because of the institution and maintenance of this legal action.

**12.    Identify with specificity each and every injury you contend has been caused by Defendants as alleged in Plaintiff's Amended Complaint.**

**RESPONSE:**

Texas fully incorporates by reference and reasserts all prior and subsequent objections and responses. Notwithstanding these objections, and without waiving these or any other objections, and in a good faith effort to provide information, Texas avers that, beyond the direct conflicts between the EEOC Rule at issue and Texas law and hiring policies, the EEOC Rule at issue also impermissibly invades the discretion of Texas, its agencies, local governments, or other instrumentalities of Texas government to make certain hiring decisions and/or otherwise maintain absolute bars to employment as determined to be in the best interests of Texas, as generally informed by Texas law and policy regarding felons (*see*, *e.g.*, https://

10

www.sll.texas.gov/library-resources/collections/restrictions-on-convicted-felons/),   or
in the best interests of the agency or government making the decision, or what those
entities believe to be in the best interests of the citizens that they serve and who
provide the tax money for their existence and operation, any number of circum-
stances or considerations which are beyond the scope of what the EEOC believes to
be relevant or appropriate, as articulated by the EEOC Rule at issue.

**13.    Identify each and every state law and longstanding hiring policy
that you contend disparately impacts a group protected by Title VII.**
<u>**RESPONSE:**</u>

Texas fully incorporates by reference and reasserts all prior and subsequent
objections and responses.

### RESPONSES AND OBJECTIONS TO DEFENDANTS' REQUESTS FOR PRODUCTION

**1.    Provide each and every document upon which you based your
responses to Defendants' First Set of Interrogatories, or that you considered
in responding to Defendants' First Set of Interrogatories.**
<u>**RESPONSE:**</u>

Texas fully incorporates by reference and reasserts all prior and subsequent
objections and responses. Notwithstanding those objections and responses, and with-
out waiving any objections, and in a good faith effort to respond, please see Declara-
tions and documents provided herewith. Additionally, notwithstanding those objec-
tions and responses, and without waiving any objections, and in a good faith effort
to respond, Plaintiff has not withheld or otherwise failed to produce any documents
responsive to this request because of Plaintiff's objections.

**2.    Provide each and every document upon which you based your
responses to Defendants' First Requests for Admission, or that you consid-
ered in responding to Defendants' First Requests for Admission.**

APP 0091

**RESPONSE:**

Texas fully incorporates by reference and reasserts all prior and subsequent objections and responses. Notwithstanding those objections and responses, and without waiving any objections, and in a good faith effort to respond, please see Declarations and documents provided herewith. Additionally, notwithstanding those objections and responses, and without waiving any objections, and in a good faith effort to respond, Plaintiff has not withheld or otherwise failed to produce any documents responsive to this request because of Plaintiff's objections.

RESPONSES AND OBJECTIONS TO DEFENDANTS' REQUESTS FOR ADMISSION

**1.    Admit that the United States Department of Justice has never filed an enforcement action or lawsuit against Plaintiff alleging that Plaintiff's laws, policies, regulations, or practices regarding the employment of individuals with criminal convictions are discriminatory or in violation of Title VII.**

**RESPONSE:**

Texas fully incorporates by reference and reasserts all prior and subsequent objections and responses. Notwithstanding those objections and responses, and without waiving any objections, and in a good faith effort to respond, the Attorney General does not possess sufficient information to admit or deny this request and, thus, out of an abundance of caution, denies this request. The Attorney General admits that he is unaware of (a) any enforcement action or lawsuit brought by the Department of Justice against Plaintiff, or Plaintiff's instrumentalities of government or agencies, alleging that Plaintiff's laws, policies, regulations, or practices regarding the employment of individuals with criminal convictions are unlawful, and (b) how many like enforcement actions or lawsuits were not pursued by Defendants or the Department of Justice because of the institution and maintenance of this legal action.

APP 0092

**2.    Admit that Plaintiff is unaware of any investigation of Plaintiff conducted by the EEOC related to the Plaintiff's laws, policies, regulations, or practices regarding the employment of individuals with criminal convictions in connection with a potential violation of Title VII.**

**RESPONSE:**

Texas fully incorporates by reference and reasserts all prior and subsequent objections and responses. Notwithstanding those objections and responses, and without waiving any objections, and in a good faith effort to respond, Texas denies this request. *See* Decl. of Kathleen Murphy, provided herewith.

**3.    Admit that Plaintiff has not altered its laws, policies, regulations, or practices with respect to the employment of individuals with criminal convictions to make them conform to the EEOC Enforcement Guidance.**

**RESPONSE:**

Texas fully incorporates by reference and reasserts all prior and subsequent objections and responses. Notwithstanding those objections and responses, and without waiving any objections, and in a good faith effort to respond, the Attorney General does not possess sufficient information to admit or deny this request and, thus, out of an abundance of caution, denies this request. The Attorney General has made a reasonable inquiry into the Texas agencies or local governments referenced in the Second Amended Complaint (ECF No. 62), or which have provided evidence herein, and the Attorney General does not believe that the Texas agencies or local governments referenced in the Second Amended Complaint (ECF No. 62), or which have provided evidence herein, or any other Texas agencies, have altered their laws, policies, regulations, or practices with respect to the employment of individuals with criminal convictions since the EEOC Rule at issue was promulgated. More specifically, the Attorney General admits that he is unaware of any Texas agency or local governmental entity that has "altered its laws, policies, regulations, or practices with

13

respect to the employment of individuals with criminal convictions to make them conform to the EEOC Enforcement Guidance." The Attorney General is unaware of (a) the number of instrumentalities or agencies of Plaintiff, if any, that specifically altered laws, policies, regulations, or practices with respect to the employment of individuals with criminal convictions since the EEOC Rule at issue ("EEOC Enforcement Guidance") was promulgated, and (b) how many agencies, local governments, or other instrumentalities of Texas government, if any, have not changed policies since the EEOC Rule at issue ("EEOC Enforcement Guidance") was released because of the institution and maintenance of this legal action.

**4.    Admit that Plaintiff contends that it has the right to enact laws that prohibit a felon from being employed in any job with the State regardless of the nature of the felony, the nature of the job, the amount of time since the felony was committed, or any other fact or circumstance.**

**RESPONSE:**

Texas fully incorporates by reference and reasserts all prior and subsequent objections and responses. Notwithstanding those objections and responses, and without waiving any objections, and in a good faith effort to respond, Texas denies this request. Texas admits that it possesses the right to enact its larger comprehensive legal scheme regarding criminal convictions (*see*, *e.g.*, https://www.sll.texas.gov/library-resources/collections/restrictions-on-convicted-felons/). Texas also admits that its larger comprehensive legal scheme regarding criminal convictions (*see*, *e.g.*, https://www.sll.texas.gov/library-resources/collections/restrictions-on-convicted-felons/), and myriad factors beyond "the nature of the felony, the nature of the job, the amount of time since the felony was committed, or any other fact or circumstance" considered important by Defendants, or others, known and unknown, may inform any number of employment decisions of Texas, its agencies, local governments, or other instrumentalities of Texas government.

APP 0094

5.    **Admit that Plaintiff has never violated state and local laws that prohibit the "'individualized assessment' that EEOC requires," as referenced in paragraph 32 of Plaintiff's Amended Complaint.**

**RESPONSE:**

Texas fully incorporates by reference and reasserts all prior and subsequent objections and responses. Moreover, Texas objects to the request as vague, confusing, and legally inappropriate as Texas is not subject to "local laws." Notwithstanding those objections and responses, and without waiving any objections, and in a good faith effort to respond, the Attorney General does not possess sufficient information to admit or deny this request and, thus, out of an abundance of caution, denies this request. The Attorney General has made a reasonable inquiry into the Texas agencies or local governments referenced in the Second Amended Complaint (ECF No. 62), or which have provided evidence herein, and the Attorney General admits that he is unaware of any instance where a Texas agency knowingly or willfully violated Texas law prohibiting the employment of convicted felons.

6.    **Admit that Plaintiff cannot identify a state or local law concerning the hiring of convicted felons that disparately impacts a group protected under Title VII.**

**RESPONSE:**

Texas fully incorporates by reference and reasserts all prior and subsequent objections and responses. Texas also objects that the request seeks a conclusion of law, not a question of fact. Notwithstanding those objections and responses, and without waiving any objections, and in a good faith effort to respond, the Attorney General does not possess sufficient information to admit or deny this request and, thus, out of an abundance of caution, denies this request. The Attorney General is also unaware of statistical evidence that may be used to support a claim that a Texas

state or local law concerning the hiring of convicted felons disparately impacts a group protected under Title VII.

~

I, the undersigned as attorney and agent for Plaintiff, do hereby affirm and verify, on my oath, that the above answers are true and correct to the best of my personal knowledge and understanding.

*/s/ Austin R. Nimocks*
AUSTIN R. NIMOCKS
Associate Deputy Attorney General


Respectfully submitted this the 29th day of August, 2017.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY D. STARR
Deputy First Assistant Attorney General

MICHAEL C. TOTH
Special Counsel to the First Assistant Attorney General

ANDREW D. LEONIE
Associate Deputy Attorney General

*/s/ Austin R. Nimocks*
AUSTIN R. NIMOCKS
Associate Deputy Attorney General
Texas Bar No. 24002695
austin.nimocks@oag.texas.gov

DAVID J. HACKER
Senior Counsel

Office of Special Litigation
ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Mail Code 009
Austin, Texas 78711-2548
(512) 936-1414
(512) 936-0545 Fax

*ATTORNEYS FOR PLAINTIFFS*

16

APP 0096

### CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2017, a true and correct copy of the foregoing document was transmitted to Justin M. Sandberg, Trial Attorney, Federal Programs Branch, Department of Justice, via e-mail at Justin.Sandberg@usdoj.gov.

*/s/Austin R. Nimocks*
AUSTIN R. NIMOCKS
Associate Deputy Attorney General

APP 0097

# Attachment 4

APP 0098

EEOC FORM 131 (11/09)

## U.S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| | **William R. Smith** |

Stuart Platt
General Counsel
TX DEPARTMENT OF PUBLIC SAFETY
P O Box 4087
Austin, TX 78773

THIS PERSON (check one or both)

[X] Claims To Be Aggrieved

[ ] Is Filing on Behalf of Other(s)

EEOC CHARGE NO.
**451-2014-00103**

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act (Title VII)    [ ] The Equal Pay Act (EPA)    [ ] The Americans with Disabilities Act (ADA)

[ ] The Age Discrimination in Employment Act (ADEA)    [ ] The Genetic Information Nondiscrimination Act (GINA)

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by **02-DEC-13** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by   to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by    **22-NOV-13**
to    **Katherine S. Perez, ADR Coordinator, at  (210) 281-2507**
If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

| Julia  Way, Intake Supervisor | San Antonio Field Office |
|---|---|
| *EEOC Representative* | 5410 Fredericksburg Rd |
| | Suite 200 |
| *Telephone*  **(210) 281-7621** | San Antonio, TX 78229 |
| | Fax: (210) 281-7690 |

TEXAS DEPT. OF PUBLIC SAFETY
OFFICE OF GENERAL COUNSEL

NOV 04 2013

Enclosure(s):  [X] Copy of Charge

---

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[X] Race   [ ] Color   [X] Sex   [ ] Religion   [ ] National Origin   [ ] Age   [ ] Disability   [ ] Retaliation   [ ] Genetic Information   [ ] Other

**See enclosed copy of charge of discrimination.**

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| **November 1, 2013** | Travis G. Hicks, Director | |

APP 0099

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 451-2014-00103 |

**Texas Workforce Commission Civil Rights Division**
State or local Agency, if any · and EEOC

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. William R. Smith   2013 OCT 30  AM 11 52 | ▮ | ▮ |

Street Address: ▮
City, State and ZIP Code:

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| TX DEPT OF PUBLIC SAFETY | Unknown | (512) 424-2000 |

Street Address: 5805 North Lamar Blvd., Austin, TX 78752

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|

Street Address:

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN  ☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION  ☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest 09-11-2013   Latest 10-08-2013
☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

On September 11, 2013, I applied online for the position of Customer Service Representative (Contact Center). Although I met the qualifications for the position I was never contacted for an interview nor hired. The job application asked if the applicant had a felony conviction and I indicated that I had been convicted of a felony for unauthorized use of a vehicle.

I believe I have discriminated against because of my race (Black), sex (male), and felony conviction, in violation of Title VII of the Civil Rights Act of 1964, as amended.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

x 10-25-13   x W. Smith
Date   Charging Party Signature

NOTARY – When necessary for State and Local Agency Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: William R. Smith | From: San Antonio Field Office<br>5410 Fredericksburg Rd<br>Suite 200<br>San Antonio, TX 78229 |
|---|---|

| ☐ | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) |
|---|---|

| EEOC Charge No.<br>451-2014-00103 | EEOC Representative<br>Travis G. Hicks, Director | Telephone No.<br>(210) 281-7603 |
|---|---|---|

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_Travis G. Hicks_                         12/19/2013

**Travis G. Hicks,**                         (Date Mailed)
**Director**

Enclosures(s)

cc:
Kathleen T. Murphy-Darveau
Senior Asst. General Counsel
TX DEPARTMENT OF PUBLIC SAFETY
P O Box 4087
Austin, TX 78773

TEXAS DEPT. OF PUBLIC SAFETY
OFFICE OF GENERAL COUNSEL

DEC 23 2013

APP 0101

# Attachment 11

*Texas Juvenile Justice Department*                                                          **PRS.02.08**
**Personnel Policy and Procedure Manual**

| Chapter: | Conditions of Employment | **Effective Date: 7/1/17** |
|---|---|---|
| **Title:** | **Criminal History: Standards, Background Checks, and Self-Reporting Requirements** | Page: 1 of 7 |
| | | Replaces: PRS.02.08, 2/15/14 |
| Statutes: | Human Resources Code §242.010 | |

(a)    **Policy.**

    (1)    Applicants for employment with the Texas Juvenile Justice Department (TJJD) must meet the criminal history standards in this policy to be eligible for hire.

    (2)    Current TJJD employees must continue to meet the criminal history standards in this policy to remain eligible for continued employment.

    (3)    To ensure that criminal history standards are met, TJJD:

- conducts pre-employment fingerprinting and criminal history background checks;
- conducts criminal history background checks throughout an employee's employment; and
- requires each employee to notify TJJD if he/she:
  - is arrested;
  - is notified of criminal charges through an indictment or other official notification; or
  - learns of a change in the status of a previously reported criminal charge.

    (4)    TJJD management takes appropriate action in response to a report of an employee's pending criminal charge or conviction in accordance with the provisions of this policy.

    (5)    TJJD ensures that contractors and volunteers meet appropriate criminal history standards before being granted access to TJJD youth.

(b)    **Applicability.**

    (1)    The criminal history standards and background check processes in this policy apply to:

        (A)    applicants for TJJD employment and current TJJD employees; and

        (B)    TJJD contractors (including their employees, volunteers, contractors, and subcontractors) who have direct access to youth in TJJD-operated facilities. (Note: these individuals are subject to the standards for correctional series positions.)

    (2)    TJJD contractors (including their employees, volunteers, contractors, and subcontractors), who have direct access to TJJD youth in facilities not operated by TJJD are subject to the criminal history standards and background check process as outlined in the contract agreement with TJJD. The contract terms must adhere to the criminal history standards for contract facilities specified in (d)(3) below.

    (3)    The criminal history background check processes in this policy apply to TJJD volunteers. The criminal history standards for non-correctional series positions as listed in this policy also apply to TJJD volunteers, with certain exceptions allowed under VLS.01.02 for volunteers who are not TJJD employees.

    (4)    The self-reporting requirements in this policy apply to current TJJD employees.

(c)    **Definitions.**

    For definitions of certain terms used in this policy, see the PRS glossary.

APP 0103

| Criminal History: Standards, Background Checks, and Self-Reporting Requirements | PRS.02.08<br>Page 2 of 7 |
|---|---|

(d)    **Criminal History Standards.**

    (1)    **Determining When a Conviction Occurred.**

        A conviction is considered to have occurred on the date of disposition for the conviction.

    (2)    **Automatic Disqualifiers for TJJD Employees and Applicants for Employment.**

        The table below shows the disqualifying criminal history for current TJJD employees and for applicants for employment.

| Disqualifying Criminal History | Non-Correctional Series Positions<br><br>Current Employees and All Applicants | Correctional Series Positions<br><br>Current Employees and Internal Applicants* | Correctional Series Positions<br><br>External Applicants* |
|---|:---:|:---:|:---:|
| Convicted ever for a felony or Class A or B misdemeanor in which a child under age 17 is a victim or is directly endangered | X | X | X |
| Current requirement to register as a sex offender | X | X | X |
| Convicted ever for an offense listed in Article 42A.054, Code of Criminal Procedure (formerly "3g" offenses) | X | X | X |
| Pending criminal charge for a disqualifying offense | X | X | X |
| Outstanding warrant (see (e)(2) below) | X | X | X |
| Convicted in last 15 years for a felony (or equivalent offense under Uniform Code of Military Justice) | X | X | X |
| Convicted ever for a felony (or equivalent offense under Uniform Code of Military Justice) | | X | X |
| Convicted in last five years for a Class A or B misdemeanor or equivalent | | | X |
| Currently serving term of probation for a criminal offense | | | X |

  *    For purposes of this policy, a current TJJD employee in a non-correctional series position who applies for a correctional series position is considered an external applicant.

| Criminal History: Standards, Background Checks, and Self-Reporting Requirements | PRS.02.08 |
|---|---|
| | Page 3 of 7 |

(3) **Standards for Contract Facilities.**

The table below shows the disqualifying criminal history for an employee, contractor, or volunteer who provides services in a facility that contracts to accept TJJD youth.

| Disqualifying Criminal History | Facilities Licensed by DFPS | Facilities Regulated by TJJD |
|---|---|---|
| Fail to obtain background clearance under Department of Family and Protective Services (DFPS) licensing background check rules | X | |
| Violate the criminal history standards established in 37 TAC §344.400 (unless an exemption or variance for a Class B misdemeanor was received in accordance with 37 TAC Chapter 344) | | X |
| Convicted ever for exploitation of child, elderly individual, or disabled individual | X | X |
| Convicted ever for failure to stop or report aggravated sexual assault of child | X | X |
| Convicted ever for official oppression (felony) | X | X |
| Convicted ever for violation of the civil rights of persons in custody | X | X |
| Convicted ever for improper sexual activity with a person in custody (felony) | X | X |
| Convicted ever for engaging in organized criminal activity | X | X |
| Convicted ever for bribery | X | X |
| Current requirement to register as a sex offender | X | X |

(4) **Other Criminal Charges or Convictions.**

(A) TJJD may determine it is in the agency's best interests to disqualify an applicant or to terminate a TJJD employee for a pending criminal charge or a conviction that is not an automatic disqualifier for employment. This determination is made jointly by the director of human resources and general counsel or their designees and is based on the nature of the pending criminal charge or conviction and/or the relationship of the offense to the duties of the position.

(B) Records of arrests or other criminal charges that are no longer pending and did not result in a conviction are not used to disqualify an individual from employment or assignment to a correctional series position.

(e) **Criminal History Background Checks.**

(1) **Background Check Process.**

Background investigation specialists in the Human Resources Department obtain criminal history information through the following processes.

(A) **Texas Crime Information Center/National Crime Information Center.**

Criminal history background checks are conducted through the Texas Crime Information Center/National Crime Information Center (TCIC/NCIC) in accordance with PRS.05.14.

(i) Pre-employment checks are conducted on:

(I) external applicants being seriously considered for hire; and
(II) internal applicants being seriously considered for another position through the competitive selection process.

(ii) An annual check is conducted during each employee's birth month.

(iii) A check conducted through TCIC/NCIC identifies the following:

(I) prior convictions and arrests;
(II) public sex offender registration information; and
(III) outstanding warrants.

(B) **FACT Clearinghouse.**

TJJD receives notifications of new arrests through the Fingerprint-based Applicant Clearinghouse of Texas (FACT Clearinghouse). TJJD receives these notifications for employees, contractors, and volunteers.

Note: These notifications are made possible because the individual's fingerprints previously submitted to the Department of Public Safety (DPS) allow the DPS to create an ongoing criminal history search for the individual.

(2) **Outstanding Warrants.**

(A) **External Applicants.**

(i) **Outstanding Traffic Warrant.**

If an external applicant has an outstanding warrant for a traffic violation, the background investigation specialist calls the telephone number provided on the application for employment in an attempt to contact or leave a message for the applicant. The applicant is disqualified from employment if:

(I) the attempt to contact the applicant fails (e.g., incorrect phone number provided or no available method to leave a message); or

(II) within three business days after being contacted by TJJD, the applicant fails to provide appropriate documentation verifying that the warrant has been withdrawn without arrest or the filing of criminal charges.

(ii) **All Other Outstanding Warrants.**

If an external applicant has an outstanding warrant for a non-traffic violation, the applicant is disqualified from employment. TJJD does not provide an opportunity to resolve the outstanding warrant.

(B) **Current Employees.**

The background investigations specialist notifies the director of human resources or designee if a check reveals that a current employee has an outstanding warrant.

| Criminal History: Standards, Background Checks, and Self-Reporting Requirements | **PRS.02.08** |
|---|---|
| | Page 5 of 7 |

    (i)    **Misdemeanor Offense (Including Traffic Violations).**

For misdemeanor warrants, the employee is notified of the outstanding warrant and placed on administrative suspension without pay until the end of three business days after notification or until the warrant is executed, withdrawn, or otherwise resolved, whichever occurs first.

    (I)    If the employee is an internal applicant, the employee will no longer be considered for the position unless he/she provides, by the end of the third business day, appropriate documentation verifying that:

    (-a-)  the warrant has been withdrawn; and

    (-b-)  the nature of any criminal charges resulting from the warrant would not disqualify the employee from employment in the position upon conviction.

    (II)   If at the end of the third business day the employee has not provided TJJD with documentation verifying that the warrant has been withdrawn, he/she is administratively separated under PRS.11.21 due to ineligibility for continued employment.

    (ii)   **Felony Offense.**

In addition to the steps above for a misdemeanor warrant, the director of human resources or designee notifies the Office of Inspector General (OIG) of the outstanding felony warrant. The OIG executes the warrant for arrest or coordinates with the issuing law enforcement agency to execute the warrant.

    (iii)   **Warrants that Result in Arrest or Criminal Charge.**

If the employee is arrested or charged with a criminal offense, the procedures in (f) and (g)(2) apply.

  (3)    **Confidentiality and Disclosure of Information.**

    (A)   Except as otherwise required or allowed by law:

    (i)    access to criminal record reports are restricted to authorized Human Resources personnel; and

    (ii)   information obtained from a criminal record check is kept confidential and disclosed only to the local human resources administrator (HRA), hiring authority, chief local administrator (CLA), or others (e.g., a hearing officer or a grievant whose criminal record is at issue in a grievance), as applicable, on a need-to-know basis.

    (B)   All documents containing criminal record history information are destroyed after the information is used for the purpose for which it was intended.

(f)    **Employee Self-Reporting Process.**

  (1)    **Employee's Responsibilities.**

    (A)   Employees must report the following to TJJD within two workdays after the event:

    (i)    an arrest;

    (ii)   notification of criminal charges through an indictment or other official notification; and

    (iii)   a change in the status of a previously reported criminal charge (e.g., dismissal, conviction, or the initiation or termination of proceedings to revoke probation).

| Criminal History: Standards, Background Checks, and Self-Reporting Requirements | PRS.02.08 |
|---|---|
| | Page 6 of 7 |

(B)   To report these events to TJJD, the employee must:

   (i)   provide a completed Employee's Report of Criminal Charges form, HR-038, to the local Human Resources office; or

   (ii)   ensure his/her supervisor is contacted by telephone, text, or email when the circumstances do not allow the employee to provide a completed HR-038 form to the local Human Resources office within the required time frame.

(2)   **Supervisor's Responsibilities.**

The supervisor must:

(A)   complete the HR-038 form when the employee is unable to do so; and

(B)   provide the completed form to the local Human Resources office on the same workday the supervisor received notice of the incident.

(3)   **Local HRA's Responsibilities.**

Upon receipt of a completed HR-038 form, the local HRA or designee must:

(A)   immediately email a scanned copy of the form to a background investigation specialist;
(B)   provide a copy to the CLA; and
(C)   file the original form in the employee's confidential personnel file.

(4)   **Background Investigation Specialist's Responsibilities.**

Upon receipt of the HR-038 form, the background investigation specialist:

(A)   conducts a criminal history background check; and

(B)   provides guidance to the local HRA and CLA regarding the appropriate management action based on the criminal history standards established by this policy.

(g)   **Management Actions for Current Employees.**

(1)   **Employee's Failure to Self-Report.**

If a criminal history background check reveals that a TJJD employee failed to report an arrest, indictment, criminal charge, or conviction as required by this policy, the employee is:

(A)   disqualified from consideration if he/she is an internal applicant for a position, regardless of the nature of the offense;

(B)   subject to disciplinary action under PRS.35.01 for failing to report the event; and

(C)   subject to the actions in (g)(2) and (3) if he/she is not terminated for failure to report the event.

(2)   **Pending Criminal Charges.**

If TJJD learns that an employee has a pending criminal charge:

(A)   the employee must be administratively separated from employment under PRS.11.19 if a conviction would violate the criminal history standards in this policy and the employee is not terminated from employment based on the conduct that resulted in the pending criminal charge; or

| Criminal History: Standards, Background Checks, and Self-Reporting Requirements | PRS.02.08 |
|---|---|
| | Page 7 of 7 |

(B)  the employee may be allowed to continue employment if a conviction would not violate the criminal history standards. However, the employee may be subject to disciplinary action for the conduct that resulted in the charge.

(3)  **Convictions.**

(A)  If TJJD learns that an employee has been convicted of a criminal offense, the employee is subject to disciplinary action under PRS.35.01.

(B)  If the employee is not terminated from employment and the conviction is under a criminal drug- or alcohol-related statute, the director of human resources or designee refers the employee to a substance abuse professional through the agency's Employee Assistance Program (EAP). As a condition of continued employment, the employee must:

(i)  satisfactorily participate in and complete a substance abuse rehabilitation program provided by the EAP or a court-approved provider; and

Note: The EAP and/or the court-approved provider provides TJJD a report indicating whether the employee satisfactorily completed the program.

(ii)  provide proof of completion to the local HRA.

(4)  **Employees Paid from Federal Grants or Contracts.**

This section applies only to employees who are paid from funds received through a federal grant or contract. If the Human Resources Department receives notice that such an employee has been convicted under a criminal drug statute for an offense that occurred on TJJD premises, the director of human resources or his/her designee must:

(A)  notify the granting agency of the conviction within 10 days after receiving notice of the conviction; and

(B)  ensure that appropriate management actions are taken within 30 days after receiving notice of the conviction.

# Attachment 20



# TEXAS LOTTERY COMMISSION

## ENFORCEMENT DIVISION

## PROCEDURE

| Number:<br>**EN-016**<br>**Page:      1 of 3** | Title:<br>**Employee Background**<br>**Investigations** | Approval:<br>**Mario L. Valdez,**<br>**Enforcement Director** |
|---|---|---|
| Effective Date:<br>**October 10, 2016** | Approval Date:<br>**October 10, 2016** | Review Date: |

**PROCEDURE NUMBER**
EN-016 [Supersedes EN-016 effective March 24, 2014]

**PURPOSE**
This procedure describes the minimum requirements for a Texas Lottery Commission (TLC) employee applicant background investigation. The Enforcement Division may expand the scope of the background investigation of an applicant for employment with the TLC as deemed necessary by the executive director, and may request the Texas Department of Public Safety (DPS) conduct the background investigation of an applicant for employment with the TLC.

**RESPONSIBILITY**
The Enforcement Division (Enforcement) is primarily responsible for this procedure. Personnel in the Human Resources Division (HR) are responsible for parts of the procedure.

**GENERAL**
HR requests Enforcement conduct a background investigation on an applicant for employment. Enforcement investigators have primary responsibility to perform background investigations.

A current or prospective employee is disqualified from employment if he or she has been convicted of a felony or of a misdemeanor involving gambling, fraud or theft and less than 10 years has elapsed since the termination of  the sentence, parole, mandatory supervision, or probation served for the offense.  Other convictions may be considered in an employment decision if the conviction is relevant to the job duties of a current or prospective employee.

An applicant is prohibited from TLC employment if the person owns a financial interest in a bingo commercial lessor, bingo distributor, bingo manufacturer, lottery sales agent or a lottery operator. TLC will also prohibit from employment a person who is a spouse, child, brother, sister, or parent residing as a member of the same household in the principal place of residence of a person who owns a financial interest in a bingo commercial lessor, bingo distributor, bingo manufacturer, lottery sales agent or a lottery operator.

APP 0111

| Number:<br>**EN-016**<br>Page:  **2 of 3** | Title:<br>**Employee Background Investigations** | Approval:<br>**Mario L. Valdez,<br>Enforcement Director** |
|---|---|---|
| Effective Date:<br>**October 10, 2016** | Approval Date:<br>**October 10, 2016** | Review Date: |

Agency policy is that the agency may not employ or continue to employ a person who holds any interest in or who works for:

- a business that manufactures, distributes, sells, or produces lottery or bingo equipment, supplies, services or advertising;

- a business that has bid or expressed the intent to bid to provide lottery operator services in the past two years; or

- a business that is licensed by the agency as a sales agent (a business that sells lottery tickets) or licensed by the Charitable Bingo Operations Division.

Agency policy is that an employee's spouse, child, brother, sister or parent residing as a member of the same household should not be employed:

- by a person or entity that contracts with the agency to provide lottery operator services, advertising services, instant tickets, security audits, financial audits or drawings audits;

- by an entity licensed as a bingo manufacturer, distributor or systems service provider; or

- by a licensed commercial lessor or conductor in a job related to bingo.

**PROCEDURE**

1. HR emails a request to Enforcement to conduct a background investigation of a person being considered for employment with the TLC. HR includes a copy of the applicant's State of Texas Application for Employment and a copy of the job posting.

2. The Intake Coordinator opens a case in the Compliance Activity Monitoring Process (CAMP) system and assigns an investigator to conduct the investigation. The investigator contacts the applicant by phone and email and provides an instructional packet to the applicant which includes an Applicant Background Information/Consent form (Exhibit A).

3. The applicant may be fingerprinted electronically through IdentoGo either at the TLC Headquarters or at one of the statewide IdentoGo sites. Fingerprints are submitted electronically to DPS and the Federal Bureau of Investigation (FBI). Applicants who do not have access to an IdentoGo site may submit fingerprint cards. Fingerprint cards received via U.S. mail or interagency mail are processed by the investigator by accessing the IdentoGO website and completing the registration process of the fingerprint card. The fingerprint card is then forwarded by mail to MorphoTrust, Springfield, IL, for electronic upload to DPS and the FBI.

4. The investigator reviews all required information and documentation submitted by the applicant, including a copy of a valid government issued photo identification card and a social security card. If any required information or documentation is missing, the investigator will notify the applicant and suspend the case until received.

APP 0112

| Number:<br>**EN-016**<br>Page:    3 of 3 | Title:<br>**Employee Background Investigations** | Approval:<br>**Mario L. Valdez,**<br>**Enforcement Director** |
|---|---|---|
| Effective Date:<br>**October 10, 2016** | Approval Date:<br>**October 10, 2016** | Review Date: |

5.  Upon receipt, the investigator reviews the applicant's criminal history for potential disqualifications and convictions.

6.  The investigator requests certified copies of court dispositions and/or offense reports from the jurisdictional courts and/or law enforcement agencies for potentially disqualified applicants.

7.  The investigator documents potential disqualifications and convictions in the Background Tab of the Compliance Activity Monitoring Process system (CAMP). Disqualifying criminal convictions are documented in the investigative report. All court documents are scanned into CAMP. The investigator informs the Enforcement Director (Director) of extenuating issues that may be discovered in the course of conducting the background investigation.

8.  Once completed, the investigative report will be closed as "Referred to Human Resources" and forwarded to the Director for final review and approval.

9.  Following final approval an email notification is sent by the Director or his designee to Human Resources indicating the outcome of the investigation.

10. The investigative case file is forwarded to the Intake Coordinator for closure. Upon request, the Intake Coordinator may forward a copy of the approved case report to the Human Resources Division.

11. The Intake Coordinator will dispose of the criminal history upon receipt of the case file, enter the appropriate CAMP closure code, and transfer the case file to the Investigative Program Support Specialist. The case file will be handled in accordance with the TLC's records retention schedule.

12. All TLC employees who are applying for another internal position shall undergo confirmation of subscription to the DPS Fingerprint-based Applicant Clearinghouse of Texas (FACT Clearinghouse) to confirm there is no disqualifying criminal history.

# presidential documents

[3195–01]

# Title 3—The President

## REORGANIZATION PLAN NO. 1 OF 1978

*Prepared by the President and transmitted to the Senate and the House of Representatives in Congress assembled, February 23, 1978, pursuant to the provisions of Chapter 9 of Title 5 of the United States Code.*

### Equal Employment Opportunity

SECTION 1. *Transfer of Equal Pay Enforcement Functions*

All functions related to enforcing or administering Section 6(d) of the Fair Labor Standards Act, as amended, (29 U.S.C. 206(d)) are hereby transferred to the Equal Employment Opportunity Commission. Such functions include, but shall not be limited to, the functions relating to equal pay administration and enforcement now vested in the Secretary of Labor, the Administrator of the Wage and Hour Division of the Department of Labor, and the Civil Service Commission pursuant to Sections 4(d)(1); 4(f); 9; 11 (a), (b), and (c); 16 (b) and (c) and 17 of the Fair Labor Standards Act, as amended, (29 U.S.C. 204(d)(1); 204(f); 209; 211 (a), (b), and (c); 216 (b) and (c) and 217) and Section 10(b)(1) of the Portal-to-Portal Act of 1947, as amended, (29 U.S.C. 259).

SECTION 2. *Transfer of Age Discrimination Enforcement Functions*

All functions vested in the Secretary of Labor or in the Civil Service Commission pursuant to Sections 2, 4, 7, 8, 9, 10, 11, 12, 13, 14, and 15 of the Age Discrimination in Employment Act of 1967, as amended, (29 U.S.C. 621, 623, 626, 627, 628, 629, 630, 631, 632, 633, and 633a) are hereby transferred to the Equal Employment Opportunity Commission. All functions related to age discrimination administration and enforcement pursuant to Sections 6 and 16 of the Age Discrimination in Employment Act of 1967, as amended, (29 U.S.C. 625 and 634) are hereby transferred to the Equal Employment Opportunity Commission.

SECTION 3. *Transfer of Equal Opportunity in Federal Employment Enforcement Functions*

(a) All equal opportunity in Federal employment enforcement and related functions vested in the Civil Service Commission pursuant to Section 717 (b) and (c) of the Civil Rights Act of 1964, as amended, (42 U.S.C. 2000e–16 (b) and (c)), are hereby transferred to the Equal Employment Opportunity Commission.

(b) The Equal Employment Opportunity Commission may delegate to the Civil Service Commission or its successor the function of making a preliminary determination on the issue of discrimination whenever, as a part of a complaint or appeal before the Civil Service Commission on other grounds, a

APP 0114

Case 5:13-cv-00255-C     Document 93     Filed 09/14/17     Page 117 of 117     PageID 1654

Federal employee alleges a violation of Section 717 of the Civil Rights Act of 1964, as amended, (42 U.S.C. 2000e–16) provided that the Equal Employment Opportunity Commission retains the function of making the final determination concerning such issue of discrimination.

SECTION 4. *Transfer of Federal Employment of Handicapped Individuals Enforcement Functions*

All Federal employment of handicapped individuals enforcement functions and related functions vested in the Civil Service Commission pursuant to Section 501 of the Rehabilitation Act of 1973 (29 U.S.C. 791) are hereby transferred to the Equal Employment Opportunity Commission. The function of being co-chairman of the Interagency Committee on Handicapped Employees now vested in the Chairman of the Civil Service Commission pursuant to Section 501 is hereby transferred to the Chairman of the Equal Employment Opportunity Commission.

SECTION 5. *Transfer of Public Sector 707 Functions*

Any function of the Equal Employment Opportunity Commission concerning initiation of litigation with respect to State or local government, or political subdivisions under Section 707 of Title VII of the Civil Rights Act of 1964, as amended, (42 U.S.C. 2000e–6) and all necessary functions related thereto, including investigation, findings, notice and an opportunity to resolve the matter without contested litigation, are hereby transferred to the Attorney General, to be exercised by him in accordance with procedures consistent with said Title VII. The Attorney General is authorized to delegate any function under Section 707 of said Title VII to any officer or employee of the Department of Justice.

SECTION 6. *Transfer of Functions and Abolition of the Equal Employment Opportunity Coordinating Council*

All functions of the Equal Employment Opportunity Coordinating Council, which was established pursuant to Section 715 of the Civil Rights Act of 1964, as amended, (42 U.S.C. 2000e–14), are hereby transferred to the Equal Employment Opportunity Commission. The Equal Employment Opportunity Coordinating Council is hereby abolished.

SECTION 7. *Savings Provision*

Administrative proceedings including administrative appeals from the acts of an executive agency (as defined by Section 105 of Title 5 of the United States Code) commenced or being conducted by or against such executive agency will not abate by reason of the taking effect of this Plan. Consistent with the provisions of this Plan, all such proceedings shall continue before the Equal Employment Opportunity Commission otherwise unaffected by the transfers provided by this Plan. Consistent with the provisions of this Plan, the Equal Employment Opportunity Commission shall accept appeals from those executive agency actions which occurred prior to the effective date of this Plan in accordance with law and regulations in effect on such effective date. Nothing herein shall affect any right of any person to judicial review under applicable law.

SECTION 8. *Incidental Transfers*

So much of the personnel, property, records and unexpended balances of appropriations, allocations and other funds employed, used, held, available, or to be made available in connection with the functions transferred under this Plan, as the Director of the Office of Management and Budget shall deter-

APP 0115