**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

| | |
|---|---|
| TEXAS,<br><br>    *Plaintiff,*<br><br>v.<br><br>EQUAL EMPLOYMENT OPPOR-<br>TUNITY COMMISSION; VICTORIA<br>A. LIPNIC, in her official capacity as<br>Acting Chair of the Equal Employ-<br>ment Opportunity Commission; and<br>JEFFERSON B. SESSIONS, III, in<br>his official capacity as Attorney Gen-<br>eral of the United States,<br><br>    *Defendants.* | Case No. 5:13-CV-00255-C |

**TEXAS'S BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Authorities ..................................................................................... iii

Introduction ................................................................................................... 1

Statement of Facts ........................................................................................ 3

    The Rule ..................................................................................................... 3

    Texas Law Regarding Felons ................................................................. 7

Procedural History....................................................................................... 11

Legal Standard ............................................................................................. 13

Argument ...................................................................................................... 13

    I.    The Significant, Depth, and Breadth of Texas Law Regarding Felons Makes Texas a Significant Object of the Rule.......................... 13

    II.    The Rule's Interference With Texas's Employment of Felons............. 14

        A.    Direct Interference With Texas Law. ......................................... 16

        B.    Interference With Texas's Hiring Practices and Discretion. .................................................................................... 18

        C.    Texas's No-Felon Policies Are Lawful Employment Practices. .................................................................................... 24

            1.    Licenses Bestow Texas's Approval that the Public May Trust a Person Working in an Industry for which a Criminal Background May Betray that Trust. ................................................................................. 24

            2.    Employment in Texas Is Colored By the Duty of Loyalty and Fiduciary Obligations for which a Criminal Background Poses an Obstacle........................ 26

            3.    The Public Trust of Government Employment Requires Strict Application of No-Felon Hiring in Some Positions. ............................................................... 27

            4.    Trust Is the Cornerstone of Texas Employment. ............ 28

                a.    Employment-at-will. ............................................. 29

                b.    Texas Workforce Commission ("TWC") ................ 30

                c.    Other Trust-Oriented Provisions of Texas Law. .............................................................................. 30

III.    The Unlawfulness of the EEOC Rule. .................................................... 31

    A.    EEOC Lacks Rulemaking Authority. ......................................... 31

    B.    The Foundations of the Rule Are Based on EEOC's Misconstruction of the Law. ......................................................... 33

        1.    EEOC's Misconstruction of the Law. .............................. 34

        2.    The Data Cited By EEOC Is Inapplicable to Texas. ....... 42

    C.    The Court Owes No Deference to EEOC. .................................. 42

        1.    Congress Did Not Delegate to EEOC Authority to Invade the Texas Legislature's Larger Scheme Regarding the Societal Opportunities and Privileges of Convicted Felons. ......................................................... 44

        2.    Congress Did Not Delegate to EEOC this Significant Political and Economic Issue. ........................................... 47

Conclusion ........................................................................................................ 50

Certificate of Service ....................................................................................... 51

ii

TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Adair v. United States,*
    208 U.S. 161 (1908) ................................................................. 29

*Albemarle Paper Co. v. Moody,*
    422 U.S. 405 (1975) ................................................................. 40

*Am. Indem. Co. v. W.C. Munn Co.,*
    278 S.W. 956 (Tex. Civ. App.—Galveston 1925, writ ref'd) ................................. 28

*Andela v. Admin. Office of U.S. Courts,*
    569 F. App'x 80 (3d Cir. 2014) ........................................................ 31

*Anderson v. Texas Workforce Comm'n,*
    No. 05-02-01595-CV, 2003 WL 21350082 (Tex. App.—Dallas June 5,
    2003, pet. denied) (mem. op.) ......................................................... 30

*Appalachian Power Co. v. EPA,*
    208 F.3d 1015 (D.C. Cir. 2000) ......................................................... 6

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
    548 U.S. 291 (2006) ................................................................. 46

*Artis v. Bernanke,*
    630 F.3d 1031 (D.C. Cir. 2011) ........................................................ 32

*Batson v. Kentucky,*
    476 U.S. 79 (1986) .................................................................... 9

*Bond v. United States,*
    134 S. Ct. 2077 (2014) ............................................................... 45

*Boyd v. Choicepoint, Inc.,*
    1:08-CV-01118-TWT, 2010 WL 5691503 (N.D. Ga. Dec. 16, 2010) ............... 37–38

*Bray v. Squires,*
    702 S.W.2d 266 (Tex. App.—Houston [1st Dist.] 1985, no writ) ......................... 26

*Brooks v. Nat'l Bank of Topeka,*
    251 F.2d 37 (6th Cir. 1958) ............................................................ 8

*Caston v. Methodist Med. Ctr. of Ill.*,
   215 F. Supp. 2d 1002 (C.D. Ill. 2002) ............................................................. 41–42

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ........................................................................................ 13

*Chevron U.S.A. v. Nat. Res. Def. Council*,
   467 U.S. 837 (1984) ........................................................................................ 43–44

*Chrisner v. Complete Auto Transit, Inc.*,
   645 F.2d 1251 (6th Cir. 1981) ........................................................................ 39

*Christensen v. Harris Cty.*,
   529 U.S. 576 (2000) ........................................................................................ 43

*City of Canton v. Harris*,
   489 U.S. 378 (1989) ........................................................................................ 17

*City of Edinburg v. Ellis*,
   59 S.W.2d 99 (Tex. Comm'n App. 1933, opinion approved) ............................ 27

*Clampitt v. Kingsville Lumber Co.*,
   57 S.W.2d 326 (Tex. Civ. App.—San Antonio 1933, writ ref'd) ...................... 28

*Coalition for Econ. Equity v. Wilson*,
   122 F.3d 718 (9th Cir. 1997) .......................................................................... 16

*Collingsworth Gen. Hosp. v. Hunnicutt*,
   988 S.W.2d 706 (Tex. 1998) ............................................................................ 30

*Colo. Cty. v. Staff*,
   510 S.W.3d 435 (Tex. 2017) ............................................................................ 26–27

*Contreras v. City of L.A.*,
   656 F.2d 1267 (9th Cir. 1981) ........................................................................ 39

*Davis v. Monroe Cty. Bd. of Educ.*,
   526 U.S. 629 (1999) (Kennedy, J., dissenting) ................................................ 46

*Delta Elec. Const. Co. v. City of San Antonio*,
   437 S.W.2d 602 (Tex. Civ. App.—San Antonio 1969, writ ref'd n.r.e.) ............. 27

*Dickson v. Strickland*,
   265 S.W. 1012 (Tex. 1924) .............................................................................. 9

*Dixon v. McMullen*,
   527 F. Supp. 711 (N.D. Tex. 1981) (Belew, J.) ................................................ 7–8

*Doctor v. Seaboard Coast Line R. Co.*,
    540 F.2d 699 (4th Cir. 1976) ................................................................. 39

*Doe v. Hillsboro Indep. Sch. Dist.*,
    81 F.3d 1395 (5th Cir. 1996), *rev'd en banc*, 113 F.3d 1412 (5th Cir.
    1997).......................................................................................................... 17

*Dowdell v. Dun & Bradstreet, Inc.*,
    CA76-H-189-S, 1977 WL 883 (N.D. Ala. Aug. 4, 1977)......................... 42

*East Line & Red River R.R. Co. v. Scott*,
    10 S.W. 99 (Tex. 1888)........................................................................... 29

*Ebbert v. DaimlerChrysler Corp.*,
    319 F.3d 103 (3d Cir. 2003)................................................................... 49

*EEOC v. Arabian Am. Oil Co.*,
    499 U.S. 244 (1991) ......................................................................... 31, 44

*EEOC v. FAPS, Inc.*,
    No. CIV.A. 10-3095 PGS, 2012 WL 1656738 (D.N.J. May 10, 2012) ... 32

*EEOC v. Freeman*,
    778 F.3d 463 (4th Cir. 2015) (Agee, J., concurring) ................................ 6

*EEOC v. Freeman*,
    961 F. Supp. 2d 783 (D. Md. 2013) ................................................... 6, 42

*EEOC v. JBS USA, LLC*,
    No. 8:10CV318, 2012 WL 169981 (D. Neb. Jan. 19, 2012) ................... 32

*EEOC v. Peoplemark, Inc.*,
    732 F.3d 584 (6th Cir. 2013) ............................................................... 6–7

*EEOC v. United Parcel Serv., Inc.*,
    No. 90 C 3862, 1995 WL 715828 (N.D. Ill. Dec. 4, 1995) ..................... 32

*El v. Se. Pa. Transp. Auth. (SEPTA)*,
    479 F.3d 232 (3d Cir. 2007).............................................................. 37, 39

*Espinoza v. Farah Mfg. Co.*,
    414 U.S. 86 (1973) ................................................................................. 43

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ................................................................... 44, 48, 49

*Ferguson v. Wilcox*,
   28 S.W.2d 526 (Tex. 1930) ...................................................................... 9

*G.A. Kelly Plow Co. v. London*,
   125 S.W. 974 (Tex. Civ. App. 1910, no writ) ......................................... 28

*Garcia v. San Antonio Metropolitan Transit Authority*,
   469 U.S. 528 (1985) .................................................................................. 45

*General Elec. Co. v. Gilbert*,
   429 U.S. 125 (1976) .................................................................... 31, 32, 44

*Georator Corp. v. EEOC*,
   592 F.2d 765 (4th Cir. 1979) ................................................................... 31

*Goldfarb v. Va. State Bar*,
   421 U.S. 773 (1975) .................................................................................. 25

*Green v. Board of Elections*,
   380 F.2d 445 (2d Cir. 1967), *cert. denied*, 389 U.S. 1048, 88 S. Ct. 768,
   19 L.Ed.2d 840 (1968) ............................................................................... 7

*Green v. Missouri Pacific Railroad Co.*,
   523 F.2d 1290 (8th Cir. 1975) .................................................... 38, 41–42

*Greene v. Thalhimer's Dep't Store*,
   93 F.R.D. 657 (E.D. Va. 1982) ................................................................ 32

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991) ............................................................................ 45–46

*Griggs v. Duke Power Co.*,
   401 U.S. 424 (1971) ....................................................................... *Passim*

*Griswold v. President of United States*,
   82 F.2d 922 (5th Cir. 1936) ...................................................................... 8

*Hartford Cas. Ins. Co. v. Walker Cty. Agency, Inc.*,
   808 S.W.2d 681 (Tex. App.—Corpus Christi 1991, no writ) ................. 26

*Hawker v. People of N.Y.*,
   170 U.S. 189 (1898) .................................................................................. 25

*HBO v. Harrison*,
   983 S.W.2d 31 (Tex. App.—Houston [14th Dist.] 1998, no pet.) ........... 27

*Hester v. S. Ry. Co.*,
   497 F.2d 1374 (5th Cir. 1974) ............................................................ 42

*Hung Ping Wang v. Hoffman*,
   694 F.2d 1146 (9th Cir. 1982) ............................................................ 39

*Jackson v. Richards Med. Co.*,
   961 F.2d 575 (6th Cir. 1992) ............................................................. 32

*Johnson v. Brewer & Pritchard, P.C.*,
   73 S.W.3d 193 (Tex. 2002) ................................................................ 26

*Johnson v. Pike Corp. of Am.*,
   332 F. Supp. 490 (C.D. Cal. 1971)................................................ 34–35

*Johnston v. Harris Cty. Flood Control Dist.*,
   869 F.2d 1565 (5th Cir. 1989) ........................................................... 32

*Jones v. City of Bos.*,
   752 F.3d 38 (1st Cir. 2014)................................................................ 39

*Kaup v. Texas Workforce Comm'n*,
   456 S.W.3d 289 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ........... 26

*King v. Burwell*,
   135 S. Ct. 2480 (2015) ........................................................... 44, 47–49

*Kitzman-Kelley v. Warner*,
   203 F.3d 454 (7th Cir. 2000) ............................................................ 17

*Klapac v. McCormick*,
   640 F.2d 1361 (D.C. Cir. 1981)......................................................... 39

*Knowles v. Horn*,
   CIV.A. 3:08-cv-1492, 2010 WL 517591 (N.D. Tex. Feb. 10, 2010) ......... 8

*Kremer v. Chem. Const. Corp.*,
   456 U.S. 461 (1982) ........................................................................ 43

*Ledbetter v. Goodyear Tire & Rubber Co.*,
   550 U.S. 618 (2007) ........................................................................ 43

*Liverpool, N.Y. & P.S.S. Co. v. Emigration Comm'rs*,
   113 U.S. 33 (1885) .......................................................................... 32

*Lunsford v. Bd. of Nurse Examiners*,
   648 S.W.2d 391 (Tex. App.—Austin 1983, no writ) ............................. 10

*Maryland v. King,*
    133 S. Ct. 1 (2012) ........................................................ 16

*McBride v. Delta Air Lines, Inc.,*
    551 F.2d 113 (6th Cir.), *vacated*, 434 U.S. 916 (1977) ........................ 39

*Morgan v. Texas Alcoholic Beverage Comm'n,*
    519 S.W.2d 250 (Tex. Civ. App.—Texarkana 1975, no writ) ................... 9

*Morris v. Rumsfeld,*
    420 F.3d 287 (3d Cir. 2005) ............................................... 32

*Murray v. Texas Workforce Comm'n,*
    337 S.W.3d 522 (Tex. App.—Dallas 2011, no pet.) ........................... 30

*Nat'l Fed'n of Indep. Bus. v. Perez,*
    No. 5:16-CV-00066-C, 2016 WL 3766121 (N.D. Tex. June 27, 2016)
    (Cummings, J.) ........................................................... 16

*Nat'l League of Cities v. Usery,*
    426 U.S. 833 (1976) ...................................................... 45

*Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.,*
    235 S.W.3d 695 (Tex. 2007) .............................................. 26

*Nat'l R.R. Passenger Corp. v. Morgan,*
    536 U.S. 101 (2002) ...................................................... 43

*Nevada, Texas et al. v. U.S. Dep't of Labor,*
    218 F. Supp. 3d 520 (E.D. Tex. 2016) ..................................... 16

*New Motor Vehicle Bd. v. Orrin W. Fox Co.,*
    434 U.S. 1345 (1977) (Rehnquist, J., in chambers) ......................... 16

*Otis Eng'g Corp. v. Clark,*
    668 S.W.2d 307 (Tex. 1983) .............................................. 26

*Patterson v. Am. Tobacco Co.,*
    535 F.2d 257 (4th Cir. 1976) ............................................. 42

*Payne v. Travenol Labs., Inc.,*
    565 F.2d 895 (5th Cir. 1978) ............................................. 39

*Payne v. Travenol Labs., Inc.,*
    673 F.2d 798 (5th Cir. 1982) ............................................. 42

*Pennhurst State Sch. & Hosp. v. Halderman,*
   451 U.S. 1 (1981) ................................................................ 46

*Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott,*
   734 F.3d 406 (5th Cir. 2013) .............................................. 16

*Red Lion Broad. Co. v. FCC,*
   395 U.S. 367 (1969) ............................................................ 43

*Ricci v. DeStefano,*
   557 U.S. 557 (2009) ................................................... 5, 14–15

*Rosenblatt v. Baer,*
   383 U.S. 75 (1966) .............................................................. 27

*Rutherford v. Exxon Co., U.S.A.,*
   855 F.2d 1141 (5th Cir. 1998) ............................................ 10

*Sabine Pilot Serv., Inc. v. Hauck,*
   687 S.W.2d 733 (Tex. 1985) ............................................... 29

*Schware v. Bd. of Bar Examiners,*
   353 U.S. 232 (1957) .............................................................. 3

*Scott v. Harris,*
   550 U.S. 372 (2007) ............................................................ 13

*Shepherd v. Trevino,*
   575 F.2d 1110 (5th Cir. 1978) ........................................... 7, 9

*Smith v. Christley,*
   684 S.W.2d 158 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) ........... 14

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs,*
   531 U.S. 159 (2001) ............................................................ 45

*Tennessee v. FCC,*
   832 F.3d 597 (6th Cir. 2016) ............................................. 46

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.,*
   135 S. Ct. 2507 (2015) ............................................... 5, 14–15

*Texas v. EEOC,*
   827 F.3d 372 (5th Cir. 2016) (*EEOC I*), *reh'g en banc granted, opinion withdrawn,* 838 F.3d 511 (5th Cir. 2016) (*EEOC II*) ................. 12, 24, 39

*Texas v. United States*,
201 F. Supp. 3d 810 (N.D. Tex. 2016), *order clarified,* No. 7:16-CV-
00054-O, 2016 WL 7852331 (N.D. Tex. Oct. 18, 2016) ........................................ 16

*Texas v. United States*,
95 F. Supp. 3d 965 (N.D. Tex. 2015) ..................................................................... 16

*Thigpen v. Locke*,
363 S.W.2d 247 (Tex. 1962) .................................................................................... 10

*Thomas v. Collins*,
323 U.S. 516 (1945) (Jackson, J., concurring) ....................................................... 25

*Thomson v. Norton*,
604 S.W.2d 473 (Tex. Civ. App.—Dallas 1980, no writ) ....................................... 10

*In re Trade-Mark Cases*,
100 U.S. 82 (1879) ................................................................................................... 32

*Trafficante v. Metro. Life Ins. Co.*,
409 U.S. 205 (1972) ................................................................................................... 7

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
136 S. Ct. 1807 (2016) ............................................................................................. 12

*United States v. Arce*,
997 F.2d 1123 (5th Cir. 1993) .................................................................................. 9

*United States v. Brown*,
941 F.2d 1300 (5th Cir. 1991) ................................................................................ 24

*United States v. Brown*,
7 F.3d 1155 (5th Cir. 1993) ..................................................................................... 27

*United States v. Buck*,
324 F.3d 786 (5th Cir. 2003) ................................................................................... 24

*United States v. City of Chi.*,
549 F.2d 415 (7th Cir. 1977) ................................................................................... 39

*United States v. Dial*,
542 F.3d 1059 (5th Cir. 2008) ................................................................................. 24

*United States v. Ehrlich*,
902 F.2d 327 (5th Cir. 1990) ............................................................................ 24–25

*United States v. Foster,*
 9 F.R.D. 367 (S.D.N.Y. 1949) ................................................................ 9

*United States v. Harrington,*
 114 F.3d 517 (5th Cir. 1997) ............................................................... 24

*United States v. Hawkins,*
 378 F. App'x 402 (5th Cir. 2010) ........................................................ 25

*United States v. Miller,*
 607 F.3d 144 (5th Cir. 2010) ............................................................... 25

*United States v. Powers,*
 168 F.3d 741 (5th Cir. 1999) ............................................................... 24

*United States v. Reeves,*
 255 F.3d 208 (5th Cir. 2001) ............................................................... 25

*United States v. St. Louis-San Francisco Ry. Co.,*
 464 F.2d 301 (8th Cir. 1972) ............................................................... 38

*United States v. Sudeen,*
 434 F.3d 384 (5th Cir. 2005) ............................................................... 24

*Util. Air Regulatory Grp. v. EPA,*
 134 S. Ct. 2427 (2014) ........................................................................ 49

*Waldon v. Cincinnati Pub. Sch.,*
 89 F. Supp. 3d 944 (S.D. Ohio 2015) ................................................. 36

*Wards Cove Packing Co. v. Atonio,*
 490 U.S. 642 (1989) ............................................................................ 40

*Watson v. Maryland,*
 218 U.S. 173 (1910) ............................................................................ 25

*Zelman v. Simmons-Harris,*
 536 U.S. 639 (2002) (Souter, J., dissenting) ..................................... 15

## Constitutional Provisions

Tex. Const. art. VI, § 1 cmt. ......................................................................... 49–50

## Statutes

5 U.S.C. § 702 ............................................................................................ 12

42 U.S.C. § 2000e-5 ........................................................................... 7, 31, 32

28 U.S.C. §§ 2201, 2202 ........................................................................... 12

42 U.S.C. § 2000e–12(a) ...................................................................... 31, 44

42 U.S.C. § 2000e-2(k)(1)(A)(i) ........................................................... 34, 41

Tex. Agric. Code § 125.013(b) ........................................................... 30–31

Tex. Alco. Bev. Code § 11.46 ................................................................... 10

Tex. Bus. Orgs. Code § 9.151 ................................................................... 10

Tex. Civ. Prac. & Rem. Code § 122.001(a) .............................................. 30

Tex. Crim. Proc. Code § 2.12 ................................................................... 16

Tex. Educ. Code § 22.085(a) ............................................................... 16–17

Tex. Elec. Code § 11.002(a)(4)(A) ............................................................. 9

Tex. Elec. Code § 13.031 ........................................................... 10, 16, 23

Tex. Elec. Code § 141.001(a)(4) ................................................................. 9

Tex. Estates Code § 304.003 ................................................................ 8, 14

Tex. Gov't Code § 62.102(8) ....................................................................... 9

Tex. Gov't Code § 82.062 ..................................................................... 9–10

Tex. Gov't Code § 406.004 ......................................................................... 11

Tex. Gov't Code § 411.172 ......................................................................... 25

Tex. Gov't Code § 411.186 ......................................................................... 25

Tex. Gov't Code § 411.187 ......................................................................... 25

Tex. Gov't Code § 411.201 ......................................................................... 25

Tex. Gov't Code § 554.002(a) ............................................................. 30–31

Tex. Health & Safety Code § 250.001 ........................................................ 16

Tex. Health & Safety Code § 250.006 ........................................ 16, 19, 22

Tex. Health & Safety Code § 502.017(c) ........................................ 30–31

Tex. Health & Safety Code § 533.007 ................................................ 16, 20

Tex. Labor Code §§ 21.055, 411.082 .............................................. 30–31

Tex. Labor Code § 201.012 ........................................................................ 30

Tex. Labor Code § 207.044 ........................................................................ 30

Tex. Labor Code § 301.001 ........................................................................ 30

Tex. Loc. Gov't Code §§ 171.002–.004 ................................................ 27

Tex. Occ. Code § 115.005 .............................................................. 10, 16

Tex. Occ. Code § 801.402 .............................................................. 9–10

Tex. Occ. Code §§ 1701.001(3)–(4) ...................................................... 16

Tex. Occ. Code § 1701.312(a) .................................................................. 16

Tex. Parks & Wild. Code § 11.019 ........................................................ 16

Tex. Transp. Code § 521.022 .................................................................. 11

Tex. Transp. Code § 521.307 .................................................................. 25

Tex. Transp. Code § 521.342 .................................................................. 25

Tex. Transp. Code § 521.348 .................................................................. 25

Tex. Transp. Code § 521.3466 ................................................................ 25

Tex. Transp. Code § 681.0101 .......................................................... 10–11

## Regulations

29 C.F.R. § 1601.24 .................................................................................. 31

22 Tex. Admin. Code § 3.149 .......................................................... 9–10

22 Tex. Admin. Code § 571.5 .................................................................... 9–10

31 Tex. Admin. Code § 55.802(1).................................................................. 16

40 Tex. Admin. Code § 3.201 ...................................................................... 16, 20

**Rules**

Fed. R. Civ. P. 56(c) ..................................................................................... 13

**Other Authorities**

51 Am. Jur. 2d § 17...................................................................................... 24

Austin ISD, *Board Policy Manual, Employment Practices*, *available at*
    http://pol.tasb.org/Policy/download/1146?filename=
    DC(REGULATION).pdf ........................................................................ 17

*Compliance Manual Section 15: Race & Color Discrimination*, U.S. Equal
    Emp't Opportunity Comm'n, § 15-VI.B.2 (April 19, 2006)................................... 33

Clyde Wayne Crews, Jr., *Mapping Washington's Lawlessness 2016: A*
    *Preliminary Inventory of "Regulatory Dark Matter,"* p. 3 (Competitive
    Enterprise Institute 2015) ................................................................. 3–4

*Developments in the Law--Public Employment, II. The Civil Service and*
    *Statutory Law of Public Employment*, 97 Harv. L. Rev. 1619, 1620
    (1984) ................................................................................... 27–28

EEOC, *EEOC Publications*,
    https://www.eeoc.gov/eeoc/publications/index.cfm ....................................... 32

EEOC, *Facts About Age Discrimination*,
    https://www.eeoc.gov/eeoc/publications/age.cfm .......................................... 32

EEOC, *Performance and Accountability Report* 20 (2011), https://
    www.eeoc.gov/eeoc/plan/upload/2011par.pdf................................................ 7

EEOC, *Policy Guidance on the Considerations of Arrest Records in*
    *Employment Decisions Under Title VII*, U.S. Equal Emp't Opportunity
    Comm'n (Sept. 7, 1990)................................................................... 33

EEOC, *Policy Statement on Mandatory Binding Arbitration of Employment Discrimination Disputes as a Condition of Employment*, https://www.eeoc.gov/policy/docs/mandarb.html ................................. 33

EEOC, *Policy Statement on the Issue of Conviction Records Under Title VII of the Civil Rights Act of 1964* (Feb. 4, 1987) ......................................... 33

*EEOC Policy Statement on the Use of Statistics in Charges Involving the Exclusion of Individuals with Conviction Records from Employment*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N (July 29, 1987) .................................... 33

EEOC, *Questions and Answers for Small Employers on Employer Liability for Harassment by Supervisors*, https://www.eeoc.gov/policy/docs/harassment-facts.html ..................................... 33

H.B. 3016, 85th Leg. (Tex. 2017), *available at* http:// www.capitol.state.tx.us/BillLookup/History.aspx?LegSess=85R&Bill= HB3016 ............................................................................................... 11

H.R. Rep. 92-238 (June 2, 1971), 1972 U.S.C.C.A.N. 2137 ........................................ 46

John F. Manning, *Clear Statement Rules and the Constitution*, 110 COLUM. L. REV. 399 (2010) ................................................................................ 46

L. TRIBE, AMERICAN CONSTITUTIONAL LAW § 6-25 (2d ed. 1988) ................................ 45

Michael J. Phillips, *Toward A Middle Way in the Polarized Debate over Employment at Will*, 30 Am. Bus. L.J. 441, 452–53 (1992) .................................. 29

Paul J. Zak, *Organizational Culture, The Neuroscience of Trust* 84–90 ............. 28, 29

Pinkerton, Agent Job Listing, https://www.pinkerton.com/career/agent-part-time-dallas-tx/ .......................................................................... 25

Rachel Gillett, *The largest employers in each US state*, HOUS. CHRON., June 11, 2017, http:// www.chron.com/ .......................................................... 24

Restatement (Third) of Agency § 1.01 (2006) ............................................. 26

Restatement (Third) of Agency § 8.01 (2006) ............................................. 26

Richard A. Epstein, *In Defense of the Contract at Will*, 51 U. Chi. L. Rev. 947 (1984) ............................................................................... 29

Stephen P. Breyer, *Judicial Review of Questions of Law and Policy*, 38 ADMIN. L. REV. 363, 370 (1986) ............................................................. 48

TDCJ, *Reentry & Integration Div.*, https://www.tdcj.state.tx.us/divisions/ rid/index.html (last visited Aug. 17, 2017) ............................................. 8

TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, https:// www.dfps.state.tx.us/ (last visited Sept. 14, 2017) ............................... 19

TEXAS GENERAL LAND OFFICE, http://www.glo.texas.gov/ (last visited Sept. 14, 2017)........................................................................................... 22

TEXAS SECRETARY OF STATE, http://www.sos.state.tx.us/ (last visited Sept. 14, 2017)........................................................................................... 23

Texas State Law Library, *Restrictions on Convicted Felons in Texas*, https:// www.sll.texas.gov/library-resources/collections/restrictions-on- convicted-felons/ .................................................................... 8–9, 10, 25

Texas Workforce Comm'n, Fidelity Bonding, *available at* http:// www.twc.state.tx.us/jobseekers/fidelity-bonding (last visited Sept. 6, 2017)....................................................................................................... 8

U.S. Census Bureau, *State and Local Government Employment and Payroll Data: March 2015 Annual Survey of Public Employment & Payroll*, http:// factfinder.census.gov/ .................................................... 24

U.S. Census Bureau, *State Government Employment and Payroll Data: March 2015 more information 2015 Annual Survey of Public Employment & Payroll*, http://factfinder.census.gov/bkmk/table/1.0/en/ GEP/2015/00A2.................................................................................... 24

U.S. EQUAL EMP'T OPPORTUNITY COMM'N, EEOC Dec. No. 72-1497 (E.E.O.C. 1972) .................................................................................. 33

U.S. EQUAL EMP'T OPPORTUNITY COMM'N, EEOC Dec. No. 74-89 (E.E.O.C. 1974)........................................................................................... 33

U.S. EQUAL EMP'T OPPORTUNITY COMM'N, EEOC Dec. No. 78-3 (E.E.O.C. 1977)........................................................................................... 33

U.S. EQUAL EMP'T OPPORTUNITY COMM'N, EEOC Dec. No. 78-35 (E.E.O.C. 1978)........................................................................................... 33

Joel Myers, *Words on Wise Management: Trust—Cornerstone for High Performance Culture*, Ariz. Emp. L. Letter (July 2017), http:// www.fhsolutionsgroup.com/sites/default/files/Words%20on%20 Wise%20_July2017.pdf .......................................................................... 28

## INTRODUCTION

This case involves competing worldviews concerning felons. In Texas, a felony conviction has enduring, sometimes permanent consequences that can affect an individual's life in over 300 ways. At EEOC, felony convictions function more like a temporary speed bump in one's life. Which worldview is the best public policy is beyond the scope of this case, but the imposition of EEOC's worldview on Texas is the heart of it. This case asks whether EEOC has the right to invade Texas's longstanding, comprehensive legal scheme regarding the privileges of felons and make Texas law reflect the federal government's preferences. Because EEOC exceeded its authority in imposing its viewpoint upon Texas, summary judgment for Texas is appropriate.

Texas takes an individual's criminal history into consideration throughout its law, and in many circumstances beyond employment. For example, in Texas, unlike Maine, convicted felons are permanently excluded from jury service. And unlike Vermont, where felons may vote from prison, Texas does not permit felons to vote until they are fully discharged from the criminal justice system. Indeed, there are over 300 restrictions in Texas law where felony (or criminal) histories impact access to the privileges of everyday society.

The right of the Texas Legislature to enact comprehensive limitations on felons, including regarding employment, is well-settled. That changed in 2012 when EEOC promulgated the rule at the center of this dispute, which seeks to reform and "consolidate" thinking about how, where, when, and why employers, like Texas, may use criminal histories in employment decisions. The rule casts a cloud of impropriety over the Texas's enduring policy judgments about felons.

Because Congress created EEOC to focus only on employment, its views regarding felons are necessarily myopic. Nonetheless, the law demands that, in analyzing disparate impact claims, EEOC consider the employer's "business necessity" or,

in the case of Texas, the "public interest" and comprehensive scheme regarding those that disobey the law. This legal design reflects Texas's "public interest" (*i.e.*, "business necessity") regarding felons, and is the product of nearly 200 years of sovereignty, countless social and legislative debates, and hundreds of legal ways that criminal histories may impact the lives of felons. Thus, unlike a private business, the "business necessity" of a sovereign cannot be encapsulated in a mission statement or a quarterly report.

EEOC did not consider the "business necessity" of Texas, or any other sovereign, in issuing its rule. Instead, over the years, EEOC deliberately and systematically discarded the requirement for "business necessity" for its preferred standard of "individualized assessments." This means that EEOC does not acknowledge, or concern itself with, Texas's longstanding employment-at-will policy. Nor does EEOC consider the professional licensing (*i.e.*, employment) opportunities denied felons by Texas government. In short, the "business necessities" of Texas are lost in EEOC's nearsighted legal framework. And given that Texas law regarding felony convictions touches virtually every area, EEOC creating special rights for felons in certain regards, while the normal rules apply in other circumstances, leads to absurd results.

At bottom, EEOC's rule takes direct aim at Texas's categorical exclusions for felons, including employment exclusions. But it is neither the privilege nor purview of EEOC to micromanage Texas's hiring decisions, much less ignore Texas's extensive public policy (*i.e.*, "business necessity") regarding felons. Congress enacted Title VII decades ago to address an era of invidious discrimination; it does not exist to invade Texas's reasonable public policy and employment systems, which are updated constantly by the Texas Legislature so that Texas may address the demands and needs of the citizenry in the 21st century. A permanent injunction of EEOC's rule is the only antidote to Defendants' lawless attempt to exceed the bounds of its power.

2

STATEMENT OF FACTS

This case and controversy regards a dispute between an EEOC "Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964" ("Rule"), and Texas law.

### *The Rule*

EEOC adopted the Rule by a 4 to 1 vote on April 25, 2012. The Rule, purports to offer "enforcement guidance" for employers' use of arrest or conviction records. App. 1–55; Rule. The Rule directs employers to conform their hiring practices to EEOC's viewpoint; it directs individuals to file charges of discrimination for alleged violations of the Rule; and it directs EEOC staff to bring the full weight of the United States' enforcement authority to bear on those employers who disobey the Rule.

The Rule limits the prerogative of Texas to exclude felons[1] from employment positions, and purports to build, in part, on "existing guidance documents . . . issued over twenty years ago." App. 6; Rule 3. But these "guidance documents" are a proverbial house of cards, existing to implement a view of the law supported by neither the text of Title VII nor the Supreme Court's interpretation of that text.

Regrettably, EEOC is but one of myriad federal agencies that regularly, and systematically, abuse the exceptions to the rulemaking process through the use of "regulatory dark matter"—the thousands of "agency and presidential memoranda, guidance documents ('nonlegislative' or interpretive rules), notices, bulletins, directives, news releases, letters, and even blog posts [that] may enact policy while flouting the APA's public notice and comment requirements for legislative rules."[2] Like the

---

[1] This case is not about excluding individuals from employment based on an arrest. As the Supreme Court recognizes, arrest alone may not be dispositive of whether a person has actually committed a crime. *Schware v. Bd. of Bar Examiners*, 353 U.S. 232, 241 (1957) ("[t]he mere fact that a [person] has been arrested has very little, if any, probative value in showing that he has engaged in misconduct").

[2] Clyde Wayne Crews, Jr., *Mapping Washington's Lawlessness 2016: A Preliminary Inventory of "Regulatory Dark Matter,"* p. 3 (Competitive Enterprise Institute 2015) (citation omitted), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2733378.

"dark matter and dark energy [that] make up most of the universe," regulatory dark matter "is hard to detect, much less measure."[3] While "guidance" and "interpretation" documents are not designed to carry legal weight, the "Enforcement Guidance" here evidences an agency rule, framed and foisted by EEOC upon Texas[4] and every other employer.[5] The illegality here is doubly offensive, since EEOC does not have substantive rulemaking authority. *See infra* Part III.A. Thus, EEOC is not merely skirting notice-and-comment, but making law that it is not entitled to make.

In addition to taking direct aim at Texas's categorical exclusions on hiring felons, the Rule undercuts Texas's discretion in hiring and fulfilling a larger, statewide policy objective regarding the significance of felony convictions. It does this by directing (1) Texas to conform its hiring practices to EEOC's Rule, (2) job-rejected felons to file charges of discrimination, and (3) EEOC staff to bring the weight of the United States' enforcement authority to bear on employers, like Texas, that follow the public policy agenda of the Texas Legislature instead of the Rule. App. 6; Rule 3.

The Rule reflects EEOC's substantive, erroneous interpretation of Title VII. In EEOC's view, hiring policies or practices that categorically exclude all convicted felons likely create a *per se*, unlawful disparate impact under Title VII. App. 5; Rule 2 ("the use of a screen that does not include individualized assessment is more likely to violate Title VII"). The Rule demands that employers always "provide[] an opportunity to [an] individual [rejected for employment because of a felony conviction] to demonstrate that the exclusion does not properly apply to him," App. 21; Rule 18, and concludes that categorical exclusions, like the many enacted by Texas, are "[n]ot [j]ob [r]elated and [c]onsistent with [b]usiness [n]ecessity," App. 22; Rule 19.

---

[3] *Id.*

[4] EEOC is clear that "All entities covered by Title VII are subject to this analysis." App. 30; Rule 27 n.2. This includes "federal, state, and local governments." App. 6; Rule 3.

[5] "In one survey, a total of 92% of responding employers stated that they subjected all or some of their job candidates to criminal background checks." App. 9; Rule 6.

Nowhere within Title VII are "individualized assessment[s]" required, or categorical exclusions prohibited. Nonetheless, in EEOC's estimation, the Rule reflects a so-called "well-established" practice of finding unlawful employment practices where employers categorically refuse to hire felons. App. 6; Rule 3. Therefore, according to EEOC, if Texas refuses to hire, or even consider, a convicted felon it is Texas's burden to prove that the felony disqualification is "job related for the position in question and consistent with business necessity." App. 12; Rule 9. The Rule warns that EEOC will investigate and challenge employers who use felony convictions as "an absolute bar to employment." App. 42; Rule 11 n.90. And it further cautions that "[a]n employer's evidence of a racially balanced workforce will not be enough to disprove disparate impact." App. 13; Rule 10. Thus, in an employment-at-will jurisdiction, like Texas, where non-felons may be rejected for employment for nearly any reason, felons now have special rights and should not be rejected for any position absent Texas performing a laborious process to justify each individual rejection.

But the efficacy of rejecting, or not, felons for given jobs has already been vetted in the most comprehensive democratic fora available in Texas—the Legislature. It is the reasoned, debated, and documented decision of Texas, by her elected representatives, to categorically exclude felons from certain job opportunities, as well as many other social privileges, as essential to the "business necessity" and "public interest" of Texas. *See Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2518 (2015) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009)) ("a business justification—or, in the case of a governmental entity, an analogous public interest"). Thus, it is hardly a trifling concern that the Rule instructs Texas to ignore its own laws to the extent those state and local laws conflict with EEOC's Rule. *See* App. 27; Rule 24 ("States and local jurisdictions also have laws and/or regulations that restrict or prohibit the employment of individuals with records of certain criminal conduct. . . . Unlike federal laws or regulations, however,

state and local laws or regulations are preempted by Title VII.”).

But the threat of the Rule to Texas doesn't end with its legal pronouncement that Texas's policies prohibiting the hiring of felons (*i.e.*, "no-felon" policies) are unlawful. The Rule, labeled an "Enforcement Guidance," directs EEOC personnel to enforce its findings in the field. *See* App. 27; Rule 24 ("EEOC investigates [the no-felon hiring policy required by state law], finding disparate impact based on race and also that the exclusionary policy is not job related and consistent with business necessity."). The Rule binds "EEOC staff" by requiring them to investigate and declare as unlawful employment practices that do not give individualized consideration to job applicants with felony convictions. App. 6; Rule 3.[6] And as with any enforceable rule, "from beginning to end . . .[, it] reads like a ukase. It commands, it requires, it orders, it dictates." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000).

EEOC zealously enforces the Rule, having a profound impact on employers. EEOC investigates employers who, in their estimation, are insufficiently solicitous of convicted felons, *see, e.g.*, Second Am. Compl., ¶¶ 16–22, ECF No. 62, and its targets are subject to abusive litigation tactics. As stated by one judge,

> [t]he story of the present action has been that of a theory in search of facts to support it. But there are simply no facts here to support a theory of disparate impact resulting from any identified, specific practice of the Defendant. . . . By bringing actions of this nature, the EEOC has placed many employers in the "Hobson's choice" of ignoring criminal history and credit background, thus exposing themselves to potential liability for criminal and fraudulent acts committed by employees, on the one hand, or incurring the wrath of the EEOC for having utilized information deemed fundamental by most employers.

*EEOC v. Freeman*, 961 F. Supp. 2d 783, 803 (D. Md. 2013).[7]

---

[6] *See, e.g.*, App. 11; Rule 8 ("EEOC would find reasonable cause to believe that discrimination occurred."); App. 15; Rule 12 ("EEOC would find reasonable cause to believe that his employer violated Title VII."); App. 20; Rule 17 ("EEOC concludes that there is reasonable cause to believe that the [employer's] policy" violates the Rule.); App. 23; Rule 20 ("EEOC finds reasonable cause to believe that Title VII was violated."); App. 24; Rule 21 ("EEOC finds that the policy is" unlawful.).

[7] *See also EEOC v. Freeman*, 778 F.3d 463, 468 (4th Cir. 2015) ("I write separately to address my concern with the EEOC's disappointing litigation conduct. The Commission's work of serving 'the public interest' is jeopardized by the kind of missteps that occurred here." (Agee, J., concurring)); *EEOC v. Peoplemark, Inc.*, 732 F.3d 584, 592 (6th Cir. 2013) (affirming sanctions award against EEOC for its

After an investigation, EEOC may refer cases to Defendant Sessions, who decides whether to bring an enforcement action. 42 U.S.C. § 2000e-5(f)(1).[8] Alternatively, suits by "private attorneys general," *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972), can be authorized by the Justice Department. Any EEOC challenge can do lasting and unwarranted damage to Texas's reputation as an equal-opportunity employer, undermining its efforts to recruit and retain the best employees, regardless of their race.

### Texas Law Regarding Felons

Texas has long maintained a thorough and reasoned approach to the allowances of felons in civil society, and for good reason. Because felony convictions are so severe, the consequences are oftentimes permanent. Beyond the enduring impact on the families and friends of those involved in the illegality, and the harm done to the victim[s], abiding legal consequences follow the felon. The Fifth Circuit recognized Texas's public interest in a case challenging Texas's restriction on felon voting,

> [Texas] properly has an interest in excluding from the franchise persons who have manifested a fundamental antipathy to the criminal laws of the state or of the nation by violating those laws sufficiently important to be classed as felonies. As Judge Friendly noted in *Green v. Board of Elections*, 380 F.2d 445 (2d Cir. 1967), *cert. denied*, 389 U.S. 1048, 88 S. Ct. 768, 19 L.Ed.2d 840 (1968), such persons have breached the social contract.

*Shepherd v. Trevino*, 575 F.2d 1110, 1115 (5th Cir. 1978). Thus, absent extraordinary circumstances, felony convictions are oftentimes an enduring societal millstone. Even if pardoned, "the Governor cannot overrule the judgment of a court of law." *Dixon v. McMullen*, 527 F. Supp. 711, 718 (N.D. Tex. 1981) (Belew, J.). "[A] final conviction does not disappear. A pardon implies guilt. Texas Courts may forgive, but they do not

---

abusive, groundless, and frivolous enforcement of the Rule).

[8] Indeed, EEOC publicly adopted a strategy of prosecuting high-profile cases against major employers to attract attention from the media. EEOC, *Performance and Accountability Report* 20 (2011), https://www.eeoc.gov/eeoc/plan/upload/2011par.pdf ("[T]he quantity of systemic lawsuits and their representation on the total docket is expected to continue to steadily increase.").

forget. The fact is not obliterated and there is no 'wash.'" *Id.* (citations omitted).[9]

To their credit, many that suffer the permanent stain of a felony conviction turn their life around after years of hardship and perseverance. Indeed, Texas is committed to assisting willing offenders in this quest. As noted by EEOC, Texas "embraced initiatives and programs that encourage the employment of ex-offenders." App. 32–33; Rule 29–30 n.16. Among other things, the Texas Workforce Commission ("TWC") provides free fidelity bonding services to employers concerned about hiring at-risk job applicants.[10] Additionally, the Reentry and Integration Division of Texas's Department of Criminal Justice ("TDCJ") provides "employment readiness training and employment services."[11] These agencies, however, obey and are loyal to the larger objectives of Texas regarding felons. Some limitations imposed by Texas law are permanent, as the trust that felons lose with family, friends, and society is oftentimes never re-earned. In many instances, the demands of society cannot tolerate the blind extension of faith to those that violated the public trust in a felonious fashion.

In Texas, the permanent legal consequences of a felony conviction are wide-ranging, covering nearly every aspect of law and Texas society.[12] From education to falconry, herbicides to kickboxing, and midwivery to pawn shops, one would be hard-pressed to find an area of civil society in Texas where a criminal past isn't relevant.[13]

---

[9] Some Texas laws expressly restore certain allowances in the wake of a pardon, *see, e.g.*, Tex. Estates Code § 304.003, but that is the exception, not the rule.

[10] *See* TWC, *Fidelity Bonding*, http://www.twc.state.tx.us/jobseekers/fidelity-bonding (last visited Sept. 6, 2017).

[11] *See* TDCJ, *Reentry & Integration Div.*, https://www.tdcj.state.tx.us/divisions/rid/index.html (last visited Aug. 17, 2017).

[12] The public interest of Texas is reflected in "the right of the legislature to enact reasonable laws having a reasonable relation to that end." *Griswold v. President of United States*, 82 F.2d 922, 924 (5th Cir. 1936). "In the public interest the state may make and enforce regulations reasonably calculated to promote care on the part of all." *Brooks v. Nat'l Bank of Topeka*, 251 F.2d 37, 41 (6th Cir. 1958). *See also Knowles v. Horn*, CIV.A. 3:08-cv-1492, 2010 WL 517591, at *8 (N.D. Tex. Feb. 10, 2010) (discussing "the public interest as conceived by the Texas Legislature").

[13] For the convenience of felons, and others, the Texas State Law Library has endeavored to compile into a navigable website the more than 300 places in Texas law where a criminal history limits privileges and opportunities. *See* Texas State Law Library, *Restrictions on Convicted Felons in Texas*,

Unlike invidious discrimination, these constraints serve a larger societal good and protect the public as a whole. As one Texas court aptly described matters, "[a]s long as the Legislature does not pass a statute which is inherently or patently discriminatory on its face, it may provide for the exercise of the State's police power as it deems best in the regulation and protection of the welfare, health, peace, temperance and safety of the people of the State." *Morgan v. Texas Alcoholic Beverage Comm'n*, 519 S.W.2d 250, 253 (Tex. Civ. App.—Texarkana 1975, no writ).

For example, in Texas, felons may not:

- Hold public office, Tex. Elec. Code § 141.001(a)(4);
- Hold positions of honor, trust, or profit. *Ferguson v. Wilcox*, 28 S.W.2d 526, 531 (Tex. 1930);[14]
- Vote until their sentence is "fully discharged" and they are formally re-infranchised, Tex. Elec. Code § 11.002(a)(4)(A);[15] or
- Serve as a juror (ever), Tex. Gov't Code § 62.102(8).[16]

But these principles extend well beyond holding public office, voting, and administering justice from the jury box. Indeed, trust is at the core of myriad societal standards and permissions we extend to our fellow man. Accordingly, questions of trust and integrity inexorably bind together the legal restrictions on felons enacted by the Texas Legislature (and agencies authorized to promulgate such rules). For example, professional licenses are generally not extended to felons.[17] Nor can felons

---

https:// www.sll.texas.gov/library-resources/collections/restrictions-on-convicted-felons/.

[14] Beyond being avenues of employment, public offices are "essentially a trust or agency for the benefit of the public. The supreme qualification is unselfish fidelity to duty." *Dickson v. Strickland*, 265 S.W. 1012, 1023 (Tex. 1924).

[15] This serves Texas's interest in limiting franchise to "responsible voters." *Shepherd*, 575 F.2d at 1115.

[16] "The petit jury has occupied a central position in our system of justice." *Batson v. Kentucky*, 476 U.S. 79, 86 (1986). In as much as participating in the administration of justice is considered a right, it is much more. As jurors are regularly charged, "[y]ou now approach the performance of one of the most sacred duties of citizenship, the meting out of justice." *United States v. Foster*, 9 F.R.D. 367, 373 (S.D.N.Y. 1949). Indeed, Texas is just in safeguarding this sacred duty from those that have demonstrated, by their actions, an absence of fidelity to the law. "The government has a legitimate interest in protecting the probity of juries. Excluding convicted felons from jury service is rationally related to achieving that purpose." *United States v. Arce*, 997 F.2d 1123, 1127 (5th Cir. 1993).

[17] From the licensing of attorneys, Tex. Gov't Code § 82.062, to veterinarians, Tex. Occ. Code § 801.402;

9

volunteer for certain public services, like assisting the election process,[18] or providing medical help in the case of a disaster.[19] Permits regarding the sale or distribution of alcohol are largely unavailable to felons, *see, e.g.*, Tex. Alco. Bev. Code § 11.46, and if a foreign business or its officers commit felonious conduct, its right to do business in Texas may be withdrawn, Tex. Bus. Orgs. Code § 9.151. Examples are virtually endless. Yet every restriction has a common thread—the reasoned judgment of the Texas Legislature[20] as deemed part of Texas's "business necessity" and "public interest."

Trust and integrity are also hallmarks of successful business relationships, including the employer-employee relationship, as "[b]usinessmen generally do trust one another." *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962).[21] Therefore, the Texas Legislature, and agencies, regularly consider the risks associated with hiring felons in certain positions, in certain agencies, in certain environments, and the like.

Like any number of circumstances presented to a decision maker, the amount of risk that can or should be tolerated is always a significant query. Regarding many employment opportunities, the Texas Legislature adopts a functional "no risk" policy—making them permanently off-limits to felons. For example, Texas law permits municipalities to appoint private citizens to enforce certain parking restrictions. Tex.

---

22 TAC § 571.5, to landscape architects, 22 TAC § 3.149, licensed employment is generally not available to felons in Texas. *See* comprehensive list of Texas license restrictions at https://www.sll.texas.gov/library-resources/collections/restrictions-on-convicted-felons/?tag=426. A license, like a job, is a "privilege," not a right, and one that receives a license "enter[s] into a covenant to serve the people of this State with all [their] professional skills and powers." *Lunsford v. Bd. of Nurse Examiners*, 648 S.W.2d 391, 395 (Tex. App.—Austin 1983, no writ).

[18] Tex. Elec. Code § 13.031; App. 190 (Att. 19, Volunteer Deputy Registrar Guide).

[19] Tex. Occ. Code § 115.005 ("Volunteer Health Practitioner").

[20] Some restrictions are the products of Texas agencies, acting with proper rulemaking authority, and publishing regulations in the Texas Administrative Code.

[21] *See also Rutherford v. Exxon Co., U.S.A.*, 855 F.2d 1141, 1146 (5th Cir. 1998) ("Women, men and companies in positions of the parties in this case do business based on the understanding that those involved in the relationship may be trusted, in the colloquial sense of the term.") (citations omitted); *Thomson v. Norton*, 604 S.W.2d 473, 476 (Tex. Civ. App.—Dallas 1980, no writ) ("Most contracting parties have some degree of trust and confidence in each other, or they would not make a deal") (citing *Thigpen*, 363 S.W.2d at 253).

Transp. Code § 681.0101. And though these individuals are not considered "peace officers," the Texas Legislature determined that felons are nonetheless permanently excluded from performing this public service for their community. *Id*. In like manner, felons may never serve as a notary public. Tex. Gov't Code § 406.004.

Of course, not all employment positions are permanently off-limits to felons. Indeed, as of September 1, 2017, Texas law permits certain criminals to seek orders of nondisclosure of certain criminal history record information.[22] And as the Texas Legislature continually weighs Texas's "business necessity," and the risk associated with certain circumstances, felons may be eligible for any number of jobs in Texas. *See, e.g.*, Tex. Transp. Code § 521.022 (school bus drivers).

Thus, from top to bottom, in both employment and non-employment contexts, Texas considers the impact of a felony conviction in nearly every aspect of its civil law. These laws all work together, forming a framework that defines, in part, the freedom and security of the Texas citizenry.

## PROCEDURAL HISTORY

On November 1, 2013, Texas learned that it was accused of unlawful discrimination under Title VII for applying a categorical ban on hiring felons. App. 89–90 (Att. 4, Notice of Charge of Discrimination). Specifically, a felon applied to be a "Customer Service Representative" for the Texas Department of Public Safety ("DPS"). *Id*. The felon alleged that he "met the qualifications for the position," but alleged unlawful discrimination because "of my race (Black), sex (male), and felony conviction." *Id*. EEOC ordered Texas to respond to the charge by December 2, 2013. *Id*.

Texas wasted no time. Three days later, while preparing its response to EEOC,[23] Texas brought this suit for declaratory and injunctive relief against EEOC

---

[22] *See* H.B. 3016, 85th Leg., (Tex. 2017), *available at* http://www.capitol.state.tx.us/BillLookup/History.aspx?LegSess=85R&Bill=HB3016.

[23] App. 92–117 (Att. 4).

11

and the Rule, as well as the United States Attorney General, who is granted authority to enforce Title VII against Texas. The lawsuit was brought under the Administrative Procedure Act, 5 U.S.C. § 702, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. Texas contends that it lawfully exercised sovereign power to impose categorical bans on hiring felons, and that discretionarily rejecting felons for certain jobs, as dictated by the needs of Texas, is likewise lawful. Texas avers that the Rule is invalid on its face.

EEOC moved to dismiss Texas's suit on the grounds that the Rule does not constitute final agency action, that Texas lacks standing, and that Texas's claims are unripe. ECF Nos. 15, 16. The Court granted EEOC's motion, ECF No. 36, and dismissed the case without prejudice for lack of subject-matter jurisdiction, ECF No. 37. The Fifth Circuit reversed. *Texas v. EEOC*, 827 F.3d 372, 376 (5th Cir. 2016) (*EEOC I*), *reh'g en banc granted, opinion withdrawn*, 838 F.3d 511 (5th Cir. 2016) (*EEOC II*). The court found that the Rule constituted final agency action, that Texas has standing, and that Texas's claims are ripe. The Fifth Circuit, however, later withdrew its opinion in light of the Supreme Court's intervening opinion in *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S. Ct. 1807 (2016), and remanded the matter for reconsideration in light of *Hawkes*. *EEOC II*, 838 F.3d at 511.

Upon remand, the Court invited the parties to brief "the issues that *Hawkes* may implicate" in this case. ECF No. 43. EEOC renewed its motion to dismiss, and the parties submitted supplemental briefing. ECF Nos. 47–50. The Court denied EEOC's renewed motion to dismiss. ECF No. 52. Among other things, the Court concluded that "Texas can be considered an 'object' of the challenged Guidance" and that if Texas's allegations are taken as true, "the Guidance amounts to an increased regulatory burden on Texas as an employer." ECF No. 52 at 7–8. The parties now move for summary judgment, in accordance with the Court's order. ECF No. 59.

## LEGAL STANDARD

Summary judgment is proper because there are no disputes as to any material facts and Texas is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Texas law is clear—a broad and comprehensive tapestry on the privileges and opportunities of felons. EEOC's Rule takes direct aim at many provisions of Texas's law, declaring them *per se* unlawful. Only questions of law remain, to wit: whether Defendants' imposition of the Rule on Texas exceeds the lawful boundaries of federalism, the separation of powers, the Administrative Procedure Act, and statutory authority.

## ARGUMENT

## I. THE SIGNIFICANT, DEPTH, AND BREADTH OF TEXAS LAW REGARDING FELONS MAKES TEXAS A SIGNIFICANT OBJECT OF THE RULE.

This Court and the Fifth Circuit both concluded that Texas is an object of the Rule, but the extent to which Texas is an object goes well beyond Texas's interactions with government employees. From an employment standpoint, Texas does more than employ its own workers; it also maintains a critical licensing function regarding other employees and industries. *See infra* Part II.C.1. And both licensing and employment barriers are inextricably connected to Texas's larger legal scheme regarding felons.

Each limitation for felons is the considered, reasoned, debated, and enacted process of Texans' elected representatives. As the guardians and overseers of Texas law, the Texas Legislature comprehensively enacts, amends, and otherwise maintains Texas law with each legislative session. The over 300 instances of legal consequences for felons in Texas are the collective product of 85 different legislatures and Texas's policy aims—our "business necessity" or "public interest." Together, these laws reflect upon Texas not just as an employer, but as a sovereign.

Moreover, the inextricable connectivity of Texas's laws regarding felons is seen

13

in the absurd results that applying the Rule to Texas creates. For example, felons may not administer estates.[24] Yet, under EEOC's regime, that same felon is employable at a bank, in charge of other's money. App. 24; Rule 21. The policy concerns regarding estates apply with equal force to institutions that oversee and maintaining others' money and valuables.[25] Yet, the Rule creates special rights for the felon that turn the policy of Texas on its head. Therefore, assessing the Rule's impact on Texas must be done in context, acknowledging that every legal impact experienced by felons shares an inextricable bond, each informed and affected by the other.

EEOC, of course, concerns itself with only employment matters and not Texas's larger legal scheme regarding convicted felons. But EEOC's ignorance, willful or otherwise, still stands as a failure to consider what the law requires—Texas's "business necessity." Therefore, EEOC cannot piecemeal remove Texas's restrictions on felons without bringing down a significantly integrated system. EEOC removing from Texas's juridical blueprint the absolute bars on employment is tantamount to removing a critical piece from a structure's foundation—it will collapse.

## II. THE RULE'S INTERFERENCE WITH TEXAS'S EMPLOYMENT OF FELONS.

Title VII preserved the importance of considering an employer's "business necessity" or "public interest." This secures the freedom of employers to make the hiring choices that serve their best interests. In the words of the Supreme Court,

> disparate-impact liability must be limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system. And before rejecting a business justification—or, in the case of a governmental entity, an analogous public interest—a court must determine that a plaintiff has shown that there is "an available alternative . . . practice that has less disparate impact and serves [Texas's] legitimate needs."

---

[24] *See* Tex. Estates Code § 304.003.

[25] *See, e.g.*, *Smith v. Christley*, 684 S.W.2d 158, 160 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) ("The interests of the creditors of the estate, beneficiaries, and other third parties could be adversely affected if a person convicted of a felony were to serve as independent executor. The entire system of efficient settlement and distribution of decedents' estates could be jeopardized.").

*Texas Dep't of Hous. & Cmty. Affairs*, 135 S. Ct. at 2518 (quoting *Ricci*, 557 U.S. at 578). In other words, what Texas is trying to accomplish, as a State, is of importance. EEOC cannot just look at the trees, losing sight of the forest.[26] But EEOC's view of disparate impact liability turns Texas's public policy virtue into a vice: because when its agencies apply absolute and categorical exclusions to felons, they never make the sort of race-conscious "individualized assessments" that the Rule requires. App. 21–23; Rule 18–20.

Yet, notwithstanding the clear parameters of the law, EEOC propounded a Rule that purports to preempt Texas's sovereign power to enact and abide by longstanding, state-law hiring practices. In the shadow of the Rule, Texas either must violate state and local laws that prohibit the "individualized assessments" that EEOC requires—and consider convicted felons for hire as Troopers, jailers, and school teachers—or Texas must ignore the Rule and risk an enforcement action. Therefore, the Rule presents Texas the Hobson's Choice[27] of honoring Texas's categorical exclusions vs. EEOC's "individualized assessment[s]."

As it pertains to Texas, the problem with the Rule is twofold. First, it bans outright any and all categorical exclusions on hiring felons. App. 19–20; Rule 16–17. The Rule provides no quarter, safe harbor, or approval in any circumstance for any employer to maintain categorical exclusions on the hiring of felons. Second, the Rule demands an "individualized assessment" in every circumstance where an employer is not forbidden to hire a felon, but may nonetheless be reluctant to do so considering the interests or needs of the agency. Both of these requirements directly conflict with

---

[26] By example, "[i]f a real-estate appraiser took into account a neighborhood's schools," and thus looked beyond the property itself to the surrounding area and community, "one could not say the appraiser acted because of race." *Texas Dep't of Hous. & Cmty. Affairs*, 135 S. Ct. at 2521.

[27] "The criterion is one of genuinely free choice on the part of the private individuals who choose, and a Hobson's choice is not a choice, whatever the reason for being Hobsonian." *Zelman v. Simmons-Harris*, 536 U.S. 639, 707 (2002) (Souter, J., dissenting).

longstanding Texas law and, thus, injure Texas.[28]

## A.    Direct Interference With Texas Law.

The Rule takes direct aim at Texas law and many longstanding hiring policies that impose absolute bans on hiring convicted felons (or in some instances persons convicted of certain categories of felonies).[29] The impact of the Rule is also felt on the local level, especially regarding schools.[30] As such, the Rule demands that agencies

---

[28] "By forcing state officials . . . to choose between a federal rule or complying with State law, the Rule causes an irreparable injury." *Nat'l Fed'n of Indep. Bus. v. Perez*, No. 5:16-CV-00066-C, 2016 WL 3766121, at *44 (N.D. Tex. June 27, 2016) (Cummings, J.) (citations omitted). Sovereigns suffer injury when their duly enacted laws or policies are enjoined or impeded. *Texas v. United States*, 201 F. Supp. 3d 810, 834–35 (N.D. Tex. 2016), *order clarified,* No. 7:16-CV-00054-O, 2016 WL 7852331 (N.D. Tex. Oct. 18, 2016), and *appeal dismissed sub nom. Texas, et al. v. United States et al.* (Oct. 21, 2016) (citations omitted); *Nevada, Texas et al. v. U.S. Dep't of Labor*, 218 F. Supp. 3d 520, 532 (E.D. Tex. 2016) (finding harm to states where "compliance costs" were expended to comply with federal regulation). *See Maryland v. King*, 133 S. Ct. 1, 3 (2012) (citing *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("It also seems to me that any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.")); *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws"); *Texas v. United States*, 95 F. Supp. 3d 965, 981 (N.D. Tex. 2015) ("[W]henever an enactment of a state's people is enjoined, the state suffers irreparable injury."); *Coalition for Econ. Equity v. Wilson,* 122 F.3d 718, 719 (9th Cir. 1997).

[29] Under Texas law, "[a] person who has been convicted of a felony is disqualified to be an officer" for any law-enforcement agency anywhere in Texas. App. 126 (Att. 7, Tex. Occ. Code § 1701.312(a) ("A person who has been convicted of a felony is disqualified to be an officer, public security officer, telecommunicator, or county jailer, and the [Texas Commission on Law Enforcement] may not issue a license to, and a law enforcement agency may not appoint or employ, the person.")). What it means to be a "peace officer" in Texas is significantly broad, covering thirty-five statutorily-delineated definitions, including "investigators commissioned by the Texas Medical Board" and "investigators employed by the Texas Racing Commission." App. 167–69 (Att. 17, Tex. Crim. Proc. Code § 2.12). Moreover, Texas's approximately 500 game wardens employed by TPWD are "peace officers," and as such, they fall under the same absolute no-felons policy that applies to other law-enforcement officers throughout Texas. *See* App. 131 (Att. 9, 31 TAC § 55.802(1)); App. 129 (Att. 8, Tex. Parks & Wild. Code § 11.019); App. 126 (Att. 7, Tex. Occ. Code § 1701.312(a)); Tex. Occ. Code §§ 1701.001(3)–(4). Facilities that house the elderly and disabled, *see* Tex. Health & Safety Code § 250.001, are also prohibited from hiring certain felons, *see* App. 150–52 (Att. 14, Tex. Health & Safety Code § 250.006); App. 147–48 (Att. 13, 40 TAC § 3.201). Many of these longstanding policies also prohibit assigning felons any form of volunteer status. *See, e.g.,* App. 150–52 (Att. 14, Tex. Health & Safety Code § 250.006); App. 147–48 (Att. 13, 40 TAC § 3.201); App. 190 (Att. 19, Volunteer Deputy Registrar Guide); App. 248 (Att. 28, Tex. Health & Safety Code § 533.007); Tex. Elec. Code § 13.031; Tex. Occ. Code § 115.005.

[30] The Texas Legislature also imposed upon schools categorical hiring bans regarding certain felons. *See* App. 77 (Att. 2, Tex. Educ. Code § 22.085(a) ("A school district . . . shall discharge or refuse to hire an employee or applicant for employment if . . . (1) the employee or applicant has been convicted of: (A) a felony offense under Title 5, Penal Code ["Criminal Homicide"]; (B) an offense on conviction of which a defendant is required to register as a sex offender . . .; or (C) an offense under the laws of

16

contemplate the hiring of felons to serve in law enforcement, teach in local elementary schools, nurse veterans and the disabled, counsel juvenile detainees, and coach little league. This conflicts directly with what the Texas Legislature determined is Texas's "public interest," necessarily exposing Texas's most vulnerable citizens to individuals who disobeyed the law in a significant fashion. This exposure, necessarily, begets another—exposing Texas governmental entities to liability for employee misconduct.[31] This irony is significant, for if Title VII exists to protect vulnerable members of society, applying it in the fashion that EEOC demands exposes vulnerable Texans.

This impact on Texas is not theory. On November 1, 2013, EEOC sent a Notice of Charge of Discrimination to DPS for refusing to hire a felon. App. 89–90 (Att. 4, Notice of Charge of Discrimination); App. 61 (Decl. of Kathleen Murphy 2). The felon sought work as a "Customer Service Representative," a position that gives him access to a Texas database containing information for over 29 million Texans (including their names, addresses, dates of birth, social security numbers, and copies of their birth certificates). App. 92–93 (Att. 4, Letter of Dec. 2, 2013 to Julia Way, EEOC). In his job application, the felon disclosed that he was a convicted felon. *Id*. Consistent with Texas law, and its policy judgment that convicted felons should not have access

---

another state or federal law that is equivalent to an offense under Paragraph (A) or (B)" (footnotes omitted))). And though the Texas Legislature prohibits school districts from hiring anyone convicted of certain felonies, because local school districts throughout Texas commit that "[s]chool campuses will maintain a safe and disciplined environment conductive to student learning," *see, e.g.*, App. 75 (Att. 1, Harrold ISD, *Board Policy Manual, Basic District Foundations: Educational Philosophy*), school districts maintain their own exclusions on hiring convicted felons to teach or coach their students. *See, e.g.*, App. 80–87 (Att. 3, Harrold ISD, *Board Policy Manual, Personnel: Employment Requirements and Restrictions – Criminal History and Credit Reports*); Austin ISD, *Board Policy Manual, Employment Practices*, *available at* http://pol.tasb.org/Policy/download/1146?filename=DC(REGULATION).pdf.

[31] *See, e.g.*, *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989); *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1403 (5th Cir. 1996) ("Common sense recommends—and state law demands—that, in the interest of the safety of school children, school officials investigate the criminal histories of prospective school employees. The School Officials' total abdication of this responsibility constitutes a facially inadequate hiring process. . . . [T]he hiring inadequacies alleged here reveal a deliberate indifference to Doe's welfare."), *rev'd en banc*, 113 F.3d 1412 (5th Cir. 1997); *Kitzman-Kelley v. Warner*, 203 F.3d 454, 456 (7th Cir. 2000) (Illinois Department of Children and Family Services can be liable under 42 U.S.C. § 1983 where it "did nothing to investigate [an abusive caretaker's] background").

to sensitive information regarding every man, woman, and child in Texas, DPS categorically refused to consider the felon's application, rejecting it without using any of the "individualized" factors that the Rule commands. *Id.*; App. 61 (Decl. of Kathleen Murphy 2). After this litigation began, EEOC made a no probable cause finding and gave the felon a "right to sue" letter. App. 91 (Att. 4, Dismissal and Notice of Rights).

### B.    Interference With Texas's Hiring Practices and Discretion.

Beyond statutory requirements, many Texas agencies maintain employment barriers of their own, as dictated by their agency's "business necessity." A review of the policies of some Texas agencies reveal carefully-crafted policies that honor the public trust of governmental employment, *see infra* Parts II.C.3.–II.C.4., and permit each agency to achieve their mission for Texas—all without conducting "individualized assessments" on every hiring decision. To comply with the Rule, and provide "individualized assessments" in all instances, these agencies would have to rewrite their hiring policies at taxpayer expense. In the words of this Court, this exercise "amounts to an increased regulatory burden on Texas as an employer . . . ." ECF No. 52 at 7–8.

*Texas Department of Public Safety*

The Texas Department of Public Safety ("DPS") is a law enforcement agency that primarily combats crime and terrorism.[32] Even if not barred by statute, DPS refuses to hire anyone convicted of any felony or certain misdemeanors.[33] DPS's no-felons policy is materially identical to the across-the-board policy employed by the

---

[32] App. 60 (Decl. of Kathleen Murphy 1).

[33] App. 115–17 (Att. 4, DPS Policy § 15.10.03); App. 119 (Att. 5, DPS, *Employment/Career Opportunities* ("Through background investigations, including criminal history record checks, previous employment verifications, and personal references are conducted on ALL prospective employees. Felony convictions and certain misdemeanor convictions will be cause for immediate rejection.")); App. 123 (Att. 6, DPS, *Disqualifiers*); App. 62 (Decl. of Kathleen Murphy 3).

Federal Bureau of Investigation.[34] Notably, EEOC does not take issue with restrictions that exist in federal law. App. 23-26; Rule 20–23. Yet, DPS's identical restriction, for an identical "public interest," provokes the ire of EEOC.

<u>*Texas Department of Aging and Disability Services*</u><br>*- and -*<br><u>*Texas Department of Family and Protective Services*</u>

The Texas Department of Aging and Disability Services ("DADS") and Texas Department of Family and Protective Services ("DFPS") are both part of the Texas Health and Human Services Commission ("HHSC") system. DADS supports Texans who are aging or have physical, intellectual, or developmental disabilities.[35] Many have "profound intellectual disabilities" or "complex medical needs or serious behavioral issues."[36] In other words, DADS serves the most vulnerable in Texas. DFPS works with communities to protect children, the elderly, and people with disabilities from abuse, neglect, and exploitation. It also works to protect the health and safety of children in daycare, as well as foster care and other types of 24-hour care.[37]

Like DPS, even if not required by statute, DADS "applies absolute criminal bars to employment,"[38] adopting rules that apply many of "the same criminal bars to employment that the Texas Legislature enacted for many kinds of licensed health care providers in Texas Health and Safety Code Chapter 250."[39] Accordingly, "[t]he DADS Operational Handbook lists additional crimes that DADS has determined are

---

[34] App. 263 (Att. 30, FBI, *Employment Disqualifiers*); ECF No. 62 at 76.

[35] App. 57 (Decl. of Amy Tippie 2).

[36] App. 58 (Decl. of Amy Tippie 3).

[37] *See generally* TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, https://www.dfps.state.tx.us/ (last visited Sept. 14, 2017).

[38] App. 144–45 (Att. 12, DADS, *Bars to Employment*); App. 57–59 (Decl. of Amy Tippie 2–4).

[39] App. 199–205 (Att. 22, HHSC, *Criminal Background Check and Registry Clearance*); App. 208 (Att. 23, HHSC, *Criminal Background Check and Registry Clearance, Appendix A*); App. 214–15 (Att. 24, HHSC, *Bars to Employment, Appendix B*); App. 58 (Decl. of Amy Tippie 3); App. 150–52 (Att. 14, Tex. Health & Safety Code § 250.006).

contraindications to employment."[40] The policies for DFPS are the same.[41] And the Texas Department of State Health Services ("DSHS"), also part of the HHSC network, maintains discretion to refuse to hire felons.[42]

### *Texas Lottery Commission*

The Texas Lottery Commission ("TLC") administers Texas's lottery system. TLC maintains an absolute bar to employing felons if less than ten years has elapsed since the felon was fully discharged from their punishment.[43] TLC maintains this policy for good reason. "First and foremost among TLC's core values are integrity and responsibility."[44] Thus, "TLC works hard to maintain the public trust by protecting and ensuring the security of its lottery games, systems, drawings and operational facilities. TLC values and requires ethical behavior by its employees, licensees and vendors."[45] As such, applicants that fall within TLC's felony prohibition do not go through "individualized assessments." Rather, TLC excludes them from consideration, in accordance with the TLC Personnel Handbook.[46] TLC's felony hiring prohibitions are not only deeply linked to related statutory provisions, but central to its "mission and uphold its core values."[47]

### *Texas Juvenile Justice Department*

The Texas Juvenile Justice Department ("TJJD") administers correctional programs and institutions for juveniles throughout Texas. "The mission of TJJD is to

---

[40] App. 220–23 (Att. 25, DADS, *Operational Handbook, Criminal History Checks: Guidelines for Employment*); App. 58–59 (Decl. of Amy Tippie 3–4).

[41] App. 225–28 (Att. 26, DFPS, *Criminal Background Checks for DFPS Applicants and Employees*); App. 230–46 (Att. 27, DFPS, List of DFPS Criminal Offense Bars to Employment).

[42] App. 248 (Att. 28, Tex. Health & Safety Code § 533.007).

[43] App. 192 (Att. 20, TLC, *Enforcement Division: Procedure*); App. 72–73 (Decl. of Bob Biard 2–3).

[44] App. 72 (Decl. of Bob Biard 2).

[45] *Id.*

[46] App. 197 (Att. 21, TLC, *Personnel Handbook*); App. 73 (Decl. of Bob Biard 3).

[47] App. 72 (Decl. of Bob Biard 2).

transform young lives and create safer communities."[48] TJJD applies absolute bars to employment for any applicant convicted of or arrested for certain felonies, "[r]egardless of the nature of the position."[49] And it imposes even more sweeping absolute bars to employment for criminals who want to work in "correctional series positions," even those that are not "peace officers" under Texas law and not subject to certain statutory prohibitions.[50] TJJD views its prerogative to reject felons for employment as "critical to fulfilling TJJD's mission."[51] Considering the strategies employed by TJJD for the juveniles in their care, its hiring restrictions are consistent with "business necessity" and Texas's "public interest."

### *Texas Parks and Wildlife Department*

The Texas Parks and Wildlife Department ("TPWD") manages and conserves the natural and cultural resources of Texas.[52] It does so to provide "hunting, fishing and outdoor recreation opportunities for the use and enjoyment of present and future generations." To administer parks and wildlife programs, and secure the safety of park visitors, TPWD employs over 500 game wardens and 155 park police officers.[53]

Even if Texas law did not impose a no-felons policy for its game wardens and park police officers, *see supra* Part II.A., TPWD nonetheless imposes an absolute ban on hiring any game warden or park police officer who ever has been convicted of a felony or Class A misdemeanor.[54] TPWD also imposes absolute prohibitions on game-

---

[48] App. 67 (Decl. of Royce Myers 1).

[49] App. 68–69 (Decl. of Royce Myers 2–3); App. 136–42 (Att. 11, TJJD, *Personnel Policy and Procedure Manual, Conditions of Employment, Criminal History: Standards, Background Checks, and Self-Reporting Requirements, PRS.02.08*).

[50] *Id.*

[51] App. 69 (Decl. of Royce Myers 3).

[52] App. 63 (Decl. of Ann Bright 1).

[53] App. 64, 65 (Decl. of Ann Bright 2, 3).

[54] App. 133–34 (Att. 10, TPWD, *Requirements for Game Warden*).

21

warden applicants convicted of certain lesser offenses.[55] Moreover, for non-"peace of-
ficer" positions, TPWD maintains an internal policy through which it "has always
reserved the right to reject applicants for any position with TPWD on the basis that
they have been convicted of a felony" or other considerations.[56]

### *Texas General Land Office*

Established by the Republic of Texas immediately after the Texas Revolution
in 1836, the Land Commissioner manages Texas's public domain. Because the federal
government would not take Texas's land as debt payments, Texas entered the Union
owning its public land. Unlike other Gulf jurisdictions, Texas owns its submerged
lands – or tidelands – three marine leagues (about 10.3 miles) into the Gulf of Mexico.
Thus, the task of the Texas General Land Office (GLO) is significant.[57]

Central to fulfilling GLO's mission is overseeing various veterans' affairs
throughout Texas, including those who live in GLO-administered Texas Veterans
Homes. These Texas-supported living centers provide necessary support to Texas vet-
erans and, by their very nature, house many elderly, disabled, and otherwise vulner-
able individuals.[58] As such, the Texas Legislature guarantees that caretakers (em-
ployees and volunteers) have a demonstrated record of integrity by applying absolute
criminal bars to employment.[59] These restrictions are also a longstanding part of
GLO's internal policy.[60]

Moreover, "GLO conducts a criminal background check on all prospective new
hires, interns, and volunteers."[61] Felony convictions do not automatically disqualify

---

[55] *Id.*

[56] App. 158–64 (Att. 16, TPWD, *Criminal History Checks Policy*); App. 65 (Decl. of Ann Bright 3).

[57] *See generally* TEXAS GENERAL LAND OFFICE, http://www.glo.texas.gov/ (last visited Sept. 14, 2017).

[58] *Id.*

[59] App. 150–52 (Att. 14, Tex. Health & Safety Code § 250.006); App. 147–48 (Att. 13, 40 TAC § 3.201).

[60] App. 156 (Att. 15, Description of GLO's Agency Background Check Process).

[61] App. 250–57 (Att 29, Excerpts from GLO Employee Handbook).

an applicant from employment, as "GLO will determine, on a case-by-case basis, whether the individual is qualified for employment." However, GLO only represents that it "may" consider certain factors required by the Rule.[62] Thus, the discretion that GLO may exercise, in choosing to *not* consider factors from the Rule's three-prong test (*e.g.*, "The nature and gravity of the offense or offenses"), is invaded by the Rule.

### *Texas Secretary of State*

The Texas Secretary of State ("SOS") is Texas's Chief Election Officer, assisting county election officials and ensuring the uniform application and interpretation of election laws throughout Texas. The Elections Division of SOS deters and detects voter fraud, and preserving voter confidence in the integrity of elections is of the utmost importance. The Elections Division also administers and maintains the Texas Election Administration Management System, designed for county officials to maintain accurate and efficient voter registration rolls.[63]

SOS aims to provide a crime-free work environment and law-abiding workforce.[64] Due to the sensitive information contained within SOS databases, and to maintain the integrity of Texas elections, SOS does not hire employees who have been convicted of a felony or Class A misdemeanor.[65] Even election *volunteers* are disqualified from service if they have a felony conviction.[66] Based on the nature of the position sought, SOS also reserves the right to reject employment applicants who have been convicted of certain lesser offenses.[67]

---

[62] *Id.*

[63] *See generally* TEXAS SECRETARY OF STATE, http://www.sos.state.tx.us/ (last visited Sept. 14, 2017).

[64] App. 185–86 (Att. 18, SOS, *Policies and Procedures Manual, Section 5: Employment Recruitment and Selection*).

[65] *Id.*

[66] Tex. Elec. Code § 13.031; App. 190 (Att. 19, Volunteer Deputy Registrar Guide).

[67] App. 185–86 (Att. 18, SOS, *Policies and Procedures Manual, Section 5: Employment Recruitment and Selection*).

### C.      Texas's No-Felon Policies Are Lawful Employment Practices.

Texas state government employs the most workers in the State—over 300,000.[68] As stated by the Fifth Circuit,

> Texas employs hundreds of thousands of people across various state agencies. Many of these state agencies do not hire convicted felons, felons convicted of particular categories of felonies, or, in some cases, individuals convicted of particular misdemeanors. The sources of these bans stem from both Texas state statutes and longstanding employment policies adopted by the agencies. According to Texas, its agencies apply the hiring bars neutrally "to all job applicants, without regard to their races." Where these exclusions exist, however, Texas applies them categorically and does not undertake an individualized assessment into the nature of the prospective employee's conviction.

*Texas*, 827 F.3d at 376.

Combining both state and local units, Texas government employs more than 1.6 million.[69] But Texas impacts more jobs through licensing and regulation.

### 1.      Licenses Bestow Texas's Approval that the Public May Trust a Person Working in an Industry for which a Criminal Background May Betray that Trust.

Licensing is an important part of employment in Texas, and, accordingly, Texas generally prohibits felons from obtaining certain licenses. Licenses protect public health, safety and welfare, "extend[ing] the public trust only to those with proven qualifications" and "protect[ing] the public from incompetence and dishonesty in those who provide the licensed service." 51 Am. Jur. 2d § 17.[70]

---

[68] U.S. Census Bureau, *State Government Employment and Payroll Data: March 2015 more information 2015 Annual Survey of Public Employment & Payroll*, http://factfinder.census.gov/bkmk/table/1.0/en/GEP/2015/00A2. The largest private employer in Texas, Wal-Mart, employs approximately half the workers of Texas government. *See, e.g.*, Rachel Gillett, The largest employers in each US state, Hous. Chron., June 11, 2017, http:// www.chron.com/technology/businessinsider/article/The-largest-employers-in-each-US-state-11211863.php#photo-13070896.

[69] U.S. Census Bureau, *State and Local Government Employment and Payroll Data: March 2015 Annual Survey of Public Employment & Payroll*, http:// factfinder.census.gov/bkmk/table/1.0/en/GEP/2015/00A4.

[70] *See, e.g.*, *United States v. Harrington*, 114 F.3d 517, 519 (5th Cir. 1997) ("[A] lawyer occupies a position of public trust."); *United States v. Dial*, 542 F.3d 1059, 1060 (5th Cir. 2008) (insurance claims adjuster occupies a position of public trust). *United States v. Buck*, 324 F.3d 786, 794 (5th Cir. 2003) (chief executive officer of nonprofit organization abused "a position of trust with respect to the government"); *United States v. Sudeen*, 434 F.3d 384, 391–92 (5th Cir. 2005) (Ponzi scheme operator abused a position of trust); *United States v. Powers*, 168 F.3d 741, 751–52 (5th Cir. 1999) (a "gas marketer" for a private company abused a position of trust); *United States v. Brown*, 941 F.2d 1300, 1304–05 (5th

Texas possesses the authority and duty to regulate the practice of professions to "shield[ ] the public against the untrustworthy, the incompetent, or the irresponsible." *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring).[71] For example, "[i]f regularly convicted of a felony, an attorney will be struck off the roll as of course, whatever the felony may be, because he is rendered infamous." *Hawker v. People of N.Y.*, 170 U.S. 189, 199 (1898). Therefore, a felony conviction normally stands as a permanent barrier to certain realms of licensed employment.

The Texas State Law Library estimates that criminal convictions result in approximately 136 legal impacts upon licensing and licenses in Texas.[72] Nearly all of them regard the ability to pursue a particular, regulated occupation. And even licensing restrictions that do not directly relate to a discrete job, like driver's licenses, Tex. Transp. Code §§ 521.307, .342, .348, .3466, or even licenses to carry concealed weapons, Tex. Gov't Code §§ 411.172, .186, .187, .201, may dramatically impact a prospective employee's qualifications for any number of jobs. For example, an employee with a suspended driver's license cannot maintain employment involving driving, and the inability to maintain a concealed carry permit may impact an employee's eligibility.[73]

---

Cir. 1991) (a "correctional case manager" violated a position of public trust); *United States v. Ehrlich*, 902 F.2d 327, 330–31 (5th Cir. 1990) ("bank loan clerk" abused a position of public trust); *United States v. Hawkins*, 378 F. App'x 402, 403 (5th Cir. 2010) (owner of medical supply company abused position of trust); *United States v. Miller*, 607 F.3d 144, 148–50 (5th Cir. 2010) (a licensed durable medical equipment (DME) provider for Medicare and Medicaid abused position of trust); *United States v. Reeves*, 255 F.3d 208, 212 (5th Cir. 2001) (financial planner abused position of trust).

[71] *See also Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975) ("We recognize that the States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions."); *accord Watson v. Maryland*, 218 U.S. 173, 176 (1910).

[72] Texas State Law Library, Restrictions on Convicted Felons in Texas, "Licenses," https://www.sll.texas.gov/library-resources/collections/restrictions-on-convicted-felons/?tag=426.

[73] For example, to be an Agent for Pinkerton, a risk management company in Dallas, Texas, the ability to maintain a concealed carry permit is necessary. *See* Agent job listing at https://www.pinkerton.com/career/agent-part-time-dallas-tx/. Moreover, a simple "concealed carry" search at popular online job sites, like LinkedIn.com or Indeed.com, reveals myriad employers that require certain employees to possess the ability to carry a concealed weapon.

     2.    **Employment in Texas Is Colored By the Duty of Loyalty and Fiduciary Obligations for which a Criminal Background Poses an Obstacle.**

In Texas, employers have a duty to control their employees, and prior criminal convictions may taint that ability. *See Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983). This is because employees are agents of the employer—their principal. *See Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 2007) (discussing "an agency relationship such as employer-employee").

Within the law of agency is the duty of loyalty. Loyalty is, indeed, a legitimate concern for an employer. *See Kaup v. Texas Workforce Comm'n*, 456 S.W.3d 289, 297 (Tex. App.—Houston [1st Dist.] 2014, no pet.). Moreover, "[i]nherent in any agency relationship is the fiduciary duty owed by the agent to his principal." *Hartford Cas. Ins. Co. v. Walker Cty. Agency, Inc.*, 808 S.W.2d 681, 687 (Tex. App.—Corpus Christi 1991, no writ) (citations omitted).[74] "[T]he agent owes his principal loyalty and good faith, integrity of the strictest kind, fair, honest dealing, and the duty not to conceal matters which might influence his actions to his principal's prejudice." *Hartford*, 808 S.W.2d at 687 (citation omitted).[75] This rule applies whether the employment relationship is contractual or at-will. *See, e.g.*, *Bray v. Squires*, 702 S.W.2d 266 (Tex. App.—Houston [1st Dist.] 1985, no writ). To be sure, the duty of loyalty that an employee owes their employer is not "absolute" in all regards in Texas. *See Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 201 (Tex. 2002) (discussing parameters of an employee's duty of loyalty). Nonetheless, it exists and forms an important component of the employer-employee relationship in Texas.

---

[74] *See also* Restatement (Third) of Agency § 1.01 (2006).

[75] *See also* Restatement (Third) of Agency § 8.01 (2006).

### 3.    The Public Trust of Government Employment Requires Strict Application of No-Felon Hiring in Some Positions.

In Texas, government employees hold a public trust as they are paid by, and expend, taxpayer monies. *See, e.g.*, *Colo. Cty. v. Staff*, 510 S.W.3d 435, 453 (Tex. 2017) (discussing whether public employers can "investigat[e] and discipline[e] errant employees charged with safekeeping the public trust" in the context of peace officers and fire fighters). Thus, "[i]t is the general rule that municipal contracts in which officers or employees of the city have a personal pecuniary interest are void." *City of Edinburg v. Ellis*, 59 S.W.2d 99 (Tex. Comm'n App. 1933, opinion approved).[76]

Moreover, many governmental employees in Texas, though not *per se* public officials, are nonetheless treated as such under the law. Public official status applies to government workers "who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs" and those holding positions of "such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees." *HBO v. Harrison*, 983 S.W.2d 31, 36 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 85–86 (1966)). Thus, even "employment inside the prison as a food service manager" is a position of "public trust." *United States v. Brown*, 7 F.3d 1155, 1161 (5th Cir. 1993).[77] And in an employment-at-will jurisdiction, like Texas, the "pursuit of efficiency in the provision of public services requires that the executive have unfettered freedom to dislodge the untrustworthy or incompetent civil servant." Developments in the Law—Public Employment, *II. The Civil Service and the Statutory Law of Public Employment*, 97 Harv. L. Rev. 1619, 1620

---

[76] *See also Delta Elec. Const. Co. v. City of San Antonio*, 437 S.W.2d 602, 609 (Tex. Civ. App.—San Antonio 1969, writ ref'd n.r.e.) ("It has long been the public policy of this state to prohibit officers of a city from having a personal pecuniary interest in contracts with the city and this policy is specifically expressed in both the penal and civil statutes."); Tex. Loc. Gov't Code §§ 171.002–.004.

[77] Thus, contrary to EEOC's suggestion, not all food service jobs present a viable path for felons. App 48; Rule 45 n.125.

(1984) (citing Congress's first debate, remarks of Representative James Madison of Virginia ("The danger to liberty, the danger of mal-administration, has not yet been found to lie so much in the facility of introducing improper persons into office, as in the difficulty of displacing those who are unworthy of the public trust.")). And inextricably intertwined with this public trust doctrine are not just those that receive a governmental paycheck, but those that are licensed by the government. *See supra* Part II.C.

Positions of public trust are ubiquitous, occupied by both government and non-government employees. But these laws and principles demand that government be an ambassador of trust to the public. While businesses may possess a desire or need to trust those that they hire and with whom they do business, the law *demands* that Texas government, and its agents, *always* be trustworthy. Thus, whether the government is performing its gatekeeping function regarding licensing, collecting child support payments from delinquent parents, or merely repaving a road, the government, and her agents/employees, hold special positions of public trust as they serve the public and spend the precious resources of taxpayers.

### 4.    Trust Is the Cornerstone of Texas Employment.

Trust is the cornerstone of a successful workplace.[78] Thus, "guaranteeing the fidelity of employees, and persons holding a position of trust, is a form of insurance." *Am. Indem. Co. v. W.C. Munn Co.*, 278 S.W. 956, 957 (Tex. Civ. App.—Galveston 1925, writ ref'd).[79] "The payoff of building a high-trust organization can be substantial,"[80]

---

[78] *Cf. G.A. Kelly Plow Co. v. London*, 125 S.W. 974, 979 (Tex. Civ. App. 1910, no writ) ("Every one who seeks and obtains employment in positions of trust and confidence impliedly warrants that he is an honest man, and the employer has the right to expect the possession of that personal integrity that will not lead to disappointment if he relies implicitly upon the honor and fidelity of his employé.").

[79] *See also Clampitt v. Kingsville Lumber Co.*, 57 S.W.2d 326, 327 (Tex. Civ. App.—San Antonio 1933, writ ref'd) (discussing "a clear case of trust and confidence abused and a wrong perpetrated against the *trusting employer*." (emphasis added)).

[80] Joel Myers, *Words on Wise Management: Trust—Cornerstone for High Performance Culture*, Ariz. Emp. L. Letter (July 2017), http://www.fhsolutionsgroup.com/sites/default/files/Words%20on%20 Wise%20_July2017.pdf (citing Paul J. Zak, *Organizational Culture, The Neuroscience of Trust* 84–90,

and "building a culture of trust is what makes a meaningful difference."[81] These principles undoubtedly apply in Texas, and in Texas government employment. As seen through Texas's employment-at-will doctrine, the mission of the Texas Workforce Commission, and certain statutory elements, Texas has not only a right, but a duty to trust at a high level those hired to serve the citizenry.

### a.    Employment-at-will.

Texas's employment-at-will doctrine[82] showcases the inextricable connection of trust and fidelity to employment. Employment continues so long as it is mutually beneficial and each party trusts the other to honor the terms of the agreement.[83] Because trust and freedom comprise the cornerstone of employment in Texas, the Texas Supreme Court recognizes only one exception to the at-will employment doctrine— that employers may not terminate employees for refusing to perform illegal acts. *Sabine Pilot Serv., Inc. v. Hauck*, 687 S.W.2d 733, 735 (Tex. 1985).

Texas has been an employment-at-will jurisdiction since 1888. *East Line & Red River R.R. Co. v. Scott*, 10 S.W. 99, 102 (Tex. 1888). Maintaining an employment-at-will policy, with limited legislative exceptions, is an important part of Texas's ideology. As it is entitled to do, Texas pursues economic freedom for its citizens, and her public servants maintain employment-at-will as a necessary end to that freedom.[84] Whether Texas's chosen path of policy achieves its stated ends, of course, is of no consequence to this litigation. The importance, however, lies in Texas's chosen path and the Rule's invasion of that path.

---

Harv. Bus. Rev. (Jan.–Feb. 2017), https://hbr.org/2017/01/the-neuroscience-of-trust).

[81] Zak, *supra* note 80 at 84.

[82] The Supreme Court defines the doctrine as "the right of the employee to quit the service of the employer, for whatever reason, is the same as the right of the employer, for whatever reason, to dispense with the services of such employee." *Adair v. United States*, 208 U.S. 161, 174–75 (1908).

[83] Employment-at-will is defended as carrying equal benefit to both employers and employees. *See, e.g.*, Richard A. Epstein, *In Defense of the Contract at Will*, 51 U. Chi. L. Rev. 947 (1984).

[84] *See, e.g.*, Michael J. Phillips, *Toward A Middle Way in the Polarized Debate over Employment at Will*, 30 Am. Bus. L.J. 441, 452–53 (1992) (discussing policy rationale of employment-at-will doctrine).

### b.    Texas Workforce Commission ("TWC")

TWC was created by the Texas Legislature to "establish[ and] operate an integrated workforce development system in this state." Tex. Labor Code § 301.001. Among other things, TWC "shall meet the needs of: (1) the businesses of this state for the development of a *highly skilled and productive* workforce; . . . and (5) the taxpayers of this state to ensure that tax revenues for workforce development are spent *efficiently and effectively*." *Id*. (emphasis added).

TWC also administers Texas's unemployment compensation program, which incorporates the trust systemic in employment into whether workers qualify for benefits. In Texas's unemployment system, though a worker may otherwise qualify for benefits, they are "disqualified for benefits if the individual was discharged for misconduct connected with the individual's last work." Tex. Labor Code § 207.044. Among other things, "misconduct" includes an "intentional violation of a law, or violation of a policy or rule adopted to ensure the orderly work and the safety of employees." Tex. Labor Code § 201.012. Good cause for termination may not necessarily disqualify one from unemployment benefits.[85] However, in Texas, the smallest display of untrustworthiness can constitute "misconduct" and deprive a worker of unemployment benefits.[86] Indeed, the violation of any rule or policy that exists to provide orderly work or safety within the workplace may constitute "misconduct."[87]

### c.    Other Trust-Oriented Provisions of Texas Law.

The Texas Legislature also safeguards law-abiding employees. Employees that are not felons, and thus eligible to serve on juries, cannot be discharged for missing work for jury duty. Tex. Civ. Prac. & Rem. Code § 122.001(a). Moreover, the Texas

---

[85] *See Collingsworth Gen. Hosp. v. Hunnicutt*, 988 S.W.2d 706, 709 (Tex. 1998).

[86] *See, e.g., Anderson v. Texas Workforce Comm'n*, No. 05-02-01595-CV, 2003 WL 21350082, at *2 (Tex. App.—Dallas June 5, 2003, pet. denied) (mem. op.) (mere insubordination is "misconduct").

[87] *Murray v. Texas Workforce Comm'n*, 337 S.W.3d 522, 525 (Tex. App.—Dallas 2011, no pet.). Even the violation of a mere attendance policy may suffice. *Id*.

Legislature carved out protections for public and private employee whistleblowers.[88]

Texas's employment-at-will policy, as well as Texas's protections for employees that demonstrate fidelity to the law, form just a part of a larger legal scheme about the types of workers that Texas wants in government. This stands in stark contrast to the Rule, which selectively looks through both wide and narrow lenses, as the circumstances fit EEOC's agenda. While EEOC looks to "national data" regarding criminal convictions to support its Rule, it pays no mind to the larger policy objectives ("business necessity") of Texas and other States.

## III.    THE UNLAWFULNESS OF THE EEOC RULE.

The Rule is unlawful for myriad reasons, not the least of which is EEOC's non-existent rulemaking authority. EEOC misconstrues Title VII and controlling precedent, building the rickety foundation upon which the Rule resides. EEOC is owed no deference because Congress did not delegate to EEOC authority to invade Texas's public policy on such a significant political and economic issue.

### A.    EEOC Lacks Rulemaking Authority.

That a Rule from EEOC even exists indicates unlawful action because EEOC possesses no rulemaking authority. EEOC may enact only "suitable *procedural* regulations," 42 U.S.C. § 2000e–12(a) (emphasis added); it may not enact substantive rules, *see EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 257 (1991); *General Elec. Co. v. Gilbert*, 429 U.S. 125, 141 (1976).

EEOC's initial function is conciliatory—acting as a proverbial mediator. EEOC issues Reasonable Cause Determinations ("RCDs") and performs investigations,[89] but these processes have no substantive impact on a particular employment situation.[90]

---

[88] *See* Tex. Agric. Code § 125.013(b), Tex. Health & Safety Code § 502.017(c); Tex. Labor Code §§ 21.055, 411.082; Tex. Gov't Code § 554.002(a).

[89] *See* 42 U.S.C. § 2000e-5(b) (EEOC "endeavor[s] to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion"); 29 C.F.R. § 1601.24.

[90] *See, e.g.*, *Andela v. Admin. Office of U.S. Courts*, 569 F. App'x 80, 83 (3d Cir. 2014) (citing *Georator Corp. v. EEOC*, 592 F.2d 765, 768–69 (4th Cir. 1979)).

If and when "informal methods" fail, an adjudicatory process begins.[91]

The Supreme Court recognizes that, like courts, EEOC works to develop "coherent polic[ies] . . . *through the pursuit of its normal adjudicatory functions*." *Gilbert*, 429 U.S. at 156–57 (emphasis added). In other words, EEOC is to produce policy and substantive statements *only* through actual cases and controversies. EEOC should not issue advisory opinions.[92] To develop policies in the absence of an actual case or controversy is to issue an improper advisory opinion, as well as expressly circumvent Congress's choice to not give EEOC substantive rulemaking authority.[93]

Notwithstanding the statutory prohibition on rulemaking authority, EEOC began promulgating policy through "regulatory dark matter." *See supra* Stmt. of Facts. EEOC issues fact sheets,[94] policy statements,[95] abstract Q&A documents,[96] and many other "dark matter" documents.[97] The Rule at issue here, though labeled an "Enforcement Guidance," is nothing more than an advisory opinion. Within the Rule are

---

[91] *See* 42 U.S.C. § 2000e—5(f)(1); *Artis v. Bernanke*, 630 F.3d 1031, 1033 (D.C. Cir. 2011) (recognizing the "adjudicatory functions" of EEOC); *Morris v. Rumsfeld*, 420 F.3d 287, 290 (3d Cir. 2005) (acknowledging EEOC's "adjudicatory process"); *Jackson v. Richards Med. Co.*, 961 F.2d 575, 586 (6th Cir. 1992) (discussing EEOC's adjudicatory function). *See also Johnston v. Harris Cty. Flood Control Dist.*, 869 F.2d 1565, 1578 (5th Cir. 1989) (recognizing testimony before the EEOC as "before an official government adjudicatory or fact-finding body").

[92] Advisory opinions are improper for tribunals because "it is manifestly the dictate of wisdom and judicial propriety to decide no more than is necessary to the case in hand," *In re Trade-Mark Cases*, 100 U.S. 82, 96 (1879). Thus, EEOC is wise to recognize two maxims of the rule against advisory opinions: "one, never to anticipate a question . . . in advance of the necessity of deciding it; the other, never to formulate a rule . . . broader than is required by the precise facts to which it is to be applied. These rules are safe guides to sound judgment. It is the dictate of wisdom to follow them closely and carefully." *Liverpool, N.Y. & P.S.S. Co. v. Emigration Comm'rs*, 113 U.S. 33, 39 (1885).

[93] Interestingly, EEOC at times refuses to release information that it believes may reflect an improper advisory opinion. *See, e.g.*, *EEOC v. JBS USA, LLC*, No. 8:10CV318, 2012 WL 169981, at *5 (D. Neb. Jan. 19, 2012); *EEOC v. FAPS, Inc.*, No. CIV.A. 10-3095 PGS, 2012 WL 1656738, at *9 (D.N.J. May 10, 2012); *Greene v. Thalimer's Dep't Store*, 93 F.R.D. 657, 659 (E.D. Va. 1982). Though when an advisory opinion suits its ends, EEOC issues (as is the case here) or seeks advisory opinions. *EEOC v. United Parcel Serv., Inc.*, No. 90 C 3862, 1995 WL 715828, at *4 (N.D. Ill. Dec. 4, 1995).

[94] *See, e.g.*, EEOC, *Facts About Age Discrimination*, https://www.eeoc.gov/eeoc/publications/age.cfm.

[95] *See, e.g.*, EEOC, *Policy Statement on Mandatory Binding Arbitration of Employment Discrimination Disputes as a Condition of Employment*, https://www.eeoc.gov/policy/docs/mandarb.html.

[96] *See, e.g.*, EEOC, *Questions and Answers for Small Employers on Employer Liability for Harassment by Supervisors*, https://www.eeoc.gov/policy/docs/harassment-facts.html.

[97] *See, e.g.*, EEOC, *EEOC Publications*, https://www.eeoc.gov/eeoc/publications/index.cfm.

twelve enumerated advisory opinions, based on particular fact patterns and EEOC's predetermined view of how the law applies to those facts. Some of the fact patterns hypothetically offered by EEOC implicate Texas as an employer. Most notably, the relevant fact patterns within the Rule fail to address the larger "business necessity" of a sovereign, like Texas, demonstrating why EEOC is to promulgate "coherent polic[ies] . . . through the pursuit of its normal adjudicatory functions," *Gilbert*, 429 U.S. at 156–57, and not by engaging in rulemaking and issuing advisory opinions.

## B.   The Foundations of the Rule Are Based on EEOC's Misconstruction of the Law.

EEOC proclaims that the Rule "builds on longstanding court decisions and policy documents that were issued over twenty years ago." App. 6; Rule 3. Thus, EEOC "has decided to update and consolidate in this document all of its prior policy statements about Title VII and the use of criminal records in employment decisions." *Id*.

In footnote 15, EEOC identifies those "court decisions" (actually, EEOC's own decisions), as well as the "prior policy statements" upon which EEOC relies for the Rule. App. 32; Rule 29 n.15. EEOC identifies only eight decisions/documents.[98]

A simple review of these eight documents, however, quickly reveals problems. Not only do they form an inadequate basis for the Rule, not one of them addresses the case presented here—where EEOC is targeting felony exclusions that are part of a larger, comprehensive statewide legal scheme that goes well beyond employment.

---

[98] App. 265–66 (U.S. EQUAL EMP'T OPPORTUNITY COMM'N, EEOC Dec. No. 72-1497 (E.E.O.C. 1972)); App. 268–75 (U.S. EQUAL EMP'T OPPORTUNITY COMM'N, EEOC Dec. No. 74-89 (E.E.O.C. 1974)); App. 277–79 (U.S. EQUAL EMP'T OPPORTUNITY COMM'N, EEOC Dec. No. 78-3 (E.E.O.C. 1977)); App. 281–84 (U.S. EQUAL EMP'T OPPORTUNITY COMM'N, EEOC Dec. No. 78-35 (E.E.O.C. 1978)); App. 286–87 (*Policy Statement on the Issue of Conviction Records Under Title VII of the Civil Rights Act of 1964*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N (Feb. 4, 1987)); App. 289–90 (*EEOC Policy Statement on the Use of Statistics in Charges Involving the Exclusion of Individuals with Conviction Records from Employment*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N (July 29, 1987)); App. 292–98 (*Policy Guidance on the Consideration of Arrest Records in Employment Decisions Under Title VII*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N (Sept. 7, 1990)); App. 300–56 (*Compliance Manual Section 15: Race & Color Discrimination*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, § 15-VI.B.2 (April 19, 2006)).

### 1.    EEOC's Misconstruction of the Law.

EEOC's misunderstanding of the law began long ago with the very decisions and publications it now seeks to consolidate into the Rule. In looking at disparate impact liability, "[t]he touchstone is business necessity." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). In the words of Congress, disparate impact liability does not exist if "the challenged practice is job related for the position in question and *consistent with business necessity*." 42 U.S.C. § 2000e-2(k)(1)(A)(i) (emphasis added).

Over the years, however, EEOC gradually jettisoned from any disparate impact analysis the "business necessity" element of the test. As part of an EEOC-concocted three-part test, EEOC focuses on the "nature of the job held or sought" with little, if any, consideration for the "business necessity" of the employer. Rather, EEOC purports to evaluate an employer's "business necessity" through what it calls an "individualized assessment," App. 21–23; Rule 18–20, giving short shrift to employment policies that do not provide for individualized considerations. In other words, EEOC makes no room in its Rule for employers that possess a no-risk hiring policy—an approach that *per se* excludes the "business necessity" needs (and legal protections) of countless businesses and employers where minimizing risk is essential to success.

Looking chronologically at the eight items enumerated by EEOC as the basis for the Rule, *supra*, plus EEOC's excessive reliance upon a case of little consequence—*Green*—the legal error committed by EEOC is easily seen. Over the years, EEOC built, decision-by-decision, and publication-by-publication, a card house of law that now, through the Rule, EEOC is using to undermine the Texas Legislature's decisions regarding the privileges of felons as is necessary to Texas's "business necessity."

### *EEOC Dec. No. 72-1497 (1972)*

In its first of eight cited publications, App. 265–66, EEOC adopted an erroneous decision by the Central District of California that "[t]he ability of the individual

effectively and efficiently to carry out his assigned duties is, therefore, the *only* justi-fication recognized by the law" for non-employment. App. 266 (quoting *Johnson v. Pike Corp. of Am.*, 332 F. Supp. 490, 496 (C.D. Cal. 1971) (emphasis added)). To date, EEOC is the *only* tribunal to quote *Pike*, and for good reason—that narrow standard is not the law. For if it was, felony restrictions may hardly ever be applicable under Title VII.[99] In its decision, EEOC noted the lack of "job-relatedness of the conviction" at issue, but never sought to assess the needs or concerns of the business at issue. *Id.*

### *EEOC Dec. No. 74-89 (1974)*

In 1974, EEOC addressed a matter where a felony conviction was considered an adverse factor that would lead to disqualification. App. 268–75. However, EEOC analyzed only "the individual's capability to perform the job effectively," and whether the individual's criminal disability "related to job performance or to measuring job capability." App. 269. Thus, again, EEOC failed to analyze the employer's larger busi-ness structure or needs, and looked only at the qualifications of the particular job at issue. Moreover, EEOC compounded its error from 1972, concluding that,

> [w]here, however, a disparate impact is found the sole permissible rea-son for discriminating against actual or prospective employees involves the individual's capability to perform the job effectively, that is, the prac-tice must be one which can be shown to be related to job performance or to measuring job capability.

*Id.*

In support of this proposition, EEOC cites *Griggs v. Duke Power*. But *Griggs* neither supports EEOC's interpretation, nor what EEOC would soon come to label its "individualized assessment" standard. In *Griggs*, the Supreme Court analyzed a com-pany's use of a "general intelligence test" that was shown to not have "a demonstrable

---

[99] The absurdity of the legal standard adopted by the court in *Pike*, and subsequently by EEOC is self-evident. Indeed, many "jailhouse lawyers" can certainly "effectively and efficiently . . . carry out his assigned duties" as an attorney, so a felony conviction should not stand between him and becoming a member of the bar? Alternatively, any number of bank robbers can certainly "effectively and efficiently . . . carry out his assigned duties" as a bank teller, so a felony conviction shouldn't prevent a bank from hiring one that formerly robbed it as a teller, or perhaps even as a security guard?

relationship" to job performance. 401 U.S. at 431. Without supporting evidence, the company in *Griggs* concluded that the test would "generally would improve the over-all quality of the work force." *Id.* But *Griggs* did not, as EEOC concludes, mandate "individualized assessments" for all companies and all jobs. The Supreme Court only concluded that Title VII required employment barriers to possess a "manifest relationship to the employment in question." *Id.* at 432.

### *EEOC Dec. No. 78-3 (1977)*

In 1977, EEOC addressed an exclusion policy based on felony or misdemeanor convictions involving moral turpitude or the use of drugs. App. 277–79.[100] Though EEOC mentioned the "business necessity" standard required by *Griggs*, it again employed the wrong standard, asking only whether the policy is "related to job performance," App. 278, and concluding that "there is no evidence that the Charging Party was unable to perform the job," App. 279.

### *EEOC Dec. No. 78-35 (1978)*

In 1978, EEOC concluded that an employee's discharge was reasonable given his pattern of criminal behavior and the severity and recentness of his criminal conduct. App. 281–84. Here, no evidence of disparate impact existed. In the absence of any such evidence, no further analysis is required.[101] But EEOC nonetheless assessed the quality of the employer's "individualized assessment" regarding an individual applicant's criminal past.[102] While the EEOC exonerated the employer, it again employed the incorrect legal standard, asking only whether "rejection of the individual

---

[100] This decision largely regards exclusions for arrests, not convictions. Though the Rule does address arrest exclusions, App. 15–16; Rule 12–13, Texas does not challenge the Rule regarding arrests in the case *sub judice, see* Second Am. Compl., ECF No. 62.

[101] *See, e.g.*, *Waldon v. Cincinnati Pub. Sch.*, 89 F. Supp. 3d 944, 949 (S.D. Ohio 2015) (dismissing case where plaintiffs did "not proffer[] evidence showing state-wide disparate impact of the background check policy.").

[102] The applicant's history included eight arrests, and at least five convictions, including convictions for rape, assault and battery, and carrying a pistol without a license. App. 283.

was reasonable in light of the facts and circumstances and *the nature of the job*." App. 283 (emphasis added). Yet, though it exonerated the employer, EEOC nonetheless admonished the employer (and, thus, all employers) that "[t]he rejection of an individual for a specific job because of job related convictions cannot be used as a blanket disqualification for all other jobs within the employer's control," App. 283 n.4, thus clinging to its manufactured "individualized assessment" standard in lieu of considering the larger, more appropriate "business necessity" standard of the employer. EEOC transformed the large and broad "business necessity" standard into a "specific job" analysis. In other words, the EEOC jettisoned its requirement to consider the needs and concerns of the business as a whole and supplanted that with a self-assumed role as matchmaker on job qualifications.

### *EEOC "Policy Statement" (Feb. 4, 1987)*

Nine years later, EEOC issued a "Policy Statement"—the next item in its list of "longstanding court decisions and existing guidance documents" upon which the present Rule is based. App. 4; Rule 1. In this "Policy Statement," EEOC used its three, previously-discussed decisions in an attempt to anchor its quest to re-write what constitutes a "business necessity." App. 287 n.3. Indeed, EEOC admits that the "Policy Guidance" reveals "[t]he Commission's revised business necessity analysis." App. 287 n.6. The "revis[ion]" involved the creation of a three-part test:

1. The nature and gravity of the offense or offenses;
2. The time that has passed since the conviction and/or completion of the sentence; and
3. The nature of the job held or sought.

App. 286.

There are several problems with EEOC's three-part test, not the least of which is that in its 30 years of existence, only two federal courts have ever cited it.[103] More

---

[103] *See El v. Se. Pa. Transp. Auth. (SEPTA)*, 479 F.3d 232 (3d Cir. 2007); *Boyd v. Choicepoint, Inc.*, 1:08-CV-01118-TWT, 2010 WL 5691503, at *1 (N.D. Ga. Dec. 16, 2010), report and recommendation

significantly, none of the three prongs address, much less consider, the larger "business necessity" of the employer. Two of the prongs are about the applicant themselves and their criminal history. The third prong only involves "[t]he nature of the job held or sought." *Id.* Thus, EEOC sought to transform the "business necessity" test into a three-pronged test having nothing to do with the "business necessity" of the employer. EEOC confesses that its test "*condenses* the Commission's previous standard for business necessity," *id.*, as if EEOC possessed the right to *condense* the "business necessity" standard created by the Supreme Court.

Another problem with EEOC's test is the absence of any tethering to *Griggs*. Indeed, *Griggs* is not even mentioned. EEOC fully divorced itself from Supreme Court precedent, and clings to *Green v. Missouri Pacific Railroad Co.*, 523 F.2d 1290 (8th Cir. 1975), calling it "the leading Title VII case on the issue of conviction records." But two primary problems exist with EEOC's use of *Green*. First, EEOC improperly narrowed the scope of the Eighth Circuit's conclusion. The Eighth Circuit did not analyze merely "[t]he nature of the job held or sought," but whether a denial "rest[ed] upon a tenuous or insubstantial basis." *Green*, 523 F.2d at 1296. What matters, thus, is not necessarily the particulars of any specific job, but the larger picture—whether an "'overriding business justification'" is behind the policy. *Id.* at 1298 (quoting *United States v. St. Louis-San Francisco Ry. Co.*, 464 F.2d 301, 308 (8th Cir. 1972)).

Second, except to EEOC, *Green* is neither a significant nor profound Title VII case. In the 42 years since *Green* was handed down, it has only been cited by eight

---

adopted, 1:08-CV-1118-TWT, 2011 WL 379162 (N.D. Ga. Feb. 3, 2011).

other circuits *eleven* total times.[104] The Fifth Circuit cited *Green* only twice, once during this case, and neither instance in the context for which EEOC claims it stands.[105] Thus, in contriving its three-pronged re-writing of "business necessity," EEOC ignores *Griggs*, misrepresents *Green*, and concocted a standard that only two federal courts have cited in 30 years.

### *EEOC "Policy Statement" (July 29, 1987)*

EEOC issued its next piece of "regulatory dark matter" nearly eight months later. App. 289–90. Having re-authored the Supreme Court's "business necessity" standard, EEOC began targeting employment bars for criminal convictions.

In this "Policy Statement," EEOC took direct aim at restrictions, like Texas's regarding felons, stating that "[a]n employer's policy of excluding from employment all persons convicted of any crime is likely to create an adverse impact for Blacks and Hispanics based on national and regional conviction rate statistics." *Id*. And like the prior "Policy Statement," *Griggs* is absent. *Green*, however, is cited with prominence and EEOC again calls it "the leading Title VII case on the issue of conviction records."

But EEOC didn't stop there. EEOC manufactured yet another standard, this time making it incumbent upon employers to prove a negative—that if they possess a felon hiring bar, the employer must prove that unknown individuals did *not* avoid applying for a job because of the pre-existing bar. EEOC described it this way:

> If the employer provides applicant flow data, information should be sought to assure that the employer's applicant pool was not artificially limited by discouragement. For example, if many Blacks with conviction records did not apply for a particular job because they knew of the employer's policy and they therefore expected to be rejected, then applicant flow data would not be an accurate reflection of the conviction policy's

---

[104] *See Texas*, 827 F.3d 372; *Jones v. City of Bos.*, 752 F.3d 38 (1st Cir. 2014); *El*, 479 F.3d 232; *Hung Ping Wang v. Hoffman*, 694 F.2d 1146 (9th Cir. 1982); *Klapac v. McCormick*, 640 F.2d 1361 (D.C. Cir. 1981); *Chrisner v. Complete Auto Transit, Inc.*, 645 F.2d 1251 (6th Cir. 1981); *Contreras v. City of L.A.*, 656 F.2d 1267 (9th Cir. 1981); *Payne v. Travenol Labs., Inc.*, 565 F.2d 895 (5th Cir. 1978); *United States v. City of Chi.*, 549 F.2d 415 (7th Cir. 1977); *McBride v. Delta Air Lines, Inc.*, 551 F.2d 113 (6th Cir.), *vacated*, 434 U.S. 916 (1977); *Doctor v. Seaboard Coast Line R. Co.*, 540 F.2d 699 (4th Cir. 1976).

[105] *See Texas*, 827 F.3d 372; *Payne*, 565 F.2d 895.

actual effect.

*Id*. At this point, the distance now between EEOC's standards, and the "business necessity" test of *Griggs*, is significant.

### *Wards Cove Packing Co. v. Atonio*

Two years later, in *Wards Cove Packing Co. v. Atonio*, the Supreme Court re-tethered "business necessity" to the actual needs of the employer, discussing "'the employer's legitimate [hiring] interest[s].'" 490 U.S. 642, 660 (1989) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975)). The Court discussed the matter in terms of "business justification." However, it explained that "[t]hough we have phrased the query differently in different cases, it is generally well established that at the justification stage of such a disparate-impact case, the dispositive issue is whether a challenged practice serves, in a significant way, the legitimate employment goals of the employer." *Id*. at 659.

### *EEOC "Policy Guidance" (Sept. 7, 1990)*

Though the Supreme Court re-anchored "business necessity" to the greater needs and considerations of the employer in *Atonio*, EEOC continued its quest to impose its "individualized assessments" standard. Thus, in 1990, EEOC issued another piece of "regulatory dark matter." App. 292–98.

In this "Policy Guidance," EEOC addresses only the use of "arrest records," and not convictions. The significance to the instant case is EEOC's effort to (a) redefine *Atonio's* "business justification" standard, and (b) setup the targeting of blanket exclusions for criminal convictions. According to EEOC,

> [s]ince business justification rests on issues of job relatedness and credibility, *a blanket exclusion of people with arrest records will almost never withstand scrutiny*.

App. 293. EEOC provides six hypothetical circumstances, each demanding that employers ask whether criminal histories prohibit applicants from "perform[ing] the duties of the position in question," rather than asking the larger question required—the

"business necessity" or "business justification" of the employer. *Id.*

### *Congress's 1991 Amendment to Title VII*

In 1991, Congress amended Title VII to incorporate the Supreme Court's standard from *Griggs*. Specifically, Congress determined that disparate impact claims can be overcome if the basis for any exclusion is "job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i). Thus, Congress reaffirmed the importance of an employer's "business necessity" in considering whether disparate impact liability existed.

Beyond considerations of "business necessity" or "business justification," the 1991 standard adopted by Congress is broader than EEOC's three-part test. Whether an applicant is capable of performing "[t]he nature of the job held or sought," App. 18; Rule 15, is a different question than whether a consideration of the employer is "job related" or regards "the position in question." Thus, disparate impact analysis requires something more than merely an analysis of an applicant's skill set regarding the "nature of the job held or sought."

### *EEOC "Compliance Manual" (April 19, 2006)*

In 2006, two significant facts existed. First, no federal court had cited EEOC's three-part test unveiled in 1987. App. 287 n.3. Second, the basis of EEOC's three-part test, *Green*, was not "the leading Title VII case on the issue of conviction records" that EEOC claimed it to be. Thus, EEOC decided to try again.

The final piece of "regulatory dark matter" cited by EEOC to justify the Rule at issue was issued in 2006. App. 328–31. And though the "touchstone," to use the Supreme Court's language, remained "business necessity" or "business justification," *see Griggs*, 401 U.S. at 431; *Atonio*, 490 U.S. at 660, EEOC remained committed to its misreading of the Eighth Circuit's 1975 decision in *Green*. App. 330 (citing *Green*, 523 F.2d at 1293–99; *Caston v. Methodist Med. Ctr. of Ill.*, 215 F. Supp. 2d 1002, 1008

(C.D. Ill. 2002)). The EEOC then re-demanded the application of its three-pronged test, App. 330–31, and took direct aim at felony hiring exclusions, declaring them *per se* unlawful:

> A blanket exclusion of persons convicted of any crime thus would not be job-related and consistent with business necessity.

App. 331 (citing only *Green*, 523 F.2d at 1298–99).

### 2.    The Data Cited By EEOC Is Inapplicable to Texas.

The then six-year-old (now eleven-year-old) "national data" utilized in the Rule[106] are insufficient to demonstrate a disparate impact in Texas, or anywhere, as generalized statistics are insufficient to demonstrate disparate impact liability altogether. As the Fifth Circuit explained, "comparison with general population statistics is of questionable value when we are considering positions for which, as here, the general population is not presumptively qualified." *Hester v. S. Ry. Co.*, 497 F.2d 1374, 1379 (5th Cir. 1974).[107]

EEOC is no stranger to pushing outdated, generalized data to support its claims of disparate impact liability. But even some of its most recent efforts to do so have been rejected. *See, e.g.*, *Freeman*, 961 F. Supp. 2d at 794. It is, thus, inappropriate to make Texas the object of a Rule that is devoid of specific data regarding Texas, much less specific data regarding Texas government.

### C.    The Court Owes No Deference to EEOC.

Neither litigants with cases before the EEOC, nor courts who review EEOC rulings, nor this Court are required to pay EEOC any deference for its "regulatory

---

[106] App. 4, 6; Rule 1, 3.

[107] *See also Payne v. Travenol Labs., Inc.*, 673 F.2d 798, 819 (5th Cir. 1982) (analyzing "work-force statistics" for the employer in question); *Patterson v. Am. Tobacco Co.*, 535 F.2d 257, 275 (4th Cir. 1976) ("Those percentages [for the Richmond Standard Metropolitan Statistical Area] furnish a more realistic measure of the company's conduct than the gross percentage of blacks and women in the whole workforce, including unskilled labor."); *Dowdell v. Dun & Bradstreet, Inc.*, CA76-H-189-S, 1977 WL 883, at *8 (N.D. Ala. Aug. 4, 1977) (analyzing statistical evidence from the "Birmingham Standard Metropolitan Statistical Area.").

dark matter." Litigants are entitled to review *de novo* from EEOC determinations. "Indeed, the requirement of a trial de novo in federal district court following EEOC proceedings was added primarily to protect employers from overzealous enforcement by the EEOC." *Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 474 (1982).

Similarly, courts are not required to extend deference to the EEOC's non-adjudicatory opinions and "regulatory dark matter,"[108] and may decline deference to the adjudications of the EEOC as well.[109] To be sure, the Supreme Court has recognized some deference to EEOC in its views of Title VII. *See Griggs*, 401 U.S. at 434. But deference has limits, especially where application of EEOC's advisory viewpoint is inconsistent with Congressional intent. *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 94–95 (1973). Here, as the Rule is neither the product of notice-and-comment rulemaking nor a formal adjudication, it is entitled to judicial deference only to the extent that the Rule has the power to persuade. *See Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000). "Courts need not defer to an administrative construction of a statute where there are 'compelling indications that it is wrong.'" *Espinoza*, 414 U.S. at 94–95 (quoting *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 381 (1969)).

Most importantly, however, deference to EEOC is not owed, at least as far as the Rule pertains to Texas, because its legal footing is shaky. As explained, *see supra* Part III.B., EEOC's analysis falls well short regarding a government employer, like Texas, possessing policies regarding felons that go far beyond questions of employment. "The Commission's guideline may have significance for a wide range of situations, but not for a case such as this where its very premise—that [Texas's "business necessity" is a narrow consideration]—is not borne out." *Espinoza*, 414 U.S. at 94.

Even under *Chevron*, the Rule fails. *Chevron U.S.A. v. Nat. Res. Def. Council*,

---

[108] *See, e.g.*, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 n.6 (2002).
[109] *See, e.g.*, *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 643 (2007), overturned due to legislative action (Jan. 29, 2009).

467 U.S. 837 (1984).[110] Most significantly, the Rule fails at *Chevron* Step Zero—the threshold inquiry into whether agency deference is warranted in the first place.

The Rule does not clear the *Chevron* Step Zero threshold for several reasons. Principles of agency deference are unwarranted when a rule exceeds Congress's authority under the Commerce Clause and amounts to an unconstitutional exercise of federal power. *Chevron* is a framework for assessing whether federal agencies properly filled "statutory gaps," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000), not an invitation to circumvent constitutional barriers. Here, *Chevron* deference is unavailable to EEOC because its Rule legislates in an area traditionally regulated by the States—the privileges of convicted felons. A clear statement of congressional intent—not a *Chevron* ambiguity—is necessary for the Rule to be valid. Second, because the Rule concerns a "major question," there is no basis upon which to presume that Congress implicitly delegated rulemaking authority to an agency to upset a state's entire legal scheme regarding the privileges of convicted felons. *King v. Burwell*, 135 S. Ct. 2480, 2489–90 (2015).

### 1. Congress Did Not Delegate to EEOC Authority to Invade the Texas Legislature's Larger Scheme Regarding the Societal Opportunities and Privileges of Convicted Felons.

If EEOC wanted to displace the Texas Legislature's authority and comprehensive scheme regarding convicted felons, *see supra* Stmt. of Facts, it could not even begin to do so without a "clear statement" from Congress that Title VII has such an effect. While Congress was concerned about entrenched vestiges of bureaucracy, it made no indication, expressly or otherwise, to go toe-to-toe with the larger police powers of the states and their legislative authority to address the privileges of felons. As such, EEOC may neither dislodge the Texas Legislature's authority under the Tenth

---

[110] Since EEOC does not possess substantive rulemaking authority, *Chevron* is arguably inapplicable. *See* 42 U.S.C. § 2000e–12(a); *Arabian Am.*, 499 U.S. at 257; *Gilbert*, 429 U.S. at 141. However, since Texas is nonetheless an object of EEOC's administrative action, ECF No. 52 at 7–8, the *Chevron* framework can nonetheless be instructive.

Amendment, nor the Texas Legislature's duly enacted, inextricably intertwined laws regarding the opportunities of felons in Texas society.

In *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985), the Supreme Court ruled 5-4 that the Tenth Amendment did not limit Congress's Commerce Clause power to apply the Fair Labor Standards Act's ("FLSA") protections to the States. Reversing an earlier holding that the FLSA "will impermissibly interfere with the integral government functions" of States, *Nat'l League of Cities v. Usery*, 426 U.S. 833, 851 (1976), the Supreme Court reasoned that the "political process" would ensure that "laws that unduly burden the States will not be promulgated." *Garcia*, 469 U.S. at 556; *but see id.* at 560 (Powell, J., dissenting) (concluding that the majority's opinion "effectively reduc[ed] the Tenth Amendment to meaningless rhetoric when Congress acts pursuant to the Commerce Clause.").

Because *Garcia* left to the "political process" the States' protection from Congress's exercise of its Commerce Clause powers, the Supreme Court later clarified that courts "must be *absolutely certain* that Congress intended such an exercise" of power before they will uphold it as applied to the States. *Gregory v. Ashcroft*, 501 U.S. 452, 464 (1991) (emphasis added). "'[T]o give the state-displacing weight of federal law to mere congressional *ambiguity* would evade the very procedure for lawmaking on which *Garcia* relied to protect states' interests.'" *Id.* (quoting L. TRIBE, AMERICAN CONSTITUTIONAL LAW § 6-25, at 480 (2d ed. 1988)). To ensure that Congress actually intended to interfere with areas that are traditionally within the States' sovereign domain, the Tenth Amendment and concerns of federalism require a "clear statement from Congress." *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001); *Bond v. United States*, 134 S. Ct. 2077, 2088–90 (2014); *Gregory*, 501 U.S. at 460, 463. "If Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Gregory*, 501 U.S. at 460 (citation

and quotation marks omitted).[111]

To be sure, the 1972 Amendments to the Civil Rights Act clearly brought state and local governmental entities within the boundaries of Title VII as employers. However, with those amendments, Congress was merely extending the law governing *individual*, private employers to *individual*, government employers. Under no circumstances did Congress express any intent to attack a state's larger, comprehensive legal scheme regarding the allowances of those that breached the public trust through felonious behavior. To the contrary, in applying Title VII to state and local governments in 1972, Congress expressed its concern only for "the existence of discrimination in those *bureaucratic systems* which most directly affect the daily interactions of this Nation's citizens." H.R. Rep. 92-238 (June 2, 1971), 1972 U.S.C.C.A.N. 2137, 2154 (emphasis added). Specifically, Congress was concerned about "widespread perpetuation of past discriminatory practices through de facto segregated job ladders, invalid selection techniques, and stereotyped misconceptions by supervisors regarding minority group capabilities." *Id.* at 2152. In other words, Congress was concerned about

---

[111] The clear-statement doctrine is a common feature of federalism jurisprudence. John F. Manning, *Clear Statement Rules and the Constitution*, 110 COLUM. L. REV. 399, 407 (2010) ("A highly prominent cluster of clear statement rules protects the value of federalism by presuming that, absent a clear statement to the contrary, acts of Congress do not intrude upon the states either by regulating state functions or displacing state law."). For example, the principle mandates that conditions on such federal funds directed to the states are stated "unambiguously," *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 17 (1981), "such a state official would clearly understand [them]," *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). The concern for states that choose to receive federally-conditioned grants

> is not based upon some abstract notion of contractual fairness. Rather, it is a concrete safeguard in the federal system. Only if States receive clear notice of the conditions attached to federal funds can they guard against excessive federal intrusion into state affairs and be vigilant in policing the boundaries of federal power.

*Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 655 (1999) (Kennedy, J., dissenting). In addition, Professor Manning notes that "[i]n the context of preemption, the Court long ago held that 'the historic police powers of the States [are] not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress,'" and that with regard to state sovereign immunity, Congress may abrogate "only by making its intention unmistakably clear in the language of the statute." Manning, *supra*, at 407 n.33 (citations omitted) (citations omitted). *See also Tennessee v. FCC*, 832 F.3d 597, 610 (6th Cir. 2016) (holding that federal preemption of the state–subdivision relationship requires a "clear directive" from Congress).

invidious discrimination imbedded within bureaucratic processes and not the laws that governed the population as a whole.

Accordingly, Congress made no "clear statement" that it possessed any concern with the larger, democratic state legislative processes that brought about certain disqualifications for all of its citizens—legal schemes well beyond assessing the average employment dispute between a single individual and a single employer. Indeed, it is one thing for Congress to provide a remedy for the victims of embedded, invidious bureaucratic discrimination within certain agencies or elements of state and local government. It is quite another thing to conclude that Congress called into question the reasoned, specific, democratically-produced restrictions of a contemporary state legislature. Nothing about Congress's amendments in 1972 expressed an inherent distrust of the state legislative processes that impact the privileges of felons.[112]

There can be no argument that the universe of state laws establishing the prerogatives of convicted felons is, indeed, reserved to the States under the Tenth Amendment. To this day, the tapestry of state laws regarding felons reflect the sovereign differences our union is designed to preserve as the States continue to perform their role as the laboratories of democracy. Outright felony exclusions or bans were not even discussed by Congress, as state legislative action was clearly beyond its concern. Thus, the Rule represents a federal invasion of Texas's legislative process.

### 2. Congress Did Not Delegate to EEOC this Significant Political and Economic Issue.

Asking whether *Chevron* deference applies places the cart before the horse. Delegation is antecedent to deference, and "there may be reason to hesitate before

---

[112] In its Rule, EEOC only seeks to insulate the reach of its authority to certain federal licenses. App. 24; Rule 21. Certainly, this is a nuanced category, in and of itself, since the States are largely responsible for the licensing of professions. Nonetheless, EEOC makes no effort to exempt any state licensing process or scheme. According to EEOC, while "[c]ompliance with federal laws and/or regulations is a defense to a charge of discrimination," App. 23; Rule 20, there is no concurrent accommodation made for any state law, no matter how identical or congruent to federal law it may be.

concluding that Congress" intended to delegate rulemaking authority to a federal agency. *King*, 135 S. Ct. at 2488–89. This is such a case. The Rule exceeds Congress's Commerce Clause powers, encroaches an area traditionally regulated by the States, and concerns a "major question." Thus, the *Chevron* framework is inapplicable.

*Chevron* presupposes "that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *King*, 135 S. Ct. at 2488 (quoting *Brown & Williamson*, 529 U.S. at 159). "In extraordinary cases, however, there may be reason to hesitate before concluding that Congress has intended such an implicit delegation." *Id*. As then-Judge Breyer noted in an influential 1986 article, the notion that Congress intended to delegate the law-interpreting function to administrative agencies is a legal fiction. Stephen P. Breyer, *Judicial Review of Questions of Law and Policy*, 38 ADMIN. L. REV. 363, 370 (1986). Courts look to "practical features of the particular circumstance to determine whether it 'makes sense'" to presume a congressional intent for agency deference. *Id*. The nature of the question at issue was a relevant inquiry. Judge Breyer explained:

> Is the particular question one that the agency or the court is more likely to answer correctly? Does the question, for example, concern common law or constitutional law, or does it concern matters of agency administration? A court may also ask whether the legal question is an important one. Congress is more likely to have focused upon, and answered major questions, while leaving interstitial matters to answer themselves in the course of the statute's daily administration.

*Id*.

Since Judge Breyer's article, the Supreme Court has recognized the "major question" exception. In *King*, for example, the Court declined to apply *Chevron* because the legal question at issue was one of "deep economic and political significance that is central to this statutory scheme; had Congress wished to assign that question

to an agency, it surely would have done so expressly." *King*, 135 S. Ct. at 2489 (internal quotations omitted).[113]

Indeed, there is no question that Congress delegated to EEOC some enforcement authority regarding Title VII. However, that delegation was not for plenary authority regarding all matters. Indeed, EEOC has been known to exercise authority beyond its delegation.[114] The delegation to EEOC has obvious limits and, of course, doesn't give EEOC the power to upset Texas's sovereign scheme.

Even if EEOC was given substantive rulemaking authority, it would be difficult to conclude that Congress deferred this deeply significant issue—invading a state's larger statutory scheme regarding convicted felons—to an independent federal agency with "no expertise in crafting [state-specific rules] of this sort," *King*, 135 S. Ct. at 2489. While EEOC may have historic expertise in mediating specific employment disputes between an individual and an employer, EEOC is not competent to run Texas. It has no comprehension of Texas's legal scheme, how long felony restrictions have been in place, or why the Texas Legislature implemented such restrictions.

Furthermore, the presumption of delegation diminishes significantly when the precise question has "its own unique political history" and already implicates "a distinct regulatory scheme." *Brown & Williamson*, 520 U.S. at 159. Well before the EEOC even existed, the Republic of Texas was legislating the allotments of felons. *See, e.g.*, Tex. Const. art. VI, § 1 cmt. ("Therefore the constitution of the Republic stipulated that laws were to be passed excluding from the right of suffrage those who

---

[113] *See also Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2444 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism. We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." (internal citations and quotations omitted)).

[114] *See, e.g.*, *Ebbert v. DaimlerChrysler Corp.*, 319 F.3d 103, 110 (3d Cir. 2003) ("The dispositive flaw in the EEOC's argument for Chevron deference is that the power to create such a rule binding on courts is beyond the authority delegated to the EEOC.").

49

in the future were convicted of bribery, perjury, or other high crimes and misdemeanors (Schedule, General Provisions, Sec. 1, Const.1836).". In the 181 years that have passed between Texas's original constitution and today, the Texas Legislature has enacted myriad limitations and restrictions for felons. *See supra* Stmt. of Facts.

Unquestionably, Congress was mindful of the "unique" history of state restrictions and limitations upon felons, including the longstanding impact that a felony record may have upon an individual's prospects for employment, irrespective of their race. And lawmakers were equally cognizant of the "regulatory scheme" at the state level governing the limitations that result from such criminal conduct. Yet there is no evidence that Congress intended to upset Texas's, or other States', larger legal scheme regarding the privileges of felons within civil society. Without evidence that Congress did not intend to defer to the States regarding their felony impact schemes, there is no basis for *Chevron* deference.

## CONCLUSION

Plaintiff request the Court grant Texas's Motion for Summary Judgment and issue an order: (1) declaring the Rule unlawful; (2) declaring that Texas is entitled to maintain laws and policies that bar convicted felons from employment, and that Texas need not conduct the "individualize assessments" that the Rule requires; and (3) permanently enjoining Defendants from enforcing the Rule against Texas.

Respectfully submitted this the 14th day of September, 2017.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY D. STARR
Deputy First Assistant Attorney General

MICHAEL C. TOTH
Special Counsel to the First Assistant Attorney General

ANDREW D. LEONIE
Associate Deputy Attorney General

*/s/ Austin R. Nimocks*
AUSTIN R. NIMOCKS
Associate Deputy Attorney General
Texas Bar No. 24002695
austin.nimocks@oag.texas.gov

DAVID J. HACKER
Senior Counsel

Office of Special Litigation
ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Mail Code 009
Austin, Texas 78711-2548
(512) 936-1414
(512) 936-0545 Fax

*ATTORNEYS FOR PLAINTIFFS*


### CERTIFICATE OF SERVICE

I certify that on the 14th day of September, 2017, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Austin R. Nimocks*
AUSTIN R. NIMOCKS
Associate Deputy Attorney General