**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

| | |
|---|---|
| TEXAS,<br><br>     *Plaintiff,*<br><br>v.<br><br>EQUAL EMPLOYMENT OPPOR-<br>TUNITY COMMISSION; VICTORIA<br>A. LIPNIC, in her official capacity as<br>Acting Chair of the Equal Employ-<br>ment Opportunity Commission; and<br>JEFFERSON B. SESSIONS, III, in<br>his official capacity as Attorney Gen-<br>eral of the United States,<br><br>     *Defendants.* | Case No. 5:13-CV-00255-C |

**APPENDIX IN SUPPORT OF
TEXAS'S MOTION FOR SUMMARY JUDGMENT**

## Document Name            Page

U.S. Equal Employment Opportunity Commission, *Enforcement Guidance*,
No. 915.002 (Apr. 25, 2012) .............................................................. 1

Declaration of Amy Tippie (HHSC, DADS, DFPS, DSHS) ........................ 56

Declaration of Kathleen T. Murphy (DPS) ................................................. 60

Declaration of Ann Bright (TPWD) ........................................................... 63

Declaration of Royce Myers (TJJD) .......................................................... 67

Declaration of Bob Biard (TLC) ............................................................... 71

Att. 1 — Harrold ISD, *Educational Philosophy* ....................................... 75

Att. 2 — Tex. Educ. Code § 22.085 ......................................................... 77

Att. 3 — Harrold ISD, *Employment Requirements and Restrictions, Criminal
History and Credit Reports* .............................................................. 80

Att. 4 — EEOC Notice of Charge of Discrimination issued to DPS with
attachments ..................................................................................... 89

1

Att. 5 — DPS, *Employment / Career Opportunities* .................................. 119

Att. 6 — DPS, *Traffic and Criminal Records* ........................................ 123

Att. 7 — Tex. Occ. Code § 1701.312 ................................................ 126

Att. 8 — Tex. Parks & Wild. Code § 11.019 ........................................ 129

Att. 9 — 31 TAC § 55.802 ........................................................ 131

Att. 10 — TPWD, *Requirements for Game Warden* .................................. 133

Att. 11 — TJJD, *Personnel Policy and Procedure Manual, PRS.02.08, Criminal History: Standards, Background Checks, and Self-Reporting Requirements* ................................................................ 136

Att. 12 — DADS, *Bars to Employment with DADS* .................................. 144

Att. 13 — 40 TAC § 3.201 ........................................................ 147

Att. 14 — Tex. Health & Safety Code § 250.006 .................................... 150

Att. 15 — GLO, *Legislative Appropriations Request* (Aug. 18, 2014) .................. 155

Att. 16 — TPWD, *Criminal History Checks Policy* .................................. 158

Att. 17 — Tex. Code Crim. Proc. art. 2.12 ........................................ 167

Att. 18 — SOS, *Policies and Procedures Manual* (2012) .............................. 172

Att. 19 — SOS, *Volunteer Deputy Registrar Guide* ................................ 189

Att. 20 — TLC, EN-016, *Employee Background Investigations* ........................ 192

Att. 21 — TLC, *Personnel Handbook* (Sept. 30, 2015) .............................. 196

Att. 22 — HHSC, *Human Resources Manual, Criminal Background Check and Registry Clearance Policy* ...................................................... 199

Att. 23 — HHSC, *Human Resources Manual, Appendix A, Criminal Background Check and Registry Clearance* ........................................ 207

Att. 24 — HHSC, *Human Resources Manual, Appendix B, Bars to Employment* ................................................................ 213

Att. 25 — DADS, *Operational Handbook, Part E, Section 1900, Criminal History Checks: Guidelines for Employment* ...................................... 220

Att. 26 — DFPS, *Operating Policies, Criminal Background Checks for DFPS Applicants and Employees* ...................................................... 225

Att. 27 — DFPS, *List of Offenses* ................................................ 230

Att. 28 — Texas Health & Safety Code § 533.007 .................................... 248

Att. 29 — GLO *Policies and Procedures on Criminal Background Checks*............ 250

Att. 30 — FBI, *Employment Disqualifiers*................................................. 263

Att. 31 — U.S. Equal Employment Opportunity Commission, EEOC Dec.
    No. 72-1497 (Mar. 29, 1972) ........................................................ 265

Att. 32 — U.S. Equal Employment Opportunity Commission, EEOC Dec.
    No. 74-89 (Feb. 12, 1974) ............................................................ 268

Att. 33 — U.S. Equal Employment Opportunity Commission, EEOC Dec.
    No. 78-3 (Nov. 7, 1977).................................................................. 277

Att. 34 — U.S. Equal Employment Opportunity Commission, EEOC Dec.
    No. 78-35 (June 8, 1978) ................................................................ 281

Att. 35 — U.S. Equal Employment Opportunity Commission, *Policy Statement
    on the Issue of Conviction Records under Title VII of the Civil Rights
    Act of 1964* (Feb. 4, 1987)............................................................ 286

Att. 36 — U.S. Equal Employment Opportunity Commission, *Policy Statement
    on the Use of Statistics in Charges Involving the Exclusion of
    Individuals with Conviction Records from Employment* (July 29, 1987) ..... 289

Att. 37 — U.S. Equal Employment Opportunity Commission, *Policy Guidance
    on the Consideration of Arrest Records in Employment Decisions under
    Title VII of the Civil Rights Act of 1964* (Sept. 7, 1990)................................ 292

Att. 38 — U.S. Equal Employment Opportunity Commission, *Compliance
    Manual Section 15: Race & Color Discrimination* (Apr. 19, 2006) .............. 300

| **EEOC Enforcement Guidance** | **Number** 915.002 **Date** 4/25/2012 |
|---|---|

1.    **SUBJECT**: Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e *et seq*.

2.    **PURPOSE**:  The purpose of this Enforcement Guidance is to consolidate and update the U.S. Equal Employment Opportunity Commission's guidance documents regarding the use of arrest or conviction records in employment decisions under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

3.    **EFFECTIVE DATE**:  Upon receipt.

4.    **EXPIRATION DATE**:  This Notice will remain in effect until rescinded or superseded.

5.    **ORIGINATOR**:  Office of Legal Counsel.

App. 001

**Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964**

**Table of Contents**

| | | | |
|---|---|---|---|
| I. | | Summary | 1 |
| II. | | Introduction | 3 |
| III. | | Background | 4 |
| | A. | Criminal History Records | 4 |
| | B. | Employers' Use of Criminal History Information | 6 |
| | C. | The EEOC's Interest in Employers' Use of Criminal Records in Employment Screening | 6 |
| IV. | | Disparate Treatment Discrimination and Criminal Records | 6 |
| V. | | Disparate Impact Discrimination and Criminal Records | 8 |
| | A. | Determining Disparate Impact of Policies or Practices that Screen Individuals Based on Records of Criminal Conduct | 9 |
| | | 1. Identifying the Practice or Policy | 9 |
| | | 2. Determining Disparate Impact | 9 |
| | B. | Job Related for the Position in Question and Consistent with Business Necessity | 10 |
| | | 1. Generally | 10 |
| | | 2. Arrests | 12 |
| | | 3. Convictions | 13 |
| | | 4. Determining Whether a Criminal Conduct Exclusion Is Job Related and Consistent with Business Necessity | 14 |
| | | 5. Validation | 14 |
| | | 6. Detailed Discussion of the *Green* Factors and Criminal Conduct Screens | 15 |
| | |    a. The Nature and Gravity of the Offense or Conduct | 15 |
| | |    b. The Time that Has Passed Since the Offense, Conduct and/or Completion of the Sentence | 15 |
| | |    c. The Nature of the Job Held or Sought | 16 |
| | | 7. Examples of Criminal Conduct Exclusions that Do Not Consider the *Green* Factors | 16 |
| | | 8. Targeted Exclusions that Are Guided by the *Green* Factors | 17 |
| | | 9. Individualized Assessment | 18 |
| | C. | Less Discriminatory Alternatives | 20 |

**App. 002**

VI.    Positions Subject to Federal Prohibitions or Restrictions on Individuals
       with Records of Certain Criminal Conduct                                    20

       A.    Hiring in Certain Industries                                          20
       B.    Obtaining Occupational Licenses                                       21
       C.    Waiving or Appealing Federally Imposed Occupational
             Restrictions                                                         21
       D.    Security Clearances                                                   23
       E.    Working for the Federal Government                                    23

VII.   Positions Subject to State and Local Prohibitions or Restrictions on Individuals
       with Records of Certain Criminal Conduct                                    24

VIII.  Employer Best Practices                                                     25

## I.    Summary

- An employer's use of an individual's criminal history in making employment decisions may, in some instances, violate the prohibition against employment discrimination under Title VII of the Civil Rights Act of 1964, as amended.

- The Guidance builds on longstanding court decisions and existing guidance documents that the U.S. Equal Employment Opportunity Commission (Commission or EEOC) issued over twenty years ago.

- The Guidance focuses on employment discrimination based on race and national origin. The Introduction provides information about criminal records, employer practices, and Title VII.

- The Guidance discusses the differences between arrest and conviction records.

  - The fact of an arrest does not establish that criminal conduct has occurred, and an exclusion based on an arrest, in itself, is not job related and consistent with business necessity. However, an employer may make an employment decision based on the conduct underlying an arrest if the conduct makes the individual unfit for the position in question.

  - In contrast, a conviction record will usually serve as sufficient evidence that a person engaged in particular conduct. In certain circumstances, however, there may be reasons for an employer not to rely on the conviction record alone when making an employment decision.

- The Guidance discusses disparate treatment and disparate impact analysis under Title VII.

  - A violation may occur when an employer treats criminal history information differently for different applicants or employees, based on their race or national origin (disparate treatment liability).

  - An employer's neutral policy (e.g., excluding applicants from employment based on certain criminal conduct) may disproportionately impact some individuals protected under Title VII, and may violate the law if not job related and consistent with business necessity (disparate impact liability).

    - National data supports a finding that criminal record exclusions have a disparate impact based on race and national origin. The national data provides a basis for the Commission to investigate Title VII disparate impact charges challenging criminal record exclusions.

**App. 004**

- o Two circumstances in which the Commission believes employers will consistently meet the "job related and consistent with business necessity" defense are as follows:

  - The employer validates the criminal conduct exclusion for the position in question in light of the Uniform Guidelines on Employee Selection Procedures (if there is data or analysis about criminal conduct as related to subsequent work performance or behaviors); or

  - The employer develops a targeted screen considering at least the nature of the crime, the time elapsed, and the nature of the job (the three factors identified by the court in *Green v. Missouri Pacific Railroad*, 549 F.2d 1158 (8th Cir. 1977)). The employer's policy then provides an opportunity for an individualized assessment for those people identified by the screen, to determine if the policy as applied is job related and consistent with business necessity. (Although Title VII does not require individualized assessment in all circumstances, the use of a screen that does not include individualized assessment is more likely to violate Title VII.).

- Compliance with other federal laws and/or regulations that conflict with Title VII is a defense to a charge of discrimination under Title VII.

- State and local laws or regulations are preempted by Title VII if they "purport[] to require or permit the doing of any act which would be an unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-7.

- The Guidance concludes with best practices for employers.

**App. 005**

## II.      Introduction

The EEOC enforces Title VII of the Civil Rights Act of 1964 (Title VII) which prohibits employment discrimination based on race, color, religion, sex, or national origin.[1]    This Enforcement Guidance is issued as part of the Commission's efforts to eliminate unlawful discrimination in employment screening, for hiring or retention, by entities covered by Title VII, including private employers as well as federal, state, and local governments.[2]

In the last twenty years, there has been a significant increase in the number of Americans who have had contact[3] with the criminal justice system[4] and, concomitantly, a major increase in the number of people with criminal records in the working-age population.[5]   In 1991, only 1.8% of the adult population had served time in prison.[6]   After ten years, in 2001, the percentage rose to 2.7% (1 in 37 adults).[7]   By the end of 2007, 3.2% of all adults in the United States (1 in every 31) were under some form of correctional control involving probation, parole, prison, or jail.[8] The Department of Justice's Bureau of Justice Statistics (DOJ/BJS) has concluded that, if incarceration rates do not decrease, approximately 6.6% of all persons born in the United States in 2001 will serve time in state or federal prison during their lifetimes.[9]

Arrest and incarceration rates are particularly high for African American and Hispanic men.[10] African Americans and Hispanics[11] are arrested at a rate that is 2 to 3 times their proportion of the general population.[12]    Assuming that current incarceration rates remain unchanged, about 1 in 17 White men are expected to serve time in prison during their lifetime;[13] by contrast, this rate climbs to 1 in 6 for Hispanic men; and to 1 in 3 for African American men.[14]

The Commission, which has enforced Title VII since it became effective in 1965, has well-established guidance applying Title VII principles to employers' use of criminal records to screen for employment.[15]    This Enforcement Guidance builds on longstanding court decisions and policy documents that were issued over twenty years ago.   In light of employers' increased access to criminal history information, case law analyzing Title VII requirements for criminal record exclusions, and other developments,[16] the Commission has decided to update and consolidate in this document all of its prior policy statements about Title VII and the use of criminal records in employment decisions.   Thus, this Enforcement Guidance will supersede the Commission's previous policy statements on this issue.

The Commission intends this document for use by employers considering the use of criminal records in their selection and retention processes; by individuals who suspect that they have been denied jobs or promotions, or have been discharged because of their criminal records; and by EEOC staff who are investigating discrimination charges involving the use of criminal records in employment decisions.

**App. 006**

## III.    Background

The contextual framework for the Title VII analysis in this Enforcement Guidance includes how criminal record information is collected and recorded, why employers use criminal records, and the EEOC's interest in such criminal record screening.

### A.    Criminal History Records

Criminal history information can be obtained from a wide variety of sources including, but not limited to, the following:

- Court Records.  Courthouses maintain records relating to criminal charges and convictions, including arraignments, trials, pleas, and other dispositions.[17] Searching county courthouse records typically provides the most complete criminal history.[18]  Many county courthouse records must be retrieved on-site,[19] but some courthouses offer their records online.[20]  Information about federal crimes such as interstate drug trafficking, financial fraud, bank robbery, and crimes against the government may be found online in federal court records by searching the federal courts' Public Access to Court Electronic Records or Case Management/Electronic Case Files.[21]

- Law Enforcement and Corrections Agency Records.  Law enforcement agencies such as state police agencies and corrections agencies may allow the public to access their records, including records of complaints, investigations, arrests, indictments, and periods of incarceration, probation, and parole.[22]  Each agency may differ with respect to how and where the records may be searched, and whether they are indexed.[23]

- Registries or Watch Lists.  Some government entities maintain publicly available lists of individuals who have been convicted of, or are suspected of having committed, a certain type of crime.  Examples of such lists include state and federal sex offender registries and lists of individuals with outstanding warrants.[24]

- State Criminal Record Repositories.  Most states maintain their own centralized repositories of criminal records, which include records that are submitted by most or all of their criminal justice agencies, including their county courthouses.[25] States differ with respect to the types of records included in the repository,[26] the completeness of the records,[27] the frequency with which they are updated,[28] and whether they permit the public to search the records by name, by fingerprint, or both.[29]  Some states permit employers (or third-parties acting on their behalf) to access these records, often for a fee.[30]  Others limit access to certain types of records,[31] and still others deny access altogether.[32]

- The Interstate Identification Index (III).  The Federal Bureau of Investigation (FBI) maintains the most comprehensive collection of criminal records in the nation, called the "Interstate Identification Index" (III).  The III database compiles

**App. 007**

records from each of the state repositories, as well as records from federal and international criminal justice agencies.[33]

The FBI's III database may be accessed for employment purposes by:

- the federal government;[34]

- employers in certain industries that are regulated by the federal government, such as "the banking, nursing home, securities, nuclear energy, and private security guard industries; as well as required security screenings by federal agencies of airport workers, HAZMAT truck drivers and other transportation workers";[35] and

- employers in certain industries "that the state has sought to regulate, such as persons employed as civil servants, day care, school, or nursing home workers, taxi drivers, private security guards, or members of regulated professions."[36]

Recent studies have found that a significant number of state and federal criminal record databases include incomplete criminal records.

> A 2011 study by the DOJ/BJS reported that, as of 2010, many state criminal history record repositories still had not recorded the final dispositions for a significant number of arrests.[37]
> A 2006 study by the DOJ/BJS found that only 50% of arrest records in the FBI's III database were associated with a final disposition.[38]

Additionally, reports have documented that criminal records may be inaccurate.

> One report found that even if public access to criminal records has been restricted by a court order to seal and/or expunge such records, this does not guarantee that private companies also will purge the information from their systems or that the event will be erased from media archives.[39]
> Another report found that criminal background checks may produce inaccurate results because criminal records may lack "unique" information or because of "misspellings, clerical errors or intentionally inaccurate identification information provided by search subjects who wish to avoid discovery of their prior criminal activities."[40]

Employers performing background checks to screen applicants or employees may attempt to search these governmental sources themselves or conduct a simple Internet search, but they often rely on third-party background screening businesses.[41] Businesses that sell criminal history information to employers are "consumer reporting agencies" (CRAs)[42] if they provide the information in "consumer reports"[43] under the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* (FCRA). Under FCRA, a CRA generally may not report records of arrests that did not result in entry of a judgment of conviction, where the arrests occurred more than seven years ago.[44]

**App. 008**

However, they may report convictions indefinitely.[45]

CRAs often maintain their own proprietary databases that compile information from various sources, such as those described above, depending on the extent to which the business has purchased or otherwise obtained access to data.[46] Such databases vary with respect to the geographic area covered, the type of information included (e.g., information about arrests, convictions, prison terms, or specialized information for a subset of employers such as information about workplace theft or shoplifting cases for retail employers[47]), the sources of information used (e.g., county databases, law enforcement agency records, sex offender registries), and the frequency with which they are updated. They also may be missing certain types of disposition information, such as updated convictions, sealing or expungement orders, or orders for entry into a diversion program.[48]

### B.    Employers' Use of Criminal History Information

In one survey, a total of 92% of responding employers stated that they subjected all or some of their job candidates to criminal background checks.[49] Employers have reported that their use of criminal history information is related to ongoing efforts to combat theft and fraud,[50] as well as heightened concerns about workplace violence[51] and potential liability for negligent hiring.[52] Employers also cite federal laws as well as state and local laws[53] as reasons for using criminal background checks.

### C.    The EEOC's Interest in Employers' Use of Criminal Records in Employment Screening

The EEOC enforces Title VII, which prohibits employment discrimination based on race, color, religion, sex, or national origin. Having a criminal record is not listed as a protected basis in Title VII. Therefore, whether a covered employer's reliance on a criminal record to deny employment violates Title VII depends on whether it is part of a claim of employment discrimination based on race, color, religion, sex, or national origin. Title VII liability for employment discrimination is determined using two analytic frameworks: "disparate treatment" and "disparate impact." Disparate treatment is discussed in Section IV and disparate impact is discussed in Section V.

### IV.    Disparate Treatment Discrimination and Criminal Records

A covered employer is liable for violating Title VII when the plaintiff demonstrates that it treated him differently because of his race, national origin, or another protected basis.[54] For example, there is Title VII disparate treatment liability where the evidence shows that a covered employer rejected an African American applicant based on his criminal record but hired a similarly situated White applicant with a comparable criminal record.[55]

> **Example 1:  Disparate Treatment Based on Race.** John, who is White, and Robert, who is African American, are both recent graduates of State University. They have similar educational backgrounds, skills, and work experience. They each pled guilty to charges of possessing and

6

**App. 009**

distributing marijuana as high school students, and neither of them had any subsequent contact with the criminal justice system.

After college, they both apply for employment with Office Jobs, Inc., which, after short intake interviews, obtains their consent to conduct a background check. Based on the outcome of the background check, which reveals their drug convictions, an Office Jobs, Inc., representative decides not to refer Robert for a follow-up interview. The representative remarked to a co-worker that Office Jobs, Inc., cannot afford to refer "these drug dealer types" to client companies. However, the same representative refers John for an interview, asserting that John's youth at the time of the conviction and his subsequent lack of contact with the criminal justice system make the conviction unimportant. Office Jobs, Inc., has treated John and Robert differently based on race, in violation of Title VII.

Title VII prohibits "not only decisions driven by racial [or ethnic] animosity, but also decisions infected by stereotyped thinking . . . ."[56] Thus, an employer's decision to reject a job applicant based on racial or ethnic stereotypes about criminality—rather than qualifications and suitability for the position—is unlawful disparate treatment that violates Title VII.[57]

**Example 2: Disparate Treatment Based on National Origin.** Tad, who is White, and Nelson, who is Latino, are both recent high school graduates with grade point averages above 4.0 and college plans. While Nelson has successfully worked full-time for a landscaping company during the summers, Tad only held occasional lawn-mowing and camp-counselor jobs. In an interview for a research job with Meaningful and Paid Internships, Inc. (MPII), Tad discloses that he pled guilty to a felony at age 16 for accessing his school's computer system over the course of several months without authorization and changing his classmates' grades. Nelson, in an interview with MPII, emphasizes his successful prior work experience, from which he has good references, but also discloses that, at age 16, he pled guilty to breaking and entering into his high school as part of a class prank that caused little damage to school property. Neither Tad nor Nelson had subsequent contact with the criminal justice system.

The hiring manager at MPII invites Tad for a second interview, despite his record of criminal conduct. However, the same hiring manager sends Nelson a rejection notice, saying to a colleague that Nelson is only qualified to do manual labor and, moreover, that he has a criminal record. In light of the evidence showing that Nelson's and Tad's educational backgrounds are similar, that Nelson's work experience is more extensive, and that Tad's criminal conduct is more indicative of untrustworthiness, MPII has failed to state a legitimate, nondiscriminatory reason for rejecting Nelson. If Nelson filed a Title VII charge alleging disparate treatment based on national origin and the EEOC's investigation

**App. 010**

confirmed these facts, the EEOC would find reasonable cause to believe that discrimination occurred.

There are several kinds of evidence that may be used to establish that race, national origin, or other protected characteristics motivated an employer's use of criminal records in a selection decision, including, but not limited to:

- Biased statements.   Comments by the employer or decisionmaker that are derogatory with respect to the charging party's protected group, or that express group-related stereotypes about criminality, might be evidence that such biases affected the evaluation of the applicant's or employee's criminal record.

- Inconsistencies in the hiring process.   Evidence that the employer requested criminal history information more often for individuals with certain racial or ethnic backgrounds, or gave Whites but not racial minorities the opportunity to explain their criminal history, would support a showing of disparate treatment.

- Similarly situated comparators (individuals who are similar to the charging party in relevant respects, except for membership in the protected group).   Comparators may include people in similar positions, former employees, and people chosen for a position over the charging party.   The fact that a charging party was treated differently than individuals who are not in the charging party's protected group by, for example, being subjected to more or different criminal background checks or to different standards for evaluating criminal history, would be evidence of disparate treatment.

- Employment testing.   Matched-pair testing may reveal that candidates are being treated differently because of a protected status.[58]

- Statistical evidence.   Statistical analysis derived from an examination of the employer's applicant data, workforce data, and/or third party criminal background history data may help to determine if the employer counts criminal history information more heavily against members of a protected group.

## V.    Disparate Impact Discrimination and Criminal Records

A covered employer is liable for violating Title VII when the plaintiff demonstrates that the employer's neutral policy or practice has the effect of disproportionately screening out a Title VII-protected group and the employer fails to demonstrate that the policy or practice is job related for the position in question and consistent with business necessity.[59]

In its 1971 *Griggs v. Duke Power Company* decision, the Supreme Court first recognized that Title VII permits disparate impact claims.[60]   The *Griggs* Court explained that "[Title VII] proscribes . . . practices that are fair in form, but discriminatory in operation.  The touchstone is business necessity.  If an employment practice which operates to exclude [African Americans] cannot be shown to be related to job performance, the practice is prohibited."[61]   In 1991,

**App. 011**

Congress amended Title VII to codify this analysis of discrimination and its burdens of proof.[62] Title VII, as amended, states:

> An unlawful employment practice based on disparate impact is established . . . if a complaining party demonstrates that an employer uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity. . . .[63]

With respect to criminal records, there is Title VII disparate impact liability where the evidence shows that a covered employer's criminal record screening policy or practice disproportionately screens out a Title VII-protected group and the employer does not demonstrate that the policy or practice is job related for the positions in question and consistent with business necessity.

### A. Determining Disparate Impact of Policies or Practices that Screen Individuals Based on Records of Criminal Conduct

#### 1. Identifying the Policy or Practice

The first step in disparate impact analysis is to identify the particular policy or practice that causes the unlawful disparate impact. For criminal conduct exclusions, relevant information includes the text of the policy or practice, associated documentation, and information about how the policy or practice was actually implemented. More specifically, such information also includes which offenses or classes of offenses were reported to the employer (e.g., all felonies, all drug offenses); whether convictions (including sealed and/or expunged convictions), arrests, charges, or other criminal incidents were reported; how far back in time the reports reached (e.g., the last five, ten, or twenty years); and the jobs for which the criminal background screening was conducted.[64] Training or guidance documents used by the employer also are relevant, because they may specify which types of criminal history information to gather for particular jobs, how to gather the data, and how to evaluate the information after it is obtained.

#### 2. Determining Disparate Impact

Nationally, African Americans and Hispanics are arrested in numbers disproportionate to their representation in the general population. In 2010, 28% of all arrests were of African Americans,[65] even though African Americans only comprised approximately 14% of the general population.[66] In 2008, Hispanics were arrested for federal drug charges at a rate of approximately three times their proportion of the general population.[67] Moreover, African Americans and Hispanics were more likely than Whites to be arrested, convicted, or sentenced for drug offenses even though their rate of drug use is similar to the rate of drug use for Whites.[68]

African Americans and Hispanics also are incarcerated at rates disproportionate to their numbers in the general population. Based on national incarceration data, the U.S. Department of Justice estimated in 2001 that 1 out of every 17 White men (5.9% of the White men in the U.S.)

**App. 012**

is expected to go to prison at some point during his lifetime, assuming that current incarceration rates remain unchanged.[69]  This rate climbs to 1 in 6 (or 17.2%) for Hispanic men.[70]  For African American men, the rate of expected incarceration rises to 1 in 3 (or 32.2%).[71]  Based on a state-by-state examination of incarceration rates in 2005, African Americans were incarcerated at a rate 5.6 times higher than Whites,[72] and 7 states had a Black-to-White ratio of incarceration that was 10 to1.[73]  In 2010, Black men had an imprisonment rate that was nearly 7 times higher than White men and almost 3 times higher than Hispanic men.[74]

National data, such as that cited above, supports a finding that criminal record exclusions have a disparate impact based on race and national origin.  The national data provides a basis for the Commission to further investigate such Title VII disparate impact charges.  During an EEOC investigation, the employer also has an opportunity to show, with relevant evidence, that its employment policy or practice does not cause a disparate impact on the protected group(s).  For example, an employer may present regional or local data showing that African American and/or Hispanic men are not arrested or convicted at disproportionately higher rates in the employer's particular geographic area.  An employer also may use its own applicant data to demonstrate that its policy or practice did not cause a disparate impact.  The Commission will assess relevant evidence when making a determination of disparate impact, including applicant flow information maintained pursuant to the Uniform Guidelines on Employee Selection Procedures,[75] workforce data, criminal history background check data, demographic availability statistics, incarceration/conviction data, and/or relevant labor market statistics.[76]

An employer's evidence of a racially balanced workforce will not be enough to disprove disparate impact.  In *Connecticut v. Teal*, the Supreme Court held that a "bottom line" racial balance in the workforce does not preclude employees from establishing a prima facie case of disparate impact; nor does it provide employers with a defense.[77]  The issue is whether the policy or practice deprives a disproportionate number of Title VII-protected individuals of employment opportunities.[78]

Finally, in determining disparate impact, the Commission will assess the probative value of an employer's applicant data.  As the Supreme Court stated in *Dothard v. Rawlinson*, an employer's "application process might itself not adequately reflect the actual potential applicant pool since otherwise qualified people might be discouraged from applying" because of an alleged discriminatory policy or practice.[79]  Therefore, the Commission will closely consider whether an employer has a reputation in the community for excluding individuals with criminal records.  Relevant evidence may come from ex-offender employment programs, individual testimony, employer statements, evidence of employer recruitment practices, or publicly posted notices, among other sources.[80]  The Commission will determine the persuasiveness of such evidence on a case-by-case basis.

### B.    Job Related For the Position in Question and Consistent with Business Necessity

#### 1.    Generally

After the plaintiff in litigation establishes disparate impact, Title VII shifts the burdens of

**App. 013**

production and persuasion to the employer to "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity."[81]  In the legislative history of the 1991 Civil Rights Act, Congress referred to *Griggs* and its progeny such as *Albemarle Paper Company v. Moody*[82] and *Dothard*[83] to explain how this standard should be construed.[84]  The *Griggs* Court stated that the employer's burden was to show that the policy or practice is one that "bear[s] a demonstrable relationship to successful performance of the jobs for which it was used" and "measures the person for the job and not the person in the abstract."[85]  In both *Albemarle*[86] and *Dothard*,[87] the Court emphasized the factual nature of the business necessity inquiry.  The Court further stated in *Dothard* that the terms of the exclusionary policy must "be shown to be necessary to safe and efficient job performance."[88]

In a case involving a criminal record exclusion, the Eighth Circuit in its 1975 *Green v. Missouri Pacific Railroad* decision, held that it was discriminatory under Title VII for an employer to "follow[] the policy of disqualifying for employment any applicant with a conviction for any crime other than a minor traffic offense."[89]  The Eighth Circuit identified three factors (the "*Green* factors") that were relevant to assessing whether an exclusion is job related for the position in question and consistent with business necessity:

- The nature and gravity of the offense or conduct;[90]
- The time that has passed since the offense or conduct and/or completion of the sentence;[91] and
- The nature of the job held or sought.[92]

In 2007, the Third Circuit in *El v. Southeastern Pennsylvania Transportation Authority*[93] developed the statutory analysis in greater depth.  Douglas El challenged SEPTA's policy of excluding everyone ever convicted of a violent crime from the job of paratransit driver.[94]  El, a 55 year-old African American paratransit driver-trainee, was terminated from employment when SEPTA learned of his conviction for second-degree murder 40 years earlier; the conviction involved a gang fight when he was 15 years old and was his only disqualifying offense under SEPTA's policy.[95]  The Third Circuit expressed "reservations" about a policy such as SEPTA's (exclusion for all violent crimes, no matter how long ago they were committed) "in the abstract."[96]

Applying Supreme Court precedent, the *El* court observed that some level of risk is inevitable in all hiring, and that, "[i]n a broad sense, hiring policies . . . ultimately concern the management of risk."[97]  Recognizing that assessing such risk is at the heart of criminal record exclusions, the Third Circuit concluded that Title VII requires employers to justify criminal record exclusions by demonstrating that they "accurately distinguish between applicants [who] pose an unacceptable level of risk and those [who] do not."[98]

The Third Circuit affirmed summary judgment for SEPTA, but stated that the outcome of the case might have been different if Mr. El had, "for example, hired an expert who testified that there is a time at which a former criminal is no longer any more likely to recidivate than the average person, . . . [so] there would be a factual question for the jury to resolve."[99]  The Third Circuit reasoned, however, that the recidivism evidence presented by SEPTA's experts, in

**App. 014**

conjunction with the nature of the position at issue—paratransit driver-trainee with unsupervised access to vulnerable adults—required the employer to exercise the utmost care.[100]

In the subsections below, the Commission discusses considerations that are relevant to assessing whether criminal record exclusion policies or practices are job related and consistent with business necessity.  First, we emphasize that arrests and convictions are treated differently.

### 2.    Arrests

The fact of an arrest does not establish that criminal conduct has occurred.[101]  Arrests are not proof of criminal conduct.  Many arrests do not result in criminal charges, or the charges are dismissed.[102]  Even if an individual is charged and subsequently prosecuted, he is presumed innocent unless proven guilty.[103]

An arrest, however, may in some circumstances trigger an inquiry into whether the conduct underlying the arrest justifies an adverse employment action.  Title VII calls for a fact-based analysis to determine if an exclusionary policy or practice is job related and consistent with business necessity.  Therefore, an exclusion based on an arrest, in itself, is not job related and consistent with business necessity.

Another reason for employers not to rely on arrest records is that they may not report the final disposition of the arrest (e.g., not prosecuted, convicted, or acquitted).  As documented in Section III.A., *supra*, the DOJ/BJS reported that many arrest records in the FBI's III database and state criminal record repositories are not associated with final dispositions.[104]  Arrest records also may include inaccuracies or may continue to be reported even if expunged or sealed.[105]

> **Example 3: Arrest Record Is Not Grounds for Exclusion.**  Mervin and Karen, a middle-aged African American couple, are driving to church in a predominantly white town.  An officer stops them and interrogates them about their destination.  When Mervin becomes annoyed and comments that his offense is simply "driving while Black," the officer arrests him for disorderly conduct.  The prosecutor decides not to file charges against Mervin, but the arrest remains in the police department's database and is reported in a background check when Mervin applies with his employer of fifteen years for a promotion to an executive position.  The employer's practice is to deny such promotions to individuals with arrest records, even without a conviction, because it views an arrest record as an indicator of untrustworthiness and irresponsibility.  If Mervin filed a Title VII charge based on these facts, and disparate impact based on race were established, the EEOC would find reasonable cause to believe that his employer violated Title VII.

Although an arrest record standing alone may not be used to deny an employment opportunity, an employer may make an employment decision based on the conduct underlying the arrest if the conduct makes the individual unfit for the position in question.  The conduct, not the arrest, is relevant for employment purposes.

**App. 015**

**Example 4: Employer's Inquiry into Conduct Underlying Arrest**. Andrew, a Latino man, worked as an assistant principal in Elementary School for several years. After several ten and eleven-year-old girls attending the school accused him of touching them inappropriately on the chest, Andrew was arrested and charged with several counts of endangering the welfare of children and sexual abuse. Elementary School has a policy that requires suspension or termination of any employee who the school believes engaged in conduct that impacts the health or safety of the students. After learning of the accusations, the school immediately places Andrew on unpaid administrative leave pending an investigation. In the course of its investigation, the school provides Andrew a chance to explain the events and circumstances that led to his arrest. Andrew denies the allegations, saying that he may have brushed up against the girls in the crowded hallways or lunchroom, but that he doesn't really remember the incidents and does not have regular contact with any of the girls. The school also talks with the girls, and several of them recount touching in crowded situations. The school does not find Andrew's explanation credible. Based on Andrew's conduct, the school terminates his employment pursuant to its policy.

Andrew challenges the policy as discriminatory under Title VII. He asserts that it has a disparate impact based on national origin and that his employer may not suspend or terminate him based solely on an arrest without a conviction because he is innocent until proven guilty. After confirming that an arrest policy would have a disparate impact based on national origin, the EEOC concludes that no discrimination occurred. The school's policy is linked to conduct that is relevant to the particular jobs at issue, and the exclusion is made based on descriptions of the underlying conduct, not the fact of the arrest. The Commission finds no reasonable cause to believe Title VII was violated.

### 3.    Convictions

By contrast, a record of a conviction will usually serve as sufficient evidence that a person engaged in particular conduct, given the procedural safeguards associated with trials and guilty pleas.[106] However, there may be evidence of an error in the record, an outdated record, or another reason for not relying on the evidence of a conviction. For example, a database may continue to report a conviction that was later expunged, or may continue to report as a felony an offense that was subsequently downgraded to a misdemeanor.[107]

Some states require employers to wait until late in the selection process to ask about convictions.[108] The policy rationale is that an employer is more likely to objectively assess the relevance of an applicant's conviction if it becomes known when the employer is already knowledgeable about the applicant's qualifications and experience.[109] As a best practice, and consistent with applicable laws,[110] the Commission recommends that employers not ask about

13

**App. 016**

convictions on job applications and that, if and when they make such inquiries, the inquiries be limited to convictions for which exclusion would be job related for the position in question and consistent with business necessity.

### 4.    Determining Whether a Criminal Conduct Exclusion Is Job Related and Consistent with Business Necessity

To establish that a criminal conduct exclusion that has a disparate impact is job related and consistent with business necessity under Title VII, the employer needs to show that the policy operates to effectively link specific criminal conduct, and its dangers, with the risks inherent in the duties of a particular position.

Two circumstances in which the Commission believes employers will consistently meet the "job related and consistent with business necessity" defense are as follows:

o    The employer validates the criminal conduct screen for the position in question per the Uniform Guidelines on Employee Selection Procedures (Uniform Guidelines) standards (if data about criminal conduct as related to subsequent work performance is available and such validation is possible); [111] or

o    The employer develops a targeted screen considering at least the nature of the crime, the time elapsed, and the nature of the job (the three *Green* factors), and then provides an opportunity for an individualized assessment for people excluded by the screen to determine whether the policy as applied is job related and consistent with business necessity.

The individualized assessment would consist of notice to the individual that he has been screened out because of a criminal conviction; an opportunity for the individual to demonstrate that the exclusion should not be applied due to his particular circumstances; and consideration by the employer as to whether the additional information provided by the individual warrants an exception to the exclusion and shows that the policy as applied is not job related and consistent with business necessity.    *See* Section V.B.9, *infra* (examples of relevant considerations in individualized assessments).

Depending on the facts and circumstances, an employer may be able to justify a targeted criminal records screen solely under the *Green* factors.  Such a screen would need to be narrowly tailored to identify criminal conduct with a demonstrably tight nexus to the position in question. Title VII thus does not necessarily require individualized assessment in all circumstances. However, the use of individualized assessments can help employers avoid Title VII liability by allowing them to consider more complete information on individual applicants or employees, as part of a policy that is job related and consistent with business necessity.

### 5.    Validation

The Uniform Guidelines describe three different approaches to validating employment screens.[112]  However, they recognize that "[t]here are circumstances in which a user cannot or

**App. 017**

need not utilize" formal validation techniques and that in such circumstances an employer "should utilize selection procedures which are as job related as possible and which will minimize or eliminate adverse impact as set forth [in the following subsections]."[113] Although there may be social science studies that assess whether convictions are linked to future behaviors, traits, or conduct with workplace ramifications,[114] and thereby provide a framework for validating some employment exclusions, such studies are rare at the time of this drafting.

6.    **Detailed Discussion of the *Green* Factors and Criminal Conduct Screens**

Absent a validation study that meets the Uniform Guidelines' standards, the *Green* factors provide the starting point for analyzing how specific criminal conduct may be linked to particular positions.  The three *Green* factors are:

- The nature and gravity of the offense or conduct;
- The time that has passed since the offense, conduct and/or completion of the sentence; and
- The nature of the job held or sought.

a.    **The Nature and Gravity of the Offense or Conduct**

Careful consideration of the nature and gravity of the offense or conduct is the first step in determining whether a specific crime may be relevant to concerns about risks in a particular position.  The nature of the offense or conduct may be assessed with reference to the harm caused by the crime (e.g., theft causes property loss).  The legal elements of a crime also may be instructive.  For example, a conviction for felony theft may involve deception, threat, or intimidation.[115]  With respect to the gravity of the crime, offenses identified as misdemeanors may be less severe than those identified as felonies.

b.    **The Time that Has Passed Since the Offense, Conduct and/or Completion of the Sentence**

Employer policies typically specify the duration of a criminal conduct exclusion.  While the *Green* court did not endorse a specific timeframe for criminal conduct exclusions, it did acknowledge that permanent exclusions from all employment based on any and all offenses were not consistent with the business necessity standard.[116]  Subsequently, in *El*, the court noted that the plaintiff might have survived summary judgment if he had presented evidence that "there is a time at which a former criminal is no longer any more likely to recidivate than the average person . . . ."[117]  Thus, the court recognized that the amount of time that had passed since the plaintiff's criminal conduct occurred was probative of the risk he posed in the position in question.

Whether the duration of an exclusion will be sufficiently tailored to satisfy the business necessity standard will depend on the particular facts and circumstances of each case.  Relevant and available information to make this assessment includes, for example, studies demonstrating how much the risk of recidivism declines over a specified time.[118]

**App. 018**

### c.     The Nature of the Job Held or Sought

Finally, it is important to identify the particular job(s) subject to the exclusion. While a factual inquiry may begin with identifying the job title, it also encompasses the nature of the job's duties (e.g., data entry, lifting boxes), identification of the job's essential functions, the circumstances under which the job is performed (e.g., the level of supervision, oversight, and interaction with co-workers or vulnerable individuals), and the environment in which the job's duties are performed (e.g., out of doors, in a warehouse, in a private home). Linking the criminal conduct to the essential functions of the position in question may assist an employer in demonstrating that its policy or practice is job related and consistent with business necessity because it "bear[s] a demonstrable relationship to successful performance of the jobs for which it was used."[119]

### 7.     Examples of Criminal Conduct Exclusions that Do Not Consider the *Green* Factors

A policy or practice requiring an automatic, across-the-board exclusion from all employment opportunities because of any criminal conduct is inconsistent with the *Green* factors because it does not focus on the dangers of particular crimes and the risks in particular positions. As the court recognized in *Green*, "[w]e cannot conceive of any business necessity that would automatically place every individual convicted of any offense, except a minor traffic offense, in the permanent ranks of the unemployed."[120]

> **Example 5:    Exclusion Is Not Job Related and Consistent with Business Necessity.** The National Equipment Rental Company uses the Internet to accept job applications for all positions. All applicants must answer certain questions before they are permitted to submit their online application, including "have you ever been convicted of a crime?" If the applicant answers "yes," the online application process automatically terminates, and the applicant sees a screen that simply says "Thank you for your interest. We cannot continue to process your application at this time."
>
> The Company does not have a record of the reasons why it adopted this exclusion, and it does not have information to show that convictions for all offenses render all applicants unacceptable risks in all of its jobs, which range from warehouse work, to delivery, to management positions. If a Title VII charge were filed based on these facts, and there was a disparate impact on a Title VII-protected basis, the EEOC would find reasonable cause to believe that the blanket exclusion was not job related and consistent with business necessity because the risks associated with all convictions are not pertinent to all of the Company's jobs.
>
> **Example 6:    Exclusion Is Not Job Related and Consistent with Business Necessity.** Leo, an African American man, has worked

**App. 019**

successfully at PR Agency as an account executive for three years. After a change of ownership, the new owners adopt a policy under which it will not employ anyone with a conviction. The policy does not allow for any individualized assessment before exclusion. The new owners, who are highly respected in the industry, pride themselves on employing only the "best of the best" for every position. The owners assert that a quality workforce is a key driver of profitability.

Twenty years earlier, as a teenager, Leo pled guilty to a misdemeanor assault charge. During the intervening twenty years, Leo graduated from college and worked successfully in advertising and public relations without further contact with the criminal justice system. At PR Agency, all of Leo's supervisors assessed him as a talented, reliable, and trustworthy employee, and he has never posed a risk to people or property at work. However, once the new ownership of PR Agency learns about Leo's conviction record through a background check, it terminates his employment. It refuses to reconsider its decision despite Leo's positive employment history at PR Agency.

Leo files a Title VII charge alleging that PR Agency's conviction policy has a disparate impact based on race and is not job related for the position in question and consistent with business necessity. After confirming disparate impact, the EEOC considers PR Agency's defense that it employs only the "best of the best" for every position, and that this necessitates excluding everyone with a conviction. PR Agency does not show that all convictions are indicative of risk or danger in all its jobs for all time, under the *Green* factors. Nor does PR Agency provide any factual support for its assertion that having a conviction is necessarily indicative of poor work or a lack of professionalism. The EEOC concludes that there is reasonable cause to believe that the Agency's policy is not job related for the position in question and consistent with business necessity. [121]

### 8.    Targeted Exclusions that Are Guided by the *Green* Factors

An employer policy or practice of excluding individuals from particular positions for specified criminal conduct within a defined time period, as guided by the *Green* factors, is a targeted exclusion. Targeted exclusions are tailored to the rationale for their adoption, in light of the particular criminal conduct and jobs involved, taking into consideration fact-based evidence, legal requirements, and/or relevant and available studies.

**App. 020**

As discussed above in Section V.B.4, depending on the facts and circumstances, an employer may be able to justify a targeted criminal records screen solely under the *Green* factors. Such a screen would need to be narrowly tailored to identify criminal conduct with a demonstrably tight nexus to the position in question. Title VII thus does not necessarily require individualized assessment in all circumstances. However, the use of individualized assessments can help employers avoid Title VII liability by allowing them to consider more complete information on individual applicants or employees, as part of a policy that is job related and consistent with business necessity.

### 9.    Individualized Assessment

Individualized assessment generally means that an employer informs the individual that he may be excluded because of past criminal conduct; provides an opportunity to the individual to demonstrate that the exclusion does not properly apply to him; and considers whether the individual's additional information shows that the policy as applied is not job related and consistent with business necessity.

The individual's showing may include information that he was not correctly identified in the criminal record, or that the record is otherwise inaccurate. Other relevant individualized evidence includes, for example:

- The facts or circumstances surrounding the offense or conduct;
- The number of offenses for which the individual was convicted;
- Older age at the time of conviction, or release from prison; [122]
- Evidence that the individual performed the same type of work, post conviction, with the same or a different employer, with no known incidents of criminal conduct;
- The length and consistency of employment history before and after the offense or conduct; [123]
- Rehabilitation efforts, e.g., education/training; [124]
- Employment or character references and any other information regarding fitness for the particular position; [125] and
- Whether the individual is bonded under a federal, state, or local bonding program. [126]

If the individual does not respond to the employer's attempt to gather additional information about his background, the employer may make its employment decision without the information.

> **Example 7: Targeted Screen with Individualized Assessment Is Job Related and Consistent with Business Necessity.** County Community Center rents meeting rooms to civic organizations and small businesses, party rooms to families and social groups, and athletic facilities to local recreational sports leagues. The County has a targeted rule prohibiting anyone with a conviction for theft crimes (e.g., burglary, robbery, larceny, identity theft) from working in a position with access to personal financial

**App. 021**

information for at least four years after the conviction or release from incarceration. This rule was adopted by the County's Human Resources Department based on data from the County Corrections Department, national criminal data, and recent recidivism research for theft crimes. The Community Center also offers an opportunity for individuals identified for exclusion to provide information showing that the exclusion should not be applied to them.

Isaac, who is Hispanic, applies to the Community Center for a full-time position as an administrative assistant, which involves accepting credit card payments for room rentals, in addition to having unsupervised access to the personal belongings of people using the facilities. After conducting a background check, the County learns that Isaac pled guilty eighteen months earlier, at age twenty, to credit card fraud, and that he did not serve time in prison. Isaac confirms these facts, provides a reference from the restaurant where he now works on Saturday nights, and asks the County for a "second chance" to show that he is trustworthy. The County tells Isaac that it is still rejecting his employment application because his criminal conduct occurred eighteen months ago and is directly pertinent to the job in question. The information he provided did nothing to dispel the County's concerns.

Isaac challenges this rejection under Title VII, alleging that the policy has a disparate impact on Hispanics and is not job related and consistent with business necessity. After confirming disparate impact, the EEOC finds that this screen was carefully tailored to assess unacceptable risk in relevant positions, for a limited time period, consistent with the evidence, and that the policy avoided overbroad exclusions by allowing individuals an opportunity to explain special circumstances regarding their criminal conduct. Thus, even though the policy has a disparate impact on Hispanics, the EEOC does not find reasonable cause to believe that discrimination occurred because the policy is job related and consistent with business necessity. [127]

**Example 8: Targeted Exclusion Without Individualized Assessment Is Not Job Related and Consistent with Business Necessity.** "Shred 4 You" employs over 100 people to pick up discarded files and sensitive materials from offices, transport the materials to a secure facility, and shred and recycle them. The owner of "Shred 4 You" sells the company to a competitor, known as "We Shred." Employees of "Shred 4 You" must reapply for employment with "We Shred" and undergo a background check. "We Shred" has a targeted criminal conduct exclusion policy that prohibits the employment of anyone who has been convicted of any crime related to theft or fraud in the past five years, and the policy does not provide for any individualized consideration. The company explains that its clients entrust it with handling sensitive and confidential information

**App. 022**

and materials; therefore, it cannot risk employing people who pose an above-average risk of stealing information.

Jamie, who is African American, worked successfully for "Shred 4 You" for five years before the company changed ownership. Jamie applies for his old job, and "We Shred" reviews Jamie's performance appraisals, which include high marks for his reliability, trustworthiness, and honesty. However, when "We Shred" does a background check, it finds that Jamie pled guilty to misdemeanor insurance fraud five years ago, because he exaggerated the costs of several home repairs after a winter storm. "We Shred" management informs Jamie that his guilty plea is evidence of criminal conduct and that his employment will be terminated. Jamie asks management to consider his reliable and honest performance in the same job at "Shred 4 You," but "We Shred" refuses to do so. The employer's conclusion that Jamie's guilty plea demonstrates that he poses an elevated risk of dishonesty is not factually based given Jamie's history of trustworthiness in the same job. After confirming disparate impact based on race (African American), the EEOC finds reasonable cause to believe that Title VII was violated because the targeted exclusion was not job related and consistent with business necessity based on these facts.

## C.    Less Discriminatory Alternatives

If an employer successfully demonstrates that its policy or practice is job related for the position in question and consistent with business necessity, a Title VII plaintiff may still prevail by demonstrating that there is a less discriminatory "alternative employment practice" that serves the employer's legitimate goals as effectively as the challenged practice but that the employer refused to adopt.[128]

## VI.    Positions Subject to Federal Prohibitions or Restrictions on Individuals with Records of Certain Criminal Conduct

In some industries, employers are subject to federal statutory and/or regulatory requirements that prohibit individuals with certain criminal records from holding particular positions or engaging in certain occupations. Compliance with federal laws and/or regulations is a defense to a charge of discrimination. However, the EEOC will continue to coordinate with other federal departments and agencies with the goal of maximizing federal regulatory consistency with respect to the use of criminal history information in employment decisions.[129]

## A.    Hiring in Certain Industries

Federal laws and regulations govern the employment of individuals with specific convictions in certain industries or positions in both the private and public sectors. For example, federal law excludes an individual who was convicted in the previous ten years of specified crimes from working as a security screener or otherwise having unescorted access to the secure areas of an airport.[130] There are equivalent requirements for federal law enforcement officers,[131]

**App. 023**

child care workers in federal agencies or facilities,[132] bank employees, [133] and port workers,[134] among other positions.[135]    Title VII does not preempt these federally imposed restrictions. However, if an employer decides to impose an exclusion that goes beyond the scope of a federally imposed restriction, the discretionary aspect of the policy would be subject to Title VII analysis.

> **Example 9: Exclusion Is Not Job Related and Consistent with Business Necessity.**  Your Bank has a rule prohibiting anyone with convictions for any type of financial or fraud-related crimes within the last twenty years from working in positions with access to customer financial information, even though the federal ban is ten years for individuals who are convicted of any criminal offense involving dishonesty, breach of trust, or money laundering from serving in such positions.
>
> Sam, who is Latino, applies to Your Bank to work as a customer service representative.  A background check reveals that Sam was convicted of a misdemeanor for misrepresenting his income on a loan application fifteen years earlier.  Your Bank therefore rejects Sam, and he files a Title VII charge with the EEOC, alleging that the Bank's policy has a disparate impact based on national origin and is not job related and consistent with business necessity.  Your Bank asserts that its policy does not cause a disparate impact and that, even if it does, it is job related for the position in question because customer service representatives have regular access to financial information and depositors must have "100% confidence" that their funds are safe.  However, Your Bank does not offer evidence showing that there is an elevated likelihood of committing financial crimes for someone who has been crime-free for more than ten years.  After establishing that the Bank's policy has a disparate impact based on national origin, the EEOC finds that the policy is not job related for the position in question and consistent with business necessity.  The Bank's justification for adding ten years to the federally mandated exclusion is insufficient because it is only a generalized concern about security, without proof.

## B.    Obtaining Occupational Licenses

Title VII also does not preempt federal statutes and regulations that govern eligibility for occupational licenses and registrations.  These restrictions cover diverse sectors of the economy including the transportation industry,[136] the financial industry,[137] and import/export activities,[138] among others.[139]

## C.    Waiving or Appealing Federally Imposed Occupational Restrictions

Several federal statutes and regulations provide a mechanism for employers or individuals to appeal or apply for waivers of federally imposed occupational restrictions.  For example, unless a bank receives prior written consent from the Federal Deposit Insurance

**App. 024**

Corporation (FDIC), an individual convicted of a criminal offense involving dishonesty, breach of trust, money laundering, or another financially related crime may not work in, own, or control "an insured depository institution" (e.g., bank) for ten years under the Federal Deposit Insurance Act.[140]  To obtain such FDIC consent, the insured institution must file an application for a waiver on behalf of the particular individual.[141]  Alternatively, if the insured institution does not apply for the waiver on the individual's behalf, the individual may file a request directly with the FDIC for a waiver of the institution filing requirement, demonstrating "substantial good cause" to grant the waiver.[142]  If the FDIC grants the individual's waiver request, the individual can then file an application directly with the FDIC for consent to work for the insured institution in question.[143]  Once the institution, or the individual, submits the application, the FDIC's criminal record waiver review process requires consideration of mitigating factors that are consistent with Title VII, including evidence of rehabilitation, and the nature and circumstances of the crime.[144]

Additionally, port workers who are denied the Transportation Workers Identification Credential (TWIC) based on their conviction record may seek a waiver for certain permanently disqualifying offenses or interim disqualifying offenses, and also may file an individualized appeal from the Transportation Security Administration's initial determination of threat assessment based on the conviction.[145]  The Maritime Transportation Security Act, which requires all port workers to undergo a criminal background check to obtain a TWIC,[146] provides that individuals with convictions for offenses such as espionage, treason, murder, and a federal crime of terrorism are permanently disqualified from obtaining credentials, but those with convictions for firearms violations and distribution of controlled substances may be temporarily disqualified.[147]  Most offenses related to dishonesty are only temporarily disqualifying.[148]

> **Example 10: Consideration of Federally Imposed Occupational Restrictions.**  John Doe applies for a position as a truck driver for Truckers USA.  John's duties will involve transporting cargo to, from, and around ports, and Truckers USA requires all of its port truck drivers to have a TWIC.  The Transportation Security Administration (TSA) conducts a criminal background check and may deny the credential to applicants who have permanently disqualifying criminal offenses in their background as defined by federal law.  After conducting the background check for John Doe, TSA discovers that he was convicted nine years earlier for conspiracy to use weapons of mass destruction.  TSA denies John a security card because this is a permanently disqualifying criminal offense under federal law.[149]  John, who points out that he was a minor at the time of the conviction, requests a waiver by TSA because he had limited involvement and no direct knowledge of the underlying crime at the time of the offense.  John explains that he helped a friend transport some chemical materials that the friend later tried to use to damage government property.  TSA refuses to grant John's waiver request because a conviction for conspiracy to use weapons of mass destruction is not subject to the TSA's waiver procedures.[150]  Based on this denial, Truckers USA rejects John's application for the port truck driver position.  Title VII does not override Truckers USA's policy because the policy is consistent with another federal law.

**App. 025**

While Title VII does not mandate that an employer seek such waivers, where an employer does seek waivers it must do so in a nondiscriminatory manner.

### D.    Security Clearances

The existence of a criminal record may result in the denial of a federal security clearance, which is a prerequisite for a variety of positions with the federal government and federal government contractors.[151]    A federal security clearance is used to ensure employees' trustworthiness, reliability, and loyalty before providing them with access to sensitive national security information.[152]    Under Title VII's national security exception, it is not unlawful for an employer to "fail or refuse to hire and employ" an individual because "such individual has not fulfilled or has ceased to fulfill" the federal security requirements.[153]    This exception focuses on whether the position in question is, in fact, subject to national security requirements that are imposed by federal statute or Executive Order, and whether the adverse employment action actually resulted from the denial or revocation of a security clearance.[154]    Procedural requirements related to security clearances must be followed without regard to an individual's race, color, religion, sex, or national origin.[155]

### E.    Working for the Federal Government

Title VII provides that, with limited coverage exceptions, "[a]ll personnel actions affecting employees or applicants for employment . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."[156]    The principles discussed above in this Guidance apply in the federal employment context.    In most circumstances, individuals with criminal records are not automatically barred from working for the federal government.[157]    However, the federal government imposes criminal record restrictions on its workforce through "suitability" requirements for certain positions.[158]    The federal government's Office of Personnel Management (OPM) defines suitability as "determinations based on a person's character or conduct that may have an impact on the integrity or efficiency of the service."[159]    Under OPM's rules, agencies may bar individuals from federal employment for up to three years if they are found unsuitable based on criminal or dishonest conduct, among other factors.[160]    OPM gives federal agencies the discretion to consider relevant mitigating criteria when deciding whether an individual is suitable for a federal position.[161]    These mitigating criteria, which are consistent with the three *Green* factors and also provide an individualized assessment of the applicant's background, allow consideration of: (1) the nature of the position for which the person is applying or in which the person is employed; (2) the nature and seriousness of the conduct; (3) the circumstances surrounding the conduct; (4) the recency of the conduct; (5) the age of the person involved at the time of the conduct; (6) contributing societal conditions; and (7) the absence or presence of rehabilitation or efforts toward rehabilitation.[162]    In general, OPM requires federal agencies and departments to consider hiring an individual with a criminal record if he is the best candidate for the position in question and can comply with relevant job requirements.[163]    The EEOC continues to coordinate with OPM to achieve employer best practices in the federal sector.[164]

**App. 026**

## VII. Positions Subject to State and Local Prohibitions or Restrictions on Individuals with Records of Certain Criminal Conduct

States and local jurisdictions also have laws and/or regulations that restrict or prohibit the employment of individuals with records of certain criminal conduct.[165] Unlike federal laws or regulations, however, state and local laws or regulations are preempted by Title VII if they "purport[] to require or permit the doing of any act which would be an unlawful employment practice" under Title VII.[166] Therefore, if an employer's exclusionary policy or practice is *not* job related and consistent with business necessity, the fact that it was adopted to comply with a state or local law or regulation does not shield the employer from Title VII liability.[167]

> **Example 11: State Law Exclusion Is Job Related and Consistent with Business Necessity.** Elijah, who is African American, applies for a position as an office assistant at Pre-School, which is in a state that imposes criminal record restrictions on school employees. Pre-School, which employs twenty-five full- and part-time employees, uses all of its workers to help with the children. Pre-School performs a background check and learns that Elijah pled guilty to charges of indecent exposure two years ago. After being rejected for the position because of his conviction, Elijah files a Title VII disparate impact charge based on race to challenge Pre-School's policy. The EEOC conducts an investigation and finds that the policy has a disparate impact and that the exclusion is job related for the position in question and consistent with business necessity because it addresses serious safety risks of employment in a position involving regular contact with children. As a result, the EEOC would not find reasonable cause to believe that discrimination occurred.

> **Example 12: State Law Exclusion Is Not Consistent with Title VII.** County Y enforces a law that prohibits all individuals with a criminal conviction from working for it. Chris, an African American man, was convicted of felony welfare fraud fifteen years ago, and has not had subsequent contact with the criminal justice system. Chris applies to County Y for a job as an animal control officer trainee, a position that involves learning how to respond to citizen complaints and handle animals. The County rejects Chris's application as soon as it learns that he has a felony conviction. Chris files a Title VII charge, and the EEOC investigates, finding disparate impact based on race and also that the exclusionary policy is not job related and consistent with business necessity. The County cannot justify rejecting everyone with any conviction from all jobs. Based on these facts, County Y's law "purports to require or permit the doing of an[] act which would be an unlawful employment practice" under Title VII.

**App. 027**

### VIII.   Employer Best Practices

The following are examples of best practices for employers who are considering criminal record information when making employment decisions.

*General*

- Eliminate policies or practices that exclude people from employment based on any criminal record.

- Train managers, hiring officials, and decisionmakers about Title VII and its prohibition on employment discrimination.

*Developing a Policy*

- Develop a narrowly tailored written policy and procedure for screening applicants and employees for criminal conduct.

  - Identify essential job requirements and the actual circumstances under which the jobs are performed.

  - Determine the specific offenses that may demonstrate unfitness for performing such jobs.

    o   Identify the criminal offenses based on all available evidence.

  - Determine the duration of exclusions for criminal conduct based on all available evidence.

    o   Include an individualized assessment.

  - Record the justification for the policy and procedures.

  - Note and keep a record of consultations and research considered in crafting the policy and procedures.

- Train managers, hiring officials, and decisionmakers on how to implement the policy and procedures consistent with Title VII.

*Questions about Criminal Records*

- When asking questions about criminal records, limit inquiries to records for which exclusion would be job related for the position in question and consistent with business necessity.

**App. 028**

*Confidentiality*

- Keep information about applicants' and employees' criminal records confidential.  Only use it for the purpose for which it was intended.


Approved by the Commission:


_____                    _____
Chair Jacqueline A. Berrien                                          Date

**App. 029**

# ENDNOTES

[1]   42 U.S.C. § 2000e *et seq*.  The EEOC also enforces other anti-discrimination laws including: Title I of the Americans with Disabilities Act of 1990, as amended (ADA),  and Section 501 of the Rehabilitation Act, as amended, which prohibit employment discrimination on the basis of disability; the Age Discrimination in Employment Act of 1967, as amended (ADEA), which prohibits discrimination on the basis of age 40 or above; Title II of the Genetic Information Nondiscrimination Act of 2008 (GINA), which prohibits discrimination on the basis of genetic information; and the Equal Pay Act of 1963, as amended (EPA), which requires employers to pay male and female employees at the same establishment equal wages for equal work.

[2]   All entities covered by Title VII are subject to this analysis.  *See* 42 U.S.C. § 2000e-2 (anti-discrimination provisions); 42 U.S.C. § 2000e(b)–(e) (defining "employer," "employment agency," and "labor organization"); 42 U.S.C. § 2000e-16(a) (prohibiting discriminatory employment practices by federal departments and agencies).  For purposes of this Guidance, the term "employer" is used in lieu of listing all Title VII-covered entities.  The Commission considers other coverage questions that arise in particular charges involving, for example, joint employment or third party interference in *Compliance Manual Section 2: Threshold Issues,* U.S. EQUAL EMP'T OPPORTUNITY COMM'N, § 2-III B., *Covered Entities,* http://www.eeoc.gov/policy/docs/threshold.html#2-III-B (last visited April 23, 2012).

[3]   For the purposes of this Guidance, references to "contact" with the criminal justice system may include, for example, an arrest, charge, indictment, citation, conviction, incarceration, probation, or parole.

[4]   *See* THOMAS P. BONCZAR, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, PREVALENCE OF IMPRISONMENT IN THE U.S. POPULATION, 1974–2001, at 3 (2003), http://bjs.ojp.usdoj.gov/content/pub/pdf/piusp01.pdf [hereinafter PREVALENCE OF IMPRISONMENT] ("Between 1974 and 2001 the number of former prisoners living in the United States more than doubled, from 1,603,000 to 4,299,000."); SEAN ROSENMERKEL ET AL., BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, FELONY SENTENCES IN STATE COURTS, 2006 – STATISTICAL TABLES 1 (2009), http://bjs.ojp.usdoj.gov/content/pub/pdf/fssc06st.pdf (reporting that between 1990 and 2006, there has been a 37% increase in the number of felony offenders sentenced in state courts); *see also* PEW CTR. ON THE STATES, ONE IN 31: THE LONG REACH OF AMERICAN CORRECTIONS 4 (2009), http://www.pewcenteronthestates.org/uploadedFiles/PSPP_1in31_report_FINAL_WEB_3-26-09.pdf [hereinafter ONE IN 31] ("During the past quarter-century, the number of prison and jail inmates has grown by 274 percent . . . .[bringing] the total population in custody to 2.3 million. During the same period, the number under community supervision grew by a staggering 3,535,660 to a total of 5.1 million."); PEW CTR. ON THE STATES, ONE IN 100: BEHIND BARS IN AMERICA 2008, at 3 (2008), http://www.pewcenteronthestates.org/uploadedFiles/8015PCTS_Prison08_FINAL_2-1-1_FORWEB.pdf ("[M]ore than one in every 100 adults is now confined in an American jail or

**App. 030**

prison."); Robert Brame, Michael G. Turner, Raymond Paternoster, & Shawn D. Bushway, *Cumulative Prevalence of Arrest From Ages 8 to 23 in a National Sample*, 129 PEDIATRICS 21, 25, 26 (2012) (finding that approximately 1 out of 3 of all American youth will experience at least 1 arrest for a nontraffic offense by the age of 23).

[5]    *See* JOHN SCHMITT & KRIS WARNER, CTR. FOR ECON. & POLICY RESEARCH, EX-OFFENDERS AND THE LABOR MARKET 12 (2010), www.cepr.net/documents/publications/ex-offenders-2010-11.pdf ("In 2008, ex-prisoners were 2.9 to 3.2 percent of the total working-age population (excluding those currently in prison or jail) or about one in 33 working-age adults. Ex-felons were a larger share of the total working-age population: 6.6 to 7.4 percent, or about one in 15 working-age adults [not all felons serve prison terms]."); *see id.* at 3 (concluding that "in the absence of some reform of the criminal justice system, the share of ex-offenders in the working-age population will rise substantially in coming decades").

[6]    PREVALENCE OF IMPRISONMENT, *supra* note 4, at 4, Table 3.

[7]    *Id.*

[8]    ONE IN 31, *supra* note 4, at 5 (noting that when all of the individuals who are probationers, parolees, prisoners or jail inmates are added up, the total is more than 7.3 million adults; this is more than the populations of Chicago, Philadelphia, San Diego, and Dallas combined, and larger than the populations of 38 states and the District of Columbia).

[9]    PREVALENCE OF IMPRISONMENT, *supra* note 4, at 7.

[10]    *Id.* at 5, Table 5; *cf.* PEW CTR. ON THE STATES, COLLATERAL COSTS: INCARCERATION'S EFFECT ON ECONOMIC MOBILITY 6 (2010), http://www.pewcenteronthestates.org/uploadedFiles/Collateral_Costs.pdf?n=8653 ("Simply stated, incarceration in America is concentrated among African American men.  While 1 in every 87 white males ages 18 to 64 is incarcerated and the number for similarly-aged Hispanic males is 1 in 36, for black men it is 1 in 12.").  Incarceration rates are even starker for 20-to-34-year-old men without a high school diploma or GED: 1 in 8 White males in this demographic group is incarcerated, compared to 1 in 14 Hispanic males, and 1 in 3 Black males. PEW CTR. ON THE STATES, *supra*, at 8, Figure 2.

[11]    This document uses the terms "Black" and "African American," and the terms "Hispanic" and "Latino," interchangeably.

[12]    *See infra* notes 65–67 (citing data for the arrest rates and population statistics for African Americans and Hispanics).

[13]    PREVALENCE OF IMPRISONMENT, *supra* note 4, at 1.

[14]    *Id.* at 8.

**App. 031**

---

[15]    *See Policy Statement on the Issue of Conviction Records Under Title VII of the Civil Rights Act of 1964*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N (Feb. 4, 1987), http://www.eeoc.gov/policy/docs/convict1.html; *EEOC Policy Statement on the Use of Statistics in Charges Involving the Exclusion of Individuals with Conviction Records from Employment*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N  (July 29, 1987), http://www.eeoc.gov/policy/docs/convict2.html; *Policy Guidance on the Consideration of Arrest Records in Employment Decisions Under Title VII*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N (Sept. 7, 1990), http://www.eeoc.gov/policy/docs/arrest_records.html;  *Compliance Manual Section 15: Race & Color Discrimination*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, § 15-VI.B.2 (April 19, 2006), http://www.eeoc.gov/policy/docs/race-color.pdf. *See also* EEOC Decision No. 72-1497 (1972) (challenging a criminal record exclusion policy based on "serious crimes"); EEOC Decision No. 74-89 (1974) (challenging a policy where a felony conviction was considered an adverse factor that would lead to disqualification); EEOC Decision No. 78-03 (1977) (challenging an exclusion policy based on felony or misdemeanor convictions involving moral turpitude or the use of drugs); EEOC Decision No. 78-35 (1978) (concluding that an employee's discharge was reasonable given his pattern of criminal behavior and the severity and recentness of his criminal conduct).

[16]    In 2011, U.S. Attorney General Eric Holder assembled a Cabinet-level interagency Reentry Council to support the federal government's efforts to promote the successful reintegration of ex-offenders back into their communities.  *National Reentry Resource Center – Federal Interagency Reentry Council*, http://www.nationalreentryresourcecenter.org/reentry-council (last visited April 23, 2012).  As a part of the Council's efforts, it has focused on removing barriers to employment for ex-offenders to reduce recidivism by publishing several fact sheets on employing individuals with criminal records.  *See, e.g.*, FED. INTERAGENCY REENTRY COUNCIL, REENTRY MYTHBUSTER! ON FEDERAL HIRING POLICIES (2011), http://www.nationalreentryresourcecenter.org/documents/0000/1083/Reentry_Council_Mythbuster_Fed_Employment.pdf; FED. INTERAGENCY REENTRY COUNCIL, REENTRY MYTHBUSTER!  ON HIRING/CRIMINAL RECORDS GUIDANCE (2011), http://www.nationalreentryresourcecenter.org/documents/0000/1082/Reentry_Council_Mythbuster_Employment.pdf; FED. INTERAGENCY REENTRY COUNCIL, REENTRY MYTHBUSTER! CRIMINAL HISTORIES AND EMPLOYMENT BACKGROUND CHECKS (2011), http://www.nationalreentryresourcecenter.org/documents/0000/1176/Reentry_Council_Mythbuster_FCRA_Employment.pdf; FED. INTERAGENCY REENTRY COUNCIL, REENTRY MYTHBUSTER! ON FEDERAL BONDING PROGRAM (2011), http://www.nationalreentryresourcecenter.org/documents/0000/1061/Reentry_Council_Mythbuster_Federal_Bonding.pdf.

        In addition to these federal efforts, several state law enforcement agencies have embraced initiatives and programs that encourage the employment of ex-offenders.  For example, Texas' Department of Criminal Justice has a Reentry and Integration Division and within that Division, a Reentry Task Force Workgroup.  *See Reentry and Integration Division-Reentry Task Force*, TEX. DEP'T OF CRIMINAL JUSTICE, http://www.tdcj.state.tx.us/divisions/rid/rid_texas_reentry_task_force.html (last visited April 23, 2012).  One of the Workgroups in this Task Force specifically focuses on identifying

**App. 032**

employment opportunities for ex-offenders and barriers that affect ex-offenders' access to employment or vocational training programs. *Reentry and Integration Division – Reentry Task Force Workgroups*, TEX. DEP'T OF CRIMINAL JUSTICE, http://www.tdcj.state.tx.us/divisions/rid/r_workgroup/rid_workgroup_employment.html (last visited April 23, 2012). Similarly, Ohio's Department of Rehabilitation and Correction has an Offender Workforce Development Office that "works with departmental staff and correctional institutions within the Ohio Department of Rehabilitation and Correction to prepare offenders for employment and the job search process." *Jobs for Ohio Offenders*, OHIO DEP'T OF REHAB. AND CORR. OFFENDER WORKFORCE DEV., http://www.drc.ohio.gov/web/JOBOFFEN.HTM (last updated Aug. 9, 2010). Law enforcement agencies in other states such as Indiana and Florida have also recognized the importance of encouraging ex-offender employment. *See, e.g.*, *IDOC: Road to Re-Entry*, IND. DEP'T OF CORR., http://www.in.gov/idoc/reentry/index.htm (last visited April 23, 2012) (describing various services and programs that are available to ex-offenders to help them to obtain employment); FLA. DEP'T OF CORRS., RECIDIVISM REDUCTION STRATEGIC PLAN: FISCAL YEAR 2009-2014, at 11, 12 (2009), http://www.dc.state.fl.us/orginfo/FinalRecidivismReductionPlan.pdf (identifying the lack of employment as one of the barriers to successful ex-offender reentry).

17      CARL R. ERNST & LES ROSEN, "NATIONAL" CRIMINAL HISTORY DATABASES 1 (2002), http://www.brbpub.com/articles/CriminalHistoryDB.pdf.

18      LEXISNEXIS, CRIMINAL BACKGROUND CHECKS: WHAT NON-PROFITS NEED TO KNOW ABOUT CRIMINAL RECORDS 4 (2009), http://www.lexisnexis.com/risk/nonprofit/documents/Volunteer_Screening_White_Paper.pdf.

19      *Id.*

20      ERNST & ROSEN, *supra* note 17, at 1; NAT'L ASS'N OF PROF'L BACKGROUND SCREENERS, CRIMINAL BACKGROUND CHECKS FOR EMPLOYMENT PURPOSES 5, http://www.napbs.com/files/public/Learn_More/White_Papers/CriminalBackgroundChecks.pdf.

21      LEXISNEXIS, *supra* note 18, at 6. *See also* NAT'L ASS'N OF PROF'L BACKGROUND SCREENERS, *supra* note 20 at 5.

22      ERNST & ROSEN, *supra* note 17, at 1.

23      *Id.*

24      *See* SEARCH, THE NATIONAL TASK FORCE ON THE CRIMINAL BACKGROUNDING OF AMERICA 3, 4 (2005), http://www.search.org/files/pdf/ReportofNTFCBA.pdf. Registries and watch lists can also include federal and international terrorist watch lists, and registries of individuals who are being investigated for certain types of crimes, such as gang-related crimes. *Id. See also* LEXISNEXIS, *supra* note 18, at 5 (reporting that "all 50 states currently have a publicly available sex offender registry").

25      *See* U.S. DEP'T OF JUSTICE, THE ATTORNEY GENERAL'S REPORT ON CRIMINAL HISTORY

**App. 033**

BACKGROUND CHECKS 4 (2006), http://www.justice.gov/olp/ag_bgchecks_report.pdf [hereinafter BACKGROUND CHECKS].  *See also* ERNST & ROSEN, *supra* note 17, at 2.

[26]    *See* NAT'L ASS'N OF PROF'L BACKGROUND SCREENERS, *supra* note 20, at 5.  *See also* LEXISNEXIS, *supra* note 18, at 5.

[27]    LEXISNEXIS, *supra* note 18, at 5.  *See also* AM. ASS'N OF COLLS. OF PHARMACY, REPORT OF THE AACP CRIMINAL BACKGROUND CHECK ADVISORY PANEL 6–7 (2006), http://www.aacp.org/resources/academicpolicies/admissionsguidelines/Documents/AACPBackgroundChkRpt.pdf.

[28]    AM. ASS'N OF COLLS. OF PHARMACY, *supra* note 27, at 6–7.

[29]    BACKGROUND CHECKS, *supra* note 25, at 4.

[30]    *Id.*

[31]    NAT'L ASS'N OF PROF'L BACKGROUND SCREENERS, *supra* note 20, at 5.

[32]    BACKGROUND CHECKS, *supra* note 25, at 4.

[33]    *Id.* at 3.

[34]    *See id.* ("Non-criminal justice screening using FBI criminal history records is typically done by a government agency applying suitability criteria that have been established by law or the responsible agency.").

[35]    *Id.* at 5.

[36]    *Id.* at 4.

[37]    DENNIS A. DEBACCO & OWEN M. GREENSPAN, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, SURVEY OF STATE CRIMINAL HISTORY INFORMATION SYSTEMS, 2010, at 2 (2011), https://www.ncjrs.gov/pdffiles1/bjs/grants/237253.pdf [hereinafter STATE CRIMINAL HISTORY].

[38]    *See* BACKGROUND CHECKS, *supra* note 25, at 17.

[39]    SEARCH, REPORT OF THE NATIONAL TASK FORCE ON THE COMMERCIAL SALE OF CRIMINAL JUSTICE RECORD INFORMATION 83 (2005), www.search.org/files/pdf/RNTFCSCJRI.pdf; *see also* Douglas Belkin, *More Job Seekers Scramble to Erase Their Criminal Past*, WALL ST. J., Nov. 11, 2009, at A1, *available at* http://online.wsj.com/article/SB125789494126242343.html?KEYWORDS=Douglas+Belkin ("Arrests that have been legally expunged may remain on databases that data-harvesting companies offer to prospective employers; such background companies are under no legal obligation to erase them.").

If applicants deny the existence of expunged or sealed records, as they are permitted to do in several states, they may appear dishonest if such records are reported in a criminal background check. *See generally* Debbie A. Mukamal & Paul N. Samuels, *Statutory Limitations on Civil Rights of People with Criminal Records*, 30 FORDHAM URB. L.J. 1501, 1509–10 (2003) (noting that 29 of the 40 states that allow expungement/sealing of arrest records permit the subject of the record to deny its existence if asked about it on employment applications or similar forms, and 13 of the 16 states that allow the expungement/sealing of adult conviction records permit the subject of the record to deny its existence under similar circumstances).

40    *See* SEARCH, INTERSTATE IDENTIFICATION NAME CHECK EFFICACY: REPORT OF THE NATIONAL TASK FORCE TO THE U.S. ATTORNEY GENERAL 21–22 (1999), www.search.org/files/pdf/III_Name_Check.pdf ("A so-called 'name check' is based not only on an individual's name, but also on other personal identifiers such as sex, race, date of birth and Social Security Number. . . . [N]ame checks are known to produce inaccurate results as a consequence of identical or similar names and other identifiers."); *id.* at 7 (finding that in a sample of 82,601 employment applicants, 4,562 of these individuals were *inaccurately* indicated by a "name check" to have criminal records, which represents approximately 5.5% of the overall sample).

41    BACKGROUND CHECKS, *supra* note 25, at 2.

42    A "consumer reporting agency" is defined by FCRA as "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information *or other information* on consumers for the purposes of furnishing consumer reports to third parties . . . ."  15 U.S.C. § 1681a(f) (emphasis added); *see also* BACKGROUND CHECKS, *supra* note 25, at 43 (stating that the records that CRAs collect include "criminal history information, such as arrest and conviction information").

43    A "consumer report" is defined by FCRA as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, *character, general reputation, personal characteristics*, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for . . . employment purposes . . . ." 15 U.S.C. § 1681a(d)(1) (emphasis added).

44    *See* 15 U.S.C. § 1681c(a)(2) ("[N]o consumer reporting agency may make any consumer report containing . . . records of arrest that, from date of entry, antedate the report by more than seven years or until the governing statute of limitations has expired, whichever is the longer period."). *But see id.* §1681c(b)(3) (stating that the reporting restrictions for arrest records do not apply to individuals who will earn "an annual salary which equals, or which may reasonably be expected to equal $75,000 or more").

45    15 U.S.C. § 1681c(a)(5) ("[N]o consumer reporting agency may make any consumer report containing . . . [a]ny other adverse item of information, other than records of convictions of crimes which antedates the report by more than seven years.").

**App. 035**

---

[46]    BACKGROUND CHECKS, *supra* note 25, at 2.

[47]    *See* Adam Klein, *Written Testimony of Adam Klein*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/7-26-11/klein.cfm (last visited April 23, 2012) (describing how "several data-collection agencies also market and sell a retail-theft contributory database that is used by prospective employers to screen applicants"). *See also Retail Theft Database, ESTEEM, Workplace Theft Contributory Database*, LEXISNEXIS, http://www.lexisnexis.com/risk/solutions/retail-theft-contributory-database.aspx (last visited April 23, 2012) (stating that their database has "[t]heft and shoplifting cases supplied by more than 75,000 business locations across the country"). These databases may contain inaccurate and/or misleading information about applicants and/or employees. *See generally* Goode v. LexisNexis Risk & Info. Analytics Grp., Inc., No. 2:11-CV-2950-JD, 2012 WL 975043 (E.D. Pa. Mar. 22, 2012) (unpublished).

[48]    BACKGROUND CHECKS, *supra* note 25, at 2.

[49]    SOC'Y FOR HUMAN RES. MGMT., BACKGROUND CHECKING: CONDUCTING CRIMINAL BACKGROUND CHECKS, slide 3 (Jan. 22, 2010), http://www.slideshare.net/shrm/background-check-criminal?from=share_email [hereinafter CONDUCTING CRIMINAL BACKGROUND CHECKS] (73% of the responding employers reported that they conducted criminal background checks on all of their job candidates, 19% reported that they conducted criminal background checks on selected job candidates, and a mere 7% reported that they did not conduct criminal background checks on any of their candidates). The survey excluded the "not sure" responses from its analysis, which may account for the 1% gap in the total number of employer responses. *Id.*

[50]    CONDUCTING CRIMINAL BACKGROUND CHECKS, *supra* note 49, at slide 7 (39% of the surveyed employers reported that they conducted criminal background checks "[t]o reduce/prevent theft and embezzlement, other criminal activity"); *see also* Sarah E. Needleman, *Businesses Say Theft by Their Workers is Up*, WALL ST. J., Dec. 11, 2008, at B8, *available at* http://online.wsj.com/article/SB122896381748896999.html.

[51]    CONDUCTING CRIMINAL BACKGROUND CHECKS, *supra* note 49, at slide 7 (61% of the surveyed employers reported that they conducted criminal background checks "[to] ensure a safe work environment for employees"); *see also* ERIKA HARRELL, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, WORKPLACE VIOLENCE, 1993–2009, at 1 (2011), http://bjs.ojp.usdoj.gov/content/pub/pdf/wv09.pdf (reporting that in 2009, "[n]onfatal violence in the workplace was about 15% of all nonfatal violent crime against persons age 16 or older"). *But see id.* (noting that from "2002 to 2009, the rate of nonfatal workplace violence has declined by 35%, following a 62% decline in the rate from 1993 to 2002"). Studies indicate that most workplace violence is committed by individuals with no relationship to the business or its employees. *See id.* at 6 (reporting that between 2005 and 2009, strangers committed the majority of workplace violence against individuals (53% for males and 41% for females) while violence committed by co-workers accounted for a much smaller percentage (16.3% for males and 14.3% for females)); *see also* NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, CTR. FOR DISEASE CONTROL & PREVENTION, WORKPLACE VIOLENCE PREVENTION STRATEGIES AND RESEARCH

**App. 036**

NEEDS 4, Table 1 (2006), http://www.cdc.gov/niosh/docs/2006-144/pdfs/2006-144.pdf (reporting that approximately 85% of the workplace homicides examined were perpetrated in furtherance of a crime by persons with no relationship to the business or its employees; approximately 7% were perpetrated by employees or former employees, 5% were committed by persons with a personal relationship to an employee, and 3% were perpetrated by persons with a customer-client relationship to the business).

52    CONDUCTING CRIMINAL BACKGROUND CHECKS, *supra* note 49, at slide 7 (55% percent of the surveyed employers reported that they conducted criminal background checks "[t]o reduce legal liability for negligent hiring"). Employers have a common law duty to exercise reasonable care in hiring to avoid foreseeable risks of harm to employees, customers, and the public. If an employee engages in harmful misconduct on the job, and the employer has not exercised such care in selecting the employee, the employer may be subject to liability for negligent hiring. *See, e.g.*, Stires v. Carnival Corp., 243 F. Supp. 2d 1313, 1318 (M.D. Fla. 2002) ("[N]egligent hiring occurs when . . . the employer knew or should have known of the employee's unfitness, and the issue of liability primarily focuses upon the adequacy of the employer's pre-employment investigation into the employee's background.").

53    CONDUCTING CRIMINAL BACKGROUND CHECKS, *supra* note 49, at slide 4 (40% of the surveyed employers reported that they conducted criminal background checks for "[j]ob candidates for positions for which state law requires a background check (e.g., day care teachers, licensed medical practitioners, etc.)"); *see id.* at slide 7 (20% of the employers reported that they conducted criminal background checks "[t]o comply with the applicable State law requiring a background check (e.g., day care teachers, licensed medical practitioners, etc.) for a particular position"). The study did not report the exact percentage of employers that conducted criminal background checks to comply with applicable federal laws or regulations, but it did report that 25% of the employers conducted background checks for "[j]ob candidates for positions involving national defense or homeland security." *Id.* at slide 4.

54    *See* 42 U.S.C. § 2000e-2(a).

55    Disparate treatment based on the race or national origin of job applicants with the same qualifications and criminal records has been documented. For example, a 2003 study demonstrated that White applicants with the same qualifications and criminal records as Black applicants were three times more likely to be invited for interviews than the Black applicants. *See* Devah Pager, *The Mark of a Criminal Record*, 108 AM. J. SOC. 937, 958, Figure 6 (2003), www.princeton.edu/~pager/pager_ajs.pdf. Pager matched pairs of young Black and White men as "testers" for her study. The "testers" in Pager's study were college students who applied for 350 low-skilled jobs advertised in Milwaukee-area classified advertisements, to test the degree to which a criminal record affects subsequent employment opportunities. The same study showed that White job applicants with a criminal record were called back for interviews more often than equally-qualified Black applicants who *did not have* a criminal record. *Id.* at 958. *See also* Devah Pager et al., *Sequencing Disadvantage: The Effects of Race and Criminal Background for Low Wage Job Seekers*, 623 ANNALS AM. ACAD. POL. & SOC. SCI., 199 (2009), www.princeton.edu/~pager/annals_sequencingdisadvantage.pdf (finding that among Black and

**App. 037**

White testers with similar backgrounds and criminal records, "the negative effect of a criminal conviction is substantially larger for blacks than whites. . . . the magnitude of the criminal record penalty suffered by black applicants (60 percent) is roughly double the size of the penalty for whites with a record (30 percent)"); *see id.* at 200–201 (finding that personal contact plays an important role in mediating the effects of a criminal stigma in the hiring process, and that Black applicants are less often invited to interview, thereby having fewer opportunities to counteract the stigma by establishing rapport with the hiring official); Devah Pager, *Statement of Devah Pager, Professor of Sociology at Princeton University*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/11-20-08/pager.cfm (last visited April 23, 2012) (discussing the results of the *Sequencing Disadvantage* study); DEVAH PAGER & BRUCE WESTERN, NYC COMMISSION ON HUMAN RIGHTS, RACE AT WORK, REALITIES OF RACE AND CRIMINAL RECORD IN THE NYC JOB MARKET 6, Figure 2 (2006), http://www.nyc.gov/html/cchr/pdf/race_report_web.pdf (finding that White testers *with* a felony conviction were called back 13% of the time, Hispanic testers *without* a criminal record were called back 14% of the time, and Black testers *without* a criminal record were called back 10% of the time).

56    *Race & Color Discrimination*, *supra* note 15, § V.A.1.

57    A 2006 study demonstrated that employers who are averse to hiring people with criminal records sometimes presumed, in the absence of evidence to the contrary, that African American men applying for jobs have disqualifying criminal records. Harry J. Holzer et al., *Perceived Criminality, Criminal Background Checks, and the Racial Hiring Practices of Employers*, 49 J.L. & ECON. 451 (2006), http://www.jstor.org/stable/pdfplus/10.1086/501089.pdf; *see also* HARRY HOLZER ET AL., URBAN INST., EMPLOYER DEMAND FOR EX-OFFENDERS: RECENT EVIDENCE FROM LOS ANGELES 6–7 (2003), http://www.urban.org/UploadedPDF/410779_ExOffenders.pdf (describing the results of an employer survey where over 40% of the employers indicated that they would "probably not" or "definitely not" be willing to hire an applicant with a criminal record).

58    The Commission has not done matched-pair testing to investigate alleged discriminatory employment practices. However, it has issued an Enforcement Guidance that discusses situations where individuals or organizations file charges on the basis of matched-pair testing, among other practices. *See generally Enforcement Guidance: Whether "Testers" Can File Charges and Litigate Claims of Employment Discrimination*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N (May 22, 1996), http://www.eeoc.gov/policy/docs/testers.html.

59    42 U.S.C. § 2000e-2(k)(1)(A)(i). If an employer successfully demonstrates that its policy or practice is job related for the position in question and consistent with business necessity, a Title VII plaintiff may still prevail by demonstrating that there is a less discriminatory "alternative employment practice" that serves the employer's legitimate goals as effectively as the challenged practice but that the employer refused to adopt. *Id.* § 2000e-2(k)(1)(A)(ii).

60    401 U.S. 424, 431–32 (1971).

**App. 038**

---

[61]    *Id.* at 431.

[62]    The Civil Rights Act of 1991, Pub. L. No. 102-166, § 105; *see also* Lewis v. City of Chicago, 130 S. Ct. 2191 (2010) (reaffirming disparate impact analysis); Ricci v. DeStefano, 557 U.S. 557 (2009) (same).

[63]    42 U.S.C. § 2000e-2(k)(1)(A)(i).

[64]    The Commission presumes that employers use the information sought and obtained from its applicants and others in making an employment decision. *See* Gregory v. Litton Sys. Inc.,316 F. Supp. 401, 403 (C.D. Cal.1970).  If an employer asserts that it did not factor the applicant's or employee's known criminal record into an employment decision, the EEOC will seek evidence supporting this assertion.  For example, evidence that the employer has other employees from the same protected group with roughly comparable criminal records may support the conclusion that the employer did not use the applicant's or employee's criminal record to exclude him from employment.

[65]    UNIF. CRIME REPORTING PROGRAM, FED. BUREAU OF INVESTIGATION, CRIME IN THE U.S. 2010, at Table 43a (2011), http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/table-43/10tbl43a.xls.

[66]    U.S. CENSUS BUREAU, THE BLACK POPULATION: 2010, at 3 (2011) , http://www.census.gov/prod/cen2010/briefs/c2010br-06.pdf (reporting that in 2010, "14 percent of all people in the United States identified as Black, either alone, or in combination with one or more races").

[67]    Accurate data on the number of Hispanics arrested and convicted in the United States is limited.  *See* NANCY E. WALKER ET AL., NAT'L COUNCIL OF LA RAZA, LOST OPPORTUNITIES: THE REALITY OF LATINOS IN THE U.S. CRIMINAL JUSTICE SYSTEM 17–18 (2004), http://www.policyarchive.org/handle/10207/bitstreams/20279.pdf (explaining why "[i]t is very difficult to find any information – let alone accurate information – on the number of Latinos arrested  in the United States").  The Department of Justice's Bureau of Justice Statistics' (BJS) *Sourcebook of Criminal Justice Statistics* and the FBI's Crime Information Services Division do not provide data for arrests by ethnicity.  *Id.* at 17.  However, the U.S. Drug Enforcement Administration (DEA) disaggregates data by Hispanic and non-Hispanic ethnicity.  *Id.* at 18.  According to DOJ/BJS, from October 1, 2008 to September 30, 2009, 45.5% of drug arrests made by the DEA were of Hispanics or Latinos.  MARK MOTIVANS, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, FEDERAL JUSTICE STATISTICS, 2009 – STATISTICAL TABLES, at 6, Table 1.4 (2011), http://bjs.ojp.usdoj.gov/content/pub/pdf/fjs09.pdf. Accordingly, Hispanics were arrested for drug offenses by the DEA at a rate of three times their numbers in the general population.  *See* U.S. CENSUS BUREAU, OVERVIEW OF RACE AND HISPANIC ORIGIN: 2010, at 3 (2011), http://www.census.gov/prod/cen2010/briefs/c2010br-02.pdf (reporting that in 2010, "there were 50.5 million Hispanics in the United States, composing 16 percent of the total population").  However, national statistics indicate that Hispanics have similar or lower drug usage rates compared to Whites.  *See, e.g.,* SUBSTANCE ABUSE & MENTAL HEALTH SERVS.

**App. 039**

ADMIN., U.S. DEP'T OF HEALTH & HUMAN SERVS., RESULTS FROM THE 2010 NATIONAL SURVEY ON DRUG USE AND HEALTH: SUMMARY OF NATIONAL FINDINGS 21, Figure 2.10 (2011), http://oas.samhsa.gov/NSDUH/2k10NSDUH/2k10Results.pdf (reporting, for example, that the usage rate for Hispanics in 2009 was 7.9% compared to 8.8% for Whites).

[68]    *See, e.g.*, HUMAN RIGHTS WATCH, DECADES OF DISPARITY: DRUG ARRESTS AND RACE IN THE UNITED STATES 1 (2009), http://www.hrw.org/sites/default/files/reports/us0309web_1.pdf (noting that the "[t]he higher rates of black drug arrests do not reflect higher rates of black drug offending . . . . blacks and whites engage in drug offenses - possession and sales - at roughly comparable rates"); SUBSTANCE ABUSE & MENTAL HEALTH SERVS. ADMIN., U.S. DEP'T OF HEALTH & HUMAN SERVS., RESULTS FROM THE 2010 NATIONAL SURVEY ON DRUG USE AND HEALTH: SUMMARY OF NATIONAL FINDINGS 21 (2011), http://oas.samhsa.gov/NSDUH/2k10NSDUH/2k10Results.pdf (reporting that in 2010, the rates of illicit drug use in the United States among persons aged 12 or older were 10.7% for African Americans,  9.1% for Whites, and 8.1% for Hispanics); HARRY LEVINE & DEBORAH SMALL, N.Y. CIVIL LIBERTIES UNION, MARIJUANA ARREST CRUSADE: RACIAL BIAS AND POLICE POLICY IN NEW YORK CITY, 1997–2007, at 13–16 (2008), www.nyclu.org/files/MARIJUANA-ARREST-CRUSADE_Final.pdf (citing U.S. Government surveys showing that Whites use marijuana at higher rates than African Americans and Hispanics; however, the marijuana arrest rate of Hispanics is nearly three times the arrest rate of Whites, and the marijuana arrest rate of African Americans is five times the arrest rate of Whites).

[69]    PREVALENCE OF IMPRISONMENT, *supra* note 4, at 1, 8.  Due to the nature of available data, the Commission is using incarceration data as a proxy for conviction data.

[70]    *Id.*

[71]    *Id.*

[72]    MARC MAUER & RYAN S. KING, THE SENTENCING PROJECT, UNEVEN JUSTICE: STATE RATES OF INCARCERATION BY RACE AND ETHNICITY 10 (2007), www.sentencingproject.org/Admin%5CDocuments%5Cpublications%5Crd_stateratesofincbyraceandethnicity.pdf.

[73]    *Id.*

[74]    PAUL GUERINO ET AL., BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, PRISONERS IN 2010, at 27, Table 14 (2011), http://bjs.ojp.usdoj.gov/content/pub/pdf/p10.pdf (reporting that as of December 31, 2010, Black men were imprisoned at a rate of 3,074 per 100,000 Black male residents, Hispanic men were imprisoned at a rate of 1,258 per 100,000 Hispanic male residents, and White men were imprisoned at a rate of 459 per 100,000 White male residents); *cf.* ONE IN 31, *supra* note 4, at 5 ("Black adults are four times as likely as whites and nearly 2.5 times as likely as Hispanics to be under correctional control.  One in 11 black adults -- 9.2 percent -- was under correctional control [probation, parole, prison, or jail] at year end 2007.").

**App. 040**

[75]     The Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. part 1607, provide that "[employers] should maintain and have available . . . information on [the] adverse impact of [their employment selection procedures]." 29 C.F.R. § 1607.15A. "Where [an employer] has not maintained [such records, the EEOC] may draw an inference of adverse impact of the selection process from the failure of [the employer] to maintain such data . . . ." *Id.* § 1607.4D.

[76]     *See, e.g.*, El v. SEPTA, 418 F. Supp. 2d 659, 668–69 (E.D. Pa. 2005) (finding that the plaintiff established a prima facie case of disparate impact with evidence from the defendant's personnel records and national data sources from the U.S. Bureau of Justice Statistics and the Statistical Abstract of the U.S.), *aff'd on other grounds,* 479 F.3d 232 (3d Cir. 2007); Green v. Mo. Pac. R.R., 523 F.2d 1290, 1294–95 (8th Cir. 1975) (concluding that the defendant's criminal record exclusion policy had a disparate impact based on race by evaluating local population statistics and applicant data), *appeal after remand*, 549 F.2d 1158, 1160 (8th Cir. 1977).

[77]     457 U.S. 440, 442 (1982).

[78]     *Id.* at 453–54

[79]     433 U.S. 321, 330 (1977).

[80]     *See, e.g.*, Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 365 (1977) (stating that "[a] consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection").

[81]     42 U.S.C. § 2000e-2(k)(1)(A)(i).  *See* Griggs v. Duke Power Co., 401 U.S. 424 (1971). *See also* 42 U.S.C. § 2000e(m) (defining the term "demonstrates" to mean "meets the burdens of production and persuasion").

[82]     422 U.S. 405 (1975).

[83]     433 U.S. 321 (1977).

[84]     137 CONG. REC. 15273 (1991) (statement of Sen. Danforth) ("[T]he terms 'business necessity' and 'job related' are intended to reflect the concepts enunciated by the Supreme Court in *Griggs v. Duke Power Co*, and in the other Supreme Court decisions prior to *Wards Cove Packing Co. v. Atonio*." (citations omitted)).  Section 105(b) of the Civil Rights Act of 1991 provides that only the interpretive memorandum read by Senator Danforth in the Congressional Record may be considered legislative history or relied upon in construing or applying the business necessity standard.

[85]     401 U.S. at 431, 436.

**App. 041**

[86]    422 U.S. at 430–31 (endorsing the EEOC's position that discriminatory tests are impermissible unless shown, by professionally acceptable methods, to predict or correlate with "'important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated'" (quoting 29 C.F.R. § 1607.4(c))).

[87]    433 U.S. at 331–32 (concluding that using height and weight as proxies for strength did not satisfy the business necessity defense because the employer failed to establish a correlation between height and weight and the necessary strength, and also did not specify the amount of strength necessary to perform the job safely and efficiently).

[88]    *Id.* at 331 n.14.

[89]    523 F.2d 1290, 1293 (8th Cir. 1975).  "In response to a question on an application form, Green [a 29-year-old African American man] disclosed that he had been convicted in December 1967 for refusing military induction. He stated that he had served 21 months in prison until paroled on July 24, 1970." *Id.* at 1292–93.

[90]    Green v. Mo. Pac. R.R., 549 F.2d 1158, 1160 (8th Cir. 1977) (upholding the district court's injunction prohibiting the employer from using an applicant's conviction record as an absolute bar to employment but allowing it to consider a prior criminal record as a factor in making individual hiring decisions, as long as the defendant took these three factors into account).

[91]    *Id.* (referring to completion of the sentence rather than completion of parole).

[92]    *Id.*

[93]    479 F.3d 232 (3d Cir. 2007).

[94]    *Id.* at 235.

[95]    *Id.*  at 235, 236.

[96]    *Id.* at 235.

[97]    *Id.* at 244.

[98]    *Id.* at 244–45.

[99]    *Id.* at 247. *Cf.* Shawn Bushway et al., *The Predictive Value of Criminal Background Checks: Do Age and Criminal History Affect Time to Redemption?*, 49 CRIMINOLOGY 27, 52 (2011) [hereinafter *The Predictive Value of Criminal Background Checks*] ("Given the results of the current as well as previous [recidivism] studies, the 40-year period put forward in *El v. SEPTA* (2007) . . . seems too old of a score to be still in need of settlement.").

**App. 042**

---

[100]     *El*, 479 F.3d at 248.

[101]     Some states have enacted laws to limit employer inquiries concerning all or some arrest records. *See* BACKGROUND CHECKS, *supra* note 25, at 48–49. At least 13 states have statutes explicitly prohibiting arrest record inquiries and/or dissemination subject to certain exceptions. *See, e.g.*, Alaska (ALASKA STAT. § 12.62.160(b)(8)); Arkansas (ARK. CODE ANN. § 12-12-1009(c)); California (CAL. LAB. CODE § 432.7(a)); Connecticut (CONN. GEN. STAT. § 46a-80(e)); Illinois (775 ILL. COMP. STAT. § 5/2-103(A)) (dealing with arrest records that have been ordered expunged, sealed, or impounded); Massachusetts (MASS. GEN. LAWS ch. 151B § 4(9)); Michigan (MICH COMP. LAWS § 37.2205a(1) (applying to misdemeanor arrests only)); Nebraska (NEB. REV. STAT. § 29-3523(2)) (ordering no dissemination of arrest records under certain conditions and specified time periods)); New York (N.Y. EXEC. LAW § 296(16)); North Dakota (N.D. CENT. CODE § 12-60-16.6(2)); Pennsylvania (18 PA. CONS. STAT. § 9121(b)(2)); Rhode Island (R.I. GEN. LAWS § 28-5-7(7)), and Wisconsin (WIS. STAT. §§ 111.321, 111.335a).

[102]     *See* United States v. Armstrong, 517 U.S. 456, 464 (1996) (discussing federal prosecutors' broad discretionary authority to determine whether to prosecute cases and whether to bring charges before a grand jury); Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978) (explaining same for state prosecutors); *see also* THOMAS H. COHEN & TRACEY KYCKELHAHN, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, FELONY DEFENDANTS IN LARGE URBAN COUNTIES, 2006, at 10, Table 11 (2010), http://bjs.ojp.usdoj.gov/content/pub/pdf/fdluc06.pdf (reporting that in the 75 largest counties in the country, nearly one-third of the felony arrests did not result in a conviction because the charges against the defendants were dismissed).

[103]     Schware v. Bd. of Bar Exam'rs, 353 U.S. 232, 241 (1957) ("The mere fact that a [person] has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct."); United States. v. Hynes, 467 F.3d 951, 957 (6th Cir. 2006) (upholding a preliminary jury instruction that stated that a "defendant is presumed to be innocent unless proven guilty. The indictment against the Defendant is only an accusation, nothing more. It's not proof of guilt or anything else."); *see* Gregory v. Litton Sys. Inc., 316 F. Supp. 401, 403 (C.D. Cal. 1970) ("[I]nformation concerning a prospective employee's record of arrests without convictions, is irrelevant to [an applicant's] suitability or qualification for employment."), *modified on other grounds*, 472 F.2d 631 (9th Cir. 1972); Dozier v. Chupka, 395 F. Supp. 836, 850 n.10 (S.D. Ohio 1975) (stating that the use of arrest records was too crude a predictor of an employee's predilection for theft where there were no procedural safeguards to prevent reliance on unwarranted arrests); City of Cairo v. Ill. Fair Empl. Prac. Comm., 8 Empl. Prac. Dec. (CCH) ¶ 9682 (Ill. App. Ct. 1974) (concluding that, where applicants sought to become police officers, they could not be absolutely barred from appointment solely because they had been arrested, as distinguished from convicted); *see also* EEOC Dec. 74-83, ¶ 6424 (CCH) (1983) (finding no business justification for an employer's unconditional termination of all employees with arrest records (all five employees terminated were Black), purportedly to reduce thefts in the workplace; the employer produced no evidence that these particular employees had been involved in any of the thefts, or that all people who are arrested but not convicted are prone towards crime in the future); EEOC Dec. 76-87, ¶ 6665 (CCH) (1983) (holding that an applicant who sought to become a police officer could not be rejected based on one arrest five years earlier

**App. 043**

for riding in a stolen car when he asserted that he did not know that the car was stolen and the charge was dismissed).

104    *See* State Criminal History, *supra* note 37, at 2; *see also* Background Checks, *supra* note 25, at 17.

105    *See supra* notes 39–40.

106    S*ee* Clark v. Arizona, 548 U.S. 735, 766 (2006) ("The first presumption [in a criminal case] is that a defendant is innocent unless and until the government proves beyond a reasonable doubt each element of the offense charged. . . ."). *See also* Fed. R. Crim P 11 (criminal procedure rule governing pleas).   The Supreme Court has concluded that criminal defendants have a Sixth Amendment right to effective assistance of counsel during plea negotiations.  *See generally* Lafler v. Cooper, 132 S. Ct. 1376  (2012); Missouri v. Frye, 132 S. Ct. 1399 (2012).

107    *See supra* text accompanying note 39.

108    *See e.g.*, Haw. Rev. Stat. § 378-2.5(b).  Under this provision, the employer may withdraw the offer of employment if the prospective employee has a conviction record "that bears a rational relationship to the duties and responsibilities of the position."  *Id.  See also* Conn. Gen. Stat. § 46a-80(b) ("[N]o employer . . . shall inquire about a prospective employee's past convictions until such prospective employee has been deemed otherwise qualified for the position."); Minn. Stat. § 364.021(a) ("[A] public employer may not inquire or consider the criminal record or criminal history of an applicant for public employment until the applicant has been selected for an interview by the employer.").  State fair employment practices agencies have information about applicable state law.

109    *See generally* Nat'l League of Cities &  Nat'l Emp't Law Project, Cities Pave the Way: Promising Reentry Policies that Promote Local Hiring of People with Criminal Records (2010), www.nelp.org/page/-/SCLP/2010/CitiesPavetheWay.pdf?nocdn=1 (identifying local initiatives that address ways to increase employment opportunities for individuals with criminal records, including delaying a background check until the final stages of the hiring process, leveraging development funds, and expanding bid incentive programs to promote local hiring priorities); Nat'l Emp't Law Project, City and County Hiring Initiatives (2010), www.nelp.org/page/-/SCLP/CityandCountyHiringInitiatives.pdf (discussing the various city and county initiatives that have removed questions regarding criminal history from the job application and have waited until after a conditional offer of employment has been made to conduct a background check and inquire about the applicant's criminal background).

110    Several federal laws automatically prohibit employing individuals with certain felony convictions or, in some cases, misdemeanor convictions.  *See, e.g.*, 5 U.S.C. § 7371(b) (requiring the mandatory removal of any federal law enforcement officer who is convicted of a felony); 46 U.S.C. § 70105(c)(1)(A) (mandating that individuals who have been convicted of espionage, sedition, treason or terrorism be permanently disqualified from receiving a biometric transportation security card and thereby excluded from port work employment); 42 U.S.C.

**App. 044**

---

§ 13726(b)(1) (disqualifying persons with felony convictions or domestic violence convictions from working for a private prisoner transport company); 25 U.S.C. § 3207(b) (prohibiting individuals with a felony conviction, or any of two or more misdemeanor convictions, from working with Indian children if their convictions involved crimes of violence, sexual assault, molestation, exploitation, contact or prostitution, crimes against persons, or offenses committed against children); 18 U.S.C. § 922(g)(1), (9) (prohibiting an individual convicted of a felony or a misdemeanor for domestic violence from possessing a firearm, thereby excluding such individual from a wide range of jobs that require such possession); 18 U.S.C. § 2381 (prohibiting individuals convicted of treason from "holding any office under the United States").  Other federal laws prohibit employing individuals with certain convictions for a defined time period. *See, e.g.*, 5 U.S.C. § 7313(a) (prohibiting individuals convicted of a felony for inciting a riot or civil disorder from holding any position in the federal government for five years after the date of the conviction); 12 U.S.C. § 1829 (requiring a ten-year ban on employing individuals in banks if they have certain financial-related convictions); 49 U.S.C. § 44936(b)(1)(B) (imposing a ten-year ban on employing an individual as a security screener for an air carrier if that individuals has been convicted of specified crimes).

[111]    *See* 29 C.F.R. § 1607.5 (describing the general standards for validity studies).

[112]    *Id.*

[113]    *Id.* § 1607.6B.  The following subsections state:

> (1) *Where informal or unscored procedures are used*. When an informal or unscored selection procedure which has an adverse impact is utilized, the user should eliminate the adverse impact, or modify the procedure to one which is a formal, scored or quantified measure or combination of measures and then validate the procedure in accord with these guidelines, or otherwise justify continued use of the procedure in accord with Federal law.
> (2) *Where formal and scored procedures are used*. When a formal and scored selection procedure is used which has an adverse impact, the validation techniques contemplated by these guidelines usually should be followed if technically feasible. Where the user cannot or need not follow the validation techniques anticipated by these guidelines, the user should either modify the procedure to eliminate adverse impact or otherwise justify continued use of the procedure in accord with Federal law.

> *Id.* § 1607.6A, B(1)–(2).

[114]    *See, e.g.,* Brent W. Roberts et al., *Predicting the Counterproductive Employee in a Child-to-Adult Prospective Study*, 92 J. APPLIED PSYCHOL. 1427, 1430 (2007), http://internal.psychology.illinois.edu/~broberts/Roberts,%20Harms,%20Caspi,%20&%20Moffitt,%202007.pdf (finding that in a study of New Zealand residents from birth to age 26, "[a]dolescent criminal convictions were unrelated to committing counterproductive activities at work [such as tardiness, absenteeism, disciplinary problems, etc.].  In fact, according to the

**App. 045**

[results of the study], people with an adolescent criminal conviction record were less likely to get in a fight with their supervisor or steal things from work.").

[115]    *See* Ohio Rev. Code Ann. § 2913.02.

[116]    523 F.2d at 1298 (stating that "[w]e cannot conceive of any business necessity that would automatically place every individual convicted of any offense, except a minor traffic offense, in the permanent ranks of the unemployed").

[117]    479 F.3d at 247.

[118]    *See, e.g.*, Keith Soothill & Brian Francis, *When do Ex-Offenders Become Like Non-Offenders?*, 48 Howard J. of Crim. Just., 373, 380–81 (2009) (examining conviction data from Britain and Wales, a 2009 study found that the risk of recidivism declined for the groups with prior records and eventually converged within 10 to 15 years with the risk of those of the nonoffending comparison groups); Alfred Blumstein & Kiminori Nakamura, *Redemption in the Presence of Widespread Criminal Background Checks,* 47 Criminology 327 (2009) (concluding that there may be a "point of redemption" (i.e., a point in time where an individual's risk of re-offending or re-arrest is reasonably comparable to individuals with no prior criminal record) for individuals arrested for certain offenses if they remain crime free for a certain number of years); Megan C. Kurlychek, Robert Brame & Shawn D. Bushway, *Enduring Risk? Old Criminal Records and Predictions of Future Criminal Involvement*, 53 Crime & Delinquency 64 (2007) (analyzing juvenile police contacts and Racine, Wisconsin police contacts for an aggregate of crimes for 670 males born in 1942 and concluding that, after seven years, the risk of a new offense approximates that of a person without a criminal record); Megan C. Kurlychek et al., *Scarlet Letters and Recidivism: Does an Old Criminal Record Predict Future Offending?*, 5 Criminology & Pub. Pol'y 483 (2006) (evaluating juvenile police contacts and arrest dates from Philadelphia police records for an aggregate of crimes for individuals born in 1958, a 2006 study concluded that the risk of recidivism decreases over time and that, six or seven years after an arrest, an individual's risk of re-arrest approximates that of an individual who has never been arrested).

[119]    *Griggs*, 401 U.S. at 431.

[120]    523 F.2d at 1298; *see also* Field v. Orkin Extermination Co., No. Civ. A. 00-5913, 2002 WL 32345739, at *1 (E.D. Pa. Feb. 21, 2002) (unpublished) ("[A] blanket policy of denying employment to any person having a criminal conviction is a [*per se*] violation of Title VII."). The only exception would be if such an exclusion were required by federal law or regulation. *See, e.g., supra* note 110.

[121]    *Cf. Field*, 2002 WL 32345739, at *1.  In *Field*, an employee of ten years was fired after a new company that acquired her former employer discovered her 6-year-old felony conviction. The new company had a blanket policy of firing anyone with a felony conviction less than 10 years old.  The court granted summary judgment for the employee because the employer's argument that her conviction was related to her job qualifications was "weak at best," especially

given her positive employment history with her former employer.  *Id.*

122    Recidivism rates tend to decline as ex-offenders' ages increase.  A 2011 study found that an individual's age at conviction is a variable that has a "substantial and significant impact on recidivism."  *The Predictive Value of Criminal Background Checks*, *supra* note 99, at 43.  For example, the 26-year-olds in the study, with no prior criminal convictions, had a 19.6% chance of reoffending in their first year after their first conviction, compared to the 36-year-olds who had an 8.8% chance of reoffending during the same time period, and the 46-year-olds who had a 5.3% of reoffending.  *Id.* at 46.  *See also* PATRICK A. LANGAN & DAVID J. LEVIN, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, SPECIAL REPORT:  RECIDIVISM OF PRISONERS RELEASED IN 1994, at 7 (2002), http://bjs.ojp.usdoj.gov/content/pub/pdf/rpr94.pdf (finding that, although 55.7% of ex-offenders aged 14–17 released in 1994 were reconvicted within three years, the percentage declined to 29.7% for ex-offenders aged 45 and older who were released the same year).

Consideration of an applicant's age at the time the offense occurred or at his release from prison would benefit older individuals and, therefore, would not violate the Age Discrimination in Employment Act of 1967, *as amended,* 29 U.S.C. § 621 *et seq.*  *See* Age Discrimination in Employment Act, 29 C.F.R. § 1625.2 ("Favoring an older individual over a younger individual because of age is not unlawful discrimination under the ADEA, even if the younger individual is at least 40 years old."); *see also* Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 600 (2004) (concluding that the ADEA does not preclude an employer from favoring an older employee over a younger one within the protected age group).

123    *See* Laura Moskowitz, *Statement of Laura Moskowitz, Staff Attorney, National Employment Law Project's Second Chance Labor Project*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/11-20-08/moskowitz.cfm (last visited April 23, 2012) (stating that one of the factors that is relevant to the assessment of an ex-offender's risk to a workplace and to the business necessity analysis, is the "length and consistency of the person's work history, including whether the person has been recently employed"; also noting that various studies have "shown a strong relationship between employment and decreases in crime and recidivism").  *But see* Stephen J. Tripodi et al., *Is Employment Associated With Reduced Recidivism?: The Complex Relationship Between Employment and Crime*, 54 INT'L J. OF OFFENDER THERAPY AND COMP. CRIMINOLOGY 716, 716 (2010) (finding that "[b]ecoming employed after incarceration, although apparently providing initial motivation to desist from crime, does not seem to be on its own sufficient to prevent recidivism for many parolees").

124    *See* WENDY ERISMAN & JEANNE BAYER CONTARDO, INST. FOR HIGHER EDUC. POLICY, LEARNING TO REDUCE RECIDIVISM: A 50 STATE ANALYSIS OF POSTSECONDARY CORRECTIONAL EDUCATION 5 (2005), http://www.ihep.org/assets/files/publications/g-l/LearningReduceRecidivism.pdf (finding that increasing higher education for prisoners enhances their prospects for employment and serves as a cost-effective approach to reducing recidivism); *see also* John H. Laud & Robert J. Sampson, *Understanding Desistance from Crime*, 28 CRIME & JUST. 1, 17–24 (2001), http://www.ncjrs.gov/pdffiles1/Digitization/192542-192549NCJRS.pdf (stating that factors associated with personal rehabilitation and social

stability, such as stable employment, family and community involvement, and recovery from substance abuse, are correlated with a decreased risk of recidivism).

[125]    Some employers have expressed a greater willingness to hire ex-offenders who have had an ongoing relationship with third party intermediary agencies that provide supportive services such as drug testing, referrals for social services, transportation, child care, clothing, and food. *See* Amy L. Solomon et al., *From Prison to Work: The Employment Dimensions of Prisoner Reentry*, 2004 URBAN INST. 20, http://www.urban.org/UploadedPDF/411097_From_Prison_to_Work.pdf.   These types of services can help ex-offenders avoid problems that may interfere with their ability to obtain and maintain employment.  *Id.*; *see generally* Victoria Kane, *Transcript of 7-26-11 Meeting,* U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/7-26-11/transcript.cfm#kane (last visited April 23, 2012) (describing why employers should partner with organizations that provide supportive services to ex-offenders).

[126]    *See generally* REENTRY MYTHBUSTER! ON FEDERAL BONDING PROGRAM, *supra* note 16; *Work Opportunity Tax Credit (WOTC),* EMP'T & TRAINING ADMIN., U.S. DEP'T OF LABOR, http://www.doleta.gov/business/incentives/opptax/ (last visited April 3, 2012); *Directory of State Bonding Coordinators*, EMP'T & TRAINING ADMIN., U.S. DEP'T OF LABOR, http://www.doleta.gov/usworkforce/onestop/FBPContact.cfm (last visited April 3, 2012); *Federal Bonding Program - Background*, U.S. DEP'T OF LABOR, http://www.bonds4jobs.com/program-background.html (last visited April 3, 2012);  *Bureau of Prisons: UNICOR's Federal Bonding Program,* http://www.bop.gov/inmate_programs/itb_bonding.jsp (last visited April 3, 2012).

[127]    This example is loosely based on a study conducted by Alfred Blumstein and Kiminori Nakamura measuring the risk of recidivism for individuals who have committed burglary, robbery, or aggravated assault.  *See* Blumstein & Nakamura, *supra* note 118.

[128]    42 U.S.C. § 2000e-2(k)(1)(A)(ii), (C).  *See also* Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 998 (1988).

[129]    *See* Exec. Order No. 12,067, 3 C.F.R. 206 (1978 Comp.).

[130]    *See* 49 U.S.C. §§ 44935(e)(2)(B), 44936(a)(1), (b)(1).  The statute mandates a criminal background check.

[131]    *See* 5 U.S.C. § 7371(b) (requiring mandatory removal from employment of law enforcement officers convicted of felonies).

[132]    *See* 42 U.S.C. § 13041(c) ("Any conviction for a sex crime, an offense involving a child victim, or a drug felony may be grounds for denying employment or for dismissal of an employee. . . .").

[133]    12 U.S.C. § 1829.

**App. 048**

[134]     46 U.S.C. § 70105(c).

[135]     Other jobs and programs subject to federally-imposed restrictions based on criminal convictions include the business of insurance (18 U.S.C. § 1033(e)), employee benefits employee (29 U.S.C. § 1111(a)), participation in Medicare and state health care programs (42 U.S.C. § 1320a-7(a)–(b)), defense contractor (10 U.S.C. § 2408(a)), prisoner transportation (42 U.S.C. § 13726b(b)(1)), and court-imposed occupational restrictions (18 U.S.C. §§ 3563(b)(5), 3583(d)).  This list is not meant to be exhaustive.

[136]     *See, e.g.*, federal statutes governing commercial motor vehicle operator's licenses (49 U.S.C. § 31310(b)-(h)), locomotive operator licenses (49 U.S.C. § 20135(b)(4)(B)), and certificates, ratings, and authorizations for pilots, flight instructors, and ground instructors (49 U.S.C. §§ 44709(b)(2), 44710(b), 4711(c); 14 C.F.R. § 61.15).

[137]     *See, e.g.*, federal statutes governing loan originator licensing/registration (12 U.S.C. § 5104(b)(2)), registration of brokers and dealers (15 U.S.C. § 78o(b)(4)(B)), registration of commodity dealers (7 U.S.C. § 12a(2)(D), (3)(D), (E), (H)), and registration of investment advisers (15 U.S.C. § 80b-3(e)(2)-(3), (f)).

[138]     *See, e.g.*, custom broker's licenses (19 U.S.C. § 1641(d)(1)(B)), export licenses (50 U.S.C. App. § 2410(h)), and arms export (22 U.S.C. § 2778(g)).

[139]     *See, e.g.*, grain inspector's licenses (7 U.S.C. § 85), merchant mariner's documents, licenses, or certificates of registry (46 U.S.C. § 7503(b)), licenses to import, manufacture, or deal in explosives or permits to use explosives (18 U.S.C. § 843(d)), and farm labor contractor's certificates of registration (29 U.S.C. § 1813(a)(5)).  This list of federally-imposed restrictions on occupational licenses and registrations for individuals with certain criminal convictions is not meant to be exhaustive.  For additional information, please consult the relevant federal agency or department.

[140]     *See* 12 U.S.C. § 1829(a)(1).  The statute imposes a ten-year ban for individuals who have been convicted of certain financial crimes such as corruption involving the receipt of commissions or gifts for procuring loans (18 U.S.C. § 215), embezzlement or theft by an officer/employee of a lending, credit, or insurance institution (18 U.S.C. § 657), false or fraudulent statements by an officer/employee of the federal reserve or a depository institution (18 U.S.C. § 1005), or fraud by wire, radio, or television that affects a financial institution (18 U.S.C. § 1343), among other crimes.  *See* 12 U.S.C. § 1829(a)(2)(A)(i)(I), (II).  Individuals who have either been convicted of the crimes listed in § 1829(a)(2)(A), or conspiracy to commit those crimes, will not receive an exception to the application of the 10-year ban from the FDIC. 12 U.S.C. § 1829(a)(2)(A).

[141]     *See* FED. DEPOSIT INS. CORP., FDIC STATEMENT OF POLICY FOR SECTION 19 OF THE FDI ACT, § C, "PROCEDURES" (amended May 13, 2011), http://www.fdic.gov/regulations/laws/rules/5000-1300.html [hereinafter FDIC POLICY]; *see also*

**App. 049**

Statement of Policy, 63 Fed. Reg. 66,177, 66,184 (Dec. 1, 1998); Clarification of Statement of Policy, 76 Fed. Reg. 28,031 (May 13, 2011) (clarifying the FDIC's Statement of Policy for Section 19 of the FDI Act).

"Approval is automatically granted and an application [for a waiver] will not be required where [an individual who has been convicted of] the covered offense [criminal offenses involving dishonesty, breach of trust, or money laundering] . . . meets all of the ["*de minimis*"] criteria" set forth in the FDIC's Statement of Policy.  FDIC POLICY, *supra*, § B (5).  These criteria include the following: (1) there is only one conviction or program of record for a covered offense; (2) the offense was punishable by imprisonment for a term of one year or less and/or a fine of $1,000 or less, and the individual did not serve time in jail; (3) the conviction or program was entered at least five years prior to the date an application would otherwise be required; and (4) the offense did not involve an insured depository institution or insured credit union.  *Id.* Additionally, an individual's conviction for writing a "bad" check will be considered a *de minimis* offense, even if it involved an insured depository institution or insured credit union, if: (1) all other requirements of the *de minimis* offense provisions are met; (2) the aggregate total face value of the bad or insufficient funds check(s) cited in the conviction was $1000 or less; and (3) no insured depository institution or insured credit union was a payee on any of the bad or insufficient funds checks that were the basis of the conviction.  *Id.*

[142]    *See* FDIC POLICY, *supra* note 141, § C, "PROCEDURES."

[143]    *Id.  But cf.* NAT'L H.I.R.E. NETWORK, PEOPLE WITH CRIMINAL RECORDS WORKING IN FINANCIAL INSTITUTIONS: THE RULES ON FDIC WAIVERS, http://www.hirenetwork.org/FDIC.html ("Institutions rarely seek a waiver, except for higher level positions when the candidate is someone the institution wants to hire.  Individuals can only seek FDIC approval themselves if they ask the FDIC to waive the usual requirement.  Most individuals probably are unaware that they have this right."); FED. DEPOSIT INSUR. CORP. 2010 ANNUAL REPORT, § VI.A: KEY STATISTICS, FDIC ACTIONS ON FINANCIAL INSTITUTION APPLICATIONS 2008–2010 (2011), http://www.fdic.gov/about/strategic/report/2010annualreport/chpt6-01.html (reporting that between 2008 and 2010, the FDIC approved a total of 38 requests for consent to employ individuals with covered offenses in their background; the agency did not deny any requests during this time period).

[144]    FDIC POLICY, *supra* note 141,  § D, "EVALUATION OF SECTION 19 APPLICATIONS" (listing the factors that are considered in this waiver review process, which include: (1) the nature and circumstances underlying the offense; (2) "[e]vidence of rehabilitation including the person's reputation since the conviction . . . the  person's  age at the time of conviction . . .  and the time which has elapsed since the conviction"; (3) the position to be held in the insured institution; (4) the amount of influence/control the individual will be able to exercise over management affairs; (5) management's ability to control and supervise the individual's activities; (6) the degree of ownership the individual will have in the insured institution; (7) whether the institution's fidelity bond coverage applies to the individual; (8) the opinion of the applicable federal and/or state regulators; and (9) any other relevant factors).

**App. 050**

---

[145]     *See* 49 C.F.R. §§ 1515.7 (describing the procedures for waiver of criminal offenses, among other standards), 1515.5 (explaining how to appeal the Initial Determination of Threat Assessment based on a criminal conviction).  In practice, some worker advocacy groups have criticized the TWIC appeal process due to prolonged delays, which leaves many workers jobless; especially workers of color.  *See generally* MAURICE EMSELLEM ET AL., NAT'L EMP'T LAW PROJECT, A SCORECARD ON THE POST-911 PORT WORKER BACKGROUND CHECKS: MODEL WORKER PROTECTIONS PROVIDE A LIFELINE FOR PEOPLE OF COLOR, WHILE MAJOR TSA DELAYS LEAVE THOUSANDS JOBLESS DURING THE RECESSION (2009), http://nelp.3cdn.net/2d5508b4cec6e13da6_upm6b20e5.pdf.

The Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 6201, 124 Stat. 721 (2010) (the Act) includes a process to appeal or dispute the accuracy of information obtained from criminal records.  The Act requires participating states to perform background checks on applicants and current employees who have direct access to patients in long-term care facilities, such as nursing homes, to determine if they have been convicted of an offense or have other disqualifying information in their background, such as a finding of patient or resident abuse, that would disqualify them from employment under the Social Security Act or as specified by state law.  *See* 42 U.S.C. § 1320a-7l(a)(3)(A), (a)(4)(B), (6)(A)–(E).  The background check involves an individualized assessment of the relevance of a conviction or other disqualifying information. The Act protects applicants and employees in several ways, for example, by: (1) providing a 60-day provisional period of employment for the prospective employee, pending the completion of the criminal records check; (2) providing an independent process to appeal or dispute the accuracy of the information obtained in the criminal records check; and (3) allowing the employee to remain employed (subject to direct on-site supervision) during the appeals process. 42 U.S.C. § 1320a-7l(a)(4)(B)(iii), (iv).

[146]     *See* 46 U.S.C. § 70105(d); *see generally* TWIC Program, 49 C.F.R. § 1572.103 (listing the disqualifying offenses for maritime and land transportation security credentials, such as convictions and findings of not guilty by reason of insanity for espionage, murder, or unlawful possession of an explosive; also listing temporarily disqualifying offenses, within seven years of conviction or five years of release from incarceration, including dishonesty, fraud, or misrepresentation (expressly excluding welfare fraud and passing bad checks), firearms violations, and distribution, intent to distribute, or importation of controlled substances).

[147]     46 U.S.C. § 70105(c)(1)(A)–(B).

[148]     46 U.S.C. § 70105(c)(1)(B)(iii).

[149]     *See* 46 U.S.C. § 70105(c)(1)(A)(iv) (listing "Federal crime of terrorism" as a permanent disqualifying offense); *see also* 18 U.S.C. § 2332b(g)(5)(B) (defining "Federal crime of terrorism" to include the use of weapons of mass destruction under § 2332a).

[150]     *See* 49 C.F.R. § 1515.7(a)(i) (explaining that only certain applicants with disqualifying crimes in their backgrounds may apply for a waiver; these applicants do not include individuals

**App. 051**

who have been convicted of a Federal crime of terrorism as defined by 18 U.S.C. § 2332b(g)).

[151]    These positions are defined as "national security positions" and include positions that "involve activities of the Government that are concerned with the protection of the nation from foreign aggression or espionage, including development of defense plans or policies, intelligence or counterintelligence activities, and related activities concerned with the preservation of the military strength of the United States" or "require regular use of, or access to, classified information." 5 C.F.R. § 732.102(a)(1)–(2). The requirements for "national security positions" apply to competitive service positions, Senior Executive Service positions filled by career appointment within the Executive Branch, and excepted service positions within the Executive Branch. *Id.* § 732.102(b). The head of each Federal agency can designate any position within that department or agency as a "sensitive position" if the position "could bring about, by virtue of the nature of the position, a material adverse effect on the national security." *Id.* § 732.201(a). Designation of a position as a "sensitive position" will fall under one of three sensitivity levels: Special-Sensitive, Critical-Sensitive, or Noncritical-Sensitive. *Id.*

[152]    *See* Exec. Order No. 12,968, § 3.1(b), 3 C.F.R. 391 (1995 Comp.):

> [E]ligibility for access to classified information shall be granted only to employees who are United States citizens for whom an appropriate investigation has been completed and whose personal and professional history affirmatively indicates loyalty to the United States, strength of character, trustworthiness, honestly, reliability, discretion, and sound judgment, as well as freedom from conflicting allegiances and potential for coercion, and willingness and ability to abide by regulations governing the use, handling, and protection of classified information. A determination of eligibility for access to such information is a discretionary security decision based on judgments by appropriately trained adjudicative personnel. Eligibility shall be granted only where facts and circumstances indicate access to classified information is clearly consistent with the national security interests of the United States, and any doubt shall be resolved in favor of the national security.

[153]    42 U.S.C. § 2000e-2(g); *see, e.g.*, Bennett v. Chertoff, 425 F.3d 999, 1001 (D.C. Cir. 2005) ("[E]mployment actions based on denial of a security clearance are not subject to judicial review, including under Title VII."); Ryan v. Reno, 168 F.3d 520, 524 (D.C. Cir. 1999) ("[A]n adverse employment action based on denial or revocation of a security clearance is not actionable under Title VII.").

[154]    *See Policy Guidance on the use of the national security exception contained in § 703(g) of Title VII of the Civil Rights Act of 1964, as amended*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, § II, *Legislative History* (May 1, 1989), http://www.eeoc.gov/policy/docs/national_security_exemption.html ("[N]ational security requirements must be applied equally without regard to race, sex, color, religion or national origin."); *see also* Jones v. Ashcroft, 321 F. Supp. 2d 1, 8 (D.D.C. 2004) (indicating that the

**App. 052**

national security exception did not apply because there was no evidence that the government considered national security as a basis for its decision not to hire the plaintiff at any time before the commencement of the plaintiff's lawsuit, where the plaintiff had not been forthright about an arrest).

155    Federal contractor employees may challenge the denial of a security clearance with the EEOC or the Office of Contract Compliance Programs when the denial is based on race, color, religion, sex, or national origin.  *See generally* Exec. Order No. 11,246, 3 C.F.R. 339 (1964–1965 Comp.).

156    42 U.S.C. § 2000e-16(a).

157    Robert H. Shriver, III, *Written Testimony of Robert H. Shriver, III, Senior Policy Counsel for the U.S. Office of Personnel Management*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/7-26-11/shriver.cfm (last visited April 23, 2012) (stating that "with just a few exceptions, criminal convictions do not automatically disqualify an applicant from employment in the competitive civil service"); *see also* REENTRY MYTHBUSTER! ON FEDERAL HIRING POLICIES, *supra* note 16 ("The Federal Government employs people with criminal records with the requisite knowledge, skills and abilities.").  *But see supra* note 110, listing several federal statutes that prohibit individuals with certain convictions from working as federal law enforcement officers or port workers, or with private prisoner transport companies.

158    OPM has jurisdiction to establish the federal government's suitability policy for competitive service positions, certain excepted service positions, and career appointments in the Senior Executive Service.  *See* 5 C.F.R. §§ 731.101(a) (stating that OPM has been directed "to examine 'suitability' for competitive Federal employment"), 731.101(b) (defining the covered positions within OPM's jurisdiction); *see also* Shriver, *supra* note 157.

OPM is also responsible for establishing standards that help agencies decide whether to grant their employees and contractor personnel long-term access to federal facilities and information systems.  *See* Homeland Security Presidential Directive 12: Policy for a Common Identification Standard for Federal Employees and Contractors, 2 PUB. PAPERS 1765 (Aug. 27, 2004) ("establishing a mandatory, Government-wide standard for secure and reliable forms of identification issued by the Federal Government to its employees and contractors [including contractor employees]"); *see also* Exec. Order No. 13,467, § 2.3(b), 3 C.F.R. 196 (2009 Comp.) ("[T]he Director of [OPM] . . . [is] responsible for developing and implementing uniform and consistent policies and procedures to ensure the effective, efficient, and timely completion of investigations and adjudications relating to determinations of suitability and eligibility for logical and physical access."); *see generally* Shriver, *supra* note 157.

159    5 C.F.R. § 731.101(a).

160    *See* 5 C.F.R. §§ 731.205(a) (stating that if an agency finds applicants unsuitable based on the factors listed in 5 C.F.R. § 731.202, it may, in its discretion, bar those applicants from federal employment for three years),  § 731.202(b) (disqualifying factors from federal civilian

employment may include: misconduct or negligence in employment; material, intentional false statement, or deception or fraud in examination or appointment; refusal to furnish testimony as required by 5 C.F.R. § 5.4; alcohol abuse without evidence of substantial rehabilitation; illegal use of narcotics, drugs, or other controlled substances; and knowing and willful engagement in acts or activities designed to overthrow the U.S. Government by force).

[161]    *See id.* § 731.202(c).

[162]    *Id.*

[163]    *See generally* Shriver, *supra* note 157.  *See also* REENTRY MYTHBUSTER! ON FEDERAL HIRING POLICIES, *supra* note 16 ("Consistent with Merit System Principles, [federal] agencies [and departments] are required to consider people with criminal records when filling positions if they are the best candidates and can comply with requirements.").

[164]    *See generally EEOC Informal Discussion Letter* (March 19, 2007), http://www.eeoc.gov/eeoc/foia/letters/2007/arrest_and_conviction_records.html#N1 (discussing the EEOC's concerns with changes to OPM's suitability regulations at 5 CFR part 731).

[165]    *See* Stephen Saltzburg, *Transcript of 7-26-11 Meeting*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, http://www.eeoc.gov/eeoc/meetings/7-26-11/transcript.cfm#saltzburg (last visited April 23, 2012) (discussing the findings from the American Bar Association's (ABA) Collateral Consequences of Conviction Project, which found that in 17 states that it has examined to date, 84% of the collateral sanctions against ex-offenders relate to employment).  For more information about the ABA's project, visit: Janet Levine, *ABA Criminal Justice Section Collateral Consequences Project*, INST. FOR SURVEY RESEARCH, TEMPLE UNIV., http://isrweb.isr.temple.edu/projects/accproject/ (last visited April 20, 2012).  In April 2011, Attorney General Holder sent a letter to every state Attorney General, with a copy to every Governor, asking them to "evaluate the collateral consequences" of criminal convictions in their state, such as employment-related restrictions on ex-offenders, and "to determine whether those [consequences] that impose burdens on individuals . . . without increasing public safety should be eliminated."  Letter from Eric H. Holder, Jr., Att'y Gen., Dep't of Justice, to state Attorney Generals and Governors (April 18, 2011), http://www.nationalreentryresourcecenter.org/documents/0000/1088/Reentry_Council_AG_Letter.pdf.

Most states regulate occupations that involve responsibility for vulnerable citizens such as the elderly and children. *See* STATE CRIMINAL HISTORY, *supra* note 37, at 10 ("Fifty states and the District of Columbia reported that criminal history background checks are legally required" for several occupations such as nurses/elder caregivers, daycare providers, caregivers in residential facilities, school teachers, and nonteaching school employees).  For example, Hawaii's Department of Human Services may deny applicants licensing privileges to operate a childcare facility if: (1) the applicant or any prospective employee has been convicted of a crime other than a minor traffic violation or has been confirmed to have abused or neglected a child or threatened harm; and (2) the department finds that the criminal history or child abuse record of

**App. 054**

the applicant or prospective employee may pose a risk to the health, safety, or well-being of children.  *See* HAW. REV. STAT. § 346-154(e)(1)–(2).

[166]     42 U.S.C. § 2000e-7.

[167]     *See* Int'l Union v. Johnson Controls, Inc., 499 U.S. 187, 210 (1991) (noting that "[i]f state tort law furthers discrimination in the workplace and prevents employers from hiring women who are capable of manufacturing the product as efficiently as men, then it will impede the accomplishment of Congress' goals in enacting Title VII"); Gulino v. N.Y. State Educ. Dep't, 460 F.3d 361, 380 (2d Cir. 2006) (affirming the district court's conclusion that "the mandates of state law are no defense to Title VII liability").

**App. 055**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

TEXAS,

      *Plaintiff,*

v.

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION;
VICTORIA A. LIPNIC, in her
official capacity as Acting Chair of
the Equal Employment
Opportunity Commission; and
JEFFERSON B. SESSIONS, III, in
his official capacity as Attorney
General of the United States,

      *Defendants.*

Case No. 5:13-CV-00255-C

## DECLARATION OF AMY TIPPIE

I, Amy Tippie, state that the following is true and correct and based upon my personal knowledge:

1.    I am a citizen of the United States and the State of Texas, over the age of 18 years, and competent to testify.

2.    I am the Deputy Director for Statewide Workforce Operations, Human Resources, of the Texas Health and Human Services Commission (HHSC). I became employed by HHSC on September 1, 2016, when the administrative support divisions of the Texas Department of Aging and Disability Services (DADS) were transferred to HHSC. Prior to that date, I was employed by DADS since September 2004 in various positions involved with implementing human resources policies and procedures across DADS programs.

3.    DADS is a state agency in the Texas Health and Human Services system. Since its inception in September 2004, DADS has served aging Texans and

App. 056  TX 0001

individuals with disabilities by providing a wide range of supports and services that promote and enhance individual well-being, dignity, and choice. These services have included community care programs to promote independent living for persons who are aging or have physical, intellectual, or developmental disabilities, and institutional care programs such as nursing facility care and state supported living centers.

4.    DADS has also been responsible for regulating long-term care service providers such as nursing facilities, assisted living facilities, intermediate care facilities for individuals with intellectual disabilities, home health agencies, home and community-based services providers, and day activity and health services facilities. DADS, and the DADS programs that have transferred to HHSC, serve people who are among the most vulnerable in the state, working in partnership with consumers, caregivers, service providers, and other stakeholders; developing and improving service options that are responsive to individual needs and preferences; and ensuring and protecting self-determination, consumer rights, and safety.

5.    However, health and human services in Texas are in the middle of a two-year transformation. In the first phase, most of DADS client services programs were transferred to HHSC on September 1, 2016. In the second phase, DADS regulatory programs and the state supported living centers will transfer to HHSC on September 1, 2017, and DADS will be abolished.

6.    All of the health and human services agencies under the umbrella of HHSC use the same Health and Human Services Human Resources Manual (HHS HR Manual) for their employees. A true and correct copy of Chapter 2.C. of the HHS HR Manual is attached hereto as Attachment 22. Appendices to the HHS HR Manual further explain barriers to employment with HHSC. A true and correct copy of Appendix A ("Criminal Background Check and Registry Clearance") of the HHS

HR Manual is attached hereto as Attachment 23. A true and correct copy of Appendix B ("Bars to Employment") of the HHS HR Manual is attached hereto as Attachment 24. To the best of my knowledge and understanding, these records were created by HHSC in the regular course of its business, and are kept by HHSC in the regular course of our business.

7.      In addition to the aforementioned policies contained within the HHS HR Manual, each agency and each program may have additional policies that apply to them. I am familiar with the human resources policies and procedures that apply to DADS employees and to HHSC employees working in programs that transferred from DADS in September 2016. I am familiar with the statutes, rules, and policies that provide for criminal bars to employment with DADS and with HHSC in the programs that transferred from DADS in September 2016.

8.      State supported living centers (SSLCs) are state-operated campus-based residential care facilities for individuals with intellectual or developmental disabilities who have severe or profound intellectual disabilities or who also have complex medical needs or serious behavioral issues. Because these individuals are so vulnerable, DADS has adopted a rule that applies to SSLCs the same criminal bars to employment that the Texas Legislature enacted for many kinds of licensed health care providers in Texas Health and Safety Code Chapter 250 (Attachment 14). The DADS rule that adopts the restrictions in Chapter 250 is found at 40 Tex. Admin. Code § 3.201 (Attachment 13). Section 250.006 lists the criminal convictions that are bars to employment. All of the criminal bars are for crimes related to harm to individuals, as DADS wants to protect the vulnerable individuals living in SSLCs from potential employees who have a history of causing harm to individuals.

9.      Additionally, 40 Tex. Admin. Code § 3.201 adopts Texas Health and Safety Code § 533.007 (Attachment 28), which provides that SSLCs may deny employment if the applicant's criminal history record indicates that the applicant is

not qualified or suitable. The DADS Operational Handbook lists additional crimes that DADS has determined are contraindications to employment. (Attachment 25). The excerpt of the DADS Operational Handbook provided as Attachment 25 is a true and correct copy. Moreover, to the best of my knowledge and understanding, this record was created by DADS in the regular course of its business, and is kept by DADS in the regular course of our business.

10.    Other kinds of DADS employees who come in contact with the vulnerable individuals we serve are also subject to the restrictions in Health and Safety Code Chapter 250 (Attachment 14). This includes Regulatory Services survey operations and enforcement staff, Trust Fund Monitoring staff, and Educational Services Regulatory Trainers, all of whom go to facilities and other health care providers DADS regulates and come in contact with the consumers there.

11.    Among HHSC employees working in programs that transferred from DADS in September 2016, Quality Monitoring Program staff, Quality Service Reviewers, and Guardianship staff are also subject to the restrictions in Health and Safety Code Chapter 250, because they come in contact with the vulnerable individuals served in facilities and other health care providers DADS regulates.

12.    These restrictions are made known to prospective applicants. *See* Bars to Employment with DADS, *available at* https://www.dads.state.tx.us/hiringbars/index.html (Attachment 12).

13.    I, Amy Tippie, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing Declaration is true and correct.

Executed this 19th day of July, 2017.

AMY TIPPIE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| TEXAS,<br><br>   *Plaintiff,*<br><br>v.<br><br>EQUAL EMPLOYMENT<br>OPPORTUNITY COMMISSION;<br>VICTORIA A. LIPNIC, in her<br>official capacity as Acting Chair of<br>the Equal Employment<br>Opportunity Commission; and<br>JEFFERSON B. SESSIONS, III, in<br>his official capacity as Attorney<br>General of the United States,<br><br>   *Defendants.* | Case No. 5:13-CV-00255-C |

## DECLARATION OF KATHLEEN T. MURPHY

  I, Kathleen T. Murphy, state that the following is based upon my personal knowledge:

  1. I am a citizen of both Texas and the United States, over the age of eighteen, and competent to testify.

  2. I am the Senior Assistant General Counsel in the Office of General Counsel of the Texas Department of Public Safety (DPS). I have been employed with DPS since September 1995 and a licensed attorney since 1991.

  3. DPS is a law enforcement agency of the State of Texas established under Chapter 411 of the Texas Government Code. The responsibilities of DPS include combating crime and terrorism, enhancing highway and public safety, enhancing statewide emergency management, and enhancing public safety licensing and regulatory services. We accomplish our mission by proactively protecting the citizens of Texas in an ever-changing threat environment, while always remaining faithful to the U.S. and Texas Constitutions. For the forthcoming

2018–2019 biennium, the Texas Legislature appropriated approximately $2.4 billion, and over 9,000 full-time-equivalent positions, for DPS to accomplish its mission.

4.     In 2013, DPS was required to respond to a charge of discrimination provided by EEOC. The charge was levied by a Mr. Smith. Though he made unsubstantiated allegations of race and sex discrimination, his primary complaint was that he was unlawfully discriminated against because of his "felony conviction." Specifically, Mr. Smith stated that "[t]he job application asked if the applicant had a felony conviction and I indicated that I had been convicted of a felony for unauthorized use of a vehicle." In correspondence dated September 18, 2013, Mr. Smith was advised that his application would not be considered because of his felony conviction.

5.     A copy of documents maintained by DPS regarding this issue is attached hereto as Attachment 4. These documents are true and correct copies of records maintained by DPS, which I am authorized to certify as true and correct. These records are kept by DPS in the regular course of our business. Furthermore, it was in the regular course of the business of DPS that employees of DPS, with knowledge of the information recorded made, transmitted, received, or otherwise archived the information to be included in the record. Finally, these records were created at or near the time of the acts, events, conditions, or information recorded in the records.

6.     In addition to addressing the aforementioned matter involving Mr. Smith, employees of DPS reviewed the EEOC Enforcement Guidance 915.002 (April 25, 2012) upon release to discern whether it presented a conflict with DPS policy regarding the hiring of felons, specifically section 01.15.10.03 of the Employment Policies and Procedures of DPS. The last two pages of Attachment 4 are a true and correct copy of DPS Policy § 01.15.10.03, which remains in full force and effect

today.

7.    DPS consistently makes prospective applicants aware of the policy against hiring felons for any DPS position. *See* http://agency.governmentjobs.com/ txdps/default.cfm ("Felony convictions and certain misdemeanor convictions will be cause for immediate rejection.") (a true and correct copy of which is Attachment 5); http://www.dps.texas.gov/trainingAcademy/recruiting/disqualifiers/trafficCriminal Rcrds.htm ("Having been or currently on court-ordered supervision or probation for any offense of the grade of felony or Class A misdemeanor" and "Having been convicted of any offense of the grade of felony or Class A misdemeanor") (a true and correct copy of which is Attachment 6).

8.    I, Kathleen T. Murphy, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing Declaration is true and correct.

Executed this 18th day of July, 2017.

_____
KATHLEEN T. MURPHY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

| | |
|---|---|
| TEXAS, | |
| *Plaintiff,* | |
| v. | Case No. 5:13-CV-00255-C |
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; VICTORIA A. LIPNIC, in her official capacity as Acting Chair of the Equal Employment Opportunity Commission; and JEFFERSON B. SESSIONS, III, in his official capacity as Attorney General of the United States, | |
| *Defendants.* | |

## DECLARATION OF ANN BRIGHT

I, Ann Bright, state that the following is based upon my personal knowledge:

1.     I am a citizen of both Texas and the United States, over the age of eighteen, and competent to testify.

2.     I am the Chief Operating Officer of the Texas Parks and Wildlife Department (TPWD). I have been employed with TPWD since August 2002 and a licensed attorney since 1987.

3.     TPWD is the Texas agency responsible for managing and conserving the natural and cultural resources of Texas and providing hunting, fishing and outdoor recreation opportunities for the use and enjoyment of present and future generations. To fulfill this mission, TPWD strives to be a recognized national leader in implementing effective natural resources conservation and outdoor recreational programs; serve Texas, its citizens, and employees with the highest standards of service, professionalism, fairness, courtesy, and respect; rely on the best available

science to guide its conservation decisions; responsibly manage agency finances and appropriations to ensure the most efficient and effective use of tax-payer and user fee resources; and attract and retain the best, brightest, and most talented workforce to successfully execute our mission. For the forthcoming 2018–2019 biennium (September 1, 2017 – August 31, 2019), the Texas Legislature appropriated approximately $728,939,928 (consisting of $385,032,636 for fiscal year 2018 and $343,907,292 for fiscal year 2019), and authorized approximately 3,145 full-time-equivalent positions, for TPWD to accomplish its mission.

4.      Central to TPWD's mission is its Law Enforcement Division. This division operates twenty-nine law enforcement offices and the Game Warden Training Center, provides safe boating and recreational water safety on public waters, and employs over 500 Texas game wardens, over 100 administrative staff and communication operators. Law enforcement is also responsible for enforcing the Parks and Wildlife Code, all TPWD regulations, the Texas Penal Code and selected statutes and regulations applicable to clean air and water, hazardous materials and human health. Applicants for game warden positions must have a B.A./B.S. from an accredited institution and graduation from the Game Warden Training Center.

5.      Also central to TPWD's mission is its State Parks Division. The State Parks Division operates over 95 sites throughout the State of Texas, including 74 state parks, 13 historic sites, and 8 natural areas, covering a total of more than 627,000 acres. Since state parks operate 7 days per week/365 days per year, a wide range of occupations and disciplines is necessary to serve state park visitors and ensure their safety. In state fiscal year 2016 (September 1, 2015 – August 31, 2016), there were almost 9 million visitors to state parks. To ensure the safety of these visitors, included in the over 1,300 full time equivalent employees in the State Parks Division are state park police officers.

---

6.    Under Texas law, the over 500 game wardens and 155 state park police officers employed by TPWD are "peace officers," and as such, they fall under the same absolute no felons policy that applies to other law-enforcement officers throughout Texas. *See,* Tex. Code Crim. Proc. Art. 2.12(10) (Attachment 17); 31 Tex. Admin. Code § 55.802(1) (Attachment 9); Tex. Occ. Code §§ 1701.001(3)–(4), 1701.312(a) (Attachment 7); Tex. Parks & Wild. Code § 11.019 (Attachment 8). TPWD imposes an absolute ban on hiring any game warden or park police officer who ever has been convicted of a felony or Class A misdemeanor. *See* http://tpwd.texas.gov/warden/recruiting-careers/requirements (Attachment 10). TPWD also rejects game-warden applicants who have been convicted of certain lesser offenses. *Id.*

7.    Though TPWD does not maintain a no felon hiring policy for all positions, TPWD has always reserved the right to reject applicants for any position with TPWD on the basis that they have been convicted of a felony or certain other designated offenses, based on the specific duties and responsibilities of the position; number of offenses committed by the individual; nature and seriousness of each offense; length of time between the offense(s) and employment decision; efforts by the individual at rehabilitation; accuracy of information on the individual's employment application; and applicable state or federal laws and regulations. TPWD has always exercised this prerogative, which is critical to fulfilling TPWD's mission and maintaining the public trust we have over the natural and cultural resources of Texas.

8.    Attached to this Declaration as Attachment 16 is a copy of TPWD's internal policy, as described above. This attached document is a record created and maintained by TPWD, which I am authorized to certify as true and correct. This record is kept by TPWD in the regular course of our business. Furthermore, it was in the regular course of the business of TPWD that employees of TPWD, with knowledge

of the information recorded made, transmitted, received, or otherwise archived the information to be included in the record. Finally, this record was created at or near the time of the acts, events, conditions, or information recorded in the records.

9.    I, Ann Bright, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing Declaration is true and correct.

Executed this 24th day of July, 2017.

_____
ANN BRIGHT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

TEXAS,

    *Plaintiff,*

v.

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION;
VICTORIA A. LIPNIC, in her
official capacity as Acting Chair of
the Equal Employment
Opportunity Commission; and
JEFFERSON B. SESSIONS, III, in
his official capacity as Attorney
General of the United States,

    *Defendants.*

Case No. 5:13-CV-00255-C

---

## DECLARATION OF ROYCE MYERS

I, Royce Myers, state that the following is based upon my personal knowledge:

1.    I am a citizen of both Texas and the United States, over the age of eighteen, and competent to testify.

2.    I am the Director of Human Resources at the Texas Juvenile Justice Department (TJJD). I have been employed with TJJD since 2005. I have been Director of HR since 2008. I am certified as a Senior Professional in Human Resources (SPHR).

3.    TJJD, created on December 1, 2011, represents the merger of the then Texas Juvenile Probation Commission (TJPC) and the Texas Youth Commission (TYC). The mission of TJJD is to transform young lives and create safer communities. TJJD contracts with eight active private sector providers in an effort to deliver a diverse array of individualized services to the youth. The programs

---

*Declaration of Royce Myers*

range from organized family care, foster group-living services, vocational trade services, secure institutional care, and gender-specific residential services for young females and young males. Through its efforts, TJJD strives to achieve an effective and integrated juvenile justice system that:

        a.     Advances public safety through rehabilitation.

        b.     Equitably affords youth access to services matching their needs to enhance opportunities for a satisfying and productive life.

        c.     Employs a stabilized and engaged workforce fully empowered to be agents of change.

        d.     Operates safe and therapeutic environments with positive peer cultures emphasizing mutual accountability.

        e.     Is a model system with innovative, data-driven, and successful programming.

4.     Central to fulfilling TJJD's mission are our correctional employees. Applicants for employment with TJJD must meet the criminal history standards outlined in TJJD policy to be eligible for hire. *See* TJJD Personnel Policy and Procedure Manual, Conditions of Employment, Criminal History: Standards, Background Checks, and Self-Reporting Requirements, PRS.02.08, *available at* https://www.tjjd.texas.gov/policies/PRS/prs02/prs0208.pdf (Attachment 11).

5.     Moreover, under Texas law, certain employees for TJJD are licensed as "peace officers" and to maintain their license, fall under the same absolute no felons policy that applies to other law-enforcement officers throughout Texas. *See* 31 Tex. Admin. Code § 55.802(1) (Attachment 9); Tex. Occ. Code §§ 1701.001(3)–(4), 1701.312(a) (Attachment 7).

6.     Though TJJD does not maintain a no felon hiring policy for all positions, TJJD has always reserved the absolute right to reject applicants for any position with our agency on the basis that they have been convicted of a felony or

*Declaration of Royce Myers*

certain other designated offenses. TJJD has always exercised this prerogative, which is critical to fulfilling TJJD's mission.

7.      Attached to this Declaration as Attachment 11 is a copy of TJJD's aforementioned internal policy, as described above. This attached document is a record created and maintained by TJJD, which I am authorized to certify as true and correct. This record is kept by TJJD in the regular course of our business. Furthermore, it was in the regular course of the business of TJJD that employees of TJJD, with knowledge of the information recorded made, transmitted, received, or otherwise archived the information to be included in the record. Finally, this record was created at or near the time of the acts, events, conditions, or information recorded in the records.

8.      TJJD provides a graduated model that assesses each applicant's criminal history in relation to the functions of the job. At one end of the spectrum, individuals applying for direct youth care positions, such as Juvenile Correctional Officers, who have a felony conviction are prohibited from that JCO position. This is consistent with Title 42 U.S.C. § 13041(d). Also, consistent with Tex. Occ. Code § 1701.312, individuals in licensed peace officer positions are prohibited if they have a felony conviction, preventing them from licensure. The same individuals may apply for other positions at TJJD and, depending on the crime, the position, and the time from the conviction be considered for employment or for an individual review.

9.      I, Royce Myers, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing Declaration is true and correct.

Executed this $\mathcal{21}^{st}$ day of July, 2017.

*Royce R Myers*

ROYCE MYERS

---

*Declaration of Royce Myers*

**SWORN TO AND SUBSCRIBED** before me on the 21st day of July 2017

DEBBI MCDAID
Notary Public, State of Texas
My Commission Expires
September 01, 2019
(Notary Seal)

NOTARY WITHOUT BOND

Debbi McDaid
_____
Notary Public in and for the State of Texas

My Commission expires: _9 · 1 · 2019_

*Declaration of Royce Myers*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

TEXAS,

       *Plaintiff,*

v.

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION;
VICTORIA A. LIPNIC, in her
official capacity as Acting Chair of
the Equal Employment
Opportunity Commission; and
JEFFERSON B. SESSIONS, III, in
his official capacity as Attorney
General of the United States,

       *Defendants.*

Case No. 5:13-CV-00255-C

## DECLARATION OF BOB BIARD

I, Bob Biard, state that the following is based upon my personal knowledge:

1.     I am a citizen of both Texas and the United States, over the age of eighteen, and competent to testify.

2.     I am the General Counsel for the Texas Lottery Commission (TLC). I have held this position since September 2012, been employed with TLC since December 2008, and acted as a licensed attorney since 1986. Overall, I have served in Texas government over 17 years.

3.     As reflected in the State Lottery Act, Bingo Enabling Act, and the TLC mission statement, TLC is the Texas state agency charged with and committed to generating revenue for the State of Texas through the responsible management and sale of entertaining lottery products; and promoting and maintaining the integrity of charitable bingo conducted in Texas for the benefit of charitable organizations. Accordingly, TLC incorporates the highest standards of security, integrity and

App. 071  TX 0353

responsible gaming principles, sets and achieves challenging goals, provides quality customer service, and utilizes a TEAM approach. To that end, for the forthcoming 2018–2019 fiscal biennium, the Texas Legislature appropriated approximately $463 million, and approximately 323.5 full-time-equivalent positions.

4.    First and foremost among TLC's core values are integrity and responsibility. TLC works hard to maintain the public trust by protecting and ensuring the security of its lottery games, systems, drawings and operational facilities. TLC values and requires ethical behavior by its employees, licensees and vendors.

5.    In order to fulfill TLC's mission and uphold its core values, TLC maintains an absolute bar to employing any person who has been convicted of a felony (or certain other designated offenses) if less than ten years has elapsed since the termination of the sentence, parole, mandatory supervision, or probation served for the offense. This policy originated as a statutory requirement in the 1991 legislation establishing the Texas Lottery as a division in the office of the Comptroller of Public Accounts, which specifically prohibited the employment of a person who would be denied a license as a lottery ticket sales agent under the statutory eligibility requirements for a lottery license. Then, and now, the eligibility requirements for lottery ticket sales agent licensees similarly prohibit licensure to convicted felons (this provision is currently codified at Texas Government Code § 466.155(a)(1)(A)). Thus, the employment prohibition has existed since before TLC commenced operation as a separate state agency in 1993 and, although it is not currently in the TLC's governing statutes, TLC management believes the prohibition continues to be critical to fulfilling TLC's mission and maintaining the public trust.

6.    Attached to this Declaration as Attachment 20 is a copy of TLC's internal written procedure (Enforcement Division Procedure EN-016) reflecting the agency's long-standing policy, as described above. This attached document is a record

created and maintained by TLC, which I am authorized to certify as true and correct. This record is kept by TLC in the regular course of TLC business. Furthermore, it was in the regular course of the business of TLC that employees of TLC, with knowledge of the information recorded, made, transmitted, received, or otherwise archived the information to be included in the record. Finally, this record was created at or near the time of the acts, events, conditions, or information recorded in the record.

7.    TLC consistently makes prospective job applicants aware that final selection for any position will be subject to an extensive criminal background investigation. The TLC also makes current employees aware of the no-felony employment policy through an express statement on eligibility for employment in the TLC Personnel Handbook. A true and correct copy of an excerpt from the TLC Personnel Handbook is provided as Attachment 21.

8.    I, Bob Biard, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing Declaration is true and correct.

Executed this _3/3I_ day of July, 2017.

BOB BIARD

**App. 073**  TX 0355

# Attachment 1

Harrold ISD
244901

EDUCATIONAL PHILOSOPHY                                                    AE
                                                                    (EXHIBIT)

## PUBLIC EDUCATION MISSION, GOALS, AND OBJECTIVES

The mission of the Texas public education system is to ensure that all Texas children have access to a quality education that enables them to achieve their full potential and fully participate now and in the future in the social, economic, and educational opportunities in our state and nation.  That mission is grounded on the conviction that a general diffusion of knowledge is essential for the welfare of Texas and for the preservation of the liberties and rights of Texas citizens.  It is further grounded on the conviction that a successful public education system is directly related to a strong, dedicated, and supportive family and that parental involvement in the school is essential for the maximum educational achievement of a child. The objectives of public education are:

OBJECTIVE 1:  Parents will be full partners with educators in the education of their children.

OBJECTIVE 2:  Students will be encouraged and challenged to meet their full educational potential.

OBJECTIVE 3:  Through enhanced dropout prevention efforts, all students will remain in school until they obtain a diploma.

OBJECTIVE 4:  A well-balanced and appropriate curriculum will be provided to all students.

OBJECTIVE 5:  Educators will prepare students to be thoughtful, active citizens who have an appreciation for the basic values of our state and national heritage and who can understand and productively function in a free enterprise society.

OBJECTIVE 6:  Qualified and highly effective personnel will be recruited, developed, and retained.

OBJECTIVE 7:  Texas students will demonstrate exemplary performance in comparison to national and international standards.

OBJECTIVE 8:  School campuses will maintain a safe and disciplined environment conducive to student learning.

OBJECTIVE 9:  Educators will keep abreast of the development of creative and innovative techniques in instruction and administration using those techniques as appropriate to improve student learning.

OBJECTIVE 10:  Technology will be implemented and used to increase the effectiveness of student learning, instructional management, staff development, and administration.

The academic goals of public education are to serve as a foundation for a well-balanced and appropriate education.  The students in the public education system will demonstrate exemplary performance in:

GOAL 1:  The reading and writing of the English language.

GOAL 2:  The understanding of mathematics.

GOAL 3:  The understanding of science.

GOAL 4:  The understanding of social studies.

*Education Code 4.001, 4.002*

DATE ISSUED: 1/9/2008                                                    1 of 1
UPDATE 82
AE(EXHIBIT)-P                                    **App. 075**  TX 0017

# Attachment 2

KeyC te Red F ag   Severe Negat ve Treatment
Enacted Leg s at onAmended by 20 7 Tex. Sess. Law Serv. Ch.  070 (H.B. 3270) (VERNON'S),

KeyC te Ye ow F ag   Negat ve TreatmentProposed Leg s at on

Vernon's Texas Statutes and Codes Annotated
  Education Code (Refs & Annos)
    Title 2. Public Education (Refs & Annos)
      Subtitle D. Educators and School District Employees and Volunteers
        Chapter 22. School District Employees and Volunteers (Refs & Annos)
          Subchapter C. Criminal History Records (Refs & Annos)

V.T.C.A., Education Code § 22.085

§ 22.085. Employees and Applicants Convicted of Certain Offenses

Effective: June 15, 2007
Currentness

(a) A school district, open-enrollment charter school, or shared services arrangement shall discharge or refuse to hire an employee or applicant for employment if the district, school, or shared services arrangement obtains information through a criminal history record information review that:

  (1) the employee or applicant has been convicted of:

    (A) a felony offense under Title 5, Penal Code;

    (B) an offense on conviction of which a defendant is required to register as a sex offender under Chapter 62, Code of Criminal Procedure; [2] or

    (C) an offense under the laws of another state or federal law that is equivalent to an offense under Paragraph (A) or (B); and

  (2) at the time the offense occurred, the victim of the offense described by Subdivision (1) was under 18 years of age or was enrolled in a public school.

(b) Subsection (a) does not apply if the employee or applicant for employment committed an offense under Title 5, Penal Code and:

  (1) the date of the offense is more than 30 years before:

    (A) the effective date [3] of S.B. No. 9, Acts of the 80th Legislature, Regular Session, 2007, in the case of a person employed by a school district, open-enrollment charter school, or shared services arrangement as of that date; or

(B) the date the person's employment will begin, in the case of a person applying for employment with a school district, open-enrollment charter school, or shared services arrangement after the effective date of S. B. No. 9, Acts of the 80th Legislature, Regular Session, 2007; and

(2) the employee or applicant for employment satisfied all terms of the court order entered on conviction.

(c) A school district, open-enrollment charter school, or shared services arrangement may not allow a person who is an employee of or applicant for employment by an entity that contracts with the district, school, or shared services arrangement to serve at the district or school or for the shared services arrangement if the district, school, or shared services arrangement obtains information described by Subsection (a) through a criminal history record information review concerning the employee or applicant. A school district, open-enrollment charter school, or shared services arrangement must ensure that an entity that the district, school, or shared services arrangement contracts with for services has obtained all criminal history record information as required by Section 22.0834.

(d) A school district, open-enrollment charter school, private school, regional education service center, or shared services arrangement may discharge an employee if the district or school obtains information of the employee's conviction of a felony or of a misdemeanor involving moral turpitude that the employee did not disclose to the State Board for Educator Certification or the district, school, service center, or shared services arrangement. An employee discharged under this section is considered to have been discharged for misconduct for purposes of Section 207.044, Labor Code.

(e) The State Board for Educator Certification may impose a sanction on an educator who does not discharge an employee or refuse to hire an applicant if the educator knows or should have known, through a criminal history record information review, that the employee or applicant has been convicted of an offense described by Subsection (a).

(f) Each school year, the superintendent of a school district or chief operating officer of an open-enrollment charter school shall certify to the commissioner that the district or school has complied with this section.

**Credits**
Added by Acts 1995, 74th Leg., ch. 260, § 1, eff. May 30, 1995. Amended by Acts 2007, 80th Leg., ch. 1372, § 10, eff. June 15, 2007.

Footnotes
1    V.T.C.A., Penal Code § 19.01, et seq.
2    Vernon's Ann.C.C.P. art. 62.001, et seq.
3    June 15, 2007.
V. T. C. A., Education Code § 22.085, TX EDUC § 22.085
Current through Chapters effective immediately through Chapter 49 of the 2017 Regular Session of the 85th Legislature

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Wor **App. 078**  TX 0020   2

# Attachment 3


EMPLOYMENT REQUIREMENTS AND RESTRICTIONS                DBAA
CRIMINAL HISTORY AND CREDIT REPORTS                     (LEGAL)

| | |
|---|---|
| DEFINITIONS | "Criminal history clearinghouse" (Clearinghouse) means the electronic clearinghouse and subscription service established by the Department of Public Safety (DPS) to provide criminal history record information to persons entitled to receive that information and to provide updates to such information.  A person who is the subject of the criminal history record information requested must consent to the release of the information.  *Gov't Code 411.0845(a), (h)* |
| | "Criminal history record information" (CHRI) means information collected about a person by a criminal justice agency that consists of identifiable descriptions and notations of arrests, detentions, indictments, information, and other formal criminal charges and their dispositions.  *Gov't Code 411.082(2)* |
| | "National criminal history record information" (NCHRI) means criminal history record information obtained from DPS under Government Code Chapter 411, Subchapter F, and the Federal Bureau of Investigation (FBI) under Government Code 411.087.  *Education Code 22.081(2)* |
| CERTIFIED PERSONS | The State Board for Educator Certification (SBEC) shall review the NCHRI of a person who is an applicant for or holder of a certificate and who is employed by or is an applicant for employment by a district.  *Education Code 22.0831(c)* |
| NONCERTIFIED EMPLOYEES<br><br>APPLICABILITY | This section applies to a person who is not an applicant for or holder of a certificate from SBEC and who, on or after January 1, 2008, is offered employment by: |

1.  A district; or

2.  A shared services arrangement, if the employee's or applicant's duties are or will be performed on school property or at another location where students are regularly present.

[For noncertified employees of a district or shared services arrangement hired before January 1, 2008, see ALL OTHER EMPLOYEES, below.]

| | |
|---|---|
| INFORMATION TO DPS AND TEA | Before or immediately after employing or securing the services of a person subject to this section, a district shall send or ensure that the person sends to DPS information that DPS requires for obtaining NCHRI, which may include fingerprints and photographs. |
| | A district shall provide TEA with the name of a person to whom this section applies.  TEA shall examine the CHRI of the person and notify the district if the person may not be hired or must be discharged under Education Code 22.085. |

App. 080  TX 0022


EMPLOYMENT REQUIREMENTS AND RESTRICTIONS                              DBAA
CRIMINAL HISTORY AND CREDIT REPORTS                                  (LEGAL)

| | |
|---|---|
| EMPLOYMENT PENDING REVIEW | After the required information is submitted, the person may begin employment, but that employment is conditional upon the review of that person's CHRI by TEA and must be terminated if TEA makes a determination that the employee or applicant is ineligible for employment. |
| CRIMINAL HISTORY | A district shall obtain all CHRI that relates to a person subject to this section through the Clearinghouse and shall subscribe to the CHRI of that person.  A district may require the person to pay any fees related to obtaining the CHRI. |
| | *Education Code 22.0833; 19 TAC 153.1109(d)* |
| SUBSTITUTE TEACHERS | This section applies to a person who is a substitute teacher for a district or shared services arrangement. |
| APPLICABILITY | For purposes of the CHRI review requirements, a "substitute teacher" is a teacher who is on call or on a list of approved substitutes to replace a regular teacher and has no regular or guaranteed hours.  A substitute teacher may be certified or noncertified. |
| INFORMATION TO DPS AND TEA | A district shall send or ensure that a person to whom this section applies sends to DPS information required for obtaining NCHRI, which may include fingerprints and photographs. |

A district shall provide TEA with the name of a person to whom this section applies.  TEA shall examine the CHRI and certification records of the person and notify the district if the person:

1.   May not be hired or must be discharged as provided by Education Code 22.085; or

2.   May not be employed as a substitute teacher because the person's educator certification has been revoked or is suspended.

| | |
|---|---|
| EMPLOYMENT PENDING REVIEW | After the required information is submitted, the person may begin employment, but that employment is conditional upon the review of that person's CHRI by TEA and must be terminated if TEA makes a determination that the employee or applicant is ineligible for employment. |
| CRIMINAL HISTORY | A district shall obtain all CHRI that relates to a person to whom this section applies through the Clearinghouse.  A district may require the person to pay any fees related to obtaining the CHRI. |
| | *Education Code 22.0836; 19 TAC 153.1101(5), .1111(d)* |
| STUDENT TEACHERS | This section applies to a person participating in an internship consisting of student teaching to receive a teaching certificate. |
| APPLICABILITY | |

**App. 081**  TX 0023

EMPLOYMENT REQUIREMENTS AND RESTRICTIONS                    DBAA
CRIMINAL HISTORY AND CREDIT REPORTS                         (LEGAL)

CRIMINAL HISTORY | A student teacher may not perform any student teaching until:

1.  The student teacher has provided to a district a driver's license or another form of identification containing the person's photograph issued by an entity of the United States government; and

2.  The district has obtained from DPS all CHRI that relates to a student teacher. A district may also obtain CHRI relating to a student teacher from any other law enforcement agency, criminal justice agency, or private consumer reporting agency. A district may require a student teacher to pay any costs related to obtaining the CHRI.

*Education Code 22.0835*

COORDINATION OF EFFORTS | TEA, SBEC, a district, and a shared services arrangement may coordinate as necessary to ensure that criminal history reviews authorized or required under Education Code Chapter 22, Subchapter C are not unnecessarily duplicated. *Education Code 22.0833(h)*

ALL OTHER EMPLOYEES | A district shall obtain CHRI that relates to a person who is not subject to an NCHRI review under Education Code Chapter 21, Subchapter C and who is an employee of:

1.  The district; or

2.  A shared services arrangement, if the employee's duties are performed on school property or at another location where students are regularly present.

A district may obtain the CHRI from:

1.  DPS;

2.  A law enforcement or criminal justice agency; or

3.  A private consumer reporting agency [see CONSUMER CREDIT REPORTS, below].

*Education Code 22.083(a), (a-1), (c); Gov't Code 411.097*

CONFIDENTIALITY OF RECORD | CHRI that a district obtains from DPS, including any identification information that could reveal the identity of a person about whom CHRI is requested and information that directly or indirectly indicates or implies involvement of a person in the criminal justice system:

1.  Is for the exclusive use of the district; and

App. 082  TX 0024

EMPLOYMENT REQUIREMENTS AND RESTRICTIONS                          DBAA
CRIMINAL HISTORY AND CREDIT REPORTS                              (LEGAL)

2.  May be disclosed or used by the district only if, and only to the extent, disclosure is authorized or directed by a statute, rule, or order of a court of competent jurisdiction.

For purposes of these confidentiality provisions, "criminal history record" information does not refer to any specific document provided by DPS, but to the information contained, wholly or partly, in a document's original form or any subsequent form or use.

A district or an individual may not confirm the existence or nonexistence of CHRI to any person who is not eligible to receive the information.

*Gov't Code 411.084*

CHRI obtained by a district, in the original form or any subsequent form, may not be released to any person except the individual who is the subject of the information, TEA, or SBEC, or by court order. The CHRI is not subject to disclosure under Government Code Chapter 552 (Public Information Act).

An employee of a district may request from the district a copy of any CHRI related to that employee that the district has obtained from DPS.  The district may charge a fee to provide the information, not to exceed the actual cost of copying the CHRI.

*Gov't Code 411.097(d), (f)*

**DESTRUCTION OF CHRI**

A district shall destroy CHRI obtained from DPS on the earlier of:

1.  The date the information is used for the authorized purpose; or

2.  The first anniversary of the date the information was originally obtained.

*Gov't Code 411.097(d)(3)*

**CONFIDENTIALITY OF INFORMATION OBTAINED FROM APPLICANT OR EMPLOYEE**

A district may not release information collected about a person in order to obtain CHRI, including the person's name, address, phone number, social security number, driver's license number, other identification number, and fingerprint records, except:

1.  To comply with Government Code Chapter 22, Subchapter C (criminal records);

2.  By court order; or

3.  With the consent of the person who is the subject of the information.

App. 083  TX 0025

EMPLOYMENT REQUIREMENTS AND RESTRICTIONS                    DBAA
CRIMINAL HISTORY AND CREDIT REPORTS                         (LEGAL)

In addition, the information is not subject to disclosure under Government Code Chapter 522 (Public Information Act).

The district shall destroy the information not later than the first anniversary of the date the information is received.

*Education Code 22.08391*

UNAUTHORIZED
DISCLOSURE OF CHRI

A person commits a Class B misdemeanor if the person knowingly or intentionally:

1.  Obtains CHRI in an unauthorized manner, uses the information for an unauthorized purpose, or discloses the information to a person who is not entitled to the information; or

2.  Violates a DPS rule adopted under Government Code Chapter 411, Subchapter F.

A person commits a second degree felony if the person:

1.  Obtains, uses, or discloses CHRI for remuneration or for the promise of remuneration; or

2.  Employs another person to obtain, use, or disclose CHRI for remuneration or for the promise of remuneration.

*Gov't Code 411.085*

SBEC NOTIFICATION

A superintendent shall promptly notify SBEC in writing by filing a report with the TEA staff within seven calendar days of the date the superintendent obtains or has knowledge of information indicating that an educator employed by or seeking employment with the district has a reported criminal history and the district obtained information about the educator's criminal record by a means other than the criminal history clearinghouse established by the Texas Department of Public Safety.  [See also DHB for details on reporting requirements.]

"Reported criminal history" means information concerning any formal criminal justice system charges and dispositions.  The term includes arrests, detentions, indictments, criminal information, convictions, deferred adjudications, and probations in any state or federal jurisdiction.

*Education Code 22.087; 19 TAC 249.14(d), .3(43)*

***Note:***    For criminal history record provisions regarding volunteers, see GKG.  For provisions on employees of entities that contract with a district, see CJA.

App. 084  TX 0026

Harrold ISD
244901

EMPLOYMENT REQUIREMENTS AND RESTRICTIONS                     DBAA
CRIMINAL HISTORY AND CREDIT REPORTS                          (LEGAL)

| | |
|---|---|
| **DISCHARGE OF CONVICTED EMPLOYEES** | A district shall discharge or refuse to hire an employee or applicant for employment if the district obtains information through a CHRI review that: |

1. The employee or applicant has been convicted of:

   a. A felony under Penal Code Title 5;

   b. An offense requiring registration as a sex offender under Code of Criminal Procedure Chapter 62; or

   c. An offense under the laws of another state or federal law that is equivalent to an offense under paragraphs a or b; and

2. At the time the offense occurred, the victim of the offense was under 18 years of age or was enrolled in a public school.

| | |
|---|---|
| **EXCEPTION** | However, a district is not required to discharge or refuse to hire an employee or applicant if the person committed an offense under Title 5, Penal Code and: |

1. The date of the offense is more than 30 years before:

   a. June 15, 2007, in the case of a person employed by a district as of that date; or

   b. The date the person's employment will begin, in the case of a person applying for employment with a district after June 15, 2007; and

2. The employee or applicant for employment satisfied all terms of the court order entered on conviction.

| | |
|---|---|
| **CERTIFICATION TO SBEC** | Each school year, the superintendent shall certify to the commissioner of education that the district has complied with the above provisions at DISCHARGE OF CONVICTED EMPLOYEES as required by Education Code 22.085. |
| **SANCTIONS** | SBEC may impose a sanction on an educator who does not discharge an employee or refuse to hire an applicant if the educator knows or should have known, through a criminal history record information review, that the employee or applicant has been convicted of an offense described above. |
| | SBEC may impose a sanction on a superintendent who falsely or inaccurately certified to the commissioner that the district had complied with Education Code 22.085.  [See DISCHARGE OF CONVICTED EMPLOYEES, above] |
| **OPTIONAL TERMINATION** | A district may discharge an employee if the district obtains information of the employee's conviction of a felony or misdemeanor |

App. 085   TX 0027

EMPLOYMENT REQUIREMENTS AND RESTRICTIONS                DBAA
CRIMINAL HISTORY AND CREDIT REPORTS                     (LEGAL)

involving moral turpitude that the employee did not disclose to SBEC or to the district. An employee so discharged is considered to have been discharged for misconduct for the purposes of Labor Code 207.044 (unemployment compensation).

*Education Code 22.085; 19 TAC 249.15(b)(12), (13)* [See DF]

**CONSUMER CREDIT REPORTS**

**DEFINITIONS**

"Adverse action" includes a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee.

"Consumer report" includes any information from a consumer reporting agency that is used or expected to be used as a factor in establishing the person's eligibility for employment.

"Consumer reporting agency" is an agency that, for monetary fees, dues, or on a cooperative nonprofit basis, regularly assembles or evaluates consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties.

"Employment purposes" when used in connection with a consumer report means a report used for the purpose of evaluating a person for employment, promotion, reassignment, or retention as an employee.

*15 U.S.C. 1681a*

**OBTAINING REPORTS**

A district may not procure a consumer report for employment purposes unless:

1.  The district has provided the applicant or employee a written disclosure that a consumer report may be obtained for employment purposes; and

2.  The applicant or employee has authorized in writing the procurement of the consumer report.

**ADVERSE ACTION**

Before taking any adverse action based on the consumer report, a district shall provide the applicant or employee a copy of the consumer report and a written description of the person's rights under the Fair Credit Reporting Act, as prescribed by the Federal Trade Commission.

*15 U.S.C. 1681b(b)(2)*

**Note:**    The following provisions apply to a district that uses consumer reports.

App. 086    TX 0028

Harrold ISD
244901

EMPLOYMENT REQUIREMENTS AND RESTRICTIONS                    DBAA
CRIMINAL HISTORY AND CREDIT REPORTS                        (LEGAL)

| | |
|---|---|
| ADDRESS DISCREPANCIES | "Notice of address discrepancy" means a notice sent to a user by a consumer reporting agency that informs the user of a substantial difference between the address for the consumer that the user provided to request the consumer report and the address(es) in the agency's file for the consumer. |

A district must develop and implement reasonable policies and procedures designed to enable the district, when it receives a notice of address discrepancy, to form a reasonable belief that a consumer report relates to the consumer about whom it has requested the report.

If a district regularly and in the ordinary course of business furnishes information to the consumer reporting agency from which it received the notice of address discrepancy, the district must also develop and implement reasonable policies and procedures for furnishing an address for the consumer, which the district has reasonably confirmed is accurate, to the consumer reporting agency.

*16 C.F.R. 641.1*

| | |
|---|---|
| DISPOSAL OF RECORDS | A district must properly dispose of a consumer report by taking reasonable measures to protect against unauthorized access to or use of the information. |

"Dispose" includes discarding or abandoning the consumer report, or selling, donating, or transferring any medium, including computer equipment, upon which the consumer report is stored.

Examples of reasonable measures include:

1.  Burning, pulverizing, or shredding papers containing a consumer report so the information cannot practicably be read or reconstructed;

2.  Destroying or erasing electronic media containing a consumer report so that the information cannot practicably be read or reconstructed; or

3.  After due diligence, entering into and monitoring compliance with a contract with another party engaged in the business of record destruction to dispose of the consumer report.

*16 C.F.R. 682.3*

App. 087  TX 0029

# Attachment 4

EEOC FORM 131 (11/09)

# U.S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| Stuart Platt<br>General Counsel<br>TX DEPARTMENT OF PUBLIC SAFETY<br>P O Box 4087<br>Austin, TX 78773 | **William R. Smith** |

THIS PERSON (check one or both)

[X] Claims To Be Aggrieved

[ ] Is Filing on Behalf of Other(s)

EEOC CHARGE NO.

**451-2014-00103**

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act (Title VII)    [ ] The Equal Pay Act (EPA)    [ ] The Americans with Disabilities Act (ADA)

[ ] The Age Discrimination in Employment Act (ADEA)    [ ] The Genetic Information Nondiscrimination Act (GINA)

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by **02-DEC-13** a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by **22-NOV-13** to **Katherine S. Perez, ADR Coordinator, at (210) 281-2507**
   If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

Julia Way,
Intake Supervisor

*EEOC Representative*

*Telephone*    **(210) 281-7621**

Enclosure(s): [X] Copy of Charge

**San Antonio Field Office
5410 Fredericksburg Rd
Suite 200
San Antonio, TX 78229
Fax: (210) 281-7690**

TEXAS DEPT. OF PUBLIC SAFETY
OFFICE OF GENERAL COUNSEL

NOV 04 2013

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[X] Race    [ ] Color    [X] Sex    [ ] Religion    [ ] National Origin    [ ] Age    [ ] Disability    [ ] Retaliation    [ ] Genetic Information    [ ] Other

**See enclosed copy of charge of discrimination.**

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| November 1, 2013 | Travis G. Hicks,<br>Director | |

**App. 089** TX 0031

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | 451-2014-00103 |

| Texas Workforce Commission Civil Rights Division | and EEOC |
|---|---|

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)*  Mr. William R. Smith   2013 OCT 30  AM 11 52 | Home Phone *(Incl. Area Code)*  (512) 507-2386 | Date of Birth  01-01-1983 |
|---|---|---|

Street Address                                              City, State and ZIP Code
**4534 Little Hill Circle, Austin, TX 78725**

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name  **TX DEPT OF PUBLIC SAFETY** | No. Employees, Members  **Unknown** | Phone No. *(Include Area Code)*  **(512) 424-2000** |
|---|---|---|

Street Address                                              City, State and ZIP Code
**5805 North Lamar Blvd., Austin, TX 78752**

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|

Street Address                                              City, State and ZIP Code

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

| ☒ RACE | ☐ COLOR | ☒ SEX | ☐ RELIGION | ☐ NATIONAL ORIGIN |
|---|---|---|---|---|
| ☐ RETALIATION | ☐ AGE | ☐ DISABILITY | ☐ GENETIC INFORMATION | |
| ☐ OTHER *(Specify)* | | | | |

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **09-11-2013**   Latest **10-08-2013**
☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

On September 11, 2013, I applied online for the position of Customer Service Representative (Contact Center). Although I met the qualifications for the position I was never contacted for an interview nor hired. The job application asked if the applicant had a felony conviction and I indicated that I had been convicted of a felony for unauthorized use of a vehicle.

I believe I have discriminated against because of my race (Black), sex (male), and felony conviction, in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.  SIGNATURE OF COMPLAINANT |
| x 10-25-13   x W~ Smith  Date        Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

**App. 090** TX 0032

EEOC Form 161 (11/09)    U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To:    William R. Smith<br>4534 Little Hill Circle<br>Austin, TX 78725 | From:    San Antonio Field Office<br>5410 Fredericksburg Rd<br>Suite 200<br>San Antonio, TX 78229 |

☐    On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 451-2014-00103 | Travis G. Hicks, Director | (210) 281-7603 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐    The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐    Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐    The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐    Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒    The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

☐    The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐    Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*Travis G. Hicks*                    12/19/2013

Enclosures(s)                    **Travis G. Hicks,**                    (Date Mailed)
**Director**

cc:    Kathleen T. Murphy-Darveau
Senior Asst. General Counsel
TX DEPARTMENT OF PUBLIC SAFETY
P O Box 4087
Austin, TX 78773

TEXAS DEPT. OF PUBLIC SAFETY
OFFICE OF GENERAL COUNSEL

DEC 23 2013

# App. 091    TX 0033



# TEXAS DEPARTMENT OF PUBLIC SAFETY

**5805 N. LAMAR BLVD • BOX 4087 • AUSTIN, TEXAS 78773-0001**
**512/424-2000**
www.dps.texas.gov




STEVEN C. McCRAW
DIRECTOR
DAVID G. BAKER
CHERYL MacBRIDE
DEPUTY DIRECTORS

COMMISSION
A. CYNTHIA LEON, CHAIR
CARIN MARCY BARTH
RANDY WATSON

December 2, 2013

Julia Way
U.S. Equal Employment Opportunity Commission
San Antonio Field Office
5410 Fredericksburg Rd
Suite 200
San Antonio, TX 78229

|     | RE: | Complainant   | : | William R. Smith                |
|-----|-----|---------------|---|---------------------------------|
|     |     | EEOC Charge No. | : | 451-2014-00103                |
|     |     | Respondent    | : | Texas Department of Public Safety |

Dear Ms. Way:

The Department of Public Safety is in receipt of the Notice of Charge of Discrimination in the above referenced case. The Charging Party, William R. Smith, has alleged that he has been discriminated against because of his race, sex and felony conviction. It is the Department's position that Mr. Smith has not been subjected to any form of discrimination. The Department has acted appropriately and in accordance with all state and federal law and established policy in its dealings with the Mr. Smith.

On September 11, 2013, Mr. Smith applied for a position with the Department as a Customer Service Representative in the Driver License Division's contact center. There were 472 applicants for this position and only 29 were granted interviews. All applications are submitted online and every applicant is required to respond to a series of screening questions regarding their ability to meet the job requirements. Mr. Smith affirmatively responded to the yes/no question asking if the applicant had ever been convicted of a felony. [See Attachment One – Application documents regarding William R. Smith] The employees who staff the contact center are responsible for answering the thousands of phone calls received each day regarding driver licensing and related issues. To perform their duties, these employees have full access to the Driver License System database which contains the personal identifying information (full name, date of birth, addresses, social security number, photograph, thumbprint, etc.) of over 29 million residents of Texas. As the State's primary law enforcement agency, the Department takes great strides to ensure the security of this highly sensitive information. Pursuant to Department policy, an applicant with a felony conviction is not eligible to be considered for employment. [See Attachment Two – DPS Policy §15.10.03] Therefore, Mr. Smith's application was screened out of the

process. By e-mail sent September 18, 2013, Mr. Smith was advised that the Department was unable to consider his application at this time.

We respectfully submit that the Charging Party's allegations are unfounded and that the Department has demonstrated a good faith effort to comply with the Commission's request. We also respectfully submit that the Commission has sufficient information to either dismiss this complaint or issue a finding of *no cause*. The Complainant has not been subjected to discrimination in any manner by the Department. Sufficient evidence exists to show that the Complainant's allegations are baseless.

If you have any further questions or the Commission needs any additional information regarding this complaint, please contact me at (512) 424-2890.

Sincerely,

Kathleen T. Murphy-Darveau
Senior Assistant General Counsel

KTM:sje

Enclosures as listed on the Table of Attachments

**App. 093**  TX 0035

WILLIAM R. SMITH
TABLE OF ATTACHMENTS
EEOC Charge No. 451-2014-00103

ATTACHMENT NO. 1          Application documents regarding William R. Smith

ATTACHMENT NO. 2          DPS Policy §15.10.03

# Attachment One

Application documents regarding
William R. Smith

## William R. Smith
## EEOC Charge No. 451-2014-00103
## Texas Department of Public Safety

## Texas Department of Public Safety
### Courtesy ~ Service ~ Protection

DPS HOME    SERVICES    EMPLOYMENT    ABOUT US

Search DPS

## Employment/Career Opportunities

Job Opportunities | Applicant Login | Internal DPS Opportunities | Job Descriptions | Job Interest Card
ADA Compliance | Become a State Trooper

Monday, December 02, 2013

powered by
NEOGOV

**Welcome to Texas Department of Public Safety's employment application process!**

The Texas Department of Public Safety only accepts online applications. If this is the first time you are applying via our online job application, you will need to create an account by clicking above on Applicant Login.

After your account has been established, you can build an application by clicking on the "Create Application" link. Your application can be saved and used to apply for more than one job opening. Online applications are stored on a secure site and only authorized employees and hiring authorities have access to the information submitted.

**It is important that your application be complete and thorough** - please include all requested education, experience, previous compensation, reasons for leaving, and other information. Résumés and other supporting documents can be provided at the time of application, however, **résumés will not be accepted in lieu of an application.** Incomplete applications are subject to rejection. Notifications to applicants are sent electronically to the email address you provide.

**\*\*Please note: Current Texas DPS employees are required to notify their supervisor when applying for other DPS positions.\*\***

Applicants must be at least 17 years of age to work for Texas DPS; some positions may have other age requirements. Proof of US Citizenship is a requirement for employment with Texas DPS. A certified copy of your birth certificate or naturalization certificate will satisfy this requirement. Background investigations, including criminal history record checks, are conducted on all prospective employees. Felony convictions and certain misdemeanor convictions will be cause for immediate rejection.

The Texas Department of Public Safety is an equal opportunity employer and does not discriminate on the basis of race, color, religion, gender, national origin, age or disability.

Employment opportunities are listed below and may be searched either by job category or by scrolling down to see all currently posted opportunities.

We thank you for your interest in employment and career opportunities with the Texas Department of Public Safety!

Texas Department of Public Safety - Courtesy, Service, Protection                    Page 2 of 4

## Search Criteria

All Categories are automatically selected. To change the results, deselect and reselect the categories by using the Clear All/Select All buttons or by clicking on the check boxes. To reset the search criteria, click 'Clear Search' at the bottom of this box.

**Select Category**                                    **Select All Categories   Clear All Categories**

| | | |
|---|---|---|
| ☑ 911 Telecommunications (3) | ☑ Accounting and Finance (3) | ☑ Administration (5) |
| ☑ Administrative Assistant (1) | ☑ Audit (4) | ☑ Automotive (1) |
| ☑ Building & Grounds Cleaning and Maintenance (1) | ☑ Business (2) | ☑ Clerical & Data Entry (5) |
| ☑ Communications (8) | ☑ Court Administration (1) | ☑ Criminology (1) |
| ☑ Custodial (1) | ☑ Customer Service (10) | ☑ Dispatch (6) |
| ☑ Education, Training & Library (2) | ☑ Emergency Management (8) | ☑ Facility Management (1) |
| ☑ Fire & EMS (1) | ☑ Fleet Services (1) | ☑ Forensics (1) |
| ☑ Grants Administration (4) | ☑ Internship (1) | ☑ Investigative (2) |
| ☑ IT and Computers (4) | ☑ Laboratory (1) | ☑ Law Enforcement (17) |
| ☑ Legal (2) | ☑ Management (1) | ☑ Mathematics (1) |
| ☑ Miscellaneous (1) | ☑ Office and Administrative Support (8) | ☑ Organizational Development (1) |
| ☑ Planning and Development (3) | ☑ Professional (1) | ☑ Program Management (3) |
| ☑ Project Management (2) | ☑ Public Safety (42) | ☑ Records Management (3) |
| ☑ Research (2) | ☑ Risk Management (2) | ☑ Sciences (3) |
| ☑ Statistics/Mathematics (2) | ☑ Technical Education (2) | ☑ Telecommunications (6) |
| ☑ Training (3) | | |

**Search**

Enter keywords (optional):                        Explain this

[Go] or Clear Search

🖶 Print this page

47 records found.
Page # 1    of 2 [go]

| Position | Emp. Type | Salary | Closing Date |
|---|---|---|---|
| Accounts Payable Technician-FIN-Austin | Full-time, Regular, day shift | $2,403.25 - $3,697.50 Monthly | 12/04/13 |
| Administrative Assistant,Training-ETR-Austin | Full-time, Regular, day shift | $2,236.75 - $2,438.83 Monthly | 12/09/13 |
| Assistant Recovery Officer, TDEM - Austin | Full-time, Regular, day shift | $3,020.91 - $3,837.87 Monthly | Continuous |
| Assistant Recovery Officer, TDEM - Houston | Full-time, Regular, day shift | $3,020.91 - $3,837.87 Monthly | Continuous |
| Crime Lab Intern-Houston | Internship | $0.00 Monthly | Continuous |
| Custodian, Regional Facilities- | Full-time, Regular, | | |

App. 097   12/2/2013
TX 0039

Texas Department of Public Safety - Courtesy, Service, Protection                    Page 3 of 4

| ADM-Odessa | day shift | $1,861.00/Month | Continuous |
|---|---|---|---|
| DL (Hourly) Customer Service Representative II - Big Spring | Temporary work | $12.37/Hour | 12/04/13 |
| DL (Hourly) Customer Service Representative II - Midland | Temporary work | $12.37/Hour | 12/09/13 |
| DL Customer Service Rep II - Dumas, Texas | Full-time, Regular, day shift | $2,144.33 - $2,290.14 Monthly | 12/09/13 |
| DL Management Analyst- Austin | Full-time, Regular, day shift | $4,820.58 - $5,320.58 Monthly | 12/02/13 |
| Document Control and Communication Specialist, THSSAA-COS-Austin | Full-time, Regular, day shift | $3,020.91 - $4,604.83 Monthly | Continuous |
| *NEW!* Field Secretary, THP - Baytown | Full-time, Regular, day shift | $2,236.75 - $2,388.83 Monthly | 12/13/13 |
| Forensic Scientist I-III (Breath Alcohol Laboratory), LES - Houston | Full-time, Regular, day shift | $3,458.35 - $5,974.49 Monthly | 12/03/13 |
| Forensic Scientist I-III Forensic Breath Alcohol-LES-Fort Stockton | Full-time, Regular, day shift | $3,451.33 - $6,293.08 Monthly | Continuous |
| Grant Accountant I, State Administration Agency-COS-Austin | Full-time, Regular, day shift | $2,544.41 - $3,100.00 Monthly | Continuous |
| Grant Administrator, TDEM - Austin | Full-time, Regular, day shift | $4,216.83 - $5,475.20 Monthly | Continuous |
| Hourly Customer Service Representative II, DL-Dallas County | Part-time, regular, day shift | $12.37/Hour | 12/03/13 |
| Hourly Customer Service Representative II, DL-Decatur | Part-time, regular, day shift | $12.37/Hour | 12/03/13 |
| Individual Assistance Officer, TDEM - Austin | Full-time, Regular, day shift | $3,451.33 - $4,473.95 Monthly | Continuous |
| Internal Auditor III , CAO - Austin | Full-time, Regular, day shift | $3,451.33 - $4,044.00 Monthly | Continuous |
| Internal Auditor IV, CAO-Austin | Full-time, Regular, day shift | $3,894.25 - $5,250.00 Monthly | Continuous |
| Legislative Coordinator, Government Relations-COS-Austin | Full-time, Regular, day shift | $3,451.33 - $4,421.75 Monthly | Continuous |
| Mainframe Data Base Administrator III-IV-IT-Austin | Full-time, Regular, day shift | $4,216.66 - $6,733.58 Monthly | Continuous |
| Motor Vehicle Technician III, Fleet Operations - Lubbock | Full-time, Regular, day shift | $2,403.25 - $2,850.00 Monthly | Continuous |
| Network Support Specialist III, IT-Lubbock | Full-time, regular, on call hours included | $3,689.41/Month | Continuous |

**App. 098**   12/2/2013
TX 0040

*The Texas Department of Public Safety is an Equal Opportunity Employer.*



Accessibility | Site Policies | TRAIL | TSIEC | Report Fraud, Waste or Abuse | American Recovery and Reinvestment ACT |
Outlook Web Access | ETA Time Entry | Texas Homeland Security | Public Information Act | Compact with Texans | Espanol |
The Governor's Committee on People with Disabilities | Personnel Complaint Process (Espanol) | Customer Survey |
| texas.gov |

© 2000-2010 Texas Department of Public Safety.



**TEXAS DEPARTMENT OF PUBLIC SAFETY**
**invites applications for the position of:**

# Customer Service Rep (Contact Center), DLD-Austin

**SALARY:**     $2,144.33 - $2,728.50 Monthly

**OPENING DATE:** 08/29/13

**CLOSING DATE:** 09/12/13 11:59 PM

**JOB SUMMARY:**
**\*\* A RESUME MAY BE ATTACHED BUT WILL NOT BE ACCEPTED IN LIEU OF A COMPLETED APPLICATION \*\***

Performs routine (journey-level) customer service work. Work involves conducting technical review of applications and supporting documentation for licenses. Communicating with varied entities to provide direct information to citizens. Providing rapid and accurate responses to telephone requests. Obtaining information relating to content and application of laws, regulations, procedures and/or official Department or other agency actions affecting citizen privileges of licensing to operate a motor vehicle as well as status of individual cases. Learning and participating in research methods, determining and authenticating policies and procedures; Work is performed under general supervision with limited latitude for the exercise of independent judgment within the limits of applicable laws, attorney general opinions, court decisions, rules, regulations, policies and procedures.

**State Classification #: 0132**
**State Classification Name: Customer Service Rep II**
**Salary Group: A11**

**GENERAL DUTIES:**

Provide customer service and answer inquiries relating to customer accounts in accordance with specific guidelines and procedures.

Enter information into databases, process letters to customers, and perform other customer services through the Contact Center, e-mail or switchboard.

Communicate and interact with internal and external customers regarding content and utilization of various laws.

Greet and respond to requests from callers for information, locations or services and inform them of actions required to accomplish their objectives, amounts of fees required for them to obtain/renew or for purchase of various official documents and Department publications;

App. 100  TX 0042

provide instructions for completing request forms, and review completed forms to determine completeness and accuracy.

Maintain and refer to listings of Department personnel and staff locations statewide.

Transfer or route telephone calls within Headquarters complex while performing directory assistance and establish telephone conference calls.

Communicate with originators of law reports to resolve problems when so requested by the subject individual or legal representative.

Examine, evaluate and analyze documents provided by citizens, computerized information and retrieved from electronic files to determine compliance with license rules and regulations or to identify deficiencies that prevent compliance with one or more laws that affect a person's privileges in the State of Texas.

Apply established procedures to verify identification of requestor and applies security procedures applicable to the types of information requested prior to its release.

Review and evaluate rules, regulations, policies and procedures in determining proper action under the Driver License laws.

Initiate correspondence, teletypes, deletions or revisions to electronic data files, notifying other agencies of actions that may affect their records or actions, etc.

Compute totals of daily activities, statistics, duties performed and production and submits weekly and monthly reports.

Perform related duties as assigned.

**EDUCATION AND EXPERIENCE:**
<u>EDUCATION & EXPERIENCE</u>

Graduation from a standard senior high school or the equivalent.

Eligibility for performance based advancement (progression) from a lower level is contingent upon Exceeding Expectations on performance evaluations, supervisory recommendation, the attainment of certain performance metrics, and availability. Merit advancement is not tenure based.

<u>KNOWLEDGE, SKILLS, & ABILITIES</u>

Ability to remain calm and professional under pressure, communicate verbally in a clear, concise and efficient manner.

Ability to accept change by demonstrating a positive attitude when changes occurs.

App. 101    TX 0043

Ability to communicate effectively with a wide variety of people with different socioeconomic status, educational levels, interests and emotional condition during the communicating and service needs that include occasional confrontational conditions and tensions in citizens.

Ability to maintain a professional attitude and approach to communications under occasional periods of verbal abuse from customers.

Ability to maintain excellent attendance and flexibility in scheduling.

Ability to meet office objectives, daily talk times.

Working knowledge of business office practices, of English grammar, spelling, punctuation and composition and of arithmetic.

Ability to understand and effectively apply complex oral and written instructions and procedures.

Must be analytical, detailed-oriented, and able to mull-task without sacrificing accuracy or timeliness.

Ability to analyze problems, indentify causative factors, and apply actions to effectively resolve current, and prevent recurrences of, problem conditions.

Ability to read and understand a variety of applicable computer printouts in which some of the data is coded and some is in narrative form.

Ability to work effectively in an open office environment with frequent interruptions and distractions, a moderate noise level, fluctuating workloads at a consistently high level, requiring special processing of some cases, priority changes and schedule adjustments.

Knowledge after training, of department functions, responsibilities, and organizational structure.

Ability to understand Key Performance Indicators statistics (KPIs).

Ability to understand and comprehend the meaning of legal language of a variety of statues and the administrative language of rules, regulations, and procedures, and to commit to recallable memory the primary factors of each that are pertinent to customers for obtaining licenses and the ability to answer questions around licensing laws.

Must be able to responsibly handle sensitive and confidential information and situations.

Must be able to speak, read, and write English.

Skill in operating a personal computer accurately at moderate speed using database, word processing and spreadsheet software.

Ability to learn procedures for and to effectively operate specialized equipment as technological improvements are applied in the work unit in order to initiate or accomplish the

App. 102   TX 0044

addition, revision, or deletion of data.

Ability to acquire knowledge of operation of a telephone and agency programs, policies and operating units in a timely manner.

PHYSICAL and/or ENVIRONMENTAL DEMANDS

The physical and environmental demands described here are representative of those encountered and/or necessary for the employee to successfully perform the essential functions of this job; reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

1. Office environment indoors,

2. Ambulatory skills, e.g. stand, walk, sit for long periods of time, balance, stoop, kneel, crouch;

3. Hand-eye coordination and arm/hand/finger dexterity;

4. Ability to speak, hear, and exercise visual acuity;

5. Ability to transfer weights of fifteen (15) pounds anticipated for this position;

6. May be required to work beyond normal working hours to accommodate customers during times of crisis, including natural or man-made disasters.

7. Ability to maintain flexibility in scheduling.

**SUPPLEMENTAL INFORMATION:**
**DUE TO THE HIGH VOLUME OF APPLICATIONS WE DO NOT ACCEPT TELEPHONE CALLS, ONLY CANDIDATES SELECTED FOR INTERVIEW WILL BE CONTACTED**

State of Texas retirees may be rehired for full-time, non-commissioned positions only under very specific circumstances.

DPS employee who is selected for a position in their current salary group and state title will be transferred with no salary change (ex: Customer Service Rep II in DLD who moves to a Customer Service Rep II in RSD).

DPS employee who is selected for a position in their current salary group with a new state title may receive an increase up to 3.4%.

Salary is contingent upon qualifications and is subject to salary administration and budgetary restrictions.

Six (6) vacancies exist for this job posting

Travel = 5%

App. 103    TX 0045

**APPLICATIONS MAY BE FILED ONLINE AT:**
http://www.txdps.state.tx.us/

5805 N. Lamar Blvd.
Austin, TX 78752

recruiter@txdps.state.tx.us

The Texas Department of Public Safety is an Equal Opportunity Employer
Veteran's and Foster Child preferences in hiring will be granted as mandated by state law

Position #5-E-2558-DLD
CUSTOMER SERVICE REP (CONTACT CENTER), DLD-AUSTIN
JD

App. 104   TX 0046

**Customer Service Rep (Contact Center), DLD-Austin Supplemental Questionnaire**

* 1.  The salary range for this position is $2,094.33 - $2,728.50 per month. Does this range meet your salary expectations?
    - Yes
    - No

* 2.  Please indicate how many years of experience you have solving problems, answering inquiries, entering information into databases, composing correspondence, and other customer service related duties:
    - No experience
    - Less than 6 months
    - 6 months - 1 year
    - 1 - 2 years
    - 2 - 3 years
    - 3 - 4 years
    - 4 - 5 years
    - 5 - 6 years
    - 6 - 7 years
    - 7 - 8 years
    - 8 - 9 years
    - 9 - 10 years
    - 10+ years

* 3.  Do you have prior experience working in a call center environment?
    - Yes
    - No

* 4.  Do you possess sufficient hand-eye coordination and arm/hand/finger dexterity to perform this job?
    - Yes
    - No

* 5.  Do you possess the ability to speak, hear, and exercise visual acuity?
    - Yes
    - No

* 6.  Do you possess sufficient ambulatory skills to stand, walk, sit for long periods of time, balance, stoop, kneel, and crouch?
    - Yes
    - No

* 7.  Do you possess the ability to transfer weights of up to 15 lbs. anticipated for this position?
    - Yes
    - No

* 8.  Please describe what world-class customer service means to you:

* 9.  Please explain how you would communicate effectively under pressure with irate customers:

App. 105  TX 0047

Job Bulletin                                                        Page 7 of 7

* 10. Please describe a time when you helped create or improve upon a process at work:


* 11. Are you willing and able to maintain scheduling flexibility, including working beyond normal working hours to accommodate customers during times of crisis, including natural or man-made disasters?
       ⅃ Yes
       ⅃ No

* 12. Are you willing and able to travel up to 5% of the time to perform the duties of this position?
       ⅃ Yes
       ⅃ No

* 13. This position requires the completion of a comprehensive background investigation including employment and reference checks. Are you willing to participate in the comprehensive investigation if requested by the Department of Public Safety?
       ⅃ Yes
       ⅃ No

* 14. If you do not live in the Austin metro area, are you willing to travel to Austin (at your own expense) if selected for a job interview?
       ⅃ Yes
       ⅃ No

* Required Question

App. 106    TX 0048

*----*----*----*----*----*----*----*----*----*----*----*----*----*----*----*----*----*
----*----*----*
Replies to this email will be sent to Jason DeBoard
*----*----*----*----*----*----*----*----*----*----*----*----*----*----*----*----*----*
----*----*----*

September 18, 2013

William Smith
4534 Little Hill Circle
Austin, TX 78725

Dear William:

We appreciate your interest in the Customer Service Rep (Contact Center), DLD-Austin
position with the Texas Department of Public Safety.   However, information obtained
on your employment application indicates that you have a felony conviction.   As a
result, we are unable to consider your application at this time.

Sincerely,

Human Resources Department
Texas Department of Public Safety

App. 107    TX 0049

## 5-E-2558-DLD – Customer Service Rep (Contact Center), DLD-Austin

### Contact Information -- Person ID: 17477906

| | | |
|---|---|---|
| Name: | William R Smith | Address: | 4534 Little Hill Circle<br>Austin, Texas 78725   US |
| Home Phone: | (512) 507-2386 | Alternate Phone: | (512) 584-7712 |
| Email: | willsr4534@gmail.com | Notification Preference: | Email |
| Former Last Name: | Mccloud | Month and Day of Birth: | 01/01 |

### Personal Information

Driver's License:                                        Yes, Texas , 07068883 , Class C
Can you, after employment, submit proof of your          Yes
legal right to work in the United States?
What is your highest level of education?                 High School

### Preferences

Preferred Salary:                                        $15.62 per hour; $30,000.00 per year
Are you willing to relocate?                             Yes
                                                         No
Types of positions you will accept:                      Regular
Types of work you will accept:                           Full Time
Types of shifts you will accept:                         Day , Evening , Night , Rotating ,
                                                         Weekends , On Call (as needed)

### Objective
To succeed in the position given by learning and interpreting
the oil and gas policy and procedure.

### Education

**Professional**                                         Did you graduate: Yes
*Cybertex Institute of Technology*                       College Major/Minor: Information
4/2006 - 6/2007                                          Technology
Austin, Texas                                            Degree Received: Certification

### Work Experience

**Prayer Leader**                                        Hours worked per week: 40
5/2013 - 7/2013                                          Monthly Salary: $0.00
                                                         May we contact this employer? Yes
Ministry of Challenge
Austin, Texas

**Duties**
General Assembly
Cooking and cleaning
Landscaping
Trained and managed new staff

**Reason for Leaving**
Disagreement with duties

**Customer Service**                                     Hours worked per week: 30
10/2011 - 1/2012                                         Monthly Salary: $0.00
                                                         May we contact this employer? Yes
Achieve Financial
Austin, Texas

**App. 108**   TX 0050

**Duties**
Answered inbound calls and provided financial account information
Transferred balances

**Reason for Leaving**
Employment Terminated

---

**Driver/Technician**                          Hours worked per week: 30
4/2010 - 11/2010                               Monthly Salary: $0.00
                                               May we contact this employer? No
Catering by Rosemary
Austin, Texas

**Duties**
Delivered equipment in Austin and San Antonio
Set up party equipment

**Reason for Leaving**
Needed more hours

---

**Customer Assistance Agent**                  Hours worked per week: 40
11/2009 - 2/2010                               Monthly Salary: $0.00
                                               May we contact this employer? Yes
Minacs
Austin, Texas

**Duties**
Answered general inquiries, technical and support questions for GM vehicles
Scheduled appointments
Resolved customer complaints

**Reason for Leaving**
Disliked job

---

**Technical Operations Agent**                 Hours worked per week: 40
10/2007 - 11/2008                              Monthly Salary: $0.00
                                               May we contact this employer? Yes
Wayport
Austin, Texas

**Duties**
Troubleshooting for basic to intermediate internet connectivity, from front end to back bone
Provided support for proper network interoperability including website and email
Responsible for billing and account issues

**Reason for Leaving**
Laid off

**Certificates and Licenses**

Type: A+

Number:

Issued by:

Date Issued: 6 /2006    Date Expires:

---

Type: Network +

Number:

Issued by:

**App. 109**  TX 0051

Date Issued: 6 /2006    Date Expires:

Type: CCNA
Number:
Issued by:
Date Issued: 7 /2007    Date Expires: 7 /2011

**Skills**

Office Skills

Typing:      45
Data Entry: 0

Other Skills

Personal computers and software Expert - 10 years and 0 months

**Additional Information**

**References**

**Resume**

**Text Resume**

**Attachments**

**Agency-Wide Questions**

1.  Q: Chapter 411.007 of the Texas Government Code requires all Texas Department of Public Safety employees be a United States citizen. If hired by the Agency, can you submit proof of United States citizenship?

    A: Yes

2.  Q: If hired by the Agency, you will be required to provide ONE (1) of the following documents for citizenship purposes: US passport, original or certified copy of birth certificate OR original or certified copy of certificate of naturalization. If hired, indicate in blank below which document you will provide to HR to show proof that you are a United States citizen:

    A: Birth certificate

3.  Q: Have you ever been convicted of a felony?

    A: Yes

4.  Q: Have you ever been convicted or been granted deferred adjudication for a Class A misdemeanor?

    A: No

5.  Q: Have you been convicted or granted deferred adjudication for a Class B misdemeanor within the last 10 years?

    A: Yes

6.  Q: Have you ever been convicted of a family violence offense?

App. 110    TX 0052

A: No

7.  Q: Have you been convicted of driving while intoxicated during the five year period immediately prior to the date of the application?
    A: No

8.  Q: Are you currently under indictment for any criminal offense?
    A: No

9.  Q: Are you at least 17 years old?
    A: Yes

10. Q: Have you earned a high school diploma or the equivalent (GED)?
    A: Yes

11. Q: Are you currently employed by the Texas Department of Public Safety? (As a reminder, current employees must notify their current supervisor when applying for other DPS positions.)
    A: No

12. Q: Were you foster youth under the Texas Department of Family and Protective Services on the day before your 18th birthday?
    A: No

13. Q: If you answered "yes" to the foster care question, are you currently 25 years of age or under?
    A:

14. Q: Are you a veteran?
    A: No

15. Q: If you answered "yes" to the veteran question, please indicate what type of discharge you received and indicate your dates of service.
    A:

16. Q: Are you a surviving spouse of a veteran who has not remarried?
    A: No

17. Q: If you answered "yes" to the surviving spouse or the orphan question, please indicate the dates of service of veteran served.
    A:

18. Q: Are you a surviving orphan of a veteran?
    A: No

19. Q: The Texas Department of Public Safety requires that new employees relinquish, at the time of hire, any license or registration they hold that are issued under the Private Security Act and requires that they not seek any such license or registration while employed. This includes

App. 111    TX 0053

Case 5:13-cv-00255-C    Document 96    Filed 09/14/17    Page 115 of 191    PageID 1841

NEOGOV Insight - Application Detail                                                      Page 5 of 7

secondary employment that requires such a license or registration. DO YOU HOLD ANY LICENSE OR REGISTRATION UNDER THE PRIVATE SECURITY ACT?

A: No

**20. Q:** If you answered "YES" to the Private Security License question, please indicate the type of license or registration you hold.

A:

**21. Q:** Do you have any relatives currently employed at the Texas Department of Public Safety?

A: No

**22. Q:** If you answered "YES" to the nepotism question, please provide the relatives name and relationship to you.

A:

**23. Q:** Can you perform the essential functions of this position with or without accommodation? (Select one)

A: Without Accommodation

**24. Q:** If you answered "WITH ACCOMMODATION" to the previous question, please indicate the accommodations necessary to perform the essential functions of the job.

A:

**25. Q:** May we contact your current employer?

A: YES

**26. Q:** How did you first hear about this opportunity?

A: Texas Workforce Commission

**27. Q:** Have you previously been employed at the Texas Department of Public Safety?

A: No

**28. Q:** If you have previously worked at DPS, please indicate previous dates of employment, your work location, and reason for leaving in the space below.

A:

**29. Q:** Have you ever been terminated from employment with the Texas Department of Public Safety?

A: No

## Supplemental Questions

**1. Q:** The salary range for this position is $2,094.33 - $2,728.50 per month. Does this range meet your salary expectations?

A: Yes

**2. Q:** Please indicate how many years of experience you have solving problems, answering inquiries, entering information into databases, composing correspondence, and other customer service related duties:

A: 6 - 7 years

**3.** Q: Do you have prior experience working in a call center environment?
   A: Yes

**4.** Q: Do you possess sufficient hand-eye coordination and arm/hand/finger dexterity to perform this job?
   A: Yes

**5.** Q: Do you possess the ability to speak, hear, and exercise visual acuity?
   A: Yes

**6.** Q: Do you possess sufficient ambulatory skills to stand, walk, sit for long periods of time, balance, stoop, kneel, and crouch?
   A: Yes

**7.** Q: Do you possess the ability to transfer weights of up to 15 lbs. anticipated for this position?
   A: Yes

**8.** Q: Please describe what world-class customer service means to you:
   A: It means to have the upmost respect for the customer and going the extra mile to supply their needs.

**9.** Q: Please explain how you would communicate effectively under pressure with irate customers:
   A: I would ask the customer what is it that they want or they reason they are irate and continue to be nice to the customer.

**10.** Q: Please describe a time when you helped create or improve upon a process at work:
   A: At my last job we were carrying heavy bags of concrete from a shed to a truck and so I decided to get a dolly and use that to lessen the strain on our backs and to get the bags loaded quickly.

**11.** Q: Are you willing and able to maintain scheduling flexibility, including working beyond normal working hours to accommodate customers during times of crisis, including natural or man-made disasters?
   A: Yes

**12.** Q: Are you willing and able to travel up to 5% of the time to perform the duties of this position?
   A: Yes

**13.** Q: This position requires the completion of a comprehensive background investigation including employment and reference checks. Are you willing to participate in the comprehensive investigation if requested by the Department of Public Safety?
   A: Yes

**14.** Q: If you do not live in the Austin metro area, are you willing to travel to Austin (at your own expense) if selected for a job interview?

A: Yes

# Attachment Two

## DPS Policy §15.10.03

## William R. Smith
## EEOC Charge No. 451-2014-00103
## Texas Department of Public Safety

## EMPLOYMENT POLICIES AND PROCEDURES
## 01.15.00.00

**10.03 Screening of Applicants on the Basis of Traffic and Criminal Records.**

1. When it is determined that an applicant fits into any one of the following categories, the applicant will not be eligible to be considered for employment with the Department, or if the applicant has been offered a position, the applicant will be rejected at once:

a. A conviction for a felony.

b. An entering of an order of deferred adjudication for a felony, until five years after court supervision ceased and the case was dismissed.

c. A conviction of driving while intoxicated during the five-year period immediately prior to the date of application.

d. A finding by a court of competent jurisdiction that the applicant was a delinquent child during the five-year period immediately prior to the date of application. If the applicant's record in the proceeding is ordered sealed, the incident should be disregarded and treated as though it did not exist.

e. The applicant's driver license has been suspended, including a probated suspension, by the Department during the last three years as a habitual·violator.

f. There may be additional disqualifiers for specific positions.

g. The applicant's driver license has been suspended for refusal to submit to a chemical test within the last ten years.

2. In addition to the above disqualifiers, an applicant applying for a position that requires access to TLETS/TCIC/CCH will not be eligible to be considered for employment with the Department, or if the applicant has been offered a position, the applicant will be rejected at once, if it is determined that an applicant fits into any one of the following categories:

a. A conviction for an offense of the grade of felony or Class A misdemeanor.

b. An entering of an order of deferred adjudication for any criminal offense of the grade of felony or Class A misdemeanor.

c. An entering of an order of deferred adjudication for any criminal offense of the grade of Class B misdemeanor within the last ten years.

d. A conviction of an offense of the grade of a Class B misdemeanor within the last ten years.

App. 116 TX 0058

e. A conviction for a family violence offense.

f. Currently being under indictment for any criminal offense.

3. For purposes of this section, a person is convicted of a crime if the court enters an adjudication of guilt regardless of whether:

a. the sentence is subsequently probated;

b. the case against the person is dismissed and the person is released from any penalties and disabilities resulting from the offense; or

c. the person is pardoned, unless the pardon is for actual innocence.

# Attachment 5

DPS HOME     SERVICES     EMPLOYMENT     ABOUT US

*Enter Text Below*

Search DPS 🔍

## Employment/Career Opportunities

Job Opportunities  |  Applicant Login  |  Internal DPS Opportunities  |  Job Descriptions  |  Job Interest Card
ADA Compliance  |  Become a State Trooper

Friday, June 30, 2017



**Welcome to Texas Department of Public Safety's employment application process!**

**<u>Due to a state-wide hiring freeze on state agencies serving under the direction of the Governor, DPS will post only certain positions meeting authorized parameters; more specifically, (1) positions not funded through funds appropriated by the legislature and (2) positions that have a direct impact on public safety.</u>**

The Texas Department of Public Safety only accepts online applications.  If this is your first time applying, you will need to create an account by clicking above on Applicant Login.

After your account has been established, you can build an application by clicking on the "Create Application" link.  Your application can be saved and used to apply for more than one job opening.  Online applications are stored on a secure site and only authorized employees and hiring authorities have access to the information submitted.  Notifications are sent electronically to the email address you provide.

**It is important that your application be complete and thorough.   In order to facilitate review of your qualifications, please include all information requested**, e.g. education, experience, previous compensation, reasons for leaving, and other information - do not leave any field blank.  This system also allows you to attach supporting documents such as transcripts, certifications and/or licensure, and any other required documents with your application.

**THOROUGH BACKGROUND INVESTIGATIONS,** including criminal history record checks,  previous employment verifications, and personal references are conducted on ALL prospective employees. Felony convictions and certain misdemeanor convictions will be cause for immediate rejection.  Background investigations also include personal contact with you by a Background Investigator.  Applicants must be at least 17 years of age to work for Texas DPS; some positions may have other age requirements.  Proof of US Citizenship is a requirement for employment with Texas DPS.  A certified copy of your birth certificate or naturalization certificate will satisfy this requirement.  DPS also utilizes the U.S. Department of Homeland Security (DHS) E-Verify system to verify identity and employment eligibility of each newly hired employee.

The Texas Department of Public Safety is an equal opportunity employer and does not discriminate on the basis of race, color, national origin, ethnicity, religion, gender, age or disability.

**\*\*Please note:  Current Texas DPS employees are required to notify their supervisor when applying for other DPS positions.\*\***

App. 119  <span style="font-size:smaller">TX 0061</span>

Employment opportunities are listed below and may be searched either by job category or by scrolling down to see all currently posted opportunities.

We thank you for your interest in employment and career opportunities with the Texas Department of Public Safety!

## Search Criteria

All Categories are automatically selected. To change the results, deselect and reselect the categories by using the Clear All/Select All buttons or by clicking on the check boxes. To reset the search criteria, click 'Clear Search' at the bottom of this box.

Select Category                    Select All Categories   Clear All Categories

☑ 911 Telecommunications (1)    ☐ Administration (1)       ☑ Athletics & Fitness (1)
☑ Building & Safety (1)          ☐ Building Maintenance (2)  ☑ Construction Maintenance (1)
☑ Construction Trades (1)        ☐ Corrections (1)          ☑ Criminology (2)
☑ Database Administration (1)    ☐ Dispatch (1)             ☑ Electronics (1)
☑ Emergency Management (2)       ☐ EMS (1)                  ☑ Fire & EMS (1)
☑ Forensics (4)                  ☐ Health Education (1)     ☑ Health Sciences (1)
☑ Higher Education (1)           ☐ Investigative (4)        ☑ Laboratory (1)
☑ Law Enforcement (2)            ☐ Maintenance (2)          ☑ Management (2)
☑ Probation (1)                  ☐ Professional (1)         ☑ Public Safety (8)
☑ Research (2)                   ☐ Safety (1)               ☑ Security (1)
☑ Social Sciences (1)            ☐ Sports & Physical Education (1)  ☑ Trades (1)
☑ Utilities (1)

### Search

Enter keywords (optional): [                    ]   Explain this

[Go]► or Clear Search

🖨  Print this page

8 records found.

Page # [1] of 1 [go]

| Position ▼ | Emp. Type ▲ | Salary ▲ | Closing Date ▲ |
|---|---|---|---|
| B-2018 Trooper Trainee | Full-time, regular, may include shift work | $4,623.44/Month | 10/01/17 |
| Crime Laboratory Evidence Technician, LES-Lubbock | Full-time, Regular, day shift | $3,196.80/Month | 06/30/17 |
| Electrician I-II, ADM-Austin | Full-time, Regular, day shift | $3,371.73 - $3,612.38 Monthly | 06/30/17 |
| Forensic Scientist I-III (DNA Analysis), LES - Corpus Christi and Laredo | Full-time, Regular, day shift | $3,615.69 - $4,933.11 Monthly | 06/30/17 |
| Forensic Scientist I-III (DNA Analysis), LES - Garland | Full-time, Regular, day shift | $3,615.69 - $4,933.11 Monthly | 06/30/17 |

**App. 120** TX 0062

| Position | Emp. Type | Salary | Closing Date |
|---|---|---|---|
| Forensic Scientist I-III (Drug Analysis), LES-Houston | Full-time, Regular, day shift | $3,615.69 – $4,933.11 Monthly | 06/30/17 |
| HVAC Mechanic, ADM-Austin | Full-time, Regular, day shift | $3,952.10 – $5,050.00 Monthly | 06/30/17 |
| Section Administrator, TDEM - Austin | Full-time, Regular, day shift | $4,917.00 – $8,060.00 Monthly | 06/30/17 |

Page # 1 of 1 [go]

*The Texas Department of Public Safety is an Equal Opportunity Employer.*



| Accessibility | Site Policies | TRAIL | TSIEC | Report Fraud, Waste or Abuse | American Recovery and Reinvestment ACT |
| Outlook Web Access | ETA Time Entry | Texas Homeland Security | Public Information Act | Compact with Texans |
| The Governor's Committee on People with Disabilities | Personnel Complaint Process | Customer Survey |
| texas.gov |

© 2000-2010 Texas Department of Public Safety.

**App. 121**   TX 0063

# Attachment 6

DPS HOME    SERVICES    EMPLOYMENT    ABOUT US

Select Language ▼

Search DPS

DPS Recruiting

Recruiting Home

Job Fairs/Recruiting Events

Apply Now

Facebook

# Traffic and Criminal Records

- Being prohibited by state or federal law from operating a motor vehicle;

- Having been convicted of three (3) or more traffic violations, or a conviction of failing to maintain financial responsibility within the last 12 months, will disqualify the applicant for three (3) years from the date of the last traffic violation or offense conviction;

- Having been convicted of six (6) or more traffic violations, or a conviction of failing to maintain financial responsibility within the last 24 months, will disqualify the applicant for 3 years from the date of the last traffic violation conviction;

- The applicant's driver license has been suspended for refusal to submit to a chemical test within the last ten years;

- Currently on probation for any traffic offense or having a suspended driver license, applicant can not apply within 3 years of the date the probation was completed or date the suspension was lifted;

- Currently delinquent or having been delinquent in child support payments within the last 5 years as determined by a court or the Texas Attorney General's Office;

- Having been or currently on court-ordered supervision or probation for any offense of the grade of felony or Class A misdemeanor;

- Having been convicted of any offense of the grade of felony or Class A misdemeanor;

- Having been on or currently on court-ordered supervision or probation for any criminal offense of the grade of Class B misdemeanor within the last ten years;

- Having been convicted of an offense of the grade of a Class B misdemeanor within the last ten years;

- Having been convicted of a family violence offense;

- Currently being under indictment or criminal investigation;

- Being prohibited by state or federal law from possessing firearms or ammunition;

- Having committed theft(s) while in a position of trust or in a pattern that shows habitual theft will permanently disqualify the applicant;

Contact DPS Recruiting toll free at:

**1-866-898-7667**
or email
JoinDPS@dps.texas.gov

**Note:** links to [PDF] files require Adobe Reader or another PDF viewer.

| Accessibility | Site Policies | TRAIL | TSIEC | Report Fraud, Waste or Abuse |
| Outlook Web Access | ETA Time Entry | Texas Homeland Security | Public Information Act | Compact with Texans |
| The Governor's Committee on People with Disabilities | Customer Survey | Texas Veterans Portal |
| Texas Fusion Center Privacy Policy | texas.gov | OST Entry | CAPPS Login |

© 2000-2017 Texas Department of Public Safety.

# Attachment 7

Vernon's Texas Statutes and Codes Annotated
   Occupations Code (Refs & Annos)
      Title 10. Occupations Related to Law Enforcement and Security
         Chapter 1701. Law Enforcement Officers (Refs & Annos)
            Subchapter G. License Requirements; Disqualifications and Exemptions

V.T.C.A., Occupations Code § 1701.312

§ 1701.312. Disqualification: Felony Conviction or Placement on Community Supervision

Effective: September 1, 2011

Currentness

(a) A person who has been convicted of a felony is disqualified to be an officer, public security officer, telecommunicator, or county jailer, and the commission may not issue a license to, and a law enforcement agency may not appoint or employ, the person.

(b) For purposes of this section and Section 1701.502, a person is convicted of a felony if a court enters an adjudication of guilt against the person on a felony offense under the laws of this or another state or the United States, regardless of whether:

   (1) the sentence is subsequently probated and the person is discharged from community supervision;

   (2) the accusation, complaint, information, or indictment against the person is dismissed and the person is released from all penalties and disabilities resulting from the offense; or

   (3) the person is pardoned for the offense, unless the pardon is granted expressly for subsequent proof of innocence.

(c) The commission, on receipt of a certified copy of a court's judgment under Article 42.011, Code of Criminal Procedure, shall note on the person's licensing records the conviction or community supervision indicated by the judgment.

**Credits**
Acts 1999, 76th Leg., ch. 388, § 1, eff. Sept. 1, 1999. Amended by Acts 2011, 82nd Leg., ch. 855 (H.B. 3823), § 6, eff. Sept. 1, 2011.

**Editors' Notes**

REVISOR'S NOTE

2012 Main Volume

Section 415.058(c), Government Code, refers to "a court of competent jurisdiction." The revised law omits "of competent jurisdiction" as unnecessary because the general laws of civil jurisdiction determine which

courts have jurisdiction over a matter. For example, see Sections 24.007-24.011, Government Code, for the general jurisdiction of district courts.

V. T. C. A., Occupations Code § 1701.312, TX OCC § 1701.312
Current through Chapters effective immediately through Chapter 49 of the 2017 Regular Session of the 85th Legislature

---

**End of Document**                                   © 20 7 Thomson Reuters. No c a m to or g na  U.S. Government Works.

# Attachment 8

Vernon's Texas Statutes and Codes Annotated
 Parks and Wildlife Code (Refs & Annos)
  Title 2. Parks and Wildlife Department (Refs & Annos)
   Chapter 11. Parks and Wildlife Department (Refs & Annos)
    Subchapter B. Organization of Department

V.T.C.A., Parks & Wildlife Code § 11.019

§ 11.019. Employees as Peace Officers

Currentness

(a) The director may commission as peace officers any of the employees provided for in the general appropriations act.

(b) Law enforcement officers commissioned by the director have the same powers, privileges, and immunities as peace officers coextensive with the boundaries of this state.

(c) Law enforcement officers commissioned by the director have the same authority as a sheriff to arrest, serve criminal or civil process, and require aid in serving criminal or civil process coextensive with the boundaries of this state.

(d) A law enforcement officer commissioned by the director may arrest without a warrant any person in this state found in the act of violating any law.

**Credits**
Acts 1975, 64th Leg., p. 1405, ch. 545, § 1, eff. Sept. 1, 1975. Amended by Acts 1983, 68th Leg., p. 122, ch. 29, § 2, eff. April 19, 1983.

Notes of Decisions (14)

V. T. C. A., Parks & Wildlife Code § 11.019, TX PARKS & WILD § 11.019
Current through Chapters effective immediately through Chapter 49 of the 2017 Regular Session of the 85th Legislature

End of Document                    © 20 7 Thomson Reuters. No c a m to or g na U.S. Government Works.

# Attachment 9

KeyC te Ye ow F ag   Negat ve Treatment
Proposed Regu at on

Texas Administrative Code
  Title 31. Natural Resources and Conservation
    Part 2. Texas Parks and Wildlife Department
      Chapter 55. Law Enforcement
        Subchapter L. Marine Safety Enforcement--Training and Certification Standards

31 TAC § 55.802

§ 55.802. Definitions

Currentness

The following words and terms, when used in this subchapter, shall have the following meanings, except where the context clearly indicates otherwise.

(1) Active duty peace officer--A peace officer holding a valid peace officer license from the Texas Commission on Law Enforcement Officer Standards and Education (TCLEOSE) and a valid peace officer commission issued by an authorized governmental entity of the State of Texas.

(2) Commission--The Texas Parks and Wildlife Commission.

(3) Department--The Texas Parks and Wildlife Department.

**Credits**
**Source:** The provisions of this § 55.802 adopted to be effective May 28, 1998, 23 TexReg 5440.

Current through 42 Tex.Reg. No. 3204, dated June 16, 2017, as effective on or before June 23, 2017

31 TAC § 55.802, 31 TX ADC § 55.802

End of Document                    © 20 7 Thomson Reuters. No c a m to or g na  U.S. Government Works.

# Attachment 10

# Requirements for Game Warden

All applicants must meet the minimum qualifications outlined below for consideration as a Game Warden Cadet with Texas Parks and Wildlife.

**Age:** An applicant must have reached the age of 21 years on or before the date of entry into the Game Warden Training Academy. There is no maximum age limit for employment.

**Education:** Applicants must have successfully completed and have conferred a Bachelors level degree from an accredited college or university in **any** field of study. *Prior military or law enforcement experience is not a substitute for the education requirements.*

**Citizenship:** Must be a citizen of the United States.

**Work Eligibility:** Federal law requires that all new employees present original documents that establish identity and U.S. employment eligibility. These documents must be presented at the time of employment.

**License:** The applicant must possess a valid driver's license.

**Peace Officer License:** The applicant must not have had a commission license denied by final order or revoked, or have a voluntary surrender of a license currently in effect.

**Military Service:** The applicant must not have been discharged from any military service under less than honorable conditions.

**Background:** Applicants will be subjected to, and must successfully pass, a thorough and comprehensive background investigation prior to appointment to a cadet position. The applicant must be of good moral character and not have any of the following incidents in their criminal history:

- a conviction for any Felony or Class A Misdemeanor offense at any time;
- a conviction for any Class B Misdemeanor offense within 10 years prior to the date of application, which includes convictions for DWI (driving while intoxicated), DUID (driving under the influence of drugs) and BWI (boating while intoxicated), never have been convicted of any family violence offense, currently on court-ordered community supervision, and/or probation or parole for any criminal offense above the grade of Class C Misdemeanor.

**Schedule C:** Applicants currently holding Schedule C positions with another state agency in Texas, who meet all minimum qualifications, are selected and complete the Game Warden Academy will return to their current Schedule C salary position after 1 year of satisfactory performance in the field. This applies only to the similar rank of Game Warden VI or below.

**Drug Use:** The applicant may have no current illegal drug use.

**Psychological Condition:** The applicant must be examined by a licensed psychologist and be declared to be in satisfactory psychological and emotional health for law enforcement duty prior to employment and the issuance of a peace officer license.

**Physical Condition:** The applicant must be examined by a licensed physician and be declared to be able to physically perform the duties of a game warden cadet prior to

App. 133    TX 0075

employment.

**Hearing:** The applicant must meet the minimal standard with or without hearing aids of 35 decibels or better in each of the following four frequencies: 500, 1000, 2000 and 3000 Hz; to include long distance, directional and voice conversation hearing.

**Vision:** The applicant must have binocular vision of 20/30 or better with or without corrective lenses, soft contacts or hard contacts. If correction with corrective lenses (glasses) or hard contact lenses is required, uncorrected vision must be no worse than 20/40 in the best eye and 20/100 in the worst eye. If soft contacts are used for correction, uncorrected vision must be 20/200 or better in each eye. Applicant must have uninterrupted peripheral vision of 140 degrees or better, have night vision and be able to distinguish red and green colors (lights and placards).

**Physical Readiness:** The applicant must successfully complete a physical readiness test, which includes the following activities:

- 21 sit-ups in one minute, 13 push-ups in one minute, 1.5 mile run in no more than 21 minutes 36 seconds and a 300 meter run in no more than 109 seconds;
- Handgun stability test: Involves dry fire of a duty weapon; five consecutive trigger pulls with each hand from a standing position while holding the barrel inside a 5 inch ring and five consecutive trigger pulls inside a 5 inch ring while holding the firearm in both hands from an unsupported kneeling position;
- Swim test: Applicant must fall backwards into the water and remain afloat for 1 minute, then swim 100 meters without assistance or rest in no more than 5 minutes.

NOTE: Applicant needs to be mentally and physically capable of submerging themselves underwater.

Applicant must successfully complete ALL components of the physical readiness test on the assigned day of testing. Since all activities must be completed in one (1) day, applicants should consider some form of advance preparation for this test. Applicants are encouraged to seek professional medical advice prior to beginning a regimen of physical activity to prepare for this test. Individuals selected for cadet positions will be required to again meet these standards at the beginning of the cadet class.

**NOTE: Before being allowed to take the physical readiness tests the applicant will be required to provide a description of the test to a physician and obtain a written medical clearance.**

# Attachment 11

| Chapter: | Conditions of Employment | **Effective Date: 7/1/17** |
|---|---|---|
| **Title:** | **Criminal History: Standards, Background Checks, and Self-Reporting Requirements** | Page: 1 of 7 |
| | | Replaces: PRS.02.08, 2/15/14 |
| Statutes: | Human Resources Code §242.010 | |

(a) **Policy.**

    (1)    Applicants for employment with the Texas Juvenile Justice Department (TJJD) must meet the criminal history standards in this policy to be eligible for hire.

    (2)    Current TJJD employees must continue to meet the criminal history standards in this policy to remain eligible for continued employment.

    (3)    To ensure that criminal history standards are met, TJJD:

- conducts pre-employment fingerprinting and criminal history background checks;
- conducts criminal history background checks throughout an employee's employment; and
- requires each employee to notify TJJD if he/she:
  - is arrested;
  - is notified of criminal charges through an indictment or other official notification; or
  - learns of a change in the status of a previously reported criminal charge.

    (4)    TJJD management takes appropriate action in response to a report of an employee's pending criminal charge or conviction in accordance with the provisions of this policy.

    (5)    TJJD ensures that contractors and volunteers meet appropriate criminal history standards before being granted access to TJJD youth.

(b) **Applicability.**

    (1)    The criminal history standards and background check processes in this policy apply to:

        (A)    applicants for TJJD employment and current TJJD employees; and

        (B)    TJJD contractors (including their employees, volunteers, contractors, and subcontractors) who have direct access to youth in TJJD-operated facilities. (Note: these individuals are subject to the standards for correctional series positions.)

    (2)    TJJD contractors (including their employees, volunteers, contractors, and subcontractors), who have direct access to TJJD youth in facilities not operated by TJJD are subject to the criminal history standards and background check process as outlined in the contract agreement with TJJD. The contract terms must adhere to the criminal history standards for contract facilities specified in (d)(3) below.

    (3)    The criminal history background check processes in this policy apply to TJJD volunteers. The criminal history standards for non-correctional series positions as listed in this policy also apply to TJJD volunteers, with certain exceptions allowed under VLS.01.02 for volunteers who are not TJJD employees.

    (4)    The self-reporting requirements in this policy apply to current TJJD employees.

(c) **Definitions.**

    For definitions of certain terms used in this policy, see the PRS glossary.

(d) **Criminal History Standards.**

(1) **Determining When a Conviction Occurred.**

A conviction is considered to have occurred on the date of disposition for the conviction.

(2) **Automatic Disqualifiers for TJJD Employees and Applicants for Employment.**

The table below shows the disqualifying criminal history for current TJJD employees and for applicants for employment.

| Disqualifying Criminal History | Non-Correctional Series Positions<br><br>Current Employees and All Applicants | Correctional Series Positions<br><br>Current Employees and Internal Applicants* | Correctional Series Positions<br><br>External Applicants* |
|---|---|---|---|
| Convicted ever for a felony or Class A or B misdemeanor in which a child under age 17 is a victim or is directly endangered | X | X | X |
| Current requirement to register as a sex offender | X | X | X |
| Convicted ever for an offense listed in Article 42A.054, Code of Criminal Procedure (formerly "3g" offenses) | X | X | X |
| Pending criminal charge for a disqualifying offense | X | X | X |
| Outstanding warrant (see (e)(2) below) | X | X | X |
| Convicted in last 15 years for a felony (or equivalent offense under Uniform Code of Military Justice) | X | X | X |
| Convicted ever for a felony (or equivalent offense under Uniform Code of Military Justice) | | X | X |
| Convicted in last five years for a Class A or B misdemeanor or equivalent | | | X |
| Currently serving term of probation for a criminal offense | | | X |

\* For purposes of this policy, a current TJJD employee in a non-correctional series position who applies for a correctional series position is considered an external applicant.

**App. 137**

(3)    **Standards for Contract Facilities.**

The table below shows the disqualifying criminal history for an employee, contractor, or volunteer who provides services in a facility that contracts to accept TJJD youth.

| Disqualifying Criminal History | Facilities Licensed by DFPS | Facilities Regulated by TJJD |
|---|---|---|
| Fail to obtain background clearance under Department of Family and Protective Services (DFPS) licensing background check rules | X | |
| Violate the criminal history standards established in 37 TAC §344.400 (unless an exemption or variance for a Class B misdemeanor was received in accordance with 37 TAC Chapter 344) | | X |
| Convicted ever for exploitation of child, elderly individual, or disabled individual | X | X |
| Convicted ever for failure to stop or report aggravated sexual assault of child | X | X |
| Convicted ever for official oppression (felony) | X | X |
| Convicted ever for violation of the civil rights of persons in custody | X | X |
| Convicted ever for improper sexual activity with a person in custody (felony) | X | X |
| Convicted ever for engaging in organized criminal activity | X | X |
| Convicted ever for bribery | X | X |
| Current requirement to register as a sex offender | X | X |

(4)    **Other Criminal Charges or Convictions.**

(A)    TJJD may determine it is in the agency's best interests to disqualify an applicant or to terminate a TJJD employee for a pending criminal charge or a conviction that is not an automatic disqualifier for employment. This determination is made jointly by the director of human resources and general counsel or their designees and is based on the nature of the pending criminal charge or conviction and/or the relationship of the offense to the duties of the position.

(B)    Records of arrests or other criminal charges that are no longer pending and did not result in a conviction are not used to disqualify an individual from employment or assignment to a correctional series position.

(e)    **Criminal History Background Checks.**

(1)    **Background Check Process.**

Background investigation specialists in the Human Resources Department obtain criminal history information through the following processes.

**App. 138**

(A) **Texas Crime Information Center/National Crime Information Center.**

Criminal history background checks are conducted through the Texas Crime Information Center/National Crime Information Center (TCIC/NCIC) in accordance with PRS.05.14.

(i) Pre-employment checks are conducted on:

(I) external applicants being seriously considered for hire; and

(II) internal applicants being seriously considered for another position through the competitive selection process.

(ii) An annual check is conducted during each employee's birth month.

(iii) A check conducted through TCIC/NCIC identifies the following:

(I) prior convictions and arrests;

(II) public sex offender registration information; and

(III) outstanding warrants.

(B) **FACT Clearinghouse.**

TJJD receives notifications of new arrests through the Fingerprint-based Applicant Clearinghouse of Texas (FACT Clearinghouse). TJJD receives these notifications for employees, contractors, and volunteers.

Note: These notifications are made possible because the individual's fingerprints previously submitted to the Department of Public Safety (DPS) allow the DPS to create an ongoing criminal history search for the individual.

(2) **Outstanding Warrants.**

(A) **External Applicants.**

(i) **Outstanding Traffic Warrant.**

If an external applicant has an outstanding warrant for a traffic violation, the background investigation specialist calls the telephone number provided on the application for employment in an attempt to contact or leave a message for the applicant. The applicant is disqualified from employment if:

(I) the attempt to contact the applicant fails (e.g., incorrect phone number provided or no available method to leave a message); or

(II) within three business days after being contacted by TJJD, the applicant fails to provide appropriate documentation verifying that the warrant has been withdrawn without arrest or the filing of criminal charges.

(ii) **All Other Outstanding Warrants.**

If an external applicant has an outstanding warrant for a non-traffic violation, the applicant is disqualified from employment. TJJD does not provide an opportunity to resolve the outstanding warrant.

(B) **Current Employees.**

The background investigations specialist notifies the director of human resources or designee if a check reveals that a current employee has an outstanding warrant.

(i) **Misdemeanor Offense (Including Traffic Violations).**

For misdemeanor warrants, the employee is notified of the outstanding warrant and placed on administrative suspension without pay until the end of three business days after notification or until the warrant is executed, withdrawn, or otherwise resolved, whichever occurs first.

(I) If the employee is an internal applicant, the employee will no longer be considered for the position unless he/she provides, by the end of the third business day, appropriate documentation verifying that:

(-a-) the warrant has been withdrawn; and

(-b-) the nature of any criminal charges resulting from the warrant would not disqualify the employee from employment in the position upon conviction.

(II) If at the end of the third business day the employee has not provided TJJD with documentation verifying that the warrant has been withdrawn, he/she is administratively separated under PRS.11.21 due to ineligibility for continued employment.

(ii) **Felony Offense.**

In addition to the steps above for a misdemeanor warrant, the director of human resources or designee notifies the Office of Inspector General (OIG) of the outstanding felony warrant. The OIG executes the warrant for arrest or coordinates with the issuing law enforcement agency to execute the warrant.

(iii) **Warrants that Result in Arrest or Criminal Charge.**

If the employee is arrested or charged with a criminal offense, the procedures in (f) and (g)(2) apply.

(3) **Confidentiality and Disclosure of Information.**

(A) Except as otherwise required or allowed by law:

(i) access to criminal record reports are restricted to authorized Human Resources personnel; and

(ii) information obtained from a criminal record check is kept confidential and disclosed only to the local human resources administrator (HRA), hiring authority, chief local administrator (CLA), or others (e.g., a hearing officer or a grievant whose criminal record is at issue in a grievance), as applicable, on a need-to-know basis.

(B) All documents containing criminal record history information are destroyed after the information is used for the purpose for which it was intended.

(f) **Employee Self-Reporting Process.**

(1) **Employee's Responsibilities.**

(A) Employees must report the following to TJJD within two workdays after the event:

(i) an arrest;

(ii) notification of criminal charges through an indictment or other official notification; and

(iii) a change in the status of a previously reported criminal charge (e.g., dismissal, conviction, or the initiation or termination of proceedings to revoke probation).

**App. 140** TX 0082

Case 5:13-cv-00255-C     Document 96     Filed 09/14/17     Page 144 of 191     PageID 1870

| Criminal History: Standards, Background Checks, and Self-Reporting Requirements | PRS.02.08 |
| --- | --- |
| | Page 6 of 7 |

(B)     To report these events to TJJD, the employee must:

  (i)     provide a completed Employee's Report of Criminal Charges form, HR-038, to the local Human Resources office; or

  (ii)     ensure his/her supervisor is contacted by telephone, text, or email when the circumstances do not allow the employee to provide a completed HR-038 form to the local Human Resources office within the required time frame.

(2)     **Supervisor's Responsibilities.**

The supervisor must:

(A)     complete the HR-038 form when the employee is unable to do so; and

(B)     provide the completed form to the local Human Resources office on the same workday the supervisor received notice of the incident.

(3)     **Local HRA's Responsibilities.**

Upon receipt of a completed HR-038 form, the local HRA or designee must:

(A)     immediately email a scanned copy of the form to a background investigation specialist;
(B)     provide a copy to the CLA; and
(C)     file the original form in the employee's confidential personnel file.

(4)     **Background Investigation Specialist's Responsibilities.**

Upon receipt of the HR-038 form, the background investigation specialist:

(A)     conducts a criminal history background check; and

(B)     provides guidance to the local HRA and CLA regarding the appropriate management action based on the criminal history standards established by this policy.

(g)     **Management Actions for Current Employees.**

(1)     **Employee's Failure to Self-Report.**

If a criminal history background check reveals that a TJJD employee failed to report an arrest, indictment, criminal charge, or conviction as required by this policy, the employee is:

(A)     disqualified from consideration if he/she is an internal applicant for a position, regardless of the nature of the offense;

(B)     subject to disciplinary action under PRS.35.01 for failing to report the event; and

(C)     subject to the actions in (g)(2) and (3) if he/she is not terminated for failure to report the event.

(2)     **Pending Criminal Charges.**

If TJJD learns that an employee has a pending criminal charge:

(A)     the employee must be administratively separated from employment under PRS.11.19 if a conviction would violate the criminal history standards in this policy and the employee is not terminated from employment based on the conduct that resulted in the pending criminal charge; or

| Criminal History: Standards, Background Checks, and Self-Reporting Requirements | PRS.02.08 |
|---|---|
| | Page 7 of 7 |

(B) the employee may be allowed to continue employment if a conviction would not violate the criminal history standards. However, the employee may be subject to disciplinary action for the conduct that resulted in the charge.

(3) **Convictions.**

(A) If TJJD learns that an employee has been convicted of a criminal offense, the employee is subject to disciplinary action under PRS.35.01.

(B) If the employee is not terminated from employment and the conviction is under a criminal drug- or alcohol-related statute, the director of human resources or designee refers the employee to a substance abuse professional through the agency's Employee Assistance Program (EAP). As a condition of continued employment, the employee must:

   (i) satisfactorily participate in and complete a substance abuse rehabilitation program provided by the EAP or a court-approved provider; and

   Note: The EAP and/or the court-approved provider provides TJJD a report indicating whether the employee satisfactorily completed the program.

   (ii) provide proof of completion to the local HRA.

(4) **Employees Paid from Federal Grants or Contracts.**

This section applies only to employees who are paid from funds received through a federal grant or contract. If the Human Resources Department receives notice that such an employee has been convicted under a criminal drug statute for an offense that occurred on TJJD premises, the director of human resources or his/her designee must:

(A) notify the granting agency of the conviction within 10 days after receiving notice of the conviction; and

(B) ensure that appropriate management actions are taken within 30 days after receiving notice of the conviction.

# Attachment 12



# Bars to Employment with DADS

Texas Department of Aging and Disability Services (DADS) applies absolute criminal bars to employment that are set out in the Texas Health and Safety Code, Chapter 250, Section 250.006 [http://www.statutes.legis.state.tx.us/Docs/HS/htm/HS.250.htm#250.006] . In addition, there are offenses that have been determined to be absolute criminal bars to employment pursuant to DADS authority granted in Texas Administrative Code, Title 40, Part 1, Chapter 3, Subchapter B, Rule §3.201 [http://info.sos.state.tx.us/pls/pub/readtac$ext.TacPage? sl=R&app=9&p_dir=&p_rloc=&p_tloc=&p_ploc=&pg=1&p_tac=&ti=40&pt=1&ch=3&rl=201] .

The state supported living centers provide campus-based direct services and supports to people with intellectual and developmental disabilities at 13 locations around the state. The current policy assures a consistent application of the criminal history review process.

## [] Bars Pursuant to Health and Safety Code §250.006

Texas Penal Code

- **Chapter 19** — Criminal homicide: includes Murder, Capital Murder, Manslaughter, or Criminally negligent homicide
- **Chapter 20** — Kidnapping and unlawful restraint
- **§21.02** — Continuous sexual abuse of young child or children
- **§21.08** — Indecent Exposure
- **§21.11** — Indecency with a child
- **§21.12** — Improper relationship between educator and student
- **§21.15** — Improper photography or visual recording
- **§22.01** — Assault: Class A Misdemeanor or Felony conviction, which occurred within the previous five years.
- **§22.011** — Assault, Sexual
- **§22.02** — Assault, Aggravated
- **§22.021** — Assault, Aggravated Sexual
- **§22.04** — Injury to a child, elderly individual, or disabled individual
- **§22.041** — Abandoning or endangering a child
- **§22.05** — Deadly Conduct
- **§22.07** — Terroristic Threat
- **§22.08** — Aiding suicide
- **§25.031** — Agreement to abduct from custody
- **§25.08** — Sale or purchase of a child
- **§28.02** — Arson
- **§29.02** — Robbery
- **§29.03** — Robbery, Aggravated
- **§30.02** — Burglary: a conviction which occurred within the previous five years.
- **Chapter 31** — Theft: a conviction that is punishable as a felony which occurred within the previous five years.

**App. 144** TX 0086

- **§32.45** — Misapplication of fiduciary property or property of a financial institution: a Class A Misdemeanor or Felony conviction which occurred in the previous five years.
- **§32.46** — Securing execution of a document by deception: a Class A Misdemeanor or Felony conviction which occurred in the previous five years.
- **§33.021** — Online solicitation of a minor
- **§34.02** — Money laundering
- **§35A.02** — Medicaid fraud
- **§36.06** — Obstruction or Retaliation
- **§37.12** — False identification as a peace officer: a conviction which occurred in the previous five years.
- **§42.01(a)(7),(8), or(9)** — Disorderly conduct associated with the discharge or display of a firearm in a public place: a conviction which occurred in the previous five years.
- **§42.09** — Cruelty to animals
- **§42.092** — Cruelty to nonlivestock animals
- A conviction under the laws of another state, federal law, or the Uniform Code of Military Justice for an offense containing elements that are substantially similar to the elements of an offense listed above.

## [] Additional to Bars to Employment

Bars pursuant to Texas Administrative Code, Title 40, Part 1, Chapter 3, §3.201 Texas Health and Safety Code

- **Chapter 481** — Texas Controlled Substances Act:  a conviction that is punishable as a felony (involving manufacture, delivery, intent to distribute, conspiracy to posses or produce with intent to distribute, distribution to a minor, illegal expenditure or investment, or transfer or receipt of chemical laboratory apparatus).

Texas Penal Code

- **§15.01** — Criminal Attempt of any offense listed as a bar
- **§43.03** — Promotion of Prostitution
- **§43.04** — Aggravated Promotion of Prostitution
- **§43.05** — Compelling Prostitution
- **§43.25** — Sexual Performance by a Child
- **§43.26** — Possession or Promotion of Child Pornography

**App. 145**

# Attachment 13

Texas Administrative Code
   Title 40. Social Services and Assistance
      Part 1. Department of Aging and Disability Services
         Chapter 3. Responsibilities of State Facilities
            Subchapter B. Criminal History Checks and Registry Clearances

40 TAC § 3.201

§ 3.201. Pre-employment or Pre-assignment Checks and Clearances

Currentness

(a) Before employment or assignment, a facility must conduct a criminal history check and registry clearance of an applicant for employment or volunteer status consisting of:

   (1) a criminal history check obtained directly from the Texas Department of Public Safety;

   (2) a criminal history check obtained through the Federal Bureau of Investigation using a complete set of fingerprints; and

   (3) searches of the registries and CANRS.

(b) A facility may not employ or assign volunteer status to an applicant who:

   (1) has been convicted of or has received deferred adjudication for any of the criminal offenses listed in Texas Health and Safety Code (HSC) § 250.006(a);

   (2) has been convicted of or has received deferred adjudication for any of the criminal offenses listed in HSC § 250.006(b) within five years preceding the date of employment or assignment of volunteer status;

   (3) has been convicted of or has received deferred adjudication for a criminal offense that DADS has determined to be a contraindication to employment or volunteer status pursuant to HSC § 533.007;

   (4) is listed as revoked in the Nurse Aide Registry;

   (5) is listed as unemployable in the Employee Misconduct Registry; or

   (6) has a confirmation of abuse or neglect in CANRS.

(c) Pursuant to HSC § 533.007(b), a facility may not take an adverse personnel action based on an arrest warrant or wanted persons information.

**Credits**
**Source:** The provisions of this §3.201 adopted to be effective October 6, 2011, 36 TexReg 6511.

Current through 42 Tex.Reg. No. 3204, dated June 16, 2017, as effective on or before June 23, 2017

40 TAC § 3.201, 40 TX ADC § 3.201

---

**End of Document**                                    © 20 7 Thomson Reuters. No c a m to or g na  U.S. Government Works.

# Attachment 14

 TX 0091

Vernon's Texas Statutes and Codes Annotated
    Health and Safety Code (Refs & Annos)
        Title 4. Health Facilities
            Subtitle B. Licensing of Health Facilities
                Chapter 250. Nurse Aide Registry and Criminal History Checks of Employees and Applicants for
                Employment in Certain Facilities Serving the Elderly, Persons with Disabilities, or Persons with
                Terminal Illnesses

V.T.C.A., Health & Safety Code § 250.006

§ 250.006. Convictions Barring Employment

Effective: January 1, 2017
Currentness

(a) A person for whom the facility or the individual employer is entitled to obtain criminal history record information may not be employed in a facility or by an individual employer if the person has been convicted of an offense listed in this subsection:

(1) an offense under Chapter 19, Penal Code (criminal homicide);

(2) an offense under Chapter 20, Penal Code (kidnapping, unlawful restraint, and smuggling of persons);

(3) an offense under Section 21.02, Penal Code (continuous sexual abuse of young child or children), or Section 21.11, Penal Code (indecency with a child);

(4) an offense under Section 22.011, Penal Code (sexual assault);

(5) an offense under Section 22.02, Penal Code (aggravated assault);

(6) an offense under Section 22.04, Penal Code (injury to a child, elderly individual, or disabled individual);

(7) an offense under Section 22.041, Penal Code (abandoning or endangering child);

(8) an offense under Section 22.08, Penal Code (aiding suicide);

(9) an offense under Section 25.031, Penal Code (agreement to abduct from custody);

(10) an offense under Section 25.08, Penal Code (sale or purchase of child);

(11) an offense under Section 28.02, Penal Code (arson);

(12) an offense under Section 29.02, Penal Code (robbery);

(13) an offense under Section 29.03, Penal Code (aggravated robbery);

(14) an offense under Section 21.08, Penal Code (indecent exposure);

(15) an offense under Section 21.12, Penal Code (improper relationship between educator and student);

(16) an offense under Section 21.15, Penal Code (improper photography or visual recording);

(17) an offense under Section 22.05, Penal Code (deadly conduct);

(18) an offense under Section 22.021, Penal Code (aggravated sexual assault);

(19) an offense under Section 22.07, Penal Code (terroristic threat);

(20) an offense under Section 32.53, Penal Code (exploitation of child, elderly individual, or disabled individual);

(21) an offense under Section 33.021, Penal Code (online solicitation of a minor);

(22) an offense under Section 34.02, Penal Code (money laundering);

(23) an offense under Section 35A.02, Penal Code (Medicaid fraud);

(24) an offense under Section 36.06, Penal Code (obstruction or retaliation);

(25) an offense under Section 42.09, Penal Code (cruelty to livestock animals), or under Section 42.092, Penal Code (cruelty to nonlivestock animals); or

(26) a conviction under the laws of another state, federal law, or the Uniform Code of Military Justice for an offense containing elements that are substantially similar to the elements of an offense listed by this subsection.

(b) A person may not be employed in a position the duties of which involve direct contact with a consumer in a facility or may not be employed by an individual employer before the fifth anniversary of the date the person is convicted of:

(1) an offense under Section 22.01, Penal Code (assault), that is punishable as a Class A misdemeanor or as a felony;

(2) an offense under Section 30.02, Penal Code (burglary);

(3) an offense under Chapter 31, Penal Code (theft), that is punishable as a felony;

(4) an offense under Section 32.45, Penal Code (misapplication of fiduciary property or property of financial institution), that is punishable as a Class A misdemeanor or a felony;

(5) an offense under Section 32.46, Penal Code (securing execution of document by deception), that is punishable as a Class A misdemeanor or a felony;

(6) an offense under Section 37.12, Penal Code (false identification as peace officer; misrepresentation of property); or

(7) an offense under Section 42.01(a)(7), (8), or (9), Penal Code (disorderly conduct).

(c) In addition to the prohibitions on employment prescribed by Subsections (a) and (b), a person for whom a facility licensed under Chapter 242 or 247 is entitled to obtain criminal history record information may not be employed in a facility licensed under Chapter 242 or 247 if the person has been convicted:

(1) of an offense under Section 30.02, Penal Code (burglary); or

(2) under the laws of another state, federal law, or the Uniform Code of Military Justice for an offense containing elements that are substantially similar to the elements of an offense under Section 30.02, Penal Code.

(d) For purposes of this section, a person who is placed on deferred adjudication community supervision for an offense listed in this section, successfully completes the period of deferred adjudication community supervision, and receives a dismissal and discharge in accordance with Article 42A.111, Code of Criminal Procedure, is not considered convicted of the offense for which the person received deferred adjudication community supervision.

**Credits**
Added by Acts 1993, 73rd Leg., ch. 747, § 25, eff. Sept. 1, 1993. Amended by Acts 1995, 74th Leg., ch. 76, § 14.39, eff. Sept. 1, 1995. Redesignated from V.T.C.A., Health & Safety Code § 250.005 and amended by Acts 1995, 74th Leg., ch. 831, § 1, eff. June 16, 1995. Amended by Acts 1997, 75th Leg., ch. 482, § 1, eff. Sept. 1, 1997; Acts 1997, 75th Leg., ch. 1159, § 1.33, eff. Sept. 1, 1997; Acts 2001, 77th Leg., ch. 1025, § 6, eff. Sept. 1, 2001; Acts 2001, 77th Leg., ch. 1267, § 5, eff. Sept. 1, 2001; Acts 2003, 78th Leg., ch. 911, § 2, eff. June 20, 2003; Acts 2003, 78th Leg., ch. 1084, § 1, eff. Sept. 1, 2003; Acts 2003, 78th Leg., ch. 1209, § 1, eff. Sept. 1, 2003; Acts 2007, 80th Leg., ch. 593, § 3.44, eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 971, § 1, eff. Sept. 1, 2007; Acts 2011, 82nd Leg., ch. 817 (H.B. 2609), § 1, eff. Sept. 1, 2011; Acts 2011, 82nd Leg., ch. 879 (S.B. 223), § 3.06, eff. Sept. 1, 2011; Acts 2011, 82nd Leg., ch. 980 (H.B. 1720), § 24, eff. Sept. 1, 2011; Acts 2013, 83rd Leg., ch. 363 (H.B. 2683), § 3, eff. Jan. 1, 2014; Acts 2015, 84th Leg., ch. 1 (S.B. 219), § 3.0757, eff. April 2, 2015; Acts 2015, 84th Leg., ch. 770 (H.B. 2299), § 2.68, eff. Jan. 1, 2017.

Notes of Decisions (1)

V. T. C. A., Health & Safety Code § 250.006, TX HEALTH & S § 250.006
Current through Chapters effective immediately through Chapter 49 of the 2017 Regular Session of the 85th Legislature

---

**End of Document**                    © 20  7 Thomson Reuters. No c a m to or g na  U.S. Government Works.

# Attachment 15



**LEGISLATIVE APPROPRIATIONS**

**R E Q U E S T**

For the Fiscal Years

# 2016 and 2017

## TEXAS GENERAL LAND OFFICE

### JERRY PATTERSON, COMMISSIONER

## August 18, 2014

Submitted to the Governor's Office of Budget,
Planning and Policy and the Legislative Budget Board

App. 155   TX 0097

The GLO receives surface damage fee revenues that are authorized for use in making permanent improvements on PSF lands, funding reclamation and conservation projects and removing coastal debris in the event of a natural disaster. Statute provides for these revenues to be available for use within two years of collection. The rider language is being modified to match statutory authority. Current language could prevent the GLO from accessing those funds as authorized.

## Historically Underutilized Businesses (HUBs)

The GLO is committed to including women and minority owned businesses in the GLO procurement process. A significant portion of the agency's budget is spent on products and services where HUBs are not available, i.e., operators of the veterans' homes and cemeteries, pharmaceuticals, bulk natural gas and gas transportation (pipeline), and some specialized professional and consulting services. It is for this reason that the agency fell short of meeting its HUB procurement goals. The GLO believes the 2009 State of Texas Disparity Study addressed obstacles such as the abovementioned, which prevent an agency from meeting it's HUB goals. It is the agency's goal this next biennium to increase HUB participation, just as we have successfully done during the current biennium. The GLO will continue to encourage HUB participation within the agency and network with other state agencies and higher education agencies to improve HUB participation.

## Agency Background Check Process

The GLO uses a third-party service to check public criminal records regarding all job applicants selected for hire and all volunteer workers, regardless of their positions. This service accesses publicly available criminal information under Govt. Code §411.135 (such as conviction records maintained by the Texas Department of Public Safety), as well as other public criminal information from other states and sources. After an initial background check, further checks of public criminal records may be performed if needed. The GLO requires contractors providing workers who will co-locate with GLO employees or work in a GLO office to conduct criminal background checks for those workers. The GLO believes that this background check process allows the agency to prudently manage its workforce, as well as insure compliance with Ch. 250 of the Texas Health & Safety Code.

## Summary

This FY 2016-2017 Legislative Appropriations Request reflects budget decisions necessary to accomplish the General Land Office's goals and ensure adequate resources are available to meet current level services. This request is in line with the

**App. 156** TX 0098

# Attachment 16

 TX 0099





SEARCH

Guidelines:

TPWD Policies

Policy and Procedure Development
(PD)

Human Resources and Personnel
(HR)

Operations (OP)

Budget and Finance (BF)

Communications (CO)

Lands and Facilities (LF)

Information:

Purpose

Background and Authorization

# Criminal History Checks Policy

POLICY NUMBER: HR-05-01
TYPE OF POLICY: HUMAN RESOURCES
DATE: SEPTEMBER 2005

All policies are in compliance with federal and state law and statutes and with the Texas Parks and Wildlife Code. The most current version of this policy will always be the on-line version.

## PURPOSE

To enhance the safety and security of Texas Parks and Wildlife Department (Department) employees, visitors and resources by establishing provisions governing employment related criminal history checks for employees, job applicants, volunteers and contractors or others providing services to the Department. This policy does not pertain to criminal history checks conducted in conjunction with criminal investigations or other criminal justice or law enforcement purposes.

**App. 158**   TX 0100

General Policy

Notice and Consent for Release of Information

Disclosure of Information

Destruction of Criminal History Records

Definitions

Additional Info:

HR-05-101 – Criminal History Checks Procedures

PWD-1039 – Authorization and Consent for Disclosure of Criminal History Information

⬇( Word  76 KB )

PWD-1075 – Criminal Background Check Results

⬇( Word  36 KB )

HR-03-03 – Hiring Practices Policy

HR-03-10 – Standards of Performance and Conduct Policy

## BACKGROUND AND AUTHORIZATION

- In accordance with Texas Government Code Section 411.1405, the Department may conduct criminal history checks (also called criminal background checks) on current and prospective information technology employees, Department interns and volunteers, or for Department contractors that have access to information technology resources. Criminal history checks may also be conducted for law enforcement personnel according to the Occupations Code (Section 1701.303).

- The Department will conduct criminal history checks on other employees and job applicants, volunteers and interns, contractors, or others filling positions. (Texas Government Code § 411.135)

- The Department will normally seek to obtain an individual's consent before conducting a criminal history check.

## GENERAL POLICY

- All job applicants (including current employees applying for other positions within the Department), interns, volunteers and other individuals providing services to the Department will be subject to standard background checks which include verification of current and/or previous employment, education, licenses, or other credentials required to meet minimum job qualifications (also see HR-03-03 – Hiring Practices Policy). An applicant's signature on the State of Texas application provides a general release and authorization for hiring supervisors to conduct standard checks of information listed on the application materials.

- In addition to the standard background check described above, criminal history checks will be conducted on all individuals applying for law enforcement, information technology, or other positions. Appropriate notice will be given and individual consent requested as provided by this

**App. 159**  TX 0101

policy and applicable state or federal law.

- Human Resources staff will coordinate and/or conduct criminal history checks for all applicable Department positions except law enforcement positions (i.e. game warden, park peace officer, internal affairs investigator, etc.). Appropriate law enforcement personnel will conduct criminal history checks for peace officer positions as required by the Texas Commission on Law Enforcement Officer Standards and Education (TCLEOSE), or other criminal justice statutes.

- Evidence of a criminal conviction or other relevant information obtained from criminal history record information will not automatically disqualify an individual from employment or volunteer or contractor status. Appropriate personnel from the division, in conjunction with the Director of Human Resources (or designee), will determine on a case by case basis whether an individual is qualified based on:

  - specific duties and responsibilities of the position;
  - number of offenses committed by the individual;
  - nature and seriousness of each offense;
  - length of time between the offense(s) and employment decision;
  - efforts by the individual at rehabilitation;
  - accuracy of information on the individual's employment application; and
  - applicable state or federal laws and regulations.

- Although negative criminal history information is not necessarily a bar to employment, volunteer or contractor status with the Department, an individual's failure to appropriately disclose arrest or conviction information, either before or during the time a position is held (also see HR-03-10 – Standards of Performance and Conduct Policy), is grounds either to be disqualified from consideration for a position or termination.

**NOTICE AND CONSENT FOR RELEASE OF**

**App. 160**   TX 0102

## INFORMATION

- The following notice will be included on all Department job postings and volunteer applications for positions subject to a criminal history check: **"Applicants for this position are required to consent to a criminal background check. An applicant who has been convicted of a criminal offense relevant to the position may be disqualified from consideration for the position."**

- The Department's failure to post such notice will not prohibit a criminal history check from being conducted if individuals are subsequently advised of the requirement and complete a release form before a criminal history check is actually conducted.

- All applicants must complete and sign form PWD-1039 – Authorization and Consent for Disclosure of Criminal History Information (Word 76 KB).

- If an individual does not complete the consent and release form, he/she will be disqualified from consideration for the position.

## DISCLOSURE OF INFORMATION

- Information obtained pursuant to this policy shall not be released or disclosed outside of the Department except:
  - by court order;
  - with the consent of the person who is the subject of the information; or
  - as otherwise required by law.

  It is a violation of Department policy for any employee to obtain, use, or disseminate criminal history information, except as noted in this policy or otherwise required or allowed by law. Questions about whether information may be disclosed should be referred to the Legal Division. Employees violating this policy will be subject to disciplinary action.

- The Internal Affairs (IA) section will be notified of any policy violations, for investigation and referral to the

**App. 161**   TX 0103

local district attorney's office if appropriate.

- If the information contained in a criminal history record is a determining factor in not selecting or retaining an individual, the Department shall give the affected individual notice of the use of the information and an opportunity to correct any inaccuracies in the information. The Department in its discretion shall specify the time period for correction when it notifies the affected individual of such information. Such notice and period of correction is part of the Department personnel policy and does not alter the at will status of Department employees.

- If the Department receives criminal history record information during the pendency of any proceeding for which a conviction is not final, the Department reserves the right to make a decision or take an action regarding a position before the conviction is final, if failure to do so would be impracticable or detrimental to the Department. In determining whether a conviction is final for the purposes of this policy, the Department will exercise its discretion in accordance with all federal and state statutes.

## DESTRUCTION OF CRIMINAL HISTORY RECORDS

The Department shall destroy (by shredding or burning) criminal history information related to an application for certain information technology positions obtained pursuant to this policy immediately after a decision is made regarding the selection or retention of the person who is the subject of the information (TX Gov. Code Section 411.1405 d). The following information will be documented and maintained by Human Resources: the name of the individual for whom the criminal history check was conducted; name of individual performing the check, date of report, source of information, and a summary notation of the results (i.e. pass or fail) as applicable. If the individual is hired, a copy of the documentation will be placed in the personnel file; otherwise the documentation will be kept in the appropriate job posting file. Criminal history information regarding

**App. 162**   TX 0104

applicants for other positions will be maintained in accordance with the Department's records retention schedule and legal requirements.

## DEFINITIONS

### Criminal history check
A check of an applicant's criminal conviction records for felonies, misdemeanors and deferred adjudications from age 17 or older. A criminal history check may be conducted through the Texas Department of Public Safety (DPS) system, contractor, or other publicly available source as authorized by law.

### Educational verification
Telephone contact with schools or written (transcripts) verification to ensure the applicant possesses all educational credentials listed on the application, or otherwise required to meet minimum qualifications.

### Employment verification
Ensuring the applicant actually worked all positions on the application/resume that qualify the individual for the position sought. Verification includes attempted interviews with past supervisors, dates of employment, reason for leaving and an explanation for any periods of unemployment.

### Information technology employee
Any employee with access to information resources or information resources technologies, other than a desktop computer or telephone station assigned to that person.

### Law enforcement employee
An employee commissioned as a peace officer by the Department and subject to Texas Commission on Law Enforcement Officer Standards and Education (TCLEOSE) certification.

### License verification
Confirmation that the applicant possesses all licenses (i.e. professional, drivers', etc.) listed on an employment application/resume or otherwise necessary for the position; and determining the disposition of any proceeding against the license.

### Personal reference check
Telephone or other contact with specific individuals identified by the applicant for the purpose of verifying the applicant's character, experience and qualifications, or other information relevant to the position sought.

**App. 163**  TX 0105

**Sensitive position**

Any position designated as such by a hiring manager or higher level authority, or a paid, volunteer or contract position whose duties and responsibilities may include, but are not limited to:

- processing currency, checks or credit card information
- license sales or boat registrations
- retail store operations
- financial management activities (revenue accounting, accounts payable, budgeting, etc.)
- property management
- public contact with persons under 18 years of age
- community education and outreach programs
- access to employee files or customer records
- information technology hardware or software
- law enforcement/criminal investigations
- program management.

## Additional Information:

HR-05-101 – Criminal History Checks Procedures

PWD-1039 – Authorization and Consent for Disclosure of Criminal History Information

↓ (   Word     76 KB)

PWD-1075 – Criminal Background Check Results

↓ (   Word     36 KB)

HR-03-03 – Hiring Practices Policy

HR-03-10 – Standards of Performance and Conduct Policy

Last modified: May 1, 2006, 9:37 am

**App. 164**   TX 0106

Home

Divisions

Forms & Publications

Policies & Guidelines

Tools & Applications

Support Services

Training & Development

Employee Resources

Safety

Outlook Web App

Timesheets

Employee Directory

Submit a Question

TPWD Homepage

# Attachment 17

KeyC te Ye ow F ag  Negat ve Treatment
Proposed Leg s at on

> Vernon's Texas Statutes and Codes Annotated
>   Code of Criminal Procedure (Refs & Annos)
>     Title 1. Code of Criminal Procedure of 1965
>       Introductory
>         Chapter Two. General Duties of Officers (Refs & Annos)

Vernon's Ann.Texas C.C.P. Art. 2.12

Art. 2.12. Who Are Peace Officers

Effective: September 1, 2015

Currentness

The following are peace officers:

(1) sheriffs, their deputies, and those reserve deputies who hold a permanent peace officer license issued under Chapter 1701, Occupations Code;

(2) constables, deputy constables, and those reserve deputy constables who hold a permanent peace officer license issued under Chapter 1701, Occupations Code;

(3) marshals or police officers of an incorporated city, town, or village, and those reserve municipal police officers who hold a permanent peace officer license issued under Chapter 1701, Occupations Code;

(4) rangers, officers, and members of the reserve officer corps commissioned by the Public Safety Commission and the Director of the Department of Public Safety;

(5) investigators of the district attorneys', criminal district attorneys', and county attorneys' offices;

(6) law enforcement agents of the Texas Alcoholic Beverage Commission;

(7) each member of an arson investigating unit commissioned by a city, a county, or the state;

(8) officers commissioned under Section 37.081, Education Code, or Subchapter E, Chapter 51, Education Code;

(9) officers commissioned by the General Services Commission;

(10) law enforcement officers commissioned by the Parks and Wildlife Commission;

(11) airport police officers commissioned by a city with a population of more than 1.18 million located primarily in a county with a population of 2 million or more that operates an airport that serves commercial air carriers;

(12) airport security personnel commissioned as peace officers by the governing body of any political subdivision of this state, other than a city described by Subdivision (11), that operates an airport that serves commercial air carriers;

(13) municipal park and recreational patrolmen and security officers;

(14) security officers and investigators commissioned as peace officers by the comptroller;

(15) officers commissioned by a water control and improvement district under Section 49.216, Water Code;

(16) officers commissioned by a board of trustees under Chapter 54, Transportation Code;

(17) investigators commissioned by the Texas Medical Board;

(18) officers commissioned by:

(A) the board of managers of the Dallas County Hospital District, the Tarrant County Hospital District, the Bexar County Hospital District, or the El Paso County Hospital District under Section 281.057, Health and Safety Code;

(B) the board of directors of the Ector County Hospital District under Section 1024.117, Special District Local Laws Code; and

(C) the board of directors of the Midland County Hospital District of Midland County, Texas, under Section 1061.121, Special District Local Laws Code;

(19) county park rangers commissioned under Subchapter E, Chapter 351, Local Government Code; [2]

(20) investigators employed by the Texas Racing Commission;

(21) officers commissioned under Chapter 554, Occupations Code;

(22) officers commissioned by the governing body of a metropolitan rapid transit authority under Section 451.108, Transportation Code, or by a regional transportation authority under Section 452.110, Transportation Code;

(23) investigators commissioned by the attorney general under Section 402.009, Government Code;

(24) security officers and investigators commissioned as peace officers under Chapter 466, Government Code;

(25) officers appointed by an appellate court under Subchapter F, Chapter 53, Government Code; [3]

(26) officers commissioned by the state fire marshal under Chapter 417, Government Code;

(27) an investigator commissioned by the commissioner of insurance under Section 701.104, Insurance Code;

(28) apprehension specialists and inspectors general commissioned by the Texas Juvenile Justice Department as officers under Sections 242.102 and 243.052, Human Resources Code;

(29) officers appointed by the inspector general of the Texas Department of Criminal Justice under Section 493.019, Government Code;

(30) investigators commissioned by the Texas Commission on Law Enforcement under Section 1701.160, Occupations Code;

(31) commission investigators commissioned by the Texas Private Security Board under Section 1702.061, Occupations Code;

(32) the fire marshal and any officers, inspectors, or investigators commissioned by an emergency services district under Chapter 775, Health and Safety Code;

(33) officers commissioned by the State Board of Dental Examiners under Section 254.013, Occupations Code, subject to the limitations imposed by that section;

(34) investigators commissioned by the Texas Juvenile Justice Department as officers under Section 221.011, Human Resources Code; and

(35) the fire marshal and any related officers, inspectors, or investigators commissioned by a county under Subchapter B, Chapter 352, Local Government Code.

**Credits**

Acts 1965, 59th Leg., vol. 2, p. 317, ch. 722, eff. Jan. 1, 1966. Amended by Acts 1967, 60th Leg., p. 1734, ch. 659, § 5, eff. Aug. 28, 1967; Acts 1971, 62nd Leg., p. 1116, ch. 246, § 3, eff. May 17, 1971; Acts 1973, 63rd Leg., p. 9, ch. 7, § 2, eff. Aug. 27, 1973; Acts 1973, 63rd Leg., p. 1259, ch. 459, § 1, eff. Aug. 27, 1973; Acts 1975, 64th Leg., p. 480, ch. 204, § 1, eff. Sept. 1, 1975; Acts 1977, 65th Leg., p. 618, ch. 227, § 2, eff. May 24, 1977; Acts 1977, 65th Leg., p. 1082, ch. 396, §1, eff.

Aug. 29, 1977; Acts 1983, 68th Leg., p. 545, ch. 114, § 1, eff. May 17, 1983; Acts 1983, 68th Leg., p. 4358, ch. 699, § 11, eff. June 19, 1983; Acts 1983, 68th Leg., p. 4901, ch. 867, § 2, eff. June 19, 1983; Acts 1983, 68th Leg., p. 5303, ch. 974, § 11, eff. Aug. 29, 1983; Acts 1985, 69th Leg., ch. 384, § 2, eff. Aug. 26, 1985; Acts 1985, 69th Leg., ch. 907, § 6, eff. Sept. 1, 1985; Acts 1986, 69th Leg., 2nd C.S., ch. 19, § 4, eff. Dec. 4, 1986; Acts 1987, 70th Leg., ch. 262, § 20, eff. Sept. 1, 1987; Acts 1987, 70th Leg., ch. 350, § 1, eff. Aug. 31, 1987; Acts 1989, 71st Leg., ch. 277, § 4, eff. June 14, 1989; Acts 1989, 71st Leg., ch. 794, § 1, eff. Aug. 28, 1989; Acts 1989, 71st Leg., ch. 1104, § 4, eff. June 16, 1989; Acts 1991, 72nd Leg., ch. 16, § 4.02, eff. Aug. 26, 1991; Acts 1991, 72nd Leg., ch. 228, § 1, eff. Sept. 1, 1991; Acts 1991, 72nd Leg., ch. 287, § 24, eff. Sept. 1, 1991; Acts 1991, 72nd Leg., ch. 386, § 70, eff. Aug. 26, 1991; Acts 1991, 72nd Leg., ch. 446, § 1, eff. June 11, 1991; Acts 1991, 72nd Leg., ch. 544, § 1, eff. Aug. 26, 1991; Acts 1991, 72nd Leg., ch. 545, § 2, eff. Aug. 26, 1991; Acts 1991, 72nd Leg., ch. 597, § 57, eff. Sept. 1, 1991; Acts 1991, 72nd Leg., ch. 853, § 2, eff. Sept. 1, 1991; Acts 1991, 72nd Leg., 1st C.S., ch. 6, § 6; Acts 1991, 72nd Leg., 1st C.S., ch. 14, § 3.01, eff. Nov. 12, 1991; Acts 1993, 73rd Leg., ch. 107, § 4.07, eff. Aug. 30, 1993; Acts 1993, 73rd Leg., ch. 116, § 1, eff. Aug. 30, 1993; Acts 1993, 73rd Leg., ch. 339, § 2, eff. Sept. 1, 1993; Acts 1993, 73rd Leg., ch. 695, § 2, eff. Sept. 1, 1993; Acts 1993, 73rd Leg., ch. 912, § 25, eff. Sept. 1, 1993; Acts 1995, 74th Leg., ch. 260, § 10, eff. May 30, 1995; Acts 1995, 74th Leg., ch. 621, § 2, eff. Sept. 1, 1995; Acts 1995, 74th Leg., ch. 729, § 1, eff. Aug. 28, 1995; Acts 1997, 75th Leg., ch. 1423, § 4.01, eff. Sept. 1, 1997; Acts 1999, 76th Leg., ch. 90, § 1, eff. Sept. 1, 1999; Acts 1999, 76th Leg., ch. 322, § 2, eff. May 29, 1999; Acts 1999, 76th Leg., ch. 882, § 2, eff. June 18, 1999; Acts 1999, 76th Leg., ch. 974, § 37, eff. Sept. 1, 1999; Acts 2001, 77th Leg., ch. 272, § 7, eff. Sept. 1, 2001; Acts 2001, 77th Leg., ch. 442, § 1, eff. Sept. 1, 2001; Acts 2001, 77th Leg., ch. 669, § 8, eff. Sept. 1, 2001; Acts 2001, 77th Leg., ch. 1420, § 3.001, eff. Sept. 1, 2001; Acts 2003, 78th Leg., ch. 235, § 16, eff. Sept. 1, 2003; Acts 2003, 78th Leg., ch. 474, § 1, eff. June 20, 2003; Acts 2003, 78th Leg., ch. 930, § 12, eff. Sept. 1, 2003; Acts 2005, 79th Leg., ch. 728, § 4.001, eff. Sept. 1, 2005; Acts 2007, 80th Leg., ch. 263, § 1, eff. June 8, 2007; Acts 2007, 80th Leg., ch. 838, § 1, eff. June 15, 2007; Acts 2007, 80th Leg., ch. 908, § 1, eff. Sept. 1, 2007; Acts 2007, 80th Leg., ch. 1172, § 1, eff. June 15, 2007; Acts 2009, 81st Leg., ch. 1164, § 1, eff. June 19, 2009; Acts 2011, 82nd Leg., ch. 85 (S.B. 653), § 3.001, eff. Sept. 1, 2011; Acts 2011, 82nd Leg., ch. 402 (S.B. 601), § 2, eff. June 17, 2011; Acts 2011, 82nd Leg., ch. 584 (H.B. 3815), § 2, eff. June 17, 2011; Acts 2011, 82nd Leg., ch. 1163 (H.B. 2702), § 5, eff. Sept. 1, 2011; Acts 2013, 83rd Leg., ch. 8 (S.B. 543), § 2, eff. May 2, 2013; Acts 2013, 83rd Leg., ch. 93 (S.B. 686), § 2.01, eff. May 18, 2013; Acts 2015, 84th Leg., ch. 333 (H.B. 11), § 1, eff. Sept. 1, 2015.

Notes of Decisions (82)

Footnotes

1   V.T.C.A., Education Code § 51.201 et seq.
2   V.T.C.A., Local Government Code § 351.081 et seq.
3   V.T.C.A., Government Code § 53.091 et seq.

Vernon's Ann. Texas C. C. P. Art. 2.12, TX CRIM PRO Art. 2.12

Current through Chapters effective immediately through Chapter 49 of the 2017 Regular Session of the 85th Legislature

---

End of Document                    © 20 7 Thomson Reuters. No c a m to or g na  U.S. Government Works.

# Attachment 18

# OFFICE OF THE SECRETARY OF STATE

## *2012*

Policies and Procedures
Manual

# TABLE OF CONTENTS

PREFACE .................................................................................................................i

**SECTION 1 ORGANIZATION AND ADMINISTRATION**

Introduction .......................................................................................................1

Organization and Duties of the Agency .............................................................1

Administration ....................................................................................................4

**SECTION 2 STANDARDS OF CONDUCT**

General .............................................................................................................10

Ethics Advisor ..................................................................................................10

General Conduct ...............................................................................................10

Personal Interest, Outside Employment and Financial Activities ...................11

Acceptance of Gifts, Benefits and Favors .......................................................11

Political Activity ...............................................................................................12

Political Contributions .....................................................................................13

Employment as a Lobbyist ...............................................................................13

Use of State Property ........................................................................................13

Use of Electronic Mail (E-Mail) ......................................................................14

Use of Internet ..................................................................................................17

Centralized Capitol Complex Telephone System .............................................18

Reporting Losses Due to Fraudulent or Unlawful Conduct .............................19

Nepotism ...........................................................................................................19

Outside Employment ........................................................................................20

**SECTION 3 EMPLOYMENT DISCRIMINATION AND ANTI-RETALIATION LAWS**

General .............................................................................................................22

**SECTION 4 ANTI-HARASSMENT AND HOSTILE FREE WORK ENVIRONMENT**

Harassment and Anti-Discrimination ..............................................................25

Sexual Harassment and Anti-Discrimination Training ....................................26

Complaint Procedure ........................................................................................26

Additional Enforcement Information ................................................................26

Disciplinary Action ..........................................................................................27

Confidentiality ..................................................................................................27

False Accusations .............................................................................................27

**SECTION 5 EMPLOYEE RECRUITMENT AND SELECTION**

At-Will Employment .........................................................................................28

**App. 173**

## TABLE OF CONTENTS

Employment Recruitment and Selection ..................................................................28

Recruitment and Selection Procedures ..................................................................28

Process for Recruiting and Selecting an Applicant ..............................................29

Process for Approval of Job Posting ....................................................................29

Evaluation of Employment Applications ..............................................................30

Applicant Interviews ............................................................................................30

Employment Preferences ......................................................................................31

Qualifications for Veteran's Preference ................................................................31

Qualification for Foster youth Preference ............................................................31

Applicants with a Criminal Record ......................................................................31

Final Selection ......................................................................................................32

New Employee Orientation ..................................................................................33

Initial Trial Period of Employment ......................................................................33

### SECTION 6 FAIR LABOR STANDARDS ACT STATE AND HOLIDAY COMPENSATORY TIME

General ..................................................................................................................34

Determination of FLSA Status ............................................................................34

Definitions ............................................................................................................34

Employees Not Exempt From the FLSA ..............................................................34

Employees Exempt from FLSA Overtime Provisions ..........................................35

State Compensatory Time ....................................................................................36

Holiday Compensatory Time ................................................................................37

### SECTION 7 SALARY ADMINISTRATION AND EMPLOYEE COMPENSATION

General Information ..............................................................................................38

New Hire Salary Rate ..........................................................................................38

Promotions ............................................................................................................38

Demotions ............................................................................................................39

Salary Reduction for Disciplinary Reasons ........................................................39

Reallocations ........................................................................................................39

Reclassifications ..................................................................................................39

Merit Increase/One-Time Merit ..........................................................................40

Merit Salary Rate ................................................................................................40

Equity Adjustments ..............................................................................................40

**App. 174**  TX 0116

**TABLE OF CONTENTS**

Enhanced Compensation Award .................................................................................................41

Lateral Transfers ....................................................................................................................42

Temporary Assignment ..........................................................................................................42

Base Salary ...........................................................................................................................42

Longevity Pay .......................................................................................................................43

Benefit Replacement Pay .......................................................................................................44

**SECTION 8 PAYROLL AND PERSONNEL REPORTING**

Payday ..................................................................................................................................45

Payroll Adjustments for Employees on Leave Without Pay ....................................................45

Method of Receipt of Payment ..............................................................................................45

Deductions from Gross Pay ...................................................................................................46

**SECTION 9 GENERAL LEAVE AND MISCELLANEOUS LEAVE PROVISIONS**

Authorization for Leave ........................................................................................................47

Leave Summary .....................................................................................................................47

Annual Leave ........................................................................................................................47

Sick Leave .............................................................................................................................48

Sick Leave Pool .....................................................................................................................50

Extended Sick Leave .............................................................................................................52

Leave without Pay .................................................................................................................54

Military Leave .......................................................................................................................55

Parental Leave .......................................................................................................................55

Miscellaneous Leave .............................................................................................................56

Transfer of Accrued Leave ....................................................................................................58

Credit for Accumulated Annual Leave and Sick Leave ...........................................................58

Absence from Work Because of Inclement Weather ...............................................................58

**SECTION 10 STATE EMPLOYEE HOLIDAYS**

General ..................................................................................................................................60

Optional Holidays (Substitute Holiday Leave) .......................................................................61

**SECTION 11 FAMILY AND MEDICAL LEAVE**

Introduction ..........................................................................................................................62

Employee Eligibility .............................................................................................................62

Leave Entitlement .................................................................................................................62

Definitions ............................................................................................................................63

**App. 175**

## TABLE OF CONTENTS

Maintenance of Health Benefits................................................................................64

Job Restoration................................................................................................64

Notice.........................................................................................................65

Certification..................................................................................................65

Military Family Leave Entitlements............................................................................66

**SECTION 12 EMPLOYEE BENEFITS**

General........................................................................................................69

Insurance......................................................................................................69

Retirement and Death Benefit..................................................................................70

**SECTION 13 MILITARY EMPLOYMENT AND RE-EMPLOYMENT RIGHTS**

The Uniformed Services Employment and Re-employment Rights Act (USERRA) ........................72

State Re-employment Following Military Service ...............................................................73

Military Leave Entitlements & Eligibility .......................................................................74

**SECTION 14 TRAINING, PROFESSIONAL DEVELOPMENT AND OTHER BENEFITS**

Acquired Immune Deficiency Syndrome (AIDS) and Human Immunodeficiency Virus (HIV)
Awareness Education............................................................................................76

Equal Employment Opportunity (EEO) Standards Training ......................................................76

Professional Development and Training.........................................................................76

Obligations Assumed By Participating Employees ..............................................................76

Parking........................................................................................................80

**SECTION 15 GRIEVANCE POLICY**

Right to Present Grievance.....................................................................................82

Representation.................................................................................................82

Expenditures for Representatives of Grievants Prohibited......................................................82

General Provision Procedures..................................................................................82

Involuntary Termination Grievance............................................................................85

**SECTION16 OFFICE MANAGEMENT**

General Comments..............................................................................................86

Document Retention............................................................................................86

Office Hours...................................................................................................86

Flex Time (Staggered Work Hours).............................................................................86

Telecommuting.................................................................................................87

Office Decorum.................................................................................................87

**App. 176**

## TABLE OF CONTENTS

Procurement ................................................................................................................89

Seminars and Conferences ..........................................................................................90

**SECTION 17 PERSONNEL MANAGEMENT**

Employee Performance Evaluation ..............................................................................92

Disciplinary Action .......................................................................................................93

Termination of Employment ..........................................................................................96

Involuntary Termination ................................................................................................97

Exit Interview ................................................................................................................98

Multiple Employment with the State ..............................................................................98

Arrest, Charging and/or Conviction of Agency Personnel ............................................99

Employment Reference Checks/Verification of Employment ........................................99

Changes in Personal Information ..................................................................................99

**SECTION 18 BUILDING MANAGEMENT**

Emergency Procedures ................................................................................................101

Safety Systems ............................................................................................................101

Security ........................................................................................................................101

Signs ............................................................................................................................102

Outside or Non-Profit Organizations ............................................................................102

Solicitations Requested by Office of the Secretary of State ........................................102

Modifications to Buildings or Offices ............................................................................103

Building Maintenance ...................................................................................................103

Accident Prevention Program .......................................................................................103

**SECTION 19 TRAVEL**

Policies and Procedures ...............................................................................................105

Travel Request .............................................................................................................105

Advance Travel Payments ............................................................................................106

Multiple Advances or Reimbursements for a Travel Expense ......................................107

Travel Voucher Documentation Requirements .............................................................107

Multiple Employee Travel .............................................................................................107

Attendance at Seminars and Conferences ..................................................................107

Reimbursement of Travel Expenses ............................................................................108

Reimbursement of Gasoline Cost ................................................................................108

Transportation Allowance .............................................................................................108

**App. 177**

TABLE OF CONTENTS

Meals and Lodging .................................................................................................111

State Business Calls on Personal Cell Phones .......................................................112

Travel Contract Restrictions ..................................................................................112

Travel Discounts ....................................................................................................113

Incidental Expenses ...............................................................................................114

Election Inspecting ................................................................................................114

Elections Inspectors Not Employees of the Agency But Are Working On Behalf Of the
Agency ...................................................................................................................114

Travel Voucher ......................................................................................................115

Ombudsperson Daily Travel ..................................................................................115

Direct Billing .........................................................................................................116

**SECTION 20 HIV/AIDS WORKPLACE GUIDELINES**

Purpose ..................................................................................................................117

Policy .....................................................................................................................117

Confidentiality .......................................................................................................117

Education and Training ..........................................................................................118

**SECTION 21 AMERICANS WITH DISABILITIES ACT (ADA)**

Purpose ..................................................................................................................119

Definitions .............................................................................................................119

Employment ...........................................................................................................119

Administration and Implementation ......................................................................121

Dissemination of Policy .........................................................................................122

Confidentiality .......................................................................................................122

ADA Grievance Procedure .....................................................................................122

Reasonable Accommodations ................................................................................122

Employment Test ...................................................................................................124

Written Job Descriptions .......................................................................................124

**SECTION 22 RETURN TO WORK PROGRAM**

Policy Statement ....................................................................................................125

Eligibility ..............................................................................................................125

Notification of Injury, Disability, or Serious Health Condition ............................126

Certification of Healthcare Provider ......................................................................127

Status Reports During Leave ..................................................................................127

## TABLE OF CONTENTS

Return to Work ...................................................................................................128

Use of Paid Leave .............................................................................................130

Responsibilities of Agency Supervisors ..........................................................131

Prohibited Actions ............................................................................................131

Definitions .........................................................................................................133

**SECTION 23 SUBSTANCE ABUSE (DRUG-FREE AND ALCOLHOL FREE WORKPLACE**

Purpose and Goal ..............................................................................................134

Covered Workers ...............................................................................................134

Applicability ......................................................................................................134

Definitions .........................................................................................................134

Prohibited Behavior ..........................................................................................135

Notification of Convictions ..............................................................................136

Searches .............................................................................................................136

Consequences ....................................................................................................136

Return to Work Agreements .............................................................................137

Treatment ..........................................................................................................137

Confidentiality ..................................................................................................138

Shared Responsibility .......................................................................................138

Communication .................................................................................................138

**SECTION 24 SERVICE AWARDS**

Purpose ..............................................................................................................139

Objective ...........................................................................................................139

Policy .................................................................................................................139

Notification .......................................................................................................140

Presentation of Awards .....................................................................................140

Service Award Committee .................................................................................140

Procedure to Purchase and Award ....................................................................141

**SECTION 25 SAFETY**

Introduction .......................................................................................................142

Assignment of Duties, Responsibility, Authority and Staffing .......................142

Hazard Identification, Reporting and Evaluation ............................................143

AED Description ................................................................................................144

**App. 179** TX 0121

**TABLE OF CONTENTS**

Employee Education .................................................................................................145

Safety Committee .....................................................................................................148

Fire and Evacuation Procedures ..............................................................................148

Fire Wardens ............................................................................................................149

Emergency Phone Numbers ......................................................................................150

Occupational Safety and Health ...............................................................................150

Safety Checklist ........................................................................................................153

Safe Lifting Techniques ............................................................................................154

Employee Notice ......................................................................................................155

Right of Employee ....................................................................................................155

**SECTION 26 NOTARIES WITHOUT BOND**

General ......................................................................................................................157

Qualification .............................................................................................................157

Notary Supplies ........................................................................................................158

Notary Stamp ............................................................................................................158

Notary Record Book ..................................................................................................158

Performing Notarizations .........................................................................................158

Transfer or Termination of Employment of Notaries without Bond .......................158

**SECTION 27 SOCIAL MEDIA**

Overview ...................................................................................................................160

Approvals Required To Use Social Media for Agency Business ...............................160

Authorized Communications .....................................................................................160

Acceptable Content ...................................................................................................161

Unacceptable Content ...............................................................................................161

Response to Questions/Comments ...........................................................................161

Posts and Comments Are Public Information ...........................................................162

Information Request ..................................................................................................162

Records Retention .....................................................................................................162

Employee Use of Social Media .................................................................................162

Personal Use .............................................................................................................162

**SECTION 28 UNEMPLOYMENT AND WORKERS' COMPENSATION**

Unemployment Compensation ..................................................................................164

Workers' Compensation ............................................................................................164

**App. 180**

**TABLE OF CONTENTS**

**Section 29 Indoor Air Quality**

Introduction ..................................................................................................................................165

**APPENDICES**

- Appendix A   Forms
- Appendix B   Information Security Agreement
- Appendix C   Training Matrix

**OFFICE OF THE SECRETARY OF STATE**
**POLICIES AND PROCEDURES MANUAL**

## SECTION 5: EMPLOYMENT RECRUITMENT AND SELECTION

### 5.0    EMPLOYMENT "AT WILL" AND "RIGHT TO WORK"

Unless explicitly exempted by written contract, statute, or policy, all employees of the Agency are employed "at will" and, as such, are free to terminate their employment at any time with or without reason. The Agency likewise retains the right to determine that continued employment of an employee is not in its best interest. Furthermore, nothing in this Manual or any of its amendments, any statement made by supervisory personnel, either verbal or written, or any benefit program is intended to be nor should be construed as being a contract or guaranty of employment between the Agency and any employee. Any salary figures stated to an employee in annual or monthly terms are stated for the sake of convenience or to facilitate comparisons and are not intended to guarantee employment for any period of time.

All employees have a "right to work." Employees cannot be denied public employment as a result of joining or not joining a labor union.

### 5.1    EMPLOYMENT RECRUITMENT AND SELECTION POLICY OBJECTIVES

The recruitment and selection procedures are based on three policy objectives:

- Selection based solely on objective, job-related criteria that can be consistently applied and quantifiably measured as to all classes of job applicants;
- Workforce diversity with an equitable distribution within all job classifications for all classes covered by anti-discrimination laws; and
- An employee selection plan solidly predicated on sound statutory and constitutional principles, as well as judicial interpretations that promote the elimination of unlawful discrimination.

### 5.2    RECRUITMENT AND SELECTION PROCEDURES.

The HRD will review all recruitment and selection procedures to ensure compliance with Agency policy and to ensure consistency. All personnel decisions, policies, procedures, and requirements shall be objective, job related, and measurable. Objective is defined as being concrete and observable as opposed to being subjective or using personal judgment. Applications, resumes, transcripts, letters of reference, and other similar documents submitted by applicants hired and not hired will be retained in accordance with the Texas State Records Retention Schedule.

The HRD shall maintain a comprehensive list of recruitment sources, including organizations representing minorities, women, and disabled persons. All sources on this recruitment list shall be sent a copy of the job posting, except when the vacancy is to be filled by promotion, re-employment of former employees, or transfer of current employees.

**App. 182** TX 0152

**OFFICE OF THE SECRETARY OF STATE**
**POLICIES AND PROCEDURES MANUAL**

## SECTION 5: EMPLOYMENT RECRUITMENT AND SELECTION

Applicants must submit The State of Texas Application for Employment.  Applications are retained for a period of two (2) years.

**5.3    PROCESS FOR RECRUITING AND SELECTING AN APPLICANT**

The HRD publishes a Recruitment Notice only after the posting has been approved by the Secretary of State or the Deputy Secretary of State.  A director may then direct the HRD to publish the notice either internally or externally after such approval has been obtained.

HRD Notifies Agency employees of the job vacancies posted on the intranet. All internal recruitment notices will remain posted for a minimum of three working days.  If a recruitment notice is published internally and no one is selected to fill the position, the notice is then published publically.  Recruitment Notices are provided to the following organizations:

- The Texas Workforce Commission via WorkInTexas.com;
- Established contact groups representing minorities, women, disabled, or older workers at state and local levels; and
- Appropriate educational institutions at state and local levels.

**5.4    PROCESS FOR APPROVAL OF JOB POSTINGS**

The request for all approved recruitment notices should include the following:

- Job Description.  List all tasks that take at least 10% of the position's time.  Be specific on responsibilities including reports due, number of persons supervised, and deadlines.  Indicate qualifications.  The job description should not contain any requirements that are not job related.

- Job Qualifications.  Do not add any new tasks or responsibilities not included in the job description.  Specific minimum qualifications, acceptable alternatives, and preferred qualifications should be included in the recruitment notice.  Minimum job qualifications must incorporate education and experience.  These two criteria must be job related and not have a statistically measurable disproportionate impact on covered classes included in laws prohibiting employment discrimination (race, color, sex, national origin, religion, age, mental or physical disabilities, and military status).

  Preferred qualifications are the experience and education desired to accomplish the tasks and responsibilities of the position.  Preferred qualifications, when used, will remain secondary in focus in selection and must be justified on the basis of business necessity or legitimate business objectives.  Preferred qualifications shall be listed on the job posting under a separate heading entitled "Preferred Qualifications."

- Job Testing.  All tests administered to applicants must be job related.  General job-related tests will be administered and graded by the HRD.  Job-specific tests may be

**App. 183**  TX 0153

Table of Contents

**OFFICE OF THE SECRETARY OF STATE**
**POLICIES AND PROCEDURES MANUAL**

### SECTION 5: EMPLOYMENT RECRUITMENT AND SELECTION

administered by the HRD or the division/section having the vacancy and graded within the relevant division/section. Each test will become a permanent part of the application for employment.

- Interview Questions. The questions must be objective and job related and must measure an applicant's knowledge of the tasks listed in the job description. All applicants must be asked the same questions. The interviewer must keep notes of each applicant's answers. Interviews must be confined to the applicant's responses to job-related questions. Such questions are to focus exclusively on the applicant's professional and technical ability or knowledge to perform the duties of the job.

- Applicant Rating Log. The applicant rating log should list all predetermined selection criteria for the position. Each criterion must be given a value. All applicants should be listed on the applicant rating log.

The division/section director shall send to the HRD the job description, applicant rating log, interview questions, and any job-specific tests to be administered by the division/section. After the HRD reviews the job description and selection criteria to ensure compliance with Agency policy, the Human Resources Manager will forward the Personnel Action Request (PAR) to the Director of Administrative Services Division to confirm requisite funds are available for the requested action. The PAR will then be sent to the Deputy Secretary of State for approval.

## 5.5    EVALUATION OF EMPLOYMENT APPLICATIONS

All applications shall be evaluated based on predetermined selection criteria developed for the position. The selection criteria shall be based upon job tasks, experience and qualifications as set forth in the job description. Each criterion must be directly related to the job description and each criterion must be given a numerical value. Each application shall be screened using an applicant rating log. The applicant rating log is to be based on quantifiable job-related experience, tasks, and qualifications as set forth in the job description. As applications are evaluated, each applicant's name should be listed on the applicant rating log and numerical values determined for each selection criterion. With respect to promotion of current employees, the applicant rating log may include job performance evaluations and length of service with the Agency in addition to the other criteria established for the position. Applicants are to be ranked on the basis of their cumulative scores. The applicants in the highest numerical cluster shall be interviewed. As an alternative, the top five (5) applicants could be selected for interviews.

## 5.6    APPLICANT INTERVIEWS

After completing the interviews, the interviewer shall record on the applicant rating log any points received by each applicant for responses to interview questions and applicable job-specific tests. At least one job reference shall be obtained on the selected applicant and will be included with the selection criteria information forwarded to the HRD for review.

**App. 184** TX 0154

**OFFICE OF THE SECRETARY OF STATE**
**POLICIES AND PROCEDURES MANUAL**

## SECTION 5: EMPLOYMENT RECRUITMENT AND SELECTION

**5.7    EMPLOYMENT PREFERENCES**

An individual who qualifies for an employment preference as a veteran or former foster child is entitled to a preference in employment over other applicants for the same position who are otherwise equally qualified.

All applicants will receive veteran's preference, if entitled, until forty percent (40%) of the Agency's workforce comprises those that are entitled to said preference. Once 40% of the Agency's workforce is persons qualifying for the preference, the preference need not be given.

**5.8    QUALIFICATIONS FOR VETERAN'S PREFERENCE**

An individual qualifying for the Veterans Preference must fulfill the following criteria:

- The Veteran served in the military for not less than ninety (90) consecutive days during a national emergency declared in accordance with federal law or was discharged from military "service for an established service-connected disability."
- The Veteran has an Honorable Discharge; and
- The Veteran is competent.

Surviving spouses who have not remarried and orphans qualify for the veteran's preference under the following circumstances:

- The veteran was killed on active duty;
- The veteran served in the military for no less than ninety (90) consecutive days during a national emergency in accordance with federal law; and
- The spouse or orphan is competent.

**5.9    QUALIFICATIONS FOR FOSTER YOUTH PREFERENCE**

An individual qualifies for foster youth preference must fulfill the following criteria:

- The individual was under the permanent managing conservatorship of the Department of Family and Protective Services on the day preceding the individual's 18th birthday.
- The individual is 25 years of age or younger.

**5.10    APPLICANTS WITH A CRIMINAL RECORD**

The Agency's policy regarding the hiring of persons with a criminal record is intended, among other things, to provide a crime-free work environment and to produce a law-abiding workforce. (The term "criminal record" in this context includes both convictions and deferred adjudication.)

**App. 185**  TX 0155

**OFFICE OF THE SECRETARY OF STATE**
**POLICIES AND PROCEDURES MANUAL**

## SECTION 5: EMPLOYMENT RECRUITMENT AND SELECTION

If an applicant is otherwise qualified for the position, a criminal record will not automatically disqualify the applicant. However, the following factors will determine whether to consider the applicant for employment:

- The specific duties of the position.
- The number of offenses committed by the individual.
- The nature and seriousness of each offense.
- The length of time between the offense and the employment decision.
- The efforts by the individual at rehabilitation.
- The accuracy of the information on the applicant's employment application.
- Any other relevant factors.

### 5.11    FINAL SELECTION

Subject to the Nepotism policy (Section 2.13), the applicant receiving the highest cumulative score based on the established selection criteria shall be selected to fill the position. The section/division director notifies the Human Resources Manager of final selection. All information used for the selection of the applicant, including information for applicants not hired, must be submitted to the HRD. The HRD will review the information to ensure compliance with Agency policy and consistency. The HRD will conduct employment reference checks and criminal history background checks on the selected applicant. Additionally, HRD will verify the Selective Service System registration status on males ages 18-25.

An individual who is not a citizen of this country is protected from discrimination under the provisions of federal law and the Texas Labor Code. It is unlawful to discriminate on the basis of citizenship or "intending citizen" status. However, federal law prohibits the Agency from knowingly hiring an individual who is not authorized to work in this country. To ensure compliance, the Agency is required to complete Form I-9, Employment Eligibility Verification, upon hiring a person. This form must be completed within three business days of the hire.

The HRD will complete a PAR listing the name of the applicant, Classification Title, Class Number, Salary Group, monthly salary, and position number. The PAR (and the results of the criminal history check if a conviction or deferred adjudication is discovered) will be forwarded to the Secretary of State or the Deputy Secretary of State for final approval. With the exception of the staff of the Executive Division, only the HRD may extend an offer of employment to an applicant. If an applicant accepts or declines the offer of employment, the HRD will notify the hiring director and/or team leader.

The manner of recruitment and selection of employees for the Executive Division is within the discretion of the Secretary of State or the Deputy Secretary of State.

**App. 186**  TX 0156

OFFICE OF THE SECRETARY OF STATE
POLICIES AND PROCEDURES MANUAL

## SECTION 5: EMPLOYMENT RECRUITMENT AND SELECTION

### 5.12    NEW EMPLOYEE ORIENTATION

Within thirty days of hire all new employees will be advised of employee benefits and responsibilities, the Agency's responsibility in providing a safe and secure workplace, and the general rules regarding Agency policy.  The orientation covers the following topics:

| | | |
|---|---|---|
| • Agency Organization | • Parking | • Insurance |
| • Working hours | • Payroll | • TexFlex |
| • Use of state property | • Overtime | • Timesheets |
| • Workers' Compensation | • Compensatory time | • Types of leave |
| • Safety program | • Deferred Compensation | • Leave accrual |
| • Employment Discrimination and Sexual Harassment | | |

The manager/team leader must complete and return the Orientation Checklist to the HRD within five work days after the date of hire.  Managers/team leaders are responsible for providing an orientation session regarding the policies and procedures applicable to their respective section.

### 5.13    INITIAL TRIAL PERIOD OF EMPLOYMENT

New or returning employees are subject to an initial trial period of employment of 180 days.  During this initial period, job performance, attendance, and conduct are reviewed and evaluated.  If an employee's employment is terminated during or at the conclusion of this initial period, the employee may not take advantage of the agency's disciplinary and grievance policies.

Notwithstanding any of the above, during this initial trial period, a new employee's employment can be terminated at any time for any reason.  The existence of an initial trial period of employment in no way affects the "at-will" status of employees during their employment.

Upon satisfactory completion of the initial trial period of employment, the employee will no longer be in the trial period and will have the right to utilize the agency's disciplinary and grievance process.

New or returning employees shall sign an acknowledgment that they are subject to this initial trial period.

App. 187  TX 0157

Respectfully submitted this the 14th day of September, 2017.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY D. STARR
Deputy First Assistant Attorney General

MICHAEL C. TOTH
Special Counsel to the First Assistant Attorney General

*/s/ Austin R. Nimocks*
AUSTIN R. NIMOCKS
Associate Deputy Attorney General
Texas Bar No. 24002695
austin.nimocks@oag.texas.gov

DAVID J. HACKER
Senior Counsel

Office of Special Litigation
ATTORNEY GENERAL OF TEXAS
P.O. Box 12548, Mail Code 009
Austin, Texas 78711-2548
(512) 936-1414
(512) 936-0545 Fax

*ATTORNEYS FOR PLAINTIFF*

## CERTIFICATE OF SERVICE

I certify that on the 14th day of September, 2017, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Austin R. Nimocks*
AUSTIN R. NIMOCKS
Associate Deputy Attorney General