# Attachment 19

**Frequently Asked Questions**

Q: I have been designated a deputy registrar from County X I will be at an event that will have attendees from County X along with County Y and County Z May I register people from County Y and County Z?

A: No Volunteer deputy registrar status is conferred on a county-by-county basis To accept applications for Y or Z counties, you would have to become a volunteer deputy registrar for those counties You could certainly give applications to the attendees from County Y and County Z and direct them to mail the application to the appropriate county voter registrar's office Under Section 13 044 of the Code, a person commits a Class C misdemeanor by acting as a volunteer deputy registrar when he or she does not have an effective appointment as a deputy registrar

Q: May I photocopy a completed application before turning it in to the county voter registrar?

A: No Section 13 004(c-1) of the Code requires the county voter registrar to ensure that certain information, such as the telephone number, on a registration application is redacted from photocopies of voter registration applications from her office In our opinion, this means that a photocopy of an application must come directly from the county voter registrar's office, so that he or she may ensure the required information has been blacked out or otherwise obscured With that said, we believe that a volunteer deputy registrar may photocopy the receipt You may also copy the relevant information from the application in writing just as you would be able to do if you went to the registrar's office and pulled a copy of the original application

Q: I am a candidate and/or working for a campaign May I serve as a volunteer deputy registrar?

A: Yes There is no prohibition against a candidate or a campaign worker serving as a deputy registrar, as long as they otherwise meet the "Qualifications" described above and have been officially appointed as a volunteer deputy registrar Similarly, there is no prohibition against a volunteer deputy registrar registering voters at a campaign rally or event While working a rally or public event, we believe a volunteer deputy registrar should offer registration to anyone who requests it

Q: Is there any way for me to become a statewide volunteer deputy registrar?

A: No Volunteer deputy registrar appointments are made on a county-by-county basis Section 13 032 of the Code provides that a county may not refuse to appoint a resident of the county as a volunteer deputy registrar A voter registrar may not refuse to appoint a volunteer deputy registrar on the basis of sex, race, color, creed, or national origin or ancestry

Q: Is there a minimum age to become a volunteer deputy registrar?

A: Yes A person must be at least 18 years of age to become a volunteer deputy registrar

Q: I just want to hand out blank voter registration application forms and encourage people to register to vote Can I do that?

A: Yes Anyone can hand out blank application forms to voters for the voters to fill out and mail in themselves If this is all you want to do, you do not have to be a volunteer deputy registrar Also, if you are already a volunteer deputy registrar in one county, you can hand out blank forms in other counties where you are not a volunteer deputy It is the voter's handing the application back to you to review and to deliver to the registrar that triggers the requirement to be an authorized volunteer deputy registrar

Q: What if someone says he or she is already registered?

A: You may wish to advise the person that the new application form will be treated as an update if the old registration is in the same county and the voter is providing new information If the person moved to a new county, he or she will need to register in the new county

Q: As a volunteer deputy registrar, may I appoint others to assist me in registering voters?

A: No Each volunteer deputy registrar must be appointed directly by the county voter registrar or that registrar's deputy in the voter registrar's office

Q: May a volunteer deputy registrar bundle completed applications and submit them to the voter registrar by mail?

A: No There are two methods for a volunteer deputy registrar to submit applications to the county voter registrar First, the applications may be submitted by personal delivery by the volunteer deputy registrar Second, the volunteer deputy registrar may give his or her applications to another volunteer deputy registrar for personal delivery to the county voter registrar

Q: I failed to submit the applications to the county voter registrar within the allotted period What should I do now?

A: Submit them to the county voter registrar as soon as possible Under the law, the voter's registration is not impacted by your late delivery to the voter registrar However, you should deliver them as soon as possible Further delay will create problems in getting the lists ready in time for early voting and election day The registration process cannot be completed until you deliver the application The registration is still effective and the voter still receives the effective date of submission to you

Q: How long do I have to keep my receipt books?

A: It is not addressed in the Code, but we would suggest that you should retain the receipt books for 22 months following the election closest to the effective date of the applications Please communicate with your county voter registrar, who may have their own timeline of retaining the receipt books

Q: What if I was appointed but still have not gone through the training adopted by the Secretary of State's office?

A: Until you have completed the training, you may not receive any person's voter registration application

For more information, Contact:
The Secretary of State's office or the Voter Registrar (who may be the County Clerk, County Elections Administrator, or County Tax Assessor-Collector) in your county

**SECRETARY OF STATE**
Elections Division
P O Box 12060
Austin, Texas 78711-2060
512 463 5650 or 1 800 252 VOTE (8683)
Fax 512 475 2811, TTY 7 1 1
www sos state tx us

Published by the Elections Division of the Secretary of State's office
This pamphlet is available in Spanish, large print, audiotape, or computer disc upon request

Este folleto está disponible en Español, tipo de imprenta más grande, cinta magnética para audio, o disco para computadora Para conseguir una de estas versiones por favor llame sin cargo a la oficina del Secretario de Estado al 1 800 252 VOTE (8683)



# Volunteer Deputy Registrar Guide

A publication of the:
**Secretary of State**
Elections Division
P.O. Box 12060
Austin, Texas 78711-2060
512.463.5650 or
1.800.252.VOTE (8683)
Fax 512.475.2811, TTY 7.1.1
http://sos.state.tx.us/elections/pamphlets/deputy.shtml

Dear Volunteer Deputy Registrar:

In 2011, the 82nd Texas Legislature enacted and the Governor signed three bills that substantially affected the qualifications to become a volunteer deputy registrar, provided a criminal penalty for persons who compensate volunteer deputy registrars based on the number of voter registrations they facilitate, and required the Secretary of State to develop a training program for volunteer deputy registrars

First, House Bill 2817, which has been precleared by the United States Department of Justice ("DOJ") and is effective on September 1, 2011, provides a new, additional qualification to be eligible to be a volunteer deputy registrar: a person may not have been finally convicted of an offense under Section 32 51 of the Penal Code, which is entitled, "Fraudulent Use or Possession of Identifying Information" Such a final conviction will bar a person from serving as a volunteer deputy registrar even after the sentence is fulfilled

Second, House Bill 2194, which has been precleared by the DOJ and became effective after such preclearance on March 6, 2012, provides that it is a Class A misdemeanor if a person compensates another person based on the number of voter registrations which that person facilitates House Bill 2194 also provides that to be eligible to be a volunteer deputy registrar, a person must meet the requirements to be a qualified voter under Section 11 002 of the Election Code ("the Code"), except that the person is not required to be a registered voter These requirements are: (1) to be 18 years of age or older; (2) to be a U S citizen; (3) not determined by a final judgment of a court exercising probate jurisdiction to be totally mentally incapacitated or partially mentally incapacitated without the right to vote; (4) to be not finally convicted of a felony or, if so convicted, to have fully discharged the sentenced or been pardoned or otherwise released from the resulting disability to vote; and (5) to be a resident of Texas

Third, House Bill 1570, which has been precleared by the DOJ, requires the Secretary of State to adopt, not later than January 1, 2012, standards of training for volunteer deputy registrars The Secretary of State adopted such training standards, which were precleared by the DOJ and became effective on March 12, 2012

Acceptance of the duties of volunteer deputy registrar places you in a position of trust and responsibility to the citizens you will register to vote

Please become familiar with the instructions and guidelines in this brochure and carry it with you while you perform your duties If, in the course of your service, a question should arise which you are unable to answer, please contact the Elections Division for assistance

Again, thank you for your service to the state of Texas

Office of the Secretary of State
Elections Division

Rev. 1/31/2013

**App. 189** TX 0293

Volunteer Deputy Registrars are entrusted with the responsibility of officially registering voters in the State of Texas  They are appointed by county voter registrars and charged with helping increase voter registration in the state

## Qualifications

To be appointed a volunteer deputy registrar, a person must

× be at least 18 years old;
× be a United States citizen;
× not have been determined by a final judgment of a court exercising probate jurisdiction to be
  o totally mentally incapacitated, or
  o partially mentally incapacitated without the right to vote;
× never have been convicted of failing to deliver a voter application to a voter registrar;
× not have been finally convicted of a felony, or, if convicted, must have
  o fully discharged the sentence, including any term of incarceration, parole, or supervision, or completed a period of probation ordered by any court, or
  o been pardoned or otherwise released from the resulting disability to vote;
× not have been finally convicted of identity theft under Section 32 51 of the Penal Code; and
× be a resident of the state of Texas

## How to Become a Volunteer Deputy Registrar

× Contact the voter registrar in your county
× If you are eligible, the voter registrar will issue you a certificate of appointment and give you a receipt book
× However, you may not receive another person's voter registration application until you have completed the training developed by the Secretary of State in accordance with House Bill 1570  At the time of your appointment, the voter registrar will provide information about the times and places at which the training is offered  This training requirement applies only to volunteer deputy registrars who are appointed on and after March 12, 2012

## Duties of a Volunteer Deputy Registrar

A volunteer deputy registrar may distribute and accept a voter registration application form from any resident of the county who is:

× A United States citizen;
× A resident of the county;
× At least 17 years and 10 months of age;
× Not a convicted felon (unless the person's sentence has been completed, including probation or parole or the person has been pardoned or otherwise released from the resulting disability to vote);
× Not a person determined by a final judgment of a court exercising probate jurisdiction to be (1) totally mentally incapacitated; or (2) partially mentally incapacitated without the right to vote

A volunteer deputy registrar may distribute and accept applications from voters who wish to change or correct information on their voter registration certificate (such as name or address)

## Checklist for a Volunteer Deputy Registrar

You should have:

× A certificate of appointment;
× A pen;
× This brochure;
× Plenty of voter registration applications; and
× A receipt book

The Texas Voting brochure provides information useful to you and applicants  It may be obtained from the Secretary of State's website at www sos state tx us or by calling 1 800 252 VOTE(8683)

## Accepting Applications

× You may help a person fill out an application
× Voters may correct or update information on their current voter registration certificate by filling out a new registration form and checking the "change" box
× You may help a person fill out the registration form if he/she cannot read or has a physical disability
× If an applicant cannot sign his/her name on the form, the applicant may make a mark on the signature line  Print the name of the applicant beside the mark  Sign your name and address as the witness and state the reason the applicant is unable to sign
× You may allow another registered voter (or anyone who has submitted a registration application) to fill out and sign an application for his or her spouse, parent or child  That person must sign the application as "agent" and state the relationship to the applicant on the registration form  The "agent" must have the permission of the applicant to do this
× Fill out a receipt for each applicant  Give the applicant the receipt  The duplicate receipt must be delivered to the voter registrar along with the application  You may wish to keep a copy or stub for your records  You should not keep a copy of the completed voter registration application itself because this document contains information that is confidential by law

## Reviewing the Application

While the applicant is still in your presence, be sure to review the application for completeness  Be sure the application includes the following:

× Full name, including any middle, maiden, or former name;
× Residence address must be a street address or a description of the location of the residence;
× Valid mailing address, if mail can't be delivered to the residence address;
× Signature of applicant and date of signing;
× Date of birth, including month, day, and year;
× Citizenship question is answered either yes or no;
× Be sure the applicant has read the statements that he/she is signing regarding qualifications to register; and
× If an agent is registering for an applicant, be sure the agent provides his/her relationship to the applicant

What you cannot do:

× Determine if the applicant is actually qualified to register to vote;
× Make the applicant provide his/her gender, social security or driver's license number; or
× Make the applicant provide his/her telephone number

## When is the Registration Effective?

× Tell the applicant that he/she can vote as soon as the 30th day after submitting the application  This 30-day waiting period starts when the volunteer deputy registrar receives the application form
× If the applicant is under the age of 18, the registration will become effective on the 30th day after the voter registrar gets the application or on the applicant's 18th birthday, whichever comes later

## How long is the Registration Effective?

Tell the applicant that the registration will be automatically renewed every even-numbered year unless:

× The voter moves to another address; or
× the voter receives a final felony conviction and has not completed the sentence, probation or parole or been otherwise pardoned or released from the resulting disability to vote  Note: "deferred adjudication" does not constitute a "final felony conviction "

## Address Changes

The voter must update the address on the registration if the voter moves within the county

× The voter can make the change on the back of the voter registration certificate and mail it to the county voter registrar;
× Submit a new application form to the voter registrar and check the box for "change"; or
× Write a letter to the voter registrar explaining the change of address

Tell voters that if they move to another county, they must re-register in the new county.

## Name Changes

× Voters can make the change on the back of their voter registration certificate and mail it to the county voter registrar; or
× Submit a new application form to the voter registrar and check the box for "change"; or
× Write a letter to the voter registrar explaining the name change

## Delivery of Applications

You must deliver completed registration applications and receipts in person to the voter registrar no later than 5 p m on the 5th day after the date you receive them  FAILURE TO DELIVER AN APPLICATION IN A TIMELY MANNER IS A CRIMINAL OFFENSE

**SPECIAL NOTE:** To be eligible to vote, a person must be registered 30 days before Election Day  When you receive a completed application after the 34th day and before the 29th day before the date of any election in the county, you must deliver the application to the county voter registrar no later than 5 p m of the 29th day before Election Day  If the 29th day falls on a Saturday or Sunday or on a legal state or national holiday, the deadline for delivering the applications is extended to 5 p m of the next regular business day

## Length of Appointment

You may be appointed a volunteer deputy registrar at any time  However, your term expires on December 31 of the even-numbered year  Your appointment as a volunteer deputy registrar may be terminated by the appointing authority if you fail to properly review a voter registration application  Your appointment as a volunteer deputy registrar will be terminated by the appointing authority if:

× You are finally convicted of an offense under the law relating to delivery of completed voter registration applications to the registrar; or
× You are finally convicted of an offense under the law relating to performance-based compensation for voter registrations

All election materials issued to a volunteer deputy registrar, including the certificate of appointment, receipt books, receipts, applications and other forms in the volunteer deputy registrar's possession, must be returned or accounted for upon termination of appointment

# Attachment 20

 TX 0295



# TEXAS LOTTERY COMMISSION

## ENFORCEMENT DIVISION

## PROCEDURE

| Number: **EN-016** | Title: | Approval: |
|---|---|---|
| **Page:      1 of 3** | **Employee Background Investigations** | **Mario L. Valdez, Enforcement Director** |
| Effective Date: **October 10, 2016** | Approval Date: **October 10, 2016** | Review Date: |

**PROCEDURE NUMBER**
EN-016 [Supersedes EN-016 effective March 24, 2014]

**PURPOSE**
This procedure describes the minimum requirements for a Texas Lottery Commission (TLC) employee applicant background investigation. The Enforcement Division may expand the scope of the background investigation of an applicant for employment with the TLC as deemed necessary by the executive director, and may request the Texas Department of Public Safety (DPS) conduct the background investigation of an applicant for employment with the TLC.

**RESPONSIBILITY**
The Enforcement Division (Enforcement) is primarily responsible for this procedure. Personnel in the Human Resources Division (HR) are responsible for parts of the procedure.

**GENERAL**
HR requests Enforcement conduct a background investigation on an applicant for employment. Enforcement investigators have primary responsibility to perform background investigations.

A current or prospective employee is disqualified from employment if he or she has been convicted of a felony or of a misdemeanor involving gambling, fraud or theft and less than 10 years has elapsed since the termination of  the sentence, parole, mandatory supervision, or probation served for the offense.  Other convictions may be considered in an employment decision if the conviction is relevant to the job duties of a current or prospective employee.

An applicant is prohibited from TLC employment if the person owns a financial interest in a bingo commercial lessor, bingo distributor, bingo manufacturer, lottery sales agent or a lottery operator. TLC will also prohibit from employment a person who is a spouse, child, brother, sister, or parent residing as a member of the same household in the principal place of residence of a person who owns a financial interest in a bingo commercial lessor, bingo distributor, bingo manufacturer, lottery sales agent or a lottery operator.

**App. 192**

| Number:            | Title:                              | Approval:            |
|--------------------|-------------------------------------|----------------------|
| **EN-016**         | **Employee Background Investigations** | **Mario L. Valdez,** |
| Page:     2 of 3   |                                     | **Enforcement Director** |
| Effective Date:    | Approval Date:                      | Review Date:         |
| **October 10, 2016** | **October 10, 2016**              |                      |

Agency policy is that the agency may not employ or continue to employ a person who holds any interest in or who works for:

- a business that manufactures, distributes, sells, or produces lottery or bingo equipment, supplies, services or advertising;

- a business that has bid or expressed the intent to bid to provide lottery operator services in the past two years; or

- a business that is licensed by the agency as a sales agent (a business that sells lottery tickets) or licensed by the Charitable Bingo Operations Division.

Agency policy is that an employee's spouse, child, brother, sister or parent residing as a member of the same household should not be employed:

- by a person or entity that contracts with the agency to provide lottery operator services, advertising services, instant tickets, security audits, financial audits or drawings audits;

- by an entity licensed as a bingo manufacturer, distributor or systems service provider; or

- by a licensed commercial lessor or conductor in a job related to bingo.

**PROCEDURE**

1. HR emails a request to Enforcement to conduct a background investigation of a person being considered for employment with the TLC. HR includes a copy of the applicant's State of Texas Application for Employment and a copy of the job posting.

2. The Intake Coordinator opens a case in the Compliance Activity Monitoring Process (CAMP) system and assigns an investigator to conduct the investigation. The investigator contacts the applicant by phone and email and provides an instructional packet to the applicant which includes an Applicant Background Information/Consent form (Exhibit A).

3. The applicant may be fingerprinted electronically through IdentoGo either at the TLC Headquarters or at one of the statewide IdentoGo sites. Fingerprints are submitted electronically to DPS and the Federal Bureau of Investigation (FBI). Applicants who do not have access to an IdentoGo site may submit fingerprint cards. Fingerprint cards received via U.S. mail or interagency mail are processed by the investigator by accessing the IdentoGO website and completing the registration process of the fingerprint card. The fingerprint card is then forwarded by mail to MorphoTrust, Springfield, IL, for electronic upload to DPS and the FBI.

4. The investigator reviews all required information and documentation submitted by the applicant, including a copy of a valid government issued photo identification card and a social security card. If any required information or documentation is missing, the investigator will notify the applicant and suspend the case until received.

**App. 193** TX 0297

| Number:<br>         **EN-016**<br>**Page:**     **3 of 3** | **Title:**<br>**Employee Background Investigations** | **Approval:**<br>**Mario L. Valdez,**<br>**Enforcement Director** |
|---|---|---|
| **Effective Date:**<br>        **October 10, 2016** | **Approval Date:**<br>        **October 10, 2016** | **Review Date:** |

5. Upon receipt, the investigator reviews the applicant's criminal history for potential disqualifications and convictions.

6. The investigator requests certified copies of court dispositions and/or offense reports from the jurisdictional courts and/or law enforcement agencies for potentially disqualified applicants.

7. The investigator documents potential disqualifications and convictions in the Background Tab of the Compliance Activity Monitoring Process system (CAMP). Disqualifying criminal convictions are documented in the investigative report. All court documents are scanned into CAMP. The investigator informs the Enforcement Director (Director) of extenuating issues that may be discovered in the course of conducting the background investigation.

8. Once completed, the investigative report will be closed as "Referred to Human Resources" and forwarded to the Director for final review and approval.

9. Following final approval an email notification is sent by the Director or his designee to Human Resources indicating the outcome of the investigation.

10. The investigative case file is forwarded to the Intake Coordinator for closure. Upon request, the Intake Coordinator may forward a copy of the approved case report to the Human Resources Division.

11. The Intake Coordinator will dispose of the criminal history upon receipt of the case file, enter the appropriate CAMP closure code, and transfer the case file to the Investigative Program Support Specialist. The case file will be handled in accordance with the TLC's records retention schedule.

12. All TLC employees who are applying for another internal position shall undergo confirmation of subscription to the DPS Fingerprint-based Applicant Clearinghouse of Texas (FACT Clearinghouse) to confirm there is no disqualifying criminal history.

**App. 194**  TX 0298

# Attachment 21

# Texas Lottery Commission



# Personnel Handbook

*Revised September 30, 2015*

- intentionally or knowingly solicit, accept, or agree to accept any benefit for having exercised the officer's or the employee's official powers or performed the officer's or the employee's official duties in favor of another.

## Playing Lottery Games or Bingo

Texas Lottery Commission employees (and family members residing in the same household) may not play bingo in Texas or purchase Texas Lottery tickets. The prohibition against playing bingo in Texas does not apply to bingo on Indian reservations or military locations or to other bingo games not subject to the jurisdiction of the Texas Lottery Commission. The prohibition against purchasing lottery tickets applies to the purchase of Mega Millions and Powerball tickets both in Texas and outside of Texas.

## Eligibility for Employment

### Disqualification Based on a Conviction

A current or prospective employee is disqualified from employment if he or she has been convicted of a felony, or of a misdemeanor involving gambling, fraud or theft and less than 10 years has elapsed since the termination of the sentence, parole, mandatory supervision, or probation served for the offense. Other convictions may be considered in an employment decision if the conviction is relevant to the job duties of a current or prospective employee.

### Financial Interest of Employee

State law provides that the agency may not employ or continue to employ a person who owns a financial interest in a bingo commercial lessor, bingo distributor, bingo manufacturer, lottery sales agency, or lottery operator.
(See Government Code § 467.035)

Agency policy is that the agency may not employ or continue to employ a person who holds any interest in or who works for:

- a business that manufactures, distributes, sells, or produces lottery or bingo equipment, supplies, services or advertising;

- a business that has bid or expressed the intent to bid to provide lottery operator services in the past two years; or

- a business that is licensed by the agency as a sales agent (a business that sells lottery tickets) or licensed by the Charitable Bingo Operations Division.

### Financial Interests of Employee's Relatives

State law provides that the agency may not employ or continue to employ a person who is a spouse, child, brother, sister or parent residing as a member of the same household in the principal place of residence of a person who owns a financial interest in a bingo commercial lessor, bingo distributor, bingo manufacturer, lottery sales agency or lottery operator. (See Government Code § 467.035)

Agency policy is that an employee's spouse, child, brother, sister or parent residing as a member of the same household should not be employed:

**App. 197** <span>TX 0301</span>

# Attachment 22

Case 5:13-cv-00255-C    Document 97    Filed 09/14/17    Page 12 of 170    PageID 1929

# C. Criminal Background Check and Registry Clearance

## Policy

(Revised 9/30/04, 8/1/05, 9/4/07, 12/3/07, 11/21/08, 6/13/14, 9/1/16)

By statute, DFPS, DSHS, DADS and HHSC are authorized to conduct criminal background checks and/or Nurse Aide and Employee Misconduct registry clearance checks on applicants and employees for certain positions. Agencies that conduct criminal background checks or registry checks may do so on any employee subject to one or both of these checks at any time the agency deems appropriate. For more information on agency authorization to conduct criminal background checks and registry clearance checks, see Appendix A, Criminal Background Check and Registry Clearance.

These agencies can deny employment to persons previously convicted of certain criminal offenses if:

- the offense is a bar to employment;
- the agency determines there is a direct relationship between the offense and the employment sought; or
- the agency determines the employment would involve an unreasonable risk to the safety or welfare of clients, consumers or employees.

## Authorization

(Revised 11/20/06, 6/5/07, 9/4/07, 10/16/13, 3/14/14, 3/14/14)

The authority for conducting criminal history checks is governed by

- Texas Administrative Code, Title 25, Chapter 414, Subchapter K, Criminal History and Registry Clearances;
- Texas Administrative Code, Title 40, Chapter 4, Subchapter K, Criminal History and Registry Clearances;
- Texas Administrative Code, Title 40, Chapter 101, Subchapter A, §101.113, Criminal History Information on Applicants for Employment;
- Texas Government Code §411.0985, Access to Criminal History Record Information: Texas Commission for the Blind;
- Texas Government Code §411.110, Access to Criminal History Record Information: Department of State Health Services;
- Texas Government Code §411.1103, Access to Criminal History Record Information: Department of State Health Services;
- Texas Government Code §411.1131, Access to Criminal History Record Information: Texas Commission For The Deaf And Hard Of Hearing;

App. 199    TX-0302
7/18/2017

- Texas Government Code §411.114, Access to Criminal History Record Information: Department of Protective and Regulatory Services (also authority for the DADS Guardianship Program via Senate Bill 6 of the 79th Regular Session);
- Texas Government Code §411.1142, Access to Criminal History Record: Interagency Council On Early Childhood Intervention;
- Texas Government Code §411.1144, Access to Criminal History Record Information: Agencies with Employees, Contractors, or Volunteers at State Supported Living Centers;
- Texas Government Code §411.115, Access to Criminal History Record Information: Texas Department of Mental Health and Mental Retardation; Local Authorities; Community Centers;
- Texas Government Code §411.117, Access to Criminal History Record Information: Texas Rehabilitation Commission;
- Texas Government Code §411.1386, Access to Criminal History Record Information: Court Clerk; Department of Aging and Disability Services; Guardianships;
- Texas Health and Safety Code §533.007, Access to Criminal History Record Information; Criminal Penalty for Unlawful Disclosure;
- Texas Health and Safety Code §555.021, Required Criminal History Checks for Employees and Volunteers of Centers;
- Texas Health and Safety Code, Chapter 250, Nurse Aide Registry and Criminal History Checks of Employees and Applicants in Certain Facilities Serving the Elderly or Persons with Disabilities;
- Texas Health and Safety Code, Chapter 253, Employee Misconduct Registry;
- Texas Human Resources Code §42.056, Required Background and Criminal History Checks; Criminal Penalties;
- Texas Human Resources Code §91.0165, Services for the Blind and Visually Handicapped, Criminal History Record Information;
- Texas Human Resources Code §111.0581, Rehabilitation of Individuals with Disabilities, Criminal History Record Information; and
- Texas Probate Code §698, Access to Criminal History Records.

## Disqualification for Employment

(Added 11/21/08, revised 8/3/09)

An agency may not hire an applicant and may discharge an employee who is:

- convicted of a criminal offense that constitutes a bar to employment (see Appendix B, Bars to Employment);
- convicted of a criminal offense that the agency determines to be a contraindication to employment;

- listed as revoked in the Nurse Aide Registry (**DSHS State Hospitals and DADS State Supported Living Centers only**); or
- listed as unemployable in the Employee Misconduct Registry (**DSHS State Hospitals and DADS State Supported Living Centers only**).

## System and Registry Listings that Constitute a Bar to Employment (DSHS State Hospitals and DADS State Supported Living Centers only)

(Revised 9/30/04, 8/1/05, 1/18/06, 9/4/07, 11/21/08, 11/12/12)

Before a final offer of employment is made:

- the agency must check the Client Abuse and Neglect Reporting System (CANRS) to determine if the applicant is a former employee of a DSHS State Hospital or DADS State Supported Living Center who has a history of confirmed abuse, neglect, or exploitation; and
- a service center staffing specialist must check the DADS Nurse Aide and Employee Misconduct registries to determine if the applicant is designated in either registry as revoked or unemployable.

Both DADS registries are available by calling 1-800-452-3934, or by contacting the Credentialing section of DADS' Long Term Care-Regulatory program at 512-438-5495.

Applicants who are listed as revoked in the Nurse Aide Registry or who are listed as unemployable in the Employee Misconduct Registry are barred from employment.

## Criminal Offenses that Constitute a Contraindication for Employment

(Revised 9/4/07, 11/21/08)

In addition to offenses that constitute a bar to employment, agencies may determine other criminal offenses for which a conviction is a contraindication to employment on a case-by-case basis.

For example, a conviction for a drug-related offense could be considered a contraindication for employing an applicant as a licensed vocational nurse, if the position is responsible for distributing medication.

In determining whether a criminal conviction is a contraindication to employment, the agency must consider the following factors:

- specific duties of the position;
- nature and seriousness of the offense;
- relationship between the specific duties of the position and the nature and seriousness of the offense;

App. 201    TX_0305
7/18/2017

- length of time between the conviction or its equivalent and the employment decision; and
- whether the individual has been convicted of more than one criminal offense.

The agency may consider additional factors relevant to a particular situation.

DFPS employees should review the agency's operating procedures for additional information.

## Arrest Warrants or Wanted Persons' Notices

(Revised 8/1/05, 11/21/08, 5/1/17, 7/11/17)

Disciplinary action must not be taken against an employee solely on the basis of an arrest warrant or a wanted persons' notice.

At the discretion of an HHS agency commissioner or an appropriate deputy executive commissioner, the employee may be temporarily removed from the workplace and placed on emergency leave for a period not to exceed ten working days. After ten working days, the employee must use applicable accrued paid leave. When paid leave is exhausted, the employee is placed on leave without pay. For information on emergency leave, see Chapter 5, Work Leave (K. Emergency Leave).

As an alternative, an HHS agency commissioner, appropriate deputy executive commissioner, or their designee may temporarily reassign the employee to another area until the matters relating to the arrest warrant or wanted persons' notice are resolved.

## Self-Reporting Requirement

(Revised 9/30/04, 8/1/05, 1/18/06, 9/4/07, 11/21/08, 5/15/09, 2/16/12)

Employees in positions requiring criminal background checks, Nursing Aide and Employee Misconduct registry checks, or system checks are required to self-report to the supervisor within five calendar days of any:

- arrests,
- indictments,
- adjudications of guilt,
- pleas of guilty or nolo contendere,
- assessments of probation, pretrial diversions or community supervision/deferred adjudications for any criminal offenses, or
- dismissals, acquittals or similar final outcomes that do not involve pleas of guilty or nolo contendere.

Employees must self-report by submitting form HR0202A, Criminal Offense Self-

App. 202   TX-0306
7/18/2017

Reporting for Employees, to their supervisor. The supervisor submits the form to the Human Resources Office via e-mail at hhshraction@hhsc.state.tx.us or fax to 512-424-4900.

Upon employment, employees must read, sign, and submit form HR0202, Notice of Criminal Offense Reporting Requirement for Employees, to their supervisor. The supervisor submits the form to the HHS Human Resources Records Unit.

Employees' failure to report subsequent convictions for criminal offenses considered bars to employment will result in disciplinary action up to and including dismissal.

Employees' failure to report the following events should be assessed on a case-by-case basis and may result in disciplinary action up to and including dismissal:

- subsequent arrests or indictments for criminal offenses that are considered bars to employment; or
- subsequent convictions, arrests, indictments, or deferred adjudications for criminal offenses that are not considered bars to employment.

The agency's assessment of appropriate disciplinary action, if any, must include consideration of:

- the specific duties of the employee's position;
- the nature and seriousness of the offense;
- the relationship between the specific duties of the employee's position and the nature and seriousness of the offense; and
- whether the employee failed to self-report an arrest versus a conviction, indictment, or deferred adjudication.

The agency may consider additional factors relevant to the event in making a determination about continued employment.

DFPS employees should review the agency's operating procedures for additional information.

### Self-Reporting and Emergency Leave

(Added 11/21/08, 11/12/12 revised 5/1/17)

An agency may place an employee on emergency leave for a maximum of ten working days if he or she is in a position that requires self-reporting, and either:

- the employee submits form HR0202A, Criminal Offense Self-Reporting for Employees; or
- a criminal background check reveals a pending arrest or indictment.

The supervisor obtains approval for the emergency leave from the designated

App. 203    TX_0303
7/18/2017

approval authority and records the leave on the employee's time sheet.

If the employee has not obtained a dismissal, acquittal, or similar outcome to the arrest or indictment (that does not involve a plea of guilty or nolo contendere) after being placed on emergency leave for ten working days, the employee must use applicable accrued paid leave. When paid leave is exhausted, the employee is placed on unpaid leave. For more information on unpaid leave, see Chapter 5, Work Leave (P. Unpaid Leave).

DFPS employees should review the agency's operating procedures for additional information.

## Self-Reporting and Disposition of Arrest or Indictment

(Added 11/21/08)

An employee who has self-reported an arrest or indictment is responsible for notifying the supervisor of the final outcome. This notification must occur within five calendar days of a dismissal, acquittal or similar outcome that does not involve a plea of guilty or nolo contendere. The employee must provide the supervisor with a certified copy of the outcome. If the employee has been reassigned or removed from the workplace, he or she may then return to the employee's position.

If the employee fails to provide the supervisor with the certified copy of the outcome within the five calendar days, or is convicted of the offense, the agency will take appropriate action.

DFPS employees should review the agency's operating procedures for additional information.

## Criminal Background Check Information Is Confidential

(Revised 8/1/05, 12/3/07, 11/21/08)

Criminal background check information obtained from the Department of Public Safety (DPS) secure database or other confidential service may not be released or disclosed to others, except:

- by court order,
- with the consent of the person who is the subject of the criminal background check, or
- to persons authorized by DPS.

## Destruction of Criminal Background Information

(Revised 11/21/08)

Agencies must collect and destroy criminal background information that relates to a

person immediately after the agency makes an employment decision or takes any personnel action relating to the person who is the subject of the criminal background check.

## Conducting Name and Fingerprint Checks

(Added 11/21/08, revised 8/3/09, 11/12/12, 3/14/14, 6/13/14)

Criminal background checks are conducted for certain positions as follows:

| The ... | Is responsible for ... |
|---|---|
| service center staffing specialist | • initiating a criminal background check on a selected applicant by entering the applicant's name and date of birth into a designated Department of Public Safety (DPS) secure website; and<br><br>• notifying the agency Job Requisition Coordinator or agency Hiring Specialist so that they can initiate a fingerprint check on a selected applicant:<br><br>   ○ for a position in the DFPS CPS Conservatorship (CVS) and Foster and Adoptive Home (FAD) programs, DSHS State Hospitals, DADS State Supported Living Centers and the DSHS Rio Grande State Center and HHSC employees who would be placed in direct contact with residents or clients at DADS State Supported Living Centers or the DSHS Rio Grande State Center, or<br><br>   ○ who has resided outside of Texas at any time during the last two years (**DFPS only**). |
| HHS human resources office | • retrieving name check results (and fingerprint check results, if applicable) from the DPS secure website;<br><br>• notifying the service center staffing specialist of whether or not the check results indicate any criminal convictions that constitute a bar to employment; consulting with the hiring authority when the check results indicate a criminal conviction that may constitute a contraindication for employment. For more information on the process for determining whether a conviction is a contraindication, see Chapter 2, Employment Testing (C. Criminal Background Check and Registry Clearance; Criminal Offenses that Constitute a Contraindication for Employment); and<br><br>• initiating a criminal background check on a management-directed transfer. |

DFPS employees should review the agency's operating procedures for additional information.

App. 205    TX 0309
7/18/2017

# Attachment 23

# Appendix A

# Criminal Background Check and Registry Clearance

(Revised 5/1/04, 9/30/04, 9/4/07, 12/3/07, 11/21/08, 8/3/09, 10/16/13, 3/14/14, 6/13/14)

This appendix lists criminal background checks and Nurse Aide and Employee Misconduct registry clearance checks allowed for and mandated by law.

| Agency | Legal Requirements |
|--------|--------------------|
| DSHS | • *For prospective and current employees of MH Hospitals. As authorized by Texas Government Code, §411.1103; Texas Health and Safety Code, Chapter 250; and Texas Administrative Code, Title 25, Part 1, Chapter 414, Subchapter K, §§414.504-414.506:*<br><br>Each facility, local authority, community center, and provider must conduct:<br>  o a pre-employment criminal history and registry clearance of all applicants (as defined) for employment; and<br>  o a pre-assignment criminal history and registry clearance of all applicants for volunteer status.<br><br>DSHS is entitled to obtain criminal history record information that is maintained by the Department of Public Safety, the Federal Bureau of Investigation, and any other criminal justice agency in Texas that relates to a person who would be placed in direct contact with a patient at a state hospital and who is:<br>  o an applicant for employment at a state hospital;<br>  o an employee of a state hospital;<br>  o a person who contracts or may contract to provide goods or services to DSHS at a state hospital or an employee of or applicant for employment with that person;<br>  o a volunteer with a state hospital; or<br>  o an applicant for a volunteer position with a state hospital.<br><br>• *For prospective and current employees of the Rio Grande State Center.  As authorized by Texas Health and Safety Code, §555.021:*<br><br>DSHS shall obtain criminal history record information that is maintained by the Department of Public Safety or the Federal Bureau of Investigation relating to each employee, volunteer or applicant for a position that will place that individual in direct contact with a resident or client.<br><br>• *For prospective and current employees of the Texas Center for Infectious Disease, the South Texas Health Care System, the Bureau of Vital Statistics, and any component of DSHS that monitors violent predators, DSHS may obtain criminal history record information that is maintained by the Department of Public Safety, as authorized by Texas Government* |

| Agency | Legal Requirements |
|---|---|
| | Code, §411.110. In determining whether to hire or retain an employee based on criminal history record information, DSHS is prohibited from considering offenses for which points are assessed under Texas Transportation Code, §708.052. |
| DADS | • For prospective and current employees of State Supported Living Centers. As authorized by Texas Health and Safety Code, §533.007, Texas Health and Safety Code, §555.021; and Texas Administrative Code, Title 40, Part 1, Chapter 4, Subchapter K, §§4.504-4.506: <br><br> Each facility, local authority, community center, and provider must conduct: <br> ○ a pre-employment criminal history and registry clearance of all applicants (as defined) for employment; and <br> ○ a pre-assignment criminal history and registry clearance of all applicants for volunteer status. <br><br> DADS shall obtain criminal history record information that is maintained by the Department of Public Safety or the Federal Bureau of Investigation relating to each employee at a state supported living center who is or will be placed in direct contact with a resident or client. <br><br> • For prospective and current employees of the Guardianship program who are or will be providing guardianship services. As authorized by Texas Government Code, §411.114 (a)(2)(D); Texas Government Code, §411.114 (a)(2)(H); Texas Government Code, §441.1386 (a-1)(1); and Texas Probate Code, §698 (a-1)(1): <br><br> DADS shall obtain criminal history record information that is maintained by the Department of Public Safety or the Federal Bureau of Investigation identification division relating to each individual who is or will be providing guardianship services to a ward of the department, including an employee of or an applicant selected for an employment position with DADS; <br><br> • For prospective and current employees of the Guardianship program, without regard to duties, DADS may obtain criminal history record information that is maintained by the Department of Public Safety, as authorized by Texas Government Code, §411.114 (a)(3)(H); and Texas Government Code, §411.114 (a)(3)(K). |

| Agency | Legal Requirements |
|---|---|
| DARS | *As authorized by Texas Government Code, §411.0985; Texas Government Code, §411.1131; Texas Government Code, §411.1142; Texas Government Code, §411.117; Texas Human Resources Code §91.0165; Texas Human Resources Code, §111.058; and Texas Human Resources Code, §111.0581:*<br><br>DARS is entitled to obtain criminal history record information that relates to a person who is:<br><br>• an applicant for rehabilitation services of the DARS;<br>• a client of the DARS;<br>• a volunteer with the DARS;<br>• an applicant for employment whose potential duties include direct contact with clients of the DARS;<br>• in any position within the Division for Disability Determination Services; and<br>• in any position within the Division for Blind Services. |
| DFPS | *As authorized by Texas Government Code, §411.114:*<br><br>DFPS shall obtain criminal history record information that relates to a person who is:<br><br>• an applicant for a license, registration, certification, or listing under Chapter 42, Human Resources Code, or Chapter 249, Health and Safety Code, or a person who registers with or has been issued a certificate to operate under accreditation by the DFPS under Subchapter E, Chapter 42, Human Resources Code;<br>• an owner, operator, or employee of or an applicant for employment by a child-care facility, child-placing agency, family home, or maternity home licensed, registered, certified, or listed under Chapter 42, Human Resources Code, or Chapter 249, Health and Safety Code, or by a child-care facility or child-placing agency that is seeking to register with or has been issued a certificate to operate under accreditation by the DFPS under Subchapter E, Chapter 42, Human Resources Code;<br>• a person 14 years of age or older who will be regularly or frequently working or staying in a child-care facility, family home, or maternity home while children are being provided care, other than a child in the care of the home or facility;<br>• an applicant selected for a position with the DFPS, the duties of which include direct delivery of protective services to children, elderly persons, or persons with a disability;<br>• an employee of, an applicant for employment with, or a volunteer or an applicant volunteer with a business entity or person that contracts with the DFPS to provide direct delivery of protective services to children, elderly persons, or persons with a disability, if the person's duties or responsibilities include direct contact with children, elderly persons, or persons with a disability;<br>• a registered volunteer with the DFPS;<br>• a person providing or applying to provide in-home, adoptive, or foster care for children in the care of the DFPS and other persons living in the residence in which the child will reside; |

- a DFPS employee who is engaged in the direct delivery of protective services to children, elderly persons, or persons with a disability;
- a person who is the subject of a report the DFPS receives alleging that the person has abused, neglected, or exploited a child, an elderly person, or a person with a disability, provided that:
  - o the report alleges the person has engaged in conduct that meets the statutory definition of abuse, neglect, or exploitation under Chapter 261, Family Code, or Chapter 48, Human Resources Code; and
  - o the person who is the subject of the report is not also the victim of the alleged conduct;
- a person providing child care for a child who is in the care of the DFPS and who is or will be receiving adoptive, foster, or in-home care;
- through a contract with a nonprofit management center, an employee of, an applicant for employment with, or a volunteer or an applicant volunteer with a nonprofit, tax-exempt organization that provides any service that involves the care of or access to children, elderly persons, or persons with a disability; or
- a child-care administrator seeking accreditation as provided by Section 43.003, Human Resources Code.

DFPS is entitled to obtain from the Texas Department of Public Safety criminal history record information that relates to a person who is:

- a volunteer or applicant volunteer with a local affiliate in this state of Big Brothers/Big Sisters of America;
- a volunteer or applicant volunteer with the "I Have a Dream/Houston" program;
- a volunteer or applicant volunteer with an organization that provides court-appointed special advocates for abused or neglected children;
- a person providing, at the request of the child's parent, in-home care for a child who is the subject of a report alleging the child has been abused or neglected;
- a volunteer or applicant volunteer with a Texas chapter of the Make-a-Wish Foundation of America;
- a person providing, at the request of the child's parent, in-home care for a child only if the person gives written consent to the release and disclosure of the information;
- a child who is related to the caretaker, as determined under Section 42.002, Human Resources Code, and who resides in or is present in a child-care facility, family home, or maternity home, other than a child described by Subdivision (2)(C), or any other person who has unsupervised access to a child in the care of a child-care facility, family home, or maternity home;
- an applicant for a position with the DFPS, other than a position described by Subdivision (2)(D), regardless of the duties of the position;
- a volunteer or applicant volunteer with the DFPS, other than a registered volunteer, regardless of the duties to be performed;
- a person providing or applying to provide in-home, adoptive, or foster care for children to the extent necessary to comply with Subchapter B, Chapter 162, Family Code;
- a DFPS employee, other than an employee described by Subdivision (2)(H), regardless of the duties of the employee's position;

- a relative of a child in the care of the DFPS, to the extent necessary to comply with Section 162.007, Family Code;
- a person, other than the subject of a report described in Subdivision (2)(I), living in the residence in which the alleged victim of the report resides;
- a contractor or an employee of a contractor who delivers services to a ward of the DFPS under a contract with the estate of the ward; or
- a person who seeks unsupervised visits with a ward of the DFPS, including a relative of the ward.

*For prospective and current employees in the CPS Conservatorship (CVS) and Foster and Adoptive Home (FAD) programs.  As authorized by Texas Human Resources Code, §42.056:*

DFPS shall obtain criminal history record information that is maintained by the Department of Public Safety and the Federal Bureau of Investigation for all residential child-care facility-based professional staff and all licensed child-placing administrators.

| | |
|---|---|
| HHSC | *For prospective and current employees who would be placed in direct contact with residents or clients at DADS State Supported Living Centers or the DSHS Rio Grande State Center. Texas Health and Safety Code, §555.021 and Texas Government Code, §411.1144:*<br><br>HHSC shall perform a state and federal criminal history background check on a person who would be placed in direct contact with a resident or client if that person is:<br><br>   • an applicant for employment with the agency;<br>   • an employee of the agency;<br>   • a volunteer with the agency;<br>   • an applicant for a volunteer position with the agency;<br>   • an applicant for a contract with the agency; or<br>   • a contractor of the agency.<br><br>A person described above is required to submit fingerprints in a form and of a quality acceptable to the Department of Public Safety and the Federal Bureau of Investigation for use in conducting a criminal history background check. |

# Attachment 24

# Appendix B

# Bars to Employment

(Revised 5/1/04, 9/30/04, 1/18/06, 9/15/06, 11/20/06, 9/4/07, 11/21/08, 8/3/09, 9/1/10, 9/1/11, 2/7/14, 6/13/14)

This appendix lists all the agency specific bars to employment.

| Agency | Bars to Employment |
|---|---|
| DSHS (MH Hospitals) | As authorized by Texas Health & Safety Code, §250.006, and Texas Administrative Code, Title 25, Part 1, Chapter 414, Subchapter K, §414.504: |
| | A "conviction" is the adjudication of guilt, plea of guilty or nolo contendere, or the assessment of probation or community supervision for a violation of the Penal Code. **Note:** An offense listed below is not considered a conviction if the applicant: |
| | • is placed on deferred adjudication community supervision, <br> • successfully completes the period of deferred adjudication community supervision, and <br> • receives a dismissal and discharge in accordance with Section 5(c), Article 42.12, Code of Criminal Procedure. |
| | Convictions for: <br> • Criminal homicide <br> • Deadly conduct <br> • Terroristic threat <br> • Kidnapping and unlawful restraint <br> • Injury to a child, elderly individual, or disabled individual <br> • Exploitation of a child, elderly individual, or disabled individual <br> • Indecency with a child <br> • Continuous sexual abuse of a young child or children <br> • Sale or purchase of a child <br> • Abandoning or endangering a child <br> • Agreement to abduct from custody <br> • Indecent exposure <br> • Online solicitation of a minor <br> • Improper photography or visual recording <br> • Improper relationship between educator and student <br> • Aggravated assault <br> • Sexual assault <br> • Aggravated sexual assault <br> • Arson <br> • Robbery <br> • Aggravated robbery <br> • Aiding suicide <br> • Cruelty to livestock and non-livestock animals <br> • Medicaid fraud <br> • Obstruction or retaliation <br> • Money laundering <br> • A conviction under the laws of another state, federal law, or the Uniform Code of Military Justice for an offense containing elements that are substantially similar to the elements of an offense listed above <br> • A Class A misdemeanor or felony conviction for Assault that occurred |

| Agency | Bars to Employment |
|---|---|
| | within the previous five years<br>• A conviction for burglary that occurred within the previous five years<br>• A felony conviction for theft that occurred within the previous five years<br>• A Class A misdemeanor or felony conviction for misapplication of fiduciary property or property of a financial institution that occurred within the previous five years<br>• A Class A misdemeanor or felony conviction for securing execution of a document by deception that occurred within the previous five years<br>• A conviction for false identification as peace officer that occurred within the previous five years<br>• A conviction for disorderly conduct associated with the display or discharge of a firearm in a public place that occurred within the previous five years |
| DADS (State Supported Living Centers) | A "conviction" is the adjudication of guilt, plea of guilty or nolo contendere, or the assessment of probation or community supervision for a violation of the Penal Code.<br><br>Convictions for:<br>• Criminal homicide<br>• Deadly conduct<br>• Terroristic threat<br>• Kidnapping and unlawful restraint<br>• Injury to a child, elderly individual, or disabled individual<br>• Exploitation of a child, elderly individual, or disabled individual<br>• Indecency with a child<br>• Continuous sexual abuse of a young child or children<br>• Sale or purchase of a child<br>• Sexual performance by a child<br>• Possession or promotion of child pornography<br>• Abandoning or endangering a child<br>• Agreement to abduct from custody<br>• Indecent exposure<br>• Online solicitation of a minor<br>• Improper photography or visual recording<br>• Improper relationship between educator and student<br>• A Class A misdemeanor or felony conviction for assault that occurred within the previous five years<br>• Aggravated assault<br>• Sexual assault<br>• Aggravated sexual assault<br>• Compelling prostitution<br>• Promoting prostitution<br>• Aggravated promotion of prostitution<br>• Arson<br>• A felony conviction for theft that occurred within the previous five years<br>• A conviction for burglary that occurred within the previous five years<br>• Robbery<br>• Aggravated robbery<br>• A conviction for false identification as peace officer that occurred within the previous five years<br>• Aiding suicide<br>• Cruelty to livestock and non-livestock animals<br>• A conviction for disorderly conduct associated with the display or |

| Agency | Bars to Employment |
|---|---|
| | discharge of a firearm in a public place that occurred within the previous five years |
| | • Medicaid fraud |
| | • Obstruction or retaliation |
| | • Money laundering |
| | • A Class A misdemeanor or felony conviction for securing execution of a document by deception that occurred within the previous five years |
| | • A Class A misdemeanor or felony conviction for misapplication of fiduciary property or property of a financial institution that occurred within the previous five years |
| | • A felony conviction under the Texas Controlled Substances Act (Health & Safety Code Chapter 481) involving manufacture, delivery, intent to distribute, conspiracy to possess or produce with intent to distribute, distribution to a minor, illegal expenditure or investment, or transfer or receipt of chemical laboratory apparatus |
| | • Criminal attempt of any offense listed as a bar above. Note: If a five year bar, the attempt is only a bar for five years |
| | • A conviction under the laws of another state, federal law, or the Uniform Code of Military Justice for an offense containing elements that are substantially similar to the elements of an offense listed above |
| DFPS | A "conviction" is the adjudication of guilt, plea of guilty or nolo contendere, or the assessment of probation or community supervision for a violation of the Penal Code. For all employees, convictions for: |
| | • Criminal homicide |
| | • Murder |
| | • Capital murder |
| | • Manslaughter |
| | • Criminally negligent homicide |
| | • Kidnapping |
| | • Aggravated kidnapping |
| | • Trafficking of persons |
| | • Indecency with a child |
| | • Continuous sexual abuse of a young child or children |
| | • Improper relationship between educator and student |
| | • Sexual assault |
| | • Aggravated assault |
| | • Aggravated sexual assault |
| | • Injury to a child, elderly individual or disabled Individual |
| | • Abandoning or endangering child |
| | • Deadly conduct |
| | • A felony conviction for terroristic threat |
| | • Prohibited sexual conduct (incest) |
| | • Sale or purchase of child |
| | • Intoxication manslaughter |
| | • Sexual performance by a child |
| | • Employment harmful to children |
| | • Possession or promotion of child porn |
| | • Arson |
| | • Robbery |
| | • Aggravated robbery |
| | • Compelling prostitution |
| | • Online solicitation of a minor |

App. 215   TX 0319

| Agency | Bars to Employment |
|--------|--------------------|
| | • Impersonating a public servant |
| | • Failure to stop or report aggravated sexual assault of a child |
| | • Harassment by persons in certain correctional facilities; harassment of a public servant |
| | • Tampering with a consumer product |
| | In addition to the conviction for all employees, the following convictions are bars to employment for employees with "direct access" (those who are reasonably likely in the course of their employment to make intentional physical contact with a DFPS client; communicate directly in any manner with a DFPS client; obtain physical access to the home or living quarters of a DFPS client; and/or obtain or access any confidential or sensitive data or information): |
| | • Unlawful restraint |
| | • A conviction for indecent exposure that occurred within the previous five years |
| | • Improper photography or visual recording |
| | • A Class A misdemeanor or felony conviction for assault that occurred within the previous five years |
| | • A conviction for coercing, soliciting or inducing gang membership that occurred within the previous five years |
| | • Aiding suicide |
| | • Agreement to abduct from custody |
| | • Enticing a child |
| | • A conviction for intoxication assault that occurred within the previous five years |
| | • Promotion of prostitution |
| | • Aggravated promotion of prostitution |
| | • Sale, distribution or display of harmful material to a minor |
| | • A misdemeanor conviction for terroristic threat that occurred within the previous five years |
| | • A conviction for burglary that occurred within the previous five years |
| | • A felony conviction for theft that occurred within the previous five years |
| | • A Class A misdemeanor or felony conviction for misapplication of fiduciary property that occurred within the previous five years |
| | • A Class A misdemeanor or felony conviction for securing execution of a document by deception that occurred within the previous five years |
| | • A conviction for Medicaid fraud that occurred within the previous five years |
| | • Money laundering |
| | • A conviction for delivery of a controlled substance or marijuana to a child that occurred within the previous five years |
| | • A conviction for disorderly conduct associated with the display or discharge of a firearm in a public place that occurred within the previous five years |
| | • Cruelty to animals |
| | • A conviction for false identification as peace officer that occurred within the previous five years |
| DARS | *As authorized by Texas Administrative Code, Title 40, Chapter 101, Subchapter A:* <br><br> A felony criminal conviction which has been determined by the Commissioner |

| Agency | Bars to Employment |
|---|---|
| | or Assistant Commissioner to make the applicant unfit or unsafe to perform the functions of the job.<br><br>(**Note:** A "conviction" is the adjudication of guilt, plea of guilty or nolo contendere, or the assessment of probation or community supervision for a violation of the Penal Code.) |
| HHSC (Employees Placed in Direct Contact with Residents or Clients at DADS State Supported Living Centers or the DSHS Rio Grande State Center) | A "conviction" is the adjudication of guilt, plea of guilty or nolo contendere, or the assessment of probation or community supervision for a violation of the Penal Code.<br><br>Convictions for:<br>• Criminal homicide<br>• Deadly conduct<br>• Terroristic threat<br>• Kidnapping and unlawful restraint<br>• Injury to a child, elderly individual, or disabled individual<br>• Exploitation of a child, elderly individual, or disabled individual<br>• Indecency with a child<br>• Continuous sexual abuse of a young child or children<br>• Sale or purchase of a child<br>• Sexual performance by a child<br>• Possession or promotion of child pornography<br>• Abandoning or endangering a child<br>• Agreement to abduct from custody<br>• Indecent exposure<br>• Online solicitation of a minor<br>• Improper photography or visual recording<br>• Improper relationship between educator and student<br>• A Class A misdemeanor or felony conviction for assault that occurred within the previous five years<br>• Aggravated assault<br>• Sexual assault<br>• Aggravated sexual assault<br>• Compelling prostitution<br>• Promoting prostitution<br>• Aggravated promotion of prostitution<br>• Arson<br>• A felony conviction for theft that occurred within the previous five years<br>• A conviction for burglary that occurred within the previous five years<br>• Robbery<br>• Aggravated robbery<br>• A conviction for false identification as peace officer that occurred within the previous five years<br>• Aiding suicide<br>• Cruelty to livestock and non-livestock animals<br>• A conviction for disorderly conduct associated with the display or discharge of a firearm in a public place that occurred within the previous five years<br>• Medicaid fraud<br>• Obstruction or retaliation<br>• Money laundering<br>• A Class A misdemeanor or felony conviction for securing execution of a document by deception that occurred within the previous five years |

| Agency | Bars to Employment |
|--------|--------------------|
| | <ul><li>A Class A misdemeanor or felony conviction for misapplication of fiduciary property or property of a financial institution that occurred within the previous five years</li><li>A felony conviction under the Texas Controlled Substances Act (Health & Safety Code Chapter 481) involving manufacture, delivery, intent to distribute, conspiracy to possess or produce with intent to distribute, distribution to a minor, illegal expenditure or investment, or transfer or receipt of chemical laboratory apparatus</li><li>Criminal attempt of any offense listed as a bar above. Note: If a five year bar, the attempt is only a bar for five years</li><li>A conviction under the laws of another state, federal law, or the Uniform Code of Military Justice for an offense containing elements that are substantially similar to the elements of an offense listed above</li></ul> |

# Attachment 25

Case 5:13-cv-00255-C    Document 97    Filed 09/14/17    Page 33 of 170    PageID 1950

## Operational Handbook

Revision: 17-1
Effective: January 11, 2017

### Part E — Section 19000
### Criminal History Checks: Guidelines for Employment

By statute, the Department of Aging and Disability Services (DADS) is required to conduct state and federal criminal history pre-employment checks on Regulatory Services, Trust Fund Monitoring, Quality Monitoring/Quality Service Review applicants and employees, and state supported living center (SSLC) applicants, volunteers and contractors, as well as annual criminal history checks on current SSLC employees, volunteers and contractors. Criminal history record information (CHRI) obtained from the Texas Department of Public Safety (DPS) secure database or other confidential service may not be released or disclosed, except by court order with the consent of the person who is the subject of the criminal history check or persons authorized by DPS.

A DPS User Acknowledgement must be completed by the employee and approved by DPS before an employee can access, retrieve or review CHRI. A DPS Entity Agreement must be completed by an employee who supervises other employees who access, retrieve or review CHRI. "Access" is defined as physical access: the ability to receive, view or discuss the criminal history record information regardless of retrieval method from DPS.

DADS program applicants, employees and volunteers must submit fingerprints in a form and of a quality acceptable to DPS and the Federal Bureau of Investigation (FBI) for use in conducting a criminal history background check. DPS and FBI may reject fingerprint images due to poor images of the ridge detail on the fingers. Poor fingerprint detail may be caused by age, trade or some other environmental/physical condition.

DPS requires re-imaging up to four additional times prior to conducting a statewide name-based criminal history background check. FBI requires two rejections through its system before conducting a federal name-based criminal history background check; however, DPS will not submit the rejected fingerprint record to the FBI for a federal name-based criminal history background check before five attempts of re-imaging.

Once the individual has completed the required number of re-imaging attempts, the DPS and FBI will conduct a name-based criminal history background check through both systems. This process can take up to several weeks before receiving criminal history information. The FBI searches its criminal history records using name and date of birth, as well as additional aliases to search records. The DPS and FBI consider a name-based search in these circumstances as final and equal to an actual fingerprint image criminal history check.

Regulatory Services, Trust Fund Monitoring, Quality Monitoring/Quality Service Review and SSLC management should use the criminal history guidelines below to determine what action to take on applicants/new hires, volunteers or employees who have offenses reported from criminal history checks.

With the exception of absolute bars to employment all criminal history offenses should be reviewed individually and a determination made as to whether the offense may be a contraindication to employment. DADS management can deny employment or the right to volunteer to persons previously convicted of certain criminal offenses if program management determines:

- there is a direct relationship between the offense and the employment or volunteer position sought; or
- the employment or volunteer position would involve an unreasonable risk to the safety or welfare of clients, individuals or employees.

App. 220    TX/032/2017

DADS programs may not hire an applicant for employment, or accept as a volunteer, and may discharge an employee or volunteer who has been convicted of a criminal offense that constitutes a bar to employment (see below).

## Criminal History Guidelines

**Note:** Time frames reflect the period since the conviction date, not the arrest date.

### Absolute Bar to Employment

### Texas Penal Code

- **Chapter 19** – Criminal homicide: includes murder, capital murder, manslaughter or criminally negligent homicide
- **Chapter 20** – Kidnapping and unlawful restraint
- **§21.02** – Continuous sexual abuse of young child or children
- **§21.08** – Indecent exposure
- **§21.11** – Indecency with a child
- **§21.12** – Improper relationship between educator and student
- **§21.15** – Improper photography or visual recording
- **§22.01** – Assault: Class A misdemeanor or felony conviction that occurred within the previous five years*
- **§22.011** – Assault, sexual
- **§22.02** – Assault, aggravated
- **§22.021** – Assault, aggravated sexual
- **§22.04** – Injury to a child, elderly individual or disabled individual
- **§22.041** – Abandoning or endangering a child
- **§22.05** – Deadly conduct
- **§22.07** – Terroristic threat
- **§22.08** – Aiding suicide
- **§25.031** – Agreement to abduct from custody
- **§25.08** – Sale or purchase of a child
- **§28.02** – Arson
- **§29.02** – Robbery
- **§29.03** – Robbery, aggravated
- **Chapter 30.02** – Burglary: a conviction that occurred within the previous five years*
- **Chapter 31** – Theft: a conviction that is punishable as a felony that occurred within the previous five years*
- **§32.45** – Misapplication of fiduciary property or property of a financial institution: a Class A misdemeanor or felony conviction that occurred within the previous five years*
- **§32.46** – Securing execution of a document by deception: a Class A misdemeanor or felony conviction that occurred within the previous five years*
- **§32.53** – Penal Code (exploitation of a child, elderly individual, or disabled individual)
- **§33.021** – Online solicitation of a minor
- **§34.02** – Money laundering
- **§35A.02** – Medicaid fraud

App. 221    TX/0323/2017

- **§36.06** – Obstruction or retaliation
- **§37.12** – False identification as a peace officer: a conviction that occurred within the previous five years\*
- **§42.01(a) (7), (8) or (9)** – Disorderly conduct associated with the discharge or display of a firearm in a public place: a conviction that occurred within the previous five years\*
- **§42.09 or §42.092** – Cruelty to livestock animals or non-livestock animals.

Bars Pursuant to Health and Safety Code §533.007

### Texas Health and Safety Code

- **Chapter 481** – Texas Controlled Substances Act: a conviction that occurred on or after Sept. 1, 1989, is punishable as a felony (involving manufacture, delivery, intent to distribute, conspiracy to possess or produce with intent to distribute, distribution to a minor, illegal expenditure or investment, or transfer or receipt of chemical laboratory apparatus).

### Texas Penal Code

- **§15.01** – Criminal attempt of any offense listed as a bar (\*If a five year bar, the attempt is only a bar for five years)
- **§25.11** – Continuous Violence Against the Family
- **§43.03** – Promotion of prostitution
- **§43.04** – Aggravated promotion of prostitution
- **§43.05** – Compelling prostitution
- **§43.25** – Sexual performance by a child
- **§43.26** – Possession or promotion of child pornography
- A conviction under the laws of another state, federal law or the Uniform Code of Military Justice for an offense containing elements that are substantially similar to the elements of an offense listed above.

### Legend

(\*) Bar to employment dependent on the date of conviction.

### E-19100 Failure to Self-Report

Revision 17-1; Effective January 11, 2017

Per Health and Human Services (HHS) policy, employees in positions requiring criminal history checks are required to self-report by submitting Form HR0202A, Criminal Offense Self-Reporting for Employees, to their supervisor within five calendar days of any:

- arrests;
- indictments;
- adjudications of guilt;
- pleas of guilty or nolo contendere;
- assessments of probation, pretrial diversions or community supervision/deferred adjudications for any criminal offenses; or
- dismissals, acquittals or similar final outcomes that do not involve pleas of guilty or nolo contendere.

An employee's failure to report any of the above events is considered a serious offense and warrants appropriate action.

The following applies to probationary employees who fail to self-report criminal history:

| Unreported Offense | Disciplinary Action |
|---|---|
| Any Offense | Dismissal |

The following applies to non-probationary/regular status employees and must be followed to ensure consistent treatment across state supported living centers (SSLCs):

| Unreported Offense | Probable Disciplinary Action |
|---|---|
| Bar to Employment | Dismissal |
| Felony Offense | Dismissal or Written Warning |
| Class A Misdemeanor | Dismissal or Written Warning |
| Class B Misdemeanor | Written Warning |
| Class C Misdemeanor | Counseling or Written Warning |

Consider the following factors when selecting the appropriate performance and conduct management or disciplinary action:

- the specific duties of the employee's position;
- the nature and seriousness of the offense;
- the relationship between the specific duties of the employee's position and the nature and seriousness of the offense;
- whether the employee failed to self-report an arrest versus a conviction, indictment or deferred adjudication;
- whether the employee previously failed to report criminal history; and
- employee's disciplinary history.

**Note:** An exception to this policy **must** be requested from the SSLC director of operations by the facility director.

# Attachment 26

Criminal Background Checks for DFPS Applicants and Employees
Page 1 of 4
Case 5:13-cv-00255-C    Document 97    Filed 09/14/17    Page 38 of 170    PageID 1955



## Criminal Background Checks for DFPS Applicants and Employees

| Policy Number | HR-1113 |
|---|---|
| Original Effective Date | October 20, 2008 |
| Most Recent Revision | November 1, 2010 |
| Reviewed and Certified as Up to Date | November 4, 2014 |
| Next Review Date | November 4, 2016 |
| Subject Matter Expert (SME) | John Adamo |
| Approved by | Terri Ware, Chief Operating Officer |

1.0     Purpose

This policy establishes the DFPS requirement to review criminal background history for all applicants and employees and sets out criteria by which applicants and employees will be evaluated for employment risk.

2.0     Policy

2.1 Applicants -- Criminal Background Checks

Applicants who are offered positions with DFPS must be checked for prior criminal history through the Department of Public Safety database. Applicants who reveal that they have not continuously lived in Texas during the two years before applying for DFPS positions must complete FBI fingerprint background checks.

2.2 Employees -- Criminal Background Checks

DFPS completes annual criminal background checks on all current employees. DFPS may conduct a criminal background check on any employee at any time that the department deems appropriate.

2.3 Bars to Employment

Certain offenses are regarded as bars to employment at DFPS. Some offenses are a bar to employment for all positions, while others are a bar for designated positions with direct access to clients.

An offense constitutes a bar if the applicant or employee has been convicted of, pleaded guilty to (whether or not convicted), pleaded *nolo contendere* (no contest) to, admitted to, or otherwise had any judgment or order rendered against himself or herself (whether by default or otherwise) that is related to any offense offenses that constitute a

**App. 225**   TX 0329
7/18/2017

bar listed in the chart *(http://www.dfps.state.tx.us/Handbooks/CBCU/Files/CBCU_px_3000-1.asp#CBCU_apx3000_1)* of offenses that constitute a bar to DFPS employment.

## 2.4 Contraindications to Employment

All criminal offenses that do not constitute a bar to employment are considered a contraindication to employment.

*Likely* contraindications are offenses that, while not constituting an absolute bar, are weighted more heavily against employment with DFPS because of the severity of the offense and the risk that such past behavior may pose to DFPS clients, employees, or property. However, these offenses will be reviewed for frequency of occurrence and any mitigating circumstances, such as the length of time since the arrest or conviction and the absence of criminal activity since the last occurrence.

All criminal offenses not classified as a bar or a likely contraindicator are considered *possible* contraindicators that may adversely impact an applicant's or an employee's eligibility to work at DFPS, depending on the nature of the offense and the duties of the position.

## 2.5 Consideration of DPS and DFPS Records

Criminal history records and DFPS history records for a given applicant or employee may contain information that would not constitute a bar or contraindication if considered separately, but may constitute a problematic pattern when considered together.

## 2.6 Self-Reporting Requirement

Employees must immediately (within five work days) report to their supervisor any arrest, indictment, adjudication of guilt, guilty or no contest plea, assessment of probation, pretrial diversion or community supervision, or deferred adjudication for any criminal offense.

To report an offense, an employee completes form HR0202A *(http://legacy-hhscx.hhsc.state.tx.us/hr/HRM/HR_Forms/hr0202A.dot)* 📝 Criminal Offense Self-Reporting for Employees and sends it by e-mail to:

- his or her supervisor; and
- the Human Resources Office of the Health and Human Services Commission (HHSC) at hhshraction@hhsc.state.tx.us *(mailto:hhshraction@hhsc.state.tx.us)*.

## 2.7 Consequences of an Arrest or Criminal Offense

A DFPS employee who self-reports an arrest or criminal offense or whose criminal background check reveals an arrest or offense not previously disclosed may, depending on the circumstances, remain in his or her position or be placed on emergency leave, transferred, demoted, or dismissed.

Once informed about the arrest or criminal offense, the employee's supervisor must consult with the employee relations staff of the HHSC Human Resources Office, as well as with staff from the DFPS Legal Division.

## 2.8 Consequences of an Absolute Bar

If an employee's records reveal a conviction (or the equivalent, as noted above) for an offense classified as a bar for all staff, the employee is dismissed from employment.

If the offense is classified as a bar for only the position in which the employee currently works, as noted in the chart in 2.3 Bars to Employment (above), the employee is removed from the position. Depending on the circumstances, the employee is then either dismissed or is transferred into another position for which the offense is not a bar.

## 2.9 Consequences of a Contraindicator

If an employee's records reveal a conviction (or the equivalent, as noted above) for an offense classified as either a *likely* or *possible* contraindicator, the employee is evaluated on a case-by-case basis and may be retained, transferred, demoted, or dismissed, depending on the circumstances.

Case 5:13-cv-00255-C    Document 97    Filed 09/14/17    Page 40 of 170    PageID 1957

Factors considered include:

- whether the employee immediately reported the arrest;
- the specific duties of the employee's current position;
- the relationship between the specific duties of the position and the nature and seriousness of the offense;
- the length of time between the arrest and the employment decision;
- the length of time between the conviction or its equivalent and the employment decision; and
- whether the employee has been convicted of more than one criminal offense.

DFPS may also consider other factors relevant to a particular position.

3.0     Definitions

3.1 Criminal History

A report of past arrests, prosecutions, plea arrangements, findings or admissions of guilt, sentencing, and punishment that pertains to a DFPS employee or applicant and is obtained from the Texas Department of Public Safety, the FBI, or the court records of any government jurisdiction with law enforcement authority.

3.2 DFPS History

Records that pertain to a DFPS employee or applicant and are obtained using the IMPACT case management system.

4.0     Persons Affected

This policy applies to all DFPS employees and applicants.

5.0     Responsibilities

All DFPS employees must comply with this policy. Employees and managers have special roles and responsibilities as described in 6.0 Compliance Procedures.

6.0     Compliance Procedures

6.1 Employees

Upon employment, DFPS employees must read and sign HR0202 *(http://legacy-hhscx.hhsc.state.tx.us/hr/HRM/HR_Forms/hr0202.dot)* W Notice of Criminal Offense Reporting Requirement for Employees to acknowledge that they understand the self-reporting requirement.

Upon arrest or other adverse involvement in a criminal matter, an employee must immediately (within five work days) report to his or her supervisor any arrest, indictment, adjudication of guilt, guilty or no contest plea, assessment of probation, pretrial diversion, community supervision or deferred adjudication for any criminal offense by:

- HR0202A *(http://legacy-hhscx.hhsc.state.tx.us/hr/HRM/HR_Forms/hr0202A.dot)* W Criminal Offense Self-Reporting for Employees; and
- sending it by e-mail to his or her supervisor and the HHSC Human Resources Office at hhshraction@hhsc.state.tx.us *(mailto:hhshraction@hhsc.state.tx.us)* .

6.2 Supervisors

DFPS supervisors must ensure that direct-report employees read and sign HR0202 *(http://legacy-hhscx.hhsc.state.tx.us/hr/HRM/HR_Forms/hr0202.dot)* W Notice of Criminal Offense Reporting Requirement for Employees to acknowledge that they understand the self-reporting requirement.

Upon discovering that a direct-report employee has been arrested or otherwise become adversely involved in a criminal matter, as described in 6.1 Employees, a supervisor:

- immediately informs his or her next-level supervisor;
- consults with staff from the HHSC Human Resources Office and DFPS Legal Division; and

**App. 227** TX 0331
7/18/2017

Case 5:13-cv-00255-C    Document 97    Filed 09/14/17    Page 41 of 170    PageID 1958

- proceeds with appropriate corrective or disciplinary measures, following consultation with human resources and legal staff.

7.0    Revision History

| Date Posted | Action | Section |
|---|---|---|
| 11/1/2010 | Revised the list of offenses that bar an applicant or employee from DFPS employment. | 2.3 Bars to Employment (See *Absolute Bar to DFPS Employment* in the chart of Texas Penal Code Offenses.) |
| 10/20/2008 | New policy | |

# Attachment 27

Texas Penal Code, Title 5, Offenses Against the Person

| Code Offenses | Texas Penal Code | Absolute Bar to DFPS Employment | Contraindication to DFPS Employment Likely | Contraindication to DFPS Employment Possible |
|---|---|---|---|---|
| Criminal Homicide | 19 | All Staff | | |
| Murder | 19.02 | All Staff | | |
| Capital Murder | 19.03 | All Staff | | |
| Manslaughter | 19.04 | All Staff | | |
| Unlawful Restraint | 20.02 | Staff with Direct Access 4 | Staff with No Direct Access 4 | |
| Kidnapping | 20.03 | All Staff | | |
| Aggravated Kidnapping | 20.04 | All Staff | | |
| Unlawful Transport | 20.05 | All Staff | | |
| Trafficking of Persons | 20A.02 | All Staff | | |
| Continuous Sexual Abuse of Young Child or Children | 21.02 | All Staff | | |
| Public Lewdness | 21.07 | | All staff | |
| Indecent Exposure | 21.08 | Staff with Direct Access if conviction occurred less than 5 years ago 4 | Staff with Direct Access if conviction occurred more than 5 years ago 4 | |

| | | | | |
|---|---|---|---|---|
| | | | Staff with No Direct Access 4 | |
| Indecency with a Child | 21.11 | All Staff | | |
| Improper relationship between educator & student | 21.12 | All Staff | | |
| Invasive Visual Recording(improper photography or visual recording) | 21.15 | Staff with Direct Access 4 | Staff with No Direct Access 4 | |
| Assault (Class A or above) | 22.01 | Staff with Direct Access if conviction occurred less than 5 years ago 4 | Staff with Direct Access if conviction occurred more than 5 years ago 4<br><br>Staff with No Direct Access 4 | |
| Assault (Class B or C) | 22.01(2) | | | |
| Sexual Assault | 22.011 | All Staff | | |
| Aggravated Assault | 22.02 | All Staff | | |
| Aggravated Sexual Assault | 22.021 | All Staff | | |
| Injury to a child, elderly individual or disabled individual | 22.04 | All Staff | | |
| Abandoning or endangering child | 22.041 | All Staff | | |

**App. 231**  TX 0335

| Deadly Conduct | 22.05 | All Staff | | |
|---|---|---|---|---|
| Terroristic Threat (felony) | 22.07 | All Staff | | |
| Terroristic Threat (misdemeanor) | 22.07 | Staff with Direct Access if conviction occurred less than 5 years ago 4 | Staff with Direct Access if conviction occurred more than 5 years ago 4<br><br>Staff with No Direct Access 4 | |
| Aiding Suicide | 22.08 | Staff with Direct Access 4 | Staff with No Direct Access 4 | |
| Tampering with a consumer product | 22.09 | All Staff | | |
| Leaving child in a vehicle | 22.10 | | All Staff | |
| Harassment by persons in certain correctional facilities; harassment of a public servant | 22.11 | All Staff | | |

Texas Penal Code, Title 6, Chapter 25, Offenses Against the Family

| Code Offenses | Texas Penal Code | Absolute Bar to DFPS Employment | Contraindication to DFPS Employment Likely | Contraindication to DFPS Employment Possible |
|---|---|---|---|---|
| Bigamy | 25.01 | | All Staff | |
| Prohibited sexual conduct (incest) | 25.02 | All Staff | | |

| Interference with child custody | 25.03 | | All Staff | |
| Agreement to abduct from custody | 25.031 | Staff with Direct Access 4 | Staff with No Direct Access 4 | |
| Enticing a child | 25.04 | Staff with Direct Access 4 | Staff with No Direct Access 4 | |
| Criminal Nonsupport | 25.05 | | All Staff | |
| Harboring a runaway child | 25.06 | | All staff | |
| Violation of certain court orders or conditions of bond in a family violence case (Felony) | 25.07 | All Staff | | |
| Violation of certain court orders or conditions of bond in a family violence case (Misdemeanor) | 25.07 | | All Staff | |
| Violation of protective orders | 25.071 | | All staff | |
| Sale or purchase of child | 25.08 | All Staff | | |

App. 233    TX 0337

| | | | | |
|---|---|---|---|---|
| Advertising for placement of child | 25.09 | | Staff with Direct Access 4 | Staff with No Direct Access 4 |
| Interference with rights of a guardian | 25.10 | | Staff with Direct Access 4 | Staff with No Direct Access 4 |
| Continuous violence against the family (Felony) | 25.11 | All Staff | | |

Texas Penal Code, Title 7, Offenses Against Property

| Code Offenses | Code Number | Absolute Bar to DFPS Employment | Contraindication to DFPS Employment Likely | Contraindication to DFPS Employment Possible |
|---|---|---|---|---|
| Arson | 28.02 | All Staff | | |
| Criminal mischief (Felony) | 28.03 | | All staff | |
| Criminal mischief (Misdemeanor) | 28.03 | | | All staff |
| Graffiti (Felony) | 28.08 | | All staff | |
| Graffiti (Misdemeanor) | 28.08 | | | All Staff |
| Robbery | 29.02 | All staff | | |
| Aggravated robbery | 29.03 | All staff | | |
| Burglary | 30.02 | Staff with Direct Access if conviction occurred | Staff with Direct Access if conviction occurred more than 5 years ago 4 | |

App. 234   TX 0338

| | | | | |
|---|---|---|---|---|
| | | less than 5 years ago 4 | Staff with No Direct Access 4 | |
| Criminal Trespass | 30.05 | | | All Staff |
| Theft (Felony) | 31.03 | Staff with Direct Access if conviction occurred less than 5 years ago 4 | Staff with Direct Access if conviction occurred more than 5 years ago 4<br><br>Staff with No Direct Access 4 | |
| Theft (Misdemeanor) | 31.03 | | | All Staff |
| Theft of Service | 31.04 | Staff with Direct Access if conviction occurred less than 5 years ago 4 | Staff with Direct Access if conviction occurred more than 5 years ago 4<br>Staff with No Direct Access 4 | Staff with Direct Access if conviction occurred more than 5 years ago 4<br>Staff with No Direct Access 4 |
| Theft of Trade Secrets | 31.05 | Staff with Direct Access if conviction occurred less than 5 years ago 4 | | |
| Tampering with Identification Numbers | 31.11 | | | All Staff |

| | | | | |
|---|---|---|---|---|
| Theft of or Tampering with Multichannel Video or Information Services | 31.12 | | | All Staff |
| Manufacture, Distribution, or Advertisement of Multichannel Video or Information Services Device | 31.13 | | | All Staff |
| Sale or Lease of Multichannel Video or Information Service Device | 31.14 | | | All Staff |
| Possession, Manufacture, or Distribution of Certain Instruments Used to Commit Retail Theft | 31.15 | | | All Staff |
| Organized Retail Theft | 31.16 | Staff with Direct Access if conviction occurred less than 5 years ago 4 | Staff with Direct Access if conviction occurred more than 5 years ago 4<br><br>Staff with No Direct Access 4 | |
| Unauthorized Acquisition or Transfer of Certain Financial Information | 31.17 | | | All Staff |
| Cargo Theft | 31.18 | Staff with Direct Access if | Staff with Direct Access if conviction | |

| | | | | |
|---|---|---|---|---|
| | | conviction occurred less than 5 years ago 4 | occurred more than 5 years ago 4<br><br>Staff with No Direct Access 4 | |
| Unauthorized Use of a Vehicle | 31.07 | | All Staff if conviction occurred less than 10 years ago | |
| Forgery | 32.21 | Staff with Direct Access if conviction occurred less than 5 years ago 4 | Staff with Direct Access if conviction occurred more than 5 years ago 4<br><br>Staff with No Direct Access 4 | |
| Credit Card Abuse (Felony) | 32.31 | Staff with Direct Access if conviction occurred less than 5 years ago 4 | Staff with Direct Access if conviction occurred more than 5 years ago 4<br>Staff with No Direct Access 4 | |
| False statement to obtain property or credit or in the provision of services Felony or Class A Misdemeanor | 32.32 | Staff with Direct Access if conviction occurred less than 5 years ago 4 | Staff with Direct Access if conviction occurred more than 5 years ago 4<br><br>Staff with No Direct Access 4 | |

**App. 237**

| | | | | |
|---|---|---|---|---|
| False statement to obtain property or credit or in the provision of services Class B or C Misdemeanor | 32.32 | | | All Staff |
| Misapplication of fiduciary property (Class A Misdemeanor or above) | 32.45 | Staff with Direct Access if conviction occurred less than 5 years ago 4 | Staff with Direct Access if conviction occurred more than 5 years ago 4<br><br>Staff with No Direct Access 4 | |
| Misapplication of fiduciary property (Class B or C Misdemeanor) | 32.45 | | | All staff |
| Securing execution of a document by deception (Class A Misdemeanor or above) | 32.46 | Staff with Direct Access if conviction occurred less than 5 years ago 4 | Staff with Direct Access if conviction occurred more than 5 years ago 4<br><br>Staff with No Direct Access 4 | |
| Securing execution of a document by deception (Class B or C Misdemeanor ) | 32.46 | | | All staff |
| Fraudulent use or possession of identifying information | 32.51 | Staff with Direct Access if conviction | Staff with Direct Access if conviction occurred more | |

| | | | | |
|---|---|---|---|---|
| | | occurred less than 5 years ago 4 | than 5 years ago 4<br><br>Staff with No Direct Access 4 | |
| Breach of computer security | 33.02 | | All staff | |
| Online solicitation of a minor | 33.021 | All Staff | | |
| Telecommunications crimes | 33A | | | All staff |
| Money Laundering | 34.02 | Staff with Direct Access 4 | Staff with No Direct Access 4 | |
| Medicaid or Welfare Fraud | 35A.02 | Staff with Direct Access if conviction occurred less than 5 years ago 4 | Staff with Direct Access if conviction occurred more than 5 years ago 4<br><br>Staff with No Direct Access 4 | |

Texas Penal Code, Title 8, Offenses Against Public Administration

| Code Offenses | Code Number | Absolute Bar to DFPS Employment | Contraindication to DFPS Employment Likely | Contraindication to DFPS Employment Possible |
|---|---|---|---|---|
| Tampering with a witness (Felony) | 36.05 | | Staff with Direct Access if conviction occurred less | |

App. 239  TX 0343

|  |  |  | than10 years ago 4<br><br>Staff with No Direct Access 4 |  |
|---|---|---|---|---|
| False report to peace officer or law enforcement officer | 37.08 |  | Staff with Direct Access if conviction occurred less than 5 years ago | With older convictions and for non-direct delivery staff |
| Tampering with governmental record | 37.10 | All staff if conviction occurred less than 5 years ago | Staff with No Direct Access4 | With older convictions |
| Impersonating a public servant | 37.11 | All staff |  |  |
| False identification as peace officer | 37.12 | Staff with Direct Access if conviction occurred less than 5 years ago 4 | Staff with Direct Access if conviction occurred more than 5 years ago 4<br><br>Staff with No Direct Access 4 |  |
| Failure to identify/giving false or fictitious information to a peace officer | 38.02(b) |  | For Class A Misdemeanor, all staff if conviction occurred less than 5 years ago | All Staff Class B & C Misdemeanors |
| Resisting arrest, search, | 38.03 | All Staff |  |  |

| | | | | |
|---|---|---|---|---|
| or transportation (Felony) | | | | |
| Resisting arrest, search, or transportation (Misdemeanor) | 38.03 | | | All Staff |
| Evading arrest or detention (Felony) | 38.04 | All Staff | | |
| Evading arrest or detention (Misdemeanor) | 38.04 | | | All Staff |
| Hindering apprehension or prosecution | 38.05 | | Staff with Direct Access if conviction occurred less than10 years ago 4 | Staff with Direct Access if conviction occurred more than 10 years ago 4

Staff with No Direct Access 4 |
| Bail Jumping and failure to appear | 38.10 | All Staff | | |
| Prohibited substances and items in adult or juvenile correctional or detention facility or on property of TDCJ or TYC | 38.11 | | All staff if conviction occurred less than10 years ago | |

| | | | | |
|---|---|---|---|---|
| Interference with public duties | 38.15 | | | All Staff |
| Failure to stop or report aggravated sexual assault of a child | 38.17 | All Staff | | |
| Official Oppression 3rd Degree Felony | 39.03 | All staff | | |
| Official Oppression Class A Misdemeanor | 39.03 | Staff with Direct Access if conviction occurred less than 5 years ago 4 | Staff with Direct Access if conviction occurred more than 5 years ago 4<br><br>Staff with No Direct Access 4 | |
| Violating the civil rights of a person in custody | 39.04(A)(2) | All Staff | | |

Texas Penal Code, Title 9, Offenses Against Public Order and Decency

| Code Offenses | Code Number | Absolute Bar to DFPS Employment | Contraindication to DFPS Employment Likely | Contraindication to DFPS Employment Possible |
|---|---|---|---|---|
| Disorderly conduct | 42.01 | | | All staff |
| Harassment | 42.07(a) | | | All Staff |

**App. 242**   TX 0346

| | | | | |
|---|---|---|---|---|
| Stalking | 42.072 | Staff with Direct Access 4 | Staff with No Direct Access 4 | |
| Cruelty to nonlivestock animals (cruelty to animals) | 42.092 | Staff with Direct Access 4 | Staff with No Direct Access 4 | |
| Disorderly conduct with display of firearm | 42.01(7) or(8) | Staff with Direct Access if conviction occurred less than 5 years ago 4 | Staff with Direct Access if conviction occurred more than 5 years ago 4<br><br>Staff with No Direct Access 4 | |
| Prostitution | 43.02 | | All staff | |
| Promotion of prostitution | 43.03 | Staff with Direct Access 4 | Staff with No Direct Access 4 | |
| Aggravated promotion of prostitution | 43.04 | Staff with Direct Access 4 | Staff with No Direct Access 4 | |
| Compelling prostitution | 43.05 | All Staff | | |
| Obscenity (Felony) | 43.23 | | All staff | |
| Obscenity (Misdemeanor) | 43.23 | | | All staff |
| Sale, distribution or Display of | 43.24 | Staff with Direct Access 4 | Staff with No Direct Access 4 | |

**App. 243**  TX 0347

| | | | |
|---|---|---|---|
| harmful material to a minor | | | |
| Sexual performance by a child | 43.25 | All staff | |
| Employment harmful to children | 43.251 | All staff | |
| Possession or promotion of child porn | 43.26 | All staff | |

Texas Penal Code, Title 10, Offenses Against Public Health, Safety, and Morals

| Code Offenses | Code Number | Absolute Bar to DFPS Employment | Contraindication to DFPS Employment Likely | Contraindication to DFPS Employment Possible |
|---|---|---|---|---|
| Unlawfully carrying a weapon | 46.02 | | | All Staff |
| Making a firearm accessible to a child | 46.13 | | Staff with Direct Access 4 | Staff with No Direct Access 4 |
| Public intoxication | 49.02 | | | All Staff |
| Possession of alcoholic beverage in motor vehicle | 49.031 | | | All staff |
| Driving while intoxicated | 49.04 | | Staff with Direct Access if conviction occurred less | Staff with Direct Access if conviction occurred more |

**App. 244**   TX 0348

| | | | than five years ago4 | than 5 years ago 4 |
| | | | | |
| | | | | Staff with No Direct Access 4 |
| Driving while intoxicated with child passenger | 49.045 | | All Staff | |
| Flying while intoxicated | 49.05 | | | All Staff |
| Boating while intoxicated | 49.06 | | | All Staff |
| Assembling or operating amusement ride while intoxicated | 49.065 | | | All Staff |
| Intoxication assault | 49.07 | Staff with Direct Access if conviction occurred less than 5 years ago 4 | Staff with Direct Access if conviction occurred more than 5 years ago 4  Staff with No Direct Access 4 | |
| Intoxication manslaughter | 49.08 | All Staff | | All Staff |

Texas Penal Code, Title 11, Organized Crime

| Code Offenses | Code Number | Absolute Bar to DFPS Employment | Contraindication to DFPS | Contraindication to DFPS |
| --- | --- | --- | --- | --- |

| | | | Employment Likely | Employment Possible |
|---|---|---|---|---|
| Engaging in organized criminal activity (Felony or Misdemeanor) | 71.02 | All Staff | | |
| Coercing, soliciting or inducing gang membership | 71.022 | Staff with Direct Access if conviction occurred less than 5 years ago 4 | Staff with Direct Access if conviction occurred more than 5 years ago 4<br><br>Staff with No Direct Access 4 | |

**App. 246**  TX 0350

# Attachment 28

Case 5:13-cv-00255-C   Document 97   Filed 09/14/17   Page 61 of 170   PageID 1978

Vernon's Texas Statutes and Codes Annotated
    Health and Safety Code (Refs & Annos)
        Title 7. Mental Health and Intellectual Disability
            Subtitle A. Services for Persons with Mental Illness or an Intellectual Disability
                Chapter 533. Powers and Duties of Department of State Health Services
                    Subchapter A. General Powers and Duties

V.T.C.A., Health & Safety Code § 533.007

§ 533.007. Use of Criminal History Record Information

Effective: April 2, 2015

Currentness

(a) Subject to the requirements of Chapter 250, the department, in relation to services provided under this title, or a local mental health authority or community center, may deny employment or volunteer status to an applicant if:

(1) the department, authority, or community center determines that the applicant's criminal history record information indicates that the person is not qualified or suitable; or

(2) the applicant fails to provide a complete set of fingerprints if the department establishes that method of obtaining criminal history record information.

(b) The executive commissioner shall adopt rules relating to the use of information obtained under this section, including rules that prohibit an adverse personnel action based on arrest warrant or wanted persons information received by the department.

**Credits**
Added by Acts 1991, 72nd Leg., ch. 76, § 1, eff. Sept. 1, 1991. Amended by Acts 1993, 73rd Leg., ch. 107, § 6.02, eff. Aug. 30, 1993; Acts 1993, 73rd Leg., ch. 790, § 46(26), eff. Sept. 1, 1993; Acts 1999, 76th Leg., ch. 1209, § 4, eff. Sept. 1, 1999; Acts 2015, 84th Leg., ch. 1 (S.B. 219), § 3.1335, eff. April 2, 2015.

V. T. C. A., Health & Safety Code § 533.007, TX HEALTH & S § 533.007
Current through Chapters effective immediately through Chapter 49 of the 2017 Regular Session of the 85th Legislature

---

End of Document                                    © 20 7 Thomson Reuters. No c a m to or g na  U.S. Government Works.

---

# Attachment 29



The GLO's intent is to ensure that persons employed by the agency do not engage in criminal behavior incompatible with their anticipated duties or the mission of the agency. To that end, the GLO will obtain and review criminal conviction information pertaining to applicants who are offered employment with the agency. Offers of employment with the agency are contingent upon the results of the criminal conviction records check.

## NOTIFICATION AND USE OF RECORDS

Included on all job postings is a notification that a criminal conviction records check is required of applicants selected for a position. All applicants who are interviewed for a position must complete the **Criminal Conviction Records Check Authorization form** (downloadable from the Forms page on the GLO Intranet at http://myglo.glo.texas.gov ) acknowledging and agreeing that the agency will perform a criminal conviction records check in connection with the selected candidate's application for employment. The hiring packet from Human Resources will contain the blank forms and the hiring supervisor (interviewer) will insure the forms are signed by all interviewed applicants. Human Resources will make sure the signed forms are part of the hiring packet before signing the new hire PAF.

Any criminal conviction records obtained may be used only for the purpose of evaluating a selected applicant for employment. Evidence of a criminal conviction obtained from the criminal records check does not automatically disqualify an individual from employment. The GLO will determine, on a case-by-case basis, whether the individual is qualified for employment. The following factors may be considered:

- The nature and seriousness of the convictions;

- The specific duties of the position;

- The efforts by the individual for rehabilitation;

- The accuracy of the information on the individual's employment application;

- The relationship of the type of conviction to the person's anticipated duties;

- The age of a conviction;

- Number of convictions; and/or

- Pattern of convictions

Before an applicant is disqualified for employment based on all or part of the results of the criminal conviction records check, HR will provide the applicant:

- A copy of the criminal conviction report upon which this decision is being made, and

- The "Summary of Your Rights under the Fair Credit Reporting Act" form

After an applicant is disqualified for employment based on all or part of the results of the criminal conviction records check, HR will provide the applicant:

- A statement declaring the applicant is not selected for the position;

- The name, address, and phone number of the reporting agency that supplied the report;

- A statement declaring the reporting agency that supplied the report did not make the decision to take the adverse action and cannot give specific reasons for it; and

- A notice of the individual's right to dispute the accuracy or completeness of any information the agency furnished, and his or her right to an additional free consumer report from the agency upon request within 60 days

## OTHER USE OF CRIMINAL CONVICTION RECORDS

The basic policies and procedures set out above will be followed if a criminal conviction records check is needed for evaluating persons applying with the GLO for a volunteer position or for evaluating job-related issues regarding current GLO employees

### VLB Veterans Homes & Cemeteries Records Checks

The GLO checks criminal conviction records, the state's Nurse Aide Registry, and the state's Employee Misconduct Registry to verify that individuals selected for hire in the VLB Veterans Homes & Cemeteries program do not have prohibited convictions or findings. Criminal conviction records checks are conducted for VLB Veterans Homes & Cemeteries employees every four years. Registry checks are conducted annually.

If any GLO employee, volunteer, or contract worker needs to have direct contact with a Texas State Veterans' Home resident, that person (or the GLO employee responsible for overseeing that person's work) must first contact GLO Human Resources.

## RECORDS MAINTENANCE

The Deputy Commissioner of Human Resources is responsible for securing and


maintaining criminal conviction records information obtained under this procedure. The Deputy Director of Human Resources may request information from a public records collection service, or from a court or law enforcement agency, including a police department, sheriff's department, a state department of public safety or department of corrections.

The criminal conviction information request, the information provided in response to a request and the decisions made as a result of the receipt of such information, shall be treated confidentially.

Any conviction data received by the GLO shall be for the exclusive use of the GLO in evaluating an individual for employment, shall be privileged and confidential and shall not be released or otherwise disclosed to any person or agency, subject only to any requirements of the Texas Public Information Act or as required by court order. After a selection decision has been made for a position, any criminal conviction information relating to the applications for the position will be destroyed.



## OBJECTIVE

The GLO is committed to hiring qualified individuals to fill positions to fulfill the overall strategic success of the GLO mission and goals. Each employee is hired to make significant contributions to the GLO. In hiring the most qualified candidates for positions, the following hiring process should be followed:

## HIRING PROCESS AND PROCEDURES

### Posting documents to submit to Human Resources

The posting process is initiated when the hiring manager emails the following completed forms to HR. All forms may be found on the GLO intranet at https://myglo.glo.texas.gov/resources/forms/index.html

- Posting Requisition Form (PRF)

- Position Description (PD)

- Interview Questions and any Tests or Writing Samples that will be used as part of the interview process.

## JOB POSTINGS

All regular, externally posted job openings are posted on the GLO intranet and internet and on the Work in Texas website at www.workintexas.com. Jobs are posted for a minimum of 10 business days, and may remain open after that time until the position is filled.

## INTERNAL POSTINGS

The hiring manger may work with HR to designate a job posting as internal only, meaning only GLO employees may apply. Internal jobs are posted for a minimum of 5 business days.

Recruitment advertising

Positions are advertised externally based on need and budget requirements. HR is responsible for placing all recruitment advertising.

## APPLICATION PROCESS

The GLO accepts applications for external postings only through Work in Texas at www.workintexas.com. Hiring managers will be granted access to Work in Texas to view applications. Please contact HR for help with Work in Texas.

For internally posted positions only, employees may submit emailed or hand-delivered State of Texas applications to HR.

Veterans' Liaison

The GLO's veterans' liaison is available to assist veterans with the application process.

## SCREENING AND INTERVIEW PROCESS

All applicants for a posted vacancy are considered on the basis of their qualifications and ability to perform the job successfully. HR initially screens applications for minimum qualifications and provides the hiring manager with a list of applicants who meet the minimum qualifications for the position. The hiring manager, with input from HR, determines the interview pool based on secondary screening of applicants for the position's preferred qualifications. The hiring manager schedules and conducts interviews. Upon the hiring manager's request, an HR representative may attend interviews.

Every interviewed applicant is asked the same set of interview questions. The hiring manager and all other interviewers shall be consistent in the method used to rate/score applicants. Every interviewed applicant must complete a Criminal Background Check Authorization form during the interview.

Internal candidates who are not selected will be notified by the hiring manager.

## CRIMINAL BACKGROUND CHECKS

GLO conducts a criminal background check on all prospective new hires, interns, and volunteers. Applicants must give the GLO permission to conduct a background check by completing a Criminal Background Check Authorization form. See the Criminal Conviction Records Check policy in the Employee Handbook for more information.

## VETERAN'S PREFERENCE

The State's goal is to employ a number of veterans equal to at least 20% of the total number of employees. The following individuals qualify for a veteran's employment preference:

- A veteran, including a veteran with a disability;

- A veteran's surviving spouse who has not remarried; and

- An orphan of a veteran if the veteran was killed while on active duty.

An individual who qualifies for veteran's employment preference is entitled to a preference in employment over other applicants who do not have a greater qualification. The veteran's preference also applies to a reduction in workforce involving other employees of a similar type or classification.



The State is required to provide a veteran's employment preference in the following order of priority:

1. A veteran with a disability;

2. A veteran;

3. A veteran's surviving spouse who has not remarried; and

4. An orphan of a veteran if the veteran was killed while on active duty.

An individual entitled to a veteran's employment preference is entitled to have additional points added to any employment test scores.

The State is required to interview at least one individual qualified for a veteran's preference if the interview pool is six applicants or less. If the interview pool is more than six applicants, the State is required to select an interview pool in which at least 20% of the candidates qualify for a veteran's preference. If a veteran is selected for hire, the hiring supervisor must contact HR.

## FORMER FOSTER CHILD PREFERENCE

There is an employment preference in most cases for former foster children who:

- Were under the permanent managing conservatorship of the Department of Family and Protective Services on the day preceding their 18th birthday; and

- Are 25 years of age or younger.

This preference entitles the former foster child to a preference in employment over other applicants for the same position who do not have a greater qualification. If a former foster child is selected for hire, the hiring supervisor must contact HR.

Employment of Aliens

An individual who is not a United States citizen is protected under the provisions of federal law and Texas Labor Code. It is unlawful for an employer to discriminate on the basis of citizenship or "intending citizen" status.

To ensure compliance with federal law that prohibits an employer from knowingly hiring an alien not authorized to work in this country, a federal Form I-9 must be completed within three business days of an employee's hire. If this is not completed as required, the



~~person's employment shall be terminated immediately. The Form I-9 cannot be completed~~ until after the person has been offered and accepted the job.

The GLO uses E-Verify to confirm work authorization. The GLO will not sponsor any person for work authorization.


# SELECTING A CANDIDATE

## Reference Checks

After a decision is made to hire a candidate, a hiring manager must conduct reference checks. HR recommends contacting prior employers going back 10 years.


## Job Offer Documents to Submit to HR

To initiate the job offer process, hiring managers must email to HR a "hire packet" containing the following documents. All forms may be found on the GLO intranet at https://myglo.glo.texas.gov/resources/forms/index.html

- Personnel Action Form (PAF)

- Posting Selection Form (PSF)

- Criminal Background Check Authorization form

- Reference checks

- Interview notes


HR will verify that the candidate meets the minimum qualifications for the position and will perform the appropriate criminal background check. It may take up to four days for HR to receive the criminal background check results. During that time, the hire packet can be routed to Budget and Executive Administration for their review and approval.

If a background check indicates a criminal conviction, HR will consult with the hiring manager and Executive Administration about how to proceed.

When HR receives a hire packet with all necessary approvals, HR will send an email to the hiring manager to notify him/her the job offer has been approved. At this point, a hiring manager may notify the candidate to extend a formal offer.


## Job Offers and Letters

The hiring manager shall notify HR if a position is accepted or declined. Upon acceptance,



HR will notify the hiring manager to complete a Network Access Request Form ("NARF"). HR will also send the new hire an official offer letter, which gives specific information about position, title, compensation, start date, parking, New Hire Orientation (NHO), and what documents to bring to NHO.

**New Hire Orientation (NHO)**

All new employees are required to attend NHO. NHO is typically scheduled twice a month, on the 1st and 15th. NHO begins promptly at 8:00 a.m. and ends at approximately 2:30 p.m. New field employees receive their own NHO in their respective field offices.

A Director considering for employment a past or present GLO employee is required to request reference information from the applicant's past or present GLO Supervisor(s). An internal request for reference information on past or present GLO employees may be made between Directors without referral to HR. In these instances, full disclosure of the employee's performance is expected. In addition, the requesting Director is entitled to any supporting documentation (e.g., performance evaluations, written disciplinary warnings, PAFs, etc.). Any questions by the requesting or receiving Director may be referred to HR.

## Background Checks

The GLO conducts a criminal background check on all prospective new hires, interns, and volunteers and offers of employment with the agency are contingent upon the results of the criminal conviction records check. See the Criminal Conviction Records Check policy for more information.

The GLO checks criminal conviction records, the state's Nurse Aide Registry, and the state's Employee Misconduct Registry to verify that individuals selected for hire in the VLB Veterans Homes & Cemeteries program do not have prohibited convictions or findings. For VLB employees, criminal conviction records checks are conducted every four years and registry checks are conducted annually. If any GLO employee, volunteer, or contract worker needs to have direct contact with a Texas State Veterans' Home resident, that person must first contact HR to ensure any required background checks have been completed.

The driving records of individuals selected for hire whose job duties will include driving on agency business will be reviewed before hire. Driving records for all employees whose job duties include driving on agency business will be reviewed annually. Any offer of employment or continued employment for these individuals is contingent upon having and maintaining a satisfactory driving record. The GLO does not release driver license information outside of our agency.

## Updating Personnel Files

Employees must inform Human Resources of any changes to the employee's name, home address, telephone number, and emergency contact information.

TEXAS GENERAL LAND OFFICE

# HUMAN RESOURCES

George P. Bush | Commissioner

**TXGLO**

## DISCLOSURE AND AUTHORIZATION FORM
## TO OBTAIN CONSUMER REPORTS FOR EMPLOYMENT PURPOSES

### *Please Read Carefully Before Signing the Authorization*

## DISCLOSURE

In considering you for employment and, if you are employed, in considering you for subsequent promotion, assignment, reassignment, retention, or discipline, **Texas General Land Office** ("the Agency") may request and rely upon one or more consumer reports or investigative consumer reports about you that we obtain from a consumer reporting agency, such as IntelliCorp Records, Inc.

IntelliCorp Records, Inc. can be contacted by mail at 3000 Auburn Dr, Suite 410; Beachwood, OH 44122; or phone: 1-888-946-8355; or website: www.intellicorp.net.

For explanation purposes:

- a "consumer report" is a written, oral or other communication of any information by a consumer reporting agency bearing on your credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in making an employment-related decision about you. Such information may include, for example, credit information, criminal history reports, or driving records; and

- an "investigative consumer report" is a consumer report in which information on your character, general reputation, personal characteristics, or mode of living is obtained through personal interviews with your prior employers, neighbors, friends, or associates, or with others who may have knowledge concerning any such items of information. In the event an investigative consumer report is requested about you, you are entitled to additional disclosures regarding the nature and scope of the investigation requested, as well as a written summary of your rights under the Fair Credit Reporting Act ("FCRA").

Under the FCRA, before the Agency can obtain a consumer report or investigative consumer report about you for employment purposes, we must have your written authorization. Before we take adverse action on the basis, in whole or in part, of information in that report, you will be provided a copy of that report, the name, address, and telephone number of the consumer reporting agency, and a summary of your rights under the FCRA.

**TEXAS GENERAL LAND OFFICE**

# HUMAN RESOURCES

George P. Bush | Commissioner

**BACKGROUND CHECK AUTHORIZATION**

I have read and understand the foregoing Disclosure, and authorize the **Texas General Land Office** to obtain and rely upon consumer reports or investigative consumer reports concerning me. By my signature below, I authorize the Company to obtain any such reports and to share the information received with any person involved in their decision about me.

I do ☐ do not ☐ authorize you to contact *my current* employer for Employment and Reference Verifications

(This will authorize immediate inquiries to the Human Resources Department and to any listed supervisors or references in the Employment/Reference Section of your application.)

I also agree that this Disclosure and Authorization in original, faxed, photocopied, or electronic (including electronically signed) form will be valid for any consumer reports or investigative consumer reports that may be requested about me by or on behalf of the Agency.

_____
Printed Name

_____      _____
Applicant Signature                                      Date

_____      _____
Parent or Legal Guardian Signature                Date
(for searches conducted on minors under
the age of 18)

Revised 05/12/2017

**App. 260**

TX 0367

TEXAS GENERAL LAND OFFICE
# HUMAN RESOURCES
George P. Bush | Commissioner

*Personal Data*

_____          _____          _____
Last Name                        First Name                       Middle Name


_____
Current Address


_____          _____
Date of Birth                    Other Names Used (including maiden name)


_____          _____          _____
Social Security Number           Driver's License #               State


_____
Email address (may be used for official correspondence)


I have the right to make a request to **IntelliCorp Records, Inc**, upon proper identification, to request the nature and substance of all information in its files on me at the time of my request, including sources of information, and the recipients of any reports on me which **IntelliCorp Records, Inc** has previously furnished within the two year period preceding my request.


_____          _____          _____
Printed Name                     Applicant Signature                      Date


Revised 05/12/2017

# App. 261

**TX 0368**

# Attachment 30





# BACKGROUND INVESTIGATION
## All FBI employees require clearance.

FBIjobs.gov > Background Investigation > FBI Employment Disqualifiers

**EMPLOYMENT DISQUALIFIERS**

There are specific elements that will automatically disqualify job candidates for employment
with the FBI. The FBI Employment Disqualifiers are:

* Conviction of a felony
* Use of illegal drugs in violation of the FBI Employment Drug Policy (see the **FBI Employment Drug Policy** for more details)
* Default of a student loan (insured by the U.S. Government)
* Failure of an FBI-administered urinalysis drug test
* Failure to register with the Selective Service System (for males only)

Please note that if you are disqualified by any of the above tests, you are not eligible for
employment with the FBI. All of these disqualifiers are extensively researched during the **FBI
Background Investigation Process**. Please make sure you can meet FBI employment
requirements and pass all disqualifiers before you apply for an FBI position.

---

**Accessibility** | **Privacy Policy** | **Site Map** | **Equal Opportunity** | **DOJ** | **DNI**
**FBIjobs.gov is an official site of the U.S. Federal Government, U.S. Department of Justice**

https://www.fbijobs.gov/51.asp

**App. 263**

1/1

# Attachment 31

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, 4 Fair Empl.Prac.Cas. (BNA)...

Case 5:13-cv-00255-C    Document 97    Filed 09/14/17    Page 78 of 170    PageID 1995

4 Fair Empl.Prac.Cas. (BNA) 849 (E.E.O.C.), EEOC Dec. No. 72-1497, EEOC Dec. P 6352, 1972 WL 4012

Decision No. 72-1497

March 29, 1972

<u>DECISION</u>

**\*1**  The Commission's Field Director issued his Findings of Fact on November 17, 1971. Exceptions have been filed by Respondent. Having reviewed the Findings, the exceptions and the entire record, the Commission reaches the following determination.

Charging Party was discharged from his machine operator position with Respondent primarily because he was convicted of, in Respondent's words, "a serious crime." The undisputed facts of Charging Party's conviction are as follows.

On the evening of August 26, 1968, upon their refusal to accept their three carry out food orders being placed in a single container, the Caucasian carry out waitress waiting on Charging Party and his two brothers told them, "you niggers will take it this way or I'll call the police." A police officer than arrived on the scene, threatened to shoot Charging Party and his companions, and, upon withdrawing his pistol from his holster, was disarmed by Charging Party. Charging Party and his two companions refused to deliver over the weapon to anyone other than the policeman's superior officer, which they did upon a superior officer's arrival on the scene. The following day, upon the complaint of the junior police officer, Charging Party and his companions were arrested and indicted for resisting an officer, assault and battery with intention to kill, and carrying a concealed weapon. Charging Party and his two companions pleaded guilty to resisting an officer. The other charges were dismissed. Each man received a three-year suspended sentence.

There is no claim or evidence that in adopting the policy of automatic discharge for conviction of a "serious crime" it was Respondent's intent to disadvantage Negroes; and it is undisputed that the policy has been applied to Respondent's Caucasian employees. Respondent states, and we credit, that its policy of discharging all employees convicted of serious crimes was adopted solely to protect "its image and maintain a safe working environment for its other employees." But, as the Supreme Court stated in Griggs v. Duke Power Co., 401 U.S. 424 (1971):

What is required by Congress is the removal of artificial, arbitrary and unnecessary barriers to employment when the barriers operate invidious to discriminate on the basis of race or other impermissible classification.....

Congress directed the thrust of the Act to the <u>consequences</u> of employment practices not simply the motivation. More than that, Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question.... (emphasis in original).

The
<u>Griggs</u>
decision recently received detailed analysis in
<u>Johnson</u>
v.
<u>Pike Corporation of America, Inc.</u>
,

F.Supp

(CD Cal. 9/29/71), 4 EPD 7517, where the court (Judge Ferguson) states, in relevant part:

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, 4 Fair.Empl.Prac.Cas. (BNA)...

Case 5:13-cv-00255-C    Document 97    Filed 09/14/17    Page 79 of 170    PageID 1996

Where the discrimination shown results, not from disparate treatment, but from the foreseeable effect of a policy neutral on its face, <u>Griggs</u>, indicates that under some circumstances the policy may be justified by a showing of "business necessity." Such a showing is an affirmative defense on which the defendant has the burden of proof.

**\*2**  The sole permissible reason for discriminating against actual or prospective employees involves the individual's capability to perform the job effectively. This approach leaves no room for arguments regarding inconvenience, annoyance or even expense to the employer.

. . .[I]t is submitted that the Court in <u>Griggs</u>, intended the [business necessity] definition therein outlined to be exclusive. The Court liberally construed Title VII in order to implement the congrssional directive that members of minority groups be insured equal opportunity in employment. All attempts to depart from this mandate must be carefully scrutinized. The Court has stated that the only permissible reason for tolerating discrimination is "business necessity" which is "related to job performance." The ability of the individual effectively and efficiently to carry out his assigned duties is, therefore, the only justification recognized by the law.

Since (1) a substantially disproportionate percentage of persons convicted of "serious crimes" are minority group persons [2] and (2) clearly it is arbitrary and therefore unnecessary [3] to treat all "serious" convictions as being equally predictive of future employability, without reference to the particular factors of a particular case, such as job-relatedness of the conviction and the employee's immediate past employment history, we hold that Respondent's policy of automatic discharge for any "serious" crime discriminates against Negroes as a class because of their race within the meaning of the Act; and since Respondent's General Superintendent, Personnel and Services, stated to the Commission representative that Charging Party's conviction did not affect his ability to perform we conclude that Charging Party is personally aggrieved by that unlawful policy. See, <u>Carter</u> v. <u>Gallagher,</u>   F.2d   (8th Cir. 1971), 3 EPD 8335 and <u>Gregory</u> v. <u>Litton Systems, Inc.,</u> 316 F.Supp 401 (DC Cal 1970).

<u>CONCLUSION</u>

There is reasonable cause to believe that Respondent has engaged, and continues to engage, in an unlawful employment policy in violation of Title VII of the Civil Rights Act of 1964 by maintaining a criminal conviction policy which discriminates against Negroes as a class, as represented by Charging Party, because of their race; and by discharging Charging Party pursuant to that policy. [4]

Footnotes

1    The issue presented in Pike, supra, was whether a policy of discharging employees for "excessive garnishments   discriminates against Negroes as a class within the meaning of Title VII. The court held that it did.

2    See, <u>Crime in the United States, Uniform Crime Reports 1969</u>. This is particularly true with respect to arrests, convictions, and incarcerations arising out of personal conflicts with local policemen. See <u>National Advisory Commission on Civil Disorders</u> ("Kerner Report  ), Bantan Ed., 1968, at p. 306; The <u>President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Police (1967)</u>, at P. 164.

3    of. <u>Robinson</u> v. <u>Lorillard Corp., 444 F.2d 791 (4th Cir. 1971).</u>

4    For the scope of class represented by Title VII complainants, and the appropriateness of back pay awards and other remedies under this Title, see <u>Phillips</u> v. <u>Lorrilard</u>, supra (at note 3) and <u>U.S.</u> v. <u>Central Motor Lines,</u>   F.Supp   (W.D. NC 12/23/71), 4 EPD par. 7624, at pgs. 5459 5461, and cases cited.

4 Fair Empl.Prac.Cas. (BNA) 849 (E.E.O.C.), EEOC Dec. No. 72-1497, EEOC Dec. P 6352, 1972 WL 4012

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Wor **App. 266**                      2

# Attachment 32

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, 8 Fair Empl.Prac.Cas. (BNA)...

Case 5:13-cv-00255-C    Document 97    Filed 09/14/17    Page 81 of 170    PageID 1998

8 Fair Empl.Prac.Cas. (BNA) 431 (E.E.O.C.), EEOC Dec. No. 74-89, EEOC Dec. P 6418, 1974 WL 3903

Decision No. 74-89

February 12, 1974

<u>DECISION</u>

**\*1**  The Commission has considered the District Director's Findings of Fact issued October 18, 1971, and has examined the entire record. Exceptions were filed by both parties. The Commission, adopts the Findings of Fact insofar as they are consistent with the following decision.

Charging Party alleges Respondent refused to hire him because of his conviction for failing to submit to military induction and that such failure was based upon his religious creed (Conscientious Objector) and race (Negro). Charging Party applied for employment with Respondent on August 31, 1970. Respondent refused to hire Charging Party. Respondent contends that it refused to hire Charging Party because it was unsure that Charging Party was bondable because of his conviction record. Respondent maintains a policy that a felony conviction is considered an adverse factor and would cause Respondent to select another applicant who was equally qualified.

The evidence substantiates the Findings of Fact which demonstrate that Charging Party was refused employment with Respondent, at least in part because of his conviction record, and that said conviction resulted from Charging Party's failure to report for military induction. Charging Party asserts that his conviction was precipitated by prejudice because of his race in that his draft board refused to classify him as a conscientious objector, after he had made known that his deeply held religious belief would not allow him to report for military induction.

Charging Party alleges that Respondent's refusal to hire him flows from the discriminatory act of his draft board, and therefore is a refusal to hire based on his religion.

The Commission finds that Respondent's employment policy tends to disqualify job applicants with conviction records, such as Charging Party, on the basis of such conviction records and therefore Charging Party's religion was apparently no consideration in Respondent's refusal to hire him. There is an absence of evidence to the contrary.

Charging Party also alleges that Respondent's refusal to hire him constituted discrimination based on his race (Negro). Respondent does not deny that Charging Party was refused employment due to his conviction record, but asserts that any person convicted of a felony will tend to be disqualified for employment. Respondent asserts that "A conviction of any felony involves moral turpitude in the sense that a felon has engaged in behavior which a state legislature or Congress... deems destructive enough to warrant severe penalties. Also,... failure to report for induction - has been held by a court to constitute conduct involving moral turpitude justifying disbarment of an attorney; the defendant Attorney claimed conscientious objection to war. In re Pontarelli, 66 N.E. 2nd 83, 393 Ill. 310 (1946)".

The Commission considers cases such as this on a case by case basis. In the instant case the evidence demonstrates the following disparity between the percentage of minorities living within political subdivisions and the percentage of minorities incarcerated in the official penal institutions maintained therein: [2]

| Political Unit | Percentage of Minorities in Total Population | Percentage of Minority Group Inmates of its Penal Institutions |
| --- | --- | --- |
| United States [3] | 12.5% | 28.5% |

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, 8 Fair.Empl.Prac.Cas. (BNA)...

Case 5:13-cv-00255-C    Document 97    Filed 09/14/17    Page 82 of 170    PageID 1999

| | | |
|---|---|---|
| State *** | 10.7% | 46.1% |
| City *** | 42% | 83% |

**\*2**  Apparent from the above percentages is the fact that minority group persons are disproportionately placed in penal institutions in the United States. In Gregory v. Litton Systems, Inc., F. Supp. 401 (1970), a similar survey was done and the Court held that an employer's policy of excluding from employment persons who have suffered a number of arrests had the foreseeable effect of denying black applicants an equal opportunity for employment and was unlawful under the Civil Rights Act of 1964 even if it appeared, on its face, to be racially neutral and, in its implementation, had not been applied discriminatorily or unfairly as between applicants of different races. Gregory, however, does not pertain to a felony conviction, as in the instant case. In Carter v. Gallagher, [4] the court states that an applicant may be disqualified from employment where it is shown that the offense for which he was convicted is manifestly inconsistent with the safe and efficient operation of the employer's business. Consequently, an employer is permitted to reject an otherwise qualified applicant if such applicant's conviction places Respondent on notice as to possible propensities in the applicant that would be dangerous to its business, e.g. Respondent Bank cannot be required to hire one who has been convicted of embezzlement. Charging Party's crime can not be so classified.

Record evidence demonstrates that Charging Party's conviction for failure to report for military induction was the only offense ever committed by him, and was in no way related to, or connected with, Respondent's business. The Court has repeatedly stressed that Congress' intention in Title VII was to invalidate all employment practices which in their final effect or consequence discriminate against racial minorities. Griggs v. Duke Power Co., 401 U.S. 424 (1971). Where the discrimination shown results, not from the disparate treatment, but from the foreseeable effect of a policy neutral on its face, Griggs indicates that under some circumstances the policy may be justified by a showing of business necessity. Griggs, supra. Respondent, however, shows no such business necessity. Where, however, a disparate impact is found the sole permissible reason for discriminating against actual or prospective employees involves the individual's capability to perform the job effectively, that is, the practice must be one which can be shown to be related to job performance or to measuring job capability. Griggs, supra. Respondent fails in both instances.

Accordingly, we conclude that Respondent's policy of refusing to hire Charging Party, based on a policy, which in this instance, is totally unrelated to Respondent's business and totally incapable of predicting job performance, is violative of Title VII.

There is reasonable cause to believe that Respondent violated Title VII of the Civil Rights Act of 1964, (amended by the Equal Employment Opportunity Act effective March 24, 1972) as alleged, by refusing to hire Charging Party because of his race on the basis of his conviction record.

**\*3**  There is not reasonable cause to believe that Respondent violated Title VII of the Civil Rights Act of 1964 (as amended by the Equal Employment Opportunity Act of 1972, effective March 24, 1972) as alleged, by refusing to hire Charging Party on the basis of his religion.

FIELD DIRECTOR'S FINDINGS OF FACT

SUMMARY OF CHARGE

Charging Party alleges that he was discriminated against by Respondent because of his religious creed (Conscientious Objector) and his race (Negro) when Respondent said that his conviction for failing to submit to military induction precluded his employment.

JURISDICTION

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, 8 Fair Empl.Prac.Cas. (BNA)...

Case 5:13-cv-00255-C    Document 97    Filed 09/14/17    Page 83 of 170    PageID 2000

Charging Party applied for employment with Respondent on August 31, 1970. He wrote Respondent a letter requesting an explanation as to why he wasn't employed on December 5, 1970. His charge was filed with the Commission on March 26, 1971 within the time limitations prescribed by Section 706 (d) of Title VII.

Respondent employs approximately 850 people and is engaged in central banking. It is an instrumentality of the United States but not an agency of the Federal Government.

SUMMARY OF CONTENTIONS AND EVIDENCE

1. Charging Party alleges that he applied for a night clerk's position with Respondent on Monday, August 31, 1970, in response to a newspaper ad the previous day. He alleges that when he informed the personnel interviewer that he was on parole, after serving 21 months of a five year sentence for failure to report for military induction, his application received no further consideration. He further alleges that three days later, when a man from the Urban League talked with a representative of Respondent's personnel office, he was told that his conviction precluded his employment by the Respondent. Charging Party alleges that Respondent has not answered his letter of December 5 requesting an explanation of its discriminatory hiring policy which would preclude his being hired following his incarceration as a "peace criminal". Charging Party further alleges that since Respondent has not denied his charge of discrimination, he can only assume that the basis for denying him employment was his offense, and possibly his race, since he thinks it is possible that more blacks are denied conscientious objector classification by either draft boards or judges. Charging Party alleges that his offense was nonviolent, not one where dishonesty is involved, and not one which would justify dismissing his application without consideration for his qualifications to do the job.

2. Respondent denies the charge. It asserts that the Charging Party was not selected that day because he was not considered to be among those who were best qualified. Its interviewer asserts that when she thinks an applicant is a good prospect for a job and there is a question as far as fidelity bond coverage is concerned, she immediately checks with her superiors; she did not do this in the Charging Party's case. Respondent further asserts that even if the Charging Party had been among those selected as being qualified, there is an unresolved legal question as to whether his conviction would disqualify him from coverage under the Bankers Blanket Bond. It asserts that everyone who works for it must be bonded, that the bonding company specifies conditions under which coverage of the bond is withdrawn, and that a record of dishonesty or moral turpitude would prevent a person from being bonded. It further asserts that regardless of whether a person could be bonded, a felony conviction would be a decided adverse factor which would cause it to select another applicant who was equally qualified for the particular job. It asserts that it does not presently have anyone working for it who has been convicted of a felony. It asserts that it has no knowledge as to whether it presently employs anyone with a conscientious objector draft status and that such status would be irrelevant to any of its considerations on employment.

 *4  3. Respondent is located in the central business district of a major city with a 42% black population. Approximately one-fourth of its employees are black. In April 1971, it submitted its Affirmative Action Program for Equal Employment Opportunity to the Board of Governors of the Federal Reserve System.Sometime after August 31, 1970, Respondent stopped asking questions about arrests in its interview and application form, substituting an inquiry into convictions.

4. Respondent interviewed 1,970 people for jobs in 1970 and hired 264 people. Two of the 1,970 applicants held a draft status indicating that they were conscientious objectors. Neither of these two men were hired.

5. Investigation revealed that Respondent has placed an ad for night clerks in the classified section of the Sunday August 30, 1970 edition of the *** under "male & female". It also revealed that there were four such positions to be filled. 41 people came to apply for these jobs on August 31, 39 of whom were interviewed. Respondent speculates that the two who were not interviewed left before their interview because of the number of other applicants in the waiting room. Of those who were interviewed, there is a high probability that the following is an accurate breakdown according to race and sex:

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, 8 Fair Empl.Prac.Cas. (BNA)...

Case 5:13-cv-00255-C    Document 97    Filed 09/14/17    Page 84 of 170    PageID 2001

| | |
|---|---|
| White males | 14 |
| Black males | 11 |
| Black females | 11 |
| White females | 3 |
| | 39 |

6. Respondent asserts that it looks for the following conducting an interview for a night clerical position:

A. Adequate intelligence.

B. Job stability.

C. Reliability.

D. Education and work background satisfactory for type of work ("not too qualified").

E. Satisfactory transportation for night job.

F. Family situation which would enable a person to perform a night job.

7. Of the 14 women interviewed only two were over 30 years of age. These two appear to have been given serious consideration for a job. One 35 year old black woman was the only one of the 39 interviewees to be tested for her clerical skills; she did poorly and was eliminated from consideration. A 48 year old black woman was hired.

8. In addition to the 48 year old woman, three men also were hired, beginning at $5,040 per year. The three men had the following things in common:

A. Each was 22 years old.

B. Each had tried some college work, but no more than a year of it, and had no apparent plans for continuing his education.

C. Each had a military record indicating some stability.

D. Each was white.

Two of the three men were married and both of those who were married had wives who worked. None of the other white male applicants were married; and only three of the 11 black male applicants were married. The three married black male applicants appear to have been disqualified for the following reasons:

- One had less than a high school education and was apparently looking for a second job to supplement his regular day-time job.

 *5  - The second had a poor work record.

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, 8 Fair.Empl.Prac.Cas. (BNA)...

Case 5:13-cv-00255-C    Document 97    Filed 09/14/17    Page 85 of 170    PageID 2002

- The third appeared to be looking for a night job so that h could go to college in the day-time.

Only one black male applicant who was not hired appears to meet the criteria Respondent was actually following in filling these night clerical positions. He was 21, had only 1 ½ years of college work, had 2 ½ years of steady work at one job, and had no apparent plans for returning to college.

9. Investigation revealed that the Charging Party differed from the pattern of those men who were hired in the following respects:

A. He was 27 years old and single.

B. He had completed two full years of college.

C. He had an uneven job record.

D. He was black.

E. He was on parole after serving 21 months of a five year sentence for failure to report for induction. However, he resembled them in that there is no evidence he planned to return to college.

10. Respondent asserts that all four people who were hired from the interviewing on August 31 are still employed with it. It also asserts that 12 male night clerks have been hired since January 1, 1970, of which five have been minorities. Investigation revealed that of the first 100 Interview Record forms filled out for Respondent's job applicants following August 31, 1970, 33 were filled out for men, 22 of whom were probably white and 11 probably black. From these 33 male applicants, four white men were hired into part-time positions and one black man with a fifth grade education was hired as a full-time janitor.

11. Respondent asserts that if an applicant for a clerical job has typing and office machine skills, it would show on the Interview Record. Investigation revealed that 29 out of 39 Interview Forms filled out by Respondent on August 31, 1970 showed a record of business courses taken or business or office equipment which could be operated. The Interview Record form for the Charging Party does not indicate that he has taken any business courses or that he has any typing or office machine skills. However, on September 9, 1970 the Charging Party took a five minute typing test in which he had a gross average of 72 words per minute with a total of two errors.

12. Investigation also revealed that time in college, time in service, and work experience accounted for all the time since the age of 18 on the Interview Record for 36 of the 39 applicants. The three for whom there was not a full accounting of their time:

A. A 35 year old divorcee. Her work record did not go beyond 1964. She is the only applicant given a clerical skills test.

B. A 26 year old male who was in service from June '65 to June '67. It is difficult to tell from the form whether he did his three years of college from age 18 in 1962 until he went into service or whether he did his college work from '67 to January 1970 when he started work as a truck driver. His form did show three office machines that he could operate, and it showed some kind of police record both for Peace Disturbance and for Careless and Reckless Driving.

*6  C. The Charging Party. His work record does not go back beyond July 1967.

Investigation revealed that prior to July 1967, the Charging Party had the following work experience:

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, 8 Fair.Empl.Prac.Cas. (BNA)...

Case 5:13-cv-00255-C     Document 97     Filed 09/14/17     Page 86 of 170     PageID 2003

A. Clerk with the *** Police Department - over 14 months.

B. Clerk position with *** Government agencies - over 15 months.

C. Repairman position - nearly six months in private industry.

Respondent's interviewer has no memory of the Charging Party's appearance on the day he applied. She does remember his saying that he was on parole.

13. With the exception of the physical examination, Respondent's interviewer has virtual authority to hire, following the guidelines as laid down in the Interview Record sheet. It showed that two of the three men offered night clerk employment were potentially high medical risks (one was 1-Y in the draft; and the other had a medical discharge from service). Both were cleared by Respondent's physician; but one has since had a poor attendance record with Respondent because of health problems.

14. Investigation revealed that Respondent has a major concern about the bondability of its new employees since all of its employees must be bonded. However, investigation showed that:

A. No new employee has ever been turned down by the bonding company.

B. The Fidelity Bond Application form is not filled out and turned in until the new employee's first working day.

C. Respondent's Bankers Blanket Bond contract speaks only of terminating the bonds of present employees and not of the terms and conditions under which bonding could be denied to new employees.

D. Since the date of the instant charge, Respondent has ceased inquiry into arrest records which had been appearing on its Interview Record form in relationship to the applicant's bondability.

E. The Charging Party was bondable.

15. Investigation revealed that Charging Party had an adequate basis for his allegation that his felony conviction was the reason why his application was dismissed without further consideration. His c ntact man with the Urban League asserts that he made a personal visit to Respondent and that he was told it was a hard and fast rule that Respondent would not hire anyone convicted of a felony. He asserts that he doesn't remember whether the Charging Party's name was mentioned specifically, but he does remember that the Charging Party's request for assistance with Respondent was his sole reason for visiting Respondent at that time.

16. However, Respondent's representative does not remember being so emphatic in talking with the man from the Urban League. He asserts that he said that someone with a record would not necessarily be prohibited from employment with Respondent, that specific cases would need to be evaluated and given individual consideration. He asserts that there was no specific mention of persons or cases during the interview with the man from the Urban League, and that he did explain the problem of bonding.

 *7  17. Investigation revealed that Respondent did not answer Charging Party's letter of December 5, 1970. However, Respondent asserts that it could not see that an answer was beneficial because the Charging Party was asking for a specific answer regarding its policy when there was no policy.

18. Investigation revealed the following disparity between the percentage of Negroes living within political subdivisions and the percentage of Negroes incarcerated in the official penal institutions maintained by them:

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, 8 Fair Empl.Prac.Cas. (BNA)...

Case 5:13-cv-00255-C    Document 97    Filed 09/14/17    Page 87 of 170    PageID 2004

| Political Unit | Percentage of Negroes in Total Population | Percentage of Negro Inmates of Its Penal Institutions |
| --- | --- | --- |
| United States | 11.6% | 26.4% |
| State *** | 10.3% | |
| | 46.1% | |
| City *** | 42% | 83% |

<u>FINDINGS OF FACT</u>

On the basis of the foregoing, I make the following findings of fact:

19. Respondent's interviewer failed to question $^{and}/_{or}$ record Charging Party's full work history and his office machine skills on her Interview Record form. The Interview Record form of no other applicant on August 31, 1970 is incomplete on both of these items of inquiry.

20. Charging Party's attempt to apply for the jobs Respondent had advertised was dismissed with less consideration than that shown to any of the other 38 applicants who were interviewed the same day.

21. Since Respondent did not have Charging Party's full past work record nor knowledge of his business machine skills, it is impossible for it to say that he was not among the best qualified applicants.

22. Charging Party's being on parole after serving 21 months on a five year sentence is the reason why his attempt to apply was dismissed with ??

23. Respondent's policy precluded anyone with a felony conviction from being hired.

24. A policy of not hiring convicted felons has the effect of disqualifying a higher percentage of Negroes than Whites.

25. The violation for which the Charging Party was convicted would not disqualify him from performing the job for which he applied since it did not involve dishonesty, violence, or moral turpitude.

26. There is nothing else in the Charging Party's past life to indicate that he is not bondable.

27. Decisions regarding an applicant's probable bondability are made by Respondent's interviewer. These decisions have the effect of being final. Decisions regarding an applicant's physical acceptability are made solely by a physician with no prejudgment made by the interviewer.

28. Charging Party was denied equal consideration for employment by Respondent because of his race (Negro).

29. With only two out of 1,970 applicants for the year holding Conscientious Objector status, even though neither of them was hired, the number is too insignificant to provide a basis for statistical probability. Therefore, it is impossible to make a finding regarding Respondent's real attitude toward employing Conscientious Objectors.

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, 8 Fair.Empl.Prac.Cas. (BNA)...

Case 5:13-cv-00255-C    Document 97    Filed 09/14/17    Page 88 of 170    PageID 2005

**\*8** 30. Respondent's criteria in the selection of night clerks meant that a woman under 30 had little chance of being considered.

31. Respondent's stated criteria, as subjectively applied, in the selection of male night clerks had the effect of excluding Negroes.

[1]    Charging Party's specific religion does not appear in the records, only the belief which results therefrom.

[2]    Statistics derived from: General Population Characteristics U.S. Census, 1970; statistical information from the Statistical Officer of Bureau of Prisons, September 13, 1971; statistical information from the Records Office of \*\*\* State Penitentiary, September 16, 1971; and, statistical information from the Commissioner of the City of \*\*\*, September 15, 1971.

[4]    Carter v. Gallagher, 425 F. 2d 315 (CA 8; 1971), 3 EPD 8205.

Footnotes

FN [3] Negro population in the U.S. is 11.1%. General Population Characteristics, supra. Percentage of Negro inmates in federal pen institutions is 26.4%. Statistical Officer, Bureau of Prisons, UPRA

8 Fair Empl.Prac.Cas. (BNA) 431 (E.E.O.C.), EEOC Dec. No. 74-89, EEOC Dec. P 6418, 1974 WL 3903

---

**End of Document**

© 20 7 Thomson Reuters. No c a m to or g na  U.S. Government Works.

---

# Attachment 33

EEOC Dec. No. 78-3 (E.E.O.C.), EEOC Dec. P 6714, 1977 WL 50963

Decision No. 78-3

November 7, 1977

**\*1**  Charging Party alleges that the Respondent engaged in an unlawful employment practice in violation of Title VII of the Civil Rights Act of 1964 (as amended) by discharging him due to his national origin, Mexican-American.

The Respondent is a state highway department which employs the requisite number of employees and is engaged in an industry affecting commerce. Timeliness and all other jurisdictional requirements have been met.

The Charging Party, a Mexican-American, applied for a job as a laborer with Respondent on August 3, 1972. The application contains the following question:

"Have you (either as a juvenile or an adult) ever been arrested, held on suspicion, or detained, or fingerprinted by any police or military authority? (Omit minor traffic violations). In case of doubt answer YES. Explain fully the circumstances of ALL arrests and detentions in the space provided in item 24 below."

The Charging Party answered yes, and added in the space provided, "for lottering (sic)." Before Respondent had verified the information on Charging Party's application, it hired him as a laborer, and Charging Party worked for Respondent for approximately three days. Respondent's subsequent check of Charging Party's application showed that he had been convicted of petty theft in 1970 and possession of marijuana on August 18, 1972 (both misdemeanors). The narcotics charge was pending at the time Charging Party applied for work with Respondent; his conviction occurred after he was employed by the Respondent. He was then discharged by the Respondent.

Respondent gives two grounds for Charging Party's discharge; falsification of his application and conviction of a crime involving the use of narcotics. Respondent's written policy does not allow anyone to be hired who has been convicted of a felony or misdemeanor involving moral turpitude or convicted of any crime involving the use of narcotics or habit-forming drugs. That is tantamount to a policy of refusing to hire anyone convicted of a "serious crime." Respondent alleges it has hired people with conviction records, but never anyone with a drug related conviction. However, Respondent failed to provide any evidence to substantiate the allegation when asked to do so.

The law is explicit; although an employment practice may be facially neutral, if it operates to exclude a disproportionate number of persons of a certain racial or ethnic class it violates Title VII unless the empllyer can show that the practice is justified by business necessity. Griggs v. Duke Power Co., 401 US 424, 3 EPD 8137 (1971). Once the disproportionate impact is established, the burden of proof shifts to the employer to show that the practice is justified by business necessity. The test for business necessity is whether the practice is necessary for the safe and efficient operation of Respondent's business and whether there is an acceptable alternative that will accomplish that goal "equally well with a lesser differential racial impact." Robinson v. Lorillard, 444 F.2d 791, 798, 3 EPD 8267 (1971).

**\*2**  A disproportionate impact may be shown by establishing that Spanish Surnamed Americans as a class are excluded by Respondent's employment practice at a significantly higher rate than Anglo-Americans. Green v. Missouri Pacific R.R. Co., 523 F.2d 1290, 10 EPD 10,314 (1975). This form of proof was used in Gregory v. Litton Systems, Inc., 316 F.Supp 401, 2 EPD 10,264, aff'd. 472 F.2d 631, 5 EPD 8089 (1972) to show that blacks suffered a disproportionately higher percentage of arrests than whites and were thereby excluded from employment at a higher rate than whites by an employer who used arrest records to disqualify applicants.

The national statistics used in that case are not available for Spanish Surnamed Americans. [2] However, relevant statistics are available from the Southwestern United States where Charging Party and Respondent are located and where the

majority of the Spanish Surnamed American population resides. Of the adult admissions to Arizona's correctional institutions for the years 1973 through 1975, 26% were Spanish Surnamed Americans. [3] Spanish Surnamed Americans comprised 13.9% of that state's population according to the 1970 census. [4] In Colorado for the years 1972, 1973 and 1974, Spanish Surnamed Americans made up 26.1% of the committments to state penal institutions, [5] while comprising 9.6% of the total state population. [6] In California, Spanish Surnamed Americans comprised 11.1% of the state population, [7] but they made up 22% of those arrested, as juveniles or adults, for felonies and misdemeanors, for 1974 through 1976. [8]

In Texas, Spanish Surnamed Americans made up 16.5% of that state's prison population for the years 1972 through 1974 [9] while comprising 14.9% of the state's population. [0] These statistics are significant at the 95% level of confidence.

It is clear that Spanish Surnamed Americans are convicted and arrested substantially more often than Anglo-Americans in proportion to their numbers. Therefore, any policy such as Respondent's which automatically excludes from employment people who have been convicted of such a wide range of unlawful actions has a disproportionate impact on Spanish Surnamed Americans compared to Anglo-Americans. Gregory v. Litton Systems Inc., supra; Commission Decision No. 72-1497, CCH Employment Practices 6352 (1972). Although the record shows that Respondent's work force is 33% Spanish Surnamed Americans, that is no defense to this charge. That evidence does not disprove our essential finding that Respondent's policy has a detrimental impact on Spanish Surnamed American applicants. See Johnson v. Goodyear Tire and Rubber Co. Synthetic Rubber Division, 491 F.2d 1364, 1372-73 (5th Cir. 1974); Commission Decision No. 71-1418; CCH Employment Practices 6223 (1971).

Having established the disparate impact of Respondent's policy, we must now determine if that policy is related to job performance. Griggs v. Duke Power Co., supra. Respondent offers no justification for its policy, stating only that it followed its correct procedure in discharging Charging Party.

*3 Further, there is no evidence that the Charging Party was unable to perform the job. Respondent does not allege, and the investigation does not reveal, that Charging Party's conviction for possession of marijuana detracted from the safe and efficient operation of Respondent's business, nor that there was no acceptable alternative that would accomplish the goal equally well with a lesser differential ethnic impact. It was just this situation the court contemplated in Green v. Missouri Pacific R.R. Co., supra, when it ruled that an absolute bar from employment of "applicants with a conviction for an offense other than minor traffic infractions" would deny job opportunities to individuals because of some conduct which may be remote in time or does not significantly bear upon the particular job requirements. Other courts have agreed, stating that the employer must take into consideration the nature and seriousness of the offense in relation to the job sought, the time elapsing since the conviction, the degree of rehabilitation, and the circumstances under which the crime was committed. Carter v. Gallagher, 452 F.2d 315, 3 EPD 8335 (8th Cir. 1971), citing Butts v. Nichols, 381 F.Supp. 573, 580-81, 8 EPD 9740 (1974).

Since there is no evidence that Respondent's policy is founded in business necessity, and since the evidence demonstrates that the policy would tend to exclude Spanish Surnamed Americans in greater proportion than Anglo-Americans, we find that Respondent's policy violates Title VII.

Respondent's application requires disclosure of arrests, detentions, and other contacts with law enforcement agencies which fall far short of conviction. The Commission has held that such inquiries violate Title VII absent a showing of business necessity. [2] Perhaps the court in Gregory v. Litton Systems Inc., supra, stated the rationale best:

There is no evidence to support a claim that persons who have suffered no criminal convictions but have been arrested on a number of occasions can be expected, when employed, to perform less efficiently or less honestly than other employees.

In fact, the evidence in the case was overwhelmingly to the contrary. Thus information concerning a prospective employee's record of arrests without convictions, is irrelevant to his suitability or qualification for employment.

For these reasons, we find that Respondent has violated Title VII by using an application which demands arrest record information.

Finally, Respondent alleges that Charging Party also was discharged because he falsified that portion of the application requesting arrest information. Respondent will not be allowed to seek information which violates Title VII and then "punish" the Charging Party for failing to give that information by discharging him. See Commission Decision No. 71-2089, CCH Employment

There is reasonable cause to believe that Respondent is engaging in an unlawful employment practice in violation of Title VII of the Civil Rights Act of 1964, as amended, by maintaining an arrest-conviction policy which discriminates against Spanish Surnamed Americans as a class and by discharging Charging Party pursuant to that policy.

Footnotes

1    See Commission Decision No. 72 1497, CCH Employment Practices, 6352 (1972). Crimes of "moral turpitude  include inter alia, adultery, burglary, extortion, embezzlement, larceny, robbery, assault with intent to kill, perjury, receiving stolen property, theft and any crime involving fraud. 27 A WORDS AND PHRASES p. 186 et. seq. (perm. ed. 1961).

2    Uniform Crime Report statistics are broken down according to race, not national origin, and Spanish Surnamed Americans are included in the white racial category.

3    Arizona correctional statistics obtained from the Arizona Dept. of Corrections.

4    "Persons of Spanish Surname,  Bureau of the Census Publication PC(2) 1D.

5    Statistics obtained from the Colorado Dept. of Institutions, Division of Correctional Services.

6    Supra, n.4.

7    Supra, n.4.

8    Statistics obtained from California Dept. of Justice, Bureau of Statistics.

9    Statistics obtained from Texas Dept. of Corrections, Research and Development Division.

10   Supra, n.4.

11   See Hazelwood School District v. U.S., 45 U.S.L.W. 4882, 14 EPD 7633 (1977).

12   Commission Decision No. 71 2089, CCH Employment Practices 6253 (1971); Commission Decision No. 72 1005, CCH Employment Practices 6350 (1972); Commission Decision No. 74 41, CCH Employment Practices 6408 (1973); Commission Decision No. 72 04554, CCH Employment Practices 6496 (1971).

EEOC Dec. No. 78-3 (E.E.O.C.), EEOC Dec. P 6714, 1977 WL 50963

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Wor **App. 279**

# Attachment 34

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, 26 Fair Empl.Prac.Cas. (BNA)...

Case 5:13-cv-00255-C    Document 97    Filed 09/14/17    Page 94 of 170    PageID 2011

26 Fair Empl.Prac.Cas. (BNA) 1755 (E.E.O.C.), EEOC Dec. No. 78-35, EEOC Dec. P 6720, 1978 WL 5827

Decision No. 78-35

June 8, 1978

DECISION

## SUMMARY OF CHARGE

*1  Charging Party alleges that Respondent has engaged in an unlawful employment practice in violation of Title VII of the Civil Rights Act of 1964, as amended, by discharging him because of his race (Negro).

## JURISDICTION

Respondent is engaged in the operation of a Civic Center, an activity affecting interstate commerce. Respondent is an employer within the meaning of Title VII and all jurisdictional requirements have been met.

## SUMMARY OF INVESTIGATION

Charging Party applied for employment with Respondent Civic Center and was employed as a utility worker on May 31, 1973. Charging Party's continued employment was contingent upon Respondent's receipt and evaluation of Charging Party's "police record." When Respondent received Charging Party's police record, it revealed several arrests and some convictions as set forth in the following chart.

| DATE | CHARGE | DISPOSITION |
|------|--------|-------------|
| 58 | Gross Cheat | To *** Armed Service Police |
| 63 | Rape | 1-3 years. Conditional Release (2-29-64) |
|  | Drunk | 30 days susp. (3-9-63) |
| 64 | Suspicion of Burglary | Released |
| 64 | Suspicion of Assault & Battery | 12 months suspended CPWOL(2-15-65) |
| 65 | Drunk & Disorderly Assault & Battery | (No disposition shown on record) |
| 71 | Carrying Pistol Without a License | $100 fine and six months (9-23-71) |
|  | Carrying a Concealed Weapon | $100 fine and six months (9-23-71) |

After evaluating Charging Party's police record, Respondent discharged him. Respondent states that "[t]he offenses are not compatible with a position at the Civic Center where thousands of people are in attendance at the various functions."

There is no evidence that Respondent's policy of evaluating an individual's conviction record against the requirements of the job has been applied in a disparate manner in regard to persons of different races or national origins. However, this fact alone does not dispose of the question of whether the policy of disqualifying persons because of convictions, in fact, discriminates against Blacks because of their race. Even though there is no evidence of disparate treatment, a policy may be violative of Title VII if it disproportionately affects a protected class of persons.

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, 26 Fair Empl.Prac.Cas. (BNA)...

Case 5:13-cv-00255-C   Document 97   Filed 09/14/17   Page 95 of 170   PageID 2012

In Griggs v. Duke Power Company, 401 U.S. 424, 3 EPD 8137 (1971), the Supreme Court stressed that Congress' intention in enacting Title VII was to invalidate all employment practices which, in their final effect or consequence, discriminate against racial minorities even though no prohibited discriminatory motivation is present. See also Robinson v. Lorillard Corp. 444 F. 2d 791, 3 EPD 8267 (4th Cir. 1971), where the court determined that the business necessity defense requires a showing that the policy effectively carries out the business purpose for which it is designed and proof that no alternative policies are available which would accomplish the purpose with a lesser differential impact. The Commission has enunciated the same policy with regard to business necessity in Commission Decision No. 72-1497, CCH EEOC Decisions (1973), para. 6352, and Commission Decision No. 730257, CCH EEOC Decisions (1973), para. 6372.

**\*2**  It is well established by the courts and in Commission Decisions that exclusion of applicants from consideration for employment because of arrests has a disproportionate impact upon Blacks because they are arrested at a rate in excess of their percentage in the population. Gregory v. Litton Systems, Inc., 316 F. Supp. 401, 2 EPD 10,264 (DC Cal. 1970), aff'd as mod 472 F. 2d. 631, 5 EPD 8089, (9th Cir. 1973)  . Partially because they are arrested more frequently, Blacks are convicted at a rate significantly in excess of their percentage in the population. [2]

Thus, an employment practice of disqualifying persons from employment because of convictions can be expected to have a disproportionate adverse impact upon Blacks and would therefore be unlawful under Title VII in the absence of a justifying business necessity. Green v. Missouri Pacific R.R. Co. 523 F. 2d. 1290, 10 EPD 10,314 (8th Cir. 1975). It is clear to the Commission that employers have a legitimate interest in ensuring that their employment selections are consonant with the efficient operation of the business and with the safety and security of the public and of other employees. An individual's record of criminal convictions may well be significant evidence of his suitability for employment in a particular job or situation. See, Richardson v. Hotel Corporation of America, 332 F. Supp. 519, 4 EPD 7666 (ED. La. 1971) aff'd, 468 F. 2d 951, 5 EPD 8101 (5th Cir. 1972), where the court held that the discharge of a Black bellman who had been convicted for theft and receipt of stolen goods was not unlawful because the employer successfully showed that the position of bellman was "security sensitive" and that the plaintiff's convictions were job-related.

Thus, while an employer violates Title VII when it arbitrarily excludes all persons who have been convicted of certain types of offenses from employment, it is entitled to evaluate, on an individual basis, the record of a person who has been convicted of a crime against the requirements of a specific job. When this evaluation results in a disqualification, the burden of justifying this rejection must be borne by the employer. [3]

The Commission and the Courts have required the examination of several factors in determining whether a specific individual who has been convicted may be disqualified for employment in a particular position. The most important factor and the one most often cited by the courts is the relationship of the conviction to the specific position the applicant is seeking.

Initially, the employer must make this determination. If it is established that the offense for which an applicant has been convicted is not job-related, it is unlawful under Title VII to disqualify the individual because of the conviction. Carter v. Gallagher, 452 F. 2d 315, 3 EPD 8335 (8th Cir. 1971), cert denied, 406 U.S. 950, 4 EPD 7818 (1972) and Richardson v. Hotel Corporation of America 332 F. Supp. 519, 4 EPD 7666 (ED LA. 1971) aff'd, 468 F. 2d 951, 5 EPD 8101 (5th Cir. 1972).

**\*3**  Even if it is determined that the offense for which the individual was convicted is job related, the employer may not disqualify the individual without further inquiry and evaluation. The employer must examine other relevant factors to determine whether, all factors considered, the conviction affects the individual's ability to perform the job consistent with the safe and efficient operation of Respondent's business.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Work
App. 282

Among the factors to be considered by an employer who has concluded that the past conviction or convictions of the prospective employee is job related are:

1. The number of offenses and circumstances of each offense for which the individual was convicted.

The number of times an individual has been convicted may be indicative of the likelihood that a job related offense may be repeated. On the other hand, if the individual has been convicted of a single offense the employer should weigh this fact in reaching its decision whether or not to hire.

The circumstances giving rise to the offenses for which the individual was convicted should also be weighed in the employer's decision and may shed favorable light on the causes for the conviction and lead the prospective employer to conclude that the offenses are unlikely to reoccur. In weighing the circumstances of the job related offenses for which the individual was convicted, the employer should consider whether, in light of the knowledge it has acquired, there is in fact a risk to the safety of the business if it hires this individual.

2. The length of time intervening between the conviction for the offense and the employment decision.

In weighing this factor against job related convictions, the employer should look favorably on an individual who has paid society's price for the offenses and has not committed any other offenses over an extended period.

3. The individual's employment history.

The prospective employer should also evaluate the individual's employment history before and after the conviction or convictions. An individual who has performed well for other employers before and after job related convictions is likely to be one that a prospective employer may decide is suitable for hire. Clearly good references by other employers aware of the individual's ability and general work habits should be considered before an individual is rejected solely on the job relatedness of the conviction.

4. The individual's efforts at rehabilitation.

This factor is particularly crucial to the employment decision since an individual who has paid his debt to society must be able to earn a living if he is to be able to avoid further offenses. Efforts by an individual to improve $^{h\,s}$/her education, successful performance on jobs which the individual has held subsequent to the convictions, satisfactory probation or parole records, community work, etc., $^{and}$/$_{or}$ the fact that the conviction occurred several years in the past are factors which indicate efforts at rehabilitation and should serve to mitigate the adverse effect of a job related conviction.

 **4** While the above factors cannot be evaluated with scientific certainty, the employer must demonstrate to the Commission that rejection of the individual was reasonable in light of the facts and circumstances and the nature of the job. [4] To justify rejection, it must appear reasonable, based upon the evaluation, as indicated above, that the conviction renders the individual unable to perform the job consistent with the safe and efficient operation of Respondent's business. See Commission Decision No. 72-1497, CCH EEOC Decisions 1973 para. 6352. In reaching this conclusion, the employer need not show a negative evaluation of all of the relevant factors but must show, in addition to the job relatedness that some factor or factors were sufficiently negative to support the rejection.

In the instant case, Charging Party's convictions for rape, assault and battery, drunkenness and at least one firearms offense were clearly related to the job of utility worker in a public auditorium. Given the employer's responsibility for the safety of the public and other employees, it is reasonable for the employer to conclude that the Charging Party's convictions might make him unsuitable for the specific job of utility worker. Further examination reveals that the

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, 26 Fair Empl.Prac.Cas. (BNA)...

Case 5:13-cv-00255-C   Document 97   Filed 09/14/17   Page 97 of 170   PageID 2014

convictions were spread over a period of years with the most recent convictions occurring approximately 20 months prior to the Charging Party's application for employment.

While the record does not reflect that Respondent was aware of or considered Charging Party's employment history or rehabilitation efforts, we find that, given the severity and recentness of the offenses for which Charging Party was convicted and the continuing pattern of offenses over a period of years, Respondent's rejection of Charging Party was justified.

CONCLUSION

The Commission finds no reasonable cause to believe that Respondent discriminated against the Charging Party because of his race in violation of Title VII.

Footnotes

1    According to the 1970 census, Blacks make up 11.1% of the total population. At the same time, Blacks constitute 26.2% of the total number of arrests. In comparison, whites make up 87.5% of the total population, but constitute only 71.4% of the arrests. See 1970 Census of Population, PC(1)B1, Table 48. See also, Uniform Crime Reports, 1973, issued by Clarence M. Kelly, Director, F.B.I., p. 133.

2    While Blacks make up only 11.1% of the population, they constitute 46.7% of the total prison population. In comparison, whites make up 87.5% of the population but constitute only 51% of the total prison population. See LEAA's Survey of Inmates in State Correctional Facilities, 1974.

3    As noted in Weeks. v. Southern Bell Telephone & Telegraph Co., 408 F. 2d 228, 1 EPD 9970, (5th Cir. 1969) "...when dealing with a humanitarian remedial statute which serves an important public purpose, it has been the practice to cast the burden of proving an exception to the general policy of the statute upon the person claiming it .

4    The rejection of an individual for a specific job because of job related convictions cannot be used as a blanket disqualification for all other jobs within the employer's control.

26 Fair Empl.Prac.Cas. (BNA) 1755 (E.E.O.C.), EEOC Dec. No. 78-35, EEOC Dec. P 6720, 1978 WL 5827

# Attachment 35

*The U.S. Equal Employment Opportunity Commission*

**EEOC Policy Statement on the Issue of Conviction Records under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. (1982). (2/4/87)**

# CONVICTION RECORDS

At the Commission meeting of November 26, 1985, the Commission approved a modification of its existing policy with respect to the manner in which a business necessity is established for denying an individual employment because of a conviction record. The modification, which is set forth below, does not alter the Commission's underlying position that an employer's policy or practice of excluding individuals from employment on the basis of their conviction records has an adverse impact on Blacks[1] and Hispanics[2] in light of statistics showing that they are convicted at a rate disproportionately greater than their representation in the population. Consequently, the Commission has held and continues to hold that such a policy or practice is unlawful under Title VII in the absence of a justifying business necessity.[3]

However, the Commission has revised the previous requirements for establishing business necessity[4] in the following manner. Where a charge involves an allegation that the Respondent employer failed[5] to hire or terminated the employment of the Charging Party as a result of a conviction policy or practice that has an adverse impact on the protected class to which the Charging Party belongs, the Respondent must show that it considered these three factors to determine whether its decision was justified by business necessity:

1. The nature and gravity of the offense or offenses;

2. The time that has passed since the conviction and/or completion of the sentence; and

3. The nature of the job held or sought.[6]

This procedure condenses the Commission's previous standard for business necessity, substituting a one-step analysis for the prior two-step procedure and retaining some but not all of the factors previously considered.[7] The modification principally eliminates the need to consider an individual's employment history and efforts at rehabilitation. However, consideration is still given to the job-relatedness of a conviction, covered by the first and third factors, and to the time frame involved, covered by the second factor. Moreover, the first factor encompasses consideration of the circumstances of the offense(s) for which an individual was convicted as well as the number of offenses.

The Commission continues to hold that, where there is evidence of adverse impact, an absolute bar to employment based on the mere fact that an individual has a conviction record is unlawful under Title VII.[8] The Commission's position on this issue is supported by the weight of judicial authority.[9]

It should be noted that the modified procedure does not affect charges alleging disparate treatment on a prohibited basis in an employer's use of a conviction record as a disqualification for employment. A charge brought under the disparate treatment theory of discrimination is one where, for example, an employer allegedly rejects Black applicants who have conviction records but does not reject similarly situated White applicants.

With respect to conviction charges that are affected by this modification--that is, those raising the issue of adverse impact--Commission decisions that apply the previous standard are no longer available as Commission decision precedent for establishing business necessity. To the extent that such prior decisions are inconsistent with the position set forth herein, they are expressly overruled.

Questions concerning the application of the Commission's revised business necessity standard to the facts of a particular charge should be directed to the Regional Attorney for the Commission office in which the charge was filed.

---

1. See, e.g., Commission Decision No. 72-1497, CCH EEOC Decisions (1973) ¶ 6352, and Commission Decision Nos. 74-89, 78-10, 78-35, and 80-10, CCH EEOC Decisions (1983) ¶¶ 6418, 6715, 6720, and 6822, respectively.

**App. 286**

2. See Commission Decision No. 78-03, CCH EEOC Decisions (1983) ¶ 6714.

3. See, e.g., Commission decisions cited supra nn.1-2.

4. Prior to this modification, for an employer to establish a business necessity justifying excluding an individual from employment because of a conviction record, the evidence had to show that the offense for which the applicant or employee was convicted was job-related. If the offense was not job-related, a disqualification based on the conviction alone violated Title VII. However, even if the offense was determined to be job-related, the employer had to examine other relevant factors to determine whether the conviction affected the individual's ability to perform the job in a manner consistent with the safe and efficient operation of the employer's business. The factors identified by the Commission to be considered by an employer included:
1. The number of offenses and the circumstances of each offense for which the individual was convicted;
2. The length of time intervening between the conviction for the offense and the employment decision;
3. The individual's employment history; and
4. The individual's efforts at rehabilitation.
See, e.g., Commission Decision No. 78-35, CCH EEOC Decisions (1983) ¶ 6720.

Thus, under the previous procedure, business necessity was established by means of a two-step process: first, by showing that the conviction was job-related; then, by separately demonstrating that the conviction would affect the individual's ability to safely and efficiently perform the job upon consideration of the four factors enumerated above.

5. Although the term "employer" is used herein, the Commission's position on this issue applies to all entities covered by Title VII. See, e.g., Commission Decision No. 77-23, CCH EEOC Decisions (1983) ¶ 6710 (union's policy of denying membership to persons with conviction records unlawfully discriminated against Blacks).

6. The Commission's revised business necessity analysis follows a decision by the United States Court of Appeals for the Eighth Circuit in the Green v. Missouri Pacific Railroad Company case. Green, 523 F.2d 1290 (8th Cir. 1975), is the leading Title VII case on the issue of conviction records. In that case, the court held that the defendant's absolute policy of refusing employment to any person convicted of a crime other than a minor traffic offense had an adverse impact on Black applicants and was not justified by business necessity. On a second appeal in that case, following remand, the court upheld the district court's injunctive order prohibiting the defendant from using an applicant's conviction record as an absolute bar to employment but allowing it to consider a prior criminal record as a factor in making individual hiring decisions as long as the defendant took into account "the nature and gravity of the offense or offenses, the time that has passed since the conviction and/or completion of sentence, and the nature of the job for which the applicant has applied." Green v. Missouri Pacific Railroad Company, 549 F.2d 1158, 1160 (8th Cir. 1977).

7. See discussion supra n.4.

8. See, e.g., Commission Decision No. 78-35, CCH EEOC Decisions (1983) ¶ 6720.

9. See Green, 523 F.2d at 1298; Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971), cert. denied, 406 U.S. 950 (1972) (brought under 42 U.S.C. §§ 1981 and 1983); and Richardson v. Hotel Corporation of America, 332 F. Supp. 519 (E.D. La. 1971), aff'd mem., 468 F.2d 951 (5th Cir. 1972). See also Hill v. United States Postal Service, 522 F. Supp. 1283 (S.D. N.Y. 1981); Craig v. Department of Health, Education, and Welfare, 508 F. Supp. 1055 (W.D. Mo. 1981); and Cross v. United States Postal Service, 483 F. Supp. 1050 (E.D. Mo. 1979).

---

*This page was last modified on September 11, 2006.*

 Return to Home Page

# Attachment 36

**EEOC Policy Statement on the Use of Statistics in Charges Involving the Exclusion of Individuals with Conviction Records from Employment (7/29/87)**

# CONVICTION RECORDS - STATISTICS

Green v. Missouri Pacific Railroad Company, 523 F.2d 129010 EPD ¶ 10,314 (8th Cir. 1975), is the leading Title VII case on the issue of conviction records. In Green, the court held that the defendant's policy of refusing employment to any person convicted of a crime other than a minor traffic offense had an adverse impact on Black applicants and was not justified by business necessity. In a second appeal following remand, the court upheld the district court's injunctive order prohibiting the defendant from using an applicant's conviction record as an absolute bar to employment but allowing it to consider a prior criminal record as long as it constituted a business necessity. Green v. Missouri Pacific Railroad Company, 549 F.2d 1158, 1160,13 EPD ¶ 11,579 (8th Cir. 1977). See also Commission Decision No. 72- 1497, CCH EEOC Decisions (1973) ¶ 6352, and Commission Decision Nos. 74-89, 78-10, 78-35, and 80-10, CCH EEOC Decisions (1983) ¶¶ 6418, 6715, 6720, and 6822, respectively.

It is the Commission's position that an employer's policy or practice of excluding individuals from employment on the basis of their conviction records has an adverse impact on Blacks[1] and Hispanics[2] in light of statistics showing that they are convicted at a rate disproportionately greater than their representation in the population. Policy Statement on the Issue of Conviction Records Under Title VII (February 4, 1987). However, when the employer can present more narrowly drawn statistics showing either that Blacks and Hispanics are not convicted at a disproportionately greater rate or that there is no adverse impact in its own hiring process resulting from the convictions policy, then a no cause determination would be appropriate.

1. Where the Employer's Policy is Not Crime-Specific

An employer's policy of excluding from employment all persons convicted of any crime is likely to create an adverse impact for Blacks and Hispanics based on national and regional conviction rate statistics. However, it is open to the respondent/employer to present more narrow local, regional, or applicant flow data, showing that the policy probably will not have an adverse impact on its applicant pool and/or in fact does not have an adverse impact on the pool. As the Supreme Court has stated,

> Although 'a statistical showing of disproportionate impact need not always be based on an analysis of the characteristics of actual applicants,' Dothard v. Rawlinson, 433 U.S. 321, 330, 'evidence showing that the figures for the general population might not accurately reflect the pool of qualified job applicants' undermines the significance of such figures. Teamsters v. United States, 431 U.S. 324, 340 n. 20.

New York City Transit Authority v. Beazer, 440 U.S. 568, 586 n. 29,19 EPD ¶ 9027 at p. 6315 (1979). See also Costa v. Markey, 30 EPD ¶ 33,173 at p. 27,638 (1st Cir. 1982), vacated on other grounds, 706 F.2d 796, 32 EPD ¶ 32,622 (1st Cir.), cert. denied, 104 S. Ct. 547, 32 EPD ¶ 33,955 (1983).

If the employer provides applicant flow data, information should be sought to assure that the employer's applicant pool was not artificially limited by discouragement. For example, if many Blacks with conviction records did not apply for a particular job because they knew of the employer's policy and they therefore expected to be rejected, then applicant flow data would not be an accurate reflection of the conviction policy's actual effect. See Dothard v. Rawlinson, 433 U.S. 321, 330 (1977). (Section 608, Recruitment, of Volume II of the Compliance Manual will provide a more detailed discussion of when and how to investigate for discouragement.)

2. Where the Employer's Policy is Crime-Specific

In the past, when the Commission has evaluated an employer's "no convictions" policy dealing with a subcategory of crimes; e.g., theft, robbery, or drug-related crimes; the Commission has relied upon national or regional conviction statistics for crimes as a whole. See, e.g., Commission Decision No. 73- 0257, CCH EEOC Decisions (1973) ¶ 6372, and Commission Decision Nos. 76-110 and 80-17, CCH EEOC Decisions (1983) ¶¶

**App. 289**

Case 5:13-cv-00255-C   Document 97   Filed 09/14/17   Page 103 of 170   PageID 2020

6676 and 6809, respectively. However, these statistics only show a probability of adverse impact for Blacks and Hispanics, while more narrow data may show no adverse impact.

If the employer can present more narrow regional or local data on conviction rates for all crimes showing that Blacks and Hispanics are not convicted at disproportionately higher rates, then a no cause determination would be proper.[3] Alternatively, the employer may present national, regional, or local data on conviction rates for the particular crime which is targeted in its crime-specific convictions policy. If such data shows no adverse impact, then a no cause determination would be appropriate. Finally, the employer can use applicant flow data to demonstrate that its conviction policy has not resulted in the exclusion from employment of a disproportionately high number of Blacks and Hispanics.

---

1. See, e.g., Commission Decision No. 72-1497, CCH EEOC Decisions (1973) ¶ 6352, and Commission Decision Nos. 74-89, 78-10, 78-35, and 80- 10, CCH EEOC Decisions (1983) ¶¶ 6418, 6715, 6720, and 6822, respectively.

2. See Commission Decision No. 78-03, CCH EEOC Decisions (1983) ¶ 6714.

3. However, if even more narrow statistics, such as regional or local crime-specific data, show adverse impact, then a cause finding would be appropriate absent a justifying business necessity.

---

*This page was last modified on September 20, 2006.*


[Return to Home Page](#)

**App. 290**

# Attachment 37

*The U.S. Equal Employment Opportunity Commission*

| | | | |
|---|---|---|---|
| **EEOC** | **NOTICE** | **Number** | |
| | | 915.061 | |
| | | **Date** | |
| | | 9/7/90 | |

1. <u>SUBJECT</u>: Policy Guidance on the Consideration of Arrest Records in Employment Decisions under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq. (1982).

2. <u>PURPOSE</u>: This policy guidance sets forth the Commission's procedure for determining whether arrest records may be considered in employment decisions.

3. <u>EFFECTIVE DATE</u>: Upon Receipt.

4. <u>EXPIRATION DATE</u>: As an exception to EEOC Order 205.001, Appendix B, Attachment 4, §a(5), this Notice will remain in effect until rescinded or superseded.

5. <u>ORIGINATOR</u>: Title VII/EPA Division, Office of the Legal Counsel.

6. <u>INSTRUCTIONS</u>: File behind the last Policy Guidance §604 of Volume II of Compliance Manual.

7. <u>SUBJECT MATTER</u>:

## I. Introduction

The question addressed in this policy guidance is "to what extent may arrest records be used in making employment decisions?" The Commission concludes that since the use of arrest records as an absolute bar to employment has a disparate impact on some protected groups, such records alone cannot be used to routinely exclude persons from employment. However, conduct which indicates unsuitability for a particular position is a basis for exclusion. Where it appears that the applicant or employee engaged in the conduct for which he was arrested and that the conduct is job-related and relatively recent, exclusion is justified.

The analysis set forth in this policy guidance is related to two previously issued policy statements regarding the consideration of conviction records in employment decisions: "Policy Statement on the Issue of Conviction Records under Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §2000e *et seq*. (1982)" (hereinafter referred to as the February 4, 1987 Statement) and "Policy Statement on the use of statistics in charges involving the exclusion of individuals with conviction records from employment" (hereinafter referred to as July 29, 1987 Statement). The February 4, 1987 Statement states that nationally, Blacks and Hispanics are convicted in numbers which are disproportionate to Whites and that barring people from employment based on their conviction records will therefore disproportionately exclude those groups.[1] Due to this adverse impact, an employer may not base an employment decision on the conviction record of an applicant or an employee absent business necessity.[2] Business necessity can be established where the employee or applicant is engaged in conduct which is particularly egregious or related to the position in question.

Conviction records constitute reliable evidence that a person engaged in the conduct alleged since the criminal justice system requires the highest degree of proof ("beyond a reasonable doubt") for a conviction. In contrast, arrests alone are not reliable evidence that a person has actually committed a crime. *Schware v. Board of Bar Examiners*, 353 U.S. 232, 241 (1957) ("[t]he mere fact that a [person] has been arrested has very little, if any, probative value in showing that he has engaged in misconduct"). Thus, the Commission concludes that to justify the use of arrest records, an additional inquiry must be made. Even where the conduct alleged in the arrest record is related to the job at issue, the employer must evaluate whether the arrest record reflects the applicant's conduct. It should, therefore, examine the surrounding circumstances, offer the applicant or employee an opportunity to explain, and, if he or she denies engaging in the conduct, make the follow-up inquiries necessary to evaluate his/her credibility. Since using arrests as a disqualifying criteria can only be justified where it appears that the applicant actually engaged in the conduct for which he\she was arrested and

**App. 292**

that conduct is job related, the Commission further concludes that an employer will seldom be able to justify making broad general inquiries about an employee's or applicant's arrests.

    The following discussion is offered for guidance in determining the circumstances under which an employer can justify excluding an applicant or an employee on the basis of an arrest record.

## II. Discussion

### A. Adverse Impact of the Use of Arrest Records

The leading case involving an employer's use of arrest records is *Gregory v. Litton Systems*, 316 F. Supp. 401, 2 EPD ¶10,264 (C.D. Cal. 1970), *modified on other grounds*, 472 F.2d 631, 5 EPD ¶8089 (9th Cir. 1972). *Litton* held that nationally, Blacks are arrested more often than are Whites. Courts and the Commission have relied on the statistics presented in *Litton* to establish a *prima facie* case of discrimination against Blacks where arrest records are used in employment decisions.[3] There are, however, more recent statistics, published by the U.S. Department of Justice, Federal Bureau of Investigation, which are consistent with the *Litton* finding.[4] It is desirable to use the most current available statistics. In addition, where local statistics are available, it may be helpful to use them, as the court did in *Reynolds v. Sheet Metal Workers Local 102*, 498 F. Supp. 952, 22 EPD ¶30,739 (D.C. 1980), *aff'd.*, 702 F.2d 221, 25 EPD ¶31,706 (D.C. Cir. 1981). In *Reynolds*, the court found that the use of arrest records in employment decisions adversely affected Blacks since the 1978 Annual Report of the Metropolitan Police of Washington, D.C., stated that 85.5% of persons arrested in the District of Columbia were nonwhite while the nonwhite population constituted 72.4% of the total population. 498 F. Supp. at 960. The Commission has determined that Hispanics are also adversely affected by arrest record inquiries. Commission Decisions Nos. 77-23 and 76-03, CCH EEOC Decisions (1983) ¶¶6714 and 6598, respectively.[5] However, the courts have not yet addressed this issue[6] and the FBI's Uniform Crime Reporting Program does not provide information on the arrest rate for Hispanics, nationally or regionally. As with conviction records (see July 29, 1987 Statement), the employer may rebut by presenting statistics which are more current, accurate and/or specific to its region or applicant pool than are the statistics presented in the *prima facie* case.

### B. Business Justification

If adverse impact is established, the burden of producing evidence shifts to the employer to show a business justification for the challenged employment practice. *Wards Cove Packing Co. v. Atonio, 109 S.Ct. 2115, 2126 (1989).*[7] As with conviction records, arrest records may be considered in the employment decision as evidence of conduct which may render an applicant unsuitable for a particular position. However, in the case of arrests, not only must the employer consider the relationship of the charges to the position sought, but also the likelihood that the applicant actually committed the conduct alleged in the charges. *Gregory v. Litton Systems*, 316 F. Supp. 401; *Carter v. Gallagher*, 452 F.2d 315, 3 EPD ¶8335 (8th Cir. 1971), *cert. denied*, 406 U.S. 950, 4 EPD ¶7818 (1972); *Reynolds v. Sheet Metal Workers Local 102*, 498 F. Supp. 952; *Dozier v. Chupka*, 395 F. Supp. 836 (D.C. Ohio 1975); *U.S. v. City of Chicago*, 411 F. Supp. 218 (N.D. Ill. 1974), *aff'd. in rel. part*, 549 F.2d 415 (7th Cir. 1977); *City of Cairo v. Illinois Fair Employment Practice Commission et al.*, 8 EPD ¶9682 (Ill. App. Ct. 1974); Commission Decisions Nos. 78-03, 77-23, 76-138, 76-87, 76-54, 76-39, 76-17, 74-92, 74-83, 76-03, 74-90, 78-03, 74-25, CCH EEOC Decisions (1983) ¶¶6714, 6710, 6700, 6665, 6639, 6630, 6612, 6424, 6414, 6598, 6423, 6400 and Commission Decisions Nos. 72-0947, 72-1005, 72-1460, CCH EEOC Decisions (1973) ¶¶6357, 6350 and 6341, respectively.

#### 1. A Business Justification Can Rarely Be Demonstrated for Blanket Exclusions on the Basis of Arrest Records

Since business justification rests on issues of job relatedness and credibility, a blanket exclusion of people with arrest records will almost never withstand scrutiny. *Gregory v. Litton Systems*, 316 F. Supp. 401. *Litton* held that an employer's policy of refusing to hire anyone who had been arrested "on a number of occasions" violated Title VII because the policy disproportionately excluded Blacks from consideration and was not justified by business necessity. In *Litton*, an applicant for a position as a sheet metal worker was disqualified because of his arrest record. The court found no business necessity because the employer had neither examined the particular circumstances surrounding the arrests nor considered the relationship of the charges made against him to the position of sheet metal worker. Since the employer had failed to establish a business necessity for its discriminatory policy, it was enjoined from basing future hiring decisions on arrest records. *Accord Carter v. Gallagher*, 452 F.2d 315 (firefighter); *Dozier v. Chupka*, 395 F. Supp. 836 (firefighter); *City of Cairo v. Illinois Fair Employment Practice Commission, et al.*, 8 EPD ¶9682 (police officer).

## App. 293

The Commission has consistently invalidated employment policies which create a blanket exclusion of persons with arrest records. Commission Decision Nos. 78-03, 76-87, 76-39, 76-17, 76-03, 74-90, 74-25, 72-0947, 72-1005, CCH EEOC Decisions (1983) ¶¶6714 (laborer), 6665 (police officer), 6630 (cashier), 6612 (credit collector), 6598 (catalogue clerk), 6423 (uniformed guard commissioned by police department), 6400 (firefighter), 6357 (line worker) and 6350 (warehouse worker or driver). In several decisions, it appears that the arrest record inquiry was made on a standard company application which was used by the employer to fill various positions and there was no mention of any particular position sought. Commission Decision Nos. 76-138, 76-54, 74-82, 74-83, 74-02 and 72-1460, CCH EEOC Decisions (1983) ¶¶6700, 6639, 6424, 6414, 6386 and 6341 and Commission Decision No. 71-1950, CCH EEOC Decisions (1973) ¶6274, respectively. An employer may not routinely exclude persons with arrest records based on the assumption that an arrest record will prevent an applicant from obtaining necessary credentials to perform a job without giving the applicant an opportunity to obtain those credentials. For example, in Decision 76-87, the Commission rejected an employer's assertion that employees' arrest records might hinder its ability to maintain fidelity (bond) insurance since it offered no proof to this effect.

Even where there is no direct evidence that an employer used an arrest record in an employment decision, a pre-employment inquiry regarding arrest records may violate Title VII. It is generally presumed that an employer only asks questions which he/she deems relevant to the employment decision. *Gregory v. Litton Systems*, 316 F. Supp. at 403-404. Noting that information which is *obtained* is likely to be used, the court in *Litton* enjoined the employer from making any pre-employment inquiries regarding arrests which did not result in convictions. *Id.*[(8)] *But see EEOC v. Local 638*, 532 F.2d 821 (2d Cir. 1976) (inquiry not invalidated where there was no evidence that union actually rejected applicants who had been arrested but not convicted); *Jimerson v. Kisco*, 404 F. Supp. 338 (E.D. Mo. 1975) (court upheld discharge for falsifying information regarding arrest record on a pre-employment application without considering the inquiry itself violated Title VII).[(9)] Numerous states have specifically prohibited or advised against pre-employment inquiries in their fair employment laws due to the possible misuse of this information.[(10)]

2. The Alleged Conduct Must Be Related to the Position Sought

As discussed above, an arrest record may be used as evidence of conduct upon which an employer makes an employment decision. An employer may deny employment opportunities to persons based on any prior conduct which indicates that they would be unfit for the position in question, whether that conduct is evidenced by an arrest, conviction or other information provided to the employer. It is the *conduct*, not the arrest or conviction *per se*, which the employer may consider in relation to the position sought. The considerations relevant to the determination of whether the alleged conduct demonstrates unfitness for the particular job were set forth in *Green v. Missouri Pacific Railroad Co.*, 549 F.2d 1158, 1160, 13 EPD ¶11,579 (8th Cir. 1977) and reiterated in the February 4, 1987 Statement on Convictions, page 2:

    1. the nature and gravity of the offense or offenses;

    2. the time that has passed since the conviction[(11)] (or in this case, arrest)...; and

    3. the nature of the job held or sought.

*See also Carter v. Maloney Trucking and Storage Inc.*, 631 F.2d 40, 43, 24 EPD ¶31,348 (5th Cir. 1980) (employer refused to rehire an ex-employee who had murdered a co-worker, not solely because of his conviction, but because he was a dangerous person and friends of the murdered man might try to retaliate against him while he was on the job); *Osborne v. Cleland*, 620 F.2d 195, 22 EPD ¶30,882 (8th Cir. 1980) (employee who had forfeited collateral on a charge of "sexual procurement" was unfit to be a nursing assistant in a psychiatric ward); *Lane v. Inman*, 509 F.2d 184 (5th Cir. 1975) (city ordinance which prohibited the issuance of taxicab driver permits to persons convicted of smuggling marijuana was "so obviously job related" that "it could not be held to be unlawful race discrimination," irrespective of any adverse impact); *EEOC v. Carolina Freight*, 723 F. Supp. 734, 52 EPD ¶39,538 (S.D. Fla. 1989) (criminal history was related to position of truck driver who transported valuable property); *McCray v. Alexander*, 30 EPD ¶33,219 (D. Colo. 1982), *aff'd* 38 EPD ¶35,509 (10th Cir. 1985) (supervisory guard was discharged for killing a motorist, while off-duty, in a traffic dispute because employer concluded that, despite his acquittal, the conduct showed poor judgment on the use of deadly force).

Where the position sought is "security sensitive," particularly where it involves enforcing the law or preventing crime, courts tend to closely scrutinize evidence of prior criminal conduct of applicants. *U.S. v. City of Chicago*, 411 F. Supp. 218, 11 EPD ¶10,597 (N.D. Ill. 1976), *aff'd in rel. part*, 549 F.2d 415, 13 EPD ¶11,380 (7th Cir. 1977), *on remand*, 437 F. Supp. 256 (N.D. Ill. 1977) (applicants for the police department were disqualified for

**App. 294**

prior convictions for "serious" offenses); *Richardson v. Hotel Corporation of America*, 332 F. Supp. 519, 4 EPD ¶7666 (E.D. La. 1971), *aff'd mem.*, 468 F.2d 951, 4 EPD ¶7666 (5th Cir. 1972) (bellman was discharged after his conviction for theft and receipt of stolen goods was discovered since bellmen had access to guests' rooms and was not subject to inspection when carrying packages); *Haynie v. Chupka*, 17 FEP Cases 267, 271 (S.D. Ohio 1976) (police department permissibly made inquiries regarding arrest records and other evidence of prior criminal conduct).[12] (See Examples 3 and 4).

Even where the employment at issue is not a law enforcement position or one which gives the employee easy access to the possessions of others, close scrutiny of an applicant's character and prior conduct is appropriate where an employer is responsible for the safety and/or well being of other persons. *Osborne v. Cleland*, 620 F.2d 195 (8th Cir. 1975) (psychiatric nursing assistant); *Lane v. Inman*, 509 F.2d 184 (taxi driver). In these instances, the facts would have to be examined closely in order to determine the probability that an applicant would pose a threat to the safety and well being of others. (See Examples 5 and 6).

3. Evaluating the Likelihood that the Applicant Engaged in the Conduct Alleged

The cases cited above illustrate the job-relatedness of certain conduct to specific positions. In cases alleging race discrimination based on the use of arrest records as opposed to convictions, courts have generally required not only job-relatedness, but also a showing that the alleged conduct was actually committed. In *City of Cairo v. Illinois Fair Employment Practice Commission, et al.*, 8 EPD ¶9682, the court held that where applicants sought to become police officers, they could not be absolutely barred from appointment solely because they had been arrested, as distinguished from convicted. *See also* Commission Decision No. 76-87, CCH EEOC Decisions (1983) ¶6665 (potential police officer could not be rejected based on one arrest five years earlier for riding in a stolen car since there was no conviction and the applicant asserted that he did not know that the car was stolen). Similarly, in Decision No. 74-83, CCH EEOC Decision (1983) ¶6424, the Commission found no business justification for an employer's unconditional termination of all employees with arrest records (all five employees terminated were Black), purportedly to cut down on thefts in the workplace. The employer could produce no evidence that the employees had been involved in any of the thefts or that persons who are arrested, but not convicted, are prone toward crime. Commission Decision No. 74-92, CCH EEOC Decisions (1983) ¶6424.

An arrest record does no more than raise a suspicion that an applicant may have engaged in a particular type of conduct.[13] Thus, the investigator must determine whether the applicant is likely to have committed the conduct alleged. This is the most difficult step because it requires the employer either to accept the employee's denial or to attempt to obtain additional information and evaluate his/her credibility. An employer need not conduct an informal "trial" or an extensive investigation to determine an applicant's or employee's guilt or innocence. However, the employer may not perfunctorily "allow the person an opportunity to explain" and ignore the explanation where the person's claims could easily be verified by a phone call, i.e., to a previous employer or a police department. The employer is required to allow the person a meaningful opportunity to explain the circumstances of the arrest(s) and to make a reasonable effort to determine whether the explanation is credible before eliminating him/her from employment opportunities.[14] (See Examples 1, 4, 5 and 6).

III. Examples

The following examples are provided to illustrate the process by which arrest record charges should be evaluated.

Example 1:

Wilma, a Black female, applies to Bus Inc. in Highway City for a position as a bus driver. In response to a pre-employment inquiry, Wilma states that she was arrested two years earlier for driving while intoxicated. Bus Inc. rejects Wilma, despite her acquittal after trial. Bus Inc. does not accept her denial of the conduct alleged and concludes that Wilma was acquitted only because the breatholizer test which was administered to her at the time of her arrest was not administered in accordance with proper police procedures and was therefore inadmissible at trial. Witnesses at Wilma's trial testified that after being stopped for reckless driving, Wilma staggered from the car and had alcohol on her breath. Wilma's rejection is justified because the conduct underlying the arrest, driving while intoxicated, is clearly related to the safe performance of the duties of a bus driver; it occurred fairly recently; and there was no indication of subsequent rehabilitation.

**App. 295**

Contrast Example Number 1 with the facts below.

<u>Example 2:</u>

Lola, a Black female, applies to Bus Inc. for a position as a bus driver. In response to an inquiry whether she had ever been arrested, Lola states that she was arrested five years earlier for fraud in unemployment benefits. Lola admits that she committed the crime alleged. She explains that she received unemployment benefits shortly after her husband died and her expenses increased. During this period, she worked part-time for minimum wage because her unemployment check amounted to slightly less than the monthly rent for her meager apartment. She did not report the income to the State Unemployment Board for fear that her payments would be reduced and that she would not be able to feed her three young children. After her arrest, she agreed to, and did, repay the state. Bus Inc. rejected Lola. Lola's rejection violated Title VII. The commission of fraud in the unemployment system does not constitute a business justification for the rejection of an applicant for the position of bus driver. The type of crime which Lola committed is totally unrelated to her ability to safely, efficiently and/or courteously drive a bus. Furthermore, the arrest is not recent.

<u>Example 3:</u>

Tom, a Black male, applies to Lodge City for a position as a police officer. The arrest rate for Blacks is substantially disproportionate to that of Whites in Lodge City. In response to an arrest record inquiry, Tom states that he was arrested three years earlier for burglary. Tom is interviewed and asked to explain the circumstances surrounding his arrest. Tom admits that although the burglary charge was dismissed for lack of sufficient evidence, he did commit the crime. He claims, however, that he is a changed man, having matured since then. Lodge City rejects Tom. Police officers are: 1) entrusted with protecting the public; 2) authorized to enter nearly any dwelling under the appropriate circumstances; and 3) often responsible for transporting valuables which are confiscated as evidence. The department is, therefore, justified in declining to take the chance that Tom has reformed. Even if the department is completely satisfied that Tom has reformed, it may reject him because his credibility as a witness in court could be severely damaged if he were asked about his own arrest and the surrounding circumstances while testifying against a person whom he had arrested. Since an essential element of police work is the ability to effect an arrest and to credibly testify against the defendant in court, the department would have two separate business justifications for rejecting Tom.

The above example is contrasted with circumstances under which an arrest record would not constitute grounds for rejection.

<u>Example 4:</u>

John, a Black male, applies to Lodge City for the same position as does Tom. John was arrested three years earlier for burglary. The charges were dismissed. Lodge City eliminates John from consideration without further investigation and will not consider the surrounding circumstances of the arrest. If allowed to explain, John could establish that his arrest was a case of mistaken identity and that someone else, who superficially fit John's description, was convicted of the crime for which John was initially charged. Since the facts indicate that John did not commit the conduct alleged in the arrest record, Lodge City has not carried its burden of proving a business justification for John's rejection.

<u>Example 5:</u>

David, a Black male, applies for a teaching position in West High School. In response to a pre-employment inquiry, David states that he was arrested two years earlier for statutory rape, having been accused of seducing a seventeen-year old student in his class when he taught at another high school. The charges were dismissed. West High rejects David. David relies on *Litton* to establish a *prima facie* case of race discrimination, and West High is unable to rebut the case with more current, accurate or specific statistics. David denies that there is any truth to the charge. West High decides to conduct a further investigation and learns that David was arrested after another teacher found him engaged in sexual activity with Ann, one of his students, in the school's locker room. This event occurred on Ann's eighteenth birthday, but in the confusion of the arrest, no one realized that Ann had just reached the age of majority. Ann's parents and other teachers believed that David had seduced Ann, who had a schoolgirl "crush" on him, prior to her eighteenth birthday.

However, since Ann would not testify against David, the charges had been dismissed. West High
may reject David. Irrespective of Ann's age, West High is justified in attempting to protect its
students from teachers who may make sexual advances toward them. Although he might not have
been guilty of statutory rape, his conduct was unbefitting a teacher.

The above example is contrasted to the following circumstances.

Example 6:

Paul, a Black male, applies for the same position as does David. Paul was arrested two years
earlier for statutory rape, having been accused of seducing a seventeen-year old student in his
class at another high school. West High eliminates Paul from consideration without further
investigation and refuses to consider the surrounding circumstances of the arrest. When filing his
complaint, Paul states that when he taught at the other high school, he befriended a troubled
student in his class, Alice, who was terrified of her disciplinarian parents. Paul insists that he never
touched Alice in any improper manner and that on the day before his arrest, Alice confided in him
that she had become pregnant by her seventeen-year old boyfriend, Peter, and was afraid to tell
her parents for fear that her father would kill him. Paul states that the charges were dismissed
because the district attorney did not believe Alice's statements. The district attorney and the
principal of the high school, Ms. P., confirm Paul's assessment of Alice. Ms. P. states that Peter
confided in her that he was the father of Alice's baby and that Alice had assured him that nothing
sexual had ever happened between her and Paul. Ms. P. states that there were indications that
Alice's father was abusive, that he had beaten her into giving him the name of someone to blame
for her pregnancy and that Alice thought that Paul could handle her father better than could Peter.
Since Paul denied committing the conduct alleged and his explanation was well supported by the
district attorney and his former employer, West High has not demonstrated a business justification
for rejecting Paul.

The examples discussed above demonstrate that whereas an employer may consider a conviction as conclusive
evidence that a person has committed the crime alleged, arrests can only be considered as a means of
"triggering" further inquiry into that person's character or prior conduct. After considering all of the
circumstances, if the employer reasonably concludes that the applicant's or employee's conduct is evidence
that he or she cannot be trusted to perform the duties of the position in question, the employer may reject or
terminate that person.

Date: 9-7-90

Approved: Date Evan J. Kemp, Jr.(Chairman)

---

### Footnotes

1.The July 29 Statement notes that despite national statistics showing adverse impact, an employer may refute
this *prima facie* showing by presenting statistics which are specific to its region or applicant pool. If these
statistics demonstrate that the policy has no adverse impact against a protected group, the plaintiff's *prima
facie* case has been rebutted and the employer need not show any business necessity to justify the use of the
policy. Statistics relating to arrests should be used in the same manner..

2.The policy statements on convictions use the term "business necessity," as used by courts prior to the
Supreme Court's decision in *Wards Cove Packing Co. v. Atonio*, 109 S. Ct. 2115 (1989). In *Atonio*, the
Supreme Court adopted the term "business justification" in place of business necessity, but noted that
"although we have phrased the query differently in different cases ... the dispositive issue is whether a
challenged practice serves, in a significant way, the legitimate employment goals of the employer," citing *inter
alia*, *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), 109 S. Ct. at 2125-2126.

3. *U.S. v. City of Chicago*, 385 F. Supp. 543, 556-557 (N.D. Ill. 1974), *adopted by reference*, 411 F. Supp. 218,
*aff'd in rel. part*, 549 F.2d 415, 432 (7th Cir. 1977); *City of Cairo v. Illinois Fair Employment Practice
Commission, et al.*, 8 EPD &9682 (Ill. App. Ct. 1974); Commission Decision Nos. 78-03, 77-23, 76-138, 76-87,
76-39, 74-92, 74-90, 74-83, 74-02, CCH EEOC Decisions (1983) &&6714, 6710, 6700, 6665, 6630, 6424,
6423, 6414, 6386 and Commission Decision Nos. 72-1460, 72-1005, 72-094 and 71-1950, CCH EEOC
Decisions (1973) &&6341, 6357 and 6274 respectively.

**App. 297**

4. The FBI's Uniform Crime Reporting Program reported that in 1987, 29.5% of all arrests were of Blacks. The U.S. Census reported that Blacks comprised 11.7% of the national population in 1980 and projected that the figure would reach 12.2% in 1987. Since the national percentage of arrests for Blacks is more than twice the percentage of their representation in the population (whether considering the 1980 figures or the 1987 projections), the *Litton* presumption of adverse impact, at least nationally, is still valid.

5. The statistics presented in Decision No. 77-23 pertain only to prison populations in the Southwestern United States. This data would, therefore, probably not constitute a *prima facie* case of discrimination for other regions of the country. In fact, there is no case law to indicate whether courts would accept this data as evidence of adverse impact for arrest records, even for cases arising in the Southwest, since all arrests do not result in incarceration. Decision No. 76-03 noted that Hispanics are arrested more frequently than are Whites, but no statistics were presented to support this statement.

6. *Cf. EEOC v. Carolina Freight Carriers*, 723 F. Supp. 734, 751, 52 EPD & 39,538 (S.D. Fla. 1989) (EEOC failed to provide statistics for the relevant labor market to prove that trucking company's exclusion of drivers with convictions for theft crimes had an adverse impact on Hispanics at a particular job site).

7. Under *Atonio*, the burden of producing evidence shifts to the employer, but the burden of persuasion remains with the plaintiff at all stages of a Title VII case. 109 S.Ct. at 2116. *Atonio* thus modifies *Griggs* and its progeny.

8. Furthermore, potential applicants who have arrest records may be discouraged from applying for positions which require them to supply this information, thus creating a "chilling effect" on the Black applicant pool. *Carter v. Gallagher*, 452 F.2d at 330-331; *Reynolds v. Sheet Metal Workers, Local 102*, 498 F. Supp. at 964 n.12, 966 n.13, 967, 973; Commission Decision Nos. 76-138, 76-87, 76-17, 74-90, 74-25 and 74-02, CCH EEOC Decisions (1983) &&6700, 6665, 6612, 6423, 6400, 6386 and Commission Decision Nos. 74-1005 and 71-1950, CCH EEOC Decisions (1973) &&6350 and 6274, respectively.

9. Note also that in *Walls v. City of Petersburg*, 895 F.2d 188, 52 EPD &39,602 (4th Cir. 1990), the court upheld an employer's policy of making an employment inquiry regarding the arrest records of employees' immediate family members. The court determined that under *Atonio*, the plaintiff was obligated to show not only that Blacks were more likely to have "negative" responses to this question, but also that the employer made adverse employment decisions based on such responses.

10. New York, Hawaii, Oregon, Wisconsin, New Jersey, Ohio, Virginia, District of Columbia, California, Maryland, Minnesota, Utah, Washington, West Virginia, Arizona, Colorado, Idaho, Massachusetts, Michigan, Mississippi.

11. *But see EEOC v. Carolina Freight Carriers*, 723 F. Supp. at 753 (court upheld trucking company's lifetime bar to employment of drivers who had been incarcerated for theft crimes since EEOC did not produce evidence that a 5-10 year bar would be an equally effective alternative). Note also that the court in *Carolina Freight* specifically rejected the Eighth Circuit's reasoning in *Green*, cautioning that *Green* could be construed too broadly. 723 F. Supp. at 752.

12. *See also Quarrels v. Brown*, 48 EPD &38,641 (D.C. Mich. 1988) (recent conviction was related to position of corrections officer). Note however, that this action was brought under 42 U.S.C. § 1983, rather than Title VII, and plaintiff alleged that he was discriminated against because he was an ex-offender, not because the policy adversely affected a protected group.

13. The employer's suspicion may be raised by an arrest record just as it would by negative comments about an applicant's conduct made by a previous employer or a personal reference.

14. Although the number of arrests is not determinative (see *Litton*), it may be relevant in making a credibility determination.

---

*This page was last modified on August 23, 2007.*

 Return to Home Page

# Attachment 38

| EEOC | *DIRECTIVES TRANSMITTAL* | **Number** **915.003** |
|---|---|---|
| | | **Date** **4/19/06** |

**SUBJECT:**　　　EEOC COMPLIANCE MANUAL

**PURPOSE:**　　　This transmittal covers the issuance of Section 15 of the new Compliance Manual, on "Race and Color Discrimination." The Manual Section provides guidance on analyzing charges of race and color discrimination under Title VII of the Civil Rights Act of 1964.

**ORIGINATOR:**　　Office of Legal Counsel, Title VII/ADEA/EPA Division

**EFFECTIVE**
**DATE:**　　　　Upon receipt

**DISTRIBUTION:**　　EEOC Compliance Manual holders

_____ /S/ _____

Cari M. Dominguez
Chair

**App. 300**

## SECTION 15: RACE and COLOR DISCRIMINATION
## TABLE OF CONTENTS

15 I   OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

15 II   WHAT IS "RACE" DISCRIMINATION? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

15 III   WHAT IS "COLOR" DISCRIMINATION? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

15 IV   RELATED PROTECTED BASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        A.      NATIONAL ORIGIN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        B.      RELIGION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        C.      INTERSECTIONAL DISCRIMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

15 V   EVALUATING EMPLOYMENT DECISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        A.      RACIAL DISPARATE TREATMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
              1.      Recognizing Racial Motive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
              2.      Conducting a Thorough Investigation . . . . . . . . . . . . . . . . . . . . . . . 13
                  •    Potential Evidence of Racial Disparate Treatment
                  •    Employer Credibility
              3.      Recognizing "Pattern or Practice" Race Discrimination . . . . . . . . . . 19
        B.      RACIAL DISPARATE IMPACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

15 VI   EQUAL ACCESS TO JOBS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        A.      RECRUITING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
              1.      Job Advertisements and Employment Agencies . . . . . . . . . . . . . . . . 23
              2.      Word of Mouth Referrals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
              3.      Homogeneous Recruitment Sources . . . . . . . . . . . . . . . . . . . . . . . . . 24
              4.      Discriminatory Screening of Recruits . . . . . . . . . . . . . . . . . . . . . . . . 24
        B.      HIRING AND PROMOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
              1.      Uniform and Consistently Applied Standards . . . . . . . . . . . . . . . . . 25
              2.      Job Related Standards, Consistent with Business Necessity . . . . . . . 27
                  •    Education Requirements
                  •    Employment Testing
                  •    Conviction and Arrest Records
        C.      DIVERSITY AND AFFIRMATIVE ACTION . . . . . . . . . . . . . . . . . . . . . . 31

15 VII   EQUAL OPPORTUNITY FOR JOB SUCCESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
        A.      RACIAL HARASSMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
              1.      Unwelcome Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
              2.      Severe or Pervasive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
              3.      Employer Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
                  •    Conduct of Supervisors
                  •    Conduct of Owner, President, Partners, or Officers
                  •    Conduct of Co workers and Non employees
        B.      RACIAL BIAS IN OTHER EMPLOYMENT TERMS AND CONDITIONS . . . . . . . . . . 44
              1.      Work Assignments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
              2.      Performance Evaluations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
              3.      Training and Constructive Feedback . . . . . . . . . . . . . . . . . . . . . . . . 46
              4.      Workplace Networks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
              5.      Appearance and Grooming Standards . . . . . . . . . . . . . . . . . . . . . . . . 47
              6.      Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
              7.      Discipline and Discharge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
        C.      RETALIATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

15 VIII   REMEDIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

15 IX   ☞PROACTIVE PREVENTION☜ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

**App. 301**

# SECTION 15: RACE and COLOR DISCRIMINATION

## 15-I  OVERVIEW

With the enactment of the Civil Rights Act of 1964, Congress sought to eliminate the problems of segregation and discrimination in the United States.  The impetus for the Act was the civil rights movement of the 1950s and 1960s, which challenged the denial of the right of Blacks to participate equally in society.

The employment title of the Act    Title VII    covers employment discrimination based on race, color, religion, sex, national origin, or protected activity.  Title VII's prohibitions against race and color discrimination were aimed at ending a system in which Blacks were "largely relegated to unskilled and semi-skilled jobs."[1]  However, Congress drafted the statute broadly to cover race or color discrimination against anyone    Whites, Blacks, Asians, Latinos, Arabs, American Indians and Alaska Natives, Native Hawaiians and Pacific Islanders, persons of more than one race, and all other persons.[2]

Today, the national policy of nondiscrimination is firmly rooted in the law.[3]  In addition, it generally is agreed that equal opportunity has increased dramatically in America, including in employment.  Blacks and other people of color now work in virtually every field, and opportunities are increasing at every level.

Yet significant work remains to be done.  Charges alleging race discrimination in employment accounted for 35.5 percent of the Commission's 2005 charge receipts, making race still the most-alleged basis of employment discrimination under federal law.[4]  In addition, several private studies conducted in the early 2000s provide telling evidence that race discrimination in employment persists.  A 2003 study in Milwaukee found that Whites with a criminal record received job call-backs at a rate more than three times that of Blacks with the same criminal record, and even

---

[1]    *See United Steelworkers of America v. Weber*, 443 U.S. 193, 202-03 (1979) (also noting: the 1962 unemployment rate of Blacks and other people of color was 124 percent higher than that of Whites).

[2]    The following terms are used interchangeably in this document due to their frequent and accepted vernacular usage: "Black" and "African American"; "White" and "Caucasian"; "Asian" and "Asian American"; "American Indian" and "Native American"; and "Latino" and "Hispanic."  The document will refer to non-Whites generally as "people of color."

[3]    *See Franks v. Bowman Transp. Co., Inc.*, 424 U.S. 747, 763 (1976) ("Congress intended to prohibit all practices in whatever form which create inequality in employment opportunity due to discrimination [prohibited by Title VII] . . . and ordained that its policy of outlawing such discrimination should have the highest priority.") (citations omitted). For a good discussion of the history of Title VII enforcement, see CELEBRATING THE 40TH ANNIVERSARY OF TITLE VII (2004), at http://www.eeoc.gov/abouteeoc/40th/panel/; and THE STORY OF THE UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION: ENSURING THE PROMISE OF OPPORTUNITY FOR 35 YEARS (2000), *available at* http://www.eeoc.gov/abouteeoc/35th/index.html.

[4]    *See* EEOC Charge Statistics, *at* http://www.eeoc.gov/stats/charges.html.

**App. 302**

at a rate higher than Blacks *without* a criminal record.[5]  A 2003 study in California found that temporary agencies preferred White applicants three to one over African American applicants.[6]  And, a 2002 study in Boston and Chicago found that résumés of persons with names common among Whites were 50 percent more likely to generate a request for an interview than equally impressive résumés of persons with names common among Blacks.[7]

Moreover, racial and ethnic disparities still exist in the labor market.  People of color are more likely than Whites to work in lower-paying jobs and less likely to work in higher-paying jobs.[8]  Unlawful employment discrimination is one of the reasons for these disparities.  Therefore, vigorous law enforcement, and proactive prevention of discrimination   i.e., enhanced outreach, education, and technical assistance to promote voluntary compliance   remain critical to ensuring that race and color play no part in employment decisions.

---

[5]    *See* Devah Pager, *The Mark of a Criminal Record*, AMERICAN JOURNAL OF SOCIOLOGY (Mar. 2003) (audit study sending matched pairs of Black and White male college students with similar self-presentation styles to apply for 350 low-skilled jobs advertised in the Milwaukee classifieds; purpose was to test the degree to which a criminal record affects subsequent employment opportunities; study found that when the White "testers" were assigned a fake 18-month prison record – for possession of cocaine with intent to sell – they were called back by employers 17% of the time, while the Black testers assigned the same record were called back only 5% of the time; Whites without a criminal record had a 34% call back rate versus a 14% call back rate for Blacks without a criminal record), *available at* http://www.northwestern.edu/ipr/publications/papers/2003/pagerajs.pdf.

[6]    *See* Jenny Bussey and John Trasviña, *Racial Preferences: The Treatment of White and African American Job Applicants by Temporary Employment Agencies in California, at* http://www.impactfund.org/DRC%20December%202003%20Report.pdf (Dec. 2003) (audit study sending specially trained matched pairs of White and Black job applicants to temporary agencies to determine whether one applicant received better treatment in one way or another, such as in obtaining an interview or job offer, higher pay, or longer job assignment; study found that the temporary agencies audited in Los Angeles preferred the White applicants 4 to 1 over the African American applicants, and more than 2 to 1 in San Francisco).

[7]    *See* Marianne Bertrand and Sendhil Mullainathan, *Are Emily and Brendan More Employable than Lakisha and Jamal?  A Field Experiment on Labor Market Discrimination, at* http://gsb.uchicago.edu/pdf/bertrand.pdf (Nov. 18, 2002) (after randomly assigning names common among Whites or Blacks to résumés of similar quality, Professors Bertrand and Mullainathan responded to over 1300 job advertisements in Boston and Chicago, and found that the hypothetical White applicants were 50 percent more likely to receive responses seeking interviews than the hypothetical Black applicants; moreover, the study revealed that improvements in résumé quality significantly increased the chances for a callback for Whites but did not significantly increase the chances for Blacks).

[8]    See generally the Census 2000 Special EEO Tabulation (Employment by EEO-1 Job Categories), available at http://www.census.gov/eeo2000/index.html.

**App. 303**

The purpose of this Manual Section is to provide guidance on Title VII's prohibition against workplace discrimination based on race or color.[9]  It discusses coverage issues, the importance of conducting a thorough investigation, various employer practices, and remedies for a violation.[10]  The Manual Section includes numerous examples, as well as guidance reflecting the Commission's strong interest in proactive prevention and "best practices."[11]

## 15-II  WHAT IS "RACE" DISCRIMINATION?

Title VII prohibits employer actions that discriminate, by motivation or impact, against persons because of race.  Title VII does not contain a definition of "race," nor has the Commission adopted one.  For the collection of federal data on race and ethnicity, the Office of Management and Budget (OMB) has provided the following five racial categories:  *American Indian or Alaska Native*; *Asian*; *Black or African American*; *Native Hawaiian or Other Pacific Islander*; and *White*; and one ethnicity category, *Hispanic or Latino*.[12]  OMB has made clear that these categories are "social-political constructs . . . and should not be interpreted as being genetic, biological, or anthropological in nature."[13]

---

[9]    Section 1981 of the Civil Rights Act of 1866 – 42 U.S.C. § 1981 – also provides a federal remedy for race discrimination in employment.  Section 1981 prohibits race discrimination in the making and enforcing of contracts, which includes, but is not limited to, most employment relationships.  While Title VII provides that private employers must have 15 or more employees to be covered, Section 1981 covers employers with any number of employees.  The EEOC does not enforce Section 1981.

[10]    The analysis in this Section generally applies to private, state and local, and federal sector complaints of race or color discrimination under Title VII.  Moreover, while this document focuses on discrimination by employers, Title VII also prohibits discriminatory practices by labor organizations, including union membership and representation, and employment agencies, including referral practices.

[11]    Best practices are proactive measures designed to reduce the likelihood of Title VII violations and to address impediments to equal employment opportunity.  A comprehensive overview of best practices is presented in the 1998 report "'Best' Equal Employment Opportunity Policies, Programs, and Practices in the Private Sector," which was prepared by an EEOC task force headed by former Commissioner Reginald E. Jones.  *See* EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, "BEST" EQUAL EMPLOYMENT OPPORTUNITY POLICIES, PROGRAMS, AND PRACTICES IN THE PRIVATE SECTOR  (2d ed. 1998).  According to the report, a "best practice":  complies with the law; promotes equal employment opportunity; shows management commitment and accountability; ensures management and employee communication; produces noteworthy results; and does not result in unfairness.  The complete report is available at http://www.eeoc.gov/abouteeoc/task_reports/practice.html.

[12]    *See* OFFICE OF MANAGEMENT AND BUDGET, PROVISIONAL GUIDANCE ON THE IMPLEMENTATION OF THE 1997 STANDARDS FOR FEDERAL DATA ON RACE AND ETHNICITY 6-7 (12/15/00).

[13]    *See id.* 9-10.

**App. 304**

Title VII's prohibition of race discrimination generally encompasses:

- **Ancestry:** Employment discrimination because of racial or ethnic ancestry. Discrimination against a person because of his or her ancestry can violate Title VII's prohibition against race discrimination. Note that there can be considerable overlap between "race" and "national origin," but they are not identical.[14] For example, discrimination against a Chinese American might be targeted at her Asian ancestry and not her Chinese national origin. In that case, she would have a claim of discrimination based on race, not national origin.

- **Physical Characteristics:** Employment discrimination based on a person's physical characteristics associated with race, such as a person's color, hair, facial features, height and weight.[15]

- **Race-linked Illness:** Discrimination based on race-linked illnesses. For example, sickle cell anemia is a genetically-transmitted disease that affects primarily persons of African descent. Other diseases, while not linked directly to race or ethnicity, may nevertheless have a disproportionate impact. For example, Native Hawaiians have a disproportionately high incidence of diabetes.[16] If the employer applies facially neutral standards to exclude treatment for conditions or risks that disproportionately affect employees on the basis of race or ethnicity, the employer must show that the standards are based on generally accepted medical criteria.[17]

- **Culture:** Employment discrimination because of cultural characteristics related to race or ethnicity. Title VII prohibits employment discrimination against a person because of cultural characteristics often linked to race or ethnicity, such as a person's name,[18] cultural dress and grooming practices,[19] or accent or manner of speech. For example, an employment decision based on a person having a so-called "Black accent," or "sounding White," violates Title VII if the accent or manner of speech does not materially interfere with the ability to perform job duties.

---

[14]    See also § 15-IV.A., *infra*.

[15]    See also § 15-VII.B.5, *infra*, on Appearance and Grooming Standards.

[16]    *See* Centers for Disease Control and Prevention Fact Sheet, *available at* http://www.cdc.gov/od/oc/media/pressrel/fs040402.htm (last visited 11/30/05).

[17]    *See* Section 3: *Employee Benefits*, EEOC Compliance Manual, Title VII/EPA Issues § II.B., *available at* http://www.eeoc.gov/policy/docs/benefits.html.

[18]    *See supra* note 7; *cf. El Hakem v. BJY, Inc.*, 415 F.3d 1068, 1073 (9th Cir. 2005) ("names are often a proxy for race and ethnicity").

[19]    See also § 15-VII.B.5, *infra*, on Appearance and Grooming Standards.

**App. 305**

- **Perception:** Employment discrimination against an individual based on a belief that the individual is a member of a particular racial group, regardless of how the individual identifies himself.  Discrimination against an individual based on a perception of his or her race violates Title VII even if that perception is wrong.

- **Association:**  Employment discrimination against an individual because of his/her association with someone of a particular race.  For example, it is unlawful to discriminate against a White person because he or she is married to an African American or has a multiracial child,[20] or because he or she maintains friendships or otherwise associates with persons of a certain race.

- **Subgroup or "Race Plus":**  Title VII prohibits discrimination against a subgroup of persons in a racial group because they have certain attributes in addition to their race.  Thus, for example, it would violate Title VII for an employer to reject Black women with preschool age children, while not rejecting other women with preschool age children.[21]

- **"Reverse" Race Discrimination:**  Title VII prohibits race discrimination against all persons, including Caucasians.[22]  A plaintiff may prove a claim of discrimination through direct or circumstantial evidence.  Some courts, however, take the position that if a White person relies on circumstantial evidence to establish a reverse discrimination claim, he or she must meet a heightened standard of proof.[23]  The

---

[20]     *See Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.*, 173 F.3d 988, 994-95 (6th Cir. 1999) (holding employee stated a claim under Title VII when he alleged that company owner discriminated against him after his biracial child visited him at work: "A white employee who is discharged because his child is biracial is discriminated against on the basis of his race, even though the root animus for the discrimination is a prejudice against the biracial child" because "the essence of the alleged discrimination . . . is the contrast in races.").

[21]     *Cf. Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971) (holding that an employer's refusal to hire a subgroup of women – those with preschool-age children – was sex-based).

[22]     *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 280 (1976) (Title VII prohibits race discrimination against all persons, including Whites).

[23]     *See, e.g., Mattioda v. White*, 323 F.3d 1288 (10th Cir. 2003) (Caucasian plaintiff failed to establish prima facie case because he did not present "background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority"); *Phelan v. City of Chicago*, 347 F.3d 679, 684-85 (7th Cir. 2003) (in cases of reverse race discrimination, White employee must show background circumstances demonstrating that particular employer has reason or inclination to discriminate invidiously against whites or evidence that there is something "fishy" about facts at hand); *Gagnon v. Sprint Corp.*, 284 F.3d 839, 848 (8th Cir. 2002) (in a Title VII claim of reverse race discrimination, employee must show that defendant is that unusual employer who discriminates against the majority, but if the employee fails to make this showing, he may still proceed by producing direct evidence of

15-5

**App. 306**

Commission, in contrast, applies the same standard of proof to all race discrimination claims, regardless of the victim's race or the type of evidence used.[24] In either case, the ultimate burden of persuasion remains always on the plaintiff.[25]

## 15-III  WHAT IS "COLOR" DISCRIMINATION?

Title VII prohibits employment discrimination because of "color" as a basis separately listed in the statute.  The statute does not define "color."  The courts and the Commission read "color" to have its commonly understood meaning    pigmentation, complexion, or skin shade or tone.  Thus, color discrimination occurs when a person is discriminated against based on the lightness, darkness, or other color characteristic of the person.  Even though race and color clearly overlap, they are not synonymous.[26]  Thus, color discrimination can occur between persons of different races or ethnicities, or between persons of the same race or ethnicity.[27]

### EXAMPLE 1
### COLOR-BASED HARASSMENT

James, a light-complexioned African American, has worked as a waiter at a restaurant for over a year.  His manager, a brown-complexioned African American, has frequently made offensive comments and jokes about James's skin color, causing him to lose sleep and dread coming in to work.  James's requests that the conduct stop only intensified the abuse.  James has been subjected to

---

discrimination).  *But see, e.g., Iadimarco v. Runyon,* 190 F.3d 151, 163 (3d Cir.1999) (rejecting heightened "background circumstances" standard); *Lucas v. Dole*, 835 F.2d 532, 533-34 (4th Cir. 1987) (declining to decide whether a "higher prima facie burden" applies in reverse discrimination cases).

[24]    *See McDonald*, 427 U.S. at 280 ("Title VII prohibits racial discrimination against the white petitioners in this case upon the *same standards* as would be applicable were they Negroes") (emphasis added).

[25]    *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000).

[26]    *See Walker v. Secretary of the Treasury, IRS*, 713 F. Supp. 403, 405-08 (N.D. Ga. 1989) (discrimination based on color not necessarily the same as race; cause of action available for suit by light skinned Black person against a dark skinned Black person), *aff'd* 953 F.2d 650 (11th Cir. 1992); c*f. Rodriguez v. Guttuso*, 795 F. Supp. 860, 865 (N.D. Ill. 1992) (Fair Housing claim succeeded on statutory ground of "color" discrimination where light-complexioned Latino defendant refused to rent to Latino couple because husband was a dark-complexioned Latino).

[27]    *See Santiago v. Stryker Corp.*, 10 F. Supp. 2d 93, 96 (D.P.R. 1998) (holding dark-complexioned Puerto Rican citizen replaced by light-complexioned Puerto Rican citizen could establish a prima facie case of "color" discrimination (quoting, with approval, *Felix v. Marquez*, 24 EPD ¶ 31,279 (D.D.C.1980): "'Color may be a rare claim, because color is usually mixed with or subordinated to claims of race discrimination, but considering the mixture of races and ancestral national origins in Puerto Rico, color may be the most practical claim to present.'")).

harassment in the form of a hostile work environment, based on his color.  (See § 15-VII.A. for a discussion of harassment.)

**EXAMPLE 2**
**COLOR-BASED EMPLOYMENT DECISIONS**

Melanie, a brown-complexioned Latina, works as a sales clerk for a major department store.  She applies for a promotion to be the Counter Manager for a major line of beauty products, but the employer denies her the promotion because the vendor prefers a "light skinned representative" to manage its product line at this particular location.  The employer has unlawfully discriminated on the basis of color.

Throughout the remainder of this Manual Section, the term "race," rather than "color," generally is used.  This is done for stylistic reasons, as well as to reflect that many more race claims are made each year than color claims.  However, the same analyses apply to both race and color.

## 15-IV  RELATED PROTECTED BASES

Multiple protected bases of discrimination can be raised by the same set of facts, both because negative stereotypes and biases may be directed at more than one protected basis at a time, and because certain protected bases overlap considerably.  Thus, for example, a discrimination complaint by an "Asian Indian" can implicate race, color, and national origin,[28] as can, for example, a complaint by a Black person from an African nation, or by a dark-skinned Latino.  For Title VII purposes, the question is whether any prohibited factors led to an adverse employment action, alone or combined.

All bases of discrimination that are reasonably implicated by the facts should be included in the charge or complaint (e.g., race, color, national origin, religion, sex, etc.).  Failure to include all possible bases may result in a court dismissing a legitimate claim.[29]

---

[28]    *See, e.g., Dixit v. City of New York Dep't of General Servs.*, 972 F. Supp. 730, 735 (S.D.N.Y. 1997) (holding that a charge that alleged discrimination on the basis of being "Asian Indian" sufficed to raise both race and national origin because EEOC could reasonably be expected to investigate both).

[29]    Although a lawsuit can encompass any claim that can reasonably be expected to flow from the charge of discrimination, some courts narrowly construe what can reasonably be expected to flow. *Compare, e.g., Bryant v. Bell Atlantic Md., Inc.*, 288 F.3d 124 (4th Cir. 2002) (plaintiff whose charge alleged only race discrimination could not later bring suit based on, *inter alia*, color) *with*, *e.g., Deravin v. Kerik*, 335 F.3d 195 (2d Cir. 2003) (African American who checked "national origin" in his charge, alleging preferential treatment of Irish Americans, could bring subsequent lawsuit based on race).

**App. 308**

## A.    NATIONAL ORIGIN

In forbidding "national origin" discrimination, Title VII prohibits the denial of equal employment opportunity because of the place of origin of an individual or his or her ancestors, or because an individual has the physical, cultural, or linguistic characteristics of a national origin group. National origin and race often overlap because persons who themselves are, or whose ancestors were, of the same national origin frequently are of the same race.[30] The overlap between race and national origin is particularly clear in the case of Asian Americans.[31] For a thorough discussion of national origin discrimination, see Section 13: *National Origin Discrimination* (2002), *available at* http://www.eeoc.gov/policy/docs/national-origin.html, and see Guidelines on Discrimination Because of National Origin, at 29 C.F.R. § 1606.1.

## B.    RELIGION

Title VII's prohibition against race discrimination also may overlap with its prohibition against discrimination based on religion. Both race and religion might be implicated where, for example, an employer discriminates against an employee based on the employee's belief in a religion tied to a particular race or ethnicity (e.g., Hinduism/Asians).

## C.    INTERSECTIONAL DISCRIMINATION

Title VII prohibits discrimination not just because of one protected trait (e.g., race), but also because of the intersection of two or more protected bases (e.g., race and sex). For example, Title VII prohibits discrimination against African American women even if the employer does not discriminate against White women or African American men.[32] Likewise, Title VII protects Asian

---

[30]    *Cf. St. Francis College v. Al Khazraji*, 481 U.S. 604, 614 (1987) (Brennan, J., concurring) (noting that, according to EEOC's definition of "national origin" at 29 C.F.R. § 1606.1, "in the Title VII context, the terms [race and national origin] overlap as a legal matter," and reading the majority opinion to state only that § 1981 does not cover discrimination where the two do not overlap, i.e., where the discrimination is based on "birthplace alone," which is purely national origin); *Perkins v. Lake County Dep't of Utils.*, 860 F. Supp. 1262, 1272-73 (N.D. Ohio 1994) (listing the § 1981 cases in which courts engaged in what it called "mental gymnastics" to define "race" and to distinguish it from national origin).

[31]    Race and national origin also clearly overlap with respect to American Indians, because they often are perceived in racial terms and they originate from tribes that "were at one time considered to be nations by both the colonizing countries and later the United States." *Dawavendewa v. Salt River Project Agric. Improvement and Powers Distr.*, 154 F.3d 1117, 1119-20 (9th Cir. 1998). Thus, an allegation that an employer discriminated against an American Indian may be analyzed as either race discrimination or national origin discrimination. *See Perkins*, 860 F. Supp. at 1273 n.7 (noting that courts have analyzed discrimination against American Indians in terms of both national origin and race discrimination).

[32]    *See Jeffries v. Harris County Comty. Action Comm'n*, 615 F.2d 1025, 1032-34 (5th Cir. 1980) ("we hold that when a Title VII plaintiff alleges that an employer discriminates against black females, the fact that black males and white females are not subject to discrimination is irrelevant"). For a discussion of the progress that women of color have made, as well as stubborn patterns of stagnation, see EEOC's study titled

15-8

American women from discrimination based on stereotypes and assumptions about them "even in the absence of discrimination against Asian American men or White women."[33]  The law also prohibits individuals from being subjected to discrimination because of the intersection of their race and a trait covered by another EEO statute    e.g., race and disability,[34] or race and age.[35]

## 15-V   EVALUATING EMPLOYMENT DECISIONS

Race and color cases generally fall under one of two categories, depending on which category most suits the facts    disparate treatment and disparate impact.   Disparate treatment discrimination occurs when race or another protected trait is a motivating factor in how an individual is treated.  Disparate impact discrimination occurs when a neutral policy or practice has a significant negative impact on one or more protected groups, and either the policy or practice is not job-related and consistent with business necessity or there is a less discriminatory alternative and the employer has refused to adopt it.

## A.    RACIAL DISPARATE TREATMENT

### 1.    Recognizing Racial Motive

Title VII is violated if race was all or part of the motivation for an employment decision.[36] The most obvious violation is a decision driven by racial animus.

-------

WOMEN OF COLOR: THEIR EMPLOYMENT IN THE PRIVATE SECTOR (2003), *available at* http://www.eeoc.gov/stats/reports/womenofcolor/index.html.

[33]    *Lam v. University of Hawaii*, 40 F.3d 1551, 1561-62 (9th Cir. 1994) (holding lower court erred when it treated the claim of an Asian woman in terms of race *or* sex separately; lower court should have considered whether discrimination occurred because of the plaintiff's combined race *and* sex).

[34]    *See* Peter Blanck et al., *The Emerging Workforce of Entrepreneurs with Disabilities: Preliminary Study of Entrepreneurship in Iowa*, 85 IOWA L. REV. 1583 n.157 (2000) (African American women with disabilities disproportionately disadvantaged in employment opportunities). The Americans with Disabilities Act of 1990 (ADA) forbids employers with 15 or more employees from discriminating against qualified individuals with disabilities. *See* 42 U.S.C. §§ 12101 *et seq.*  Numerous EEOC resources explaining the ADA can be found on the Commission's web site at www.eeoc.gov.

[35]    The Age Discrimination in Employment Act of 1967 (ADEA) forbids employers with 20 or more employees from discriminating against applicants or employees age 40 and over because of their age. *See* 29 U.S.C. §§ 621 *et seq.*

[36]    However, note that under certain circumstances the statute permits "a business or enterprise on or near an Indian reservation" to give a preference to "an Indian living on or near a reservation." 42 U.S.C. § 2000e-2(i); Section 2: *Threshold Issues*, EEOC Compl.  Man., § 2-II.B.4.ii, *at* http://www.eeoc.gov/policy/docs/threshold.html#2-III-B-4-b-ii.  See also § 15-VI.C, *infra*, discussing diversity and affirmative action.

**App. 310**

## EXAMPLE 3
## RACIAL ANIMUS

The employer is a family-owned construction company in need of a construction manager for one of its work crews. Dexter, an African American, is new to the area and applies for the job. He held the same position with another company before relocating. Dexter is rejected. When he finds out that a less-qualified White person was hired instead of him, Dexter alleges discrimination. The company secretary credibly testifies that she overheard an argument between the owner and his son over whether Dexter should be hired. Because Dexter was clearly the most qualified applicant, the son wanted to hire Dexter, but the owner did not. At one point the secretary heard the owner say: "As long as I'm running this company I won't have a Black man doing a White man's job!" The employer has violated Title VII.

Racially biased decisionmaking and treatment, however, are not always conscious.[37] The statute thus covers not only decisions driven by racial animosity, but also decisions infected by stereotyped thinking or other forms of less conscious bias.[38]

## EXAMPLE 4
## RACIAL STEREOTYPING OR BIAS

Charles, an African American, files a charge alleging that the employer, a retailer, used an interview to discriminate against him in favor of a less experienced White applicant. During the EEOC investigator's discussion with the hiring manager, she notices that the hiring manager's statements are peppered with comments such as "we were looking for a clean cut image," and "this is a sophisticated upscale location . . . I have to make sure the people I hire have, you know, the 'soft-skills' we need." Knowing that these statements

---

[37]    *See Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 42, 59-61 (1st Cir. 1999) (holding layoff could be found unlawful where performance evaluations on which layoffs were based were racially biased, and discussing the longstanding recognition that unlawful discrimination can stem from stereotyping and cognitive bias, as well as from conscious animus). For an academic discussion of the role unconscious bias can play in discrimination, see also Charles R. Lawrence III, *The Id, the Ego, and Equal Protection: Reckoning with Unconscious Racism*, 39 STAN. L. REV. 317 (1987).

[38]    For example, although a "personality conflict" can be a legitimate, nondiscriminatory reason for an employment decision, the personality conflict must not be rooted in any employer racial bias toward the employee. See generally Chad Derum and Karen Engle, *The Rise of the Personal Animosity Presumption in Title VII and the Return of "No Cause" Employment*, 81 TEX. L. REV. 1177, 1224-47 (2003).

could be reflective of racial stereotyping and bias,[39] the investigator evaluates the employer's decisionmaking very carefully.    The investigator interviews Charles's most recent employer, who tells the investigator that "customers just loved working with Charles . . . he was one of our most effective and motivated employees."    The investigator also interviews the person hired and finds no basis for believing her "soft skills," or her "image," were any better than Charles's.    In addition, the investigator notices that, like the person hired over Charles, the rest of the staff also is White even though the qualified labor market is significantly more diverse.    The investigator concludes that the employer rejected Charles based on racial stereotyping or bias.

Title VII also does not permit racially motivated decisions driven by business concerns    for example, concerns about the effect on employee relations,[40] or the negative reaction of clients or customers.[41]  Nor may race or color ever be a bona fide occupational qualification under Title VII.[42]

### EXAMPLE 5
### RACIAL STEERING OR ASSIGNMENT

An employer admits that it usually assigns Black and Asian American salespersons to sales territories with a high percentage of

---

[39]        See PHILIP MOSS & CHRIS TILLY, STORIES EMPLOYERS TELL: RACE, SKILL, AND HIRING IN AMERICA (2001) (discussing wide-ranging survey of employers in major U.S. cities regarding skills employers seek for jobs requiring no more than a high school education; concluding that in this segment of labor market racial disparities are caused by hard-to-separate mix of objective skill differences, cultural gaps, and employer racial bias in assessing skills, particularly "soft skills," i.e., positive attitude, interaction skills, motivation, dependability).

[40]        See International Union, UAW v. Johnson Controls, Inc., 499 U.S. 187, 199 (1991) (disparate treatment liability "does not depend on why the employer discriminates but rather on the explicit terms of the discrimination"); Goodman v. Lukens Steel Co., 482 U.S. 656, 668-69 (1987) (though there was "no suggestion below that the Unions held any racial animus against or denigrated Blacks generally," Unions violated Title VII and § 1981 by intentionally not pressing the work grievances of Black employees so as not to antagonize the employer or upset White workers).

[41]        Cf. Rucker v. Higher Educational Aids Bd., 669 F.2d 1179 (7th Cir. 1982) (Black employee had viable retaliation claim for opposing employer's rejection of White person for promotion to youth counselor on grounds that the predominantly Black community preferred a Black counselor: stating "Title VII is a blanket prohibition of racial discrimination, rational and irrational alike, even more so than of other forms of discrimination attacked in Title VII . . . .   [Thus,] it is clearly forbidden by Title VII to refuse on racial grounds to hire someone because your customers or clientele do not like his race.").

[42]        See 42 U.S.C. § 2000e-2(e)(1) (Title VII's "bona fide occupational qualification" (BFOQ) exception applies to all Title VII bases except race and color); 42 U.S.C. § 2000e-2(k)(2) ("business necessity" defense available in disparate impact cases is not available in intentional discrimination cases).

Blacks and Asian Americans.  It is uncontested that the employer does not harbor ill-will toward either group.  Instead, the employer believes they will better serve sales territories with high percentages of Blacks and Asian Americans, and thus increase sales to the benefit of the firm's bottom line and their careers.  Charges are filed by employees who want the opportunity to work in territories regardless of their racial makeup.  The employer has violated Title VII, which prohibits employers from depriving employees of employment opportunities by limiting, segregating, or classifying them on the basis of race.[43]

## EXAMPLE 6
### YIELDING TO CUSTOMERS' RACIAL PREFERENCES

The employer is a home care agency that hires out aides to provide personal, in-home assistance to elderly, disabled, and ill persons. It has a mostly White clientele.  Many of its clients have expressed a desire for White home care aides.  Gladys, an African American aide at another agency, applies for a job opening with the employer because it pays more than her current job.  She is well qualified and has received excellent performance reviews in her current position.  The employer wants to hire Gladys but ultimately decides not to because it believes its clientele would not be comfortable with an African American aide.  The employer has violated Title VII because customer preference is not a defense to race discrimination.[44]

---

[43]    *See* 42 U.S.C. § 2000e-2(a) ((1) unlawful to discriminate in, among other things, compensation, terms, conditions, or privileges of employment, because of such individual's race, etc; (2) unlawful to deprive employment opportunities by limiting, segregating, or classifying employees because of race or other Title VII-protected traits); *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 743-44 (7th Cir. 1999) (African American Plaintiff who alleged he was fired because of race could survive summary judgment because a jury could infer from unlawful segregation and job limitations – i.e, African-American salespersons were required to serve predominantly African-American accounts, and White salespersons were required to serve accounts owned or frequented by Whites – that the employer's stated nondiscriminatory reason for firing Plaintiff was pretext); *cf. Ferrill v. The Parker Group, Inc.*, 168 F.3d 468, 472-73 & 475 n.7 (11th Cir. 1999) (holding liable under § 1981 telephone marketing firm that admittedly assigned Black employees to make calls to Black households, and White employees to make calls to White households).

[44]    *E.g., Ray v. University of AK*, 868 F. Supp. 1104, 1126-27 (E.D. Ark. 1994) (even if race could be a BFOQ, customer preference could not satisfy the defense); *Rucker*, at note 41, *supra*.

**App. 313**

## 2.    Conducting a Thorough Investigation

Because discrimination often is subtle, and there rarely is a "smoking gun,"[45] determining whether race played a role in the decisionmaking requires examination of all of the surrounding facts and circumstances.[46]  The presence or absence of any one piece of evidence often will not be determinative.  Sources of information can include witness statements, including consideration of their credibility; documents; direct observation; and statistical evidence such as EEO-1 data, among others.  *See* EEOC Compl. Man., Vol. I, Sec. 26, "Selection and Analysis of Evidence."  A non-exhaustive list of important areas of inquiry and analysis is set out below.

### Potential Evidence of Racial Disparate Treatment

- **Race-related statements (oral or written) made by decisionmakers or persons influential to the decision**.  Race-related statements include not only slurs and patently biased statements, but also "code words" that are purportedly neutral on their face but which, in context, convey a racial meaning.[47]  The credibility of the witness(es) attesting to discriminatory statements, and the credibility of the witness(es) denying them, are critical to determining whether such statements actually were made.  If racially discriminatory statements were made, their importance will depend on their egregiousness and how closely they relate   in time

---

[45]    *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081-82 (3d Cir. 1996) ("It has become easier to coat various forms of discrimination with the appearance of propriety, or to ascribe some other less odious intention to what is in reality discriminatory behavior. In other words, while discriminatory conduct persists, violators have learned not to leave the proverbial 'smoking gun' behind."); *cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973) ("it is abundantly clear that Title VII tolerates no racial discrimination, subtle or otherwise").

[46]    Circumstantial evidence can be just as useful and persuasive as direct evidence, and sometimes more so.  *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("The reason for treating circumstantial and direct evidence alike is both clear and deep-rooted: 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'") (citation omitted).

[47]    *See, e.g., Ash v. Tyson Foods, Inc.*, No. 05-379, 2006 WL 386343, at *1 (U.S. Feb. 21, 2006) (per curiam) (referring to African American men as "boy" could be evidence of discrimination without any explicit racial modifiers: "Although it is true the disputed word will not always be evidence of racial animus, it does not follow that the term, standing alone, is always benign. The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage.  Insofar as the Court of Appeals held that modifiers or qualifications are necessary in all instances to render the disputed term probative of bias, the court's decision is erroneous."); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1117 (9th Cir. 2004) ("The reference to McGinest as a 'drug dealer' might certainly be deemed to be a code word or phrase.  In fact, reported cases have recognized the racial motivations behind this and other comments and slurs experienced by McGinest. . . .  GTE's attempt to deny the possible racial overtones of many of the comments made to McGinest or uttered in his presence indicates a willful blindness to racial stereotyping.") (citations omitted); *Aman ,*85 F.3d at 1083 (supervisor's statement to Black employee that he would get rid of "all of you" could be seen, in context, as conveying a racially offensive message).

and content   to the decision in question.  For example, a statement that there are "too many Asians" in a department, made by a hiring official when discussing applicants, would be strong evidence supporting an Asian American's failure-to-hire claim.  Such a statement also would support a claim of hostile work environment by Asian American employees.[48]

- **Comparative treatment evidence**.  This is evidence as to whether the claimant was treated the same as, or differently than, similarly situated persons of a different race.  Such evidence is not always required, but a difference in the treatment of similarly situated persons of different races is probative of discrimination because it tends to show that the treatment was not based on a nondiscriminatory reason.  Conversely, an employer's consistent treatment of similarly situated persons of different races tends to support its contention that no discrimination occurred.  Comparator evidence that supports either party's position must be weighed in light of all the circumstances.  For example, if the group of similarly situated persons who were treated better than the claimant included persons of the claimant's race, that would weaken his or her claim, but it would not be conclusive proof of nondiscrimination because the balance of the evidence overall might still more convincingly point to discrimination.[49]  Identification of persons who are similarly situated to the claimant should be based on the nature of the allegations, the alleged nondiscriminatory reasons, and other important factors suggested by the context,[50] but should not be based on unduly restrictive standards.[51]

---

[48]    See subsection 15-VII.A. for a discussion of harassment.

[49]    *See, e.g., Connecticut v. Teal*, 457 U.S. 440, 455 (1982) ("Congress never intended to give an employer license to discriminate against some [persons of a certain race] merely because he favorably treats other members of the employees' group."); *cf. Sinai v. New England Telephone & Telegraph Co*, 3 F.3d 471, 474 (1st Cir. 1993) (in a Section 1981 case: "The relevant issue in a discrimination claim is whether the defendant discriminates against the plaintiff on an improper basis.  The fact that the defendant hired other members of the protected class is evidence that the jury can consider in reaching the ultimate issue, but is not dispositive in itself.  The jury must weigh all of the evidence.").

[50]    For example, if an employee alleges that his race was a reason he was discharged or disciplined for misconduct, similarly situated employees should be identified who engaged in misconduct of comparable seriousness.  *See McDonnell Douglas*, 411 U.S. at 804 (Court stated that Black employee who was terminated and refused rehire because of alleged misconduct should be given a fair opportunity to show that the reason was pretextual, and "[e]specially relevant to such a showing would be evidence that white employees involved in acts . . . of comparable seriousness . . . were nevertheless retained or rehired").

[51]    Some courts engage in an analysis of "similarly situated" that is unduly restrictive.  *See, e.g.,Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (requiring plaintiff to show that all relevant aspects of her employment situation were "nearly identical" to those of her comparator).  See generally Ernest F. Lidge III, *The Courts' Misuse of the Similarly Situated Concept in Employment Discrimination Law,* 67 Mo. L. Rev. 831, 863-82 (2002).

**App. 315**

- **Relevant background facts**. Specific employment decisions and issues should not be looked at in isolation. Other information that can shed light on whether the employer's adverse employment decision was motivated by race includes the employer's treatment of other employees (or customers, etc.), race-related attitudes, the work environment generally, and the context of the challenged employment decision.[52] For example, background evidence that an employer has permitted racial jokes and slurs about Asian Americans in the workplace would support an Asian American employee's allegation that her termination was based on her race.[53] Similarly, background evidence that an employer has discriminated against African Americans in hiring, pay, or promotions would support an African American employee's claim that a pattern of mistreatment — e.g., her supervisor undermining her work, ostracizing her, and making snide comments — is actually a pattern of race-based harassment.[54] The point is that background evidence can help determine the employer's state of mind and otherwise provide important context. Also, as suggested by the above examples, the inquiry into background evidence can reveal other potential violations of the statute.

- **Relevant personnel policies**. An employer's deviation from an applicable personnel policy, or a past practice, can support an inference of a discriminatory motive. Conversely, acting in conformance with a consistently applied nondiscriminatory policy or practice would suggest there is no such motive.

- **The decisionmaker's race**. The race of the decisionmaker may be relevant, but is not controlling.[55] In other words, it should not be presumed that a person would not

---

[52]    *See, e.g., National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (prior discriminatory acts may be used as background evidence to support a claim); *Aman*, 85 F.3d at 1083 ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.") (citation and quotation marks omitted).

[53]    *See, e.g., United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 713 n.2 (1983) (background evidence that person responsible for promotion decisions made derogatory remarks about Blacks in general and Plaintiff in particular was relevant to Plaintiff's failure to promote claim); *Robinson v. Runyon*, 149 F.3d 507, 512-13 (6th Cir. 1998) (evidence that coworkers circulated fake employment application incorporating racial stereotypes of African-Americans, and that supervisors laughed upon reading the document, was relevant to African American employee's discriminatory discharge claim).

[54]    See subsection 15-VII.A. for a discussion of harassment.

[55]    *See United States v. Crosby,* 59 F.3d 1133, 1135 n. 4 (11th Cir.1995) (although a Title VII violation may occur even where a supervisor or decisionmaker is of the same race as the alleged victim, there was no evidence here that the Black supervisor held members of his own race to a higher standard of conduct than members of another race) (citing *Billingsley v. Jefferson County*, 953 F.2d 1351, 1353 (11th Cir.1992) (Title VII cause of action even where decision-maker and employee are of the same race)). Same-race harassment also violates Title VII. *See infra* note 122.

discriminate against members of his own race.   As the Supreme Court has noted, "[b]ecause of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group."[56]

●   **Statistical evidence**.  Statistics reflecting the employer's general policy or practice can be helpful in determining whether race was a factor in a particular selection decision.  For example, a Black applicant's allegation of hiring discrimination would be bolstered by evidence that the selection rate of qualified Black applicants is significantly below the selection rate of qualified applicants of other races, or that Blacks are significantly under-represented in the employer's workplace given their availability in the qualified labor market.[57]   Conversely, while a racially diverse workforce cannot immunize an employer from liability for specific acts of discrimination, the more racially diverse the relevant part of the employer's workforce is, the less credible would be the claim of discrimination.[58]  Statistical evidence also is important in determining whether the employer has a systemic pattern or  practice of discriminating (see § 15-V.A.3.).

### Employer Credibility

The credibility of the employer's explanation is key and must be judged in light of all the evidence obtained during the investigation.  If an employer's explanation for the employee's treatment ultimately is not credible, that is powerful evidence that discrimination is the most likely explanation.[59]  An employer's credibility will be undermined if its explanation is unsupported by

---

[56]    *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Castaneda v. Partida*, 430 U.S. 482, 499 (1977)).

[57]    *See McDonnell Douglas*, 411 U.S. at 804-05 (statistical evidence showing an employer's general policy or practice is relevant to whether individual employment decision was discriminatory); *Bell v. E.P.A.*, 232 F.3d 546, 553-54 (7th Cir. 2000) (stating statistical evidence may be "relevant to and probative of the issue of pretext even when it is insufficient to support a pattern and practice disparate treatment case" and "the evidence that blacks are not promoted as often as nonblacks, even though not statistically significant, is still circumstantial evidence of possible discrimination").

[58]    *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978) (while "[a] racially balanced work force cannot immunize an employer from liability for specific acts of discrimination, . . . [p]roof that [the employer's] workforce was racially balanced or that it contained a disproportionately high percentage of minority employees is not wholly irrelevant").

[59]    *See Reeves*, 530 U.S. at 147 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.  Proving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination.  In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law

**App. 317**

or contrary to the balance of the facts. Similarly, the credibility of the explanation can be called into question if it is unduly vague,[60] appears to be an after-the-fact explanation, or appears otherwise fabricated (e.g., the explanation shifts, or inconsistent reasons are given).

Of course, even if the employer's explanation lacks credibility, discrimination will not be found if the evidence affirmatively demonstrates that the employer's real motivation was not race or another protected EEO trait, but something not covered by the laws enforced by EEOC    for example, an employee's blowing the whistle to the SEC about violations of securities laws. Also, an employer's business decision cannot be found discriminatory simply because it appears that the employer acted unwisely, or that the employer's decision was in error or a misjudgment. At the same time, the reasonableness of the employer's explanation is an important part of the overall picture.[61] The investigator must look at the totality of the evidence to determine if there is reason to believe the employer acted in a racially motivated manner.

### EXAMPLE 7
### EMPLOYER EXPLANATION CREDIBLE

Alex, of Hispanic descent, has been progressively promoted and now holds a mid-level management position in a public relations firm in which he is responsible for several important accounts. The clients and the employer are happy with his performance. A senior-level management position that involves more responsibility opens up. The employer desires someone with demonstrated creativity to fill it. Alex applies for the job, but is not selected. Instead, the employer chooses Jennifer, a White female who, while qualified, has slightly less seniority and relevant experience. Alex files a charge alleging race and/or national origin discrimination. The investigation reveals that while Jennifer has somewhat less experience than Alex, she has displayed more creativity than Alex by developing a new way to reach the youth market, consistently suggesting improvements on the

---

that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt.") (citations and internal quotation marks omitted).

[60]    Employers have leeway to make subjective decisions, but regardless of whether the reasons are objective or subjective, the employer's "explanation of its legitimate reasons must be clear and reasonably specific" so that "the plaintiff is afforded a 'full and fair opportunity' to demonstrate pretext." *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 258 (1981). The explanation must be clearly set forth through the presentation of evidence. *Id.* at 255. A person evaluating a decision based on subjective factors should do so carefully because subjective factors "are more susceptible of abuse and more likely to mask pretext." *See Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 320 (3d Cir. 2000) (citation and quotation marks omitted).

[61]    *See, e.g., Burdine*, 450 U.S. at 259 (Title VII "was not intended to 'diminish traditional management prerogatives.'  .  .  .  The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination") (citations omitted).

15-17

**App. 318**

design of marketing materials, and implementing a new system for quickly disseminating time-sensitive documents. Alex, on the other hand, is seen as competent, hard working, and professional, but not as someone who displays quite as much creativity as wanted for the new job. There is clear and reasonably specific evidence verifying the perceived difference between Alex's and Jennifer's creativity. There is no evidence of discrimination other than comparative qualifications. The relatively minor differences in the employees' qualifications, alone, do not warrant a conclusion that Alex's nonpromotion was motivated by race or national origin.[62]

## EXAMPLE 8
## EMPLOYER EXPLANATION NOT CREDIBLE

To change Example 7, if Alex outshone Jennifer in the other performance categories important for the promotion, such as customer relations, and leadership skills, the employer's stated reason that it chose the most qualified person would lack credibility and it would be reasonable to suspect that Alex's race/national origin motivated the employer. Similarly, if there was any evidence supporting Alex's case other than relative qualifications e.g., derogatory statements about the leadership potential of Hispanics, shifting explanations, a pattern of not promoting Hispanics, or inconsistency suggesting bias against Hispanics in measuring creativity the totality of the evidence could lead one to conclude that Alex's race/national origin likely motivated the employer.[63]

---

[62] In *Ash v. Tyson Foods*, the Supreme Court declined to articulate a standard for inferring pretext from superior qualifications, but the Court rejected the Eleventh Circuit's formulation – that "the disparity in qualifications [must be] so apparent as virtually to jump off the page and slap you in the face" – as unhelpful, imprecise, and unlikely to yield consistent results in the courts. *See Ash v. Tyson Foods, Inc.*, No. 05-379, 2006 WL 386343, at *2 (U.S. Feb. 21, 2006) (per curiam).

[63] *See Goosby*, 228 F.3d at 320-21 (summary judgment for employer inappropriate because sufficient evidence existed for a jury to find discrimination; even though the employer contended that the decision was based on Plaintiff's score on a competency-assessment tool called "the Matrix" that was purported to be objective, its criteria and their weighting actually were highly subjective and decisions based on the Matrix were inconsistent in that Plaintiff pointed out that her supervisor did not follow the Matrix with respect to certain Whites); *Bell*, 232 F.3d at 554 (reversing summary judgment for employer because Plaintiffs' comparative qualifications, coupled with statistical evidence, were sufficient to support the conclusion that the employer's stated reason that it promoted the best persons was pretextual).

**App. 319**

### 3.    Recognizing "Pattern or Practice" Race Discrimination

A systemic "pattern or practice" of intentional discrimination involves statistical and/or other evidence that demonstrates that discrimination is "standard operating procedure   the regular rather than the unusual practice."[64]  For example, a pattern or practice would be established if, despite the fact that Blacks made up 20 percent of a company's applicants for manufacturing jobs and 22 percent of the available manufacturing workers, not one of the 87 jobs filled during a six year period went to a Black applicant.[65]

To the extent possible, the statistical analysis must include nondiscriminatory factors that reasonably might be said to account for any disparity.  In a hiring case, for example, relevant factors would include the racial makeup and qualifications (e.g., education and experience relevant to the job) of the applicants, or of the general labor market if applicant data are unreliable or difficult to obtain.[66]  The disparity also should be "statistically significant," meaning unlikely to have occurred by chance.[67]  Other instances and evidence of discrimination should be examined in conjunction

---

[64]    *Teamsters v. United States*, 431 U.S. 324, 336 (1977).  "Absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population from which employees are hired," and statistics showing a stark imbalance are often a "telltale sign" of discrimination. *Id.* at 339 n.20.  At the same time, Title VII does not *require* an employer's workforce to be racially balanced. *See* 42 U.S.C. § 2000e-2(j) (Title VII does not require race-based hiring simply because there is a racial imbalance between the employer's workforce and the community).

[65]    This example is based on the facts in *EEOC v. O&G Spring and Wire Forms Specialty Co.*, 38 F.3d 872, 876-78 & n.8 (7th Cir. 1994) (company engaged in pattern or practice of race discrimination).

[66]    For example, in a pattern-or-practice case involving alleged hiring discrimination against Blacks, the analysis could measure the difference between the percentage of qualified Black applicants selected and the percentage of qualified non-Black applicants selected.  If applicant flow data are unreliable, or are difficult or impossible to obtain, the analysis could measure the difference between the percentage of Blacks in the job(s) at issue and the percentage of Blacks in the relevant geographical area working in comparable positions. *See Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 311 n.13 (1977). *See also Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (regression analysis that accounted for major relevant factors – here, job title, education, tenure – was admissible; failure of analysis to include "all measurable variables" went not to admissibility, but to probative value).  The probative value of statistics also may be affected by the size of the at-issue pool (i.e., sample size). *See Teamsters*, 431 U.S. at 339 n.20.

[67]    *See Hazelwood*, 433 U.S. at 311 n.17 ("a fluctuation of more than two or three standard deviations would undercut the hypothesis that decisions were being made randomly with respect to race," though "not intend[ing] to suggest that precise calculations of statistical significance are necessary in employing statistical proof").  When statistics are not being relied upon as the core of a pattern-or-practice case, but as circumstantial evidence in an individual case, the statistics need not be as finely tuned, nor is statistical significance required. *See supra* note 57 and accompanying text.

15-19

**App. 320**

with the statistics.[68]  If the statistical disparity is gross, it alone can establish a pattern or practice claim, such as when there is an "inexorable zero."[69]  In all cases, the employer's explanation or rebuttal (which may be statistical, nonstatistical, or both) should be fully analyzed and weighed against the evidence supporting the claim.  EEOC staff should contact headquarters experts for assistance in statistical cases.[70]

## B.    RACIAL DISPARATE IMPACT

A finding of discrimination in the form of disparate impact does not depend on the existence of an unlawful motive.[71]  Disparate impact analysis is aimed at removing barriers to EEO that are not necessarily intended or designed to discriminate    "practices that are fair in form, but discriminatory in operation"[72] in that they operate as "built-in headwinds for [a protected class] and are unrelated to measuring job capability."[73]

---

[68]    *See, e.g.*, *Teamsters*, 431 U.S. at 339-40 (anecdotal evidence of discrimination experienced by specific individuals brings the "cold numbers convincingly to life," and the usefulness of statistics depends on all of the surrounding facts and circumstances); *Bazemore*, 478 U.S. at 400 (probative value of statistics will "depend in a given case on the factual context of each case in light of all the evidence").

[69]    *See Hazelwood*, 433 U.S. at 307-08 ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination."); *Teamsters*, 431 U.S. at 341 n.23 ("In any event, fine tuning of the statistics could not have obscured the glaring absence of minority line drivers.  As the Court of Appeals remarked, the company's inability to rebut the inference of discrimination came not from a misuse of statistics but from 'the inexorable zero.'"); *cf. United States v. City of Warren*, 138 F.3d 1083, 1094 (6th Cir. 1998) (in disparate impact case: "The fact that as of 1986, when both the durational residency requirement and the challenged recruiting practices were intact, the City of Warren employed not a single black person out of a workforce of 1500 certainly demonstrates a grossly discriminatory impact. Statistical analysis is unnecessary to establish this point.").

[70]    Investigators generally should contact the Research and Technical Information division of the Office of Research, Information and Planning (ORIP) with questions during an investigation.  The Office of General Counsel's Research and Analytical Services (RAS) unit also is an available resource for investigators and attorneys.

[71]    *See* 42 U.S.C. § 2000e-2(k) (disparate impact provision of Title VII); 29 C.F.R. Part 1607 (Uniform Guidelines on Employee Selection Procedures); *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971).

[72]    *Griggs*, 401 U.S. at 431.

[73]    *Id.* at 432.

The statute exempts certain policies or practices from disparate impact challenges  most notably, seniority systems.[74]  Otherwise, however, the disparate impact approach applies to all types of employment criteria, whether objective or subjective,[75] including:

- recruitment practices
- hiring or promotion criteria
- layoff or termination criteria
- appearance or  grooming standards
- education requirements
- experience requirements
- employment tests

Proving unlawful disparate impact under Title VII first requires a statistical demonstration that the employer has an employment policy or practice that causes a significant disparate impact based on race (or another protected trait).  The particular policy or practice causing the impact must be identified, unless the elements of the employer's decision-making process cannot be separated for analysis, in which case the decision-making process can be analyzed as one employment practice.[76]

Once a policy or practice has been proven to cause a significant impact, the employer has the burden of demonstrating that the policy or practice is job related for the position in question and consistent with business necessity.[77]  If the employer satisfies this burden, the case focuses on

---

[74]     The disparate impact exemption for bona fide seniority systems and certain other bona fide systems is in section 703(h) of Title VII.  *See* 42 U.S.C. § 2000e-2(h); *Teamsters*, 431 U.S. at 353-54.  Title VII also exempts from disparate impact challenge rules barring the employment of individuals who currently and knowingly use or possess a controlled substance, unless the use or possession is under the supervision of a licensed health care professional or otherwise authorized by Federal law.  *See* 42 U.S.C. § 2000e-2(k)(3).

[75]     *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990-91 (1988) ("If an employer's undisciplined system of subjective decision-making has precisely the same effects as a system pervaded by impermissible intentional discrimination, it is difficult to see why Title VII's proscription against discriminatory actions should not apply.").

[76]     *See* 42 U.S.C. § 2000e-2(k)(1)(B)(i).

[77]     *See* 42 U.S.C. § 2000e-2(k)(1)(A)(i).  If a policy or practice used at a certain point of the selection process has a discriminatory impact, the employer must justify the discriminatory policy or practice even if later stages of the selection process eliminate the disparate impact when looking at the selection process as a whole.  *See Teal*, 457 U.S. at 453-55.

15-21

**App. 322**

whether the person challenging the policy or practice can demonstrate that a less discriminatory alternative exists that meets the business need and whether the employer refuses to adopt it.[78]

### EXAMPLE 9
### NO-BEARD POLICY

A pizza delivery restaurant has an inflexible no-beard policy. The restaurant fires Jamal, one of its African American drivers, for failing to remain clean shaven. Jamal has a severe case of pseudofolliculitis barbae ("PFB"), an inflammatory skin condition that occurs primarily in Black men and that is caused by shaving. The severity of the condition varies, but many of those who suffer from PFB effectively cannot shave at all. If Jamal or EEOC were to challenge the no-beard policy as unlawful because it has a significant negative impact on Blacks, the employer would have to prove the policy is job-related and consistent with business necessity.[79] See also § 15-VII.B.5.

## 15-VI  EQUAL ACCESS TO JOBS

### A.    RECRUITING

*Who* ultimately receives employment opportunities is highly dependent on *how* and *where* the employer looks for candidates. Accordingly, Title VII forbids not only recruitment practices that purposefully discriminate on the basis of race but also practices that disproportionately limit employment opportunities based on race and are not related to job requirements or business needs.[80] For example, recruiting from racially segregated sources, such as certain neighborhoods, schools,

---

[78]    *See* 42 U.S.C. §§ 2000e-2(k)(1)(A)(ii) & (k)(1)(C).

[79]    *See Bradley v. Pizzaco of Nebraska*, 7 F.3d 797, 798-99 (8th Cir. 1993) (granting EEOC an injunction against a pizza restaurant because burden of a narrow exception for Black men with PFB was minimal and the restaurant "failed to prove a compelling need for the strict no-beard policy as applied to those afflicted with PFB and has failed to present any evidence suggesting that the current policy is without workable alternatives or that it has a manifest relationship to the employment in question"). The analysis of job-relatedness and business necessity is fact specific – there are no absolutes. For example, a no-beard policy could be legal in a situation in which beards were shown to interfere with safely using a respirator and no viable alternative existed under the circumstances. *See* 29 C.F.R. § 1910.134(g)(1)(i) (OSHA respirator standard); Interpretation Letter from John L. Henshaw, Assistant Secretary of Labor for OSHA, to Senator Carl Levin (Mar. 7, 2003) (while employers "cannot permit respirators with tight-fitting facepieces to be worn by employees who have facial hair that comes between the sealing surface of the facepiece and the face, or that interferes with valve function," the problem sometimes can be solved by trimming the beard, and "[s]ome types of respirators do not require a face seal and can usually be worn by bearded employees. . . . All respirators must be selected based on the respiratory hazard to which the worker is exposed. The employer must also consider user factors that affect performance and reliability."), *available at* http://www.osha.gov/.

[80]    *See* 42 U.S.C. §§ 2000e-2(a)(1), (a)(2).

**App. 323**

religious institutions, and social networks, leads to hiring that simply replicates societal patterns of racial segregation.

### 1.    Job Advertisements and Employment Agencies

Title VII specifically forbids job advertisements based on race, color, and other protected traits.[81]  The statute also prohibits discrimination by employment agencies.[82]  If an employer asks an employee-referral agency or search firm not to refer or search for candidates of a particular race, both the employer that made the request and the employment agency that honored it would be liable.[83]

### 2.    Word-of-Mouth Referrals

While word-of-mouth recruiting in a racially diverse workforce can be an effective way to promote diversity, the same method of recruiting in a non-diverse workforce is a barrier to equal employment opportunity if it does not create applicant pools that reflect the diversity in the qualified labor market.[84]  Similarly, unions that are not racially diverse should avoid relying solely on member referrals as the source of new members.[85]

---

[81]    *See* 42 U.S.C. § 2000e-3(b) (unlawful for entities covered by Title VII to print or publish or cause to be printed or published any notice or advertisement indicating any preference, limitation, specification, or discrimination based on race, color, religion, sex, or national origin, except when religion, sex, or national origin is a BFOQ (race and color can never be BFOQs)).

[82]    *See* 42 U.S.C. § 2000e-2(b) (unlawful for employment agencies to discriminate); 42 U.S.C. § 2000e(c) (defining "employment agency").

[83]    *See* Enforcement Guidance: *Application of EEO Laws to Contingent Workers Placed by Temporary Employment Agencies and Other Staffing Firms*, at Question 7 (Dec. 1997), *available at* http://www.eeoc.gov/policy/docs/conting.html.

[84]    Investigative staff should contact their legal units when investigating potential disparate impact of word-of-mouth recruiting, nepotism, and the like.  *Compare Thomas v. Washington County Sch. Bd.*, 915 F.2d 922, 924-26 (4th Cir. 1990) (affirming disparate impact ruling where employer's "practices of nepotism and word-of-mouth hiring kept [African Americans] unaware of job openings"), *with EEOC v. Chicago Miniature Lamp Works, Inc.*, 947 F.2d 292 (7th Cir. 1991) (passive reliance on employee referrals by accepting applicants who learned of jobs through current employees could be basis of pattern or practice disparate treatment claim, but disparate impact claim not allowed because, without an affirmative act by the employer, such a claim would in essence be a "bottom-line" attack on employer's workforce statistics).

[85]    *See EEOC v. Steamship Clerks Union, Local 1066*, 48 F.3d 594 (1st Cir. 1995) (affirming lower court ruling that union's "membership sponsorship policy" had unlawful disparate impact on Blacks); *cf. Teamsters*, 431 U.S. at 349 n.32 (describing how neutral practices can unlawfully perpetuate the effect of discrimination: "*Local 53 Asbestos Workers v. Vogler* . . . provides an apt illustration:  There a union had a policy of excluding persons not related to present members by blood or marriage.  When in 1966 suit was brought to change this policy, all of the union's members were white, largely as a result of pre-Act intentional [racial] discrimination.  The court observed: 'While the nepotism requirement is applicable to black and white

### 3.    Homogeneous Recruitment Sources

Title VII is violated by recruiting persons only from largely homogeneous sources if the recruitment practice has a racial purpose, or if it has a significant racial impact and cannot be justified as job related and consistent with business necessity.  For example, Title VII might be violated if a municipal employer with an overwhelmingly White population and workforce abuts a major city with an overwhelmingly Black population, but the municipality only hires its own residents and refuses to advertise its jobs in newspapers that circulate in the abutting major city.[86] As another example, Title VII might be violated if a statistically significant racial disparity results from recruiting persons exclusively from predominantly White schools, or exclusively from predominantly Black schools, when it would be feasible to recruit qualified students from a range of sources.  More investigation would be needed to determine whether a racial motivation exists, or whether the employer's recruitment practices can be justified as job related and consistent with business necessity.

### 4.    Discriminatory Screening of Recruits

The process of screening or culling recruits presents another opportunity for discrimination. Race obviously cannot be used as a screening criterion.  Nor may employers use a screening criterion that has a significantly disparate racial impact unless it is proven to be job related and consistent with business necessity.

### EXAMPLE 10
### DISCRIMINATORY SCREENING

An executive in a large company asks a recruiter in the human resources department to find her a new secretary.  The executive tells the recruiter that in addition to excellent secretarial skills, she wants

---

alike and is not on its face discriminatory, in a completely white union the present effect of its continued application is to forever deny to [Blacks] and Mexican-Americans any real opportunity for membership'").

[86]    *Compare United States v. City of Warren, MI*, 138 F.3d 1083, 1094 (6th Cir. 1998) (on similar facts, holding Department of Justice established that municipality's recruiting practices had a disparate impact on Black potential job applicants in violation of Title VII: "Warren's limitation of its applicant pool to residents of the overwhelmingly white city, combined with its refusal to publicize jobs outside the racially homogenous county, produced a de facto barrier between employment opportunities and members of a protected class.  A plaintiff need not identify a sign reading 'No Blacks Need Apply' before invoking Title VII."), *and NAACP v. Town of Harrison, NJ*, 940 F.2d 792, 799-805 (3d Cir. 1991) (affirming lower court's finding that requirement that town employees become residents within one year of hire had unlawful disparate impact on Blacks; town's population was 0.2 percent Black and town had never hired a Black person, though the metropolitan area was home to over 214,000 Blacks, and Blacks made up 22 percent of town's private sector workforce), *with NAACP v. City of Bayonne, NJ*, 134 F.3d 113, 123-25 (3d Cir. 1998) (upholding finding that the plaintiff did not prove that residency requirement caused disparate impact – statistical evidence was not strong, and city showed that its four-year moratorium on the residency requirement did not raise the number of Black employees).

15-24

**App. 325**

only to interview candidates who will relate well with high level executives inside and outside the company. In response to this, the recruiter searches the company's résumé database. The search produces 50 current résumés. In order to reduce this to a more manageable number, the recruiter refines the search to eliminate résumés from zip codes that are predominantly Black or Latino. This violates Title VII.

## B.    HIRING AND PROMOTION

The law generally leaves it to the employer's business judgment to determine who should be hired or promoted. Within that context, however, an applicant's race should not affect his or her chances. This means that employers cannot treat persons of different races differently in the hiring or promotion process. Nor may employers use selection criteria that have a significant discriminatory effect without being able to prove that the criteria are job-related and consistent with business necessity. Thus, a sound way for employers both to achieve business goals and to comply with the law is to hire and promote based on job-related ability, as measured by uniform and consistently applied qualification/selection standards.

### 1.    Uniform and Consistently Applied Standards

When making hiring and promotion decisions, employers must apply the same selection criteria to persons of different races, and apply them in the same way, giving the same weight to each criterion for each person. The reasons given for selection decisions should be credible and supported by the evidence. The following are examples.

**EXAMPLE 11**
**NONDISCRIMINATORY SELECTION DECISION**

Malcolm, an Asian American, applies for an executive position with the employer, a health maintenance organization. Malcolm is well qualified; he has a B.S. in biology from a large state university and an M.D. from a prestigious private university. Malcolm also has seven years' experience practicing internal medicine and recently obtained an Executive M.B.A. from a well-respected business school. The employer interviewed Malcolm and eight other candidates. Malcolm was one of two finalists brought back for a final round of interviews. The employer's selection committee ultimately chose Robert, a White finalist with slightly fewer qualifications but with experience in a similar job for a competitor. The employer tells EEOC that given Robert's experience, it believed it would gain the most competitive benefit by hiring him. The EEOC investigator confirms Robert's experience working for a competitor, and reads the minutes of the selection committee's final meeting which reflect that this was the reason discussed at the meeting for choosing Robert over

15-25

**App. 326**

Malcolm.  Here, the evidence supports the employer's legitimate, nondiscriminatory reason.

## EXAMPLE 12
### DISCRIMINATORY SELECTION DECISION

Kai, a Native American, files a charge after he applied for a promotion, was interviewed, and was not selected.  The investigation reveals that, based on objective qualifications, Kai was deemed one of the top candidates but the job ended up going to Ted, a similarly qualified White candidate from outside the company.  The hiring manager tells the investigator that he thought that Kai was well qualified but he chose Ted because he "seemed to be a better fit; I'm comfortable with him and I can see him in my job one day."  When pressed to be more specific,[87] the manager says he liked the fact that Ted worked for a competitor.  However, the investigation reveals that although Ted did work for another company in the industry, it was not really a competitor.  Employee and management witnesses tell the investigator that Ted's experience working for another company in the industry was no more valuable than Kai's experience working for the company itself.  The witnesses also tell the investigator that, until now, the company practice had been to prefer qualified internal candidates over similarly qualified external candidates.  There is reasonable cause to believe that Kai was discriminated against based on his race or national origin.

## EXAMPLE 13
### DISCRIMINATORY SELECTION DECISION

Rita, an African American, has worked seven years as a Program Analyst for a federal agency.  She consistently has received outstanding performance evaluations.  Each of the last four years, Rita has applied for openings for jobs in her office in a higher grade.  The agency has rejected Rita each time.  After the fourth rejection, Rita initiated EEO counseling, and then a formal complaint, because she believed she had been repeatedly discriminated against.  She stated that four White employees were promoted over her, each time for a different reason.  The investigation reveals that the agency actually did apply the same promotion criteria during each selection.  Importantly, however, witness interviews and documentary evidence (e.g., the employer's interview notes) strongly suggest that the agency weighted the criteria differently each time so that Rita was the least qualified applicant.  In other words, it appears that when a job-related qualification favored Rita it was deemed less important than

---

[87]    *See supra* note 60.

when a qualification favored a White candidate. Moreover, statistics reveal that Whites are promoted more often than similarly qualified African Americans. There is reasonable cause to believe Rita was discriminated against based on her race.

## 2. Job-Related Standards, Consistent with Business Necessity

In an employer's important effort to hire the best candidate, it might unintentionally engage in race discrimination by using selection standards that measure differences between racial groups that are not related to the job. Title VII provides that, if a selection standard is shown to have a significant impact based on race, the employer must demonstrate that the standard is job-related and consistent with business necessity. Thus, employers should be sure to "measure the person for the job and not the person in the abstract."[88]

### Education Requirements

Educational requirements obviously may be important for certain jobs. For example, graduation from medical school is required to practice medicine. However, employers often impose educational requirements out of their own sense of desirable qualifications. Such requirements may run afoul of Title VII if they have a disparate impact and exceed what is needed to perform the job. As the Supreme Court stated in one of its earliest interpretations of Title VII: "History is filled with examples of men and women who rendered highly effective performance without the conventional badges of accomplishment in terms of certificates, diplomas, or degrees. Diplomas and tests are useful servants, but Congress has mandated the commonsense proposition that they are not to become masters of reality."[89]

**EXAMPLE 14**
**EDUCATION REQUIREMENT**

Chloe, White, is the Head Secretary for a division of XYZ Corp. She took the job right after college and now is departing after three years to go to graduate school. The employer was thrilled with Chloe's work, and when it gets notice that she is leaving, it sets out to find a replacement. Sylvia, an African American, applies for the job. Sylvia is a successful graduate of the local business institute, and has spent the last five years working as a secretary for a regional bank, rising a year ago to become the Executive Secretary in one of its major departments. The employer rejects Sylvia's application because she is not a college graduate, which triggers a charge. Statistical evidence shows that in the local labor market African Americans and Hispanics in the pool of administrative and clerical

---

[88] *Griggs*, 401 U.S. at 433.

[89] *Id*.

workers are significantly less likely to have college degrees than Whites. The employer defends its education requirement by attributing Chloe's success to the fact that she was college educated, noting that the Head Secretary position involves not only traditional secretarial work, but also more complex responsibilities such as preparing reports, and training and supervising other clerical staff. The investigation reveals, however, that none of the firm's prior successful Head Secretaries had college degrees, and it is not the industry standard. Most importantly, the employer presents no evidence that a college degree is more predictive of, or correlated with, job performance than a degree from a business institute plus significant relevant experience (i.e., Sylvia's qualifications), or other credentials and experiences that would render a person qualified for the job. The evidence establishes that the employer has violated Title VII because the college-degree requirement screens out African Americans and Hispanics to a significant degree but it has not been demonstrated to be job related and consistent with business necessity.

**Employment Testing**

Employment testing is another practice to which the disparate impact principle frequently is applied. Title VII provides that it is not an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test "provided that such test, its administration or action upon the results is not designed, intended or used to discriminate on the basis of race" or other protected bases.[90] Under this provision, employment tests that have a disparate impact based on race or another protected trait must be validated pursuant to the government's Uniform Guidelines on Employee Selection Procedures.[91] For example, if an employer decides to use a personality test to determine which employees are "management material," and the test has a significant disparate impact based on race or another protected trait, the employer first must have the test professionally validated to ensure that the test is predictive of, or significantly correlates with, important elements of a manager's job performance.[92] Even if the employer meets that standard, the test still may violate Title VII if there is another, less

---

[90]    See 42 U.S.C. § 2000e-2(h).

[91]    See 29 C.F.R. Part 1607 (UGESP); Griggs, 401 U.S. at 436 ("From the sum of the legislative history relevant in this case, the conclusion is inescapable that the EEOC's construction of § 703(h) to require that employment tests be job-related comports with Congressional intent.").

[92]    See 29 C.F.R. § 1607.3A ("The use of any selection procedure which has an adverse impact on the hiring, promotion, or other employment or membership opportunities of members of any race, sex, or ethnic group will be considered to be discriminatory and inconsistent with these guidelines, unless the procedure has been validated in accordance with these guidelines, or the provisions of section 6 below are satisfied.").

**App. 329**

discriminatory alternative to the test that serves the employer's needs and the employer fails to use this alternative.[93]

Title VII also explicitly prohibits employers from race-norming employment tests, i.e, adjusting scores, using different cutoff scores, or otherwise altering the results of employment tests on the basis of race or other Title VII-protected bases.[94]  For example, it is illegal to use different "passing" scores for different racial groups or to alter scores on employment tests in order to make the mean score the same for each race.  This does not mean an employer cannot change the way it grades employment tests.  For example, an employer may go from a straight ranking system to a grade banding system (i.e., a system that groups similar grades together) if done for nondiscriminatory purposes.[95]

### Conviction and Arrest Records

Of course, it is unlawful to disqualify a person of one race for having a conviction or arrest record while not disqualifying a person of another race with a similar record.  For example, an employer cannot reject Black applicants who have conviction records when it does not reject similarly situated White applicants.[96]

In addition to avoiding disparate treatment in rejecting persons based on conviction or arrest records, upon a showing of disparate impact, employers also must be able to justify such criteria as job related and consistent with business necessity.[97]  This means that, with respect to conviction

---

[93]    *See* 42 U.S.C. § 2000e-2(k)(1)(A).

[94]    *See* 42 U.S.C. § 2000e-2(*l*).

[95]    *See Chicago Firefighters Local 2 v. City of Chicago*, 249 F.3d 649, 655-56 (7th Cir. 2001) (rather than using a straight ranking system to measure and compare test scores on a promotional exam, the fire department banded similar scores together; court stated that the banding was designed to simplify scoring and remove meaningless gradations, not for the unlawful purpose of making the scores of any particular race seem higher).

[96]    A 2003 study suggests this is a significant problem.  *See* Devah Pager, *The Mark of a Criminal Record*, AMERICAN JOURNAL OF SOCIOLOGY (Mar. 2003) (audit study sending matched pairs of Black and White male college students with similar self-presentation styles to apply for 350 low-skilled jobs advertised in the Milwaukee classifieds; purpose was to test the degree to which a criminal record affects subsequent employment opportunities; study found that when the White "testers" were assigned a fake 18-month prison record – for possession of cocaine with intent to sell – they were called back by employers 17% of the time, while the Black testers assigned the same record were called back only 5% of the time; Whites without a criminal record had a 34% call back rate versus a 14% call back rate for Blacks without a criminal record), *available at* http://www.northwestern.edu/ipr/publications/papers/2003/pagerajs.pdf.

[97]    *See Green v. Missouri Pacific Railroad Co.*, 523 F.2d 1290, 1293-99 (8th Cir. 1975) (applying Title VII disparate impact principles to employer's "no convictions" hiring policy; *Caston v. Methodist Medical Center of Ill.*, 215 F. Supp. 2d 1002, 1008 (C.D. Ill. 2002) (race-based disparate impact

App. 330

records, the employer must show that it considered the following three factors: (1) the nature and gravity of the offense(s); (2) the time that has passed since the conviction and/or completion of the sentence; and (3) the nature of the job held or sought.[98]  A blanket exclusion of persons convicted of any crime thus would not be job-related and consistent with business necessity.[99]  Instead, the above factors must be applied to each circumstance.  Generally, employers will be able to justify their decision when the conduct that was the basis of the conviction is related to the position, or if the conduct was particularly egregious.

Arrest records are treated slightly differently.  While a conviction record constitutes reliable evidence that a person engaged in the conduct alleged (i.e., convictions require proof "beyond a reasonable doubt"), an arrest without a conviction does not establish that a person actually engaged in misconduct.[100]  Thus, when a  policy or practice of rejecting applicants based on arrest records has a disparate impact on a protected class, the arrest records must not only be related to the job at issue, but the employer must also evaluate whether the applicant or employee actually engaged in the misconduct.  It can do this by giving the person the opportunity to explain and by making follow-up inquiries necessary to evaluate his/her credibility.[101]

Other employment policies that relate to off-the-job employee conduct also are subject to challenge under the disparate impact approach, such as policies related to employees' credit history.  People of color have also challenged, under the disparate impact theory, employer policies of discharging persons whose wages have been garnished to satisfy creditors' judgments.[102]

---

claim challenging employer's policy of not hiring former felons was cognizable under Title VII and thus survived motion to dismiss).

[98]    See generally EEOC's *Policy Statement on the Issue of Conviction Records under Title VII of the Civil Rights Act of 1964* (1987).

[99]    See Green, 523 F.2d at 1298-99 (striking down employer's absolute bar of anyone ever convicted of a crime other than a minor traffic offense:  "Although the reasons [the employer] advances for its absolute bar can serve as relevant considerations in making individual hiring decisions, they in no way justify an absolute policy which sweeps so broadly.  We cannot conceive of any business necessity that would automatically place every individual convicted of any offense, except a minor traffic offense, in the permanent ranks of the unemployed.  This is particularly true for blacks who have suffered and still suffer from the burdens of discrimination in our society.").

[100]    See Gregory v. Litton Sys., Inc., 316 F. Supp. 401 (C.D. Cal. 1970) (judgment for Plaintiff who challenged employer policy of not hiring anyone who had been arrested on "a number of occasions," where this threshold was undefined, and company had in its employ many persons who had been arrested), *aff'd*, 472 F.3d 631 (9th Cir. 1972).

[101]    See generally EEOC's *Policy Guidance on the Consideration of Arrest Records in Employment Decisions under Title VII of the Civil Rights Act of 1964* (1990).

[102]    Compare, e.g., Robinson v. City of Dallas, 514 F.2d 1271 (5th Cir. 1975) (recognizing policy of discharging persons who failed to pay "just debts" could be challenged, but ruling for employer because

15-30

**App. 331**

## C.     DIVERSITY AND AFFIRMATIVE ACTION

In order to open the American workplace to historically excluded groups, some employers use diversity and affirmative action programs.  Diversity and affirmative action are related concepts, but the terms have different origins and legal connotations.  Workforce diversity is a business management concept under which employers voluntarily promote an inclusive workplace.  Employers that value diversity create a culture of respect for individual differences in order to "draw talent and ideas from all segments of the population" and thereby potentially gain a "competitive advantage in the increasingly global economy."[103]  Many employers have concluded that a diverse workforce makes a company stronger, more profitable, and a better place to work,[104] and they implement diversity initiatives for competitive reasons rather than in response to discrimination, although such initiatives may also help to avoid discrimination.

Title VII permits diversity efforts designed to open up opportunities to everyone.  For example, if an employer notices that African Americans are not applying for jobs in the numbers that would be expected given their availability in the labor force, the employer could adopt strategies to expand the applicant pool of qualified African Americans such as recruiting at schools with high African American enrollment.[105]  Similarly, an employer that is changing its hiring practices can take steps to ensure that the practice it selects minimizes the disparate impact on any racial group.[106]  For

---

although Plaintiffs established that Blacks comprised a disproportionately large portion of the poor people in Dallas, they did not offer statistics showing that people who do not pay their just debts tend to be poor people), *with Johnson v. Pike Corp. of America*, 332 F. Supp. 490 (C.D. Cal. 1971) (approving stipulation for judgment against defendant where garnishment policy had disparate impact on Blacks and other people of color and was not supported by business necessity).

[103]     EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, "BEST" EQUAL EMPLOYMENT OPPORTUNITY POLICIES, PROGRAMS, AND PRACTICES IN THE PRIVATE SECTOR 7 (2d ed. 1998).  The complete report is available at http://www.eeoc.gov/abouteeoc/task_reports/practice.html.

[104]     *Cf. Grutter v. Bollinger*, 539 U.S. 306, 330 (2003) ("major American businesses have made clear that the skills needed in today's increasingly global marketplace can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints. . . .  What is more, high- ranking retired officers and civilian leaders of the United States military assert that, '[b]ased on [their] decades of experience,' a 'highly qualified, racially diverse officer corps . . . is essential to the military's ability to fulfill its principle mission to provide national security'") (citations to briefs omitted).

[105]     *Cf. Duffy v. Wolle*, 123 F.3d 1026, 1038-39 (8th Cir. 1997) (*Bivens* action under the *McDonnell Douglas* framework: "An employer's affirmative efforts to recruit minority and female applicants [do] not constitute discrimination.  An inclusive recruitment effort enables employers to generate the largest pool of qualified applicants and helps to ensure that minorities and women are not discriminatorily excluded from employment.  This not only allows employers to obtain the best possible employees, but it is an excellent way to avoid lawsuits.") (citations and quotation marks omitted).

[106]     *See* EEOC Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. §§ 1607.3(B), 1607.6(A) (approving use of alternative selection procedures in order to eliminate or decrease adverse impact).

example, an employer that previously required new hires to have a college degree could change this requirement to allow applicants to have a college degree or two years of relevant experience in the field. A need for diversity efforts may be prompted by a change in the population's racial demographics, which could reveal an underrepresentation of certain racial groups in the work force in comparison to the current labor pool.

Affirmative action, in contrast, "means those actions appropriate to overcome the effects of past or present practices, policies, or other barriers to equal employment opportunity."[107] Affirmative action under Title VII may be (1) court-ordered after a finding of discrimination,[108] (2) negotiated as a remedy in consent decrees and settlement agreements, or (3) conducted pursuant to government regulation.[109] Also, employers may implement voluntary affirmative action plans in appropriate circumstances, such as to eliminate a manifest imbalance in a traditionally segregated job category.[110] In examining whether such a voluntary affirmative action plan is legal under Title VII, courts consider whether the affirmative action plan involves a quota or inflexible goal, whether the plan is flexible enough so that each candidate competes against all other qualified candidates, whether the plan unnecessarily trammels the interests of third parties, and whether the action is temporary, e.g., not designed to continue after the plan's goal has been met.[111]

---

[107]    EEOC Guidelines on Affirmative Action, 29 C.F.R. § 1608.1(c).

[108]    *See*, *e.g.*, *Local 28 of the Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 448-49 (1986) (Congress gave lower courts broad power under Title VII to fashion the most complete relief possible to remedy discrimination, including the power to fashion affirmative action relief).

[109]    For example, federal contractors may be subject to affirmative action requirements of Executive Order 11246, which is enforced by the Department of Labor's Office of Federal Contract Compliance Programs (http://www.dol.gov/esa/ofccp/index.htm) and/or the affirmative action requirements of state and local governments. Federal executive branch agencies must have "an affirmative program of equal employment opportunity" for all employees and applicants for employment, *see* 42 U.S.C. § 2000e-16 and 29 U.S.C. § 791, as set forth in EEOC's Management Directive 715 (http://www.eeoc.gov/federal/md715/index.html).

[110]    *See United Steel Workers of America v. Weber,* 443 U.S. 193 (1979)*, and Johnson v. Transportation Agency,* 480 U.S. 616 (1987).

[111]    *See Weber*, 443 U.S. at 208 (because Blacks had long been excluded from craft unions because of race, only 1.83% of the plant's craft workers were Black, and thus the union and the employer collectively bargained an affirmative action plan that reserved for Blacks 50% of the openings in an in-plant craft training program, to be followed until the percentage of Black craftworkers in the plant was commensurate with the percentage of Blacks in the local labor force; Supreme Court upheld the affirmative action plan on grounds that its purposes mirrored those of Title VII, the plan did not unnecessarily trammel the interests of White employees, and the plan was a temporary measure not intended to maintain a racial balance, but intended to eliminate a racial imbalance); *Sheet Metal Workers*, 478 U.S. at 448 ("[t]he availability of race-conscious affirmative relief . . . as a remedy for a violation of Title VII . . . furthers the broad purposes underlying the statute" because "Congress enacted Title VII based on its determination that racial minorities were subject to pervasive and systematic discrimination in employment"). *See also Johnson,* 480 U.S. at 632 ("manifest imbalance" does not need to reach the level of a *prima facie* case of

An affirmative action plan implemented by a public sector employer is subject to both Title VII of the Civil Rights Act of 1964 and the Equal Protection Clause of the United States Constitution.[112] Some federal courts have held that public law enforcement agencies may satisfy the Equal Protection Clause if an "operational need" justifies the employer's voluntary affirmative action efforts.[113] In the higher education context, the Supreme Court decided in *Grutter v. Bollinger* that attaining a diverse student body can justify considering race as a factor in specific admissions decisions at colleges and universities without violating the Equal Protection Clause or Title VI of the Civil Rights Act of 1964. The Supreme Court has not yet ruled on whether an "operational need" or diversity rationale could justify voluntary affirmative action efforts under Title VII, but a

---

discrimination); EEOC Guidelines on Affirmative Action, 29 C.F.R. Part 1608.

[112] *Compare Wygant v. Jackson Board of Education*, 476 U.S. 267, 273-76 (1986) (finding that a race-based layoff provision in a collective-bargaining agreement, which was created by a public school board and teachers union to remedy present effects of societal discrimination against minority employees and to provide minority role models for minority students, violated the Equal Protection Clause), *with Johnson*, 480 U.S. at 620 n.2 & 641-42 (upholding under Title VII a public employer's voluntary affirmative action plan which permitted sex to be considered as a factor for promotions to positions within a traditionally segregated job classification, and noting that, "where the issue is properly raised, public employers must justify the adoption and implementation of a voluntary affirmative action plan under the Equal Protection Clause"). The *Johnson* Court observed, in a footnote, that "[Title VII] was not intended to extend as far as . . . the Constitution." *Johnson*, 480 U.S. at 628 n.6.

[113] *See, e.g., Petit v. City of Chicago*, 352 F.3d 1111, 1115 (7th Cir. 2003) (Chicago Police Department had a compelling interest in diversity in police force serving large, racially and ethnically divided metropolitan area, justifying, under Equal Protection Clause, city's affirmative action promotions of African American and Hispanic officers to rank of sergeant); *Reynolds v. City of Chicago*, 296 F.3d 524, 530-31 (7th Cir. 2002) (upholding non-remedial promotion of Hispanic officer because city proved it was warranted by compelling public safety need for Hispanic officers in supervisory roles to sensitize other officers to special problems related to Hispanic neighborhoods, and to promote trust in the citizens of those neighborhoods; court recognized this as particularly compelling in light of the need for effective police work in the age of public concern about international terrorism); *Talbert v. City of Richmond*, 648 F.2d 925, 931-32 (4th Cir. 1981) (holding that "the attainment of racial diversity in the top ranks of the police department was a legitimate interest of the city" and thus promotion of City's first Black officer to Major over White plaintiff in a city with a 50% Black population was lawful); *accord Cotter v. City of Boston*, 323 F.3d 160, 172 n.10 (1st Cir. 2002) (declining to address whether meeting the operational needs of the police department are compelling state interests but stating that Court is "sympathetic to the argument that communities place more trust in a diverse police force and that the resulting trust reduces crime rates and improves policing"). *But see Patrolmen's Benevolent Ass'n. v. City of New York*, 310 F.3d 43, 52-53 (2d Cir. 2002) (acknowledging that "'a law enforcement body's need to carry out its mission effectively, with a workforce that appears unbiased, is able to communicate with the public and is respected by the community it serves,' may constitute a compelling state interest," but holding that race-based transfers of Black and Hispanic police officers to precinct where a Black man was tortured were not lawful because "mere assertion of an 'operational need' to make race-conscious employment decisions does not give a police department *carte blanche* to dole out work assignments based on race if no such justification is established") (internal citation omitted).

15-33

**App. 334**

number of legal scholars and practitioners have debated the issue.[114]

The Commission encourages voluntary affirmative action and diversity efforts to improve opportunities for racial minorities in order to carry out the Congressional intent embodied in Title VII.[115]   Further, the Commission believes that "persons subject to Title VII must be allowed flexibility in modifying employment systems and practices to comport with the purposes" of the statute.[116] However, employers are cautioned that very careful implementation of affirmative action and diversity programs is recommended to avoid the potential for running afoul of the law.[117] EEOC investigators should consult with attorneys from their legal unit on charges of discrimination involving affirmative action and diversity plans.

---

[114]     *See, e.g.,* Richard N. Appel, *Affirmative Action in the Workplace: Forty Years Later,* 22 HOFSTRA LAB. & EMP. L.J. 549, 571-74 (Spring 2005) (addressing whether *Grutter* diversity rationale will justify race-conscious decisions in the private sector employment context under Title VII); Michael L. Foreman, Kristin M. Dadey and Audrey J. Wiggins, *The Continuing Relevance of Race conscious Remedies and Programs in Integrating the Nation's Workforce*, 22 HOFSTRA LAB. & EMP. L.J. 81, 101-104 (Fall 2004) (discussing the implications of *Grutter* for affirmative action plans in employment); Paul Frymer and John D. Skrentny, *The Rise of Instrumental Affirmative Action: Law and the New Significance of Race in America*, 36 CONN. L. REV. 677, 693-697 (Spring 2004) (discussing the treatment of "operational need" cases involving police under Title VII and the Equal Protection Clause); Rebecca Hanner White, *Affirmative Action in the Workplace: The Significance of Grutter,* 92 KY. L.J. 263, 272-78 (2003-2004) (distinguishing affirmative action in employment context from educational context and analyzing whether the diversity rationale in *Grutter* will justify affirmative use of race for non-remedial purpose under Title VII, especially for private employers).

[115]     EEOC Guidelines on Affirmative Action, 29 C.F.R. § 1608.1(c).

[116]     *Id.*

[117]     *See, e.g., Frank v. Xerox Corp*., 347 F.3d 130, 137 (5th Cir. 2003) (a jury could consider Xerox's "Balanced Workforce Initiative" (BWF), in which Xerox identified explicit, specific racial goals for each grade and job level, to be direct evidence of discrimination against Blacks in light of evidence that Blacks were considered to be "over-represented" and Whites  "under-represented," and managers were evaluated on how well they complied with the BWF; thus "a jury looking at these facts could find that Xerox considered race in fashioning its employment policies and that because Plaintiffs were black, their employment opportunities had been limited"); *Taxman v. Board of Education of the Township of Piscataway*, 91 F.3d 1547, 1557-58 (3d Cir. 1996) (holding that where Black employees were not underutilized or under-represented, school district conducting reduction in force could not choose to retain a Black employee instead of a White employee of equal seniority, ability, and qualifications, solely on grounds of diversity).

## 15-VII  EQUAL OPPORTUNITY FOR JOB SUCCESS

### A.    RACIAL HARASSMENT

Failing to provide a work environment free of racial harassment is a form of discrimination under Title VII.  Liability can result from the conduct of a supervisor, coworkers, or non-employees such as customers or business partners over whom the employer has control.[118]

A hostile environment can be comprised of various types of conduct.  While there is not an exhaustive list, examples include offensive jokes, slurs, epithets or name calling, physical assaults or threats, intimidation, ridicule or mockery, insults or put-downs, offensive objects or pictures, and interference with work performance.  The conduct need not be explicitly racial in nature to violate Title VII's prohibition against race discrimination, but race must be a reason that the work environment is hostile.[119]  To determine if a work environment is hostile, all of the circumstances should be considered.  Incidents of racial harassment directed at other employees in addition to the charging party are relevant to a showing of hostile work environment.[120]

There are two requirements for race-based conduct to trigger potential liability for unlawful harassment:  (1) the conduct must be unwelcome; and (2) the conduct must be sufficiently severe *or* pervasive to alter the terms and conditions of employment in the mind of the victim and from the

---

[118]    For a more detailed discussion of the standards for unlawful harassment, see Enforcement Guidance: *Vicarious Employer Liability for Unlawful Harassment by Supervisors* (June 1999); *Enforcement Guidance on Harris v. Forklift Sys., Inc.* (November 1993); *Policy Guidance on Current Issues of Sexual Harassment* (Mar. 1990); 29 C.F.R. § 1604.11.

[119]    *See Aman*, 85 F.3d at 1083 (conduct need not be overtly racial in character as long as harassment was because of race); *Policy Guidance on Current Issues of Sexual Harassment*, at 19 (Mar. 1990) (harassment need not be explicitly sexual, racial, religious, etc. to give rise to Title VII liability as long as it was because of the protected trait), *available at* http://www.eeoc.gov/policy/docs/currentissues.html.

[120]    *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185-86 (4th Cir. 2001) (racial harassment both directed at Plaintiff, and not specifically directed at Plaintiff but part of Plaintiff's work environment, could be considered);  *Schwapp v. Town of Avon*, 118 F.3d 106, 111-12 (2d Cir. 1997) (permitting claim of Black Plaintiff to survive summary judgment based on racially offensive incidents involving Plaintiff directly, as well as incidents he was aware of involving other Blacks (some occurring prior to his employment) and other minority groups).  Courts might give less weight to racially offensive conduct experienced second-hand. *See Singletary v. Missouri Dep't of Corrections*, 423 F.3d 886, 893 (8th Cir. 2005) (affirming summary judgment for employer in part because racial epithets about Plaintiff were not made in his presence, which lessened the objective hostility of his work environment); *Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 567 (7th Cir. 2004) ("We do not mean to hold that a plaintiff can never demonstrate a hostile work environment through second-hand comments or in situations where a plaintiff is not the intended target of the statements. However, what Weaver personally experienced does not amount to an objectively hostile work environment. She heard an offensive term directed at a third person once and only learned from others about other offensive comments directed at third persons.").

perspective of a reasonable person in the victim's position.  At this point, the harassing conduct "offends Title VII's broad rule of workplace equality."[121]

### 1.    Unwelcome Conduct

The conduct must be unwelcome in the sense that the alleged victim did not solicit or incite the conduct and regarded it as undesirable or offensive.  When the conduct involves mistreatment or is racially derogatory in nature, unwelcomeness usually is not an issue, even when the alleged harasser and victim are of the same race.[122]  Sometimes employers argue that the conduct in question was not unwelcome because it was playful banter, and the alleged victim was an active participant. The facts in such cases require careful scrutiny to determine whether the alleged victim was, in fact, a willing participant.[123]

### 2.    Severe or Pervasive

To violate Title VII, racially abusive conduct does not have to be so egregious that it causes economic or psychological injury.[124]  At the same time, Title VII is not "a general civility code,"[125] and thus conduct is not illegal just because it is uncomfortable, or inappropriate.  The "severe or pervasive" standard reflects what the Supreme Court has called a "middle path" between these extremes.[126]

---

[121]    *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).

[122]    *See, e.g., Kang v. U. Lim America*, 296 F.3d 810, 817 (9th Cir. 2002) (hostile work environment could be found where Korean supervisor with stereotypical beliefs about the superiority of Korean workers held Korean Plaintiff to higher standards, required him to work harder for longer hours, and subjected Plaintiff to verbal and physical abuse when he failed to live up to supervisor's expectations); *Ross v. Douglas County*, 234 F.3d 391, 393 & 395-97 (8th Cir. 2000) (affirming verdict in favor of Black employee whose Black supervisor subjected him to racially derogatory slurs, such as the "N-word" and "black boy," and referred to the employee's wife, who was White, as "whitey": "Such comments were demeaning to Ross.  They could have been made to please Johnson's white superior or they may have been intended to create a negative and distressing environment for Ross.  Whatever the motive, we deem such conduct discriminatory.").

[123]    *E.g., Vaughn v. Pool Offshore Co.*, 683 F.2d 922, 924-25 (5th Cir. 1982) (trial court did not err in finding for employer where plaintiff used racial slurs along with his co-employees, other employees were subjected to the same obnoxious treatment as plaintiff, his co-workers expressed amicable feelings towards him, and plaintiff testified at trial that he did not believe that pranks against him were racially motivated or that he was singled out for abusive treatment).

[124]    *See Harris*, 510 U.S. at 22; *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986).

[125]    *Oncale*, 523 U.S. at 80-81.

[126]    *Harris*, 510 U.S. at 21 ("This standard, which we reaffirm today, takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury.").

Harassment must be analyzed on a case-by-case basis, by looking at all the circumstances and the context. Relevant factors in evaluating whether racial harassment creates a sufficiently hostile work environment may include any of the following (no single factor is determinative):

- The frequency of the discriminatory conduct;

- The severity of the conduct;

- Whether the conduct was physically threatening or humiliating;

- Whether it unreasonably interfered with the employee's work performance; and

- The context in which the harassment occurred, as well as any other relevant factor.

The more severe the harassment, the less pervasive it needs to be, and vice versa. Accordingly, unless the harassment is quite severe, a single incident or isolated incidents of offensive racial conduct or remarks generally do not create an abusive working environment.[127] But a single, extremely serious incident of harassment may be sufficient to constitute a Title VII violation, especially if the harassment is physical.[128] Examples of the types of single incidents that can create a hostile work environment based on race include: an actual or depicted noose or burning cross (or any other manifestation of an actual or threatened racially motivated physical assault),[129] a favorable reference to the Ku Klux Klan, an unambiguous racial epithet such as the "N-word,"[130] and a racial comparison to an animal.[131] Racial comments or other acts that are not sufficiently

---

[127]    *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'").

[128]    *See Smith v. Sheahan*, 189 F.3d 529, 533-34 (7th Cir. 1999) (a sufficiently severe episode may occur as rarely as once and still violate Title VII).

[129]    *See Reedy v. Quebecor Printing Eagle, Inc.*, 333 F.3d 906, 909 (8th Cir. 2003) (racially hateful bathroom graffiti that amounted to death threat aimed at Plaintiff could be fairly characterized as severe); *Williams v. New York City Housing Auth.*, 154 F. Supp. 2d 820, 824-25 (S.D.N.Y. 2001) ("Indeed, the noose is among the most repugnant of all racist symbols, because it is itself an instrument of violence. It is impossible to appreciate the impact of the display of a noose without understanding this nation's opprobrious legacy of violence against African-Americans."); *cf. Jackson v. Flint Ink North Am. Corp.*, 379 F.3d 791, 795 (8th Cir. 2004) (in racial discrimination case involving graffiti depicting a burning cross, court noted that because "its symbolism is potentially more hostile and intimidating than the racial slurs[,] [e]ven a single instance of workplace graffiti, if sufficiently severe, can go a long way toward making out a Title VII claim"), *rev'd on reh'g on other grounds*, 382 F.3d 869, 870 (8th Cir. 2004).

[130]    *Cf. Spriggs*, 242 F.3d at 185 ("Far more than a mere offensive utterance," the N-word is "pure anathema to African Americans. Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'n-----' by a supervisor in the presence of his subordinates.") (citation and quotation marks omitted).

[131]    In an *amicus curiae* brief in *Oates v. Discovery Zone*, 116 F.3d 1161 (7th Cir. 1997), the Commission argued that a Black employee provided sufficient evidence of racial harassment where he

15-37

severe standing alone may become actionable when repeated, although there is no threshold magic number of harassing incidents giving rise to liability.[132]  Moreover, investigators must be sensitive to the possibility that comments, acts, or symbols that might seem benign to persons of the harasser's race could nevertheless create a hostile work environment for a reasonable person in the victim's position.[133]

Below are examples designed to explain the concept of conduct sufficiently "severe or pervasive" to alter someone's working conditions.

### EXAMPLE 15
### SUFFICIENTLY SEVERE CONDUCT

Tim, an African American, is an employee at an auto parts manufacturing plant.  After a racially charged dispute with a White coworker, the coworker told Tim: "Watch your back, boy!"  The next day, a hangman's noose, reminiscent of those historically used for racially motivated lynchings, appeared above Tim's locker.  Given the violently threatening racial nature of this symbol and the context, this incident would be enough to alter Tim's working conditions.[134]

---

complained to his supervisor that a picture of gorillas with his name written on it was racially offensive, and his supervisor laughed at his complaint, refused to take the picture down, and allowed it to remain on display for a week after his complaint.  The Seventh Circuit did not reach the merits of the Commission's argument, finding that the plaintiff had waived his racial harassment claim by not alleging it in his complaint.  *Id.* at 1168.  One member of the panel, however, noted that "[h]ad it been properly before the district court, I agree with the amicus brief filed by the Equal Employment Opportunity Commission that it would not have been a proper candidate for summary judgment."  *Id.* at 1177 (Wood, J., concurring in part and dissenting in part).  A copy of the Commission's *amicus curiae* brief is available at http://www.eeoc.gov/briefs/oates_v_discovery.txt.  *See also Spriggs*, 242 F.3d at 185 ("To suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the merely unflattering; it is degrading and humiliating in the extreme.").

[132]    The character of the comments or acts is important in determining the frequency needed to alter someone's working conditions.  *See, e.g., Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002) (no magic number of offensive comments needed; unambiguous racial epithets fall on the more severe end of the spectrum).  *See also* Example 16 and accompanying note 135, *infra*.

[133]    *Cf. Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 824 (4th Cir. 2004) (Gregory, Circuit Judge, concurring in the judgment) ("While many Southerners unquestionably embrace the [Confederate] flag, not out of malice or continued belief in racial subordination, but out of genuine respect for their ancestors, we must also acknowledge that some minorities and other individuals feel offended, threatened or harassed by the symbol.").  See also discussion of "code words," at note 47, *supra*.

[134]    *See supra* notes 129-131 and accompanying text.

15-38

**App. 339**

## EXAMPLE 16
## SUFFICIENTLY PERVASIVE CONDUCT

Miyuki, of Japanese descent, gets a job as a clerk in a large general merchandise store. After her first day on the job, a small group of young male coworkers starts making fun of her when they see her by slanting their eyes, or performing Karate chops in the air, or intentionally mispronouncing her name. This occurs many times during her first month on the job. This is pervasive harassment because of race and/or national origin.[135]

## EXAMPLE 17
## CONDUCT NOT SUFFICIENTLY SEVERE OR PERVASIVE

Steven, an African American, is a librarian at a public library. Steven approaches his supervisor, White, with the idea of creating a section in the stacks devoted to books of interest particularly to African Americans, similar to those he has seen in major bookstore chains. Steven's supervisor rejects the idea out of hand, stating that he does not want to create a "ghetto corner" in the library. This statement alone, while racially offensive, does not constitute severe or pervasive racial harassment, absent more frequent or egregious incidents.[136]

## EXAMPLE 18
## SUFFICIENTLY SEVERE OR PERVASIVE CONDUCT

Patrick, Caucasian, is a new employee in a company owned by an African American. All of the employees in Patrick's department, including his manager, also happen to be African American. Patrick's manager was pressured to hire Patrick because his father is a friend of a company executive. On Patrick's first day on the job, the manager said to him, "This is a Black company. Whiteboys like

---

[135]    *Compare with, e.g., Manatt v. Bank of America*, 339 F.3d 792 (9th Cir. 2003) (Asian Plaintiff's working environment was not so objectively abusive as to alter the conditions of her employment where, over a two-and-a-half year period, harassment consisted of: two offensive and inappropriate incidents (one in which two co-workers cruelly ridiculed Plaintiff for mispronouncing a word, and another instance in which co-workers pulled their eyes back with their fingers in an attempt to imitate or mock the appearance of Asians), as well as other offhand remarks by her coworkers and supervisors (Plaintiff overheard jokes in which the phrase 'China man' was used, and overheard a reference to China and communism); the court noted that the incidents occurred over a span of two-and-a-half years and that if they had occurred over a shorter period of time or been repeated more frequently, Plaintiff "may very well have had an actionable hostile environment claim").

[136]    *Compare with, e.g., Reedy*, 333 F.3d at 908-09 (working environment of Plaintiff, Black, was so objectively abusive as to alter the conditions of his employment where, over a seven-month period coworkers called him and other Black employees "n------" on numerous occasions and threatened them with violence, and the company allowed racial slurs, pictures, and threats to linger in the men's bathroom).

**App. 340**

you might get all the breaks in your world, but not here. Your daddy got you this job, but he can't do it for you." Although Patrick made every effort to prove himself, he was unable to do so because over the course of the next six months the manager subjected him to a pattern of mistreatment. For example, the manager would assign Patrick the majority of the uninteresting and routine work, and would set artificial and unrealistic deadlines. The manager would yell at Patrick when he made a mistake due to having to rush. The manager also frequently failed to inform Patrick of important meetings, or ignored Patrick when he spoke at meetings he did attend. Once the manager asked Patrick to get him a cup of coffee    a task not part of his job, and which no one else ever was asked to do    and said to him, "By the way, as you've probably guessed, I like my coffee black." In contrast to the manager's treatment of Patrick, the manager assigned Patrick's coworkers    all African American    challenging assignments, provided them with coaching and training, and often extended their work deadlines. The totality of the evidence supports the conclusion that Patrick suffered from race-based harassment sufficient to alter his working conditions.[137]

## EXAMPLE 19
## SUFFICIENTLY SEVERE OR PERVASIVE CONDUCT

Kyra is a newly hired programer at a computer software development company. She is the first African American, and the first woman, to be hired by the company. All of the other employees are White or Asian American men. During her first few weeks on the job, several employees made insensitive comments to her. For example, one of her coworkers told her, "You're so articulate for a Black person." Kyra also overheard a conversation between a group of coworkers in which one said, "I didn't know Oprah could write code," to which the group responded with laughter. Her team leader said to her, "I know you got this job because you're a 'twofer' under our new affirmative action program, but you won't get any breaks here." Over her first few weeks, Kyra learned that the team leader held her to more exacting standards than her newly hired White and Asian American counterparts. While normally each programer's work was reviewed once by management to look for bugs    a process the company called "code review"    the computer code Kyra wrote was put to an extra round of code review, without any evidence that it was warranted.

---

[137]    *See Aman*, 85 F.3d at 1078-84 (reasonable jury could find two Black employees were subjected to racially hostile environment where managers and coworkers repeatedly made coded racial remarks, and managers required them to do menial tasks outside their job description, yelled at them, and made their jobs more difficult by withholding necessary information, refusing to deal with them, and falsely accusing them of misconduct).

After the first project Kyra was assigned to work on was complete,
Kyra had trouble getting assigned to another project because other
team leaders incorrectly assumed that Kyra's work was substandard.
When she raised the issue with management, she was told that the
company had always had a word-of-mouth assignment system, and
she needed to learn how to "play with the boys." The evidence
supports the conclusion that Kyra was subjected to a hostile work
environment because of her race, sex, or the intersection of both, in
light of the pattern of offensive comments and evidence that the bias
altered the terms and conditions of Kyra's employment.

### 3.    Employer Liability

Employers and employees each have an essential role in preventing race harassment. When
employers and employees both take appropriate steps to prevent and correct harassment, offensive
conduct generally will be corrected before escalating to the point of violating Title VII.

### <u>Conduct of Supervisors</u>

The rules for liability differ depending on whether the harasser is a supervisor. An
individual qualifies as an employee's supervisor if the individual has authority to undertake or
recommend tangible employment decisions affecting the employee, or the individual has authority
to direct the employee's daily work activities.[138] As a general rule, employers are responsible for
the behavior of their supervisors because employers act through their supervisors.

Thus, any time discrimination by a supervisor results in the victim suffering a tangible
employment action, such as being fired (or quitting in response to intolerable harassment
accompanied by an official company act),[139] demoted, not promoted, or docked in pay, the employer
is automatically liable, and there are no defenses available to the employer. For example, if a
supervisor has a racially motivated grudge against an employee and acts on it by denying the
employee a raise otherwise deserved under the employer's pay system, the employer would be
automatically liable and no defense would be available.

---

[138]    *See* Enforcement Guidance: *Vicarious Employer Liability for Unlawful Harassment by
Supervisors*, § III (June 1999). The Guidance also states the Commission's position that even if the harasser
had no actual supervisory power over the employee, the employer will be subject to vicarious liability if the
employee reasonably believed that the harasser had such authority. But, if the harasser had no actual
supervisory authority over the employee and the employee did not reasonably believe that the harasser had
such authority, then the standard of liability for co-worker harassment applies. *Id.*

[139]    The Supreme Court has held that a claim for constructive discharge is available under Title
VII when the harassment is so egregious or intolerable that quitting is a fitting response, and no affirmative
defense is available when the constructive discharge is caused by an official company act, such as when a
person quits in response to a humiliating demotion, an extreme cut in pay, or a transfer to a position that is
unbearable. *See Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004).

**App. 342**

There is an exception to the general rule that applies when the supervisor's harassment was not tangible — i.e., the case involves a hostile work environment instead of a firing, demotion, pay cut, etc. In this situation, the employer avoids liability if it proves the elements of the following affirmative defense:

- The employer exercised reasonable care to prevent and correct promptly any harassing behavior; *and*

- The employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.[140]

**EXAMPLE 20**
**EMPLOYER NOT LIABLE FOR UNLAWFUL HARASSMENT BY A SUPERVISOR**

Carla, an Asian American, claims that she was subjected to frequent offensive comments based on race and sex by her first-level supervisor. Carla was aware of the employer's anti-harassment complaint procedures, but did not notify her employer; nor were there extenuating circumstances explaining her failure to follow the employer's procedures. The employer learned of the harassment from Carla's coworker, and immediately conducted an investigation. The employer reprimanded the supervisor and transferred him to another division. The employer is not liable for the harassment because it took reasonable preventative and corrective measures and Carla unreasonably failed to complain about the harassment.[141]

For a full discussion of the affirmative defense for supervisory harassment, see Enforcement Guidance: *Vicarious Employer Liability for Unlawful Harassment by Supervisors* (June 1999), *available at* http://www.eeoc.gov/policy/docs/harassment.html.

---

[140]    *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher*, 524 U.S. at 807. The failure to complain is not necessarily fatal if it was not unreasonable – for example, if the victim can establish that he or she reasonably believed, based on evidence (not mere speculation), that a complaint would result in retaliation, or that there were obstacles to making or filing a complaint, or that the employer's complaint mechanism otherwise was ineffective.

[141]    *Compare with, e.g., Spriggs*, 242 F.3d at 188-89 (jury could conclude that employer did not meet duty to prevent and correct supervisor's racial harassment: Black Plaintiff complained to management that his White supervisor repeatedly used epithets such as "n-----" and "monkey" to describe Plaintiff and Blacks generally, as well as to describe the supervisor's own wife (who was Black), but management downplayed the complaints, tried to defend the conduct, or responded with indifference, and thus the conduct continued).

15-42

**App. 343**

**Conduct of Owner, President, Partners, or Officers**

If the harasser is of a sufficiently high rank to fall "within that class . . . who may be treated as the organization's proxy,"[142] the employer cannot raise the affirmative defense even if the harassment did not result in a tangible employment action.  Examples of officials who qualify as "proxies" or "alter egos" include a president, an owner, partners, and corporate officers.

**Conduct of Co-Workers and Non-Employees**

For the unlawful harassing conduct of non-supervisory employees, or non-employees over whom the employer has control (e.g., independent contractors or customers on the premises), the employer will be liable if it knew or should have known about the conduct and failed to take prompt and appropriate corrective action.[143]  This means that an employer should have an anti-harassment policy and complaint procedure and should be vigilant enough to detect harassing conduct that it reasonably should know about even without a complaint.[144]  It should also create an environment in which employees feel free to raise concerns, and are confident that those concerns will be addressed.  Victims of harassment, in turn, should make sure management knows about the harassing conduct.

**EXAMPLE 21**
**EMPLOYER LIABLE FOR UNLAWFUL HARASSMENT**
**BY A NON-EMPLOYEE OVER WHOM IT HAS CONTROL**

Charles is a frequent visitor on XYZ Senior Community's "neighborhood days," when XYZ allows senior citizens in the neighborhood to visit its residents.  During his visits, Charles often yells derogatory comments about Blacks and Latinos at Cheryl, a Black employee of Puerto Rican national origin, and has even pushed and tripped her on a few occasions.  Cheryl complains about the conduct to a manager, and is told that XYZ cannot take any action against Charles because he is not a resident.  On subsequent visits, Charles continues to yell racial and ethnic slurs at Cheryl, and she files an EEOC charge.  XYZ is liable for the actions of Charles, a non-employee, because it had the power to control Charles's access

---

[142]    *Faragher*, 524 U.S. at 789-90.

[143]    *See, e.g.*, *Reedy*, 333 F.3d at 910 (reversing summary judgment for employer because "Reedy offered sufficient evidence that Quebecor knew or should have known about the harassment but failed to take prompt and effective remedial action").

[144]    *See, e.g.*, *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278-79 (11th Cir. 2002) (under circuit precedent the employer did not have actual notice that Mexican employee was being called epithets such as "Julio," "taco," and "sp--," but there was "ample evidence" that it had constructive notice: harasser's supervisor's office was located in the department where much of the abuse occurred; and the abuse occurred up to three to four times each day and in the presence of others).

15-43

to the premises, was aware of Charles's offensive conduct, and did
not take corrective action.

## B.    RACIAL BIAS IN OTHER EMPLOYMENT TERMS AND CONDITIONS

Even if a company works hard to recruit and hire in a way that provides equal opportunity, and even if it maintains a harassment-free workplace, it still must ensure that race is not otherwise a barrier to employee success. Employers cannot permit race bias to affect work assignments, performance measurements, pay, training, mentoring or networking, discipline, or any other term, condition, or privilege of employment.[145]

### 1.    Work Assignments

Work assignments are part-and-parcel of employees' everyday terms and conditions of employment and are also important for gaining valuable on-the-job experience. Work assignments must be distributed in a nondiscriminatory manner. This means that race cannot be a factor in determining the amount of work a person receives, or in determining who gets the more, or less, desirable assignments.

### EXAMPLE 22
### WORK ASSIGNMENTS

After receiving an advanced business degree, Mary was hired as an entry-level associate at a management and technology consulting firm. She was the only Black associate among the new entry-level associates. Most of the firm's managers are White males. Initially, as with other new associates, Mary received routine assignments, and consistently met the expectations of the assigning managers. But as other associates became increasingly busy with complex, long-term projects, Mary noticed that she continued to receive projects that were short-term and routine. At her six-month performance review, the firm told Mary that her performance was good, and she received a bonus on par with other associates. She told the reviewers that she would like to receive more demanding work. Nevertheless, Mary's difficulty getting choice assignments became compounded in the remaining half of the year as managers gave important work to those associates who had successfully handled it for them in the past. This happened despite Mary's repeating on several occasions her request for more challenges. After a year at the firm, it was clear that her contemporaries had much higher standing in the firm than she did, as reflected in the low pay raise she received as compared to others.

---

[145]    *See* 42 U.S.C. § 2000e-2(a)(1) (unlawful "to discriminate . . . with respect to . . . compensation, terms, conditions, or privileges of employment"); Section 2: *Threshold Issues*, EEOC Compliance Manual, § 2-II.B.1, *available at* http://www.eeoc.gov/policy/docs/threshold.html; Section 613: *Terms, Conditions and Privileges of Employment*, EEOC Compliance Manual, Volume II.

Mary opted to seek a fresh start with another firm. Soon after, Mary filed a charge against the employer alleging race discrimination in the terms and conditions of her employment. The employer cannot offer, and the investigation does not reveal, a credible nondiscriminatory explanation for Mary's treatment. Thus, the evidence suggests that race bias affected how managers assigned Mary work, which in turn stalled her career development and affected her pay.[146]

**2.    Performance Evaluations**

Performance evaluations frequently serve as the basis for numerous other employment decisions, such as pay, promotions, and terminations. They should be unaffected by race bias.

**EXAMPLE 23**
**PERFORMANCE EVALUATIONS**

Daniel is a customer service representative, and the only African American in his unit. Until recently he has received uniformly stellar performance ratings, received performance awards, and earned a good reputation among his customers and colleagues. Things began to change, however, when a new supervisor was assigned a year ago to manage his unit. While Daniel had long been rated one of the best employees, the new supervisor began rating Daniel as below average, which has affected Daniel's quarterly bonuses. He files a charge alleging race discrimination. A review of the performance evaluations of Daniel and others in his unit reveals that while Daniel's overall performance rating has dropped markedly, the ratings of his counterparts have gone up. Significantly, on the most objective part of his performance evaluation ─ "quantity of results," which measures the number of accounts serviced ─ Daniel was rated below average when in actuality he serviced more accounts than persons with higher ratings in this performance category. In addition, there is evidence that the supervisor undermined Daniel's professional standing with customers ─ for example, by taking over meetings Daniel was supposed to lead, and refusing to correct a customer's clearly mistaken belief that Daniel was responsible for an error. This treatment is markedly different than that of Daniel's colleagues. The investigation reveals no evidence of a nondiscriminatory reason ─ such as a pure personality clash (i.e., one

---

[146]    *Cf. Herrnreiter v. Chicago Housing Authority*, 315 F.3d 742, 744-45 (7th Cir. 2002) (in this circuit, among the employment actions an employee may challenge are those that "reduce the employee's career prospects by preventing him from using the skills in which he is trained and experienced, so that the skills are likely to atrophy and his career is likely to be stunted").

15-45

**App. 346**

not rooted in the alleged bias)[147]    that explains Daniel's treatment. There is reasonable cause to believe Daniel's performance evaluations, and thus his pay, were racially discriminatory.[148]

### 3.    Training and Constructive Feedback

Training is important for employees to become proficient in their jobs and to prepare for advancement. This includes both formal training and informal training through feedback from supervisors. As with other aspects of the employment relationship, race cannot be a factor in who receives training and constructive feedback.

**EXAMPLE 24**
**TRAINING AND CONSTRUCTIVE FEEDBACK**

Tina, a brown-skinned woman of Mexican descent, is a new office clerk. Her primary duties are to sort and file purchase orders and invoices. Within a few weeks, it is clear to the employer that Tina is processing her purchase orders and invoices too slowly due to mistakes. The employer terminates Tina, who then files a charge alleging race discrimination. The investigation reveals that although White employees who perform at a substandard level are coached toward increasingly good performance, Tina and other employees of color get less feedback and thus tend to repeat mistakes and make new ones that could have been avoided. The evidence establishes that the employer unlawfully terminated Tina.[149]

---

[147]    *See supra* note 38, regarding "personality conflict" as a potential mask for unconscious bias.

[148]    *See Thomas*, 183 F.3d at 62-65 (denying summary judgment for employer because reasonable person could conclude Plaintiff's layoff was based on racially biased performance evaluations: after a new supervisor was hired, Plaintiff, the office's only African American customer service representative, went from being one of the highest rated employees to one of the lowest rated, and the evidence suggested that the new supervisor deliberately undermined Plaintiff's work, rated Plaintiff harsher than Whites, and that Plaintiff's earlier high ratings were more accurate).

[149]    *See Vaughn v. Edel*, 918 F.2d 517, 522 (5th Cir. 1990) (suit by Black female terminated as part of cost-cutting staff reductions; company had refrained from criticizing, counseling, or giving poor performance ratings to Plaintiff for fear of triggering a charge of discrimination; court upheld company liability because evidence established that if Plaintiff were White the company would not have inflated her performance ratings and would have criticized and counseled her, all of which would have given her an equal chance to improve to a level that would have prevented her termination). Similarly, it would violate Title VII to avoid hiring Blacks or other people of color for fear that a later employment decision (e.g, discipline, nonpromotion, layoff) might trigger a discrimination charge.

15-46

### 4.    Workplace Networks

Informal workplace networks can be just as important to an organization as official job titles and reporting relationships.  Thus, an employee's success may depend not only on his or her job duties, but also on his or her integration into important workplace networks.  Employers cannot allow racial bias to affect an employee's ability to become part of these networks.

**EXAMPLE 25**
**WORKPLACE NETWORKS**

Suhail, of Arab descent, works for a computer software company. The company thrives on active socializing between employees and decisionmakers both on and off the job   from lunch outings, after-work happy hours and weekend golf outings, to children's birthday parties and family barbeques.  Many employees establish strong relationships with decisionmakers through these informal networks, and as a result, tend to get put on the plum projects and get the plum promotions.   Suhail has experienced difficulty in building relationships with decisionmakers because he often receives invitations late or indirectly from peers, rather from the decisionmakers themselves.  After being passed over for several important projects, Suhail files a charge alleging race/national origin discrimination because he believes he is being excluded from his workplace network for reasons related to his Arab descent.  Suhail's exclusion would be actionable if it affects the terms and conditions of his employment.[150]

### 5.    Appearance and Grooming Standards

Appearance standards generally must be neutral, adopted for nondiscriminatory reasons, consistently applied to persons of all racial and ethnic groups, and, if the standard has a disparate

---

[150]    *Cf. Firefighters Institute for Racial Equality v. City of Saint Louis*, 549 F.2d 506, 514-15 (8th Cir. 1977) (City was liable under Title VII for White firefighters' exclusion of Blacks from their "supper clubs," informal eating arrangements among on-duty firefighters at firehouses using employer-provided cooking facilities; court ordered Fire Department to issue regulations prohibiting segregated use of City kitchen facilities such that City "may comport with its duty to provide a nondiscriminatory working environment," adding that "the inclusion of Blacks and the reduction of racial tension in firehouses cannot help but aid the City as an employer where the job at hand requires the close cooperation of its employees and a concerted team effort"); *Meritor*, 477 U.S. at 65-66 (citing *Firefighters* with approval).  *But cf. Domingo v. New England Fish Co.*, 727 F.2d 1429, 1438 (9th Cir. 1984) (holding rationale of *Firefighters* inapplicable because, while seating in Alaska cannery mess hall was racially segregated, there were no employer seating restrictions, and plaintiffs failed to offer evidence that their segregated eating was not by choice).

15-47

**App. 348**

impact, it must be job-related and consistent with business necessity.[151]  The following are examples of areas in which appearance standards may implicate Title VII's prohibition against race discrimination:

- **Height and Weight:**  Standards for height and weight sometimes are challenged as having an unlawful adverse impact.  For example, a requirement that employees be at least six feet tall might have an adverse impact on Asian Americans due to average height and weight differences, and thus such a requirement would need to be job-related and consistent with business necessity.[152]

- **Dress:**  An employer can impose the same dress code on all workers in similar jobs, regardless of their race or ethnicity, as long as the policy was not adopted for discriminatory reasons and is enforced evenhandedly.  However, an employer must treat racial or ethnic attire that complies with the dress code the same as other attire that complies with the dress code.[153]  For example, Title VII prohibits employers from banning the wearing of traditional Hawaiian dress that complies with the employer's dress code requirements.

- **Hair:**  Employers can impose neutral hairstyle rules    e.g., that hair be neat, clean, and well-groomed    as long as the rules respect racial differences in hair textures and are applied evenhandedly.  For example, Title VII prohibits employers from preventing African American women from wearing their hair in a natural, unpermed "afro" style that complies with the neutral hairstyle rule.  Title VII also prohibits employers from applying neutral hairstyle rules more restrictively to hairstyles worn

---

[151]    Employer appearance and grooming standards also may raise discrimination issues with respect to other protected bases, such as national origin, gender, or religion.  When an employee's dress or appearance is religiously-based, an employer has an affirmative duty to accommodate the employee's religious beliefs, unless doing so would pose an undue hardship.  For a detailed discussion of religious accommodation and undue hardship, refer to 29 C.F.R. § 1605.2.

[152]    *See Officers for Justice v. Civil Service Comm'n of City and County of San Francisco*, 395 F. Supp. 378, 380-81 (D.C. Cal. 1976) (granting preliminary injunction eliminating pre-selection requirement of a height of 5 ft. 6 in. for certain police officers; holding plaintiffs were likely to succeed at trial on argument that the requirement had a disparate impact on Asian Americans, Latinos, and females, and the city was unlikely to be able to demonstrate job relatedness and business necessity), *cited with approval in Dothard v. Rawlinson*, 433 U.S. 321, 332 n.15 (1977) (height and weight requirement had disparate impact on women).

[153]    By the same token, an employee whose clothing complies with the dress code cannot be forced to wear cultural attire.  *See Bryant v. Begin Manage Program*, 281 F. Supp. 2d 561 (E.D.N.Y. 2003) (reasonable jury could find race discrimination where Plaintiff, an African American who wore business suits on "casual days," was pressured by her African American supervisor to wear afro-centric clothing even though the dress code made no mention of afro-centric clothing, and Plaintiff was replaced by an African American who did wear afro-centric attire).

by African Americans.[154]

- **Beards:** Employers generally can require employees to be clean-shaven. However, Title VII requires an employer to make exceptions to a no-beard policy for men with pseudofolliculitis barbae, an inflammatory skin condition that occurs primarily in Black men and that is caused by shaving, unless being clean-shaven is job-related and consistent with business necessity (see Example 9 and accompanying footnote).

### 6.    Compensation

Employees must receive compensation without regard to race. All forms of compensation are covered, such as salary, overtime pay, bonuses, stock options, expense accounts, commissions, life insurance, vacation and holiday pay, and benefits.

**EXAMPLE 26**
**COMPENSATION**

Andrew Kim, of Korean descent, alleges that he is being discriminatorily paid less than his White counterparts. The employer cites Kim's performance as the reason for his lower pay. The investigator then compares the compensation of Kim and similarly situated employees, according to the factors the employer says go into salary (experience ("Exp.") and performance rating ("Perf.")):

| Protected Class | Salary | Salary Factors | Not in Protected Class | Salary | Salary Factors |
|---|---|---|---|---|---|
| Kim (CP) | $28,000 | Exp.    3 yrs<br>Perf.    3 | Smith | $31,000 | Exp.    3 yrs<br>Perf.    4 |
| | | | Thomas | $34,000 | Exp.    5 yrs<br>Perf.    4 |
| | | | Adams | $37,000 | Exp.    5 yrs<br>Perf.    5 |

---

[154]    *See Hollins v. Atlantic Co., Inc.*, 188 F.3d 652, 661 (6th Cir. 1999) (court held a reasonable jury could find Title VII violation where company prevented Black female from wearing hair in a "finger waves" hairstyle and in other hairstyles deemed "too eyecatching," while not subjecting White women to such standards, and even though the company admitted Plaintiff's hairstyles complied with company policy that hairstyles be neat, well-groomed, and safe); *Rogers v. American Airlines*, 527 F. Supp. 229, 232-34 (S.D.N.Y. 1981) (holding that a neutral employer policy against women wearing braids or cornrows was not a race-based distinction, and thus such a policy would violate Title VII only if it had a disparate impact on Black women and was not job-related and consistent with business necessity, or if the policy were applied in a discriminatory manner; the court also stated in *dicta* that an employer policy banning "afro" hairstyles likely would be a race-based distinction in violation of Title VII because, unlike braids or cornrows, an "afro" is the product of natural hair growth rather than artifice).

15-49

The employer's explanation for Kim's salary is credible because it accounts for the pay disparity. While Kim has the same amount of experience as Smith, Kim's performance rating is one point lower. There is no evidence that the performance rating itself was discriminatory. The $3000 difference between the pay of Kim and Smith is in line with the $3000 differences between the pay of Smith and the other non-Asian American employees. The evidence does not indicate discrimination.

For further information on discrimination in compensation, see Section 10: *Compensation Discrimination* (2000), *available at* http://www.eeoc.gov/policy/docs/compensation.html.

### 7.    Discipline and Discharge

Discipline and discharge decisions are typically based on either employee misconduct or unsatisfactory work performance. Such rules and policies regarding discipline and discharge must be enforced in an evenhanded manner, without regard to race.

### EXAMPLE 27
### DISCIPLINE AND DISCHARGE

Monica, a Filipino sales representative, is the only person of color in her district. Monica's job requires that she travel to the offices of clients and potential clients to market company products. Company policy requires sales representatives to be in the field from 8:30 a.m. to 5:30 p.m., and that they make sales calls on at least seven clients each and every day. Actual practice, however, is different. Most sales representatives "bank" their sales calls so that if they have a particularly productive day, they record the "extra" sales calls as occurring on a less productive day. When Monica learns that the practice is common among sales representatives, she begins to do it too, because she likes the flexibility that it offers. Things change after the company assigns a new District Manager to Monica's district. The new manager tells Monica that "banking" sales calls is against policy and that he intends to ask the Regional Manager for permission to discipline Monica, which would deny her a bonus and make her a candidate for layoff. When Monica protests that other sales representatives in her district use the same practice, her supervisor feigns ignorance and does nothing about it. The Regional Manager approves the discipline based upon the District Manager's recommendation. Monica files a charge alleging race discrimination. The investigation does not reveal a credible and persuasive nondiscriminatory explanation for what otherwise appears to be a

racial double standard. Thus, it is likely that Monica's discipline was racially motivated, in violation of Title VII.[155]

## C.    RETALIATION

Employees have a right to be free from retaliation for their opposition to discrimination or their participation in an EEOC proceeding by filing a charge, testifying, assisting, or otherwise participating in any manner in an investigation, proceeding, or hearing under Title VII.[156]  There are three essential elements of a retaliation claim:

- **Employee Protected Activity** — opposition to discrimination or participation in the statutory complaint process;

- **Employer Adverse Action** — any adverse treatment (beyond a petty slight or a trivial annoyance) that is based on a retaliatory motive and is reasonably likely to deter protected activity; and

- **Causal Connection** — between the protected activity and the adverse action.

### EXAMPLE 28
### RETALIATION

Pedro files a charge alleging discrimination because of his race, Black, and his national origin, Dominican.  In the months following his charge, Pedro begins receiving less and less overtime work.  He files another charge alleging that the denial of overtime is retaliatory.  The employer states that Pedro was not assigned overtime because there is less work.  The investigation reveals no significant change in the amount of overtime available before and after Pedro's charge.  Other employees with similar qualifications as Pedro have continued to be assigned overtime at approximately the same rate.  These facts establish that Pedro has been subjected to retaliation for filing a charge, in violation of Title VII.

---

[155]    *See Ellerth*, 524 U.S. at 762 (company may be vicariously liable for tangible employment action taken after review by higher level supervisors; citing with approval *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir.1990) (committee was unaware of discriminatory animus driving supervisor's recommendation, but company was liable because the committee "acted as the conduit of [the supervisor's] prejudice – his cat's paw")).

[156]    *See* 42 U.S.C. § 2000e-3(a).  *See Johnson v. University of Cincinnati*, 215 F.3d 561, 579-81 (6th Cir. 2000) (affirmative action official who alleged discrimination not based on his status as an African American, but based on his advocacy for increased employment opportunities for minorities and women, could bring a claim under §704(a) of Title VII for retaliation).  The other statutes enforced by EEOC also prohibit retaliation.  *See* 29 U.S.C. § 623(d) (ADEA); 42 U.S.C. §§ 12203(a), (b) (ADA); 29 U.S.C. § 215(a)(3) (Equal Pay Act).

**App. 352**

For a detailed discussion of the prohibition against retaliation, refer to Section 8: *Retaliation*, EEOC Compliance Manual (1998), *available at* http://www.eeoc.gov/policy/docs/retal.html.

## 15-VIII  REMEDIES

In a disparate treatment case, the statute allows the following remedies (as applicable): injunctive relief, reinstatement, front pay (until or in lieu of reinstatement), back pay, attorney's fees and costs, compensatory damages for any past or future out-of-pocket losses and any emotional harm, and punitive damages if the employer acted with malice or with reckless indifference to the individual's federally protected rights.  Punitive damages are unavailable against a federal, state, or local government employer.

The law places caps on the sum of compensatory and punitive damages for which an employer may be liable.  The caps are based on the size of the employer's workforce:

- Employers with 15 - 100 employees:  up to $50,000

- Employers with 101 - 200 employees:  up to $100,000

- Employers with 201 - 500 employees:  up to $200,000

- Employers with 501 or more employees:  up to $300,000

*See* 42 U.S.C. § 1981a(b).  The caps apply to the sum of: punitive damages, and compensatory damages for emotional harm and future pecuniary losses.  The caps do not apply to back pay and interest on back pay, front pay, or past pecuniary losses.[157]  For further information, see Enforcement Guidance: *Compensatory and Punitive Damages Available Under §102 of the Civil Rights Act of 1991* (1992), *available at* http://www.eeoc.gov/policy/docs/damages.html.

In a "mixed motives" case, in which an employment decision was motivated in part by race but the employer proves it also was motivated in part by a nondiscriminatory reason that would have resulted in the same decision by itself, Title VII still is violated but the remedies available are limited.  The law allows declaratory relief, injunctive relief, and attorney's fees and costs, but not reinstatement, hiring, back pay, or compensatory or punitive damages.[158]

In an "after-acquired evidence" case, in which an employment decision was motivated by race but the employer proves that it subsequently discovered evidence of the applicant's or employee's wrongdoing that would have led to a similar decision on legitimate grounds even absent

---

[157]    The caps on damages do not apply to suits filed under 42 U.S.C. § 1981, which also prohibits race discrimination in employment.  *See supra* note 9.

[158]    *See* 42 U.S.C. § 2000e-2(m) (proof that race was motivating factor establishes unlawful employment practice, even though other factors also motivated the practice); 42 U.S.C. §2000e-5(g)(2)(B) (limiting remedies when employer demonstrates that it would have taken same action in the absence of the impermissible motivating factor).

**App. 353**

discrimination, Title VII still is violated. However, the remedies available are limited as follows: back pay is generally limited to the period from the date of the unlawful employment action to the date that the misconduct was discovered, compensatory damages are typically excluded for out-of-pocket losses incurred after the date that the evidence of wrongdoing was discovered, and reinstatement (or instatement) and front pay are not available. Other remedies, including compensatory damages for emotional harm and punitive damages, are not affected. For a fuller discussion of after-acquired evidence, see *Enforcement Guidance on After-Acquired Evidence and McKennon v. Nashville Banner Publishing Co.* (1995), *available at* http://www.eeoc.gov/policy/docs/mckennon.html.

In a disparate impact case, in which a policy or practice has a significant disparate impact but cannot be justified by job-relatedness and business necessity, the employee is entitled to injunctive relief, reinstatement, front pay (until or in lieu of reinstatement), back pay, and attorney's fees and costs. Compensatory damages and punitive damages are not available in disparate impact cases.[159]

## 15-IX ☞ PROACTIVE PREVENTION ☜

*The following are examples of **best practices** for employers    proactive measures designed to reduce the likelihood of Title VII violations and to address impediments to equal employment opportunity.*

### General

- Develop a **strong EEO policy** that is **embraced by the CEO** and top executives, **train managers and employees** on its contents, enforce it, and **hold company managers accountable**.

- Make sure decisions are **transparent (to the extent feasible) and documented**. The reasons for employment decisions should be well explained to affected persons. Make sure managers maintain records for at least the statutorily-required periods.

### Recruitment, Hiring, and Promotion

- Recruit, hire, and promote with EEO in mind, by implementing practices designed to widen and **diversify the pool of candidates** considered for employment openings, including openings in upper-level management.

- Monitor for EEO by **conducting self-analyses** to determine whether current employment practices disadvantage people of color, treat them differently, or leave uncorrected the effects of historical discrimination in the company.

---

[159]    *See* 42 U.S.C. § 1981a(a)(1) (compensatory and punitive damages not available for "an employment practice that is unlawful because of disparate impact").

- Analyze the duties, functions, and competencies relevant to jobs. Then create **objective, job-related qualification standards** related to those duties, functions, and competencies. Make sure they are **consistently applied** when choosing among candidates. **Identify and remove barriers** to EEO    such as word-of-mouth recruiting in a workforce that does not reflect the diversity of the qualified labor market, or employment tests    if they cannot demonstrably be tied to job performance and business necessity.

- Develop the potential of employees, supervisors, and executives with EEO in mind, by providing **training and mentoring** to give workers of all backgrounds the opportunity, skill, experience, and information necessary to perform well, and to ascend to upper-level jobs.[160]

- Make sure **promotion criteria** are made **known**, and that **job openings** are **communicated** to all eligible employees.

## Harassment

To protect employees from unlawful racial (and other) harassment, employers should adopt a strong anti-harassment **policy**, periodically **train** each employee on its contents and procedures, and vigorously **follow and enforce** it. The policy should contain:

- A clear **explanation** of prohibited conduct, including examples;

- Clear assurance that employees who make complaints or provide information related to complaints will be **protected against retaliation**;

- A clearly described **complaint process** that provides multiple, accessible avenues of complaint;

- Assurance that the employer will protect the **confidentiality** of harassment complaints to the extent possible;

- A complaint process that provides a **prompt, thorough, and impartial investigation**; and

- Assurance that the employer will take **immediate and appropriate corrective action** when it determines that harassment has occurred.

---

[160]    Harvard Business School Professor David A. Thomas found in a three-year study of several large corporations that high quality mentoring was one of the most salient features of the careers of high-potential Blacks who successfully made it to the upper executive level. Professor Thomas also found that the career trajectories of Black executives differed markedly from the career trajectories of White executives. High-potential Whites who ultimately reached the executive level entered a fast track much earlier in their careers than high-potential Blacks. Blacks who reached the executive level were much more likely to have distinguished themselves through special projects, task force assignments, turnaround assignments, a change in location, or having a highly visible big success. *See* David A. Thomas, *The Truth About Mentoring Minorities: Race Matters*, HARVARD BUSINESS REVIEW (April 2001).

**App. 355**

For a full explanation of these points, see Enforcement Guidance: *Vicarious Employer Liability for Unlawful Harassment by Supervisors* (June 1999), *available at* http://www.eeoc.gov/policy/docs/harassment.html.

### Terms, Conditions, and Privileges of Employment

- **Monitor** compensation practices and performance appraisal systems for **patterns of potential discrimination**. Make sure performance appraisals are based on employees' actual job performance. Ensure consistency, i.e., that comparable job performances receive comparable ratings regardless of the evaluator, and that appraisals are neither artificially low nor artificially high. Allow employees, without negative consequences, to have their appraisals reviewed and corrected when appropriate.

- Develop the potential of employees, supervisors, and executives with EEO in mind, by providing **training and mentoring** that provides workers of all backgrounds the opportunity, skill, experience, and information necessary to perform well, and to ascend to upper-level jobs.

- Promote an **inclusive culture** in the workplace by inculcating an environment of professionalism and respect for personal differences. In addition, employees of all backgrounds should have **equal access to workplace networks**.[161]

- Foster open communication and early dispute resolution. This will minimize the chance of misunderstandings escalating into legally actionable EEO problems. In addition, an **alternative dispute-resolution (ADR) program** can resolve EEO problems without the acrimony associated with an adversarial process. Importantly, however, even if there is such a program, an employee still is free to file a charge of discrimination with EEOC, and utilizing a company grievance procedure or other ADR mechanism does not suspend the running of the time period for filing an EEOC charge. As a best practice, however, employers should consider expressly waiving in advance any defense related to an employee's failure to adhere to the charge-filing time period if the employee properly utilizes the employer's ADR program.

- Protect against retaliation. Provide clear and credible assurances that if employees make complaints or provide information related to complaints the employer will **protect employees from retaliation**, and consistently follow through on this guarantee.

---

[161] The Commission's Best Practices Task Force Report uses the phrase "like me bias" to describe one of the key general barriers to equal employment opportunity: "It is an axiom of human nature that people often like to associate with other people who are like themselves. This enhances a comfort level in working relationships. Such 'like me' bias may be conscious or unconscious. Nevertheless, the 'like me' syndrome can lead to a tendency to employ and work with people like oneself . . . ." *See* EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, "BEST" EQUAL EMPLOYMENT OPPORTUNITY POLICIES, PROGRAMS, AND PRACTICES IN THE PRIVATE SECTOR 27 (2d ed. 1998). The complete report is available at http://www.eeoc.gov/abouteeoc/task_reports/practice.html.

**App. 356**

Respectfully submitted this the 14th day of September, 2017.

> KEN PAXTON
> Attorney General of Texas
>
> JEFFREY C. MATEER
> First Assistant Attorney General
>
> BRANTLEY D. STARR
> Deputy First Assistant Attorney General
>
> MICHAEL C. TOTH
> Special Counsel to the First Assistant Attorney General
>
> */s/ Austin R. Nimocks*
> AUSTIN R. NIMOCKS
> Associate Deputy Attorney General
> Texas Bar No. 24002695
> austin.nimocks@oag.texas.gov
>
> DAVID J. HACKER
> Senior Counsel
>
> Office of Special Litigation
> ATTORNEY GENERAL OF TEXAS
> P.O. Box 12548, Mail Code 009
> Austin, Texas 78711-2548
> (512) 936-1414
> (512) 936-0545 Fax
>
> *ATTORNEYS FOR PLAINTIFF*

## CERTIFICATE OF SERVICE

I certify that on the 14th day of September, 2017, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

> */s/ Austin R. Nimocks*
> AUSTIN R. NIMOCKS
> Associate Deputy Attorney General