```
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF TEXAS
 2                        LUBBOCK DIVISION

 3   STATE OF TEXAS                )
                 Plaintiff,        )
 4                                 )
     VS.                           )   CAUSE NO. 5:13-CV-255-C
 5                                 )
     EQUAL EMPLOYMENT OPPORTUNITY   )
 6   COMMISSION, et al.,           )
                 Defendants.       )
 7

 8       -------------------------------------------------------

 9            MOTION FOR SUMMARY JUDGMENT HEARING
            BEFORE THE HONORABLE SAM R. CUMMINGS,
10           SENIOR UNITED STATES DISTRICT JUDGE

11            TUESDAY, OCTOBER 17, 2017
                   LUBBOCK, TEXAS
12       -------------------------------------------------------

13

14                    A P P E A R A N C E S

15   FOR THE PLAINTIFF:
     OFFICE OF THE ATTORNEY GENERAL
16   P.O. BOX 12548
     CAPITOL STATION
17   AUSTIN, TEXAS 78711-2548
     BY:  AUSTIN NIMOCKS
18        ANDREW D. LEONIE

19
     FOR THE DEFENDANTS:
20   UNITED STATES DEPARTMENT OF JUSTICE
     CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
21   20 MASSACHUSETTS AVENUE NW
     WASHINGTON, DC 25030
22   BY:  JAMES RYAN POWERS

23
     FEDERAL OFFICIAL COURT REPORTER: MECHELLE DANIEL, 1205 TEXAS
24   AVENUE, LUBBOCK, TEXAS 79401, (806) 744-7667.
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT
25   PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
```

1                              **I N D E X**

2

3    ARGUMENT BY THE PLAINTIFF                          3
     ARGUMENT BY THE DEFENDANTS                        46
4    REBUTTAL BY THE PLAINTIFF                         71
     STATEMENT BY THE COURT                            76

5

6

7

8

9

10

11                          *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Mechelle Daniel, Federal Official Court Reporter*
*(806) 744-7667*

```
 1                 P R O C E E D I N G S
 2             THE COURT:  The Court calls for hearing Cause
 3    Number CV5-13-255.  This case is styled State of Texas,
 4    Plaintiff, vs. Equal Employment Opportunity Commission;
 5    Victoria A. Lipnic, in her Official Capacity as Acting Chair of
 6    the EEOC; and Jefferson B. Sessions, III, in his Official
 7    Capacity as Attorney General of the United States, Defendants.
 8             Who is here on behalf of the plaintiff?
 9             MR. NIMOCKS:  Good morning, Your Honor.  Austin
10    Nimocks on behalf of Texas, joined by my colleague Andrew
11    Leonie.
12             MR. LEONIE:  Good morning, Your Honor.
13             THE COURT:  Good morning.
14             All right.  Who is here on behalf of the
15    defendants?
16             MR. POWERS:  Good morning, Your Honor.  Jim Powers
17    on behalf of the United States.
18             THE COURT:  All right.
19             Okay.  This morning, the Court will entertain
20    argument from each side concerning your respective motions for
21    summary judgment.  I've given each side up to 90 minutes to
22    present your position.
23             Plaintiff, you may begin.
24             MR. NIMOCKS:  Thank you, Your Honor.  Good morning
25    and may it please the Court.
```

1           The case before you is a case about authority.  And
2    the primary question this case asks, Your Honor, is whether
3    Title VII prohibits the Texas legislature from adopting
4    categorical hiring prohibitions for felons.
5           As we've demonstrated in our briefing, there are
6    over 300 places in Texas law where a felonious history
7    automatically impacts an individual's access to societal
8    privileges, and that includes employment.  Of course, those
9    restrictions go well beyond employment, Your Honor.  These laws
10   apply without exception in Texas, leaving no discretion to be
11   exercised by those charged with implementing the law.
12          The guidance, or rule as we call it, at issue in
13   this case takes a very hard-line stance against these
14   categorical prohibitions, finding and suggesting in other
15   places that these categorical prohibitions in Texas law, and
16   other places where they may be found, create a per se, unlawful
17   disparate impact under Title VII or do not survive Title VII
18   scrutiny.
19          The rule at issue demands that where felons apply
20   for jobs in Texas for which they are categorically excluded,
21   Texas must nonetheless engage in EEOC's three-part
22   individualized assessment protocol, a protocol that exists
23   nowhere in Title VII.  So even though the felon is completely
24   unqualified for the position at issue, Texas need not--cannot
25   stop there.  We must continue to expend taxpayer resources

1    going through a useless exercise of listening to why the felon

2    nonetheless should be given the position in question.

3              This is, of course, troublesome for Texas, because

4    the Supreme Court and the Fifth Circuit have been clear that

5    legislative enactments of the legislature are presumed valid.

6    And that's made clear in the Cleburne case from the Supreme

7    Court in 1985, the Burlington Northern case from the Fifth

8    Circuit in 2005, both of which we cite in our response brief,

9    Your Honor.

10             Because these legislative enactments of Texas are

11   presumed valid, we believe that any Texas law that disparately

12   impacts a protected class is presumed, as a matter of law, to

13   be valid or survive Title VII scrutiny, at least the initial

14   stages.  In the Title VII context, to be more specific, Your

15   Honor, this means that the Texas laws are presumed job-related

16   for the position in question and consistent with business

17   necessity or public interest, is the standard when it comes to

18   a sovereign, as the Supreme Court has made clear.

19             The Supreme Court has been clear that the

20   touchstone for the question is business necessity.  EEOC, in

21   this rule at issue before Your Honor, does not consider the

22   business necessity or the public interest of Texas or any other

23   sovereign in issuing the rule.  Indeed, EEOC makes it clear

24   that the rule extends to sovereigns and municipalities but does

25   not at one point in time in the rule consider the special

1    circumstances that a sovereign like Texas have.  Texas, of
2    course, is not engaged in the normal business process of hiring
3    individuals to make widgets.  We're a sovereign.  We have a
4    greater interest at stake, and the laws that we have form a
5    greater tapestry or legal framework, each one impacting the
6    other.
7           This explains why Texas is entitled to special
8    solicitude before this Court as it pertains to our standing,
9    but also our substantive interest in this Title VII analysis.
10   Because the public interest dynamic of Texas is lost upon the
11   EEOC and its rule, or really more accurately fully ignored by
12   the EEOC, there's a significant substantive conflict with the
13   rule and Texas law and policy.  The rule thusfore questions the
14   propriety of Texas's longstanding interdependent laws, laws
15   that predate not only Title VII, but EEOC itself.  These laws
16   are the product of over 85 legislatures, over 180 years of
17   sovereignty, and are deeply embedded and rooted in Texas
18   history.
19          You can see the problems at issue here, Your Honor,
20   when the rule was applied against Texas law.  And let me give
21   you some examples.  Texas law, as we made clear in our
22   briefing, specifically forbids felons from being hired as peace
23   officers.  In other words, felons are not allowed to carry guns
24   and be charged with the responsibility of securing the peace of
25   the citizenry.  We have similar restrictions in Texas law

1    regarding being a schoolteacher, taking care of elderly or
2    vulnerable Texans, and other significant positions of public
3    trust or where the public trust is significant.
4              Yet this rule demands that, even in those
5    instances, we must nonetheless engage in conducting
6    individualized assessments, that we must explore the history of
7    a felon to determine whether they might, in some respect,
8    qualify to actually be a good peace officer or a game warden or
9    an elderly caretaker for the Department of Aging and Disability
10   Services.
11             The Department of Justice ups the game, Your Honor,
12   in the briefing before this Court.  Not once does the
13   Department of Justice disavow the individualized assessment
14   standard that EEOC promulgates in the rule, or even concede
15   that there are certain positions of public trust in Texas law
16   that justify taking a no-risk proposition with regard to
17   felons.  And we believe some of these propositions are very
18   easy, to the point of self-evident to anybody.
19             This is concerning, because the problem is, is that
20   the rule says that categorical prohibitions like those in Texas
21   law are per se unlawful, that we've got to conduct these
22   individualized assessments and we can never say that a felon is
23   per se excluded from employment opportunities.
24             This creates a conflict, because other areas of
25   Texas law that don't involve employment make clear and have

1    been upheld multiple times by courts that there are certain

2    societal privileges that felons do not qualify for: the

3    privilege of serving on juries; the privilege of holding public

4    office in places of significant public trust; and, of course,

5    the privilege of voting, which can only be restored under

6    certain circumstances.

7          Your Honor, the Department of Justice declares the

8    rule at issue as, quote, "eminently reasonable," unquote, and,

9    quote, "fairly encompassed by Title VII," unquote, in its

10   briefing.  This is concerning, because, as the Department of

11   Justice makes clear, it holds the key to being able to

12   prosecute Texas for any prospective violations under Title VII.

13         And, of course, Your Honor, this conflict that

14   Texas is concerned about is not just theory.  As our briefing

15   makes clear and I know the Court is aware, because of this

16   rule, a felon filed a complaint for not being given a job with

17   the Department of Public Safety.  This is a job where this

18   felon would have access to a database containing the personal

19   intimate information for over 29 million Texans.

20         The Texas Department of Public Safety has a no-risk

21   policy regarding the safety and security of Texans and those

22   that it will employ.  The Department of Public Safety will not

23   risk the safety and security and privacy of Texans, period, on

24   an individual that has a problem in their past, like a felony

25   conviction.  And as the Fifth Circuit has recognized, felony

1    convictions are serious, because they represent egregious

2    violations of the public trust.

3                  Your Honor, there is no debate, nor there should

4    be, that individuals with felony histories should not be

5    employed at the Texas Department of Public Safety with access

6    to that type of information, or even in a position carrying a

7    firearm.  And yet, because of the rule, this applicant believed

8    that he was entitled to that job.  For the first time that we

9    are aware of, Your Honor, in Texas, a felon demanded to be

10   employed with the Department of Public Safety, bolstered by the

11   rule.  And the fact that the rule bolstered this individual's

12   belief or entitlement goes directly into questions regarding

13   the APA cause of action, which I'll get to in a moment.

14                  According to this rule, Texas violated Title VII by

15   not wasting taxpayer resources to conduct an individualized

16   assessment of this felon.  According to this rule, Your Honor,

17   notwithstanding the fact that this man was a felon and did not

18   qualify for the position, we nonetheless needed to solicit

19   information from him so he could explain the circumstances of

20   his felony conviction and make a case as to why he was entitled

21   to be employed at the Department of Public Safety.  This cannot

22   be correct on how Texas must use taxpayer resources, especially

23   for positions of significant public trust.

24                  The rule's demand for individualized assessments,

25   Your Honor, is not something that occurred overnight.  The

1    defendants formulated this new rule, as we believe we

2    demonstrate in our briefing, through a series of snowballing

3    decisions, policy statements that did not go through notice and

4    comment, Your Honor.  The EEOC titles these things as guidances

5    and statements, but the pragmatic and common-sense approach

6    required by the controlling case law requires us to look at the

7    essence of those documents and how they are treated by the

8    defendants and the impact that they have on everybody involved.

9            With ruling after ruling and guidance after

10    guidance, the EEOC systematically pushed the business necessity

11    requirement from the analysis, instead replacing it by its

12    preferred three-part test.  And as business necessity was

13    marginalized, the EEOC's individualized assessment mandate

14    became more and more prominent in the things that it was

15    releasing, and now it has a prominent place, and I would say an

16    exclusive place, in the new rule.

17            Your Honor, I want to get more specific now and

18    turn to some of the issues that--some of the threshold issues

19    that have been raised in the briefing on this.  I know that

20    this Court has ruled on the question of standing, at least in

21    the motion to dismiss.  This has been discussed by the Fifth

22    Circuit in the prior case.  And I recognize that the Fifth

23    Circuit opinion was vacated, so when I reference that, I want

24    the Court to understand that I recognize I'm referencing a

25    vacated case, but nonetheless, as this Court found it

1    instructive, so do we in many respects.

2         I think the standing analysis that this Court has

3    to conduct, if it feels compelled to do it in a more thorough

4    sense, is relatively simple.  First and foremost, as made clear

5    by the Supreme Court in Massachusetts against EPA, Texas stands

6    before this Court with a special solicitude.  We are not the

7    average plaintiff.  We are not the average party.  The depth

8    and breadth of our concerns and circumstances that we have--and

9    here, that's demonstrated especially with the over-300 places

10   in Texas law where having a felonious history impacts your

11   ability to access sole societal privileges.  This is all at

12   stake and at issue before the Court, and Texas has an interest

13   in protecting it all.

14        Texas also stands here in a capacity as parens

15   patriae.  Why is that?  Well, Texas has an interest to bring

16   forth a case as parens patriae when it's acting to protect the

17   health, welfare, and safety of its citizens.  Oftentimes this

18   can be in the capacity of an actual physical threat, but also

19   the Supreme Court has made clear that this applies when the

20   threat can be economic.  And that's from the Alfred Snapp case,

21   1982, which I'm fairly certain we do cite, although I don't

22   have the page number, Your Honor.  That's at 458 U.S. 592.

23        And so the interests are not just physical

24   interests we're protecting of the Texas citizenry, but economic

25   interests.  And as a matter of fact, in this day and age, Your

1    Honor, I would argue that felons with nonviolent histories may

2    be more dangerous to society than felons with violent

3    histories, simply because of the electronic age in which we

4    live, the propensity for identify theft.  And so Texas has to

5    consider on an equal basis not just violent felonies, but

6    nonviolent felonies, felonies that have to do with fraud,

7    felonies that have to do with deceit and represent general

8    propensity of an individual to be dishonest or not respect the

9    rights, not only of Texas, but their fellow citizens.

10           A helpful indication, says the Supreme Court, of

11    parens patriae standing, which we do plead in our complaint,

12    Your Honor, is whether the injury is one that the State would

13    likely attempt to address through its sovereign lawmaking

14    powers.  This is why the over-300 places in Texas law where a

15    felonious history exists or impact an individual matter so

16    much, because Texas has been addressing what it means to be a

17    felon for a very long time, across every aspect of society.

18    And as we demonstrate in our briefing, the places where Texas

19    law addresses the consequences of being a felon affect

20    virtually every aspect of Texas law and society.  You would be

21    hard-pressed to not find an area of Texas law where having that

22    history doesn't matter.

23           So in addition to our special solicitude and our

24    presence here as parens patriae, as the Fifth Circuit has made

25    clear, we are an object of the rule at issue.  This is a

 1    relatively simple proposition, because the rule itself says so.
 2    This is on page 6 of our appendix, page 3 of the rule, where
 3    the guidance expressly states that it applies to state and
 4    local governments.  So we are an object of this rule
 5    notwithstanding--because EEOC says so, notwithstanding the fact
 6    that EEOC neglected to consider the special circumstances of
 7    state and local governments with regard to the rule.  And the
 8    EEOC has previously, in this case, conceded that we are an
 9    object of the rule.  The Fifth Circuit recognized that in its
10    opinion at Note 3.
11            And I would say this, Your Honor, with regard to
12    the Fifth Circuit's opinion.  I realize that it has been
13    vacated, but I don't know that the Fifth Circuit vacating that
14    opinion necessarily vacates the underlying facts or,
15    especially, concessions that were made that I think really fall
16    into the law of the case doctrine in some respect, or facts
17    that are still part of this dispute.  So I think, from a
18    factual standpoint, this Court could reasonably extract
19    necessary facts that are still part of the record, acknowledged
20    by the Fifth Circuit in their opinion, without necessarily
21    disrespecting the fact that the opinion was vacated.  And so I
22    think there are some valid underlying facts that are in the
23    record that the Court can acknowledge, especially some of the
24    concessions made by the government during the course of the
25    litigation.

```
 1                    In addition, from a standing standpoint, we have
 2       standing beyond being an object of the regulation, because the
 3       guidance does impose a mandatory scheme.  And this is discussed
 4       by the Fifth Circuit in terms of the increased regulatory
 5       burden that Texas is facing with regard to the rule.
 6                    Now, the government makes an argument that because
 7       Texas has not fully incurred the increased regulatory burden,
 8       somehow we don't have standing.  We don't have an injury in
 9       fact.  But, Your Honor, that is not the standard.  We do not
10       have to go shoot ourselves in the foot or self-inflict an
11       injury in order to come to court.  As a matter of fact,
12       self-inflicting an injury would run contrary to Supreme Court
13       precedent, and I think about cases like Clapper against Amnesty
14       International off the top of my head where it specifically says
15       that you can't create your own injury.
16                    Now, the standard is whether we are being
17       pressured, and the Fifth Circuit talked about this.  Is the
18       existence of pressure enough?  And, of course, it is.  And we
19       don't have to go beyond pressure.  We don't have to incur the
20       harm of going back inside of our agencies and reevaluating our
21       hiring processes or having, more significantly, the governor
22       call a special session and demand that the legislature conform
23       the statutes at issue with the rule so we can avoid that.  We
24       don't have to do that to then come to court and say we have a
25       problem.  No, the existence of the pressure or the legal
```

     1       conundrum that the rule faces is enough.

     2              And the Fifth Circuit talked about this in the EEOC

     3       opinion, looking at specifically the DAPA, D-A-P-A, or Deferred

     4       Action case that the Fifth Circuit had.  We did not--"we" being

     5       Texas--in the face of that particular presidential

     6       proclamation, go back and start reforming our rules or

     7       anything.  What we recognize is that this proclamation is

     8       valid.  Texas is going to have to start expending money with

     9       regard to driver's licenses and other things.  And seeing that

    10       harm on the horizon was reflective of the pressure circumstance

    11       that was inflicted and more than enough for us to have standing

    12       and walk into court.

    13              And that's not the only example.  There are several

    14       examples of pressure.  You, yourself, Your Honor, in the

    15       Persuader Rule case last year--even though the rule at issue

    16       was not yet in effect--the effective date was not there--we

    17       could see the harm forthcoming.  We could see that this rule

    18       was going to impact Texas's sovereignty, and we had standing,

    19       and this Court had jurisdiction in order to grant the relief

    20       requested.

    21              There was a similar circumstance last year with

    22       Judge Mazzant in the Eastern District of Texas regarding a rule

    23       from the Department of Labor.  Again, the rule was not into

    24       effect yet.  It was a preenforcement challenge.  But again, the

    25       pressure of the rule being promulgated and the forthcoming

1    effective date of the rule was the pressure that we needed to

2    have standing to be able to walk into court.

3              Now, to be fair, the last two cases I discussed,

4    the Persuader Rule case and the case from the Eastern District

5    from Judge Mazzant--  And by the way, Your Honor, we cite those

6    cases, if you want to look at them more deeply, on page 16 of

7    our opening brief.  That's Docket Number 95 at page 16 in

8    Footnote 28 where we cite those cases.

9              One of the cases in--  So let me back up.  To be

10   fair, those two cases that I just mentioned are cases where you

11   have a formally promulgated rule that has a certain effective

12   date, and so you see this effective date getting closer and

13   closer with each passing day on the calendar.  Well, what about

14   a circumstance here where you don't have a formally promulgated

15   rule?  There is no necessary effective date, and so can you

16   really see the harm on the horizon?  And that's one of the

17   questions that DOJ poses in their briefing.

18             And I think we can, Your Honor.  And this was dealt

19   with by Judge O'Connor in a case that we filed against the

20   Department of Education--and this is a case that's also cited

21   in Footnote 28--regarding a guidance document that was issued

22   by the Department of Education.  So we have kind of a similar

23   circumstance here, a nonformally promulgated rule that has a

24   legal consequence.

25             And in that case, Judge O'Connor found that we have

1    standing, because the guidance document was binding employees

2    of the Department of Education, because they were out in the

3    field enforcing the promulgation of the guidance document.  And

4    in that instance in particular, there had been actually a

5    lawsuit brought against the State of North Carolina, and so a

6    sovereign that had been--like Texas, that had schools and had

7    interests at stake here.

8              As we demonstrate in our briefing, Your Honor--and

9    I know that the Court--I think we even mention this in our

10   complaint.  That lawsuits have been filed against employers

11   with regard to the rule is not in dispute here.  It has been.

12   It has been enforced.  The fact that the Department of Justice

13   has not filed one really doesn't matter.  I mean, that's--I

14   think that's an apples and oranges proposition, quite frankly,

15   Your Honor.  This rule is being viewed seriously by EEO staff,

16   and lawsuits have been filed in federal court over this rule.

17   So you have nonetheless, even with a guidance document,

18   enforcement mechanisms happening.  You have this foreseeable

19   harm going on.

20             It has been almost, today, Your Honor, four years

21   since this lawsuit was filed.  But it's important, in looking

22   at standing--and these are cases that we cite--that it is to be

23   determined at the time the lawsuit was filed, on November 4th,

24   2013.  And so in looking at the standing analysis, we have to

25   go back four years and look at what's happening.  And, of

1    course, there are cases from the Supreme Court and the Fifth

2    Circuit which we cite on pages--on our response brief, which is

3    Docket Number 101, at pages 7 and 9 and 10.  I'm looking at the

4    Davis against FEC case from the Supreme Court, Lujan against

5    Defenders of Wildlife, Pederson against Louisiana State

6    University, the 2000 Fifth Circuit case.  All of those cases,

7    and more, support the proposition that we look at standing at

8    the time the lawsuit is filed.

9         So what is happening at the time the lawsuit is

10    filed?  And in addition, one case I don't know that I did cite

11    in our brief, Your Honor--actually, I think I did, on page 8 of

12    Docket Number 101, but I think it's significant here, is the

13    Toilet Goods case from the Supreme Court in 1967.  And in that

14    case, the Supreme Court found standing where the impact was

15    felt by those subject to the rule at issue in conducting their

16    day-to-day affairs.

17         Why is that important?  Because we filed this

18    lawsuit on November 4th, 2013.  Three days later--three days

19    earlier, on November 1st, Texas was notified that we had been

20    charged with discrimination under Title VII for not hiring a

21    felon, and this is the felon issue with DPS that I have alluded

22    to earlier.  It cannot be disputed that, at that moment, we

23    were feeling the impact of the rule.  The fate of that

24    complaint was unknown.  It was uncertain.  But we certainly

25    were feeling the impact of the rule, by any reasonable

1    standard, at that moment, Your Honor.

2            And we have to look at-- Well, let me transition

3    here, Your Honor.  From a standing standpoint, I think I've

4    articulated that we have injury in fact.  And so the question

5    is, do we have a right to walk into court from that injury?  We

6    filed a lawsuit with two causes of action: a declaratory

7    judgment cause of action, which is Count I, and an APA cause of

8    action, which is Count II.  And the Department of Justice goes

9    to great lengths to try to demonstrate in the briefing that we

10   are not entitled to walk into court on either one.  So I'm

11   going to take those in order here, Your Honor, and address

12   first and foremost the declaratory judgment cause of action,

13   Count I.

14           When we're looking at whether a declaratory

15   judgment cause of action is appropriate, obviously there's no

16   precise test, as the case law makes clear from both the Supreme

17   Court and the Fifth Circuit.  I'm referring to the Maryland

18   Casualty case from the Supreme Court in 1941, the Roark,

19   R-o-a-r-k, case of the Fifth Circuit in 2008, both of which are

20   cited in our response brief where the Supreme Court and the

21   Fifth Circuit made clear, is we have to look at the facts

22   alleged under all the circumstances, whether there is a

23   substantial controversy between the parties at the time the

24   lawsuit is filed.

25           Declaratory judgments are, of course, appropriate

 1    where the questions before the Court are legal ones.  And we
 2    don't really have any disputed facts here, Your Honor.  This
 3    is, of course, a legal dispute regarding the per se validity of
 4    Texas's categorical hiring bans.  Declaratory judgments are
 5    appropriate where there is actual present harm, Your Honor, or
 6    a significant possibility of future harm, again, at the time
 7    the lawsuit was filed, three days after this rule--or the
 8    consequences of this rule turned into a realistic complaint.
 9              And so we didn't talk about this in our opening
10    brief, Your Honor, but in our response brief, which is Docket
11    Number 101, and I would direct the Court to page 12.  We talk
12    about the appropriateness of a declaratory judgment action as a
13    cause of action in this case.  And there are four Fifth Circuit
14    cases that we cite to on page 12 there: the Sherwin Williams
15    case from 2003, the St. Paul case from 1994, the Travelers case
16    from 1993, and the Collin County case from 1990, which the
17    Department of Justice also cites in its briefing.
18              Those cases are significant, because what those
19    cases tell the Court is that, looking at the declaratory
20    judgment context, the Court needs to flip the V.  In other
21    words, it has to ask, if the defendants were on the top side
22    and Texas is on the bottom side, would Defendants be able to
23    sue Texas, or, in this context, would the Department of Justice
24    be able to sue Texas?
25              And, of course, we say that they would be able to.

1    Not only does the Department of Justice possess the power and

2    the authority to enforce Title VII against Texas, but the

3    Department of Justice has indicated significant substantive

4    agreement with the rule, has not disavowed the rule, and won't

5    even disavow the rule's application to even the factual

6    circumstances presented with regard to the DPS complaint,

7    Texas's laws regarding police officers, or anything else

8    around--surrounding some of the specific facts and jobs that we

9    have put into issue.

10           Texas is also entitled to bring a declaratory

11   judgment action and it is appropriate when Texas is trying to

12   avoid a multiplicity of lawsuits.  So looking through the lens

13   of Texas, Your Honor--  And the multiplicity concern is

14   extolled in the Travelers case I mentioned at page 12.  On

15   November 4th, 2013, when we filed this lawsuit, the abstract

16   concerns, if you would even call them those--I don't think

17   they're abstract, but the Department of Justice calls them

18   abstract--of the rule became reality with this complaint filed

19   against Texas.

20           The lens through which we're looking is that we

21   employ over 300,000 people in over 175 state agencies.  We've

22   got categorical bans regarding felons throughout Texas law in

23   different agency policies.  This is the tip of the iceberg.

24           We're also looking at, as we're looking through

25   this lens, of the depth and breadth of Texas as an employer and

1    the risk that has now been foisted upon us, the rule's

2    condemnation of our categorical hiring bans, this complaint

3    that has now been filed against us.  We're looking at what the

4    Attorney General--at the time, General Holder--did in sending

5    out a letter to every State Attorney General questioning the

6    propriety of state law restrictions regarding felons, a letter

7    that only acknowledges that when it comes to gun possession do

8    we have a legitimate public safety issue.  And we cite to that

9    in our response brief, Your Honor.  That letter from General

10    Holder is not in the appendix, but we do provide a link to it.

11        At the time this lawsuit was filed on November 4,

12    2013, this is an era where there is a lot of litigation between

13    Texas and the federal government, a lot of litigation between

14    the Department of Justice, a lot of litigation that Texas is

15    winning, Your Honor, where the federal government is continuing

16    on a regular basis to overreach and invade Texas's sovereignty.

17    And so you have this history of antagonism, if you will, Your

18    Honor, going on in that context.

19        So what do all these things together mean, Your

20    Honor?  We've got a prospective multiplicity of lawsuits.

21    We've got a realistic complaint now based on the rule.  We have

22    this history of antagonism.  We have the Attorney General of

23    the United States calling into question the validity of things.

24    Can Texas at that moment say that there is a reasonable or

25    imminent threat of litigation at that moment?  Of course we

```
 1    can.  And we don't have to have been right.

 2            And the fact that there hasn't been litigation,

 3    Your Honor, doesn't matter and, I think, is quite suspect.

 4    Obviously we believe that our lawsuit chilled any effort or

 5    intent by the federal government to come after us.  I think

 6    it's completely discountable that the EEOC determined to issue

 7    a right-to-sue letter to the gentleman who filed a complaint

 8    saying it didn't find a reasonable basis.  It's completely

 9    discountable that the Department of Justice has not filed a

10    lawsuit just because we beat them to the courthouse and filed

11    first and chilled whatever was being cooked up at the federal

12    levels.

13            But the question is, Your Honor, could we be here

14    today arguing about the exact same thing if the Department of

15    Justice had filed this lawsuit against us?  Of course we would.

16    Of course we would.  So when you look at the Fifth Circuit

17    precedent and you flip the V, could the Department of Justice

18    have brought us all here today?  Of course they could have.

19            And so in that context, we have a very valid

20    declaratory judgment act.  This is an appropriate use of the

21    Declaratory Judgment Act, looking at all the circumstances, our

22    interest in avoiding a multiplicity of suits, and everything

23    else along those lines.  And so we have a valid threat of

24    litigation, and so I think we have a very sustainable, Your

25    Honor, cause of action under the Declaratory Judgment Act for
```

1    those reasons.

2         This brings us to Count II of our second amended

3    complaint, which is the APA cause of action.  As the Court is

4    aware, we look at this cause of action through a flexible and

5    pragmatic approach.  There is no hard rule.  And the two

6    primary considerations at issue, whether the rule at issue

7    marks the consummation of the decision-making process--  That's

8    not in dispute, Your Honor, I don't believe.  The Fifth Circuit

9    didn't think it was in dispute, and there has been no argument,

10   to my knowledge, that the rule does not represent that.  So

11   that prong is easily met.

12        The second prong is whether the action is one by

13   which rights or obligations have been determined or from which

14   legal consequences flow.  The Department of Justice has focused

15   a lot on the lack of an enforcement action in this case.  But

16   the Fifth Circuit vacated and remanded because of the Hawkes

17   case, Your Honor, as you're aware.  And the Supreme Court, in

18   Hawkes, makes very clear--and I quote from page 1815--"Parties

19   need not await enforcement proceedings before challenging final

20   agency action where the proceedings carry the risk of serious

21   criminal and civil penalties," unquote.

22        Obviously the risk of civil penalties contextually

23   is the Title VII liability that awaits Texas for not engaging

24   in individualized assessments or for maintaining its

25   categorical hiring bans.

1          So I believe that we have the conundrum presented
2   in Hawkes.  We can stay the course with Texas law and risk
3   being wrong after the fact, or we can go through the sausage
4   making of changing Texas law and agency policy in order to
5   bring ourselves within the safe harbors articulated by the
6   rule.  That's the pressure that we're feeling.  Obviously
7   that's the risk afoot, and those are the legal consequences
8   that the rule provides to Texas.  As the Hawkes court
9   recognized, in that instance, the landowner could discharge
10  without a permit and it was incurring a risk.  Texas can stay
11  the course with our current laws and we are incurring a risk,
12  and, as I mentioned, the depth and breadth of who we employ.
13          So this is not just a proposition of one position
14  or one agency or a handful of things.  We're talking about over
15  300,000 employees, over 175 agencies.  The risk is significant
16  to Texas.  As a matter of fact, I would almost argue that there
17  is some element of inevitability given the footprint that
18  Texas, as an employer, has.  We are the largest employer inside
19  of Texas by far, and so we necessarily have a huge risk,
20  because we are the proverbial landowner in Hawkes, and so
21  carrying on is a risk.
22          Now, in Hawkes, the Supreme Court addressed the
23  question, well, why not wait?  Why not wait for an unfavorable
24  decision?  And in this--the corollary in this case says, Texas,
25  why not wait for an actual case to be filed?  The analysis in

1    Hawkes, the Supreme Court said, was that seeking review of an
2    unfavorable decision in that case, a permitting decision, an
3    unfavorable permitting decision, was long and very expensive.
4    It just wasn't a practical option.  It didn't work.  And so the
5    landowner would have to consume years and I think the estimates
6    were over six figures' worth of expense in pursuing the review.
7    So this was not a really viable option.  It wasn't just a
8    simple quid pro quo and due process.
9            Your Honor, I think Texas has a very similar
10   corollary here.  Waiting for a case to be filed is not a
11   reasonable option for us, because a single case over a single
12   job inside a single agency doesn't really answer the larger
13   macro question that we need answered.  We could win a
14   particular case.  We could win the DPS case, for example.  But
15   that doesn't give us relief on all of the other absolute
16   categorical bars that we have.  It could become persuasive
17   precedent if we win.  But if we have to go through every single
18   categorical hiring ban and litigate every single one of those
19   things over however many years at whatever amount of taxpayer
20   expense would be incurred to that end, we're looking at the
21   same long, expensive process that the landowner was looking at
22   in Hawkes, and that's just not a viable option.  If the
23   question was more narrow to a particular job or circumstance,
24   maybe, maybe it's possible.  But that's just not the case here.
25   And so we are faced, like the landowner in Hawkes, with, the

```
 1    remedy that's being suggested for us doesn't really work on a
 2    macro level.
 3              And this is especially so, Your Honor, if Texas law
 4    is entitled to a presumption of validity, because if the
 5    categorical prohibitions enacted by the Texas legislature are
 6    presumptively valid and they presumptively are job-related for
 7    the position in question and consistent with business
 8    necessity, to use the standard from Title VII, then a single
 9    case does not answer the larger question of whether the other
10    laws' categorical prohibitions, in fact, meet with the standard
11    of Title VII.
12              The Court also has subject matter jurisdiction
13    under the Administrative Procedure Act because, like the Hawkes
14    case, Title VII does not have a stand-alone jurisdictional
15    determinator.  So in Hawkes, the Supreme Court was analyzing
16    whether the APA was an appropriate remedial route for a problem
17    with the Clean Water Act, and the Clean Water Act didn't have a
18    jurisdictional marker, so to speak, in it or a separate dynamic
19    where remedy could be pursued.  And so because the CWA was
20    devoid of such an indicator, the APA had to be the appropriate
21    route for the landowner to get relief.
22              We have a very similar dynamic here, Your Honor.
23    There is no stand-alone jurisdictional determination in
24    Title VII that exists.  And so the APA is, in that regard, an
25    appropriate route for Texas, looking at the APA cause of
```

1    action.

2              I would also say that the APA question is--or,

3    excuse me, the APA is a proper cause of action when you look at

4    the fact that this rule has legal consequences, Your Honor, at

5    a minimum, as the Fifth Circuit acknowledged, in binding EEOC

6    employees, and yet, the EEOC does not possess substantive

7    rulemaking authority.  There is a paradox with what this rule

8    does, and it's coming right out in the very front of it and

9    saying, this applies to every employer regulated and controlled

10   by Title VII and, yet, the suggestion that, well, this really

11   isn't a substantive or a legislative rule.  What other remedy

12   would there be for a regulated entity to challenge the

13   substantive impact of a rule from an agency that's not supposed

14   to be issuing rules that have a substantive impact?  It must be

15   the APA, and that is a legal consequence that flows from the

16   rule.

17             And so the second prong of the APA query that

18   rights or obligations are being determined or that legal

19   consequences flow is, of course, significant.

20             And finally, Your Honor, on this APA question, one

21   of the things that was significant--  Well, let me back up just

22   a little bit and go through all of the legal consequences that

23   we believe flow in the--and what the Court has before it that

24   satisfy the second prong of the APA analysis.

25             First, as I mentioned--and this Court mentions it

1    in your opinion, Your Honor.  The Fifth Circuit talks about

2    these two things, that the rule binds employees of the EEOC,

3    and it has articulated safe harbor provisions.  So those are

4    legal consequences.  It shows where you're safe and, therefore,

5    where you're not safe, and it binds the employees.

6            But there are several other legal consequences that

7    flow from this rule.  First and foremost, we believe the rule

8    preempts, in fact, Texas law by clashing with Texas categorical

9    bans.  And we talk about that in both of our briefs, most

10   recently our response brief, Docket 101, at pages 3 and 4.

11           And the Fifth Circuit didn't dive into the factual

12   analysis of the preemption question, but it acknowledged that

13   we have that concern.  But it didn't have to go that far in the

14   opinion at the time in order to conclude that we had a

15   sustainable cause of action.  But that clash, we think, is very

16   real and significant.

17           Now, it's not just the clash with Texas's

18   categorical prohibitions.  Because the rule clashes with

19   Texas's categorical prohibitions, the rule also clashes with

20   Texas's larger sovereign scheme.  And what it does is, we

21   believe, attacks a foundation of a larger thing, and when you

22   attack the foundation of a building, the building becomes

23   unstable.  It cannot be, Your Honor, the case in Texas law that

24   where the policy interests are the same, felons get treated

25   differently.

1          So one of the examples that we use in our brief is
2    the Texas law that says that a felon cannot be the
3    administrator of an estate.  Why is that?  Well, as I think it
4    was the Texarkana Court of Appeals articulated, because the
5    administrator is in charge of other people's money.  They have
6    a duty to fulfill to the Court, and we just can't trust a felon
7    with that responsibility.
8          And yet under the rule, Your Honor, a felon should
9    be able to qualify for a job with the Texas Lottery Commission,
10   managing billions of taxpayer dollars and the sensitivity
11   overseeing the integrity that must accompany any lottery system
12   that exists.  There is an inherent conflict there, Your Honor.
13   There's a conflict when Texas has certain--  The public trust
14   in certain positions is dramatic, and we can protect that
15   public trust in a nonemployment circumstance, but we can't
16   protect it in an employment circumstance because of Title VII.
17         And so the conflict is not just as simple as the
18   peace officer prohibition and the rule.  It's a bigger thing.
19   This is attacking the tapestry of Texas law regarding felons,
20   because it would produce inconsistent results in Texas law.  It
21   just can't be that a felon is entitled to be a peace officer
22   and carry a gun but, yet, can't serve on a jury.  It doesn't
23   make any sense in that regard.  And so we think that there's a
24   micro conflict with Texas law and then a more specific--or
25   general, I say, macro conflict.

```
 1                Now, another way that there is a legal

 2     consequence--and we're talking about the second prong of the

 3     APA cause of action--is that this rule increased the field of

 4     potential plaintiffs and Texas's footprint of potential

 5     liability.  This is not something that was in my briefing, Your

 6     Honor, so I'm throwing something new at you, but bear with me.

 7                This is something that was discussed in the Hawkes

 8     opinion by the Supreme Court, and I'm looking at page 1814,

 9     when the Supreme Court specifically talked about the legal

10     consequence of a negative jurisdictional determination in that

11     case.  And a negative jurisdictional determination held the

12     federal government at bay for five years and limited the

13     potential liability of that particular landowner.  And so by

14     decreasing the field of liability, the Supreme Court said, the

15     JD, or jurisdictional determination, had a legal consequence.

16                Well, we have a similar circumstance here, Your

17     Honor, because this rule now for the first time takes direct

18     aim at categorical hiring prohibitions.  And because of the

19     complaint that was filed against the Department of Public

20     Safety, Texas knows that the public is taking this rule

21     seriously.  The field of potential plaintiffs now that may file

22     Title VII complaints against Texas has grown, because now every

23     felon has a right to say under the rule, you Texas, you Texas

24     agency, you school district, you City of Lubbock, did not give

25     me my individualized assessment.  Even though you have your
```

 1   categorical prohibition, the rule requires that we talk about

 2   this.  The rule requires that you expend time and effort to

 3   determine whether I'm really required to undergo--or, excuse

 4   me--are entitled for this job.

 5            And so the complaint against the Department of

 6   Public Safety stands for multiple propositions in this case,

 7   but it shows the increase of the field of potential plaintiffs

 8   that are now coming against Texas because of this rule, and

 9   there's a parallel there with the Hawkes case.

10            And then in the Hawkes case lastly, Your Honor, the

11   legal consequence is that the rule at issue here warns of risk,

12   and the mere warning of risk is a legal consequence.  In the

13   Hawkes case, the Supreme Court discussed the Frozen Foods case

14   from 1956, and in that case, the Interstate Commerce Commission

15   issued a piece of--I'll call it regulatory dark matter, because

16   that's really what it was.  That's very much like the guidance

17   here.  It wasn't a formally promulgated rule, and it just told

18   everybody what the Interstate Commerce Commission thought may

19   or may not be the case.

20            But the Supreme Court latched onto that in Hawkes

21   and said, just because it was telling you what the Interstate

22   Commerce Commission thought may or may not be the case, that's

23   a warning.  That's slapping something up against the wall for

24   everybody to see.  And then just issuing a warning is a legal

25   consequence that satisfies the second prong of the APA

1    analysis.

2            So we clearly believe that we satisfy not just

3    standing, but also the question of subject matter jurisdiction

4    that the Department of Justice brings forth challenging our

5    causes of action, that we're rightfully before the Court on the

6    declaratory judgment action looking at the landscape as it

7    existed when we filed; and that also, under the APA, there are

8    clearly legal consequences, not just the ones the Fifth Circuit

9    and this Court have previously recognized, but several more

10    that flow from this rule that make the APA analysis ripe.

11            And lastly as to both, Your Honor, the declaratory

12    judgment action and the APA cause of action, Texas does

13    demonstrate with evidence the existence of an actual regulatory

14    burden.  We actually have expended effort with regard to this

15    rule.

16            And the clearest piece of evidence of that is the

17    Department of Public Safety's interaction with EEOC.  When we

18    got served with that complaint--and as made clear in the

19    record, I think this starts on page 89 of our appendix--the

20    Department of Public Safety had to go into the trench and look

21    at what had been alleged, assess the rule, and develop and

22    explain to the EEOC why the felon hiring ban was necessary.

23    And we provided the EEOC a long letter--I think it's a two- or

24    three-page letter--copies of internal memos and policies.

25    That's an increased regulatory burden in fact.  We had to do

1    that because of the rule.

2              And so even if some expenditure of Texas resources

3    was required and we weren't entitled to take--press the Pause

4    button on State spending money because we see the harm

5    forthcoming, we did expend resources having to deal with this

6    complaint that came forth based on nothing else than the fact

7    that he was told that he was rejected because he was a felon,

8    and for no other reason.

9              Now, Your Honor, having addressed some of the

10   threshold questions of standing and subject matter

11   jurisdiction, I'm going to now move to the merits, and

12   specifically, I want to look at whether this rule complies with

13   the Administrative Procedure Act, specifically the notice and

14   comment requirement.

15             EEOC or the defendants claim that notice and

16   comment is not required because it's an interpretive rule.  But

17   things that do not go through formal rulemaking process are

18   nonetheless capable of being declared substantive rules for

19   which notice and comment was required because of the substance

20   or nature of the rule or guidance at issue.

21             And the first thing that the Court has to look at

22   is whether the rule grants rights or imposes obligations.  And

23   this is from the Chrysler against Brown case from the Supreme

24   Court in 1979 at 441 U.S. 281.  As we have just demonstrated, I

25   believe, Your Honor, there are legal consequences that flow

1    from the guidance at issue, and so that's the first step in

2    determining whether this is really a legislative rule or an

3    interpretive rule.

4           Secondly, one of the things the courts look at, and

5    particularly the Fifth Circuit, is whether the rule changes

6    long-standing agency practice or alters something from the

7    past.  So has the status quo now deviated one way or another.

8           Looking at that, some cases I'll cite into the

9    record here that I believe--on this point that I don't believe

10   are in our briefing, so I will cite them into the record:

11   Phillips Petroleum against Johnson--these are all Fifth Circuit

12   cases, Your Honor--22 F.3d 616; Davidson against Glickman,

13   G-l-i-c-k-m-a-n, 169 F.3d 996; and Shell Offshore against

14   Babbitt, B-a-b-b-i-t-t, 238 F.3d 622.

15          Texas's contention, Your Honor, is that the rule at

16   issue takes a quantum leap in going from the previous policy

17   statements and rulings of EEOC into now declaring categorical

18   bans per se unlawful.  This is a step up in the substantive

19   proclamations of EEOC.  EEOC says at the beginning of the rule

20   that they are looking to consolidate and update what they have

21   previously done.

22          It's interesting, Your Honor, that the rule comes

23   in 2012 after the 2007 Third Circuit case, the SEPTA,

24   S-E-P-T-A, case that's discussed in both of our briefing.  And

25   this is significant, Your Honor, in my opinion, in this regard:

1    The Third Circuit in the SEPTA case, contrary to briefing by
2    the government, I don't think is helpful to the government.  I
3    think this is a helpful case to Texas, because the Third
4    Circuit rejected the three-prong individualized assessment test
5    that EEOC requires in the rule.  The SEPTA case took a
6    circumstance--  Well, first of all, now, SEPTA is a
7    governmental agency.  So you have a governmental agency that
8    has the public safety and interest concerns that Texas is
9    articulating, you have a driver or a bus operator who is
10   responsible for the safety of the general public, and you have
11   somebody who had been doing this job for a long time but,
12   nonetheless, had a 40-year-old felony conviction.

13        And the Third Circuit ended up concluding that the
14   government's concern about the risk of having a 40-year-old
15   felon in that bus seat was enough to justify not--by--having a
16   felon categorical exclusion in that case.  That case is 2007.
17   The rule comes out in 2012.  And I think the rule is a
18   repudiation of the Third Circuit's decision, because the Third
19   Circuit now disagrees with the Eighth Circuit, which EEOC has
20   been riding on for a long time.  The Green against MOPAC case
21   from 1975 has been EEOC's guiding star and the source of its
22   three-pronged analysis.

23        And now the Third Circuit not only repudiates the
24   three-pronged analysis but refused to engage the question that
25   the complainant asked it to do, which was to declare that

1    categorical hiring bans are per se unlawful.  The Third Circuit

2    acknowledged that it was asked to do that and said, we're not

3    going to do that; we don't have to in this case.

4           So it didn't go as far as we're asking you to go in

5    this--in that particular case, but I think the timing is

6    significant.  So how does this matter?  It matters that the

7    EEOC--this rule represents not just a consolidation of

8    everything the EEOC has previously said, but a new direction.

9    We are amping up the game, says EEOC.  We are now going to put

10   a target on categorical bans, and we're doing this in the wake

11   of the Third Circuit decision, which EEOC tries to spin in the

12   rule as somehow helpful to its ends.  But we certainly don't

13   see it that way.

14          And lastly, Your Honor, the third question is

15   whether a rule or a guidance is, in fact, legislative and must

16   go through notice and comment, is whether it binds the agency

17   or the regulated entities.  And as the Fifth Circuit has made

18   clear, the guidance, at a minimum, binds EEOC employees and

19   investigators and what they're doing.  That's not really in

20   dispute.  And, like other guidances, statements, policy memos,

21   or memoranda that have been declared legislative rules

22   notwithstanding their title, if you look at the guidance at

23   issue, it uses all those key words: must, require, directs.  In

24   the language of the DC Circuit, whether--you have to ask

25   whether it commands, requires, orders, or dictates.  And the

1    language of this guidance, we believe, clearly does.

2          This guidance is the product of the five EEOC

3    commissioners themselves, and it states, quote, "The Commission

4    intends this document for use by EEOC staff who are

5    investigating discrimination charges involving the use of

6    criminal records in employment decisions," unquote.  And, of

7    course, this guidance is titled An Enforcement Guidance for use

8    in enforcing EEOC's view of Title VII.

9          So this rule needed to go through notice and

10    comment, because it is legislative in character.  And then the

11    query before the Court, Your Honor, in that instance would be,

12    does it fall within EEOC's rulemaking authority?  Is it a

13    suitable procedural regulation to use the language from

14    Title VII cabining what EEOC's rulemaking authority is?

15          So once you determine it had to go through notice

16    and comment, which we believe it did, the Court then asks

17    whether it is a suitable procedural regulation, and we believe

18    obviously this rule is not merely procedural and doesn't

19    satisfy the substance of that test.

20          Why is that?  Why is it not procedural?  I think

21    that there are a couple of indicators I will highlight that

22    I've already mentioned in some--but just to demonstrate in this

23    particular part of the argument why it's not procedural.  It is

24    devoid of the substantive analysis that a sovereign like Texas

25    requires, or special solicitude.  It provides all kinds of

1    substantive examples; says it applies to us but never once uses
2    an example that's emblematic of the concerns of a governmental
3    entity like Texas.

4              Of course, it's substantive because it represents
5    the slow--the culmination of the slow snowball approach that
6    the EEOC has taken to raising its individualized assessment
7    standard and, at the same time, lowering the business necessity
8    query that is so central to the analysis.

9              The rule does not acknowledge and, in fact, we
10   think substantively says the contrary, that it may be
11   permissible for an employer to maintain a no-risk policy with
12   regard to felons, as Texas clearly does in multiple, eminently
13   reasonable circumstances.

14             Looking more generally, Your Honor, at, as I start
15   to turn the corner and near the end of my initial presentation
16   here, some of the substantive problems--I want to highlight
17   some of the substantive problems that Texas has with the rule
18   in general, which would provide the basis for the Court to do
19   what we're asking it to do, to declare that the rule is not
20   just an unlawful exercise of EEOC's rulemaking power, but also
21   that it is substantively inept for the conflicts that it has
22   and the legal consequences that it imposes.

23             The three-part test, Your Honor, that EEOC extolls
24   in this rule as the North Star of analysis came from the
25   February 4, 1987, policy statement.  We talk about this on

 1    pages 37 and 38 of our opening brief, Docket Number 95.  There
 2    is no mention of the Griggs Supreme Court standard that
 3    business necessity is the touchstone in this document.  This is
 4    significant, Your Honor, because even though the Supreme Court
 5    has said that business necessity is the touchstone, now the
 6    three-part test, unveiled for the first time in 1987, has no
 7    mention of Griggs whatsoever.  The individualized assessment is
 8    born; business necessity is now put in the back seat.  And from
 9    this point forward, EEOC makes no quarter whatsoever in any of
10    its releases, statements, policy memoranda, for no-risk
11    policies like those that Texas has.
12              The SEPTA case, as I alluded to a moment ago, Your
13    Honor, shows that categorical bans are appropriate and should
14    survive judicial scrutiny.  There, you had a governmental body,
15    SEPTA--it was a deliberative body, so it's not just run by a
16    single head, but it has commissioners or trustees--I forget
17    what their formal title is--and we believe that their
18    pronouncement as a governmental body is entitled to the
19    presumption of validity.  The Third Circuit certainly extended,
20    at some level--  It didn't extend--I don't want to misstate the
21    case, Your Honor.  It didn't say that the SEPTA rule was
22    entitled to a presumption of validity, because it was enacted
23    by a deliberative body.
24              But that's one of the requests that we're making of
25    this Court is that--to acknowledge that when a deliberative

1    body issues something, the presumption of validity is attached

2    to that and should fill the Title VII analysis, then placing

3    the burden on the challenger to demonstrate, under the

4    Title VII language, that there was an alternative employment

5    practice.

6              The reason we win--one of the reasons we win on the

7    merits, Your Honor, here, we believe, is because--  You can

8    look at this from two avenues.  The first avenue is the

9    presumptive avenue for which we're advocating, is that because

10   Texas law came from a deliberative body, the legislature, and

11   is presumptively valid, we have now satisfied the Title VII

12   test, notwithstanding any disparate impact.

13             Under the statute, the challenger must now

14   demonstrate that there is an alternative employment practice

15   available.  Our opponents in this case have brought forth no

16   evidence whatsoever, no argument, put nothing in the record

17   that there is a suitable alternative employment practice that

18   satisfies Title VII regarding any of our categorical bans, much

19   less the ones that we have specifically highlighted in our

20   briefing and in the evidence that we have put before the Court.

21   So I think simply based on the absence of evidence, the Court

22   can find for Texas in that regard.

23             But even if you don't, Your Honor, extend to Texas

24   the legislative presumption that we're asking for, we have put

25   forth evidence in this case demonstrating that the categorical

1    bans are job-related for the position in question and

2    consistent with business necessity or public interest.  And

3    in the face of that evidence, there has been no argument,

4    push-back, evidence to the contrary that an alternative

5    employment practice exists.

6            So let's get specific.  In our opening brief,

7    Docket Number 95, at pages 18 and 19, we discuss the evidence

8    put forth by the Department of Public Safety regarding the--

9    meeting the--what we believe meets the Title VII standard, and

10   that specifically includes the declaration of Kathleen Murphy,

11   which is in the appendix at pages 60 through 62, and the many

12   related attachments to that declaration.

13           Your Honor, that is evidence that is before the

14   Court filling up the Title VII box, if you will, from the

15   employer's standpoint, and there is no rebuttal.  So we

16   should--we win in that regard because of the absence of

17   evidence on the other side.

18           And to be fair, Your Honor, we think that these

19   categorical bars are unassailable, that there really isn't any

20   evidence that could be forthcoming from our opponent that could

21   show an alternate employment practice with regard to these

22   things.

23           Pages 19 and 20 of Docket Number 95, the Department

24   of Aging and Disability Services demonstrating the business

25   necessity and why the categorical bar is important to the

 1    workings of that agency.  And I could go on from pages 20

 2    through 23.  We put forth evidence and argument regarding the

 3    Texas Lottery Commission, the Texas Juvenile Justice

 4    Department, the Texas Parks & Wildlife Department, the Texas

 5    General Land Office, and the Texas Secretary of State.

 6    You have evidence and argument before you, Your Honor, on those

 7    things at a minimum that demonstrate that we satisfy any

 8    Title VII query and that, therefore, Texas's categorical hiring

 9    bars are not presumptively invalid under Title VII.

10             We ask the Court for a declaratory judgment.  And

11    as we articulate in our second amended complaint--this is on

12    pages 16 and 17 of that, which is Docket Number 62--we're

13    asking the Court to declare that the Texas laws and policies

14    that categorically bar felons from certain positions of

15    employment, or certain kinds of felons from certain positions

16    of employment, are presumed lawful under Title VII.

17             Secondly, we're asking the Court to declare that

18    Title VII does not, contrary to the rule, outright prohibit

19    categorical hiring bars.  What this means, Your Honor, is, as a

20    corollary, individualized assessments are not always required,

21    because the rule says the same thing in two different ways.  In

22    some breaths, it takes a stab at categorical hiring bars.  In

23    other breaths, it extolls the necessity of individualized

24    assessments.  Either way, I think the rule is saying the same

25    thing; it's just saying it in a different way, that you must

1    always do individualized assessments and you can never have a
2    categorical hiring bar.
3            And so if the Court were to find for Texas on the
4    merits, we would ask that the declaration cover both of those
5    bases, not just preserving the right of Texas to maintain the
6    bars, but the fact that the right to preserve those bars means
7    that we don't have to conduct individualized assessments.
8            And the DPS example that the Court has before it is
9    a good one. We received the gentleman's application. We put
10   it through the regular process for which we put all
11   applications. We let the gentleman know that, because he's a
12   felon, he doesn't qualify, thank you very much, and that was
13   the end of it. We preserved our bar, did not conduct an
14   individualized assessment. Both of those things were valid.
15           The third thing, Your Honor, in the context of a
16   declaration, is that--and this piggybacks on the first two
17   things--is that necessarily, then, the safe harbors that the
18   rule articulates, the Fifth Circuit talks about these, and
19   these exist on page 2 of the rule, which is page 5 of our
20   appendix, that the safe harbors are improper, incomplete, or
21   nonexhaustive.
22           Your Honor, you can also mention in that regard the
23   deference question in terms of what deference is or is not owed
24   to the Equal Employment Opportunity Commission. The Department
25   of Justice is correct that the Supreme Court has acknowledged

1    interpretive rules from the EEOC and extended to them Skidmore

2    deference, which I think functionally is really no deference at

3    all.  Skidmore deference is, we'll give you deference if it's

4    right and makes sense, depending on how well you research it,

5    you know, how sound are your conclusions.

6              I think a declaration in Texas's favor would be, at

7    some level, incomplete if it did not include a reference to the

8    deference that is owed to this particular guidance, or the

9    absence of deference that is owed to the particular guidance,

10    because in the wake of the declaration that we are asking the

11    Court to make, the question still remains, well, what does the

12    guidance mean then?  What do we do with it?  How do we--how do

13    we use it?

14              And so the fact that the Court owes what we believe

15    is no deference to the document, because it did not go through

16    notice and comment therefore is unlawful, I think would be

17    important.  At a minimum, the Court could extend Skidmore

18    deference and then get into the analysis of why the guidance is

19    wrong.  I don't think you have to do that, Your Honor, given

20    the absence of evidentiary retort from the defendants, given

21    what we put forth.  But if you wanted to go there, Your Honor,

22    you certainly could.  I think we have articulated why the legal

23    foundations of this guidance document are shaky and not on a

24    firm foundation and, therefore, you know, set up an appropriate

25    Skidmore analysis.

1              But I think the Court could also say no deference

2      is owed to this document because it is legislative in nature,

3      it did not go through notice and comment, and, therefore, it is

4      unlawful as a matter of law and do away with the whole thing.

5      And I think that's implicit in our remedial request, and we are

6      asking the Court to do that.

7              THE COURT:  You have about ten minutes.

8              MR. NIMOCKS:  Your Honor, I will, please the Court,

9      save that for any rebuttal I may have.

10             THE COURT:  All right, sir.

11             MR. NIMOCKS:  Thank you very much, Judge.

12             THE COURT:  All right.

13             MR. POWERS:  Good morning, Your Honor.

14             THE COURT:  Good morning.

15             MR. POWERS:  Again, Jim Powers on behalf of the

16     United States.

17             In one respect, Your Honor, this suit concerns a

18     2012 EEOC enforcement guidance concerning the Title VII

19     implications of the use of criminal background information in

20     employment decision-making.  Texas here challenges that

21     guidance under the Administrative Procedure Act in Count II of

22     its complaint, and for the reasons that we've laid out in our

23     briefing and which I'll discuss again today here, Texas lacks

24     standing to pursue that challenge, and its challenge lacks

25     merit under the Administrative Procedure Act and under

1    Title VII.

2              But Texas here in this lawsuit goes a substantial

3    step further than simply challenging the 2012 guidance.

4    Because Texas here, in Count I, asks the Court to bless, under

5    Title VII, all of its various felony conviction and related

6    employment practices.  It asks the Court to do so upon a

7    minimal factual record without an immediate concrete dispute

8    among the parties and with respect to employment practices that

9    do not even exist yet because the legislature hasn't yet

10   enacted them.

11             In both counts as well, Texas here challenges a

12   view of Title VII that the EEOC has held for at least 30 years,

13   going back to the Reagan Administration and even longer.  In

14   all that time, Texas has coexisted with the government's view

15   of these issues and has not suffered injury.

16             In short, the State's claims lack merit, and the

17   Court is without jurisdiction to consider them, and we

18   respectfully urge the Court to grant summary judgment for the

19   defendants.

20             And I want to begin by responding to a few handful

21   of the issues raised by Texas that also are present in its

22   briefing and which we believe bear clearing up and which

23   demonstrate the lack of merit to Texas's claims.

24             The first is that Texas's claims are based on a

25   series of misimpressions and misstatements about what the

1    EEOC's 2012 enforcement guidance says and does.  First and

2    maybe most pivotally, the guidance does not require the use of

3    individualized assessments.  It says it repeatedly that

4    employers, under Title VII, need not employ the mechanism of

5    individualized assessments in using criminal background

6    information in employment decision-making.  It certainly

7    recommends it as a best practice, but that's far from saying

8    that the guidance requires that.

9         The guidance also does not take a categorical

10   position on Texas's practices as they have been alleged and put

11   before the Court.  The guidance simply provides a framework for

12   understanding when the business necessity defense may or may

13   not be met, a framework for regulated parties and for EEOC

14   staff to understand the Commission's views on that question.

15   But it does not take a categorical position on the kinds of

16   what appear to be targeted screens that Texas has here.

17        Texas has put forward evidence of a series of

18   different agencies which have different hiring practices.  Some

19   forbid all felons from all jobs but not certain misdemeanors,

20   some categories of felons for certain jobs, some for certain

21   periods of time.  The guidance contemplates that an employer

22   may or may not meet the business necessity defense when it

23   employs that kind of targeted screening.

24        And I think that it's important to note, at one

25   point during its argument, Texas says that the guidance doesn't

1    include any examples that go towards the kinds of concerns that

2    Texas has, namely with respect to, for example, peace officers

3    and schoolteachers.

4           Now, first, I want to note that the guidance

5    doesn't take any categorical position on the Title VII validity

6    of--or invalidity of employment restrictions with respect to

7    those particular positions.  It doesn't take a categorical

8    position on any particular kind of screen like that.

9           But the guidance actually states--and I want to

10   point the Court to page 24 of the guidance.  In Example 11, it

11   discusses a state law exclusion which--for a particular

12   hypothetical state that imposes criminal record restrictions on

13   school employees and an applicant for a position as an office

14   assistant at a preschool, and the applicant was going to be in

15   a position where he would be dealing with children.

16          The applicant was forbidden--or was not--did not

17   obtain employment with the school, and he filed a charge of

18   discrimination in the hypothetical.  But the EEOC recommends

19   or, in the hypothetical, determines that there is no disparate

20   impact or business necessity demonstration--or I should say

21   there is a business necessity demonstration, because the

22   restriction at issue addresses serious safety concerns in a

23   position involving regular contact with children.

24          So the EEOC's guidance, while not taking a

25   categorical position either way on the kinds of restrictions at

1    issue in this case, certainly acknowledges that these kinds of

2    safety concerns would have an important bearing on the analysis

3    of any particular employment restriction.

4            I also want to note another misperception about the

5    guidance, which is that the guidance does not, of its own

6    force, preempt any state law, and that that certainly doesn't

7    preempt Texas law.  The guidance does state at one point what

8    is true of Title VII, which is that Title VII does directly--

9    when a state law directly conflicts with federal law, then

10   Title VII would preempt that law.  But that's not something the

11   EEOC came up with.  That's simply the operation of Title VII

12   and the Constitution Supremacy clause.

13           Moreover, of course, the guidance does not firmly

14   and conclusively state that any particular practice would be a

15   violation of Title VII.

16           A second essential issue with Texas's claims which

17   Texas relies principally on in its arguments is that they seek

18   to relitigate a question here before the Court that was settled

19   by the Supreme Court 40 years ago, and that question is whether

20   or not Title VII applies to states in their capacity as

21   employers just as it does to private employers.

22           In the Dothard vs. Rawlinson case, the Court heard

23   argument from the State of Alabama that employment restrictions

24   enacted pursuant to Alabama statute were entitled to special

25   treatment, special solicitude because of the fact that they

 1    were the product of a state legislative process and that

 2    Title VII should not treat those kinds of restrictions just as

 3    they would a private employer's employment restrictions.

 4            And the Court, in summary fashion in a footnote,

 5    rejected that argument.  It said that Title VII was intended to

 6    apply to state and private employers alike.  And, therefore,

 7    Texas's arguments here with respect to the various statutorily

 8    enacted hiring bars is simply foreclosed by the Dothard case

 9    from the Supreme Court.

10            A third essential problem that I'd like to note

11    here is that Texas's claims here are fundamentally based on a

12    series of disagreements with federal statutes and with Congress

13    through its enactment of those statutes rather than with the

14    EEOC and the EEOC's 2012 enforcement guidance.  For example,

15    Texas, I think, seems to have a disagreement simply with

16    Title VII's permission of--and provision for disparate impact

17    liability.  They note the idea that there's going to be

18    countless lawsuits from felons.  They note that--a potential

19    flood of litigation in their briefing.

20            But regardless of whether or not the guidance had

21    or had never existed, Title VII provides that persons may seek

22    relief pursuant to a charge of disparate impact, and so, you

23    know, ultimately, in claiming that there's going to be this

24    kind of flood of litigation, which I note has not actually

25    occurred, that they're really disputing the fact that Title VII

 1    allows people to seek relief pursuant to a claim of disparate

 2    impact.  Now, the merits of any particular claim, that's

 3    something to be adjudicated by the courts.  But the fact of

 4    these lawsuits, if they were to ever exist, would be something

 5    that would be pursuant to Title VII, not the EEOC or its

 6    enforcement guidance.

 7         I think Texas also seems to dispute the nature of

 8    the business necessity defense as it's laid out by statute.

 9    The statute requires that an employer, first of all, has the

10    burden of establishing a business necessity once a showing of

11    disparate impact has been made.  Additionally, that showing

12    must involve a showing that the restriction at issue is

13    job-related for the position in question, which necessarily

14    involves a job-by-job kind of inquiry.

15         And the Supreme Court's case law on the business

16    necessity defense bears that out.  Business necessity measures

17    the person in relation to the job, not the person in the

18    abstract.  So again, Texas's attempt to kind of obtain a ruling

19    on a blanket basis that there's a notion that Texas's

20    enactments are presumed valid I think runs contrary to the

21    statute's provision for a job-related business necessity

22    defense.

23         Texas also, in referring to the idea of regulatory

24    dark matter, seems to take quarrel with the idea of

25    interpretive rules, statements of policy, and the fact that

1  these kinds of agency mechanisms can be issued without notice

2  and comment rulemaking.  But the Administrative Procedure Act

3  provides agencies with those tools, and it provides that

4  agencies need not engage in notice and comment rulemaking in

5  pursuing those mechanisms.

6          Again, Texas doesn't have a claim here with respect

7  to the APA, just as it doesn't with respect to Title VII.  And

8  so the fact that so many of Texas's claims rely on their

9  disagreement with federal statutes rather than the EEOC or the

10 Department of Justice I think shows that those claims lack

11 merit.

12         Now, I'd like to--and I'll get into some of the

13 other points that Texas has raised, but go through a little bit

14 the various specific arguments we have made in our summary

15 judgment briefing with respect to Counts I and II.

16         Count I seeks a declaration, as I've said,

17 regarding the validity of Texas's hiring practices, and it

18 focuses primarily on Title VII's provision for disparate impact

19 liability.  So I'll just, for background, lay that out, which

20 is that, under Title VII, an employer may be liable if it is

21 shown that a particular restriction or practice

22 disproportionately screens out a protected group and the

23 practice is not supported by business necessity and job-related

24 for the position in question.

25         Now, that claim, Texas seeks to have a blessing

1    from the Court that all of its various restrictions on the

2    employment of felons in--of various kinds in--various kinds of

3    restrictions, various kinds of jobs necessarily does not give

4    rise to disparate impact liability.  That claim is unripe, and

5    it's also meritless.

6           Now, with respect to the ripeness issue, Texas

7    doesn't have a lot of arguments--or has not made many

8    arguments, and we think, you know, the issue of ripeness is

9    firmly presented with the Court, and it precludes the kind of

10    relief Texas seeks in Count I.  Count I is unripe because,

11    first of all, it's not fit for review.  There is no adverse

12    parties in actual controversy to the dispute here with respect

13    to Count I.  And I think that is framed in part by noting that

14    Count I is not really about the guidance.  Count I instead is a

15    claim with respect to Title VII, which kind of would go forward

16    or not, regardless of the guidance and its existence.

17           Now, there is no adverse parties here because,

18    first of all, the EEOC could not enforce Title VII against

19    Texas, as both parties agree.  And Texas points to the idea

20    that, in a declaratory judgment action, you sort of flip the V

21    and look at the underlying suit the defendant would bring

22    against the plaintiff.  Now, the EEOC couldn't bring a

23    Title VII claim against Texas.  So the Count I declaratory

24    judgment claim against the EEOC fails on that basis alone.

25           Now, it's true that the Department of Justice could

```
 1    enforce Title VII against Texas, and it has that authority.

 2    But there is no basis to believe that it's going to do so, that

 3    any kind of enforcement action is imminent.  There hasn't been

 4    one before in this context, and so, in the absence of any

 5    showing that there is any kind of concrete immediate dispute

 6    between these parties, Count I is really unripe, as well, as to

 7    the Department of Justice.

 8              It's unripe, as well, because there is no concrete

 9    dispute presented here.  Texas doesn't purely seek any kind of

10    just a legal ruling here.  What they seek is a declaratory

11    judgment that involves a number of predicate factual

12    determinations.  For example, in the Fifth Circuit, the

13    business necessity defense involves questions of fact, the fact

14    being, does the particular employment restriction bear and

15    manifest relationship to the particular job in question and

16    satisfying the requirements of that job, and does Texas's

17    particular employment restriction meet that test.

18              And here, we've got virtually no facts about

19    hundreds of jobs that Texas claims its various employment

20    restrictions apply to.  I mean, we certainly don't have any

21    about jobs that would arise in the future or the employment

22    restrictions that would arise in the future.  And there is no

23    basis in the briefing and in Texas's argument for the idea of

24    addressing that issue on a blanket basis or sort of on a purely

25    legal basis.
```

1          I think Texas's arguments about the presumption of

2    validity that should apply to its statutes are foreclosed by

3    the Dothard case and the Supreme Court's determination that

4    Title VII applies to states and private employers alike.  I

5    also note that I believe many of the cases Texas cites on that

6    issue regard the issue of the presumption of validity to

7    statutes as a constitutional matter, that when evaluating the

8    constitutionality of statutes, they are presumed valid.  That's

9    a separate issue from a presumption of validity of employment

10   practices under Title VII, which the case law in Title VII does

11   not support.

12          Now, there is also no hardship to withholding

13   review here, which is the second and independent reason why

14   Count I is unripe.  As I said, the EEOC has held this view

15   about Title VII and the fact that it can apply in this context

16   going back to at least 1987, thirty years.  And the Department

17   of Justice and the EEOC in all that time have not taken any

18   concrete legal actions against Texas.

19          There is also no evidence here of any costs that

20   Texas has incurred by virtue of this view of Title VII, for

21   example, Texas changing its laws or Texas having its laws

22   preempted by virtue of Title VII.  As I've said, there is no

23   showing here that any of Texas's laws actually are preempted by

24   Title VII in this context.  We simply don't have a sufficient

25   record to say that.

1          And so as Justice Scalia said in another Texas vs.

2    United States case we cite in our briefing, you know, if Texas

3    is as confident as it appears to be with regard to the

4    Title VII validity of its employment practices, there is no

5    hardship in awaiting its vindication in a future lawsuit, if

6    that lawsuit were to ever arise.

7          Now, for similar reasons, many of the same kinds of

8    reasons, Count I is also without merit, and so even if the

9    Court got beyond the jurisdictional inquiry, we would

10   respectfully request that the Court enter judgment for the

11   defendants under Count I.   Again, there is no concrete,

12   immediate dispute between the parties, and the Declaratory

13   Judgment Act requires the existence of some kind of a concrete

14   immediate dispute among the parties.

15         And also, Texas has failed to put forward evidence

16   that would justify and support the declaration that it seeks,

17   and as the plaintiff, it bears the burden of establishing its

18   entitlement to relief.  Again, with respect to the business

19   necessity and job-relatedness defense, that defense involves

20   questions of fact, and Texas has put forward no evidence with

21   regard to hundreds of jobs to which its employment restrictions

22   purportedly apply.

23         Even with respect, for example, to the Department

24   of Public Safety, the Department of Public Safety does not

25   merely employ peace officers.   It presumably employees

1    administrative assistants and clerical workers and custodians,

2    et cetera.  And Texas has not shown and presented evidence

3    that, with respect to all of those various kinds of jobs, that

4    Texas's employment restrictions actually do satisfy the

5    business necessity defense and that there would be a supported

6    factual ruling on that question.

7             Again, also, there is no basis in the case law to

8    address this issue on a blanket basis, or in the statute.  And

9    there is no special analysis just because of the fact that

10   Texas is a state and that this case involves state statutes.

11            And I also just note Texas raises the idea--the

12   issue of alternative employment practices.  It's true that,

13   under Title VII, once business necessity has been established,

14   a plaintiff could then come back and say that there is an

15   alternative employment practice that would just as readily

16   satisfy that business necessity without imposing a burden on a

17   Title VII group, a disparate impact.  But, of course, that

18   involves first the threshold of, have you actually demonstrated

19   business necessity, and we think the evidence clearly fails to

20   do that for Texas here.

21            Now, setting aside Count I, which, again, is a much

22   broader claim than Count II and which concerns much more than

23   just the guidance but which concerns the overall Title VII

24   validity of hundreds of employment practices, as Texas has put

25   them before the Court, Count II simply challenges the 2012 EEOC

1    enforcement guidance under the Administrative Procedure Act.

2    And I think the first step here is standing, and we believe

3    that Texas has failed to carry its burden to establish

4    Article III standing.

5         Now, it's true that Your Honor previously ruled on

6    the standing issue at the motion-to-dismiss stage, concluding

7    that Texas is the object of regulation and that, therefore,

8    Texas may rely upon a presumption of injury by virtue of being

9    the object of regulation.  But that's simply a presumption, and

10   as we move through the case, now that we're at the

11   summary-judgment stage, Texas's burden of persuasion and

12   production on the standing issue increases.

13        And the discovery we served and the responses we

14   received and the evidence before the Court demonstrates that

15   there is no--there is no injury here, and no cognizable

16   Article III injury, and that, therefore, the Court would be

17   well--would be well advised to deviate from that presumption of

18   injury and, in fact, to find that Texas has not established it.

19        Again, just to kind of run through some of the

20   points that we've discussed in our briefing, there hasn't been

21   any government enforcement proceedings against Texas pursuant

22   to Title VII in this context.  Now, Texas points to--

23   extensively to the charge of discrimination filed by an

24   applicant for DPS employment in 2013.  I'll note just a couple

25   of things about that episode.

```
 1                    First, it was not a government-initiated action.
 2    It was not an enforcement proceeding in the sense that it did
 3    not involve a lawsuit filed by the government.  What it
 4    involved was a private individual filing a charge of
 5    discrimination and then the EEOC investigating that charge,
 6    which it is statutorily obligated to do.  It's not a product of
 7    the guidance.  That's a product of Title VII.  And then
 8    subsequently, the EEOC was unable to establish a violation of
 9    Title VII, and the EEOC issued a right-to-sue letter, which,
10    again, it is statutorily obligated to do, regardless of its
11    view of the merits of a Title VII claim.
12                    And so, you know, Texas kind of attempts to say
13    that it has incurred costs here by virtue of that charge of
14    discrimination, but there is no evidence before the Court
15    indicating that this person was inspired or--or what motivated
16    his charge of discrimination, the fact that it--was it the
17    result of the guidance or simply his views of Title VII and his
18    relationship to it.  And there is no evidence that there has
19    actually been any government enforcement proceedings against
20    the EEOC, which I think shows the lack of injury there.
21                    There has also been no showing that Texas agencies
22    have changed their policies as a result of the guidance or the
23    government's views of these issues.  Texas isn't aware of any,
24    as it stated in discovery.  It's also unaware of any agencies
25    or Texas entities violating Texas law in order to comply with
```

1    their understanding of Title VII.

2            And one other point that I want to raise is the

3    idea of a forced choice, a Hobson's choice.  This is raised in

4    part by Texas's discussion of the Texas vs. United States case,

5    the DAPA case from a couple of years ago.  Now, there is no

6    forced choice shown here because there is simply no basis under

7    the guidance to say firmly or with anything more than

8    speculation that any one of Texas's laws or policies actually

9    violates Title VII.

10            What we can say is that the DAPA case involved a

11    situation where Texas was, by undisputed evidence, facing

12    substantial financial costs if it did not change its laws.  And

13    so there really was a forced choice, where Texas either was

14    going to incur substantial financial costs or it was going to

15    have to change its law.  And in that situation, the Court

16    concluded that there was a kind of forced choice, that there

17    was a cognizable injury related to the State's sovereignty.

18            Here, there is no showing of that kind of violation

19    that's certainly in the offing.  As I've said and as we have

20    sort of stressed repeatedly, the guidance does not conclusively

21    state that Texas's practices do violate federal law.  They may

22    or they may not, or some may or some may not.  And so there's

23    no showing here sufficient to bear the kind of forced choice

24    inquiry that Texas brings up that Texas is actually violating

25    federal law and that it needs to change its law or feels that

1    it needs to in order to comply with federal law.  And, you

2    know, that's--there's no kind of pressure, quote unquote, that

3    Texas referred to in its oral presentation.

4              So we think all those--all those elements

5    demonstrate the lack of Article III injury and the lack of

6    jurisdiction to pursue Count II.  But even if the Court were to

7    move to the merits of Count II, we think that Count II fails

8    under the substantive standards of the Administrative Procedure

9    Act and Title VII.

10             Now, there's three kind of challenges to the

11   guidance that are lodged in Count II, two procedural ones and

12   one sort of substantive one.  The procedural challenges

13   basically say that the EEOC was without authority to issue the

14   guidance and that the guidance must have been issued pursuant

15   to notice and comment rulemaking.

16             Texas's challenge here, I think, rises and falls on

17   the idea that the guidance is a legislative or substantive

18   rule, because if the guidance was not a legislative or

19   substantive rule, if it was, instead, an interpretive rule or a

20   statement of policy under administrative law, then EEOC was

21   certainly within its authority to issue it, as I think Texas

22   seems to have acknowledged in its oral argument by noting that

23   the Supreme Court has even accorded Skidmore deference to EEOC

24   interpretive rules.

25             But it also would not have been needed--it would

1    not have needed to have been issued pursuant to notice and

2    comment rulemaking in that circumstance, because the APA is

3    clear that interpretive rules are exempt from the notice and

4    comment rulemaking process.  And, of course, courts are

5    precluded by the APA from prescribing any different or higher

6    procedural burdens than the APA itself prescribes.

7            Now, the guidance is decidedly not a legislative

8    rule under the relevant standards.  Simply put, none of the

9    hallmarks of a legislative rule are shown here with respect to

10   the guidance.  I think most importantly, if a lawsuit were

11   brought in this context or an enforcement proceeding were

12   brought in this context, that suit or that enforcement would be

13   pursuant to Title VII itself, not to the guidance.  The finding

14   of liability would be entirely supported if the guidance had

15   never existed or if it ceased to exist.  That's because the

16   guidance does not, in fact, grant legal rights.

17           What the guidance does is describe the EEOC's views

18   of this issue, and this is shown by the fact that, as we have

19   cited in our briefing, a number of different district courts,

20   for example, have denied motions to dismiss in disparate impact

21   claims in this context where there was no reliance upon the

22   guidance or the guidance was either not discussed or accorded,

23   at most, Skidmore deference.  And so the fact that--the fact

24   that courts are able to and are enforcing Title VII in this

25   context in the absence of the guidance, or without reliance

1    upon it, really shows that the guidance isn't actually a

2    legislative rule.

3              Some of the other kinds of hallmarks are that, you

4    know, the guidance was not published in the Code of Federal

5    Regulations.  EEOC didn't invoke legislative authority in

6    promulgating it, and it doesn't change a prior legislative

7    rule.  Now, Texas points to the idea that the guidance marks a

8    sea change or a quantum leap in the EEOC's views of this issue.

9    We would respectfully disagree.  We think that the guidance is

10   consistent with prior policy statements and guidelines from the

11   EEOC on this issue, and it certainly doesn't conclude that

12   individualized assessments are required or that Texas is, in

13   fact, violating federal law, which I think Texas points to as

14   being the primary ways in which the guidance marks a sea

15   change.

16             We think, Your Honor, instead, that the guidance is

17   best interpreted, for purposes of this motion, as an

18   interpretive rule.  Now, I'll just kind of, I guess, highlight

19   one point from our briefing.  We are not here seeking to

20   relitigate the question at this time that the guidance is final

21   agency action.  Your Honor has ruled that it is.  The agency, I

22   think, continues to believe and our position continues to be

23   that it is not, and we will preserve that point as needed.  But

24   we are not relitigating that question for purposes of this

25   motion.

1              Now, the agency also, I think, takes the position

2      that the guidance is best construed, for purposes of

3      administrative law, as a statement of policy, because it

4      represents a statement of how the agency intends to exercise

5      discretionary authority.  But there is a lot of overlap between

6      the final agency action inquiry and the statement of policy

7      inquiry.

8              So again, we're not pressing that point here,

9      because we take Your Honor's ruling at the prior stage of the

10     case.  Instead, we think that the guidance is also quite

11     reasonably interpreted as an interpretive rule for

12     administrative law purposes, and that's how we ask Your Honor

13     to construe it for purposes of this motion.

14             An interpretive rule simply states what an agency

15     understands a statute to mean in a particular context.  And

16     here, that's exactly what the agency has done.  It has

17     interpreted Title VII, applied the statute and the case law

18     interpreting the statute to a particular type of situation,

19     namely, the use of criminal background information in

20     employment decision-making.

21             Now, it's true that the guidance provides more

22     detail than is contained in Title VII, but the key test for an

23     interpretive rule is whether or not, nonetheless, the guidance

24     is fairly encompassed by Title VII.  And it is.  And I think

25     the chief way we know this, again, is that, even in the absence

1    of the guidance and the agency's interpretation, Title VII

2    liability in this context would be fully supported.

3              So the guidance hasn't created a new kind of

4    liability or a new kind of right.  It simply explained how

5    Title VII--or how the EEOC understands Title VII in this

6    context, and it's provided guidance and additional information

7    to regulated parties, which, I should note, courts have stated

8    that there is nothing sort of dark or dark matter about

9    interpretive rules.  Instead, they provide regulated parties

10   with an understanding of how an agency understands a statute

11   which it's tasked with enforcing, and the EEOC is certainly

12   tasked with enforcing Title VII, particularly outside of the

13   context of state employers.

14             I'd also just like to note as well that the issue

15   of the practical effect of the rule--or of the guidance, I

16   should say, is not the dispositive question.  Interpretive

17   rules may have practical effects on regulated parties, because

18   regulated parties may conclude that they should--that it would

19   be best that they change their conduct to conform to the

20   agency's views of a question.  But the issue, instead, is

21   whether or not there is legal effect, that a new right or duty

22   is created.  And the guidance does not create any kinds of new

23   rights or duties.  Instead, it just interprets Title VII in

24   this arena.

25             Texas also, I think, related to this issue, talks

1    about the idea of an increased field of potential plaintiffs.

2    Again, this may go somewhat to the idea of the plaintiffs being

3    inspired by the guidance in some way to file suit.  But the

4    guidance does not, as a legal matter, expand the field of

5    plaintiffs that Texas could face suit from, because again,

6    Title VII itself creates disparate impact liability, and there

7    is no basis to say that disparate impact liability in this

8    particular context is any different than in any other

9    employment context.

10           So all that's why it's our view that the procedural

11    challenges to the guidance fail.  The guidance is properly

12    construed, for purposes of this motion, as an interpretive

13    rule, and so those portions of Count II fail on their merits.

14           Now, the guidance is also challenged as a

15    substantive matter in Count II, but here, Texas brings a facial

16    challenge to the guidance, and it bears a heavy burden in doing

17    so.  Count II states that the guidance on its face is an

18    unreasonable interpretation of Title VII and is contrary to the

19    statute.  But in bringing that kind of facial challenge, Texas

20    here bears the burden of showing that in no circumstances is

21    the guidance actually reasonable or in keeping with the

22    statute, and Texas fails to do so.

23           Now, the guidance discusses the issue of disparate

24    treatment liability under Title VII, which Texas--is not really

25    the focus of Texas's suit, and Texas doesn't respond to our

1    arguments that, with respect to disparate treatment liability,

2    the guidance is perfectly reasonable.  As Judge Higginbotham

3    said in his since-vacated dissenting opinion, with respect to

4    disparate treatment, the guidance simply states elementary

5    propositions of law.

6              Even with respect to disparate impact, though, the

7    guidance is reasonable, and it's in keeping with Title VII.

8              Now, the guidance applies simply the particular

9    factual context discussed there to the context of the statutory

10    language and the case law interpreting it.  It does not set

11    forth binding rules of law about individualized assessments.

12    Instead, in its discussion of individualized assessments and

13    the Green factors, it sets forth a framework for interpreting

14    and understanding the business necessity defense.  You know,

15    the Supreme Court has held that that defense requires that

16    there be some kind of connection between the particular

17    employment restriction and the particular job at issue and a

18    showing that there is some necessity for the restriction for

19    that job.

20              By pointing to, for example, the Green factors,

21    which are that a targeted screen should consider the nature of

22    the job, the nature of the crime, and the amount of time since

23    the crime's occurrence, those factors really just go to a way

24    of analyzing the broader business necessity defense in this

25    particular context.

1            And I want to go to the SEPTA case briefly in this

2    context.  I think both parties seem to believe that the SEPTA

3    case provides support for their respective positions, and I

4    want to point the Court to a couple of points in the SEPTA case

5    which I think do support the guidance and demonstrate its

6    reasonableness.

7            Again, SEPTA is cited extensively in our briefing,

8    but it's 479 F.3d 232, and I want to point to a passage at

9    page 245 of the Court's opinion.  The Court stated, and I'll

10   quote, "If a bright-line policy can distinguish between

11   individual applicants that do and do not pose an unacceptable

12   level of risk, then such a policy is consistent with business

13   necessity.  Whether a policy can do so is most often a question

14   of fact that the district courts and juries must resolve in

15   specific cases."

16           So I think the SEPTA case supports our position,

17   because it demonstrates, first of all, that Title VII is

18   applicable in this context.  Disparate impact liability is

19   applicable.  Business necessity is a question of fact that must

20   be evaluated in regard to particular jobs, and that there is no

21   basis to evaluate that question on a blanket basis.

22           And later on the same page, just after this, the

23   Court evaluated whether or not the policy at issue was

24   consistent with business necessity, and it pointed to evidence

25   that the defendant had put forward concerning a particular job

1    at issue, the nature of the job, the fact that it involved

2    exposure to vulnerable populations, also that--evidence that

3    violent criminals recidivate at a high rate, that it is

4    impossible to predict with a reasonable degree of accuracy

5    which criminals would recidivate, and so on.  So there, the

6    Court had before it an evidentiary record, a basis to say that,

7    in fact, the employment restriction at issue did distinguish

8    between persons who posed an acceptable level of risk and those

9    that did not.

10           So there wasn't--it wasn't kind of a broad,

11    blanket, public-policy-based rationale or a common-sense-based

12    rationale.  It involved evidence and a record demonstrating the

13    fact that business necessity defense was met.  And that's what

14    the guidance really, I think overall, requires, is that, by

15    discussing individualized assessments, the Green factors--the

16    Green factors being basically targeted screens--ultimately what

17    the EEOC is recommending is that employers consider these

18    issues in a way that takes account of the job-relatedness and

19    business necessity test.  And I think that, in that respect,

20    Texas has not raised a persuasive basis to challenge the

21    substantive points that the guidance has raised.

22           So unless Your Honor has any questions on these

23    issues, I'd just like to respectfully request that the Court

24    grant summary judgment for the defendants, that the Court

25    conclude either that this case is without jurisdiction and

1    dismiss accordingly or enter judgment for the defendants.

2    Thank you.

3                THE COURT:  All right, sir.

4                Yes, sir, rebuttal.

5                MR. NIMOCKS:  Your Honor, I just have a few notes

6    of rebuttal that I'd like to make to the argument made by my

7    esteemed counterpart.

8                The position of the defendants, Your Honor, first

9    and foremost, is that the guidance is not as absolute as Texas

10   claims it to be.  Mr. Powers just articulated that it does not

11   require the use of individualized assessments in all cases and

12   doesn't take a categorical position on the various categorical

13   bans that Texas has.

14               Your Honor, in assessing the language of the

15   guidance, I think the Court is required to take a pragmatic

16   approach.  And just because EEOC may put a little caveat in

17   here or there or use a "likely" here or there does not escape--

18   or does not allow it to escape the impact of what the rule

19   does.  If that was the standard, Your Honor, every guidance

20   that has a substantive impact could always avoid review under

21   the APA because they used the right magic words to make sure it

22   didn't sound too concrete or too absolutist.  And I think

23   practically, the impact of this guidance is absolutely clear,

24   and the EEOC can't play fast and loose with the language.

25               But even if the Court has to give credence to every

1    "likely" and caveat that EEOC puts in that guidance, this is

2    where Hawkes comes in and the discussion of the Frozen Foods

3    case from the U.S. Supreme Court in 1956.  So if you look at

4    page 1815 of Hawkes, looking at this interpretive guidance from

5    the Interstate Commerce Commission, the warning was enough.

6    The fact that the ICC was sharing what it thought put a marker

7    on the wall, that was enough.  So under that standard, this

8    guidance, even if it's not absolute and concrete in all of its

9    terms, is enough to fill up the second prong of the APA

10   analysis.

11           Mr. Powers just said that a job-by-job analysis is,

12   in fact, required.  And this is really the problem.  In terms

13   of interpreting what it means for something to be job-related

14   for the position in question, that we have to do a job-by-job

15   analysis.  With respect, that is not what the language of

16   Title VII requires.  What the defendants are omitting is the

17   idea that a categorical ban with regard to a particular

18   employer can be job-related for every position in question with

19   regard to that employer and consistent with business necessity.

20   The idea that that language in Title VII requires in every

21   instance a job-by-job analysis and makes no room for a

22   categorical ban just doesn't fit with the actual text of

23   Title VII.  There is room in there for categorical bans, and

24   this is one of the problems that Texas has with the guidance.

25           And this is exampled by the rule itself.  My

 1    esteemed opponent made reference to Example Number 11 on
 2    page 24 of the rule, which is page 27 of our appendix regarding
 3    the office assistant at a preschool example there.  It would be
 4    perfectly permissible, we contend, for that school to say, not
 5    only do we not want you in close contact with the kids in this
 6    particular position; we don't want you on the school grounds,
 7    period, because that's job-related for the position in question
 8    and consistent with business necessity, because the risk
 9    factors are the same in both instances, and, therefore, we
10    don't hire felons, period.  There is room for that type of
11    analysis under Title VII.  And so the idea that Title VII
12    demands an individualized assessment or prohibits a categorical
13    ban just doesn't stand.
14              I want to address the Dothard case briefly, and I
15    think the Dothard case is distinguishable, Your Honor.  It does
16    not foreclose what Texas is asking.  That was a question of sex
17    discrimination, and it was a question of a statute that may
18    well have said sex discrimination in it.  It was a height and
19    weight requirement that basically, on its face, would exclude
20    women from the particular job at issue.  And that statute only
21    went to an employment question.  That statute--  Height and
22    weight restrictions have no provenance in Alabama law beyond
23    the question the Court took.
24              Felony restrictions, Your Honor, this is something
25    that dates back to the inception of the Republic.  This is a

1    far different animal that we're talking about.  And so the idea

2    that the Supreme Court grabbed the statute by both hands in

3    Dothard doesn't foreclose the idea that we're asking the Court

4    to say, is that these felony restrictions are presumptively

5    valid under Title VII because of the deliberative process they

6    go through.

7              So it's not--it's not an isolated statute that, on

8    its face, you can recognize categorically excludes women.

9    That's not what we're dealing with here.  We're dealing with

10   deeply embedded systematic patchwork of Texas laws impacting

11   over 300 places.

12             And I probably just have a couple more minutes, and

13   let me--  Two last points, Your Honor.

14             The declaratory judgment cause of action is

15   appropriate to EEOC.  Even though EEOC can't sue us--and I

16   acknowledge that--EEOC is the key-holder to individual and

17   private lawsuits.  They pull the lever.  An individual cannot

18   sue Texas under Title VII unless they get that ever-valid and

19   sacred right-to-sue letter from EEOC.  EEOC is the gatekeeper

20   on that.  So because they are as it pertains to the private

21   lawsuits, which are as equal threat to Texas as is a lawsuit

22   from the Department of Justice, we think that they are an

23   appropriate defendant in a flip-the-V declaratory judgment

24   analysis.

25             And from a remedial standpoint, I want to be very

1    clear, Your Honor, that we are not asking the Court to blanket

2    declare that every categorical hiring ban that Texas has

3    survives and is per se lawful under Title VII.  That's not the

4    request.  What the request is, is that we are asking you to

5    issue a declaration that our categorical hiring bans are

6    presumed lawful.  So there is room when we establish a

7    presumption for this factual dispute that my opponents are

8    demanding happen to still happen in the wake of a presumption.

9            Or, if the Court is unwilling to declare the

10   presumption that we're asking, you can declare that categorical

11   bans are not presumptively unlawful, as the guidance says that

12   they are, because there is room in the Title VII language for a

13   categorical ban.  There is room, as the SEPTA case

14   demonstrates, for a categorical ban.  There is room to say that

15   an employer has an absolute concrete right that's job-related

16   and consistent with business necessity to not hire felons for a

17   particular type of job, or all jobs, as the Department of

18   Public Safety has done given the--like a weapons around the

19   office, all kinds of--any number of reasons that the Department

20   of Public Safety can come up with that I think are self-evident

21   as to why you don't have felons running around DPS in an

22   employment capacity.

23           So with that, Your Honor, those are my points of

24   rebuttal.  I thank the Court's time and attention--the Court

25   for its time and attention today.

1          THE COURT:  All right.  Thank you.

2          By 9:00 a.m. on October the 25th, the parties need

3     to file their proposed findings and conclusions.  That will

4     give you about a week.

5          Thank you for your presentations.  Court will stand

6     adjourned.

7        (END OF HEARING)

8                          *  *  *  *  *

9

10        I, Mechelle Daniel, Federal Official Court Reporter in and
    for the United States District Court for the Northern District

11    of Texas, do hereby certify pursuant to Section 753,
    Title 28, United States Code, that the foregoing is a true and

12    correct transcript of the stenographically reported proceedings
    held in the above-entitled matter and that the transcript page

13    format is in conformance with the regulations of the Judicial
    Conference of the United States.

14

15     s/ *Mechelle Daniel*            **DATE** OCTOBER 20, 2017

16    MECHELLE DANIEL, CSR #3549
    FEDERAL OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25