# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

| | |
|---|---|
| STATE OF TEXAS,<br><br>                                    *Plaintiff*,<br><br>                     v.<br><br>EQUAL EMPLOYMENT OPPORTUNITY<br>COMMISSION, *et al*.,<br><br>                                    *Defendants*. | Civil Action. No. 5:13-CV-255-C |

**BRIEF OF AMICI CURIAE BEVERLY HARRISON, TEXAS STATE CONFERENCE
OF THE NAACP, NAACP LEGAL DEFENSE & EDUCATIONAL FUND, AND
NATIONAL EMPLOYMENT LAW PROJECT IN SUPPORT OF
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES .................................................................................... ii

INTEREST OF AMICI CURIAE .......................................................................... 1

INTRODUCTION & SUMMARY OF ARGUMENT .................................................. 5

ARGUMENT ....................................................................................................... 6

    A.    Employment Policies that Categorically Exclude Individuals with Felony and Other Conviction Records Are Devastatingly Counterproductive.................. 6

        1.    Policies that Render Employment Unattainable for People with Records Weaken Our Economy............................................................... 8

        2.    Policies that Make Employment Unattainable for People with Records Significantly Undermine Public Safety. .................................... 10

        3.    Policies that Make Employment Unattainable for People with Records Are Adopted at the Expense of Communities and Families. ........................................................................................ 11

        4.    The Texas Legislature—Aware of the Damage to the Economy, Public Safety, and Families Wrought by Its Policies—Has Begun Taking Steps to Address Employment Barriers for Individuals with Records. .............................................................................................. 12

    B.    Courts Have Long Held that Facially-Neutral Hiring Policies that Exclude Applicants with Conviction or Arrest Records Can Violate Title VII.................. 13

    C.    The 2012 Guidance Represents a Valid Interpretation of Title VII, and the EEOC Fully Complied with the APA When Adopting It.................................... 16

        1.    The Guidance is an Interpretive Rule Under the APA. ........................... 16

        2.    The Guidance Represents a Valid Interpretation of Title VII and Federal Jurisprudence that Merits Deference. ......................................... 20

CONCLUSION..................................................................................................... 21

i

# **TABLE OF AUTHORITIES**

**PAGE(S)**

## **CASES:**

*Albemarle Paper Co. v. Moody*,
   422 U.S. 405 (1975)............................................................................................................ 3

*Am. Mining Cong. v. Mine Safety & Health Admin.*,
   995 F.2d 1106 (D.C. Cir. 1993)...................................................................................... 19

*Avoyelles Sportsmen's League, Inc. v. Marsh*,
   715 F.2d 897 (5th Cir. 1983) ......................................................................................... 16

*Cmty. Nutrition Inst. v. Young*,
   818 F.2d 943 (D.C. Cir. 1987).....................................................................................18-19

*EEOC v. Com. Office Prod. Co.*,
   486 U.S. 107 (1988)......................................................................................................... 20

*El v. Southeastern Pennsylvania Transportation Authority (SEPTA)*
   479 F.3d 233 (3d Cir. 2007) ...............................................................................15, 19, 20

*Franks v. Bowman Transp. Co.*,
   424 U.S. 747 (1976)............................................................................................................ 3

*Gen. Elec. Co. v. Gilbert*,
   429 U.S. 125 (1976)......................................................................................................... 17

*Green v. Missouri Pacific Railroad*
   523 F.2d 1290 (8th Cir. 1975) ...............................................................................14-15, 20

*Griggs v. Duke Power Co.*,
   401 U.S. 424 (1971)..................................................................................................... 3, 13

*Guerrero v. Cal. Dep't of Corrs. & Rehab.*,
   119 F. Supp. 3d 1065 (N.D. Cal. 2015), *aff'd in part, rev'd in part and remanded*,
   No. 15-17001, 2017 WL 2963531 (9th Cir. July 12, 2017) .........................................4-5, 19, 20

**PAGE(S)**

*Hithon v. Tyson Foods, Inc.*,
  144 F. App'x 795 (11th Cir. 2005) ......................................................... 3

*Hoctor v. U.S. Dep't of Agric.*,
  82 F.3d 165 (7th Cir. 1996) ................................................................... 17

*Houser v. Pritzker*,
  28 F. Supp. 3d. 222 (S.D.N.Y. 2014) ...............................................15-16

*Lewis v. City of Chicago*,
  560 U.S. 205 (2010) ............................................................................... 3

*Maryland Dep't of Human Res. v. Sullivan*,
  738 F. Supp. 555 (D.D.C. 1990) ...................................................... 17, 18

*Nason v. Kennebec Cty. CETA*,
  646 F.2d 10 (1st Cir. 1981) ................................................................... 19

*Patterson v. McLean Credit Union*,
  491 U.S. 164 (1989) ............................................................................... 3

*Perez v. Mortg. Bankers Ass'n*,
  135 S. Ct. 1199 (2015) .............................................................. 16, 17, 19

*Prof'ls & Patients for Customized Care v. Shalala*,
  56 F.3d 592 (5th Cir. 1995) .............................................................17-18, 20

*Richardson v. Hotel Corp. of Am.*,
  332 F. Supp. 519 (E.D. La. 1971), *aff'd,* 468 F.2d 951 (5th Cir. 1972) ................................... 15

*Rogers v. Pearland Indep. Sch. Dist.*,
  827 F.3d 403 (5th Cir. 2016) ................................................................ 16

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ............................................................................. 20

*Sullivan v. City of Phoenix*,
  845 F. Supp. 698 (D. Ariz. 1993) ......................................................... 19

**PAGE(S)**

*Townsend v. Benjamin Enters.,*
   679 F.3d 41 (2d Cir. 2012) ............................................................... 17

*Waldon v. Cincinnati Pub. Schs.,*
   941 F. Supp. 2d 884 (S.D. Ohio 2013) .............................................. 3, 16

**STATUTES & OTHER AUTHORITIES:**

5 U.S.C. § 553 ...................................................................................... 16

42 U.S.C.
   § 2000e-2(k)(1)(A)(i) ....................................................................... 14
   § 2000e-2(k)(1)(A)(ii) ...................................................................... 14

Pub. L. No. 102-166, 105 Stat 1071 ...................................................... 14

H.B. 1188, 85th Leg. (Tex. 2017), http://bit.ly/2hQmwOz ....................... 13

Tex. Occ. Code
   § 53.022 .......................................................................................... 13
   § 53.023 .......................................................................................... 13

Alexander, Michelle, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness*
   (The New Press 2010) ......................................................................... 7

Am. Civil Liberties Union, *Back to Business: How Hiring Formerly Incarcerated Job Seekers
   Benefits Your Company* (2017), http://bit.ly/2sforzk ............................. 10

Berg, Mark T. & Beth M. Huebner, *Reentry and the Ties that Bind: An Examination of Social
   Ties, Employment, and Recidivism*, 28 Just. Q. 382 (Apr. 2011), http://bit.ly/2kirpkj ............. 11

Bucknor, Cherrie & Alan Barber, Ctr. for Econ. & Policy Research, *The Price We Pay:
   Economic Costs of Barriers to Employment for Former Prisoners and People Convicted of
   Felonies* (June 2016), http://bit.ly/2atNJBu ......................................... 10

Carson, E. Ann, U.S. Bureau of Justice Statistics, *Prisoners in 2015* (Dec. 2016),
   http://bit.ly/2fLPkTY. ......................................................................... 7

**PAGE(S)**

Chammah, Maurice, *Business Association Scores Victories on Criminal Justice Agenda*, Tex. Trib., May 23, 2013, 6:00 AM, http://bit.ly/2wAODUh .................................................. 13

Christman, Anastasia & Michelle Natividad Rodriguez, Nat'l Emp't Law Project, *Research Supports Fair Chance Policies* (Aug. 1, 2016), http://bit.ly/1sk48Nn ..................... 7

Decker, Scott H., et al., Nat'l Inst. of Justice, *Criminal Stigma, Race, Gender, and Employment: An Expanded Assessment of the Consequences of Imprisonment for Employment* (Jan. 2014); http://bit.ly/2w3mVT1 .................................................................... 12

Duran, Le'Ann, et al., The Council of State Gov'ts Justice Ctr., *Integrated Reentry and Employment Strategies: Reducing Recidivism and Promoting Job Readiness* (Sep. 2013), http://bit.ly/2gNND9F ........................................................................................ 12

Econ. League of Greater Phila., *Economic Benefits of Employing Formerly Incarcerated Individuals in Philadelphia* (Sept. 2011), http://bit.ly/2m2dei3. ........................................... 10

Exec. Office of the President, *Economic Perspectives on Incarceration and the Criminal Justice System* (Apr. 2016), http://bit.ly/2y0VMko. ................................................................ 7

Fed. Bureau of Investigation, *Crime in the United States, 2015: Overview Table 43* (2016), http://bit.ly/2m0yMf5. .................................................................................................... 7

Gaebler, Helen, *Criminal Records in the Digital Age: A Review of Current Practices and Recommendations for Reform in Texas* (William Wayne Justice Ctr. for Public Interest Law, Univ. of Tex. School of Law, Mar. 2013), http://bit.ly/2y0Awej................................. 7, 8

Lundquist, Jennifer, et al., *Does a Criminal Past Predict Worker Performance?* (Dec. 2, 2016) (unpublished manuscript), http://bit.ly/2lloRle................................................... 9

Mem. & Op., *Little v. Wash. Metro Area Transit Auth. (WMATA)*, No. 1:14-cv-01289-RMC (D.D.C. Apr. 18, 2017), ECF No. 186 ............................................................................... 3-4

Minor, Dylan, Nicola Persico & Deborah M. Weiss, *Criminal Background and Job Performance? Evidence from America's Largest Employer* (May 1, 2017), http://bit.ly/2vJT5jR........................................................................................................ 9

Naser, Rebecca L. & Christy A. Visher, *Family Members' Experiences with Incarceration and Reentry*, 7 W. Criminology Rev. 20 (2006), http://bit.ly/2xjaOT2. ......................... 12

**PAGE(S)**

Pager, Devah, *The Mark of a Criminal Record*, 108 Am. J. Soc. 937 (Mar. 2003),
http://bit.ly/1vNQBJk. ........................................................................................ 9

Petersilia, Joan, Nat'l Inst. of Justice, *When Prisoners Return to the Community: Political,
Economic, and Social Consequences* (Nov. 2000), http://bit.ly/2sr7gao. ................................. 9

The Sentencing Project, *Incarcerated Women and Girls* (Nov. 2015),
http://bit.ly/2xXkccx ........................................................................................ 12

The Sentencing Project, *Trends in U.S. Corrections* (June 2017),
http://bit.ly/2hRzQSV. ........................................................................................ 7

Soc'y for Human Res. Mgmt., *Background Checking—The Use of Criminal Background
Checks in Hiring Decisions* (Jul. 19, 2012), http://bit.ly/2mhlrzh ............................................ 8

Tex. Dep't of Criminal Justice, *Statistical Report Fiscal Year 2016*,
http://bit.ly/2hPaQvo ........................................................................................ 7

Thompson, Senfronia, Judiciary & Civ. Juris. Comm. Rep.,
*Bill Analysis of H.B. 1188* (2013), http://bit.ly/2ijNbUb ........................................................ 9

U.S. Census Bureau, *Quickfacts: United States*, http://bit.ly/2m1NMFZ. ................................... 7

U.S. Dep't of Justice, Bureau of Justice Statistics, *Survey of State Criminal History
Information Systems, 2014* (Dec. 2015), http://bit.ly/2y0gyQQ. .............................................. 7

U.S. Dep't of Justice, Bureau of Justice Statistics, *Survey of State Criminal History
Information Systems, 2012* (Jan. 2014), http://bit.ly/2m1uC4U. ............................................... 7

Vallas, Rebecca et al., Ctr. for Am. Progress, *Removing Barriers to Opportunity for Parents
with Criminal Records and Their Children* (Dec. 2015), http://ampr.gs/2g9hdWF ................ 11

Visher, Christy et al., Urban Inst., *Employment after Prison: A Longitudinal Study of
Releasees in Three States* (October 2008), http://urbn.is/2yPIXHN ...................................... 11

Wagner, Peter & Alison Walsh, Prison Policy Initiative, *States of Incarceration:
The Global Context 2016* (June 16, 2016), http://bit.ly/2xiBej8. ............................................. 7

Western, Bruce & Becky Pettit, Pew Charitable Trusts, *Collateral Costs:
Incarceration's Effect on Economic Mobility* (2010), http://bit.ly/1YjcAau .................. 8, 9, 11

**PAGE(S)**

Yang, Chrystal S. *Local Labor Markets and Criminal Recidivism*,
    147 J. Pub. Econ. 16 (Dec. 2016) ............................................................................ 10

## INTEREST OF AMICI CURIAE

Pursuant to the Court's Order of August 23, 2017 (Docket No. 90), the following impacted individual and civil rights and workers' rights organizations seek to participate in this case as amici curiae. Amici write not to repeat arguments made by the parties, but to illuminate the significant barriers to employment faced by people with arrest and conviction records, particularly people of color. The Equal Employment Opportunity Commission's ("EEOC") 2012 Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions ("Guidance") explains how Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") applies to employers' consideration of arrest and conviction records when assessing job applicants, and Amici write to urge the Court to view the Guidance in light of that important real-life context. Amici also supplement, where appropriate, the arguments advanced by Defendants in their detailed summary judgment briefing. *See generally* Docs. 92, 100.

Amicus Beverly Harrison resides in Dallas, Texas. She is a 61-year-old Black woman, mother, and grandmother who retired from the Dallas City Marshal's Office in 2009 after 28 years of service to the City of Dallas. Ms. Harrison has continued to work since her retirement to serve her community and supplement her income, including by serving as a certified nursing assistant and home health aide between 2009 and 2013. Most recently, Ms. Harrison worked for the Dallas Independent School District as a school cafeteria employee. In 2013, Ms. Harrison applied for a job with Dallas County Schools ("DCS") as a school crossing guard or bus monitor. Ms. Harrison received a conditional offer of employment from DCS and began work as a school crossing guard. After eight days on the job, however, DCS terminated Ms. Harrison's employment because of an entry that appeared on her background check report. In 1975, when she was 19 years old, Ms. Harrison pleaded no contest to the offense of aggravated assault, a third-degree felony, and was

1

sentenced to five years of probation. However, in 1977, after two years of satisfactory compliance with the terms of her probation, the Dallas County Criminal Court issued an order discharging Ms. Harrison from probation early, setting aside the judgment of conviction, and "releas[ing her] from all penalties and disabilities resulting from the Judgment of Conviction." In the more than 40 years since then, Ms. Harrison has never been convicted of a crime. Nonetheless, the entry from 1975 has rendered her ineligible to secure employment with DCS. DCS's denial of employment to Ms. Harrison, based on her decades-old conviction record, is the basis of a pending complaint with the EEOC alleging a violation of Title VII. Moreover, Ms. Harrison has been barred from other employment in Texas due to her criminal history. Ms. Harrison recently learned that a home health agency would not employ her after it conducted a background check, even though she has worked as a home health aide for several years. Ms. Harrison has reasonable fear that her conviction record may continue to render her ineligible for employment in Texas.

The Texas State Conference of the NAACP ("Texas NAACP") is the oldest and one of the largest and most significant non-profit organizations in the State of Texas that promotes and protects the rights of Black Americans and other people of color. With over 70 adult branches across Texas and dozens more youth units, it has thousands of members who reside in every region of the state. The Texas NAACP and its branches have worked to eliminate employers' categorical bans on hiring applicants with felony convictions and other barriers faced by people with conviction and arrest records, including Texas NAACP members and other people of color. For example, during recent legislative sessions, the Texas NAACP has advocated for individuals with records in various ways, including by expending resources and time by staff and members fighting back against efforts to preempt fair chance hiring ordinances; advocating for Senate Bill 578, which would have required the Texas Department of Criminal Justice to provide comprehensive,

county-specific reentry and reintegration resources to individuals released from prison; and advocating for House Bill 1510, which would have increased housing options for individuals with conviction records. Where Texas defends policies that categorically deny jobs to people with convictions, the Texas NAACP is forced to redirect resources away from its affirmative reentry work of conducting job searches and providing training for individuals and reallocate those resources toward helping its members and constituents secure employment and defending and enforcing antidiscrimination statutes such as Title VII, which we believe renders such categorical bans illegal.

The NAACP Legal Defense & Educational Fund, Inc. ("LDF") is a non-profit, non-partisan law organization, founded in 1940 under the leadership of Thurgood Marshall to achieve racial justice and ensure the full, fair, and free exercise of constitutional and statutory rights for Black people and other communities of color. LDF has been involved in precedent-setting and other important litigation challenging employment discrimination before federal and state courts. *See, e.g.*, *Lewis v. City of Chicago*, 560 U.S. 205 (2010); *Hithon v. Tyson Foods, Inc.*, 144 F. App'x 795 (11th Cir. 2005); *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989); *Franks v. Bowman Transp. Co.*, 424 U.S. 747 (1976); *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975); *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971). In the unanimous decision in *Griggs v. Duke Power Co.*, which LDF litigated, the U.S. Supreme Court recognized the disparate impact theory of liability in the employment context. LDF also challenges policies that exclude individuals with criminal records from jobs. *See, e.g.*, *Waldon v. Cincinnati Pub. Schs.*, 941 F. Supp. 2d 884 (S.D. Ohio 2013) (denying defendants' motion to dismiss a disparate impact case alleging that Black former public school employees were terminated for having been convicted of specified crimes under Ohio law); Mem. & Op., *Little v. Wash. Metro Area Transit Auth. (WMATA)* at 1, 46-47, No. 1:14-

cv-01289-RMC (D.D.C. Apr. 18, 2017), ECF No. 186 (certifying a class of affected job applicants with respect to plaintiffs' claim that WMATA's criminal background check policy is facially neutral, but has a disparate impact on Black applicants). LDF contributed to the efforts that led a bipartisan EEOC to adopt the Guidance in 2012. At the heart of this case is Texas's challenge to the legality of the Guidance, which memorializes case law, like *Griggs*, and decades of EEOC policies that show that categorical bans on hiring people with convictions, such as the ones that Texas asks this Court to declare lawful, may violate Title VII to the extent that they disproportionally impact Black people and other protected groups and are not job-related and consistent with business necessity.

The National Employment Law Project, Inc. ("NELP") is a non-profit legal research and advocacy organization with 45 years of experience advancing the rights of low-wage workers and those struggling to access the labor market. NELP seeks to ensure that vulnerable workers across the nation receive the full protection of employment laws. Specializing in the employment rights of people with arrest and conviction records, NELP has helped to lead the national movement to restore fairness to employment background checks. NELP works with allies in Texas and across the country to promote enforcement of antidiscrimination laws, like Title VII, and to reduce the barriers to employment faced by workers with records, such as categorical bans on hiring people with felony conviction histories or other records. NELP has litigated and participated as amicus in numerous cases addressing the rights of workers with records. Like LDF, NELP was a leader in the efforts to encourage a bipartisan EEOC to adopt the 2012 Guidance. Both LDF and NELP served as amici in *Guerrero v. Cal. Dep't of Corrs. & Rehab.*, arguing that the court should rely on the Guidance in determining whether particular employers' criminal background check policies

unfairly exclude applicants of color. 119 F. Supp. 3d 1065 (N.D. Cal. 2015), *aff'd in part, rev'd in part and remanded,* No. 15-17001, 2017 WL 2963531 (9th Cir. July 12, 2017).

## INTRODUCTION & SUMMARY OF ARGUMENT

The State of Texas asks this Court to issue several broad pronouncements. *First*, as Defendants explain in detail, Texas essentially seeks an advisory opinion declaring that its hiring practices related to conviction records—covering potentially *thousands* of individual existing policies as well as hypothetical, future policies—are lawful pursuant to Title VII. *See, e.g.*, Doc. 92 at 3, 12, 14. *Second*, as Defendants explain, Texas, without proper standing, also requests that this Court strike down and prohibit the federal government from using the EEOC's Guidance, which is consistent with decades-old EEOC policy and reflects longstanding federal case law from multiple circuits. *See, e.g.*, *id.* In all respects, Texas overreaches. Not only are its extraordinary claims technically deficient and meritless, as Defendants detail, but Texas also ignores the myriad harms that flow from the blanket hiring exclusions of people with felony records like those that Texas preemptively and prematurely seeks to have declared lawful. While, as Defendants explain, Texas's claims may rightly be dismissed on grounds of nonjusticiability, *see, e.g.*, *id.* at 23, should the Court reach the merits of any of Texas's claims, an understanding of the breadth and depth of the case's impact on millions of Americans, including millions of Texans who are disproportionately Black and Latino, is critical and should be considered.

People with records are, contrary to Texas's characterization, not simply "felons." *See, e.g.*, Doc. 95 at 1. They are our family members, friends, and neighbors. They form a shockingly large portion of the U.S. population—nearly 1 in 3 adults—and people of color are disproportionately represented among those with records because of the race disparities that plague the criminal justice system.

Hiring barriers faced by people with records frequently deprive them of a means to support themselves, their families, and their communities. Their resulting unemployment weakens the national, state, and local economies and drives up the rate of recidivism, thus decreasing public safety. Furthermore, through overbroad hiring restrictions, employers needlessly screen out a hard-working segment of their talent pools, as exemplified by the experiences of Amicus Ms. Harrison.

Unfortunately, both parties' briefs are devoid of this real-life context and impact. *See generally* Docs. 92, 95, 100 & 101. Defendants detail the numerous deficiencies in Texas's legal claims,[1] and Texas balks at the notion that *facts* might enter the Court's analysis—even simple ones, like identification of the potentially thousands of jobs and hiring policies impacted by the outcome of this case. *See, e.g.*, Doc. 92 at 3. But justice is not served when laws are assessed in ignorance of the disparate and negative impacts that they have on communities of color, like those of Ms. Harrison, members of the Texas NAACP, and other people of color in Texas. Therefore, Amici offer the following information to assist the Court in fully reckoning with the legal and public policy implications of its decision.

## ARGUMENT

**A. Employment Policies that Categorically Exclude Individuals with Felony and Other Conviction Records Are Devastatingly Counterproductive.**

Barriers to employment for people with records serve none of us well. These individuals form a significant share of the U.S. population: across the country, more than 70 million people—or nearly 1 in 3 adults—have an arrest or conviction record, and 700,000 people re-enter their

---

[1] For purposes of this brief, Amici do not repeat those arguments, instead supplementing them only where additional information might be helpful to the Court.

6

communities following a term of incarceration every year.[2] In Texas, which has one of the highest rates of incarceration *in the world,*[3] nearly 164,000 individuals are behind bars,[4] and over 370,000 people are under community supervision, including parole and probation.[5] In 2015 alone, more than 70,000 people were released from Texas incarceration to rejoin their communities.[6] All told, across the state, more than 13 million people have an arrest or a conviction record.[7] But this already large number is likely to grow, as more than one million Texans are arrested, for the first time, every year.[8] These trends—decades in the making—have landed the most direct blow to Black and Latino communities, largely due to the widely discredited "war on drugs" and the era of mass incarceration.[9] For example, nationally, Black individuals are arrested at a rate that is two times their proportion of the general population,[10] such that, overall, 1 in 3 Black men can expect to go to prison in their lifetime.[11] Moreover, 1 in 87 working-age white men are in prison or jail,

---

[2] Anastasia Christman & Michelle Natividad Rodriguez, Nat'l Emp't Law Project, *Research Supports Fair Chance Policies* 1 & n.1 (Aug. 1, 2016), http://bit.ly/1sk48Nn (citing U.S. Dep't of Justice, Bureau of Justice Statistics, *Survey of State Criminal History Information Systems, 2012*, at 2 (Jan. 2014), http://bit.ly/2m1uC4U).

[3] Peter Wagner & Alison Walsh, Prison Policy Initiative, *States of Incarceration: The Global Context 2016* (June 16, 2016), http://bit.ly/2xiBej8.

[4] E. Ann Carson, U.S. Bureau of Justice Statistics, *Prisoners in 2015*, at 5 (Dec. 2016), http://bit.ly/2fLPkTY.

[5] Tex. Dep't of Criminal Justice, *Statistical Report Fiscal Year 2016* 6, http://bit.ly/2hPaQvo.

[6] Carson, *supra* n.4, at 11.

[7] U.S. Dep't of Justice, Bureau of Justice Statistics, *Survey of State Criminal History Information Systems, 2014*, at 14 (Dec. 2015), http://bit.ly/2y0gyQQ.

[8] Helen Gaebler, *Criminal Records in the Digital Age: A Review of Current Practices and Recommendations for Reform in Texas* 4 (William Wayne Justice Ctr. for Public Interest Law, Univ. of Tex. School of Law, Mar. 2013), http://bit.ly/2y0Awej.

[9] *See, e.g.*, Exec. Office of the President, *Economic Perspectives on Incarceration and the Criminal Justice System* 27-30 (Apr. 2016), http://bit.ly/2y0VMko; Michelle Alexander, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* (The New Press 2010).

[10] *Compare* Fed. Bureau of Investigation, *Crime in the United States, 2015: Overview Table 43* (2016), http://bit.ly/2m0yMf5 (noting 26.6% of 2015 arrests were of Black or African American people), *with* U.S. Census Bureau, *Quickfacts: United States*, http://bit.ly/2m1NMFZ (indicating that 13.3% of the U.S. population was Black or African American in 2015).

[11] The Sentencing Project, *Trends in U.S. Corrections* 5 (June 2017), http://bit.ly/2hRzQSV.

compared with 1 in 36 Hispanic men and 1 in 12 Black men of the same age range.[12] More than 60% of people in prison today are people of color.[13]

Texas is not immune from the race disparities that permeate the criminal justice system: Black Texans constitute 27% of drug arrests and 36% of the state prison and jail population; yet they make up only 11% of the state's adult population.[14] In light of these statistics, employment policies that categorically ban individuals with conviction records from securing jobs harm millions of Texans and disproportionately harm communities and individuals of color.[15]

**1. Policies that Render Employment Unattainable for People with Records Weaken Our Economy.**

Public policies that exclude people with records from employment represent a triple threat to individual workers, employers, and the economy.[16]

At the individual level, the importance of keeping people who have been involved in the criminal justice system connected to the workforce cannot be overstated because the stigma associated with a conviction record—even for minor offenses—is difficult to wash away, particularly in the employment context. For example, studies show that nearly 9 in 10 employers conduct background checks on some or all job candidates.[17] When these background checks reveal a record, the applicant's job prospects plummet: the callback rate for white applicants drops by

---

[12] Bruce Western & Becky Pettit, Pew Charitable Trusts, *Collateral Costs: Incarceration's Effect on Economic Mobility* 4 (2010), http://bit.ly/1YjcAau.

[13] *Id.*

[14] *See, e.g.*, Gaebler, *supra* n.8, at 10.

[15] Plaintiff claims that Defendants support the Guidance merely through the use of national data, *see* Doc. 101 at 3, but Texas-specific data thoroughly evidences the potential disparate impact of the undefined existing and future policies that Texas seeks to uphold.

[16] While Plaintiffs argue that, "[a]s *parens patriae*, Texas may protect the health, welfare, and safety of its citizens," Doc. 101 at 5, its policies do just the opposite. Indeed, Texas's references to its citizens almost exclusively as "felon[s]" dehumanizes them. *See, e.g.*, *id.* at 5-6, 8, 12.

[17] Soc'y for Human Res. Mgmt., *Background Checking—The Use of Criminal Background Checks in Hiring Decisions* 3 (Jul. 19, 2012), http://bit.ly/2mhlrzh. Texas acknowledges this statistic. *See* Doc. 95 at 4 n.5.

half, from 34% to 17%, and by almost two-thirds, from 14% to 5%, for Black candidates.[18] As a result, upwards of 60% of people who have been incarcerated are unemployed one year after release.[19] This is not news in Texas. The Legislature has recognized that job seekers with conviction records receive less than half as many job offers as other applicants.[20]

Even for individuals who are able to find work following release, there is a steep price to be paid, as a history of incarceration operates as a lifelong drag on economic security. Formerly incarcerated men can expect to work nine fewer weeks per year and earn 40% less annually, for an overall loss of $179,000 even before the age of 50.[21] In the year after an incarcerated father is released, family income drops by 15% relative to pre-incarceration levels.[22] In other words, exclusionary employment policies of the sort that Texas champions make a bad problem worse.

Such policies also disadvantage employers, who are left with a smaller pool of qualified workers. An emerging body of research demonstrates that people with records make good employees. One study found that employees with criminal records are less likely to leave voluntarily, generally have a longer tenure, and are no more likely than people without records to be terminated involuntarily.[23] Another study of individuals with a felony record serving in the U.S. military found that they were promoted more quickly and to higher ranks than other enlistees and were no more likely than service members without records to be discharged for negative reasons.[24] Amicus Ms. Harrison's post-conviction employment record, as a dedicated professional for 28

---

[18] Devah Pager, *The Mark of a Criminal Record*, 108 Am. J. Soc. 937, 955-58 (Mar. 2003), http://bit.ly/1vNQBJk.

[19] Joan Petersilia, Nat'l Inst. of Justice, *When Prisoners Return to the Community: Political, Economic, and Social Consequences* 3 (Nov. 2000), http://bit.ly/2sr7gao.

[20] Senfronia Thompson, Judiciary & Civ. Juris. Comm. Rep., *Bill Analysis of H.B. 1188* (2013), http://bit.ly/2ijNbUb.

[21] Western & Pettit, *supra* n.12, at 11-12.

[22] *Id.* at 21.

[23] Dylan Minor, Nicola Persico & Deborah M. Weiss, *Criminal Background and Job Performance? Evidence from America's Largest Employer* 2, 14 (May 1, 2017), http://bit.ly/2vJT5jR.

[24] Jennifer Lundquist, et al., *Does a Criminal Past Predict Worker Performance?* 2 (Dec. 2, 2016) (unpublished manuscript), http://bit.ly/2lloRle.

years with the City of Dallas and thereafter as a home health aide for several years, gives further credence to the conclusion that this research supports.

Moreover, these consequences—which flow directly from policies excluding people with records from employment—accrue and impair economic vitality. Specifically, the stigmatization of people with felony records effectively reduces the annual U.S. gross domestic product by an estimated $78 to $87 billion.[25] Under such policies, taxpayers lose as well. A 2011 study found that putting just 100 formerly incarcerated persons back to work increased their lifetime earnings by $55 million, their income tax contributions by $1.9 million, and government sales tax revenues by $770,000, while saving more than $2 million annually by keeping them out of the justice system.[26] Another study estimated that increasing employment for individuals released from Florida prisons by 50% would save $86 million annually in costs related to future recidivism.[27]

### 2. Policies that Make Employment Unattainable for People with Records Significantly Undermine Public Safety.

Prohibitions against hiring individuals with conviction records, such as those implemented by Texas, do not make communities safer. To the contrary, empirical evidence shows that employment reduces crime.[28] Indeed, research published in 2011 revealed that employment was the *single most important* influence on decreasing recidivism by the formerly incarcerated subjects of the study; two years after release, nearly twice as many employed individuals had avoided

---

[25] Cherrie Bucknor & Alan Barber, Ctr. for Econ. & Policy Research, *The Price We Pay: Economic Costs of Barriers to Employment for Former Prisoners and People Convicted of Felonies* 1 (June 2016), http://bit.ly/2atNJBu (relying on 2014 data).

[26] Econ. League of Greater Phila., *Economic Benefits of Employing Formerly Incarcerated Individuals in Philadelphia* 11-13, 18 (Sept. 2011), http://bit.ly/2m2dei3.

[27] Am. Civil Liberties Union, *Back to Business: How Hiring Formerly Incarcerated Job Seekers Benefits Your Company* 10 (2017), http://bit.ly/2sforzk (citing a study finding that providing job training and employment to previously incarcerated individuals in the State of Washington returned more than $2,600 to taxpayers).

[28] *See, e.g.*, Chrystal S. Yang, *Local Labor Markets and Criminal Recidivism*, 147 J. Pub. Econ. 16 (Dec. 2016), http://bit.ly/2ziISLQ (finding that releasing incarcerated individuals into a local labor market with lower unemployment and higher wages decreased the risk of recidivism).

another interaction with the criminal justice system when compared with their unemployed counterparts.[29]

It also matters—from a public safety perspective—that people with records have access to good-paying jobs because higher wages translate to lower recidivism. One study calculated that the likelihood of re-incarceration was 8% for those earning more than $10 per hour, 16% for those earning less than $7 per hour, and 23% for those who remained unemployed.[30] As such, public safety is not advanced by Texas's exclusionary hiring policies.

### 3. Policies that Make Employment Unattainable for People with Records Are Adopted at the Expense of Communities and Families.

Blanket exclusions of people with felony and other conviction records harm families— men, women, and children—all across the State of Texas. Today, *nearly half* of all children in America have at least one parent with a record, which—on account of the counterproductive policies that Texas trumpets—necessarily means that the damaging impacts of a record touch multiple generations.[31] In the context of one family, an incarcerated parent is devastating. In the aggregate, mass incarceration destabilizes entire communities; more than 120,000 mothers and 1.1 million fathers are behind bars across the United States.[32] When these individuals return to their communities, challenges await and are heightened when state policies push employment out of reach. For example, interviews with family members of formerly incarcerated men revealed that 83% had provided the recently released person with financial support, half described providing

---

[29] Mark T. Berg & Beth M. Huebner, *Reentry and the Ties that Bind: An Examination of Social Ties, Employment, and Recidivism*, 28 Just. Q. 382, 397-98 (Apr. 2011), http://bit.ly/2kirpkj.

[30] Christy Visher, et al., Urban Inst., *Employment after Prison: A Longitudinal Study of Releasees in Three States,* 8 (October 2008), http://urbn.is/2yPIXHN.

[31] Rebecca Vallas, et al., Ctr. for Am. Progress, *Removing Barriers to Opportunity for Parents with Criminal Records and Their Children* 1 (Dec. 2015), http://ampr.gs/2g9hdWF.

[32] Western & Pettit, *supra* n.12, at 18.

this support as "pretty or very hard," and 30% were facing "financial hardships."[33] Policies that erect barriers to employment for people with records take their toll at the very moment when these individuals are seeking to regain their footing.

It bears emphasizing that women in particular are hit hard by the kinds of hiring policies that Texas now promotes. The incarceration of women ballooned by 700% between 1980 and 2014.[34] This trend is compounded by another harsh reality: "women with a prison record are seen as having committed two offenses, one against the law and one against social expectations of how women are supposed to behave."[35] This has been demonstrated empirically, as one experimental study evidenced that nearly 60% of men with a prison record would have been called back for a job interview, whereas only 30% of women *with the same record* would have received such a callback.[36]

In sum, Texas advocates for destructive hiring bans at its own peril. Individuals with employment opportunities are more likely to succeed as thriving, law-abiding, contributing members of their families and communities.[37]

### 4. The Texas Legislature—Aware of the Damage to the Economy, Public Safety, and Families Wrought by Its Policies—Has Begun Taking Steps to Address Employment Barriers for Individuals with Records.

At times, Plaintiff's brief touts, without apology, the "over 300 ways" in which a record can impact a person's "access to the privileges of everyday society." Doc. 95 at 1. But this misreads, or misrepresents, the zeitgeist in Texas.

---

[33] Rebecca L. Naser & Christy A. Visher, *Family Members' Experiences with Incarceration and Reentry*, 7 W. Criminology Rev. 20, 26 (2006), http://bit.ly/2xjaOT2.
[34] The Sentencing Project, *Incarcerated Women and Girls* 1 (Nov. 2015), http://bit.ly/2xXkccx.
[35] Scott H. Decker, et al., Nat'l Inst. of Justice, *Criminal Stigma, Race, Gender, and Employment: An Expanded Assessment of the Consequences of Imprisonment for Employment* 57 (Jan. 2014); http://bit.ly/2w3mVT1.
[36] *Id.*
[37] Le'Ann Duran, et al., The Council of State Gov'ts Justice Ctr., *Integrated Reentry and Employment Strategies: Reducing Recidivism and Promoting Job Readiness* 2 (Sep. 2013), http://bit.ly/2gNND9F.

Indeed, in some respects, Texas has begun to recognize that removing obstacles to employment for people with records is beneficial to the state. For example, in 2013, with the backing of the Texas Association of Business, then-Governor Rick Perry signed into law House Bill 1188, which was passed with near unanimous bipartisan support in the Texas Legislature.[38] The new law encourages employers to hire qualified applicants with records by limiting potential civil liability facing employers based on employee misconduct; the law makes clear that negligent hiring lawsuits cannot be based solely on an employee's conviction history. Furthermore, while Plaintiff emphasizes licensing as an important part of employment in Texas, Doc. 95 at 24-25, the State Legislature amended the Texas Occupations Code nearly two decades ago to require licensing authorities to consider several factors when deciding whether to grant certain occupational licenses to people with conviction histories—many of the same factors contained in the 2012 EEOC Guidance.[39]

## B. Courts Have Long Held that Facially-Neutral Hiring Policies that Exclude Applicants with Conviction or Arrest Records Can Violate Title VII.

Nearly 50 years ago, the Supreme Court in *Griggs v. Duke Power Co.* first acknowledged that disparate impact claims challenging facially-neutral employment policies could succeed under Title VII. 401 U.S. 424 (1971). There, Duke Power Company instituted a facially-neutral policy that required individuals to pass two aptitude tests and have a high school education. *Id.* at 428. Noting that Congress's aim in enacting Title VII was to "achieve equality of employment opportunities and remove barriers" that tended to favor white employees over other employees, the Court held that Title VII allows for both disparate impact and disparate treatment claims. *Id.* at 429-31.

---

[38] H.B. 1188, 85th Leg. (Tex. 2017), http://bit.ly/2hQmwOz; *see also* Maurice Chammah, *Business Association Scores Victories on Criminal Justice Agenda*, Tex. Trib., May 23, 2013, 6:00 AM, http://bit.ly/2wAODUh.
[39] *Compare* Guidance § 6, *with* Tex. Occ. Code §§ 53.022–53.023 (effective Sept. 1, 1999).

Congress later codified disparate impact analysis through the 1991 amendments to the Civil Rights Act of 1964. Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat 1071 (stating that the purposes of the act include "codify[ing] the concepts of 'business necessity' and 'job related' enunciated by the Supreme Court in *Griggs v. Duke Power* Co., 401 U.S. 424 (1971), and in . . . other Supreme Court decisions"). Title VII now expressly protects against employment practices that are facially neutral but have a disparate impact on the basis of race, color, religion, sex, or national origin *unless* the employer can show that the practice or policy is "job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i) (2017). If the employer can show that the practice is job-related and consistent with business necessity, the complainant can nevertheless prevail by demonstrating the availability of a less discriminatory alternative employment practice. 42 U.S.C. § 2000e-2(k)(1)(A)(ii) (2017).

Following *Griggs*, federal courts have held that an employer's race-neutral policy against hiring individuals with a conviction record may violate Title VII under a disparate impact framework. Thus, regardless of the outcome of this litigation, Title VII continues to prohibit any policy that Texas may employ to bar applicants with felony convictions, if such policies have a racially disparate impact and are not job related and consistent with business necessity.

Indeed, more than 40 years ago, the Eighth Circuit in *Green v. Missouri Pacific Railroad* further refined the analysis in *Griggs* by identifying three factors which are relevant to performing a business necessity analysis of the link between a criminal conviction and a particular employment position: (1) the nature and gravity of the offense or conduct; (2) the time that has passed since the offense, conduct, and/or completion of the sentence; and (3) the nature of the job

held or sought. 523 F.2d 1290, 1297 (8th Cir. 1975).[40] The *Green* court performed this analysis in the context of holding that Missouri Pacific Railroad's *absolute bar* on hiring *any* person convicted of a crime other than a minor traffic offense was discriminatory on the basis of race under Title VII. *Id.* at 1298-99. The Guidance reflects the factors listed in *Green. See* Doc. 31 at App 0014.

More recently, in *El v. Southeastern Pennsylvania Transportation Authority (SEPTA)*, the Third Circuit reiterated that hiring policies excluding people with records can violate Title VII if they have a disparate impact on people of color and are not job-related and consistent with business necessity. 479 F.3d 233, 239 (3d Cir. 2007). Although the panel affirmed summary judgment for the employer on grounds of business necessity, it did so only after noting the relevance of the age and nature of the offense and nature of the job, among other things, to a proper business necessity analysis. More specifically, the Third Circuit tailored its previous standard for business necessity from the "minimum qualifications necessary for successful performance of the job in question" to one that allows for a policy that "can distinguish between individual applicants that do and do not pose an unacceptable level of risk." *Id.* at 243, 245. The panel noted that summary judgment might have been properly denied if only the plaintiff had introduced certain additional evidence (such as expert testimony) that might have undermined the defendant's business necessity defense.[41]

---

[40] Prior to *Green*, federal courts recognized that an employer policy that was not "reasonable and related to job necessities" could violate Title VII. *Richardson v. Hotel Corp. of Am.*, 332 F. Supp. 519, 521 (E.D. La. 1971), *aff'd*, 468 F.2d 951 (5th Cir. 1972). In *Richardson*, a Black individual with a prior conviction for theft was hired as a bellman, but was asked to take another position within the company upon discovery of his conviction. *Id.* at 520. Mr. Richardson rejected the offer and was discharged. *Id.* While recognizing that whether such a termination passes Title VII muster depends on the particular job, the court held in favor of the defendant, finding that the evidence presented demonstrated that the hotel rejected individuals with conviction records from positions that were considered "security sensitive," such as a bellman. *Id.* at 521.

[41] Job applicants and employees have increasingly filed challenges to hiring decisions based on background checks. Just this year, in *Little v. Washington Metro Area Transit Authority* (*WMATA*), a federal court certified a class of affected job applicants with respect to plaintiffs' claim that WMATA's criminal background check policy is facially neutral, but has a disparate impact on Black applicants. Mem. & Op., *Little v. Wash. Metro Area Transit Auth. (WMATA)* at 1, 46-47, No. 1:14-cv-01289-RMC (D.D.C. Apr. 18, 2017), ECF No. 186. Similarly, in *Houser v. Pritzker*, a federal court denied a defendant's motion to dismiss and granted the plaintiffs' class certification motion in a challenge to the U.S. Census Bureau's consideration of arrest and conviction records in its hiring process. 28 F.

Thus, federal courts have long applied disparate impact analysis to cases where employers rejected job applicants because of their conviction record. The Eighth and Third Circuits, as well as numerous district courts, have acknowledged that such policies violate Title VII when they have a disparate impact on people of color and are not job related and consistent with business necessity.

## C. The 2012 Guidance Represents a Valid Interpretation of Title VII, and the EEOC Fully Complied with the APA When Adopting It.

Amici agree—for the reasons detailed in Defendants' Summary Judgment Brief—that Texas lacks standing to bring Count II. Doc. 92 at 23-27. But in the event that this Court reaches the merits of that claim, this brief aims to fortify two points: the EEOC's 2012 Guidance constitutes—in the context of this litigation—an interpretive rule, rather than a legislative rule, and the agency's view of Title VII is both reasonable and entitled to deference.

### 1.  The Guidance is an Interpretive Rule Under the APA.

The EEOC satisfied the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, in developing the Guidance. The APA requires notice-and-comment procedures for legislative or substantive rules, Section 553(b), which carry the "force and effect of law." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1200–01 (2015) (citation omitted). However, all other agency actions—including interpretive rules—are not subject to the notice-and-comment process. *See* § 553 (b). Unlike legislative rules, interpretive rules are neither "determinative of issues or rights addressed" nor do they "foreclose alternate courses of action or conclusively affect rights of private parties." *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 908-09 (5th Cir. 1983). Instead, interpretive rules "advise the public of the agency's construction of the statutes and rules

Supp. 3d. 222, 254-55 (S.D.N.Y. 2014); *see also Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403 (5th Cir. 2016) (considering, but granting summary judgment on, pro se plaintiff's claims that defendant's hiring policy related to felony convictions resulted in an improper disparate impact on people of color pursuant to Title VII); *Waldon v. Cincinnati Public Schs.*, 941 F. Supp. 2d 884, 888 (S.D. Ohio 2013) (denying defendants' motion to dismiss a disparate impact case alleging that Black former public school employees were terminated for having been convicted of specified crimes under Ohio law).

16

which it administers." *Perez*, 135 S. Ct. at 1201 (citation omitted). The APA encourages this kind of transparency, as "[i]t would be no favor to the public to discourage the announcement of agencies' interpretations by burdening the interpretive process with cumbersome formalities." *Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165, 167 (7th Cir. 1996).

While the EEOC cannot promulgate legislative rules pursuant to Title VII, the agency can issue interpretive rules pertaining to that statute, which the agency is charged with enforcing. *See, e.g.*, *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 141 (1976); *Townsend v. Benjamin Enters.*, 679 F.3d 41, 53 (2d Cir. 2012) (upholding EEOC's interpretation of Title VII set forth in an enforcement guidance).

Here, the Guidance is clearly an interpretive rule, one that states the EEOC's understanding of how the use of arrest and conviction records in employment decisions may implicate Title VII. *See Perez*, 135 S. Ct. at 1201. For this reason, discussed in more detail below, the Guidance was exempt from notice-and-comment procedures.

In classifying an agency pronouncement, the Fifth Circuit has explained that the "starting point is the agency's characterization of the rule," even though that does not conclusively resolve the issue. *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 596 (5th Cir. 1995). Here, the EEOC has never portrayed the Guidance as a legislative rule and, in the context of the current litigation, the agency has described it as an interpretive rule. Doc. 92 at 28; Doc. 100 at 8, 9; *see Maryland Dep't of Human Res. v. Sullivan*, 738 F. Supp. 555, 561 (D.D.C. 1990) (holding that "program instruction" from the U.S. Department of Health and Human Services was an interpretive rule, in part because it was labeled as "guidance").

Moreover, the Guidance—which emphasizes the importance of the specific facts and context of every employment situation—can hardly be said to establish a "binding norm." *Shalala*,

17

56 F.3d at 596. The Fifth Circuit's decision in *Shalala* is particularly instructive. In that case, the U.S. Food and Drug Administration ("FDA") issued a guidance that listed nine factors for the agency to consider when deciding whether to bring enforcement actions against pharmacies. *Id.* at 597. The court held that the guidance was not a legislative rule subject to notice-and-comment requirements because it still afforded "an opportunity for individualized determinations." *Id.* Because the factors were "broad, general, [and] elastic," they did not remove the agency's discretion in deciding which enforcement actions to bring, or "draw a line in the sand." *Id. at* 601; *see also Maryland,* 738 F. Supp. at 561 (explaining that the agency's rule was interpretive because it did "not implement a rigid set of rules based on a generalized statutory mandate").

The same is true of the Guidance. The very first page of the Guidance states that "[a]n employer's use of an individual's criminal history in making employment decisions *may, in some instances,* violate" Title VII. Doc. 31 at App 0004 (emphasis added). Later, the Guidance explicitly states that the "facts and circumstances" are critical in determining whether an employer's exclusion of applicants with a record is job related and consistent with business necessity. *Id.* at App 0017. The Guidance *twice* reiterates that Title VII does not require an individualized assessment in all circumstances. *Compare id.* at App 0017, App 0021, *with* Doc. 95 at 50 (Texas inaccurately stating that the Guidance requires individualized assessments); *see also* Doc. 100 at 6. Indeed, the purpose of including factual illustrations throughout the Guidance is to demonstrate that the agency's view of how Title VII operates—in the context of hiring applicants with criminal records—turns on the particulars of every case, which is antithetical to drawing lines in the sand. *See Shalala*, 56 F.3d at 601.

That more flexible approach clearly distinguishes this case from scenarios in which an agency's discretionary role has been eliminated. *See, e.g.*, *Cmty. Nutrition Inst. v. Young*, 818 F.2d

18

943, 948 (D.C. Cir. 1987) (explaining that, once a certain level of aflatoxin was established, the FDA had no choice but to detain the food, thereby giving rise to a legislative rule); *Sullivan v. City of Phoenix*, 845 F. Supp. 698, 702 (D. Ariz. 1993) (finding a regulation to be substantive where it set "a binding norm affecting individual rights and obligations, which the agency must apply without discretion . . . in all circumstances").

The Guidance also lacks the force and effect of law. *Perez*, 135 S. Ct. at 1200–01. As noted above, the Guidance only interprets Title VII and "builds on longstanding court decisions and existing guidance documents" that the EEOC issued decades ago. Doc. 31 at App 0004. For precisely this reason, courts have recognized that the agency's work in this arena has attempted to *reflect* existing law, rather than *create* new law. *See SEPTA*, 479 F.3d at 244 ("[T]he EEOC's policy [on criminal records and employment] was rewritten to bring it in line with the *Green* case."); *Guerrero v. Cal. Dep't of Corr. & Rehab.*, 119 F. Supp. 3d 1065, 1079 (N.D. Cal. 2015), *aff'd in part, rev'd in part and remanded,* No. 15-17001, 2017 WL 2963531 (9th Cir. July 12, 2017) ("The EEOC . . . updated its guidelines in 2012 regarding criminal record exclusions, building on the *Green* factors (recency, relevancy, and severity) adopted in 1987 and incorporating recent court decisions and criminological research."); *see also Nason v. Kennebec Cty. CETA*, 646 F.2d 10, 18 (1st Cir. 1981) (holding that U.S. Department of Labor policy pronouncement was an interpretive rule because it did not create a new rule, but rather construed the "practical realities and congressional design" of the statute).

The fact that the Guidance offers a nuanced and context-specific interpretation of Title VII does not compel a different result. An interpretive rule does not become a legislative rule simply because "it supplies crisper and more detailed lines than the authority being interpreted." *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). If that were

the standard, "no rule could pass as an interpretation of a legislative rule unless it were confined to parroting the rule or replacing the original vagueness with another." *Id.*

For all of these reasons and those detailed in Defendants' summary judgment briefing, *see, e.g.*, Doc. 92 at 29, 31-32, the Guidance merely "clarifies, rather than creates, law." *Shalala,* 56 F.3d at 602. Accordingly, the Guidance is an interpretive rule and thus not subject to the APA's notice-and-comment requirements.

### 2. The Guidance Represents a Valid Interpretation of Title VII and Federal Jurisprudence that Merits Deference.

As discussed above, and detailed in Defendants' summary judgment briefing, the Guidance reflects the EEOC's longstanding and reasonable interpretation of Title VII and federal jurisprudence. Doc. 92 at 34-38; *see generally SEPTA,* 479 F.3d 232; *Green,* 523 F.2d 1290. On this point, Amici seek to only underscore for the Court that the EEOC's interpretation of Title VII, as embodied in the Guidance, is entitled to *Skidmore* deference. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see also EEOC v. Com. Office Prod. Co.*, 486 U.S. 107, 115 (1988) ("EEOC's interpretation of Title VII, for which it has primary enforcement responsibility . . . need only be reasonable to be entitled to deference.").

In fact, a recent district court decision concluded that the Guidance was worthy of such deference. In *Guerrero*, the court explained that the Guidance was "entitled to deference because thoroughness is clearly evident in its consideration, its reasoning is valid, and it is consistent with earlier pronouncements." 119 F. Supp. at 1079. Specifically, the court observed that, in addition to incorporating existing legal authorities, the "EEOC held meetings in 2008 and 2011 to specifically address employer policies on criminal history," which bolstered the persuasive power of the Guidance. *Id.*

20

## CONCLUSION

For the foregoing reasons, Amici respectfully request that the Court grant Defendants'

Motion for Summary Judgment and Deny Plaintiff's Motion for Summary Judgment.

Respectfully submitted,

Dated:  October 25, 2017

*s/ Leah C. Aden*
Samuel Spital* (N.Y. Bar No. 4334595)
Leah C. Aden* (N.Y. Bar No. 4555207)
Nana Wilberforce* (D.C. Bar. No. 1025742, Cal. Bar
No. 296436)
NAACP LEGAL DEFENSE & EDUCATIONAL
  FUND, INC.
40 Rector Street, 5th Floor
New York, New York 10006
Telephone:  212.965.2200
Facsimile:  212.226.7592
E-Mail:  sspital@naacpldf.org
          laden@naacpldf.org
          nwilberforce@naacpldf.org

Coty Montag* (D.C. Bar No. 498357, Cal. Bar No.
255703)
NAACP LEGAL DEFENSE & EDUCATIONAL
  FUND, INC.
1444 I Street NW, 10th Floor
Washington, District of Columbia 20005
Telephone:  202.682.1300
Facsimile:  202.682.1312
E-Mail:  cmontag@naacpldf.org

Edward B. Cloutman III (Bar No. 04411000)
CLOUTMAN & CLOUTMAN, L.L.P.
3301 Elm Street
Dallas, Texas 75226
Telephone:  214.939.9222
Facsimile:  214.939.9229
E-Mail:  crawfish11@prodigy.net

Robert H. Stroup* (N.Y. Bar No. 2824712)
Dana Lossia* (N.Y. Bar No. 706482)
LEVY RATNER, P.C.
80 Eighth Avenue
New York, New York 10011
Telephone: 212.627.8100
Facsimile: 212.627.8182
E-Mail: rstroup@levyratner.com
            dlossia@levyratner.com

Beth Avery* (Cal. Bar No. 298232)
NATIONAL EMPLOYMENT LAW PROJECT
2030 Addison Street, Suite 310
Berkeley, California 94704
Telephone: 510.982.5945
Facsimile: 866.665.5705
E-Mail: bavery@nelp.org

*Admitted pro hac vice*

*Counsel for Proposed Amici Curiae*