**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

| | |
|---|---|
| TEXAS,<br><br>   *Plaintiff,*<br><br>v.<br><br>EQUAL EMPLOYMENT OPPOR-<br>TUNITY COMMISSION; VICTORIA<br>A. LIPNIC, in her official capacity as<br>Acting Chair of the Equal Employ-<br>ment Opportunity Commission; and<br>JEFFERSON B. SESSIONS, III, in<br>his official capacity as Attorney Gen-<br>eral of the United States,<br><br>   *Defendants.* | Case No. 5:13-CV-00255-C |

---

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

On October 17, 2017, counsel for the parties appeared before the Court for argument on their cross-motions for summary judgment, filed September 14, 2017. (Dkts. 91, 94.) After considering the arguments of the parties, both orally and in writing, the Court finds as follows:

### I.

### BACKGROUND

Texas filed this lawsuit seeking declaratory and injunctive relief against the Equal Employment Opportunity Commission ("EEOC") and the Attorney General of the United States (who has authority to enforce Title VII against Texas) challenging the EEOC's "Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII" ("Guidance").[1]

---

[1] The Guidance was adopted by the EEOC Commissioners on April 25, 2012. A complete copy of the Guidance was placed into the record by both plaintiff (Dkt. 96 at 4–58) and defendants (Dkt. 93 at 3–57), and also is available online at https://www.eeoc.gov/laws/guidance/arrest_conviction.cfm.

Texas contends that the Guidance interferes with its lawfully-exercised sovereign power to impose categorical bans on hiring felons, and discretionarily reject felons for certain jobs, as dictated by the needs of Texas. Defendants maintain that EEOC is within its bounds in promulgating the Guidance in an effort to enforce the disparate-impact discrimination provisions of Title VII. More specifically, EEOC expresses through the Guidance its conclusion that employment practices or policies that categorically exclude convicted felons as a possibly unlawful disparate-impact practice. The Guidance also contends that Title VII requires employers, like Texas, to conduct what it calls "individualized assessments" of each employment applicant's job application in relation to their criminal history.[2]

Texas's Second Amended Complaint (Dkt. 62) contains two causes of action. Count I is brought under the Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201, 2202. Count I seeks a declaration of Texas's "right to maintain and enforce its laws and policies that absolutely bar convicted felons (or certain categories of convicted felons) from serving . . . [in] any [ ] job the State and its Legislature deem appropriate." (Pl.'s Second Am. Compl. ¶ 43, Dkt. 62.) Count I also seeks to enjoin the Defendants from "enforce[ing] the interpretation of Title VII that appears in [the Guidance]" and from "issu[ing] right-to-sue letters." (*Id.* at ¶ 44.) Count II is brought under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702. Count II asks the Court to hold the Guidance to be unlawful and to set it aside as (1) a substantive rule issued without notice and the opportunity for comment, (2) outside the scope of statutory authority given to the EEOC, and (3) an unreasonable interpretation of Title VII. (*Id.* at ¶¶ 48–50.)

---

[2] Title VII generally requires that an employer must carry the burden of showing that a person's criminal history disqualification is "job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i).

By prior order, the Court dismissed Texas's claims after finding a lack of standing, ripeness, and "final agency action." (Dkt. 36.) On appeal, the United States Court of Appeals for the Fifth Circuit reversed and remanded the case by opinion dated June 27, 2016, with instructions for further proceedings not inconsistent with that opinion. On petition for rehearing, the appellate court withdrew its June 27, 2016 opinion and remanded with instructions for this Court to further consider the case in light of *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S. Ct. 1807 (2016). *See Texas v. EEOC*, 827 F.3d 372, 376 (5th Cir. 2016) (*EEOC I*), *reh'g en banc granted, opinion withdrawn*, 838 F.3d 511 (5th Cir. 2016) (*EEOC II*).

Upon remand, this Court invited the parties to brief "the issues that *Hawkes* may implicate" in this case. (Dkt. 43.) EEOC renewed its motion to dismiss, and the parties submitted supplemental briefing. (Dkts. 47–50.) This Court denied EEOC's renewed motion to dismiss, concluding that "Texas can be considered an 'object' of the challenged Guidance" and that the Guidance may constitute "an increased regulatory burden on Texas as an employer." (Dkt. 52 at 7–8.) The parties now move for summary judgment, in accordance with the Court's order.

## II.

## APPLICABLE LEGAL STANDARDS

### Rule 56—Summary Judgment

Summary judgment is proper when there are no disputes as to any material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The parties agree that the material facts are not in dispute in this matter and both move for summary judgment. The Court finds that the material facts are not in dispute. Therefore, only questions of law remain and summary judgment is appropriate.

**Standing**

Under Article III of the Constitution, the Court has jurisdiction over a claim between a plaintiff and a defendant only if the plaintiff presents an actual case or controversy. *Okpalobi v. Foster*, 244 F.3d 405, 425 (5th Cir. 2001) *(en banc)*. "The many doctrines that have fleshed out that 'actual controversy' requirement—standing, mootness, ripeness, political question, and the like—are 'founded in concern about the proper-and properly limited-role of the courts in a democratic society.'" *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 541–42 (5th Cir. 2008) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)).

"In every federal case, the party bringing the suit must establish standing to prosecute the action. 'In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.'" *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Standing is critically important; as such, it is not subject to waiver. *United States v. Hays*, 515 U.S. 737, 742 (1995). Standing must be considered, even if the parties fail to raise the issue. *Id.* "Although the question of standing is one of degree and is 'not discernible by any precise test,'" *Roark & Hardee LP*, 522 F.3d at 542 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 297 (1979)), the federal courts have established that in order "to meet the Article III standing requirement when a plaintiff is seeking injunctive or declaratory relief, a plaintiff must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." *Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003). "Abstract injury is not enough," but a plaintiff must show that the injury or threat of injury is "both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of L.A. v. Lyons*, 461 U.S. 95, 101–02 (1983). "To obtain equitable relief for past wrongs, a plaintiff must demonstrate either continuing harm or a real and immediate threat of repeated injury in the future." *Bauer*, 341 F.3d at 358.

4

States, like Texas, receive "'special solicitude in the Court's standing analysis'" because they are not "'normal litigants for the purpose of invoking federal jurisdiction.'" *Texas v. United States*, 809 F.3d 134, 152 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016) (*per curiam*) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 518, 520 (2007)). Indeed, "[w]hen a litigant is vested with a procedural right," as a State is under the DJA and APA, "that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Id.* at 150–51 (quoting *Massachusetts*, 549 U.S. at 518).

Moreover, as *parens patriae*, a State may act to protect the health, welfare, and safety of its citizens. *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982). A State "has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general."[3] *Id.* A "helpful indication" of *parens patriae* standing "is whether the injury is one the State, if it could, would likely attempt to address through its sovereign lawmaking powers," *id.*, and when the State alleges an "injury to a sufficiently substantial segment of its population," *id.*

Finally, the Court is to assess standing at the time this lawsuit was filed—November 4, 2013. *Davis v. FEC*, 554 U.S. 724, 734 (2008) ("[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 571 n.4 (1992) (the "longstanding rule [is] that jurisdiction is to be assessed under the facts existing when the complaint is filed"); *Freeport–McMoRan, Inc. v. K N Energy,*

---

[3] *See Halter v. Nebraska*, 205 U.S. 34, 40–41 (1907) ("[A] state possesses all legislative power consistent with a republican form of government; therefore each state, when not thus restrained, and so far as this court is concerned, may, by legislation, provide not only for the health, morals, and safety of its people, but for the common good, as involved in the well-being, peace, happiness, and prosperity of the people."). *See also Texas v. Richards*, 301 S.W.2d 597, 602 (Tex. 1957) ("As a general rule the [police] power is commensurate with, but does not exceed, the duty to provide for the real needs of the people in their health, safety, comfort and convenience . . . .").

5

*Inc.*, 498 U.S. 426, 428 (1991) ("We have consistently held that if jurisdiction exists at the time an action is commenced, such jurisdiction may not be divested by subsequent events."); *Smith v. Sperling*, 354 U.S. 91, 93 (1957) ("the jurisdiction of the Court depends upon the state of things at the time of the action brought, and that after vesting, it cannot be ousted by subsequent events"); *Pederson v. La. State Univ.*, 213 F.3d 858, 870 (5th Cir. 2000) (disapproving the assessment of standing at "the time of trial" versus "the time the suit was filed"). And because the Court must view the conflict at the time the lawsuit is filed, the question on November 4, 2013 is whether "the impact of the administrative action could be said to be felt immediately by those subject to it in conducting their day-to-day affairs." *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967).

## Ripeness

Courts will not grant declaratory judgments unless a lawsuit is ripe for review. *United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000). Ripeness "separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for judicial review." *Id*. When it comes to declaratory relief, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941) (citation omitted). A court is to consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). A case should be dismissed on ripeness grounds when the case is abstract or hypothetical. *Thomas v. Union Carbide Ag. Prods. Co.*, 473 U.S. 568, 580 (1985). However, a case is ripe for review if any remaining questions are purely legal ones. *Id*. at 581. Whether facts are sufficiently immediate to establish an actual controversy is to be evaluated on a case-by-case basis.

*Orix Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 896 (5th Cir. 2000).

**Prudential Standing**

Though neither raised nor briefed by the parties, the Court raises whether Texas has sufficiently asserted prudential standing *sua sponte*. The Supreme Court has "interpreted § 10(a) of the APA to impose a prudential standing requirement in addition to the requirement, imposed by Article III of the Constitution, that a plaintiff has suffered a sufficient injury in fact." *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488 (1998). "For a plaintiff to have prudential standing under the APA, 'the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute . . . in question.'" *Id.* (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152 (1970)). The Supreme Court has stated that the "zone of interests" test "denies a right of review if the plaintiff's interests are . . . marginally related to or inconsistent with the purposes implicit in the statute." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399 (1987). Therefore, the inquiry is whether "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected . . . by the statute." *Ass'n of Data Processing*, 397 U.S. at 153.

**Subject Matter Jurisdiction**

Texas brings forth two causes of action in this matter, one under the DJA, the other under the APA. The Court analyzes subject matter jurisdiction as to each.

### Count I – Declaratory Judgment Act

The Supreme Court has dispelled any "doubts about the compatibility of declaratory-judgment actions with Article III's case-or-controversy requirement." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007). "[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *Id.* at 128–29. The

7

DJA grants federal courts the power "in a case of actual controversy within its jurisdiction . . . [to] declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

The question is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Cas. Co.*, 312 U.S. at 273. One way to establish a "substantial controversy" and "sufficient immediacy" is through a valid "threat of litigation." *Wolfe*, 212 F.3d at 897. "The threat of litigation, if specific and concrete, can indeed establish a controversy upon which declaratory judgment can be based." *Id*. Standing is conferred with a "reasonable apprehension of litigation with defendant," and "point[ing] to conduct by defendant which supports that asserted fear. And in "cases raising issues of federal law or cases in which there are no parallel state proceedings," *Wilton v. Seven Falls Co.*, 515 U.S. 277, 290 (1995), the Court should acknowledge jurisdiction, especially where any remaining questions are purely legal ones, *Thomas*, 473 U.S. at 581. Indeed, a declaratory judgment action is ripe for judicial determination when "an issue presents purely legal questions" and the plaintiff shows "some hardship." *Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 690 (5th Cir. 2000).

Importantly, in a declaratory judgment action, the Fifth Circuit asks whether the defendant has standing to sue the plaintiff:

> [s]ince it is the underlying cause of action of the defendant against the plaintiff that is actually litigated in a declaratory judgment action, a party bringing a declaratory judgment action must have been a proper party had the defendant brought suit on the underlying cause of action.

*Collin Cty., Texas v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 171 (5th Cir. 1990); *see Md. Cas. Co.*, 312 U.S. at 273 ("It is immaterial that

frequently, in the declaratory judgment suit, the positions of the parties in the conventional suit are reversed; the inquiry is the same in either case."); *Sherwin-Williams Co. v. Holmes Cty.*, 343 F.3d 383, 388 (5th Cir. 2003); *St. Paul Ins. Co. v. Trejo*, 39 F.3d 585, 591 (5th Cir. 1994); *Travelers Ins. Co. v. La. Farm Bureau Fed'n, Inc.*, 996 F.2d 774, 776–77 (5th Cir. 1993).

Thus, "in many actions for declaratory judgment, the realistic position of the parties is reversed" and that when "the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, it is the character of the threatened action, and not of the defense, which will determine whether there is federal-question jurisdiction in the District Court." *Pub. Serv. Comm. v. Wycoff Co.*, 344 U.S. 237, 248 (1952).

### Count II – Administrative Procedure Act

The APA allows for claims against a United States government agency seeking relief other than money damages. 5 U.S.C. § 702. Judicial review is authorized under the APA for "final agency action for which there is no other adequate remedy in Court." *Id.* § 704. Generally, if there is no final agency action, a court lacks subject-matter jurisdiction. *Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000).

"[T]his court is guided by the Supreme Court's interpretation of the APA's finality requirement," which is both "'flexible' and 'pragmatic.'" *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011) (quoting *Abbott Labs.*, 387 U.S. at 149–50).

> As a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the 'consummation' of the agency's decisionmaking process, *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow," *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970).

*Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

However, "[e]ven if final, an agency action is reviewable under the APA only if

9

there are no adequate alternatives to APA review in court." *Hawkes*, 136 S. Ct. at 1815 (citing 5 U.S.C. § 704).

**Notice and Comment**

Not all agency publications must be issued through the notice-and-comment process. "Section 4(b)(A) of the APA provides that unless another statute states otherwise, the notice-and-comment requirement 'does not apply' to 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice.'" *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1203–04 (2015) (quoting 5 U.S.C. § 553(b)(A)). On the other hand, agency rules that affect rights and obligations are legislative. *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979). Legislative rules must endure the APA's three-step procedure for notice-and-comment rulemaking as they generally carry the force and effect of law. *Id.* at 302–03.

"The rights, conduct, obligations, and interests affected by legislative, binding rules cover a broad range." *Batterton v. Marshall*, 648 F.2d 694, 702 n.30 (D.C. Cir. 1980). In *Chrysler*, the Supreme Court held that regulations requiring Chrysler and other businesses with government contracts to furnish reports about their affirmative-action programs were legislative rules because they affected the rights of contractors. *Chrysler*, 441 U.S. at 303. The Supreme Court reasoned that the agency could not affect the rights of contractors without complying with the APA. *Id.* And in *Morton v. Ruiz*, the Supreme Court ruled that the agency needed to submit eligibility requirements to APA procedures before denying federal benefits to members of a Native American tribe. 415 U.S. 199, 236 (1974).

Second, "[i]t is a fundamental tenet of administrative law that: 'If a second rule repudiates or is irreconcilable with [a prior legislative rule], the second rule must be an amendment of the first; and, *of course*, an amendment to a legislative rule must itself be legislative.'" *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 235 (D.C. Cir. 1992) (internal quotations omitted) (emphasis added).

As Judge Easterbrook has explained: "When an agency gets out the Dictionary of Newspeak and pronounces that for purposes of its regulation war is peace, it has made a substantive change for which the APA may require procedures." *Homemakers N. Shore, Inc. v. Bowen,* 832 F.2d 408, 412 (7th Cir. 1987). The Fifth Circuit has required notice and comment for regulatory instruments that conflict with existing rules, *Phillips Petroleum Co. v. Johnson*, 22 F.3d 616 (5th Cir. 1994), add conditions to them, *Davidson v. Glickman*, 169 F.3d 996 (5th Cir. 1999), or represent a significant departure from established and consistent agency practice, *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622 (5th Cir. 2001).

Third, an agency rule is legislative "if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2001) (citation omitted). Thus, the Court asks whether the agency publication at issue reads like an edict—whether it "command[s]," "require[s]," "order[s]," or otherwise "dictate[s]." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000).

Lastly, the APA prohibits agencies from issuing rules contrary to the unambiguous intent of Congress. *See, e.g., Chevron U.S.A. v. Nat. Res. Def. Council*, 467 U.S. 837, 843 n.9 (1984) ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."). Thus, the Court analyzes whether the agency action is consistent with the intent of Congress, or otherwise exceeds statutory boundaries.

## III.

## FINDINGS OF FACT

As to the material facts of the case, the Court finds as follows:

**The Guidance**

By a 4 to 1 vote on April 25, 2012, the EEOC Commissioners adopted Enforce-ment Guidance Number 915.002, *Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964* at 3 (Apr. 25, 2012) ("Guidance"). The Guidance did not go through notice and comment and was unseen by the public until its release on April 25, 2012.[4] The Guidance offers "en-forcement guidance" for employers' use of arrest or conviction records. It provides:

> The Commission intends this document for use by employers con-sidering the use of criminal records in their selection and retention pro-cesses; by individuals who suspect that they have been denied jobs or promotions, or have been discharged because of their criminal records; and by EEOC staff who are investigating discrimination charges involv-ing the use of criminal records in employment decisions.

Guidance 3. Thus, by its own terms, the Guidance directs employers to conform hiring practices to EEOC's viewpoint; it directs individuals to file charges of discrimination for alleged violations; and it directs the EEOC to bring enforcement actions upon em-ployers that do not follow the terms of the Guidance.

In pertinent part, the Guidance utilizes national data to express that the use

---

[4] Texas characterizes the Guidance as "regulatory dark matter." *See* Clyde Wayne Crews, Jr., *Mapping Washington's Lawlessness 2016: A Preliminary Inventory of "Regulatory Dark Matter,"* p. 3 (Competi-tive Enterprise Institute 2015) (citation omitted), *available at* https://papers.ssrn.com/sol3/pa-pers.cfm?abstract_id=2733378. (coining the phrase "regulatory dark matter" to refer to the thousands of "agency and presidential memoranda, guidance documents ('nonlegislative' or interpretive rules), notices, bulletins, directives, news releases, letters, and even blog posts [that] may enact policy while flouting the APA's public notice and comment requirements for legislative rules."). Indeed, like the "dark matter and dark energy [that] make up most of the universe," regulatory dark matter "is hard to detect, much less measure." *Id.* EEOC is no stranger to the use of "regulatory dark matter," as it issues fact sheets, *see, e.g.*, EEOC, *Facts About Age Discrimination*, https://www.eeoc.gov/eeoc/publi-cations/age.cfm, policy statements, *see, e.g.*, EEOC, *Policy Statement on Mandatory Binding Arbitra-tion of Employment Discrimination Disputes as a Condition of Employment*, https://www.eeoc.gov/pol-icy/docs/mandarb.html, Q&A documents, *see, e.g.*, EEOC, *Questions and Answers for Small Employers on Employer Liability for Harassment by Supervisors*, https://www.eeoc.gov/policy/docs/harassment-facts.html, and many other documents that do not go through notice and comment. *See, e.g.*, EEOC, *EEOC Publications*, https://www.eeoc.gov/eeoc/publications/index.cfm.

of criminal histories in employment creates an unlawful disparate impact, primarily among African Americans and Hispanics. *Id.* at 1–3. Thus, the Guidance purports to limit the prerogative of employers to categorically exclude felons from employment positions and both "consolidate[s] and update[s] the U.S. Equal Employment Opportunity Commission's guidance documents regarding the use of arrest or conviction records in employment decisions under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq." *Id.* at 1. Moreover, the "Enforcement Guidance builds on longstanding court decisions and policy documents that were issued over twenty years ago." *Id.* at 3. The Guidance is clear that "[a]ll entities covered by Title VII are subject to this analysis," *id.* at 27 n.2, which includes Texas, as it expressly applies to "federal, state, and local governments." *Id.* at 3.

The Court finds that the Guidance reflects the view that hiring policies or practices that categorically exclude convicted felons from employment opportunities create a *per se*, unlawful disparate impact under Title VII. *See id.* at 2 ("the use of a screen that does not include individualized assessment is more likely to violate Title VII"). The Guidance, thus, requires that employers always "provide[] an opportunity to [an] individual [rejected for employment because of a felony conviction] to demonstrate that the exclusion does not properly apply to him," *id.* at 18, and concludes that categorical exclusions for felons are "[n]ot [j]ob [r]elated and [c]onsistent with [b]usiness [n]ecessity," *id.* at 19.

According to the Guidance, there is a "well-established" practice of finding unlawful employment practices where employers categorically refuse to hire felons for certain positions. *Id.* at 3. Thus, if an employer refuses to hire, or even consider, a convicted felon, the Guidance concludes it is the employer's burden to prove that the felony disqualification is "job related for the position in question and consistent with business necessity." *Id.* at 9. As to sovereign employers, the Guidance purports to preempt state and local laws. *Id.* at 24 ("States and local jurisdictions also have laws

and/or regulations that restrict or prohibit the employment of individuals with records of certain criminal conduct. . . . Unlike federal laws or regulations, however, state and local laws or regulations are preempted by Title VII.").

Part and parcel to the Guidance's condemnation of categorical exclusions is its "Individualized Assessment" standard. *Id.* at 18–20. According to the Guidance,

> Individualized assessment generally means that an employer informs the individual that he may be excluded because of past criminal conduct; *provides an opportunity to the individual to demonstrate that the exclusion does not properly apply to him; and considers whether the individual's additional information shows that the policy as applied is not job related and consistent with business necessity.*
>
> The individual's showing may include information that he was not correctly identified in the criminal record, or that the record is otherwise inaccurate. Other relevant individualized evidence includes, for example:
>
> - The facts or circumstances surrounding the offense or conduct;
> - The number of offenses for which the individual was convicted;
> - Older age at the time of conviction, or release from prison;
> - Evidence that the individual performed the same type of work, post conviction, with the same or a different employer, with no known incidents of criminal conduct;
> - The length and consistency of employment history before and after the offense or conduct;
> - Rehabilitation efforts, e.g., education/training;
> - Employment or character references and any other information regarding fitness for the particular position; and
> - Whether the individual is bonded under a federal, state, or local bonding program.
>
> If the individual does not respond to the employer's attempt to gather additional information about his background, the employer may make its employment decision without the information.

*Id.* (footnotes omitted) (emphasis added). The Guidance then provides two hypothetical examples regarding an "individualized assessment," one which concludes that a **"Targeted Exclusion Without Individualized Assessment Is Not Job Related and Consistent with Business Necessity."** *Id.* at 19–20 (emphasis in original).

The Guidance also warns that Defendants will investigate and challenge employers who use felony convictions as "an absolute bar to employment." *Id.* at 11 n.90. And it further cautions that "[a]n employer's evidence of a racially balanced workforce

will not be enough to disprove disparate impact." *Id.* at 10. Therefore, the Guidance binds "EEOC staff" by requiring them to investigate and declare as unlawful employment practices that do not give individualized consideration to job applicants with felony convictions. *Id.* at 3.[5]

The Guidance also substantively provides two "safe harbors" to protect employers from a finding of liability (or referral for enforcement by the United States Attorney General against a State or governmental entity), to wit:

○ Two circumstances in which the Commission believes employers will consistently meet the "job related and consistent with business necessity" defense are as follows:

- The employer validates the criminal conduct exclusion for the position in question in light of the Uniform Guidelines on Employee Selection Procedures (if there is data or analysis about criminal conduct as related to subsequent work performance or behaviors); or

- The employer develops a targeted screen considering at least the nature of the crime, the time elapsed, and the nature of the job (the three factors identified by the court in *Green v. Missouri Pacific Railroad*, 549 F.2d 1158 (8th Cir. 1977)). The employer's policy then provides an opportunity for an individualized assessment for those people identified by the screen, to determine if the policy as applied is job related and consistent with business necessity. (Although Title VII does not require individualized assessment in all circumstances, the use of a screen that does not include individualized assessment is more likely to violate Title VII.).

*Id.* at 2.

Since the Guidance was released on April 25, 2012, Defendants have enforced its terms in federal courts, at times in abusive manners. *See EEOC v. Freeman*, 961 F. Supp. 2d 783, 803 (D. Md. 2013) ("By bringing actions of this nature, the EEOC has placed many employers in the 'Hobson's choice' of ignoring criminal history and credit background, thus exposing themselves to potential liability for criminal and

---

[5] *See, e.g.*, Guidance 8 ("EEOC would find reasonable cause to believe that discrimination occurred."); Guidance 12 ("EEOC would find reasonable cause to believe that his employer violated Title VII."); Guidance 7 ("EEOC concludes that there is reasonable cause to believe that the [employer's] policy" violates the Rule.); Guidance 20 ("EEOC finds reasonable cause to believe that Title VII was violated."); Guidance 21 ("EEOC finds that the policy is" unlawful.).

fraudulent acts committed by employees, on the one hand, or incurring the wrath of the EEOC for having utilized information deemed fundamental by most employers."); *EEOC v. Freeman*, 778 F.3d 463, 468 (4th Cir. 2015) ("I write separately to address my concern with the EEOC's disappointing litigation conduct. The Commission's work of serving 'the public interest' is jeopardized by the kind of missteps that occurred here." (Agee, J., concurring)); *EEOC v. Peoplemark, Inc.*, 732 F.3d 584, 592 (6th Cir. 2013) (affirming sanctions award against EEOC for its abusive, groundless, and frivolous enforcement of the Guidance).

**EEOC Publications Preceding the Guidance**

The Guidance proclaims that it "builds on longstanding court decisions and policy documents that were issued over twenty years ago." Guidance 3. In footnote 15, the Guidance lists the "policy documents" relied upon. Guidance 29 n.15. Listed chronologically, they are:

1) U.S. EQUAL EMP'T OPPORTUNITY COMM'N, EEOC Dec. No. 72-1497 (E.E.O.C. 1972);

2) U.S. EQUAL EMP'T OPPORTUNITY COMM'N, EEOC Dec. No. 74-89 (E.E.O.C. 1974);

3) U.S. EQUAL EMP'T OPPORTUNITY COMM'N, EEOC Dec. No. 78-3 (E.E.O.C. 1977);

4) U.S. EQUAL EMP'T OPPORTUNITY COMM'N, EEOC Dec. No. 78-35 (E.E.O.C. 1978);

5) *Policy Statement on the Issue of Conviction Records Under Title VII of the Civil Rights Act of 1964*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N (Feb. 4, 1987), http://www.eeoc.gov/policy/docs/convict1.html;

6) *EEOC Policy Statement on the Use of Statistics in Charges Involving the Exclusion of Individuals with Conviction Records from Employment*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N (July 29, 1987), http://www.eeoc.gov/policy/docs/convict2.html;

7) *Policy Guidance on the Consideration of Arrest Records in Employment Decisions Under Title VII*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N (Sept. 7, 1990), http://www.eeoc.gov/policy/docs/arrest_records.html;

8) *Compliance Manual Section 15: Race & Color Discrimination*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, § 15-VI.B.2 (April 19, 2006), http://www.eeoc.gov/policy/docs/race-color.pdf.

The substance of these publications is more fully analyzed below. Important to

the dispute in this matter is the policy statement from February 4, 1987.

On February 4, 1987, EEOC issued a "Policy Statement," building upon its preceding adjudicatory decisions. Policy Stmt. of Feb. 4, 1987 at 1–2 nn.1–3. The Policy Statement reveals "[t]he Commission's *revised* business necessity analysis." *Id.* at 2 n.6 (emphasis added). The "revis[ion]" involved the creation of a three-part test to determine whether an employer's decision to not employ someone "as a result of a conviction policy or practice that has an adverse impact on the protected class to which the Charging Party belongs" was justified by business necessity:

1. The nature and gravity of the offense or offenses;
2. The time that has passed since the conviction and/or completion of the sentence; and
3. The nature of the job held or sought.

*Id.* at 1 (footnote omitted). The test "*condenses* the Commission's previous standard for business necessity," *id.* (emphasis added), and it does so based upon *Green v. Missouri Pacific Railroad Co.*, 523 F.2d 1290 (8th Cir. 1975), calling it "the leading Title VII case on the issue of conviction records," *id.* at 2 n.6. As the Court analyzes herein, this February 4, 1987 Policy Statement formed the initial foundation for the Guidance's "Individualized Assessment" standard. Guidance 18–20.

**Texas Law Regarding Felons**

Texas has long maintained laws regarding the allowances of felons in civil society. Because felony convictions are so severe, the consequences are oftentimes permanent. For example, in Texas, felons may not:

- Hold public office, Tex. Elec. Code § 141.001(a)(4);
- Hold positions of honor, trust, or profit. *Ferguson v. Wilcox*, 28 S.W.2d 526, 531 (Tex. 1930);[6]
- Vote until their sentence is "fully discharged" and they are formally re-

---

[6] Beyond being avenues of employment, public offices are "essentially a trust or agency for the benefit of the public. The supreme qualification is unselfish fidelity to duty." *Dickson v. Strickland*, 265 S.W. 1012, 1023 (Tex. 1924).

enfranchised, Tex. Elec. Code § 11.002(a)(4)(A);[7] or

- Serve as a juror (ever), Tex. Gov't Code § 62.102(8).[8]

The public interest of Texas in maintaining such laws has been articulated by the Fifth Circuit.

> [Texas] properly has an interest in excluding from the franchise persons who have manifested a fundamental antipathy to the criminal laws of the state or of the nation by violating those laws sufficiently important to be classed as felonies. As Judge Friendly noted in *Green v. Board of Elections*, 380 F.2d 445 (2d Cir. 1967), *cert. denied*, 389 U.S. 1048, 88 S. Ct. 768, 19 L.Ed.2d 840 (1968), such persons have breached the social contract.

*Shepherd v. Trevino*, 575 F.2d 1110, 1115 (5th Cir. 1978).

In Texas, the permanent legal consequences of a felony conviction are wide-ranging, covering nearly every aspect of law and Texas society, including employment.[9] From education to falconry, herbicides to kickboxing, and midwivery to pawn shops, there is nary an area of civil society in Texas where a criminal past isn't relevant.[10] For example, professional licenses are generally not extended to felons.[11] Nor

---

[7] This serves Texas's interest in limiting franchise to "responsible voters." *Shepherd*, 575 F.2d at 1115.

[8] "The petit jury has occupied a central position in our system of justice." *Batson v. Kentucky*, 476 U.S. 79, 86 (1986). In as much as participating in the administration of justice is considered a right, it is much more. As jurors are regularly charged, "[y]ou now approach the performance of one of the most sacred duties of citizenship, the meting out of justice." *United States v. Foster*, 9 F.R.D. 367, 373 (S.D.N.Y. 1949). Indeed, Texas is just in safeguarding this sacred duty from those that have demonstrated, by their actions, an absence of fidelity to the law. "The government has a legitimate interest in protecting the probity of juries. Excluding convicted felons from jury service is rationally related to achieving that purpose." *United States v. Arce*, 997 F.2d 1123, 1127 (5th Cir. 1993).

[9] The public interest of Texas is reflected in "the right of the legislature to enact reasonable laws having a reasonable relation to that end." *Griswold v. President of United States*, 82 F.2d 922, 924 (5th Cir. 1936). "In the public interest the state may make and enforce regulations reasonably calculated to promote care on the part of all." *Brooks v. Nat'l Bank of Topeka*, 251 F.2d 37, 41 (6th Cir. 1958). *See also Knowles v. Horn*, 3:08-cv-1492, 2010 WL 517591, at *8 (N.D. Tex. Feb. 10, 2010) (discussing "the public interest as conceived by the Texas Legislature").

[10] For the convenience of felons, and others, the Texas State Law Library compiled into a navigable website the more than 300 places in Texas law where a criminal history limits privileges and opportunities. *See* Texas State Law Library, *Restrictions on Convicted Felons in Texas*, https://www.sll.texas.gov/library-resources/collections/restrictions-on-convicted-felons/.

[11] From the licensing of attorneys, Tex. Gov't Code § 82.062, to veterinarians, Tex. Occ. Code § 801.402; 22 TAC § 571.5, to landscape architects, 22 TAC § 3.149, licensed employment is generally not available to felons in Texas. *See* comprehensive list of Texas license restrictions at https://www.sll.texas.gov/library-resources/collections/restrictions-on-convicted-felons/?tag=426. A license, like a job, is a "privilege," not a right, and one that receives a license "enter[s] into a covenant to serve the people of this State with all [their] professional skills and powers." *Lunsford v. Bd. of Nurse Examiners*, 648 S.W.2d

can felons volunteer for certain public services, like assisting the election process, Tex. Elec. Code § 13.031, or providing medical help in the case of a disaster, *see* Tex. Occ. Code § 115.005 ("Volunteer Health Practitioner"). Permits regarding the sale or distribution of alcohol are largely unavailable to felons, Tex. Alco. Bev. Code § 11.46, and if a foreign business or its officers commit felonious conduct, its right to do business in Texas may be withdrawn, Tex. Bus. Orgs. Code § 9.151. Examples are virtually endless. Yet virtually every restriction has a common thread—the reasoned judgment of Texas lawmakers.[12]

Under Texas law, these constraints serve a larger societal good and protect the public as a whole. As one Texas court described matters, "[a]s long as the Legislature does not pass a statute which is inherently or patently discriminatory on its face, it may provide for the exercise of the State's police power as it deems best in the regulation and protection of the welfare, health, peace, temperance and safety of the people of the State." *Morgan v. Texas Alcoholic Beverage Comm'n*, 519 S.W.2d 250, 253 (Tex. Civ. App.—Texarkana 1975, no writ). Thus, from top to bottom, in both employment and non-employment contexts, Texas considers the impact of a felony conviction in nearly every aspect of its civil law. These laws all work together, forming a framework that defines the public interest of the Texas citizenry.

## Texas as an Employer

The Court acknowledges that Texas government employs the most workers in the State—over 300,000.[13] As stated by the Fifth Circuit,

---

391, 395 (Tex. App.—Austin 1983, no writ).

[12] Some restrictions are the products of Texas agencies, acting with rulemaking authority, and publishing regulations in the Texas Administrative Code.

[13] U.S. Census Bureau, *State Government Employment and Payroll Data: March 2015 more information 2015 Annual Survey of Public Employment & Payroll*, http://factfinder.census.gov/bkmk/table/1.0/en/GEP/2015/00A2. The largest private employer in Texas, Wal-Mart, employs approximately half the workers of Texas government. *See, e.g.*, Rachel Gillett, The largest employers in each US state, HOUS. CHRON., June 11, 2017, http://www.chron.com/technology/businessinsider/article/The-largest-employers-in-each-US-state-11211863.php#photo-13070896.

> Texas employs hundreds of thousands of people across various state agencies. Many of these state agencies do not hire convicted felons, felons convicted of particular categories of felonies, or, in some cases, individuals convicted of particular misdemeanors. The sources of these bans stem from both Texas state statutes and longstanding employment policies adopted by the agencies. According to Texas, its agencies apply the hiring bars neutrally "to all job applicants, without regard to their races." Where these exclusions exist, however, Texas applies them categorically and does not undertake an individualized assessment into the nature of the prospective employee's conviction.

*EEOC I*, 827 F.3d at 376. Combining both state and local units, Texas government employs more than 1.6 million.[14] Furthermore, Texas impacts even more jobs through licensing and regulation—an important part of employment.

It is undisputed that Texas possesses the authority and duty to regulate the practice of professions to "shield[ ] the public against the untrustworthy, the incompetent, or the irresponsible." *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring).[15] For example, "[i]f regularly convicted of a felony, an attorney will be struck off the roll as of course, whatever the felony may be, because he is rendered infamous." *Hawker v. People of N.Y.*, 170 U.S. 189, 199 (1898). Therefore, a felony conviction normally stands as a permanent barrier to certain realms of licensed employment. And even licensing restrictions that do not directly relate to a discrete job, like driver's licenses, Tex. Transp. Code §§ 521.307, .342, .348, .3466, or even licenses to carry concealed weapons, Tex. Gov't Code §§ 411.172, .186, .187, .201, may dramatically impact a prospective employee's qualifications for any number of jobs.

Under Texas law, employers have a duty to control their employees, and prior criminal convictions may taint that ability. *See Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983). This is because employees are agents of the employer—their

---

[14] U.S. Census Bureau, *State and Local Government Employment and Payroll Data: March 2015 Annual Survey of Public Employment & Payroll*, http:// factfinder.census.gov/bkmk/table/1.0/en/GEP/ 2015/00A4.

[15] *See also Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975) ("We recognize that the States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions."); *accord Watson v. Maryland*, 218 U.S. 173, 176 (1910).

principal. *See Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 2007) (discussing "an agency relationship such as employer-employee").

Within the law of agency is the duty of loyalty. Loyalty is, indeed, a legitimate concern for a Texas employer. *See Kaup v. Texas Workforce Comm'n*, 456 S.W.3d 289, 297 (Tex. App.—Houston [1st Dist.] 2014, no pet.). And "[i]nherent in any agency relationship is the fiduciary duty owed by the agent to his principal." *Hartford Cas. Ins. Co. v. Walker Cty. Agency, Inc.*, 808 S.W.2d 681, 687 (Tex. App.—Corpus Christi 1991, no writ) (citations omitted). "[T]he agent owes his principal loyalty and good faith, integrity of the strictest kind, fair, honest dealing, and the duty not to conceal matters which might influence his actions to his principal's prejudice." *Hartford*, 808 S.W.2d at 687 (citation omitted). This rule applies whether the employment relationship is contractual or at-will. *See, e.g., Bray v. Squires*, 702 S.W.2d 266 (Tex. App.—Houston [1st Dist.] 1985, no writ).[16]

As urged by Texas, the Court finds that trust is the cornerstone of a successful workplace in Texas.[17] "[G]uaranteeing the fidelity of employees, and persons holding a position of trust, is a form of insurance." *Am. Indem. Co. v. W.C. Munn Co.*, 278 S.W. 956, 957 (Tex. Civ. App.—Galveston 1925, writ ref'd). Texas government employees hold a public trust as they are paid by, and expend, taxpayer monies. *See, e.g., Colo. Cty. v. Staff*, 510 S.W.3d 435, 453 (Tex. 2017) (discussing whether public employers can "investigat[e] and discipline[e] errant employees charged with safekeeping the public trust"). Thus, in Texas, "[i]t is the general rule that municipal contracts in which officers or employees of the city have a personal pecuniary interest

---

[16] To be sure, the duty of loyalty that an employee owes their employer is not "absolute" in all regards in Texas. *See Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 201 (Tex. 2002) (discussing parameters of an employee's duty of loyalty). Nonetheless, it exists and forms an important component of the employer-employee relationship in Texas.

[17] *Cf. G.A. Kelly Plow Co. v. London*, 125 S.W. 974, 979 (Tex. Civ. App. 1910, no writ) ("Every one who seeks and obtains employment in positions of trust and confidence impliedly warrants that he is an honest man, and the employer has the right to expect the possession of that personal integrity that will not lead to disappointment if he relies implicitly upon the honor and fidelity of his employé.").

are void." *City of Edinburg v. Ellis*, 59 S.W.2d 99 (Tex. Comm'n App. 1933, opinion approved); *see* Tex. Loc. Gov't Code §§ 171.002–.004.

Moreover, many governmental employees in Texas, though not *per se* public officials, are nonetheless treated as such under the law. Public official status applies to government workers "who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs" and those holding positions of "such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees." *HBO v. Harrison*, 983 S.W.2d 31, 36 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 85–86 (1966)).

Texas has been an employment-at-will jurisdiction since 1888. *E. Line & Red River R.R. Co. v. Scott*, 10 S.W. 99, 102 (Tex. 1888). The employment-at-will doctrine showcases the inextricable connection of trust and fidelity to employment,[18] and maintaining an employment-at-will policy is an important part of Texas's sovereign ideology and "public interest."

Positions of public trust are ubiquitous in Texas, occupied by both government and non-government employees, and these principles demand that government be an ambassador of trust to the public. While businesses have a need to trust those that

---

[18] The Supreme Court defines the employment-at-will doctrine as "the right of the employee to quit the service of the employer, for whatever reason, is the same as the right of the employer, for whatever reason, to dispense with the services of such employee." *Adair v. United States*, 208 U.S. 161, 174–75 (1908). Employment-at-will is defended as carrying equal benefit to both employers and employees. *See, e.g.*, Richard A. Epstein, *In Defense of the Contract at Will*, 51 U. Chi. L. Rev. 947 (1984). Thus, in employment-at-will, employment continues so long as each party trusts the other. Thus, in Texas, the "pursuit of efficiency in the provision of public services requires that the executive have unfettered freedom to dislodge the untrustworthy or incompetent civil servant." Developments in the Law—Public Employment, *II. The Civil Service and the Statutory Law of Public Employment*, 97 Harv. L. Rev. 1619, 1620 (1984) (citing Congress's first debate, remarks of Representative James Madison of Virginia ("The danger to liberty, the danger of mal-administration, has not yet been found to lie so much in the facility of introducing improper persons into office, as in the difficulty of displacing those who are unworthy of the public trust.")).

they hire and with whom they do business, the law demands that Texas government, and its agents, always be trustworthy. Thus, whether the government is performing its gatekeeping function regarding licensing, collecting child support payments from delinquent parents, or merely repaving a road, Texas government, and her agents/employees, hold special positions of public trust as they serve the public and spend the precious resources of taxpayers.

**Texas's Categorical Felon Hiring Prohibitions**

Because trust and integrity are hallmarks of successful business relationships in Texas, *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962), including the employer-employee relationship, the Texas Legislature, and agencies, regularly consider the risks associated with hiring felons in certain positions, in certain agencies, in certain environments, and the like. Like any circumstance presented to a decision maker, the amount of risk that can or should be tolerated is paramount.

Regarding many jobs, the Texas Legislature adopts a functional "no risk" policy—making them permanently off-limits to felons. Many longstanding hiring policies of Texas impose absolute bans on hiring convicted felons (or in some instances persons convicted of certain categories of felonies).[19] These principles permeate Texas

---

[19] Under Texas law, "[a] person who has been convicted of a felony is disqualified to be an officer" for any law-enforcement agency anywhere in Texas. Tex. Occ. Code § 1701.312(a) ("A person who has been convicted of a felony is disqualified to be an officer, public security officer, telecommunicator, or county jailer, and the [Texas Commission on Law Enforcement] may not issue a license to, and a law enforcement agency may not appoint or employ, the person."). What it means to be a "peace officer" in Texas is significantly broad, covering thirty-five statutory definitions, including "investigators commissioned by the Texas Medical Board" and "investigators employed by the Texas Racing Commission." Tex. Crim. Proc. Code § 2.12. Moreover, Texas's approximately 500 game wardens employed by the Texas Parks and Wildlife Department are "peace officers," and as such, they fall under the same absolute no-felons policy that applies to other law-enforcement officers throughout Texas. *See* 31 TAC § 55.802(1); Tex. Parks & Wild. Code § 11.019; Tex. Occ. Code § 1701.312(a); Tex. Occ. Code §§ 1701.001(3)–(4). Texas owned and run facilities that house the elderly and disabled, *see* Tex. Health & Safety Code § 250.001, are also prohibited from hiring certain felons, *see* Tex. Health & Safety Code § 250.006; 40 TAC § 3.201. Many of these longstanding policies also prohibit assigning felons any form of volunteer status. *See, e.g.*, Tex. Health & Safety Code §§ 250.006, 533.007; 40 TAC § 3.201; Tex. Elec. Code § 13.031; Tex. Occ. Code § 115.005.

law and are also implemented on the local level, especially regarding schools.[20] The Texas Legislature determines, through these many laws, Texas's "public interest" and a desire to *not* expose Texas's most vulnerable citizens to individuals who disobeyed the law in a significant fashion.

Of course, not all employment positions are permanently off-limits to felons. Indeed, as of September 1, 2017, Texas law permits certain convicted criminals to seek orders of nondisclosure of certain criminal history record information.[21] And as the Texas Legislature continually weighs Texas's "business necessity," or "public interest" in the case of sovereign entities, *see Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2518 (2015) ("a business justification—or, in the case of a governmental entity, an analogous public interest"), and the risk associated with certain circumstances, felons may become eligible for any number of jobs in Texas.

Texas commits taxpayer resources to assisting felons in returning to the workforce. As noted by the Guidance, Texas "embraced initiatives and programs that encourage the employment of ex-offenders." Guidance 29–30 n.16. Among other things, the Texas Workforce Commission ("TWC") provides free fidelity bonding services to employers concerned about hiring at-risk job applicants.[22] Additionally, the Reentry

---

[20] The Texas Legislature imposes upon school districts categorical hiring bans regarding certain felons. *See* Tex. Educ. Code § 22.085(a). And though the Texas Legislature prohibits school districts from hiring anyone convicted of certain felonies, because local school districts throughout Texas commit that "[s]chool campuses will maintain a safe and disciplined environment conductive to student learning," *see, e.g.*, Harrold ISD, *Board Policy Manual, Basic District Foundations: Educational Philosophy*, https://pol.tasb.org/Policy/Download/1232?filename=AE(XHIBIT).pdf, school districts maintain their own exclusions on hiring convicted felons to teach or coach their students, *see, e.g.*, Harrold ISD, *Board Policy Manual, Personnel: Employment Requirements and Restrictions – Criminal History and Credit Reports*; Austin ISD, *Board Policy Manual, Employment Practices*, http://pol.tasb.org/Policy/download/1146?filename=DC(REGULATION).pdf.

[21] *See* H.B. 3016, 85th Leg., (Tex. 2017), *available at* http://www.capitol.state.tx.us/BillLookup/History.aspx?LegSess=85R&Bill=HB3016.

[22] *See* TWC, *Fidelity Bonding*, http://www.twc.state.tx.us/jobseekers/fidelity-bonding (last visited Sept. 6, 2017).

24

and Integration Division of Texas's Department of Criminal Justice ("TDCJ") pro-vides "employment readiness training and employment services."[23] These agencies, however, obey and are loyal to the larger objectives of Texas regarding felons. Some limitations imposed by Texas law are permanent, as the trust that felons lose with family, friends, and society is oftentimes never re-earned.[24] In many instances, Texas law reflects the policy judgment that refuses extend faith and trust to those that vio-late the public trust in a felonious fashion.

Beyond statutory requirements, many Texas agencies maintain employment barriers of their own, as dictated by their agency's "business necessity" or "public interest." A review of the policies of some Texas agencies reveal carefully-crafted pol-icies that honor the public trust of governmental employment, and permit each agency to achieve their mission for Texas—all without conducting the Guidance's "in-dividualized assessments" on every hiring decision.

### Texas Health and Human Services Commission

The Texas Department of Aging and Disability Services ("DADS") and Texas Department of Family and Protective Services ("DFPS") are both part of the Texas Health and Human Services Commission ("HHSC"). The evidence submitted shows that DADS supports Texans who are aging or have physical, intellectual, or develop-mental disabilities. Many have profound intellectual disabilities or complex medical needs or serious behavioral issues. Thus, DADS serves the vulnerable in Texas. DFPS works with communities to protect children, the elderly, and the disabled from abuse,

---

[23] *See* TDCJ, *Reentry & Integration Div.*, https://www.tdcj.state.tx.us/divisions/rid/index.html (last vis-ited Aug. 17, 2017).

[24] Felons unquestionably harm civil society. Beyond the costs of their incarceration and rehabilitation, they significantly affect their fellow citizens. By example, the Texas Crime Victims' Compensation Program provided $64 million in financial assistance to Texas crime victims and their families during fiscal year 2017. Press Release, Attorney General of Texas, *AG Paxton: $64 Million Awarded to Texas Crime Victims and Their Families During Fiscal Year 2017* (Oct. 23, 2017), *available at* https://www.texasattorneygeneral.gov/news/releases/ag-paxton-64-million-awarded-to-texas-crime-victims-and-their-families-duri.

neglect, and exploitation. It also protects the health and safety of children in daycare, as well as foster care and other types of 24-hour care.[25]

Even if not required by statute, the evidence shows that DADS applies absolute criminal bars to employment, adopting rules that apply many of the same criminal bars to employment that the Texas Legislature enacted for many kinds of licensed health care providers in the Texas Health and Safety Code Chapter 250. Accordingly, the parts of the DADS Operational Handbook remitted into evidence list crimes that DADS has determined are contraindications to employment. The policies for DFPS, as shown by the evidence submitted, are the same. And the Texas Department of State Health Services ("DSHS"), also part of the HHSC network, maintains discretion to refuse to hire felons. *See* Tex. Health & Safety Code § 533.007.

*Texas Lottery Commission*

The Texas Lottery Commission ("TLC") administers Texas's lottery system. The evidence shows that TLC maintains absolute bars to employing those convicted of a felony within the last ten years. TLC "maintain[s] the public trust by protecting and ensuring the security of its lottery games, systems, drawings and operational facilities," and keeps its employment policies to protect and preserve its core values of integrity and responsibility. Thus, TLC requires ethical behavior by its employees, and applicants that fall within TLC's felony prohibition do not go through "individualized assessments." The Court finds that TLC's felony hiring policies are both deeply linked to related statutes and central to TLC's mission and core values.

*Texas Juvenile Justice Department*

The Texas Juvenile Justice Department ("TJJD") administers correctional programs and institutions for juveniles throughout Texas. The evidence provides demon-

---

[25] *See generally* TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, https://www.dfps.state.tx.us/ (last visited Sept. 14, 2017).

strates that the mission of TJJD is to transform young lives and create safer communities. The portions of the Personnel Policy and Procedure Manual for TJJD provided into evidence show that TJJD applies absolute bars to employment for any applicant convicted of or arrested for certain felonies, regardless of the nature of the position. Moreover, TJJD imposes even more sweeping absolute bars to employment for criminals who want to work in what TJJD calls "correctional series positions," including those not subject to statutory prohibitions. TJJD views rejecting felons for certain positions as critical to fulfilling its mission, and the Court finds that TJJD's hiring restrictions are consistent with Texas's "public interest."

### Texas Parks and Wildlife Department

The Texas Parks and Wildlife Department ("TPWD") manages and conserves the natural and cultural resources of Texas. It does so to provide hunting, fishing and outdoor recreation opportunities for the use and enjoyment of present and future generations. To administer parks and wildlife programs, and secure the safety of park visitors, TPWD employs over 500 game wardens and 155 park police officers.

Even if Texas did not impose a no-felons policy for its game wardens and park police officers, the evidence shows that TPWD nonetheless bars hiring game wardens or park police officers convicted of a felony or Class A misdemeanor. TPWD also imposes prohibitions on hiring game-warden applicants convicted of certain lesser offenses. And for non-"peace officer" positions, TPWD maintains a policy reserving the right to reject applicants for any position with TPWD on the basis that they have been convicted of a felony or other considerations.

### Texas General Land Office

Established by the Republic of Texas in 1836, the Land Commissioner manages Texas's public domain. Because the federal government would not take Texas's land as debt payments, Texas entered the Union owning its public land. Unlike other Gulf jurisdictions, Texas owns its submerged lands – or tidelands – three marine

leagues (about 10.3 miles) into the Gulf of Mexico.[26]

Central to fulfilling GLO's mission is overseeing various veterans' affairs throughout Texas, including those who live in GLO-administered Texas Veterans Homes. These Texas-supported living centers support Texas veterans and, by their very nature, house many elderly, disabled, and otherwise vulnerable individuals. As such, the Texas Legislature guarantees that caretakers have a demonstrated record of integrity by applying absolute criminal bars to employment. *See* Tex. Health & Safety Code § 250.006; 40 TAC § 3.201. The evidence submitted shows that these restrictions are also a longstanding part of GLO's internal policy.

Moreover, the portions of the Employee Handbook of GLO submitted into evidence shows that GLO conducts a criminal background check on all prospective new hires, interns, and volunteers. Felony convictions do not automatically disqualify an applicant from employment, as GLO determines, on a case-by-case basis, whether the individual is qualified for employment. However, GLO only represents in its policies that it "may" consider certain factors required by the Guidance.

### Texas Secretary of State

The Texas Secretary of State ("SOS") is Texas's Chief Election Officer, assisting election officials and ensuring the uniform application and interpretation Texas's election laws. SOS deters and detects voter fraud, as preserving voter confidence in the integrity of elections is critical. SOS also administers and maintains the Texas Election Administration Management System, designed for county officials to maintain accurate and efficient voter registration rolls.[27]

The portions of the Policies and Procedures Manual of SOS remitted into evidence show that SOS aims to provide a crime-free work environment and law-abiding workforce. Due to the sensitive information contained within SOS databases, and to

---

[26] *See generally* TEXAS GENERAL LAND OFFICE, http://www.glo.texas.gov/ (last visited Sept. 14, 2017).

[27] *See generally* TEXAS SECRETARY OF STATE, http://www.sos.state.tx.us/ (last visited Sept. 14, 2017).

maintain the integrity of Texas elections, SOS does not hire employees convicted of a felony or Class A misdemeanor. Even election *volunteers* are disqualified from service if they have a felony conviction. *See* Tex. Elec. Code § 13.031. Based on the nature of the position sought, SOS reserves the right to reject employment applicants convicted of certain lesser offenses.

## Complaint Against the Texas Department of Public Safety

The Texas Department of Public Safety ("DPS") is a law enforcement agency that primarily combats crime and terrorism. Even if not barred by statute, the evidence shows that DPS refuses to hire anyone convicted of any felony or certain misdemeanors. DPS's no-felons policy is materially identical to the across-the-board policy employed by the Federal Bureau of Investigation.

On August 29, 2013, DPS posted an opening for a Customer Service Representative with its Driver's License Division in Austin, Texas. Pls. Appx. 100. The position was open through September 12, 2013. *Id.* On September 11, 2013, William R. Smith, a convicted felon, applied for the position. *Id.* 108–14. He was one of 472 applicants that applied. *Id.* 92.

Mr. Smith applied for the position with DPS online, like all other applicants. *Id.* 108–14. On the application webpage, it is clear that "[f]elony convictions and certain misdemeanor convictions will be cause for immediate rejection." *Id.* 96. The information contained on the website reflects DPS Policy § 15.10.03, which categorically bars from employment with DPS any individual that has "[a] conviction for a felony." *Id.* 116. Moreover, during the online application process, Mr. Smith was asked "Have you ever been convicted of a felony?" Mr. Smith answered "Yes." *Id.* 110.

On September 18, 2013, after the application deadline of September 12, 2013, DPS sent Mr. Smith a letter:

Dear William:

We appreciate your interest in the Customer Service Rep (Contact Center), DLD-Austin position with the Texas Department of Public Safety.

> However, information obtained on your employment application indi-
> cates that you have a felony conviction. As a result, we are unable to
> consider your application at this time.
>
> Sincerely,
>
> Human Resources Department
> Texas Department of Public Safety

*Id.* 107. Thus, as per DPS policy, DPS refused to consider Mr. Smith's application,

rejecting it without using any of the "individualized" factors outlined in the Guidance.

On October 25, 2013, Mr. Smith completed EEOC Form 5, levying a "Charge

of Discrimination" against DPS. *Id.* 90. In it, Mr. Smith stated:

> On September 11, 2013, I applied online for the position of Customer
> Service Representative (Contact Center). Although I met the qualifica-
> tions for the position I was never contacted for an interview nor hired.
> The job application asked if the applicant had a felony conviction and I
> indicated that I had been convicted of a felony for unauthorized use of a
> vehicle.
>
> I believe I have discriminated against because of my race (Black), sex
> (male), and felony conviction, in violation of Title VII of the Civil Rights
> Act of 1964, as amended.

*Id.*

Two days later, on November 1, 2013, EEOC dispatched notice of the complaint

to General Counsel for DPS. *Id.* 89. DPS received the notice on November 4, 2013,

*id.*, and was ordered to respond to the charge by December 2, 2013, *id.* Texas wasted

no time. That same day, on November 4, 2013, Texas brought this suit.

On December 2, 2013, DPS responded to Mr. Smith's Charge of Discrimination.

*Id.* 92–117. In its 26-page response, DPS denied that any violation of Title VII oc-

curred by following its policy categorically prohibiting the hiring of felons. *Id.* 92–93.

DPS advised EEOC that there were 472 applicants for the position in question and

that 29 were granted interviews. *Id.* 92. Moreover, DPS provided a written justifica-

tion for refusing to consider the applications of felons, like Mr. Smith. *Id.* 92–117.

> The employees who staff the contact center are responsible for answer-
> ing the thousands of phone calls received each day regarding driver li-
> censing and related issues. To perform their duties, these employees
> have full access to the Driver License System database which contains
> the personal identifying information (full name, date of birth, addresses,
> social security number, photograph, thumbprint, etc.) of over 29 million

residents of Texas. As the State's primary law enforcement agency, the Department takes great strides to ensure the security of this highly sensitive information. Pursuant to Department policy, an applicant with a felony conviction is not eligible to be considered for employment. . . . Therefore, Mr. Smith's application was screened out of the process.

*Id.* 92–93.

On December 19, 2013, EEOC dispatched a "Dismissal and Notice of Rights" to Mr. Smith, with a copy provided to DPS. *Id.* 91. In accordance with the requirements of 42 U.S.C. § 2000e-5(b), EEOC notified Mr. Smith that, "[b]ased upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge." *Id.* Though not required by Title VII, the EEOC notice provided to Mr. Smith contained a section entitled "Notice of Suit Rights" and advised Mr. Smith that he may bring suit against Texas within 90 days of receiving the notice, if he chose to do so. *Id.* Mr. Smith did not bring suit.

## IV.

## CONCLUSIONS OF LAW

Though the Court previously adjudicated many of the jurisdictional issues urged by Defendants, the Court reanalyzes those issues herein before turning to the merits of Texas's claims.

### A.

### Jurisdictional Issues

The Court concludes that Texas has standing, that the Court has subject matter jurisdiction over the dispute, and that the matter is justiciable.

**Standing**

As both an employer and a sovereign, Texas satisfies Article III standing requirements. The Guidance's condemnation of categorical hiring bars preempts, in fact, the many Texas laws and policies that categorically prohibit the hiring of felons.

Thus, Texas is acting to defend its laws and policies that limit employment opportunities for felons, which the Guidance impugns.

Moreover, Texas is acting to protect its larger public policy regarding the privileges of felons, including laws that do not directly affect employment. The legal consequences for felons in Texas are the collective product of 85 legislatures, showing Texas's efforts to address felonious behavior through its sovereign lawmaking powers. Together, these laws reflect upon Texas not just as an employer, but as a sovereign, extending beyond interactions with government employees.

From an employment standpoint, Texas does more than employ its own workers as it also maintains a licensing function regarding other employees and industries. The inextricable connectivity of Texas law regarding felons leads to inconsistent legal consequences if Texas can enforce its policy in some areas of law, but not others. For example, Texas law does not permit felons to administer estates. *See* Tex. Estates Code § 304.003. Yet, under the Guidance, that same felon may be employable at a bank (*see, e.g.*, Guidance 21) or at TLC in charge of billions of dollars. The policy concerns regarding estates apply with equal force to institutions overseeing others' money and valuables.[28] But the Guidance demands special consideration for felons in employment, turning Texas policy on its head. Therefore, the Court must assess the Guidance's impact on Texas in context, acknowledging that the legal impacts experienced by felons share inextricable bonds throughout Texas law, each informed and affected by the other. The Court recognizes that the conflict inflicted by the Guidance upon Texas law goes beyond Texas's categorical hiring bans. That the Guidance purports to extract from Texas's juridical blueprint certain employment bars removes critical pieces from a greater foundation of Texas law, placing it into peril.

---

[28] *See, e.g.*, *Smith v. Christley*, 684 S.W.2d 158, 160 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) ("The interests of the creditors of the estate, beneficiaries, and other third parties could be adversely affected if a person convicted of a felony were to serve as independent executor. The entire system of efficient settlement and distribution of decedents' estates could be jeopardized.").

Moreover, because Texas law exists to safeguard the rights and safety of its citizens, Texas satisfies *parens patriae* standing. Felons violate the public trust, and limiting their ability to further harm the physical and/or economic security of the citizenry is why Texas law contains over 300 restrictions where felony histories impact the privileges of everyday society. As the overseers of Texas law, the Texas Legislature comprehensively enacts, amends, and otherwise maintains Texas law with each legislative session. Many of the limitations for felons are the considered, reasoned, debated, and enacted product of Texans' elected representatives.

At bottom, Texas demonstrates an injury in fact. Texas is an object of the Guidance, both by its express terms and the extent to which its application threatens Texas's larger governmental operations and ability to protect and secure the health, safety, and welfare of its citizens. And because Texas comes within the "zone of interests" to be protected by the relevant laws, Texas satisfies prudential standing.

**Subject Matter Jurisdiction**

The Court also concludes that it has subject matter jurisdiction over both the DJA and APA causes of action contained in Texas's Second Amended Complaint.

*Count I – Declaratory Judgment Act*

To determine whether the Court has subject matter jurisdiction over Texas's DJA cause of action, the Court asks whether Defendants have standing to sue Texas. Defendants do not disavow this notion, repeatedly stating in its briefing that it has not sued Texas. Importantly, however, Defendants affirm (a) a right to sue Texas under Title VII, and (b) substantive agreement with the Guidance. Indeed, Defendants characterize the Guidance as "eminently reasonable" and "fairly encompassed by Title VII." Thus, even though they have yet to do so, Defendants could sue Texas over its categorical prohibitions regarding the hiring of felons. And if Defendants have standing to challenge whether Texas law is preempted by or compliant with Title VII, Texas's lawsuit is a proper exercise of the Declaratory Judgment Act. *See Sherwin-*

33

*Williams*, 343 F.3d at 388; *Trejo*, 39 F.3d at 591; *Travelers*, 996 F.2d at 776–77; *Collin Cty.*, 915 F.2d at 171.

The *threat* of litigation that sparked this lawsuit was real and imminent. *Lyons*, 461 U.S. at 101–02. Texas need not predict the future with a crystal ball, which makes Defendants' lack of a lawsuit (or counterclaim) to this point irrelevant. At the time the lawsuit was filed on November 4, 2013, many factors collectively demonstrated a reasonable threat of imminent litigation. First, the evidence provided shows that Defendants were enforcing the Guidance against employers that maintained categorical prohibitions on hiring felons. That some of these enforcement efforts were considered by some judges to be abusive cannot be discounted.

Second, a formal complaint was filed against DPS over its categorical hiring ban. In the eyes of Texas, the formal complaint was merely the tip of the iceberg as DPS is not the only Texas agency that has categorical prohibitions on the hiring of felons. Rather, in the mind of Texas, litigation was imminent as Texas was staring down the barrel of countless lawsuits from any number of felons unsettled with their lack of employment opportunities and encouraged by the new direction of the Guidance. With its myriad categorical bans on the hiring of felons sprinkled throughout Texas law and policy, and the fact that Texas employs over 300,000 workers, Texas need not wait to be sued by one or more individuals, the Department of Justice ("DOJ"), 42 U.S.C. § 2000e-5(f)(1), or private attorneys general, *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972), to pursue a declaratory judgment action. Thus, Texas properly sued under the DJA "to avoid a multiplicity of suits in various forums," *Travelers*, 996 F.2d at 777, and is entitled to sue under the DJA "so that the one pertinent issue, which [may] involve[ several individuals] . . . could be resolved consistently in one, rather than multiple, forums." *Id.*

Other factors animated Texas's belief that litigation was imminent and affirmed its right to come to court under the DJA. DOJ assisted EEOC in developing

the Guidance,[29] and Texas was concerned over Defendants' adopted strategy of seeking high-profile cases against major employers to attract attention from the media regarding the Guidance.[30] This confirmed, to Texas, DOJ's commitment to enforce the Guidance in the same manner enforced by EEOC.

Moreover, DOJ's commitment to the Guidance was consistent with statements by the U.S. Attorney General. On April 18, 2011, Attorney General Holder sent a letter to all attorneys general asking that their "collateral consequences" laws impacting felons be reevaluated. In the opinion of General Holder,

> [c]ollateral consequence statutes and policies impose additional burdens on people who have served their sentences, including denial of employment and housing opportunities, without increasing public safety in essential ways. Some of those restrictions, such as the prohibition on gun possession, serve meaningful public safety goals.[31]

Thus, General Holder averred that laws removing employment opportunities from felons do not "increase[e] public safety in essential ways." Only regarding gun possession did General Holder concede the existence of "meaningful public safety goals."

---

[29] At a July 26, 2011 meeting of EEOC regarding arrest and conviction records as hiring barriers, a senior official from DOJ testified and called into question the legitimacy of hiring bans like those in Texas. Amy Solomon, Senior Advisor to the Assistant Attorney General, U.S. Department of Justice, testified. In her written testimony, she criticized some state laws that deny employment opportunities to felons as "antiquated" and "unnecessary." *See* EEOC Meeting to Examine Arrest and Conviction Records as a Hiring Barrier, *Written Testimony for Amy Solomon Senior Advisor to the Assistant Attorney General Office of Justice Programs, U.S. Department of Justice* (July 26, 2011), https://www.eeoc.gov/eeoc/meetings/7-26-11/solomon.cfm#fn34. When asked during her oral testimony whether employers should be banned from asking questions about someone's criminal history, she explained that, based on evidence she's reviewed, that after three to eight years following a felony conviction, that "there are no differences" which would justify an employer's concern with a prospective employee's criminal history. *See* EEOC Meeting to Examine Arrest and Conviction Records as a Hiring Barrier, *Arrest and Conviction Records as a Hiring Barrier* (July 26, 2011) (meeting transcript), http://www.eeoc.gov/eeoc/meetings/7-26-11/transcript.cfm. Ms. Solomon concluded that "we need to share that information very broadly with the field and with employers so that they know the relevance of that information for applicants who have basically been clean from the criminal justice system for a number of years." *Id.*

[30] EEOC, *Performance and Accountability Report* 20 (2011), https://www.eeoc.gov/eeoc/plan/upload/2011par.pdf ("[T]he quantity of systemic lawsuits and their representation on the total docket is expected to continue to steadily increase.").

[31] Letter of U.S. Attorney General Eric H. Holder, Jr. to all Attorneys General, April 18, 2011, https://csgjusticecenter.org/wp-content/uploads/2014/02/Reentry_Council_AG_Letter.pdf.

These circumstances, of course, come against a backdrop of significant antagonism and a plethora of lawsuits between Texas and the Federal Government, particularly the federal administrative state. *See, e.g., Texas v. United States*, 809 F.3d at 163. Indeed, the public record is replete with the many differences that Texas had with the presidential administration in charge when the Guidance was issued, several of which became subjects of litigation. Together, all of these collective facts establish a concrete clash between the parties and whether Texas reasonably perceived a valid threat of litigation on November 4, 2013. Because Texas's suit presents a ripe "case of actual controversy" under the DJA, 28 U.S.C. § 2201(a), the Court has authority to provide Texas with declaratory relief.

### Count II – Administrative Procedure Act

The Court finds that the Guidance represents final agency action. As the Court previously found, the first prong of APA analysis of final agency action is not reasonably contested. The Guidance represents the consummation of the agency decisionmaking process, and Defendants offer no argument to the contrary. The Court reaffirms its prior finding that second prong is met. The Guidance clearly determines rights and obligations, and legal consequences flow from it.

First, the Guidance binds EEOC employees to utilize the Guidance in any investigation relating to the issues encompassed by the Guidance. Second, the Guidance creates two specific "safe harbors" that will purportedly protect an employer, like Texas, from a finding of liability. Both of these legal consequences are more than sufficient to sustain Texas's APA cause of action. However, as articulated by Texas, several other legal consequences that flow from the Guidance.

As previously mentioned by the Court herein, the Guidance's condemnation of categorical hiring bars preempts, in fact, the many Texas laws and policies that categorically prohibit the hiring of felons. Indeed, the Guidance provides no quarter, safe harbor, or approval in any circumstance for any employer to maintain categorical

36

exclusions on the hiring of felons. The legal consequence of the Guidance's preemption of Texas law is irreparable harm.[32]

Moreover, beyond its specific categorical hiring bans, Texas is acting to protect the consistency of and policies behind its larger sovereign scheme regarding the allowances of felons in Texas (including laws that do not directly regard employment). The over 300 legal consequences for felons in Texas law are largely the consistent, collective product of 85 different legislatures and reflect its reasoned judgment regarding Texas's policy aims. The inextricable connectivity of Texas's laws regarding felons means that inconsistent legal consequences may result if Texas can enforce its policy in some areas of law, but not others.

Defendants protest that any form of legal consequence is present, arguing that "the Guidance does not express a conclusion regarding the ultimate validity, under Title VII, of other 'categorical exclusions' used by Texas." The Court disagrees, as the Guidance takes clear aim at categorical hiring exclusions, like those contained in Texas laws and policies. Yet, even if the Guidance did not express an ultimate opinion

---

[32] Sovereigns suffer injury when their duly enacted laws or policies are enjoined or impeded. *See Maryland v. King*, 133 S. Ct. 1, 3 (2012) (citing *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("It also seems to me that any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.")); *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws"); *Nat'l Fed'n of Indep. Bus. v. Perez*, No. 5:16-CV-00066-C, 2016 WL 3766121, at *44 (N.D. Tex. June 27, 2016) (Cummings, J.) ("By forcing state officials . . . to choose between a federal rule or complying with State law, the Rule causes an irreparable injury." (citations omitted)); *Texas v. United States*, 201 F. Supp. 3d 810, 834–35 (N.D. Tex. 2016), *order clarified*, No. 7:16-CV-00054-O, 2016 WL 7852331 (N.D. Tex. Oct. 18, 2016), and *appeal dismissed sub nom. Texas, et al. v. United States et al.* (Oct. 21, 2016) (citations omitted); *Nevada, Texas et al. v. U.S. Dep't of Labor*, 218 F. Supp. 3d 520, 532 (E.D. Tex. 2016) (finding harm to states where "compliance costs" were expended to comply with federal regulation). *Texas v. United States*, 95 F. Supp. 3d 965, 981 (N.D. Tex. 2015) ("[W]henever an enactment of a state's people is enjoined, the state suffers irreparable injury."); *Coalition for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997); *Illinois Dep't of Transp. v. Hinson*, 122 F.3d 370, 372 (7th Cir. 1997) (State has standing where it "complains that a federal regulation will preempt one of the state's laws"); *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989) (agreeing that the State has standing to seek declaratory and injunctive relief "because DOT claims that its rules preempt state consumer protection statutes, [and therefore] the States have suffered injury to their sovereign power to enforce state law").

on the validity of certain categorical felon hiring bans, by merely expressing its opinion as to what it believes the law may be, the Guidance nonetheless represents an actionable legal consequence in the form of a warning.

In *Hawkes*, the Supreme Court discussed its conclusion in *Frozen Food Express v. United States*, 351 U.S. 40 (1956). *Hawkes*, 136 S. Ct. at 1815. In *Frozen Food*, the Supreme Court "considered the finality of an order specifying which commodities the Interstate Commerce Commission *believed* were exempt by statute from regulation, and which it *believed* were not." *Id.* (emphasis added). Though the order in *Frozen Food* "'had no authority except to give notice of how the Commission interpreted' the relevant statute, and 'would have effect only if and when a particular action was brought against a particular carrier,' we held that the order was nonetheless immediately reviewable." *Id.* (quoting *Frozen Food*, 351 U.S. at 44–45). Thus, the Interstate Commerce Commission's order "'warns every carrier, who does not have authority from the Commission to transport those commodities, that it does so at the risk of incurring criminal penalties.'" *Id.* (quoting *Frozen Food*, 351 U.S. at 44). "So too here, while no administrative or criminal proceeding can be brought for failure to conform to the approved [jurisdictional determination] itself, that final agency determination not only deprives respondents of a five-year safe harbor from liability under the Act, but warns that if they discharge pollutants onto their property without obtaining a permit from the Corps, they do so at the risk of significant criminal and civil penalties." *Id.* This analysis is apt to the case *sub judice*.

Here, adopting for the moment Defendants' view that the Guidance is non-binding, and that "no administrative or criminal proceeding can be brought for failure to conform" to the Guidance, the Guidance nonetheless issues a warning. It does so, by its express terms, to "[a]ll entities covered by Title VII," and those entities "are subject to this analysis." Guidance 3 n.2. Therefore, the Guidance lets every employer "covered by Title VII" know that if they do not follow the Guidance's safe harbors, do

not adopt its "individualized assessment" viewpoint, or otherwise maintain categorical felon hiring bans, "they do so at the risk of significant criminal and civil penalties."

The Court recognizes that the Guidance carefully choses its words, *see, e.g.*, Guidance 2 ("*more likely* to violate Title VII" (emphasis added)), and Defendants declare that the Guidance "is not categorical." But Defendants cannot wiggle out of the legal consequences of the Guidance by employing a few adverbs as "[w]hether someone is in fact an object of a regulation is a flexible inquiry rooted in common sense." *Contender Farms LLP v. U.S. Dep't of Agric.*, 779 F.3d 258, 265 (5th Cir. 2015). Were the Guidance able to dodge accountability through using a "likely" here, or a "probably" there, the APA could be rendered functionally meaningless. Indeed, notice and comment will become a thing of the past if agencies can avoid review through using "magic words"[33] and issue interpretive rules that have the consequences of legislative rules, but are never subjected to scrutiny under the APA. This shows the importance of the warning standard articulated in *Frozen Food*, and reaffirmed in *Hawkes*. Rules that avoid notice and comment, and caveat their terms, do not escape APA review. Thus, the mere warning put forth by the Guidance is a "legal consequence" actionable under the APA.

The next legal consequence of the Guidance is seen in its practical expansion of potential plaintiffs that can file Title VII claims against Texas. By taking aim at categorical hiring bans, like the many in Texas, the Guidance extends to every felon what was previously not firmly available to them—a legal cause of action against employers that were previously able to exclude their employment candidacy by virtue of their felony conviction. The complaint filed against DPS in the wake of the Guidance is demonstrative of this fact. In *Hawkes*, the Supreme Court discussed as a "legal

---

[33] *See, e.g., Citizens United v. Fed. Elec. Comm'n*, 558 U.S. 310, 439–40 (2010) (disapproving the use of "magic words" to circumvent liability under election laws); *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 755 (2017) ("a 'magic words' approach would make § 1415(l)'s exhaustion rule too easy to bypass.").

consequence" whether an administrative action affects "the field of potential plaintiffs." In *Hawkes*, the Supreme Court recognized that "a negative [jurisdictional determination] both narrows the field of potential plaintiffs and limits the potential liability a landowner faces for discharging pollutants without a permit." *Hawkes*, 136 S. Ct. at 1814. The Supreme Court concluded that the "narrow[ing]" in *Hawkes* was a "'legal consequence[ ]' satisfying the second *Bennett* prong." *Id*. Here, that the Guidance functionally *increases* the field of potential plaintiffs, while the action in *Hawkes* narrowed the field of potential plaintiffs, is a distinction of no legal consequence. Each circumstance presented more risk to the plaintiff bringing the APA challenge.

Lastly, the Guidance causes a "legal consequence" to Texas through an increased regulatory burden. The Court finds that the fact that DPS was required to assess and defend its categorical felon hiring prohibition in response to the complaint of discrimination is an increased regulatory burden incurred as a direct result of the Guidance. Moreover, that the Guidance demands "individualized assessments" in every circumstance where an employer's hiring policies conflict with the prospective employee's felonious history represents yet another increased burden. In such an instance, the Guidance requires the prospective employer to converse with the applicant about his criminal history and other prospective qualifications for the job, notwithstanding the clear legislative or policy prohibition to their candidacy.

However, "[e]ven if final, an agency action is reviewable under the APA only if there are no adequate alternatives to APA review in court. 5 U.S.C. § 704." *Hawkes*, 136 S. Ct. at 1815. Defendants protest that legal consequences flow from the Guidance as "the text of the Guidance does not demonstrate that the EEOC is imminently likely to request that the Department of Justice initiate an enforcement action with respect to any of Texas's employment practices, much less that the Department of Justice would actually accede to the request." However, "[a]s we have long held, parties need not await enforcement proceedings before challenging final agency action

where such proceedings carry the risk of 'serious criminal and civil penalties.'" *Hawkes*, 136 S. Ct. at 1815. (quoting *Abbott Labs.*, 387 U.S. at 153).

Additionally, Defendants contend that Texas has the reasonable alternative of continuing to conduct business as usual. As stated by Defendants, "Texas has produced no evidence that it has modified its conduct to conform to the EEOC's longstanding understanding of Title VII. Rather, Texas has hired and fired who it has wanted to when it comes to the consideration of felony convictions, fully exercising its sovereign authority." Thus, according to Defendants, Texas "can behave in the way that it believes is right, as it has for decades." But this is the exact same argument made by the federal government in *Hawkes*, to no avail.

In *Hawkes*, "[t]he Corps contend[ed] that respondents have two such alternatives: either discharge fill material without a permit, risking an EPA enforcement action during which they can argue that no permit was required, or apply for a permit and seek judicial review if dissatisfied with the results. Neither alternative is adequate." *Hawkes*, 136 S. Ct. at 1815 (citation omitted). "If respondents discharged fill material without a permit, in the mistaken belief that their property did not contain jurisdictional waters, they would expose themselves to civil penalties of up to $37,500 for each day they violated the Act, to say nothing of potential criminal liability." *Id.* Here, the alternatives proposed by Defendants—keep conducting business as usual, and just await a lawsuit—are equally unacceptable. Texas need not continue enforcing its laws and policies to see if Title VII liability awaits.

Waiting for a lawsuit from a private individual, or the Department of Justice, is not an adequate alternative for Texas. Like the permitting process faced by the landowner in *Hawkes*, the vindication of Texas law and policy against the Guidance will be "arduous, expensive, and long." *Hawkes*, 136 S. Ct. at 1815. Indeed, even if Texas is victorious in a single lawsuit by a single aggrieved employment applicant, it

may do little to remove the threat of liability imposed by the Guidance upon the entirety of Texas's categorical felon barring laws and policies. Were the complaint filed by Mr. Smith against DPS to ripen into an actual lawsuit, a victory by Texas could vindicate DPS policy, or perhaps just DPS policy as applied to the position for which Mr. Smith applied. But it is questionable that a victory by Texas in this hypothetical would resolve the other questions that Texas brings forth in this case regarding the legitimacy of other state laws and policies as applied to several agencies.

Of course, Texas could change its laws and policies to come within the safe harbors provided by the Guidance. But this is also an inadequate alternative. In addition to the increased regulatory and legislative burden associated with such an undertaking, a new liability is created—exposing Texas governmental entities to liability for the risks of employee misconduct that necessarily accompany hiring felons for positions for which they previously did not qualify.[34] There is certainly irony in Texas changing its laws and policies to avoid liability under the Guidance, for if Title VII exists to protect vulnerable members of society, necessarily applying Title VII in the fashion demanded by the Guidance exposes vulnerable Texans to harm from those with a documented history of violating the public trust. Texas, therefore, has no reasonable alternative remedy and may seek relief under the APA.

## B.

## Merits

Having determined that Texas has standing, that the case is ripe for review,

---

[34] *See, e.g.*, *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989); *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1403 (5th Cir. 1996) ("Common sense recommends—and state law demands—that, in the interest of the safety of school children, school officials investigate the criminal histories of prospective school employees. The School Officials' total abdication of this responsibility constitutes a facially inadequate hiring process. . . . [T]he hiring inadequacies alleged here reveal a deliberate indifference to Doe's welfare."), *rev'd en banc*, 113 F.3d 1412 (5th Cir. 1997); *Kitzman-Kelley v. Warner*, 203 F.3d 454, 456 (7th Cir. 2000) (Illinois Department of Children and Family Services can be liable under 42 U.S.C. § 1983 where it "did nothing to investigate [an abusive caretaker's] background").

and that the Court has subject matter jurisdiction over both of Texas's causes of action, the Court now turns to the merits of Texas's claims. The Court concludes that the Guidance violates both the APA and Title VII and analyzes the merits as to both of Texas's causes of action simultaneously.

**Notice and Comment**

EEOC possesses no substantive rulemaking authority. Rather, EEOC may enact only "suitable *procedural* regulations." 42 U.S.C. § 2000e–12(a) (emphasis added). Thus, EEOC may not enact substantive rules. *See EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 257 (1991); *General Elec. Co. v. Gilbert*, 429 U.S. 125, 141 (1976). Indeed, EEOC's primary function is conciliatory—acting as a proverbial mediator. EEOC issues Reasonable Cause Determinations and performs investigations, 42 U.S.C. § 2000e-5(b); 29 C.F.R. § 1601.24. If and when "informal methods" fail, an adjudicatory process begins. 42 U.S.C. § 2000e—5(f)(1).

An agency must provide notice of a proposed rule in the *Federal Register* and afford an opportunity for others to present their views. 5 U.S.C. § 553. Regulatory instruments within the meaning of section 553 are called "legislative" or "substantive" rules to differentiate them from "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice," and are exempted from the notice and comment requirements. *Id.* § 553(b)(A).

Texas contends that the Guidance is unlawful because it imposes legal requirements exceeding the boundaries of "suitable procedural regulations." Defendants argue the Guidance is "an interpretive rule, one that simply provides the EEOC's understanding of Title VII's meaning in a particular context" and, thus, "did not need to be issued through the notice and comment process." In accordance with applicable precedent, the Court concludes that the Guidance is a legislative rule as it: (1) grants rights while also imposing obligations; (2) "consolidate[s] and update[s]" prior agency statements and adjudications, or longstanding agency practice; and (3) it purports to

43

bind the agencies and regulated entities.

The Guidance is unlawful for myriad reasons, not the least of which is EEOC's non-existent substantive rulemaking authority. Here, the Guidance clearly affects the rights and obligations of employers and employees (and prospective employees) across the country. It also purports to substantively alter or "update" the meaning of Title VII, and prior decisions and publications of EEOC interpreting Title VII. Moreover, the Guidance marks just the latest event—not the beginning—of what the Court views as a multi-year effort to revise Title VII by executive fiat. The Guidance binds agency employees and will control agency enforcement actions, and while it is clear that Congress intended to address employment matters with Title VII, there is no evidence of Congressional intent to invade a State's larger, comprehensive legal scheme affecting felons.

Because the Guidance represents a legislative rule, the Court also finds that it exceeds the legislative boundaries of EEOC's rulemaking power. *See, e.g., Am. Fed'n of Gov't Emps., AFL-CIO, Local 3669 v. Shinseki,* 709 F.3d 29 (D.C. Cir. 2013). Congress withheld rulemaking authority from the EEOC, giving it power to enact only "suitable procedural regulations." 42 U.S.C. § 2000e–12(a). But the agency unlawfully circumvented the limits on its power by announcing a substantive interpretation of Title VII, backed by the credible threat of civil prosecution and the issuance of right-to-sue notices to those that complained.

**Substantive Problems with the Guidance**

There are many problems with the Guidance and the extent that it:

(1) Concludes that categorical felon hiring bans *per se* violate Title VII;

(2) Concludes that employers must always conduct "individualized assessments" of felons that are automatically disqualified for certain jobs; and

(3) Purports to articulate the depth and breadth of any particular safe harbors provided by Title VII regarding the hiring and employment of felons.

44

The Guidance is premised "on longstanding court decisions and policy documents that were issued over twenty years ago." Guidance 3. In part, the Guidance relies upon eight "policy documents," but a simple review of these eight "policy documents" against the applicable "court decisions," as well as the text of Title VII, reveals problems. The Court finds that the "policy documents" not only form an inadequate basis for the challenged conclusions within the Guidance, but none of them address the case presented—where felony hiring exclusions are the product of state government and part of a larger, statewide legal scheme that goes beyond employment.

**Comparing the Guidance to Title VII**

EEOC's misunderstanding of the law began long ago with the very decisions and publications it now seeks to consolidate into the Guidance. In looking at disparate impact liability, the Supreme Court is clear that "[t]he touchstone is business necessity." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). In the words of Congress, even if a disparate impact is shown, liability does not exist if "the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i).

Over the years, however, it is clear that Defendants gradually jettisoned from disparate impact analysis the "business necessity" element of the test. As part of EEOC's three-part test, the Guidance focuses on the "nature of the job held or sought" with little, if any, consideration for the "business necessity" or "public interest" of the employer. Rather, the Guidance evaluates an employer's "business necessity" only through the Guidance's "individualized assessments," Guidance 18–20, giving little thought to employment policies that do not provide for individualized considerations, and especially the policies of sovereigns that may reflect only a portion of a larger statutory scheme regarding felons in general. Necessarily, the Guidance's view of disparate impact liability turns Texas's public policy virtue into a vice: because when its agencies apply absolute and categorical exclusions to felons, they never make the sort

45

of race-conscious "individualized assessments" that the Guidance requires. At bottom, the Guidance makes no room for government employers that enact no-risk hiring policies as necessary to the sovereign's "public interest."

Looking chronologically at the eight items enumerated by the Guidance as central to its foundation, plus the Guidance's reliance upon cases of little consequence, the legal errors of the Guidance are easily detected.

### EEOC Dec. No. 72-1497 (1972)

In its first of eight cited publications, EEOC adopts a decision by the Central District of California that "[t]he ability of the individual effectively and efficiently to carry out his assigned duties is, therefore, the *only* justification recognized by the law" for non-employment. U.S. EQUAL EMP'T OPPORTUNITY COMM'N, EEOC Dec. No. 72-1497 (E.E.O.C. 1972) (quoting *Johnson v. Pike Corp. of Am.*, 332 F. Supp. 490, 496 (C.D. Cal. 1971) (emphasis added)). To date, EEOC is the *only* tribunal to quote *Pike*, and for good reason—that narrow standard is not the law. For if it was, felony restrictions may hardly ever be applicable under Title VII. And in the decision, EEOC never sought to assess the needs or concerns of the business at issue. *Id.*

### EEOC Dec. No. 74-89 (1974)

In 1974, EEOC whether a felony conviction was an adverse factor that led to disqualification. U.S. EQUAL EMP'T OPPORTUNITY COMM'N, EEOC Dec. No. 74-89 (E.E.O.C. 1974). However, EEOC analyzed only "the individual's capability to perform the job effectively," and whether the individual's criminal disability "related to job performance or to measuring job capability." *Id.* EEOC did not analyze the employer's larger business structure or needs, and looked only at the qualifications of the particular job at issue. Thus, EEOC concluded that,

> [w]here, however, a disparate impact is found the *sole permissible reason* for discriminating against actual or prospective employees involves the individual's capability to perform the job effectively, that is, the practice must be one which can be shown to be related to job performance or to measuring job capability.

*Id.* (emphasis added).

Supporting what was functionally an "individualized assessment" evaluation, EEOC cited *Griggs*. But in *Griggs*, the Supreme Court analyzed an employer's use of a "general intelligence test" that did not have "a demonstrable relationship" to job performance. 401 U.S. at 431. The employer in *Griggs* concluded that the test "generally would improve the overall quality of the work force." *Id.* But *Griggs* did not mandate "individualized assessments" for all companies and all jobs. The Supreme Court only concluded that Title VII required employment barriers to possess a "manifest relationship to the employment in question." *Id.* at 432.

### EEOC Dec. No. 78-3 (1977)

Next, in 1977, EEOC addressed an employment exclusion based on felony or misdemeanor convictions involving moral turpitude or the use of drugs. U.S. EQUAL EMP'T OPPORTUNITY COMM'N, EEOC Dec. No. 78-3 (E.E.O.C. 1977).[35] Though EEOC mentioned the "business necessity" standard required by *Griggs*, it asked only whether the employer's policy at issue was "related to job performance" and concluded that "there is no evidence that the Charging Party was unable to perform the job," *id.* No evaluation of the employer's "business necessity" was performed.

### EEOC Dec. No. 78-35 (1978)

In 1978, EEOC concluded that an employee's discharge was reasonable given his pattern of criminal behavior and the severity and recentness of his criminal conduct. U.S. EQUAL EMP'T OPPORTUNITY COMM'N, EEOC Dec. No. 78-35 (E.E.O.C. 1978). There was no evidence of disparate impact, so further analysis was not required.[36]

---

[35] EEOC Dec. No. 78-3 largely regarded exclusions for arrests, not convictions. Though the Guidance does address employment exclusions for arrests, Guidance 12–13, Texas does not challenge how Title VII applies to the use of arrest data in employment. As the Supreme Court recognizes, arrest alone may not be dispositive of whether a person has actually committed a crime. *Schware v. Bd. of Bar Examiners*, 353 U.S. 232, 241 (1957) ("[t]he mere fact that a [person] has been arrested has very little, if any, probative value in showing that he has engaged in misconduct").

[36] *See* 42 U.S.C. § 2000e-2(k)(1)(A); *Waldon v. Cincinnati Pub. Sch.*, 89 F. Supp. 3d 944, 949 (S.D. Ohio 2015) (dismissing case where plaintiffs did "not proffer[] evidence showing state-wide disparate impact

However, EEOC still assessed its perception of the employer's "individualized assessment" regarding the individual applicant's criminal past.[37]

Though it ultimately exonerated the employer, EEOC asked whether the "rejection of the individual was reasonable in light of the facts and circumstances and the nature of the job." *Id.* EEOC admonished the employer (and, thus, all employers) that "[t]he rejection of an individual for a specific job because of job related convictions cannot be used as a blanket disqualification for all other jobs within the employer's control." *Id.* n.4. Thus, EEOC transformed the larger "business necessity" standard into a "specific job" analysis and jettisoned the requirement to consider the needs and concerns of the business as a whole.

*EEOC "Policy Statement" (Feb. 4, 1987)*

Nine years later, EEOC issued a "Policy Statement." *Policy Statement on the Issue of Conviction Records Under Title VII of the Civil Rights Act of 1964*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N (Feb. 4, 1987), http://www.eeoc.gov/policy/docs/convict1.html. As previously articulated by the Court, it was within this Policy Statement that EEOC first articulated "[t]he Commission's revised business necessity analysis," *id.* n.6, in the creation of a three-part test:

1. The nature and gravity of the offense or offenses;
2. The time that has passed since the conviction and/or completion of the sentence; and
3. The nature of the job held or sought.

*Id.*

There are several problems with EEOC's test. None of the three prongs address, much less consider, the larger "business necessity" of the employer. Two prongs regard the applicant themselves. The third prong only involves "[t]he nature of the

---

of the background check policy.").

[37] The applicant's history included eight arrests, and at least five convictions, including convictions for rape, assault and battery, and carrying a pistol without a license.

job held or sought." *Id.* Thus, EEOC's test transforms the "business necessity" test of Title VII into an analysis having nothing to do with the employer's "business necessity." EEOC confesses that its test *"condenses* the Commission's previous standard for business necessity." *Id.*

To the Court, this explains why EEOC's test is untethered to *Griggs,* which is not mentioned in the Policy Statement. The three-part test clings to *Green v. Missouri Pacific Railroad Co.,* 523 F.2d 1290 (8th Cir. 1975), calling it "the leading Title VII case on the issue of conviction records." But EEOC's analysis of *Green* is flawed. *Green* did not analyze "[t]he nature of the job held or sought," but whether a denial "rest[ed] upon a tenuous or insubstantial basis." *Green,* 523 F.2d at 1296. The Eighth Circuit did not concern itself with the particulars of the job, but the larger picture—whether an "'overriding business justification'" was behind the policy. *Id.* at 1298 (quoting *United States v. St. Louis-San Francisco Ry. Co.,* 464 F.2d 301, 308 (8th Cir. 1972)).

The Guidance's misconstruction of *Green* shows why it is not significant, as the Guidance proclaims. In the 42 years since *Green,* it has been sparsely cited by other circuits, and the Fifth Circuit has cited *Green* only twice, once during this case, and neither instance in the context for which EEOC claims it stands.[38]

### EEOC "Policy Statement" (July 29, 1987)

EEOC issued its next "Policy Statement" eight months later. *EEOC Policy Statement on the Use of Statistics in Charges Involving the Exclusion of Individuals with Conviction Records from Employment,* U.S. EQUAL EMP'T OPPORTUNITY COMM'N (July 29, 1987), http://www.eeoc.gov/policy/docs/convict2.html. This statement takes a more direct aim at categorical hiring bans, like those in Texas, and provides that "[a]n employer's policy of excluding from employment all persons convicted of any crime is likely to create an adverse impact for Blacks and Hispanics based on national

---

[38] *See EEOC I,* 827 F.3d 372; *Payne v. Travenol Labs., Inc.,* 565 F.2d 895 (5th Cir. 1978).

and regional conviction rate statistics." *Id*. Like the prior Policy Statement that unveiled the three-part test, *Griggs* is absent from the analysis. *Green*, however, is again cited as "the leading Title VII case on the issue of conviction records." *Id*.

### Wards Cove Packing Co. v. Atonio

Two years later, in *Wards Cove Packing Co. v. Atonio*, the Supreme Court retethered "business necessity" to the actual needs of the employer, discussing "'the employer's legitimate [hiring] interest[s].'" 490 U.S. 642, 660 (1989) (quotation omitted). The Supreme Court discussed the matter in terms of "business justification," though explained that "[t]hough we have phrased the query differently in different cases, it is generally well established that at the justification stage of such a disparate-impact case, the dispositive issue is whether a challenged practice serves, in a significant way, the legitimate employment goals of the employer." *Id*. at 659.

### EEOC "Policy Guidance" (Sept. 7, 1990)

The following year, EEOC continued its quest to impose "individualized assessments" as the controlling Title VII standard. *See Policy Guidance on the Consideration of Arrest Records in Employment Decisions Under Title VII*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N (Sept. 7, 1990), http://www.eeoc.gov/policy/docs/arrest_records.html. Here, EEOC addressed the use of arrest records, which are not at issue here. However, significant to the instant case, EEOC employed the Supreme Court's ruling on arrest records in *Schware* as another step towards the Guidance's ultimate condemnation of categorical bars based on convictions. According to EEOC,

> [s]ince business justification rests on issues of job relatedness and credibility, *a blanket exclusion of people with arrest records will almost never withstand scrutiny.*

*Id*. In addition to repeating its three-part test, EEOC provides six hypotheticals, each demanding employers ask whether criminal histories prohibit applicants from "perform[ing] the duties of the position in question," rather than asking the larger question required—the "business necessity" or "business justification" of the employer. *Id*.

*Congress's 1991 Amendment to Title VII*

In 1991, Congress amended Title VII to incorporate the Supreme Court's standard from *Griggs*. Specifically, Congress determined that employers may survive evidence of disparate impact if the basis for any exclusion is "job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i). Thus, Congress reaffirmed the importance of an employer's "business necessity" in considering whether disparate impact liability existed.

Analyzing the text of Title VII shows that the 1991 standard adopted by Congress is broader than EEOC's three-part test. In argument before the Court, counsel for Defendants urges that a proper Title VII analysis involves the employer "showing that the restriction at issue is job-related for the position in question, which necessarily involves a job-by-job kind of inquiry." In the Guidance, this is called an "individualized assessment." But the language of Title VII does not require a "job-by-job kind of inquiry." Rather, what it means for something to be "job related for the position in question and consistent with business necessity" does not necessarily call for a job-by-job analysis in all instances. Defendants' analysis omits that a categorical ban can be "job related for [every] position in question and consistent with business necessity." Defendants' conclusion that Title VII requires, in every instance, an "individualized assessment" or job-by-job analysis, and never makes no room for certain categorical bans, does not fit with the text of Title VII.

*EEOC "Compliance Manual" (April 19, 2006)*

In 2006, EEOC acted again, this time through a "Compliance Manual." *See Compliance Manual Section 15: Race & Color Discrimination*, U.S. EQUAL EMP'T OPPORTUNITY COMM'N, § 15-VI.B.2 (April 19, 2006), http://www.eeoc.gov/policy/docs/race-color.pdf. In it, EEOC maintained fidelity to its three-pronged test, and then took direct aim at felony hiring exclusions, declaring them *per se* unlawful:

A blanket exclusion of persons convicted of any crime thus would not be

51

job-related and consistent with business necessity.

*Id.* (citing *Green*, 523 F.2d at 1298–99).

**Deference**

The Court concludes that the Guidance is afforded no deference because Congress did not delegate to EEOC authority to invade a sovereign's public policy on a significant political and economic issue—governmental felony hiring exclusions that are part of a comprehensive legal scheme that goes beyond employment.

Litigants before the EEOC are not required to pay deference to EEOC regarding its "regulatory dark matter," as litigants are entitled to review *de novo* from EEOC determinations "to protect employers from overzealous enforcement by the EEOC." *Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 474 (1982). Similarly, courts are not required to extend deference to EEOC's non-adjudicatory opinions,[39] and may also decline deference to the adjudications of EEOC.[40] To be sure, the Supreme Court has recognized some deference to EEOC in its views of Title VII. *See Griggs*, 401 U.S. at 434. But deference has limits, especially where an agency's viewpoint is inconsistent with Congressional intent. *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 94–95 (1973). As the Guidance is neither the product of notice-and-comment rulemaking, nor a formal adjudication, it is entitled to only *Skidmore* deference—respect to the extent that it has the power to persuade. *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). "Courts need not defer to an administrative construction of a statute where there are compelling indications that it is wrong." *Espinoza*, 414 U.S. at 94–95 (quotation omitted).

Here, there are indications that the challenged effects of the Guidance are wrong. In over 30 years, only two federal courts have ever cited the Guidance's three-part test for "business necessity." *See El v. Se. Pa. Transp. Auth. (SEPTA)*, 479 F.3d

---

[39] *See, e.g., Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 n.6 (2002).

[40] *See, e.g., Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 643 (2007), overturned due to legislative action (Jan. 29, 2009).

232 (3d Cir. 2007); *Boyd v. Choicepoint, Inc.*, 1:08-CV-01118-TWT, 2010 WL 5691503, at *1 (N.D. Ga. Dec. 16, 2010), report and recommendation adopted, 1:08-CV-1118-TWT, 2011 WL 379162 (N.D. Ga. Feb. 3, 2011). The *SEPTA* court, however, did not cite EEOC's test with approval, concluding that "it does not appear that the EEOC's Guidelines are entitled to great deference." *SEPTA*, 479 F.3d at 244. The *SEPTA* court was asked to conclude that categorical bans on hiring felons *per se* violated Title VII. However, the Third Circuit declined and distanced itself from EEOC's viewpoint. And because the job at issue involved "door-to-door and curb-to-curb transportation service for people with mental and physical disabilities," *id.* at 235, "[t]he public safety concern is of more moment in our case," *id.* at 243. Accordingly, the Third Circuit upheld a categorical employment ban regarding felony that was 40 years old.

Moreover, the Guidance falls short regarding a government employer, like Texas, with policies regarding felons that go beyond employment. "The Commission's guideline may have significance for a wide range of situations, but not for a case such as this where its very premise—[Texas's "business necessity"—is not borne out." *Espinoza*, 414 U.S. at 94.

Though inapplicable here, even if a *Chevron* analysis were appropriate, the Guidance still fails.[41] Significantly, the Rule fails at *Chevron* Step Zero—the threshold inquiry into whether agency deference is warranted in the first place.

Agency deference is unwarranted when a legislative rule exceeds Congress's authority. *Chevron* is a framework for assessing whether federal agencies properly filled "statutory gaps," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000), not an invitation to circumvent legal barriers. The Guidance legislates in an area traditionally regulated by the States—the societal privileges of convicted felons.

---

[41] Since EEOC does not possess substantive rulemaking authority, *Chevron* is arguably inapplicable. But since Texas is nonetheless an object of EEOC's administrative action, the *Chevron* framework can nonetheless be instructive.

Thus, a clear statement of congressional intent—not a *Chevron* ambiguity—is necessary for the Guidance to carry any legal weight.

If Defendants wanted to displace the Texas Legislature's authority and comprehensive scheme regarding convicted felons, a "clear statement" from Congress is necessary. While the legislative history of Title VII reflects Congressional concern over entrenched vestiges of bureaucracy, Congress made no indication to go toe-to-toe with the police powers of the States and their legislative authority to address the privileges of felons. As such, the Guidance may not dislodge the Texas Legislature's authority under the Tenth Amendment, nor the Texas Legislature's enacted, inextricably intertwined laws regarding the opportunities of felons in Texas society.

In *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985), the Supreme Court ruled 5-4 that the Tenth Amendment did not limit Congress's Commerce Clause power to apply the Fair Labor Standards Act's ("FLSA") protections to the States. Reversing an earlier holding that the FLSA "will impermissibly interfere with the integral government functions" of States, *Nat'l League of Cities v. Usery*, 426 U.S. 833, 851 (1976), the Supreme Court reasoned that the "political process" would ensure that "laws that unduly burden the States will not be promulgated." *Garcia*, 469 U.S. at 556.

Because *Garcia* left to the "political process" the States' protection from Congress's exercise of its Commerce Clause powers, the Supreme Court later clarified that courts "must be *absolutely certain* that Congress intended such an exercise" of power before they will uphold it as applied to the States. *Gregory v. Ashcroft*, 501 U.S. 452, 464 (1991) (emphasis added). "'[T]o give the state-displacing weight of federal law to mere congressional *ambiguity* would evade the very procedure for lawmaking on which *Garcia* relied to protect states' interests.'" *Id.* (quoting L. TRIBE, AMERICAN CONSTITUTIONAL LAW § 6-25, at 480 (2d ed. 1988)). To ensure that Congress actually intended to interfere with areas that are traditionally within the States' sovereign

domain, the Tenth Amendment and concerns of federalism require a "clear statement from Congress." *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001); *Bond v. United States*, 134 S. Ct. 2077, 2088–90 (2014); *Gregory*, 501 U.S. at 460, 463. "If Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Gregory*, 501 U.S. at 460 (citation and quotation marks omitted).[42]

To be sure, amendments to the Civil Rights Act brought state and local governments as employers within Title VII. But under no circumstances did Congress express intent to attack a State's comprehensive legal scheme regarding the allowances of those that breach the public trust through felonious behavior. To the contrary, in applying Title VII to state and local governments, Congress expressed concern only for "bureaucratic systems which most directly affect the daily interactions of this Nation's citizens." H.R. Rep. 92-238 (June 2, 1971), 1972 U.S.C.C.A.N. 2137, 2154. Congress was concerned about "widespread perpetuation of past discriminatory practices through de facto segregated job ladders, invalid selection techniques, and stereotyped misconceptions by supervisors regarding minority group capabilities." *Id.* at 2152. Thus, Title VII reflects Congress's concern about discrimination within bureaucratic processes and not the laws that governed the population as a whole.

Accordingly, Congress made no "clear statement" of concern with the larger,

---

[42] The clear-statement doctrine is a common feature of federalism jurisprudence. John F. Manning, *Clear Statement Rules and the Constitution*, 110 COLUM. L. REV. 399, 407 (2010) ("A highly prominent cluster of clear statement rules protects the value of federalism by presuming that, absent a clear statement to the contrary, acts of Congress do not intrude upon the states either by regulating state functions or displacing state law."). For example, the principle mandates that conditions on federal funds directed to the states are "unambiguous[]," *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 17 (1981), "such a state official would clearly understand [them]," *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). "In the context of preemption, the Court long ago held that 'the historic police powers of the States [are] not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress,'" and that with regard to state sovereign immunity, Congress may abrogate "only by making its intention unmistakably clear in the language of the statute." Manning, *supra*, at 407 n.33 (citations omitted) (citations omitted).

democratic state legislative processes that bring about certain disqualifications for all of its citizens—legal schemes well beyond assessing the average employment dispute between a single individual and a single employer. Thus, Title VII does not call into question the reasoned, specific, democratically-produced restrictions of a contemporary state legislature as nothing about the amendments to Title VII express an inherent distrust of the state legislative processes that impact felons.

There can be no argument that the universe of Texas laws establishing the prerogatives of convicted felons is, indeed, reserved to Texas under the Tenth Amendment. To this day, the tapestry of Texas law regarding felons reflects the sovereign differences our union is designed to preserve as Texas continues to perform its role as a laboratory of democracy. Outright felony exclusions or bans were not even discussed by Congress, as state legislative action was clearly beyond its concern. Thus, the Guidance represents an improper federal invasion of Texas's legislative process.

Second, as it pertains to Texas, the Guidance concerns a "major question." Thus, there is no basis upon which to presume that Congress implicitly delegated rulemaking authority to an agency to upset a Texas's legal scheme regarding the privileges of convicted felons. *King v. Burwell*, 135 S. Ct. 2480, 2489–90 (2015). To ask whether *Chevron* deference even applies, the Court necessarily places the cart before the horse. Delegation is antecedent to deference, and "there [is] reason to hesitate before concluding that Congress" delegated authority to a federal agency. *Id.* at 2488–89. The Guidance exceeds Congress's power and encroaches an area traditionally regulated by Texas, thus concerning a "major question."

Extending deference to the Guidance presupposes "that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *King*, 135 S. Ct. at 2488 (quotation omitted). "In extraordinary cases, however, there may be reason to hesitate before concluding that Congress has intended such an implicit delegation." *Id.* As then-Judge Breyer noted in an influential article, the

notion that Congress intended to delegate the law-interpreting function to adminis-
trative agencies is a legal fiction. Stephen P. Breyer, *Judicial Review of Questions of
Law and Policy*, 38 ADMIN. L. REV. 363, 370 (1986). Courts look to "practical features
of the particular circumstance to determine whether it makes sense" to presume a
congressional intent for agency deference. *Id.* (quotation omitted). The nature of the
question at issue was a relevant inquiry. Judge Breyer explained:

> Is the particular question one that the agency or the court is more likely
> to answer correctly? Does the question, for example, concern common
> law or constitutional law, or does it concern matters of agency admin-
> istration? A court may also ask whether the legal question is an im-
> portant one. Congress is more likely to have focused upon, and answered
> major questions, while leaving interstitial matters to answer themselves
> in the course of the statute's daily administration.

*Id.*

Since Judge Breyer's article, the Supreme Court has recognized the "major
question" exception. In *King*, for example, the Supreme Court declined to extend def-
erence because the legal question at issue was one of "deep economic and political
significance that is central to this statutory scheme; had Congress wished to assign
that question to an agency, it surely would have done so expressly." *King*, 135 S. Ct.
at 2489 (internal quotations omitted).[43]

Congress delegated to Defendants some enforcement authority regarding Title
VII. However, that delegation was not plenary authority regarding all sovereign mat-
ters that may happen to intersect with Title VII. It is difficult to conclude that Con-
gress deferred this deeply significant issue—a State's larger comprehensive statutory
scheme regarding convicted felons—to an independent federal agency with "no exper-
tise in crafting [state-specific rules] of this sort," *King*, 135 S. Ct. at 2489. While De-
fendants have historic expertise in mediating and litigating employment disputes,

---

[43] *See also Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2444 (2014) ("When an agency claims to
discover in a long-extant statute an unheralded power to regulate a significant portion of the American
economy, we typically greet its announcement with a measure of skepticism. We expect Congress to
speak clearly if it wishes to assign to an agency decisions of vast economic and political significance."
(internal citations and quotations omitted)).

Defendants are not competent to run Texas or speak to the comprehensive privileges of felons in Texas. Defendants have no comprehension of Texas's legal scheme, containing over 300 legal consequences for felons, how long the felony restrictions have been in place, why the Texas Legislature implemented such restrictions, or the delicate balance that each restriction strikes with others.

This is why any presumption of delegation diminishes significantly when the precise question has "its own unique political history" and already implicates "a distinct regulatory scheme." *Brown & Williamson*, 520 U.S. at 159. Before EEOC or Title VII even existed, the Republic of Texas was legislating the allotments of felons. *See, e.g.*, Tex. Const. art. VI, § 1 cmt. In the 181 years since Texas's original constitution and today, the Texas Legislature and its agencies have enacted hundreds of limitations and restrictions for felons, all of which are part of and essential to Texas's "business necessity" and "public interest."

Congress was certainly aware of the "unique" history of State restrictions and limitations upon felons, including the longstanding impact that being a felon has upon an individual's prospects for employment, irrespective of their race. Congress was equally cognizant of the State's "regulatory scheme[s]" governing the limitations that result from felonious conduct. And yet there is no evidence that Congress intended to upset the States' larger legal schemes regarding the privileges of felons in civil society. Thus, the Court has no basis to extend deference to the Guidance.

**Analysis Under Title VII**

In a declaratory judgment context, the Court views the case as if Defendants brought suit against Texas challenging Texas's categorical felon hiring exclusions. Under Title VII, Defendants must first demonstrate the existence of a disparate impact. 42 U.S.C. §§ 2000e-2(k)(1)(A). The data provided by Defendants fails in three significant ways. First, the Guidance uses "national data," which is neither regional nor specific to Texas. Guidance 1, 3. As the Fifth Circuit explained, "comparison with

58

general population statistics is of questionable value when we are considering positions for which, as here, the general population is not presumptively qualified." *Hester v. S. Ry. Co.*, 497 F.2d 1374, 1379 (5th Cir. 1974).[44]

Second, the data cited in the Guidance is eleven years old, and Defendants offered no new data into evidence. Necessarily, this undermines its reliability as applied to Texas, as courts are not "obliged to assume that plaintiffs' statistical evidence is reliable." *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 996 (1988).

Third, the statistics cited by the Guidance largely regard incarceration demographics, and not disparate impacts in employment. Guidance 3, 9–10. The Guidance concludes that the national incarceration data "supports a finding that criminal record exclusions have a disparate impact based on race and national origin." *Id.* at 10. But the existence of disparate impact in Texas governmental employment cannot be divined from national incarceration data. Thus, the Court is unable to make the statistical leap that the Guidance demands.

The Guidance commits to "assess[ing] relevant evidence when making a determination of disparate impact, including applicant flow information maintained pursuant to the Uniform Guidelines on Employee Selection Procedures, workforce data, criminal history background check data, demographic availability statistics, incarceration/conviction data, and/or relevant labor market statistics." Guidance 10. But this begs the question. If Defendants do not possess the evidence needed to evaluate claims of disparate impact, upon what basis does the Guideance stand to drag into the shadows of Title VII categorical felon hiring bans, like those in Texas? None,

---

[44] *See also Payne v. Travenol Labs., Inc.*, 673 F.2d 798, 819 (5th Cir. 1982) (analyzing "work-force statistics" for the employer in question); *Patterson v. Am. Tobacco Co.*, 535 F.2d 257, 275 (4th Cir. 1976) ("Those percentages [for the Richmond Standard Metropolitan Statistical Area] furnish a more realistic measure of the company's conduct than the gross percentage of blacks and women in the whole workforce, including unskilled labor."); *Dowdell v. Dun & Bradstreet, Inc.*, CA76-H-189-S, 1977 WL 883, at *8 (N.D. Ala. Aug. 4, 1977) (analyzing statistical evidence from the "Birmingham Standard Metropolitan Statistical Area.").

clearly. Therefore, because Defendants provide no credible evidence of disparate impact upon which the Court can rely, the analysis need go no further.

However, were the Court to accept the national data and statistics provided within the Guidance as demonstrating a disparate impact regarding Texas's categorical felon hiring bars, Texas's laws and policies still survive Title VII scrutiny. Under Title VII, where a disparate impact is shown, the burden then shifts to the employer to demonstrate that the employment practice at issue is "job related for the position in question and consistent with business necessity." *See* 42 U.S.C. §§ 2000e-2(k)(1)(A)(i). In the case of Texas, it must show that its categorical felon hiring exclusions are "job related for the position[s] in question and consistent with [Texas's public interest]." *See Texas Dep't of Hous. & Cmty. Affairs*, 135 S. Ct. at 2518.

Texas urges that it satisfies any such burden by virtue of its categorical felons hiring bars being largely the product of its legislature. The Court agrees. When such prohibitions are the product of a fair and representative legislative assembly, and part of a larger, longstanding legislative scheme regarding the best interests and "public interest" of the Texas citizenry, legislatively-enacted felon-hiring bans should be presumed as job related and consistent with public interest. Indeed, "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (citations omitted); *see also Burlington N. & Santa Fe Ry. Co. v. Poole Chemical Co.*, 419 F.3d 355, 361 (5th Cir. 2005) (citing *Enron Corp. v. Spring Indep. Sch. Dist.*, 922 S.W. 2d 931, 934 (Tex. 1996)). And while the "business necessity" or "public interest" query can be factually intensive in some cases, when it comes to assessing the tailored restrictions by a sovereign, felons (and others) that protest the legislature's expression of the public interest should be required to rebut the presumptively lawful enactment. Thus, as

Texas's felon hiring bars are largely the product of the legislature, the legal presumption of their validity, *see Cleburne*, 473 U.S. at 440, more than satisfies any burden Texas has "to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2. That DOJ offers nothing to rebut this presumption, or Texas's evidence, completes any factual query required by Title VII, and the Court may adjudicate the controversy. Texas's no-risk employment policies apply where the public trust and welfare of Texans is at its height and should be presumed essential to Texas's "public interest."

Defendants contest that any presumption should be extended and argue that Texas lacks "evidence that any of the handful of felony conviction-related hiring practices that it has identified accurately distinguish between applicants who pose an unacceptable risk and those who do not." In response, Texas contends that the "public interest" supporting Texas's hiring bars is self-evident. The Court agrees. Indeed, it strains credibility to conclude that Congress intended Title VII to require Texas to waste valuable taxpayer resources in conducting "individualized assessments" of felons as peace officers, elementary school teachers, elderly caretakers, and other positions of significant public trust. Though Texas urges the point *ad nauseam*, Defendants refuse to confess as *per se* reasonable, and clearly within Texas's "public interest," that "[a] person who has been convicted of a felony is disqualified to be an officer" for any law-enforcement agency anywhere in Texas. *See* Tex. Occ. Code § 1701.312(a). Does Title VII truly demand that Texas must provide evidence in every instance and "essential facts" for the proposition that felons should not be carrying guns and charged with combating crime and terrorism, among other things? It does not. Because the propriety of the bar is self-evident, any evidentiary obligation Title VII places upon Texas in such an instance is satisfied, thus shifting the burden to Defendants to show an "alternative employment practice." But Defendants bring forth no evidence in this regard.

Defendants contest this presumption, arguing that in *Dothard v. Rawlinson*, 433 U.S. 321 (1977), the Supreme Court explained that "Congress expressly indicated the intent that the same Title VII principles be applied to governmental and private employers alike." The Court finds, however, that *Dothard* was very narrow. In *Dothard*, the underlying lawsuit did not challenge Alabama law as a whole, but was brought against only the Alabama Department of Public Safety and Board of Corrections, and officials within those agencies. *Mieth v. Dothard*, 418 F. Supp. 1169, 1172 (M.D. Ala. 1976), *aff'd in part, rev'd in part sub nom.*, *Dothard v. Rawlinson*, 433 U.S. 321 (1977). Moreover, in *Dothard*, the Supreme Court addressed discrimination on the basis of "sex"—an immutable characteristic—based on certain height and weight qualifications in Alabama law. However, the statutory height and weight qualifications at issue in *Dothard*, on their face, functionally excluded women from the particular job at issue and only extended to a single employment question. The statute in *Dothard*, unlike pervasive laws regarding felons, had no provenance in Alabama law beyond the question answered by the Supreme Court. *Mieth*, 418 F. Supp. at 1177–78 (quoting the law at issue). Moreover, the height and weight of an individual has never been adjudicated to be an absolute virtue or liability regarding the public trust. Thus, a far greater question is presented regarding the privileges or opportunities that Texas must extend to "persons who have manifested a fundamental antipathy to the criminal laws of the state or of the nation by violating those laws sufficiently important to be classed as felonies." *Shepherd v. Trevino*, 575 F.2d 1110, 1115 (5th Cir. 1978). Thus, *Dothard* does not control the questions before the Court.

Of course, not every felon hiring prohibition at issue is of the Texas Legislature. As articulated in the Court's Findings of Fact, many felon hiring bans in Texas are the products of agencies. Thus, it may not be appropriate to extend the same presumption of validity to those policies that the Court extends to legislative enactments. The Court nonetheless finds that the Texas agency policies presented are job

related for the positions in question and consistent with Texas's public interest. More-over, as to these agency policies, it is self-evident to the Court that they are job related for the positions in question and consistent with Texas's public interest.

And notwithstanding the self-evident nature of these policies, as demonstrated in the Court's Findings of Fact, Texas nonetheless provided evidence to sustain its agency policies, and DOJ makes no effort to rebut it. As to DADS, the Court agrees with the evidence that "[a]ll of the criminal bars are for crimes related to harm to individuals, as DADS wants to protect the vulnerable individuals living in SSLCs from potential employees who have a history of causing harm to individuals." As to TPWD, the Court agrees that TPWD's prerogative to reject felons is "critical to ful-filling TPWD's mission and maintaining the public trust we have over the natural and cultural resources of Texas." Regarding TJJD, the Court agrees that the justifi-cation for its categorical bars to employment, which are the same as TPWD, are like-wise just. And as for the TLC, the Court finds that its policies exist to reasonably sustain its "core values" of "integrity and responsibility" which are essential to man-aging taxpayer monies. Moreover, the Court acknowledges TLC's evidence that it "works hard to maintain the public trust by protecting and ensuring the security of its lottery games, systems, drawings and operational facilities," and that "TLC values and requires ethical behavior by its employees, licensees and vendors." The Court finds similarly regarding the evidence provided by DPS. And though unnecessary, the Court finds that Texas satisfies the Guidance's "individualized assessment" standard regarding the complaint filed against DPS. All of the "essential facts" that Defendants seek in an "individualized assessment" are in the record.

Because Title VII expressly preserves the importance of considering Texas's "business necessity" or "public interest" as both an employer and sovereign, it secures the freedom of Texas to make the hiring choices that serve the best interests of its

citizens. If Defendants, or an individual claimant, seek to challenge the presumptively valid hiring policies of Texas, they must demonstrate that Texas could still employ an "alternative employment practice" that avoids any alleged disparate impact. *See* 42 U.S.C. §§ 2000e-2(k)(1)(A)(ii), (k)(1)(C). According to the Supreme Court,

> disparate-impact liability must be limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system. And before rejecting a business justification—or, in the case of a governmental entity, an analogous public interest—a court must determine that a plaintiff has shown that there is "an available alternative . . . practice that has less disparate impact and serves [Texas's] legitimate needs."

*Texas Dep't of Hous. & Cmty. Affairs*, 135 S. Ct. at 2518 (quoting *Ricci*, 557 U.S. at 578). In other words, in cases questioning Texas's categorical hiring bans for felons, the challenger (here, the Defendants) must prove that there is a better way that Texas is unreasonably refusing to implement.

In this matter, there is no evidence of such a showing by Defendants, nor do Defendants even attempt to argue that "alternative employment practice[s]" exist regarding Texas's categorical bans for felons. Therefore, every law and policy placed into issue by Texas in this matter is not only presumptively valid under Title VII, but survives Title VII scrutiny on the facts and arguments provided herein.

## V.

## REMEDIES

Texas seeks declaratory and injunctive relief, all of which the Court finds proper to grant in the premises.

### Declaratory Relief

First, Texas seeks a declaration that it, its constituent agencies, and its officials are entitled to maintain and enforce its existing laws and policies that absolutely bar convicted felons, or a certain category of convicted felons, from government employment. More specifically, Texas is asking the Court to declare that the Texas laws

and policies that absolutely bar convicted felons, or a certain category of convicted felons, from government employment, are presumed lawful under Title VII. (Pl.'s Second Am. Compl. ¶ A, Dkt. 62.)

Second, Texas seeks a declaration that it, its constituent agencies, and its officials need not conduct the "individualized assessments" that the Guidance purports to require. Put another way, Texas is asking the Court to declare that Title VII does not, contrary to the Guidance, outright prohibit categorical hiring bars. The first and second requests do overlap, but nonetheless stand on their own as the Guidance seeks the same legal result in two different ways. In some places, the Guidance condemns categorical hiring bars. In other places, the Guidance extols the necessity of "individualized assessments." In both regards, the Guidance seeks to accomplish a similar result, but because it employs two different paths to the end it seeks, Texas asks the Court to declare unlawful both paths. Thus, Texas asks the Court to preserve a right to maintain its absolute bars, but also recognize that the right to preserve those bars necessarily means that individualized assessments are not always required. *Id.*

Third, if the Court grants the first two requests, Texas requests the Court declare the safe harbors of the Guidance as improper, incomplete, or non-exhaustive.

Fourth, Texas seeks a declaratory judgment, holding unlawful and setting aside the Guidance. (*Id.* ¶ B, Dkt. 62.) The Court finds that all of these remedies requested by Texas are appropriate and warranted and, thus, grants them in full. Therefore, the Court declares:

(1) That Texas, its constituent agencies, and its officials are entitled to maintain and enforce laws and policies that absolutely bar convicted felons, or a certain category of convicted felons, from government employment as such absolute bars do not constitute an "unlawful employment practice" under 42 U.S.C. § 2000e-2(k)(1)(A).

(2) That the Texas laws and policies that absolutely bar convicted felons, or a

certain category of convicted felons, from government employment, are pre-
sumed lawful under Title VII.

(3) That Texas, its constituent agencies, and its officials need not conduct the
"individualized assessments" that the Guidance purports to require.

(4) That the safe harbors that the Guidance articulates are improper, incom-
plete, and nonexhaustive.

(5) That the Guidance is unlawful and set aside.

## Doctrine of Severability

Though not urged by Defendants, the Court considers *sua sponte* the principle
of severability and whether it should apply to the Guidance. As a general rule, sever-
ability applies to regulations. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 293–95
(1988); *United States v. Booker*, 543 U.S. 220, 320 (2005) (Thomas, J., dissenting) ("I
also assume that our doctrine on severability and facial challenges applies equally to
regulations and to statutes." (citation omitted)). The severability doctrine ensures
that agency policy is made by agencies themselves, and not by the courts. Thus, the
doctrine of severability permits a court to minimize the extent to which it displaces
legislative will. *See Crowell v. Benson*, 285 U.S. 22, 62–63 (1932).

"Whether an administrative agency's order or regulation is severable, permit-
ting a court to affirm it in part and reverse it in part, depends on the issuing agency's
intent." *North Carolina v. FERC*, 730 F.2d 790, 795–96 (D.C. Cir. 1984). "Severance
and affirmance of a portion of an administrative regulation is improper if there is
'substantial doubt' that the agency would have adopted the severed portion on its
own." *Davis Cty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997)
(citing *FERC*, 730 F.2d at 795–96; *Bell Atl. Tel. Cos. v. FCC*, 24 F.3d 1441, 1447 (D.C.
Cir. 1994)).

Here, however, the Court finds the principles of severability inapplicable, as

the Guidance is not a regulation promulgated in accordance with the notice and comment requirements of the APA. Rather, because the Court finds the Guidance to be a legislative rule that subverts the text of Congress and the APA, severability should not be permitted. The doctrine of severability is the refuge of statutes and regulations which, though partially unlawful, were legitimately enacted by Congress or properly promulgated in accordance with the APA's notice and comment requirement.[45] Here, there is nothing for the Court to salvage. The Court finds the intent of EEOC in issuing to the Guidance to be unlawful and, therefore, unredeemable.

Moreover, were the Court to conclude that the APA requires severance of the Guideline, then the APA would not serve as a deterrent to improper agency action, but an enabler of it. By severing improper sentences or paragraphs from the unlawful Guidance, there is no incentive for agencies to comply with the APA and enact wholly proper regulations. Rather, Defendants will be encouraged to continually "enact" through "regulatory dark matter" rules containing both proper and improper content, knowing that most of its unlawful rulemaking will find enduring, solid footing amidst the lawful matter following the occasional legal challenge.

Additionally, severability, applied here, creates a significant burden on the Court, the parties, and the public. Though courts may enforce their own injunctions,

---

[45] *See, e.g., New York v. United States*, 505 U.S. 144, 187 (1992); *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 697 (1987); *Luminant Generation Co. LLC v. EPA*, 714 F.3d 841, 859 (5th Cir. 2013); *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 963–64 (D.C. Cir. 2013), *overruled on other grounds, Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18 (D.C. Cir. 2014); *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 827–28 (D.C. Cir. 1993); *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 110 F. Supp. 3d 176, 192–93 (D.D.C. 2015), *aff'd*, 640 F. App'x 5 (D.C. Cir. 2016); *Conservation Law Found. v. Pritzker*, 37 F. Supp. 3d 254, 271 (D.D.C. 2014); *Consumer Energy Council of Am. v. Fed. Energy Regulatory Comm'n*, 673 F.2d 425, 440–45 (D.C. Cir. 1982), *aff'd sub nom., Process Gas Consumers Grp. v. Consumer Energy Council of Am.*, 463 U.S. 1216 (1983); *Earth Island Inst. v. Pengilly*, 376 F. Supp. 2d 994, 1011 (E.D. Cal.), *amended in part sub nom., Earth Island Inst. v. Ruthenbeck*, No. Civ. F-03-6386 JKS, 2005 WL 5280466 (E.D. Cal. Sept. 20, 2005), *aff'd in part, remanded in part sub nom., Earth Island Inst. v. Ruthenbeck*, 490 F.3d 687 (9th Cir. 2007), *aff'd in part, rev'd in part sub nom, Summers v. Earth Island Inst.*, 555 U.S. 488 (2009); *United States v. Rainbow Family*, 695 F. Supp. 294, 312 (E.D. Tex. 1988); *but see Philip Morris USA, Inc. v. FDA*, 2016 WL 4378970, at *22 (D.D.C. Aug. 16, 2016) (applying severance to a "Guidance," though the "Guidance" was "not a legislative rule" and, therefore, "no notice-and-comment was required, and the Guidance was issued appropriately.").

*Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir. 1985), this Court depends upon information from the parties to litigation, or the public, to inform them that the terms of an injunction are being violated. Here, severing any aspect of the Guidance makes the enforcement dynamics extensive and complicated.

First, it will be difficult for the Court to ensure that the unlawful portions of the Guidance are appropriately invalidated. Unlike statutes and regulations, any Guidance enjoined by the Court is not available on Westlaw. In the online world of legal research in which we now live, the absence of an indelible "red flag" at the top of an invalid case, or law, speaks volumes.

As to the public in general, it is impossible to redact the Guidance, as it has already been distributed for years. Undoubtedly, copies of the Guidance exist on countless computers, endless e-mail strings, and in hard copy forms in various files across the country. Thus, there is no practical way for the Court to reach its editorial hand into those places and properly revise the Guidance, or even notify the recipients of the Guidance about what is or is not improper. Thus, properly redacting the endless distribution of the Guidance is not possible. And since the Guidance is not chronicled in Westlaw, there is no practical way for an employer, served with an investigatory notice or complaint from EEOC, to know that the relevant Guidance is enjoined.

Therefore, at bottom, nothing requires the Court to apply the doctrine of severability or otherwise engage in remedial measures to conform the Guidance to lawful form. Defendants created this problem by engaging in unlawful rulemaking and must be held responsible for their actions.

**Injunctive Relief**

Last, Texas seeks a declaration and injunction that Defendants may not issue right-to-sue letters to persons seeking to sue the Texas or any of its constituent agencies or Texas officials based on the interpretation of Title VII that appears in the Guidance. (Pl.'s Second Am. Compl. ¶ C, Dkt. 62.) "At common law, for a permanent

injunction to issue the plaintiff must prevail on the merits of his claim and establish that equitable relief is appropriate in all other respects." *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 847 (5th Cir. 2004) (citing *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987) (recognizing that the standard for a permanent injunction is essentially the same as for a preliminary injunction with the exception that the plaintiff must show actual success on the merits rather than a mere likelihood of success)). Four equitable factors govern Plaintiffs' injunctive request: (1) whether there is a substantial likelihood that the Plaintiffs will prevail on the merits; (2) whether there is a substantial threat that irreparable injury will result if the injunction is not granted; (3) whether the threatened injury outweighs the threatened harm, if any, to the Defendants; and (4) whether granting the preliminary injunction will serve the public interest. *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014). All four factors weigh in Texas's favor here.

First, as the Court has found herein, Texas has prevailed on the merits of its claims. Second, the Court finds that there is a threat that irreparable injury will result if the injunction is not granted. Indeed, informing individuals of a right to sue over a Guidance document that the Court has concluded does not comport with Title VII risks frivolous litigation and Texas law being again clouded by an unlawful legislative rule that not only thwarted notice and comment, but exceeds the rulemaking powers of EEOC. Third, the threatened injury to Texas prevails, as there is no harm to Defendants. Defendants are not required to notify individuals of a right to sue, so the injunction impedes no duty or obligation of Defendants. Fourth, an injunction serves the public interest by maintaining, for employers and employees alike, a proper understanding of the parameters of Title VII and, additionally, permitting Texas to maintain is longstanding sovereign scheme regarding the civil privileges of felons. Accordingly,

(6) The Court declares that Defendants do not possess the statutory duty or

right to notify complaining parties about rights to pursue litigation against employers based on theories of disparate impact contained within the Guidance. Title VII only requires that "[i]f the Commission determines after such investigation that there is not reasonable cause to believe that the charge is true, it shall dismiss the charge and promptly notify the person claiming to be aggrieved and the respondent of its action." 42 U.S.C. § 2000e-5(b). Though not required by Title VII, EEOC's Notice and Dismissal of Rights Form (EEOC Form 161) contains a "Notice of Suit Rights" and an entire second page containing gratuitous advise to a complaining party regarding their ability to pursue a claim in court, if they so choose. The Court declares that providing a party complaining of an alleged violation of Title VII based upon the Guidance with a "Notice of Suit Rights" inappropriately signals to that a party an improper understanding of the law, necessarily impeding the legal rights and responsibilities between that party and Texas.

(7) The Court enjoins Defendants from issuing right-to-sue notices that traditionally form part of and accompany the EEOC form sent to persons filing complaints against Texas, any of its constituent agencies, or Texas officials based on the interpretation of Title VII that appears in the Guidance. This injunction does not interfere with Defendants' statutory duty to "promptly notify the person claiming to be aggrieved and the respondent of its action." 42 U.S.C. § 2000e-5(b).

## VI.

## CONCLUSION

The Guidance is an unlawful legislative rule that takes direct aim at Texas's categorical employment exclusions for felons, as well as Texas's larger tapestry of over 300 legal consequences for felons. These laws and policies, largely products of

the Texas Legislature, are presumed valid under Title VII. Defendants not only fail to bring forth specific or regional data demonstrating that the Texas laws and policies at issue create a disparate impact, but it also fails to demonstrate a suitable "alternative employment practice" regarding any of Texas's categorical felon hiring bans.

Congress enacted Title VII decades ago to address an era of invidious discrimination; it does not exist to invade Texas's reasonable public policy and employment systems, which are updated constantly by the Texas Legislature so that Texas may address the demands and needs of the citizenry in the 21st century.

SO ORDERED this the ___ day of _____, 2017.

_____

SAM R. CUMMINGS
SENIOR UNITED STATES DISTRICT JUDGE